**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

```
------------------------------------------------------- x
In re:                                                  :   Chapter 11
                                                        :
HI-CRUSH INC., et al.,¹                                 :   Case No. 20-33495 (DRJ)
                                                        :
                    Debtors.                            :   (Jointly Administered)
                                                        :
------------------------------------------------------- x
```

**DECLARATION OF J. PHILIP MCCORMICK, JR.,
CHIEF FINANCIAL OFFICER OF THE DEBTORS, IN
SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

Under 28 U.S.C. § 1764, J. Philip McCormick, Jr. declares as follows under the penalty of

perjury:

1.      I am the Chief Financial Officer ("**CFO**") of each of the debtors and debtors-in-

possession in the above-captioned cases (collectively, the "**Debtors**" or "**Hi-Crush**").  I served as

the Debtors' CFO beginning on January 1, 2020, and prior to that I served as the Debtors' Vice

President of Finance between August 2018 and December 2019.  I am authorized to submit this

declaration (the "**First Day Declaration**") on behalf of the Debtors in the above-captioned chapter

11 cases (collectively, the "**Chapter 11 Cases**").

---

¹       The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number,
are: Hi-Crush Inc. (0530), OnCore Processing LLC, Hi-Crush Augusta LLC (0668), Hi-Crush Whitehall LLC (5562),
PDQ Properties LLC (9169), Hi-Crush Wyeville Operating LLC, D & I Silica, LLC (9957), Hi-Crush Blair LLC
(7094), Hi-Crush LMS LLC, Hi-Crush Investments Inc. (6547), Hi-Crush Permian Sand LLC, Hi-Crush Proppants
LLC (0770), Hi-Crush PODS LLC, Hi-Crush Canada Inc. (9195), Hi-Crush Holdings LLC , Hi-Crush Services LLC
(6206), BulkTracer Holdings LLC (4085), Pronghorn Logistics Holdings, LLC (5223), FB Industries USA Inc. (8208),
PropDispatch LLC, Pronghorn Logistics, LLC (4547), and FB Logistics, LLC (8641).  The Debtors' address is 1330
Post Oak Blvd, Suite 600, Houston, Texas 77056.

2.      As CFO, I am responsible for managing the Debtors' finances, including financial planning, financial risk-management, record-keeping, and financial reporting.  As a result of my tenure with the Debtors, my review of public and non-public documents, and my discussions with other members of the Debtors' management team, I am generally familiar with the Debtors' businesses, financial condition, policies and procedures, day-to-day operations, and books and records.  Except as otherwise noted, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from the Debtors' management or retained advisers in the ordinary course of my responsibilities.  References to the Bankruptcy Code (as hereafter defined), the chapter 11 process, and related legal matters are based on my understanding of such matters in reliance on the explanation provided by, and on the advice of, counsel.  If called upon to testify, I would testify competently to the facts set forth in this First Day Declaration.

3.      On July 12, 2020 (the "**Petition Date**"), Hi-Crush Inc. and each of its wholly-owned domestic subsidiaries filed voluntary petitions for relief in the United States Bankruptcy Court for the Southern District of Texas (the "**Court**").  The Debtors will continue to operate their businesses and manage their properties as debtors in possession.

4.      I submit this First Day Declaration on behalf of the Debtors in support of their (i) voluntary petitions for relief that were filed under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") and (ii) "first-day" pleadings, which are being filed concurrently herewith (collectively, the "**First Day Pleadings**").[2]  The Debtors seek the relief set forth in the First Day Pleadings to minimize the adverse effects of the commencement of the Chapter 11 Cases on their businesses.  I have reviewed the Debtors' petitions and the First Day Pleadings, or have

---

[2]      Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the applicable First Day Pleadings.

otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to ensure the uninterrupted operation of the Debtors' businesses and to successfully maximize the value of the Debtors' estates.

5.      Part I of this First Day Declaration provides an overview of the Debtors' business and corporate and capital structure, as well as a discussion of the events leading up to the Debtors' chapter 11 filings.  Part II sets forth the relevant facts in support of the First Day Pleadings.

## PART I

### A.      COMPANY AND BUSINESS OVERVIEW

6.      The Debtors are a fully-integrated provider of proppant and logistics services used in hydraulic fracturing of oil and gas wells.  Proppant is sand (also known as "frac sand") or similar particulate material suspended in water or other fluid injected into wells at high pressure to keep fractures open to stimulate the extraction of hydrocarbons.   In addition to frac sand production, the Debtors also offer their customers advanced wellsite storage systems, flexible "last mile" transportation services, and innovative software for real-time supply chain visibility and management from loadout terminals to wellsites.  The Debtors' strategic suite of solutions provides operators and service companies in all major U.S. oil and gas basins with the ability to build safety, reliability and efficiency into every well completion.

7.      The Debtors' headquarters are located in Houston, Texas and they maintain regional offices in Denver, Colorado, and Odessa, Texas.  The Debtors own and operate six production facilities located in Wisconsin and Texas and utilize an extensive logistics network of rail-served destination terminals strategically located throughout Pennsylvania, Ohio, New York, Texas, and Colorado.  As a result, the Debtors are effectively positioned to reach all areas of unconventional well completion activity ranging from the Permian and DJ basins to the Marcellus, Utica, Bakken and Eagle Ford shales.

US-DOCS\114694751.32

8.      Debtor Hi-Crush Inc., a publicly-traded Delaware corporation, is the ultimate parent of the Debtors in these Chapter 11 Cases.  A copy of the Debtors' organizational chart is attached hereto as <u>Exhibit A</u>.

**(i)      Company History**

9.      Hi-Crush Inc. was originally formed as a Delaware limited partnership named Hi-Crush Partners LP on May 8, 2012.  On May 31, 2019, Hi-Crush Partners LP converted to the Delaware corporation Hi-Crush Inc.  On the effective date of the conversion, each common unit representing limited partnership interests in Hi-Crush Partners LP was automatically converted into one share of common stock of Hi-Crush Inc., with a par value of $0.01 per share.

10.      As of the date hereof, there were approximately 99,876,054 Hi-Crush Inc. shares issued and outstanding, with a market capitalization of approximately $27.5 million.  The common stock is publicly traded on the NYSE under the ticker symbol "HCR".

11.      To continue growth in their logistics services, in August 2018, the Debtors completed the acquisition of FB Industries Inc., a company engaged in the engineering, design and marketing of silo-based frac sand management systems.  Additionally, in 2019, the Debtors expanded the breadth of their operations through two key acquisitions.  On January 18, 2019, the Debtors completed the acquisition of BulkTracer Holdings LLC ("**BulkTracer**"), the owner of a logistics software system, PropDispatch.  The BulkTracer acquisition bolstered the Debtors' proppant management, logistics dispatch and inventory monitoring software capabilities.  Additionally, on May 7, 2019, the Debtors completed the acquisition of Proppant Logistics LLC ("**Proppant Logistics**"), which owned Pronghorn Logistics, LLC, a provider of end-to-end proppant logistics services.  The Proppant Logistics acquisition expanded the Debtors' logistics and wellsite operations into additional major U.S. oil and gas basins.

US-DOCS\114694751.32

12.     In January 2020, the Debtors announced an extension of their logistics and equipment service offerings with the commencement of engineering on its first mobile processing unit, which is branded as OnCore Processing ("**OnCore Processing**").  The OnCore Processing solution is comprised of portable wet and dry plant equipment mounted on trailer chassis, and is designed to improve logistics efficiencies by moving the production and processing of raw frac sand as close to customers' wellsites as possible.  OnCore Processing is expected to allow the Debtors to profitably reduce costs for customers that have reserves on their acreage or adjacent land, and that are otherwise economically disadvantaged from other frac sand pull points.

**(ii)     Overview of Operations and Revenue**

a.     Business Lines

13.     As a premier provider of proppant and logistics solutions to the North American petroleum industry, the Debtors provide their customers with proppant supply and midstream distribution management, advanced logistics operations, silo equipment sales and leasing, proppant management, as well as logistics dispatch and inventory monitoring software.  Their business primarily consists of the following highly-integrated offerings: (i) production and processing facilities, (ii) transportation capabilities, (iii) rail terminal facilities, and (iv) logistics and wellsite operations.

14.     The Debtors' production facilities are located in Wisconsin and Texas, with their eleven owned or operated terminals strategically located throughout Pennsylvania, Ohio, New York, Texas, and Colorado.

15.     Production and Processing Facilities.   Raw frac sand is a naturally occurring mineral that is mined and processed.  It is generally mined from the surface or underground, and

5

in some cases crushed, and then cleaned, dried, and sorted into consistent "mesh" sizes.[3]  Oil and natural gas producers generally require that frac sand used in their drilling and well completion processes meet specifications formulated by the American Petroleum Institute ("**API**") regarding frac sand grades and mesh sizes, among other things.  There are three main types of raw frac sand: Northern White Sand ("**NWS**"), Brady Brown, and what is commonly referred to as "in-basin" frac sand.  NWS is a commonly-used designation for premium white sand produced in Wisconsin and other parts of the upper Midwest region of the United States.  NWS is known for its high crush strength, low turbidity (i.e., low levels of contaminants), roundness and sphericity, and monocrystalline grain structure and, as such, has historically commanded premium prices.  Brady Brown, or regional sand, had been preferred by some E&P companies due to its proximity to the Permian Basin and Eagle Ford shale plays and, therefore, its lower costs due to reduced logistics costs (which do not include rail shipment costs) compared to NWS.  In-basin frac sand, however, which began to be developed and produced in 2017 in the Permian Basin, has also been developed and produced in the Eagle Ford, Haynesville, and Mid-Con basins, and has been quickly adopted due to its proximity to wellsites, resulting in greatly reduced logistics costs (which consist almost exclusively of direct trucking costs).

16.     The Debtors' portfolio of six production facilities is capable of producing approximately 17.3 million tons per year of high-quality monocrystalline sand.  The four Wisconsin production facilities produce NWS, while the two Texas production facilities produce in-basin sand.

---

[3]      Mesh size is used to describe the size of the proppant grains and is determined by sieving the proppant through screens with uniform openings corresponding to the desired size of the overall proppant product.  Each type of proppant comes in various sizes, categorized as mesh sizes, and the various mesh sizes are used in different applications in the oil and natural gas industry.

US-DOCS\114694751.32

17.     The Debtors utilize third-party contractors to conduct the mining operations at their production facilities.[4] Once the raw frac sand is mined, the Debtors' processing facilities are designed to wash, sort, dry and store the Debtors' frac sand, with each plant employing modern and efficient wet and dry processing technology.  The Debtors' mined raw frac sand is initially stockpiled before processing.  The material is recovered by a mounted belt feeder, which extends beneath a surge pile and is fed onto a conveyor.  The sand exits the tunnel on the conveyor belt and is fed into the wet plant where impurities, such as clay, organic particles, and unusable fine grain sand are removed from the raw feed.  The wet processed sand is then stockpiled in advance of being fed into the dry plant for further processing.

18.     The Wisconsin wet plants operate for seven to eight months per year due to the limitations arising from sustained freezing temperatures during winter months.  When in operation, the Debtors' Wisconsin wet plants process more sand per day than the dry plants can process, which results in the build-up of stockpiles of frac sand to be processed by the dry plants during the winter months.  The Kermit, Texas wet plants operate year round and, therefore, the stockpiles of frac sand are processed by the dry plants in a shorter timeframe.

19.     The wet processed sand stockpile is fed into the dry plant hopper using a front end loader.  The material is processed in a natural gas fired vibratory fluid bed dryer contained in an enclosed building.  After drying, the sand is screened through gyratory screens and separated into industry standard product sizes.  The finished product is then conveyed to multiple on-site storage

---

[4]     The type of mining operations depends primarily on the geologic setting of the production facility.  The Debtors' third-party contractors conduct surface excavation operations at the Kermit, Augusta, Blair, and Whitehall production facilities and dredging operations at the Debtors' Wyeville production facility.  No underground mines are operated at the Debtors' production facilities.

silos for each size specification, and the Debtors' railcar or truck loads are tested to ensure that the delivery meets the API's specifications.

20.     The chart below provides an overview of the characteristics of each of the Debtors' production facilities.

| Facility | Geography | Capacity/Deposits | Logistics |
|---|---|---|---|
| Augusta | Location: Eau Claire, WI<br>Acreage: 1,187 | Reserves: 42 million tons (MT)<br>Production Capacity: 2.86 MT/year<br>Coarse 20-100 mesh (NWS) | On-site: 38k feet of rail track, product storage silos<br>Rail connection: Union Pacific Railroad (UPR) main |
| Blair | Location: Blair, WI<br>Acreage: 1,285 | Reserves: 110 MT<br>Production Capacity: 2.86 MT/year<br>Coarse 20-100 mesh (NWS) | On-site: 45k feet of rail track, product storage silos<br>Rail connection: Canadian National Railroad (CNR) main |
| Kermit | Location: Kermit, TX<br>Acreage: 1,226 | Reserves: 105 MT<br>Production Capacity: 6.00 MT/year<br>Fine 100 and 40/70 mesh (in-basin) | On-site: 12 on-site silos with 36k tons storage<br>Direct truck loading |
| Whitehall | Location: Whitehall, WI<br>Acreage: 1,626 | Reserves: 85 MT<br>Production Capacity: 2.86 MT/year<br>Coarse 20-100 mesh (NWS) | On-site: 38k feet of rail track, product storage silos<br>Rail connection: CNR main |
| Wyeville, | Location: Wyeville, WI<br>Acreage: 973 | Reserves: 70 MT<br>Production Capacity: 2.70 MT/year<br>Coarse 20-100 mesh (NWS) | On-site: 32k feet of rail track, product storage silos<br>Rail connection: UPR main |

21.     In addition to the Debtors' six production facilities, as noted above, the Debtors expect to deploy in the near term their first OnCore Processing mobile frac sand production unit. The Debtors expect OnCore Processing to allow customers to move sand supply closer to their development acreage and better maximize truck turn efficiencies.  Consistent with the Debtors' focus on safety and environmental stewardship, the OnCore Processing solution is designed to

reduce the total number of trucks required to haul sand, as well as reduce overall truck miles driven on public roads per year.

22.     <u>Transportation Capabilities</u>.  Most frac sand is shipped in bulk from processing facilities to terminal facilities, or directly to the customers, by truck, rail, or barge.  For bulk raw frac sand, transportation costs often represent a significant portion of the customer's overall product cost.  Consequently, shipping in large quantities, particularly by unit train when shipping over long distances, may provide a significant cost advantage to the customer, emphasizing the importance of rail or barge access for low cost delivery.  As a result, facility location and transportation capabilities are among the most important considerations for producers, distributors and customers.

23.     All of the product sold from the Debtors' Kermit facilities is delivered by truck to the wellsite from twelve on-site silos with 36,000 tons of storage capacity.  All of the product sold from the Debtors' Wyeville and Augusta facilities is shipped by rail from approximately 32,000 feet and 38,000 feet, respectively, of track that connects the Debtors' facilities to a Union Pacific Railroad mainline.  All of the product sold from the Debtors' Blair and Whitehall facilities is shipped by rail from approximately 45,000 feet and 38,000 feet, respectively, of track that connects the Debtors' facilities to a Canadian National Railway mainline.  These rail spurs, size of the rail yards, and the capacity of the associated product storage silos allow the Debtors to accommodate a large number of railcars, including unit trains, which significantly increases the Debtors' efficiency in meeting customers' frac sand transportation needs.

24.     The Debtors have, over time, built a significant fleet of leased railcars. As of the Petition Date, Debtor D & I Silica, LLC (the "**<u>Debtor Lessee</u>**") was party to seven master railcar

leases (the "**Railcar Leases**") pursuant to which the Debtor Lessee leases an existing fleet of approximately 4,800 railcars.  Approximately 20% of the Railcar Leases expire between 2020-2021, approximately 65% of the Railcar Leases expire between 2022-2025, and approximately 15% of the Railcar Leases expire in 2028.   All of the Railcar Leases contain significantly above-market rates.  The Debtor Lessee's annual lease expense on account of the Railcar Leases is approximately $28 million.

25.     Beginning in late 2017, demand for NWS began to significantly weaken.  E&P companies have demonstrated a willingness to forego higher quality NWS in favor of less expensive, locally-sourced frac sand, so long as such sand meets certain minimum quality criteria.  Although the Debtors are well-positioned to accommodate their customers' preferences through their in-basin production facilities in Texas, four out of the Debtors' six production facilities (accounting for approximately two-thirds of the Debtors' production capacity) produce NWS in Wisconsin.  The decline in demand for NWS has, therefore, significantly impacted the Debtors and led to a material oversupply of leased railcars under the Railcar Leases.  There is currently insufficient demand for NWS for the Debtors to operate their NWS business profitably absent a restructuring of these burdensome Railcar Leases.  Therefore, the Debtors require significant, immediate relief from the financial burden created by this market shift.  As discussed in further detail below, prior to the Petition Date, the Debtors engaged in extensive negotiations with the lessors under the Railcar Leases, and, as a result, the Debtors were able to achieve material economic concessions, which they intend to implement in these Chapter 11 Cases.

26.     Rail Terminal Facilities.  Once the frac sand is loaded into railcars at the origin, the Debtors utilize an extensive network through a combination of class I and short-line railroads to move the sand to their terminals.  For terminals with silo storage capabilities, frac sand is loaded

10

into delivery trucks directly from the Debtors' silos, which deploy sand via gravity to trucks stationed directly on scales under each silo.  This process allows for the loading, electronic recording of weight, and truck dispatch to be completed in less than five minutes.  Where silos are not possible, frac sand can instead be unloaded from the railcars to delivery trucks via a conveyor, though this method is less efficient because the trucks must be loaded and then moved to separate scales to be weighed.

27.    The Debtors generally operate their terminal locations under long-term lease agreements with third-party operators or short-line rail companies.  Some of these leases include performance requirements, which typically specify a minimum number of railcars that the Debtors must process each year through their terminals.  Each of the Debtors' owned or operated terminal locations are strategically positioned in the shale plays so that customers typically do not need to travel more than 75 miles from wellsites to purchase their frac sand requirements.

28.    <u>Logistics and Wellsite Operations</u>.  In addition to producing and supplying high-quality frac sand, the Debtors also offer their customers a full suite of logistical services.  The Debtors' logistics and wellsite operations do business under the trade names of Pronghorn Energy Services and NexStage Equipment,[5] and utilize containers and/or silo systems and maintain strict proppant quality control from the mine to the blender, while also addressing environmental concerns through reduction of particulate matter emissions.  The Debtors handle the full spectrum of logistics management, from railcar fleet management to truck dispatching and wellsite operations, including proppant inventory management, structurally reducing costs for customers by eliminating inefficiencies throughout the proppant delivery process, primarily through the use of the Debtors' proprietary PropDispatch software suite.  Pronghorn Energy Services provides

---

[5]    NexStage Equipment covers the Debtors' silo equipment leasing and sales business.

US-DOCS\114694751.32

increased transportation efficiency and reduces supply chain related congestion at the wellsite, thereby decreasing the number of trucks required per job and decreasing or eliminating trucking demurrage costs.  The Debtors' logistics and wellsite operations are designed to meet or exceed the federal Occupational Safety and Health Act's respirable crystalline silica standards that became effective in June 2018 for most aspects of hydraulic fracturing, as well as the engineering control obligations in connection with hydraulic fracturing that are set to become effective in 2021. Pronghorn Energy Services and NexStage Equipment help eliminate supply risk and improve efficiency with the industry's only fully integrated solution offering both silo systems and containers for proppant transportation and onsite management.

> b.   Customers

29.     The Debtors' current customer base includes major oil and natural gas E&P companies and pressure pumping service providers.  A substantial portion of the Debtors' frac sand is sold to customers with whom the Debtors have long-term contracts.  As of July 1, 2020, the Debtors' long-term contracts had remaining contractual terms ranging from 3 to 60 months, with an average remaining contractual term of approximately 36 months.

30.     The Debtors' contracts typically define, among other commitments, the volume of product that the Debtors must provide and the volume that customers must purchase by the end of the periods defined in such contracts.  Pricing structures under the Debtors' agreements are, in many cases, subject to certain contractual adjustments and consist of a combination of negotiated pricing and fixed pricing.  These arrangements allow for continual negotiations regarding pricing and volume requirements, which may occur in volatile market conditions.  The Debtors also sell sand on the spot market, at prices and on terms determined by the existing market conditions as well as the specific requirements of the customer.

31.     A substantial portion of the Debtors' logistics services are also provided to customers with whom the Debtors have long-term agreements.  In addition to these production and logistics services, from time to time, the Debtors also sell silo systems and related equipment to third parties at negotiated prices for the specific equipment.

       c.     <u>Competitors</u>

32.     There are numerous large and small producers in all sand producing regions of the United States with whom the Debtors compete.  Competition in the frac sand industry has increased recently, and the Debtors expect competition to increase in the future as significant new entrants began operations in 2018 with local, in-basin sand mines.  The most important factors on which the Debtors compete are price, reliability of supply, transportation capabilities, product quality, performance, and sand characteristics.  Demand for frac sand and related logistics, as well as the prices that the Debtors will be able to obtain for their products and services, are closely linked to proppant consumption patterns for the completion of oil and natural gas wells in North America.  These consumption patterns are influenced by numerous factors, such as the market price for hydrocarbons and the E&P industry's drilling rig count and hydraulic fracturing activity, including the number of drilling stages completed and the mesh size and amount of proppant used per stage.  Further, these consumption patterns are also influenced by the location, quality, price, and availability of proppant.

       d.     <u>Employees</u>

33.     As of the Petition Date, the Debtors employed 297 employees.  None of the Debtors' employees is subject to a collective bargaining agreement.  The Debtors contract their excavation and trucking operations to third parties and, accordingly, have no employees directly involved in those operations.

e.     Revenue

34.     In 2019, the Debtors' revenue was $636,370,000, but the Debtors ended the year with a net loss of $413,559,000.  Approximately $432,466,000 (68%) of the Debtors' 2019 revenue is attributable to excavating, processing, and delivering frac sand, approximately $194,577,000 (30.5%) is attributable to logistics and wellsite services, and approximately $9,327,000 (1.5%) is attributable to the sale of silo systems and related equipment to third parties.

**B.     SUMMARY OF PREPETITION DEBT**

35.     ABL Agreement.  The Debtors are party to that certain Credit Agreement, dated as of August 1, 2018 (as the same may be amended, modified or supplemented, the "**ABL Agreement**"), by and among Hi-Crush Partners LP, as borrower, JPMorgan Chase Bank, N.A., as administrative agent and as an issuing lender, and the other lenders party thereto from time to time (the "**ABL Lenders**"), providing for a $200 million commitment asset-based revolving loan facility (the "**ABL Facility**").[6]  Availability of funds under the ABL Facility is subject to a borrowing base, which is currently approximately $7 million excluding line of credit reserves.  The borrowing base is determined by analyzing the ending accounts receivable and inventory balances at the end of each month.  The borrowing base certificate is due on the 20th day of the following month.  The borrower's obligations under the ABL Agreement are secured by security interests in, and liens upon, substantially all of the Debtors' assets, and each of the Debtors has guaranteed the borrower's obligations.  The ABL Agreement provides for interest at a rate equal to, at the Debtors' option, either (i) a base rate plus an applicable margin ranging between 0.75% per annum and 1.50% per annum, based upon the Debtors' leverage ratio, or (ii) a LIBOR rate plus an applicable

---

[6]     The ABL Lenders' commitments under the ABL Facility were subsequently reduced from $200 million to $100 million.

margin ranging between 1.75% per annum and 2.50% per annum, based upon the Debtors' leverage ratio.  Based on the Company's current leverage ratio, the current weighted average interest rate for all borrowings under the ABL Agreement is 4.75%.

36.     On June 22, 2020, the Debtors entered into that certain Forbearance Agreement (the "**Forbearance Agreement**") with the ABL Lenders following the occurrence of an event of default with respect to the ABL Agreement's fixed charge coverage ratio covenant.  On July 3, 2020, the Debtors entered into that certain First Amendment to Forbearance Agreement and Amendment to Credit Agreement with the ABL Lenders, thereby extending the forbearance period under the Forbearance Agreement to July 12, 2020.

37.     As of the Petition Date, there were no outstanding borrowings under the ABL Agreement, but the Debtors had approximately $22.3 million in outstanding letter of credit commitments under the ABL Facility.

38.     <u>Senior Unsecured Notes</u>.  Hi-Crush Partners LP issued approximately $450 million in 9.500% senior unsecured notes due 2026 (the "**Senior Unsecured Notes**") pursuant to that certain Indenture, dated as of August 1, 2018 (as the same may be amended, modified or supplemented, the "**Indenture**"), by and among Hi-Crush Partners LP, each of the guarantors party thereto, and U.S. Bank National Association, as trustee.  Each of Hi-Crush Inc.'s wholly-owned domestic subsidiaries—all Debtors in these Chapter 11 Cases—have guaranteed the issuer's obligations.  As of the Petition Date, the Debtors remain obligated under the Indenture for an outstanding principal amount of approximately $450 million, plus accrued but unpaid interest, fees, costs, and expenses.

39.     <u>Miscellaneous Notes</u>.  The Debtors are party to various promissory notes and short-term obligations arising from on-property mining sand exchanges, equipment financing and

US-DOCS\114694751.32

insurance premium financing programs (the "**Miscellaneous Notes**").  As of the Petition Date, the Debtors are obligated under the Miscellaneous Notes for approximately $5.3 million, plus any accrued but unpaid interest, fees, costs, and expenses.

40.     _Right of Use Financing Leases_.  As of the Petition Date, the Debtors are obligated under certain "right of use" financing leases for approximately $1.8 million, plus any accrued but unpaid interest, fees, costs, and expenses.  These "right of use" financing leases grant the Debtors the right to use certain sand trailers.

41.     _Railcar Lease Obligations_. As discussed above, as of the Petition Date, the Debtor Lessee was party to seven master Railcar Leases pursuant to which it leases the railcars utilized in certain of the Debtors' business operations.  Debtor Hi-Crush Inc. guaranteed the Debtor Lessee's obligations under certain of the Railcar Leases.

42.     As discussed in greater detail below, following discussions with their Railcar Lessors, the Debtors have decided, in the exercise of their business judgment, to (a) reject the Railcar Leases identified in the _Debtors' Motion for Entry of an Order Authorizing the Debtors to (i) Reject Certain Railcar Lease Agreements Effective as of the Petition Date, and (ii) Enter into Proposed New Railcar Lease Agreements, Effective as of the Petition Date_ (the "**Railcar Rejection Motion**"), filed concurrently herewith, and enter into new railcar lease agreements reflecting a reduced number of railcars and materially improved terms with the Railcar Lessors under those Railcar Leases, effective as of the Petition Date, and (b) reject certain other Railcar Leases identified in the _Debtors' First Omnibus Motion for Entry of an Order Authorizing the Debtors to (i) Reject Certain Executory Contracts and Unexpired Leases Effective as of the Dates Specified in the Motion And (ii) Abandon Certain Remaining Personal Property in Connection Therewith_ (the "**Omnibus Rejection Motion**"), filed concurrently herewith.

16

43.     <u>Trade Debt and Related Obligations</u>.  The Debtors incur trade debt with certain vendors in connection with the ordinary course operation of their business.  The Debtors believe that, as of the Petition Date, they have trade debt and other related obligations in the aggregate amount of approximately $30 million.

## C.     EVENTS LEADING TO THE CHAPTER 11 FILINGS

44.     As discussed above, the Debtors face dual stresses of decreasing earnings and increasing costs.  The Debtors' earnings have experienced a significant decline as a result of depressed demand for NWS, the effects of the COVID-19 pandemic, and the Saudi-Russian oil price war, and their costs are significantly inflated due to the above-market rates associated with the Railcar Leases, as well as the oversupply of leased railcars that the Debtors no longer require.

### (i)     Challenging Sand Market Conditions

45.     Current trends in the North American sand market and changes in the preferences of E&P companies have negatively impacted the demand outlook for the Debtors' NWS product.

46.     Some E&P companies have recently been willing to sacrifice the quality of NWS in exchange for lower priced, local in-basin reserves, so long as the local reserves meet minimum acceptable quality levels.  In addition, while E&P companies located in the Bakken, DJ, Powder River and Appalachia regions are currently still using meaningful quantities of NWS, there are indications that in-basin supply may become available in the near future.  As a result of these developments, the Debtors expect that only the lowest cost NWS production facilities will survive (and at nominal margins), with Canada and the Northeast likely to become the last bastions of NWS usage.

47.     As a result of this shift in the market, NWS currently only accounts for approximately 36% of total frac sand supply, down from 75% in 2014.  NWS prices have also fallen dramatically during that period of time, and are expected to remain below $20 per ton in the

17

near to medium term. Downward pressure on NWS prices is further exacerbated by increasingly common "fire sales," with operators selling NWS with pricing in the low teens per ton as they struggle to clear inventory and generate cash proceeds. Demand is likely to be capped, and pricing range bound, since capacity already exists to satisfy marginal increases in demand. These issues have led to an oversupply of NWS relative to demand, which in turn has necessitated mine closures as producers attempt to rebalance cost structures against lower prices and reduced demand. The charts below illustrate the evolution, since 2014, of NWS's market share and price.



48.     These market trends have led to a steady decline in production at the Debtors' NWS mines in Wisconsin, with only the Wyeville facility currently expected to operate at over 50% capacity. Indeed, such Wisconsin mines have seen consistent year-over-year total utilization declines since 2014, with projected slowdowns in terminal sales and no prospects for coarse mesh product. Should gas prices continue to be depressed and in-basin sand remain an attractive option in other markets, NWS sales projections may be further impacted.

18

**(ii)      The Impact of the COVID-19 Pandemic and the Saudi-Russian Price War**

49.      The first two quarters of 2020 were characterized by unforeseeable shocks to the global economy generally, and the energy sector in particular.  Specifically, the Debtors were greatly harmed by the Saudi-Russian oil price war that took place in early 2020, as well as by the COVID-19 pandemic that ground the global economy to a standstill.  The COVID-19 pandemic had unprecedented ripple effects throughout most sectors of the U.S. and world economy, including the energy sector where the Debtors and their customers operate.  These harms to the Debtors were further exacerbated by the Saudi-Russian oil price war, which led to greatly depressed oilfield activity and a dislocation of crude oil's supply and demand balance.

50.      As a result of these developments, the Debtors' financial outlook has suffered, their access to additional liquidity under the ABL Facility has been essentially eliminated (from approximately $31.4 million in January 2020), and their bonds and equity have lost significant value.

**(iii)      Cost Reduction Initiatives**

51.      Recognizing these challenges, the Debtors implemented a number of cost reduction activities to "right size" operations to the current business environment.  First, the Debtors have idled their Wisconsin production facilities in Augusta (as of January 2019), Blair (as of March 2020), and Whitehall (as of April 2020).

52.      The Debtors have also realized cost savings through certain reductions in force and workforce-related benefits.  For example, total company headcount has been reduced from approximately 740 employees on January 1, 2020 to 297 employees as of the Petition Date.  In addition, the Debtors have eliminated certain of their historical ordinary-course incentive and bonus programs, which has resulted in annual savings of approximately $4 million.

US-DOCS\114694751.32

### (iv)   The Debtors' Restructuring Efforts

53.     Despite these cost-cutting initiatives, the Debtors have continued to experience revenue, cash flow, and liquidity challenges.  Beginning in late 2019, Hi-Crush Inc.'s board of directors (the "**Board**") authorized the retention of advisors to assist in the Debtors' evaluation of various strategic alternatives, including Latham & Watkins LLP ("**Latham**") as counsel, Lazard Frères and Co. LLP as investment banker, and Alvarez & Marsal North America, LLC as financial advisor.  The Debtors and their advisors engaged in extensive discussions and negotiations with various stakeholders, including the Railcar Lessors, the ABL Lenders, and an ad hoc group of holders of the Senior Unsecured Notes  (the "**Ad Hoc Group**") regarding a potential restructuring of the Debtors' balance sheet and business operations.  It is the Debtors' understanding that the Ad Hoc Group collectively owns or otherwise controls approximately 94% in principal amount of the Senior Unsecured Notes.  The Debtors and their advisors focused on proactively exploring a wide range of strategic alternatives, taking into account various factors, including market feedback, the Debtors' deteriorating economic outlook, as well as the deteriorating industry-wide environment.  These strategic alternatives included various potential asset sales, joint ventures, recapitalizations, financing alternatives (including uptiering exchanges, subsidiary financings and rights offerings), Railcar Lease renegotiations and equitizations.

### a.   Railcar Lease Negotiations

54.     Given the decline of the NWS market, in early 2020 the Debtors determined that their current railcar need was significantly reduced from their fleet of approximately 4,800 cars to approximately 1,500 cars.  The Debtors further estimated that approximately $20 million out of the $28 million in yearly payments on account of the Railcar Leases was attributable to redundant cars and above-market lease rates.  Indeed, as discussed above, the Debtors' Railcar Leases were multiple times more expensive than the current spot market, despite diminishing NWS volumes.

55.     In recognition of these facts, in the months leading up to these Chapter 11 Cases, the Debtors and their advisors engaged with their largest railcar lessors in an attempt to alleviate the Railcar Leases' burden on cash flow.  Specifically, the Debtors solicited and received formal bids for new lease terms from their larger railcar lessors.  As a result of the Debtors' proactive outreach to the railcar lessors, the Debtors were able to achieve material economic concessions in connection with their Railcar Leases, thereby paving the way for a realignment of the Debtors' railcar needs, current market prices, and the terms of the Railcar Leases.

56.     To achieve this realignment during the pendency of these Chapter 11 Cases, the Debtors have decided, in the exercise of their business judgment, to (a) reject, effective as of the Petition Date and pursuant to the Railcar Rejection Motion, certain Railcar Leases with certain lessors (the "**Go-Forward Lessors**"), and enter, effective as of the Petition Date, into new railcar lease agreements with the Go-Forward Lessors reflecting a reduced number of railcars and materially improved terms, and (b) reject, pursuant to the Omnibus Rejection Motion, certain other Railcar Leases under which the Debtors currently pay the lessor counterparties a fixed fee per car based on market terms negotiated at the time the leases were executed.

### b.     The Prepetition KERP Payments

57.     Prior to the Petition Date, the Debtors made certain retention payments to approximately 36 of their non-insider key employees and 4 insider employees  (the "**Prepetition KERP Payments**").   The Prepetition KERP Payments, which amounted to approximately $5,817,000 in the aggregate, are subject to certain claw-back provisions triggered if the recipients of Prepetition KERP Payments terminate their employment with the Debtors prior to June 30, 2021, or in the case of the 4 insider employees, the earlier of June 30, 2021 or the effective date of the emergence from bankruptcy.  As such, the Prepetition KERP Payments were structured to incentivize the Debtors' key employees not to seek alternative employment in advance of or during

these Chapter 11 Cases, ultimately to the benefit of the Debtors, their estates and stakeholders, and their restructuring efforts. As noted below, the Debtors are not seeking Court approval of the Prepetition KERP Payments, but are disclosing them out of an abundance of caution.

c.    The Restructuring Support Agreement

58.    In addition to their negotiations with the Railcar Lessors, in the months leading up to these Chapter 11 Cases, the Debtors and their advisors also engaged with their prepetition ABL Lenders and the Ad Hoc Group. These negotiations culminated in the Restructuring Support Agreement, dated as of July 12, 2020, by and among the Debtors and the Ad Hoc Group (as amended from time to time, the "**RSA**"). A copy of the RSA is attached hereto as Exhibit B, and its key terms are as follows:[7]

**DIP Loan & Exit Loan Facilities; Rights Offering**

- The Chapter 11 Cases will be financed by two debtor-in-possession financing facilities, including (a) a $25 million superpriority secured asset-based revolving loan financing facility (the "**DIP ABL Facility**") and (b) a $40 million superpriority secured delayed-draw term loan financing facility (the "**DIP Term Loan Facility**" and, together with the DIP ABL Facility, the "**DIP Facilities**");

- The DIP ABL Facility will refinance and satisfy in full the Debtors' obligations under the prepetition ABL Agreement;

- On the effective date of the Plan, the reorganized Debtors will enter into a new credit agreement providing for a new senior secured asset-based revolving loan facility with an aggregate principal commitment amount of $25 million and a $25 million letter of credit sub-limit, which will refinance and replace the DIP ABL Facility;

- The Debtors will conduct a $43.3 million Rights Offering to eligible holders of Allowed Senior Notes Claims and Allowed General Unsecured Claims pursuant to which the rights offering participants will be offered the right to purchase New Secured Convertible Notes;

---

[7]    The bullets below are solely intended to be a summary of certain material terms and conditions of the RSA and the restructuring term sheet appended to the RSA (the "**Term Sheet**") and are entirely qualified by reference to the entire RSA and the Term Sheet. Any capitalized terms used but not defined herein have the respective meanings ascribed to them in the RSA and/or the Term Sheet, as applicable.

- The Rights Offering will be backstopped by the Backstop Parties on the terms and conditions set forth in the Backstop Commitment Agreement; and

- The claims arising under the DIP Term Loan Facility will be paid in full in cash from the proceeds of the Rights Offering.

## **Plan Treatment**

- The treatment of certain Classes of Claims and Equity Interests will be as follows:

  o Payment in full of all administrative expense claims, priority tax claims, other priority claims, and other secured claims (or such other treatment rendering such claims unimpaired);

  o With respect to holders of Senior Notes Claims and General Unsecured Claims:

    (a)  rights to participate in the Rights Offering (which shall be attached to each applicable claim and transferable with such allowed claim as set forth in the Rights Offering Procedures, but the rights may only be exercised to the extent the holder is an Accredited Investor); and

    (b) its *pro rata* share of 100% of the New Common Stock, subject to dilution on account of (i) the New Common Stock issued upon conversion of the New Secured Convertible Notes and (ii) the MIP Equity; and

  o The Old Parent Interests will be cancelled, and each holder of an Old Parent Interest will not receive any distribution or retain any property on account of such Old Parent Interest;

## **Other Terms**

- The composition of the new board of directors of the Reorganized Parent will consist of five (5) directors in total, which will include the Chief Executive Officer of Reorganized Parent and other directors designated by the Backstop Parties prior to the Effective Date and disclosed in the Plan Supplement;

- The New Board will adopt an incentive plan for the benefit of the new management of the reorganized company; and

- The Plan will contain customary releases, exculpations, and injunctions among the parties to the RSA and certain other parties in interest.

US-DOCS\114694751.32

**Chapter 11 Milestones**

- The DIP Facilities and RSA provide for certain milestones to be met during the Chapter 11 Cases, including the  following:

  o Commencement of the Chapter 11 Cases by no later than July 12, 2020;

  o Entry of the Interim DIP Order by no later than five (5) days following the Petition Date;

  o Filing of the Plan and the Disclosure Statement, the related Solicitation Materials, and the motion seeking entry of the Solicitation Order by no later than fourteen (14) days following the Petition Date;

  o Entry of the Final DIP Order by no later than twenty-five (25) days following the Petition Date;

  o Entry of both the Backstop Order and the Solicitation Order by no later than forty-five (45) days following the Petition Date;

  o Entry of the Confirmation Order by no later than seventy-five (75) days following the Petition Date; and

  o The occurrence of the Effective Date of the Plan by no later than ninety (90) days following the Petition Date.

59.    The RSA provides for a comprehensive restructuring of the Debtors to maximize value for the benefit of all stakeholders, and provides the Debtors with a clear path to accomplish their restructuring goals.  The transactions contemplated by the RSA, including the exit financing, are fully committed, and the material deleveraging will enable the company to put the Reorganized Company in a position to execute on its business plan and pursue future growth opportunities.

**PART II**

60.    In furtherance of the objective of preserving value for all stakeholders, the Debtors have sought approval of the First Day Pleadings and related orders (the "**Proposed Orders**"), and respectfully request that the Court consider entering the Proposed Orders granting the relief requested in the First Day Pleadings.  For the avoidance of doubt, the Debtors seek authority, but

not direction, to pay amounts or satisfy obligations with respect to the relief requested in any of the First Day Pleadings.

61.     I have reviewed each of the First Day Pleadings, Proposed Orders, and exhibits thereto (or have otherwise had their contents explained to me), and the facts set forth therein are true and correct to the best of my knowledge, information, and belief.  Moreover, I believe that the relief sought in each of the First Day Pleadings (i) is vital to enabling the Debtors to make the transition to, and operate in, chapter 11 with minimal interruptions and disruptions to their businesses or loss of productivity or value and (ii) constitutes a critical element in the Debtors' ability to successfully maximize value for the benefit of their estates.

## A.     ADMINISTRATIVE AND PROCEDURAL PLEADINGS

### (i)     Joint Administration Motion[8]

62.     By the Joint Administration Motion, the Debtors seek entry of an order directing the joint administration of their twenty-two (22) Chapter 11 Cases for procedural purposes only. Many of the motions, hearings, and other matters involved in the Chapter 11 Cases will affect all Debtors.   Thus, I believe that the joint administration of the Chapter 11 Cases will avoid the unnecessary time and expense of duplicative motions, applications, orders, and other pleadings, thereby saving considerable time and expense for the Debtors and resulting in substantial savings for their estates.   On behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be granted and that failure to do so on an emergency basis would severely disrupt the Debtors' operations at this critical juncture.

---

[8]     "**Joint Administration Motion**" means the *Debtors' Motion for Entry of an Order Authorizing Joint Administration of the Chapter 11 Cases*, filed concurrently herewith.

### (ii)  Retention Applications

63.     I believe that the retention of chapter 11 professionals is essential to the Chapter 11 Cases.  Accordingly, during the Chapter 11 Cases, the Debtors anticipate that they will request permission to retain, among others, the following professionals: (i) Latham & Watkins LLP, as co-counsel; (ii) Hunton Andrews Kurth LLP, as co-counsel; (iii) Kurtzman Carson Consultants LLC, as claims and noticing agent; (iv) Lazard Frères & Co. LLC, as investment banker; and (v) Alvarez & Marsal North America, LLC, as Financial Advisor.   I believe that the above professionals are well-qualified to perform the services contemplated by their various retention applications, the services are necessary for the success of the Chapter 11 Cases, and the professionals will coordinate their services to avoid duplication of efforts.  I understand that the Debtors may find it necessary to seek retention of additional professionals as the Chapter 11 Cases progress.

### (iii)  Schedules Extension Motion[9]

64.     By the Schedules Extension Motion, the Debtors seek entry of an order (a) extending the deadline by which the Debtors must file the their schedules of assets and liabilities, schedules of current income and current expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "**Schedules and Statements**"), an additional 16 days, for a total of 30 days from the Petition Date, through and including August 11, 2020, without prejudice to the Debtors' ability to request additional extensions for cause shown; and (b) extending the deadline by which the Debtors must file their

---

[9]     "**Schedules Extension Motion**" means the *Debtors' Emergency Motion for Entry of an Order Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, Statements of Financial Affairs, and Rule 2015.3 Financial Reports*, filed concurrently herewith.  Capitalized terms used, but not otherwise defined, in this section shall have the respective meanings ascribed to them in the SOFAs and Schedules Extension Motion.

US-DOCS\114694751.32

initial reports of financial information with respect to entities in which the Debtors hold a controlling or substantial interest as set forth in Federal Rule of Bankruptcy Procedure 2015.3 (the "**2015.3 Reports**") to and including the later of (i) 15 days after the initial 341 Meeting or (ii) 45 days from and after the Petition Date (i.e., August 26, 2020), or to file a motion with the Court seeking a modification of such reporting requirements for cause, without prejudice to the Debtors' ability to request additional extensions for cause shown.

65.    I believe ample cause exists to grant the relief requested in the Schedules Extension Motion.  To prepare their Schedules and Statements and 2015.3 Reports, the Debtors will have to compile information from books, records, and documents relating to claims, assets, and contracts. The collection of the necessary information will require a significant expenditure of time and effort on the part of the Debtors and their employees.  Additionally, the Debtors may lack access to certain information necessary to complete the Schedules and Statements because invoices related to prepetition expenditures have not yet been received and entered into the Debtors' accounting system, among other reasons.

66.    Given the size and complexity of the Debtors' business and financial affairs and the critical matters that the Debtors' management and professionals were required to address prior to the commencement of these Chapter 11 Cases, the Debtors were not in a position to complete the Schedules and Statements as of the Petition Date.  Rather, in the days leading up to the Petition Date, the Debtors' primary focus has been negotiating with creditors and preparing for these chapter 11 cases to ensure a smooth transition into chapter 11, thereby maximizing value for their estates, their creditors, and other parties in interest.  Moreover, I believe an extension will not harm creditors or other parties in interest because, even under the extended deadline, the Debtors will

US-DOCS\114694751.32

file the Schedules and Statements in advance of any deadline for filing proofs of claim in these Chapter 11 Cases.

67.     Further, certain of the Debtors maintain interests in certain non-Debtor subsidiaries. The Debtors cannot complete the initial 2015.3 Reports in the time set forth under Bankruptcy Rule 2015.3 without significant hardship.  I believe that cause exists to extend the deadline for filing the 2015.3 Reports as requested herein based on (a) the size, complexity, and geographic scope of the Debtors' businesses, and (b) the substantial burdens imposed by compliance with Bankruptcy Rule 2015.3 in the early days of these Chapter 11 Cases.  Additionally, I believe that extending the deadline to file the initial 2015.3 Reports will allow the Debtors to work with their financial advisors and the Office of the U.S. Trustee to determine the appropriate nature and scope of the reports and any proposed modifications to the reporting requirements established by Bankruptcy Rule 2015.3.

68.     On behalf of the Debtors, I respectfully submit that the Schedules Extension Motion should be granted and that failure to do so on an emergency basis would severely disrupt the Debtors' operations at this critical juncture.

**(iv)     Consolidated Creditor List Motion[10]**

69.     By the Consolidated Creditor List Motion, the Debtors seek entry of an order (a) authorizing the Debtors to file a consolidated creditor matrix and list of the 30 largest general unsecured creditors in lieu of submitting separate mailing matrices and creditor lists for each

---

[10]     "**Consolidated Creditor List Motion**" means the *Debtors' Emergency Motion for Entry of Order (I) Authorizing the Debtors to File a Consolidated List of Creditors and a Consolidated List of the Debtors' Thirty (30) Largest Unsecured Creditors, (II) Waiving the Requirement to File a List of Equity Security Holders, (III) Authorizing the Debtors to Redact Certain Personal Identification Information, and (IV) Approving the Form and Manner of Notifying Creditors of the Commencement of these Chapter 11 Cases and Other Information*, filed concurrently herewith.  Capitalized terms used, but not otherwise defined, in this section shall have the respective meanings ascribed to them in the Consolidated Creditor List Motion.

28

Debtor; (b) waiving the requirement to file a list of and provide notice directly to the Debtor entity Hi-Crush Inc.'s equity security holders; (c) authorizing the Debtors to redact certain personal identification information for individuals; and (d) approving the form and manner of notice of commencement of these Chapter 11 Cases and the scheduling of the meeting of creditors under section 341 of the Bankruptcy Code.

70.     The preparation of separate lists of creditors for each Debtor would be expensive and unduly burdensome, and a large number of creditors may be shared among the Debtors.  For this reason, I believe that the Creditor Matrix and Top 30 List will reduce administrative costs and promote administrative efficiency.

71.     In addition, Hi-Crush Inc. is a publicly-traded company with actively trading stock and does not maintain a list of its equity security holders and, therefore, must obtain the names and addresses of its shareholders from a securities agent.  I believe that preparing and submitting such a list with last known addresses for each such equity security holder and sending notices to all such parties will create undue expense and administrative burden with limited corresponding benefit to the estates or parties in interest.

72.     I believe that cause exists to authorize the Debtors to redact from any paper filed with the Court the home addresses of individual creditors—including the Debtors' employees and contract workers—from the Creditor Matrix because, among other reasons, such information could be used to perpetrate identity theft or harass such individuals.

73.     I believe that service of the single Notice of Commencement (rather than notice by each Debtor) on the Creditor Matrix will not only avoid confusion among creditors, but will prevent the Debtors' estates from incurring unnecessary costs associated with serving multiple notices to the parties listed on the Debtors' Creditor Matrix.  On behalf of the Debtors, I

respectfully submit that the Consolidated Creditor List Motion should be granted and that failure to do so on an emergency basis would create undue expenses and administrative burden and severely disrupt the Debtors' operations at this critical juncture.

        **(v)**      **Bar Date Motion[11]**

74.     By the Bar Date Motion, the Debtors seek entry of an order (i) establishing (a) August 16, 2020 at 5:00 p.m. (Prevailing Central Time) (the "**General Bar Date**") as the last date and time by which creditors (as defined in section 101(10) of the Bankruptcy Code) may file proofs of claim (the "**Proofs of Claim**") in these Chapter 11 Cases and (b) related procedures for filing Proofs of Claim; (ii) approving (a) the form and scope of the notice of the Bar Dates in substantially the form attached to the Bar Date Order as Exhibit 1 (the "**Bar Date Notice**") and (b) mailing procedures with respect thereto; and (iii) granting related relief. I understand that the Debtors also request that the Court establish January 8, 2021 at 5:00 p.m. (Prevailing Central Time) as the deadline for governmental units (as defined in section 101(27) of the Bankruptcy Code) to file a Proof of Claim against the Debtors as (the "**Governmental Bar Date**" and together with the General Bar Date, the "**Bar Dates**").

75.     I believe that providing for Bar Dates that differ from those provided for in the Complex Case Procedures is warranted, is in the best interests of the Debtors and their estates, and is critical to providing certainty that will allow the Debtors to maximize the benefits of the chapter 11 process. Further, I believe that the proposed notification procedures allow for the Debtors to reach the widest possible audience of creditors who may not otherwise have notice of these Chapter 11 Cases.

---

[11]     "**Bar Date Motion**" means the *Debtors' Emergency Motion for Entry of Order (I) Establishing (A) Bar Dates and (B) Related Procedures for Filing Proofs Of Claim, (II) Approving the Form and Manner of Notice Thereof and (III) Granting Related Relief*, filed concurrently herewith. Capitalized terms used, but not otherwise defined, in this section shall have the respective meanings ascribed to them in the Bar Date Motion.

US-DOCS\114694751.32

76.     I believe that a prompt bar date will allow the Debtors sufficient time to analyze the Proofs of Claim as necessary in connection with the rights offering contemplated under the RSA.  If the relief requested in the Bar Date Motion is not granted, I understand that the Debtors may fail to reach the milestones set forth in the RSA, which I believe would be to the detriment of all parties in interest in these Chapter 11 Cases.

77.     Accordingly, I believe that it is in the best interest of the Debtors, their estates, and all parties in interest to grant the relief requested in the Bar Date Motion.

## B.     OPERATIONAL AND FINANCING MOTIONS

### (i)     DIP and Cash Collateral Motion[12]

78.     By the DIP and Cash Collateral Motion, the Debtors seek (i) authorization to obtain senior secured postpetition obligations on a superpriority basis with respect to the DIP ABL Facility in the aggregate principal amount of $25,000,000 pursuant to the terms and conditions of the DIP ABL Credit Agreement; (ii) authorization to obtain senior secured postpetition financing on a superpriority basis consisting of a $40,000,000 new money delayed draw DIP Term Loan Facility, pursuant to the terms and conditions of the DIP Term Loan Agreement; (iii) authorization to execute and enter into the DIP Agreements, and to perform their respective obligations thereunder and to perform such other and further acts as may be required in connection with the DIP Documents, including, without limitation, the payment of all principal, interest, fees, expenses and other amounts payable under the DIP Documents as such amounts become due and payable; (iv) the grant of automatically perfected security interests in and liens on all of the DIP Collateral

---

[12]     "**DIP and Cash Collateral Motion**" means the *Debtors' Emergency Motion for Entry of Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection to Prepetition ABL Secured Parties, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief*, filed concurrently herewith.  Capitalized terms used, but not otherwise defined, in this section shall have the respective meanings ascribed to them in the DIP and Cash Collateral Motion.

including all property constituting Cash Collateral; (v) authorization for the Debtors to use the Prepetition ABL Collateral, including Cash Collateral of the Prepetition ABL Secured Parties, and provide adequate protection to the Prepetition ABL Secured Parties for any diminution in value on or after the Petition Date resulting from the imposition of the automatic stay, the Debtors' use, sale, or lease of the Prepetition ABL Collateral, including Cash Collateral, the priming of the Prepetition ABL Secured Parties' respective interests in the Prepetition ABL Collateral of their respective interests in the Prepetition ABL Collateral; (vi) to vacate and modify the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and the Interim Order.

79.     I believe that access to the DIP Facilities is critical to ensure the Debtors' smooth entry into chapter 11 and their ability to ensure they have sufficient liquidity to operate their business and administer their estates during these Chapter 11 Cases.  I am advised that the commencement of these Chapter 11 Cases will place increased demands on liquidity due to, among other things, the costs of administering these Chapter 11 Cases and the acceleration or elimination of trade terms.  Accordingly, I believe that the Debtors will suffer immediate and irreparable harm if the relief requested in the DIP and Cash Collateral Motion is not granted.

80.     I believe, and the Debtors have determined, in consultation with their advisors, that the DIP Facilities represented the best postpetition DIP financing alternative available to the Debtors.  The DIP Facilities were the product of extensive arm's-length, good-faith negotiations. Alternative sources of postpetition financing were not readily available to the Debtors (whether on an unsecured or secured basis) on terms better than or comparable to the DIP Facilities.  I believe that the proposed DIP Facilities provide the Debtors with immediate and critical access to liquidity that is necessary to ensure that the Debtors' businesses are stabilized, that chapter 11 administrative

costs are paid in full, and that value is preserved during the course of the Debtors' Chapter 11 Cases.

### (ii)     Cash Management Motion[13]

81.     By the Cash Management Motion, the Debtors seek entry of an order (i) authorizing, but not directing, the Debtors to continue to maintain and use their existing cash management system, including maintenance of their existing bank accounts, checks, and business forms; (ii) authorizing, but not directing, the Debtors to continue to maintain and use their existing deposit and investment practices notwithstanding the provisions of section 345(b) of the Bankruptcy Code; (iii) granting the Debtors an extension of time for a period of 60 days from the Petition Date, (*i.e.*, until September 10, 2020) within which to comply with certain bank account and related requirements of the Office of the United States Trustee (the "**U.S. Trustee**") or make such other arrangements as agreed with the U.S. Trustee to the extent that such requirements are inconsistent with the Debtors' practices under their existing cash management system or other actions described herein; (iv) authorizing, but not directing, the Debtors to continue the Intercompany Transactions; (v) authorizing the Debtors to open and close Bank Accounts; (vi) according administrative expense status to postpetition Intercompany Claims arising from Intercompany Transactions among the Debtors; and (vii) authorizing the Debtors to maintain the Fuel Card Program.

82.     The Debtors maintain a complex Cash Management System that, I believe, is critical to the Debtors' operations.  The Cash Management System enables the Debtors to, among

---

[13]     "**Cash Management Motion**" means the *Debtors' Emergency Motion for Entry of Order (I) Authorizing Continued Use of Existing Cash Management System, Including Maintenance of Existing Bank Accounts, Checks, and Business Forms, (II) Authorizing Continuation of Existing Deposit and Investment Practices, (III) Approving the Continuation of Intercompany Transactions, and (IV) Granting Administrative Expense Status to Certain Postpetition Intercompany Claims*, filed concurrently herewith.  Capitalized terms used, but not otherwise defined, in this section shall have the respective meanings ascribed to them in the Cash Management Motion.

33

other things, (i) monitor cash receipts and ensure payment of necessary disbursements, (ii) track various intercompany transfers and transactions, and (iii) ensure accurate cash forecasting and reporting.  The Cash Management System includes a total of 11 bank accounts (together with any accounts opened after the Petition Date, the "**Bank Accounts**"), which are held at Zions and JPM Chase (together, the "**Banks**").  The Bank Accounts include two Master Operating Accounts, five Ancillary Operating Accounts, a Payroll Account, an Investment Account, an ABL Sweep Account, and an ABL Reserve.  I understand that, as of the Petition Date, the approximate balances of the Bank Accounts are as follows:

| Account Name | Debtor Account Holder | Approx. Balance as of the Petition Date |
|---|---|---|
| **D & I Silica Master Operating Account** **Zions - 7705** | D & I Silica, LLC | $2.9 million |
| **Hi-Crush Master Operating Account** **Zions - 1598** | Hi-Crush Inc. | $2.1 million |
| **Hi-Crush Services Operating Account** **Zions - 9232** | Hi-Crush Services LLC | $109,000 |
| **Hi-Crush Wyeville Operating Account** **Zions - 1514** | Hi-Crush Wyeville Operating LLC | $106,000 |
| **Hi-Crush Augusta Operating Account** **Zions - 1571** | Hi-Crush Augusta LLC | $7,000 |
| **Hi-Crush Blair Operating Account** **Zions - 8408** | Hi-Crush Blair LLC | $265,000 |
| **Hi-Crush Whitehall Operating Account** **Zions - 8760** | Hi-Crush Whitehall LLC | $21,000 |
| **Payroll Account** | Hi-Crush Services LLC | $403,000 |

34

| Account Name | Debtor Account Holder | Approx. Balance as of the Petition Date |
|---|---|---|
| **Zions - 0237** | | |
| **Investment Account** <br> **Zions - 8806** | Hi-Crush Inc. | $2.3 million |
| **ABL Sweep Account** <br> **JPM Chase - 6020** | Hi-Crush Inc. | $0 |
| **ABL Reserve Account** <br> **JPM Chase - 6288** | Hi-Crush, Inc. | $13.6 million |

83.    I understand that the Debtors' Cash Management System has three main components: cash collection, cash disbursement, and investment.  The Debtors receive payments from customers directly into one of the two Master Operating Accounts.  Cash that is concentrated in the Master Operating Accounts is then used to satisfy various financial obligations, including funding the Ancillary Operating Accounts, Payroll Account, Investment Account, and other accounts, as necessary.  I understand that the Debtors disburse approximately $30 million per month and pay the majority of their vendors by check, resulting in check "float" of $6 million on any given day.  I also understand that the Debtors maintain relationships with certain vendors who have the ability to draw amounts directly from the Debtors' accounts.  I also understand that the Debtors' Cash Management System consists of Investment Practices that, I believe, provide safe returns to the Debtors while maximizing the value of the Debtors' excess funds.  The Debtors also pay certain Bank Fees to the Banks related to the costs of administered their bank accounts.  I believe that the Cash Management System is an ordinary course, customary, and essential business practice, the continued use of which is essential to the Debtors' business operations during the Chapter 11 Cases and the Debtors' goal of maximizing value for the benefit of all parties in interest.

US-DOCS\114694751.32

84.     I also understand that the Debtors conduct certain Intercompany Transactions in the ordinary course of business that may result in Intercompany Claims.   The Intercompany Transactions are made to (i) reimburse certain Debtors for various expenditures associated with their businesses, (ii) fund the Bank Accounts for general corporate and capital expenditures, or (iii) transfer funds to or from the Master Operating Accounts.  I believe that if the Intercompany Transactions were to be discontinued, the Cash Management System and the Debtors' operations would be disrupted unnecessarily to the detriment of the Debtors, their creditors, and other stakeholders.

85.     I believe that (i) the Debtors are able to work with the Banks to ensure that the goal of separation between the prepetition and postpetition periods is observed, and (ii) enforcement of certain of UST Requirements would disrupt the Debtors' operations and impose a financial burden on the Debtors' estates.   Specifically, I believe that the creation of new debtor-in-possession accounts designated solely for tax obligations would be unnecessarily burdensome.  I also believe that changing the Debtors' existing checks, correspondence, and other business forms would be expensive, unnecessary, and burdensome to the Debtors' estates.   Therefore, I believe that the Debtors should be granted an extension of time to comply with the UST Requirements.

86.     I believe that the Debtors should be authorized to continue their Deposit Practices and Investment Policy.  I believe that maintaining the Deposit Practices is in the best interests of the Debtors, especially in light of the fact that all of the Bank Account are insured by the FDIC.  I also believe that the Debtors' approach to managing their cash reserves balances their need to access liquidity on a daily basis with the requisite protections and that bonding the Investment Account would impose considerable costs on the Debtors' estates.

US-DOCS\114694751.32

87.     I understand that, pursuant to the Fuel Card Program, the Debtors assign Fuel Cards issued by WEX to certain light trucks used in its field operations to pay limited vehicle-related expenses.  I believe that the Fuel Card Program is critical to the Debtors' ability to carry out their ongoing operations without disruption because Fuel Cards enable eligible employees to purchase fuel for company vehicles and pay for small but critical expenses incurred in the Debtors' daily operations without undue delay.

88.     I believe that immediate and irreparable harm would result if the relief requested in the Cash Management Motion is not granted.  Continuity of the Cash Management System is critical to the Debtors' ongoing business operations.  I believe that to require the Debtors to adopt a new cash management system at this early and critical stage would be expensive, impose needless administrative burdens, and cause undue disruption.  Any disruption in the collection of funds as currently implemented would adversely (and perhaps irreparably) affect the Debtors' ability to maximize estate value.  Accordingly, I believe that it is in the best interest of the Debtors, their estates, and all parties in interest to grant the relief requested in the Cash Management Motion.

**(iii)     Employee Wages Motion[14]**

89.     By the Employee Wages Motion, the Debtors seek entry of an order (i) authorizing the Debtors, in their discretion, to (a) pay or otherwise honor various Workforce Obligations to or for the benefit of their Workforce for compensation, expense reimbursements, and benefits under the Workforce Programs, and (b) continue the Workforce Programs in the ordinary course of

---

[14]     "**Employee Wages Motion**" means the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing (A) Payment of Prepetition Workforce Obligations and (B) Continuation of Workforce Programs on a Postpetition Basis, (II) Authorizing Payment of Payroll Taxes, (III) Confirming the Debtors' Authority to Transmit Payroll Deductions, (IV) Authorizing Payment of Prepetition Claims Owing to Administrators, and (V) Directing Banks To Honor Prepetition Checks and Fund Transfers for Authorized Payment*, filed concurrently herewith.  Capitalized terms used, but not otherwise defined, in this section shall have the respective meanings ascribed to them in the Employee Wages Motion.

37

business during the pendency of the Chapter 11 Cases in the manner and to the extent that such Workforce Programs were in effect immediately prior to the filing of the Chapter 11 Cases; (ii) authorizing the Debtors to pay any and all local, state, federal, and foreign withholding and payroll-related or similar taxes, as applicable, relating to the prepetition Workforce Obligations; (iii) authorizing, but not requiring the Debtors to continue to deduct and to transmit deductions from payroll checks as authorized by Employees, as required by any Workforce-related plan, program or policy, or as required by law; (iv) authorizing, but not requiring, the Debtors to pay any prepetition claims owing to vendors and third party Administrators; and (v) authorizing and directing all banks to receive, process, honor, and pay all of the Debtors' prepetition checks and fund transfers on account of any obligations authorized to be paid pursuant hereto.

       a.     <u>The Debtors' Workforce</u>

90.     As of the Petition Date, the Debtors' Workforce consisted of 297 Employees (116 salaried and 181 hourly).  None of the Debtors' Employees are subject to a collective bargaining agreement or similar labor agreement.  The Debtors' Workforce also consists of certain Independent Contractors.  The number of Independent Contractors fluctuates based on whether the Debtors are in a peak business season and based on the Debtors' specific needs at any given time. The Debtors' Workforce currently includes 13 Independent Contractors.

91.     I believe that the Debtors' ability to preserve their businesses and successfully reorganize is dependent on the expertise and continued enthusiasm and service of their Workforce. Due to the disruption and uncertainty that typically accompanies a chapter 11 filing, I believe that the morale and, thus, the performance of the Workforce will be adversely affected absent the relief requested in the Employee Wages Motion.  I also believe that if the Debtors fail to pay the Workforce Obligations in the ordinary course, their Workforce will suffer extreme personal hardship and, in some cases, may be unable to pay their basic living expenses.  Such a result would

have a highly negative impact on Workforce morale and likely would result in unmanageable performance issues or turnover, thereby resulting in immediate and irreparable harm to the Debtors and their estates. I believe that continuation of the Workforce Programs is vital to preserving and rebuilding Workforce morale during the pendency of the Chapter 11 Cases and to reducing the level of attrition that might otherwise occur.

b.    <u>Workforce Compensation Programs</u>

92.    *Employee Payroll.*  The Employees are paid wages and salaries on a bi-weekly basis. In the twelve months prior to the Petition Date, the average payroll amount for each two-week pay period was approximately $1,726,800, net of the Deductions (as defined below). The Debtors utilize ADP for payroll processing services related to payment of the Employees' wages and salaries. The Debtors pay their Employees in arrears for work performed prior to the Debtors' normal bi-weekly payroll. As a result, such Employees often have a significant amount of unpaid wages and other compensation that has accrued but is unpaid. The Debtors estimate that, as of the Petition Date, they owe approximately $358,900 in wages and salaries to Employees, net of Deductions (as defined below). No Employee will be paid wages or salary compensation in excess of the $13,650 statutory cap pursuant to section 507(a)(4) of the Bankruptcy Code.

93.    *Independent Contractors' Compensation.* The Debtors pay the Independent Contractors directly. I believe it is critical for the Debtors' business to maintain the flexibility to secure the services of their Independent Contractors as necessitated by their business needs from time to time. I believe further that remaining current on payments due to Independent Contractors is necessary for that purpose. In the twelve months prior to the Petition Date, the Debtors spent on average approximately $110,100 per month on account of obligations due to Independent Contractors. As of the Petition Date, the Debtors estimate that there are approximately $96,700 in amounts due and owing to Independent Contractors.

39

94.     *Payroll Deductions*.  In the ordinary course of their businesses, the Debtors make Deductions from Employees' paychecks for payments to third parties on behalf of Employees for various federal, state, local, and foreign income, FICA, employment insurance and other taxes, as well as for court ordered garnishments, savings programs, repayments for loans taken against the savings programs, benefit plans, insurance and other similar programs.  In the twelve months prior to the Petition Date, the Debtors' average aggregate bi-weekly Deductions for Employees was approximately $758,900.  As of the Petition Date, and as permitted under the CARES Act, the Debtors have deferred the remittance of approximately $991,786 in FICA Taxes related to their Employees' wages (the "**FICA Deferrals**") and anticipate an additional $775,385 in FICA Deferrals during 2020.  The Debtors estimate that, as of the Petition Date, accrued but not remitted Deductions (including FICA Deferrals) total approximately $983,200.

95.     *PTO*.  As part of their overall compensation, Employees are eligible, in certain circumstances, to receive PTO for, among other things, vacation, illness, and personal days. Entitlements under the Debtors' PTO policy vary based upon the Employee's work experience or length of employment, whichever is greater.  I believe these programs are typical and customary, and continuing to offer them is necessary for the Debtors to retain Employees during the reorganization process.  The Debtors estimate that, as of the Petition Date, aggregate accrued but unpaid PTO liability for all Employees totals approximately $609,700.  This accrued amount, however, does not represent a true "cash" liability, as the Debtors anticipate that Employees will use most of their PTO in the ordinary course of business.  Accordingly, unless an eligible Employee has resigned, PTO is not calculated for the purposes of the statutory priority cap under section 507(a)(4) of the Bankruptcy Code.

96.     *Employee Cash Incentive Programs.*   In the ordinary course of business, to encourage and reward outstanding performance, the Debtors offer certain Employees the opportunity to earn bonuses under three Employee Cash Incentive Programs:  the PES Monthly Program, the NexStage Quarterly Program, and the Broad-based Annual Incentive Program. The Employee Cash Incentive Programs are not retention or severance plans as contemplated by section 503(c) of the Bankruptcy Code.  With the exception of the Broad-based Annual Incentive Program, no insiders participate in or are eligible for the Employee Cash Incentive Programs.  For the avoidance of doubt, the Debtors are not seeking authority in the Employee Wages Motion to make any retention or incentive payments to insiders under any of the Employee Cash Incentive Programs absent further order of the Court.

97.     Pursuant to the PES Monthly Program and the NexStage Quarterly Program, certain non-insider Employees are eligible to receive bonus compensation, on a monthly or quarterly basis, based on their performance during the previous month as determined by their supervisors via a scorecards system built around objective individual and business performance metrics.  Pursuant to the Broad-based Annual Incentive Program, certain Employees who are not eligible for either the PES Monthly Program or the NexStage Quarterly Program are eligible to receive bonus compensation on an annual basis.  Payments under the Broad-based Incentive Program are partly discretionary and partly based on both individual and company-wide performance (as indicated by certain financial and operational metrics).  During the twelve months prior to the Petition Date, the Debtors paid approximately $6,091,400 in connection with the Employee Cash Incentive Programs.  As of the Petition Date, the Debtors believe that approximately $65,000 is owed in connection with the Employee Cash Incentive Programs (all of which is owed to non-insider Employees pursuant to the PES Monthly Program and the NexStage Quarterly Program).

41

98.     *The LTIP*.  In the ordinary course of business, the Debtors provide certain of their Employees (both insiders and non-insiders) with the opportunity to earn additional compensation under the LTIP.  Under the LTIP, Employees are eligible to receive awards such as options, stock appreciation rights, restricted stock, restricted stock units, cash awards, stock awards, dividend equivalents, other stock-based awards, substitute awards, or any combination of the foregoing, in the Debtors' discretion.  An Employee's eligibility to receive awards under the LTIP is based on roles, responsibilities, performance, and service.  Under the LTIP, the Debtors have granted certain insider and non-insider Employees restricted Stock Units.  The grant of the Stock Units also included a grant of tandem dividend equivalent rights with respect to each Stock Unit (the "**DERs**").  The Debtors project that approximately 278,865 Stock Units will vest in 2020 and 2021 and be settled in shares of common stock.  In addition, the Debtors project that approximately $74,000 in previously unvested DERs will vest in 2020 and 2021, but the Debtors do not seek authority to settle such DERs in cash at this time.

99.     While the Debtors do not intend to make any further grants under the LTIP during the Chapter 11 Cases, pursuant to the Employee Wages Motion, the Debtors request authority to honor the LTIP Awards previously granted and continue the vesting of Stock Units and DERs in the ordinary course of business and consistent with historical practice, both for insider and non-insider Employees.  For the avoidance of doubt, the Debtors do not request by the Employee Wages Motion authority to make any cash payments under the LTIP (whether on account of DERs or otherwise) without further order of the Court.

100.     *The Prepetition KERP Payments*.  Prior to the Petition Date, the Debtors made a total of $5,817,000  in Prepetition KERP Payments to approximately 36 of their non-insider key Employees and 4 insider Employees.  The Prepetition KERP Payments are subject to certain claw-

back provisions triggered if the recipients of Prepetition KERP Payments terminate their employment with the Debtors prior to June 30, 2021, or in the case of 4 insider Employees, the earlier of June 30, 2021 or the effective date of the emergence from these Chapter 11 Cases.  As such, I believe that the Prepetition KERP Payments were structured to incentivize the Debtors' key Employees not to seek alternative employment in advance of or during these Chapter 11 Cases, ultimately to the benefit of the Debtors, their estates and stakeholders, and their restructuring efforts.  By the Employee Wages Motion, the Debtors are not seeking approval of the Prepetition KERP Payments, but are disclosing them out of an abundance of caution.

c.     Employee Reimbursement Programs

101.    In the ordinary course of business, the Debtors reimburse eligible members of their Workforce by making various payments in connection with: (i) reimbursement of business expenses, (ii) payment of Per Diem Stipends (iii) reimbursement or payment of Mobile Expenses, (iv) reimbursement of certain Tuition Expenses, (v) payment and reimbursement of the fees and expenses of the Debtors' Directors, (vi) payment of Lodging Expenses, and (vii) reimbursement of Relocation Expenses.

102.    As further provided in the Employee Wages Motion, certain of the amounts due on account of the Employee Reimbursement Obligations remained unsatisfied as of the Petition Date because certain obligations of the Debtors under the applicable programs or policies accrued either in whole or in part prior to the commencement of the Chapter 11 Cases, but will not be required to be paid or provided in the ordinary course of the Debtors' business until a later date.  The Debtors request authority to satisfy, as they become due, all prepetition Employee Reimbursement Obligations that have accrued.  The Debtors estimate that the aggregate accrued but unsatisfied amount of such prepetition Employee Reimbursement Obligations is approximately $308,900.

43

d.    Employee Benefits Programs

103.    In the ordinary course of business, the Debtors offer eligible Employees, their eligible spouses and dependents, and certain former Employees various employee benefits, including, without limitation: (i) medical, prescription drug, dental, and vision coverage, (ii) the opportunity to participate in the HSAs, FSAs, and the HRA, (iii) the opportunity to participate in the Income Protection Plans, (iv) the ability to participate in the 401(k) Program, (v) workers' compensation, (vi) the ability to participate in Supplemental Benefits Programs, and (vii) the Benefits Reimbursement Arrangement.

104.    As further provided in the Employee Wages Motion, certain of the Employee Benefits Obligations remained unsatisfied as of the Petition Date because certain obligations of the Debtors under the applicable plans, programs, or policies accrued either in whole or in part prior to the commencement of the Chapter 11 Cases, but will not be required to be paid or provided in the ordinary course of the Debtors' business until a later date.  The Debtors request authority to satisfy, as they become due, all prepetition Employee Benefits Obligations that have already accrued.  The Debtors estimate that the aggregate accrued but unsatisfied amount of such prepetition Employee Benefits Obligations is approximately $250,785.

e.    Honoring Prepetition Workforce Obligations

105.    The Debtors request authority to pay or provide, as they become due, all prepetition Workforce Obligations that are described in the Employee Wages Motion.  The Debtors estimate that the aggregate amount of the prepetition Workforce Obligations is approximately $2,873,785.

106.    Due to the disruption and uncertainty that typically accompanies a chapter 11 filing, I believe that the continuity and competence of the Workforce would be jeopardized if the relief requested herein is not granted.  Specifically, I believe that if the Debtors fail to honor and pay prepetition Employee Compensation Obligations, Employee Reimbursement Obligations and

44

Employee Benefits Obligations, in the ordinary course of business, the Debtors' Workforce will suffer extreme personal hardship and, in some cases, may be unable to pay their basic living expenses. I believe that this hardship would have a highly negative impact on Workforce morale and productivity, thereby resulting in immediate and irreparable harm to the Debtors' continuing operations and their estates. Accordingly, I believe that payment of these amounts is vital to preventing losses in the Debtors' Workforce during the pendency of the Chapter 11 Cases and to maintaining the continuity and stability of the Debtors' operations.

f.      <u>Postpetition Continuation of Workforce Programs</u>

107. The Debtors also request confirmation of their right to continue to honor and perform their obligations with respect to all of the Workforce Programs. I believe that the Workforce Programs are essential to the Debtors' efforts to maintain morale, reward performance through certain incentives, minimize attrition, and preserve the continuity and stability of the Debtors' operations. I believe that the expenses associated with the Workforce Programs are reasonable and cost-efficient in light of the potential attrition, loss of morale and productivity, and disruption of business operations that would occur if the Workforce Programs were discontinued. Notwithstanding the foregoing, the Debtors reserve the right to evaluate all Workforce Programs and to make such modifications, including terminating any particular plan, program, or policy, as may be necessary or appropriate during these Chapter 11 Cases.

g.      <u>Payments to Administrators</u>

108. The Debtors contract with the Administrators to administer and deliver payments or other benefits to their Employees. The Debtors pay certain of these Administrators' fees and expenses incurred in connection with the administration of the Workforce Programs. As of the Petition Date, the Debtors estimate they owe approximately $135,000 to the Administrators. I believe that the Administrators may fail to adequately and timely perform or may terminate their

45

services to the Debtors unless the Debtors pay the Administrators' prepetition claims for administrative services rendered and expenses incurred.  I believe that a need to engage replacement Administrators postpetition likely would cause significant disruption to the payment of benefits and other obligations to the Workforce.  Accordingly, I believe that the payment of claims owed to the Administrators is in the best interest of the Debtors' estates.

h.   Honoring of Prepetition Checks

109.   Prior to the Petition Date, the Debtors paid certain of their prepetition Workforce Obligations with checks that had not been presented for payment as of the Petition Date.  In order to ensure the orderly payment of the prepetition Workforce Obligations, the Debtors request that the Court enter the Order authorizing the Debtors' banks to honor any such checks that are drawn on the Debtors' accounts, and authorizing the banks to rely on the representations of the Debtors as to which checks are subject to the Employee Wages Motion.  To the extent that any such checks are nevertheless refused payment, the Debtors additionally request authority to replace any checks or electronic fund transfers that may be dishonored and to reimburse any related expenses that may be incurred as a result of any bank's failure to honor a prepetition check or electronic fund transfer.

**(iv)   Insurance and Bonding Motion[15]**

110.   By the Insurance and Bonding Motion, the Debtors request entry of an order authorizing them to: (i) pay prepetition obligations arising under their ordinary course insurance and bonding programs; (ii) in the ordinary course of business pay all postpetition obligations relating to the insurance coverage and related programs and the Debtors' surety bond program as

---

[15]   "**Insurance and Bonding Motion**" means the *Debtors' Emergency Motion For Entry Of An Order Authorizing Debtors To (I) Pay their Prepetition Insurance Obligations, (II) Pay their Prepetition Bonding Obligations, (III) Maintain their Postpetition Insurance Coverage, (IV) Maintain their Bonding Program, and (V) Maintain Postpetition Financing of Insurance Premiums*, filed concurrently herewith.  Capitalized terms used, but not otherwise defined, in this section shall have the respective meanings ascribed to them in the Insurance and Bonding Motion.

46

such payments become due; (iii) revise, extend, supplement, change, terminate and/or replace the Debtors' insurance coverage, or purchase new, supplemental, or replacement surety bonds as needed in the ordinary course of business; and (iv) maintain or renew current, or enter into new, postpetition financing arrangements with respect to insurance premiums.

        a.      <u>The Debtors' Insurance Obligations</u>

111.    In the ordinary course of business, the Debtors maintain certain insurance policies that are administered by Insurance Carriers who provide coverage pursuant to the various Insurance Policies.  A detailed list of the Insurance Policies under which the Debtors are currently covered is attached to the Insurance and Bonding Motion.  I believe that the Insurance Policies are essential to the preservation of the Debtors' businesses, property, and assets, and, in some cases, such coverage is required by various federal and state laws and regulations, as well as the terms of the Debtors' various commercial contracts.  I believe that the Insurance Policies provide coverage that is typical in scope and amount for businesses within the Debtors' industry.

112.    The total amount paid in annual premiums and payments associated with all of the Insurance Policies is approximately \$6.14 million.[16]  The Debtors' Insurance Policies are annual policies that renew at various times throughout each year.  The Debtors' commercial automobile, general liability, workers compensation, umbrella liability, excess liability, commercial property, inland marine, cyber liability and professional liability policies expire on July 1, 2021.  The Debtors' directors' and officers', employment practices liability, fiduciary liability, and contractors' risk liability policies expire on August 15, 2020.

---

[16]    On April 20, 2020, the Debtors entered into six directors and officers runoff policies (the "**<u>Runoff Policies</u>**"). All of the premiums related to the Runoff Policies were paid in advance of the Petition Date.

US-DOCS\114694751.32

113.   The Debtors have financed the premiums for the Debtors' primary general, commercial automobile liability, inland marine, commercial property, umbrella liability, workers compensation, cyber liability, professional liability, and excess liability (the "**First Insurance Financed Policies**") pursuant to First Insurance PFA.  Under the First Insurance PFA, the Debtors will make an initial down payment of $1.4 million on or before August 1, 2020, and will pay the remaining premium balance of approximately $2.1 million in nine monthly payments of approximately $240,000, the first of which is due together with the down payment on August 1, 2020.  Each of the monthly payments includes interest at a rate of 6.54% per annum.  Accordingly, as of the Petition Date, there is approximately $3.5 million outstanding under the First Insurance PFA.

114.   The Debtors have also financed the premiums for the Debtors' directors' and officer's, employment practices liability and fiduciary liability, and contractors' risk liability (the "**TPF Financed Policies**" and together with the First Insurance Financed Policies, the "**Financed Policies**") pursuant to the TPF PFA.  Under the TPF PFA, the Debtors make eleven monthly payments of approximately $47,000, each of which includes interest at a rate of 6.29% per annum. The Debtors believe that, as of the Petition Date, no amounts are currently due and owing in connection with the TPF PFA, however, there is one more scheduled payment to be made under the TPF PFA on July 15, 2020 in the amount of approximately $47,000.

115.   Alliant and Lockton serve as the Debtors' insurance brokers and manage the Debtors' relationships with the Insurance Carriers.  Among other things, the Insurance Brokers assist the Debtors in selecting the appropriate carriers and represent the Debtors in negotiations with the Insurance Carriers.  The Insurance Brokers have allowed the Debtors to obtain the insurance coverage necessary to operate their businesses in a reasonable and prudent manner, and

to realize savings in the procurement of such policies. The Insurance Brokers' Fees are included in the premium payments the Debtors make under the Insurance Policies. In 2019, the Debtors paid approximately $740,000 in the aggregate to the Insurance Brokers and Surety Brokers on account of Broker's Fees in connection with the Insurance Policies and the Bonding Program.

116.   I believe that maintenance of insurance coverage under the various Insurance Policies on an uninterrupted basis is essential to the continued operation of the Debtors' businesses and is required under the United States Trustee's Operating Guidelines, the federal laws and regulations applicable to the Debtors' businesses, the laws of the various states in which the Debtors operate, and the Debtors' various contractual commitments. Thus, I believe that the Debtors should be authorized to continue to pay premiums, taxes, charges, fees, and other obligations owed under or with respect to the Insurance Policies or the financing of the same under the PFAs as such obligations come due in the ordinary course of the Debtors' businesses.

117.   I believe that the Debtors' maintenance of their relationships with the Insurance Carriers, the Insurance Brokers, and the Premium Financiers is critical to ensuring the continued availability of insurance coverage and reasonable pricing of such coverage for future policy periods. Accordingly, although the Debtors believe no Prepetition Insurance Obligations and no prepetition amounts under the PFAs are outstanding, out of an abundance of caution the Debtors request authorization to pay any Prepetition Insurance Obligations to the Insurance Carriers, the Insurance Brokers, or the Premium Financiers, as applicable, to the extent that the Debtors determine, in their sole discretion, that such payment is necessary to avoid cancellation, default, alteration, assignment, attachment, lapse, or any form of impairment to the coverage, benefits, or proceeds provided under the Insurance Policies, and to maintain good relationships with the various Insurance Carriers, the Insurance Brokers, and the Premium Financiers. The Debtors

additionally request, out of an abundance of caution, authority to renew or replace the Insurance Policies as necessary in the ordinary course.

        b.      <u>The Debtors' Bonding Program</u>

118.    In the ordinary course of business, the Debtors are required by certain statutes, rules, and regulations to participate in the Bonding Program, pursuant to which the Debtors provide surety bonds to certain third parties to secure the Debtors' payment or performance of certain obligations, often to governmental units or other public agencies.[17]   The Bonding Program generally covers reclamation, permits and taxes, conservation and environmental obligations, and other miscellaneous items (collectively, the "**<u>Covered Obligations</u>**").  A detailed list of the surety bonds that are currently maintained for the benefit of the Debtors is attached to the Insurance and Bonding Motion.[18]  I believe that the Bonding Program provides coverage that is typical in scope and amount for businesses within the Debtors' industry.

119.    The issuance of a surety bond shifts the risk of the Debtors' nonperformance or nonpayment of their obligations covered by the surety bond from the beneficiary of the surety to the surety.  If the Debtors fail to pay the Covered Obligations, the applicable surety will pay the Debtors' obligations, up to a specified amount.  Unlike an insurance policy, if a surety incurs a loss on a surety bond, the surety is entitled to recover the full amount of that loss from the Debtors.

120.    As of the Petition Date, the Debtors' outstanding surety bonds were issued by six separate Sureties: (i) Travelers Casualty and Surety Company of America (two surety bonds totaling approximately $77,500), (ii) The Hanover Insurance Company (two surety bonds totaling

---

[17]      Certain of the Debtors' Surety Bonds are backed by letters of credit.

[18]      The Debtors request authority to honor obligations and renew all surety bonds, as applicable, notwithstanding any failure of the Debtors to include a particular surety bond on <u>Exhibit B</u> to the Insurance and Bonding Motion.

US-DOCS\114694751.32

approximately $2.2 million), (iii) Westchester Fire Insurance Company (one surety bond totaling approximately $10,000), (iv) Endurance American Insurance Company (three surety bonds totaling approximately $3.0 million), (v) Lexon Insurance Company (two surety bonds totaling approximately $3.4 million), and (vi) The Ohio Casualty Insurance Company (one surety bond totaling approximately $150,000).

121.    The premiums for the surety bonds are generally determined on an annual basis and are paid when the bonds are issued and annually upon renewal.  Such premiums are approximately 1.8% of the total amount of the surety bond, which are paid to the Surety Broker, who in turn pays the Sureties.  The total amount paid in annual premiums and payments associated with all of the surety bonds is approximately $161,000.  The Debtors do not believe that any amounts are currently due on account of the Prepetition Bonding Obligations.

122.    Alliant serves as the Debtors' Surety Broker and manages the Debtors' relationships with the Sureties.  Among other things, the Surety Broker assists the Debtors in selecting the appropriate Sureties (subject to the Debtors' approval) and represents the Debtors in negotiations with the Sureties.  The Surety Broker has allowed the Debtors to obtain the bonding coverage necessary to operate their businesses in a reasonable and prudent manner, and to realize savings in the procurement of such policies.  The Surety Broker's Fees are included in the premium payments the Debtors make under the Bonding Program.  As noted above, in 2019, the Debtors paid approximately $740,000 in the aggregate to the Surety Broker and Insurance Brokers on account of Broker's Fees in connection with the Bonding Program and Insurance Policies.

123.    I believe that, to continue their business operations, the Debtors must be able to provide financial assurances to federal and state governments, regulatory agencies, and other third parties.  This, in turn, requires the Debtors to maintain access to the existing Bonding Program,

including by paying the Bonding Obligations as they come due, maintaining required letters of credit, and paying any indemnity obligations that may arise in connection with the Bonding Program in the ordinary course of business, as well as renewing or potentially acquiring additional bonding capacity as needed in the ordinary course of their businesses, requesting releases from obsolete bonding obligations, and executing other agreements in connection with the Bonding Program.

124.    The Debtors, therefore, request that they be authorized to participate in the Bonding Program in the same manner as they did prepetition and to: (i) pay any Prepetition Bonding Obligations; (ii) continue to make all payments for Postpetition Bonding Obligations; and (iii) revise, extend, supplement, or change the Bonding Program as needed, including through the issuance of new surety bonds.

### (v)    Tax Motion[19]

125.    By the Tax Motion the Debtors request authority to pay prepetition Taxes and Fees. Prior to the Petition Date, the Debtors incurred obligations related to the Taxes and Fees, which include:

- **Franchise and Business Taxes**.  The Debtors are required to pay various taxes, including the CAT, in order to conduct business in the ordinary course.

- **Income Taxes**.  In the ordinary course of operating their businesses, the Debtors incur international and federal income taxes.  I believe that the Debtors are current with respect to payment of income taxes, but out of an abundance of caution seek authority to pay any prepetition income taxes.

- **Property Taxes**.  State and local laws in the jurisdictions where the Debtors operate generally grant Taxing Authorities the power to levy property taxes against the Debtors' real and personal property.  To avoid

---

[19]    "**_Tax Motion_**" means the _Debtors' Emergency Motion for Entry of an Order Authorizing Payment of Prepetition Taxes and Fees_, filed concurrently herewith.  Capitalized terms used, but not otherwise defined, in this section shall have the respective meanings ascribed to them in the Tax Motion.

US-DOCS\114694751.32

the imposition of statutory liens on their real and personal property, the Debtors typically pay property taxes in the ordinary course of business.

- **Sales and Use Taxes**.  The Debtors incur, collect, and remit sales taxes to the Taxing Authorities in connection with the sale and use of certain goods and services.  Accordingly, the Debtors seek authority to pay and remit any such prepetition sales and use taxes to the relevant Taxing Authorities.

- **Government Regulatory Taxes/Licensing Fees**.  The Debtors incur various taxes and obligations related to regulatory fees and the granting of licenses that are required to conduct business in the ordinary course.

126.    Although, as of the Petition Date, the Debtors are substantially current in the payment of assessed and undisputed Taxes and Fees, certain Taxes and Fees attributable to the prepetition period may not yet have become due and owing or may be or become subject to audit by the applicable Taxing Authority.  The Debtors' estimate of Taxes and Fees accrued prior to the Petition Date is as follows:

| Category | Estimated Amount |
|---|---|
| Franchise and Business Taxes | $320,000 |
| Income Taxes | $0 |
| Property Taxes | $3,000,000 |
| Sales and Use Taxes | $660,000 |
| Government Regulatory Taxes/Licensing Fees | $0 |

127.    By paying the Taxes and Fees in the ordinary course of business, as and when due, I believe that the Debtors will avoid unnecessary disputes with the Taxing Authorities—and expenditures of time and money resulting from such disputes—over myriad issues that are typically raised by the Taxing Authorities as they attempt to enforce their rights to collect Taxes and Fees.  Moreover, certain of the Taxes and Fees may be considered to be obligations as to which the Debtors' officers and directors may be held directly or personally liable in the event of nonpayment.  I believe that these collection efforts by the Taxing Authorities would create obvious distractions for the Debtors and their officers and directors in their efforts to bring the Chapter 11 Cases to a successful conclusion.

US-DOCS\114694751.32

**(vi)    Utilities Motion[20]**

128.    By the Utilities Motion, the Debtors request entry of an order approving procedures that would provide adequate assurance of payment to the Utility Companies under section 366 of the Bankruptcy Code, while allowing the Debtors to avoid the threat of imminent termination of the Utility Services.

129.    As of the Petition Date, approximately 50 Utility Companies provide Utility Services to the Debtors at various locations.   The Utility Companies service the Debtors' operations and facilities related to the Debtors' mining, processing, and distribution of high-quality silica sand.   The success and smooth operation of the Debtors' businesses depend on the reliable delivery of electricity, fuel, and the other Utility Services.   The Debtors require the Utility Services to operate their businesses, run their mines and plants, and maintain and service the equipment the Debtors use to service their customers.   I am not currently aware of any past due amounts owed to any of the Utility Companies.   Based on the timing of the filings in relation to the Utility Companies' billing cycles, however, there may be outstanding invoices reflecting prepetition utility costs that have been incurred by the Debtors but for which payment is not yet due, as well as prepetition utility costs for services provided since the end of the last billing cycle that have not yet been invoiced.

130.    I understand that the Debtors intend to pay any postpetition obligations owed to the Utility Companies in a timely manner.   Nevertheless, to provide adequate assurance of payment for future services to the Utility Companies, the Debtors will deposit $463,000, which is an amount

---

[20]       "**Utilities Motion**" means the *Debtors' Emergency Motion for Entry of Order (I) Prohibiting Utility Companies from Altering or Disconnecting Service on Account of Prepetition Invoices, (II) Approving Deposit as Adequate Assurance of Payment, and (III) Establishing Procedures for Resolving Requests by Utility Companies for Additional Assurance of Payment*, filed concurrently herewith.   Capitalized terms used, but not otherwise defined, in this section shall have the respective meanings ascribed to them in the Utilities Motion.

US-DOCS\114694751.32

equal to approximately fifty percent of the estimated monthly cost of the Utility Services, into a segregated, non-interest-bearing account, within twenty days of the Petition Date (the "**Adequate Assurance Deposit**").  As to each Utility Company, the amount of the Adequate Assurance Deposit will be equal to the lesser of (A)(i) fifty percent of the Debtors' estimated monthly cost of Utility Services, calculated based on the Debtors' average expenses for such Utility Services during the twelve full months preceding the Petition Date, minus (ii) the amount of any bond or deposit held by such Utility Company, plus (iii) the amount owed to such Utility Company for prepetition Utility Services, whether or not such amount has been billed; and (B) fifty percent of the Debtors' estimated monthly cost of Utility Services, calculated based on the Debtors' average expenses for such Utility Services during the twelve full months preceding the Petition Date.[21] The Adequate Assurance Deposit will be maintained during the Chapter 11 Cases, which may be adjusted and/or reduced by the Debtors to account for any of the following: (i) to the extent that the Adequate Assurance Deposit includes any amount on account of a company that the Debtors subsequently determine is not a "utility" within the meaning of section 366 of the Bankruptcy Code, (ii) an adjustment or payment made in accordance with the Delinquency Notice Procedures described in the Utilities Motion, (iii) the termination of a Utility Service by a Debtor regardless of any Additional Adequate Assurance Request, (iv) the closure of a utility account with a Utility Company for which funds have been contributed for the Adequate Assurance Deposit, or (v) any other arrangements with respect to adequate assurance of payment reached by a Debtor with individual Utility Companies; *provided*, that, (a) with respect to a company that the Debtors subsequently determine is not a "utility" within the meaning of section 366 of the Bankruptcy

---

[21]     As of the Petition Date, one Utility Company, Constellation Energy Services, Inc. ("**Constellation**") held a deposit in the amount of $125,000 and was owed approximately $52,710 by the Debtors.  During the twelve months prior to the Petition Date, the Debtor paid Constellation an average of $252,864 per month.  Accordingly, the Adequate Assurance Deposit for Constellation is $54,142, calculated as ($252,862/2)-$125,000+$52,710.

US-DOCS\114694751.32

Code, the Debtors may adjust and/or amend the balance of the Adequate Assurance Deposit upon fourteen days' advance notice to such company; or, (b) with respect to the Debtors' termination of a Utility Service or closure of a utility account with a Utility Company, the Debtors may adjust and/or amend the balance of the Adequate Assurance Deposit upon reconciliation and payment by the Debtors of such Utility Company's final invoice in accordance with applicable nonbankruptcy law, to the extent that there are no outstanding disputes related to postpetition payments due.

131.    I also understand that the Utilities Motion outlines and seeks this Court's approval of certain Additional Adequate Assurance Procedures in the event that any Utility Company requests additional adequate assurance of payment.  I believe that the Additional Adequate Assurance Procedures are necessary and appropriate to implement an orderly process to determine any challenges to the adequacy of the Debtors' adequate assurance of payment to the Utility Companies.

**(vii)    Customer Programs Motion[22]**

132.    By the Customer Programs Motion, the Debtors request entry of an order authorizing the Debtors, in their discretion, to continue, enforce, renew, replace, implement new and/or terminate their Customer Programs (as defined below) and any other customer practices as the Debtors deem appropriate, without further application to the Court.

133.    Before the Petition Date and in the ordinary course of their businesses, the Debtors entered into certain supply contracts and established various programs with certain customers, including the Prepayment Program, the Volume Discount Program, Minimum Purchase

---

[22]    "**Customer Programs Motion**" means the *Debtors' Emergency Motion for Entry of Order (I) Authorizing the Debtors to Continue their Customer Programs and (II) Granting Related Relief*, filed concurrently herewith.. Capitalized terms used, but not otherwise defined, in this section shall have the respective meanings ascribed to them in the Customer Programs Motion.

Agreements, and Credits  (collectively, the "**Customer Programs**"), each of which is described in more detail below and in the Customer Programs Motion.

134.   *The Prepayment Program*.  I understand that the Debtors have certain customers who have entered into agreements to prepay for silica sand or equipment in return for committed access to sand supply and discounted pricing.  I believe that the Prepayment Program accelerates the receipt of payment, improves the Debtors' cash flow and working capital positions and frees up resources for the Debtors to utilize in other parts of their businesses and reduces counterparty payment risk and increases the Debtors' sales.  I believe that without the Prepayment Program, the Debtors risk losing business and customers to competitors.  I understand that, according to the Debtors' most recent public financials as of March 31, 2020, total liability for the future deliveries of frac sand and silo equipment under the Prepayment Program is recorded at approximately $18 million and the Debtors expect to recognize these deliveries over the next two and a half years, subject to customary and contractual adjustments in the ordinary course.

135.   *The Volume Discount Program.*  The Debtors also have pre-negotiated contractual agreements with select customers whereby they provide such customers with discounts on silica sand and related equipment and services from current market spot rates based on the volume purchased.  I believe that the Volume Discount Program incentivizes customers to purchase additional goods from the Debtors, engenders customer loyalty, and allows the Debtors to develop and maintain a broad customer base.

136.   *The Minimum Purchase Agreements.*  I also understand that, in the ordinary course of business, the Debtors enter into minimum purchase agreements with certain customers that require the customer to either order a minimum amount of product over a set time period from the Debtors or otherwise pay for the shortfall.  As with the Prepayment Program and the Volume

Discount Program, I believe that the Minimum Purchase Agreements provide an additional mechanism to reward loyal customers, promote brand loyalty, and strengthen the Debtors' businesses.

137.     *Credits.*  In the ordinary course of business, the Debtors also provide credits to certain of their customers, frequently in the form of discounts off of future invoices or as otherwise negotiated.  I understand that the Debtors offer the Credits either as a vehicle to enhance the Debtors' customer service to existing key customers or as an incentive to new customers.

138.     I believe that the continuance of the Customer Programs or the implementation of new customer practices in the ordinary course of the Debtors' businesses as the Debtors' deem necessary is in the best interests of the Debtors and all parties in interest.  I also believe that the relief requested in the Customer Programs Motion represents a sound exercise of the Debtors' business judgment and is necessary to avoid immediate and irreparable harm.  Accordingly, I believe that the relief requested in the Customer Programs Motion should be granted.

### (viii)   Lienholders Motion[23]

139.     By the Lienholders Motion, the Debtors seek entry of an order, (i) authorizing, but not directing, the Debtors to pay certain prepetition claims held by Shippers, Lien Claimants, and Royalty Interest Owners; (ii) confirming the administrative expense priority status of Outstanding Orders and authorizing, but not directing, the Debtors to pay prepetition amounts related to the Outstanding Orders; (iii) authorizing financial institutions to honor and process related checks and transfers; and (iv) granting certain related relief.

---

[23]     "**Lienholders Motion**" means the *Debtors' Emergency Motion for Entry of Order (I) Authorizing Debtors to Pay Certain Prepetition Claims of Shippers, Lien Claimants, and Royalty Interest Owners, (II) Confirming Administrative Expense Priority of Undisputed and Outstanding Prepetition Orders, and (III) Granting Related Relief,* filed concurrently herewith.  Capitalized terms used, but not otherwise defined, in this section shall have the respective meanings ascribed to them in the Lienholders Motion.

140.     An estimate of the prepetition claims is set forth below:

|  | Claim Amount |
|---|---|
| **Shipping Claims** | $10,950,000 |
| **Lien Claims** | $18,490,000 |
| **Royalty Payments** | $1,080,000 |

141.     In operating their silica sand business, the Debtors rely on their network of Transporters to transport, ship, and deliver silica sand and other goods and products between the Debtors' mines, plants, and distribution terminals, or from the Debtors to their customers.  In addition, I understand that, in connection with the transport of their goods, the Debtors often temporarily store silica sand with third party Warehouses (together with the Transporters, the "**Shippers**").  Many of the Shippers currently hold prepetition Shipping Claims.

142.     I have been made aware that, if the Debtors fail to pay the Shippers in a timely manner, the Shippers may seek to assert liens against the silica sand or other goods in their possession, which could potentially block the Debtors' access to the goods that are in transport. I believe that, if this occurs, the Debtors' ability to operate their businesses would be severely disrupted.

143.     In addition to the Shippers, the Debtors routinely transact business with a number of third party service providers or contractors (collectively, the "**Lien Claimants**") who, I have been informed, may be permitted to assert statutory or possessory liens against the Debtors' equipment, sand, and other property if the Debtors fail to pay for those parties' various services. If the Debtors become delinquent in their payments for such services rendered, I have been informed that the Lien Claimants may assert liens, including mining liens, mechanic's liens, artisan's liens, materialman's liens, possessory liens, and other similar Lien Claims.

144.     I believe that, if the Debtors are unable to satisfy the Lien Claims, such parties may refuse to provide services to the Debtors or assert liens against the Debtors' property.  I believe that such an outcome would be detrimental to the Debtors' business, their estates, and all parties in interest.

145.     As part of their silica sand business, the Debtors also enter into royalty lease agreements. I understand that such agreements generally consist of an interest in silica sand in place on a parcel of property and the exclusive right to explore, mine, produce and otherwise capture silica sand from the land.  Through a written agreement, owners of the silica sand interests ("**Royalty Interest Owners**") may lease or otherwise convey the exclusive right to capture silica sand to a third party in exchange for either a share of production or payments in lieu of a share of production.  The nature of the interest retained by the Royalty Interest Owners (the "**Royalty Interests**") represents a share of the revenue derived from the sale of such silica sand, subject to the terms of the applicable agreement.  Pursuant to agreements with Royalty Interest Owners, the Debtors periodically make Royalty Payments at a monthly rate or based upon the volume of silica sand mined, or a minimum annual payment if certain volumes of sand are not mined by the Debtors.  The Debtors are party to approximately 31 royalty lease agreements with Royalty Interest Owners.  I believe that failure to pay prepetition obligations owed to the Royalty Interest Owners would be detrimental to the Debtors and their stakeholders.

146.     Prior to the Petition Date, I understand that the Debtors placed various orders for goods that will not be delivered until on or after the Petition Date (collectively, the "**Outstanding Orders**").  I believe that the suppliers of these goods may be concerned that because the Debtors' obligations under the Outstanding Orders arose prior to the Petition Date, such obligations will be treated as general unsecured claims in the Chapter 11 Cases.  I believe that, in order to prevent

60

disruption to the Debtors' operations, the Court should confirm that claims arising from Outstanding Orders are entitled to administrative priority and may be paid in the ordinary course of business.

147.    For the aforementioned reasons, I believe it is in the best interests of the Debtors, their estates, and all parties in interest that the court grant the relief requested in the Lienholders Motion.

**(ix)    Critical Vendors Motion[24]**

148.    By the Critical Vendors Motion, the Debtors seek entry of an order (i) authorizing, but not directing, the Debtors to pay the prepetition Critical Vendor Claims owing to the Critical Vendors; (ii) authorizing, but not directing, the Debtors to pay the 503(b)(9) Claims owing to the 503(b)(9) Claimants; (iii) authorizing the Debtors' banks and financial institutions to receive, process, honor, pay, and, if necessary, reissue all prepetition and postpetition checks and fund transfers, including prepetition checks and electronic payment and transfer requests that the Debtors reissue or re-request postpetition, on account of obligations owed to the Critical Vendors and 503(b)(9) Claimants; and (iv) authorizing the banks and financial institutions to rely on the representations of the Debtors as to which checks and fund transfers should be honored and paid in respect of such obligations, provided that sufficient funds are on deposit in the applicable accounts to cover such payments.

149.    The Debtors believe that, as of the Petition Date, they owe approximately $182,000 on account of the Critical Vendors Claims and approximately $494,000 on account of the 503(b)(9)

---

[24]    "**Critical Vendors Motion**" means the *Debtors' Emergency Motion for Entry of Order (I) Authorizing Payment of (A) Prepetition Claims of the Critical Vendors and (B) 503(B)(9) Claims; (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers; and (III) Granting Related Relief*, filed concurrently herewith.  Capitalized terms used, but not otherwise defined, in this section shall have the respective meanings ascribed to them in the Critical Vendors Motion.

Claims.  I believe that payment of the Critical Vendor Claims and 503(b)(9) Claims is necessary to protect the Debtors' assets and operations and preserve value for the Debtors' estates and creditors.

150.    I believe that payment of the Critical Vendor Claims as requested in the Critical Vendors Motion is necessary due to the critical nature of the goods and services provided by the Critical Vendors.  The Critical Vendors are comprised of vendors that are either Software Vendors, Support Vendors, or Temp Agencies.  The Software Vendors provide software that, I believe, is vital to the company's back-end functions, including accounting, operations, personnel, and many other key functions that are critical to the management of the Debtors' day-to-day business operations.  The Software Vendors also supply certain specialized tracking software that allows the Debtors to accurately manage their supply chain, including tracking sand throughout the shipping process from mining through delivery.  The Support Vendors provide integral services with respect to public company reporting, investor relations, and registered agent services for the Debtors' various entities.  I believe that the Support Vendors services are essential for the Debtors to maintain their corporate and reporting requirements during the pendency of the Debtors' Chapter 11 Cases.  The Temp Agencies provide staffing that, I believe, is essential to the Debtors and are frequently used to supplement the Debtors' workforce by providing low-cost assistance on crucial, short-term projects that otherwise do not require the hiring of full-time employees but are essential to the Debtors' on-going operations.  I believe that the Temp Agencies allow the Debtors to maintain workforce flexibility, supplement the skills of their workforce, and effectively manage costs related to employee wages and benefits.

151.    I understand that the Critical Vendors provide specialized software and skilled employees that only a handful of vendors that are reasonably accessible to the Debtors have the

means or skillset to provide.  If these existing Critical Vendors were to stop doing business with the Debtors, I believe that it would be difficult for the Debtors to locate acceptable alternative vendors and suppliers.  As a result, I believe that any inability to continue receiving goods or services from these specific vendors would greatly disrupt the Debtors' businesses.

152.    I also believe that the Debtors used stringent criteria to determine which of the Debtors' vendors and services providers should be designated as Critical Vendors and that such criteria will result in designating only those vendors and service providers that are truly critical to the Debtors' estates as Critical Vendors.

153.    Further, I understand that the Debtors will attempt to condition the payment of Critical Vendor Claims on the agreement of individual Critical Vendors to continue supplying goods or services to the Debtors on Customary Trade Terms.  I believe that such condition will enable the Debtors to realize their chapter 11 objectives and that such Trade Agreements (as defined in the Critical Vendors Motion) are advisable.  I also believe that it is prudent to authorize the Debtors to make payments on account of Critical Vendor Claims in the absence of a Trade Agreement if the Debtors determine, in their business judgment, that the failure to pay such Critical Vendor Claims will result in harm to the Debtors' businesses.

154.    Additionally, I understand that, in the ordinary course of business, the Debtors have received certain materials or other goods from the 503(b)(9) Claimants within the 20 days prior to the Petition Date, which, I have been informed, are entitled to priority under section 503 of the Bankruptcy Code.  I believe that, the 503(b)(9) Claimants may refuse to supply new orders without payment of its prepetition claims, to the detriment of the Debtors' operations.

155.    For the reasons set forth above, I believe that granting the relief requested in the Critical Vendors Motion is in the best interests of the Debtors, their estates, and all stakeholders.

(x)     **Equity Trading Motion**[25]

156.    By the Equity Trading Motion, the Debtors seek entry of interim and final orders authorizing the Debtors to establish Stock Procedures to protect the potential value of NOLs, NUBILs, and other Tax Attributes of one or more of the Debtors for U.S. federal income tax purposes in connection with the reorganization of the Debtors.

157.    One or more of the Debtors possess significant Tax Attributes, including, as of the Petition Date, estimated federal NOLs of approximately $160 million and an indeterminate amount of NUBIL.  The Tax Attributes are valuable assets.  The Debtors do not believe that Hi-Crush Inc. has undergone an "ownership change" within the meaning of section 382 of the Tax Code (an "**Ownership Change**") for 3 years prior to the Petition Date.  Accordingly, the Debtors believe that they have significant Tax Attributes that would be severely impaired by the occurrence of an Ownership Change during the pendency of the Chapter 11 Cases.  Therefore, it is in the best interests of the Debtors and their stakeholders to restrict acquisitions of Hi-Crush Stock that could result in an Ownership Change occurring before the effective date of a chapter 11 plan or any applicable bankruptcy court order.  Such restriction would protect the Debtors' ability to use the Tax Attributes during the pendency of the Chapter 11 Cases or, potentially, in the event of a future transaction, to offset gain or other income recognized in connection with the Debtors' sale or ownership of their assets, which may be significant in amount.

a.     The Proposed Procedures Relating to Hi-Crush Stock

158.    By establishing Stock Procedures for monitoring the ownership and acquisitions of Hi-Crush Stock, the Debtors can preserve their ability to seek the necessary relief if it appears that

---

[25]     "**Equity Trading Motion**" means the *Debtors' Emergency Motion for Entry of Interim and Final Orders Establishing Notification Procedures and Approving Restrictions on Certain Transfers of Stock of Debtors*, filed concurrently herewith.  Capitalized terms used, but not otherwise defined, in this section shall have the respective meanings ascribed to them in the Equity Trading Motion.

any such acquisition(s) may impair the Debtors' ability to use their Tax Attributes. Therefore, the Debtors propose the following Stock Procedures:

- Notice of Substantial Stock Ownership. Any Person (as such term is defined in Exhibit 1 to the proposed Interim Order and proposed Final Order) that Beneficially owns (as such term is defined in Exhibit 1 to the proposed Interim Order and proposed Final Order), at any time on or after the Petition Date, at least 4.75 million shares of Hi-Crush Stock (representing approximately 4.75% of all issued and outstanding shares of Hi-Crush Stock) (a "**Substantial Stockholder**") shall file with this Court and serve a Substantial Stock Ownership Notice, which describes specifically and in detail such Person's ownership of Hi-Crush Stock, on or before the date that is five calendar days after the later of (x) the date the order granting the requested relief is entered or (y) the date such Person qualifies as a Substantial Stockholder.

- Acquisition of Hi-Crush Stock. At least twenty calendar days prior to the proposed date of any transfer of Hi-Crush Stock or exercise of any Option to acquire Hi-Crush Stock that would result in an increase in the amount of Hi-Crush Stock beneficially owned by any Person that currently is or, as a result of the proposed transaction, would be a Substantial Stockholder (a "**Proposed Stock Acquisition Transaction**"), such Person or Substantial Stockholder (a "**Proposed Stock Transferee**") shall file with this Court and serve a Stock Acquisition Notice, which describes specifically and in detail the Proposed Stock Acquisition Transaction.

- Disposition of Hi-Crush Stock. At least twenty calendar days prior to the proposed date of any transfer of Hi-Crush Stock that would result in a decrease in the amount

65

of Hi-Crush Stock beneficially owned by any Person that prior to such transfer is a Substantial Stockholder (a "**Proposed Stock Transfer**"), such Person or Substantial Stockholder (a "**Proposed Stock Transferor**") shall file with this Court and serve a Stock Transfer Notice, which describes specifically and in detail the Proposed Stock Transfer.

- <u>Objection Procedures</u>.  The Debtors, counsel to the Ad Hoc Group, and any Official Committee shall have an Objection Period of seventeen calendar days after the receipt of a Stock Acquisition Notice or a Stock Transfer Notice to file with this Court and serve on a Proposed Stock Transferee or Proposed Stock Transferor, as applicable, an Objection to any Proposed Stock Acquisition Transaction described in such Stock Acquisition Notice or any Proposed Stock Transfer described in such Stock Transfer Notice.  If the Debtors, counsel to the Ad Hoc Group or any Official Committee files an Objection by the Objection Deadline, then the applicable Proposed Stock Acquisition Transaction or Proposed Stock Transfer shall not be effective unless approved by a final and nonappealable order of this Court or such Objection is withdrawn.  If none of the Debtors, counsel to the Ad Hoc Group, or any Official Committee file an Objection by the Objection Deadline, or if the Debtors, counsel to the Ad Hoc Group, and any and all Official Committees provide written authorization to the Proposed Stock Transferee or the Proposed Stock Transferor, as applicable, approving the Proposed Stock Acquisition Transaction or Proposed Stock Transfer, then such Proposed Stock Acquisition Transaction or Proposed Stock Transfer may proceed solely as specifically described in the relevant Stock Acquisition Notice or Stock Transfer Notice, as applicable.  Any

further or alternative Proposed Stock Acquisition Transaction or Proposed Stock Transfer must be the subject of an additional Stock Acquisition Notice or Stock Transfer Notice, as applicable, and Objection Period.

159.    Due to the importance of the Debtors' Tax Attributes to the value of the estate, I believe that the relief requested in the Equity Trading Motion should be granted.

## C.    CONCLUSION

160.    The Debtors' ultimate goal in the Chapter 11 Cases is the maximization of estate value through a plan process contemplating a conversion of the Prepetition Credit Facility to equity in the reorganized Debtors.  In the near term, however, to minimize any loss of value of their businesses during the Chapter 11 Cases, the Debtors' immediate objective is to maintain a business-as-usual atmosphere during the early stages of the Chapter 11 Cases, with as little interruption or disruption to the Debtors' operations as possible.  I believe that if the Court grants the relief requested in each of the First Day Pleadings, the prospect for achieving these objectives and confirmation of a Chapter 11 plan will be substantially enhanced.

161.    I hereby certify that the foregoing statements are true and correct to the best of my knowledge, information and belief, and respectfully request that all of the relief requested in the First Day Pleadings be granted, together with such other and further relief as is just.

US-DOCS\114694751.32

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 12th day of July 2020.

/s/ J. Philip McCormick, Jr.

J. Philip McCormick, Jr.
Chief Financial Officer

Signature Page to Declaration

**Exhibit A**

**Organizational Chart**



**Exhibit B**

**Restructuring Support Agreement**

*Execution Version*

**THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER, NOR A SOLICITATION FOR AN OFFER, WITH RESPECT TO ANY SECURITIES, NOR IS IT A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND PROVISIONS OF THE BANKRUPTCY CODE.**

**THIS RESTRUCTURING SUPPORT AGREEMENT IS A PART OF A COMPREHENSIVE COMPROMISE AND SETTLEMENT, EACH ELEMENT OF WHICH IS CONSIDERATION FOR THE OTHER ELEMENTS AND AN INTEGRAL ASPECT OF THE RESTRUCTURING. THIS RESTRUCTURING SUPPORT AGREEMENT IS CONFIDENTIAL AND SUBJECT TO FEDERAL RULE OF EVIDENCE 408. NOTHING IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION OR A WAIVER, AND EACH STATEMENT CONTAINED HEREIN IS MADE WITHOUT PREJUDICE SOLELY FOR SETTLEMENT PURPOSES, WITH A FULL RESERVATION AS TO ALL RIGHTS, REMEDIES, CLAIMS OR DEFENSES OF THE PARTIES.**

**THE TRANSACTIONS DESCRIBED HEREIN WILL BE SUBJECT TO THE NEGOTIATION AND COMPLETION OF DEFINITIVE DOCUMENTATION INCORPORATING THE TERMS SET FORTH HEREIN, AND THE CLOSING OF ANY TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH AGREED DEFINITIVE DOCUMENTATION.**

---

**HI-CRUSH, INC., ET AL.**

**RESTRUCTURING SUPPORT AGREEMENT**

**July 12, 2020**

---

This RESTRUCTURING SUPPORT AGREEMENT (together with the exhibits and schedules attached hereto, as each may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof, this "Agreement"), dated as of July 12, 2020, is entered into by and among: (i) Hi-Crush Inc. ("Holdco") and its undersigned subsidiaries (collectively with Holdco, the "HCR Entities" and each an "HCR Entity"); and (ii) the undersigned holders (the "Consenting Noteholders") of the 9.500% senior notes (the "Senior Notes") issued by Holdco pursuant to that certain Indenture, dated as of August 1, 2018, by and among Holdco, as issuer, the guarantors party thereto, and U.S. Bank National Association, as trustee (in such capacity, together with any successor transferee, the "Notes Trustee") (as amended, restated, supplemented or otherwise modified, the "Indenture" and, together with all ancillary documents related thereto, the "Senior Notes Documents"), and any holder of Senior Notes that may become in accordance with Section 13 hereof. This Agreement collectively refers to the HCR Entities and the Consenting Noteholders as the "Parties" and each individually as a "Party."

## RECITALS

WHEREAS, the Parties have engaged in good faith, arm's-length negotiations regarding certain restructuring transactions (the "Restructuring Transactions") pursuant to the terms and conditions set forth in this Agreement that is consistent with the terms and conditions of the term sheet attached hereto as **Exhibit A** (the "Restructuring Term Sheet")[1];

WHEREAS, it is anticipated that the Restructuring Transactions will be implemented through a prearranged plan of reorganization (as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with its terms and this Agreement, the "Plan") to be consummated in jointly administered voluntary cases commenced by the HCR Entities (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the, "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"), pursuant to the Plan, which will be filed by the HCR Entities in the Chapter 11 Cases;

WHEREAS, certain of the HCR Entities' current lenders (the "Existing Lenders", and in such capacities, the "DIP ABL Lenders") and JPMorgan Chase Bank, N.A., as administrative agent (the "Existing Agent", and in such capacity, the "DIP ABL Agent") under that certain Credit Agreement, dated as of August 1, 2018 (as amended, restated, supplemented or otherwise modified from time to time, the "Existing Credit Agreement" and, together with the collateral and ancillary documents related thereto the "Existing Credit Documents") by and among Holdco, as borrower, the guarantors party thereto, the Existing Lenders, and the Existing Agent, have committed to provide a debtor-in-possession superpriority senior secured asset-based revolving loan financing facility (the "DIP ABL Facility") and otherwise extend credit to the HCR Entities during the pendency of the Chapter 11 Cases pursuant to a credit agreement substantially in the form attached as Exhibit 1 to the Restructuring Term Sheet (the "DIP ABL Agreement") and otherwise pursuant to the DIP Orders (as defined herein) and the applicable Definitive Documentation;

WHEREAS, certain Consenting Noteholders or affiliates thereof (in their capacities as such, the "DIP Term Loan Lenders") have committed to provide a debtor-in-possession superpriority secured delayed-draw term loan financing facility (the "DIP Term Loan Facility") and otherwise extend credit to the HCR Entities during the pendency of the Chapter 11 Cases pursuant to a credit agreement substantially in the form attached as Exhibit 2 to the Restructuring Term Sheet (the "DIP TL Credit Agreement" and together with the DIP ABL Agreement, the "DIP Agreements") and otherwise pursuant to the DIP Orders and the applicable Definitive Documentation (as defined herein);

WHEREAS, the DIP ABL Lenders and DIP ABL Agent have committed to refinance the DIP ABL Facility and the obligations thereunder, including any issued and outstanding letters of credit, and to provide post-emergence working capital liquidity to the HCR Entities through a new senior secured asset-based revolving loan facility (including the letter of credit sub-limit,

---

[1]   Unless otherwise noted, capitalized terms used but not immediately defined have the meanings given to such terms elsewhere in this Agreement or in the Restructuring Term Sheet (including any exhibits thereto), as applicable.

2

the "Exit ABL Facility") on terms consistent with the Restructuring Term Sheet and otherwise pursuant to the applicable Definitive Documentation, and such exit financing will be consummated in conjunction with the Plan; and

WHEREAS, certain Consenting Noteholders or affiliates thereof (in their capacities as such, the "Backstop Parties") have committed to backstop the Rights Offering for the New Secured Convertible Notes on terms consistent with the Restructuring Term Sheet and the term sheet attached as Exhibit 3 to the Restructuring Term Sheet (the "New Secured Notes Term Sheet") and otherwise pursuant to the applicable Definitive Documentation, and such Rights Offering will be consummated in conjunction with the Plan, with the proceeds of such Rights Offering to be used to satisfy in full the DIP TL Obligations and to provide liquidity to the Reorganized Debtors.

NOW, THEREFORE, in consideration of the promises, mutual covenants, and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the Parties, intending to be legally bound, hereby agrees as follows:

## AGREEMENT

1.　　RSA Effective Date.  This Agreement shall become effective, and the obligations contained herein shall become binding upon the Parties, upon the first date (such date, the "RSA Effective Date") that:

(a)　　this Agreement has been executed and delivered by all of the following:

(i)　　each HCR Entity; and

(ii)　　Consenting Noteholders holding, in aggregate, at least two-thirds in principal amount of all "claims" (as defined in section 101(5) of the Bankruptcy Code) outstanding under the Senior Notes Documents (the "Senior Notes Claims").

(b)　　the reasonable and documented fees and expenses of the Ad Hoc Group Advisors invoiced and outstanding as of the date hereof have been paid in full in cash.

2.　　Exhibits and Schedules Incorporated by Reference.  Each of the exhibits attached hereto, including the Restructuring Term Sheet, and any schedules to such exhibits (collectively, the "Exhibits and Schedules") are expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include the Exhibits and Schedules.  In the event of any inconsistency between this Agreement (excluding the Exhibits and Schedules) and the Exhibits and Schedules, the Exhibits and Schedules shall govern.  In the event of any inconsistency between the terms of this Agreement (including the Exhibits and Schedules) and the Plan, the terms of the Plan shall govern.

3.    <u>Definitive Documentation</u>.

(a)    The definitive documents and agreements governing the Restructuring Transactions (collectively, the "<u>Definitive Documentation</u>") shall include, without limitation:

(i)    this Agreement (as amended, modified, or otherwise supplemented);

(ii)    the Plan and any exhibit to the Plan or document contained in a supplement to the Plan that is not otherwise identified herein or in the Restructuring Term Sheet;

(iii)    the order confirming the Plan (the "<u>Confirmation Order</u>") and any motion or other pleadings related to the Plan, all exhibits thereto, or confirmation of the Plan;

(iv)    a disclosure statement and all exhibits thereto with respect to the Plan (the "<u>Disclosure Statement</u>") and the solicitation materials (including the Rights Offering Procedures) with respect to the Plan (the "<u>Solicitation Materials</u>");

(v)    the (A) motion by the Debtors seeking an order from the Bankruptcy Court (1) granting approval of the Solicitation Materials and the Disclosure Statement, (2) scheduling a hearing for confirmation of the Plan, and (3) approving the Rights Offering Procedures (such order, the "<u>Solicitation Order</u>"), and (B) Solicitation Order;

(vi)    the (A) interim order authorizing the use of cash collateral and approving the DIP ABL Facilities and DIP Term Loan Facility (together, the "<u>DIP Facilities</u>") on terms consistent with the Restructuring Term Sheet and the DIP Agreements (the "<u>Interim DIP Order</u>"), (B) the final order authorizing the use of cash collateral and approving the DIP Facilities on terms consistent with the Restructuring Term Sheet and the DIP Agreements (the "<u>Final DIP Order</u>" and together with the Interim DIP Order, the "<u>DIP Orders</u>"), and (C) any motions or other pleadings or documents to be filed in support of the entry of the DIP Orders;

(vii)    the DIP TL Credit Agreement to be entered into in accordance with the Restructuring Term Sheet and the DIP Orders, including any amendments, modifications, or supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, supplements, or modifications of any of the foregoing) related to or executed in connection therewith (collectively, the "<u>DIP TL Documents</u>");

(viii)   the DIP ABL Agreement to be entered into in accordance with the Restructuring Term Sheet and the DIP Orders, including any amendments, modifications, or supplements thereto, and together with any related notes, certificates, agreements, letters of credit, security agreements, documents, and instruments (including any amendments, supplements, or modifications of any of the foregoing) related to or executed in connection therewith (collectively, the "DIP ABL Documents" and together with the DIP TL Documents, the "DIP Documents");

(ix)     the credit agreement for the Exit ABL Facility (the "Exit ABL Credit Agreement") to be entered into in accordance with the Restructuring Term Sheet, including any amendments, modifications, or supplements thereto, and together with any related notes, certificates, agreements, letters of credit, security agreements, documents, and instruments (including any amendments, modifications, or supplements of any of the foregoing) related to or executed in connection therewith (collectively, the "Exit ABL Documents");

(x)      the terms, conditions, and procedures setting forth the method to conduct the Rights Offering (the "Rights Offering Procedures"), and any amendments, modifications, or supplements thereto, and together with any related agreements, documents, or instruments thereto;

(xi)     the (A) agreement setting forth (1) the identities of the Backstop Parties (including any third-parties other than Consenting Noteholders) for the Rights Offering and (2) the terms and conditions of the Rights Offering, the Backstop Commitments, and the payment of consideration to the Backstop Parties in exchange for such commitments (as amended, modified, or supplemented, the "Backstop Purchase Agreement"), together with any related agreements, documents, or instruments, and which shall be acceptable to the Consenting Noteholders comprising the Backstop Parties, (B) motion by the Debtors seeking authority from the Bankruptcy Court to enter into the Backstop Purchase Agreement and to satisfy their obligations to the Backstop Parties thereunder (including granting such obligations administrative expense priority status under sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code), together with any other pleadings or documents to be filed in support of such motion, and (C) order of the Bankruptcy Court approving such motion (the "Backstop Order", and together the documents referenced in clauses (A) and (B), the "Backstop Documents");

(xii) the definitive debt documents for the New Secured Convertible Notes, in accordance with the terms and conditions of the New Secured Notes Term Sheet, including any amendments, modifications, or supplements thereto, and together with any related indenture, notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, supplements, or modifications of any of the foregoing) related to or executed in connection therewith (the foregoing documents collectively, the "New Secured Convertible Notes Documents");

(xiii) the new stockholders agreement (which may include an amendment to the existing Holdco stockholder agreement), that shall set forth the rights and obligations of the holders of the common stock to be issued by Reorganized Holdco (the "New Common Stock"), and to which all such holders shall be bound or deemed bound (the "New Stockholders' Agreement"); and

(xiv) the forms of certificates of incorporation, certificates of formation, limited liability company agreements, partnership agreements, or other forms of organizational documents and bylaws for Reorganized Debtors (the "Amended Governance Documents").

(b) Except as set forth herein, the Definitive Documentation (and any modifications, restatements, supplements or amendments to any of them) will, after the RSA Effective Date, remain subject to negotiation and shall, upon completion, contain terms, conditions, representations, warranties, and covenants consistent in all material respects with the terms of this Agreement (including the Exhibits and Schedules) and be in form and substance reasonably satisfactory in all respects to each of: (i) the HCR Entities, and (ii) the Consenting Noteholders (A) who have agreed, as Backstop Parties, to provide Backstop Commitments to fund the Rights Offering under the Backstop Purchase Agreement, as indicated on their respective signature pages hereto, and (B) who represent at least two-thirds of such Backstop Commitments (the "Required Consenting Noteholders").

4.    Milestones.  The HCR Entities shall implement the Restructuring Transactions in accordance with the following milestones (the "Milestones"); provided that the HCR Entities may extend a Milestone only with the express prior written consent of the Required Consenting Noteholders:

(a) The HCR Entities shall commence the Chapter 11 Cases by filing voluntary petitions under chapter 11 of the Bankruptcy Code with the Bankruptcy Court no later than July 12, 2020 (the "Petition Date").

(b)    No later than the date that is five (5) days following the Petition Date, the Bankruptcy Court shall enter the Interim DIP Order approving the DIP Facilities on an interim basis, subject to compliance with <u>Section 3</u> hereof.

(c)    No later than the date that is fourteen (14) days following the Petition Date, the HCR Entities shall file the Plan, the Disclosure Statement, the related Solicitation Materials and the motion seeking entry of the Solicitation Order, which documents shall be subject to compliance with <u>Section 3</u> hereof.

(d)    No later than the date that is twenty-five (25) days following the Petition Date, the Bankruptcy Court shall enter the Final DIP Order approving the DIP Facilities on a final basis, each subject to compliance with <u>Section 3</u> hereof.

(e)    No later than the date that is forty-five (45) days following the Petition Date, the Bankruptcy Court shall enter (i) the Backstop Order approving the Backstop Purchase Agreement and other Backstop Documents, and (ii) the Solicitation Order approving the Solicitation Materials and Rights Offering Procedures, each subject to compliance with <u>Section 3</u> hereof.

(f)    No later than the date that is seventy-five (75) days following the Petition Date, the Bankruptcy Court shall enter the Confirmation Order, which order shall be subject to compliance with <u>Section 3</u> hereof.

(g)    No later than the date that is ninety (90) days following the Petition Date, the effective date of the Plan (the "<u>Effective Date</u>") shall occur.

5.    <u>Commitment of Consenting Noteholders</u>.  Each Consenting Noteholder shall (severally and not jointly and severally) from the RSA Effective Date until the occurrence of a Termination Date (as defined in <u>Section 11</u>):

(a)    support and cooperate with the HCR Entities and make commercially reasonable efforts to consummate the Restructuring Transactions in accordance with the Plan and the terms and conditions of this Agreement, the Restructuring Term Sheet, and the other Definitive Documentation (but without limiting the applicable consent and approval rights provided in this Agreement and the Definitive Documentation), by:  (i) voting all of its Claims and Interests, as applicable, now or hereafter owned by such Consenting Noteholder (or for which such Consenting Noteholder now or hereafter serves as the nominee, investment manager, or advisor for holders thereof) to accept the Plan; (ii) timely returning a duly-executed ballot in connection therewith; and (iii) not "opting out" of or objecting to any releases, indemnity and exculpation under the Plan (and to the extent required by the ballot, affirmatively "opting in" to such releases, indemnity and exculpation) (except such Consenting Noteholder shall no

longer be prohibited from "opting out" of, or required to "opt in" to, granting such a release, indemnity, or exculpation to any Party that has materially breached or terminated this Agreement);

(b) support and, as applicable, take all reasonable actions necessary to implement and consummate, the Rights Offering, including to the extent such Consenting Noteholder is a Backstop Party, the funding of any commitments under the Backstop Documents, in each case subject further to the terms and conditions of the Backstop Documents;

(c) not, directly or indirectly, seek, support, negotiate, engage in any discussions relating to, or solicit an Alternative Transaction (as defined below);

(d) not withdraw, amend, or revoke (or cause to be withdrawn, amended, or revoked) its tender, consent, or vote with respect to the Plan; *provided however*, that upon the occurrence of a Termination Date all tenders, consents, and votes tendered by the Consenting Noteholders shall be immediately revoked and deemed void *ab initio*, without any further notice to or action, order, or approval of the Bankruptcy Court;

(e) support, and not object to, or delay or impede, or take any other action to interfere, directly or indirectly, with the Restructuring Transactions;

(f) support, and not object to, or delay or impede, or take any other action to interfere, directly or indirectly, with the entry by the Bankruptcy Court of any of the DIP Orders, the Backstop Order, the Solicitation Order, or the Confirmation Order; and

(g) to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions, negotiate in good faith appropriate additional or alternative provisions to address any such impediment; *provided* that the economic outcome for the Parties, the anticipated timing of the closing and other material terms of this Agreement must be substantially preserved in any such alternate provisions.

Notwithstanding the foregoing, in the event that (i) the Bankruptcy Court does not approve the releases and exculpation as described in the Restructuring Term Sheet pursuant to the Plan and the Confirmation Order and (ii) this Agreement has not been terminated as of the date of entry of the Confirmation Order, then each Consenting Noteholder covenants and agrees to support and not object to the Reorganized Debtors providing such releases and exculpation (and, to the extent applicable, take reasonable steps to cause the Reorganized Debtors to provide such releases and exculpation) as promptly as reasonably possible after the occurrence of the date on which the Restructuring Transactions are substantially consummated in accordance with the terms and conditions of the Definitive Documentation (and each Consenting Noteholder covenants and agrees not to object to, delay, impede, or take any other action (including to

instruct or direct any other person or entity) to interfere with the prompt consummation thereof), which covenants and agreements shall survive the occurrence of the Termination Date.

Further, notwithstanding the foregoing, (i) nothing in this Agreement and neither a vote to accept the Plan by any Consenting Noteholder nor the acceptance of the Plan by any Consenting Noteholder shall (x) be construed to prohibit any Consenting Noteholder from contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement or the Definitive Documentation, or exercising any consent rights provided with respect to the Required Consenting Noteholders hereunder or its rights or remedies specifically reserved herein or in the Senior Notes Documents, the DIP TL Documents, or the Definitive Documentation; (y) be construed to prohibit or limit any Consenting Noteholder from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases, so long as, from the RSA Effective Date until the occurrence of a Termination Date, such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement, are not prohibited by this Agreement and are not for the purpose of hindering, delaying, or preventing the consummation of the Restructuring Transactions; or (z) limit the ability of a Consenting Noteholder to sell or enter into any transactions in connection with any Claims, Interests or any other claims against or interests in the HCR Entities, subject to Section 13 of this Agreement, and (ii) except as otherwise expressly provided in this Agreement, nothing in this Agreement shall require any Consenting Noteholder to incur any expenses, liabilities, or other obligations, or agree to any commitments, undertakings, concessions, indemnities, or other arrangements that would reasonably be expected to result in expenses, liabilities, or other obligations to any Consenting Noteholder.

6.   Commitment of the HCR Entities.

(a)   Subject to clause (c) of this Section 6, the HCR Entities shall, from the RSA Effective Date until the occurrence of a Termination Date:

(i)   (A) support and take all reasonable actions necessary to implement and consummate the Restructuring in as timely a manner as practicable under applicable law and on the terms and conditions contemplated by this Agreement, the Restructuring Term Sheet, and the Definitive Documentation, (B) not take any actions, directly or indirectly, inconsistent with this Agreement, the Restructuring Term Sheet, or the Definitive Documentation, and (C) negotiate in good faith, execute, perform its obligations under, and consummate the transactions contemplated by, the Definitive Documentation to which it is (or will be) a party;

(ii)   timely file a formal objection, in form and substance reasonably acceptable to the Required Consenting Noteholders, to any motion filed with the Bankruptcy Court by a third-party seeking the entry of an order (A) directing the appointment of a trustee or examiner with enlarged powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code with respect to any HCR Entity, any of their subsidiaries, or their respective properties,

(B) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (C) dismissing the Chapter 11 Cases, (D) modifying or terminating the HCR Entities' exclusive right to file or solicit acceptances of a plan of reorganization; (E) challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the DIP Term Loan Claims, DIP ABL Claims, or the Senior Notes Claims, as applicable, or asserting any other cause of action against or with respect or relating to such claims or any liens securing such claims (if applicable); or (F) that would hinder, impede, or delay the implementation of the Restructuring as contemplated by this Agreement;

(iii)    timely comply with all Milestones;

(iv)    to the extent that any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the transactions contemplated in this Agreement or the Plan, negotiate in good faith appropriate additional or alternative provisions to address any such impediment, in consultation with the Required Consenting Noteholders; provided, however, that the economic outcome for the Parties, the anticipated timing of confirmation and the effective date of the Plan, and other material terms as contemplated herein and in the Plan must be substantially preserved, as determined by the Required Consenting Noteholders, in their sole discretion;

(v)    not sell, or file any motion or application seeking to sell, any assets other than in the ordinary course of business without the prior written consent of the Required Consenting Noteholders (not to be unreasonably withheld or delayed);

(vi)    (A) not make or declare any dividends, distributions, or other payments on account of its equity and (B) ensure that Holdco does not make any transfers (whether by dividend, distribution, or otherwise) to any direct or indirect parent entity or shareholder of Holdco and that no other HCR Entity makes any transfers (whether by dividend, distribution, or otherwise) to any direct or indirect parent entity or shareholder of Holdco;

(vii)    maintain their good standing under the laws of the state or other jurisdiction in which they are incorporated or organized;

(viii)    promptly notify the Consenting Noteholders and Ad Hoc Group Advisors in writing of the commencement of any governmental or third party complaints, litigations, investigations, or hearings (or

10

communications indicating that the same may be contemplated or threatened);

(ix)    if the HCR Entities know of a breach by any Party of such Party's obligations, undertakings, representations, warranties, or covenants set forth in this Agreement, furnish prompt written notice (and in any event within two (2) business days of such actual knowledge) to the Consenting Noteholders and Ad Hoc Group Advisors;

(x)    consult with and provide to the Ad Hoc Group Advisors any proposed treatments, amendments, or modifications with respect to any Railcar Lease to which the Required Consenting Noteholders are entitled to consent per the terms of this Agreement and the Restructuring Term Sheet;

(xi)    not grant, agree to grant or make any payment on account of (including pursuant to a key employee retention plan, key employee incentive plan, or other similar agreement or arrangement) any additional or any increase in the wages, salary, bonus, commissions, retirement benefits, pension, severance or other compensation or benefits (including in the form of any vested or unvested Interests in Holdco or any other equity interest of any kind or nature) of any director, manager, officer, or management- or executive-level employee of any of the HCR Entities without the prior written consent of the Required Consenting Noteholders (not to be unreasonably withheld or delayed);

(xii)    not (a) enter into, adopt, or establish any new compensation or benefit plans or arrangements (including employment agreements and any retention, success, or other bonus plans), or (b) amend or terminate any existing compensation or benefit plans or arrangements (including employment agreements), except in the case of this clause (b) as required by Law or the terms of the benefit plan or arrangement, in each case, without the prior written consent of the Required Consenting Noteholders (not to be unreasonably withheld or delayed);

(xiii)    not incur or commit to incur any capital expenditures, other than capital expenditures that are contemplated by the DIP Budget;

(xiv)    pay in cash (A) prior to the Petition Date, all reasonable and documented fees and expenses accrued prior to the Petition Date for which invoices or receipts are furnished by the Ad Hoc Group Advisors, (B) after the Petition Date, subject to any applicable orders of the Bankruptcy Court but without the need to file fee or retention applications, all reasonable and documented fees and expenses incurred prior to (to the extent not previously paid) on

and after the Petition Date from time to time by the Ad Hoc Group Advisors, but in any event within five business days of delivery to the HCR Entities of any applicable invoice or receipt, and (C) on the Effective Date, reimbursement to the Ad Hoc Group Advisors for all reasonable and documented fees and expenses incurred and outstanding in connection with the Restructuring Transactions (including any estimated fees and expenses estimated to be incurred through the Effective Date pursuant to the terms and conditions of the Plan); and

(xv)    not terminate the applicable engagement agreements of, and not breach the reimbursement obligations owed to, the Ad Hoc Group Advisors.

(b)    The HCR Entities shall not, directly or indirectly, at any time prior to consummation of the Restructuring Transactions, solicit, encourage or initiate any offer or proposal from, or actively negotiate term sheets or other definitive documentation, or enter into any agreement (other than a confidentiality agreement permitted under this Section 6(b)) with, any person or entity concerning any actual or proposed transaction involving any or all of any dissolution, winding up, liquidation, reorganization (including a competing plan of reorganization or other financial and/or corporate restructuring of the HCR Entities), assignment for the benefit of creditors, transaction, merger, consolidation, tender offer, exchange offer, business combination, joint venture, partnership, sale of a material portion of assets, sale, issuance, or other disposition of any equity or debt interests, financing (debt (including any alternative debtor-in-possession financing other than under the DIP Facilities) or equity), or recapitalization or restructuring of any of the Debtors (including, for the avoidance of doubt, a transaction premised on a sale of a material portion of assets under section 363 of the Bankruptcy Code), other than the Restructuring Transactions (each, an "Alternative Transaction"); provided, however, that if any of the HCR Entities receives a proposal or expression of interest regarding any Alternative Transaction from the RSA Effective Date until the occurrence of a Termination Date, the HCR Entities shall, (A) within twenty-four (24) hours, (i) notify counsel to the other Parties of any proposals for, or expressions of interest in, an Alternative Transaction, with such notice to include the material terms thereof, including the identity of the person or group of persons involved, and (ii) furnish counsel to the other Parties with copies of any written offer, oral offer, or any other information that they receive relating to the foregoing and shall promptly inform counsel to the other Parties of any material changes to such proposals, and (B) not enter into any confidentiality agreement with a party interested in an Alternative Transaction unless such party consents to identifying and providing to counsel to the Parties (under a reasonably acceptable confidentiality agreement) the information contemplated under this Section 6(b).

(c)     Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require the HCR Entities or any directors, officers, managers, or members of the HCR Entities, each in its capacity as a director, officer, manager, or member of the HCR Entities, to take any action or to refrain from taking any action, to the extent inconsistent with the exercise of its fiduciary duties they have under applicable law, rule, or regulation (as reasonably determined by them in good faith after receiving advice from outside counsel).

(d)     From and after the RSA Effective Date, the HCR Entities will operate the business of the HCR Entities in the ordinary course (subject to the terms of the DIP Budget) and keep the Consenting Noteholders reasonably informed about the operations of the HCR Entities (provided, that any transaction (or series of related transactions) in an amount exceeding $5 million is deemed not to be in the ordinary course of business for purposes of this <u>Section 6(d)</u> and the HCR Entities shall be required to obtain the consent of the Required Consenting Noteholders to effectuate such transaction (or series of related transactions)), and the HCR Entities shall provide to the Ad Hoc Group Advisors, and shall direct its employees, officers, advisors, and other representatives to provide the Ad Hoc Group Advisors, (A) reasonable access (without any material disruption to the conduct of the HCR Entities' businesses) to the HCR Entities' books and records during normal business hours; (B) reasonable access to the management and advisors of the HCR Entities during normal business hours; and (C) timely and reasonable responses to all reasonable diligence requests, in each case, for the purposes of evaluating the HCR Entities' assets, liabilities, operations, businesses, finances, strategies, prospects, and affairs.

7.     <u>Noteholder Termination Events</u>.  The obligations of the Consenting Noteholders under this Agreement shall automatically terminate upon the occurrence of any of the following events, unless waived, in writing, by the Required Consenting Noteholders on a prospective or retroactive basis (each, a "<u>Noteholder Termination Event</u>"):

(a)     the failure to meet any of the Milestones unless (i) such failure is the result of any act, omission, or delay on the part of the Consenting Noteholders, as the case may be, in violation of their obligations under this Agreement or (ii) such Milestone is extended in accordance with <u>Section 4</u> of this Agreement;  <u>provided</u> that, a Party in breach of any of its respective undertakings, obligations, representations, warranties, or covenants set forth in this Agreement cannot enforce this <u>Section 7(a)</u>;

(b)     the occurrence of a material breach of this Agreement by any HCR Entity that has not been cured (if susceptible to cure) before the earlier of (i) five (5) business days after written notice to the HCR Entities of such material breach from the Required Consenting Noteholders, as the case may be, asserting such termination and (ii) one (1) calendar day prior to any

13

proposed Effective Date; _provided_, that for the avoidance of doubt, any breach of Sections 6(a)(xi), 6(a)(xii) or 6(a)(xiii) shall constitute a material breach;

(c)     the conversion of one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code;

(d)     the dismissal of one or more of the Chapter 11 Cases;

(e)     the appointment of a trustee, receiver, or examiner with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code in one or more of the Chapter 11 Cases;

(f)     (i) any Definitive Documentation does not comply with Section 3 of this Agreement or (ii) any other document or agreement necessary to consummate the Restructuring Transactions is not satisfactory or reasonably satisfactory (as applicable) to the Required Consenting Noteholders;

(g)     the HCR Entities (i) amend or modify, or file a pleading seeking authority to amend or modify, any Definitive Documentation in a manner that is materially inconsistent with this Agreement; (ii) suspend, withdraw, or revoke their support for the Restructuring Transactions; (iii) actively negotiate term sheets or other definitive documentation regarding an Alternative Transaction; or (iv) publicly announce their intention to take any such action listed in clauses (i) through (iii) of this subsection;

(h)     any HCR Entity (i) files or publicly announces that it will file any plan of reorganization other than the Plan or (ii) withdraws or publicly announces its intention not to support the Plan;

(i)     any HCR Entity files any motion or application seeking authority to sell any material assets without the prior written consent of the Required Consenting Noteholders, or such motion or application is inconsistent with the commitments set forth in Sections 6 hereof;

(j)     the issuance by any governmental authority, including the Bankruptcy Court, any regulatory authority, or any other court of competent jurisdiction, of any ruling or order enjoining the substantial consummation of any of the Restructuring Transactions, which ruling or order has become final and non-appealable;

(k)     the Bankruptcy Court enters any order authorizing the use of cash collateral or post-petition financing that is not in the form of the applicable DIP Orders or otherwise consented to by the Required Consenting Noteholders (such consent not to be unreasonably withheld);

14

(l) the occurrence of any Event of Default under the DIP Orders or the DIP TL Credit Agreement or DIP ABL Credit Agreement (as defined therein, respectively), as applicable, that has not been cured (if susceptible to cure) or waived by the applicable percentage of DIP Term Loan Lenders or DIP ABL Lenders, as applicable, in accordance with the terms of the DIP TL Credit Agreement or DIP ABL Credit Agreement, as applicable;

(m) the termination of the Backstop Purchase Agreement in accordance with the Backstop Documents;

(n) the HCR Entities seek to, or file any motion or application, including in connection with the Plan, seeking authority to, reject, assume, assume and assign, amend, supplement, or modify any Railcar Lease or other material executory contract or unexpired lease, without the prior written consent of the Required Consenting Noteholders (such consent not to be unreasonably withheld);

(o) the HCR Entities assume, assume and assign, amend, supplement or modify any Railcar Lease, or enter into any new agreement or arrangement with the Railcar Lessors on a post-petition basis without the prior written consent of the Required Consenting Noteholders (such consent not to be unreasonably withheld);

(p) a breach by any HCR Entity of any representation, warranty, or covenant of such HCR Entity set forth in Section 17 of this Agreement that could reasonably be expected to have a material adverse impact on the consummation of the Restructuring Transactions that (to the extent curable) has not been cured before the earlier of (i) five (5) business days after the receipt by the HCR Entities of written notice and description of such breach from any other Party and (ii) one (1) calendar day prior to any proposed Effective Date;

(q) either (i) any HCR Entity, or any other party acting on behalf, of the HCR Entities, files a motion, application, or adversary proceeding (or any HCR Entity supports any such motion, application, or adversary proceeding filed or commenced by any third party) challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the DIP Term Loan Claims or the Senior Notes Claims or asserting any other cause of action against the DIP Term Loan Lenders or the Consenting Noteholders and/or with respect or relating to such DIP Term Loan Claims or Senior Notes Claims, each as applicable; or (ii) the Bankruptcy Court (or any court with jurisdiction over the Chapter 11 Cases) enters an order that could reasonably be expected to have a material adverse impact on the consummation of the Restructuring Transactions and such order has become final and non-appealable;

(r)   any HCR Entity terminates its obligations under and in accordance with Section 8 of this Agreement;

(s)   the Bankruptcy Court enters an order in the Chapter 11 Cases terminating any of the HCR Entities' exclusive right to file a plan or plans of reorganization or to solicit acceptances thereof pursuant to section 1121 of the Bankruptcy Code;

(t)   the Bankruptcy Court enters an order granting relief from the automatic stay imposed by section 362 of the Bankruptcy Code authorizing any party to proceed against any material asset of any of the HCR Entities that would materially and adversely affect any of the HCR Entities' ability to operate their businesses in the ordinary course;

(u)   the commencement of an involuntary case against any HCR Entity or any HCR Entity's foreign subsidiaries and affiliates or the filing of an involuntary petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization or other relief in respect of such HCR Entity or such HCR Entity's foreign subsidiaries and affiliates, or their debts, or of a substantial part of their assets, under any federal, state or foreign bankruptcy, insolvency, administrative receivership or similar law now or hereafter in effect, provided, that such involuntary proceeding is not dismissed or converted by the HCR Entities to a voluntary case within a period of thirty (30) days after the filing thereof, or if any court grants the relief sought in such involuntary proceeding;

(v)   any HCR Entity (i) voluntarily commences any case or files any petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization or other relief under any federal, state, or foreign bankruptcy, insolvency, administrative receivership or similar law now or hereafter in effect except the voluntary case contemplated under this Agreement, (ii) consents to the institution of, or failing to contest in a timely and appropriate manner, any involuntary proceeding or petition described above, (iii) files an answer admitting the material allegations of a petition filed against it in any such proceeding, (iv) applies for or consents to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator or similar official, (v) makes a general assignment or arrangement for the benefit of creditors or (vi) takes any corporate action for the purpose of authorizing any of the foregoing;

(w)   if (i) any of the DIP Orders or the Backstop Order are reversed, stayed, dismissed, vacated, reconsidered, modified, or amended without the consent of the Required Consenting Noteholders, or (ii) a motion for reconsideration, reargument, or rehearing with respect to any such order

16

has been filed and the HCR Entities have failed to timely object to such motion;

(x)    if (i) the Solicitation Order or the Confirmation Order are reversed, stayed, dismissed, vacated, reconsidered, modified, or amended without the consent of the Required Consenting Noteholders, or (ii) a motion for reconsideration, reargument, or rehearing with respect to any such order has been filed and the HCR Entities have failed to timely object to such motion;

(y)    the occurrence of the Maturity Date (as defined in either the DIP TL Credit Agreement or in the DIP ABL Agreement, as applicable) without the Plan having been substantially consummated; or

(z)    at any time after the RSA Effective Date but prior to the Effective Date, Mr. Robert Rasmus ceases to serve as Chief Executive Officer of Holdco for any reason; provided, that a Noteholder Termination Event shall not occur under this Section 7(z) if, within three (3) business days of the date that Mr. Rasmus ceases to serve as Chief Executive Officer for any reason, the board of directors, managing members or other governing body of each HCR Entity, as applicable, appoints Mr. Ryan Omohundro, of Alvarez & Marsal North America, LLC (or such other person acceptable to the Required Consenting Noteholders), to the position of Chief Restructuring Officer (the "CRO") of each of the HCR Entities and bestows upon the CRO all duties and responsibilities customarily associated with such position, including, without limitation, the duties and responsibilities exercised by Mr. Rasmus as of the RSA Effective Date.

For the avoidance of doubt, subject to Section 9, any written waiver of the occurrence of a Noteholder Termination Event granted in writing by the Required Consenting Noteholders shall bind all Consenting Noteholders with respect to such written waiver.

8.    HCR Entities' Termination Events.  Each HCR Entity may, upon notice to the Consenting Noteholders, terminate its obligations under this Agreement upon the occurrence of any of the following events (each, a "HCR Termination Event"), subject to the rights of the HCR Entities to fully or conditionally waive, in writing, on a prospective or retroactive basis, the occurrence of a HCR Termination Event:

(a)    a breach by a Consenting Noteholder (such Consenting Noteholder in breach, a "Defaulting Noteholder") of any obligation, representation, warranty, or covenant of such Consenting Noteholder set forth in this Agreement that could reasonably be expected to have a material adverse impact on the consummation of the Restructuring Transactions that (to the extent curable) has not been cured before the earlier of (i) five (5) business days after notice to all Parties of such breach and a description thereof and (ii) one (1) calendar day prior to any proposed Effective Date; provided, however, notwithstanding the foregoing, it shall not be a HCR

Termination Event if the non-breaching Consenting Noteholders hold more than two-thirds in principal amount of the Senior Notes Claims;

(b)    if the board of directors of any HCR Entity determines, and notifies the Ad Hoc Group Advisors within twenty-four (24) hours of such determination, after receiving advice from outside counsel, that (i) proceeding with the Restructuring Transactions (including, without limitation, the Plan or solicitation of the Plan) would be inconsistent with the exercise of its fiduciary duties, or (ii) an Alternative Transaction is more favorable than the Plan and continued support of the Plan would be inconsistent with the exercise of its fiduciary duties; provided, that the HCR Entities shall give the Consenting Noteholders not less than three (3) Business Days' prior written notice before exercising the termination right in accordance with this Section 8(b); or

(c)    the issuance by any governmental authority, including the Bankruptcy Court, any regulatory authority, or any other court of competent jurisdiction, of any ruling or order enjoining the substantial consummation of any of the Restructuring Transactions, which ruling or order has become final and non-appealable; provided, however, that the HCR Entities have made commercially reasonable, good faith efforts to cure, vacate, or have overruled such ruling or order prior to terminating this Agreement.

9.    <u>Individual Termination</u>. Any Consenting Noteholder may terminate this Agreement as to itself only, upon written notice to the other Parties, in the event that:

(a)    such Consenting Noteholder has transferred all (but not less than all) of its Senior Notes Claims in accordance with Section 13 of this Agreement (such termination shall be effective on the date on which such Consenting Noteholder has effected such transfer, satisfied the requirements of Section 13 and provided the written notice required above in this Section 9); or

(b)    this Agreement is amended without its consent in such a way as to alter any of the material terms hereof in a manner that is disproportionately adverse to such Consenting Noteholder as compared to similarly situated Consenting Noteholders by giving ten (10) Business Days' written notice to the HCR Entities and the other Consenting Noteholders; provided, that such written notice shall be given by the applicable Consenting Noteholder within five (5) Business Days of such amendment, filing, or execution.

10.    <u>Mutual Termination; Automatic Termination</u>.    This Agreement and the obligations of all Parties hereunder may be terminated by mutual written agreement by and among Holdco, on behalf of itself and each other HCR Entity and the Required Consenting Noteholders.  Notwithstanding anything in this Agreement to the contrary, this Agreement shall terminate automatically without further required action upon the occurrence of the Effective Date.

11.    <u>Effect of Termination</u>.

(a)    The earliest date on which termination of this Agreement as to a Party is effective in accordance with <u>Sections 7</u>, <u>8</u>, <u>9</u> or <u>10</u> of this Agreement shall be referred to, with respect to such Party, as a "<u>Termination Date</u>".

(b)    Upon the occurrence of a Termination Date, the terminating Party's obligations under this Agreement shall be terminated effective immediately, and such Party or Parties shall be released from its commitments, undertakings, and agreements; <u>provided</u>, <u>however</u>, that each of the following shall survive any such termination:  (a) any claim for breach of this Agreement that occurs prior to such Termination Date, and all rights and remedies with respect to such claims shall not be prejudiced in any way; and (b) <u>Sections 2</u>, <u>11</u>, <u>15</u> (for purposes of enforcement of obligations accrued through the Termination Date), <u>16</u>, <u>18</u>, <u>19</u>, <u>20</u>, <u>21</u>, <u>22</u>, <u>23</u>, <u>24</u>, <u>25</u>, <u>26</u>, <u>27</u>, <u>29</u>, with respect to the last sentence of <u>31</u>, <u>32</u>, <u>33</u>, <u>35</u>, <u>36</u> and <u>37</u>.  The automatic stay imposed by section 362 of the Bankruptcy Code shall not prohibit a Party from taking any action necessary to effectuate the termination of and otherwise enforce this Agreement pursuant to and in accordance with the terms hereof.

12.    <u>Cooperation and Support</u>.  The HCR Entities shall provide draft copies of all material "first day" motions, applications, and other material documents related to the Definitive Documentation that any HCR Entity intends to file with the Bankruptcy Court in any of the Chapter 11 Cases to the Ad Hoc Group Advisors at least three (3) calendar days (or as soon as is reasonably practicable under the circumstances) prior to the date when such HCR Entity intends to file such document, and shall consult in good faith with such counsel regarding the form and substance of any such proposed filing; provided that all such "first day" and other material motions, applications, and other documents that any HCR Entity intends to file with the Bankruptcy Court in any of the Chapter 11 Cases (other than the Definitive Documentation) shall be in the form and substance reasonably satisfactory to the Required Consenting Noteholders. The HCR Entities will use reasonable efforts to provide draft copies of all other material pleadings any HCR Entity intends to file with the Bankruptcy Court to the Ad Hoc Group Advisors at least three (3) calendar days prior to filing such pleading (or as soon as is reasonably practicable under the circumstances), and shall consult in good faith with such counsel regarding the form and substance of any such proposed pleading.  For the avoidance of doubt, the Parties agree, consistent with clause (b) of <u>Section 3</u> hereof, (a) to negotiate in good faith the Definitive Documentation that is subject to negotiation and completion on the RSA Effective Date and (b) that, notwithstanding anything herein to the contrary, the Definitive Documentation, including any motions or orders related thereto, shall be consistent with this Agreement and

otherwise subject to the applicable consent rights of the Consenting Noteholders set forth in clause (b) of <u>Section 3</u>.

13.   <u>Transfers of Claims</u>.

(a)   No Consenting Noteholder shall (i) sell, transfer, assign, pledge, grant a participation interest in, or otherwise dispose of, directly or indirectly, any of its right, title, or interest in respect of any of such Consenting Noteholder's Senior Notes Claims in whole or in part, or (ii) deposit any of such Consenting Noteholder's Senior Notes Claims into a voting trust, or grant any proxies, or enter into a voting agreement with respect to any such claims (the actions described in <u>Clauses (i)</u> and <u>(ii)</u> are collectively referred to herein as a "<u>Transfer</u>" and the Consenting Noteholder making such Transfer is referred to herein as the "<u>Transferor</u>"), unless such Transfer is to or with another Consenting Noteholder or any other entity (a "<u>Transferee</u>") that first agrees in writing to be bound by the terms of this Agreement by executing and delivering to the HCR Entities and the Ad Hoc Group Advisors a Transferee Joinder substantially in the form attached hereto as **<u>Exhibit B</u>** (the "<u>Transferee Joinder</u>").  With respect to Senior Notes Claims held by the relevant Transferee upon consummation of a Transfer in accordance herewith, such Transferee is deemed to make all of the representations, warranties, and covenants of a Consenting Noteholder set forth in this Agreement as of the date of such Transfer. Upon compliance with the foregoing, the Transferor shall be deemed to relinquish its rights and be released from its obligations (except for any claim for breach of this Agreement that occurs prior to such Transfer and any remedies with respect to such claim) under this Agreement to the extent of such transferred rights and obligations.

(b)   Notwithstanding anything herein to the contrary, (i) the foregoing <u>Clause (a)</u> of this <u>Section 13</u> shall not preclude any Consenting Noteholder from transferring Senior Notes Claims to affiliates of such Consenting Noteholder (each, a "<u>Consenting Noteholder Affiliate</u>"), which Consenting Noteholder Affiliate shall be automatically bound by this Agreement upon the transfer of such Senior Notes Claims; and (ii) a Consenting Noteholder may effect a Transfer of its Senior Notes Claims to an entity that is acting in its capacity as a Qualified Marketmaker[2] without the requirement that the Qualified Marketmaker become a Consenting Noteholder; <u>provided</u>, that any subsequent Transfer by such Qualified Marketmaker of the right, title or interest in such Senior Notes Claims is to

---

[2]   As used herein, the term "***Qualified Marketmaker***" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers claims against the HCR Entities (or enter with customers into long and short positions in claims against the HCR Entities), in its capacity as a dealer or market maker in claims against the HCR Entities and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

a Transferee that is or becomes a Consenting Noteholder at the time of such Transfer by executing and delivering a Transferee Joinder and to the extent any Consenting Noteholder is acting in its capacity as a Qualified Marketmaker, it may effect a Transfer of any Senior Notes Claims that it acquires from a holder of such claims that is not a Consenting Noteholder without the requirement that the Transferee be or become a Consenting Noteholder.  Notwithstanding the foregoing, if, at the time of the proposed Transfer of such claims to the Qualified Marketmaker, such claims (A) may be voted on the Plan, the proposed Transferor must first vote such claims in accordance with the requirements of this Agreement or (B) have not yet been and may not yet be voted on the Plan and such Qualified Marketmaker does not effect a Transfer of such claims to a subsequent transferee prior to the third (3rd) business day prior to the expiration of the voting deadline (such date, the "Qualified Marketmaker Joinder Date"), such Qualified Marketmaker shall be required to (and the Transfer documentation to the Qualified Marketmaker shall have provided that it shall), on the first (1st) business day immediately following the Qualified Marketmaker Joinder Date, become a Consenting Noteholder with respect to such Senior Notes Claims in accordance with the terms hereof for the purposes of voting on the Plan as contemplated hereunder (provided that the Qualified Marketmaker shall automatically, and without further notice or action, no longer be a Consenting Noteholder with respect to such Senior Notes Claims at such time that the transferee of such claims becomes a Consenting Noteholder with respect to such claims).

(c)     Any Transfer made in violation of this Section 13 shall be deemed null and void *ab initio* and of no force or effect, regardless of any prior notice provided to the HCR Entities and/or any Consenting Noteholder, and shall not create any obligation or liability of any HCR Entity or any other Consenting Noteholder to the purported transferee.

(d)     This Section 13 shall not impose any obligation on the HCR Entities to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Noteholder to transfer any of its Senior Notes Claims.  Notwithstanding anything to the contrary herein, to the extent the HCR Entities and any another Party have entered into a confidentiality agreement, the terms of such confidentiality agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such confidentiality agreement.

14.     Further Acquisition of Claims or Interests.  Except as set forth in Section 13, nothing in this Agreement shall be construed as precluding any Consenting Noteholder or any of its affiliates from acquiring any claims (as defined in section 101(5) of the Bankruptcy Code) against the HCR Entities ("Claims"), Senior Notes Claims, additional claims arising from the DIP Term Loan Facility (the "DIP Term Loan Claims"), or interests in the instruments underlying any of the Claims, Senior Notes Claims or the DIP Term Loan Claims; provided,

however, that any such additional Claims, Senior Notes Claims or DIP Term Loan Claims acquired by any Consenting Noteholder or by any of its affiliates shall automatically be subject to the terms and conditions of this Agreement.  Upon any such further acquisition by a Consenting Noteholder or any of its affiliates, such Consenting Noteholder shall promptly notify counsel to the HCR Entities, who will then promptly notify the Ad Hoc Group Advisors.

15.     Fees and Expenses.  In accordance with and subject to Section 6(a)(xiv) and Section 6(a)(xv) hereof, the DIP Orders and/or the Backstop Order (as applicable), which orders shall provide for the payment of all reasonable and documented fees and expenses described in this Agreement and the Definitive Documentation, the HCR Entities shall pay or reimburse when due all reasonable and documented fees and expenses (including reasonable and documented travel costs and expenses) of the Ad Hoc Group Advisors (regardless of whether such fees and expenses were incurred before or after the Petition Date) incurred through and including the date on which a Termination Date has occurred, in each case solely to the extent set forth in the engagement letters between the HCR Entities and each respective Ad Hoc Group Advisor.

16.     Consents and Acknowledgments.

(a)     Each Party irrevocably acknowledges and agrees that this Agreement is not and shall not be deemed to be a solicitation for acceptances of the Plan.  The acceptance of the Plan by each of the Consenting Noteholders will not be solicited until such Consenting Noteholders has received the Disclosure Statement and Solicitation Materials in accordance with the Solicitation Order or applicable law, and will be subject to sections 1125, 1126, and 1127 of the Bankruptcy Code.

(b)     By executing this Agreement, each Consenting Noteholder (including, for the avoidance of doubt, any entity that may execute this Agreement or a Transferee Joinder after the RSA Effective Date) forbears from exercising remedies with respect to any Default or Event of Default as defined under the Senior Notes Documents that has occurred and is continuing as of the RSA Effective Date or is caused by the HCR Entities' entry into this Agreement or the other documents related to this Agreement and the transactions contemplated in this Agreement.  For the avoidance of doubt, the forbearance set forth in this Section 16(b) shall not constitute a waiver with respect to any Default or Event of Default under the Senior Notes Documents and shall not bar any Consenting Noteholders from filing a proof of claim or taking action to establish the amount of such claim. Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict any right of any holder of the Senior Notes to protect and preserve any right, remedy, condition, or approval requirement under this Agreement or the Definitive Documentation.  Upon the termination of this Agreement, the agreement of the Consenting Noteholders to forbear from exercising rights and remedies in accordance with this Section 16(b) shall immediately terminate without requirement of any demand, presentment or protest of any kind, all of which the HCR Entities hereby waive.

17. <u>Representations and Warranties</u>.

(a) Each Consenting Noteholder hereby represents and warrants on a several and not joint and several basis for itself and not any other person or entity that the following statements are true, correct, and complete, to the best of its actual knowledge, as of the date hereof:

(i) it has the requisite organizational power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement;

(ii) the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate or other organizational action on its part;

(iii) the execution and delivery by it of this Agreement does not (A) violate its certificates of incorporation, or bylaws, or other organizational documents, or those of any of its affiliates in any material respect, or (B) result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its affiliates is a party;

(iv) this Agreement is its legally valid and binding obligation, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally, or by equitable principles relating to enforceability;

(v) the execution, delivery, and performance by it of this Agreement does not require any registration or filing with, the consent or approval of, notice to, or any other action with any federal, state, or other governmental authority or regulatory body, except (A) any of the foregoing as may be necessary and/or required for disclosure by the Securities and Exchange Commission and applicable state securities laws, (B) any of the foregoing as may be necessary and/or required in connection with the Chapter 11 Cases, including the approval of the Disclosure Statement and confirmation of the Plan, (C) any other registrations, filings, consents, approvals, notices, or other actions, the failure of which to make, obtain or take, as applicable, would not be reasonably likely, individually or in the aggregate, to materially delay or materially impair the ability of any Party hereto to consummate the Restructuring Transactions contemplated hereby;

(vi) such Consenting Noteholder is an "accredited investor" within the meaning of Rule 501 of Regulation D promulgated under the

Securities Act of 1933, as amended (the "Securities Act"), with sufficient knowledge and experience to evaluate properly the terms and conditions of this Agreement, and has been afforded the opportunity to consult with its legal and financial advisors with respect to its decision to execute this Agreement, and it has made its own analysis and decision to enter into this Agreement and otherwise investigated this matter to its full satisfaction;

(vii)   such Consenting Noteholder acknowledges the HCR Entities' representation and warranty that the issuance and any resale of the New Common Stock pursuant to the Plan is intended to be exempt from registration under the Securities Act pursuant to Section 4(a)(2) of the Securities Act and Regulation D thereunder or pursuant to section 1145 of the Bankruptcy Code, as applicable; and

(viii)   it (A) either (1) is the sole owner of the claims and interests identified below its name on its signature page hereof and in the amounts set forth therein, free and clear of all claims, liens, encumbrances, charges, equity options, proxy, voting restrictions, rights of first refusal or other limitations on dispositions of any kind, or (2) has all necessary investment or voting discretion with respect to the principal amount of claims and interests identified below its name on its signature page hereof, and has the power and authority to bind the owner(s) of such claims and interests to the terms of this Agreement; (B) is entitled (for its own accounts or for the accounts of such other owners) to all of the rights and economic benefits of such claims and interests; and (C) to the knowledge of the individuals working on the Restructuring Transactions, does not directly or indirectly own any Senior Notes Claims, other than as identified below its name on its signature page hereof.

(b)   Each HCR Entity hereby represents and warrants on a joint and several basis (and not any other person or entity other than the HCR Entities) that the following statements are true, correct, and complete, to the best of its actual knowledge, as of the date hereof:

(i)   it has the requisite corporate or other organizational power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement;

(ii)   the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate or other organizational action on its part, including, without limitation, approval of each of the independent

24

directors of each of the corporate entities that comprise the HCR Entities;

(iii)    the execution and delivery by it of this Agreement does not (A) violate its certificates of incorporation, or bylaws, or other organizational documents, or those of any of its affiliates in any material respect, or (B) result in a breach of, or constitute (with due notice or lapse of time or both) a default (other than, for the avoidance of doubt, a breach or default that would be triggered as a result of the Chapter 11 Cases of any HCR Entity's undertaking to implement the Restructuring Transactions through the Chapter 11 Cases) under any material contractual obligation to which it or any of its affiliates is a party;

(iv)    the execution, delivery, and performance by it of this Agreement does not require any registration or filing with, the consent or approval of, notice to, or any other action with any federal, state, or other governmental authority or regulatory body, except (A) any of the foregoing as may be necessary and/or required for disclosure by the Securities and Exchange Commission and applicable state securities or "blue sky" laws, (B) any of the foregoing as may be necessary and/or required in connection with the Chapter 11 Cases, including the approval of the Disclosure Statement and confirmation of the Plan, (C) filings of amended certificates of incorporation or articles of formation or other organizational documents with applicable state authorities, and other registrations, filings, consents, approvals, notices, or other actions that are reasonably necessary to maintain permits, licenses, qualifications, and governmental approvals to carry on the business of the HCR Entities, and (D) any other registrations, filings, consents, approvals, notices, or other actions, the failure of which to make, obtain or take, as applicable, would not be reasonably likely, individually or in the aggregate, to materially delay or materially impair the ability of any Party hereto to consummate the Restructuring Transactions contemplated hereby;

(v)    the issuance of and any resale of the New Common Stock pursuant to the Plan is intended to be exempt from registration under the Securities Act pursuant to Section 4(a)(2) of the Securities Act and Regulation D thereunder or pursuant to section 1145 of the Bankruptcy Code;

(vi)    subject to the provisions of sections 1125 and 1126 of the Bankruptcy Code, this Agreement is its legally valid and binding obligation, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or

limiting creditors' rights generally, or by equitable principles relating to enforceability; and

(vii)   it has sufficient knowledge and experience to evaluate properly the terms and conditions of the Plan and this Agreement, and has been afforded the opportunity to consult with its legal and financial advisors with respect to its decision to execute this Agreement, and it has made its own analysis and decision to enter into this Agreement and otherwise investigated this matter to its full satisfaction.

18.   <u>Survival of Agreement</u>.  Each of the Parties acknowledges and agrees that this Agreement is being executed in connection with negotiations concerning a possible financial restructuring of the HCR Entities and in contemplation of possible chapter 11 filings by the HCR Entities and the rights granted in this Agreement are enforceable by each signatory hereto without approval of any court, including, without limitation, the Bankruptcy Court.

19.   <u>Settlement Discussions</u>.  The Parties acknowledge that this Agreement, the Plan, and all negotiations relating hereto are part of a proposed settlement of matters that could otherwise be the subject of litigation.  Pursuant to Rule 408 of the Federal Rules of Evidence, any applicable state rules of evidence, and any other applicable law, foreign or domestic, the Restructuring Term Sheet, this Agreement, the Plan, any related documents, and all negotiations relating thereto shall not be construed as or deemed to be an admission of any kind or be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

20.   <u>Relationship Among Parties</u>.

(a)   None of the Consenting Noteholders shall have any fiduciary duty, any duty of trust or confidence in any form, or other duties or responsibilities to each other, the HCR Entities or their affiliates, or any of the HCR Entities' or their affiliates' creditors or other stakeholders, including any holders of Senior Notes Claims, and, other than as expressly set forth in this Agreement, there are no commitments among or between the Consenting Noteholders.  It is understood and agreed that any Consenting Noteholder may trade in any debt or equity securities of the HCR Entities without the consent of the HCR Entities or any other Consenting Noteholder, subject to applicable securities laws and <u>Sections 13</u> and <u>14</u> of this Agreement.  No prior history, pattern, or practice of sharing confidences among or between any of the Consenting Noteholders or the HCR Entities shall in any way affect or negate this understanding and agreement.

(b)   The obligations of each Consenting Noteholder are several and not joint with the obligations of any other Consenting Noteholder.  Nothing contained herein and no action taken by any Consenting Noteholder shall be deemed to constitute the Consenting Noteholders as a partnership, an association, a joint venture, or any other kind of group or entity, or create

a presumption that the Consenting Noteholders are in any way acting in concert. The decision of each Consenting Noteholder to enter into this Agreement has been made by each such Consenting Noteholder independently of any other Consenting Noteholder.

(c) The Consenting Noteholders are not part of a "group" (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Securities Exchange Act of 1934, as amended or any successor provision), including any group acting for the purpose of acquiring, holding, or disposing of securities (within the meaning of Rule 13d-5(b)(1) under the Securities Exchange Act of 1934, as amended), with any other Party. For the avoidance of doubt, neither the existence of this Agreement, nor any action that may be taken by a Consenting Noteholder pursuant to this Agreement, shall be deemed to constitute or to create a presumption by any of the Parties that the Consenting Stakeholders are in any way acting in concert or as such a "group" within the meaning of Rule 13d-5(b)(1).

(d) The HCR Entities understand that the Consenting Noteholders are engaged in a wide range of financial services and businesses, and in furtherance of the foregoing, the HCR Entities acknowledge and agree that the obligations set forth in this Agreement shall only apply to the trading desk(s) or business group(s) of the Consenting Noteholders that principally manage or supervise such Consenting Noteholder's investment in the HCR Entities, and shall not apply to any other trading desk or business group of the Consenting Noteholder so long as they are not acting at the direction or for the benefit of such Consenting Noteholder.

21. <u>Specific Performance</u>. It is understood and agreed by the Parties that money damages may be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief as a remedy of any such breach of this Agreement, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

22. <u>Governing Law & Jurisdiction</u>. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to such state's choice of law provisions which would require the application of the law of any other jurisdiction, except where preempted by the Bankruptcy Code. By its execution and delivery of this Agreement, each Party irrevocably and unconditionally agrees for itself that any legal action, suit, or proceeding against it with respect to any matter arising under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit, or proceeding, may be brought in the United States District Court for the Southern District of New York, and by executing and delivering this Agreement, each of the Parties irrevocably accepts and submits itself to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding. Notwithstanding the foregoing consent to New York jurisdiction, if the Chapter 11 Cases are commenced, each Party agrees that the Bankruptcy Court shall have exclusive jurisdiction of all

matters arising out of or in connection with this Agreement.  By executing and delivering this Agreement, and upon commencement of the Chapter 11 Cases, each of the Parties irrevocably and unconditionally submits to the personal jurisdiction of the Bankruptcy Court solely for purposes of any action, suit, proceeding, or other contested matter arising out of or relating to this Agreement, or for recognition or enforcement of any judgment rendered or order entered in any such action, suit, proceeding, or other contested matter.

23.     <u>WAIVER OF RIGHT TO TRIAL BY JURY</u>.   EACH OF THE PARTIES WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, BETWEEN ANY OF THE PARTIES ARISING OUT OF, CONNECTED WITH, RELATING TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN ANY OF THEM IN CONNECTION WITH THIS AGREEMENT.  INSTEAD, ANY DISPUTES RESOLVED IN COURT SHALL BE RESOLVED IN A BENCH TRIAL WITHOUT A JURY.

24.     <u>Successors and Assigns</u>.  Subject to Section 13, neither this Agreement nor any of the rights or obligations hereunder may be assigned by any Party hereto without the prior written consent of the other Parties hereto, and then only to a Person who has agreed to be bound by the provisions of this Agreement.  Except as otherwise provided in this Agreement, this Agreement is intended to bind and inure to the benefit of each of the Parties and each of their respective permitted successors, assigns, heirs, executors, administrators, and representatives.

25.     <u>No Third-Party Beneficiaries</u>.  Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary of this Agreement.

26.     <u>Notices</u>.  All notices (including, without limitation, any notice of termination or breach) and other communications from any Party hereunder shall be in writing and shall be deemed to have been duly given if personally delivered by courier service, messenger, email, or facsimile to the other Parties at the applicable addresses below, or such other addresses as may be furnished hereafter by notice in writing.  Any notice of termination or breach shall be delivered to all other Parties.

(a)     If to any HCR Entity:

Hi-Crush, Inc.
1330 Post Oak Blvd., #600
Houston, Texas 77056
Attn.:  Robert E. Rasmus
Email: razz@redoakcap.com

*With a copy to*:

28

Latham & Watkins LLP
885 Third Avenue
New York, New York 10022
Attn:   Keith A Simon
          Annemarie V. Reilly
Email: keith.simon@lw.com
          annemarie.reilly@lw.com

(b)     If to the Consenting Noteholders, to the notice address provided on such Consenting Noteholder's signature page

*With a copy to*:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Attn.: Brian S. Hermann
          Elizabeth McColm
          John T. Weber
Email: bhermann@paulweiss.com
          emccolm@paulweiss.com
          jweber@paulweiss.com

27.     <u>Entire Agreement</u>.   This Agreement (including the Exhibits and Schedules) constitutes the entire agreement of the Parties with respect to the subject matter of this Agreement, and supersedes all prior negotiations, agreements, and understandings, whether written or oral, among the Parties with respect to the subject matter of this Agreement; <u>provided</u> that any confidentiality agreement between or among the Parties shall remain in full force and effect in accordance with its terms; <u>provided</u> further that the Parties intend to enter into the Definitive Documentation after the date hereof to consummate the Restructuring Transactions.

28.     <u>Amendments</u>.  Except as otherwise provided herein, this Agreement may not be modified, amended, or supplemented, and no term or provision hereof or thereof waived, without the prior written consent of the HCR Entities and the Required Consenting Noteholders, <u>provided</u> that, (i) the written consent of each Consenting Noteholder and the HCR Entities shall be required for any amendments, amendments and restatements, modifications, or other changes to <u>Section 9</u> and this <u>Section 28</u> and (ii) the written consent of each Consenting Noteholder and the HCR Entities shall be required for any amendment or modification of the defined term "Required Consenting Noteholders".  In determining whether any consent or approval has been given or obtained by the Required Consenting Noteholders or the Consenting Noteholders, as applicable, each then existing Defaulting Noteholder and its respective Senior Notes Claims shall be excluded from such determination.

29.     <u>Reservation of Rights</u>.

(a)     Except as expressly provided in this Agreement or the Restructuring Term Sheet, including, without limitation, <u>Section 5(a)</u> of this Agreement,

nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of any Party to protect and preserve its rights, remedies and interests, including, without limitation, its claims against any of the other Parties.

(b)     Without limiting clause (a) of this <u>Section 29</u> in any way, if this Agreement is terminated for any reason, nothing shall be construed herein as a waiver by any Party of any or all of such Party's rights, remedies, claims, and defenses and the Parties expressly reserve any and all of their respective rights, remedies, claims and defenses, subject to <u>Section 19</u> of this Agreement.  This Agreement, the Plan, and any related document shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever.  Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.

30.     <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which, when so executed, shall constitute the same instrument, and the counterparts may be delivered by facsimile transmission or by electronic mail in portable document format (.pdf).

31.     <u>Public Disclosure</u>.  The HCR Entities shall deliver drafts to the Ad Hoc Group Advisors of any press releases and public documents that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement to the general public (each a "<u>Public Disclosure</u>") at least two (2) calendar days before making any such disclosure. Any Public Disclosure shall be reasonably acceptable to the HCR Entities and the Required Consenting Noteholders.  Under no circumstances may any Party make any public disclosure of any kind that would disclose either: (i) the holdings of any Consenting Noteholder (including on the signature pages of the Consenting Noteholders, which shall not be publicly disclosed or filed) or (ii) the identity of any Consenting Noteholder without the prior written consent of such Consenting Noteholder or the order of a Bankruptcy Court or other court with competent jurisdiction; provided, however, that notwithstanding the foregoing, the HCR Entities shall not be required to keep confidential the aggregate holdings of all Consenting Noteholders, and each Consenting Noteholder hereby consents to the disclosure of the execution of this Agreement by the HCR Entities, and the terms and contents hereof, in the Plan, the Disclosure Statement filed therewith, and any filings by the HCR Entities with the Bankruptcy Court or the Securities and Exchange Commission, or as otherwise required by applicable law or regulation, or the rules of any applicable stock exchange or regulatory body.

32.     <u>Creditors' Committee</u>. Notwithstanding anything herein to the contrary, if any Consenting Noteholder is appointed to, and serves on an official committee of creditors in the Chapter 11 Cases, the terms of this Agreement shall not be construed so as to limit such Consenting Noteholder's exercise of its fiduciary duties arising from its service on such committee; *provided*, *however*, that service as a member of a committee shall not relieve such Consenting Noteholder of its obligations to affirmatively support the Restructuring Transactions on the terms and conditions set forth in this Agreement and the Restructuring Term Sheet on the terms and conditions set forth in this Agreement

33. <u>Severability</u>. If any portion of this Agreement shall be held to be invalid, unenforceable, void or voidable, or violative of applicable law, the remaining portions of this Agreement insofar as they may practicably be performed shall remain in full force and effect and binding on the Parties.

34. <u>Headings</u>.   The section headings of this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement.

35. <u>Interpretation</u>.   This Agreement is the product of negotiations among the Parties, and the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement or any portion hereof, shall not be effective in regard to the interpretation hereof.  For purposes of this Agreement, unless otherwise specified: (a) each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) all references herein to "Articles," "Sections," and "Exhibits" are references to Articles, Sections, and Exhibits of this Agreement; (c) the words "herein," "hereof," "hereunder," and "hereto," refer to this Agreement in its entirety rather than to a particular portion of this Agreement; and (d) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation".   The phrase "reasonable best efforts", "commercially reasonable best efforts", "commercially reasonable efforts" or words or phrases of similar import as used herein shall not be deemed to require any party to enforce or exhaust their appellate rights in any court of competent jurisdiction, including, without limitation, the Bankruptcy Court.

36. <u>Computation of Time</u>. Rule 9006(a) of the Federal Rules of Bankruptcy Procedure applies in computing any period of time prescribed or allowed herein only to the extent such period of time governs a Milestone pertaining to the entry of an order by the Bankruptcy Court in the Chapter 11 Cases.

37. <u>Remedies Cumulative; No Waiver</u>. All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.  The failure of any Party hereto to exercise any right, power, or remedy provided under this Agreement or otherwise available in respect hereof at law or in equity, or to insist upon strict compliance by any other Party hereto with its obligations hereunder, and any custom or practice of the parties at variance with the terms hereof, shall not constitute a waiver by such Party of its right to exercise any such or other right, power, or remedy or to demand such strict compliance.

38. <u>Additional Parties</u>.  Without in any way limiting the provisions hereof, additional holders of Senior Notes Claims may elect to become Parties by executing and delivering to the HCR Entities and the Ad Hoc Group Advisors a counterpart hereof.  Such additional holders of Senior Notes Claims shall become a Party to this Agreement as a Consenting Noteholder in accordance with the terms of this Agreement.

*[Signature pages follow]*

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date and year first written above.

**HCR Entities**

Hi Crush Inc.
OnCore Processing LLC,
Hi Crush Augusta LLC,
Hi-Crush Whitehall LLC,
PDQ Properties LLC,
Hi-Crush Wyeville Operating LLC,
D & I Silica, LLC,
Hi-Crush Blair LLC,
Hi Crush LMS LLC,
Hi Crush Investments Inc.,
Hi Crush Permian Sand LLC,
Hi Crush Proppants LLC,
Hi-Crush Pods LLC,
Hi-Crush Canada Inc.,
Hi-Crush Holdings LLC,
Hi Crush Services LLC,
BulkTracer Holdings LLC,
Pronghorn Logistics Holdings, LLC,
FB Industries USA Inc.,
PropDispatch LLC,
Pronghorn Logistics, LLC, and
FB Logistics, LLC

By: _____

Name: J Philip McCormick, Jr.
Title:   Authorized Signatory

**CONSENTING NOTEHOLDER**

**BlueMountain Foinaven Master Fund L.P.**
By: BlueMountain Capital Management, LLC,
      its investment manager



_____
Name: Richard Horne
Title: Deputy General Counsel, Tax

Principal Amount of Senior Notes Claims:

█████████████████

<u>Notice Address</u>:

280 Park Avenue, 12th floor
New York, NY 10017

Fax:
Attention:
Email: legalnotices@bluemountaincapital.com


        **THE ABOVE-SIGNED CONSENTING NOTEHOLDER HEREBY (PLEASE CHECK <u>ONE AND ONLY ONE</u>):**

**X  ELECTS TO BE A BACKSTOP PARTY AND COMMITS TO BACKSTOPPING THE RIGHTS OFFERING PURSUANT TO THE BACKSTOP PURCHASE AGREEMENT;**

**OR**

☐ **ELECTS NOT TO BE A BACKSTOP PARTY.**

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING NOTEHOLDER**

**BlueMountain Fursan Fund L.P.**
By: BlueMountain Capital Management, LLC,
     its investment manager

_____
Name: Richard Horne
Title: Deputy General Counsel, Tax

Principal Amount of Senior Notes Claims:

<u>Notice Address</u>:

280 Park Avenue, 12th floor
New York, NY 10017

Fax:
Attention:
Email: legalnotices@bluemountaincapital.com

       THE ABOVE-SIGNED CONSENTING NOTEHOLDER HEREBY (PLEASE CHECK <u>ONE AND ONLY ONE</u>):

**X  ELECTS TO BE A BACKSTOP PARTY AND COMMITS TO BACKSTOPPING THE RIGHTS OFFERING PURSUANT TO THE BACKSTOP PURCHASE AGREEMENT;**

**OR**

☐ **ELECTS NOT TO BE A BACKSTOP PARTY.**

**CONSENTING NOTEHOLDER**

**BlueMountain Summit Trading L.P.**
By: BlueMountain Capital Management, LLC,
        its investment manager



_____
Name: Richard Horne
Title: Deputy General Counsel, Tax

Principal Amount of Senior Notes Claims:

<u>Notice Address</u>:

280 Park Avenue, 12th floor
New York, NY 10017

Fax:
Attention:
Email: legalnotices@bluemountaincapital.com

THE ABOVE-SIGNED CONSENTING NOTEHOLDER HEREBY (PLEASE CHECK <u>ONE AND ONLY ONE</u>):

**X  ELECTS TO BE A BACKSTOP PARTY AND COMMITS TO BACKSTOPPING THE RIGHTS OFFERING PURSUANT TO THE BACKSTOP PURCHASE AGREEMENT;**

**OR**

☐ **ELECTS NOT TO BE A BACKSTOP PARTY.**

**CONSENTING NOTEHOLDER**

**CLEARLAKE CAPITAL PARTNERS V FINANCE, L.P.**

By: Clearlake Capital Partners V GP, L.P.
Its: General Partner

By: _____
      Name: José E. Feliciano
      Title: Co-President

By: Clearlake Capital Partners, LLC
Its: General Partner

By: _____
      Name: José E. Feliciano
      Title: Managing Partner

Principal Amount of Senior Notes Claims:

Notice Address:

Fax:
Attention:
Email:

　　　　　THE ABOVE-SIGNED CONSENTING NOTEHOLDER HEREBY (PLEASE CHECK <u>ONE AND ONLY ONE</u>):

☑ **ELECTS TO BE A BACKSTOP PARTY AND COMMITS TO BACKSTOPPING THE RIGHTS OFFERING PURSUANT TO THE BACKSTOP PURCHASE AGREEMENT;**

**OR**

*[Signature Page to Restructuring Support Agreement]*

☐ ELECTS NOT TO BE A BACKSTOP PARTY.

**CONSENTING NOTEHOLDER**

**MSD CREDIT OPPORTUNITY MASTER FUND, L.P.**

By: _____

Name:      Marcello Liguori
Title:      Managing Director

Principal Amount of Senior Notes Claims:



Notice Address:
c/o MSD Partners, L.P.
645 Fifth Avenue, 21st Floor
New York, NY 10022

Fax:
Attention:      Marcello Liguori


      THE ABOVE-SIGNED CONSENTING NOTEHOLDER HEREBY (PLEASE CHECK <u>ONE AND ONLY ONE</u>):

✓ **ELECTS TO BE A BACKSTOP PARTY AND COMMITS TO BACKSTOPPING THE RIGHTS OFFERING PURSUANT TO THE BACKSTOP PURCHASE AGREEMENT;**

**OR**

    **ELECTS NOT TO BE A BACKSTOP PARTY.**

**CONSENTING NOTEHOLDER**

**PineBridge Investments,** on behalf of its managed funds and accounts set forth on Schedule A

By: _John Yovanovic (signature)_

Name:   John Yovanovic

Title:   Managing Director

Principal Amount of Senior Notes Claims:   ███████████████

Notice Address:
PineBridge Investments
Park Avenue Tower
65 East 55th Street
New York, NY 10022


Fax:
Attention:       Shivank Kumar
Email:          Shivank.Kumar@pinebridge.com


       THE ABOVE-SIGNED CONSENTING NOTEHOLDER HEREBY (PLEASE CHECK <u>ONE AND ONLY ONE</u>):

☐ **ELECTS TO BE A BACKSTOP PARTY AND COMMITS TO BACKSTOPPING THE RIGHTS OFFERING PURSUANT TO THE BACKSTOP PURCHASE AGREEMENT;**

**OR**

**[●] ELECTS NOT TO BE A BACKSTOP PARTY.**

**Schedule A**

| PineBridge Funds and Accounts | Principal Amount of Senior Notes Claims |
|---|---|
| CSAA Insurance Exchange | ▮ |
| IA Clarington Global Bond Fund | ▮ |
| Ivy PineBridge High Yield Fund | ▮ |
| Maryland State Retirement | ▮ |
| PineBridge US Focus High Yield Bond Mother Fund | ▮ |
| PineBridge Global Opportunistic DM Credit Fund | ▮ |
| PineBridge Multi-Income Fund | ▮ |
| PineBridge Global Funds – PineBridge Global Strategic Income Fund | ▮ |
| Seasons ST – Diversified Fixed Income Core Bnd | ▮ |
| Standard Insurance Company | ▮ |
| PineBridge TW Global Multi Strategic | ▮ |
| VALIC Retirement Co II – Core Bond Fund | ▮ |
| Honeywell Fixed Income | ▮ |
| RLI Insurance | ▮ |

**CONSENTING NOTEHOLDER**

**PineBridge Investments,** on behalf of its managed funds and accounts set forth on Schedule B

By:

Name:     John Yovanovic

Title:     Managing Director

Principal Amount of Senior Notes Claims:

Notice Address:
PineBridge Investments
Park Avenue Tower
65 East 55th Street
New York, NY 10022

Fax:
Attention:          Shivank Kumar
Email:          Shivank.Kumar@pinebridge.com

　　　　THE ABOVE-SIGNED CONSENTING NOTEHOLDER HEREBY (PLEASE CHECK <u>ONE AND ONLY ONE</u>):

[●] ELECTS TO BE A BACKSTOP PARTY AND COMMITS TO BACKSTOPPING THE RIGHTS OFFERING PURSUANT TO THE BACKSTOP PURCHASE AGREEMENT;

OR

[] ELECTS NOT TO BE A BACKSTOP PARTY.

**Schedule B**

| PineBridge Funds and Accounts | Principal Amount of Senior Notes Claims |
|---|---|
| Abbott Laboratories Annuity Retirement Plan | ███████ |
| Abbott-AbbVie Multiple Employer Pension Plan | ███████ |
| Dunham High-Yield Bond Fund | █████ |
| VALIC Retirement Co II –Strategic Bond Fund | ███████ |
| NM PERA PINEBRIDGE | ██████ |
| Sun America Strategic Income Fund | █████ |
| Sun America Series High Yield | ██████ |
| TA UNCONSTRAINED BOND FUND HY | █████ |

**CONSENTING NOTEHOLDER**

**WHITEBOX RELATIVE VALUE PARTNERS, L.P.**
**By: Whitebox Advisors LLC its investment manager**

By: *Luke Harris*
Name: Luke Harris
Title: General Counsel – Corporate, Transactions &
Litigation

Principal Amount of Senior Notes Claims: 

Notice Address:

3033 Excelsior Blvd., Suite 500
Minneapolis, MN 55416

Fax: N/A
Attention: Scott Specken
Email: SSpecken@whiteboxadvisors.com

THE ABOVE-SIGNED CONSENTING NOTEHOLDER HEREBY (PLEASE CHECK <u>ONE AND ONLY ONE</u>):

☒ ELECTS TO BE A BACKSTOP PARTY AND COMMITS TO BACKSTOPPING THE RIGHTS OFFERING PURSUANT TO THE BACKSTOP PURCHASE AGREEMENT;

OR

☐ ELECTS NOT TO BE A BACKSTOP PARTY.

**CONSENTING NOTEHOLDER**

**WHITEBOX CREDIT PARTNERS, LP**

By: _____

Name:   Mark Strefling

Title:    Partner & CEO

Principal Amount of Senior Notes Claims:                     ████████████

Notice Address:

3033 Excelsior Blvd, Suite 500
Minneapolis, MN 55416

Fax: N/A
Attention: Scott Specken
Email:
SSpecken@whiteboxadvisors.com

          THE ABOVE-SIGNED CONSENTING NOTEHOLDER HEREBY (PLEASE
CHECK <u>ONE AND ONLY ONE</u>):

[X] ELECTS TO BE A BACKSTOP PARTY AND COMMITS TO BACKSTOPPING THE
RIGHTS OFFERING PURSUANT TO THE BACKSTOP PURCHASE AGREEMENT;

OR

[ ] ELECTS NOT TO BE A BACKSTOP PARTY.

*[Signature Page to Restructuring Support Agreement]*

DocuSign Envelope ID: E49E79B0-3490-4244-B9B9-18ACF3D824D1

**CONSENTING NOTEHOLDER**

**WHITEBOX GT FUND, LP**
**By: Whitebox Advisors LLC its investment manager**

By: _____
Name: Luke Harris
Title: General Counsel – Corporate, Transactions &
Litigation

Principal Amount of Senior Notes Claims: 

Notice Address:

3033 Excelsior Blvd., Suite 500
Minneapolis, MN 55416

Fax: N/A
Attention: Scott Specken
Email: SSpecken@whiteboxadvisors.com

THE ABOVE-SIGNED CONSENTING NOTEHOLDER HEREBY (PLEASE
CHECK <u>ONE AND ONLY ONE</u>):

☒ **ELECTS TO BE A BACKSTOP PARTY AND COMMITS TO BACKSTOPPING THE
RIGHTS OFFERING PURSUANT TO THE BACKSTOP PURCHASE AGREEMENT;**

**OR**

☐ **ELECTS NOT TO BE A BACKSTOP PARTY.**

**CONSENTING NOTEHOLDER**

**WHITEBOX MULTI-STRATEGY PARTNERS, L.P.**
**By: Whitebox Advisors LLC its investment manager**

By: _Luke Harris_
Name: Luke Harris
Title: General Counsel – Corporate, Transactions &
Litigation

Principal Amount of Senior Notes Claims: █████████

Notice Address:

3033 Excelsior Blvd., Suite 500
Minneapolis, MN 55416

Fax: N/A
Attention: Scott Specken
Email: SSpecken@whiteboxadvisors.com

THE ABOVE-SIGNED CONSENTING NOTEHOLDER HEREBY (PLEASE CHECK <u>ONE AND ONLY ONE</u>):

☒ **ELECTS TO BE A BACKSTOP PARTY AND COMMITS TO BACKSTOPPING THE RIGHTS OFFERING PURSUANT TO THE BACKSTOP PURCHASE AGREEMENT;**

**OR**

☐ **ELECTS NOT TO BE A BACKSTOP PARTY.**

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING NOTEHOLDER**

**PANDORA SELECT PARTNERS, L.P.**
**By: Whitebox Advisors LLC its investment manager**

By: *Luke Harris*
Name: Luke Harris
Title: General Counsel – Corporate, Transactions & Litigation

Principal Amount of Senior Notes Claims: ███████████

Notice Address:

3033 Excelsior Blvd., Suite 500
Minneapolis, MN 55416

Fax: N/A
Attention: Scott Specken
Email:
SSpecken@whiteboxadvisors.com

THE ABOVE-SIGNED CONSENTING NOTEHOLDER HEREBY (PLEASE CHECK **ONE AND ONLY ONE**):

☒ ELECTS TO BE A BACKSTOP PARTY AND COMMITS TO BACKSTOPPING THE RIGHTS OFFERING PURSUANT TO THE BACKSTOP PURCHASE AGREEMENT;

**OR**

☐ ELECTS NOT TO BE A BACKSTOP PARTY.

**Exhibit A** to the Restructuring Support Agreement

**Restructuring Term Sheet**

## HI-CRUSH INC., ET AL.

## RESTRUCTURING TERM SHEET

### July 12, 2020

This non-binding indicative term sheet (the "Term Sheet") sets forth the principal terms of a comprehensive restructuring (the "Restructuring") of the existing debt and other obligations of the HCR Entities (defined below). The Restructuring will be consummated through the commencement by the HCR Entities of voluntary cases under chapter 11 (the "Chapter 11 Cases") of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"), in accordance with the terms of the RSA (as defined below) to be executed by the HCR Entities and the Consenting Noteholders (as defined below) and to which this Term Sheet is appended. Capitalized terms used but not otherwise defined herein have the meaning given to such terms in the RSA (defined below).

THIS TERM SHEET DOES NOT CONSTITUTE AN OFFER OF SECURITIES OR A SOLICITATION OF THE ACCEPTANCE OR REJECTION OF A CHAPTER 11 PLAN FOR PURPOSES OF SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE (AS DEFINED IN THE RSA). ANY SUCH OFFER OR SOLICITATION WILL ONLY BE MADE IN COMPLIANCE WITH ALL APPLICABLE SECURITIES, BANKRUPTCY, AND OTHER APPLICABLE LAWS.

THIS TERM SHEET IS BEING PROVIDED AS PART OF A COMPREHENSIVE COMPROMISE AND SETTLEMENT, EACH ELEMENT OF WHICH IS CONSIDERATION FOR THE OTHER ELEMENTS AND AN INTEGRAL ASPECT OF THE RESTRUCTURING. THIS TERM SHEET IS CONFIDENTIAL AND SUBJECT TO FEDERAL RULE OF EVIDENCE 408. NOTHING IN THIS TERM SHEET SHALL CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION OR A WAIVER, AND EACH STATEMENT CONTAINED HEREIN IS MADE WITHOUT PREJUDICE SOLELY FOR SETTLEMENT PURPOSES, WITH A FULL RESERVATION AS TO ALL RIGHTS, REMEDIES, CLAIMS OR DEFENSES OF THE CONSENTING LENDERS.

THE TRANSACTIONS DESCRIBED HEREIN WILL BE SUBJECT TO THE NEGOTIATION AND COMPLETION OF DEFINITIVE DOCUMENTATION INCORPORATING THE TERMS SET FORTH HEREIN, AND THE CLOSING OF ANY TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH AGREED DEFINITIVE DOCUMENTATION.

| Material Terms of the Restructuring | |
|---|---|
| **Term** | **Description** |
| ***Overview of the Restructuring*** | This Term Sheet contemplates the Restructuring of Hi-Crush Inc. (f/k/a Hi-Crush Partners LP) ("Holdco") and its direct and indirect subsidiaries (collectively with Holdco, the "HCR Entities" or the "Debtors" and each a "HCR Entity"). The Restructuring will be consummated pursuant to a joint "pre-arranged" chapter 11 plan of reorganization (as amended, restated, modified or otherwise supplemented, the "Plan" and, the supplement thereto, the "Plan Supplement") to be confirmed by the Bankruptcy Court. To effectuate the Restructuring, certain parties, including: (a) the HCR Entities and (b) certain holders (the "Consenting Noteholders") of the 9.500% senior notes (the "Senior Notes") issued by Holdco pursuant to that certain Indenture, dated as of August 1, 2018 (as amended, restated, supplemented or otherwise modified, the "Indenture" and, together with all ancillary documents related thereto, the "Senior Notes Documents"), by among Holdco, as issuer, the guarantors party thereto, and U.S. Bank National Association, as trustee, will enter into a Restructuring Support Agreement (as amended, restated, supplemented or otherwise modified in accordance with the terms hereof and thereof, the "RSA") consistent in all respects with the material terms set forth herein. |
| | The Chapter 11 Cases will be financed by two debtor-in-possession financing facilities, including (a) an up to $30 million superpriority senior secured asset-based revolving loan financing facility (the "DIP ABL Facility") pursuant to a credit agreement substantially in the form attached hereto as **Exhibit 1** (the "DIP ABL Agreement") that shall refinance and satisfy in full the HCR Entities' obligations under that certain Credit Agreement, dated as of August 1, 2018 (as amended, restated, supplemented or otherwise modified from time to time, the "Existing Credit Agreement" and, together with the collateral and ancillary documents related thereto the "Existing Credit Documents" and the credit facility thereunder, the "Existing Credit Facility") by and among Holdco, as borrower, the guarantors party thereto, the lenders party thereto from time to time and JPMorgan Chase Bank, N.A., as administrative agent. The DIP ABL Facility shall be funded by certain of the existing lenders to the Existing Credit Agreement (such lenders, the "Existing Lenders", and in such capacity, the "DIP ABL Lenders"), and the existing administrative agent under the Existing Credit Agreement shall act as the administrative agent thereunder (the "Existing Agent" and, in such capacity, the "DIP ABL Agent"). The letters of credit outstanding under the Existing Credit Agreement shall be deemed ("Existing L/Cs") outstanding under the DIP ABL Facility. |
| | The second debtor-in-possession financing facility shall be a $40 million superpriority secured delayed-draw term loan financing facility (the "DIP Term Loan Facility") pursuant to a credit agreement substantially in the form attached hereto as **Exhibit 2** (the "DIP TL Agreement"). The DIP Term Loan Facility shall be funded by members of the ad hoc group of Consenting Noteholders (the "Ad Hoc Group") that are represented by Paul, Weiss, Rifkind, Wharton & Garrison LLP, as counsel, Porter Hedges LLP, as local counsel, and Moelis & Company LLC, as financial advisor and investment banker (together, the "Ad Hoc Group Advisors"). |
| | On the effective date of the Restructuring (the "Effective Date"): (a) subject to satisfaction of certain conditions set forth in the DIP ABL Facility, the Exit ABL |

| | |
|---|---|
| | Facility (as defined herein) and/or the other Definitive Documentation, the DIP ABL Facility shall be refinanced by the Exit ABL Facility (as defined herein), and the Existing L/Cs shall be deemed outstanding under the Exit ABL Facility; (b) the HCR Entities shall consummate the Rights Offering (as defined below) pursuant to which the Rights Offering Participants and the Backstop Parties (each as defined below) shall fund an aggregate amount of $43.3 million[1] (excluding the Put Option Premium) to acquire the New Secured Convertible Notes (defined below) to be issued by the Reorganized Debtors (as defined below), and the proceeds of the Rights Offering shall be used to satisfy the HCR Entities' obligations under the DIP Term Loan Facility, including any accrued and unpaid fees and interest (the "<u>DIP TL Obligations</u>"), and (c) the Senior Notes Claims and the General Unsecured Claims (each, as defined below) shall be equitized.<br><br>As reorganized on the Effective Date pursuant to the Plan, the HCR Entities shall be referred to collectively herein as the "<u>Reorganized Debtors</u>," and as reorganized on the Effective Date pursuant to the Plan, Holdco shall be referred to herein as "<u>Reorganized Holdco</u>." |
| *Rights Offering* | The Debtors shall effectuate a rights offering during the Chapter 11 Cases and in conjunction with and pursuant to the Plan (the "<u>Rights Offering</u>") to record holders as of a specified record date of Allowed[2] Senior Notes Claims and Allowed General Unsecured Claims (each, as defined below), each of which shall be an "accredited investor" (as such term is defined in Rule 501 under the Securities Act) (an "<u>Accredited Investor</u>") and shall complete a customary accredited investor questionnaire (each such holder, a "<u>Rights Offering Participant</u>" and, collectively, the "<u>Rights Offering Participants</u>"). Each Rights Offering Participant shall be offered the right (collectively, the "<u>Rights</u>"), attached to its respective Allowed Senior Notes Claim or Allowed General Unsecured Claim, to purchase its *pro rata* share (based on such Rights Offering Participant's relative share of the total amount of all Allowed Senior Notes Claims and Allowed General Unsecured Claims) of the New Secured Convertible Notes (defined below) for an aggregate purchase price of $43.3 million (the "<u>Rights Offering Amount</u>"). Rights Offering Participants shall be issued Rights at no charge. The Rights shall be attached to each Allowed Senior Notes Claim and each Allowed General Unsecured Claim and shall be transferable with such Allowed claims as shall be set forth in the Rights Offering Procedures (as defined herein).<br><br>Each Rights Offering Participant electing to exercise its Rights shall purchase New Secured Convertible Notes by paying cash in an aggregate amount equal to the aggregate original principal amount of the New Secured Convertible Notes to be acquired by such Rights Offering Participant in the Rights Offering.<br><br>Any New Secured Convertible Notes that are not subscribed for and purchased in the Rights Offering by a Rights Offering Participant (including any portion of the Rights Offering Amount that holders of Allowed Senior Notes Claims or Allowed General Unsecured Claims as of the applicable record date who are not Accredited Investors could have purchased if such holders exercised their respective Rights in the Rights Offering) shall be put to and purchased by the Backstop Parties in |

---

[1] Amount subject to professional fee budget acceptable to the Backstop Parties.

[2] "<u>Allowed</u>" shall mean any claim that is determined to be an allowed claim in the Chapter 11 Cases in accordance with section 502 or section 506 of the Bankruptcy Code.

|  | accordance with the terms and conditions of the Backstop Purchase Agreement; provided, however, that no Backstop Party shall be required to purchase the New Secured Convertible Notes pursuant to such Backstop Party's Backstop Commitment in an aggregate original principal amount that exceeds the Backstop Commitment Amount (as defined below) for such Backstop Party. There will be no over-subscription privilege in the Rights Offering, such that any New Secured Convertible Notes that are not subscribed for and purchased in the Rights Offering by a Rights Offering Participant (including any portion of the Rights Offering Amount that holders of Allowed Senior Notes Claims or Allowed General Unsecured Claims as of the applicable record date who are not Accredited Investors could have purchased if such holders exercised their respective Rights in the Rights Offering) will not be offered to other Rights Offering Participants, but rather will be purchased by the Backstop Parties (subject to their respective Backstop Commitment Amounts applicable to the Rights Offering) in accordance with the terms and conditions of the Backstop Purchase Agreement. |
|  | The aggregate amount of cash received by the Debtors from (a) Rights Offering Participants and (b) the Backstop Parties pursuant to the Backstop Purchase Agreement, in each case, for the New Secured Convertible Notes shall be used: (w) first, to satisfy the DIP TL Obligations; (x) second, to satisfy out-of-pocket costs and expenses incurred by the Debtors in connection with the Restructuring, (y) third, if necessary, to cash collateralize letter of credit obligations that shall become outstanding under the Exit ABL Facility, in an amount not to exceed $25 million, and (z) fourth, for working capital and other general corporate purposes of the Reorganized Debtors following the Effective Date. |
|  | The Rights Offering shall be conducted by the Debtors and consummated on terms, subject to conditions and in accordance with procedures that are consistent in all material respects with this Term Sheet and otherwise in form and substance acceptable to the Debtors and the Required Backstop Parties (the "Rights Offering Procedures"). The HCR Entities shall seek to establish the general bar date to file proofs of claim for a date no later than forty-five (45) days after the Petition Date so the universe of General Unsecured Claims (defined below) is known for purposes of the Rights Offering. |
| **Backstop Commitments** | In conjunction with the Restructuring, certain members of the Ad Hoc Group (in such capacity, the "Backstop Parties" and, the Backstop Parties representing at least two-thirds of the Backstop Commitments, the "Required Backstop Parties") shall provide the Debtors with a commitment to backstop the Rights Offering on terms and conditions set forth in the Backstop Purchase Agreement. |
|  | On the terms and subject to the conditions set forth in the Backstop Purchase Agreement, each of the Backstop Parties will severally, and not jointly, purchase its Backstop Commitment Percentage (as defined below) (subject to such Backstop Party's applicable Backstop Commitment Amount) of the New Secured Convertible Notes offered for sale in the Rights Offering that are not purchased by Rights Offering Participants (including any portion of the Rights Offering Amount that holders of Allowed Senior Notes Claims or Allowed General Unsecured Claims as of the applicable record date who are not Accredited Investors could have purchased if such holders exercised their respective Rights in the Rights Offering) (the "Unsubscribed Notes") at par. |

In the event that a Backstop Party defaults on its obligation to purchase Unsubscribed Notes (a "<u>Defaulting Backstop Party</u>"), then each Backstop Party that is not a Defaulting Backstop Party (each, a "<u>Non-Defaulting Backstop Party</u>") shall also have the right, but not the obligation, to purchase its Adjusted Commitment Percentage of such Unsubscribed Notes at par and on the terms set forth in the Backstop Purchase Agreement.

"<u>Adjusted Commitment Percentage</u>" means, with respect to any Non-Defaulting Backstop Party, a fraction, expressed as a percentage, the numerator of which is the Backstop Commitment Percentage of such Non-Defaulting Backstop Party and the denominator of which is the aggregate Backstop Commitment Percentages of all Non-Defaulting Backstop Parties.

"<u>Backstop Commitment</u>" means, with respect to any Backstop Party for the Rights Offering, the commitment, on the terms set forth in the Backstop Purchase Agreement, of such Backstop Party to purchase (directly or through an affiliate) a portion of the New Secured Convertible Notes offered for sale in the Rights Offering to the extent that such Rights Offering is not fully subscribed pursuant to the terms and conditions thereof.  If a group of Backstop Parties that are affiliates of one another purchase New Secured Convertible Notes in the Rights Offering in an aggregate original principal amount that is less than the product of (a) aggregate Backstop Commitment Percentages of such Backstop Parties and (b) the Rights Offering Amount, then such affiliated Backstop Parties shall be required to purchase Unsubscribed Notes such that no such deficiency exists and such obligation shall constitute the Backstop Commitments of such affiliated Backstop Parties (it being understood that such obligation to purchase such Unsubscribed Notes shall be satisfied prior to determining the Backstop Commitments of all other Backstop Parties).

"<u>Backstop Commitment Amount</u>" means, with respect to any Backstop Party, (a) the product of (i) the Rights Offering Amount and (ii) such Backstop Party's Backstop Commitment Percentage, <u>minus</u> (b) the aggregate original principal amount of New Secured Convertible Notes that such Backstop Party purchases in the Rights Offering in its capacity as a Rights Offering Participant.

"<u>Backstop Commitment Percentage</u>" means, with respect to any Backstop Party, a percentage that will be ascribed to such Backstop Party, which percentage will based upon the amount of Senior Notes Claims held by each respective Backstop Party as compared to the aggregate amount of Senior Notes Claims held by all Backstop Parties.

"<u>Backstop Purchase Agreement</u>" means an agreement to be executed by and between the Debtors and the Backstop Parties setting forth, among other things, the terms and conditions of the Rights Offering, the Backstop Commitments, the payment of the Put Option Premium, the Liquidated Damages Payment and the Backstop Expenses (each as defined below), such agreement to contain representations, warranties, covenants, conditions to closing, termination rights, indemnities, reimbursements and other terms and provisions that are consistent in all material respects with this Term Sheet and otherwise acceptable to the Debtors and the Backstop Parties, and the disclosures to the representations and warranties made by the Debtors in the Backstop Purchase Agreement shall be reasonably acceptable to the Backstop Parties.

In consideration for the Debtors' right to cause the Backstop Parties to purchase (directly or through an affiliate) their respective Backstop Commitment Percentages of the Unsubscribed Notes (limited by their respective Backstop Commitment Amounts), the Reorganized Debtors shall be required to make a non-refundable put option premium (the "Put Option Premium") equal to $4.8 million, which Put Option Premium shall be paid in the form of New Secured Convertible Notes to be issued on the Effective Date.  The Put Option Premium shall be paid to the Backstop Parties on a *pro rata* basis based upon their respective Backstop Commitment Percentages; provided, however, that (a) no Defaulting Backstop Party shall be entitled to any portion of the Put Option Premium, and (b) Non-Defaulting Backstop Parties that purchase Unsubscribed Notes that are offered for sale in the Rights Offering that are not purchased by any other Backstop Party (in its capacity as a Right Offering Participant) pursuant to the exercise of such other Backstop Party's Rights in such Rights Offering shall be entitled to receive a proportionate share of the amount of the Put Option Premium that would have otherwise been distributed to the applicable Defaulting Backstop Party if such Defaulting Backstop Party had been a Non-Defaulting Backstop Party.  The Put Option Premium (i) shall be fully earned as of the date of execution of the Backstop Purchase Agreement, (ii) shall not be refundable under any circumstance or creditable against any other amount paid or to be paid in connection with the Backstop Purchase Agreement or otherwise, (iii) shall be issued without setoff or recoupment and shall not be subject to defense or offset on account of any claim, defense or counterclaim, (iv) shall be issued free and clear of and without deduction for any and all applicable taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto (with appropriate gross-up for withholding taxes), and (v) shall be treated for U.S. federal income tax purposes as a premium for an option to put the Unsubscribed Notes to the Backstop Parties.

If any Debtor (a) enters into, publicly announces its intention to enter into, or announces to any of the parties to the RSA or other holders of claims against or interest in any of the Debtors its intention to enter into, an agreement (including, without limitation, any agreement in principle, letter of intent, memorandum of understanding or definitive agreement), whether binding or non-binding, or whether subject to terms and conditions, with respect to any Alternative Transaction (as defined in the RSA), (b) files any pleading or document with the Bankruptcy Court agreeing to, evidencing its intention to support, or otherwise supports, any Alternative Transaction or (c) consummates any Alternative Transaction (any of the events described in clause (a), clause (b) or clause (c), a "Triggering Event"), in any such case described in clause (a), clause (b) or clause (c), at any time prior to the termination of the Backstop Purchase Agreement or within twelve (12) months following the termination of the Backstop Purchase Agreement, then the Debtors will pay to the Non-Defaulting Backstop Parties a cash payment in the aggregate amount of $4.8 million (the "Liquidated Damages Payment"), such Liquidated Damages Payment shall be deemed earned in full on the date of the occurrence of the Triggering Event and to be paid to the Non-Defaulting Backstop Parties on a *pro rata* basis based upon their respective Adjusted Commitment Percentages.  The Liquidated Damages Payment, if any, shall be (A) paid (1) only upon consummation of an Alternative Transaction, (2) without setoff or recoupment and shall not be subject to defense or offset on account of any claim, defense or counterclaim, and (3) free and clear of and without deduction for any and all applicable taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto

(with appropriate gross-up for withholding taxes), and (B) treated as having administrative expense priority status under sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code.

The Debtors will reimburse or pay, as the case may be, all reasonable fees, costs, expenses, disbursements and charges of the Backstop Parties incurred in connection with or relating to the diligence, negotiation, preparation, execution, delivery, implementation and/or consummation of the Plan, the Rights Offering, the Backstop Commitments, the Backstop Purchase Agreement, the Backstop Approval Motion, the Backstop Order, and the transactions contemplated by any of the foregoing, or any of the other Definitive Documentation, and the enforcement, attempted enforcement or preservation of any rights or remedies under the Backstop Purchase Agreement or any of the other Definitive Documentation (collectively, the "Backstop Expenses"), including, but not limited to, (i) the reasonable and documented fees, costs and expenses of, counsel, advisors and agents for the Backstop Parties (including, for the avoidance of doubt, the Ad Hoc Group Advisors' reasonable and documented fees and expenses) and (y) filing fees (if any) required by the Hart Scott Rodino Antitrust Improvements Act of 1976 or any other competition Laws and any expenses related thereto.

The Backstop Commitment of a Backstop Party shall not be assigned (whether by operation of Law or otherwise) without the prior written consent of the Debtors and the Required Backstop Parties. Notwithstanding the immediately preceding sentence, any Backstop Party's Backstop Commitment may be freely assigned or transferred, in whole or in part, by such Backstop Party, to (a) any other Backstop Party or (b) any affiliate of a Backstop Party; provided, that any such assignee of a Backstop Commitment must be an Accredited Investor.

| | |
|---|---|
| **New Secured Convertible Notes** | On the Effective Date, Reorganized Holdco shall issue new secured convertible notes in an aggregate principal amount of the Rights Offering Amount (the "New Secured Convertible Notes"). The New Secured Convertible Notes shall be on terms acceptable to the Debtors and the Required Backstop Parties and consistent with the material terms set forth in the term sheet attached hereto as **Exhibit 3** (the "New Secured Notes Term Sheet"). |
| **Exit ABL Facility** | On the Effective Date, the Reorganized Debtors shall enter into a new credit agreement (the "Exit ABL Credit Agreement" and, collectively with any other definitive documentation governing the Exit ABL Facility, the "Exit ABL Documents") providing for a new senior secured asset-based revolving loan facility in the aggregate principal commitment amount of not less than $20 million, and shall provide for a not less than $20 million letter of credit sub-limit (the "Exit ABL Facility"), which shall refinance and replace the DIP ABL Facility, and the Existing L/Cs outstanding under the DIP ABL Facility shall be deemed outstanding under the Exit ABL Facility.

The Exit ABL Documents shall be on terms substantially similar to the Existing Credit Documents, and shall be on terms reasonably acceptable to the Reorganized HCR Entities and the Required Backstop Parties. |

| Treatment of Claims and Interests Under the Restructuring and the Plan ||
| Claim | Proposed Treatment |
| --- | --- |
| **Unclassified Claims** ||
| *DIP ABL Claims* | **Treatment.** On the Effective Date, each holder of an Allowed claim under DIP ABL Agreement (collectively, the "DIP ABL Claims") shall receive payment in full in cash from the proceeds of the Exit ABL Facility, and the Existing L/Cs under the DIP ABL Facility that remain undrawn as of the Effective Date shall be deemed outstanding under the Exit ABL Facility or, if necessary, be 105% cash collateralized as of the Effective Date and remain outstanding. |
|  | **Voting.** Not classified; non-voting. |
| *DIP Term Loan Claims* | **Treatment.** On the Effective Date, each holder of an Allowed claim under the DIP TL Agreement (collectively, the "DIP Term Loan Claims") shall receive payment in full in cash from the proceeds of the Rights Offering and Backstop Purchase Agreement. |
|  | **Voting.** Not classified; non-voting. |
| *Administrative Claims* | **Treatment.** Except to the extent that a holder of an Allowed administrative claim (collectively, the "Administrative Claims") and the Debtors, with the consent of the Required Backstop Parties, which consent shall not be unreasonably withheld, agree in writing to less favorable treatment for such Administrative Claim, such holder shall receive payment in full, in cash, of the unpaid portion of its Allowed Administrative Claim on the Effective Date or as soon thereafter as reasonably practicable (or, if payment is not then due, on the due date of such Allowed Administrative Claim). |
|  | Administrative Claims shall include, among other things: (a) claims against the Debtors arising under section 503(b) of the Bankruptcy Code; (b) Allowed claims for reasonable fees and expenses of professionals retained in the Chapter 11 Cases with the approval of the Bankruptcy Court; and (c) the Backstop Expenses and the Liquidated Damages Payment in accordance with the terms and conditions of the Backstop Purchase Agreement and the Backstop Order. |
|  | **Voting.** Not classified; non-voting. |
| *Priority Tax Claims* | **Treatment.** All Allowed claims against the Debtors under section 507(a)(8) of the Bankruptcy Code (collectively, the "Priority Tax Claims") shall be treated in accordance with section 1129(a)(9)(C) of the Bankruptcy Code. |
|  | **Voting.** Not classified; non-voting. |
| *Intercompany Claims* | There shall be no distributions on account of intercompany claims between and among the Debtors and their subsidiaries. Notwithstanding the foregoing, (a) the Debtors, with the consent of the Required Backstop Parties, may reinstate or compromise, as the case may be, the intercompany claims between and among the Debtors and their subsidiaries, and (b) the treatment of the intercompany claims shall be effectuated in a tax efficient manner. |

| Classified Claims and Interests | |
|---|---|
| ***Other Secured Claims*** | **Treatment.** Except to the extent that a holder of an Allowed secured claim, other than a DIP Claim (collectively, the "Other Secured Claims"), and the Debtors, with the consent of the Required Backstop Parties, which consent shall not be unreasonably withheld, agree in writing to less favorable treatment for such Other Secured Claim, such holder shall receive either (a) payment in full in cash of the unpaid portion of their Allowed Other Secured Claims, including any interest thereon required to be paid under section 506(b) of the Bankruptcy Code (or if payment is not then due, on the due date of such Allowed Other Secured Claims), (b) reinstatement pursuant to section 1124 of the Bankruptcy Code, (c) the return or abandonment of the collateral securing such claim to such holder, or (d) such other treatment necessary to satisfy section 1129 of the Bankruptcy Code. |
| | **Voting.** Unimpaired. Each holder of an Allowed Other Secured Claim will be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, each holder of an Allowed Other Secured Claim will not be entitled to vote to accept or reject the Plan. |
| ***Other Priority Claims*** | **Treatment.** Except to the extent that a holder of an Allowed claim described in section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim (collectively, the "Other Priority Claims") and the Debtors, with the consent of the Required Backstop Parties, which consent shall not be unreasonably withheld, agree in writing to less favorable treatment for such Other Priority Claim, such holder shall receive payment in full, in cash, of the unpaid portion of its Allowed Other Priority Claim on the Effective Date or as soon thereafter as reasonably practicable (or, if payment is not then due, on the due date of such Other Priority Claim). |
| | **Voting.** Unimpaired. Each holder of an Other Priority Claim will be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, each holder of an Allowed Other Priority Claim will not be entitled to vote to accept or reject the Plan. |
| ***Senior Notes Claims*** | **Treatment.** On the Effective Date or as soon thereafter as reasonably practicable, each holder of an Allowed claim arising under the Senior Notes Documents (collectively, the "Senior Notes Claims"), except to the extent that a holder of an Allowed Senior Notes Claim agrees to less favorable treatment of its Allowed Senior Notes Claim, shall receive its *pro rata* share of: |
| | (a) the Rights (which shall be attached to each Allowed Senior Notes Claim and transferable with such Allowed Senior Notes Claim as set forth in the Rights Offering Procedures, but the Rights may only be exercised to the extent the holder is an Accredited Investor); and |
| | (b) 100% of the common equity of Reorganized Holdco (the "New Common Stock") shared *pro rata* with the holders of Allowed General Unsecured Claims (as defined herein) (subject to dilution on account of (i) the New Common Stock issued upon conversion of the New Secured Convertible Notes, and (ii) the MIP Equity). |
| | **Voting.** Impaired. Each holder of an Allowed Senior Notes Claim will be entitled to vote to accept or reject the Plan. |

| | |
|---|---|
| **General Unsecured Claims** | **Treatment.** On the Effective Date or as soon thereafter as reasonably practicable, each holder of an Allowed unsecured claim that is not (a) an Administrative Claim, (b) a Priority Tax Claim, (c) an Other Priority Claim, (d) a Senior Notes Claim, (e) an Intercompany Claim, or (f) a Section 510(b) Claim (as defined below) (collectively, the "<u>General Unsecured Claims</u>"), except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment of its Allowed General Unsecured Claim, shall receive its *pro rata* share of: |
| | (c) the Rights (which shall be attached to each Allowed General Unsecured Claim and transferable with such Allowed General Unsecured Claim as set forth in the Rights Offering Procedures, but the Rights may only be exercised to the extent the holder is an Accredited Investor); and |
| | (d) 100% of the New Common Stock shared *pro rata* with the holders of Allowed Senior Notes Claims (subject to dilution on account of (i) the New Common Stock issued upon conversion of the New Secured Convertible Notes, and (ii) the MIP Equity). |
| | **Voting.** Impaired. Each holder of an Allowed General Unsecured Claim will be entitled to vote to accept or reject the Plan. |
| **Section 510(b) Claims** | **Treatment.** Holders of any claim subject to subordination under section 510(b) of the Bankruptcy Code (collectively, the "<u>Section 510(b) Claims</u>"), shall receive no recovery. |
| | **Voting.** Impaired. Each holder of a Section 510(b) Claim will be deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, each holder of a Section 510(b) Claim will not be entitled to vote to accept or reject the Plan. |
| **Interests in Holdco** | **Treatment**. On the Effective Date, all Interests in Holdco will be cancelled and the holders of Interests in Holdco shall not receive or retain any distribution, property, or other value on account of their Interests in Holdco. |
| | "<u>Interests</u>" means the common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Debtor and options, warrants, rights, or other securities or agreements to acquire the common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Debtor (whether or not arising under or in connection with any employment agreement). |
| | **Voting.** Impaired. Holders of Interests in Holdco are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan. |
| **General Provisions** | |
| **Capital Structure** | On the Effective Date, the debt and equity capital structure of the Reorganized Debtors will be consistent in all material respects with the capital structure of the Reorganized Debtors as set forth in this Term Sheet, unless otherwise agreed to by the Required Backstop Parties. |
| | Neither the New Common Stock, the New Secured Convertible Notes nor any other Interests in of any of the Reorganized Debtors will be listed for trading on a securities exchange, and none of the Reorganized Debtors will be required to file |

| | |
|---|---|
| | reports with the United States Securities and Exchange Commission unless it is required to do so pursuant to the Exchange Act. |
| **Interests in Holdco Subsidiaries** | All existing Interests in HCR Entities other than Holdco shall remain effective and outstanding on the Effective Date and shall be owned and held by the same applicable Person(s) that held or owned such Interests immediately before the Effective Date. |
| **Executory Contracts and Unexpired Leases** | Executory contracts and unexpired leases shall be assumed or rejected (as the case may be), as determined by the Debtors, and with the consent of the Required Backstop Parties, which consent shall not be unreasonably withheld; _provided, however_, that any executory contract or unexpired lease between any of the HCR Entities in respect of the use of rail cars shall be assumed or rejected by the applicable HCR Entity (such executory contracts or unexpired leases, the "Railcar Leases") only with the consent of the Required Backstop Parties; _provided, further_, that the Debtors shall not enter into any modification or amendment to any Railcar Leases or enter into any new Railcar Leases without the consent of the Required Backstop Parties. |
| **Employee Compensation, Severance, and Benefits Programs** | All employment agreements and severance policies, including all employment, compensation and benefit plans, policies, and programs of the Debtors applicable to any of their employees and retirees, including without limitation, all workers' compensation programs, savings plans, retirement plans, healthcare plans, disability plans, incentive plans, life and accidental death and dismemberment insurance plans (collectively, the "Specified Employee Plans"), shall be assumed by the Debtors (and assigned to the Reorganized Debtors, if necessary) pursuant to section 365(a) of the Bankruptcy Code, either by separate motion filed with the Bankruptcy Court or pursuant to the terms of the Plan and the order confirming the Plan; _provided_, in each case, with respect to any provision of a Specified Employee Plan that relates to a "change in control", "change of control" or words of similar import, that the Debtors, and, if applicable, the individual participants in the applicable Specified Employee Plan, agree that the Restructuring and related transactions do not constitute such an event for purposes of such Specified Employee Plan. Notwithstanding anything contained herein, any employment agreements or offer letters relating to senior management personnel and officers of the HCR Entities shall not be assumed without the advanced written consent of the Required Backstop Parties. |
| **D&O Liability Insurance Policies, Tail Policies, and Indemnification** | The Debtors shall maintain and continue in full force and effect all insurance policies (and purchase any related tail policies providing for coverage for at least a six-year period after the Effective Date) for directors', managers' and officers' liability (the "D&O Liability Insurance Policies"). The Debtors shall assume (and assign to the Reorganized Debtors, if necessary), pursuant to section 365(a) of the Bankruptcy Code, either by a separate motion filed with the Bankruptcy Court or pursuant to the terms of the Plan and the order confirming the Plan, all of the D&O Liability Insurance Policies and all indemnification provision in existence as of the date of the RSA for directors, managers and officers of the HCR Entities (whether in by-laws, certificate of formation or incorporation, board resolutions, employment contracts, or otherwise, such indemnification provisions, "Indemnification Provisions"). All claims arising from the D&O Liability Insurance Policies and such Indemnification Provisions shall be unimpaired by the Plan. Notwithstanding anything to the contrary herein, the Reorganized Debtors shall not assume any obligations under the Indemnification Provisions with respect to any of the Debtors' |

| | |
|---|---|
| | senior officers or managers, as applicable, who (i) received retention payments from the Debtors in July 2020 and prior to the Petition Date, and (ii) are not employed by the Reorganized Debtors as of June 30, 2021 (such senior managers or officers, the "Designated Persons"). |
| **Cancellation of Instruments, Certificates and Other Documents** | On the Effective Date, except to the extent otherwise provided above or in the Plan, all instruments, certificates and other documents evidencing indebtedness or debt securities of, or Interests in, any of the Debtors shall be cancelled, and the obligations of the Debtors thereunder, or in any way related thereto, shall be discharged. |
| **Restructuring Expenses** | On the Effective Date, in addition to the Backstop Expenses, without the need to file a fee or retention application in the Chapter 11 Cases, the HCR Entities shall pay all reasonable and documented fees and expenses, including fees and expenses estimated to be incurred through the Effective Date to the extent invoiced at least one (1) business day prior to the Effective Date, of the Ad Hoc Group Advisors (the "Restructuring Expenses"). |
| **Exemption from SEC Registration** | The issuance of all securities under the Plan will be exempt from registration under (a) section 1145 of the Bankruptcy Code to the extent permitted pursuant to section 1145 of the Bankruptcy Code, or (b) such other applicable securities law exemption that is acceptable to the Debtors and the Required Backstop Parties. |
| **Definitive Documentation** | The Definitive Documentation, including the Plan Supplement, shall be in form and substance acceptable to the Debtors and the Required Backstop Parties. The Plan and each of the Definitive Documentation shall contain conditions precedent that are usual and customary for the transactions contemplated thereby. |
| **Tax Issues** | The terms of the Restructuring shall, to the extent practicable, be structured to (a) preserve or otherwise maximize favorable tax attributes (including tax basis) of the HCR Entities, and (b) achieve the most optimal and efficient tax outcomes for the HCR Entities, the Consenting Noteholders, and the Backstop Parties taking into account applicable tax and securities law, applicable regulations, and business and cost considerations, in a manner acceptable to the Debtors and the Required Backstop Parties. |
| **Fiduciary Out** | Notwithstanding anything to the contrary herein, the terms of this Term Sheet shall be subject to the "fiduciary out" provisions set forth in the RSA. |
| **Company Governance/Organizational Documents/Release** | |
| **New Board** | The composition of Reorganized Holdco's initial board of directors (the "New Board") shall consist of five (5) directors in total, which shall include (a) the Chief Executive Officer of Reorganized Holdco and (b) other directors designated by the Backstop Parties prior to the Effective Date and disclosed in the Plan Supplement. |
| **Management Incentive Plan** | After the Effective Date, the New Board shall adopt a management equity incentive plan (the "MIP") pursuant to which New Common Stock (or restricted stock units, options, or other instruments (including "profits interests" in Reorganized Holdco), or some combination of the foregoing) representing up to 10% of the New Common Stock issued as of the Effective Date on a fully diluted basis may be reserved for grants (the "MIP Equity") to be made from time to time to the directors, officers, and other management of Reorganized Holdco, subject to the terms and conditions |

| | |
|---|---|
| | set forth in the MIP.  The details and allocation of the MIP and the underlying awards will be determined by the New Board. |
| **New Stockholders' Agreement / Amended Governance Documents** | Holders of New Common Stock shall be deemed parties to the New Stockholders' Agreement, subject to the consent rights set forth in the RSA, the material terms of which shall be set forth in the Plan Supplement. The Amended Governance Documents shall be subject to the consent rights set forth in the RSA. |
| **Releases** | The Plan and order confirming the Plan shall provide customary mutual releases, with a customary exclusion for criminal acts, gross negligence, willful misconduct, and fraud, in each case, to the fullest extent permitted by law, for the benefit of the HCR Entities, members of the Ad Hoc Group, the DIP ABL Lenders, the DIP ABL Agent, the DIP Term Loan Lenders, the DIP Term Loan Agent, the Consenting Noteholders, the Backstop Parties, the Existing Agent, the Existing Lenders, and such entities' respective current and former affiliates, and such entities' and their current and former affiliates' current and former officers, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, and each of their current and former officers, managers, directors, equity holders, principals, members, employees, agents, managed accounts or funds, management companies, fund advisors, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such (collectively, the "Released Parties"); provided, that the Designated Persons shall not be Released Parties. |
| | Such releases shall include, without limitation, any and all claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, including any derivative claims and avoidance actions, of the HCR Entities and such other releasing party, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the HCR Entities or such other releasing party would have been legally entitled to assert in its own right (whether individually or collectively), or on behalf of the holder of any claim or equity interest (whether individually or collectively) or other entity, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place at any time prior to or on the Effective Date arising from or related in any way in whole or in part to the HCR Entities or their affiliates or subsidiaries, the Existing Credit Facility, the Senior Notes, the DIP ABL Facility, the DIP Term Loan Facility, the Exit ABL Facility, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the HCR Entities, the subject matter of, or the transactions or events giving rise to, any claim or equity interest that is treated in the Plan, or the negotiation, formulation, or preparation of the Definitive Documentation or related agreements, instruments, or other documents.  To the maximum extent permitted by applicable law, any such releases shall bind all parties who affirmatively vote to accept the Plan, those parties who abstain from voting on the Plan if they fail to opt-out of the releases, those parties that vote to reject the Plan unless they opt-out of the releases, and those non-voting parties that fail to return an opt-out form. |
| **Exculpation** | Customary exculpation provisions. |

| Discharge | Customary discharge provisions. |
| Injunction | Customary injunction provisions. |

*     *     *     *

## Exhibit 1

**DIP ABL Agreement**

**DIP ABL Agreement**

Available at Docket No. 9

**<u>Exhibit 2</u>**

**DIP TL Agreement**

**DIP TL Agreement**

Available at Docket No. 9

## Exhibit 3

**New Secured Notes Term Sheet**

| Hi-Crush Inc. – Summary of Terms of New Secured Convertible Notes[1] | |
|---|---|
| **Issuer** | ▪ Reorganized Holdco |
| **Guarantors** | ▪ All domestic subsidiaries of Reorganized Holdco |
| **Size** | ▪ $48.1 million of New Secured Convertible Notes (inclusive of $4.8 million on account of the Put Option Premium) to be issued on the Effective Date |
| **Initial Principal Amount** | ▪ $1,000 per New Secured Convertible Note |
| **Initial Purchasers** | ▪ Holders of Allowed Senior Notes Claims and Allowed General Unsecured Claims who are Accredited Investors and participate in the Rights Offering; to be fully backstopped by the Backstop Parties |
| **Trustee / Collateral Agent** | ▪ To be selected by the Required Backstop Parties |
| **Collateral and Priority** | ▪ Secured on (a) a second lien basis on all assets of the Issuer and the Guarantors securing any obligations under the prepetition credit agreement (the "Exit ABL Priority Collateral"), which such Exit ABL Priority Collateral shall secure on a first lien basis the obligations of the Issuer and the Guarantors under the Exit ABL Facility, and (b) a first lien basis on all assets that do not constitute Exit ABL Priority Collateral, in each case, subject to certain exceptions agreed to by the Required Backstop Parties. <br> ▪ A typical crossing-lien arrangement and secured note/ABL intercreditor agreement, in each case that is acceptable to the Required Backstop Parties, shall be entered into in order to provide the holders of the New Secured Convertible Notes with first lien claims on all assets of the Issuer and the Guarantors other than the Exit ABL Priority Collateral, on which the holders of the New Secured Convertible Notes would have a second lien claim. |
| **Interest Rate and Fees** | ▪ Interest Rate: 8.0%, payable in cash; or 10.0% payable in-kind at the Issuer's option. |
| **Conversion** | ▪ In the aggregate, convertible into 95% of the total number of shares of New Common Stock that are issued and outstanding on the Effective Date after giving effect to the consummation of the Restructuring (subject to dilution by the MIP Equity). <br> ▪ The New Secured Convertible Notes will be convertible at any time in whole or in part at the sole option of the holder thereof. <br> ▪ Mandatory Conversion Events: None, except for mandatory conversion upon the consummation of a M&A transaction involving all, or substantially all, of the Issuer's and Guarantors' assets that has been consented to by holders of at least two-thirds in amount of the aggregate principal amount of all then outstanding New Secured Convertible Notes. |
| **Maturity** | ▪ 5½ years from the issue date |
| **Amortization** | ▪ None |
| **Call Protection** | ▪ NC2 / 50% of the coupon / 25% of the coupon / par |
| **Use of Proceeds** | ▪ To satisfy DIP Term Loan Facility obligations, pay expenses incurred in connection with the Restructuring and for working capital and other general corporate purposes |
| **Mandatory Prepayments** | ▪ Asset sale offers shall be made at par with any excess cash proceeds after giving effect to reinvestment rights acceptable to the Required Backstop Parties <br> ▪ Such asset sale offers shall be subject to *de minimis* exceptions and customary carveouts acceptable to the Required Backstop Parties |

---

[1] Defined terms used herein but not defined herein shall have the definitions assigned to such terms in the Restructuring Term Sheet to which this Exhibit 2 is attached.

| Change of Control | • To be defined in a manner acceptable to the Required Backstop Parties<br>• Occurrence triggers a 101 Change of Control Offer |
|---|---|
| Governance Voting Rights | • Pursuant to Section 221 of Delaware Law, holders shall be entitled to vote upon all matters upon which holders of any class or classes of New Common Stock have the right to vote and shall be deemed to be stockholders of Reorganized Holdco (and the New Secured Convertible Notes shall be deemed to be stock) for the purpose of any provision of Delaware law that requires the vote of stockholders as a prerequisite to any corporate action, including the appointment of directors. The number of votes represented by each New Secured Convertible Note shall be equal to the largest number of whole shares of New Common Stock (rounded down to the nearest whole share) into which such New Secured Convertible Note may be converted, in accordance with the indenture governing the terms of the New Secured Convertible Notes, at the record date for the determination of the stockholders entitled to vote on such matters or, if no such record date is established, at the date such vote is taken. |
| Covenants | • To include an aggregate of $35 million of debt and lien incurrence capacity for project financing, with all such project financing to be subject to the approval of the New Board in all respects.<br>• To include other affirmative and negative covenants acceptable to the Required Backstop Parties |
| Financial Covenants | • None |
| Events of Default | • To include events of default acceptable to the Required Backstop Parties |
| Conditions Precedent | • Other customary conditions precedent for an issuance of senior secured convertible notes<br>• Consummation of a plan of reorganization acceptable to the Required Backstop Parties<br>• Execution of definitive documentation acceptable to the Required Backstop Parties |

**Exhibit B** to the Restructuring Support Agreement

**Form of Transferee Joinder**

**Form of Transferee Joinder**

This joinder (this "Joinder") to the Restructuring Support Agreement (the "Agreement"), dated as of July 12, 2020, by and among: (i) the HCR Entities and (ii) Consenting Noteholders, is executed and delivered by [_____] (the "Joining Party") as of [_____]. Each capitalized term used herein but not otherwise defined shall have the meaning ascribed to it in the Agreement.

1.     Agreement to be Bound. The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder as Annex 1 (as the same has been or may be hereafter amended, restated, or otherwise modified from time to time in accordance with the provisions thereof). The Joining Party shall hereafter be deemed to be a Party for all purposes under the Agreement and one or more of the entities comprising the Consenting Noteholder.

2.     Representations and Warranties. The Joining Party hereby represents and warrants to each other Party to the Agreement that, as of the date hereof, such Joining Party (a) is the legal or beneficial holder of, and has all necessary authority (including authority to bind any other legal or beneficial holder) with respect to, the Senior Notes Claims identified below its name on the signature page hereof, and (b) makes, as of the date hereof, the representations and warranties set forth in Section 17(a) of the Agreement to each other Party.

3.     Governing Law. This Joinder shall be governed by and construed in accordance with the internal laws of the State of New York without regard to any conflicts of law provisions which would require the application of the law of any other jurisdiction.

4.     Notice. All notices and other communications given or made pursuant to the Agreement shall be sent to:

To the Joining Party at:

[JOINING PARTY]
[ADDRESS]
Attn:
Facsimile:
Email:

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date first written above.

**[JOINING PARTY]**

By: _____

Name:

Title:


Principal Amount of Senior Notes Claims:            $_____


Notice Address:



Fax:

Attention:

Email:

**<u>Annex 1</u> to the Form of Transferee Joinder**

**Restructuring Support Agreement**