*Solicitation Version*

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |  |
|---|---|---|
| ------------------------------------------------------------- | x | |
| In re: | : | Chapter 11 |
| | : | |
| HI-CRUSH INC., *et al.*,[1] | : | Case No. 20-33495 (DRJ) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |
| ------------------------------------------------------------- | x | |

## DISCLOSURE STATEMENT FOR THE JOINT
## PLAN OF REORGANIZATION FOR HI-CRUSH INC. AND ITS
## AFFILIATE DEBTORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

<table>
<tr><td><b>HUNTON ANDREWS KURTH LLP</b></td><td><b>LATHAM & WATKINS LLP</b></td></tr>
<tr><td>Timothy A. ("Tad") Davidson II (No. 24012503)<br>Ashley L. Harper (No. 24065272)<br>600 Travis Street, Suite 4200<br>Houston, Texas 77002<br>Telephone:  (713) 220-4200<br>Facsimile:  (713) 220-4285</td><td>George A. Davis (admitted <i>pro hac vice</i>)<br>Keith A. Simon (admitted <i>pro hac vice</i>)<br>David A. Hammerman (admitted <i>pro hac vice</i>)<br>Annemarie V. Reilly (admitted <i>pro hac vice</i>)<br>Hugh K. Murtagh (admitted <i>pro hac vice</i>)<br>885 Third Avenue<br>New York, New York 10022<br>Telephone:  (212) 906-1200<br>Facsimile:  (212) 751-4864</td></tr>
</table>

*Proposed Counsel for the Debtors and Debtors-in-Possession*

Dated:   August 15, 2020

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Hi-Crush Inc. (0530), OnCore Processing LLC (9403), Hi-Crush Augusta LLC (0668), Hi-Crush Whitehall LLC (5562), PDQ Properties LLC (9169), Hi-Crush Wyeville Operating LLC (5797), D & I Silica, LLC (9957), Hi-Crush Blair LLC (7094), Hi-Crush LMS LLC, Hi-Crush Investments Inc. (6547), Hi-Crush Permian Sand LLC, Hi-Crush Proppants LLC (0770), Hi-Crush PODS LLC, Hi-Crush Canada Inc. (9195), Hi-Crush Holdings LLC, Hi-Crush Services LLC (6206), BulkTracer Holdings LLC (4085), Pronghorn Logistics Holdings, LLC (5223), FB Industries USA Inc. (8208), PropDispatch LLC, Pronghorn Logistics, LLC (4547), and FB Logistics, LLC (8641).  The Debtors' address is 1330 Post Oak Blvd, Suite 600, Houston, Texas 77056.

US-DOCS\117417332.2

*Solicitation Version*

**DISCLOSURE STATEMENT, DATED AUGUST 15, 2020**

**Solicitation of Votes**
**On the Joint Plan of Reorganization of**

**HI-CRUSH INC., *ET AL*.**

**from the holders of outstanding**

**PREPETITION NOTES CLAIMS**

**and**

**GENERAL UNSECURED CLAIMS**

> **THE VOTING DEADLINE IS 5:00 P.M. PREVAILING CENTRAL TIME ON SEPTEMBER 18, 2020 (UNLESS THE DEBTORS EXTEND THE VOTING DEADLINE) (THE "VOTING DEADLINE"). THE VOTING RECORD DATE FOR DETERMINING WHICH HOLDERS OF PREPETITION NOTES CLAIMS AND WHICH HOLDERS OF GENERAL UNSECURED CLAIMS MAY VOTE ON THE PLAN IS AUGUST 14, 2020 (THE "VOTING RECORD DATE").**
>
> **TO BE COUNTED AS A VOTE TO ACCEPT OR REJECT THE PLAN, THE VOTING AND CLAIMS AGENT MUST ACTUALLY RECEIVE YOUR BALLOT ON OR BEFORE THE VOTING DEADLINE AS SET FORTH IN THE DISCLOSURE STATEMENT ORDER.**
>
> **THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN AND ANY EXHIBITS ATTACHED SHOULD NOT BE RELIED UPON IN MAKING INVESTMENT DECISIONS WITH RESPECT TO THE DEBTORS OR ANY OTHER ENTITIES THAT MAY BE AFFECTED BY THE CHAPTER 11 CASES.**

---

**IMPORTANT INFORMATION FOR YOU TO READ**

---

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT FOR THE PURPOSE OF SOLICITING VOTES TO ACCEPT THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY STATE AUTHORITY AND NEITHER THE SEC NOR ANY STATE AUTHORITY HAVE PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THIS DISCLOSURE STATEMENT CONTAINS "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF

FORWARD-LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE" OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY.  THE READER IS CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS.  THE LIQUIDATION ANALYSIS, DISTRIBUTION PROJECTIONS AND OTHER INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ESTIMATES ONLY, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED.  THEREFORE, ANY ANALYSES, ESTIMATES OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.

FURTHERMORE, WHILE THE DEBTORS BELIEVE THE ASSUMPTIONS ON WHICH THE FORWARD-LOOKING STATEMENTS HEREIN ARE BASED ARE REASONABLE, READERS ARE CAUTIONED AGAINST RELYING ON ANY FORWARD-LOOKING STATEMENTS, AS IT IS VERY DIFFICULT TO PREDICT THE IMPACT OF KNOWN FACTORS AND IT IS IMPOSSIBLE TO ANTICIPATE ALL FACTORS THAT COULD AFFECT ACTUAL RESULTS. IMPORTANT FACTORS THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY FROM THOSE IN THE FORWARD-LOOKING STATEMENTS HEREIN INCLUDE, BUT ARE NOT LIMITED TO, THE ABILITY TO CONFIRM AND CONSUMMATE A PLAN OF REORGANIZATION IN ACCORDANCE WITH THE TERMS OF THE RESTRUCTURING SUPPORT AGREEMENT; RISKS ATTENDANT TO THE BANKRUPTCY PROCESS, INCLUDING THE DEBTORS' ABILITY TO OBTAIN THE APPROVAL OF THE BANKRUPTCY COURT WITH RESPECT TO MOTIONS FILED IN THE CASES; THE OUTCOMES OF BANKRUPTCY CASES AND THE LENGTH OF TIME THAT THE DEBTORS MAY BE REQUIRED TO OPERATE IN BANKRUPTCY; THE EFFECTIVENESS OF THE OVERALL RESTRUCTURING ACTIVITIES AND ANY ADDITIONAL STRATEGIES THAT THE DEBTORS EMPLOY TO ADDRESS LIQUIDITY AND CAPITAL RESOURCES; THE ACTIONS AND DECISIONS OF CREDITORS, REGULATORS AND OTHER THIRD PARTIES THAT HAVE AN INTEREST IN THE CASES, WHICH MAY INTERFERE WITH THE ABILITY TO CONFIRM AND CONSUMMATE A PLAN OF REORGANIZATION; RESTRICTIONS ON THE DEBTORS DUE TO THE TERMS OF THE DEBTOR-IN-POSSESSION CREDIT FACILITIES ENTERED INTO IN CONNECTION WITH THE BANKRUPTCY CASES AND RESTRICTIONS IMPOSED BY THE BANKRUPTCY COURT; THE DEBTORS' ABILITY TO REALIZE THE COST SAVINGS AND BUSINESS ENHANCEMENTS FROM THEIR RESTRUCTURING EFFORTS; A WEAKENING OF GLOBAL ECONOMIC AND FINANCIAL CONDITIONS; CHANGES IN GOVERNMENTAL REGULATIONS AND RELATED COMPLIANCE; AND LITIGATION COSTS AND THE OTHER FACTORS LISTED IN THE DEBTORS' SEC FILINGS.  THE DEBTORS ARE UNDER NO OBLIGATION TO (AND EXPRESSLY DISCLAIM ANY OBLIGATION TO) UPDATE OR ALTER ANY FORWARD-LOOKING STATEMENTS WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016 AND IS NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.  THE SECURITIES DESCRIBED HEREIN WILL BE ISSUED TO CREDITORS WITHOUT REGISTRATION UNDER THE UNITED STATES SECURITIES ACT

US-DOCS\117417332.2

OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY SIMILAR FEDERAL, STATE OR LOCAL LAW, AND WILL INSTEAD RELY UPON THE EXEMPTIONS SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE AND SECTION 4(A)(2) OF THE SECURITIES ACT OR OTHER APPLICABLE EXEMPTIONS.  THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF ANY SECURITIES PURSUANT TO THE PLAN CONSULT THEIR OWN LEGAL COUNSEL CONCERNING THE SECURITIES LAWS GOVERNING THE TRANSFERABILITY OF ANY SUCH SECURITIES.

THE RIGHTS OFFERING WILL BE CONDUCTED PURSUANT TO SEPARATE RIGHTS OFFERING PROCEDURES.  ANY DISCLOSURE CONTAINED HEREIN CONCERNING THE RIGHTS OFFERING IS SOLELY FOR INFORMATIONAL PURPOSES.

THE NEW EQUITY INTERESTS, THE SUBSCRIPTION RIGHTS (AND THE NEW SECURED CONVERTIBLE NOTES ISSUABLE PURSUANT TO THE EXERCISE OF THE SUBSCRIPTION RIGHTS), AND ANY OTHER NEW SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SEC OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL, OR REGULATORY AUTHORITY, AND NEITHER THE SEC NOR ANY AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF PLAN.

THE PLAN PROVIDES THAT (A) HOLDERS OF CLAIMS THAT VOTE TO ACCEPT THE PLAN, (B) HOLDERS OF CLAIMS IN VOTING CLASSES WHO DO NOT SUBMIT A BALLOT VOTING TO ACCEPT OR REJECT THE PLAN OR WHO VOTE TO REJECT THE PLAN BUT DO NOT OPT OUT OF THE RELEASE PROVISIONS OF THE PLAN, AND (C) HOLDERS OF CLAIMS OR EQUITY INTERESTS WHO ARE IN A NON-VOTING CLASS WHO DO NOT OPT OUT OF THE RELEASE PROVISIONS SET FORTH IN ARTICLE X.B OF THE PLAN ARE DEEMED TO HAVE GRANTED THE RELEASES THEREIN.

NO LEGAL OR TAX ADVICE IS PROVIDED TO YOU BY THIS DISCLOSURE STATEMENT.  THE DEBTORS URGE EACH HOLDER OF A CLAIM OR AN EQUITY INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF DISCLOSURE CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE MERITS OF THE PLAN.

IT IS THE DEBTORS' POSITION THAT THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER.  RATHER, THIS DISCLOSURE STATEMENT SHALL CONSTITUTE A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS RELATED TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS.

NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR LITIGATION CLAIM OR PROJECTED OBJECTION TO A PARTICULAR CLAIM IS, OR IS NOT, IDENTIFIED IN THE DISCLOSURE STATEMENT.  THE DEBTORS OR THE REORGANIZED DEBTORS MAY SEEK TO INVESTIGATE, FILE AND PROSECUTE CLAIMS

US-DOCS\117417332.2

**AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THE DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.**

**IN REVIEWING THIS DISCLOSURE STATEMENT AND THE PLAN, AND IN DETERMINING WHETHER TO VOTE IN FAVOR OF OR AGAINST, OR TO OBJECT TO CONFIRMATION OF, THE PLAN, CREDITORS, AND STAKEHOLDERS SHOULD BE AWARE THAT THE PLAN PRESERVES CERTAIN CAUSES OF ACTION (INCLUDING AVOIDANCE ACTIONS) AND THAT THE PLAN AUTHORIZES THE REORGANIZED DEBTORS TO PROSECUTE THE SAME.**

**THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE DEBTORS' CHAPTER 11 CASES AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE ATTACHED HERETO AND INCORPORATED HEREIN BY REFERENCE. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THE SUMMARIES DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY CONFLICT, INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN AND CONTROL FOR ALL PURPOSES. EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED, FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.**

**THE DEBTORS' MANAGEMENT HAS REVIEWED THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT. ALTHOUGH THE DEBTORS HAVE USED THEIR REASONABLE BUSINESS JUDGMENT TO ENSURE THE ACCURACY OF THIS FINANCIAL INFORMATION, THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED (UNLESS EXPRESSLY PROVIDED HEREIN).**

**THE DEBTORS ARE GENERALLY MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF WHERE FEASIBLE, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO. HOLDERS OF CLAIMS AND EQUITY INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THE DISCLOSURE STATEMENT WAS FILED. THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.**

US-DOCS\117417332.2

**HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN MUST RELY ON THEIR OWN EVALUATION OF THE DEBTORS AND THEIR OWN ANALYSES OF THE TERMS OF THE PLAN IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.  IMPORTANTLY, PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM IN A VOTING CLASS SHOULD REVIEW THE PLAN IN ITS ENTIRETY AND CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT AND ANY EXHIBITS HERETO, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL IN SECTION VI HEREIN, "PLAN-RELATED RISK FACTORS."**

**TABLE OF CONTENTS**

**Page**

I.     **EXECUTIVE SUMMARY** ............................................................................................... i

     A.     Purpose and Effect of the Plan........................................................................... ii

     B.     Administrative, DIP Facility Claims, and Priority Tax Claims ................................... vi

     C.     Classification and Treatment of Claims and Equity Interests Under the Plan........... viii

     D.     Solicitation Procedures ...................................................................................xv

     E.     Voting Procedures..........................................................................................xx

     F.     Confirmation of the Plan.............................................................................. xxiii

     G.     Consummation of the Plan............................................................................ xxiv

     H.     Risk Factors ............................................................................................... xxiv

II.     **BACKGROUND TO THE CHAPTER 11 CASES** ..............................................................1

     A.     Overview of The Debtors' Corporate History and Businesses...................................1

     B.     Prepetition Indebtedness .................................................................................3

     C.     Events Leading to the Chapter 11 Filing .............................................................4

III.     **EVENTS DURING THE CHAPTER 11 CASES** .............................................................11

     A.     First Day Motions and Certain Related Relief.....................................................11

     B.     The Railcar Rejection Motion and the Omnibus Rejection Motion ..........................13

     C.     Rights Offering And Backstop Purchase Agreement ............................................13

     D.     Filing of the Schedules...................................................................................14

     E.     Exclusive Period for Filing a Chapter 11 Plan and Soliciting Votes...........................15

IV.     **SUMMARY OF THE PLAN** ........................................................................................16

     A.     Administrative and Priority Tax Claims.............................................................16

     B.     Classification and Treatment of Classified Claims and Equity Interests....................18

     C.     Acceptance or Rejection of the Plan..................................................................24

     D.     Means for Implementation of the Plan...............................................................25

     E.     Treatment of Executory Contracts and Unexpired Leases .....................................33

     F.     Provisions Governing Distributions..................................................................38

     G.     Procedures for Resolving Contingent, Unliquidated and Disputed Claims.................42

H.      Conditions Precedent to Confirmation and Consummation of the Plan ......................44

I.      Release, Discharge, Injunction And Related Provisions ...........................................46

V.   **CONFIRMATION AND CONSUMMATION PROCEDURES** ...................................**54**

A.      Confirmation Procedures .........................................................................................54

B.      Statutory Requirements for Confirmation of the Plan ................................................54

C.      Consummation of the Plan .......................................................................................60

VI.  **PLAN-RELATED RISK FACTORS** ..............................................................................**61**

A.      Certain Bankruptcy Law Considerations .................................................................61

B.      Risk Factors That May Affect the Value of Securities to be Issued Under the
        Plan and/or Recoveries Under the Plan ....................................................................64

C.      Risk Factors that Could Negatively Impact the Debtors' And Reorganized
        Debtors' Business ....................................................................................................65

D.      Risks Associated with Forward-Looking Statements ................................................82

E.      Disclosure Statement Disclaimer .............................................................................83

VII. **ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE
     PLAN** ...............................................................................................................................**86**

A.      Liquidation Under Chapter 7 of the Bankruptcy Code ..............................................86

B.      Filing of an Alternative Plan of Reorganization .......................................................86

VIII. **EXEMPTIONS FROM SECURITIES ACT REGISTRATION** ...................................**87**

IX.  **CERTAIN U.S. FEDERAL INCOME  TAX CONSEQUENCES OF THE
     PLAN** ...............................................................................................................................**91**

A.      Introduction ............................................................................................................91

B.      Certain U.S. Federal Income Tax Consequences to the Debtors ...............................92

C.      Certain U.S. Federal Income Tax Consequences to Holders of Prepetition notes
        claims and General Unsecured Claims .....................................................................95

X.   **DISCLOSURE STATEMENT OBJECTIONS** ............................................................**102**

A.      Tort Claims ...........................................................................................................102

B.      Surety Matters .......................................................................................................103

**RECOMMENDATION** ..............................................................................................................**105**

## EXHIBITS

EXHIBIT A     Plan of Reorganization

EXHIBIT B     Financial Projections

EXHIBIT C     Liquidation Analysis

EXHIBIT D     [Reserved]

EXHIBIT E     Valuation Analysis

EXHIBIT F     Disclosure Statement Order

> THE DEBTORS HEREBY ADOPT AND INCORPORATE EACH EXHIBIT ATTACHED TO THIS DISCLOSURE STATEMENT BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN.

US-DOCS\117417332.2

# I.
# EXECUTIVE SUMMARY

Hi-Crush Inc. ("**Parent**"), a Delaware corporation with its primary headquarters in Houston, Texas, and the other debtors and debtors in possession (collectively, the "**Debtors**" or the "**Company**"), submit this Disclosure Statement pursuant to sections 1125 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended from time to time, the "**Bankruptcy Code**") and other applicable law, in connection with the solicitation of votes (the "**Solicitation**") on the *Joint Plan of Reorganization for Hi-Crush Inc. and its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code* dated August 15, 2020 (the "**Plan**"),[1] which was filed by the Debtors in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "**Bankruptcy Court**").  A copy of the Plan is attached hereto as Exhibit A.

The Debtors are commencing this Solicitation to implement a comprehensive financial restructuring to deleverage the Debtors' balance sheet to ensure the long-term viability of the Debtors' enterprise.  As a result of extensive, good faith, and arm's-length negotiations, the Debtors and Holders of approximately 94% of the Prepetition Notes (the "**Consenting Noteholders**") entered into a restructuring support agreement (the "**Restructuring Support Agreement**") dated as of July 12, 2020, a copy of which is attached to the *Declaration of J. Philip McCormick, Jr., Chief Financial Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 24] as Exhibit B.  Under the terms of the Restructuring Support Agreement, the Consenting Noteholders have agreed, subject to the terms and conditions of the Restructuring Support Agreement, to support a restructuring of the Debtors' existing capital structure and operations in chapter 11 and to vote to accept the Plan.

Prior to soliciting votes on a proposed plan of reorganization, section 1125 of the Bankruptcy Code requires debtors to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance or rejection of the plan of reorganization.  As such, this Disclosure Statement is being submitted in accordance with the requirements of section 1125 of the Bankruptcy Code.

This Disclosure Statement solicits votes for acceptance of the Plan from Holders of Prepetition Notes Claims and Holders of General Unsecured Claims.  This Executive Summary is being provided as an overview of the material items addressed in the Disclosure Statement and the Plan, which is qualified by reference to the entire Disclosure Statement and by the actual terms of the Plan (and including all exhibits attached hereto, to the Plan and the Plan Supplement), and should not be relied upon for a comprehensive discussion of the Disclosure Statement and/or the Plan.  This Disclosure Statement includes, without limitation, information about:

- the Debtors' prepetition operating and financial history;

- the events leading up to the commencement of the above-captioned chapter 11 cases (collectively, the "**Chapter 11 Cases**");

- the significant events that have occurred during the Chapter 11 Cases;

---

[1]   All capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.  To the extent that a definition of a term in the text of this Disclosure Statement and the definition of such term in the Plan are inconsistent, the definition included in the Plan shall control and govern.

US-DOCS\117417332.2

- the solicitation procedures for voting on the Plan;

- the confirmation process and the voting procedures that Holders of Claims who are entitled to vote on the Plan must follow for their votes to be counted;

- the terms and provisions of the Plan, including certain effects of confirmation of the Plan, certain risk factors relating to the Debtors or the Reorganized Debtors, the Plan and the securities to be issued under the Plan, and the manner in which distributions will be made under the Plan; and

- the proposed organization, operations and financing of the Reorganized Debtors if the Plan is confirmed and becomes effective.

## A.      PURPOSE AND EFFECT OF THE PLAN

### 1.      Plan of Reorganization Under Chapter 11 of the Bankruptcy Code

The Debtors are reorganizing pursuant to chapter 11 of the Bankruptcy Code, which is the principal business reorganization chapter of the Bankruptcy Code.  As a result, the confirmation of the Plan means that the Reorganized Debtors will continue to operate their businesses going forward and does not mean that the Debtors will be liquidated or forced to go out of business.  Additionally, as discussed in greater detail in Section IV.I.8 herein, titled "Binding Nature of the Plan," a bankruptcy court's confirmation of a plan binds debtors, any entity acquiring property under the plan, any holder of a claim against or equity interest in a debtor and all other entities as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code to the terms and conditions of the confirmed plan, whether or not such entity voted on the particular plan or affirmatively voted to reject the plan.

### 2.      Financial Restructurings Under the Plan

The Plan contemplates certain transactions, including, without limitation, the following transactions (described in greater detail in Section IV herein):

- The Chapter 11 Cases will be financed by two debtor-in-possession financing facilities, including (a) the DIP ABL Facility, which consists of a $25 million superpriority senior secured asset-based revolving loan financing facility, which will refinance and satisfy in full the Debtors' obligations under the Prepetition Credit Agreement and (b) the DIP Term Loan Facility, which consists of a $40 million superpriority secured delayed-draw term loan financing facility funded by the members of the Ad Hoc Noteholders Committee.

- On the effective date of the Plan, the Reorganized Debtors will enter into a new credit agreement providing for a new senior secured asset-based revolving loan facility with an aggregate principal commitment amount of $25 million and a $25 million letter of credit sub-limit (the "**Exit Facility Loans**"), which will refinance and replace the DIP ABL Facility;

- As set forth in the Restructuring Term Sheet (which is attached as Exhibit A to the Restructuring Support Agreement, itself attached as Exhibit A to the Plan), the Debtors will conduct a $43.3 million Rights Offering to eligible Holders of Allowed Prepetition Notes Claims and Allowed General Unsecured Claims, to be fully backstopped by the Backstop Parties on the terms and conditions set forth in the Backstop Purchase Agreement, and in accordance with the Rights Offering Procedures, pursuant to which the rights offering

ii

participants will be offered the right to purchase New Secured Convertible Notes. As set forth in the New Secured Notes Term Sheet (attached as Exhibit 3 to the Restructuring Term Sheet) and described in further detail below:

o  the New Secured Convertible Notes (including the Put Option Notes) to be issued pursuant to the Rights Offering and the Backstop Purchase Agreement are, in the aggregate, convertible into 95% of the total number of shares of New Equity Interests that are issued on the Effective Date after giving effect to the consummation of the Restructuring Transactions (subject to dilution by the New Management Incentive Plan Equity);

o  the New Secured Convertible Notes will be convertible at any time in whole or in part at the sole option of the holder thereof; and

o  there are no mandatory conversion events with respect to the New Secured Convertible Notes except for mandatory conversion upon the consummation of a merger or acquisition transaction involving all, or substantially all, of the Reorganized Debtors' assets that has been consented to by holders of at least two-thirds in amount of the aggregate principal amount of all then outstanding New Secured Convertible Notes.

• The claims arising under the DIP Term Loan Facility will be paid in full in cash from the proceeds of the Rights Offering.

• The treatment of certain Classes of Claims and Equity Interests will be as follows:

o  Payment in full of all administrative expense claims, DIP Facility Claims, priority tax claims, other priority claims, other secured claims, and secured tax claims (or such other treatment rendering such claims unimpaired);

o  With respect to holders of Prepetition Notes Claims and General Unsecured Claims:

(a)  subscription rights to participate in the Rights Offering (which shall be attached to each applicable claim and transferable with such claim as set forth in the Rights Offering Procedures, but such subscription rights may only be exercised to the extent the holder is an Accredited Investor as of the Questionnaire Deadline) in accordance with the Disclosure Statement Order and the Rights Offering Procedures; and

(b)  its *pro rata* share of 100% of the New Equity Interests Pool, subject to dilution by (i) the New Equity Interests issued upon conversion of the New Secured Convertible Notes and (ii) the New Management Incentive Plan Equity;

**HOLDERS OF PREPETITION NOTES CLAIMS AND GENERAL UNSECURED CLAIMS ARE ADVISED THAT THE NEW EQUITY INTERESTS ISSUED TO THE HOLDERS OF ALLOWED PREPETITION NOTES CLAIMS AND ALLOWED GENERAL UNSECURED CLAIMS UNDER THE PLAN ARE (A) SUBJECT TO DILUTION BY (I) THE NEW EQUITY INTERESTS TO BE ISSUED UPON CONVERSION OF THE NEW SECURED CONVERTIBLE NOTES AND (II) THE NEW MANAGEMENT INCENTIVE PLAN EQUITY AND (B) SUBJECT TO THE TERMS OF THE NEW STOCKHOLDERS AGREEMENT OF**

iii

**REORGANIZED PARENT, IN SUBSTANTIALLY THE FORM TO BE FILED WITH THE PLAN SUPPLEMENT, WHICH AGREEMENT SHALL CONTAIN TERMS AND CONDITIONS ACCEPTABLE TO THE DEBTORS AND THE REQUIRED CONSENTING NOTEHOLDERS.**

**UPON CONVERSION OF THE NEW SECURED CONVERTIBLE NOTES, HOLDERS OF SUCH NEW SECURED CONVERTIBLE NOTES WILL (A) OWN 95% OF THE NEW EQUITY INTERESTS AND (B) SHARE OWNERSHIP OF THE REMAINING 5% OF THE NEW EQUITY INTERESTS PRO RATA WITH HOLDERS OF ALLOWED PREPETITION NOTES CLAIMS AND ALLOWED GENERAL UNSECURED CLAIMS WHO DO NOT PARTICIPATE IN THE RIGHTS OFFERING, IN EACH CASE, SUBJECT TO DILUTION BY THE NEW MANAGEMENT INCENTIVE PLAN EQUITY.   ACCORDINGLY, THE DEBTORS RECOMMEND THAT ELIGIBLE HOLDERS OF PREPETITION NOTES CLAIMS AND GENERAL UNSECURED CLAIMS PARTICIPATE IN THE RIGHTS OFFERING TO MAXIMIZE THEIR RECOVERY UNDER THE PLAN.**

    o   The New Equity Interests issued pursuant to the Plan to the holders of Prepetition Notes Claims and General Unsecured Claims is (a) subject to the terms of the New Stockholders Agreement of Reorganized Parent, in substantially the form to be filed with the Plan Supplement, which agreement shall contain terms and conditions acceptable to the Debtors and the Required Consenting Noteholders, and (b) subject to dilution by (i) the New Equity Interests issued upon conversion of the New Secured Convertible Notes and (ii) the New Management Incentive Plan Equity; and

    o   The Old Parent Interests will be cancelled, and each holder of an Old Parent Interest will not receive any distribution or retain any property on account of such Old Parent Interest.

- After the Effective Date, the New Board will adopt a management equity incentive plan for the benefit of the new management of the Reorganized Debtors.  The New Management Incentive Plan Equity issued pursuant to such management equity incentive plan shall dilute all New Equity Interests equally, including the New Equity Interests issued upon conversion of the New Secured Convertible Notes after the Effective Date.

**3.       Summary of Terms of the New Secured Convertible Notes[2]**

The following is a summary of the material terms of the New Secured Convertible Notes issued pursuant to the Rights Offering and the Backstop Purchase Agreement.  For further information regarding the terms of the New Secured Convertible Notes, Holders of Claims and Equity Interests are advised to review the New Secured Notes Term Sheet (attached as <u>Exhibit 3</u> to the Restructuring Term Sheet attached to the Restructuring Support Agreement):

- <u>Issuer</u>: Reorganized Holdco.

- <u>Guarantors</u>: All domestic subsidiaries of Reorganized Holdco.

---

[2]      Capitalized terms used but not defined in this subsection A.3 have the meanings ascribed to them in the Restructuring Term Sheet.

iv

US-DOCS\117417332.2

- **Size**: $48. l million aggregate principal amount of New Secured Convertible Notes (inclusive of $4.8 million on account of the Put Option Notes) to be issued on the Effective Date.

- **Initial Principal Amount**: $1,000 per New Secured Convertible Note.

- **Initial Purchasers**: Holders of Allowed Prepetition Notes Claims and Allowed (as defined in the Rights Offering Procedures) General Unsecured Claims who are Accredited Investors and participate in the Rights Offering; to be fully backstopped by the Backstop Parties pursuant to the Backstop Purchase Agreement.

- **Collateral and Priority**: Secured on (a) a second lien basis on all assets of the Issuer and the Guarantors securing any obligations under the Prepetition Credit Agreement (the "**Exit Priority Collateral**"), which such Exit Priority Collateral shall secure on a first lien basis the obligations of the Issuer and the Guarantors under the Exit Facility Credit Agreement, and (b) a first lien basis on all assets that do not constitute Exit Priority Collateral, in each case, subject to certain exceptions agreed to by the Required Backstop Parties.

- **Interest Rates and Fees**: Interest Rate: 8.0% payable semi-annually in cash or, at the Issuer's option, 10.0% payable in-kind.

- **Conversion**:

  o In the aggregate, convertible into 95% of the total number of shares of New Common Stock that are issued and outstanding on the Effective Date after giving effect to the consummation of the Restructuring (subject to dilution by the New Management Incentive Plan Equity).

  o The New Secured Convertible Notes will be convertible at any time in whole or in part at the sole option of the holder thereof.

  o *Mandatory Conversion Events*: None, except for mandatory conversion upon the consummation of a M&A transaction involving all, or substantially all, of the Issuer's and Guarantors' assets that has been consented to by holders of at least two-thirds in amount of the aggregate principal amount of all then outstanding New Secured Convertible Notes.

- **Maturity**: 5.5 years from the Effective Date.

- **Amortization**: None.

- The New Secured Convertible Notes are expected to be held through DTC.  Thus, in order to participate in the Rights Offering and receive New Secured Convertible Notes, a holder of an Eligible General Unsecured Claim must have, or open, a brokerage account with a DTC Participant to act as its nominee to hold any New Secured Convertible Notes.

v

**B.      ADMINISTRATIVE, DIP FACILITY CLAIMS, AND PRIORITY TAX CLAIMS**

The following is a summary of the treatment of Administrative Claims, DIP Facility Claims, and Priority Tax Claims under the Plan.  For a more detailed description of the treatment of such Claims under the Plan, please see Article II of the Plan.

**1.      Administrative Claims**

Subject to sub-paragraph (a) below, on the later of the Effective Date or the date on which an Administrative Claim becomes an Allowed Administrative Claim, or, in each such case, as soon as reasonably practicable thereafter, each Holder of an Allowed Administrative Claim (other than an Allowed Professional Fee Claim) will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim either (i) Cash equal to the amount of such Allowed Administrative Claim; or (ii) such other less favorable treatment as to which the Debtors (with the consent of the Required Consenting Noteholders) or Reorganized Debtors, as applicable, and the Holder of such Allowed Administrative Claim will have agreed upon in writing; *provided*, *however*, that Administrative Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.

(a)      Bar Date for Administrative Claims

Except as otherwise provided in the Plan, unless previously Filed or paid, requests for payment of Administrative Claims must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order or the occurrence of the Effective Date (as applicable) no later than the Administrative Claims Bar Date; *provided* that the foregoing will not apply to either the Holders of Claims arising under section 503(b)(1)(D) of the Bankruptcy Code or the Bankruptcy Court or United States Trustee as the Holders of Administrative Claims.  Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request by the Administrative Claims Bar Date will be forever barred, estopped and enjoined from asserting such Administrative Claims against the Debtors, the Reorganized Debtors and their respective Estates and property and such Administrative Claims will be deemed discharged as of the Effective Date.  All such Claims will, as of the Effective Date, be subject to the permanent injunction set forth in Article X.G of the Plan.  Nothing in Article II.A of the Plan will limit, alter, or impair the terms and conditions of the Claims Bar Date Order with respect to the Claims Bar Date for filing administrative expense claims arising under section 503(b)(9) of the Bankruptcy Code.

Objections to such requests must be Filed and served on the Reorganized Debtors and the requesting party by the later of (a) 120 days after the Effective Date and (b) 60 days after the Filing of the applicable request for payment of Administrative Claims, if applicable, as the same may be modified or extended from time to time by Final Order of the Bankruptcy Court.

vi

        (b)      Professional Fee Claims

Professionals or other Entities asserting a Professional Fee Claim for services rendered before the Effective Date must File and serve on the Reorganized Debtors and such other Entities who are designated in the Confirmation Order an application for final allowance of such Professional Fee Claim no later than the Professional Fees Bar Date; *provided* that the Reorganized Debtors will pay the reasonable fees, costs, and out-of-pocket expenses of the Debtors' Professionals in the ordinary course of business for any work performed after the Effective Date, including those reasonable and documented fees, costs, and expenses incurred by such Professionals in connection with the implementation and consummation of the Plan, in each case without further application or notice to or order of the Bankruptcy Court; *provided*, *further*, that any Debtor Professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses from the Debtors and Reorganized Debtors for services rendered before the Effective Date pursuant to the Ordinary Course Professionals Order, in each case without further application or notice to or order of the Bankruptcy Court.

Objections to any Professional Fee Claim must be Filed and served on the Reorganized Debtors and the requesting party by no later than thirty (30) days after the Filing of the applicable final request for payment of the Professional Fee Claim. Each Holder of an Allowed Professional Fee Claim will be paid in full in Cash by the Reorganized Debtors, including from the Carve-Out Reserve, within five (5) Business Days after entry of the order approving such Allowed Professional Fee Claim. The Reorganized Debtors will not commingle any funds contained in the Carve-Out Reserve and will use such funds to pay only the Professional Fee Claims, as and when allowed by order of the Bankruptcy Court. Notwithstanding anything to the contrary contained in the Plan, the failure of the Carve-Out Reserve to satisfy in full the Professional Fee Claims will not, in any way, operate or be construed as a cap or limitation on the amount of Professional Fee Claims due and payable by the Reorganized Debtors.

       **2.**      **DIP Facility Claims**

Upon entry of the Final DIP Order, and pursuant to the Final DIP Order, the Prepetition Credit Agreement Claims were deemed outstanding under the DIP ABL Facility and constitute DIP ABL Facility Claims. On the Effective Date, the Allowed DIP ABL Facility Claims will, in full satisfaction, settlement, discharge and release of, and in exchange for such DIP ABL Facility Claims, be indefeasibly paid in full in Cash from the proceeds of the Exit Facility, and any unused commitments under the DIP ABL Loan Documents, and the outstanding letters of credit thereunder will be deemed outstanding under the Exit ABL Facility or, if necessary, be cash collateralized at 105% of such outstanding amount as of the Effective Date and remain outstanding.

On the Effective Date, the Allowed DIP Term Loan Facility Claims will, in full satisfaction, settlement, discharge and release of, and in exchange for such DIP Term Loan Facility Claims, be indefeasibly paid in full in Cash from the proceeds of the Rights Offering and Backstop Purchase Agreement, and the DIP Term Loan Facility Liens will be deemed discharged, released, and terminated for all purposes without further action of or by any Person or Entity.

       **3.**      **Priority Tax Claims**

Subject to Article VIII of the Plan, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement, discharge and release of, and

US-DOCS\117417332.2

in exchange for, such Allowed Priority Tax Claim, at the election of the Debtors or Reorganized Debtors, as applicable:  (A) Cash equal to the amount of such Allowed Priority Tax Claim; (B) such other less favorable treatment as to which the Debtors (with the consent of the Required Consenting Noteholders) or Reorganized Debtors, as applicable, and the Holder of such Allowed Priority Tax Claim will have agreed upon in writing; (C) such other treatment such that it will not be Impaired pursuant to section 1124 of the Bankruptcy Code or (D) pursuant to and in accordance with sections 1129(a)(9)(C) and 1129(a)(9)(D) of the Bankruptcy Code, Cash in an aggregate amount of such Allowed Priority Tax Claim payable in regular installment payments over a period ending not more than five (5) years after the Petition Date, plus simple interest at the rate required by applicable non-bankruptcy law on any outstanding balance from the Effective Date, or such lesser rate as is agreed to in writing by a particular taxing authority and the Debtors or Reorganized Debtors, as applicable, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; *provided*, *however*, that Priority Tax Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.  Any installment payments to be made under clause (C) or (D) above will be made in equal quarterly Cash payments beginning on the first applicable Subsequent Distribution Date, and continuing on each Subsequent Distribution Date thereafter until payment in full of the applicable Allowed Priority Tax Claim.

**C.     CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN**

The following table provides a summary of the classification and treatment of Claims and Equity Interests and the potential distributions to Holders of Allowed Claims and Equity Interests under the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND, THEREFORE, ARE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN AND THE RISK FACTORS DESCRIBED IN <u>ARTICLE VI</u> BELOW.  THE TABLE IS INTENDED FOR ILLUSTRATIVE PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR A REVIEW OF THE PLAN AND DISCLOSURE STATEMENT IN THEIR ENTIRETY.  FOR CERTAIN CLASSES OF CLAIMS, THE ACTUAL AMOUNT OF ALLOWED CLAIMS COULD BE MATERIALLY DIFFERENT THAN THE ESTIMATED AMOUNTS SHOWN IN THE TABLE BELOW**.

US-DOCS\117417332.2

**SUMMARY OF EXPECTED RECOVERIES**

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| 1 | Other Priority Claims<br><br>Expected Amount:<br><br>$0 | Subject to Article VIII of the Plan, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Class 1 Claim is an Allowed Class 1 Claim as of the Effective Date or (ii) the date on which such Class 1 Claim becomes an Allowed Class 1 Claim, each Holder of an Allowed Class 1 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim, at the election of the Debtors or Reorganized Debtors, as applicable (with the consent of the Required Consenting Noteholders): (A) Cash equal to the amount of such Allowed Class 1 Claim; (B) such other less favorable treatment as to which the Debtors or Reorganized Debtors, as applicable, and the Holder of such Allowed Class 1 Claim will have agreed upon in writing; or (C) such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code; *provided, however*, that Class 1 Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with the terms and conditions of any agreements relating thereto without further notice to or order of the Bankruptcy Court. | 100% |
| 2 | Other Secured Claims<br><br>Expected Amount:<br>$0 | Subject to Article VIII of the Plan, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Class 2 Claim is an Allowed Class 2 Claim as of the Effective Date or (ii) the date on which such Class 2 Claim becomes an Allowed Class 2 Claim, each Holder of an Allowed Class 2 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim, at the election of the Debtors or Reorganized Debtors, as applicable (with the consent of the Required Consenting Noteholders): (A) Cash equal to the amount of such Allowed Class 2 Claim; (B) such other less favorable treatment as to which the Debtors or Reorganized Debtors, as applicable, and the Holder of such Allowed Class 2 Claim will have agreed upon in writing; (C) the Collateral securing such Allowed Class 2 Claim; (D) such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code; or (E) such | 100% |

ix

US-DOCS\117417332.2

## SUMMARY OF EXPECTED RECOVERIES

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan |
|-------|----------------------|-----------------------------------|----------------------------------|
| | | other treatment necessary to satisfy section 1129 of the Bankruptcy Code; *provided*, *however*, that Class 2 Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with the terms and conditions of any agreements relating thereto without further notice to or order of the Bankruptcy Court. | |
| 3 | Secured Tax Claims<br><br>Expected Amount: $3.8 million | Subject to Article VIII of the Plan, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Class 3 Claim is an Allowed Class 3 Claim as of the Effective Date or (ii) the date on which such Class 3 Claim becomes an Allowed Class 3 Claim, each Holder of an Allowed Class 3 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 3 Claim, at the election of the Debtors or Reorganized Debtors, as applicable (with the consent of the Required Consenting Noteholders):  (A) Cash equal to the amount of such Allowed Class 3 Claim; (B) such other less favorable treatment as to which the Debtors or Reorganized Debtors, as applicable, and the Holder of such Allowed Class 3 Claim will have agreed upon in writing; (C) the Collateral securing such Allowed Class 3 Claim; (D) such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code; or (E) pursuant to and in accordance with sections 1129(a)(9)(C) and 1129(a)(9)(D) of the Bankruptcy Code, Cash in an aggregate amount of such Allowed Class 3 Claim payable in regular installment payments over a period ending not more than five (5) years after the Petition Date, plus simple interest at the rate required by applicable non-bankruptcy law on any outstanding balance from the Effective Date, or such lesser rate as is agreed to in writing by a particular taxing authority and the Debtors or Reorganized Debtors, as applicable, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; *provided*, *however*, that Class 3 Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.  Any installment payments to be made under clause (D) or (E) above will be made in equal quarterly Cash payments beginning on the first applicable Subsequent Distribution Date, and continuing on each | 100% |

x

**SUMMARY OF EXPECTED RECOVERIES**

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| | | Subsequent Distribution Date thereafter until payment in full of the applicable Allowed Class 3 Claim. | |
| 4 | Prepetition Notes Claims<br><br>Expected Amount: $477.8 million | The Prepetition Notes Claims are Allowed in full as set forth in the DIP Orders, therein defined collectively as the "Prepetition Senior Notes Obligations".<br><br>On the Effective Date, or as soon thereafter as reasonably practicable, each Holder of an Allowed Class 4 Claim shall receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 4 Claim its Pro Rata share of the following or such other less favorable treatment as to which the Debtors or Reorganized Debtors, as applicable, and the Holder of such Allowed Class 4 Claim shall have agreed upon in writing:<br><br>(i)  The Subscription Rights (which will be attached to each Allowed Prepetition Notes Claim and transferable with such Allowed Prepetition Notes Claim as set forth in the Rights Offering Procedures, but such Subscription Rights may only be exercised to the extent such Holder is an Accredited Investor) in accordance with the Disclosure Statement Order and the Rights Offering Procedures. Each Holder of an Allowed Prepetition Notes Claim that will receive the Subscription Rights shall receive its Pro Rata share of the Subscription Rights, as shared with the aggregate amount of (A) all Eligible General Unsecured Claims as of the Rights Offering Record Date held by each Person or Entity that has certified that it is an Accredited Investor (as demonstrated by an AI Questionnaire that has been properly completed, duly executed, and timely delivered by such Holder to the subscription agent for the Rights Offering on or before the Questionnaire Deadline in accordance with the Rights Offering Procedures) *plus* (B) all Allowed Prepetition Notes Claims as of the Rights Offering Record Date held by each Person or Entity that has certified that it is an Accredited Investor (as demonstrated by an AI Questionnaire that has been properly completed, duly executed, and timely delivered by such Holder to the subscription agent for the Rights Offering on or before the Questionnaire Deadline in accordance with the Rights Offering Procedures).<br><br>(ii)  100% of the New Equity Interests Pool, shared Pro Rata with the Holders of Allowed General Unsecured Claims | 26.2% to 37.4% |

US-DOCS\117417332.2

## SUMMARY OF EXPECTED RECOVERIES

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| | | (subject to dilution by (A) the New Equity Interests issued upon conversion of the New Secured Convertible Notes and (B) the New Management Incentive Plan Equity).  For the avoidance of doubt, the New Equity Interests in the New Equity Interests Pool shall be distributed on a Pro Rata basis to (A) Holders of Allowed Prepetition Notes Claims and (B) Holders of Allowed General Unsecured Claims, in accordance with the terms of the Plan. | |
| | | **THE NEW EQUITY INTERESTS ISSUED TO THE HOLDERS OF PREPETITION NOTES CLAIMS UNDER THE PLAN ARE (A) SUBJECT TO DILUTION BY (I) THE NEW EQUITY INTERESTS ISSUED UPON CONVERSION OF THE NEW SECURED CONVERTIBLE NOTES AND (II) THE NEW MANAGEMENT INCENTIVE PLAN EQUITY AND (B) SUBJECT TO THE TERMS OF THE NEW STOCKHOLDERS AGREEMENT OF REORGANIZED PARENT.** | |
| | | **UPON CONVERSION OF THE NEW SECURED CONVERTIBLE NOTES, HOLDERS OF SUCH NEW SECURED CONVERTIBLE NOTES WILL (A) OWN 95% OF THE NEW EQUITY INTERESTS AND (B) SHARE OWNERSHIP OF THE REMAINING 5% OF THE NEW EQUITY INTERESTS PRO RATA WITH HOLDERS OF ALLOWED PREPETITION NOTES CLAIMS AND ALLOWED GENERAL UNSECURED CLAIMS WHO DO NOT PARTICIPATE IN THE RIGHTS OFFERING, IN EACH CASE, SUBJECT TO DILUTION BY THE NEW MANAGEMENT INCENTIVE PLAN EQUITY.** | |
| 5 | General Unsecured Claims<br><br>Expected Amount: $86.7 million | Subject to Article VIII of the Plan, on the Effective Date, or as soon thereafter as reasonably practicable, each Holder of an Allowed Class 5 Claim will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 5 Claim its Pro Rata share of the following or such other less favorable treatment as to which the Debtors or Reorganized Debtors, as applicable, and the Holder of such Allowed Class 5 Claim will have agreed upon in writing:<br><br>(i)  The Subscription Rights (which will be attached to each Allowed General Unsecured Claim and transferable with | 26.2% to 37.4% |

xii

**SUMMARY OF EXPECTED RECOVERIES**

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| | | such Allowed General Unsecured Claim as set forth in the Rights Offering Procedures, but such Subscription Rights may only be exercised to the extent such Holder is an Accredited Investor) in accordance with the Disclosure Statement Order and Rights Offering Procedures.  Each Holder of an Eligible General Unsecured Claim that will receive the Subscription Rights as a certified Accredited Investor (as demonstrated by an AI Questionnaire that has been properly completed, duly executed, and timely delivered by such Holder to the subscription agent for the Rights Offering on or before the Questionnaire Deadline, in accordance with the Rights Offering Procedures) shall receive its Pro Rata share of the Subscription Rights, as shared with the aggregate amount of (A) all Eligible General Unsecured Claims as of the Rights Offering Record Date held by each Person or Entity that has certified that it is an Accredited Investor (as demonstrated by an AI Questionnaire that has been properly completed, duly executed, and timely delivered by such Holder to the subscription agent for the Rights Offering on or before the Questionnaire Deadline in accordance with the Rights Offering Procedures) *plus* (B) all Allowed Prepetition Notes Claims as of the Rights Offering Record Date held by each Person or Entity that has certified that it is an Accredited Investor (as demonstrated by an AI Questionnaire that has been properly completed, duly executed, and timely delivered by such Holder to the subscription agent for the Rights Offering on or before the Questionnaire Deadline in accordance with the Rights Offering Procedures).<br><br>(ii) 100% of the New Equity Interests Pool, shared Pro Rata with the Holders of Allowed Prepetition Notes Claims (subject to dilution by (A) the New Equity Interests issued upon conversion of the New Secured Convertible Notes and (B) the New Management Incentive Plan Equity).  For the avoidance of doubt, the New Equity Interests in the New Equity Interests Pool shall be distributed on a Pro Rata basis to (A) Holders of Allowed Prepetition Notes Claims and (B) Holders of Allowed General Unsecured Claims, in accordance with the terms of this Plan. | |

xiii

## SUMMARY OF EXPECTED RECOVERIES

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| | | **THE NEW EQUITY INTERESTS ISSUED TO THE HOLDERS OF ALLOWED GENERAL UNSECURED CLAIMS UNDER THE PLAN ARE (A) SUBJECT TO DILUTION BY (I) THE NEW EQUITY INTERESTS TO BE ISSUED UPON CONVERSION OF THE NEW SECURED CONVERTIBLE NOTES AND (II) THE NEW MANAGEMENT INCENTIVE PLAN EQUITY AND (B) SUBJECT TO THE TERMS OF THE NEW STOCKHOLDERS AGREEMENT OF REORGANIZED PARENT.** **UPON CONVERSION OF THE NEW SECURED CONVERTIBLE NOTES, HOLDERS OF SUCH NEW SECURED CONVERTIBLE NOTES WILL (A) OWN 95% OF THE NEW EQUITY INTERESTS AND (B) SHARE OWNERSHIP OF THE REMAINING 5% OF THE NEW EQUITY INTERESTS PRO RATA WITH HOLDERS OF ALLOWED PREPETITION NOTES CLAIMS AND ALLOWED GENERAL UNSECURED CLAIMS WHO DO NOT PARTICIPATE IN THE RIGHTS OFFERING, IN EACH CASE, SUBJECT TO DILUTION BY THE NEW MANAGEMENT INCENTIVE PLAN EQUITY.** | |
| 6 | Intercompany Claims Expected Amount: $54.5 million | Subject to the Restructuring Transactions, the Intercompany Claims will be reinstated, compromised, or cancelled, at the option of the relevant Holder of such Intercompany Claims with the consent of the Required Consenting Noteholders. | N/A |
| 7 | Old Affiliate Interests in any Parent Subsidiary | Subject to the Restructuring Transactions, the Old Affiliate Interests will remain effective and outstanding on the Effective Date and will be owned and held by the same applicable Person or Entity that held and/or owned such Old Affiliate Interests immediately prior to the Effective Date. | N/A |
| 8 | Old Parent Interests | On the Effective Date, the Old Parent Interests will be cancelled without further notice to, approval of or action by any Person or Entity, and each Holder of an Old Parent Interest will not receive any distribution or retain any property on account of such Old Parent Interest. | 0% |

US-DOCS\117417332.2

D.      **SOLICITATION PROCEDURES**

1.      **The Solicitation Procedures**

On August 14, 2020, the Bankruptcy Court entered an order [Docket No. 288] (the "**Disclosure Statement Order**") that, among other things, (a) approved this Disclosure Statement, (b) scheduled the hearing to consider confirmation of the Plan (the "**Confirmation Hearing**"), (c) established the deadline for filing objections to the Plan, (d) approved the notice of the Disclosure Statement hearing and the form and manner of the notice of the Confirmation Hearing, (e) established the Voting Record Date and approved procedures for temporary allowance of Claims that are subject to an objection filed by the Debtors and the form and manner of the notice related thereto, (f) approved the dates, procedures and forms applicable to the process of soliciting votes on and providing notice of the Plan, as well as certain vote tabulation procedures, (e) approved the Rights Offering Procedures and authorized the Debtors to commence the Rights Offering, and (f) approved the Assumption Procedures and the form and manner of the Cure Notice (each as defined in the Disclosure Statement Order).  A copy of the Disclosure Statement Order is attached hereto as Exhibit F.

**The discussion of the procedures below is a summary of the solicitation and voting process**.  Detailed voting instructions will be provided with each Ballot (defined below) and are also set forth in greater detail in the Disclosure Statement Order.

> PLEASE REFER TO THE INSTRUCTIONS ACCOMPANYING THE BALLOTS AND THE DISCLOSURE STATEMENT ORDER FOR MORE INFORMATION REGARDING VOTING REQUIREMENTS TO ENSURE THAT YOUR BALLOT IS PROPERLY AND TIMELY SUBMITTED SUCH THAT YOUR VOTE MAY BE COUNTED.

2.      **The Voting and Claims Agent**

The Debtors have retained Kurtzman Carson Consultants LLC to, among other things, act as Voting and Claims Agent.

Specifically, the Voting and Claims Agent will assist the Debtors with:  (a) mailing Confirmation Hearing Notices (as defined in the Disclosure Statement Order); (b) mailing Solicitation Packages (as defined in the Disclosure Statement Order and as described below); (c) soliciting votes on the Plan; (d) receiving, tabulating, and reporting on ballots cast for or against the Plan by Holders of Claims against the Debtors; (e) responding to inquiries from creditors and stakeholders relating to the Plan, the Disclosure Statement, the Ballots and matters related thereto, including, without limitation, the procedures and requirements for voting to accept or reject the Plan and objecting to the Plan; and (f) if necessary, contacting creditors regarding the Plan and their Ballots.

3.      **Holders of Claims Entitled to Vote on the Plan**

Under the provisions of the Bankruptcy Code, not all holders of claims against and equity interests in a debtor are entitled to vote on a chapter 11 plan.  The following table provides a summary of the status and voting rights of each Class (and, therefore, of each Holder of a Claim within such Class) under the Plan:

xv

US-DOCS\117417332.2

## SUMMARY OF STATUS AND VOTING RIGHTS

| Class | Claim/Equity Interest | Status | Voting Rights |
|-------|----------------------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | Secured Tax Claims | Unimpaired | Deemed to Accept |
| **4** | **Prepetition Notes Claims** | **Impaired** | **Entitled to Vote** |
| **5** | **General Unsecured Claims** | **Impaired** | **Entitled to Vote** |
| 6 | Intercompany Claims | Impaired | Deemed to Accept |
| 7 | Old Affiliate Interests in any Parent Subsidiary | Unimpaired | Deemed to Accept |
| 8 | Old Parent Interests | Impaired | Deemed to Reject |

Based on the foregoing, the Debtors are soliciting votes to accept the Plan only from Holders of Claims in Class 4 and Class 5 (the "**Voting Classes**") because Holders of Claims in the Voting Classes are Impaired under the Plan and, therefore, have the right to vote to accept or reject the Plan. The Debtors are **not** soliciting votes from (a) Holders of Unimpaired Claims in Classes 1, 2, and 3, and Holders of Unimpaired Equity Interests in Class 7 because such parties are conclusively deemed to have accepted the Plan, (b) Holders of Equity Interests in Class 8 because such parties are conclusively deemed to have rejected the Plan, and (c) Holders of Intercompany Claims in Class 6, which are Impaired under the Plan, however, the Holders of such Claims are Affiliates of the Debtors and are conclusively deemed to have accepted the Plan (collectively, the "**Non-Voting Classes**"). In lieu of a Solicitation Package, (x) Holders of Claims in Classes 1, 2, and 3[3] will receive a Notice of Non-Voting Status and Opt Out Opportunity: Deemed to Accept, and (y) Holders of Equity Interests in Class 8 will receive a Notice of Non-Voting Status and Opt Out Opportunity: Deemed to Reject, each of which will include an option for such Holders to affirmatively opt out of the Third Party Release contained in Article X of the Plan.

### 4.     The Voting Record Date

The Bankruptcy Court has approved August 14, 2020 as the voting record date (the "**Voting Record Date**") with respect to all Claims in the Voting Classes and Equity Interests. The Voting Record Date is the date on which it will be determined:  (a) which Holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan and receive Solicitation Packages in accordance with the Disclosure Statement Order and (b) which Holders of Claims and Equity Interests in the Non-Voting Classes are entitled to receive the Confirmation Hearing Notice, including notice of such Holder's non-voting status and an opportunity to opt out of the Third Party Releases, in accordance with the Disclosure Statement Order.

---

[3]     Holders of Claims and Equity Interests in Class 6 and Class 7 are Affiliates of the Debtors and, therefore, will not receive any notice from the Debtors in connection with the Solicitation.

US-DOCS\117417332.2

5.      **Contents of Solicitation Package**

The following documents and materials will collectively constitute the Solicitation Package:

- a cover letter from the Debtors explaining the solicitation process and urging Holders of Claims in the Voting Classes to vote to accept the Plan;

- the Confirmation Hearing Notice, attached to the Disclosure Statement Order;

- this Disclosure Statement (and exhibits annexed thereto, including the Plan and the Disclosure Statement Order);

- to the extent applicable, a Ballot and/or notice, appropriate for the specific creditor, in substantially the forms attached to the Disclosure Statement Order (as may be modified for particular classes and with instruction attached thereto); and

- such other materials as the Bankruptcy Court may direct.

6.      **Distribution of the Solicitation Package to Holders of Claims Entitled to Vote on the Plan**

With the assistance of the Voting and Claims Agent, the Debtors intend to distribute Solicitation Packages on or before August 20, 2020 (the "**Solicitation Mailing Date**").  The Debtors submit that the timing of such distribution will provide such Holders of Claims with adequate time within which to review the materials required to allow such parties to make informed decisions with respect to voting on the Plan in accordance with Bankruptcy Rules 3017(d) and 2002(b).  The Debtors will make every reasonable effort to ensure that Holders who have more than one Allowed Claim in the Voting Classes receive no more than one Solicitation Package.

7.      **Distribution of Notices to Holders of Claims in Non-Voting Classes and Holders of Disputed Claims**

As set forth above, certain Holders of Claims and Equity Interests are **not** entitled to vote on the Plan.  As a result, such parties will not receive Solicitation Packages and, instead, will receive the appropriate form of notice as follows:

- Unimpaired Claims – Deemed to Accept.  Administrative Claims, DIP Facility Claims, and Priority Tax Claims are unclassified, non-voting Claims and Claims in Classes 1, 2, and 3 are Unimpaired under the Plan and, therefore, are presumed to have accepted the Plan.  As such, Holders of such Claims will receive, in lieu of a Solicitation Package, a "Notice of Non-Voting Status and Opt Out Opportunity: Deemed to Accept" and the applicable form that will provide Holders of such Claims with the opportunity to affirmatively opt out of the Third Party Release, in the forms attached as Exhibits 4 and 4A to the Disclosure Statement Order.

- Affiliate Holders of Claims – Deemed to Accept.  Claims in Class 6 are Impaired and Equity Interests in Class 7 are Unimpaired.  However, because the Holders of such Claims and Equity Interests are Affiliates of the Debtors, both the Holders of Claims in Class 6 and Holders of Equity Interests in Class 7 will be conclusively deemed to have accepted the Plan.  As such, Holders of Claims in Class 6 and Equity Interests in Class 8 will not receive a Solicitation Package or any other form of notice.

xvii

- Impaired Claims – Deemed to Reject.  Holders of Equity Interests in Class 8 are receiving no distribution under the Plan on account of such Equity Interests and, therefore, are conclusively deemed to reject the Plan.  However, the Holders of Equity Interests in Class 8 will receive a "Notice of Non-Voting Status and Opt Out Opportunity: Deemed to Reject" and a form that will provide Holders of such Equity Interests with the opportunity to affirmatively opt out of the Third Party Release, in the forms attached as Exhibits 5, 5A, 5B, and 5C to the Disclosure Statement Order.

- Disputed Claims.

  (a) Any Holder of a Claim for which the Debtors or any other party in interest have filed an objection, whether such objection related to the entire Claim or a portion thereof, will not be entitled to vote on the Plan and will not be counted in determining whether the requirements of section 1126(c) of the Bankruptcy Code have been met with respect to the Plan (except to the extent and in the manner as may be set forth in the objection) unless (i) the Claim has been temporarily allowed for voting purposes pursuant to Bankruptcy Rule 3018(a) and in accordance with the Disclosure Statement Order, or (ii) on or before the Voting Deadline, the objection to such Claim has been withdrawn or resolved in favor of the creditor asserting the Claim.  Such Holders will receive a "Notice of Non-Voting Status: Disputed Claims," in the form attached as Exhibit 3 to the Disclosure Statement Order.

  (b) The Bankruptcy Court has (i) approved August 30, 2020 (the "**Rule 3018(a) Motion Deadline**"), as the deadline for the filing and serving of motions pursuant to Bankruptcy Rule 3018(a) requesting temporary allowance of a movant's Claim for purposes of voting (the "**Rule 3018(a) Motion(s)**"), and (ii) required that such Rule 3018(a) Motions be filed with the Bankruptcy Court by no later than 5:00 p.m. (prevailing Central Time) on the Rule 3018(a) Motion Deadline; *provided however*, that if an objection to a Claim is filed on or after the date that is seven (7) days before the Rule 3018(a) Motion Deadline, then the Rule 3018(a) Motion Deadline shall be extended as to such Claim such that the holder thereof shall have at least seven (7) days to file a Rule 3018(a) Motion.  The Bankruptcy Court will only consider those Rule 3018(a) Motions that have been timely filed and served in accordance with the Disclosure Statement Order.  Any party timely filing and serving a Rule 3018(a) Motion will be provided a Ballot and will be permitted to cast a provisional vote to accept or reject the Plan (assuming such holder is in a Voting Class).  If, and to the extent that, the Debtors and such party are unable to resolve the issues raised by the Rule 3018(a) Motion prior to the Voting Deadline, then at the Confirmation Hearing the Court shall determine whether the provisional Ballot should be counted as a vote on the Plan.

  (c) For Holders of Claims in a Voting Class who have filed timely Proofs of Claim, which, in whole or in part, reflect a disputed, unliquidated, or contingent Claim, and which are not subject to a pending objection, the Debtors will distribute (i) a Solicitation Package that contains a Ballot, (ii) the Confirmation Hearing Notice, and (iii) a "Notice of Limited Voting Status to Holders of Contingent, Unliquidated, or Disputed Claims for Which No Objection Has Been Filed," substantially in the form attached hereto as Exhibit 7, which notice informs such claimant that its entire Claim has been allowed temporarily for voting purposes only and not for purposes of allowance or distribution, at $1.00.

  If any Holder described in the preceding two subparagraphs disagrees with the Debtors' classification or status of its Claim, then such Holder MUST file and serve a motion requesting

xviii

US-DOCS\117417332.2

temporary allowance of its Claim solely for voting purposes in accordance with the procedures set forth in the Disclosure Statement Order.

- Contract/Lease Counterparties.  Parties to certain of the Debtors' executory contracts and unexpired leases may not have scheduled Claims, or may maintain Claims based upon filed Proofs of Claim pending the disposition of their contracts or leases by assumption or rejection. To ensure that such parties nevertheless receive notice of the Confirmation Hearing, they will receive a notice, substantially in the form of Exhibit 8 attached to the Disclosure Statement Order (the "**Contract/Lease Notice**"), that gives (i) notice of the filing of the Plan, (ii) notice that such party has been identified as a party to an Executory Contract or Unexpired Lease, (iii) instructions regarding the Confirmation Hearing and how to obtain a copy of the Solicitation Package (other than a Ballot) free of charge, and (iv) detailed directions for filing objections to confirmation of the Plan.

## 8.    Additional Distribution of Solicitation Documents

In addition to the distribution of Solicitation Packages to Holders of Claims in the Voting Classes, the Debtors will also provide parties who have filed requests for notices under Bankruptcy Rule 2002 as of the Voting Record Date with the Disclosure Statement, Disclosure Statement Order, and the Plan. Additionally, parties may request (and obtain at the Debtors' expense) a copy of the Disclosure Statement (and any exhibits thereto, including the Plan) by:  (a) calling the Voting and Claims Agent at (866) 554-5810 (U.S./Canada) or (781) 575-2032 (International); (b) writing to Hi-Crush Inc., c/o Kurtzman Carson Consultants LLC, 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA 90245; and/or (c) visiting the Debtors' restructuring website at: http://www.kccllc.net/HiCrush.  Parties may also obtain any documents filed in the Chapter 11 Cases for a fee via PACER at http://www.pacer.gov.

## 9.    Filing of Plan Supplement

The Debtors will file the Plan Supplement by September 11, 2020.  The Debtors will transmit a copy of the Plan Supplement to the Distribution List, as defined in this Section I.D.9.  Additionally, parties may request (and obtain at the Debtors' expense) a copy of the Plan Supplement by:  (a)  calling the Voting and Claims Agent at (866) 554-5810 (U.S./Canada) or (781) 575-2032 (International); (b) writing to Hi-Crush Inc., c/o Kurtzman Carson Consultants LLC, 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA 90245; and/or (c) visiting the Debtors' restructuring website at: http://www.kccllc.net/HiCrush.  Parties may also obtain any documents filed in the Chapter 11 Cases for a fee via PACER at http://www.pacer.gov.

The Plan Supplement will include, among other things, the documents and forms of documents, schedules, and exhibits to the Plan (as more fully set forth in the definition for Plan Supplement in the Plan), all of which are incorporated by reference into, and are an integral part of, the Plan, as all of the same may be amended, supplemented, or modified from time to time.

As used herein, the term "**Distribution List**" means (a) the United States Trustee for the Southern District of Texas; (b) the parties included on the Debtors' consolidated list of the holders of the 30 largest unsecured claims against the Debtors; (c) Simpson, Thacher & Bartlett LLP as counsel to the agent for the Debtors' prepetition and postpetition secured asset-based revolving credit facility; (d) U.S. Bank National Association, as indenture trustee for the Debtors' prepetition notes; (e) counsel to the Ad Hoc Group (i) Paul, Weiss, Rifkind, Wharton & Garrison LLP and (ii) Porter Hedges LLP; (f) Shipman & Goodwin LLP as counsel to the agent under the Debtors' postpetition term loan facility; (g) the United States Attorney's Office for the Southern District of Texas; (h) the Internal Revenue Service; (i) the Securities and Exchange

xix

US-DOCS\117417332.2

Commission; (j) the state attorneys general for states in which the Debtors conduct business; and (k) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002.

## E.   VOTING PROCEDURES

Holders of Claims entitled to vote on the Plan are advised to read the Disclosure Statement Order, which sets forth in greater detail the voting instructions summarized herein.

### 1.   The Voting Deadline

The Bankruptcy Court has approved 5:00 p.m. prevailing Central Time on September 18, 2020 as the Voting Deadline.  The Voting Deadline is the date by which all Ballots must be properly executed, completed and delivered to the Voting and Claims Agent in order to be counted as votes to accept or reject the Plan.

### 2.   Types of Ballots

The Debtors will provide the following ballots (collectively, the "**Ballots**") to Holders of Claims in the Voting Classes (*i.e.*, Class 4 and Class 5):

- "***Beneficial Holder Ballots***", the form of which is attached to the Disclosure Statement Order as Exhibit 6A, will be sent to Beneficial Holders of Class 4 Claims;

- "***Master Ballots***", the form of which is attached to the Disclosure Statement Order as Exhibit 6B, will be sent to Registered Record Owners and Intermediary Record Owners holding Prepetition Notes for, and voting on behalf of, Beneficial Holders of Class 4 Claims; and

- "***Class 5 Ballots***", the form of which are attached to the Disclosure Statement Order as Exhibit 6C will be sent to Holders of Claims in Class 5.

Subject to the terms of the Restructuring Support Agreement, each Ballot will include an option for the applicable Holder of Claims to affirmatively opt out of the Third Party Release contained in Article X of the Plan.

### 3.   Voting Instructions

Under the Plan, Holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan.  Those Holders may so vote by completing a Class 5 Ballot, a Beneficial Holder Ballot and/or Master Ballot, as applicable, and returning it to the Voting and Claims Agent so that it is **actually received** by the Voting Deadline.  There are special voting rules and procedures for Beneficial Holders of Class 4 Claims, which are discussed in Section I.E.4 herein (and set forth in greater detail in the Disclosure Statement Order).  Each Ballot will also allow Holders of Claims in the Voting Classes to opt-out of the Third Party Release set forth in Article X of the Plan.  Any Holder of Claims in the Voting Classes that opts out of the Third Party Release will not receive a Debtor Release or a Third Party Release from the Releasing Parties, subject to the terms of the Restructuring Support Agreement.

> **PLEASE REFER TO THE INSTRUCTIONS ATTACHED TO THE CLASS 5 BALLOTS, BENEFICIAL HOLDER BALLOTS, OR MASTER BALLOTS THAT YOU HAVE RECEIVED FOR MORE DETAILED INFORMATION REGARDING THE VOTING REQUIREMENTS, RULES AND PROCEDURES APPLICABLE TO VOTING YOUR CLAIM.**

US-DOCS\117417332.2

To be counted as votes to accept or reject the Plan, all Class 5 Ballots, pre-validated Beneficial Holder Ballots, and Master Ballots, as applicable (all of which will clearly indicate the appropriate return address), must be properly executed, completed, dated and delivered according to the instructions contained thereon, so that they are **actually received** on or before the Voting Deadline by the Voting and Claims Agent at the following address:

> Hi-Crush Inc. Balloting Center
> c/o Kurtzman Carson Consultants LLC
> 222 N. Pacific Coast Highway, Suite 300
> El Segundo, CA 90245
> Attention: Hi-Crush Inc. Ballot Processing
>
> If you have any questions on the procedures for voting on the Plan, please call the Voting and Claims Agent at: (866) 554-5810 (U.S./Canada) or (781) 575-2032 (International)

***BENEFICIAL HOLDERS OF CLASS 4 CLAIMS MUST EXECUTE, COMPLETE AND RETURN THEIR BENEFICIAL HOLDER BALLOTS IN ACCORDANCE WITH THE RULES FOR VOTING THEIR CLASS 4 PREPETITION NOTES CLAIMS SET FORTH IN THIS SECTION AND SECTION I.E.4 BELOW.***

### 4. Voting Procedures

Prior to the Solicitation Mailing Date, the Voting and Claims Agent will determine the identity of those Registered Record Owners and Intermediary Record Owners (collectively, "**Record Owners**") holding Prepetition Notes on behalf of Beneficial Holders as of the Voting Record Date and will distribute an appropriate number of Solicitation Packages to such Record Owners to allow them to forward one to each applicable Beneficial Holder. Intermediary Record Holders will distribute Solicitation Packages to the respective Beneficial Holders within five (5) business days of receiving Solicitation Packages.

Record Owners who elect to pre-validate Beneficial Holder Ballots must deliver Solicitation Packages, including pre-validated Beneficial Holder Ballots, to Beneficial Holders along with a pre-addressed return envelope addressed to the Voting and Claims Agent. Beneficial Holders who receive pre-validated Beneficial Holder Ballots must complete, date, execute and deliver such Beneficial Holder Ballots directly to the Voting and Claims Agent so they are actually received on or before the Voting Deadline.

Record Owners who do not elect to pre-validate Beneficial Holder Ballots must deliver to the Beneficial Holders the Solicitation Packages, including Beneficial Holder Ballots and pre-addressed return envelopes addressed to the Record Owners. Upon the return of completed Beneficial Holder Ballots, such Record Owners will summarize and compile the votes cast and/or other relevant information onto the Master Ballots and date and return the Master Ballot(s) so that they are actually received on or before the Voting Deadline by the Voting and Claims Agent.

US-DOCS\117417332.2

**5.      Tabulation of Votes**

> **THE FOLLOWING IS IMPORTANT INFORMATION REGARDING VOTING THAT SHOULD BE READ CAREFULLY BY ALL HOLDERS OF CLAIMS IN THE VOTING CLASSES.**

- FOR YOUR VOTE TO BE COUNTED, YOUR CLASS 5 BALLOT, PRE-VALIDATED BENEFICIAL HOLDER BALLOT, OR MASTER BALLOT, AS APPLICABLE, MUST BE PROPERLY EXECUTED, COMPLETED, DATED AND DELIVERED SUCH THAT IT IS **ACTUALLY RECEIVED** ON OR BEFORE THE VOTING DEADLINE BY THE VOTING AND CLAIMS AGENT.

- A HOLDER OF A CLAIM MAY CAST ONLY ONE VOTE PER EACH CLAIM SO HELD. BY SIGNING AND RETURNING A CLASS 5 BALLOT, BENEFICIAL HOLDER BALLOT, OR MASTER BALLOT, EACH HOLDER OF A CLAIM WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER CLASS 5 BALLOTS, BENEFICIAL HOLDER BALLOTS, OR MASTER BALLOTS WITH RESPECT TO SUCH CLAIM HAS BEEN CAST OR, IF ANY OTHER CLASS 5 BALLOT, BENEFICIAL HOLDER BALLOTS, OR MASTER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLAIM, SUCH EARLIER CLASS 5 BALLOT, BENEFICIAL HOLDER BALLOTS, OR MASTER BALLOTS ARE THEREBY SUPERSEDED AND REVOKED.[4]

- **ANY CLASS 5 BALLOT, BENEFICIAL HOLDER BALLOT, OR MASTER BALLOT THAT IS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED TOWARD CONFIRMATION OF THE PLAN UNLESS THE DEBTORS HAVE GRANTED AN EXTENSION OF THE VOTING DEADLINE IN WRITING WITH RESPECT TO SUCH CLASS 5 BALLOT, BENEFICIAL HOLDER BALLOT, OR MASTER BALLOT.**

- **ADDITIONALLY, THE FOLLOWING CLASS 5 BALLOTS, BENEFICIAL HOLDER BALLOTS, AND MASTER BALLOTS WILL NOT BE COUNTED:**

  o    any Ballot received after the Voting Deadline unless the Debtors shall have granted an extension of the Voting Deadline in writing with respect to such Ballot;

  o    any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim;

  o    any Ballot cast by or on behalf of an entity that does not hold a Claim in one of the Voting Classes;

---

[4]    If a Beneficial Holder submits more than one Beneficial Holder Ballot to its Intermediary Record Owner, (i) the latest dated Beneficial Holder Ballot received before the submission deadline imposed by the Intermediary Record Owner will be deemed to supersede any prior Beneficial Holder Ballots submitted by the Beneficial Holder; and (ii) the Intermediary Record Owner will complete the Master Ballot accordingly.

US-DOCS\117417332.2

o    any Ballot cast for a Claim listed in the Schedules as contingent, unliquidated or disputed for which the applicable bar date has passed and no proof of claim was timely filed;

o    any Ballot that is otherwise properly completed, executed and timely returned to the Voting and Claims Agent, but that (a) does not indicate an acceptance or rejection of the Plan, (b) indicates both an acceptance and rejection of the Plan, or (c) partially accepts and partially rejects the Plan;

o    any Ballot cast for a Claim that is subject to an objection pending as of the Voting Record Date (except as otherwise provided in the Disclosure Statement Order);

o    any Ballot sent to the Debtors, the Debtors' agents/representatives (other than the Voting and Claims Agent), any indenture trustee or the Debtors' financial or legal advisors;

o    any Ballot transmitted by facsimile, telecopy, or electronic mail (other than a Master Ballot or a Ballot submitted through the Voting and Claims Agent's online portal in accordance with the instructions provided);

o    any unsigned Ballot; or

o    any Ballot not cast in accordance with the procedures approved in the Disclosure Statement Order.

## F.    CONFIRMATION OF THE PLAN

### 1.    The Confirmation Hearing

The Confirmation Hearing will commence at 2:00 p.m. prevailing Central Time on September 23, 2020 before the Honorable David R. Jones, United States Bankruptcy Judge, in the United States Bankruptcy Court for Southern District of Texas, Houston Division, located at Bob Casey United States Courthouse, 515 Rusk Avenue, 4th Floor, Courtroom 400, Houston, Texas 77002.  The Confirmation Hearing may be continued from time to time by the Bankruptcy Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Bankruptcy Court and served on such parties as the Bankruptcy Court may order.  Moreover, the Plan may be modified or amended, if necessary, pursuant to section 1127 of the Bankruptcy Code and in accordance with the terms of the Restructuring Support Agreement, prior to, during or as a result of the Confirmation Hearing, without further notice to parties-in-interest.

### 2.    Objections to Confirmation

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan of reorganization.  **The Plan Objection Deadline is 5:00 p.m. prevailing Central Time on September 18, 2020.**  Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Local Rules, must set forth the name of the objector, the nature and amount of Claims or Equity Interests held or asserted by the objector against the Debtors' estates or properties, the basis for the objection and the specific grounds therefore, and must be filed with the Bankruptcy Court.

US-DOCS\117417332.2

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

3.      **Effect of Confirmation of the Plan**

Article X of the Plan contains certain provisions relating to (a) the compromise and settlement of Claims, (b) the release of the Released Parties by the Debtors and certain Holders of Claims and Equity Interests, and each of their respective Related Persons, (c) exculpation of certain parties, and (d) an injunction from taking actions in connection with the foregoing, each as more fully set forth in Article X of the Plan. **It is important to read such provisions carefully so that you understand the implications of these provisions with respect to your Claim such that you may cast your vote accordingly**.

**THE PLAN WILL BIND ALL HOLDERS OF CLAIMS
AGAINST AND EQUITY INTERESTS IN THE DEBTORS TO THE MAXIMUM
EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER
OR NOT SUCH HOLDER (A) WILL RECEIVE OR RETAIN ANY PROPERTY, INTEREST
IN PROPERTY, OR OTHER VALUE UNDER THE PLAN, (B) HAS FILED A PROOF
OF CLAIM OR EQUITY INTEREST IN THE CHAPTER 11 CASES, OR (C) FAILED TO
VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.**

**G.      CONSUMMATION OF THE PLAN**

It will be a condition to Consummation of the Plan that all provisions, terms and conditions of the Plan are approved in the Confirmation Order unless otherwise satisfied or waived pursuant to the provisions of Article IX of the Plan. Following Confirmation, the Plan will be Consummated on the Effective Date.

**H.      RISK FACTORS**

**PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM IN A VOTING CLASS SHOULD CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN SECTION VI HEREIN TITLED, "PLAN-RELATED RISK FACTORS."**

US-DOCS\117417332.2

## II.
## BACKGROUND TO THE CHAPTER 11 CASES

### A.      OVERVIEW OF THE DEBTORS' CORPORATE HISTORY AND BUSINESSES

The Debtors are a fully-integrated provider of proppant and logistics services used in hydraulic fracturing of oil and gas wells.  Proppant is sand (also known as "frac sand") or similar particulate material suspended in water or other fluid injected into wells at high pressure to keep fractures open to stimulate the extraction of hydrocarbons.  In addition to frac sand production, the Debtors also offer their customers advanced wellsite storage systems, flexible "last mile" transportation services, and innovative software for real-time supply chain visibility and management from loadout terminals to wellsites.  The Debtors' strategic suite of solutions provides operators and service companies in all major U.S. oil and gas basins with the ability to build safety, reliability and efficiency into every well completion.

The Debtors' headquarters are located in Houston, Texas and they maintain regional offices in Denver, Colorado, and Odessa, Texas.  The Debtors own and operate six production facilities located in Wisconsin and Texas and utilize an extensive logistics network of rail-served destination terminals strategically located throughout Pennsylvania, Ohio, New York, Texas, and Colorado.  As a result, the Debtors are effectively positioned to reach all areas of unconventional well completion activity ranging from the Permian and DJ basins to the Marcellus, Utica, Bakken and Eagle Ford shales.

#### 1.      Company History

Hi-Crush Inc. was originally formed as a Delaware limited partnership named Hi-Crush Partners LP ("**Hi-Crush Partners**") on May 8, 2012.  On May 31, 2019, Hi-Crush Partners converted to the Delaware corporation Hi-Crush Inc.  On the effective date of the conversion, each common unit representing limited partnership interests in Hi-Crush Partners was automatically converted into one share of common stock of Hi-Crush Inc., with a par value of $0.01 per share.  As of the Petition Date, there were approximately 99,876,054 Hi-Crush Inc. shares issued and outstanding, with a market capitalization of approximately $27.5 million.  The common stock is publicly traded on the NYSE under the ticker symbol "HCR." Hi-Crush Inc. directly or indirectly owns all of the Debtors in the Chapter 11 Cases.

To continue growth in their logistics services, in August 2018, the Debtors completed the acquisition of FB Industries Inc., a company engaged in the engineering, design and marketing of silo-based frac sand management systems.  In 2019, the Debtors expanded the breadth of their operations through two key acquisitions.  On January 18, 2019, the Debtors completed the acquisition of BulkTracer Holdings LLC ("**BulkTracer**"), the owner of a logistics software system, PropDispatch.  The BulkTracer acquisition bolstered the Debtors' proppant management, logistics dispatch and inventory monitoring software capabilities.  Additionally, on May 7, 2019, the Debtors completed the acquisition of Proppant Logistics LLC ("**Proppant Logistics**"), which owned Pronghorn Logistics, LLC, a provider of end-to-end proppant logistics services.  The Proppant Logistics acquisition expanded the Debtors' logistics and wellsite operations into additional major U.S. oil and gas basins.

1

In January 2020, the Debtors announced an extension of their logistics and equipment service offerings with the commencement of engineering on its first mobile processing unit, which is branded as OnCore Processing ("**OnCore Processing**").  The OnCore Processing solution is comprised of portable wet and dry plant equipment mounted on trailer chassis, and is designed to improve logistics efficiencies by moving the production and processing of raw frac sand as close to customers' wellsites as possible.  OnCore Processing is expected to allow the Debtors to profitably reduce costs for customers that have reserves on their acreage or adjacent land, and that are otherwise economically disadvantaged from other frac sand pull points.

### 2. Business Lines

As a premier provider of proppant and logistics solutions to the North American petroleum industry, the Debtors provide their customers with proppant supply and midstream distribution management, advanced logistics operations, silo equipment sales and leasing, proppant management, as well as logistics dispatch and inventory monitoring software.  Their business primarily consists of the following highly-integrated offerings: (i) production and processing facilities, (ii) transportation capabilities, (iii) rail terminal facilities, and (iv) logistics and wellsite operations.

Production and Processing Facilities.  Raw frac sand is a naturally occurring mineral that is mined and processed.  It is generally mined from the surface or underground, and in some cases crushed, and then cleaned, dried, and sorted into consistent "mesh" sizes.[5]  Oil and natural gas producers generally require that frac sand used in their drilling and well completion processes meet specifications formulated by the American Petroleum Institute regarding frac sand grades and mesh sizes, among other things.  There are three main types of raw frac sand: Northern White Sand ("**NWS**"), Brady Brown, and what is commonly referred to as "in-basin" frac sand.  NWS is a commonly-used designation for premium white sand produced in Wisconsin and other parts of the upper Midwest region of the United States.  The Debtors utilize third-party contractors to conduct the mining operations at their production facilities.  Once the raw frac sand is mined, the Debtors' processing facilities are designed to wash, sort, dry and store the Debtors' frac sand, with each plant employing modern and efficient wet and dry processing technology.

Transportation Capabilities.  Most frac sand is shipped in bulk from processing facilities to terminal facilities, or directly to the customers, by truck, rail, or barge.  For bulk raw frac sand, transportation costs often represent a significant portion of the customer's overall product cost, and the Debtors' extensive transportation networks allow them to provide a significant cost advantage to their customers.

Rail Terminal Facilities.  Once the frac sand is loaded into railcars at the origin, the Debtors utilize an extensive network consisting of a combination of class I and short-line railroads to move the sand to their terminals.  For terminals with silo storage capabilities, frac sand is loaded into delivery trucks directly from the Debtors' silos, which deploy sand via gravity to trucks stationed directly on scales under each silo.  This process allows for the loading, electronic recording of weight, and truck dispatch to be completed in less than five minutes.  Where silos are not possible, frac sand can instead be unloaded from the railcars to delivery trucks via a conveyor.  Each of the Debtors' owned or operated terminal locations are strategically

---

[5]     Mesh size is used to describe the size of the proppant grains and is determined by sieving the proppant through screens with uniform openings corresponding to the desired size of the proppant.  Each type of proppant comes in various sizes, categorized as mesh sizes, and the various mesh sizes are used in different applications in the oil and natural gas industry.

US-DOCS\117417332.2

positioned in the shale plays so that customers typically do not need to travel more than 75 miles from wellsites to purchase their frac sand requirements.

Logistics and Wellsite Operations.  In addition to producing and supplying high-quality frac sand, the Debtors also offer their customers a full suite of logistical services.  The Debtors' logistics and wellsite operations do business under the trade names of Pronghorn Energy Services and NexStage Equipment.[6] The Debtors utilize containers and/or silo systems and  maintain strict proppant quality control from the mine to the blender, while also addressing environmental concerns through reduction of particulate matter emissions.  The Debtors handle the full spectrum of logistics management, from railcar fleet management to truck dispatching and wellsite operations, including proppant inventory management, structurally reducing costs for customers by eliminating inefficiencies throughout the proppant delivery process, primarily through the use of the Debtors' proprietary PropDispatch software suite.

### 3. Employees

As of the Petition Date, the Debtors employed 297 employees.  None of the Debtors' employees is subject to a collective bargaining agreement.  The Debtors contract their excavation and trucking operations to third parties and, accordingly, have no employees directly involved in those operations.

### 4. Revenue

In 2019, the Debtors' revenue was $636,370,000, but the Debtors ended the year with a net loss of $413,559,000.  Approximately $432,466,000 (68%) of the Debtors' 2019 revenue is attributable to excavating, processing, and delivering frac sand, approximately $194,577,000 (30.5%) is attributable to logistics and wellsite services, and approximately $9,327,000 (1.5%) is attributable to the sale of silo systems and related equipment to third parties.

### B.  PREPETITION INDEBTEDNESS

Prepetition Credit Agreement.  The Debtors are parties to that certain Credit Agreement, dated as of August 1, 2018 (as the same may be amended, modified or supplemented, the "**Prepetition Credit Agreement**"), by and among Hi-Crush Partners LP, as borrower, JPMorgan Chase Bank, N.A., as administrative agent and as an issuing lender, and the other lenders party thereto from time to time (the "**Prepetition Credit Agreement Lenders**"), providing for a $200 million commitment asset-based revolving loan facility (the "**Prepetition Credit Facility**").[7]  Availability of funds under the Prepetition Credit Facility is subject to a borrowing base, which is currently approximately $7 million excluding line of credit reserves.  The borrowing base is determined by analyzing the ending accounts receivable and inventory balances at the end of each month.  The borrowing base certificate is due on the 20th day of the following month.  The borrower's obligations under the Prepetition Credit Agreement are secured by security interests in, and liens upon, substantially all of the Debtors' assets, and each of the Debtors has guaranteed the borrower's obligations.

On June 22, 2020, the Debtors entered into that certain Forbearance Agreement (the "**Forbearance Agreement**") with the Prepetition Credit Agreement Lenders following the occurrence of an event of default with respect to the Prepetition Credit Agreement's fixed charge coverage ratio covenant.  On July 3, 2020, the Debtors entered into that certain First Amendment to Forbearance Agreement and Amendment

---

[6]     NexStage Equipment covers the Debtors' silo equipment leasing and sales business.

[7]     The Prepetition Credit Agreement Lenders' commitments under the Prepetition Credit Facility were subsequently reduced from $200 million to $100 million.

US-DOCS\117417332.2

to Credit Agreement with the Prepetition Credit Agreement Lenders, thereby extending the forbearance period under the Forbearance Agreement to July 12, 2020.

As of the Petition Date, there were no outstanding borrowings under the Prepetition Credit Agreement, but the Debtors had approximately $22.3 million in outstanding letter of credit commitments under the Prepetition Credit Facility.

Prepetition Notes. On August 1, 2018, Hi-Crush Partners LP issued approximately $450 million in 9.500% senior unsecured notes due 2026 (the "**Prepetition Notes**") pursuant to that certain Indenture, dated as of August 1, 2018 (as the same may be amended, modified, or supplemented, the "**Prepetition Notes Indenture**") by and among Hi-Crush Partners, each of the guarantors party thereto, and U.S. Bank National Association, as Prepetition Notes Trustee. Each of Hi-Crush Inc.'s domestic subsidiaries—all Debtors in these Chapter 11 Cases—have guaranteed the issuer's obligations. As of the Petition Date, the Debtors remain obligated under the Prepetition Notes Indenture for an outstanding principal amount of approximately $450 million, plus accrued but unpaid interest, fees, costs, and expenses.

Miscellaneous Notes. The Debtors are parties to various promissory notes and short term obligations arising from on-property mining sand exchanges, equipment financing and insurance premium financing programs (the "**Miscellaneous Notes**"). As of the Petition Date, the Debtors are obligated under the Miscellaneous Notes for approximately $5.3 million, plus any accrued but unpaid interest, fees, costs, and expenses.

Right of Use Finance Leases. As of the date hereof, the Debtors are obligated under certain "right of use" financing leases for approximately $1.8 million, plus any accrued but unpaid interest, fees, costs, and expenses. These "right of use" financing leases grant the Debtors the right to use certain sand trailers.

Railcar Lease Obligations. As of the Petition Date, Debtor D & I Silica, LLC (the "**Debtor Lessee**") was party to seven master railcar leases (the "**Railcar Leases**") pursuant to which it leases the railcars utilized in certain of the Debtors' business operations. Debtor Hi-Crush Inc. guaranteed the Debtor Lessee's obligations under certain of the Railcar Leases. All of the Railcar Leases contain above-market rates which, in some instances, are multiple times more expensive than the current spot price. Accordingly, prior to the Petition Date, the Debtors engaged in extensive negotiations with the lessors under the Railcar Leases, and, as a result, the Debtors were able to achieve material economic concessions from the majority of the lessors, including improved pricing and other lease terms. As described in detail in Article III below, the Debtors intend to implement these changes in the Chapter 11 Cases by rejecting the Railcar Leases and entering into new leases with certain of the existing lessors.

Trade Debt and Related Obligations. The Debtors incur trade debt with certain vendors in connection with the ordinary course operation of their business. The Debtors believe that, as of the Petition Date, they had trade debt and other related obligations in the aggregate amount of approximately $30 million.

## C. EVENTS LEADING TO THE CHAPTER 11 FILING

In the months leading up to the date of this Disclosure Statement, the Debtors faced dual stresses of decreasing earnings and increasing costs. The Debtors' earnings have experienced a significant decline as a result of depressed demand for NWS, the effects of the COVID-19 pandemic, and the Saudi-Russian oil price war, and their costs are significantly inflated due to the above-market rates associated with the Railcar Leases, as well as the oversupply of leased railcars that the Debtors no longer require.

4

1.      **Challenging Sand Market Conditions**

Current trends in the North American sand market and changes in the preferences of E&P companies have negatively impacted the demand outlook for the Debtors' NWS product.

Some E&P companies have recently been willing to sacrifice the quality of NWS in exchange for lower priced, local in-basin reserves, so long as the local reserves meet minimum acceptable quality levels. In addition, while E&P companies located in the Bakken, DJ, Powder River and Appalachia regions are currently still using meaningful quantities of NWS, there are indications that in-basin supply may become available in the near future.  As a result of these developments, the Debtors expect that only the lowest cost NWS production facilities will survive (and at nominal margins), with Canada and the Northeast likely to become the last bastions of NWS usage.

As a result of this shift in the market, NWS currently only accounts for approximately 36% of total frac sand supply, down from 75% in 2014.  NWS prices have also fallen dramatically during that period of time, and are expected to remain below $20 per ton in the near to medium term.  Downward pressure on NWS prices is further exacerbated by increasingly common "fire sales," with operators selling NWS with pricing in the low teens per ton as they struggle to clear inventory and generate cash proceeds.  Demand is likely to be capped, and pricing range bound, since capacity already exists to satisfy marginal increases in demand.  These issues have led to an oversupply of NWS relative to demand, which in turn has necessitated mine closures as producers attempt to rebalance cost structures against lower prices and reduced demand.

These market trends have led to a steady decline in production at the Debtors' NWS mines in Wisconsin, with only the Wyeville facility currently expected to operate at over 50% capacity.  Indeed, such Wisconsin mines have seen consistent year-over-year total utilization declines since 2014, with projected slowdowns in terminal sales and no prospects for coarse mesh product.  Should gas prices continue to be depressed and in-basin sand remain an attractive option in other markets, NWS sales' projections may be further impacted.

2.      **The Impact of the COVID-19 Pandemic and the Saudi-Russian Price War**

The first two quarters of 2020 were characterized by unforeseeable shocks to the global economy generally, and the energy sector in particular.  Specifically, the Debtors were greatly harmed by the Saudi-Russian oil price war that took place in early 2020, as well as by the COVID-19 pandemic that ground the global economy to a standstill.  The COVID-19 pandemic had unprecedented ripple effects throughout most sectors of the U.S. and world economy, including the energy sector where the Debtors and their customers operate.  These harms to the Debtors were further exacerbated by the Saudi-Russian oil price war, which led to greatly depressed oilfield activity and a dislocation of crude oil's supply and demand balance.

As a result of these developments, the Debtors' financial outlook has suffered, their access to additional liquidity under the Prepetition Credit Facility has been essentially eliminated (from approximately $31.4 million in January 2020), and their bonds and equity have lost significant value.

3.      **The Debtors' Cost-Reduction Initiatives**

Recognizing these challenges, the Debtors implemented a number of cost reduction activities to "right size" operations to the current business environment.  First, the Debtors have idled their Wisconsin production facilities in Augusta (as of January 2019), Blair (as of March 2020), and Whitehall (as of April 2020).

5

US-DOCS\117417332.2

The Debtors have also realized cost savings through certain reductions in force and workforce-related benefits. For example, total company headcount has been reduced from approximately 740 employees on January 1, 2020 to 297 employees as of the Petition Date. In addition, the Debtors have eliminated certain of their historical ordinary-course incentive and bonus programs, which has resulted in annual savings of approximately $4 million.

### 4.     The Debtors' Restructuring Efforts

Despite these cost-cutting initiatives, the Debtors continued to experience revenue, cash flow, and liquidity challenges. Beginning in late 2019, Hi-Crush Inc.'s board of directors (the "**Board**") authorized the retention of advisors to assist in the Debtors' evaluation of various strategic alternatives, including Latham & Watkins LLP ("**Latham**"), as counsel, Lazard Frères and Co. LLP as investment banker, and Alvarez & Marsal North America, LLC as financial advisor. The Debtors and their advisors engaged in extensive discussions and negotiations with various stakeholders, including the lessors under their Railcar Leases (the "**Railcar Lessors**"), the Prepetition Credit Agreement Lenders, and the Ad Hoc Noteholders Committee, which collectively owns or controls approximately 94% in principal amount of the Prepetition Notes, regarding a potential restructuring of the Debtors' balance sheet and business operations.

The Debtors and their advisors focused on proactively exploring a wide range of strategic alternatives, taking into account various factors, including market feedback, the Debtors' deteriorating economic outlook, as well as the deteriorating industry-wide environment. These strategic alternatives included various potential asset sales, joint ventures, recapitalizations, financing alternatives (including uptiering exchanges, subsidiary financings and rights offerings), Railcar Lease renegotiations and equitizations.

Ultimately, these negotiations were successful, and resulted in the restructuring embodied in the Plan and agreed in the Restructuring Support Agreement with the Consenting Noteholders, the agreement with certain of the Go-Forward Lessors (defined below) to implement new railcar lease agreements with improved economic terms, and the Debtors' receipt of the proceeds and benefits of the DIP Facilities in these Chapter 11 Cases.

#### (a)     Railcar Lease Negotiations

Given the decline of the NWS market, in early 2020 the Debtors determined that their current railcar need was significantly reduced from their fleet of approximately 4,800 cars to approximately 1,500 cars. The Debtors further estimated that approximately $20 million out of the $28 million in yearly payments on account of the Railcar Leases was attributable to redundant cars and above-market lease rates. Indeed, as discussed above, the Debtors' Railcar Leases were multiple times more expensive than the current spot market, despite diminishing NWS volumes.

In recognition of these facts, in the months leading up to these Chapter 11 Cases, the Debtors and their advisors engaged with their largest Railcar Lessors in an attempt to alleviate the Railcar Leases' burden on cash flow. Specifically, the Debtors solicited and received formal bids for new lease terms from their larger Railcar Lessors. As a result of the Debtors' proactive outreach to the Railcar Lessors, the Debtors were able to achieve material economic concessions in connection with their Railcar Leases, thereby paving the way for a realignment of the Debtors' railcar needs, current market prices, and the terms of the Railcar Leases.

6

US-DOCS\117417332.2

To achieve this realignment during the pendency of these Chapter 11 Cases, as described in Article III below, the Debtors have decided, in the exercise of their business judgment, to (a) reject, effective as of the Petition Date, Railcar Leases with certain Railcar Lessors (the "**Go-Forward Lessors**"), and enter into, effective as of the Petition Date, new railcar lease agreements with the Go-Forward Lessors reflecting a reduced number of railcars and materially improved terms, and (b) reject certain other Railcar Leases under which the Debtors currently pay the lessor counterparties a fixed fee per car based on market terms negotiated at the time the leases were executed.

(b)      The Debtors' Restructuring Support Agreement

While the Debtors, their management, and their Advisors examined all strategic options, it soon became clear that an out-of-court restructuring transaction would not be feasible.  After extensive, good faith, arm's-length negotiations, the Debtors and the Ad Hoc Noteholders Committee ultimately reached an agreement around a consensual plan of reorganization and entered into the Restructuring Support Agreement on July 12, 2020.  The Restructuring Support Agreement provides an agreed-upon framework with the Consenting Noteholders, who hold approximately 94% of the Prepetition Notes Claims under the Prepetition Notes Indenture, for the Plan, and forms the cornerstones the strategic restructuring the Debtors seek to implement in these Chapter 11 Cases.

The Restructuring Support Agreement establishes certain obligations of both the Debtors and the Consenting Noteholders, including, without limitation, to prosecute and support the Plan on terms consistent with the Restructuring Term Sheet and conditions to the Effective Date of the Plan.  The Restructuring Support Agreement and the Restructuring Term Sheet establish, among other things, the following key terms:[8]

**DIP Loan & Exit Loan Facilities; Rights Offering**

- The Chapter 11 Cases will be financed by the $25 million DIP ABL Facility and the $40 million DIP Term Loan Facility;

- The DIP ABL Facility will refinance and satisfy in full the Debtors' obligations under the Prepetition Credit Agreement;

- On the Effective Date, the Reorganized Debtors will enter into the a new credit agreement providing for the Exit Facility Loans, which will refinance and replace the DIP ABL Facility;

- The Debtors will conduct a $43.3 million Rights Offering to eligible holders of Allowed Prepetition Notes Claims and Allowed (as defined in the Rights Offering) General Unsecured Claims pursuant to which such Rights Offering Participants will be offered the right to purchase New Secured Convertible Notes;

---

[8]      The bullets below are solely intended to be a summary of certain material terms and conditions of the Restructuring Support Agreement and the Restructuring Term Sheet and are qualified by reference to the entire Restructuring Support Agreement and Restructuring Term Sheet.  This summary should not be relied upon for a comprehensive discussion of the Restructuring Support Agreement and the Restructuring Term Sheet or in lieu of reviewing the Restructuring Support Agreement and the Restructuring Term Sheet in their entirety.  To the extent of any conflict between the terms of this summary and the Restructuring Support Agreement or the Restructuring Term Sheet, the terms of the Restructuring Support Agreement or the Restructuring Term Sheet, as applicable shall control. Capitalized terms used, but not otherwise defined herein or in the Plan shall have the respective meanings ascribed to such terms in the Restructuring Support Agreement and the Restructuring Term Sheet.

US-DOCS\117417332.2

- As set forth in the New Secured Notes Term Sheet (attached as <u>Exhibit 3</u> to the Restructuring Term Sheet attached to the Restructuring Support Agreement):

  o the New Secured Convertible Notes (including the Put Option Notes) to be issued pursuant to the Rights Offering and the Backstop Purchase Agreement are, in the aggregate, convertible into 95% of the total number of shares of New Equity Interests that are issued on the Effective Date after giving effect to the consummation of the Restructuring Transactions (subject to dilution by the New Management Incentive Plan Equity);

  o the New Secured Convertible Notes will be convertible at any time in whole or in part at the sole option of the holder thereof; and

  o there are no mandatory conversion events with respect to the New Secured Convertible Notes except for mandatory conversion upon the consummation of a merger or acquisition transaction involving all, or substantially all, of the Reorganized Debtors' assets that has been consented to by holders of at least two-thirds in amount of the aggregate principal amount of all then outstanding New Secured Convertible Notes;

- The Rights Offering will be fully backstopped by the Backstop Parties on the terms and conditions set forth in the Backstop Purchase Agreement, as approved by the Bankruptcy Court in the Backstop Order; and

- The claims arising under the DIP Term Loan Facility will be paid in full in cash from the proceeds of the Rights Offering and the Backstop Purchase Agreement.

### Plan Treatment

- The treatment of certain Classes of Claims and Equity Interests will be as follows:

  o Payment in full of all administrative expense claims, priority tax claims, other priority claims, other secured claims, and secured tax claims (or such other treatment rendering such claims unimpaired);

  o With respect to holders of Prepetition Notes Claims and General Unsecured Claims:

    (a) subscription rights to participate in the Rights Offering (which shall be attached to each applicable claim and transferable with such allowed claim as set forth in the Rights Offering Procedures, but such subscription rights may only be exercised to the extent the holder is an Accredited Investor) in accordance with the Disclosure Statement Order and the Rights Offering Procedures; and

    (b) its *pro rata* share of 100% of the New Equity Interests Pool, subject to dilution by (i) the New Equity Interests issued upon conversion of the New Secured Convertible Notes and (ii) the New Management Incentive Plan Equity;

    **HOLDERS OF PREPETITION NOTES CLAIMS AND GENERAL UNSECURED CLAIMS ARE ADVISED THAT THE NEW EQUITY INTERESTS ISSUED TO THE HOLDERS OF ALLOWED PREPETITION NOTES CLAIMS AND ALLOWED GENERAL UNSECURED CLAIMS UNDER THE PLAN ARE (A) SUBJECT TO DILUTION BY (I) THE NEW EQUITY INTERESTS TO BE ISSUED UPON CONVERSION OF THE**

8

**NEW SECURED CONVERTIBLE NOTES AND (II) THE NEW MANAGEMENT INCENTIVE PLAN EQUITY AND (B) SUBJECT TO THE TERMS OF THE NEW STOCKHOLDERS AGREEMENT OF REORGANIZED PARENT, IN SUBSTANTIALLY THE FORM TO BE FILED WITH THE PLAN SUPPLEMENT, WHICH AGREEMENT SHALL CONTAIN TERMS AND CONDITIONS ACCEPTABLE TO THE DEBTORS AND THE REQUIRED CONSENTING NOTEHOLDERS.**

**UPON CONVERSION OF THE NEW SECURED CONVERTIBLE NOTES, HOLDERS OF SUCH NEW SECURED CONVERTIBLE NOTES WILL (A) OWN 95% OF THE NEW EQUITY INTERESTS AND (B) SHARE OWNERSHIP OF THE REMAINING 5% OF THE NEW EQUITY INTERESTS PRO RATA WITH HOLDERS OF ALLOWED PREPETITION NOTES CLAIMS AND ALLOWED GENERAL UNSECURED CLAIMS WHO DO NOT PARTICIPATE IN THE RIGHTS OFFERING, IN EACH CASE, SUBJECT TO DILUTION BY THE NEW MANAGEMENT INCENTIVE PLAN EQUITY.  ACCORDINGLY, THE DEBTORS RECOMMEND THAT ELIGIBLE HOLDERS OF PREPETITION NOTES CLAIMS AND ALLOWED (AS DEFINED IN THE RIGHTS OFFERING PROCEDURES) GENERAL UNSECURED CLAIMS PARTICIPATE IN THE RIGHTS OFFERING IN ORDER TO MAXIMIZE THEIR RECOVERY UNDER THE PLAN.**

- o The Old Parent Interests will be cancelled, and each holder of an Old Parent Interest will not receive any distribution or retain any property on account of such Old Parent Interest.

### Other Terms

- After the Effective Date, the New Board will adopt a management equity incentive plan for the benefit of the new management of the Reorganized Debtors.  The New Management Incentive Plan Equity issued pursuant to such management equity incentive plan shall dilute all New Equity Interests equally, including the New Equity Interests issued upon conversion of the New Secured Convertible Notes after the Effective Date;

- The composition of the new board of directors of the Reorganized Parent will consist of five (5) directors in total, which will include the Chief Executive Officer of Reorganized Parent and other directors designated by the Backstop Parties prior to the Effective Date and disclosed in the Plan Supplement; and

- The Plan will contain customary releases, exculpations, and injunctions among the parties to the Restructuring Support Agreement and certain other parties in interest.

### Chapter 11 Milestones

- The DIP Facilities and the Restructuring Support Agreement provide for certain milestones to be met during the Chapter 11 Cases, including the  following:

- o Commencement of the Chapter 11 Cases by no later than July 12, 2020;

- o Entry of the Interim DIP Order by no later than five (5) days following the Petition Date;

9

o   Filing of the Plan and the Disclosure Statement, the related Solicitation Materials, and the motion seeking entry of the Solicitation Order by no later than fourteen (14) days following the Petition Date;

o   Entry of the Final DIP Order by no later than twenty-five (25) days following the Petition Date;

o   Entry of both the Backstop Order and the Solicitation Order by no later than forty-five (45) days following the Petition Date;

o   Entry of the Confirmation Order by no later than seventy-five (75) days following the Petition Date; and

o   The occurrence of the Effective Date of the Plan by no later than ninety (90) days following the Petition Date.

The Restructuring Support Agreement provides for a comprehensive restructuring of the Debtors to maximize value for the benefit of all stakeholders, and provides the Debtors with a clear path to accomplish their restructuring goals.   The transactions contemplated by the Restructuring Support Agreement, including the exit financing, are fully committed, and the material deleveraging will enable the company to put the Reorganized Company in a position to execute on its business plan and pursue future growth opportunities.

10

**III.**
**EVENTS DURING THE CHAPTER 11 CASES**

**A.      FIRST DAY MOTIONS AND CERTAIN RELATED RELIEF**

The Debtors intend to continue operating their businesses in the ordinary course during the pendency of the Chapter 11 Cases as they have been doing prior to the Petition Date.  To facilitate the efficient and expeditious implementation of the Plan through the Chapter 11 Cases, the Debtors have devoted substantial efforts to stabilizing their operations and preserving and restoring their relationships with, among others, vendors, customers, employees and utility providers that the Debtors believed could be impacted by the commencement of the Chapter 11 Cases.  As a result of these efforts, the Debtors were able to minimize, as much as practicable, the negative impacts of the commencement of the Chapter 11 Cases.

On July 12, 2020, the Debtors filed a number of motions (collectively referred to herein as "**First Day Motions**") with the Bankruptcy Court.  At a hearing conducted on July 13, 2020, the Bankruptcy Court entered several orders (the "**First Day Orders**") granting the relief requested in the First Day Motions and allowing the Debtors to, among other things: (i) prevent interruptions to the Debtors' businesses; (ii) ease the strain on the Debtors' relationships with certain essential constituents, including employees, vendors, customers and utility providers; (iii) provide access to critical financing and capital; and (iv) allow the Debtors to retain certain advisors to assist with the administration of the Chapter 11 Cases.

**1.      Procedural Motions**

To facilitate a smooth and efficient administration of the Chapter 11 Cases, the Bankruptcy Court entered certain "procedural" First Day Orders, by which the Bankruptcy Court (a) approved the joint administration (for procedural purposes only) of the Debtors' Chapter 11 Cases, (b) authorized the Debtors to file a consolidated list of creditors in lieu of submitting a separate mailing matrix for each Debtor, (c) approved an extension of time to file the Debtors' Schedules, and (d) established notice and hearing procedures with respect to trading in equity securities of the Debtors.

**2.      Stabilizing Operations**

Recognizing that any interruption of the Debtors' businesses, even for a brief period of time, would negatively impact their operations, relationships with their vendors, revenue and profits, the Debtors filed a number of First Day Motions to help facilitate the stabilization of their operations and effectuate, as much as possible, a smooth transition into operations as debtors in possession.  Specifically, in addition to certain orders discussed in greater detail below, the Debtors sought and obtained First Day Orders authorizing the Debtors to:

- pay prepetition wages, salaries and other compensation, reimbursable employee expenses and employee medical and similar benefits;

- pay prepetition obligations on account of amounts owing shippers, warehousemen, mechanics, and other potential lienholders, as well as royalty interest owners;

- determine adequate assurance for future utility service and establish procedures for utility providers to object to such assurance;

- continue insurance coverage and a bonding program, and enter into new insurance policies and purchase new surety bonds, if necessary;

11

US-DOCS\117417332.2

- maintain the existing cash management system; and

- remit and pay certain taxes and fees.

In addition to the foregoing relief, to prevent the imposition of the automatic stay from disrupting their businesses and to ensure continued deliveries and services on favorable credit terms, the Debtors sought and obtained Bankruptcy Court approval to pay the prepetition claims of certain vendors and third-party service providers who the Debtors believe are essential to the ongoing operation of their businesses. The Debtors' ability to pay the claims of these vendors and service providers was and remains critical to their ongoing business operations and ultimate success in the Chapter 11 Cases.

### 3.      Debtor in Possession Financing and Use of Cash Collateral

The Debtors also filed a motion to approve the DIP Facilities and the use of cash collateral (the "**DIP Motion**").  Through the DIP Motion, the Debtors sought permission from the Bankruptcy Court to, among other things, (i) obtain secured postpetition financing in the form of a DIP ABL Facility and DIP Term Loan Facility, (ii) grant liens and superpriority administrative expense status on account thereof, (iii) utilize the cash collateral of prepetition secured parties, (iv) grant adequate protection to those prepetition secured parties for any aggregate diminution in value of their respective interests in the cash collateral, and (v) modify the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary.

**Following the hearing held on July 13, 2020, the Bankruptcy Court entered an order on July 13, 2020, approving the Debtors' DIP Motion on an interim basis [Docket No. 98].**

Access to postpetition financing, coupled with the use of cash collateral, allows the Debtors to, among other things:  (a) continue their businesses in an orderly manner; (b) maintain their valuable relationships with vendors, suppliers, customers and employees; and (c) support their working capital, general corporate and overall operational needs.

### 4.      Claims Bar Date Order

On July 13, 2020, the Bankruptcy Court entered the *Order (I) Establishing (A) Bar Dates and (B) Related Procedures for Filing Proofs of Claim, (II) Approving the Form and Manner of Notice thereof and (III) Granting Related Relief* [Docket No. 8], setting the general deadline for filing a Proof of Claim in the Chapter 11 Cases as August 16, 2020 at 5:00 p.m. (Prevailing Central Time) (the "**Claims Bar Date**"), and the deadline for governmental units for filing a Proof of Claim as January 8, 2021 at 5:00 p.m. (Prevailing Central Time).

### 5.      Employment of Advisors

On July 13, 2020, the Bankruptcy Court entered an order authorizing the Debtors to retain Kurtzman Carson Consultants LLC as the Voting and Claims Agent in the Chapter 11 Cases.  In addition, to assist the Debtors in carrying out their duties as debtors in possession and to represent their interests in the Chapter 11 Cases, the Debtors have also sought orders authorizing the Debtors to retain and employ the following advisors:  (a) Latham and Hunton Andrews Kurth LLP, as restructuring co-counsel; (b) Lazard, as financial advisor; and (c) A&M, as restructuring advisor.  The Debtors also sought an order approving and establishing procedures for the retention of professionals utilized in the ordinary course of the Debtors' businesses.

12

US-DOCS\117417332.2

**B.      THE RAILCAR REJECTION MOTION AND THE OMNIBUS REJECTION MOTION**

As discussed above, following extensive negotiations with their Railcar Lessors, the Debtors decided, in the exercise of their business judgment, to reject the Railcar Leases with each of their Railcar Lessors and enter into new railcar lease agreements with the Go-Forward Lessors reflecting a reduced number of railcars and materially improved terms.  To that end, on July 13, 2020, the Debtors filed the (a) *Debtors' Motion for Entry of an Order Authorizing the Debtors to (i) Reject Certain Railcar Lease Agreements, Effective as of the Petition Date, and (ii) Enter into Proposed New Railcar Lease Agreements, Effective as of the Petition Date* [Docket No. 21] and (b) *Debtors' First Omnibus Motion for Entry of an Order Authorizing the Debtors to (i) Reject Certain Executory Contracts and Unexpired Leases Effective as of the Dates Specified in the Motion and (ii) Abandon Certain Remaining Personal Property in Connection Therewith* [Docket No. 20].  On August 4, 2020, the Bankruptcy Court entered orders granting the relief requested in the foregoing motions [Docket Nos. 211 and 220].

**C.      RIGHTS OFFERING AND BACKSTOP PURCHASE AGREEMENT**

      **1.      Rights Offering and Backstop Purchase Agreement**

In connection with the Restructuring Support Agreement, the Debtors intend to effectuate a rights offering during the Chapter 11 Cases and in conjunction with and pursuant to the Plan (the "**Rights Offering**") and the Rights Offering Procedures.  Under the Rights Offering, eligible record holders of Allowed Prepetition Notes Claims and Eligible General Unsecured Claims will receive the right (a "**Subscription Right**") to purchase their *pro rata* share (based on such Holder's relative share of Allowed Prepetition Notes Claims and Eligible General Unsecured Claims, as applicable) of the New Secured Convertible Notes for an aggregate purchase price of $43.3 million.  The Subscription Rights shall attach to the Allowed Prepetition Notes Claims and Eligible General Unsecured Claims and be transferable with such Claims in accordance with the Rights Offering Procedures.  Only Holders of Allowed Prepetition Notes Claims and Eligible General Unsecured Claims who are "accredited investors" (as such term is defined in Rule 501 of the Securities Act) (each such holder, a "**Rights Offering Participant**") as of the Rights Offering Record Date of September 4, 2020 shall be entitled to exercise such Subscription Rights, as more fully described and set forth in the Rights Offering Procedures and the Plan.  Each Rights Offering Participant electing to exercise its Subscription Rights will purchase the New Secured Convertible Notes by paying cash in an aggregate amount equal to the aggregate principal amount of the New Secured Convertible Notes to be acquired by such Rights Offering Participant in the Rights Offering.  The New Secured Convertible Notes are expected to be held through DTC.  Thus, in order to participate in the Rights Offering and receive New Secured Convertible Notes, a holder of an Eligible General Unsecured Claim must have, or open, a brokerage account with a DTC Participant to act as its nominee to hold any New Secured Convertible Notes.

As discussed above, and as set forth in the New Secured Notes Term Sheet (attached as <u>Exhibit 3</u> to the Restructuring Term Sheet attached to the Restructuring Support Agreement):

- the New Secured Convertible Notes (including the Put Option Notes) to be issued pursuant to the Rights Offering and the Backstop Purchase Agreement are, in the aggregate, convertible into 95% of the total number of shares of New Equity Interests that are issued on the Effective Date after giving effect to the consummation of the Restructuring Transactions (subject to dilution by the New Management Incentive Plan Equity);

- the New Secured Convertible Notes will be convertible at any time in whole or in part at the sole option of the holder thereof; and

13

- there are no mandatory conversion events with respect to the New Secured Convertible Notes except for mandatory conversion upon the consummation of a merger or acquisition transaction involving all, or substantially all, of the Reorganized Debtors' assets that has been consented to by holders of at least two-thirds in amount of the aggregate principal amount of all then outstanding New Secured Convertible Notes.

Pursuant to the Disclosure Statement Order, the Bankruptcy Court approved the Rights Offering Procedures and the Debtors' commencement of the Rights Offering in accordance therewith.

Certain members of the Ad Hoc Noteholders Committee will provide the Debtors with a commitment to fully backstop the Rights Offering, in the event the Rights Offering is not fully subscribed by the Rights Offering Participants, on the terms and conditions set forth in the Backstop Purchase Agreement.  As consideration for the Debtors' right to call on the Backstop Parties' Backstop Commitments and consistent with the Backstop Order, on the effective date of the Plan, the Reorganized Debtors shall issue a $4.8 million aggregate principal amount of New Secured Convertible Notes (the "**Put Option Notes**") to the Backstop Parties under and as set forth in the Backstop Purchase Agreement.  On July 27, 2020, the Debtors filed the *Debtors' Emergency Motion for (i) Authorization to (a) Enter Into Backstop Purchase Agreement, (b) Pay Certain Amounts and Related Expenses, (C) Honor Indemnification Obligations to Certain Parties, and (ii) Grant Related Relief* seeking approval from the Bankruptcy Court to enter into the Backstop Purchase Agreement and perform their obligations in accordance therewith, including authority to issue the Put Option Notes to the Backstop Parties.  On August 14, 2020, the Bankruptcy Court entered an order granting the relief requested in the foregoing motion [Docket No. 287].

**Holders of Prepetition Notes Claims and General Unsecured Claims are advised that the New Equity Interests issued to the Holders of Allowed Prepetition Notes Claims and Allowed General Unsecured Claims under the Plan are (a) subject to dilution by (i) the New Equity Interests to be issued upon conversion of the New Secured Convertible Notes and (ii) the New Management Incentive Plan Equity and (b) subject to the terms of the New Stockholders Agreement of Reorganized Parent, in substantially the form to be filed with the Plan Supplement, which agreement shall contain terms and conditions acceptable to the Debtors and the Required Consenting Noteholders.**

**Upon conversion of the New Secured Convertible Notes, Holders of such New Secured Convertible Notes will (a) own 95% of the New Equity Interests and (b) share ownership of the remaining 5% of the New Equity Interests Pro Rata with Holders of Allowed Prepetition Notes Claims and Allowed General Unsecured Claims who do not participate in the Rights Offering, in each case, subject to dilution by the New Management Incentive Plan Equity.  Accordingly, the Debtors recommend that eligible Holders of Prepetition Notes Claims and Allowed (as defined in the Rights Offering Procedures) General Unsecured Claims participate in the Rights Offering in order to maximize their recovery under the Plan.**

## D.     FILING OF THE SCHEDULES

On July 13, 2020, the Bankruptcy Court entered the *Order Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, Statements of Financial Affairs, and Rule 2015.3 Financial Reports* [Docket No. 87], setting August 11, 2020 as the deadline by which the Debtors must file their Schedules.  On August 11, 2020, the Debtors filed their Schedules.

14

**E.      EXCLUSIVE PERIOD FOR FILING A CHAPTER 11 PLAN AND SOLICITING VOTES**

Under the Bankruptcy Code, a debtor has the exclusive right to file and solicit acceptances of a plan or plans of reorganization for an initial period of 120 days from the date on which the debtor filed for voluntary relief.  If a debtor files a plan within this exclusive period, then the debtor has the exclusive right for 180 days from the petition date to solicit acceptances to the plan.  During these exclusive periods, no other party in interest may file a competing plan of reorganization; however, a court may extend these periods upon request of a party in interest "for cause."

15

US-DOCS\117417332.2

IV.
**SUMMARY OF THE PLAN**

> **THIS SECTION IV IS INTENDED ONLY TO PROVIDE A SUMMARY OF THE <u>MATERIAL TERMS</u> OF THE PLAN AND IS QUALIFIED BY REFERENCE TO THE ENTIRE DISCLOSURE STATEMENT AND THE PLAN AND SHOULD <u>NOT</u> BE RELIED ON FOR A COMPREHENSIVE DISCUSSION OF THE PLAN.  TO THE EXTENT THERE ARE ANY INCONSISTENCIES OR CONFLICTS BETWEEN THIS SECTION IV AND THE PLAN, THE TERMS AND CONDITIONS SET FORTH IN THE PLAN WILL CONTROL AND GOVERN.**

**A.      ADMINISTRATIVE AND PRIORITY TAX CLAIMS**

**1.      Administrative Claims**

Subject to <u>sub-paragraph (a)</u> below, on the later of the Effective Date or the date on which an Administrative Claim becomes an Allowed Administrative Claim, or, in each such case, as soon as reasonably practicable thereafter, each Holder of an Allowed Administrative Claim (other than an Allowed Professional Fee Claim) will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim either (i) Cash equal to the amount of such Allowed Administrative Claim; or (ii) such other less favorable treatment as to which the Debtors (with the consent of the Required Consenting Noteholders) or Reorganized Debtors, as applicable, and the Holder of such Allowed Administrative Claim will have agreed upon in writing; *provided*, *however*, that Administrative Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.

(a)      <u>Bar Date for Administrative Claims</u>

Except as otherwise provided in the Plan, unless previously Filed or paid, requests for payment of Administrative Claims must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order or the occurrence of the Effective Date (as applicable) no later than the Administrative Claims Bar Date; *provided* that the foregoing will not apply to either the Holders of Claims arising under section 503(b)(1)(D) of the Bankruptcy Code or the Bankruptcy Court or United States Trustee as the Holders of Administrative Claims.  Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request by the Administrative Claims Bar Date will be forever barred, estopped and enjoined from asserting such Administrative Claims against the Debtors, the Reorganized Debtors and their respective Estates and property and such Administrative Claims will be deemed discharged as of the Effective Date.  All such Claims will, as of the Effective Date, be subject to the permanent injunction set forth in Article X.G of the Plan.  Nothing in Article II.A of the Plan will limit, alter, or impair the terms and conditions of the Claims Bar Date Order with respect to the Claims Bar Date for filing administrative expense claims arising under section 503(b)(9) of the Bankruptcy Code.

Objections to such requests must be Filed and served on the Reorganized Debtors and the requesting party by the later of (a) 120 days after the Effective Date and (b) 60 days after the Filing of the applicable request for payment of Administrative Claims, if applicable, as the same may be modified or extended from time to time by Final Order of the Bankruptcy Court.

16

(b)      Professional Fee Claims

Professionals or other Entities asserting a Professional Fee Claim for services rendered before the Effective Date must File and serve on the Reorganized Debtors and such other Entities who are designated in the Confirmation Order an application for final allowance of such Professional Fee Claim no later than the Professional Fees Bar Date; *provided* that the Reorganized Debtors will pay the reasonable fees, costs, and out-of-pocket expenses of the Debtors' Professionals in the ordinary course of business for any work performed after the Effective Date, including those reasonable and documented fees, costs, and expenses incurred by such Professionals in connection with the implementation and consummation of the Plan, in each case without further application or notice to or order of the Bankruptcy Court; *provided*, *further*, that any Debtor Professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses from the Debtors and Reorganized Debtors for services rendered before the Effective Date pursuant to the Ordinary Course Professionals Order, in each case without further application or notice to or order of the Bankruptcy Court.

Objections to any Professional Fee Claim must be Filed and served on the Reorganized Debtors and the requesting party by no later than thirty (30) days after the Filing of the applicable final request for payment of the Professional Fee Claim.  Each Holder of an Allowed Professional Fee Claim will be paid in full in Cash by the Reorganized Debtors, including from the Carve-Out Reserve, within five (5) Business Days after entry of the order approving such Allowed Professional Fee Claim.  The Reorganized Debtors will not commingle any funds contained in the Carve-Out Reserve and will use such funds to pay only the Professional Fee Claims, as and when allowed by order of the Bankruptcy Court.  Notwithstanding anything to the contrary contained in the Plan, the failure of the Carve-Out Reserve to satisfy in full the Professional Fee Claims will not, in any way, operate or be construed as a cap or limitation on the amount of Professional Fee Claims due and payable by the Reorganized Debtors.

2.      **DIP Facility Claims**

Upon entry of the Final DIP Order, and pursuant to the Final DIP Order, the Prepetition Credit Agreement Claims were deemed outstanding under the DIP ABL Facility and constitute DIP ABL Facility Claims. On the Effective Date, the Allowed DIP ABL Facility Claims will, in full satisfaction, settlement, discharge and release of, and in exchange for such DIP ABL Facility Claims, be indefeasibly paid in full in Cash from the proceeds of the Exit Facility, and any unused commitments under the DIP ABL Loan Documents, and the outstanding letters of credit thereunder will be deemed outstanding under the Exit ABL Facility or, if necessary, be cash collateralized at 105% of such outstanding amount as of the Effective Date and remain outstanding.

On the Effective Date, the Allowed DIP Term Loan Facility Claims will, in full satisfaction, settlement, discharge and release of, and in exchange for such DIP Term Loan Facility Claims, be indefeasibly paid in full in Cash from the proceeds of the Rights Offering and Backstop Purchase Agreement, and the DIP Term Loan Facility Liens will be deemed discharged, released, and terminated for all purposes without further action of or by any Person or Entity.

3.      **Priority Tax Claims**

Subject to Article VIII of the Plan, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtors or Reorganized Debtors,

17

US-DOCS\117417332.2

as applicable:  (A) Cash equal to the amount of such Allowed Priority Tax Claim; (B) such other less favorable treatment as to which the Debtors (with the consent of the Required Consenting Noteholders) or Reorganized Debtors, as applicable, and the Holder of such Allowed Priority Tax Claim will have agreed upon in writing; (C) such other treatment such that it will not be Impaired pursuant to section 1124 of the Bankruptcy Code or (D) pursuant to and in accordance with sections 1129(a)(9)(C) and 1129(a)(9)(D) of the Bankruptcy Code, Cash in an aggregate amount of such Allowed Priority Tax Claim payable in regular installment payments over a period ending not more than five (5) years after the Petition Date, plus simple interest at the rate required by applicable non-bankruptcy law on any outstanding balance from the Effective Date, or such lesser rate as is agreed to in writing by a particular taxing authority and the Debtors or Reorganized Debtors, as applicable, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; *provided*, *however*, that Priority Tax Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.  Any installment payments to be made under clause (C) or (D) above will be made in equal quarterly Cash payments beginning on the first applicable Subsequent Distribution Date, and continuing on each Subsequent Distribution Date thereafter until payment in full of the applicable Allowed Priority Tax Claim.

**B.      CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS**

### 1.      Summary

The Plan constitutes a separate plan of reorganization for each Debtor.  All Claims and Equity Interests, except Administrative Claims, DIP Facility Claims, and Priority Tax Claims, are placed in the Classes set forth below. For all purposes under the Plan, each Class will contain sub-Classes for each of the Debtors (*i.e.*, there will be seven (7) Classes for each Debtor); *provided*, that any Class that is vacant as to a particular Debtor will be treated in accordance with Article III.D of the Plan.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including, without limitation, for voting, confirmation and distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remaining portion of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released, Disallowed or otherwise settled prior to the Effective Date.

### 2.      Classification and Treatment of Classified Claims and Equity Interests

(a)      Class 1 – Other Priority Claims

o   *Classification*:  Class 1 consists of the Other Priority Claims.

o   *Treatment*: Subject to Article VIII of the Plan, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Class 1 Claim is an Allowed Class 1 Claim as of the Effective Date or (ii) the date on which such Class 1 Claim becomes an Allowed Class 1 Claim, each Holder of an Allowed Class 1 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim, at the election of the Debtors or Reorganized Debtors, as applicable (with the

18

consent of the Required Consenting Noteholders): (A) Cash equal to the amount of such Allowed Class 1 Claim; (B) such other less favorable treatment as to which the Debtors or Reorganized Debtors, as applicable, and the Holder of such Allowed Class 1 Claim will have agreed upon in writing; or (C) such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code; *provided*, *however*, that Class 1 Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with the terms and conditions of any agreements relating thereto without further notice to or order of the Bankruptcy Court.

o   *Voting*:  Class 1 is an Unimpaired Class, and the Holders of Claims in Class 1 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Claims in Class 1 are not entitled to vote to accept or reject the Plan.  Notwithstanding the foregoing, the Holders of Claims in Class 1 will be provided a Ballot/Opt-Out Form solely for purposes of affirmatively opting out of the Third Party Release.

(b)   Class 2 – Other Secured Claims

o   *Classification*:  Class 2 consists of the Other Secured Claims.  Class 2 consists of separate subclasses for each Other Secured Claim.

o   *Treatment*:  Subject to Article VIII of the Plan, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Class 2 Claim is an Allowed Class 2 Claim as of the Effective Date or (ii) the date on which such Class 2 Claim becomes an Allowed Class 2 Claim, each Holder of an Allowed Class 2 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim, at the election of the Debtors or Reorganized Debtors, as applicable (with the consent of the Required Consenting Noteholders): (A) Cash equal to the amount of such Allowed Class 2 Claim; (B) such other less favorable treatment as to which the Debtors or Reorganized Debtors, as applicable, and the Holder of such Allowed Class 2 Claim will have agreed upon in writing; (C) the Collateral securing such Allowed Class 2 Claim; (D) such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code; or (E) such other treatment necessary to satisfy section 1129 of the Bankruptcy Code; *provided*, *however*, that Class 2 Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with the terms and conditions of any agreements relating thereto without further notice to or order of the Bankruptcy Court.

o   *Voting*:  Class 2 is an Unimpaired Class, and the Holders of Claims in Class 2 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Claims in Class 2 are not entitled to vote to accept or reject the Plan.  Notwithstanding the foregoing, the Holders of Claims in Class 2 will be provided a Ballot/Opt-Out Form solely for purposes of affirmatively opting out of the Third Party Release.

19

(c)     Class 3 - Secured Tax Claims

o   *Classification*:  Class 3 consists of the Secured Tax Claims.

o   *Treatment*:  Subject to <u>Article VIII</u> of the Plan, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Class 3 Claim is an Allowed Class 3 Claim as of the Effective Date or (ii) the date on which such Class 3 Claim becomes an Allowed Class 3 Claim, each Holder of an Allowed Class 3 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 3 Claim, at the election of the Debtors or Reorganized Debtors, as applicable (with the consent of the Required Consenting Noteholders):  (A) Cash equal to the amount of such Allowed Class 3 Claim; (B) such other less favorable treatment as to which the Debtors or Reorganized Debtors, as applicable, and the Holder of such Allowed Class 3 Claim will have agreed upon in writing; (C) the Collateral securing such Allowed Class 3 Claim; (D) such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code; or (E) pursuant to and in accordance with sections 1129(a)(9)(C) and 1129(a)(9)(D) of the Bankruptcy Code, Cash in an aggregate amount of such Allowed Class 3 Claim payable in regular installment payments over a period ending not more than five (5) years after the Petition Date, *plus* simple interest at the rate required by applicable non-bankruptcy law on any outstanding balance from the Effective Date, or such lesser rate as is agreed to in writing by a particular taxing authority and the Debtors or Reorganized Debtors, as applicable, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; *provided*, *however*, that Class 3 Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.  Any installment payments to be made under clause (D) or (E) above will be made in equal quarterly Cash payments beginning on the first applicable Subsequent Distribution Date, and continuing on each Subsequent Distribution Date thereafter until payment in full of the applicable Allowed Class 3 Claim.

o   *Voting*:  Class 3 is an Unimpaired Class, and the Holders of Claims in Class 3 will be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Claims in Class 3 are not entitled to vote to accept or reject the Plan.  Notwithstanding the foregoing, the Holders of Claims in Class 3 will be provided a Ballot/Opt-Out Form solely for purposes of affirmatively opting out of the Third Party Release.

(d)     Class 4 – Prepetition Notes Claims

o   *Classification:* Class 4 consists of Prepetition Notes Claims.

o   *Allowance*:  The Prepetition Notes Claims are Allowed in full as set forth in the DIP Orders, therein defined collectively as the "Prepetition Senior Notes Obligations".

US-DOCS\117417332.2

o *Treatment*:   On the Effective Date, or as soon thereafter as reasonably practicable, each Holder of an Allowed Class 4 Claim will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 4 Claim its Pro Rata share of the following or such other less favorable treatment as to which the Debtors or Reorganized Debtors, as applicable, and the Holder of such Allowed Class 4 Claim will have agreed upon in writing:

- The Subscription Rights (which will be attached to each Allowed Prepetition Notes Claim and transferable with such Allowed Prepetition Notes Claim as set forth in the Rights Offering Procedures, but such Subscription Rights may only be exercised to the extent such Holder is an Accredited Investor) in accordance with the Disclosure Statement Order and the Rights Offering Procedures.   Each Holder of an Allowed Prepetition Notes Claim that will receive the Subscription Rights will receive its Pro Rata share of the Subscription Rights, as shared with the aggregate amount of (A) all Eligible General Unsecured Claims as of the Rights Offering Record Date held by each Person or Entity that has certified that it is an Accredited Investor (as demonstrated by an AI Questionnaire that has been properly completed, duly executed, and timely delivered by such Holder to the subscription agent for the Rights Offering on or before the Questionnaire Deadline in accordance with the Rights Offering Procedures) *plus* (B) all Allowed Prepetition Notes Claims as of the Rights Offering Record Date held by each Person or Entity that has certified that it is an Accredited Investor (as demonstrated by an AI Questionnaire that has been properly completed, duly executed, and timely delivered by such Holder to the subscription agent for the Rights Offering on or before the Questionnaire Deadline in accordance with the Rights Offering Procedures).

- 100% of the New Equity Interests Pool, shared Pro Rata with the Holders of Allowed General Unsecured Claims (subject to dilution by (A) the New Equity Interests issued upon conversion of the New Secured Convertible Notes and (B) the New Management Incentive Plan Equity).   For the avoidance of doubt, the New Equity Interests in the New Equity Interests Pool will be distributed on a Pro Rata basis to (A) Holders of Allowed Prepetition Notes Claims and (B) Holders of Allowed General Unsecured Claims, in accordance with the terms of the Plan.

o *Voting*:  Class 4 is Impaired, and Holders of Claims in Class 4 are entitled to vote to accept or reject the Plan.

(e)    Class 5 – General Unsecured Claims

o *Classification*: Class 5 consists of General Unsecured Claims.

o *Treatment*:  Subject to Article VIII of the Plan, on the Effective Date, or as soon thereafter as reasonably practicable, each Holder of an Allowed Class 5 Claim will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 5 Claim its Pro Rata share of the following or such other less favorable treatment as to which the Debtors or

21

Reorganized Debtors, as applicable, and the Holder of such Allowed Class 5 Claim will have agreed upon in writing:

- The Subscription Rights (which will be attached to each Allowed General Unsecured Claim and transferable with such Allowed General Unsecured Claim as set forth in the Rights Offering Procedures, but such Subscription Rights may only be exercised to the extent such Holder is an Accredited Investor) in accordance with the Disclosure Statement Order and the Rights Offering Procedures.  Each Holder of an Eligible General Unsecured Claim that will receive the Subscription Rights as a certified Accredited Investor (as demonstrated by an AI Questionnaire that has been properly completed, duly executed, and timely delivered by such Holder to the subscription agent for the Rights Offering on or before the Questionnaire Deadline, in accordance with the Rights Offering Procedures) will receive its Pro Rata share of the Subscription Rights, as shared with the aggregate amount of (A) all Eligible General Unsecured Claims as of the Rights Offering Record Date held by each Person or Entity that has certified that it is an Accredited Investor (as demonstrated by an AI Questionnaire that has been properly completed, duly executed, and timely delivered by such Holder to the subscription agent for the Rights Offering on or before the Questionnaire Deadline in accordance with the Rights Offering Procedures) *plus* (B) all Allowed Prepetition Notes Claims as of the Rights Offering Record Date held by each Person or Entity that has certified that it is an Accredited Investor (as demonstrated by an AI Questionnaire that has been properly completed, duly executed, and timely delivered by such Holder to the subscription agent for the Rights Offering on or before the Questionnaire Deadline in accordance with the Rights Offering Procedures).

- 100% of the New Equity Interests Pool, shared Pro Rata with the Holders of Allowed Prepetition Notes Claims (subject to dilution by (A) the New Equity Interests issued upon conversion of the New Secured Convertible Notes and (B) the New Management Incentive Plan Equity).  For the avoidance of doubt, the New Equity Interests in the New Equity Interests Pool will be distributed on a Pro Rata basis to (A) Holders of Allowed Prepetition Notes Claims and (B) Holders of Allowed General Unsecured Claims, in accordance with the terms of the Plan.

o *Voting*:  Class 5 is Impaired, and Holders of Claims in Class 5 are entitled to vote to accept or reject the Plan.

(f)   Class 6 – Intercompany Claims

o *Classification*:  Class 6 consists of the Intercompany Claims.

o *Treatment*:  Subject to the Restructuring Transactions, the Intercompany Claims will be reinstated, compromised, or cancelled, at the option of the relevant Holder of such Intercompany Claims with the consent of the Required Consenting Noteholders.

22

o *Voting*:  Class 6 is an Impaired Class.  However, because the Holders of such Claims are Affiliates of the Debtors, the Holders of Claims in Class 6 shall be conclusively deemed to have accepted this Plan.  Therefore, Holders of Claims in Class 6 are not entitled to vote to accept or reject this Plan.

(g)     Class 7 – Old Affiliate Interests in any Parent Subsidiary

o *Classification*:  Class 7 consists of the Old Affiliate Interests in any Parent Subsidiary.

o *Treatment*:  Subject to the Restructuring Transactions, the Old Affiliate Interests will remain effective and outstanding on the Effective Date and will be owned and held by the same applicable Person or Entity that held and/or owned such Old Affiliate Interests immediately prior to the Effective Date.

o *Voting*:  Class 7 is an Unimpaired Class and the Holders of the Old Affiliate Interests in Class 7 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of the Old Affiliate Interests in Class 7 are not entitled to vote to accept or reject the Plan.

(h)     Class 8 – Old Parent Interests

o *Classification*:  Class 8 consists of the Old Parent Interests.

o *Treatment*:  On the Effective Date, the Old Parent Interests will be cancelled without further notice to, approval of, or action by any Person or Entity, and each Holder of an Old Parent Interest will not receive any distribution or retain any property on account of such Old Parent Interest.

o *Voting*:  Class 8 is an Impaired Class, and the Holders of Old Parent Interests in Class 7 will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Old Parent Interests in Class 8 will not be entitled to vote to accept or reject the Plan. Notwithstanding the foregoing, the Holders of Old Parent Interests in Class 8 will be provided a Ballot/Opt-Out Form solely for purposes of affirmatively opting out of the Third Party Release.

**3.     Special Provision Governing Unimpaired Claims**

Except as otherwise provided therein, nothing under the Plan will affect or limit the Debtors' or the Reorganized Debtors' rights and defenses (whether legal or equitable) in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

**4.     Elimination of Vacant Classes**

Any Class of Claims that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or a claim temporarily allowed under Bankruptcy Rule 3018, or as to which no vote is cast, will be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

23

C.      **ACCEPTANCE OR REJECTION OF THE PLAN**

1.      **Presumed Acceptance of Plan**

Classes 1-3, and 7 are Unimpaired under the Plan.  Therefore, the Holders of Claims or Equity Interests in such Classes are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.  Class 6 is Impaired under the Plan; however, because the Holders of such Claims are Affiliates of the Debtors, the Holders of Claims in Class 6 are conclusively deemed to have accepted the Plan.

2.      **Presumed Rejection of Plan**

Class 8 is Impaired and Holders of Old Parent Interests in such Class will receive no distribution under the Plan on account of such Old Parent Interests.  Therefore, the Holders of Old Parent Interests in such Class are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.  Such Holders will, however, receive a Ballot/Opt-Out Form to allow such Holders to affirmatively opt-out of the Third Party Release.

3.      **Voting Classes**

Classes 4 and 5 are Impaired under the Plan.  The Holders of Claims in such Classes as of the Voting Record Date are entitled to vote to accept or reject the Plan.

4.      **Acceptance by Impaired Class of Claims**

Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in such Class actually voting have voted to accept the Plan.

5.      **Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code**

Section 1129(a)(10) of the Bankruptcy Code will be satisfied for purposes of Confirmation by acceptance of the Plan by either Class 4 or Class 5.  The Debtors request confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code.  The Debtors reserve the right to modify the Plan or any Exhibit or the Plan Supplement in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

6.      **Votes Solicited in Good Faith**

The Debtors have, and upon the Confirmation Date will be deemed to have, solicited votes on the Plan from the Voting Classes in good faith and in compliance with the Disclosure Statement Order and the applicable provisions of the Bankruptcy Code, including, without limitation, sections 1125 and 1126 of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with the solicitation.  Accordingly, the Debtors, the Reorganized Debtors, and each of their respective Related Persons will be entitled to, and upon the Confirmation Date are hereby granted, the protections of section 1125(e) of the Bankruptcy Code.

24

**D.     MEANS FOR IMPLEMENTATION OF THE PLAN**

     **1.     Restructuring Transactions**

     Without limiting any rights and remedies of the Debtors or Reorganized Debtors under the Plan or applicable law, but in all cases subject to the terms and conditions of the Restructuring Documents and any consents or approvals required thereunder, the entry of the Confirmation Order will constitute authorization for the Reorganized Debtors to take, or to cause to be taken, all actions necessary or appropriate to consummate and implement the provisions of the Plan prior to, on and after the Effective Date, including such actions as may be necessary or appropriate to effectuate a corporate restructuring of their respective businesses, to otherwise simplify the overall corporate structure of the Reorganized Debtors, or to reincorporate or reorganize certain of the Affiliate Debtors under the laws of jurisdictions other than the laws of which the applicable Affiliate Debtors are presently incorporated.  Such restructuring may include one or more mergers, consolidations, restructures, dispositions, liquidations or dissolutions, as may be determined by the Debtors or Reorganized Debtors to be necessary or appropriate, but in all cases subject to the terms and conditions of the Plan and the Restructuring Documents and any consents or approvals required thereunder (collectively, the "**Restructuring Transactions**").

     All such Restructuring Transactions taken, or caused to be taken, will be deemed to have been authorized and approved by the Bankruptcy Court upon the entry of the Confirmation Order.  The actions to effectuate the Restructuring Transactions may include: (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, disposition, liquidation, or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable state law and such other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, duty, or obligation on terms consistent with the terms of the Plan and having such other terms to which the applicable entities may agree; (iii) the filing of appropriate certificates or articles of merger, consolidation, or dissolution pursuant to applicable state law; and (iv) all other actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable state law in connection with such transactions, but in all cases subject to the terms and conditions of the Plan and the Restructuring Documents and any consents or approvals required thereunder.

     **2.     Continued Corporate Existence**

     Subject to the Restructuring Transactions permitted by Article V.A of the Plan, after the Effective Date, the Reorganized Debtors will continue to exist as separate legal entities in accordance with the applicable law in the respective jurisdiction in which they are incorporated or formed and pursuant to their respective certificates or articles of incorporation and by-laws, or other applicable organizational documents, in effect immediately prior to the Effective Date, except to the extent such certificates or articles of incorporation and by-laws, or other applicable organizational documents, are amended, restated or otherwise modified under the Plan.  Notwithstanding anything to the contrary in the Plan, the Claims against a particular Debtor or Reorganized Debtor will remain the obligations solely of such Debtor or Reorganized Debtor and will not become obligations of any other Debtor or Reorganized Debtor solely by virtue of the Plan or the Chapter 11 Cases.

US-DOCS\117417332.2

3.        **Vesting of Assets in the Reorganized Debtors Free and Clear of Liens and Claims**

Except as otherwise expressly provided in the Plan, the Confirmation Order, or any Restructuring Document, pursuant to sections 1123(a)(5), 1123(b)(3), 1141(b) and (c) and other applicable provisions of the Bankruptcy Code, on and after the Effective Date, all property and assets of the Estates of the Debtors, including all claims, rights, and Retained Causes of Action of the Debtors, and any other assets or property acquired by the Debtors or the Reorganized Debtors during the Chapter 11 Cases or under or in connection with the Plan (other than the Claims or Causes of Action subject to the Debtor Release, any rejected Executory Contracts and/or Unexpired Leases, and the Carve-Out Reserve (subject to the Reorganized Debtors' reversionary interest in the Unused Carve-Out Reserve Amount as set forth in Article V.R. of the Plan)), will vest in the Reorganized Debtors free and clear of all Claims, Liens, charges, and other encumbrances, subject to the Restructuring Transactions and Liens which survive the occurrence of the Effective Date as described in Article III of the Plan (including, without limitation, Liens that secure the Exit Facility Loans and the New Secured Convertible Notes and all other obligations of the Reorganized Debtors under the Exit Facility Loan Documents and the New Secured Convertible Notes Documents).  On and after the Effective Date, the Reorganized Debtors may (i) operate their respective businesses, (ii) use, acquire, and dispose of their respective property and (iii) compromise or settle any Claims, in each case without notice to, supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than restrictions expressly imposed by the Plan or the Confirmation Order.

4.        **Exit Facility Loan Documents; New Secured Convertible Notes Documents**

On the Effective Date, the Debtors and the Reorganized Debtors, as applicable, will be authorized to execute and deliver, and to consummate the transactions contemplated by, the Exit Facility Loan Documents and the New Secured Convertible Notes Documents, in each case in form and substance acceptable to the Required Consenting Noteholders and without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity (other than as expressly required by the Exit Facility Loan Documents and the New Secured Convertible Notes Documents).  On the Effective Date, the Exit Facility Loan Documents and the New Secured Convertible Notes Documents will constitute legal, valid, binding and authorized indebtedness and obligations of the Reorganized Debtors, enforceable in accordance with their respective terms and such indebtedness and obligations will not be, and will not be deemed to be, enjoined or subject to discharge, impairment, release or avoidance under the Plan, the Confirmation Order or on account of the Confirmation or Consummation of the Plan.

5.        **Rights Offering**

The Debtors shall conduct and consummate the Rights Offering on the terms and subject to the conditions set forth in the Rights Offering Procedures, the Backstop Purchase Agreement, and the Backstop Order and the Disclosure Statement Order.  The proceeds received by the Debtors under the Rights Offering from the Rights Offering Participants and the Backstop Parties pursuant to the Backstop Purchase Agreement will be utilized to, among other things, (i) satisfy the Allowed DIP Term Loan Facility Claims, (ii) satisfy out-of-pocket costs and expenses incurred by the Debtors in connection with the Chapter 11 Cases, (iii) if necessary, to cash collateralize letter of credit obligations that become outstanding under the Exit Facility Loan Documents, and (iv) for working capital and other general corporate purposes of the Reorganized Debtors after the Effective Date.

US-DOCS\117417332.2

6. **New Equity Interests**

On the Effective Date, subject to the terms and conditions of the Restructuring Transactions, Reorganized Parent will issue the New Equity Interests pursuant to the Plan and the Amended/New Organizational Documents. Except as otherwise expressly provided in the Restructuring Documents, the Reorganized Parent will not be obligated to register the New Equity Interests under the Securities Act or to list the New Equity Interests for public trading on any securities exchange.

Distributions of the New Equity Interests may be made by delivery or book-entry transfer thereof by the applicable Distribution Agent in accordance with the Plan and the Amended/New Organizational Documents. Upon the Effective Date, after giving effect to the transactions contemplated hereby, the authorized capital stock or other equity securities of Reorganized Parent will be that number of shares of New Equity Interests as may be designated in the Amended/New Organizational Documents.

7. **New Stockholders Agreement; New Registration Rights Agreement**

Subject to the Restructuring Transactions permitted by Article V.A of the Plan, on the Effective Date, Reorganized Parent will enter into the New Stockholders Agreement and, if applicable, the New Registration Rights Agreement, each of which will become effective and binding in accordance with its terms and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity (other than as expressly required by the New Stockholders Agreement and the New Registration Rights Agreement, as applicable).

On and as of the Effective Date, all of the Holders of New Equity Interests will be deemed to be parties to the New Stockholders Agreement, without the need for execution by such Holder. The New Stockholders Agreement will be binding on all Persons or Entities receiving, and all Holders of, the New Equity Interests (and their respective successors and assigns), whether such New Equity Interest is received or to be received on or after the Effective Date and regardless of whether such Person or Entity executes or delivers a signature page to the New Stockholders Agreement.

To the extent applicable, on and as of the Effective Date, all Backstop Parties will be deemed to be parties to the New Registration Rights Agreement, without the need for execution by any such Persons or Entities. The New Registration Rights Agreement will be binding on all such Persons or Entities (and their respective successors and assigns) regardless of whether such applicable Person or Entity executes or delivers a signature page to the New Registration Rights Agreement; *provided*, that to the extent the Required Backstop Parties elect not to enter into the New Registration Rights Agreement, the New Registration Rights Agreement will not be included in the Plan Supplement, and the provisions herein related to the New Registration Rights Agreement will be null and void.

8. **New Management Incentive Plan**

After the Effective Date, the New Board will adopt the New Management Incentive Plan pursuant to which New Equity Interests (or restricted stock units, options, or other instruments (including "profits interests" in the Reorganized Parent), or some combination of the foregoing) representing up to ten percent (10%) of the New Equity Interests issued as of the Effective Date on a fully diluted basis may be reserved for grants to be made from time to time to the directors, officers, and other management of the Reorganized Parent, subject to the terms and conditions set forth in the New Management Incentive Plan. The details and allocation of the New Management Incentive Plan and the underlying awards thereunder will be determined by the New Board. For the avoidance of doubt, the New Management Incentive Plan Equity

27

will dilute all of the New Equity Interests equally, including the New Equity Interests issued upon conversion of the New Secured Convertible Notes after the Effective Date.

### 9.       Plan Securities and Related Documentation; Exemption from Securities Laws

On and after the Effective Date, the Debtors and the Reorganized Debtors, as applicable, are authorized to and will provide or issue, as applicable, the New Equity Interests, the New Secured Convertible Notes, and any and all other securities to be distributed or issued under the Plan (collectively, the "**Plan Securities**") and any and all other notes, stock, instruments, certificates, and other documents or agreements required to be distributed, issued, executed or delivered pursuant to or in connection with the Plan (collectively, the "**Plan Securities and Documents**"), in each case in form and substance acceptable to the Required Consenting Noteholders, and without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity.

The offer, distribution, and issuance, as applicable, of the Plan Securities and Documents under the Plan will be exempt from registration and prospectus delivery requirements under applicable securities laws (including Section 5 of the Securities Act or any similar state or local law requiring the registration and/or delivery of a prospectus for offer or sale of a security or registration or licensing of an issuer of a security) pursuant to section 1145(a) of the Bankruptcy Code, Section 4(a)(2) of the Securities Act and/or other applicable exemptions. An offering of Plan Securities provided in reliance on the exemption from registration under the Securities Act pursuant to section 1145(a) of the Bankruptcy Code may be sold without registration to the extent permitted under section 1145 of the Bankruptcy Code and is deemed to be a public offering, and such Plan Securities may be resold without registration to the extent permitted under section 1145 of the Bankruptcy Code. Any Plan Securities and Documents provided in reliance on the exemption from registration under the Securities Act provided by Section 4(a)(2) of such act will be provided in a private placement.

All Plan Securities issued to Holders of Allowed Claims on account of their respective Claims will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance on section 1145(a) of the Bankruptcy Code; *provided* that all Plan Securities issued (a) to Holders of Allowed Claims as Rights Offering Participants in the Rights Offering upon exercise of their respective Subscription Rights or upon subsequent conversion of their New Secured Convertible Notes into New Equity Interests, or (b) to the Backstop Parties pursuant to the Backstop Purchase Agreement (i) in satisfaction of their obligations to purchase any Unsubscribed Notes or (ii) in connection with the Put Option Notes, in each case, including upon any subsequent conversion of such New Secured Convertible Notes into New Equity Interests, will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance on Section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder.

Resales by Persons or Entities who receive any Plan Securities that are offered pursuant to an exemption under section 1145(a) of the Bankruptcy Code, who are deemed to be "underwriters" (as such term is defined in the Bankruptcy Code) (such Persons or Entities, the "**Restricted Holders**") would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act. Restricted Holders would, however, be permitted to resell the Plan Securities that are offered pursuant to an exemption under section 1145(a) of the Bankruptcy Code, as applicable, without registration if they are able to comply with the provisions of Rule 144 under the Securities Act, or if such securities are registered with the SEC pursuant to a registration statement or otherwise.

Persons or Entities who receive Plan Securities pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder will hold "restricted

28

securities" as defined under Rule 144 under the Securities Act.  Resales of such restricted securities would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law.  Holders of restricted securities would, however, be permitted to resell Plan Securities without registration if they are able to comply with the applicable provisions of Rule 144 or Rule 144A under the Securities Act or any other applicable registration exemption under the Securities Act, or if such securities are registered with the SEC.

In the event that the Reorganized Debtors elect on or after the Effective Date to reflect any ownership of the Plan Securities through the facilities of DTC, the Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of such securities under applicable securities laws.  DTC shall accept and be entitled to conclusively rely upon the Plan or the Confirmation Order in lieu of a legal opinion regarding whether such securities are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

### 10.    Release of Liens and Claims

To the fullest extent provided under section 1141(c) and other applicable provisions of the Bankruptcy Code, except as otherwise provided in the Plan (including, without limitation, Article V.D of the Plan) or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to Article VII of the Plan, all Liens, Claims, mortgages, deeds of trust, or other security interests against the assets or property of the Debtors or the Estates will be fully released, canceled, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity.  The filing of the Confirmation Order with any federal, state, or local agency or department will constitute good and sufficient evidence of, but will not be required to effect, the termination of such Liens, Claims and other interests to the extent provided in the immediately preceding sentence.  Any Person or Entity holding such Liens, Claims or interests will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Reorganized Debtors such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtors.

### 11.    Organizational Documents of the Reorganized Debtors

The respective organizational documents of each of the Debtors will be amended and restated or replaced (as applicable) in form and substance satisfactory to the Debtors and the Required Consenting Noteholders and as necessary to satisfy the provisions of the Plan and the Bankruptcy Code.  Such organizational documents will: (i) to the extent required by section 1123(a)(6) of the Bankruptcy Code, include a provision prohibiting the issuance of non-voting equity securities; (ii) authorize the issuance of New Equity Interests in an amount not less than the amount necessary to permit the distributions thereof required or contemplated by the Plan; (iii) to the extent necessary or appropriate, include restrictions on the transfer of New Equity Interests; and (iv) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate the Plan and the transactions contemplated therein.  After the Effective Date, the Reorganized Debtors may, subject to the terms and conditions of the Restructuring Documents, amend and restate their respective organizational documents as permitted by applicable law.

### 12.    Directors and Officers of the Reorganized Debtors

The New Board will be identified in the Plan Supplement.  The initial new board of directors or other governing body of each Parent Subsidiary will consist of one or more of the directors or officers of Reorganized Parent.

29

US-DOCS\117417332.2

Consistent with the requirements of section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose, at or prior to the Confirmation Hearing, the identity and affiliations of any Person proposed to serve on the initial board of directors or be an officer of each of the Reorganized Debtors, and, to the extent such Person is an insider other than by virtue of being a director or an officer, the nature of any compensation for such Person. Each such director and officer will serve from and after the Effective Date pursuant to applicable law and the terms of the Amended/New Organizational Documents and the other constituent and organizational documents of the applicable Reorganized Debtors. The existing boards of directors and other governing bodies of the Debtors will be deemed to have resigned on and as of the Effective Date, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity.

**13.     Corporate Action**

Each of the Debtors and the Reorganized Debtors may take any and all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan, including, without limitation, the issuance and the distribution of the securities to be issued pursuant hereto, in each case in form and substance acceptable to the Required Consenting Noteholders, and without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers or directors of the Debtors or the Reorganized Debtors or by any other Person or Entity (except for those expressly required pursuant hereto or by the Restructuring Documents).

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the stockholders, directors, officers, managers, members or partners of the Debtors (as of prior to the Effective Date) will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the stockholders, directors, officers, managers, members or partners of the Debtors or the Reorganized Debtors, or the need for any approvals, authorizations, actions or consents of any Person or Entity.

As of the Effective Date, all matters provided for in the Plan involving the legal or corporate structure of the Debtors or the Reorganized Debtors (including, without limitation, the adoption of the Amended/New Organization Documents and similar constituent and organizational documents, and the selection of directors and officers for, each of the Reorganized Debtors), and any legal or corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan, will be deemed to have occurred and will be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the stockholders, directors, officers, managers, members or partners of the Debtors or the Reorganized Debtors or by any other Person or Entity.

On and after the Effective Date, the appropriate officers of the Debtors and the Reorganized Debtors are authorized to issue, execute, deliver, consummate, and take all such actions as may be necessary or appropriate to effectuate and implement the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in the Plan in the name of and on behalf of the Debtors and the Reorganized Debtors, in each case in form and substance acceptable to the Required Consenting Noteholders, and without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person or Entity. The

30

secretary and any assistant secretary of the Debtors and the Reorganized Debtors will be authorized to certify or attest to any of the foregoing actions.

### 14.     Cancellation of Notes, Certificates and Instruments

On the Effective Date, except to the extent otherwise provided in the Plan and the Restructuring Documents, all notes, stock, indentures, instruments, certificates, agreements and other documents evidencing or relating to Claims or Equity Interests (other than Old Affiliate Interests) will be canceled, and the obligations of the Debtors thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person or Entity; _provided_ that the Prepetition Notes and the Prepetition Notes Indenture will continue in effect for the limited purpose of (i) allowing Holders of Claims thereunder to receive, and allowing and preserving the rights of the Prepetition Notes Indenture Trustee to make, distributions under the Plan and (ii) permitting the Prepetition Notes Indenture Trustee to exercise its Prepetition Notes Indenture Trustee Charging Lien against such distributions for payment of any unpaid portion of the Prepetition Notes Indenture Trustee Fees and Expenses.  Except to the extent otherwise provided in the and the Restructuring Documents, upon completion of all such distributions, the Prepetition Notes Indenture and any and all notes, securities and instruments issued in connection therewith will terminate completely without further notice or action and be deemed surrendered.

### 15.     Old Affiliate Interests

On the Effective Date, the Old Affiliate Interests will remain effective and outstanding, and will be owned and held by the same applicable Person or Entity that held and/or owned such Old Affiliate Interests immediately prior to the Effective Date.  Each Parent Subsidiary will continue to be governed by the terms and conditions of its applicable organizational documents as in effect immediately prior to the Effective Date, except as amended or modified by the Plan.

### 16.     Sources of Cash for Plan Distributions

Except as otherwise provided in the Plan or the Confirmation Order, all Cash necessary for the Debtors or the Reorganized Debtors, as applicable, to make payments required pursuant to the Plan will be obtained from their respective Cash balances, including Cash from operations, the Exit Facility, and the Rights Offering.  The Debtors and the Reorganized Debtors, as applicable, may also make such payments using Cash received from their subsidiaries through their respective consolidated cash management systems and the incurrence of intercompany transactions, but in all cases subject to the terms and conditions of the Restructuring Documents.

### 17.     Continuing Effectiveness of Final Orders

Payment authorization granted to the Debtors under any prior Final Order entered by the Bankruptcy Court will continue in effect after the Effective Date.  Accordingly, the Debtors or the Reorganized Debtors may pay or otherwise satisfy any Claim to the extent permitted by, and subject to, the applicable Final Order without regard to the treatment that would otherwise be applicable to such Claim under the Plan.

### 18.     Funding and Use of Carve-Out Reserve

On the Effective Date, the Debtors will fund the Carve-Out Reserve in the amount equal to the Carve-Out Reserve Amount.  The Carve-Out Reserve Amount will be determined by the Debtors, with the

31

consent of the Required Consenting Noteholders or as determined by order of the Bankruptcy Court, as necessary in order to be able to pay in full in Cash the obligations and liabilities for which the Carve-Out Reserve was established.

The Cash contained in the Carve-Out Reserve will be used solely to pay the Allowed Professional Fee Claims, with the Unused Carve-Out Reserve Amount (if any) being returned to the Reorganized Debtors. The Debtors and the Reorganized Debtors, as applicable, will maintain detailed records of all payments made from the Carve-Out Reserve, such that all payments and transactions will be adequately and promptly documented in, and readily ascertainable from, their respective books and records. After the Effective Date, neither the Debtors nor the Reorganized Debtors will deposit any other funds or property into the Carve-Out Reserve absent further order of the Bankruptcy Court, or otherwise commingle funds in the Carve-Out Reserve.

The Carve-Out Reserve will be maintained in trust for the Professionals and will not be considered property of the Debtors' Estates; *provided* that the Reorganized Debtors will have a reversionary interest in the Unused Carve-Out Reserve Amount. To the extent that funds held in the Carve-Out Reserve do not or are unable to satisfy the full amount of the Allowed Professional Fee Claims, such Professionals will have an Allowed Administrative Claim for any such deficiency, which will be satisfied in full in Cash in accordance with Article II.A of the Plan.

### 19.     Put Option Notes

As consideration for the Debtors' right to call on the Backstop Parties' Backstop Commitments and consistent with the Backstop Order, on the Effective Date, the Reorganized Debtors will issue the Put Option Notes to the Backstop Parties under and as set forth in the Backstop Purchase Agreement.

### 20.     Payment of Fees and Expenses of Certain Creditors

The Debtors will, on and after the Effective Date and to the extent invoiced, pay (i) the Prepetition Credit Agreement Agent and Lender Fees and Expenses, (ii) the Ad Hoc Noteholders Committee Fees and Expenses and (iii) the Backstop Expenses (in each case whether accrued prepetition or postpetition and to the extent not otherwise paid during the Chapter 11 Cases), without application by any such parties to the Bankruptcy Court, and without notice and a hearing pursuant to section 1129(a)(4) of the Bankruptcy Code or otherwise; *provided*, *however*, if the Debtors or Reorganized Debtors and any such Person or Entity cannot agree with respect to the reasonableness of the fees and expenses (incurred prior to the Effective Date) to be paid to such party, the reasonableness of any such fees and expenses will be determined by the Bankruptcy Court (with any undisputed amounts to be paid by the Debtors on or after the Effective Date (as applicable) and any disputed amounts to be escrowed by the Reorganized Debtors). Notwithstanding anything to the contrary in the Plan, the fees and expenses described in this paragraph will not be subject to the Administrative Claims Bar Date.

### 21.     Payment of Fees and Expenses of Indenture Trustee

The Debtors will, on and after the Effective Date, and upon the presentment of invoices in customary form (which may be redacted to preserve any confidential or privileged information), pay the Prepetition Notes Indenture Trustee Fees and Expenses (in each case whether accrued prepetition or postpetition and to the extent not otherwise paid during the Chapter 11 Cases), without application by any party to the Bankruptcy Court, and without notice and a hearing pursuant to section 1129(a)(4) of the Bankruptcy Code or otherwise; *provided*, *however*, if the Debtors or Reorganized Debtors and the Prepetition Notes Indenture Trustee cannot agree with respect to the reasonableness of any Prepetition Notes Indenture Trustee Fees and Expenses (incurred prior to the Effective Date), the reasonableness of

32

any such Prepetition Notes Indenture Trustee Fees and Expenses will be determined by the Bankruptcy Court (with any undisputed amounts to be paid by the Debtors on or after the Effective Date (as applicable) and any disputed amounts to be escrowed by the Reorganized Debtors). Nothing in the Plan will be deemed to impair, waive, or discharge the Prepetition Notes Indenture Trustee Charging Lien for any amounts not paid pursuant to the Plan and otherwise claimed by the Prepetition Notes Indenture Trustee pursuant to and in accordance with the Prepetition Notes Indenture. From and after the Effective Date, the Reorganized Debtors will pay any Prepetition Notes Indenture Trustee Fees and Expenses in full in Cash without further court approval. Notwithstanding anything to the contrary in the Plan, the fees and expenses described in this paragraph will not be subject to the Administrative Claims Bar Date.

E.   **TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

   1.   **Assumption of Executory Contracts and Unexpired Leases**

   On the Effective Date, with the consent of the Required Consenting Noteholders, all Executory Contracts and Unexpired Leases of the Debtors will be assumed by the Debtors in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except for those Executory Contracts and Unexpired Leases that:

   (i)   have been assumed or rejected by the Debtors by prior order of the Bankruptcy Court;

   (ii)   are the subject of a motion to reject filed by the Debtors that is pending on the Effective Date;

   (iii)   are identified in the Schedule of Rejected Executory Contracts and Unexpired Leases, which may be amended by the Debtors to add or remove Executory Contracts and Unexpired Leases by filing with the Bankruptcy Court an amended Schedule of Rejected Executory Contracts and Unexpired Leases and serving it on the affected non-Debtor contract parties prior to the Effective Date; or

   (iv)   are rejected by the Debtors or terminated pursuant to the terms of the Plan.

   Without amending or altering any prior order of the Bankruptcy Court approving the assumption or rejection of any Executory Contract or Unexpired Lease, entry of the Confirmation Order by the Bankruptcy Court will constitute approval of such assumptions pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

   To the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned (as applicable) pursuant to the Plan or any prior order of the Bankruptcy Court (including, without limitation, any "change in control" provision, "change of control" provision, or provision with words of similar import) prohibits, restricts or conditions, or purports to prohibit, restrict or condition, or is modified, breached or terminated, or deemed modified, breached or terminated by, (i) the commencement of these Chapter 11 Cases or the insolvency or financial condition of any Debtor at any time before the closing of its respective Chapter 11 Case, (ii) any Debtor's or any Reorganized Debtor's assumption or assumption and assignment (as applicable) of such Executory Contract or Unexpired Lease or (iii) the Confirmation or Consummation of the Plan, then such provision will be deemed modified such that the transactions contemplated by the Plan will not entitle the non-debtor party thereto to modify or terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights or remedies with respect thereto, and any required consent under any such contract or lease will be deemed satisfied by the Confirmation of the Plan.

33

Each Executory Contract and Unexpired Lease assumed and/or assigned pursuant to the Plan will revest in and be fully enforceable by the applicable Reorganized Debtor or the applicable assignee in accordance with its terms and conditions, except as modified by the provisions of the Plan, any order of the Bankruptcy Court approving its assumption and/or assignment, or applicable law.

The inclusion or exclusion of a contract or lease on any schedule or exhibit will not constitute an admission by any Debtor that such contract or lease is an Executory Contract or Unexpired Lease or that any Debtor has any liability thereunder.

**2.      Cure of Defaults; Assignment of Executory Contracts and Unexpired Leases**

Any defaults under each Executory Contract and Unexpired Lease to be assumed, or assumed and assigned, pursuant to the Plan will be satisfied, pursuant to and to the extent required by section 365(b)(1) of the Bankruptcy Code, by payment of the applicable default amount in Cash on or in connection with the Effective Date or on such other terms as the Bankruptcy Court may order or the parties to such Executory Contracts or Unexpired Leases may otherwise agree in writing (the "Cure Claim Amount").

In the event of an assumption, or an assumption and assignment, of an Executory Contract or Unexpired Lease under the Plan, at least fourteen (14) days prior to the Plan Objection Deadline, the Debtors will File and serve upon counterparties to such Executory Contracts and Unexpired Leases, a notice of the proposed assumption, or proposed assumption and assignment, which will: (a) list the applicable Cure Claim Amount, if any; (b) if applicable, identify the party to which the Executory Contract or Unexpired Lease will be assigned; (c) describe the procedures for filing objections thereto; and (d) explain the process by which related disputes will be resolved by the Bankruptcy Court.

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption, or proposed assumption and assignment under the Plan, or any related cure amount, must be Filed, served and actually received by the Debtors prior to the Plan Objection Deadline (notwithstanding anything in the Schedules or a Proof of Claim to the contrary). Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption, or proposed assumption and assignment, or cure amount will be deemed to have consented to such matters and will be deemed to have forever released and waived any objection to such proposed assumption, proposed assumption and assignment, and cure amount. The Confirmation Order will constitute an order of the Bankruptcy Court approving each proposed assumption, or proposed assumption and assignment, of Executory Contracts and Unexpired Leases pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

In the event of a dispute regarding (a) the amount of any cure payment, (b) the ability of any Debtor or assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or assumed and assigned or (c) any other matter pertaining to assumption or assignment, the applicable cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order resolving the dispute and approving such assumption, or assumption and assignment. If such objection is sustained by Final Order of the Bankruptcy Court, the Debtors or the Reorganized Debtors, as applicable, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming or assigning it. The Debtors or the Reorganized Debtors, as applicable, will be authorized to effect such rejection by filing a written notice of rejection with the Bankruptcy Court and serving such notice on the applicable counterparty within ten (10) days of the entry of such Final Order.

Subject to any cure claims Filed with respect thereto, assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan will result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions

34

restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assumption and assignment, in each case as provided in section 365 of the Bankruptcy Code. Any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned by Final Order will be deemed disallowed and expunged (subject to any cure claims Filed with respect thereto), without further notice to or action, order, or approval of the Bankruptcy Court.

With respect to any Executory Contract or Unexpired Lease assumed and assigned pursuant to the Plan, upon and as of the Effective Date, the applicable assignee will be deemed to be substituted as a party thereto for the applicable Debtor party to such assigned Executory Contract or Unexpired Lease and, accordingly, the Debtors and the Reorganized Debtors will be relieved, pursuant to and to the extent set forth in section 365(k) of the Bankruptcy Code, from any further liability under such assigned Executory Contract or Unexpired Lease.

### 3. Rejection of Executory Contracts and Unexpired Leases

The Debtors reserve the right, and subject to the consent of the Required Consenting Noteholders, at any time prior to the Effective Date, except as otherwise specifically provided in the Plan, to seek to reject any Executory Contract or Unexpired Lease and to file a motion requesting authorization for the rejection of any such contract or lease. All Executory Contracts and Unexpired Leases listed on the Schedule of Rejected Executory Contracts and Unexpired Leases will be deemed rejected as of the Effective Date. The Confirmation Order will constitute an order of the Bankruptcy Court approving the rejections described in Article VI of the Plan pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise will not constitute a termination of any preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases.

### 4. Claims on Account of the Rejection of Executory Contracts or Unexpired Leases

All Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be filed with the Bankruptcy Court within thirty (30) days after service of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.

Any Person or Entity that is required to file a Proof of Claim arising from the rejection of an Executory Contract or an Unexpired Lease that fails to timely do so will be forever barred, estopped and enjoined from asserting such Claim, and such Claim will not be enforceable, against the Debtors, the Reorganized Debtors or the Estates, and the Debtors, the Reorganized Debtors and their Estates and their respective assets and property will be forever discharged from any and all indebtedness and liability with respect to such Claim unless otherwise ordered by the Bankruptcy Court or as otherwise provided in the Plan. All such Claims will, as of the Effective Date, be subject to the permanent injunction set forth in Article X.G of the Plan.

### 5. D&O Liability Insurance Policies

On the Effective Date, each D&O Liability Insurance Policy will be deemed and treated as an Executory Contract that is and will be assumed by the Debtors (and assigned to the applicable Reorganized Debtors, if necessary) pursuant to section 365(a) and section 1123 of the Bankruptcy Code as to which no Proof of Claim, request for administrative expense, or cure claim need be Filed, and all Claims arising from the D&O Liability Insurance Policies will survive the Effective Date and be Unimpaired. Unless previously

35

effectuated by separate order entered by the Bankruptcy Court, entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' assumption of each of the D&O Liability Insurance Policies.

In furtherance of the foregoing, the Reorganized Debtors will maintain and continue in full force and effect such D&O Liability Insurance Policies for the benefit of the insured Persons at levels (including with respect to coverage and amount) no less favorable than those existing as of the date of entry of the Confirmation Order for a period of no less than six (6) years following the Effective Date; *provided*, *however*, that, after assumption of the D&O Liability Insurance Policies, nothing in the Plan otherwise alters the terms and conditions of the D&O Liability Insurance Policies. Confirmation and Consummation of the Plan will not impair or otherwise modify any available defenses of the Reorganized Debtors under the D&O Liability Insurance Policies. For the avoidance of doubt, the D&O Liability Insurance Policies will continue to apply with respect to actions, or failures to act, that occurred on or prior to the Effective Date, subject to the terms and conditions of the D&O Liability Insurance Policies.

The Debtors are further authorized to take such actions, and to execute and deliver such documents, as may be reasonably necessary or appropriate to implement, maintain, cause the binding of, satisfy any terms or conditions of, or otherwise secure for the insureds the benefits of the D&O Tail Policy, without further notice to or order of the Bankruptcy Court or approval or consent of any Person or Entity.

### 6. Indemnification Provisions

On the Effective Date, and, if applicable, subject to the assumption or assumption and assignment of the Specified Employee Plans in accordance Article VI.G of the Plan, all Indemnification Provisions will be deemed and treated as Executory Contracts that are and will be assumed by the Debtors (and assigned to the applicable Reorganized Debtors, if necessary) pursuant to section 365(a) and section 1123 of the Bankruptcy Code as to which no Proof of Claim, request for administrative expense, or cure claim need be Filed, and all Claims arising from the Indemnification Provisions will survive the Effective Date and be Unimpaired; *provided*, that the Reorganized Debtors will not be deemed to have assumed under the Plan, and will have no obligation whatsoever with respect to, any obligations under any Indemnification Provision related to any Designated Person (the "**Designated Person Indemnity Carve-Out**"). Unless previously effectuated by separate order entered by the Bankruptcy Court, entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' assumption of each of the Indemnification Provisions, except with respect to the Designated Person Indemnity Carve-Out. Confirmation and Consummation of the Plan will not impair or otherwise modify any available defenses of the Reorganized Debtors or other applicable parties under the Indemnification Provisions. For the avoidance of doubt, the Indemnification Provisions will continue to apply with respect to actions, or failures to act, that occurred on or prior to the Effective Date, subject to the terms and conditions of the Indemnification Provisions, and the Designated Person Indemnity Carve-Out.

### 7. Employee Compensation and Benefit Programs

On the Effective Date, all employment agreements and severance policies, including all employment, compensation, and benefit plans, policies, and programs of the Debtors applicable to any of their respective employees or retirees, and any of the employees or retirees of their respective subsidiaries, including, without limitation, all workers' compensation programs, savings plans, retirement plans, healthcare plans, disability plans, life, and accidental death and dismemberment insurance plans, health and welfare plans, and 401(k) plans (in each case, as applicable) (collectively, the "**Specified Employee Plans**") will be deemed and treated as Executory Contracts that are and will be assumed by the Debtors (and assigned to the applicable Reorganized Debtors, if necessary) pursuant to section 365(a) and section 1123 of the Bankruptcy Code as to which no Proof of Claim, request for administrative expense, or cure

36

claim need be Filed.  All Claims arising from the Specified Employee Plans will survive the Effective Date and be Unimpaired; *provided* that, in each case, with respect to any provision of a Specified Employee Plan that relates to a "change in control", "change of control" or words of similar import, that the Debtors, and, if applicable, the individual participants in the applicable Specified Employee Plan, agree that Confirmation and Consummation of the Plan and the related transactions hereunder do not constitute such an event for purposes of such Specified Employee Plan.  Unless previously effectuated by separate order entered by the Bankruptcy Court, entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' assumption of each of the Specified Employee Plans; *provided further* that any employment agreements or offer letters relating to senior management personnel and officers of the Debtors will not be assumed under the Plan without the advanced written consent of the Required Backstop Parties.  Confirmation and Consummation of the Plan will not impair or otherwise modify any available defenses of the Reorganized Debtors or other applicable parties under the Specified Employee Plans.

> **8.  Insurance Contracts**

On the Effective Date, and without limiting the terms or provisions of Paragraph E of Article VI of the Plan, each Insurance Contract will be deemed and treated as an Executory Contract that is and will be assumed by the Debtors pursuant to section 365(a) and section 1123 of the Bankruptcy Code as to which no Proof of Claim, request for administrative expense, or cure claim need be Filed.  Unless previously effectuated by separate order entered by the Bankruptcy Court, entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' assumption of each of the Insurance Contracts.  Confirmation and Consummation of the Plan will not impair or otherwise modify any available defenses of the Reorganized Debtors under the Insurance Contracts.

> **9.  Extension of Time to Assume or Reject**

Notwithstanding anything to the contrary set forth in Article VI of the Plan, in the event of a dispute as to whether a contract is executory or a lease is unexpired, the right of the Reorganized Debtors to move to assume or reject such contract or lease will be extended until the date that is ten (10) days after entry of a Final Order by the Bankruptcy Court determining that the contract is executory or the lease is unexpired.  The deemed assumption provided for in Article VI.A of the Plan will not apply to any such contract or lease, and any such contract or lease will be assumed or rejected only upon motion of the Reorganized Debtors following the Bankruptcy Court's determination that the contract is executory or the lease is unexpired.

> **10.  Modifications, Amendments, Supplements, Restatements, or Other Agreements**

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed by the Debtors or the Reorganized Debtors will include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing has been previously rejected or repudiated or is rejected or repudiated hereunder.  Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases will not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

37

### F.        PROVISIONS GOVERNING DISTRIBUTIONS

#### 1.        Distributions for Claims Allowed as of the Effective Date

Except as otherwise provided in the "Treatment" sections in Article III of the Plan or as ordered by the Bankruptcy Court, initial distributions to be made on account of Claims that are Allowed Claims as of the Effective Date will be made on the Initial Distribution Date or as soon thereafter as is practicable.  Any payment or distribution required to be made under the Plan on a day other than a Business Day will be made on the next succeeding Business Day.  Distributions on account of Disputed Claims that first become Allowed Claims after the Effective Date will be made pursuant to Article VIII of the Plan.

#### 2.        No Postpetition Interest on Claims

Unless otherwise specifically provided for in the Plan, the Confirmation Order or Final Order of the Bankruptcy Court, or required by applicable bankruptcy law (including, without limitation, as required pursuant to section 506(b) or section 511 of the Bankruptcy Code), postpetition interest will not accrue or be paid on any Claims and no Holder of a Claim will be entitled to interest accruing on or after the Petition Date on any Claim.

#### 3.        Distributions by Reorganized Debtors or Other Applicable Distribution Agent

Other than as specifically set forth below, the Reorganized Debtors or other applicable Distribution Agent will make all distributions required to be distributed under the Plan.  Distributions on account of the Allowed DIP Facility Claims and the Allowed Prepetition Notes Claims will be made to the DIP Facility Agents and the Prepetition Notes Indenture Trustee, respectively, and such agent and trustee will be, and will act as, the Distribution Agent with respect to its respective Class of Claims in accordance with the terms and conditions of the Plan.  All such distributions will be deemed completed when made by the Reorganized Debtors to the applicable Distribution Agent.  The Reorganized Debtors may employ or contract with other entities to assist in or make the distributions required by the Plan and may pay the reasonable fees and expenses of such entities and the Distribution Agents in the ordinary course of business. No Distribution Agent will be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

The distributions of New Equity Interests to be made under the Plan to Holders of Allowed Prepetition Notes Claims will be made to the Prepetition Notes Indenture Trustee, which, subject to the right of the Prepetition Notes Indenture Trustee to assert its Prepetition Notes Indenture Trustee Charging Lien against such distributions, will transmit such distributions to Holders of Allowed Prepetition Notes Claims in accordance with the Prepetition Notes Indenture.  Notwithstanding anything to the contrary in the Plan, the Prepetition Notes Indenture Trustee may transfer or direct the transfer of such distributions through the facilities of DTC and, in such event, will be entitled to recognize and transact with for all purposes under the Plan with Holders of Allowed Prepetition Notes Claims to the extent consistent with the customary practices of DTC.  The Debtors or Reorganized Debtors (as applicable) will use their best efforts to make the New Equity Interests to be distributed to Holders of Allowed Prepetition Notes Claims eligible for distribution through the facilities of DTC.  The distributions of Subscription Rights under the Plan to Holders of Allowed Prepetition Notes Claims and Eligible General Unsecured Claims will be made by the Voting and Claims Agent as provided in the Rights Offering Procedures.

38

**4.        Delivery and Distributions; Undeliverable or Unclaimed Distributions**

   (a)      Record Date for Distributions

On the Distribution Record Date, the Claims Register will be closed.  Accordingly, the Debtors, the Reorganized Debtors or other applicable Distribution Agent will have no obligation to recognize the assignment, transfer or other disposition of, or the sale of any participation in, any Allowed Claim (other than Prepetition Debt Claims) that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes in the Plan to recognize and distribute securities, property, notices and other documents only to those Holders of Allowed Claims (other than Prepetition Debt Claims) who are Holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date.  The Reorganized Debtors or other applicable Distribution Agent will be entitled to recognize and deal for all purposes under the Plan with only those record holders stated on the Claims Register, or their books and records, as of the close of business on the Distribution Record Date; *provided*, however, that the Distribution Record Date will not apply to the Prepetition Debt Claims and DIP Facility Claims.

   (b)      Delivery of Distributions in General

Except as otherwise provided in the Plan, the Debtors, the Reorganized Debtors or other applicable Distribution Agent, as applicable, will make distributions to Holders of Allowed Claims, or in care of their authorized agents, as appropriate, at the address for each such Holder or agent as indicated on the Debtors' or other applicable Distribution Agent's books and records as of the date of any such distribution; *provided*, *however*, that the manner of such distributions will be determined in the discretion of the applicable Distribution Agent (subject to the terms and conditions of the relevant Prepetition Debt Documents, if applicable); *provided further,* that the address for each Holder of an Allowed Claim will be deemed to be the address set forth in the latest Proof of Claim Filed by such Holder pursuant to Bankruptcy Rule 3001 as of the Distribution Record Date.

   (c)      Minimum Distributions

Notwithstanding anything in the Plan to the contrary, no Distribution Agent will be required to make distributions or payments of less than $50.00 (whether in Cash or otherwise) or to make partial distributions or payments of fractions of dollars or New Equity Interests, in each case with respect to Impaired Claims.  With respect to Impaired Claims, whenever any payment or distribution of a fraction of a dollar or share of New Equity Interest under the Plan would otherwise be called for, the actual payment or distribution will reflect a rounding of such fraction to the nearest whole dollar or share of New Equity Interest (up or down), with half dollars and half shares of New Equity Interest or more being rounded up to the next higher whole number and with less than half dollars and half shares of New Equity Interest being rounded down to the next lower whole number (and no Cash will be distributed in lieu of such fractional New Equity Interest).

No Distribution Agent will have any obligation to make a distribution on account of an Allowed Claim that is Impaired under the Plan if: (a) the aggregate amount of all distributions authorized to be made on the Subsequent Distribution Date in question is or has an economic value less than $25,000, unless such distribution is a final distribution; or (b) the amount to be distributed to the specific Holder of an Allowed Claim on such Subsequent Distribution Date does not constitute a final distribution to such Holder and is or has an economic value less than $50.00, which will be treated as an undeliverable distribution under Article VII.D.4 of the Plan.

39

(d)     Undeliverable Distributions

Holding of Certain Undeliverable Distributions.  If the distribution to any Holder of an Allowed Claim is returned to the Distribution Agent as undeliverable or is otherwise unclaimed, no further distributions will be made to such Holder unless and until the Distribution Agent is notified in writing of such Holder's then current address, at which time all currently due but missed distributions will be made to such Holder on the next Subsequent Distribution Date (or such earlier date as determined by the applicable Distribution Agent).  Undeliverable distributions will remain in the possession of the Reorganized Debtors or in the applicable reserve, subject to Article VII.D.4.(b) of the Plan, until such time as any such distributions become deliverable.  Undeliverable distributions will not be entitled to any additional interest, dividends or other accruals of any kind on account of their distribution being undeliverable.

Failure to Claim Undeliverable Distributions.  Any Holder of an Allowed Claim (or any successor or assignee or other Person or Entity claiming by, through, or on behalf of, such Holder) that does not assert a right pursuant to the Plan for an undeliverable or unclaimed distribution within one (1) year after the later of the Effective Date or the date such distribution is due will be deemed to have forfeited its rights for such undeliverable or unclaimed distribution and will be forever barred and enjoined from asserting any such rights for an undeliverable or unclaimed distribution against the Debtors or their Estates, the Reorganized Debtors or their respective assets or property, or any Distribution Agent.  In such case, (i) for Claims other than Classes 4 and 5, any Cash, Plan Securities, or other property reserved for distribution on account of such Claim will become the property of the Estates free and clear of any Claims of such Holder with respect thereto and notwithstanding any federal or state escheat laws to the contrary, and (ii) for Claims in Classes 4 and 5, any Plan Securities and Documents, and/or other property, as applicable, held for distribution on account of such Claim will be allocated Pro Rata by the applicable Distribution Agent for distribution among the other Holders of Claims in such Class.  Nothing contained in the Plan will require the Debtors, the Reorganized Debtors, or any Distribution Agent to attempt to locate any Holder of an Allowed Claim.

Failure to Present Checks.  Checks issued by the Distribution Agent on account of Allowed Claims will be null and void if not negotiated within 180 days after the issuance of such check.  In an effort to ensure that all Holders of Allowed Claims receive their allocated distributions, no later than 90 days after the issuance of such checks, the Reorganized Debtors will File with the Bankruptcy Court a list of the Holders of any un-negotiated checks.  This list will be maintained and updated periodically in the sole discretion of the Reorganized Debtors for as long as the Chapter 11 Cases stay open.  Requests for reissuance of any check will be made directly to the Distribution Agent by the Holder of the relevant Allowed Claim with respect to which such check originally was issued.  Any Holder of an Allowed Claim holding an un-negotiated check that does not request reissuance of such un-negotiated check within 365 days after the date of mailing or other delivery of such check will have its Claim for such un-negotiated check discharged and be forever barred, estopped and enjoined from asserting any such Claim against the Debtors or their Estates, the Reorganized Debtors or their respective assets or property.  In such case, any Cash held for payment on account of such Claims will be distributed to the applicable Distribution Agent for distribution or allocation in accordance with the Plan, free and clear of any Claims of such Holder with respect thereto and notwithstanding any federal or state escheat laws to the contrary.

**5.     Compliance with Tax Requirements**

In connection with the Plan and all distributions thereunder, the Reorganized Debtors or other applicable Distribution Agent will comply with all applicable withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions hereunder will be subject to any such applicable withholding and reporting requirements.  The Reorganized Debtors or other applicable Distribution Agent will be authorized to take any and all actions that may be necessary or appropriate to comply with such applicable withholding and reporting requirements.  All Persons holding

40

US-DOCS\117417332.2

Claims will be required to provide any information necessary to effect information reporting and the withholding of such taxes. Notwithstanding any other provision of the Plan to the contrary, each Holder of an Allowed Claim will have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding, and other tax obligations, on account of such distribution.

6.      **Allocation of Plan Distributions Between Principal and Interest**

To the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution will, to the extent permitted by applicable law, be allocated for income tax purposes to the principal amount of the Claim first and then, to the extent that the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

7.      **Means of Cash Payment**

Payments of Cash made pursuant to the Plan will be in U.S. dollars and will be made, at the option of the Debtors or the Reorganized Debtors (as applicable), by checks drawn on, or wire transfer from, a domestic bank selected by the Debtors or the Reorganized Debtors. Cash payments to foreign creditors may be made, at the option of the Debtors or the Reorganized Debtors, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

8.      **Timing and Calculation of Amounts to Be Distributed**

Except as otherwise provided in the "Treatment" sections in Article III of the Plan or as ordered by the Bankruptcy Court, on the Initial Distribution Date (or if a Claim is not an Allowed Claim on the Effective Date, on the Subsequent Distribution Date occurring after such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim will receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims will be made pursuant to the provisions set forth in the applicable class treatment or in Article VIII of the Plan. Except as otherwise provided in the Plan, Holders of Claims will not be entitled to interest, dividends or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

9.      **Setoffs**

Without altering or limiting any of the rights and remedies of the Debtors and the Reorganized Debtors under section 502(d) of the Bankruptcy Code, all of which rights and remedies are hereby reserved, the Debtors and the Reorganized Debtors may, but will not be required to, withhold (but not setoff except as set forth below) from the distributions called for hereunder on account of any Allowed Claim an amount equal to any claims, Causes of Action and Retained Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim; *provided* that, at least ten (10) days prior to effectuating such withholding, the Debtors or the Reorganized Debtors, as applicable, will provide written notice thereof to the applicable Holder of such Claim, and all objections and defenses of such Holder to such withholding are preserved. In the event that any such claims, Causes of Action or Retained Causes of Action are adjudicated by Final Order or otherwise resolved against the applicable Holder, the Debtors and the Reorganized Debtors may, pursuant to sections 553 or 558 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant hereto on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), the amount of such adjudicated or resolved claims, Causes of Action or Retained Causes

41

of Action.  Neither the failure to effect such a setoff nor the allowance of any Claim hereunder will constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claims, Causes of Action or Retained Causes of Action, all of which are reserved unless expressly released or compromised pursuant to the Plan or the Confirmation Order.

## G.    PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS

### 1.    Resolution of Disputed Claims

#### (a)    Allowance of Claims

After the Effective Date, and except as otherwise provided in the Plan, the Reorganized Debtors will have and will retain any and all available rights and defenses that the Debtors had with respect to any Claim, including, without limitation, the right to assert any objection to Claims based on the limitations imposed by section 502 of the Bankruptcy Code.  The Debtors and the Reorganized Debtors may contest the amount and validity of any Disputed Claim or contingent or unliquidated Claim in the ordinary course of business in the manner and venue in which such Claim would have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced.

#### (b)    Prosecution of Objections to Claims

After the Confirmation Date but before the Effective Date, the Debtors, and after the Effective Date, the Reorganized Debtors will have the authority to File objections to Claims (other than Claims that are Allowed under the Plan) and settle, compromise, withdraw or litigate to judgment objections to any and all such Claims, regardless of whether such Claims are in an Unimpaired Class or otherwise; *provided*, *however*, this provision will not apply to Professional Fee Claims, which may be objected to by any party-in-interest in these Chapter 11 Cases.  From and after the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Claim without any further notice to or action, order or approval of the Bankruptcy Court.  The Reorganized Debtors will have the sole authority to administer and adjust the Claims Register and their respective books and records to reflect any such settlements or compromises without any further notice to or action, order or approval of the Bankruptcy Court.

#### (c)    Claims Estimation

After the Confirmation Date but before the Effective Date, the Debtors, and after the Effective Date, the Reorganized Debtors may at any time request that the Bankruptcy Court estimate any Disputed Claim or contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, and the Bankruptcy Court will retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any such Claim, whether for allowance or to determine the maximum amount of such Claim, including during the litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection.  All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.  The rights and objections of all parties are reserved in connection with any such estimation.  Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, will be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the relevant

42

Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.

> (d)    <u>Deadline to File Objections to Claims</u>

Any objections to Claims will be Filed by no later than the Claims Objection Deadline; *provided* that nothing contained in the Plan will limit the Reorganized Debtors' right to object to Claims, if any, Filed or amended after the Claims Objection Deadline.  Moreover, notwithstanding the expiration of the Claims Objection Deadline, the Debtors or the Reorganized Debtors will continue to have the right to amend any claims objections and to file and prosecute supplemental objections and counterclaims to a Disputed Claim until such Disputed Claim is Allowed.  Moreover, notwithstanding the expiration of the Claims Objection Deadline, the Reorganized Debtors will continue to have the right to amend any claims or other objections and to File and prosecute supplemental objections and counterclaims to a Disputed Claim until such Disputed Claim is or becomes Allowed by Final Order of the Bankruptcy Court.

### 2.    No Distributions Pending Allowance

Notwithstanding any other provision of the Plan to the contrary, no payments or distributions of any kind or nature will be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim has become an Allowed Claim pursuant to a Final Order.

### 3.    Distributions on Account of Disputed Claims Once They Are Allowed and Additional Distributions on Account of Previously Allowed Claims

On each Subsequent Distribution Date (or such earlier date as determined by the Reorganized Debtors in their sole discretion), the Reorganized Debtors or other applicable Distribution Agent will make distributions (a) on account of any Disputed Claim that has become an Allowed Claim during the preceding calendar quarter, and (b) on account of previously Allowed Claims of property that would have been distributed to the Holders of such Claims on the dates distributions previously were made to Holders of Allowed Claims in such Class had the Disputed Claims that have become Allowed Claims or Disallowed Claims by Final Order of the Bankruptcy Court been Allowed or disallowed, as applicable, on such dates. Such distributions will be made pursuant to the applicable provisions of Article VII of the Plan.  For the avoidance of doubt, but without limiting the terms or conditions of Article VII.B or Article VIII.B of the Plan, any dividends or other distributions arising from property distributed to holders of Allowed Claims in a Class and paid to such Holders under the Plan will also be paid, in the applicable amounts, to any Holder of a Disputed Claim in such Class that becomes an Allowed Claim after the date or dates that such dividends or other distributions were earlier paid to holders of Allowed Claims in such Class.

### 4.    Reserve for Disputed Claims

The Debtors, the Reorganized Debtors, and the Distribution Agent may, in their respective sole discretion, establish such appropriate reserves for Disputed Claims in the applicable Class(es) as it determines necessary and appropriate, in each case with the consent of the Required Consenting Noteholders or as otherwise approved by the Bankruptcy Court.  Without limiting the foregoing, reserves (if any) for Disputed Claims will equal, as applicable, an amount equal to 100% of distributions or property to which Holders of Disputed Claims in each applicable Class would otherwise be entitled to receive under the Plan as of such date if such Disputed Claims were Allowed Claims in their respective Face Amount (or based on the Debtors' books and records if the applicable Holder has not yet Filed a Proof of Claim and the Claims Bar Date has not yet expired); *provided*, *however*, that the Debtors and the Reorganized Debtors, as applicable, will have the right to file a motion seeking to estimate any Disputed Claims.

43

US-DOCS\117417332.2

On the Effective Date, the Reorganized Debtors will make a distribution of the New Equity Interests to the Holders of Allowed Prepetition Notes Claims consistent with Article III.B of the Plan; *provided*, that the Reorganized Debtors will reserve the amount of New Equity Interests necessary to make distributions to all Holders of General Unsecured Claims in the Face Amount of such Holders' General Unsecured Claims as if all such General Unsecured Claims were determined to be Allowed Claims (the "**Reserved New Equity Interests**").  The Reserved New Equity Interests will be distributed to Holders of General Unsecured Claims, as such Claims become Allowed, in accordance with the terms of the Plan.

**H.    CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN**

**1.    Conditions Precedent to Confirmation**

It will be a condition to Confirmation of the Plan that the following conditions will have been satisfied or waived pursuant to the provisions of Article IX.C of the Plan:

- The Plan and the Restructuring Documents will be in form and substance consistent in all material respects with the Restructuring Support Agreement and otherwise acceptable to the Debtors and the Required Consenting Noteholders;

- The Disclosure Statement Order and the Backstop Order will have been entered by the Bankruptcy Court and such orders will have become a Final Order that has not been stayed, modified, or vacated on appeal; and

- The Confirmation Order will have been entered by the Bankruptcy Court.

**2.    Conditions Precedent to Consummation**

It will be a condition to Consummation of the Plan that the following conditions will have been satisfied or waived pursuant to the provisions of Article IX.C of the Plan:

- The Confirmation Order will have become a Final Order and such order will not have been amended, modified, vacated, stayed, or reversed;

- The Confirmation Date will have occurred;

- The Bankruptcy Court will have entered one or more Final Orders (which may include the Confirmation Order), in form and substance acceptable to the Debtors and the Required Consenting Noteholders, authorizing the assumption, assumption and assignment, and rejection of the Executory Contracts and Unexpired Leases by the Debtors as contemplated in the Plan and the Plan Supplement;

- The Plan and the Restructuring Documents will not have been amended or modified other than in a manner in form and substance consistent in all material respects with the Restructuring Term Sheet and otherwise acceptable to the Debtors and the Required Consenting Noteholders;

- The Restructuring Documents will have been filed, tendered for delivery, and been effectuated or executed by all Entities party thereto (as appropriate), and in each case in full force and effect.  All conditions precedent to the effectiveness of such Restructuring Documents, including, without limitation, the Exit Facility Credit Agreement, the New Secured Convertible Notes Indenture, and the Backstop Purchase Agreement, will have been satisfied or waived

44

pursuant to the terms of such applicable Restructuring Documents (or will be satisfied concurrently with the occurrence of the Effective Date);

- All consents, actions, documents, certificates and agreements necessary to implement the Plan and the transactions contemplated by the Plan will have been, as applicable, obtained and not otherwise subject to unfulfilled conditions, effected or executed and delivered to the required parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable laws, and in each case in full force and effect;

- All governmental approvals and consents, including Bankruptcy Court approval, that are applicable and legally required for the consummation of the Plan will have been obtained, not be subject to unfulfilled conditions and be in full force and effect, and all applicable waiting periods under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, will have expired;

- The Debtors will have received, or concurrently with the occurrence of the Effective Date will receive, at least $43.3 million as contemplated in connection with the Backstop Purchase Agreement and the Rights Offering;

- The New Board will have been selected in accordance with the terms of the Plan and the Restructuring Support Agreement;

- The Exit Facility Credit Agreement and the New Secured Convertible Notes Indenture will each have closed or will close simultaneously with the effectiveness of the Plan;

- The Restructuring Support Agreement will be in full force and effect and will not have been terminated in accordance with its terms;

- The Backstop Purchase Agreement will not have been terminated, and all conditions precedent (including the entry of the Backstop Order by the Bankruptcy Court and the Backstop Order becoming a Final Order, but excluding any conditions related to the occurrence of the Effective Date) to the obligations of the Backstop Parties under the Backstop Purchase Agreement will have been satisfied or waived in accordance with the terms thereof, and the closing of the Backstop Purchase Agreement will occur concurrently with the occurrence of the Effective Date;

- The Debtors will not be in default under either of the DIP Facilities or the Final DIP Order (or, to the extent that the Debtors are in default on the proposed Effective Date, such default will have been waived by the applicable DIP Lenders or cured by the Debtors in a manner consistent with the DIP Facilities and the DIP Orders) and both of the DIP Credit Agreements will be in full force and effect and will not have been terminated in accordance with their terms;

- The Carve-Out Reserve will have been funded in full in Cash by the Debtors in accordance with the terms and conditions of the Plan;

- To the extent invoiced, all (i) Ad Hoc Noteholders Committee Fees and Expenses, (ii) Prepetition Credit Agreement Agent and Lender Fees and Expenses, (iii) Prepetition Notes Indenture Trustee Fees and Expenses, and (iv) Backstop Expenses will have been paid in full in Cash or reserved in a manner acceptable to the applicable Required Consenting Noteholders (or approved by order of the Bankruptcy Court) to the extent of any disputes related thereto;

45

- There will be no ruling, judgment, or order issued by any Governmental Unit making illegal, enjoining, or otherwise preventing or prohibiting the consummation of the Restructuring Transactions, unless such ruling, judgment, or order has been stayed, reversed, or vacated within three (3) Business Days after such issuance;

- There will be no material litigation or investigation by any Governmental Unit involving the Debtors as of the Effective Date that has had, or would reasonably be expected to have, a material adverse effect on the business, financial condition or results of operations of the Reorganized Debtors, taken as a whole; and

- To the extent required under applicable non-bankruptcy law, the Amended/New Organizational Documents will have been duly filed with the applicable authorities in the relevant jurisdictions.

### 3.    Waiver of Conditions

Subject to section 1127 of the Bankruptcy Code, the conditions to Confirmation and Consummation of the Plan set forth in Article IX of the Plan may be waived by the Debtors, with the consent of the Required Consenting Noteholders, without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.  The failure of the Debtors or Reorganized Debtors to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each right will be deemed an ongoing right that may be asserted at any time.

### 4.    Effect of Non-Occurrence of Conditions to Confirmation or Consummation

If the Confirmation or the Consummation of the Plan does not occur with respect to one or more of the Debtors, then the Plan will, with respect to such applicable Debtor or Debtors, be null and void in all respects and nothing contained in the Plan or this Disclosure Statement will: (1) constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any Holders or any other Person or Entity; (3) constitute an Allowance of any Claim or Equity Interest; or (4) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders or any other Person or Entity in any respect.

## I.    RELEASE, DISCHARGE, INJUNCTION AND RELATED PROVISIONS

### 1.    General

Notwithstanding anything contained in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions (if any) and treatments hereunder, takes into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code or otherwise.  As of the Effective Date, any and all contractual, legal and equitable subordination rights, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code or otherwise, relating to the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions (if any) and treatments hereunder, are settled, compromised, terminated and released pursuant hereto; *provided*, *however*, that nothing contained in the Plan will preclude any Person or Entity from exercising their rights pursuant to and consistent with the terms of the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with the Plan.

46

US-DOCS\117417332.2

### 2.    Release of Claims and Causes of Action

(a)    <u>Release by the Debtors and their Estates</u>

**Pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, and except as otherwise expressly provided in the Plan, effective as of the Effective Date, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, the Debtors and the Reorganized Debtors, in their respective individual capacities and as debtors-in-possession, and on behalf of themselves and their respective Estates, including, without limitation, any successor to the Debtors or any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code (collectively, the "<u>Debtor Releasing Parties</u>") will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver and release to each of the Released Parties (and each such Released Party so released will be deemed forever released, waived and discharged by the Debtor Releasing Parties) and their respective assets and properties (the "<u>Debtor Release</u>") from any and all Claims, Causes of Action, and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of the Debtors or their Affiliates, including, without limitation, (i) the Chapter 11 Cases, the Disclosure Statement, the Plan, the Restructuring Support Agreement, the Backstop Purchase Agreement, the Rights Offering, the Restructuring Documents, the Prepetition Debt Documents, and the DIP Loan Documents, (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, the Backstop Purchase Agreement, the Rights Offering, the Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Documents, the Prepetition Debt Documents, the DIP Loan Documents, or related agreements, instruments or other documents, (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale, or rescission of the purchase or sale of any Equity Interest or Plan Securities of the Debtors or the Reorganized Debtors, and/or (vii) the Confirmation or Consummation of the Plan or the solicitation of votes on the Plan that such Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) or that any Holder of a Claim or Equity Interest or other Person or Entity would have been legally entitled to assert for, or on behalf or in the name of, any Debtor, its respective Estate or any Reorganized Debtor (whether directly or derivatively) against any of the Released Parties; _provided_, _however_, that the foregoing provisions of this Debtor Release will not operate to waive or release (A) the rights of such Debtor Releasing Party to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with the Plan (including, without limitation, the Exit Facility Loan Documents and the New Secured Convertible Notes Documents) or assumed or assumed and assigned, as applicable pursuant to the Plan or pursuant to a Final Order of the Bankruptcy Court and (B) claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes a criminal act, fraud, willful misconduct, or gross negligence, in each case as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction. The foregoing release will be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity and the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of**

47

**Action, or liabilities released pursuant to this Debtor Release.  Notwithstanding the foregoing, nothing in <u>Article X.B</u> of the Plan will or will be deemed to (i) prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person or Entity that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors and/or (ii) operate as a release or waiver of any Intercompany Claims, in each case unless otherwise expressly provided for in the Plan.**

**Entry of the Confirmation Order will constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, will constitute the Bankruptcy Court's finding that the Debtor Release is:  (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims released by the Debtor Release; (iii) in the best interest of the Debtors and their Estates; (iv) fair, equitable and reasonable; (v) given and made after due notice and opportunity for hearing; and (vi) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any claim or Cause of Action released pursuant to the Debtor Release.**

(b)     <u>Release by Third Parties</u>

**Except as otherwise expressly provided in the Plan, effective as of the Effective Date, to the fullest extent permitted by applicable law, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, and without limiting or otherwise modifying the scope of the Debtor Release provided by the Debtor Releasing Parties above, each Non-Debtor Releasing Party (together with the Debtor Releasing Parties, the "<u>Releasing Parties</u>") will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver, and release to each of the Released Parties (and each such Released Party so released will be deemed forever released, waived, and discharged by the Non-Debtor Releasing Parties) and their respective assets and properties (the "<u>Third Party Release</u>") from any and all Claims, Causes of Action, and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of the Debtors or their Affiliates, including, without limitation, (i) the Chapter 11 Cases, the Disclosure Statement, the Plan, the Restructuring Support Agreement, the Backstop Purchase Agreement, the Rights Offering, the Restructuring Documents, the Prepetition Debt Documents, and the DIP Loan Documents, (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, the Backstop Purchase Agreement, the Rights Offering, the Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Documents, the Prepetition Debt Documents, the DIP Loan Documents, or related agreements, instruments or other documents, (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale or rescission of the purchase or sale of any Equity Interest or Plan Securities of the Debtors or the Reorganized Debtors, and/or (vii) the Confirmation or Consummation of the Plan or the solicitation of votes on the Plan that such Non-Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) against any of the Released Parties; _provided_, _however_, that the foregoing provisions of this Third Party Release will not operate to waive or release (A) the rights of such Non-Debtor Releasing Party to enforce the Plan**

48

US-DOCS\117417332.2

**and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with the Plan (including, without limitation, the Exit Facility Loan Documents and the New Secured Convertible Notes Documents) or assumed or assumed and assigned, as applicable, pursuant to the Plan or pursuant to a Final Order of the Bankruptcy Court and (B) claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes a criminal act, fraud, willful misconduct, or gross negligence, in each case as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction. The foregoing release will be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity and the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Third Party Release.**

**Entry of the Confirmation Order will constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, will constitute the Bankruptcy Court's finding that the Third Party Release is: (i) consensual; (ii) essential to the confirmation of the Plan; (iii) in exchange for the good and valuable consideration provided by the Released Parties; (iv) a good faith settlement and compromise of the Claims released by the Third Party Release; (v) in the best interest of the Debtors and all Holders of Claims and Equity Interests; (vi) fair, equitable and reasonable; (vii) given and made after due notice and opportunity for hearing; and (viii) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third Party Release.**

### 3.      Waiver of Statutory Limitations on Releases

Each of the Releasing Parties in each of the releases contained above expressly acknowledges that although ordinarily a general release may not extend to Claims which the Releasing Party does not know or suspect to exist in its favor, which if known by it may have materially affected its settlement with the party released, they have carefully considered and taken into account in determining to enter into the above releases the possible existence of such unknown losses or claims. Without limiting the generality of the foregoing, each Releasing Party expressly waives any and all rights conferred upon it by any statute or rule of law which provides that a release does not extend to claims which the claimant does not know or suspect to exist in its favor at the time of providing the release, which if known by it may have materially affected its settlement with the released party. Except as otherwise provided in the Plan, the releases contained in the Plan are effective regardless of whether those released matters are presently known, unknown, suspected or unsuspected, foreseen or unforeseen.

### 4.      Discharge of Claims and Equity Interests

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by the Plan (including, without limitation, Article V.D of the Plan) or the Confirmation Order, effective as of the Effective Date, all consideration distributed under the Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims, Equity Interests and Causes of Action of any kind or nature whatsoever against the Debtors or any of their respective assets or properties, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims, Equity Interests or Causes of Action.

49

Except as otherwise expressly provided by the Plan (including, without limitation, Article V.D of the Plan) or the Confirmation Order, upon the Effective Date, the Debtors and their Estates will be deemed discharged and released under and to the fullest extent provided under sections 524 and 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code.  Such discharge will void any judgment obtained against the Debtors or the Reorganized Debtors at any time, to the extent that such judgment relates to a discharged Claim.

Except as otherwise expressly provided by the Plan (including, without limitation, Articles V.D of the Plan) or the Confirmation Order, upon the Effective Date: (i) the rights afforded in the Plan and the treatment of all Claims and Equity Interests will be in exchange for and in complete satisfaction, settlement, discharge, and release of all Claims and Equity Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors or any of their respective assets, property, or Estates; (ii) all Claims and Equity Interests will be satisfied, discharged, and released in full, and each of the Debtor's liability with respect thereto will be extinguished completely without further notice or action; and (iii) all Persons and Entities will be precluded from asserting against the Debtors, the Estates, the Reorganized Debtors, each of their respective successors and assigns, and each of their respective assets and properties, any such Claims or Equity Interests, whether based upon any documents, instruments or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date or otherwise.

**5.      Exculpation**

**Effective as of the Effective Date, to the fullest extent permitted by law, the Exculpated Parties will neither have nor incur any liability to any Person or Entity for any claims or Causes of Action arising prior to or on the Effective Date for any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Confirmation or Consummation of the Plan, the Disclosure Statement, the Restructuring Documents, the Rights Offering, the Prepetition Debt Documents, the DIP Loan Documents, or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan, including the Restructuring Support Agreement and the Backstop Purchase Agreement, or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the approval of the Disclosure Statement or Confirmation or Consummation of the Plan; _provided_, _however_, that the foregoing provisions of this exculpation will not operate to waive or release: (i) any Causes of Action arising from willful misconduct, actual fraud, or gross negligence of such applicable Exculpated Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; and/or (ii) the rights of any Person or Entity to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements and documents delivered under or in connection with the Plan or assumed pursuant to the Plan or Final Order of the Bankruptcy Court; _provided_, _further_, that each Exculpated Party will be entitled to rely upon the advice of counsel concerning its respective duties pursuant to, or in connection with, the above referenced documents, actions or inactions.  The foregoing exculpation will be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity. Notwithstanding the foregoing, nothing in Article X.E of the Plan will or will be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person or Entity that is based upon an alleged breach of a confidentiality or non-compete obligation owed to**

50

US-DOCS\117417332.2

**the Debtors or the Reorganized Debtors, in each case unless otherwise expressly provided for in the Plan.**

6. **Preservation of Causes of Action**

(a) <u>Maintenance of Retained Causes of Action</u>

Except as otherwise provided in <u>Article X</u> of the Plan (including, without limitation, and for the avoidance of doubt, the Releases contained in <u>Article X.B</u> of the Plan and Exculpation contained in <u>Article X.E</u> of the Plan) or elsewhere in the Plan or the Confirmation Order, after the Effective Date, the Reorganized Debtors will retain all rights to commence, prosecute, pursue, litigate or settle, as appropriate, any and all Retained Causes of Action (including those not identified in the Plan Supplement), whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including, without limitation, in an adversary proceeding Filed in the Chapter 11 Cases, and all such Retained Causes of Action will vest in the Reorganized Debtors in accordance with the Plan.  The Reorganized Debtors, as the successors-in-interest to the Debtors and the Estates, may, and will have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all of such Retained Causes of Action without notice to or approval from the Bankruptcy Court.

(b) <u>Preservation of All Causes of Action Not Expressly Settled or Released</u>

The Debtors expressly reserve all Causes of Action and Retained Causes of Action for later adjudication by the Debtors or the Reorganized Debtors (including, without limitation, Causes of Action and Retained Causes of Action not specifically identified or of which the Debtors may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances that may change or be different from those the Debtors now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action or Retained Causes of Action upon or after the Confirmation or Consummation of the Plan based on the Disclosure Statement, the Plan or the Confirmation Order, except in each case where such Causes of Action or Retained Causes of Action have been expressly waived, relinquished, released, compromised or settled in the Plan (including, without limitation, and for the avoidance of doubt, the Releases contained in <u>Article X.B</u> of the Plan and Exculpation contained in <u>Article X.E</u> of the Plan) or any other Final Order (including, without limitation, the Confirmation Order). In addition, the Debtors and the Reorganized Debtors expressly reserve the right to pursue or adopt any claims alleged in any lawsuit in which any of the Debtors are a plaintiff, defendant or an interested party, against any Person or Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

**No Person or Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action or Retained Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action or Retained Causes of Action against them.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action and Retained Causes of Action against any Person or Entity, except as otherwise expressly provided in the Plan or the Confirmation Order.**

7. **Injunction**

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, FROM AND AFTER THE EFFECTIVE DATE, ALL PERSONS AND ENTITIES ARE, TO THE FULLEST EXTENT PROVIDED UNDER SECTION 524 AND OTHER**

51

APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, PERMANENTLY ENJOINED FROM (I) COMMENCING OR CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY SUIT, ACTION OR OTHER PROCEEDING; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING IN ANY MANNER ANY JUDGMENT, AWARD, DECREE, OR ORDER; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE; (IV) ASSERTING A SETOFF OR RIGHT OF SUBROGATION OF ANY KIND; OR (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND,  IN EACH CASE ON ACCOUNT OF OR WITH RESPECT TO ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, EQUITY INTEREST, OR REMEDY RELEASED OR TO BE RELEASED, EXCULPATED OR TO BE EXCULPATED, SETTLED OR TO BE SETTLED OR DISCHARGED OR TO BE DISCHARGED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER AGAINST ANY PERSON OR ENTITY SO RELEASED, DISCHARGED, OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY PERSON OR ENTITY SO RELEASED, DISCHARGED, OR EXCULPATED).  ALL INJUNCTIONS OR STAYS PROVIDED FOR IN THE CHAPTER 11 CASES UNDER SECTION 105 OR SECTION 362 OF THE BANKRUPTCY CODE, OR OTHERWISE, AND IN EXISTENCE ON THE CONFIRMATION DATE, WILL REMAIN IN FULL FORCE AND EFFECT UNTIL THE EFFECTIVE DATE.

8.     **Binding Nature of the Plan**

ON THE EFFECTIVE DATE, AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE PLAN WILL BIND, AND WILL BE DEEMED BINDING UPON, THE DEBTORS, THE REORGANIZED DEBTORS, ANY AND ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS, ALL PERSONS AND ENTITIES THAT ARE PARTIES TO OR ARE SUBJECT TO THE SETTLEMENTS, COMPROMISES, RELEASES, EXCULPATIONS, DISCHARGES, AND INJUNCTIONS DESCRIBED IN THE PLAN, EACH PERSON AND ENTITY ACQUIRING PROPERTY UNDER THE PLAN, ANY AND ALL NON-DEBTOR PARTIES TO EXECUTORY CONTRACTS AND UNEXPIRED LEASES WITH THE DEBTORS AND THE RESPECTIVE SUCCESSORS AND ASSIGNS OF EACH OF THE FOREGOING, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, AND NOTWITHSTANDING WHETHER OR NOT SUCH PERSON OR ENTITY (I) WILL RECEIVE OR RETAIN ANY PROPERTY, OR INTEREST IN PROPERTY, UNDER THE PLAN, (II) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASES OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN, AFFIRMATIVELY VOTED TO REJECT THE PLAN OR IS CONCLUSIVELY PRESUMED TO REJECT THE PLAN.

9.     **Protection Against Discriminatory Treatment**

To the extent provided by section 525 of the Bankruptcy Code and the Supremacy Clause of the United States Constitution, all Persons and Entities, including Governmental Units, will not discriminate against the Reorganized Debtors or deny, revoke, suspend or refuse to renew a license, permit, charter, franchise or other similar grant to, condition such a grant to, discriminate with respect to such a grant, against the Reorganized Debtors, or another Person or Entity with whom the Reorganized Debtors have been associated, solely because any Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge) or has not paid a debt that is dischargeable in the Chapter 11 Cases.

US-DOCS\117417332.2

**10.      Integral Part of Plan**

Each of the provisions set forth in the Plan with respect to the settlement, release, discharge, exculpation, injunction, indemnification and insurance of, for or with respect to Claims and/or Causes of Action are an integral part of the Plan and essential to its implementation.  Accordingly, each Person or Entity that is a beneficiary of such provision will have the right to independently seek to enforce such provision and such provision may not be amended, modified, or waived after the Effective Date without the prior written consent of such beneficiary.

US-DOCS\117417332.2

## V.
## CONFIRMATION AND CONSUMMATION PROCEDURES

### A.     CONFIRMATION PROCEDURES

#### 1.       Confirmation Hearing

The Bankruptcy Court will consider confirmation of the Plan at the Confirmation Hearing, which will commence at 2:00 p.m. prevailing Central Time on September 23, 2020 before the Honorable David R. Jones, United States Bankruptcy Judge, in the United States Bankruptcy Court for Southern District of Texas, Houston Division, located at Bob Casey United States Courthouse, 515 Rusk Avenue, 4th Floor, Courtroom 400, Houston, Texas 77002.  The Confirmation Hearing may be continued from time to time by the Bankruptcy Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Bankruptcy Court and served on such parties as the Bankruptcy Court may order.  Moreover, the Plan may be modified or amended, if necessary, pursuant to section 1127 of the Bankruptcy Code, prior to, during or as a result of the Confirmation Hearing, without further notice to parties-in-interest.

#### 2.       Filing Objections to the Plan

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan of reorganization.  **The Plan Objection Deadline is 5:00 p.m. prevailing Central Time on September 18, 2020.**  Any objection to the confirmation of the Plan must be in writing, must conform to the Federal Rules of Bankruptcy Procedure and the Bankruptcy Local Rules for the Southern District of Texas, must set forth the name of the objector, the nature and amount of Claims or Equity Interests held or asserted by the objector against the Debtors' estates or properties, the basis for the objection and the specific grounds therefore, and must be filed with the Bankruptcy Court.

> **CONFIRMATION OBJECTIONS NOT TIMELY FILED AND SERVED IN THE MANNER SET FORTH HEREIN MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND MAY BE OVERRULED WITHOUT FURTHER NOTICE.**

### B.     STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that:  (i) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (ii) the Debtors have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith.  Specifically, the Debtors believe that the Plan satisfies or will satisfy the applicable confirmation requirements of section 1129 of the Bankruptcy Code set forth below:

- The Plan complies with the applicable provisions of the Bankruptcy Code;

- The Debtors complied with the applicable provisions of the Bankruptcy Code;

- The Plan has been proposed in good faith and not by any means forbidden by law;

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the cases,

54

has been or will be disclosed to the Bankruptcy Court, and any such payment: (a) made before the confirmation of the Plan is reasonable; or (b) if it is to be fixed after confirmation of the Plan, is subject to the approval of the Bankruptcy Court for the determination of reasonableness;

- The Debtors have disclosed, or will disclose in advance of the Confirmation Hearing, the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtors, an affiliate of the Debtors participating in the Plan with the Debtors, or a successor to the Debtors under the Plan. The appointment to, or continuance in, such office by such individual, will be consistent with the interests of creditors and equity security holders and with public policy and the Debtors will have disclosed the identity of any insider that the Reorganized Debtors will employ or retain, and the nature of any compensation for such insider;

- Either each Holder of an Impaired Claim will have accepted the Plan, or will receive or retain under the Plan on account of such Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code;

- Each Class of Claims or Equity Interests that is entitled to vote on the Plan will either have accepted the Plan or will not be Impaired under the Plan, or the Plan can be confirmed without the approval of such Voting Classes pursuant to section 1129(b) of the Bankruptcy Code;

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Claims, DIP Facility Claims, and Other Priority Claims will be paid in full in Cash on the Effective Date, or as soon thereafter as is reasonably practicable, and that Priority Tax Claims will be paid in accordance with section 1129(a)(9)(C) of the Bankruptcy Code;

- At least one Class of Impaired Claims will accept the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class;

- Confirmation of the Plan will not likely be followed by the liquidation or the need for further financial reorganization of the Debtors or any successor thereto under the Plan; and

- All outstanding fees payable pursuant to section 1930 of title 28 of the United States Code will be paid when due.

## 1.    Best Interests of Creditors Test/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provide, with respect to each class, that each holder of a claim or an equity interest in such class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor or debtors are liquidated under chapter 7 of the Bankruptcy Code. To make these findings, the Bankruptcy Court must: (a) estimate the cash liquidation proceeds that a chapter 7 trustee would generate if the chapter 11 cases were converted to a chapter 7 case and the assets of the particular debtors' estate were liquidated; (b) determine the liquidation distribution that each non-accepting holder of a claim or an equity interest would receive from such liquidation proceeds under the priority scheme dictated in chapter 7; and (c) compare such holder's

55

liquidation distribution to the distribution under the chapter 11 plan that such holder would receive if the chapter 11 plan were confirmed.

In chapter 7 cases, creditors and interest holders of a debtor are paid from available assets generally in the following order, with no junior class receiving any payments until all amounts due to senior classes have been paid in full:  (a) holders of secured claims (to the extent of the value of their collateral); (b) holders of administrative and priority claims; (c) holders of unsecured claims; (d) holders of debt expressly subordinated by its terms or by order of the bankruptcy court; and (e) holders of equity interests.

Accordingly, the Cash amount that would be available for satisfaction of claims (other than secured claims) would consist of the proceeds resulting from the disposition of the unencumbered assets of the debtors, augmented by the unencumbered Cash held by the debtors at the time of the commencement of the liquidation.  Such Cash would be reduced by the amount of the costs and expenses of the liquidation and by such additional administrative and priority claims that may result from termination of the debtor's business and the use of chapter 7 for purposes of a liquidation.

As described in more detail in the liquidation analysis attached hereto as <u>Exhibit C</u> (the "**Liquidation Analysis**"), the Debtors believe that confirmation of the Plan will provide each Holder of an Allowed Claim or Equity Interest in each Class with a recovery greater than or equal to the value of any distributions if the Chapter 11 Cases were converted to a case under chapter 7 of the Bankruptcy Code because, among other reasons, proceeds received in a chapter 7 liquidation are likely to be significantly discounted due to the distressed nature of the sale of the Debtors' assets and the fees and expenses of a chapter 7 trustee would likely further reduce Cash available for distribution.  In addition, distributions in a chapter 7 case may not occur for a longer period of time than distributions under the Plan, thereby reducing the present value of such distributions.  In this regard, it is possible that distribution of the proceeds of a liquidation could be delayed for a significant period while the chapter 7 trustee and its advisors become knowledgeable about, among other things, the Chapter 11 Cases and the Claims against the Debtors.  As set forth in the Liquidation Analysis, Holders of Claims in Class 4 and Class 5 would receive a recovery of between 0.6% to 4.7%, and between 0.0% to 0.5%, respectively, of the amount of their Allowed Claims under a chapter 7 liquidation, which is substantially less than the projected recovery ranging between 26.2% and 37.4% for such Classes pursuant to the Plan.  Accordingly, the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code with respect to such Classes.

### 2.     Valuation Analysis

The Plan provides for the distribution of the New Equity Interests and Subscription Rights to holders of Allowed Prepetition Notes Claims and holders of Eligible General Unsecured Claims upon consummation of certain of the Restructuring Transactions set forth in the Plan.  Accordingly, Lazard, at the request of the Debtors, has performed an analysis, which is attached hereto as <u>Exhibit E</u>, of the estimated implied value of the Debtors on a going-concern basis as of September 30, 2020 (the "**Valuation Analysis**").  The Valuation Analysis, including the procedures followed, assumptions made, qualifications, and limitations on review undertaken described therein, should be read in conjunction with Article VI.B. of this Disclosure Statement, entitled "Risk Factors That May Affect the Value of Securities to be Issued Under the Plan and/or Recoveries Under the Plan".  The Valuation Analysis is based on data and information as of July 2, 2020.  Lazard makes no representations as to changes to such data and information that may have occurred since July 2, 2020.

THE VALUATION ANALYSIS REPRESENTS A HYPOTHETICAL VALUATION OF THE REORGANIZED DEBTORS AND THEIR ASSETS AND BUSINESSES AND ASSUMES THAT SUCH REORGANIZED DEBTORS CONTINUE AS AN OPERATING BUSINESS IN SUBSTANTIALLY THE SAME CORPORATE STRUCTURE.  THE ESTIMATED VALUE SET FORTH IN THE

56

VALUATION ANALYSIS DOES NOT PURPORT TO CONSTITUTE AN APPRAISAL OR NECESSARILY REFLECT THE ACTUAL MARKET VALUE THAT MIGHT BE REALIZED THROUGH A SALE OR LIQUIDATION OF THE REORGANIZED DEBTORS, THEIR SECURITIES OR THEIR ASSETS, AND SUCH MARKET VALUE MAY BE MATERIALLY DIFFERENT THAN THE ESTIMATES SET FORTH IN THE VALUATION ANALYSIS.  ACCORDINGLY, SUCH ESTIMATED VALUE IS NOT NECESSARILY INDICATIVE OF THE PRICES AT WHICH ANY SECURITIES OF THE REORGANIZED DEBTORS MAY TRADE AFTER GIVING EFFECT TO THE RESTRUCTURING TRANSACTIONS SET FORTH IN THE PLAN.  ANY SUCH PRICES MAY BE MATERIALLY DIFFERENT THAN INDICATED BY THE VALUATION ANALYSIS.

### 3.     Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that the bankruptcy court find that confirmation is not likely to be followed by the liquidation of the Reorganized Debtors or the need for further financial reorganization, unless the plan contemplates such liquidation.  For purposes of demonstrating that the Plan meets this "feasibility" standard, the Debtors have analyzed the ability of the Reorganized Debtors to meet their obligations under the Plan and to retain sufficient liquidity and capital resources to conduct their businesses.

The Debtors believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code.  In connection with the development of the Plan and for the purposes of determining whether the Plan satisfies this feasibility standard, the Debtors analyzed the ability of the Reorganized Debtors to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.  Financial projections of the Reorganized Debtors for the 4 months ending December 31, 2020, and for the years ending 2021, 2022, 2023, 2024, and 2025 (the "**Financial Projections**") are attached hereto as Exhibit B.

In general, as illustrated by the Financial Projections, the Debtors believe that as a result of the transactions contemplated by the Plan, including the Exit Facility Credit Agreement, the Rights Offering, and the Backstop Commitment provided pursuant to the terms of the Backstop Purchase Agreement, the Reorganized Debtors should have sufficient cash flow and availability to make all payments required pursuant to the Plan while conducting ongoing business operations.  The Debtors believe that confirmation and consummation is, therefore, not likely to be followed by the liquidation or further reorganization of the Reorganized Debtors.  Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

THE FINANCIAL PROJECTIONS, INCLUDING THE UNDERLYING ASSUMPTIONS, SHOULD BE CAREFULLY REVIEWED IN EVALUATING THE PLAN.  WHILE MANAGEMENT BELIEVES THE ASSUMPTIONS UNDERLYING THE FINANCIAL PROJECTIONS, WHEN CONSIDERED ON AN OVERALL BASIS, ARE REASONABLE IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE CAN BE GIVEN THAT THE FINANCIAL PROJECTIONS WILL BE REALIZED.

THE FINANCIAL PROJECTIONS HAVE NOT BEEN EXAMINED OR COMPILED BY INDEPENDENT ACCOUNTANTS.  THE DEBTORS MAKE NO REPRESENTATION OR WARRANTY AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS OR THEIR ABILITY TO ACHIEVE THE PROJECTED RESULTS.  MANY OF THE ASSUMPTIONS ON WHICH THE PROJECTIONS ARE BASED ARE INHERENTLY SUBJECT TO SIGNIFICANT ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES WHICH ARE BEYOND THE CONTROL OF THE DEBTORS.  INEVITABLY, SOME ASSUMPTIONS WILL NOT MATERIALIZE AND UNANTICIPATED EVENTS AND CIRCUMSTANCES MAY AFFECT THE ACTUAL FINANCIAL

57

RESULTS.  THEREFORE, THE ACTUAL RESULTS ACHIEVED THROUGHOUT THE PERIOD OF THE FINANCIAL PROJECTIONS MAY VARY FROM THE PROJECTED RESULTS AND THE VARIATIONS MAY BE MATERIAL.  ALL HOLDERS OF CLAIMS THAT ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN ARE URGED TO EXAMINE CAREFULLY ALL OF THE ASSUMPTIONS ON WHICH THE FINANCIAL PROJECTIONS ARE BASED IN CONNECTION WITH THEIR EVALUATION OF THE PLAN.

BASED ON THE FINANCIAL PROJECTIONS SET FORTH IN EXHIBIT B HERETO, THE DEBTORS BELIEVE THAT THEY WILL BE ABLE TO MAKE ALL DISTRIBUTIONS AND PAYMENTS UNDER THE PLAN AND THAT CONFIRMATION OF THE PLAN IS NOT LIKELY TO BE FOLLOWED BY LIQUIDATION OF THE REORGANIZED DEBTORS OR THE NEED FOR FURTHER FINANCIAL REORGANIZATION OF THE REORGANIZED DEBTORS.

### 4.  Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or equity interests that is impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.  A class is "impaired" unless the plan:  (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; (b) cures any default and reinstates the original terms of such obligation; or (c) provides that, on the consummation date, the holder of such claim or equity interest receives Cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan.  Thus, a class of claims will have voted to accept the plan only if two-thirds (2/3) in amount and a majority in number actually voting cast their ballots in favor of acceptance.

Claims in Classes 1, 2, and 3 and Equity Interests in Class 7 are not Impaired under the Plan, and, as a result, the Holders of such Claims and Equity Interests are deemed to have accepted the Plan.  Claims in Class 6 are Impaired under the Plan, but are deemed to have accepted the Plan because the Holders of such Claims are Affiliates of the Debtors.  Accordingly, the Debtors are not required to solicit their vote.

Claims in Class 4 and Class 5 are Impaired under the Plan, and as a result, the Holders of Claims in Class 4 and Class 5 are entitled to vote on the Plan.  Pursuant to section 1129 of the Bankruptcy Code, the Holders of Claims in the Voting Classes must accept the Plan for the Plan to be confirmed without application of the "fair and equitable test" to Classes 4 and 5 and without considering whether the Plan "discriminates unfairly" with respect to Class 4 and Class 5, as both standards are described herein.  As explained above, Class 4 and Class 5 will have accepted the Plan if the Plan is accepted by at least two-thirds (2/3) in amount and a majority in number of the Claims of Class 4 and Class 5, as applicable (other than any Claims of creditors designated under section 1126(e) of the Bankruptcy Code), that have voted to accept or reject the Plan.

Equity Interests in Class 8 are Impaired and deemed to have rejected the Plan.  The Debtors, therefore, will request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code as more fully described below.

58

**5.      Confirmation Without Acceptance by All Impaired Classes**

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if less than all impaired classes entitled to vote on the plan have accepted it, *provided* that the plan has been accepted by at least one impaired class of claims.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired Class's rejection or deemed rejection of the Plan, the Plan will be confirmed, at the Debtors' request, in a procedure commonly known as "cram down," so long as the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each Class of Claims or Equity Interests that is impaired under, and has not accepted, the Plan.

**6.      No Unfair Discrimination**

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

**7.      Fair and Equitable Test**

This test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class.  As to the dissenting class, the test sets different standards depending on the type of claims or equity interests in such class:

- Secured Claims.  The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that:  (a) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (b) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

- Unsecured Claims.  The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the following requirement that either:  (a) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) the holder of any claim or any equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior equity interest any property.

- Equity Interests.  The condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirements that either:

  o      the plan provides that each holder of an equity interest in that class receives or retains under the plan on account of that equity interest property of a value, as of the effective date of the plan, equal to the greater of:  (a) the allowed amount of any fixed liquidation

US-DOCS\117417332.2

preference to which such holder is entitled; (b) any fixed redemption price to which such holder is entitled; or (c) the value of such interest; <u>or</u>

o    if the class does not receive the amount required in the paragraph directly above, no class of equity interests junior to the non-accepting class may receive a distribution under the plan.

**As noted above, the Debtors will seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code, to the extent applicable, in view of the deemed rejection by Class 8.**

The votes of Holders of Equity Interests in Class 8 are not being solicited because, under Article III of the Plan, there will be no distribution to such Holders and, therefore, such Holders are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  All Class 8 Equity Interests will be deemed cancelled and will be of no further force and effect, whether surrendered for cancellation or otherwise.

Notwithstanding the deemed rejection by Class 8, the Debtors do not believe that the Plan discriminates unfairly against any Impaired Class of Claims or Equity Interests.  The Debtors believe that the Plan and the treatment of all Classes of Claims and Equity Interests under the Plan satisfy the foregoing requirements for non-consensual confirmation of the Plan.

## C.      CONSUMMATION OF THE PLAN

The Plan will be consummated on the Effective Date.  For a more detailed discussion of the conditions precedent to the Consummation of the Plan and the impact of failure to meet such conditions, see Article IX.B of the Plan.

60

US-DOCS\117417332.2

# VI.
# PLAN-RELATED RISK FACTORS

**PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS THAT ARE IMPAIRED SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT. ALTHOUGH THESE RISK FACTORS ARE MANY, THESE FACTORS SHOULD <u>NOT</u> BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES, THE PLAN OR THE IMPLEMENTATION OF THE PLAN.**

## A.      CERTAIN BANKRUPTCY LAW CONSIDERATIONS

### 1.      Parties in Interest May Object to the Debtors' Classification of Claims and Equity Interests.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Equity Interests, each encompassing Claims or Equity Interests, as applicable, that are substantially similar to the other Claims and Equity Interests in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 2.      The Debtors May Fail to Satisfy the Vote Requirement.

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to accomplish an alternative chapter 11 plan of reorganization.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

### 3.      The Debtors May Not Be Able to Secure Confirmation of the Plan.

As discussed above, section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, findings by the bankruptcy court that: (a) such plan does not "unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determined that the Disclosure Statement, the balloting procedures and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation were not met,

61

US-DOCS\117417332.2

including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes.

Section 1129(b)(1) of the Bankruptcy Code provides that, in the event an impaired class does not vote in favor of a plan, but all other requirements of section 1129(a) are satisfied, the Bankruptcy Court may only confirm such a plan if it "does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the Plan." Subject to the Restructuring Transactions, the Plan contemplates that all Old Affiliate Interests in any Parent Subsidiary will remain effective and outstanding on the Effective Date and will be owned and held by the same applicable Person(s) that held and/or owned such Old Affiliate Interests immediately prior to the Effective Date. The Plan's treatment of Old Affiliate Interests has no economic substance and does not enable any junior creditor or interest holder to retain or recover any value under the Plan. This technical preservation of Old Affiliate Interests is solely a means to preserve the corporate and organizational structure of the Debtors in order to avoid the unnecessary cost of reconstituting that structure. There can be no assurance, however, that the Bankruptcy Court will find that the Plan satisfies the requirements of section 1129(b)(1) of the Bankruptcy Code.

Confirmation of the Plan is also subject to certain conditions as described in Article IX of the Plan. If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims and Equity Interests would receive with respect to their Allowed Claims or Equity Interests.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for confirmation. Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Classes junior to such non-accepting Class, than the treatment currently provided in the Plan. Such less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

### 4.      Non-Consensual Confirmation of the Plan May Be Necessary.

In the event that any impaired class of claims or equity interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm such a plan at the proponents' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. The Debtors believe that the Plan satisfies these requirements and the Debtors may request such non-consensual confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, in the event that the Voting Classes do not accept the Plan, there can be no assurance that the Bankruptcy Court will reach this conclusion.

### 5.      The Debtors May Object to the Amount or Classification of a Claim.

Except as otherwise provided in the Plan, the Debtors and Reorganized Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim where such Claim is or may become subject to an objection. Any Holder of a Claim that is or may become subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

US-DOCS\117417332.2

6.      **The Effective Date May Not Occur.**

As more fully set forth in <u>Article IX</u> of the Plan, the Effective Date is subject to a number of conditions precedent.  If such conditions precedent are not met or waived, the Effective Date will not take place.  Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

7.      **The Exit Facility Credit Agreement and the Transactions Contemplated Thereby May Not Become Effective.**

Although the Debtors believe that the Exit Facility Credit Agreement will become effective shortly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Exit Facility Credit Agreement and the transactions contemplated thereunder, will become effective.

8.      **Contingencies May Affect Votes of the Voting Classes to Accept or Reject the Plan.**

The distributions available to Holders of Allowed Claims and Equity Interests under the Plan can be affected by a variety of contingencies, including, among other things, the total amount of Allowed Claims in certain Classes or whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims or Allowed Equity Interests.  The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims and Equity Interests under the Plan, will not affect the validity of the votes taken by the Voting Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

9.      **The Debtors Cannot State with Certainty What Recovery Will be Available to Holders of Allowed Claims.**

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated amounts contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time the number or amount of Claims that will ultimately be Allowed.  Accordingly, because certain Claims under the Plan will be paid on a Pro Rata basis, the Debtors cannot state with certainty what recoveries will be available to Holders of Allowed Claims.

10.     **Releases, Injunctions, and Exculpation Provisions May Not Be Approved.**

<u>Article X</u> of the Plan provides for certain releases, injunctions, and exculpations, including third-party releases that may otherwise be asserted against the Debtors, the Reorganized Debtors, the Exculpated Parties, or Released Parties, as applicable.  The releases, injunctions, and exculpations (including, for the avoidance of doubt, the definitions of Released Parties, Releasing Parties, and Exculpated Parties) provided in the Plan are subject to objection by parties in interest and may not be approved.  If the releases are not approved, certain parties may not be considered Released Parties, Releasing Parties, or Exculpated Parties, and certain Released Parties or Exculpated Parties may withdraw their support for the Plan.  There can be no assurance that the Plan will be confirmed or that the Effective Date will occur without the support of such parties.

63

**B.      RISK FACTORS THAT MAY AFFECT THE VALUE OF SECURITIES TO BE ISSUED UNDER THE PLAN AND/OR RECOVERIES UNDER THE PLAN**

**1.      The Valuation of the Reorganized Debtors May Not Be Adopted by the Bankruptcy Court.**

At the Confirmation Hearing, the Bankruptcy Court will hear evidence regarding the views of the Debtors and opposing parties, if any, with respect to the valuation of the Reorganized Debtors.  Based on that evidence, the Bankruptcy Court will determine the appropriate valuation for the Reorganized Debtors for purposes of the Plan.  Parties in interest in these Chapter 11 Cases may oppose confirmation of the Plan by alleging that the value of the Reorganized Debtors is higher than estimated by the Debtors and that the Plan thereby improperly limits or extinguishes their rights to recoveries under the Plan.  There can be no assurance that the Debtors' estimated valuation of the Reorganized Debtors will be approved by the Bankruptcy Court.

**2.      The Estimated Valuation of the Reorganized Debtors, the New Equity Interests, and the Plan Securities and the Estimated Recoveries to Holders of Allowed Claims and Equity Interests Are Not Intended to Represent the Private or Public Sale Values.**

The Debtors' estimated recoveries to Holders of Allowed Claims are not intended to represent the private or public sale values of the Reorganized Debtors' securities.  The estimated recoveries are based on numerous assumptions (the realization of many of which is beyond the control of Reorganized Debtors), including, without limitation:  (a) the successful reorganization of the Debtors; (b) an assumed date for the occurrence of the Effective Date; (c) the Debtors' ability to achieve the operating and financial results included in the Financial Projections; and (d) the Debtors' ability to maintain adequate liquidity to fund operations.  If the estimated valuations are lower than the private or public sale values, then the value of the Reorganized Debtors' securities or your recovery could be lower than if there were a private or public sale.

**3.      The Reorganized Debtors May Not Be Able to Achieve Projected Financial Results or Service Their Debt.**

Although the Financial Projections represent management's view based on current known facts and assumptions about the future operations of the Reorganized Debtors there is no guarantee that the Financial Projections will be realized.  The Reorganized Debtors may not be able to meet their projected financial results or achieve projected revenues and Cash flows assumed in projecting future business prospects.  To the extent the Reorganized Debtors do not meet their projected financial results or achieve projected revenues and Cash flows, the Reorganized Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date, may be unable to service their debt obligations as they come due or may not be able to meet their operational needs.  Any one of these failures may preclude the Reorganized Debtors from, among other things:  (a) taking advantage of future opportunities; (b) growing their businesses; or (c) responding to future changes in the frac sand industry.  Furthermore, a failure of the Reorganized Debtors to meet their projected financial results or achieve projected revenues and Cash flows could lead to Cash flow and working capital constraints, which constraints may require the Reorganized Debtors to seek additional working capital.  The Reorganized Debtors may not be able to obtain such working capital when it is required.

**4.      The Prepetition Noteholders Will Control the Reorganized Debtors.**

Consummation of the Plan and the effectuation of the New Stockholders Agreement and, if applicable, the New Registration Rights Agreement will result in the Prepetition Noteholders acquiring the

64

majority of the New Equity Interests upon the Effective Date.  Accordingly, the Prepetition Noteholders will exercise a controlling influence over the business and affairs of the Reorganized Debtors, and may choose to exercise such controlling influence in a way that affects other stakeholders.

## C.    RISK FACTORS THAT COULD NEGATIVELY IMPACT THE DEBTORS' AND REORGANIZED DEBTORS' BUSINESS[9]

### 1.    DIP Facilities

The DIP Facilities require that the Debtors comply with general affirmative and negative covenants such as prohibiting the incurrence of debt, investments, liens or dispositions unless specifically permitted and require disbursements not to exceed a budgeted amount.  The Debtors' ability to comply with these provisions may be affected by events beyond their control and their failure to comply, or obtain a waiver in the event they cannot comply with a covenant, could result in an event of default under either the DIP Facilities and permit the lenders thereunder to accelerate the loans and otherwise exercise remedies allowable by the agreements governing the facilities.

### 2.    Events Outside of the Debtors' Control, Including a Pandemic, Epidemic or Outbreak of an Infectious Disease, such as the Recent Global Outbreak of COVID-19, Have Materially Adversely Affected, and May Further Materially Adversely Affect, the Debtors' Business.

The Debtors face risks related to pandemics, epidemics, outbreaks or other public health events that are outside of their control and could significantly disrupt their operations and adversely affect their business and financial condition.  For example, the recent global outbreak of COVID-19 has reduced demand for oil and natural gas and, consequently, the demand for the Debtors' products and services, because of significantly reduced global and national economic activity. In March 2020, the United States declared the COVID-19 pandemic a national emergency, and all 50 states and many municipalities have declared public health emergencies.  Along with these declarations, there have been extraordinary and wide-ranging actions taken by international, federal, state and local public health and governmental authorities to contain and combat the outbreak and spread of COVID-19 in regions across the United States and the world, including mandates for many individuals to substantially restrict daily activities and for many businesses to curtail or cease normal operations. To the extent COVID-19 continues or worsens, governments may impose additional similar restrictions.

In addition, the impact of COVID-19 or other public health events may adversely affect the Debtors' operations or the health of their workforce and the workforces of their customers and service providers by rendering employees or contractors unable to work or unable to access the Debtors' their facilities for an indefinite period of time. There can be no assurance that the Debtors' personnel will not be impacted by these pandemic diseases, which may lead to a reduction in the Debtors' workforce productivity or increased medical costs or insurance premiums as a result of these health risks.

Though future and cumulative impacts from COVID-19 are uncertain due to the ongoing and dynamic nature of the circumstances, the Debtors have already experienced disruption to their business and operations.  Beginning in March 2020 and continuing into the second quarter of 2020, in response to

---

[9]    Additional risk factors are provided in the Debtors' 10-K and 10-Q, filed with the SEC on February 20, 2020 and June 25, 2020, respectively.

US-DOCS\117417332.2

industry impacts associated with COVID-19, the Debtors have begun to idle facilities and incrementally reduce their workforce by a substantial amount through layoffs and furloughs in order to better align their cost structure with current and expected market demand for their products and services. It is difficult to predict the extent to which the COVID-19 pandemic may further negatively affect the Debtors' business, including, without limitation, the Debtors' operating results, financial position and liquidity, the duration of any disruption of the Debtors' business, how and the degree to which the outbreak may impact the Debtors' customers, workforce, supply chain and distribution network, the health of the Debtors' employees, their insurance premiums, costs attributable to the Debtors' emergency measures, payments from customers and uncollectable accounts, limitations on travel, the availability of industry experts and qualified personnel and the market for the Debtors' securities. Any further impact will depend on future developments and new information that may emerge regarding the severity and duration of COVID-19 and the actions taken by authorities to contain it or treat its impact, all of which are beyond the Debtors' control. These potential impacts, while uncertain, could continue to adversely affect global economies and financial markets and result in a persistent economic downturn that could have an adverse effect on the industries in which the Debtors and their customers operate and on the demand for their products and services, their operating results and their future prospects.

   **3.      The Debtors' Business and Financial Performance Depends on Well Completion Activity in the Oil and Natural Gas Industry.**

   Demand for frac sand is materially dependent on the levels of activity in oil and natural gas exploration, development and production, and more specifically, the number of oil and natural gas wells completed in geological formations where proppants are used in hydraulic fracturing treatments and the amount of frac sand customarily used in the completion of such wells.

   Industry conditions that impact the activity levels of oil and natural gas producers are influenced by numerous factors over which the Debtors have no control, including:

- commodity prices;

- future economic returns and the cost of producing and delivering oil and natural gas;

- worldwide political, military, and economic conditions;

- governmental regulations, including the policies of governments regarding the exploration for and production and development of their oil and natural gas reserves;

- global weather conditions and natural disasters;

- stockholder activism or activities by non-governmental organizations to restrict the exploration, development, and production of oil and natural gas; and

- global or national health concerns, including health epidemics such as the outbreak of COVID-19 at the beginning of 2020.

   In the midst of the ongoing COVID-19 pandemic, the Organization of Petroleum Exporting Countries and other oil producing nations ("OPEC+") struggled to reach an agreement on oil production quotas, at which point Saudi Arabia and Russia initiated efforts to aggressively increase production. The combination of these events created the unprecedented dual impact of a global oil demand decline coupled with the risk of a substantial increase in supply. NYMEX WTI oil spot prices decreased from a high of $63

66

per barrel in early January 2020 to a low of $14 per barrel in late March 2020, a level which had not been experienced since March 1999.  While OPEC+ agreed in April 2020 to cut production and has agreed to extend production cuts through the end of July 2020, downward pressure on oil prices could continue for the foreseeable future.  Although some market stabilization occurred in the second quarter of 2020, we cannot predict whether or when oil production and economic activities will return to normalized levels.

A reduction in oil and natural gas prices would further depress the level of oil and natural gas exploration, development, production and well completion activity, which could result in a corresponding decline in the demand for the frac sand the Debtors produce and deliver. In addition, any future decreases in the rate at which oil and natural gas reserves are developed, whether due to increase governmental regulation, limitations on exploration and production activity or other factors, could have a material adverse effect on the Debtors' business, even in a stronger oil and natural gas price environment. If there is a decrease in the demand for frac sand, the Debtors may be unable to sell or deliver volumes, or be forced to reduce their sales prices, any of which would reduce the amount of cash they generate.

4. **The Debtors' Operations Are Subject to Operating Risks that Are Often Beyond Their Control and Could Adversely Affect Production Levels and Costs, and Such Risks May Not Be Covered by Insurance.**

The Debtors' operations are subject to risks normally encountered in the oil field services and commercial silica industries, some of which are beyond their control, including the following:

- the pace of adoption of the Debtors' integrated logistics solutions;

- demand and pricing for the Debtors' integrated logistics solutions;

- the volume of frac sand the Debtors are able to buy and sell;

- the price at which the Debtors are able to buy and sell frac sand;

- the amount of frac sand the Debtors are able to timely deliver at the wellsite, which could be adversely affected by, among other things, logistics constraints, weather, or other delays at the wellsite or transloading facility;

- changes in prevailing economic conditions, including the extent of changes in crude oil, natural gas and other commodity prices;

- the amount of frac sand the Debtors are able to excavate and process, which could be adversely affected by, among other things, operating difficulties, cave-ins, pit wall failures, rock falls and unusual or unfavorable geologic conditions;

- changes in the price and availability of natural gas or electricity;

- inability to obtain necessary equipment or replacement parts;

- changes in railroad infrastructure, price, capacity, and availability, including the potential for rail line disruptions;

- changes in road infrastructure, including the potential for trucking and other transportation disruptions;

67

- changes in the price and availability of transportation;

  extensive regulation of trucking services;

- changes in, and volatility of, fuel prices;

- availability of or failure of the Debtors' contractors, partners, and service providers to provide services at the agreed-upon levels or times;

- failure to maintain safe work sites at the Debtors' facilities or by third parties at their work sites;

- inclement or hazardous weather conditions, including flooding, and the physical impacts of climate change;

- environmental hazards, such as leaks and spills, as well as unauthorized discharges of fluids or other pollutants into the surface and subsurface environment;

- industrial and transportation related accidents;

- fires, explosions, or other accidents;

- difficulty collecting receivables;

- inability of the Debtors' customers to take delivery;

- changes in the product specifications requested by customers and the regional destinations for such product;

- difficulty or inability in obtaining, maintaining and renewing permits, including environmental permits or other licenses and approvals such as mining or water rights;

- facility shutdowns or restrictions in operations in response to environmental regulatory actions including but not limited to actions related to endangered species;

- systemic design or engineering flaws in the equipment the Debtors use to produce product and provide logistics services;

- changes in laws and regulations (or the interpretation or enforcement thereof) related to the mining and hydraulic fracturing industries, silica dust exposure or the environment;

- the outcome of litigation, claims or assessments, including unasserted claims;

- challenges to or infringement upon the Debtors' intellectual property rights;

- labor disputes and disputes with the Debtors' third-party contractors;

- inability to attract and retain key personnel;

- cyber security breaches of the Debtors' systems and information technology;

68

- the Debtors' ability to borrow funds and access to capital markets;

- changes in the foreign currency exchange rates in the countries that the Debtors conduct business;

- changes in income tax rates, changes in income tax laws or unfavorable resolution of tax matters; and

- changes in the political environment of the geographical areas in which the Debtors and their customers operate.

To the extent any or all of these risks eventuate, the Debtors' ability to provide oil-field services and their production levels of frac sands could be negatively impacted, which could have a material adverse effect on the Debtors' business, financial condition, results of operations, and cash flows.

5.      **The Debtors' Future Performance Will Depend on Their Ability to Succeed in Competitive Markets, and on Their Ability to Appropriately React to Potential Fluctuations in The Demand for Logistics and Wellsite Services, as Well as The Supply of Frac Sand.**

The Debtors operate in a highly competitive market that is characterized by a small number of large, national companies and a larger number of small, regional or local companies in the production, distribution and logistics of frac sand. Competition in the industry is based on price, reliability of supply, transportation capabilities, product quality, performance and sand characteristics.

The Debtors compete with large, national companies such as U.S. Silica Holdings, Inc., Covia Holdings Corporation, Solaris Oilfield Infrastructure, Inc. and others.  The Debtors' competitors may have greater financial and other resources than the Debtors do, may develop technology superior to the Debtors or may have production and distribution facilities or last mile delivery solutions that are significantly advantaged over the Debtors'. Should the demand for hydraulic fracturing services decrease, prices in the frac sand market could materially decrease as competitors may sell frac sand at below market prices. In addition, E&Ps and other providers of hydraulic fracturing services could compete directly with the Debtors, which may negatively impact pricing and demand for their frac sand and related services. Because the markets for their products and logistics services are typically local, the Debtors also compete with smaller regional or local companies. If demand for hydraulic fracturing services decreases and the supply of frac sand available in the market increases, prices in the frac sand market could continue to materially decrease.  Furthermore, the Debtors' competitors may choose to consolidate, which could provide them with greater financial and other resources than the Debtors. The Debtors may not be able to compete successfully against their competitors in the future, and competition could have a material adverse effect on their business, financial condition, results of operations and cash flows.

6.      **The Debtors Face Distribution and Logistics Challenges in Their Business.**

As oil and natural gas prices fluctuate, the Debtors' customers may shift their focus back and forth between different resource plays, some of which can be located in geographic areas that do not have well-developed transportation and distribution infrastructure systems. Transportation and logistics operating expenses comprise a significant portion of the Debtors' total delivered cost of sales. Therefore, serving their customers in these less-developed areas presents distribution and other operational challenges that may affect the Debtors' sales and negatively impact their operating costs.  Disruptions in transportation services, including shortages of railcars or trucks, or a lack of developed infrastructure, could affect the Debtors'

69

ability to timely and cost effectively deliver to their customers and could provide a competitive advantage to competitors located in closer proximity to their customers. Additionally, increases in the price of transportation costs, including freight charges, fuel surcharges, terminal switch fees and demurrage costs, excess railcars or trucking rates could negatively impact operating costs if the Debtors are unable to pass those increased costs along to their customers. Failure to find long-term solutions to these logistics challenges could adversely affect the Debtors' ability to respond quickly to the needs of their customers or result in additional increased costs, and thus could negatively impact their results of operations and financial condition.

7.  **The Majority of the Debtors' Sales are Generated Under Contracts with Companies in The Oil and Natural Gas Industry.  The Loss of A Contract Or Customer, A Significant Reduction in Purchases by Any Customer, The Debtors' Failure to Comply with Contract Terms, or the Debtors' Inability to Renegotiate, Renew, or Replace Their Existing Contracts on Favorable Terms Could, Individually or in The Aggregate, Adversely Affect The Debtors' Business, Financial Condition, and Results of Operations.**

As of January 1, 2020, the Debtors have contracted to sell raw frac sand under long-term supply agreements to customers with remaining terms ranging from 3 to 60 months. For the year ended December 31, 2019, the Debtors generated 72% of their revenues from sales of frac sand to customers with whom they had long-term contracts. A substantial portion of the Debtors' logistics services are provided to customers with whom they have long-term agreements as defined in a MSA and related work orders.

Some of the Debtors' customers have exited or could exit the business, or have been or could be acquired by other companies that purchase frac sand or logistics services the Debtors provide from other third-party providers. The Debtors' current customers also may seek to acquire frac sand or logistics services from other providers that offer more competitive pricing or capture and develop their own sources of frac sand or logistics services. As a result of the recent COVID-19 outbreak or other adverse public health developments, including voluntary and mandatory quarantines, travel restrictions and other restrictions, the operations of our customers continue to experience delays or disruptions and temporary suspensions of operations.  The loss of a customer or contract, or a reduction in the amount of frac sand or logistics services purchased by any customer, could have an adverse effect on the Debtors' business, financial condition and results of operations.

The Debtors' customers may fail to comply with the terms of their existing contracts. The Debtors' enforcement of specific contract terms may be limited by market dynamics and other factors, including the COVID-19 outbreak. A customer's failure to comply with contract terms or the Debtors' limited enforcement thereof could have an adverse effect on their business, financial condition and results of operations.

Upon the expiration of the Debtors' current contracts, their customers may not continue to purchase the same levels of frac sand or logistics services due to a variety of reasons. In addition, the Debtors may choose to renegotiate their existing contracts on less favorable terms or at reduced volumes in order to preserve relationships with their customers. Upon the expiration of their current contract terms, the Debtors may be unable to renew their existing contracts or enter into new contracts on terms favorable to them, or at all. Any renegotiation of their contracts on less favorable terms, or inability to enter into new contracts on economically acceptable terms upon the expiration of their current contracts, could have an adverse effect on the Debtors' business, financial condition and results of operations.

70

US-DOCS\117417332.2

**8.    The Debtors' Long-Term Contracts May Preclude Them from Mitigating the Effect of Increased Operational Costs During the Term of Their Long-Term Contracts, Even Though Certain Volumes Under Certain of Their Long-Term Contracts Are Subject to Annual Fixed Price Escalators or Other Pricing Adjustment Mechanisms.**

The pricing arrangements under the Debtors' long-term supply contracts may negatively impact their results of operations. If the Debtors' operational costs increase during the terms of their long-term supply contracts, they may not be able to pass any of those increased costs to their customers. If they are unable to otherwise mitigate these increased operational costs, their net income could decline. Additionally, in periods with increasing prices, the Debtors' sales may not keep pace with market prices.

**9.    The Debtors Are Subject to the Credit Risk of Their Customers, and Any Material Nonpayment or Nonperformance by the Debtors' Customers Could Adversely Affect Their Financial Results.**

The Debtors are subject to the risk of loss resulting from nonpayment or nonperformance by their customers, whose operations are concentrated in a single industry, the global oil and natural gas industry, which is subject to recent extreme volatility and, therefore, credit risk due to the recent actions of Saudia Arabia and Russia, which resulted in a substantial decrease in oil and natural gas prices during the first quarter of 2020 and into the second quarter of 2020, and the global outbreak of COVID-19, which has reduced demand for oil and natural gas because of significantly reduced global and national economic activity.  In particular, as a result of the recent extreme volatility in oil and natural gas prices and ongoing uncertainty in the global economic environment, including the global outbreak of COVID-19, their customers may not be able to fulfill their existing commitments or access financing necessary to fund their current or future obligations. The Debtors' credit procedures and policies may not be adequate to fully eliminate customer credit risk. If they fail to adequately assess the creditworthiness of existing or future customers or unanticipated deterioration in their creditworthiness, any resulting increase in nonpayment or nonperformance by them and the Debtors' inability to re-market or otherwise sell the volumes could have a material adverse effect on their business, financial condition and results of operations.

**10.    The Debtor' Expansion or Modification of Existing Assets, or the Construction of New Assets, May Not Result in Revenue Increases and May Be Subject to Regulatory, Environmental, Political, Legal, and Economic Risk, Which Could Adversely Affect the Debtors' Results of Operations and Financial Condition.**

The construction of new facilities, additions or modifications to the Debtors' existing facilities, or equipment may require the expenditure of significant amounts of capital. If the Debtors undertake these projects, they may not be completed on schedule or at the budgeted cost or at all. Moreover, upon the expenditure of future funds on a particular project, the Debtors' revenues may not increase immediately, or as anticipated, or at all.  For instance, the Debtors may construct new facilities or equipment over an extended period of time and will not receive any material increases in revenues until the projects are completed. Moreover, the Debtors may expend capital to capture anticipated future growth in a location in which such growth does not materialize. Since the Debtors are not engaged in the hydraulic fracturing process, they may be unable to accurately predict the extent of well completion activity to take place in future periods. To the extent the Debtors rely on estimates of future levels of well completion activity in any decision to construct facilities or equipment, such estimates may prove to be inaccurate because there are numerous uncertainties inherent in forecasting levels of well completion activity. In addition, the Debtors' assets may be subject to numerous regulatory, environmental, political and legal uncertainties, which could negatively impact the Debtors' ability to capture anticipated economic benefits. The Debtors' expansion or modification of existing or new assets may not be able to attract enough throughput to achieve

71

their expected investment return, which could adversely affect their business, financial condition and results of operations.

11. **The Debtors May be Adversely Affected by Decreased Demand for Raw Frac Sand Due to the Development of Either Effective Alternative Proppants or New Processes to Replace Hydraulic Fracturing.**

Raw frac sand is a proppant used in the completion and re-completion of oil and natural gas wells to stimulate and maintain oil and natural gas production through the process of hydraulic fracturing. Raw frac sand is the most commonly used proppant and is less expensive than other proppants, such as resin-coated sand and manufactured ceramics. A significant shift in demand from frac sand, including from the types of raw frac sand product that the Debtors produce and sell to other proppants, or the development of new processes to replace hydraulic fracturing altogether, could cause a decline in the demand for the frac sand the Debtors produce and result in a material adverse effect on their financial condition and results of operation.

12. **Any Adverse Developments at the Debtors' Production Facilities or Which Impact the Debtors' Logistics and Wellsite Operations Could Have an Adverse Effect on Their Financial Condition and Results of Operations.**

Any adverse development at the Debtors' production facilities or which impact their logistics and wellsite operations, due to catastrophic events, weather or any other event that would cause them to curtail, suspend or terminate operations, could result in the Debtors being unable to meet their contracted sand deliveries or other service commitments to their customers. If the Debtors are unable to deliver contracted volumes within the required time frame they could be required to pay make-whole payments to their customers that could have an adverse effect on their financial condition and results of operations. If the Debtors are unable to provide supply from their production facilities or unable to fulfill logistics service commitments there could be an adverse effect on the Debtors' business, financial condition and results of operations.

13. **Inaccuracies in Estimates of Volumes and Qualities of the Debtors' Sand Reserves Could Result in Lower Than Expected Sales and Higher Than Expected Production Costs.**

John T. Boyd Company ("John T. Boyd"), the Debtors' independent reserve engineers, prepared estimates of their reserves based on engineering, economic and geological data assembled and analyzed by the Debtors' engineers and geologists. However, frac sand reserve estimates are by nature imprecise and depend to some extent on statistical inferences drawn from available data, which may prove unreliable. There are numerous uncertainties inherent in estimating quantities and qualities of reserves and non-reserve frac sand deposits and costs to mine recoverable reserves, including many factors beyond the Debtors' control. Estimates of economically recoverable frac sand reserves necessarily depend on a number of factors and assumptions, all of which may vary considerably from actual results, such as:

- geological and mining conditions and/or effects from prior mining that may not be fully identified by available data or that may differ from experience;

- assumptions concerning future prices of frac sand, operating costs, mining technology improvements, development costs and reclamation costs; and

72

- assumptions concerning future effects of regulation, including the issuance of required permits and taxes by governmental agencies.

Any inaccuracy in John T. Boyd's estimates related to the Debtors' frac sand reserves and non-reserve frac sand deposits could result in lower than expected sales and higher than expected costs. For example, John T. Boyd's estimates of the Debtors' proven reserves assume that their revenue and cost structure will remain relatively constant over the life of their reserves. If these assumptions prove to be inaccurate, some or all of their reserves may not be economically mineable, which could have a material adverse effect on their results of operations and cash flows. In addition, the Debtors pay a fixed price per ton of sand excavated regardless of the quality of the frac sand, and their current customer contracts require them to deliver frac sand that meets certain specifications. If John T. Boyd's estimates of the quality of the Debtors' reserves, including the volumes of the various specifications of those reserves, prove to be inaccurate, the Debtors may incur significantly higher excavation costs without corresponding increases in revenues, they may not be able to meet their contractual obligations, or their facilities may have a shorter than expected reserve life, which could have a material adverse effect on the Debtors' results of operations and cash flows.

14. **The Debtors' Operations Are Dependent on Their Rights and Ability to Mine Their Properties and on Their Having Received or Renewed the Required Permits and Approvals from Governmental Authorities and Other Third Parties.**

The Debtors hold and will seek numerous governmental, environmental, mining and other permits, water rights, and approvals authorizing operations. For their extraction and processing, the permitting process is subject to federal, state and local authority. For example, on the federal level, a Mine Identification Request (MSHA Form 7000-51) must be filed and obtained before mining commences. If wetlands are implicated, a Corps Wetland Permit is required. At the state level, a series of permits and approvals are required related to air quality, wetlands, water quality (waste water, stormwater), grading permits, endangered species, archaeological assessments, and high capacity wells in addition to others depending upon site-specific factors and operational detail. At the local level, zoning, building, stormwater, erosion control, wellhead protection, road usage and access, among other matters may be regulated and require permitting or approval to some degree. Additionally, a non-metallic mining reclamation permit is required for the Debtors' Wisconsin production facilities while an Aggregate Production Operations permit is required for their Texas production facilities. A decision by a governmental agency or other third party to deny or delay issuing a new or renewed permit or approval, or to revoke or substantially modify an existing permit or approval, could have a material adverse effect on the Debtors' ability to commence or continue related operations.

Title to, and the area of, mineral properties and water rights may also be disputed. Mineral properties sometimes contain claims or transfer histories that examiners cannot verify. Legal challenges successfully claiming that the Debtors do not have title to their property or lack appropriate water rights could cause the Debtors to lose any rights to explore, develop, and extract minerals, without compensation for their prior expenditures relating to such property. The Debtors' business may suffer a material adverse effect in the event they have title deficiencies.

In some instances, the Debtors have received access rights or easements from third parties, which allow for a more efficient operation than would exist without the access or easement. Such third party could take legal action to restrict or suspend the access or easement or could refuse to renew such rights of access or easements upon their contractual expiration, and any such action could be materially adverse to the Debtors' business, results of operations or financial condition.

73

US-DOCS\117417332.2

**15.**     **Laws and Regulations Relating to Hydraulic Fracturing Could Increase the Debtors' Costs of Doing Business and Result in Additional Operating Restrictions, Delays, or Cancellations in Completion of New Oil and Natural Gas Wells by the Debtors' Customers, Which Could Cause a Decline in the Demand for the Debtors' Frac Sand and Have a Material Adverse Effect on Their Business, Financial Condition, and Results of Operations.**

Although the Debtors do not directly engage in hydraulic fracturing activities, their customers purchase their frac sand for use in their hydraulic fracturing activities. Hydraulic fracturing is currently generally exempt from regulation under the federal Safe Drinking Water Act ("SDWA") Underground Injection Control ("UIC") program and is typically regulated by state oil and natural gas commissions or similar agencies. However, the practice of hydraulic fracturing continues to be controversial in certain parts of the country, resulting in increased scrutiny and regulation of the fracturing process, including by federal agencies that have asserted regulatory authority or pursued investigations over certain aspects of the hydraulic fracturing process. For example, the EPA has asserted regulatory authority pursuant to the SDWA UIC program over hydraulic fracturing activities involving the use of diesel and issued guidance covering such activities as well as published an Advanced Notice of Proposed Rulemaking regarding reporting of the chemical substances and mixtures used in hydraulic fracturing under the federal Toxic Substance Control Act. Additionally, the EPA has published an effluent limit guideline final rule prohibiting the discharge of wastewater from onshore unconventional oil and natural gas extraction facilities to publicly owned wastewater treatment plants. The federal Bureau of Land Management published a final rule in 2015 that established new or more stringent standards for performing hydraulic fracturing on federal and Indian lands but the bureau rescinded the 2015 rule in late 2017; however, litigation challenging the bureau's decision to rescind the 2015 rule remains pending in federal district court. Also, in late 2016, the EPA released its final report on the potential impacts of hydraulic fracturing on drinking water resources, concluding that "water cycle" activities associated with hydraulic fracturing may impact drinking water resources under some circumstances.

From time to time, Congress has considered legislation to provide for federal regulation of hydraulic fracturing under the SDWA and to require disclosure of the chemicals used in the hydraulic fracturing process but no comprehensive hydraulic fracturing legislation at the federal level has been implemented to date. However, concern over the threat of climate change has resulted in the making of pledges by certain candidates seeking the office of the President of the United States in 2020 to ban hydraulic fracturing of oil and natural gas wells and ban new leases for production of minerals on federal properties, including onshore lands and offshore waters.

In addition, some state and local governments have adopted, and other governmental entities are considering adopting, increased regulatory oversight of hydraulic fracturing through additional restrictions on hydraulic fracturing, including states where the Debtors or their customers operate. For example, Texas, New Mexico, Oklahoma, Pennsylvania and North Dakota, among others, have adopted regulations that impose new or more stringent permitting, disclosure, disposal and well construction requirements on hydraulic fracturing operations. Also, in April 2019, the Governor of Colorado signed Senate Bill 19-181 into law, which legislation, among other things, revises the mission of the state oil and gas agency from fostering energy development in the state to instead focusing on regulating the oil and natural gas industry in a manner that is protective of public health and safety and the environment, as well as authorizing cities and counties to regulate oil and natural gas operations within their jurisdiction as they do other developments. Among other things, the Colorado oil and gas agency will consider enhanced safety and environmental protections during well development operations, including drilling and hydraulic fracturing activities. States could also elect to place certain prohibitions on hydraulic fracturing, following the

74

approach taken by the States of Maryland, New York and Vermont.  Local governments also may seek to adopt ordinances to regulate or severely restrict the time, place and manner of hydraulic fracturing activities within their jurisdictions. Moreover, non-governmental organizations may seek to restrict hydraulic fracturing.  For example, notwithstanding the adoption of Colorado Senate Bill 19-181 in 2019, one or more interest groups in Colorado have already filed new ballot initiatives with the state in January 2020, in hopes of extending drilling setbacks from oil and gas development.

Increased regulation and attention given to the hydraulic fracturing process could lead to greater opposition to oil and natural gas production activities using hydraulic fracturing techniques. The adoption of new or more stringent laws or regulations at the federal, state and local levels imposing reporting obligations on, or otherwise limiting or delaying, the hydraulic fracturing process could make it more difficult to complete oil and natural gas wells, increase the Debtors' customers' costs of compliance and doing business and otherwise adversely affect the hydraulic oil and natural gas fracturing services they perform, which could negatively impact demand for the Debtors' frac sand. Also, presidential executive orders could be issued seeking to further restrict or ban hydraulic fracturing activities or new leases for production of minerals on federal properties and heightened political, regulatory, and public scrutiny of hydraulic fracturing practices could expose the Debtors' or their customers to increased legal and regulatory proceedings, which could be time-consuming, costly or result in substantial legal liability or significant reputational harm.  The Debtors could be directly affected by adverse litigation involving the Debtors, or indirectly affected if the cost of compliance limits the ability of the Debtors' customers to operate.  Such costs and scrutiny could directly or indirectly, through reduced demand for the Debtors' frac sand, have a material adverse effect on the Debtors' business, financial condition and results of operations.

**16.    A Facility Closure or Long-Term Idling Entails Substantial Costs, and If the Debtors Close Their Production Facilities Sooner Than Anticipated, Their Results of Operations May Be Adversely Affected.**

In January 2019, the Augusta facility was idled.  In August 2019, the Debtors reduced the hours of operations at the Whitehall facility and in April 2020 it was idled. Also, in April 2020, the Debtors idled the Blair facility and one of the Kermit facilities.

The closure or long-term idling of a production facility could involve significant fixed closure costs, including accelerated employment legacy costs, severance-related obligations, reclamation and other environmental costs and the costs of terminating long-term obligations, including energy contracts and equipment leases.  The Debtors accrue for the costs of reclaiming open pits, stockpiles, non-saleable sand, ponds, roads and other mining support areas over the estimated mining life of their property. They base their assumptions regarding the life of their production facilities on detailed studies that the Debtors perform from time to time, but their studies and assumptions may not prove to be accurate.  If the Debtors were to reduce the estimated life of their production facilities, the fixed facility closure costs would be applied to a shorter period of production, which would increase production costs per ton produced and could materially and adversely affect their results of operations and financial condition.

Applicable statutes and regulations require that mining property be reclaimed following a mine closure in accordance with specified standards and an approved reclamation plan.  The plan addresses matters such as removal of facilities and equipment, regrading, minimizing or preventing erosion and limiting the potential for sediment run-off into surface waters other forms of water pollution, re- vegetation and post-mining land use.  The Debtors are required to post a surety bond or other form of financial assurance equal to the cost of reclamation as set forth in the approved reclamation plan. The establishment of the final mine closure reclamation liability is based on permit requirements and requires various estimates

75

and assumptions, principally associated with reclamation costs and production levels.  If the Debtors' accruals for expected reclamation and other costs associated with facility closures for which they will be responsible were later determined to be insufficient, their business, results of operations and financial condition would be adversely affected.

17. **Given the Nature of the Debtors' Frac Sand Mining and Processing Operations, They Face a Material Risk of Liability, Delays, and Increased Cash Costs of Production from Environmental and Industrial Accidents as Well as Due to Operational Breakdowns.**

The Debtors' business involves significant risks and hazards, including environmental hazards, industrial accidents and breakdowns of equipment and machinery. Their business is exposed to hazards associated with frac sand mining, processing and the related storage, handling and transportation of raw materials, products and wastes. Furthermore, during operational breakdowns, the relevant facility may not be fully operational within the anticipated timeframe, which could result in further business losses. The occurrence of any of these or other hazards could delay production, suspend operations, increase repair, maintenance or medical costs and, due to the integration of the Debtors' facilities, could have an adverse effect on the productivity and profitability of a particular facility or on their business as a whole.  Incidents of this nature have occurred in the past and may happen again in the future. The Debtors have insurance policies for industrial, environmental and other accidents, but such policies are limited by their terms and may not cover certain risks in their entirety or at all.

18. **The Debtors' Production Process Consumes Large Amounts of Natural Gas and Electricity.  An Increase in the Price or a Significant Interruption in the Supply of These or Any Other Energy Sources Could Have a Material Adverse Effect on the Debtors' Financial Condition or Results of Operations.**

Energy costs, primarily natural gas and electricity, represented 2% of the Debtors' total sales and 12% of their total production costs during the year ended December 31, 2019.  Natural gas is the primary fuel source used for drying in the frac sand production process and, as such, the Debtors' profitability is impacted by the price and availability of natural gas they purchase from third parties. Because the Debtors have not contracted for the provision of natural gas on a fixed-price basis, their costs and profitability will be impacted by fluctuations in prices for natural gas. The price and supply of natural gas are unpredictable and can fluctuate significantly based on international, political and economic circumstances, as well as other events outside the Debtors' control, such as changes in supply and demand due to weather conditions, actions by OPEC and other oil and natural gas producers, regional production patterns and environmental concerns. In addition, potential climate change regulations or carbon or emissions taxes could result in higher production costs for energy, which may be passed on to the Debtors in whole or in part. The price of natural gas has been extremely volatile over the last several years. In order to manage this risk, the Debtors may hedge natural gas prices through the use of derivative financial instruments, such as forwards, swaps and futures. However, these measures carry risk (including nonperformance by counterparties) and do not in any event entirely eliminate the risk of decreased margins as a result of natural gas price increases. A significant increase in the price of energy that is not recovered through an increase in the price of the Debtors' products or covered through hedging arrangements or an extended interruption in the supply of natural gas or electricity to their production facilities could have a material adverse effect on the Debtors' business, financial condition, results of operations, cash flows and prospects.

US-DOCS\117417332.2

19.     **Seasonal and Severe Weather Conditions Could Have a Material Adverse Impact on the Debtors' Business.**

The Debtors' business could be materially adversely affected by seasonal and severe weather conditions. Severe weather conditions may affect the Debtors' customers' operations, thus reducing their need for the Debtors' products or ability to take delivery of the Debtors' product at the terminal or the wellsite, or impact the Debtors' operations by resulting in weather-related damage to their facilities and equipment and impact their customers' ability to take delivery of the Debtors' products at their plant site. For example, severe winter weather conditions impact the Debtors' Wisconsin operations by causing them to halt their excavation and wet-plant-related production activities during the winter months. During non-winter months, the Debtors excavate and process excess sand to build a sufficient washed sand stockpile that feeds the dry plant. Unexpected winter conditions (e.g., if winter conditions come earlier than expected or last longer than expected) may result in the Debtors not having a sufficient sand stockpile to supply feedstock for their dry plant during winter months, which could result in the Debtors being unable to meet their contracted sand deliveries during such time and lead to a material adverse effect on their business, financial condition, results of operations and reputation.

Additionally, some scientists have concluded that increasing concentrations of GHGs in the atmosphere may produce climate changes that have significant physical effects, such as increased frequency and severity of storms, droughts, floods and other climate events. Any weather-related interference with the Debtors' operations could force them to delay or curtail services and potentially breach their contractual obligations to deliver minimum volumes or result in a loss of productivity and an increase in their operating costs.

20.     **Diminished Access to Water May Adversely Affect the Debtors' Operations.**

The excavation and processing activities in which the Debtors engage require significant amounts of water, of which they seek to recycle a significant percentage in their operating process. As a result, securing water rights and water access to sufficient volumes of water is necessary for the operation of the Debtors' processing facilities. If future excavation and processing activities are located in an area that is water-constrained, there may be additional costs associated with securing sufficient water access. The Debtors have obtained water rights that they currently use to service the activities on their properties, and they plan to obtain all required water rights to service other properties they may develop or acquire in the future.  However, the amount of water that the Debtors are entitled to use pursuant to their water rights must be determined by the appropriate regulatory authorities in the jurisdictions in which they operate. Such regulatory authorities may amend the regulations regarding such water rights, increase the cost of maintaining such water rights or eliminate their current water rights, and the Debtors may be unable to retain all or a portion of such water rights. These new regulations, which could also affect local municipalities and other industrial operations, could have a material adverse effect on the Debtors' operating costs if implemented.  Such changes in laws, regulations or government policy and related interpretations pertaining to water rights may alter the environment in which the Debtors do business, which may have an adverse effect on their financial condition and results of operations.  Additionally, one or more water discharge permits may be required to properly dispose of water, including wastewater and stormwater at the Debtors' processing sites. The water discharge permitting process is also subject to regulatory discretion, and any inability or delay in obtaining the necessary permits could have an adverse effect on the Debtors' business, financial condition and results of operations.

US-DOCS\117417332.2

21. **A Shortage of Skilled Labor Together with Rising Labor Costs in the Industry May Further Increase Operating Costs, Which Could Adversely Affect the Debtors' Results of Operations.**

Efficient sand production and delivery requires skilled laborers, preferably with several years of experience and proficiency in multiple tasks. The Debtors' operations also utilize third-party contractors. There may be a shortage of skilled labor required throughout the Debtors' operations in various locations. If the shortage of experienced skilled labor continues or worsens, the Debtors may find it difficult to retain or replace third-party contractors, and they may be unable to retain, attract and hire or train the necessary number of skilled laborers to perform their own operations. In either event, there could be an adverse impact on the Debtors' labor productivity and costs and their ability to conduct operations.

22. **The Debtors Do Not Own the Land on Which the Majority of Their Terminal Facilities Are Located, Which Could Disrupt Their Operations.**

The Debtors do not own the land on which the majority of their terminals are located and instead own leasehold interests and rights-of-way for the operation of these facilities. Upon expiration, termination or other lapse of their current leasehold terms, the Debtors may be unable to renew their existing leases or rights-of-way on terms favorable to them, or at all. Any renegotiation on less favorable terms or inability to enter into new leases on economically acceptable terms upon the expiration, termination or other lapse of the Debtors' current leases or rights-of-way could cause them to cease operations on the affected land, increase costs related to continuing operations elsewhere and have a material adverse effect on their business, financial condition and results of operations.

23. **Disruption of Transportation Services or Fluctuations in Transportation Costs Could Reduce Revenues by Impeding the Debtors' Ability to Deliver Product or Services to Their Customers.**

Transportation costs represent a significant portion of the total delivered cost of frac sand for the Debtors' customers and, as a result, the cost of transportation is a critical factor in a customer's purchasing decision. Disruption of transportation services due to shortages of rail cars or trucks, weather-related problems, flooding, drought, accidents, mechanical difficulties, strikes, lockouts, bottlenecks or other events could temporarily impair the Debtors' ability to supply their customers through their logistics network of rail-based terminals or their last mile operations or, if their customers are not using their transportation services, the ability of their customers to take delivery of frac sand. Accordingly, if there are disruptions of the rail transportation or trucking services utilized by the Debtors or their customers, the Debtors' business could be adversely affected.

24. **The Debtors Are Subject to Cyber Security Risks. A Cyber Incident Could Occur and Result in Information Theft, Data Corruption, Operational Disruption and/or Financial Loss.**

The oil and natural gas industry has become increasingly dependent on digital technologies to conduct certain processing activities. For example, the Debtors depend on digital technologies to perform many of their services and to process and record financial and operating data. In addition, in the ordinary course of their business, the Debtors collect and store sensitive data, including their proprietary business information and personally identifiable information of their employees in their data centers and on their networks. The secure processing, maintenance and transmission of this information is important to the Debtors' operations. At the same time, cyber incidents, including deliberate attacks, have increased. The U.S. government has issued public warnings that indicate that energy assets might be specific targets of

78

US-DOCS\117417332.2

cyber security threats. The Debtors' technologies, systems and networks, and those of their vendors, suppliers and other business partners, may become the target of cyber-attacks or information security breaches that could result in the unauthorized release, gathering, monitoring, misuse, loss or destruction of proprietary and other information, or other disruption of business operations. In addition, certain cyber incidents, such as surveillance, may remain undetected for an extended period.  The Debtors' systems and insurance coverage for protecting against cyber security risks may not be sufficient. As cyber incidents continue to evolve, the Debtors will likely be required to expend additional resources to continue to modify or enhance their protective measures or to investigate and remediate any vulnerability to cyber incidents. The audit committee is responsible for cyber oversight.

25. **The Debtors and Their Customers Are Subject to Extensive Environmental and Occupational Health and Safety Laws and Regulations That Impose, and Will Continue to Impose, Significant Costs and Liabilities.  In Addition, Future New or Amended Legal Requirements, or More Stringent Interpretation or Enforcement of Existing Requirements, Could Increase Those Costs and Liabilities, Which Could Adversely Affect the Debtors' Results of Operations.**

The Debtors are subject to extensive federal, state, and local environmental and occupational health and safety laws and regulations governing the mining and mineral processing industry, including among other things, those relating to health and safety aspects of their operations, environmental permitting and licensing, air emissions and water discharges, water pollution and soil and groundwater contamination, waste management, hazardous materials, land use, remediation, reclamation and restoration of properties, wildlife protection, and natural resources. These laws and regulations, and the permits implemented thereunder have had, and will continue to have, a significant effect on the Debtors' business. Environmental laws may impose substantial penalties for noncompliance, and certain of these laws, such as CERCLA, may impose strict, retroactive, and joint and several liability for the removal or remediation of releases of hazardous substances or property contamination, regardless of whether the Debtors or third parties were responsible for such release and even if the Debtors' conduct was lawful at the time it occurred. Additionally, the Debtors may incur liability associated with releases of materials into the environment or for injuries to persons or damages to properties and natural resources, and such liability may potentially impair their ability to conduct their operations.

Any failure by the Debtors to comply with applicable environmental laws and regulations may cause governmental authorities to take actions that could adversely impact their operations and financial condition, including:

- issuance of sanctions, including administrative, civil, and criminal penalties;

- denial, modification, or revocation of permits or other authorizations;

- imposition of injunctive obligations or other limitations on the Debtors' operations, including cessation of operations; and

- requirements to perform site investigatory, remedial, of other corrective actions

Any such regulations could require the Debtors to modify existing permits or obtain new permits, implement additional pollution control technology, curtail operations, increase significantly their operating costs, or impose additional operating restrictions among their customers that reduce demand for their products and services.

US-DOCS\117417332.2

Environmental laws and regulations are subject to change in the future, possibly resulting in more stringent legal requirements that could restrict the Debtors' ability to expand their facilities or extract their mineral deposits or could require the Debtors to acquire costly equipment or to incur other significant expenses in connection with their business. If existing regulatory requirements or enforcement policies change or new regulatory or enforcement initiatives are developed and implemented in the future, the Debtors or their customers may be required to make significant, unanticipated capital and operating expenditures, which costs and expenditures could have a material adverse effect on the Debtors. Examples of recent environmental regulations include the following:

- Ground-Level Ozone Standards. In 2015, the EPA issued a final rule under the CAA, lowering the National Ambient Air Quality Standard ("NAAQS") for ground-level ozone to 70 parts per billion under both the primary and secondary standards to provide requisite protection of public health and welfare, respectively. Since that time, the EPA issued area designations with respect to ground-level ozone and issued final requirements that apply to state, local and tribal air agencies for implementing the 2015 NAAQS for ground-level ozone. State implementation of the revised standard could, among other things, require installation of new emission controls on some of the Debtors' or their customers' equipment, result in longer permitting timelines, and significantly increase the Debtors' or their customers' capital expenditures and operating costs.

- Federal Jurisdiction over Waters of the United States. In 2015, the EPA and U.S. Army Corps of Engineers ("Corps") under the Obama Administration released a final rule outlining federal jurisdictional reach under the Clean Water Act over waters of the United States, including wetlands. In 2017, the EPA and the Corps under the Trump Administration agreed to reconsider the 2015 rule and, thereafter, on October 22, 2019, the agencies published a final rule made effective on December 23, 2019, rescinding the 2015 rule. On January 23, 2019, the two agencies issued a final rule re-defining such jurisdiction, which redefinition is narrower than found in the 2015 rule. Upon being published in the Federal Register and the passage of 60 days thereafter, the January 23, 2020 final rule will become effective, at which point the United States will be covered under a single regulatory scheme as it relates to federal jurisdictional reach over waters of the United States. However, there remains the expectation that the January 23, 2020 final rule also will be legally challenged in federal district court. To the extent that any challenge to the January 23, 2020 final rule is successful and the 2015 rule or a revised rule expands the scope of the Clean Water Act's jurisdiction in areas where the Debtor or their customers conduct operations, the Debtors or their customers could incur increased costs and delays or cancellations, which could reduce demand for the Debtors' products and services.

The Debtors may not be able to comply with any new or amended environmental or worker health and safety laws and regulations, and any such new or amended laws and regulations could have a material adverse effect on their operating results by requiring the Debtors to modify their operations or equipment or shut down their facilities. Additionally, the Debtors' customers may not be able to comply with new or amended environmental or worker health and safety laws and regulations, which could cause their customers to curtail or cease their operations, which could significantly reduce the demand for the Debtors' products and services. The Debtors cannot at this time reasonably estimate their costs of compliance or the timing of any costs associated with any new or amended environmental or worker health and safety laws and regulations, or any material adverse effect that any such standards will have on their customers and, consequently, on their operations.

US-DOCS\117417332.2

**26.     Silica-Related Legislation, Health Issues and Litigation Could Have a Material Adverse Effect on the Debtors' Business, Reputation or Results of Operations.**

The Debtors are subject to laws and regulations relating to human exposure to crystalline silica. Several federal and state regulatory authorities, including MSHA and OSHA, may continue to propose and implement changes in their regulations regarding workplace exposure to crystalline silica, such as permissible exposure limits and required controls and personal protective equipment.  For example, in 2016, OSHA published a final rule that established a more stringent permissible exposure limit for respirable crystalline silica and provided other provisions to protect employees, such as requirements for exposure assessments, methods for controlling exposure, respiratory protection, medical surveillance, hazard communication, and recording. Compliance with most aspects of the 2016 rule relating to hydraulic fracturing was required by June 2018, and the 2016 rule further requires compliance with engineering control obligations to limit exposures to respirable crystalline silica in connection with hydraulic fracturing activities by June 2021. While compliance with the requirements of the 2016 rule may result in significant operating costs or capital expenditures, the Debtors do not expect such compliance will have a material adverse effect on their results of operations. In the event and to the extent that additional legal requirements with respect to limiting human exposure to crystalline silica are adopted in the future, the Debtors may not be able to comply with such new legal requirements, and any such new requirements could have a material adverse effect on their operating results by requiring them to modify or cease their operations.

**27.     The Debtors Are Subject to the MSH Act and the OSH Act, Both of Which Impose Stringent Health and Safety Standards on Numerous Aspects of Their Operations.**

The Debtors' operations are subject to the MSH Act, as amended by the Mine Improvement and New Emergency Response Act of 2006, as well as the OSH Act, including but not limited to the OSHA rule imposing more stringent requirements regarding respirable crystalline silica that was published in 2016 and most of which requirements became effective in June 2018. The MSH Act and the OSH Act impose stringent health and safety standards on numerous aspects of the Debtors' operations inclusive of mineral extraction and processing operations, transportation and transloading of silica and delivery of silica sand to wellsites. These standards include the training of personnel, operating procedures, operating and safety equipment, and other matters. The Debtors' failure to comply with such standards or changes in such standards or the reinterpretation or more stringent enforcement thereof, could have a material adverse effect on their business and financial condition or otherwise impose significant restrictions on their ability to conduct operations.

**28.     The Debtors and Their Customers Are Subject to Other Extensive Regulations, Including Plant and Wildlife Protection and Reclamation Regulation, That Impose, and Will Continue to Impose, Significant Costs and Liabilities.  In Addition, Future Regulations, or More Stringent Enforcement of Existing Regulations, Could Increase Those Costs and Liabilities, Which Could Adversely Affect the Debtors' Results of Operations.**

In addition to the regulatory matters described above in other risk factors, the Debtors and their customers are subject to other extensive laws and regulations on matters such as plant and wildlife protection, wetlands protection, reclamation and restoration activities at mining properties after mining is completed, the discharge of materials into the environment, and the effects that mining and hydraulic fracturing have on groundwater quality and availability. The Debtors' future success depends, among other things, on the quantity and quality of their frac sand deposits, their ability to extract these deposits profitably, and their customers being able to operate their businesses as they currently do.

81

In order to obtain permits and renewals of permits with respect to these other regulatory matters in the future, the Debtors may be required to prepare and present data to governmental authorities pertaining to the potential adverse impact that any proposed excavation or production activities, individually or in the aggregate, may have on the environment. Certain approval procedures may require preparation of archaeological surveys, endangered species studies, and other studies to assess the environmental impact of new sites or the expansion of existing sites. Compliance with these regulatory requirements is expensive and significantly lengthens the time needed to develop a site. Finally, obtaining or renewing required permits is sometimes hindered due to community opposition and other factors beyond the Debtors' control. The denial of a permit essential to their operations or the imposition of conditions with which it is not practicable or feasible to comply could impair or prevent their ability to develop or expand a site. Significant opposition to a permit by neighboring property owners, members of the public, or other third parties, or delay in the environmental review and permitting process also could delay or impair the Debtors' ability to develop or expand a site. New legal requirements, including those related to the protection of the environment, could be adopted that could materially adversely affect the Debtors' mining operations (including their ability to extract or the pace of extraction of mineral deposits), their cost structure, or their customers' ability to use the Debtors' frac sand. Such current or future regulations could have a material adverse effect on the Debtors' business and they may not be able to obtain or renew permits in the future.

29. **The Debtors' Inability to Acquire, Maintain or Renew Financial Assurances Related to the Reclamation and Restoration of Mining Property Could Have a Material Adverse Effect on Their Business, Financial Condition and Results of Operations.**

The Debtors are generally obligated to restore property in accordance with regulatory standards and their approved reclamation plan following the completion of mining activities at the property. The Debtors are required under federal, state, and local laws to maintain financial assurances, such as surety bonds, to secure such obligations. The inability to acquire, maintain or renew such assurances, as required by federal, state, and local laws, could subject the Debtors to fines and penalties as well as the revocation of their operating permits. Such inability could result from a variety of factors, including:

- The lack of availability, higher expense, or unreasonable terms of such financial assurances;

- The ability of current and future financial assurance counterparties to increase required collateral; and

- The exercise by financial assurance counterparties of any rights to refuse to renew the financial assurance instruments.

The Debtors' inability to acquire, maintain, or renew necessary financial assurances related to the reclamation and restoration of mining property could have a material adverse effect on their business, financial conditions, and results of operations.

D. **RISKS ASSOCIATED WITH FORWARD-LOOKING STATEMENTS**

1. **The Financial Information Contained Herein Is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit Was Performed.**

**The financial information contained in this Disclosure Statement has not been audited.** In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement,

82

and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

2.      **Financial Projections and Other Forward-Looking Statements Are Not Assured, Are Subject to Inherent Uncertainty Due to the Numerous Assumptions Upon Which They Are Based and, as a Result, Actual Results May Vary.**

This Disclosure Statement contains various projections concerning the financial results of the Reorganized Debtors' operations, including the Financial Projections, that are, by their nature, forward-looking, and which projections are necessarily based on certain assumptions and estimates. Should any or all of these assumptions or estimates ultimately prove to be incorrect, the actual future experiences of the Reorganized Debtors may turn out to be different from the Financial Projections.

Specifically, the projected financial results contained in this Disclosure Statement reflect numerous assumptions concerning the anticipated future performance of the Reorganized Debtors, some of which may not materialize, including, without limitation, assumptions concerning: (a) the timing of confirmation and consummation of the Plan in accordance with its terms; (b) the anticipated future performance of the Reorganized Debtors, including, without limitation, the Reorganized Debtors' ability to maintain or increase revenue and gross margins, control future operating expenses or make necessary capital expenditures; (c) general business and economic conditions; (d) overall industry performance and trends; (e) the Debtors' and Reorganized Debtors' ability to maintain market strength and receive vendor support by way of favorable commercial terms; and (f) anticipated future commodity prices.

DUE TO THE INHERENT UNCERTAINTIES ASSOCIATED WITH PROJECTING FINANCIAL RESULTS GENERALLY, THE PROJECTIONS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD <u>NOT</u> BE CONSIDERED ASSURANCES OR GUARANTEES OF THE AMOUNT OF FUNDS OR THE AMOUNT OF CLAIMS THAT MAY BE ALLOWED IN THE VARIOUS CLASSES. WHILE THE DEBTORS BELIEVE THAT THE FINANCIAL PROJECTIONS CONTAINED IN THIS DISCLOSURE STATEMENT ARE REASONABLE, THERE CAN BE NO ASSURANCE THAT THEY WILL BE REALIZED.

E.      **DISCLOSURE STATEMENT DISCLAIMER**

1.      **The Information Contained Herein Is for Soliciting Votes Only.**

The information contained in this Disclosure Statement is for purposes of soliciting votes on the Plan and may not be relied upon for any other purpose.

2.      **This Disclosure Statement Was Not Approved by the Securities and Exchange Commission.**

This Disclosure Statement has not been filed with the SEC or any state regulatory authority. Neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

US-DOCS\117417332.2

3.      **The Debtors Relied on Certain Exemptions from Registration Under the Securities Act.**

This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Rule 3016(b) of the Federal Rules of Bankruptcy Procedure and is not necessarily in accordance with the requirements of federal or state securities laws or other similar laws.  All Plan Securities issued to Holders of Allowed Claims on account of their respective Claims will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance on section 1145(a) of the Bankruptcy Code; _provided_ that all Plan Securities issued (a) to Holders of Allowed Claims as Rights Offering Participants in the Rights Offering upon exercise of their respective Subscription Rights or upon subsequent conversion of their New Secured Convertible Notes into New Equity Interests, or (b) to the Backstop Parties pursuant to the Backstop Purchase Agreement (i) in satisfaction of their obligations to purchase any Unsubscribed Notes or (ii) in connection with the Put Option Notes, in each case, including upon any subsequent conversion of such New Secured Convertible Notes into New Equity Interests, will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance on Section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder.  To the maximum extent permitted by section 1145 of the Bankruptcy Code, the Securities Act and other applicable nonbankruptcy law, the distribution and issuance, as applicable, of the Plan Securities and Documents will be exempt from registration under the Securities Act by virtue of section 1145 of the Bankruptcy Code or section 4(a)(2) of the Securities Act.  Because such securities are being distributed pursuant to exemptions from registration under the Securities Act, recipients of such securities will not have the benefit of a registration statement being on file with respect to such securities.

4.      **This Disclosure Statement Contains Forward-Looking Statements.**

This Disclosure Statement contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.  Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward-looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology.  The reader is cautioned that all forward-looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements.  The liquidation analysis, distribution projections and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted.  Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

5.      **No Legal or Tax Advice Is Provided to You by this Disclosure Statement.**

**This Disclosure Statement is not legal advice to you.**  The contents of this Disclosure Statement should not be construed as legal, business or tax advice.  Each Holder of a Claim or an Equity Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Equity Interest.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

6.      **No Admissions Are Made by This Disclosure Statement.**

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, any Debtor) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, Holders of Allowed Claims or Equity Interests or any other parties in interest.

US-DOCS\117417332.2

7.      **No Reliance Should be Placed on any Failure to Identify Litigation Claims or Projected Objections.**

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Equity Interest is, or is not, identified in this Disclosure Statement.  The Debtors or the Reorganized Debtors may seek to investigate, file and prosecute Claims or causes of action and may object to Claims after the Confirmation Date or Effective Date of the Plan irrespective of whether the Disclosure Statement identifies such Claims, causes of action or objections to Claims.

8.      **Nothing Herein Constitutes a Waiver of any Right to Object to Claims or Recover Transfers and Assets.**

The vote by a Holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors or the Reorganized Debtors (or any party in interest, as the case may be) to object to that Holder's Allowed Claim or recover any preferential, fraudulent or other voidable transfer or assets, regardless of whether any Claims or Causes of Action of the Debtors or its Estate are specifically or generally identified herein.

9.      **The Information Used Herein Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors.**

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement.  Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

10.      **The Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update.**

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date.  While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.  Furthermore, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

11.      **No Representations Made Outside the Disclosure Statement Are Authorized.**

No representations concerning or relating to the Debtors, the Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision.  You should promptly report unauthorized representations or inducements to counsel to the Debtors and the United States Trustee.

85

**VII.**
**ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN**

**A.      LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE**

If the Plan or an alternative chapter 11 plan of reorganization cannot be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which case, a trustee would be elected or appointed to liquidate the Debtors' assets.  A discussion of the effect a chapter 7 liquidation would have on the recovery of Holders of Claims is set forth in Section V.B herein, titled "Statutory Requirements for Confirmation of the Plan."  The Debtors believe that liquidation under chapter 7 would result in (i) smaller or equal distributions being made to creditors entitled to a recovery than those provided for in the Plan based on the liquidation value of the Debtors' assets and because of the additional administrative expenses involved in the appointment of a trustee and attorneys and other professionals to assist such trustee, (ii) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of unexpired leases and executory contracts in connection with the cessation of the Debtors' operations, and (iii) the failure to realize the greater, going-concern value of all of the Debtors' assets.

**B.      FILING OF AN ALTERNATIVE PLAN OF REORGANIZATION**

If the Plan is not confirmed, the Debtors or any other party in interest could attempt to formulate a different chapter 11 plan of reorganization.  Such a plan might involve either a reorganization and continuation of the Debtors' businesses or an orderly liquidation of the Debtors' assets.  As discussed above, during the negotiations prior to the filing of the Chapter 11 Cases and the Plan, the Debtors explored various alternatives to the Plan.

The Debtors believe that the Plan, and the associated Exit Facility Credit Agreement, Rights Offering, and Backstop Commitment under the Backstop Purchase Agreement, the material terms for each of which was negotiated and agreed before the Petition Date in the Restructuring Support Agreement, enable the Debtors to emerge from chapter 11 successfully and expeditiously, preserving their businesses and allowing their creditors to realize the highest recoveries under the circumstances.  In a liquidation under chapter 11 of the Bankruptcy Code, the assets of the Debtors would be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7, and a trustee need not be appointed.  Accordingly, creditors would receive greater recoveries than in a chapter 7 liquidation.  Although a chapter 11 liquidation is preferable to a chapter 7 liquidation, the Debtors believe that a liquidation under chapter 11 is a much less attractive alternative to creditors than the Plan because the Plan provides for a greater return to creditors.

The prolonged continuation of the Chapter 11 Cases is likely to adversely affect the Debtors' businesses and operations.  So long as the Chapter 11 Cases continue, senior management of the Debtors will be required to spend a significant amount of time and effort dealing with the Debtors' reorganization instead of focusing exclusively on business operations.  In addition, the longer the Chapter 11 Cases continue, the more likely it is that the Debtors' vendors and service providers will lose confidence in the Debtors' ability to reorganize their businesses successfully and will seek to establish alternative commercial relationships.  Furthermore, so long as the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the proceedings.  The prolonged continuation of the Chapter 11 Cases may also result in the termination of the Restructuring Support Agreement or a default under the DIP Facilities.  In addition, the Debtors may no longer be permitted to use cash collateral on a consensual basis.  Under these circumstances, it is unlikely the Debtors could successfully reorganize without damage to their business operations and material decreases in recoveries for creditors.

86

# VIII.
# EXEMPTIONS FROM SECURITIES ACT REGISTRATION

## SECTION 1145 OF THE BANKRUPTCY CODE AND SECTION 4(A)(2) OF THE SECURITIES ACT

All Plan Securities issued to Holders of Allowed Claims on account of their respective Claims will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance on section 1145(a) of the Bankruptcy Code; *provided* that all Plan Securities issued (a) to Holders of Allowed Claims as Rights Offering Participants in the Rights Offering upon exercise of their respective Subscription Rights or upon subsequent conversion of their New Secured Convertible Notes into New Equity Interests, or (b) to the Backstop Parties pursuant to the Backstop Purchase Agreement (i) in satisfaction of their obligations to purchase any Unsubscribed Notes or (ii) in connection with the Put Option Notes, in each case, including upon any subsequent conversion of such New Secured Convertible Notes into New Equity Interests, will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance on Section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder.

### 1.      Securities Issued in Reliance on Section 1145 of the Bankruptcy Code

Under the Plan, the Plan Securities and Documents will be issued to certain Holders of Allowed Claims in reliance upon section 1145(a)(1) of the Bankruptcy Code (collectively, the "**1145 Securities**"). Section 1145(a)(1) of the Bankruptcy Code provides that the securities registration requirements of federal and state securities laws do not apply to the offer or sale of a security by a debtor if:

- the offer or sale occurs under a plan of reorganization;

- the recipients of such security hold a claim against, an interest in or claim for administrative expense in the case concerning the debtor; and

- such security is offered in exchange for a claim against, an interest in or claim for administrative expense in the case concerning the debtor, or is offered principally in such exchange and partly for cash and property.

### 2.      Resale of 1145 Securities by Affiliates of the Reorganized Debtors

Pursuant to section 1145(c) of the Bankruptcy Code, an offer or sale of the 1145 Securities is deemed to be a public offering. The 1145 Securities may be resold without registration under (a) state securities or "blue sky" laws pursuant to various exemptions provided by the respective laws of the several states and (b) the Securities Act pursuant to an exemption provided by Section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" (as such term is defined in the Bankruptcy Code) with respect to the 1145 Securities. Section 1145(b)(1)(D) of the Bankruptcy Code defines an "underwriter" to include any person who is an issuer with respect to the securities, as the term "issuer" is defined in the Securities Act.

The term "issuer" is defined in Section 2(a)(4) of the Securities Act; however, the reference contained in section 1145(b)(1)(D) of the Bankruptcy Code to Section 2(a)(11) of the Securities Act purports to include as statutory underwriters all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by or are under common control with, an issuer of securities. "Control" (as defined in Rule 405 under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise. Accordingly, an officer or director of a

87

reorganized debtor or its successor under a plan of reorganization may be deemed to be a "control person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. Moreover, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of the securities of a reorganized debtor may be presumed to be a "control person."

### 3.     Resale of the 1145 Securities by Restricted Holders

Furthermore, section 1145(b)(1)(A)-(C) of the Bankruptcy Code defines an "underwriter" to include any person who:

- purchases a claim against, an interest in, or a claim for an administrative expense in the case concerning the debtor, if such purchase is with a view to distributing any security received in exchange for such a claim or interest;

- offers to sell securities offered under a plan of reorganization for the holders of such securities; or

- offers to buy those securities from the holders of the securities, if the offer to buy is (i) with a view to distributing such securities and (ii) under an agreement made in connection with the plan of reorganization, the completion of the plan of reorganization or with the offer or sale of securities under the plan of reorganization.

We refer to persons who fall under section 1145(b)(1)(A)-(C) of the Bankruptcy Code as "**Restricted Holders**".  Resale of the 1145 Securities by such Restricted Holders would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act.  Restricted Holders would, however, be permitted to sell the New Equity Interests or the other 1145 Securities, as applicable, without registration if they are able to comply with the provisions of Rule 144 under the Securities Act, as described further below, or if such securities are registered with the SEC pursuant to a registration agreement or otherwise.  Any person who is a "Restricted Holder" but not an "issuer" with respect to an offer of the 1145 Securities is, in addition, entitled to engage in exempt "ordinary trading transactions" within the meaning of section 1145(b)(1) of the Bankruptcy Code.

### 4.     Resale of Plan Securities Issued Pursuant to Section 4(a)(2)

Plan Securities issued pursuant to the exemption from registration set forth in Section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder, including (a) all New Secured Convertible Notes issued in connection with the Rights Offering, (b) all Unsubscribed Notes purchased by the Backstop Parties in accordance with their obligations under the Backstop Purchase Agreement, (c) all Put Option Notes issued to the Backstop Parties as consideration for their Backstop Commitments under the Backstop Purchase Agreement, and (d) for all of the New Secured Convertible Notes referenced in (a) through (c) of this paragraph, any New Equity Interests issued upon any subsequent conversion of the New Secured Convertible Notes, and will each be "restricted securities" as defined under Rule 144.  Resales of such restricted securities would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law.  Holders of restricted securities would, however, be permitted to resell such Plan Securities without registration if they are able to comply with the applicable provisions of Rule 144, as described further below, or any other registration exemption under the Securities Act, or if such Plan Securities are registered with the SEC.

88

5.      **Rule 144**

All Plan Securities issued under Section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder will be "restricted securities" under Rule 144.  Under certain circumstances, Restricted Holders and holders of "restricted securities" may be entitled to resell their securities pursuant to the limited safe harbor resale provisions under Rule 144 of the Securities Act, to the extent available and in compliance with applicable state and foreign securities laws.

Rule 144 provides an exemption for the public resale of "restricted securities" if certain conditions are met. These conditions vary depending on whether the holder of the restricted securities has been an affiliate of the issuer at any time during the three months preceding a resale.  An affiliate is defined as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the issuer."

The Debtors currently expect that the Reorganized Debtors will not be required to file, and will not file, periodic reports under the Exchange Act.  The Debtors also currently expect that the Reorganized Debtors will make certain current public information required under Rule 144 available regarding the Reorganized Debtors, although not through periodic reports under the Exchange Act.  In such a case, a non-affiliate who has not been an affiliate of the issuer during the preceding three months may resell restricted securities under Rule 144 after the expiration of a one-year holding period.

Also, in such a case, an affiliate (or a non-affiliate who was an affiliate at any time during the three months prior to the sale of the restricted securities) may resell restricted securities after the twelve-month holding period, *provided*, *however*, that an affiliate (or such non-affiliate) must also comply with the volume, manner of sale and notice requirements of Rule 144.  First, the rule limits the number of restricted securities (plus any unrestricted securities) sold for the account of an affiliate (and related persons) in any three-month period to the greater of 1% of the outstanding securities of the same class being sold, or, if the class is listed on a stock exchange, the greater of 1% of the average weekly reported volume of trading in such restricted securities during the four weeks preceding the filing of a notice of proposed sale on Form 144. Second, the manner of sale requirement provides that the restricted securities must be sold in a broker's transaction, which generally means they must be sold through a broker and handled as a routine trading transaction. The broker must receive no more than the usual commission and cannot solicit orders for the sale of the restricted securities except in certain situations. Third, if the sale exceeds 5,000 restricted securities or has an aggregate sale price greater than $50,000, an affiliate must file with the SEC three copies of a notice of proposed sale on Form 144. The sale must occur within three months of filing the notice unless an amended notice is filed.

The Debtors believe that the exemption provided under Rule 144 will not be available with respect to any Plan Securities issued pursuant to Section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder (whether held by non-affiliates or affiliates), or with respect to any Plan Securities issued pursuant to section 1145 of the Bankruptcy Code held by Restricted Holders or affiliates of the Reorganized Debtors, until at least twelve months after the Effective Date.  Accordingly, holders of such Plan Securities will be required to hold their Plan Securities for at least twelve months and, thereafter, to sell them only in accordance with the applicable requirements of Rule 144, including the provision by the Reorganized Debtors of certain current public information and, to the extent such holder is an affiliate of the issuer, the above-mentioned volume limitations.

Pursuant to the Plan, certificates evidencing Plan Securities issued pursuant to section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder will bear a legend substantially in the form below (the "**Legend**"):

89

"THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR APPLICABLE STATE SECURITIES LAWS ("STATE ACTS") AND MAY NOT BE SOLD, ASSIGNED, PLEDGED OR TRANSFERRED OR OTHERWISE DISPOSED OF UNLESS THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR STATE ACTS COVERING SUCH SECURITIES OR THE SECURITIES ARE SOLD AND TRANSFERRED IN A TRANSACTION THAT IS EXEMPT FROM OR NOT SUBJECT TO THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF THE ACT OR STATE ACTS."

**WHETHER OR NOT ANY PARTICULAR PERSON WOULD BE DEEMED TO BE AN "UNDERWRITER" OF SECURITIES TO BE ISSUED PURSUANT TO THE PLAN OR AN "AFFILIATE" OF REORGANIZED PARENT WOULD DEPEND UPON VARIOUS FACTS AND CIRCUMSTANCES APPLICABLE TO THAT PERSON.  ACCORDINGLY, THE DEBTORS EXPRESS NO VIEW AS TO WHETHER ANY SUCH PERSON WOULD BE SUCH AN "UNDERWRITER" OR AN "AFFILIATE."  IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN "UNDERWRITER" OR AN "AFFILIATE" OF REORGANIZED PARENT, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN SECURITIES OF REORGANIZED PARENT.  ACCORDINGLY, THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.**

Additionally, any of the 1145 Securities held by an identified Restricted Holder will be issued bearing the Legend on any certificates evidencing such securities.

US-DOCS\117417332.2

## IX.
## CERTAIN U.S. FEDERAL INCOME
## TAX CONSEQUENCES OF THE PLAN

### A.    INTRODUCTION

The following discussion summarizes certain U.S. federal income tax consequences that are expected to result from the consummation of the Plan. This discussion is only for general information purposes and only describes certain of the expected tax consequences to the Debtors and to U.S. Holders and Non-U.S. Holders (each as defined below) of Claims who are entitled to vote to accept or reject the Plan.  This discussion is based on the Internal Revenue Code of 1986, as amended (the "**IRC**"), Treasury Regulations promulgated thereunder, judicial decisions, and published rulings and administrative pronouncements of the Internal Revenue Service (the "**IRS**"), all as in effect on the date of this Disclosure Statement. These authorities may change, possibly with retroactive effect, resulting in U.S. federal income tax consequences different from those discussed below.  No ruling has been or is intended to be sought from the IRS, and no legal opinion of counsel will be rendered, with respect to the matters discussed below. There can be no assurance that the IRS will not take a contrary position regarding the U.S. federal income tax consequences resulting from the consummation of the Plan or that any contrary position would not be sustained by a court.

This summary does not address state, local, foreign or non-income tax consequences of the consummation of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its particular circumstances, including the impact of the tax on net investment income imposed by IRC Section 1411.  In addition, this summary does not address considerations that may be relevant to Holders subject to special tax rules, such as "qualified foreign pension funds" (as defined in IRC Section 897(l)(2)), entities all of the interests of which are held by qualified foreign pension funds, controlled foreign corporations, passive foreign investment companies, real estate investment trusts, registered investment companies, financial institutions, insurance companies, brokers, dealers or traders in securities, commodities or currencies, tax-exempt organizations, tax-qualified retirement plans, partnerships and other pass-through entities, Holders subject to the alternative minimum tax, Holders eligible for the benefits of a tax treaty with respect to their Claims, the Plan or any consideration received in exchange for their Claims pursuant to the Plan, Holders who use installment method reporting with respect to their Claims, Holders holding Claims as part of a hedge, straddle or other risk reduction strategy or as part of a conversion transaction or other integrated investment, Holders who received Equity Interests pursuant to the exercise of any employee stock option or otherwise as compensation and U.S. Holders who have a functional currency other than the U.S. dollar.

This summary assumes that Holders of the Prepetition Notes have held such property as "capital assets" within the meaning of IRC Section 1221 (generally, property held for investment) and that holders of the New Equity Interests will hold such property as capital assets.  In addition, this discussion assumes that the Debtors' obligations under the Prepetition Notes and General Unsecured Claims will be treated as debt for U.S. federal income tax purposes.

**HOLDERS SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE U.S. FEDERAL INCOME TAX CONSEQUENCES TO THEM OF THE CONSUMMATION OF THE PLAN AND THE OWNERSHIP AND DISPOSITION OF NEW EQUITY INTERESTS RECEIVED PURSUANT TO THE PLAN, AS WELL AS ANY TAX CONSEQUENCES ARISING UNDER ANY STATE, LOCAL OR FOREIGN TAX LAWS OR ANY OTHER FEDERAL TAX LAWS.**

91

**B.       CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES TO THE DEBTORS**

**1.       Cancellation of Indebtedness and Reduction of Tax Attributes**

Upon consummation of the Plan, the Debtors are expected to realize cancellation of indebtedness ("**COD**") income to the extent the adjusted issue price of the Claims exchanged pursuant to the Plan exceeds the amount of cash and the fair market value of any other property treated as received in exchange for such Claims. The amount of COD income that will be realized by the Debtors is uncertain because it will depend on, among other things, the fair market value of the New Equity Interests on the Effective Date.

Under IRC Section 108, COD income realized by a debtor will be excluded from gross income if the discharge of debt occurs in a case brought under the Bankruptcy Code, the debtor is under the court's jurisdiction in such case and the discharge is granted by the court or is pursuant to a plan approved by the court (the "**Bankruptcy Exception**").  Because the Bankruptcy Exception should apply to the transactions consummated pursuant to the Plan, the Debtors should be entitled to exclude from gross income any COD income realized as a result of the implementation of the Plan.

Under IRC Section 108(b), a debtor that excludes COD income from gross income under the Bankruptcy Exception generally must reduce certain tax attributes by the amount of the excluded COD income.  Attributes subject to reduction include net operating losses ("**NOLs**"), NOL carryforwards and certain other losses, credits and carryforwards, and the debtor's tax basis in its assets (including stock of subsidiaries).  In the case of a group of corporations filing a consolidated return the attribute reduction rules apply first to the separate attributes of or attributable to the particular corporation whose debt is being discharged, and then, if necessary, to certain attributes of other members of the group. Accordingly, COD income of a debtor would result first in the reduction of any NOLs and other attributes, including asset tax basis, of or attributable to such debtor, and then, potentially, of consolidated NOLs and/or asset tax basis of or attributable to other members of the group. The reduction in a debtor's tax basis in its assets generally does not have to exceed the excess of (i) its tax basis in assets held immediately after the discharge of indebtedness over (ii) the amount of liabilities remaining immediately after the discharge of indebtedness (the "**Liability Floor**").  In general, tax attributes will be reduced in the following order: (a) NOLs and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets (but not below the Liability Floor); (f) passive activity loss and credit carryovers; and (g) foreign tax credit carryovers.  However, a debtor may elect under IRC Section 108(b)(5) (the "**Section 108(b)(5) Election**") to reduce its basis in its depreciable property first. If a debtor makes a Section 108(b)(5) Election, the Liability Floor does not apply to the reduction in basis of depreciable property.  For tax periods through the 2019 tax year, the Debtors anticipate to report on their U.S. federal income tax returns approximately $45 million of consolidated NOLs and NOL carryforwards.  The Debtors believe that for U.S. federal income tax purposes, the Debtors' consolidated group (the "**Debtor Group**") likely will generate additional NOLs for the 2020 tax year.  However, the amount of the Debtor Group's 2020 NOLs will not be determined until the Debtor Group prepares its consolidated U.S. federal income tax returns for such period. Moreover, the Debtor Group's NOLs are subject to audit and possible challenge by the IRS. Accordingly, the amount of the Debtor Group's NOLs ultimately may vary from the amounts set forth above.

**2.       Section 382 Limitation on Net Operating Losses and Built-In Losses**

Under IRC Section 382, if a corporation or a consolidated group of corporations with NOLs, interest deductions suspended under IRC Section 163(j) (collectively with NOLs and certain other tax attributes, "**Pre-Change Tax Attributes**") or built-in losses (a "**loss corporation**") undergoes an "ownership change," the loss corporation's use of its Pre-Change Tax Attributes and recognized built-in losses ("**RBILs**") generally will be subject to an annual limitation in the post-change period.  In general,

92

an "ownership change" occurs if the percentage of the value of the loss corporation's stock owned by one or more direct or indirect "five percent shareholders" increases by more than fifty percentage points over the lowest percentage of value owned by the five percent shareholders at any time during the applicable testing period (an "**Ownership Change**").  The testing period generally is the shorter of (i) the three-year period preceding the testing date or (ii) the period of time since the most recent Ownership Change of the corporation.

Subject to the special bankruptcy rules discussed below, the amount of the annual limitation on a loss corporation's use of its Pre-Change Tax Attributes and RBILs is generally equal to the product of the applicable long-term tax-exempt rate (as published by the IRS for the month in which the Ownership Change occurs) and the value of the loss corporation's outstanding stock immediately before the Ownership Change (excluding certain capital contributions).  If a loss corporation has a net unrealized built-in gain (a "**NUBIG**") immediately prior to the Ownership Change, the annual limitation may be increased as certain gains are recognized during the five-year period beginning on the date of the Ownership Change (the "**Recognition Period**").  If a loss corporation has a net unrealized built-in loss (a "**NUBIL**") immediately prior to the Ownership Change, certain losses recognized during the Recognition Period also would be subject to the annual limitation and thus may reduce the amount of Pre-Change Tax Attributes that could be used by the loss corporation during the Recognition Period.

A NUBIG or NUBIL is generally the difference between the fair market value of a loss corporation's assets (or, if greater, the amount of a loss corporation's relevant liabilities) and its tax basis in the assets, subject to a statutorily-defined threshold amount. The amount of a loss corporation's NUBIG or NUBIL must be adjusted for built-in items of income or deduction that would be attributable to a pre-change period if recognized during the Recognition Period. The NUBIG or NUBIL of a consolidated group generally is calculated on a consolidated basis, subject to special rules.

If a loss corporation has a NUBIG immediately prior to an Ownership Change, any recognized built-in-gains ("**RBIGs**") will increase the annual limitation in the taxable year the RBIGs are recognized. An RBIG generally is any gain (and certain income) with respect to an asset held immediately before the date of the Ownership Change that is recognized during the Recognition Period to the extent of the fair market value of the asset over its tax basis immediately prior to the Ownership Change. The aggregate amount of all RBIGs that are recognized during the Recognition Period, however, may not exceed the NUBIG. On the other hand, if a loss corporation has a NUBIL immediately prior to an Ownership Change, any RBILs will be subject to the annual limitation in the same manner as Pre-Change Tax Attributes. An RBIL generally is any loss (and certain deductions) with respect to an asset held immediately before the date of the Ownership Change that is recognized during the Recognition Period to the extent of the excess of the tax basis of the asset over its fair market value immediately prior to the Ownership Change. The aggregate amount of all RBILs that are recognized during the Recognition Period, however, may not exceed the NUBIL. RBIGs and RBILs may be recognized during the Recognition Period for depreciable and amortizable assets that are not actually disposed of by the loss corporation. The Debtors believe that the Debtor Group may have a NUBIL on the Effective Date.

An Ownership Change prior to the Effective Date would result in an annual limitation on the Debtors' use of the Debtor Group's NOLs (and possibly other tax attributes) attributable to the period prior to such date. It is likely that any change in ownership prior to the Effective Date would result in a significant portion of the Debtor Group's existing NOLs (and possibly other tax attributes) being unusable in periods after such Ownership Change. The Debtors expect the consummation of the Plan will result in an Ownership Change of the Debtor Group. Because the Ownership Change will occur in a case brought under the Bankruptcy Code, one of the following two special rules should apply in determining the Debtor Group's ability to use Pre-Change Tax Attributes and RBILs in post-Effective Date tax periods provided there is no Ownership Change of the Debtor Group prior to the Effective Date.

93

Under IRC Section 382(l)(5), an Ownership Change in bankruptcy will not result in any annual limitation on the debtor's Pre-Change Tax Attributes and RBILs arising during the Recognition Period if the stockholders and qualified creditors of the debtor receive at least 50% of the stock (by vote and value) of the reorganized debtor (or of a controlling corporation if also in bankruptcy) in the bankruptcy reorganization as a result of being shareholders or creditors of the debtor.  Instead, the debtor's pre-change NOLs are reduced by the amount of any interest deductions with respect to debt converted into stock in the bankruptcy reorganization that were allowed in the three full taxable years preceding the taxable year in which the Ownership Change occurs and in the part of the taxable year prior to and including the date of the Ownership Change attributable to the bankruptcy reorganization (the "**Plan Ownership Change**").   If any Pre-Change Tax Attributes of the debtor already are subject to an annual usage limitation under IRC Section 382 at the time of an Ownership Change subject to IRC Section 382(l)(5), however, those Pre-Change Tax Attributes will continue to be subject to such limitation.

A qualified creditor is any creditor who has held the debt of the debtor for at least eighteen months prior to the petition date or who has held "ordinary course indebtedness" that has been owned at all times by such creditor.   A creditor who does not become a direct or indirect five percent shareholder of the reorganized debtor (or of a controlling corporation if also in bankruptcy) generally may be treated by the debtor as having always held any debt owned immediately before the Ownership Change, unless the creditor's participation in formulating the plan of reorganization makes evident to the debtor that the creditor has not owned the debt for the requisite period.

A debtor may elect not to apply IRC Section 382(l)(5) to an Ownership Change that otherwise satisfies its requirements.  This election must be made on the debtor's U.S. federal income tax return for the taxable year in which the Ownership Change occurs.  If IRC Section 382(l)(5) applies to an Ownership Change (and the debtor does not elect out), any subsequent Ownership Change of the debtor within the two-year period following the date of the Plan Ownership Change will result in the debtor being unable to use any pre-change losses in any taxable year ending after such subsequent Ownership Change to offset future taxable income.

If an Ownership Change pursuant to a bankruptcy plan does not satisfy the requirements of IRC Section 382(l)(5), or if a debtor elects not to apply IRC Section 382(l)(5), the debtor's use of its Pre-Change Tax Attributes and RBILs arising during the Recognition Period will be subject to an annual limitation as determined under IRC Section 382(l)(6).  In such case, the amount of the annual limitation generally will be equal to the product of the applicable long-term tax-exempt rate (0.89% for July 2020) and the value of the debtor's outstanding stock immediately after the bankruptcy reorganization, provided such value may not exceed the value of the debtor's gross assets immediately before the Ownership Change, subject to certain adjustments.  If any Pre-Change Tax Attributes or RBILs of the debtor already are subject to an annual limitation at the time of an Ownership Change subject to IRC Section 382(l)(6), however, those Pre-Change Tax Attributes and RBILs will be subject to the lower of the two annual limitations.

The Debtors are unable to determine whether the Ownership Change expected to result from the consummation of the Plan may satisfy the requirements of IRC Section 382(l)(5), as such determination will depend on the extent to which Holders of Prepetition Notes Claims and General Unsecured Claims, immediately prior to consummation of the Plan, may be treated as qualified creditors for purposes of IRC Section 382(l)(5).  Even if the Plan satisfies the requirements of IRC Section 382(l)(5), the Debtors  currently intend to elect out of the application of IRC Section 382(l)(5), in which case, the Debtor Group's Pre-Change Tax Attributes remaining after reduction for excluded COD income along with RBILs arising during the Recognition Period will be subject to an annual limitation generally equal to the product of the long-term tax-exempt rate for the month in which the Plan Ownership Change occurs and the value of the Debtor's outstanding stock immediately after consummation of the Plan pursuant to

94

IRC Section 382(l)(6).   Pre-Change Tax Attributes and RBILs not used in a given year due to the annual limitation may be carried forward for use in future years until their expiration dates.   To the extent the annual limitation of the Reorganized Debtors' consolidated group (the "**Reorganized Debtor Group**") exceeds the Reorganized Debtor Group's taxable income (for purposes of IRC Section 382) in a given year, the excess will increase the annual limitation in future taxable years.

**C.   CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF PREPETITION NOTES CLAIMS AND GENERAL UNSECURED CLAIMS**

**1.   Definition of U.S. Holder and Non-U.S. Holder**

A "U.S. Holder" is a beneficial owner of Prepetition Notes Claims, General Unsecured Claims or New Equity Interests that, for U.S. federal income tax purposes, is or is treated as:

- an individual who is a citizen or resident of the United States;

- a corporation created or organized under the laws of the United States, any state thereof or the District of Columbia;

- an estate, the income of which is subject to U.S. federal income tax regardless of its source; or

- a trust that (1) is subject to the primary supervision of a U.S. court and the control of one or more "United States persons" (within the meaning of IRC Section 7701(a)(30)), or (2) has a valid election in effect to be treated as a United States person for U.S. federal income tax purposes.

A "Non-U.S. Holder" means a beneficial owner of Prepetition Notes Claims, General Unsecured Claims or New Equity Interests that is not a U.S. Holder and is, for U.S. federal income tax purposes, an individual, corporation (or other entity classified as a corporation for U.S. federal income tax purposes), estate or trust.

If a partnership or other entity or arrangement classified as a partnership for U.S. federal income tax purposes holds Prepetition Notes Claims, General Unsecured Claims or New Equity Interests, the tax treatment of a partner in such partnership generally will depend upon the status of the partner and the activities of the partnership. Partnerships holding Prepetition Notes Claims, General Unsecured Claims or New Equity Interests and partners thereof should consult their tax advisors regarding the tax consequences to them of the consummation of the Plan.

**2.   U.S. Holders of Prepetition Notes Claims**

(a)   Exchange of Prepetition Notes for New Equity Interests

*Treatment of Exchange*.   The U.S. federal income tax consequences of the exchange of Prepetition Notes for New Equity Interests (the "**Prepetition Notes Exchange**") depend, in part, on whether the Prepetition Notes constitute "securities" for purposes of the provisions of the IRC relating to tax-free transactions.   The test of whether a debt obligation is a security involves an overall evaluation of the nature of the obligation, with the term of the obligation usually regarded as one of the most significant factors.   Debt obligations with a term of five years or less generally have not qualified as securities, whereas debt obligations with a term of ten years or more generally have qualified as securities. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor,

95

convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued.

Although not free from doubt, the Debtors believe, and the remainder of this summary assumes, that the Prepetition Notes are properly treated as securities for U.S. federal income tax purposes. Accordingly, the Debtors currently intend to take the position that the Prepetition Notes Exchange constitutes a tax-free recapitalization for U.S. federal income tax purposes.

*Recognition of Gain or Loss.* Assuming the Prepetition Notes Exchange constitutes a tax-free recapitalization, U.S. Holders of Prepetition Notes should not recognize gain or loss in the Prepetition Notes Exchange. A U.S. Holder's initial tax basis in the New Equity Interests should be equal to its adjusted tax basis in the Prepetition Notes exchanged therefor and a U.S. Holder's holding period in such New Equity Interests should include the U.S. Holder's holding period in the Prepetition Notes. A U.S. Holder's tax basis and holding period in such New Equity Interests would generally be required to be calculated separately for each block of Prepetition Notes exchanged therefor.

*Market Discount.* A U.S. Holder that acquired a Prepetition Note at any time other than at its original issuance at a market discount generally will be required to treat gain, if any, recognized on the Prepetition Notes Exchange as ordinary income to the extent of accrued market discount, unless an election to include market discount in income currently as it accrues was made by the U.S. Holder. A U.S. Holder will be considered to have acquired a Prepetition Note at a market discount if its tax basis in the note immediately after acquisition was less than the sum of all amounts payable thereon (other than payments of qualified stated interest) after the acquisition date, unless the difference is less than 0.25% of the Prepetition Note's stated redemption price at maturity multiplied by the number of complete years from the acquisition date to maturity (in which case, the difference is de minimis market discount).

If the Prepetition Notes Exchange, however, qualifies as a recapitalization as described above in "—*Exchange of Prepetition Notes for New Equity Interests—Treatment of Exchange*," special rules apply whereby a U.S. Holder that acquired a Prepetition Note at a market discount generally should not be required to recognize any accrued market discount as income at the time of the Prepetition Notes Exchange to the extent it receives New Equity Interests in exchange for the Prepetition Note. Rather, any gain realized by the U.S. Holder on a subsequent taxable disposition of the New Equity Interests received in the exchange will be ordinary income to the extent of the amount of market discount accrued on the Prepetition Note prior to the exchange that is allocable to New Equity Interests.

### 3.     U.S. Holders of General Unsecured Claims

*Treatment of Exchange*. The Debtors believe, and the remainder of this summary assumes, that General Unsecured Claims are not properly treated as securities for U.S. federal income tax purposes. The exchange of General Unsecured Claims for New Equity Interests should, therefore, be a taxable exchange for U.S. federal income tax purposes.

96

*Recognition of Gain or Loss*.  A U.S. Holder of General Unsecured Claims should recognize gain or loss in an amount equal to the difference between the fair market value of the New Equity Interests received (less amounts attributable to any accrued but unpaid interest, which will be taxable as interest to the extent not previously included in income) and the U.S. Holder's adjusted tax basis in the Claim exchanged therefor.  The character of such gain or loss as capital gain or loss or as ordinary income or loss depends on a number of factors, including the nature of the Claim, whether the Claim was purchased at a discount, and whether and to what extent the U.S. Holder has claimed a bad debt deduction previously with respect to its Claim. A U.S. Holder's initial tax basis in the New Equity Interests should be equal to the fair market values of such New Equity Interests as of the Effective Date. A U.S. Holder's holding period in the New Equity Interests received in exchange for its Claim should begin on the day after the Effective Date.

### 4.    Ownership and Disposition of New Equity Interests by U.S. Holders

*Distributions*.  A U.S. Holder of New Equity Interests generally will be required to include in  gross income as ordinary dividend income the amount of any distributions paid on the New Equity Interests  to the extent such distributions are paid out of the Reorganized Parent's current or accumulated earnings and profits as determined for U.S. federal income tax purposes.  Distributions in excess of Parent's current and accumulated earnings and profits will constitute a return of capital and will first be applied against and reduce a U.S. Holder's adjusted tax basis in the New Equity Interests, but not below zero.  Any excess amount will be treated as gain from a sale or exchange of the New Equity Interests.  U.S. Holders that are treated as corporations for U.S. federal income tax purposes may be entitled to a dividends received deduction with respect to distributions out of earnings and profits.

*Sale or Other Taxable Disposition*.  A U.S. Holder of New Equity Interests will recognize gain or loss upon the sale or other taxable disposition of New Equity Interests equal to the difference between the amount realized upon the disposition and the U.S. Holder's adjusted tax basis in the New Equity Interests. Subject to the rules discussed above in "—*Exchange of Prepetition Notes for New Equity Interests—Market Discount*" and the recapture rules under IRC Section 108(e)(7), any such gain or loss generally will be capital gain or loss, and will be long-term capital gain or loss if the U.S. Holder has held the New Equity Interests for more than one year as of the date of disposition.  Under the IRC Section 108(e)(7) recapture rules, a U.S. Holder may be required to treat gain recognized on the taxable disposition of the New Equity Interests as ordinary income if the U.S. Holder took a bad debt deduction with respect to its Claims.  U.S. Holders should consult their tax advisors regarding the applicable tax rates and netting rules for capital gains and losses.  There are limitations on the deduction of capital losses by both corporate and noncorporate taxpayers.

### 5.    Non-U.S. Holders

The rules governing U.S. federal income taxation of a Non-U.S. Holder are complex.  The following discussion includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders. The discussion does not include any non-U.S. tax considerations.  Non-U.S. Holders should consult with their own tax advisors to determine the effect of U.S. federal, state, and local tax laws, as well as any other applicable non-U.S. tax laws and/or treaties, with regard to their participation in the transactions contemplated by the Plan, their ownership of Claims, and the ownership and disposition of New Equity Interests.

Whether a Non-U.S. Holder realizes gain or loss on an exchange and the amount of such gain or loss is determined in the same manner as set forth above in connection with U.S. Holders.

97

(a)      Gain Recognition

Any gain recognized by a Non-U.S. Holder on the Prepetition Notes Exchange or a subsequent sale or other taxable disposition of the New Equity Interests generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the relevant sale, exchange or other taxable disposition occurs and certain other conditions are met, (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and if required by an applicable income tax treaty, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) or (c) the New Equity Interests constitute a U.S. real property interest ("**USRPI**") by reason of the Reorganized Parent being treated as a U.S. real property holding corporation ("**USRPHC**") for U.S. federal income tax purposes, in the circumstances described below.

If the first exception applies, to the extent that any gain is recognized, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed its capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain recognized in the same manner as a U.S. Holder.  In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates).  In addition, if such Non-U.S. Holder is a corporation for U.S. federal income tax purposes, it may be subject to a branch profits tax equal to 30% (or such lower rate provided by an applicable income tax treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

With respect to the third exception above, the Debtors believe that Old Parent currently is, and the Reorganized Parent will be, a USRPHC. Generally, a corporation is a USRPHC if the fair market value of its U.S. real property interests equals or exceeds 50% of the sum of the fair market value of its worldwide real property interests and its other assets used or held for use in a trade or business.

If in the calendar year of a disposition of New Equity Interests by a Non-U.S. Holder, the New Equity Interests are considered to be regularly traded on an established securities market (within the meaning of applicable Treasury Regulations), only a Non-U.S. Holder that actually or constructively owns, or owned at any time during the shorter of the five-year period ending on the date of the disposition or the Non-U.S. Holder's holding period for the New Equity Interests, more than 5% of the New Equity Interests will be taxable on gain realized on the disposition of New Equity Interests as a result of Reorganized Parent's status as a USRPHC.  If the New Equity Interests were not considered to be regularly traded on an established securities market during the calendar year in which the relevant disposition by a Non-U.S. Holder occurs, such holder (regardless of the percentage of stock owned) would be subject to U.S. federal income tax on a taxable disposition of the New Equity Interests, and a 15% withholding tax would apply to the gross proceeds from such disposition.

(b)      Interest

Payments to a Non-U.S. Holder that are attributable to interest that is not effectively connected with the Non-U.S. Holder's conduct of a trade or business within the United States generally will not be subject to U.S. federal income or withholding tax, *provided* that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the Non-U.S. Holder is not a U.S. person.  Interest income, however, may be subject to U.S. withholding tax if, at the applicable time:

98

US-DOCS\117417332.2

- the Non-U.S. Holder actually or constructively owns 10% or more of the total combined voting power of all classes of voting stock of Old Parent;

- the Non-U.S. Holder is a "controlled foreign corporation" that is a "related person" (each, within the meaning of the IRC) with respect to Old Parent; or

- the Non-U.S. Holder is a bank receiving interest described in IRC Section 881(c)(3)(A).

If interest paid to a Non-U.S. Holder is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and if required by an applicable income tax treaty, such interest is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States), the Non-U.S. Holder generally will not be subject to U.S. federal withholding tax but will be subject to U.S. federal income tax with respect to such interest in the same manner as a U.S. Holder under rules similar to those discussed above with respect to gain that is effectively connected with the conduct of a trade or business in the United States (see *"—Gain Recognition"* above).

A Non-U.S. Holder that does not qualify for the above exemption with respect to interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax on such interest at a 30% rate, unless such Non-U.S. Holder is entitled to a reduction in or exemption from withholding on such interest as a result of an applicable income tax treaty. To claim such entitlement, the Non-U.S. Holder must provide the applicable withholding agent with a properly executed IRS Form W-8BEN or W-8BEN-E claiming a reduction in or exemption from withholding tax on such payments of interest under the benefit of an income tax treaty between the United States and the country in which the Non-U.S. Holder resides or is established. For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

(c)     Dividends on New Equity Interests

Any distributions made with respect to New Equity Interests that constitute dividends for U.S. federal income tax purposes (see *"—Ownership and Disposition of New Equity Interests by U.S. Holders"*) that are not effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (or, if required by an applicable income tax treaty, are not attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30% (or lower treaty rate or exemption from tax, if applicable) of the gross amount of the dividends. A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by providing the applicable withholding agent with a properly executed IRS Form W-8BEN or W-8BEN-E (or a successor form) upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments. Dividends paid with respect to New Equity Interests held by a Non-U.S. Holder that are effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (and, if required by an applicable income tax treaty, are attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax with respect to such dividends in the same manner as a U.S. Holder under rules similar to those discussed above with respect to gain that is effectively connected with the conduct of a trade or business in the United States (see "—*Gain Recognition*" above). To claim such exemption, the Non-U.S. Holder must furnish to the applicable withholding agent a valid IRS Form W-8ECI, certifying that the dividends are effectively connected with the Non-U.S. Holder's conduct of a trade or business within the United States.

99

(d)      Additional Withholding Tax on Payments Made to Foreign Accounts

Withholding taxes may be imposed under IRC Sections 1471 to 1474 (such Sections commonly referred to as the Foreign Account Tax Compliance Act, or "FATCA") on certain types of payments made to non-U.S. financial institutions and certain other non-U.S. entities.  Specifically, a 30% withholding tax may be imposed on dividends (including constructive dividends) on New Equity Interests or (subject to the proposed Treasury Regulations discussed below) gross proceeds from the sale  or  other  disposition of, New Equity Interests paid to a "foreign financial institution" or a "non-financial foreign entity" (each as defined in the IRC), unless (1) the foreign financial institution undertakes certain diligence and reporting obligations, (2) the non-financial foreign entity either certifies it does not have any "substantial United States owners" (as defined in the IRC) or furnishes identifying information regarding each substantial United States owner, or (3) the foreign financial institution or non-financial foreign entity otherwise qualifies for an exemption from these rules.  If the payee is a foreign financial institution and is subject to the diligence and reporting requirements in (1) above, it must enter into an agreement with the U.S. Department of the Treasury requiring, among other things, that it undertake to identify accounts held by certain "specified United States persons" or "United States-owned foreign entities" (each as defined in the IRC), annually report certain information about such accounts, and withhold 30% on certain payments to non-compliant foreign financial institutions and certain other account holders. Foreign financial institutions located in jurisdictions that have an intergovernmental agreement with the United States governing FATCA may be subject to different rules.

Under the applicable Treasury Regulations and administrative guidance, withholding under FATCA generally applies to payments of dividends on New Equity Interests. While withholding under FATCA would have applied also to payments of gross proceeds from the sale or other disposition of New Equity Interests on or after January 1, 2019, proposed Treasury Regulations eliminate FATCA withholding on payments of gross proceeds entirely. Taxpayers generally may rely on these proposed Treasury Regulations until final Treasury Regulations are issued.

**6.      Accrued Interest**

To the extent a Holder of a Claim receives consideration that is attributable to indebtedness and unpaid accrued interest thereon, the Debtors intend to take the position, and the Plan provides, that for U.S. federal income tax purposes, such consideration should be allocated to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing unpaid accrued interest.  Notwithstanding this Plan provision, there is general uncertainty regarding the extent to which the receipt of cash or other property should be treated as attributable to unpaid accrued interest.  Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest.  To the extent any property received pursuant to the Plan is considered attributable to unpaid accrued interest, a Holder will recognize ordinary income to the extent the value of the property exceeds the amount of unpaid accrued interest previously included in gross income by the Holder.  A Holder's tax basis in such property should be equal to the amount of interest income treated as satisfied by the receipt of the property, and its holding period in the property should begin on the day after the Effective Date.  A Holder generally will be entitled to recognize a loss to the extent any accrued interest previously included in its gross income is not paid in full.   HOLDERS SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE EXTENT TO WHICH CONSIDERATION RECEIVED UNDER THE PLAN SHOULD BE TREATED AS ATTRIBUTABLE TO UNPAID ACCRUED INTEREST.

US-DOCS\117417332.2

7.       **Information Reporting and Backup Withholding**

The Debtors and applicable withholding agents will withhold all amounts required by law to be withheld from payments of interest and from distributions on New Equity Interests (including dividends), whether in connection with the Plan or following consummation of the Plan, and will comply with all applicable information reporting requirements. The IRS may make the information returns reporting such interest and dividends and withholding available to the tax authorities in the country in which a Non-U.S. Holder is resident. In general, information reporting requirements may apply to certain distributions or payments under the Plan. Additionally, under the backup withholding rules, a Holder may be subject to backup withholding (currently at a rate of 24%) with respect to distributions or payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption). Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; *provided* that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE FOREGOING DISCUSSION OF U.S. FEDERAL INCOME TAX CONSIDERATIONS IS FOR GENERAL INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. EACH HOLDER SHOULD CONSULT ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN DESCRIBED HEREIN. NEITHER THE PROPONENTS NOR THEIR PROFESSIONALS WILL HAVE ANY LIABILITY TO ANY PERSON OR HOLDER ARISING FROM OR RELATED TO THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN OR THE FOREGOING DISCUSSION.**

US-DOCS\117417332.2

## X.
## DISCLOSURE STATEMENT OBJECTIONS

The Debtors received certain formal and informal comments and objections to this Disclosure Statement, all of which have been resolved by the inclusion of sections A and B below.

### A.    TORT CLAIMS

The Blair and Whitehall Wisconsin claimants (the "**Wisconsin Tort Claimants**") are an alleged group of approximately 45 individuals, 40 of whom are Wisconsin state court plaintiffs engaged in pre-petition litigation against Debtors (i) Hi-Crush Blair LLC ("**HC-Blair**") or (ii) Hi-Crush Whitehall LLC ("**HC-Whitehall**"), who seek recovery on claims and causes of action including alleged negligence, alleged negligence per se, alleged public nuisance, alleged private nuisance, alleged trespass, and alleged strict liability for ultra-hazardous activities.  The claims and causes of action asserted by the Wisconsin Tort Claimants include matters arising prior to the Petition Date and which the Wisconsin Tort Claimants allege to include continuing torts.  The pending litigation cases are styled and numbered as follows: (i) *Michael Sylla, et al. v. Hi-Crush Whitehall, LLC, et al.,* Trempealeau (Wis.) County Case No. 19-CV-63; (ii) *Darrell Bork, et al. v. Hi-Crush Whitehall, LLC, et al.*, Trempealeau (Wis.) County Case No. 19-CV-64; (iii) *Cory Berg, et al. v. Hi-Crush Blair, LLC, et al.*, Trempealeau (Wis.) County Case No. 19-CV-65; and (iv) *Leland and Mary Drangstveit v. Hi-Crush Blair, LLC, et al.*, Trempealeau (Wis.) County Case No. 19-CV-66 (the "**Wisconsin Suits**").

The Wisconsin Tort Claimants assert that they have suffered ill effects from exposure to particulate matter pollution, and each of the Wisconsin Tort Claimants also assert that they have individualized damages arising from variable facts including, but not limited to, the following: (i) alleged nuisance from 24-hour-per-day heavy industrial and rail operations, (ii) alleged seismic effects from blasting in close proximity to homes, and (iii) alleged excessive nighttime light.  In addition, the Wisconsin Tort Claimants allege that they have sustained significant devaluation of their real estate, loss of viewshed, numerous disruptions of their lives, and the loss of the quiet use and enjoyment of their real estate.  Some of the Wisconsin Tort Claimants allege that they have suffered from water pollution asserted, upon the Wisconsin Tort Claimants' information and belief, to be caused by Debtor HC-Blair's and/or Debtor HC-Whitehall's blasting and mining activities.  The Wisconsin Tort Claimants also allege that HC-Whitehall caused a spill of 10 million gallons of contaminated mine sludge, which the Wisconsin Tort Claimants allege (i) flowed across real estate owned or leased by some of the Wisconsin Tort Claimants, and (ii) the leaks and spills were transmitted into public waterways, causing the pollution alleged by the Wisconsin Tort Claimants.  The Wisconsin Tort Claimants allege that Debtor HC-Blair and/or Debtor HC-Whitehall have received multiple Letters of Noncompliance and/or Notices of Violation from the Wisconsin Department of Natural Resources as a result of their activities and alleged violations of environmental regulations and/or permits.  The Wisconsin Tort Claimants believe that their asserted claims and causes of action may be covered by the Debtors' insurance, and allege that the Debtors have refused to provide the relevant insurance policy documentation available to each for the time periods in which the alleged claims and causes of action arose and are alleged to continue. The Wisconsin Tort Claimants assert the claims and causes of action have damages in varying amounts as to each Wisconsin Tort Claimant and that such claims and causes of action are unliquidated, and pursuant to Wisconsin substantive state law, are incapable of

102

US-DOCS\117417332.2

precise measurement absent judicial process.  The alleged damages sustained by the Wisconsin Tort Claimants, while unliquidated, are asserted by the Wisconsin Tort Claimants to exceed $80.3 million in aggregate.

The Debtors dispute and deny any and all liability in connection with the Wisconsin Suits and all of the conduct alleged by the Wisconsin Tort Claimants and reserve all of their rights and defenses with respect to such alleged claims and causes of action.  The Debtors have agreed to include the preceding disclosure in this Disclosure Statement in order to provide holders of claims in the Voting Classes with adequate information to make an informed decision to vote to accept or reject the Plan.  The inclusion of the preceding disclosure in this Disclosure Statement should not be construed as (i) an admission as to the validity of any claim or cause of action against any Debtor; (ii) a waiver of the Debtors' rights to dispute any claim or cause of action alleged by the Wisconsin Tort Claimants or to contest the Wisconsin Suits; (iii) a promise to pay any claim or causes of action alleged in the Wisconsin Suits or otherwise by the Wisconsin Tort Claimants; or (iv) an implication or admission that any claim or causes of action asserted in the Wisconsin Suits or otherwise by the Wisconsin Tort Claims would constitute an allowed claim.

## B.   SURETY MATTERS

The Debtors are working constructively with their surety bond providers to address issues regarding bonding obligations and bonding appropriate for the Reorganized Debtors' operations. In that regard, certain surety providers have requested that the Confirmation Order contain the language below:

> "Notwithstanding any other provisions of the Plan, this Order, or any other order of this Bankruptcy Court, on the Effective Date, all rights and obligations   related to the (i) Debtors' current surety bonds issued by a surety provider (each a "Surety", and collectively, the "Surety Bonds")  and maintained in the ordinary course of business; (ii) surety payment and indemnity agreements, setting forth the Surety's rights against the Debtors, and the Debtors' obligations to pay and indemnify the Surety from any loss, cost, or expense that the Surety may incur, in each case, on account of the issuance of any surety bonds on behalf of the Debtors; (iii) surety collateral agreements governing collateral, if any, in connection with the Debtors' surety bonds; and/or (iv) ordinary course premium payments to the Surety for the Debtors' surety bonds (collectively, the "Surety Bond Program," and the Debtors' obligations arising therefrom, the "Surety Bond Obligations") shall be reaffirmed and ratified by the applicable Reorganized Debtors and continue in full force and effect and are not discharged, enjoined or released by the Plan in any way.  For the avoidance of doubt, nothing in the Plan, this Order or other agreements between the Debtors and third parties, including, without limitation, any exculpation, release, injunction, exclusions and discharge provision of the Plan, including, without limitation, any of those provisions contained in Article X of the Plan, shall bar, alter, limit, impair, release or modify or enjoin any Surety Bond Obligations.  The Sureties are deemed to have opted out of any release, exculpation, injunction provisions of the Plan that apply or could be interpreted to apply to the Sureties, their rights or claims in any respect, and are otherwise not Releasing Parties under the Plan.  The Surety Bond Program and all Surety Bond Obligations related thereto shall be treated by the Reorganized Debtors and the Surety in the ordinary course of business as if these Chapter 11 Cases had not been

103

commenced.  For the avoidance of any doubt, with a reservation of rights to all parties, and only to the extent applicable, any agreements related to the Surety Bond Program are assumed by the Debtors and the Reorganized Debtors pursuant to section 365 of the Bankruptcy Code upon the Effective Date.  Nothing in the Plan or this paragraph shall affect in any way the Surety's rights against any non-debtor, or any non-debtor's rights against the Surety, including under the Surety Bond Program or with regard to the Surety Bond Obligations."

The Debtors are not yet in a position to agree to the language (and reserve their rights to not agree in the future), but are working constructively with their surety bond providers on the above referenced issues and hope to consensually resolve these matters.

US-DOCS\117417332.2

### RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to the Debtors' creditors than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code. In addition, any alternative other than confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims than that which is proposed under the Plan. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan support confirmation of the Plan and vote to accept the Plan.

Respectfully submitted,

/s/ J. Philip McCormick, Jr.

Hi-Crush, Inc.

By:    J. Philip McCormick, Jr.

Title:    Chief Financial Officer

Dated:    August 15, 2020

Prepared by:

| **HUNTON ANDREWS KURTH LLP** | **LATHAM & WATKINS LLP** |
|---|---|
| Timothy A. ("Tad") Davidson II (No. 24012503) | George A. Davis (admitted *pro hac vice*) |
| Ashley L. Harper (No. 24065272) | Keith A. Simon (admitted *pro hac vice*) |
| 600 Travis Street, Suite 4200 | David A. Hammerman (admitted *pro hac vice*) |
| Houston, Texas 77002 | Annemarie V. Reilly (admitted *pro hac vice*) |
| Telephone:  (713) 220-4200 | Hugh K. Murtagh (admitted *pro hac vice*) |
| Facsimile:  (713) 220-4285 | 885 Third Avenue |
| | New York, New York 10022 |
| | Telephone:  (212) 906-1200 |
| | Facsimile:  (212) 751-4864 |

*Proposed Counsel for the Debtors and Debtors in Possession*

US-DOCS\117417332.2

## EXHIBIT A

Plan of Reorganization

US-DOCS\115539486.19

**Solicitation Version**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

```
---------------------------------------------------------   x
In re:                                                       :   Chapter 11
                                                             :
HI-CRUSH INC., et al., 1                                     :   Case No. 20-33495 (DRJ)
                                                             :
                    Debtors.                                 :   (Jointly Administered)
                                                             :
---------------------------------------------------------   x
```

---

**JOINT PLAN OF REORGANIZATION FOR
HI-CRUSH INC. AND ITS AFFILIATE DEBTORS
UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

---

| **HUNTON ANDREWS KURTH LLP** | **LATHAM & WATKINS LLP** |
|---|---|
| Timothy A. ("Tad") Davidson II (No. 24012503) | George A. Davis (admitted *pro hac vice*) |
| Ashley L. Harper (No. 24065272) | Keith A. Simon (admitted *pro hac vice*) |
| 600 Travis Street, Suite 4200 | David A. Hammerman (admitted *pro hac vice*) |
| Houston, Texas 77002 | Annemarie V. Reilly (admitted *pro hac vice*) |
| Telephone:  (713) 220-4200 | Hugh K. Murtagh (admitted *pro hac vice*) |
| Facsimile:  (713) 220-4285 | 885 Third Avenue |
| | New York, New York 10022 |
| | Telephone:  (212) 906-1200 |
| | Facsimile:  (212) 751-4864 |

Proposed Counsel for the Debtors and Debtors-in-Possession

Dated:   August 15, 2020

---

1       The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Hi-Crush Inc. (0530), OnCore Processing LLC (9403), Hi-Crush Augusta LLC (0668), Hi-Crush Whitehall LLC (5562), PDQ Properties LLC (9169), Hi-Crush Wyeville Operating LLC (5797), D & I Silica, LLC (9957), Hi-Crush Blair LLC (7094), Hi-Crush LMS LLC, Hi-Crush Investments Inc. (6547), Hi-Crush Permian Sand LLC, Hi-Crush Proppants LLC (0770), Hi-Crush PODS LLC, Hi-Crush Canada Inc. (9195), Hi-Crush Holdings LLC, Hi-Crush Services LLC (6206), BulkTracer Holdings LLC (4085), Pronghorn Logistics Holdings, LLC (5223), FB Industries USA Inc. (8208), PropDispatch LLC, Pronghorn Logistics, LLC (4547), and FB Logistics, LLC (8641).  The Debtors' address is 1330 Post Oak Blvd, Suite 600, Houston, Texas 77056.

**TABLE OF CONTENTS**

**CONTENTS**

**Page**

ARTICLE I. RULES OF INTERPRETATION, COMPUTATION OF TIME AND
DEFINED TERMS ..................................................................................................1
    A.    Rules of Interpretation; Computation of Time.........................................................1
    B.    Defined Terms .........................................................................................................2

ARTICLE II. ADMINISTRATIVE, DIP FACILITY, AND PRIORITY TAX CLAIMS............21
    A.    Administrative Claims ............................................................................................21
    B.    DIP Facility Claims.................................................................................................22
    C.    Priority Tax Claims .................................................................................................22

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS
AND EQUITY INTERESTS...................................................................................23
    A.    Summary.................................................................................................................23
    B.    Classification and Treatment of Claims and Equity Interests................................24
    C.    Special Provision Governing Unimpaired Claims...................................................28
    D.    Elimination of Vacant Classes ...............................................................................29

ARTICLE IV. ACCEPTANCE OR REJECTION OF THE PLAN ...........................................29
    A.    Presumed Acceptance of Plan.................................................................................29
    B.    Presumed Rejection of Plan ....................................................................................29
    C.    Voting Classes ........................................................................................................29
    D.    Acceptance by Impaired Class of Claims ...............................................................29
    E.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the
Bankruptcy Code ...................................................................................................29
    F.    Votes Solicited in Good Faith.................................................................................30

ARTICLE V. MEANS FOR IMPLEMENTATION OF THE PLAN .........................................30
    A.    Restructuring Transactions .....................................................................................30
    B.    Continued Corporate Existence ..............................................................................30
    C.    Vesting of Assets in the Reorganized Debtors Free and Clear of Liens and
Claims.....................................................................................................................31
    D.    Exit Facility Loan Documents; New Secured Convertible Notes
Documents ..............................................................................................................31
    E.    Rights Offering .......................................................................................................31
    F.    New Equity Interests...............................................................................................32
    G.    New Stockholders Agreement; New Registration Rights Agreement....................32
    H.    New Management Incentive Plan ............................................................................32
    I.    Plan Securities and Related Documentation; Exemption from Securities
Laws........................................................................................................................33
    J.    Release of Liens and Claims...................................................................................34
    K.    Organizational Documents of the Reorganized Debtors ........................................34
    L.    Directors and Officers of the Reorganized Debtors................................................35

i

M.      Corporate Action..................................................................................35
N.      Cancellation of Notes, Certificates and Instruments............................36
O.      Old Affiliate Interests ..........................................................................36
P.      Sources of Cash for Plan Distributions.................................................36
Q.      Continuing Effectiveness of Final Orders.............................................36
R.      Funding and Use of Carve-Out Reserve ...............................................37
S.      Put Option Notes...................................................................................37
T.      Payment of Fees and Expenses of Certain Creditors ............................37
U.      Payment of Fees and Expenses of Indenture Trustee ...........................37

ARTICLE VI. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
        LEASES..................................................................................................38
A.      Assumption of Executory Contracts and Unexpired Leases...................38
B.      Cure of Defaults; Assignment of Executory Contracts and Unexpired
        Leases....................................................................................................39
C.      Rejection of Executory Contracts and Unexpired Leases......................40
D.      Claims on Account of the Rejection of Executory Contracts or Unexpired
        Leases....................................................................................................40
E.      D&O Liability Insurance Policies..........................................................41
F.      Indemnification Provisions ...................................................................41
G.      Employee Compensation and Benefit Programs ...................................41
H.      Insurance Contracts..............................................................................42
I.      Extension of Time to Assume or Reject ................................................42
J.      Modifications, Amendments, Supplements, Restatements, or Other
        Agreements ...........................................................................................42

ARTICLE VII. PROVISIONS GOVERNING DISTRIBUTIONS..................................43
A.      Distributions for Claims Allowed as of the Effective Date ...................43
B.      No Postpetition Interest on Claims .......................................................43
C.      Distributions by the Reorganized Debtors or Other Applicable Distribution
        Agent.....................................................................................................43
D.      Delivery and Distributions; Undeliverable or Unclaimed Distributions ..............44
E.      Compliance with Tax Requirements......................................................46
F.      Allocation of Plan Distributions Between Principal and Interest..........46
G.      Means of Cash Payment........................................................................46
H.      Timing and Calculation of Amounts to Be Distributed ........................46
I.      Setoffs ..................................................................................................46

ARTICLE VIII. PROCEDURES FOR RESOLVING CONTINGENT,
        UNLIQUIDATED AND DISPUTED CLAIMS .......................................47
A.      Resolution of Disputed Claims .............................................................47
B.      No Distributions Pending Allowance ....................................................48
C.      Distributions on Account of Disputed Claims Once They Are Allowed and
        Additional Distributions on Account of Previously Allowed Claims ..................48
D.      Reserve for Disputed Claims ................................................................49

US-DOCS\115394754.19

ARTICLE IX. CONDITIONS PRECEDENT TO CONFIRMATION AND
CONSUMMATION OF THE PLAN ..................................................................................49
    A.    Conditions Precedent to Confirmation.................................................................49
    B.    Conditions Precedent to Consummation..............................................................49
    C.    Waiver of Conditions ...........................................................................................51
    D.    Effect of Non-Occurrence of Conditions to Confirmation or
        Consummation .....................................................................................................51

ARTICLE X. RELEASE, DISCHARGE, INJUNCTION AND RELATED
PROVISIONS ....................................................................................................................52
    A.    General..................................................................................................................52
    B.    **Release of Claims and Causes of Action** ........................................................52
    C.    Waiver of Statutory Limitations on Releases ......................................................54
    D.    Discharge of Claims and Equity Interests............................................................55
    E.    Exculpation ..........................................................................................................55
    F.    Preservation of Causes of Action.........................................................................56
    G.    **Injunction**..........................................................................................................57
    H.    **Binding Nature Of Plan**...................................................................................57
    I.    Protection Against Discriminatory Treatment .....................................................58
    J.    Integral Part of Plan .............................................................................................58

ARTICLE XI. RETENTION OF JURISDICTION ......................................................................58

ARTICLE XII. MISCELLANEOUS PROVISIONS ...................................................................60
    A.    Substantial Consummation ..................................................................................60
    B.    Payment of Statutory Fees; Post-Effective Date Fees and Expenses ...................60
    C.    Conflicts...............................................................................................................60
    D.    Modification of Plan ............................................................................................60
    E.    Revocation or Withdrawal of Plan.......................................................................61
    F.    Successors and Assigns.........................................................................................61
    G.    Reservation of Rights............................................................................................61
    H.    Further Assurances...............................................................................................61
    I.    Severability ..........................................................................................................61
    J.    Service of Documents ..........................................................................................62
    K.    Exemption from Transfer Taxes Pursuant to Section 1146(a) of the
        Bankruptcy Code .................................................................................................63
    L.    Governing Law ....................................................................................................63
    M.    Tax Reporting and Compliance ...........................................................................63
    N.    Exhibits, Schedules, and Supplements.................................................................63
    O.    No Strict Construction ........................................................................................64
    P.    Entire Agreement .................................................................................................64
    Q.    Closing of Chapter 11 Cases................................................................................64
    R.    Statutory Committees...........................................................................................64
    S.    2002 Notice Parties ..............................................................................................64

US-DOCS\115394754.19

## EXHIBITS

Exhibit A        Backstop Order

Exhibit B        Backstop Purchase Agreement

Exhibit C        Exit Facility Term Sheet

Exhibit D        Restructuring Support Agreement

Exhibit E        Rights Offering Procedures

US-DOCS\115394754.19

## JOINT PLAN OF REORGANIZATION FOR
## HI-CRUSH INC. AND ITS AFFILIATE DEBTORS
## UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

Hi-Crush Inc. and the other above-captioned debtors and debtors-in-possession (each a "**Debtor**" and, collectively, the "**Debtors**") jointly propose the following chapter 11 plan of reorganization (this "**Plan**") for the resolution of the outstanding Claims (as defined below) against, and Equity Interests (as defined below) in, each of the Debtors. Although proposed jointly for administrative purposes, this Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims against and Equity Interests in each Debtor pursuant to the Bankruptcy Code (as defined below). The Debtors are the proponents of this Plan within the meaning of section 1129 of the Bankruptcy Code. Reference is made to the Disclosure Statement (as such term is defined herein and distributed contemporaneously herewith) for a discussion of the Debtors' history, business, results of operations, historical financial information, and projections, and for a summary and analysis of this Plan, the treatment provided for herein and certain related matters. There also are other agreements and documents, which will be filed with the Bankruptcy Court (as defined below), that are referenced in this Plan or the Disclosure Statement as Exhibits or are a part of the Plan Supplement. All such Exhibits and the Plan Supplement are incorporated into and are a part of this Plan as if set forth in full herein. Subject to certain restrictions and requirements set forth in 11 U.S.C. § 1127, Fed. R. Bankr. P. 3019 and the terms and conditions set forth in this Plan, the Debtors reserve the right to alter, amend, modify, revoke or withdraw this Plan prior to its substantial consummation.

## ARTICLE I.

## RULES OF INTERPRETATION, COMPUTATION OF TIME AND DEFINED TERMS

*A.     Rules of Interpretation; Computation of Time*

For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced item shall be substantially in that form or substantially on those terms and conditions; (c) except as otherwise provided herein, any reference herein to an existing or to be Filed contract, lease, instrument, release, indenture, or other agreement or document shall mean as it may be amended, modified or supplemented from time to time; (d) any reference to an Entity as a Holder of a Claim or an Equity Interest includes that Entity's successors and assigns; (e) unless otherwise specified, all references herein to "Articles", "Sections", and "Exhibits" are references to Articles, Sections, and Exhibits hereof or hereto; (f) unless otherwise stated, the words ''herein,'' "hereof," "hereunder" and ''hereto'' refer to this Plan in its entirety rather than to a particular portion of this Plan; (g) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, indenture, or other agreement or document entered into in connection with this Plan and except as expressly provided in Article XII.C of this Plan, the rights and obligations arising pursuant to this Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (h) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (i) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply to this Plan; (j) references to a specific article, section, or subsection of any statute, rule, or regulation expressly referenced herein shall, unless otherwise specified, include any amendments to or successor provisions of such article, section, or subsection; (k) any term used in capitalized form herein that is not otherwise defined

but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (l) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (m) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; (n) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (o) any reference in this Agreement to "$" or "dollars" shall mean U.S. dollars; and (p) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated.  Except as otherwise specifically provided in this Plan to the contrary, references in this Plan to "the Debtors" or to "the Reorganized Debtors" shall mean "the Debtors and the Reorganized Debtors", as applicable, to the extent the context requires.

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to this Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

B.      *Defined Terms*

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

"*510(b) Equity Claim*" means any Claim subordinated pursuant to section 510(b) of the Bankruptcy Code.

"*Accredited Investor*" has the same meaning ascribed to such term in Rule 501 under the Securities Act.

"*Ad Hoc Noteholders Committee*" means that certain ad hoc committee of Holders of the Prepetition Notes represented by the Ad Hoc Noteholders Committee Professionals.

"*Ad Hoc Noteholders Committee Fees and Expenses*" means all unpaid reasonable and documented costs, fees, disbursements, charges and out-of-pocket expenses of the Ad Hoc Noteholders Committee, in their capacity as DIP Term Loan Lenders and Backstop Parties, incurred in connection with the Chapter 11 Cases, including, but not limited to, the reasonable and documented costs, fees, disbursements, charges and out-of-pocket expenses of the Ad Hoc Noteholders Committee Professionals.

"*Ad Hoc Noteholders Committee Professionals*" means, collectively, (i) Paul, Weiss, Rifkind, Wharton & Garrison LLP, as counsel to the Ad Hoc Noteholders Committee, (ii) Porter Hedges LLP, as local counsel to the Ad Hoc Noteholders Committee, (iii) Moelis & Company LLC, as financial advisor and investment banker to the Ad Hoc Noteholders Committee, and (iv) any other professional retained by the Ad Hoc Noteholders Committee during the Chapter 11 Cases.

"*Administrative Claim*" means a Claim for costs and expenses of administration of the Chapter 11 Cases that are Allowed under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including, without limitation: (a) any actual and necessary costs and expenses incurred on or after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Professional Fee Claims and any other compensation for legal, financial, advisory, accounting, and other services and reimbursement of expenses Allowed by the Bankruptcy Court under sections 328,

US-DOCS\115394754.19

330, 331 or 503(b) of the Bankruptcy Code to the extent incurred on or after the Petition Date and through the Effective Date; (c) all fees and charges assessed against the Estates under section 1930, chapter 123, of title 28, United States Code; (d) the Backstop Expenses; (e) the Liquidated Damages Payment; (f) the Put Option Notes (which is only payable in New Secured Convertible Notes); (g) the Backstop Indemnification Obligations; and (h) the Cure Claim Amounts.

"*Administrative Claims Bar Date*" means the Business Day which is thirty (30) days after the Effective Date, or such other date as approved by Final Order of the Bankruptcy Court.

"*Affiliate*" means an "affiliate" as defined in section 101(2) of the Bankruptcy Code.

"*Affiliate Debtor(s)*" means, individually or collectively, any Debtor or Debtors other than Parent.

"*AI Questionnaire*" means the accredited investor questionnaire sent to each Holder of an Allowed Prepetition Notes Claim or an Eligible General Unsecured Claim in accordance with the Rights Offering Procedures.

"*Allowed*" means, with respect to a Claim or Equity Interest, an Allowed Claim or Equity Interest in a particular Class or category specified.  Any reference herein to the allowance of a particular Allowed Claim includes both the secured and unsecured portions of such Claim.

"*Allowed Claim*" means any Claim that is not a Disputed Claim or a Disallowed Claim and (a) for which a Proof of Claim has been timely Filed by the applicable Claims Bar Date and as to which no objection to allowance thereof has been timely interposed within the applicable period of time fixed by this Plan, the Bankruptcy Code, the Bankruptcy Rules or order of the Bankruptcy Court; (b) that has been listed by the Debtors in their Schedules as liquidated in a specified amount and is not disputed or contingent and for which no contrary Proof of Claim has been timely Filed; or (c) that is expressly Allowed pursuant to the terms of this Plan or a Final Order of the Bankruptcy Court.  The term "Allowed Claim" shall not, for purposes of computing distributions under this Plan, include interest on such Claim from and after the Petition Date, except as provided in sections 506(b) or 511 of the Bankruptcy Code or as otherwise expressly set forth in this Plan or a Final Order of the Bankruptcy Court.

"*Amended/New Organizational Documents*" means, as applicable, the amended and restated or new applicable organizational documents of Reorganized Parent in substantially the form Filed with the Plan Supplement.

"*Avoidance Actions*" means any and all actual or potential avoidance, recovery, subordination or similar actions or remedies that may be brought by and on behalf of the Debtors or their Estates under the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, actions or remedies arising under chapter 5 of the Bankruptcy Code.

"*Backstop Commitment*" has the meaning set forth in the Backstop Purchase Agreement.

"*Backstop Parties*" has the meaning set forth in the Backstop Purchase Agreement.

"*Backstop Expenses*" has the meaning set forth in the Backstop Purchase Agreement.

"*Backstop Indemnification Obligations*" means the Debtors' obligations to indemnify the parties identified in the Backstop Purchase Agreement on the terms and conditions set forth in the Backstop Purchase Agreement.

US-DOCS\115394754.19

"*Backstop Order*" means that certain *Order (I) Authorizing Debtors to (A) Enter into Backstop Purchase Agreement, (B) Pay Certain Amounts and Related Expenses, and (C) Provide Indemnification Obligations to Certain Parties, and (II) Granting Related Relief*, entered by the Bankruptcy Court on August 14, 2020 (Docket No. 287), a copy of which is attached hereto as Exhibit A, as such order may be amended, supplemented or modified from time to time.

"*Backstop Purchase Agreement*" means the Backstop Purchase Agreement approved by the Bankruptcy Court in the Backstop Order, a copy of which is attached hereto as Exhibit B.

"*Ballots/Opt-Out Forms*" means the ballots and opt-out forms accompanying the Disclosure Statement and approved by the Bankruptcy Court in the Disclosure Statement Order.

"*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time and as applicable to the Chapter 11 Cases.

"*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas, having jurisdiction over the Chapter 11 Cases and, to the extent of the withdrawal of any reference under section 157 of title 28 of the United States Code and/or the Order of the United States District Court for the Southern District of Texas pursuant to section 157(a) of the Judicial Code, the United States District Court for the Southern District of Texas.

"*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, in each case as amended from time to time and as applicable to the Chapter 11 Cases.

"*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

"*Cash*" means the legal tender of the United States of America or the equivalent thereof.

"*Carve-Out Reserve*" means the reserve, established and maintained by the Reorganized Debtors in an interest-bearing escrow account, funded by the Debtors from Cash on hand on the Effective Date in an amount equal to the Carve-Out Reserve Amount, to pay in full in Cash the Professional Fee Claims incurred on or prior to the Effective Date.

"*Carve-Out Reserve Amount*" means the estimated amount determined by the Debtors, with the consent of the Required Consenting Noteholders or approved by order of the Bankruptcy Court, to satisfy the aggregate amount of Professional Fee Claims and other unpaid fees, costs, and expenses that the Debtors have incurred or are reasonably expected to incur from the Professionals for services rendered to the Debtors prior to and as of the Effective Date.

"*Causes of Action*" means any and all actions, claims, proceedings, causes of action, suits, accounts, demands, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment and claims, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured, and whether asserted or assertable directly or derivatively, in law, equity or otherwise, including actions brought prior to the Petition Date, Avoidance Actions, and actions against any Person or Entity for failure to pay for products or services provided or rendered by the Debtors, all claims, suits or proceedings relating to enforcement of the Debtors' intellectual property rights, including patents, copyrights and trademarks, and all claims or causes of action seeking recovery of the Debtors' or the Reorganized Debtors' accounts receivable or other receivables or rights to payment created or arising in the ordinary course of the Debtors' or the Reorganized Debtors' businesses, based in whole or in part upon any act or omission or

4

other event occurring prior to the Petition Date or during the course of the Chapter 11 Cases, including through the Effective Date.

"*Chapter 11 Case(s)*" means (a) when used with reference to a particular Debtor, the case under chapter 11 of the Bankruptcy Code commenced by such Debtor in the Bankruptcy Court, and (b) when used with reference to all Debtors, the cases under chapter 11 of the Bankruptcy Code commenced by the Debtors in the Bankruptcy Court being jointly administered under Case No. 20-33495 (DRJ)

"*Claim*" means any "claim" (as defined in section 101(5) of the Bankruptcy Code) against any Debtor.

"*Claims Bar Date*" means the last date for filing a Proof of Claim in these Chapter 11 Cases, as provided in the Claims Bar Date Order.

"*Claims Bar Date Order*" means that certain *Order (I) Establishing (A) Bar Dates and (B) Related Procedures for Filing Proofs of Claim (II) Approving the Form and Manner of Notice Thereof, and (III) Granting Related Relief* entered by the Bankruptcy Court on July 13, 2020 (Docket No. 88), as amended, supplemented or modified from time to time.

"*Claims Objection Deadline*" means, with respect to any Claim, the latest of (a) one hundred eighty (180) days after the Effective Date; (b) ninety (90) days after the Filing of an applicable Proof of Claim, or (c) such other date as may be specifically fixed by Final Order of the Bankruptcy Court for objecting to such Claim.

"*Claims Register*" means the official register of Claims maintained by the Voting and Claims Agent.

"*Class*" means a category of Holders of Claims or Equity Interests as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

"*CM/ECF*" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

"*Collateral*" means any property or interest in property of the Debtors' Estates that is subject to a valid and enforceable Lien to secure a Claim.

"*Commission*" means the U.S. Securities and Exchange Commission.

"*Committee*" means the official committee of unsecured creditors appointed in the Chapter 11 Cases, if any.

"*Confirmation*" means the occurrence of the Confirmation Date, subject to all conditions specified in Article IX of this Plan having been satisfied or waived pursuant to Article IX of this Plan.

"*Confirmation Date*" means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court in the Chapter 11 Cases.

"*Confirmation Hearing*" means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

US-DOCS\115394754.19

"*Confirmation Order*" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code, which order shall be consistent in all material respects with the Restructuring Support Agreement and the Restructuring Term Sheet, and otherwise in form and substance acceptable to the Debtors and the Required Consenting Noteholders in the manner set forth in the Restructuring Support Agreement.

"*Consenting Noteholders*" means those Holders of the Prepetition Notes that are party to the Restructuring Support Agreement as "Consenting Noteholders" thereunder.

"*Consummation*" means the occurrence of the Effective Date.

"*Cure Claim Amount*" has the meaning set forth in Article VI.B of this Plan.

"*D&O Liability Insurance Policies*" means all unexpired insurance policies (including, without limitation, the D&O Tail Policy, any general liability policies, any errors and omissions policies, and, in each case, any agreements, documents, or instruments related thereto) issued at any time and providing coverage for liability of any Debtor's directors, managers, and officers.

"*D&O Tail Policy*" means that certain directors' & officers' liability insurance policy purchased by the Debtors prior to the Petition Date.

"*Debtor(s)*" means, individually, any of the above-captioned debtors and debtors-in-possession and, collectively, all of the above-captioned debtors and debtors-in-possession.

"*Debtor Release*" has the meaning set forth in Article X.B hereof.

"*Debtor Releasing Parties*" has the meaning set forth in Article X.B hereof.

"*Designated Persons*" means, collectively, any of the Debtors' senior officers or managers, as applicable, who (i) received retention payments from the Debtors in July 2020 and prior to the Petition Date and (ii) are not employed by the Reorganized Debtors as of June 30, 2021.

"*DIP ABL Agent*" means JPMorgan Chase Bank, N.A., or its duly appointed successor, in its capacity as administrative agent and collateral agent under the DIP ABL Credit Agreement.

"*DIP ABL Credit Agreement*" means that certain Senior Secured Debtor-in-Possession Credit Agreement, dated as of July 14, 2020, by and among the Debtors, the DIP ABL Agent, and the DIP ABL Lenders, as amended, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof prior to the Effective Date.

"*DIP ABL Facility*" means the debtor-in-possession financing facility provided by the DIP ABL Lenders.

"*DIP ABL Facility Claims*" means any and all Claims arising from, under, or in connection with the DIP ABL Credit Agreement or any other DIP ABL Loan Documents, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges and all other "Secured Obligations" as defined in the DIP ABL Credit Agreement.

"*DIP ABL Facility Liens*" means the Liens securing the payment of the DIP ABL Facility Claims.

US-DOCS\115394754.19

"*DIP ABL Loan Documents*" means the "Loan Documents" as defined in the DIP ABL Credit Agreement, as well as any documents evidencing "Banking Services Obligations" and any documents evidencing obligations owing to an "Swap Counterparties" under any "Hedging Arrangements" (each as defined in the DIP ABL Credit Agreement), and the DIP Orders, in each case as amended, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof prior to the Effective Date.

"*DIP ABL Lenders*" means the lenders party to the DIP ABL Credit Agreement from time to time.

"*DIP Agents*" means the DIP ABL Agent and the DIP Term Loan Agent.

"*DIP Credit Agreements*" means the DIP ABL Credit Agreement and the DIP Term Loan Credit Agreement.

"*DIP Contingent Obligations*" means all contingent obligations not due and payable under the DIP Loan Documents on the Effective Date, including any and all indemnification and expense reimbursement obligations of the Debtors that are contingent as of the Effective Date.

"*DIP Facilities*" means the DIP ABL Facility and the DIP Term Loan Facility.

"*DIP Facility Claims*" means the DIP ABL Facility Claims and the DIP Term Loan Facility Claims.

"*DIP Facility Liens*" means the DIP ABL Facility Liens and the DIP Term Loan Facility Liens.

"*DIP Lenders*" means the DIP ABL Lenders and the DIP Term Loan Lenders.

"*DIP Loan Documents*" means the DIP ABL Loan Documents and the DIP Term Loan Documents.

"*DIP Orders*" means the Interim DIP Order and the Final DIP Order.

"*DIP Term Loan Agent*" means Cantor Fitzgerald Securities, or its duly appointed successor, in its capacity as administrative agent and collateral agent under the DIP Term Loan Credit Agreement.

"*DIP Term Loan Credit Agreement*" means that certain that certain Senior Secured Debtor-in-Possession Term Loan Credit Agreement, dated as of July 14, 2020, by and among the Debtors, the DIP Term Loan Agent, and the DIP Term Loan Lenders, as amended, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof prior to the Effective Date.

"*DIP Term Loan Facility*" means the debtor-in-possession financing facility provided by the DIP Term Loan Lenders.

"*DIP Term Loan Facility Claims*" means any and all Claims arising from, under, or in connection with the DIP Term Loan Credit Agreement or any other DIP Term Loan Documents, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges and all other "Obligations" as defined in the DIP Term Loan Credit Agreement.

"*DIP Term Loan Facility Liens*" means the Liens securing the payment of the DIP Term Loan Facility Claims.

"*DIP Term Loan Documents*" means the "Loan Documents" as defined in the DIP Term Loan Credit Agreement, and the DIP Orders, in each case as amended, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof prior to the Effective Date.

US-DOCS\115394754.19

"*DIP Term Loan Lenders*" means the lenders party to the DIP Term Loan Credit Agreement from time to time.

"*Disallowed Claim*" means a Claim, or any portion thereof, that (a) is determined to be disallowed pursuant to a Final Order of the Bankruptcy Court or is deemed disallowed in accordance with the terms of this Plan or the Confirmation Order, (b) (i) is Scheduled at zero, in an unknown amount or as contingent, disputed or unliquidated and (ii) as to which the Claims Bar Date has been established but no Proof of Claim has been timely Filed or deemed timely Filed under applicable law, or (c) (i) is not Scheduled and (ii) as to which the Claims Bar Date has been established but no Proof of Claim has been timely Filed or deemed timely Filed under applicable law.

"*Disclosure Statement*" means that certain *Disclosure Statement for the Joint Plan of Reorganization for Hi-Crush Inc. and its Affiliate Debtors under Chapter 11 of the Bankruptcy Code*, dated as of August 15, 2020, as amended, supplemented, or modified from time to time and including all exhibits and schedules thereto and references therein that relate to this Plan and as approved by the Disclosure Statement Order.

"*Disclosure Statement Order*" means that certain *Order (I) Approving the Disclosure Statement, (II) Establishing the Voting Record Date, Voting Deadline and Other Dates, (III) Approving Procedures for Soliciting, Receiving and Tabulating Votes on the Plan and for Filing Objections to the Plan, (IV) Approving the Manner and Form of Notice and Other Related Documents, (V) Approving Rights Offering Procedures, (VI) Approving Procedures for Assumption of Contracts and Leases and Form and Manner of Assumption Notice, and (VII) Granting Related Relief*, entered by the Bankruptcy Court on August 14, 2020 (Docket No. 288), as amended, supplemented or modified from time to time.

"*Disputed Claim*" means any Claim, or any portion thereof, that as of any date of determination is not a Disallowed Claim and has not been Allowed pursuant to this Plan or a Final Order of the Bankruptcy Court, and

(a)    if a Proof of Claim has been timely Filed by the applicable Claims Bar Date, such Claim is designated on such Proof of Claim as unliquidated, contingent or disputed, or in zero or unknown amount, and has not been resolved by written agreement of the parties or a Final Order of the Bankruptcy Court; or

(b)    that is the subject of an objection or request for estimation Filed in the Bankruptcy Court and which such objection or request for estimation has not been withdrawn, resolved or overruled by Final Order of the Bankruptcy Court; or

(c)    that is otherwise disputed by any Debtor in accordance with the provisions of this Plan or applicable law, which dispute has not been withdrawn, resolved or overruled by Final Order.

"*Distribution Agent*" means the Reorganized Debtors or any party designated by the Reorganized Debtors to serve as distribution agent under this Plan. For purposes of distributions under this Plan to the Holders of Allowed DIP Facility Claims, Allowed Prepetition Credit Agreement Claims and Allowed Prepetition Notes Claims, the DIP Agents, the Prepetition Credit Agreement Agent, and the Prepetition Notes Indenture Trustee, respectively, will be and shall act as the Distribution Agent.

"*Distribution Record Date*" means the date for determining which Holders of Claims are eligible to receive distributions under this Plan, which date shall be the Effective Date.

8

US-DOCS\115394754.19

"*DTC*" means The Depository Trust Company.

"*Effective Date*" means the date on which this Plan shall take effect, which date shall be the first Business Day on which (a) no stay of the Confirmation Order is in effect, and (b) the conditions specified in Article IX of this Plan, have been satisfied or waived in accordance with the terms of Article IX, which date shall be specified in a notice Filed by the Reorganized Debtors with the Bankruptcy Court.

"*Eligible General Unsecured Claim*" means any General Unsecured Claim that is either Allowed or Disputed; provided, that to the extent such General Unsecured Claim is Disputed, it must become an Allowed Claim by the dated that is one (1) Business Day after entry of the Confirmation Order by the Bankruptcy Court.

"*Entity*" means an "entity" as defined in section 101(15) of the Bankruptcy Code.

"*Equity Interest*" means (a) any Equity Security in any Debtor, including, without limitation, all issued, unissued, authorized or outstanding shares of stock and other ownership interests, together with (i) any options, warrants or contractual rights to purchase or acquire any such Equity Securities at any time with respect to any Debtor, and all rights arising with respect thereto and (ii) the rights of any Person or Entity to purchase or demand the issuance of any of the foregoing and shall include: (1) conversion, exchange, voting, participation, and dividend rights; (2) liquidation preferences; (3) options, warrants, and call and put rights; and (4) share-appreciation rights; (b) any Unexercised Equity Interest; and (c) any 510(b) Equity Claim, in each case, as in existence immediately prior to the Effective Date.

"*Equity Security*" means an "equity security" as defined in section 101(16) of the Bankruptcy Code.

"*Estate(s)*" means, individually, the estate of each of the Debtors and, collectively, the estates of all of the Debtors created under section 541 of the Bankruptcy Code.

"*Exchange Act*" means the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a *et seq*., as now in effect or hereafter amended, and any similar federal, state or local law.

"*Exculpated Parties*" means, collectively, the following:

(a) the Debtors;

(b) the Reorganized Debtors;

(c) the Prepetition Credit Agreement Agent;

(d) the Prepetition Credit Agreement Lenders;

(e) the Prepetition Notes Indenture Trustee;

(f) the DIP Agents;

(g) the DIP Lenders;

(h) the Ad Hoc Noteholder Committee and the members thereof in their capacities as such;

(i) the Consenting Noteholders;

(j) the Backstop Parties;

9

(k) the Distribution Agents;

(l) the Exit Facility Agent;

(m) the Exit Facility Lenders;

(n) the New Secured Convertible Notes Indenture Trustee;

(o) the New Secured Convertible Noteholders;

(p) the Releasing Old Parent Interestholders; and

(q) with respect to each of the foregoing Persons or Entities in clauses (a) through (p), the Related Persons of each such Person or Entity, in each case solely in their capacity as such.

"*Exculpation*" means the exculpation provision set forth in Article X.E hereof.

"*Executory Contract*" means a contract to which any Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

"*Exhibit*" means an exhibit annexed to either this Plan or as an appendix to the Disclosure Statement (as such exhibits are amended, modified or otherwise supplemented from time to time).

"*Exit Facility Agent*" means the administrative agent and collateral agent under the Exit Facility Credit Agreement, solely in its capacity as such.

"*Exit Facility Credit Agreement*" means the credit agreement, in substantially the form Filed with the Plan Supplement, which credit agreement shall contain terms and conditions consistent in all respects with those set forth on the Exit Facility Term Sheet and shall be on terms and conditions as are acceptable to the Debtors and the Required Consenting Noteholders in the manner set forth in the Restructuring Support Agreement.

"*Exit Facility Lenders*" means each of the lenders under the Exit Facility Credit Agreement, solely in their respective capacities as such.

"*Exit Facility Loan Documents*" means the Exit Facility Credit Agreement and any other guarantee, security agreement, deed of trust, mortgage, and other documents (including UCC financing statements), contracts, and agreements entered into with respect to, or in connection with, the Exit Facility Credit Agreement.

"*Exit Facility Loans*" means the loans contemplated under the Exit Facility Credit Agreement.

"*Exit Facility Term Sheet*" means the term sheet attached hereto as Exhibit C.

"*Face Amount*" means (a) when used in reference to a Disputed Claim, the full stated amount of the Claim asserted by the applicable Holder in any Proof of Claim timely Filed with the Bankruptcy Court and (b) when used in reference to an Allowed Claim, the Allowed amount of such Claim.

"*File*" or "*Filed*" or "*Filing*" means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

US-DOCS\115394754.19

"*Final DIP Order*" means that certain *Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection to Prepetition ABL Secured Parties, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* entered by the Bankruptcy Court on August 4, 2020 (Docket No. 209), as amended,  supplemented or modified from time to time.

"*Final Order*" means an order or judgment of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the Clerk of the Bankruptcy Court (or such other court) on the docket in the Chapter 11 Cases (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed and as to which (x) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall then be pending or (y) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, stay, reargument or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; provided that no order shall fail to be a Final Order solely due to the possibility that a motion pursuant to section 502(j) of the Bankruptcy Code, Rules 59 or 60 of the Federal Rules of Civil Procedure, or Rule 9024 of the Bankruptcy Rules may be filed with respect to such order.

"*General Unsecured Claim*" means any Claim that is not a/an: Administrative Claim; DIP Facility Claim; Professional Fee Claim; Priority Tax Claim; Secured Tax Claim; Other Priority Claim; Other Secured Claim; Prepetition Credit Agreement Claim; Prepetition Notes Claim; Intercompany Claim; or 510(b) Equity Claim.

"*Governmental Unit*" means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

"*Holder*" means an Entity holding a Claim or Equity Interest, as the context requires.

"*Impaired*" means, when used in reference to a Claim or Equity Interest, a Claim or Equity Interest that is "impaired" within the meaning of section 1124 of the Bankruptcy Code.

"*Indemnification Provisions*" means, collectively, each of the provisions in existence immediately prior to the Effective Date (whether in bylaws, certificates of formation or incorporation, board resolutions, employment contracts, or otherwise) whereby any Debtor agrees to indemnify, reimburse, provide contribution or advance fees and expenses to or for the benefit of, defend, exculpate, or limit the liability of, any Indemnified Party.

"*Indemnified Parties*" means each of the Debtors' and their respective subsidiaries' current and former directors, officers, and managers in their respective capacities as such, and solely to the extent that such Person was serving in such capacity on or any time after the Petition Date; provided, that the Designated Persons shall not be Indemnified Parties under this Plan.

"*Initial Distribution Date*" means the date that is on or as soon as reasonably practicable after the Effective Date, but no later than thirty (30) days after the Effective Date, when, subject to the "Treatment" sections in Article III hereof, distributions under this Plan shall commence to Holders of Allowed Claims; provided that any applicable distributions under this Plan on account of the DIP Facility Claims and the

11

US-DOCS\115394754.19

Prepetition Debt Claims shall be made to the applicable Distribution Agent on the Effective Date, and each such Distribution Agent shall make its respective distributions as soon as practicable thereafter.

"*Insurance Contract*" means all insurance policies and all surety bonds and related agreements of indemnity that have been issued at any time to, or provide coverage to, any of the Debtors and all agreements, documents, or instruments relating thereto.

"*Insurer*" means any company or other entity that issued any Insurance Contract, and any respective predecessors and/or affiliates thereof.

"*Intercompany Claim*" means any Claim against any of the Debtors held by another Debtor or non-Debtor Affiliate, other than an Administrative Claim.

"*Interim DIP Order*" means that certain *Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection to Prepetition ABL Secured Parties, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* entered by the Bankruptcy Court on July 13, 2020 (Docket No. 98), as amended, supplemented or modified from time to time.

"*IRC*" means the Internal Revenue Code of 1986, as amended.

"*IRS*" means the Internal Revenue Service of the United States of America.

"*Lien*" means a "lien" as defined in section 101(37) of the Bankruptcy Code, and, with respect to any property or asset, includes, without limitation, any mortgage, lien, pledge, charge, security interest or other encumbrance of any kind, or any other type of preferential arrangement that has the practical effect of creating a security interest, in respect of such property or asset.

"*Liquidated Damages Payment*" has the meaning set forth in the Backstop Purchase Agreement.

"*Local Rules*" means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Southern District of Texas.

"*New Board*" means the initial five (5) member board of directors of Reorganized Parent, which shall comprise the chief executive officer of Reorganized Parent and other directors designated by the Backstop Parties prior to the Effective Date.  The members of the New Board shall be Filed with the Plan Supplement.

"*New Equity Interests*" means the ownership interests in Reorganized Parent authorized to be issued pursuant to this Plan (and subject to the Restructuring Transactions) and the Amended/New Organizational Documents.

"*New Equity Interests Pool*" means 100% of the New Equity Interests issued and outstanding on the Effective Date to be distributed to the Holders of Allowed Prepetition Notes Claims and Allowed General Unsecured Claims in accordance with Article III of this Plan, subject to dilution by (a) the New Equity Interests issued upon conversion of the New Secured Convertible Notes and (b) the New Management Incentive Plan Equity.

"*New Management Incentive Plan*" means the management equity incentive plan to be adopted by the New Board as described in Article V.H hereof.

"*New Management Incentive Plan Equity*" means the New Equity Interests issued under or pursuant to the New Management Incentive Plan.

"*New Registration Rights Agreement*" means, if applicable, that certain registration rights agreement with respect to the New Equity Interests, in substantially the form Filed with the Plan Supplement, which agreement shall contain terms and conditions as are acceptable to the Debtors and the Required Consenting Noteholders in the manner set forth in the Restructuring Support Agreement.

"*New Secured Convertible Noteholder*" means a Holder of the New Secured Convertible Notes.

"*New Secured Convertible Notes*" means the new secured convertible notes to be issued by the Reorganized Debtors on the Effective Date, consisting of (a) the new secured convertible notes to be issued pursuant to the Rights Offering and (b) the Put Option Notes, which will each have the terms set forth in the New Secured Convertible Notes Indenture.

"*New Secured Convertible Notes Documents*" means the New Secured Convertible Notes Indenture and any other guarantee, security agreement, deed of trust, mortgage, and other documents (including UCC financing statements), contracts, and agreements entered into with respect to, or in connection with, the New Secured Convertible Notes Indenture.

"*New Secured Convertible Notes Indenture*" means the indenture governing the New Secured Convertible Notes, in substantially the form Filed with the Plan Supplement, which indenture shall contain terms and conditions consistent in all respects with those set forth on the Restructuring Term Sheet and shall be on terms and conditions as are acceptable to the Debtors and the Required Consenting Noteholders in the manner set forth in the Restructuring Support Agreement.

"*New Secured Convertible Notes Indenture Trustee*" means the indenture trustee under the New Secured Convertible Notes Indenture, to be selected by the Required Backstop Parties.

"*New Stockholders Agreement*" means that certain stockholders agreement of Reorganized Parent, in substantially the form Filed with the Plan Supplement, which agreement shall contain terms and conditions acceptable to the Debtors and the Required Consenting Noteholders in the manner set forth in the Restructuring Support Agreement.

"*Non-Debtor Releasing Parties*" means, collectively, the following:

    (a) the Prepetition Credit Agreement Agent;

    (b) the Prepetition Credit Agreement Lenders;

    (c) the Prepetition Notes Indenture Trustee;

    (d) the DIP Agents;

    (e) the DIP Lenders;

    (f) the Ad Hoc Noteholder Committee and the members thereof in their capacities as such;

    (g) the Releasing Prepetition Noteholders;

    (h) the Backstop Parties;

US-DOCS\115394754.19

(i) the Distribution Agents;

(j) the Exit Facility Agent and the Exit Facility Lenders;

(k) the New Secured Convertible Notes Indenture Trustee and the New Secured Convertible Noteholders;

(l) those Holders of Claims deemed to accept this Plan that do not affirmatively opt out of the Third Party Release as provided on their respective Ballots/Opt-Out Forms;

(m) those Holders of General Unsecured Claims that do not affirmatively opt out of the Third Party Release as provided on their respective Ballots/Opt-Out Forms;

(n) all Holders of Claims that vote to accept this Plan; and

(o) the Releasing Old Parent Interestholders.

"*Non-Voting Classes*" means, collectively, Classes 1-3 and 6-8.

"*Notice*" has the meaning set forth in Article XII.J of this Plan.

"*Old Affiliate Interests*" means, collectively, the Equity Interests in each Parent Subsidiary, in each case as in existence immediately prior to the Effective Date.

"*Old Parent Interest*" means the Equity Interests in Parent, as in existence immediately prior to the Effective Date.

"*Ordinary Course Professionals Order*" means that certain *Order Authorizing Debtors to Retain and Compensate Professionals Used in the Ordinary Course of Busines*s as may be entered by the Bankruptcy Court, as amended, supplemented or modified from time to time.

"*Other Priority Claim*" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim, an Administrative Claim, or a DIP Facility Claim.

"*Other Secured Claim*" means any Secured Claim other than an Administrative Claim, Secured Tax Claim, DIP Facility Claim, or Prepetition Credit Agreement Claim.

"*Parent*" means Hi-Crush Inc. (formerly known as Hi-Crush Partners LP), a Delaware corporation, and a debtor-in-possession in these Chapter 11 Cases.

"*Parent Subsidiary*" means each direct and indirect, wholly-owned subsidiary of Parent.

"*Person*" means a "person" as defined in section 101(41) of the Bankruptcy Code and also includes any natural person, corporation, general or limited partnership, limited liability company, firm, trust, association, government, governmental agency or other Entity, whether acting in an individual, fiduciary or other capacity.

"*Petition Date*" means July 12, 2020.

"*Plan*" means this *Joint Plan of Reorganization for Hi-Crush Inc. and its Affiliate Debtors under Chapter 11 of the Bankruptcy Code*, dated August 15, 2020, including the Exhibits and all supplements, appendices, and schedules thereto (including any appendices, exhibits, schedules, and supplements to this

14

US-DOCS\115394754.19

Plan that are contained in the Plan Supplement), either in its present form or as the same may be amended, supplemented, or modified from time to time.

"*Plan Objection Deadline*" means the date and time by which objections to Confirmation and Consummation of this Plan must be Filed with the Bankruptcy Court and served in accordance with the Disclosure Statement Order, which date is September 18, 2020 as set forth in the Disclosure Statement Order.

"*Plan Securities*" has the meaning set forth in Article V.I of this Plan.

"*Plan Securities and Documents*" has the meaning set forth in Article V.I of this Plan.

"*Plan Supplement*" means, collectively, the compilation of documents and forms of documents, schedules, and exhibits to this Plan (as amended, supplemented, or modified from time to time in accordance with the terms hereof, the Bankruptcy Code, the Bankruptcy Rules, and the Restructuring Support Agreement), all of which are incorporated by reference into, and are an integral part of, this Plan, to be Filed by the Debtors no later than seven (7) days before the Plan Objection Deadline or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, and additional documents or amendments to previously Filed documents, Filed before the Effective Date as amendments to the Plan Supplement, including the following, as applicable: (a) the Exit Facility Credit Agreement; (b) the Amended/New Organizational Documents; (c) the Retained Causes of Action; (d) to the extent known, a disclosure of the members of the New Board; (e) the New Secured Convertible Notes Indenture; (f) the Schedule of Rejected Executory Contracts and Unexpired Leases; (g) the New Stockholders Agreement and (h) the New Registration Rights Agreement (if applicable).  The Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date subject in all respects to the consent rights set forth herein and in the Restructuring Support Agreement.

"*Prepetition Credit Agreement*" means that certain Credit Agreement, dated as August 1, 2018 (as the same may be amended, modified or supplemented from time to time) among Parent, as borrower, the guarantors party thereto from time to time, the Prepetition Credit Agreement Agent, the Prepetition Credit Agreement Lenders, and the other agents and parties party thereto.

"*Prepetition Credit Agreement Agent*" means JPMorgan Chase Bank, N.A. in its capacity as administrative agent under the Prepetition Credit Agreement.

"*Prepetition Credit Agreement Agent and Lender Fees and Expenses*" means all unpaid fees and reasonable and documented out-of-pocket costs and expenses (regardless of whether such fees, costs, and expenses were incurred before or after the Petition Date) of the Prepetition Credit Agreement Agent and the Prepetition Credit Agreement Lenders, including, without limitation, the reasonable fees, costs, and expenses of attorneys, advisors, consultants, or other professionals retained by the Prepetition Credit Agreement Agent, that are payable in accordance with the terms of the Prepetition Credit Agreement or the DIP Orders.

"*Prepetition Credit Agreement Claims*" means all claims and obligations arising under or in connection with the Prepetition Credit Agreement or any other Prepetition Loan Document.

"*Prepetition Credit Agreement Lenders*" means the lenders party from time to time to the Prepetition Credit Agreement.

"*Prepetition Credit Agreement Liens*" means the Liens securing the payment of the Prepetition Credit Agreement Claims.

15

US-DOCS\115394754.19

"*Prepetition Debt Claims*" means, collectively, the Prepetition Credit Agreement Claims and the Prepetition Notes Claims.

"*Prepetition Debt Documents*" means, collectively, the Prepetition Credit Agreement, the Prepetition Loan Documents, the Prepetition Notes, and the Prepetition Notes Indenture.

"*Prepetition Loan Documents*" means the "Loan Documents" as defined in the Prepetition Credit Agreement, in each case as amended, supplemented, or modified from time to time prior to the Petition Date.

"*Prepetition Noteholder*" means a Holder of the Prepetition Notes.

"*Prepetition Notes*" means those certain 9.500% senior unsecured notes due 2026 issued by Parent pursuant to the Prepetition Notes Indenture.

"*Prepetition Notes Claims*" means any and all Claims arising from, under, or in connection with the Prepetition Notes, the Prepetition Notes Indenture or any other related document or agreement.

"*Prepetition Notes Indenture*" means that certain indenture, dated as of August 1, 2018 among Parent, the guarantors named therein or party thereto, and the Prepetition Notes Indenture Trustee, as may be amended modified or supplemented from time to time.

"*Prepetition Notes Indenture Trustee*" means U.S. Bank National Association, solely in its capacity as indenture trustee under the Prepetition Notes Indenture.

"*Prepetition Notes Indenture Trustee Charging Lien*" means any Lien or other priority in payment arising prior to the Effective Date to which the Prepetition Notes Indenture Trustee is entitled, pursuant to the Prepetition Notes Indenture, against distributions to be made to Holders of Allowed Prepetition Notes Claims for payment of any Prepetition Notes Indenture Trustee Fees and Expenses.

"*Prepetition Notes Indenture Trustee Fees and Expenses*" means the reasonable and documented compensation, fees, expenses, disbursements and indemnity claims incurred by the Prepetition Notes Indenture Trustee, including without limitation, attorneys' and agents' fees, expenses and disbursements, incurred by the Prepetition Notes Indenture Trustee, whether prior to or after the Petition Date and whether prior to or after consummation of this Plan, in each case to the extent payable or reimbursable under the Prepetition Notes Indenture.

"*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

"*Pro Rata*" means the proportion that (a) the Face Amount of a Claim in a particular Class or Classes (or portions thereof, as applicable) bears to (b) the aggregate Face Amount of all Claims (including Disputed Claims, but excluding Disallowed Claims) in such Class or Classes (or portions thereof, as applicable), unless this Plan provides otherwise.

"*Professional*" means any Person or Entity retained by the Debtors or the Committee in the Chapter 11 Cases pursuant to section 327, 328, 363, and/or 1103 of the Bankruptcy Code (other than an ordinary course professional).

16

"*Professional Fee Claim*" means all Claims for accrued, contingent, and/or unpaid fees, costs, and expenses earned, accrued or incurred by a Professional in the Chapter 11 Cases on or after the Petition Date and through and including the Effective Date.

"*Professional Fees Bar Date*" means the Business Day that is forty-five (45) days after the Effective Date or such other date as approved by Final Order of the Bankruptcy Court.

"*Proof of Claim*" means a proof of Claim Filed against any Debtor in the Chapter 11 Cases.

"*Put Option Notes*" has the meaning set forth in the Backstop Purchase Agreement.

"*Questionnaire Deadline*" means September 4, 2020, as set forth in the Rights Offering Procedures.

"*Related Persons*" means, with respect to any Person or Entity, such Person's or Entity's respective predecessors, successors, assigns and present and former Affiliates (whether by operation of law or otherwise) and subsidiaries, and each of their respective current and former officers, directors, principals, employees, shareholders, members (including *ex officio* members and managing members), managers, managed accounts or funds, management companies, fund advisors, advisory or subcommittee board members, partners, agents, financial advisors, attorneys, accountants, investment bankers, investment advisors, consultants, representatives, and other professionals, in each case acting in such capacity at any time on or after the Petition Date, and any Person or Entity claiming by or through any of them, including such Related Persons' respective heirs, executors, estates, servants, and nominees; *provided*, *however*, that no insurer of any Debtor shall constitute a Related Person.

"*Release*" means the release given by the Releasing Parties to the Released Parties as set forth in Article X.B hereof.

"*Released Party*" means, collectively, the following:

(a) the Debtors;

(b) the Reorganized Debtors;

(c) the Prepetition Credit Agreement Agent;

(d) the Prepetition Credit Agreement Lenders;

(e) the Prepetition Notes Indenture Trustee;

(f) the DIP Agents;

(g) the DIP Lenders;

(h) the Ad Hoc Noteholder Committee and the members thereof in their capacities as such;

(i) the Releasing Prepetition Noteholders;

(j) the Backstop Parties;

(k) the Distribution Agents;

(l) the Exit Facility Agent and the Exit Facility Lenders;

(m) the New Secured Convertible Notes Indenture Trustee and the New Secured Convertible Noteholders;

(n) the Releasing Old Parent Interestholders; and

(o) with respect to each of the foregoing Persons or Entities in clauses (a) through (n), the Related Persons of each such Person or Entity, in each case solely in their capacity as such; provided, that the Designated Persons shall not be Released Parties under this Plan.

"*Releasing Old Parent Interestholder*" means a Holder of an Old Parent Interest that does not affirmatively opt out of the Third Party Release as provided on its respective Ballot/Opt-Out Form.

"*Releasing Prepetition Noteholder*" means, collectively, (a) each Consenting Noteholder and (b) any other Prepetition Noteholder that does not affirmatively opt out of the Third Party Release as provided on its respective Ballot/Opt-Out Form.

"*Releasing Party*" has the meaning set forth in Article X.B hereof.

"*Reorganized Debtors*" means, subject to the Restructuring Transactions, the Debtors as reorganized pursuant to this Plan on or after the Effective Date, and their respective successors.

"*Reorganized Parent*" means, subject to the Restructuring Transactions, Hi-Crush Inc., a Delaware corporation, as reorganized pursuant to this Plan on or after the Effective Date, and its successors.

"*Required Backstop Parties*" has the meaning set forth in the Backstop Purchase Agreement.

"*Required Consenting Noteholders*" has the meaning set forth in the Restructuring Support Agreement.

"*Reserved New Equity Interests*" has the meaning set forth in Article V.I of this Plan

"*Restricted Holders*" has the meaning set forth in Article V.I of this Plan.

"*Restructuring Documents*" means, collectively, the documents and agreements (and the exhibits, schedules, annexes and supplements thereto) necessary to implement, or entered into in connection with, this Plan, including, without limitation, the Plan Supplement, the Exhibits, and the Plan Securities and Documents.

"*Restructuring Support Agreement*" means that certain Restructuring Support Agreement, dated as of July 12, 2020, by and between the Debtors and the Consenting Noteholders (as amended, supplemented or modified from time to time), a copy of which is attached hereto as Exhibit D.

"*Restructuring Term Sheet*" means the term sheet attached as Exhibit A to the Restructuring Support Agreement.

"*Restructuring Transaction*" has the meaning ascribed thereto in Article V.A of this Plan.

"*Retained Causes of Action*" means all claims, rights of action, suits or proceedings, whether in law or in equity, whether known or unknown, that any Debtor or any Estate may hold against any Person or Entity, including, without limitation, the Causes of Action of the Debtors or their Estates, in each case solely to the extent of the Debtors' or their Estates' interest therein.  A non-exclusive list of the Retained

18

US-DOCS\115394754.19

Causes of Action held by the Debtors as of the Effective Date shall be Filed with the Plan Supplement, which shall be deemed to include any derivative actions filed against any Debtor as of the Effective Date.

"*Rights Offering*" means that certain rights offering pursuant to which each Rights Offering Participant is entitled to receive Subscription Rights to acquire New Secured Convertible Notes on a Pro Rata basis in accordance with the Rights Offering Procedures and which will be fully backstopped by the Backstop Parties pursuant to the Backstop Purchase Agreement.

"*Rights Offering Participant*" means a Holder of an Allowed Prepetition Notes Claim or an Eligible General Unsecured Claim as of the Rights Offering Record Date who is an Accredited Investor and has completed an AI Questionnaire in accordance with the Rights Offering Procedures.

"*Rights Offering Procedures*" means the procedures for the implementation of the Rights Offering as approved in the Disclosure Statement Order, a copy of which is attached hereto as Exhibit E.

"*Rights Offering Record Date*" means September 4, 2020, the record date specified in the Disclosure Statement Order.

"*Rights Offering Termination Time*" means 5:00 p.m. (Prevailing Central Time) on September 29, 2020, as set forth in the Rights Offering Procedures.

"*Schedule of Rejected Executory Contracts and Unexpired Leases*" means the schedule of Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to this Plan and Filed as part of the Plan Supplement, as such schedule may be amended, modified, or supplemented by the Debtors from time to time prior to the Confirmation Date, which Schedule of Rejected Executory Contracts and Unexpired Leases shall be subject to the consent of the Required Consenting Noteholders.

"*Scheduled*" means with respect to any Claim, the status and amount, if any, of such Claim as set forth in the Schedules.

"*Schedules*" means the schedules of assets and liabilities, schedules of Executory Contracts, and statement of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and the applicable Bankruptcy Rules, as such Schedules may be amended, modified, or supplemented from time to time.

"*Secured Claim*" means a Claim that is secured by a Lien on property in which any of the Debtors' Estates have an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim holder's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code.

"*Secured Tax Claim*" means any Secured Claim which, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code.

"*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77c-77aa, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

"*Specified Employee Plans*" has the meaning set forth in Article VI.G of this Plan.

"*Stamp or Similar Tax*" means any stamp tax, recording tax, conveyance fee, intangible or similar tax, mortgage tax, personal or real property tax, real estate transfer tax, sales tax, use tax, transaction

US-DOCS\115394754.19

privilege tax (including, without limitation, such taxes on prime contracting and owner-builder sales), privilege taxes (including, without limitation, privilege taxes on construction contracting with regard to speculative builders and owner builders), and other similar taxes or fees imposed or assessed by any Governmental Unit.

"*Subscription Rights*" means the right to participate in the Rights Offering as set forth in the Rights Offering Procedures.

"*Subsequent Distribution*" means any distribution of property under this Plan to Holders of Allowed Claims other than the initial distribution given to such Holders on the Initial Distribution Date.

"*Subsequent Distribution Date*" means the last Business Day of the month following the end of each calendar quarter after the Effective Date; *provided*, *however*, that if the Effective Date is within thirty (30) days of the end of a calendar quarter, then the first Subsequent Distribution Date will be the last Business Day of the month following the end of the first (1st) calendar quarter after the calendar quarter in which the Effective Date falls.

"*Third Party Release*" has the meaning set forth in <u>Article X.B</u> hereof.

"*Unexercised Equity Interests*" means any and all unexercised options, performance, stock units, restricted stock units, restricted stock awards, warrants, calls, rights, puts, awards, commitments, or any other agreements, arrangements, or commitments of any character, kind, or nature to acquire, exchange for, or convert into an Old Parent Interest, as in existence immediately prior to the Effective Date.

"*Unexpired Lease*" means a lease to which any Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

"*Unimpaired*" means, with respect to a Class of Claims or Equity Interests, a Claim or an Equity Interest that is "unimpaired" within the meaning of section 1124 of the Bankruptcy Code.

"*Unsubscribed Notes*" means the New Secured Convertible Notes offered for sale in the Rights Offering that are not subscribed for by the Rights Offering Participants by the Rights Offering Termination Time in accordance with the terms of the Rights Offering Procedures.

"*Unused Carve-Out Reserve Amount*" means the remaining Cash, if any, in the Carve-Out Reserve after all obligations and liabilities for which such reserve was established are paid, satisfied, and discharged in full in Cash or are Disallowed by Final Order in accordance with this Plan.

"*Voting and Claims Agent*" means Kurtzman Carson Consultants LLC, in its capacity as solicitation, notice, claims and balloting agent for the Debtors.

"*Voting Classes*" means Classes 4 and 5.

"*Voting Deadline*" means the date and time by which all Ballots/Opt-Out Forms must be received by the Voting and Claims Agent in accordance with the Disclosure Statement, as set forth in the Disclosure Statement Order.

"*Voting Record Date*" means August 14, 2020, as approved by the Bankruptcy Court in the Disclosure Statement Order, and is the date for determining which Holders of Claims in the Voting Classes are entitled, as applicable, to receive the Disclosure Statement and to vote to accept or reject this Plan.

20

US-DOCS\115394754.19

# ARTICLE II.

## ADMINISTRATIVE, DIP FACILITY, AND PRIORITY TAX CLAIMS

*A.      Administrative Claims*

Subject to sub-paragraph 1 below, on the later of the Effective Date or the date on which an Administrative Claim becomes an Allowed Administrative Claim, or, in each such case, as soon as reasonably practicable thereafter, each Holder of an Allowed Administrative Claim (other than an Allowed Professional Fee Claim) will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim either (i) Cash equal to the amount of such Allowed Administrative Claim; or (ii) such other less favorable treatment as to which the Debtors (with the consent of the Required Consenting Noteholders) or Reorganized Debtors, as applicable, and the Holder of such Allowed Administrative Claim shall have agreed upon in writing; *provided*, *however*, that Administrative Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.

1.   Bar Date for Administrative Claims

Except as otherwise provided in this Plan, unless previously Filed or paid, requests for payment of Administrative Claims must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order or the occurrence of the Effective Date (as applicable) no later than the Administrative Claims Bar Date; provided that the foregoing shall not apply to either the Holders of Claims arising under section 503(b)(1)(D) of the Bankruptcy Code or the Bankruptcy Court or United States Trustee as the Holders of Administrative Claims.  Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped and enjoined from asserting such Administrative Claims against the Debtors, the Reorganized Debtors and their respective Estates and property and such Administrative Claims shall be deemed discharged as of the Effective Date.  All such Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in Article X.G hereof.  Nothing in this Article II.A shall limit, alter, or impair the terms and conditions of the Claims Bar Date Order with respect to the Claims Bar Date for filing administrative expense claims arising under Section 503(b)(9) of the Bankruptcy Code.

Objections to such requests must be Filed and served on the Reorganized Debtors and the requesting party by the later of (a) 120 days after the Effective Date and (b) 60 days after the Filing of the applicable request for payment of Administrative Claims, if applicable, as the same may be modified or extended from time to time by Final Order of the Bankruptcy Court.

2.   Professional Fee Claims

Professionals or other Entities asserting a Professional Fee Claim for services rendered before the Effective Date must File and serve on the Reorganized Debtors and such other Entities who are designated in the Confirmation Order an application for final allowance of such Professional Fee Claim no later than the Professional Fees Bar Date; provided that the Reorganized Debtors shall pay the reasonable fees, costs, and out-of-pocket expenses of the Debtors' Professionals in the ordinary course of business for any work performed after the Effective Date, including those reasonable and documented fees, costs, and expenses incurred by such Professionals in connection with the implementation and consummation of this Plan, in each case without further application or notice to or order of the Bankruptcy Court; provided, further, that any Debtor Professional who may receive compensation or reimbursement of expenses pursuant to the

21

Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses from the Debtors and Reorganized Debtors for services rendered before the Effective Date pursuant to the Ordinary Course Professionals Order, in each case without further application or notice to or order of the Bankruptcy Court.

Objections to any Professional Fee Claim must be Filed and served on the Reorganized Debtors and the requesting party by no later than thirty (30) days after the Filing of the applicable final request for payment of the Professional Fee Claim.  Each Holder of an Allowed Professional Fee Claim shall be paid in full in Cash by the Reorganized Debtors, including from the Carve-Out Reserve, within five (5) Business Days after entry of the order approving such Allowed Professional Fee Claim.  The Reorganized Debtors shall not commingle any funds contained in the Carve-Out Reserve and shall use such funds to pay only the Professional Fee Claims, as and when allowed by order of the Bankruptcy Court.  Notwithstanding anything to the contrary contained in this Plan, the failure of the Carve-Out Reserve to satisfy in full the Professional Fee Claims shall not, in any way, operate or be construed as a cap or limitation on the amount of Professional Fee Claims due and payable by the Reorganized Debtors.

B.      *DIP Facility Claims*

Upon entry of the Final DIP Order, and pursuant to the Final DIP Order, the Prepetition Credit Agreement Claims were deemed outstanding under the DIP ABL Facility and constitute DIP ABL Facility Claims.  On the Effective Date, the Allowed DIP ABL Facility Claims will, in full satisfaction, settlement, discharge and release of, and in exchange for such DIP ABL Facility Claims, be indefeasibly paid in full in Cash from the proceeds of the Exit Facility, and any unused commitments under the DIP ABL Loan Documents and the outstanding letters of credit thereunder shall be deemed outstanding under the Exit ABL Facility or, if necessary, be cash collateralized at 105% of such outstanding amount as of the Effective Date and remain outstanding.

On the Effective Date, the Allowed DIP Term Loan Facility Claims will, in full satisfaction, settlement, discharge and release of, and in exchange for such DIP Term Loan Facility Claims, be indefeasibly paid in full in Cash from the proceeds of the Rights Offering and Backstop Purchase Agreement, and the DIP Term Loan Facility Liens will be deemed discharged, released, and terminated for all purposes without further action of or by any Person or Entity.

C.      *Priority Tax Claims*

Subject to Article VIII hereof, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtors or Reorganized Debtors, as applicable:  (A) Cash equal to the amount of such Allowed Priority Tax Claim; (B) such other less favorable treatment as to which the Debtors (with the consent of the Required Consenting Noteholders) or Reorganized Debtors, as applicable, and the Holder of such Allowed Priority Tax Claim shall have agreed upon in writing; (C) such other treatment such that it will not be Impaired pursuant to section 1124 of the Bankruptcy Code or (D) pursuant to and in accordance with sections 1129(a)(9)(C) and 1129(a)(9)(D) of the Bankruptcy Code, Cash in an aggregate amount of such Allowed Priority Tax Claim payable in regular installment payments over a period ending not more than five (5) years after the Petition Date, plus simple interest at the rate required by applicable non-bankruptcy law on any outstanding balance from the Effective Date, or such lesser rate as is agreed to in writing by a particular taxing authority and the Debtors or Reorganized Debtors, as applicable, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; *provided*, *however*, that Priority Tax Claims incurred by any Debtor in the ordinary course of business may be paid

22

in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.  Any installment payments to be made under clause (C) or (D) above shall be made in equal quarterly Cash payments beginning on the first applicable Subsequent Distribution Date, and continuing on each Subsequent Distribution Date thereafter until payment in full of the applicable Allowed Priority Tax Claim.

## ARTICLE III.

## CLASSIFICATION AND TREATMENT
## OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

*A.    Summary*

This Plan constitutes a separate plan of reorganization for each Debtor.  All Claims and Equity Interests, except Administrative Claims, DIP Facility Claims, and Priority Tax Claims, are placed in the Classes set forth below. For all purposes under this Plan, each Class will contain sub-Classes for each of the Debtors (*i.e.*, there will be eight (8) Classes for each Debtor); *provided*, that any Class that is vacant as to a particular Debtor will be treated in accordance with Article III.D below.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including, without limitation, for voting, confirmation and distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  This Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remaining portion of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released, Disallowed or otherwise settled prior to the Effective Date.

Summary of Classification and Treatment of Classified Claims and Equity Interests

| Class | Claim/Equity Interest | Status | Voting Rights |
|---|---|---|---|
| 1. | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2. | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3. | Secured Tax Claims | Unimpaired | Deemed to Accept |
| *4.* | *Prepetition Notes Claims* | *Impaired* | *Entitled to Vote* |
| *5.* | *General Unsecured Claims* | *Impaired* | *Entitled to Vote* |
| 6. | Intercompany Claims | Impaired | Deemed to Accept |
| 7. | Old Affiliate Interests in any Parent Subsidiary | Unimpaired | Deemed to Accept |
| 8. | Old Parent Interests | Impaired | Deemed to Reject |

23

B.      *Classification and Treatment of Claims and Equity Interests*

1.   <u>Class 1 - Other Priority Claims</u>

(a)   *Classification*: Class 1 consists of the Other Priority Claims.

(b)   *Treatment*: Subject to <u>Article VIII</u> hereof, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Class 1 Claim is an Allowed Class 1 Claim as of the Effective Date or (ii) the date on which such Class 1 Claim becomes an Allowed Class 1 Claim, each Holder of an Allowed Class 1 Claim shall receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim, at the election of the Debtors or Reorganized Debtors, as applicable (with the consent of the Required Consenting Noteholders): (A) Cash equal to the amount of such Allowed Class 1 Claim; (B) such other less favorable treatment as to which the Debtors or Reorganized Debtors, as applicable, and the Holder of such Allowed Class 1 Claim shall have agreed upon in writing; or (C) such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code; *provided*, *however*, that Class 1 Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with the terms and conditions of any agreements relating thereto without further notice to or order of the Bankruptcy Court.

(c)   *Voting*:  Class 1 is an Unimpaired Class, and the Holders of Claims in Class 1 are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Claims in Class 1 are not entitled to vote to accept or reject this Plan.  Notwithstanding the foregoing, the Holders of Claims in Class 1 will be provided a Ballot/Opt-Out Form solely for purposes of affirmatively opting out of the Third Party Release.

2.   <u>Class 2 - Other Secured Claims</u>

(a)   *Classification*:  Class 2 consists of the Other Secured Claims.  Class 2 consists of separate subclasses for each Other Secured Claim.

(b)   *Treatment*: Subject to <u>Article VIII</u> hereof, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Class 2 Claim is an Allowed Class 2 Claim as of the Effective Date or (ii) the date on which such Class 2 Claim becomes an Allowed Class 2 Claim, each Holder of an Allowed Class 2 Claim shall receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim, at the election of the Debtors or Reorganized Debtors, as applicable (with the consent of the Required Consenting Noteholders): (A) Cash equal to the amount of such Allowed Class 2 Claim; (B) such other less favorable treatment as to which the Debtors or Reorganized Debtors, as applicable, and the Holder of such Allowed Class 2 Claim shall have agreed upon in writing; (C) the Collateral securing such Allowed Class 2 Claim; (D) such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code; or (E) such other treatment necessary to satisfy section 1129 of the Bankruptcy Code; *provided*, *however*, that Class 2 Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with

24

the terms and conditions of any agreements relating thereto without further notice to or order of the Bankruptcy Court.

(c)     *Voting*: Class 2 is an Unimpaired Class, and the Holders of Claims in Class 2 are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Claims in Class 2 are not entitled to vote to accept or reject this Plan.  Notwithstanding the foregoing, the Holders of Claims in Class 2 will be provided a Ballot/Opt-Out Form solely for purposes of affirmatively opting out of the Third Party Release.

3.   Class 3 - Secured Tax Claims

(a)     *Classification*:  Class 3 consists of the Secured Tax Claims.

(b)     *Treatment*:  Subject to Article VIII hereof, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Class 3 Claim is an Allowed Class 3 Claim as of the Effective Date or (ii) the date on which such Class 3 Claim becomes an Allowed Class 3 Claim, each Holder of an Allowed Class 3 Claim shall receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 3 Claim, at the election of the Debtors or Reorganized Debtors, as applicable (with the consent of the Required Consenting Noteholders):  (A) Cash equal to the amount of such Allowed Class 3 Claim; (B) such other less favorable treatment as to which the Debtors or Reorganized Debtors, as applicable, and the Holder of such Allowed Class 3 Claim shall have agreed upon in writing; (C) the Collateral securing such Allowed Class 3 Claim; (D) such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code; or (E) pursuant to and in accordance with sections 1129(a)(9)(C) and 1129(a)(9)(D) of the Bankruptcy Code, Cash in an aggregate amount of such Allowed Class 3 Claim payable in regular installment payments over a period ending not more than five (5) years after the Petition Date, plus simple interest at the rate required by applicable non-bankruptcy law on any outstanding balance from the Effective Date, or such lesser rate as is agreed to in writing by a particular taxing authority and the Debtors or Reorganized Debtors, as applicable, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; *provided*, *however*, that Class 3 Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.  Any installment payments to be made under clause (D) or (E) above shall be made in equal quarterly Cash payments beginning on the first applicable Subsequent Distribution Date, and continuing on each Subsequent Distribution Date thereafter until payment in full of the applicable Allowed Class 3 Claim.

(c)     *Voting:*  Class 3 is an Unimpaired Class, and the Holders of Claims in Class 3 shall be conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Claims in Class 3 are not entitled to vote to accept or reject this Plan.  Notwithstanding the foregoing, the Holders of Claims in Class 3 will be provided a Ballot/Opt-Out Form solely for purposes of affirmatively opting out of the Third Party Release.

25

US-DOCS\115394754.19

4. Class 4 – Prepetition Notes Claims

    (a)    *Classification:* Class 4 consists of Prepetition Notes Claims.

    (b)    *Allowance*: The Prepetition Notes Claims are Allowed in full as set forth in the DIP Orders, therein defined collectively as the "Prepetition Senior Notes Obligations".

    (c)    *Treatment:*  On the Effective Date, or as soon thereafter as reasonably practicable, each Holder of an Allowed Class 4 Claim shall receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 4 Claim its Pro Rata share of the following or such other less favorable treatment as to which the Debtors or Reorganized Debtors, as applicable, and the Holder of such Allowed Class 4 Claim shall have agreed upon in writing:

        (i)    The Subscription Rights (which shall be attached to each Allowed Prepetition Notes Claim and transferable with such Allowed Prepetition Notes Claim as set forth in the Rights Offering Procedures, but such Subscription Rights may only be exercised to the extent such Holder is an Accredited Investor) in accordance with the Disclosure Statement Order and the Rights Offering Procedures.  Each Holder of an Allowed Prepetition Notes Claim that will receive the Subscription Rights shall receive its Pro Rata share of the Subscription Rights, as shared with the aggregate amount of (A) all Eligible General Unsecured Claims as of the Rights Offering Record Date held by each Person or Entity that has certified that it is an Accredited Investor (as demonstrated by an AI Questionnaire that has been properly completed, duly executed, and timely delivered by such Holder to the subscription agent for the Rights Offering on or before the Questionnaire Deadline in accordance with the Rights Offering Procedures) *plus* (B) all Allowed Prepetition Notes Claims as of the Rights Offering Record Date held by each Person or Entity that has certified that it is an Accredited Investor (as demonstrated by an AI Questionnaire that has been properly completed, duly executed, and timely delivered by such Holder to the subscription agent for the Rights Offering on or before the Questionnaire Deadline in accordance with the Rights Offering Procedures).

        (ii)    100% of the New Equity Interests Pool, shared Pro Rata with the Holders of Allowed General Unsecured Claims (subject to dilution by (A) the New Equity Interests issued upon conversion of the New Secured Convertible Notes and (B) the New Management Incentive Plan Equity).  For the avoidance of doubt, the New Equity Interests in the New Equity Interests Pool shall be distributed on a Pro Rata basis to (A) Holders of Allowed Prepetition Notes Claims and (B) Holders of Allowed General Unsecured Claims, in accordance with the terms of this Plan.

    (d)    *Voting*:  Class 4 is Impaired, and Holders of Claims in Class 4 are entitled to vote to accept or reject this Plan.

26

5. <u>Class 5 – General Unsecured Claims</u>

    (a)    *Classification:* Class 5 consists of General Unsecured Claims.

    (b)    *Treatment:* Subject to <u>Article VIII</u> hereof, on the Effective Date, or as soon thereafter as reasonably practicable, each Holder of an Allowed Class 5 Claim shall receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 5 Claim its Pro Rata share of the following or such other less favorable treatment as to which the Debtors or Reorganized Debtors, as applicable, and the Holder of such Allowed Class 5 Claim shall have agreed upon in writing:

        (i)    The Subscription Rights (which shall be attached to each Allowed General Unsecured Claim and transferable with such Allowed General Unsecured Claim as set forth in the Rights Offering Procedures, but such Subscription Rights may only be exercised to the extent such Holder is an Accredited Investor) in accordance with the Disclosure Statement Order and the Rights Offering Procedures. Each Holder of an Eligible General Unsecured Claim that will receive the Subscription Rights as a certified Accredited Investor (as demonstrated by an AI Questionnaire that has been properly completed, duly executed, and timely delivered by such Holder to the subscription agent for the Rights Offering on or before the Questionnaire Deadline, in accordance with the Rights Offering Procedures) shall receive its Pro Rata share of the Subscription Rights, as shared with the aggregate amount of (A) all Eligible General Unsecured Claims as of the Rights Offering Record Date held by each Person or Entity that has certified that it is an Accredited Investor (as demonstrated by an AI Questionnaire that has been properly completed, duly executed, and timely delivered by such Holder to the subscription agent for the Rights Offering on or before the Questionnaire Deadline in accordance with the Rights Offering Procedures) *plus* (B) all Allowed Prepetition Notes Claims as of the Rights Offering Record Date held by each Person or Entity that has certified that it is an Accredited Investor (as demonstrated by an AI Questionnaire that has been properly completed, duly executed, and timely delivered by such Holder to the subscription agent for the Rights Offering on or before the Questionnaire Deadline in accordance with the Rights Offering Procedures).

        (ii)    100% of the New Equity Interests Pool, shared Pro Rata with the Holders of Allowed Prepetition Notes Claims (subject to dilution by (A) the New Equity Interests issued upon conversion of the New Secured Convertible Notes and (B) the New Management Incentive Plan Equity). For the avoidance of doubt, the New Equity Interests in the New Equity Interests Pool shall be distributed on a Pro Rata basis to (A) Holders of Allowed Prepetition Notes Claims and (B) Holders of Allowed General Unsecured Claims, in accordance with the terms of this Plan.

    (c)    *Voting*: Class 5 is Impaired, and Holders of Claims in Class 5 are entitled to vote to accept or reject this Plan.

US-DOCS\115394754.19

6.  Class 6 – Intercompany Claims

    (a)  *Classification*: Class 6 consists of the Intercompany Claims.

    (b)  *Treatment:*  Subject to the Restructuring Transactions, the Intercompany Claims shall be reinstated, compromised, or cancelled, at the option of the relevant Holder of such Intercompany Claims with the consent of the Required Consenting Noteholders.

    (c)  *Voting:* Class 6 is an Impaired Class.  However, because the Holders of such Claims are Affiliates of the Debtors, the Holders of Claims in Class 6 shall be conclusively deemed to have accepted this Plan.  Therefore, Holders of Claims in Class 6 are not entitled to vote to accept or reject this Plan

7.  Class 7 - Old Affiliate Interests in any Parent Subsidiary

    (a)  *Classification*: Class 7 consists of the Old Affiliate Interests in any Parent Subsidiary.

    (b)  *Treatment*:  Subject to the Restructuring Transactions, the Old Affiliate Interests shall remain effective and outstanding on the Effective Date and shall be owned and held by the same applicable Person or Entity that held and/or owned such Old Affiliate Interests immediately prior to the Effective Date.

    (c)  *Voting*: Class 7 is an Unimpaired Class, and the Holders of the Old Affiliate Interests in Class 7 are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of the Old Affiliate Interests in Class 7 are not entitled to vote to accept or reject this Plan.

8.  Class 8 - Old Parent Interests

    (a)  *Classification*: Class 8 consists of the Old Parent Interests.

    (b)  *Treatment*:  On the Effective Date, the Old Parent Interests will be cancelled without further notice to, approval of or action by any Person or Entity, and each Holder of an Old Parent Interest shall not receive any distribution or retain any property on account of such Old Parent Interest.

    (c)  *Voting*: Class 8 is an Impaired Class, and the Holders of Old Parent Interests in Class 8 will be conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Old Parent Interests in Class 8 will not be entitled to vote to accept or reject this Plan.  Notwithstanding the foregoing, the Holders of Old Parent Interests in Class 8 will be provided a Ballot/Opt-Out Form solely for purposes of affirmatively opting out of the Third Party Release.

C.  *Special Provision Governing Unimpaired Claims*

Except as otherwise provided herein, nothing under this Plan shall affect or limit the Debtors' or the Reorganized Debtors' rights and defenses (whether legal or equitable) in respect of any Unimpaired

28

Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

D.      *Elimination of Vacant Classes*

Any Class of Claims that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or a claim temporarily allowed under Bankruptcy Rule 3018, or as to which no vote is cast, shall be deemed eliminated from this Plan for purposes of voting to accept or reject this Plan and for purposes of determining acceptance or rejection of this Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

## ARTICLE IV.

## ACCEPTANCE OR REJECTION OF THE PLAN

A.      *Presumed Acceptance of Plan*

Classes 1-3 and 7 are Unimpaired under this Plan. Therefore, the Holders of Claims or Equity Interests in such Classes are deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject this Plan. Class 6 is Impaired under this Plan; however, because the Holders of such Claims are Affiliates of the Debtors, the Holders of Claims in Class 6 are conclusively deemed to have accepted this Plan.

B.      *Presumed Rejection of Plan*

Class 8 is Impaired and Holders of Old Parent Interests in such Class shall receive no distribution under this Plan on account of such Old Parent Interests. Therefore, the Holders of Old Parent Interests in such Class are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject this Plan. Such Holders will, however, receive a Ballot/Opt-Out Form to allow such Holders to affirmatively opt-out of the Third Party Release.

C.      *Voting Classes*

Classes 4 and 5 are Impaired under this Plan. The Holders of Claims in such Classes as of the Voting Record Date are entitled to vote to accept or reject this Plan.

D.      *Acceptance by Impaired Class of Claims*

Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted this Plan if the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in such Class actually voting have voted to accept this Plan.

E.      *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of this Plan by either Class 4 or Class 5. The Debtors request confirmation of this Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept this Plan pursuant to section 1126 of the Bankruptcy Code. The Debtors reserve the right to modify this Plan or any Exhibit or the Plan Supplement in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

US-DOCS\115394754.19

*F.      Votes Solicited in Good Faith*

The Debtors have, and upon the Confirmation Date shall be deemed to have, solicited votes on this Plan from the Voting Classes in good faith and in compliance with the Disclosure Statement Order and the applicable provisions of the Bankruptcy Code, including, without limitation, sections 1125 and 1126 of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with the solicitation.  Accordingly, the Debtors, the Reorganized Debtors, and each of their respective Related Persons shall be entitled to, and upon the Confirmation Date are hereby granted, the protections of section 1125(e) of the Bankruptcy Code.

## ARTICLE V.

## MEANS FOR IMPLEMENTATION OF THE PLAN

*A.      Restructuring Transactions*

Without limiting any rights and remedies of the Debtors or Reorganized Debtors under this Plan or applicable law, but in all cases subject to the terms and conditions of the Restructuring Documents and any consents or approvals required thereunder, the entry of the Confirmation Order shall constitute authorization for the Reorganized Debtors to take, or to cause to be taken, all actions necessary or appropriate to consummate and implement the provisions of this Plan prior to, on and after the Effective Date, including such actions as may be necessary or appropriate to effectuate a corporate restructuring of their respective businesses, to otherwise simplify the overall corporate structure of the Reorganized Debtors, or to reincorporate or reorganize certain of the Affiliate Debtors under the laws of jurisdictions other than the laws of which the applicable Affiliate Debtors are presently incorporated.  Such restructuring may include one or more mergers, consolidations, restructures, dispositions, liquidations or dissolutions, as may be determined by the Debtors or Reorganized Debtors to be necessary or appropriate, but in all cases subject to the terms and conditions of this Plan and the Restructuring Documents and any consents or approvals required thereunder (collectively, the "**Restructuring Transactions**").

All such Restructuring Transactions taken, or caused to be taken, shall be deemed to have been authorized and approved by the Bankruptcy Court upon the entry of the Confirmation Order.  The actions to effectuate the Restructuring Transactions may include: (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, disposition, liquidation, or dissolution containing terms that are consistent with the terms of this Plan and that satisfy the applicable requirements of applicable state law and such other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, duty, or obligation on terms consistent with the terms of this Plan and having such other terms to which the applicable entities may agree; (iii) the filing of appropriate certificates or articles of merger, consolidation, or dissolution pursuant to applicable state law; and (iv) all other actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable state law in connection with such transactions, but in all cases subject to the terms and conditions of this Plan and the Restructuring Documents and any consents or approvals required thereunder.

*B.      Continued Corporate Existence*

Subject to the Restructuring Transactions permitted by Article V.A of this Plan, after the Effective Date, the Reorganized Debtors shall continue to exist as separate legal entities in accordance with the applicable law in the respective jurisdiction in which they are incorporated or formed and pursuant to their respective certificates or articles of incorporation and by-laws, or other applicable organizational

30

documents, in effect immediately prior to the Effective Date, except to the extent such certificates or articles of incorporation and by-laws, or other applicable organizational documents, are amended, restated or otherwise modified under this Plan.  Notwithstanding anything to the contrary herein, the Claims against a particular Debtor or Reorganized Debtor shall remain the obligations solely of such Debtor or Reorganized Debtor and shall not become obligations of any other Debtor or Reorganized Debtor solely by virtue of this Plan or the Chapter 11 Cases.

C.      *Vesting of Assets in the Reorganized Debtors Free and Clear of Liens and Claims*

Except as otherwise expressly provided in this Plan, the Confirmation Order, or any Restructuring Document, pursuant to sections 1123(a)(5), 1123(b)(3), 1141(b) and (c) and other applicable provisions of the Bankruptcy Code, on and after the Effective Date, all property and assets of the Estates of the Debtors, including all claims, rights, and Retained Causes of Action of the Debtors, and any other assets or property acquired by the Debtors or the Reorganized Debtors during the Chapter 11 Cases or under or in connection with this Plan (other than the Claims or Causes of  Action subject to the Debtor Release, any rejected Executory Contracts and/or Unexpired Leases and the Carve-Out Reserve (subject to the Reorganized Debtors' reversionary interest in the Unused Carve-Out Reserve Amount as set forth in <u>Article V.R</u>)), shall vest in the Reorganized Debtors free and clear of all Claims, Liens, charges, and other encumbrances, subject to the Restructuring Transactions and Liens which survive the occurrence of the Effective Date as described in <u>Article III</u> of this Plan (including, without limitation, Liens that secure the Exit Facility Loans and the New Secured Convertible Notes and all other obligations of the Reorganized Debtors under the Exit Facility Loan Documents and the New Secured Convertible Notes Documents).  On and after the Effective Date, the Reorganized Debtors may (i) operate their respective businesses, (ii) use, acquire, and dispose of their respective property and (iii) compromise or settle any Claims, in each case without notice to, supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than restrictions expressly imposed by this Plan or the Confirmation Order.

D.      *Exit Facility Loan Documents; New Secured Convertible Notes Documents*

On the Effective Date, the Debtors and the Reorganized Debtors, as applicable, shall be authorized to execute and deliver, and to consummate the transactions contemplated by, the Exit Facility Loan Documents and the New Secured Convertible Notes Documents, in each case in form and substance acceptable to the Required Consenting Noteholders and without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity (other than as expressly required by the Exit Facility Loan Documents and the New Secured Convertible Notes Documents).  On the Effective Date, the Exit Facility Loan Documents and the New Secured Convertible Notes Documents shall constitute legal, valid, binding and authorized indebtedness and obligations of the Reorganized Debtors, enforceable in accordance with their respective terms and such indebtedness and obligations shall not be, and shall not be deemed to be, enjoined or subject to discharge, impairment, release or avoidance under this Plan, the Confirmation Order or on account of the Confirmation or Consummation of this Plan.

E.      *Rights Offering*

The Debtors shall conduct and consummate the Rights Offering on the terms and subject to the conditions set forth in the Rights Offering Procedures, the Backstop Purchase Agreement, the Backstop Order, and the Disclosure Statement Order.  The proceeds received by the Debtors under the Rights Offering from the Rights Offering Participants and the Backstop Parties pursuant to the Backstop Purchase Agreement will be utilized to, among other things, (i) satisfy the Allowed DIP Term Loan Facility claims, (ii) satisfy out-of-pocket costs and expenses incurred by the Debtors in connection with the Chapter 11

US-DOCS\115394754.19

Cases, (iii) if necessary, to cash collateralize letter of credit obligations that become outstanding under the Exit Facility Loan Documents, and (iv) for working capital and other general corporate purposes of the Reorganized Debtors after the Effective Date.

F.      *New Equity Interests*

On the Effective Date, subject to the terms and conditions of the Restructuring Transactions, Reorganized Parent shall issue the New Equity Interests pursuant to this Plan and the Amended/New Organizational Documents.  Except as otherwise expressly provided in the Restructuring Documents, the Reorganized Parent shall not be obligated to register the New Equity Interests under the Securities Act or to list the New Equity Interests for public trading on any securities exchange.

Distributions of the New Equity Interests may be made by delivery or book-entry transfer thereof by the applicable Distribution Agent in accordance with this Plan and the Amended/New Organizational Documents.  Upon the Effective Date, after giving effect to the transactions contemplated hereby, the authorized capital stock or other equity securities of Reorganized Parent shall be that number of shares of New Equity Interests as may be designated in the Amended/New Organizational Documents.

G.      *New Stockholders Agreement; New Registration Rights Agreement*

Subject to the Restructuring Transactions permitted by Article V.A of this Plan, on the Effective Date, Reorganized Parent shall enter into the New Stockholders Agreement and, if applicable, the New Registration Rights Agreement, each of which shall become effective and binding in accordance with its terms and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity (other than as expressly required by the New Stockholders Agreement and the New Registration Rights Agreement, as applicable).

On and as of the Effective Date, all of the Holders of New Equity Interests shall be deemed to be parties to the New Stockholders Agreement, without the need for execution by such Holder.  The New Stockholders Agreement shall be binding on all Persons or Entities receiving, and all Holders of, the New Equity Interests (and their respective successors and assigns), whether such New Equity Interest is received or to be received on or after the Effective Date and regardless of whether such Person or Entity executes or delivers a signature page to the New Stockholders Agreement.

To the extent applicable, on and as of the Effective Date, all Backstop Parties will be deemed to be parties to the New Registration Rights Agreement, without the need for execution by any such Persons or Entities.  The New Registration Rights Agreement will be binding on all such Persons or Entities (and their respective successors and assigns) regardless of whether such applicable Person or Entity executes or delivers a signature page to the New Registration Rights Agreement; provided, that to the extent the Required Backstop Parties elect not to enter into the New Registration Rights Agreement, the New Registration Rights Agreement shall not be included in the Plan Supplement, and the provisions herein related to the New Registration Rights Agreement shall be null and void.

H.      *New Management Incentive Plan*

After the Effective Date, the New Board shall adopt the New Management Incentive Plan pursuant to which New Equity Interests (or restricted stock units, options, or other instruments (including "profits interests" in the Reorganized Parent), or some combination of the foregoing) representing up to ten percent (10%) of the New Equity Interests issued as of the Effective Date on a fully diluted basis may be reserved for grants to be made from time to time to the directors, officers, and other management of the Reorganized

US-DOCS\115394754.19

Parent, subject to the terms and conditions set forth in the New Management Incentive Plan. The details and allocation of the New Management Incentive Plan and the underlying awards thereunder shall be determined by the New Board. For the avoidance of doubt, the New Management Incentive Plan Equity shall dilute all of the New Equity Interests equally, including the New Equity Interests issued upon conversion of the New Secured Convertible Notes after the Effective Date.

I.      *Plan Securities and Related Documentation; Exemption from Securities Laws*

On and after the Effective Date, the Debtors and the Reorganized Debtors, as applicable, are authorized to and shall provide or issue, as applicable, the New Equity Interests, the New Secured Convertible Notes, and any and all other securities to be distributed or issued under this Plan (collectively, the "**Plan Securities**") and any and all other notes, stock, instruments, certificates, and other documents or agreements required to be distributed, issued, executed or delivered pursuant to or in connection with this Plan (collectively, the "**Plan Securities and Documents**"), in each case in form and substance acceptable to the Required Consenting Noteholders, and without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity.

The offer, distribution, and issuance, as applicable, of the Plan Securities and Documents under this Plan shall be exempt from registration and prospectus delivery requirements under applicable securities laws (including Section 5 of the Securities Act or any similar state or local law requiring the registration and/or delivery of a prospectus for offer or sale of a security or registration or licensing of an issuer of a security) pursuant to section 1145(a) of the Bankruptcy Code, Section 4(a)(2) of the Securities Act and/or other applicable exemptions. An offering of Plan Securities provided in reliance on the exemption from registration under the Securities Act pursuant to section 1145(a) of the Bankruptcy Code may be sold without registration to the extent permitted under section 1145 of the Bankruptcy Code and is deemed to be a public offering, and such Plan Securities may be resold without registration to the extent permitted under section 1145 of the Bankruptcy Code. Any Plan Securities and Documents provided in reliance on the exemption from registration under the Securities Act provided by Section 4(a)(2) of such act will be provided in a private placement.

All Plan Securities issued to Holders of Allowed Claims on account of their respective Claims will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance on Section 1145(a) of the Bankruptcy Code. All Plan Securities issued (a) to Holders of Allowed Claims as Rights Offering Participants in the Rights Offering upon exercise of their respective Subscription Rights or upon subsequent conversion of their New Secured Convertible Notes into New Equity Interests, or (b) to the Backstop Parties pursuant to the Backstop Purchase Agreement (i) in satisfaction of their obligations to purchase any Unsubscribed Notes or (ii) in connection with the Put Option Notes, in each case, including upon any subsequent conversion of such New Secured Convertible Notes into New Equity Interests, will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance on Section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder.

Resales by Persons or Entities who receive any Plan Securities that are offered pursuant to an exemption under section 1145(a) of the Bankruptcy Code, who are deemed to be "underwriters" (as such term is defined in the Bankruptcy Code) (such Persons or Entities, the "**Restricted Holders**") would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act. Restricted Holders would, however, be permitted to resell the Plan Securities that are offered pursuant to an exemption under section 1145(a) of the Bankruptcy Code, as applicable, without registration if they are able to comply with the provisions of Rule 144 under the Securities Act, or if such securities are registered with the Commission pursuant to a registration statement or otherwise.

US-DOCS\115394754.19

Persons or Entities who receive Plan Securities pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder will hold "restricted securities" as defined under Rule 144 under the Securities Act. Resales of such restricted securities would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Holders of restricted securities would, however, be permitted to resell Plan Securities without registration if they are able to comply with the applicable provisions of Rule 144 or Rule 144A under the Securities Act or any other applicable registration exemption under the Securities Act, or if such securities are registered with the Commission.

In the event that the Reorganized Debtors elect on or after the Effective Date to reflect any ownership of the Plan Securities through the facilities of DTC, the Reorganized Debtors need not provide any further evidence other than this Plan or the Confirmation Order with respect to the treatment of such securities under applicable securities laws. DTC shall accept and be entitled to conclusively rely upon this Plan or the Confirmation Order in lieu of a legal opinion regarding whether such securities are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

### J.    Release of Liens and Claims

To the fullest extent provided under section 1141(c) and other applicable provisions of the Bankruptcy Code, except as otherwise provided herein (including, without limitation, Article V.D of this Plan) or in any contract, instrument, release or other agreement or document entered into or delivered in connection with this Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to Article VII hereof, all Liens, Claims, mortgages, deeds of trust, or other security interests against the assets or property of the Debtors or the Estates shall be fully released, canceled, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity. The filing of the Confirmation Order with any federal, state, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens, Claims and other interests to the extent provided in the immediately preceding sentence. Any Person or Entity holding such Liens, Claims or interests shall, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Reorganized Debtors such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtors.

### K.    Organizational Documents of the Reorganized Debtors

The respective organizational documents of each of the Debtors shall be amended and restated or replaced (as applicable) in form and substance satisfactory to the Debtors and the Required Consenting Noteholders and as necessary to satisfy the provisions of this Plan and the Bankruptcy Code. Such organizational documents shall: (i) to the extent required by section 1123(a)(6) of the Bankruptcy Code, include a provision prohibiting the issuance of non-voting equity securities; (ii) authorize the issuance of New Equity Interests in an amount not less than the amount necessary to permit the distributions thereof required or contemplated by this Plan; (iii) to the extent necessary or appropriate, include restrictions on the transfer of New Equity Interests; and (iv) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate this Plan and the transactions contemplated herein. After the Effective Date, the Reorganized Debtors may, subject to the terms and conditions of the Restructuring Documents, amend and restate their respective organizational documents as permitted by applicable law.

US-DOCS\115394754.19

L.      *Directors and Officers of the Reorganized Debtors*

The New Board shall be identified in the Plan Supplement.  The initial new board of directors or other governing body of each Parent Subsidiary shall consist of one or more of the directors or officers of Reorganized Parent.

Consistent with the requirements of section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose, at or prior to the Confirmation Hearing, the identity and affiliations of any Person proposed to serve on the initial board of directors or be an officer of each of the Reorganized Debtors, and, to the extent such Person is an insider other than by virtue of being a director or an officer, the nature of any compensation for such Person.  Each such director and officer shall serve from and after the Effective Date pursuant to applicable law and the terms of the Amended/New Organizational Documents and the other constituent and organizational documents of the applicable Reorganized Debtors.  The existing boards of directors and other governing bodies of the Debtors will be deemed to have resigned on and as of the Effective Date, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity.

M.      *Corporate Action*

Each of the Debtors and the Reorganized Debtors may take any and all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of this Plan, including, without limitation, the issuance and the distribution of the securities to be issued pursuant hereto, in each case in form and substance acceptable to the Required Consenting Noteholders, and without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers or directors of the Debtors or the Reorganized Debtors or by any other Person or Entity (except for those expressly required pursuant hereto or by the Restructuring Documents).

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to this Plan that would otherwise require approval of the stockholders, directors, officers, managers, members or partners of the Debtors (as of prior to the Effective Date) shall be deemed to have been so approved and shall be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the stockholders, directors, officers, managers, members or partners of the Debtors or the Reorganized Debtors, or the need for any approvals, authorizations, actions or consents of any Person or Entity.

As of the Effective Date, all matters provided for in this Plan involving the legal or corporate structure of the Debtors or the Reorganized Debtors (including, without limitation, the adoption of the Amended/New Organization Documents and similar constituent and organizational documents, and the selection of directors and officers for, each of the Reorganized Debtors), and any legal or corporate action required by the Debtors or the Reorganized Debtors in connection with this Plan, shall be deemed to have occurred and shall be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the stockholders, directors, officers, managers, members or partners of the Debtors or the Reorganized Debtors or by any other Person or Entity.

On and after the Effective Date, the appropriate officers of the Debtors and the Reorganized Debtors are authorized to issue, execute, deliver, consummate, and take all such actions as may be necessary or appropriate to effectuate and implement, the transactions contemplated by, the contracts, agreements,

US-DOCS\115394754.19

documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in this Plan in the name of and on behalf of the Debtors and the Reorganized Debtors, in each case in form and substance acceptable to the Required Consenting Noteholders, and without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person or Entity.  The secretary and any assistant secretary of the Debtors and the Reorganized Debtors shall be authorized to certify or attest to any of the foregoing actions.

*N.       Cancellation of Notes, Certificates and Instruments*

On the Effective Date, except to the extent otherwise provided in this Plan and the Restructuring Documents, all notes, stock, indentures, instruments, certificates, agreements and other documents evidencing or relating to Claims or Equity Interests (other than Old Affiliate Interests) shall be canceled, and the obligations of the Debtors thereunder or in any way related thereto shall be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person or Entity; provided that the Prepetition Notes and the Prepetition Notes Indenture shall continue in effect for the limited purpose of (i) allowing Holders of Claims thereunder to receive, and allowing and preserving the rights of the Prepetition Notes Indenture Trustee to make, distributions under this Plan and (ii) permitting the Prepetition Notes Indenture Trustee to exercise its Prepetition Notes Indenture Trustee Charging Lien against such distributions for payment of any unpaid portion of the Prepetition Notes Indenture Trustee Fees and Expenses.  Except to the extent otherwise provided in this Plan and the Restructuring Documents, upon completion of all such distributions, the Prepetition Notes Indenture and any and all notes, securities and instruments issued in connection therewith shall terminate completely without further notice or action and be deemed surrendered.

*O.       Old Affiliate Interests*

On the Effective Date, the Old Affiliate Interests shall remain effective and outstanding, and shall be owned and held by the same applicable Person or Entity that held and/or owned such Old Affiliate Interests immediately prior to the Effective Date.  Each Parent Subsidiary shall continue to be governed by the terms and conditions of its applicable organizational documents as in effect immediately prior to the Effective Date, except as amended or modified by this Plan.

*P.       Sources of Cash for Plan Distributions*

Except as otherwise provided in this Plan or the Confirmation Order, all Cash necessary for the Debtors or the Reorganized Debtors, as applicable, to make payments required pursuant to this Plan will be obtained from their respective Cash balances, including Cash from operations, the Exit Facility, and the Rights Offering.  The Debtors and the Reorganized Debtors, as applicable, may also make such payments using Cash received from their subsidiaries through their respective consolidated cash management systems and the incurrence of intercompany transactions, but in all cases subject to the terms and conditions of the Restructuring Documents.

*Q.       Continuing Effectiveness of Final Orders*

Payment authorization granted to the Debtors under any prior Final Order entered by the Bankruptcy Court shall continue in effect after the Effective Date.  Accordingly, the Debtors or the Reorganized Debtors may pay or otherwise satisfy any Claim to the extent permitted by, and subject to, the applicable Final Order without regard to the treatment that would otherwise be applicable to such Claim under this Plan.

US-DOCS\115394754.19

*R.      Funding and Use of Carve-Out Reserve*

On the Effective Date, the Debtors shall fund the Carve-Out Reserve in the amount equal to the Carve-Out Reserve Amount.  The Carve-Out Reserve Amount shall be determined by the Debtors, with the consent of the Required Consenting Noteholders or as determined by order of the Bankruptcy Court, as necessary in order to be able to pay in full in Cash the obligations and liabilities for which the Carve-Out Reserve was established.

The Cash contained in the Carve-Out Reserve shall be used solely to pay the Allowed Professional Fee Claims, with the Unused Carve-Out Reserve Amount (if any) being returned to the Reorganized Debtors.  The Debtors and the Reorganized Debtors, as applicable, shall maintain detailed records of all payments made from the Carve-Out Reserve, such that all payments and transactions shall be adequately and promptly documented in, and readily ascertainable from, their respective books and records.  After the Effective Date, neither the Debtors nor the Reorganized Debtors shall deposit any other funds or property into the Carve-Out Reserve absent further order of the Bankruptcy Court, or otherwise commingle funds in the Carve-Out Reserve.

The Carve-Out Reserve shall be maintained in trust for the Professionals and shall not be considered property of the Debtors' Estates; provided that the Reorganized Debtors shall have a reversionary interest in the Unused Carve-Out Reserve Amount.  To the extent that funds held in the Carve-Out Reserve do not or are unable to satisfy the full amount of the Allowed Professional Fee Claims, such Professionals shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied in full in Cash in accordance with Article II.A of this Plan.

*S.      Put Option Notes*

As consideration for the Debtors' right to call on the Backstop Parties' Backstop Commitments and consistent with the Backstop Order, on the Effective Date, the Reorganized Debtors shall issue the Put Option Notes to the Backstop Parties under and as set forth in the Backstop Purchase Agreement.

*T.      Payment of Fees and Expenses of Certain Creditors*

The Debtors shall, on and after the Effective Date and to the extent invoiced, pay (i) the Prepetition Credit Agreement Agent and Lender Fees and Expenses, (ii) the Ad Hoc Noteholders Committee Fees and Expenses and (iii) the Backstop Expenses (in each case whether accrued prepetition or postpetition and to the extent not otherwise paid during the Chapter 11 Cases), without application by any such parties to the Bankruptcy Court, and without notice and a hearing pursuant to section 1129(a)(4) of the Bankruptcy Code or otherwise; provided, however, if the Debtors or Reorganized Debtors and any such Person or Entity cannot agree with respect to the reasonableness of the fees and expenses (incurred prior to the Effective Date) to be paid to such party, the reasonableness of any such fees and expenses shall be determined by the Bankruptcy Court (with any undisputed amounts to be paid by the Debtors on or after the Effective Date (as applicable) and any disputed amounts to be escrowed by the Reorganized Debtors).  Notwithstanding anything to the contrary in this Plan, the fees and expenses described in this paragraph shall not be subject to the Administrative Claims Bar Date.

*U.      Payment of Fees and Expenses of Indenture Trustee*

The Debtors shall, on and after the Effective Date, and upon the presentment of invoices in customary form (which may be redacted to preserve any confidential or privileged information), pay the Prepetition Notes Indenture Trustee Fees and Expenses (in each case whether accrued prepetition or postpetition and to the extent not otherwise paid during the Chapter 11 Cases), without application by any

37

US-DOCS\115394754.19

party to the Bankruptcy Court, and without notice and a hearing pursuant to section 1129(a)(4) of the Bankruptcy Code or otherwise; *provided*, *however*, if the Debtors or Reorganized Debtors and the Prepetition Notes Indenture Trustee cannot agree with respect to the reasonableness of any Prepetition Notes Indenture Trustee Fees and Expenses (incurred prior to the Effective Date), the reasonableness of any such Prepetition Notes Indenture Trustee Fees and Expenses shall be determined by the Bankruptcy Court (with any undisputed amounts to be paid by the Debtors on or after the Effective Date (as applicable) and any disputed amounts to be escrowed by the Reorganized Debtors).  Nothing herein shall be deemed to impair, waive, or discharge the Prepetition Notes Indenture Trustee Charging Lien for any amounts not paid pursuant to this Plan and otherwise claimed by the Prepetition Notes Indenture Trustee pursuant to and in accordance with the Prepetition Notes Indenture.  From and after the Effective Date, the Reorganized Debtors shall pay any Prepetition Notes Indenture Trustee Fees and Expenses in full in Cash without further court approval.  Notwithstanding anything to the contrary in this Plan, the fees and expenses described in this paragraph shall not be subject to the Administrative Claims Bar Date.

## ARTICLE VI.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

*A.      Assumption of Executory Contracts and Unexpired Leases*

On the Effective Date, with the consent of the Required Consenting Noteholders, all Executory Contracts and Unexpired Leases of the Debtors will be assumed by the Debtors in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except for those Executory Contracts and Unexpired Leases that:

(i)      have been assumed or rejected by the Debtors by prior order of the Bankruptcy Court;

(ii)      are the subject of a motion to reject filed by the Debtors that is pending on the Effective Date;

(iii)      are identified in the Schedule of Rejected Executory Contracts and Unexpired Leases, which may be amended by the Debtors to add or remove Executory Contracts and Unexpired Leases by filing with the Bankruptcy Court an amended Schedule of Rejected Executory Contracts and Unexpired Leases and serving it on the affected non-Debtor contract parties prior to the Effective Date; or

(iv)      are rejected by the Debtors or terminated pursuant to the terms of this Plan.

Without amending or altering any prior order of the Bankruptcy Court approving the assumption or rejection of any Executory Contract or Unexpired Lease, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

To the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned (as applicable) pursuant to this Plan or any prior order of the Bankruptcy Court (including, without limitation, any "change in control" provision, "change of control" provision, or provision with words of similar import) prohibits, restricts or conditions, or purports to prohibit, restrict or condition, or is modified, breached or terminated, or deemed modified, breached or terminated by, (i) the commencement of these Chapter 11 Cases or the insolvency or financial condition of any Debtor at any time before the closing of its respective Chapter 11 Case, (ii) any Debtor's or any Reorganized Debtor's assumption or assumption and assignment (as applicable) of such Executory Contract or Unexpired Lease or (iii) the Confirmation or Consummation of this Plan, then such provision shall be deemed modified such that the

38

transactions contemplated by this Plan shall not entitle the non-debtor party thereto to modify or terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights or remedies with respect thereto, and any required consent under any such contract or lease shall be deemed satisfied by the Confirmation of this Plan.

Each Executory Contract and Unexpired Lease assumed and/or assigned pursuant to this Plan shall revest in and be fully enforceable by the applicable Reorganized Debtor or the applicable assignee in accordance with its terms and conditions, except as modified by the provisions of this Plan, any order of the Bankruptcy Court approving its assumption and/or assignment, or applicable law.

The inclusion or exclusion of a contract or lease on any schedule or exhibit shall not constitute an admission by any Debtor that such contract or lease is an Executory Contract or Unexpired Lease or that any Debtor has any liability thereunder.

B.      *Cure of Defaults; Assignment of Executory Contracts and Unexpired Leases*

Any defaults under each Executory Contract and Unexpired Lease to be assumed, or assumed and assigned, pursuant to this Plan shall be satisfied, pursuant to and to the extent required by section 365(b)(1) of the Bankruptcy Code, by payment of the applicable default amount in Cash on or in connection with the Effective Date or on such other terms as the Bankruptcy Court may order or the parties to such Executory Contracts or Unexpired Leases may otherwise agree in writing (the "**Cure Claim Amount**").

In the event of an assumption, or an assumption and assignment, of an Executory Contract or Unexpired Lease under this Plan, at least fourteen (14) days prior to the Plan Objection Deadline, the Debtors shall File and serve upon counterparties to such Executory Contracts and Unexpired Leases, a notice of the proposed assumption, or proposed assumption and assignment, which will: (a) list the applicable Cure Claim Amount, if any; (b) if applicable, identify the party to which the Executory Contract or Unexpired Lease will be assigned; (c) describe the procedures for filing objections thereto; and (d) explain the process by which related disputes will be resolved by the Bankruptcy Court.

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption, or proposed assumption and assignment under this Plan, or any related cure amount, must be Filed, served and actually received by the Debtors prior to the Plan Objection Deadline (notwithstanding anything in the Schedules or a Proof of Claim to the contrary). Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption, or proposed assumption and assignment, or cure amount will be deemed to have consented to such matters and will be deemed to have forever released and waived any objection to such proposed assumption, proposed assumption and assignment, and cure amount. The Confirmation Order shall constitute an order of the Bankruptcy Court approving each proposed assumption, or proposed assumption and assignment, of Executory Contracts and Unexpired Leases pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

In the event of a dispute regarding (a) the amount of any cure payment, (b) the ability of any Debtor or assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or assumed and assigned or (c) any other matter pertaining to assumption or assignment, the applicable cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving such assumption, or assumption and assignment. If such objection is sustained by Final Order of the Bankruptcy Court, the Debtors or the Reorganized Debtors, as applicable, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming or assigning it. The Debtors or the Reorganized Debtors, as applicable, shall be authorized to effect such rejection by filing a

39

written notice of rejection with the Bankruptcy Court and serving such notice on the applicable counterparty within ten (10) days of the entry of such Final Order.

Subject to any cure claims Filed with respect thereto, assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to this Plan shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assumption and assignment, in each case as provided in section 365 of the Bankruptcy Code. Any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned by Final Order shall be deemed disallowed and expunged (subject to any cure claims Filed with respect thereto), without further notice to or action, order, or approval of the Bankruptcy Court.

With respect to any Executory Contract or Unexpired Lease assumed and assigned pursuant to this Plan, upon and as of the Effective Date, the applicable assignee shall be deemed to be substituted as a party thereto for the applicable Debtor party to such assigned Executory Contract or Unexpired Lease and, accordingly, the Debtors and the Reorganized Debtors shall be relieved, pursuant to and to the extent set forth in section 365(k) of the Bankruptcy Code, from any further liability under such assigned Executory Contract or Unexpired Lease.

C.      *Rejection of Executory Contracts and Unexpired Leases*

The Debtors reserve the right, subject to the consent of the Required Consenting Noteholders, at any time prior to the Effective Date, except as otherwise specifically provided herein, to seek to reject any Executory Contract or Unexpired Lease and to file a motion requesting authorization for the rejection of any such contract or lease. All Executory Contracts and Unexpired Leases listed on the Schedule of Rejected Executory Contracts and Unexpired Leases shall be deemed rejected as of the Effective Date. The Confirmation Order shall constitute an order of the Bankruptcy Court approving the rejections described in this Article VI pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Rejection of any Executory Contract or Unexpired Lease pursuant to this Plan or otherwise shall not constitute a termination of any preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases.

D.      *Claims on Account of the Rejection of Executory Contracts or Unexpired Leases*

All Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to this Plan or the Confirmation Order, if any, must be filed with the Bankruptcy Court within thirty (30) days after service of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.

Any Person or Entity that is required to file a Proof of Claim arising from the rejection of an Executory Contract or an Unexpired Lease that fails to timely do so shall be forever barred, estopped and enjoined from asserting such Claim, and such Claim shall not be enforceable, against the Debtors, the Reorganized Debtors or the Estates, and the Debtors, the Reorganized Debtors and their Estates and their respective assets and property shall be forever discharged from any and all indebtedness and liability with respect to such Claim unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein. All such Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in Article X.G hereof.

40

US-DOCS\115394754.19

E.      *D&O Liability Insurance Policies*

On the Effective Date, each D&O Liability Insurance Policy shall be deemed and treated as an Executory Contract that is and shall be assumed by the Debtors (and assigned to the applicable Reorganized Debtors, if necessary) pursuant to section 365(a) and section 1123 of the Bankruptcy Code as to which no Proof of Claim, request for administrative expense, or cure claim need be Filed, and all Claims arising from the D&O Liability Insurance Policies shall survive the Effective Date and be Unimpaired.  Unless previously effectuated by separate order entered by the Bankruptcy Court, entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' assumption of each of the D&O Liability Insurance Policies.

In furtherance of the foregoing, the Reorganized Debtors shall maintain and continue in full force and effect such D&O Liability Insurance Policies for the benefit of the insured Persons at levels (including with respect to coverage and amount) no less favorable than those existing as of the date of entry of the Confirmation Order for a period of no less than six (6) years following the Effective Date; provided, however, that, after assumption of the D&O Liability Insurance Policies, nothing in this Plan otherwise alters the terms and conditions of the D&O Liability Insurance Policies.  Confirmation and Consummation of this Plan shall not impair or otherwise modify any available defenses of the Reorganized Debtors under the D&O Liability Insurance Policies. For the avoidance of doubt, the D&O Liability Insurance Policies shall continue to apply with respect to actions, or failures to act, that occurred on or prior to the Effective Date, subject to the terms and conditions of the D&O Liability Insurance Policies.

The Debtors are further authorized to take such actions, and to execute and deliver such documents, as may be reasonably necessary or appropriate to implement, maintain, cause the binding of, satisfy any terms or conditions of, or otherwise secure for the insureds the benefits of the D&O Tail Policy, without further notice to or order of the Bankruptcy Court or approval or consent of any Person or Entity.

F.      *Indemnification Provisions*

On the Effective Date, and, if applicable, subject to the assumption or assumption and assignment of the Specified Employee Plans in accordance Article VI.G hereof, all Indemnification Provisions shall be deemed and treated as Executory Contracts that are and shall be assumed by the Debtors (and assigned to the applicable Reorganized Debtors, if necessary) pursuant to section 365(a) and section 1123 of the Bankruptcy Code as to which no Proof of Claim, request for administrative expense, or cure claim need be Filed, and all Claims arising from the Indemnification Provisions shall survive the Effective Date and be Unimpaired; provided, that the Reorganized Debtors shall not be deemed to have assumed under this Plan, and shall have no obligation whatsoever with respect to, any obligations under any Indemnification Provision related to any Designated Person (the "**Designated Person Indemnity Carve-Out**").  Unless previously effectuated by separate order entered by the Bankruptcy Court, entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' assumption of each of the Indemnification Provisions, except with respect to the Designated Person Indemnity Carve-Out.  Confirmation and Consummation of this Plan shall not impair or otherwise modify any available defenses of the Reorganized Debtors or other applicable parties under the Indemnification Provisions.  For the avoidance of doubt, the Indemnification Provisions shall continue to apply with respect to actions, or failures to act, that occurred on or prior to the Effective Date, subject to the terms and conditions of the Indemnification Provisions and the Designated Person Indemnity Carve-Out.

G.      *Employee Compensation and Benefit Programs*

On the Effective Date, all employment agreements and severance policies, including all employment, compensation, and benefit plans, policies, and programs of the Debtors applicable to any of

41

their respective employees or retirees, and any of the employees or retirees of their respective subsidiaries, including, without limitation, all workers' compensation programs, savings plans, retirement plans, healthcare plans, disability plans, life, and accidental death and dismemberment insurance plans, health and welfare plans, and 401(k) plans (in each case, as applicable) (collectively, the "**Specified Employee Plans**") shall be deemed and treated as Executory Contracts that are and shall be assumed by the Debtors (and assigned to the applicable Reorganized Debtors, if necessary) pursuant to section 365(a) and section 1123 of the Bankruptcy Code as to which no Proof of Claim, request for administrative expense, or cure claim need be Filed.  All Claims arising from the Specified Employee Plans shall survive the Effective Date and be Unimpaired; provided that, in each case, with respect to any provision of a Specified Employee Plan that relates to a "change in control", "change of control" or words of similar import, that the Debtors, and, if applicable, the individual participants in the applicable Specified Employee Plan, agree that Confirmation and Consummation of this Plan and the related transactions hereunder do not constitute such an event for purposes of such Specified Employee Plan.  Unless previously effectuated by separate order entered by the Bankruptcy Court, entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' assumption of each of the Specified Employee Plans; provided further that any employment agreements or offer letters relating to senior management personnel and officers of the Debtors shall not be assumed under this Plan without the advanced written consent of the Required Backstop Parties. Confirmation and Consummation of this Plan shall not impair or otherwise modify any available defenses of the Reorganized Debtors or other applicable parties under the Specified Employee Plans.

*H.      Insurance Contracts*

On the Effective Date, and without limiting the terms or provisions of Paragraph E of this Article VI, each Insurance Contract shall be deemed and treated as an Executory Contract that is and shall be assumed by the Debtors pursuant to section 365(a) and section 1123 of the Bankruptcy Code as to which no Proof of Claim, request for administrative expense, or cure claim need be Filed.  Unless previously effectuated by separate order entered by the Bankruptcy Court, entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' assumption of each of the Insurance Contracts. Confirmation and Consummation of this Plan shall not impair or otherwise modify any available defenses of the Reorganized Debtors under the Insurance Contracts.

*I.      Extension of Time to Assume or Reject*

Notwithstanding anything to the contrary set forth in Article VI of this Plan, in the event of a dispute as to whether a contract is executory or a lease is unexpired, the right of the Reorganized Debtors to move to assume or reject such contract or lease shall be extended until the date that is ten (10) days after entry of a Final Order by the Bankruptcy Court determining that the contract is executory or the lease is unexpired. The deemed assumption provided for in Article VI.A of this Plan shall not apply to any such contract or lease, and any such contract or lease shall be assumed or rejected only upon motion of the Reorganized Debtors following the Bankruptcy Court's determination that the contract is executory or the lease is unexpired.

*J.      Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in this Plan, each Executory Contract or Unexpired Lease that is assumed by the Debtors or the Reorganized Debtors shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing has been previously rejected or repudiated or is rejected or repudiated hereunder.  Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that

US-DOCS\115394754.19

have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

## ARTICLE VII.

## PROVISIONS GOVERNING DISTRIBUTIONS

*A.      Distributions for Claims Allowed as of the Effective Date*

Except as otherwise provided in the "Treatment" sections in Article III hereof or as ordered by the Bankruptcy Court, initial distributions to be made on account of Claims that are Allowed Claims as of the Effective Date shall be made on the Initial Distribution Date or as soon thereafter as is practicable.  Any payment or distribution required to be made under this Plan on a day other than a Business Day shall be made on the next succeeding Business Day.  Distributions on account of Disputed Claims that first become Allowed Claims after the Effective Date shall be made pursuant to Article VIII hereof.

*B.      No Postpetition Interest on Claims*

Unless otherwise specifically provided for in this Plan, the Confirmation Order or Final Order of the Bankruptcy Court, or required by applicable bankruptcy law (including, without limitation, as required pursuant to section 506(b) or section 511 of the Bankruptcy Code), postpetition interest shall not accrue or be paid on any Claims and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim.

*C.      Distributions by the Reorganized Debtors or Other Applicable Distribution Agent*

Other than as specifically set forth below, the Reorganized Debtors or other applicable Distribution Agent shall make all distributions required to be distributed under this Plan.  Distributions on account of the Allowed DIP Facility Claims and the Allowed Prepetition Notes Claims shall be made to the DIP Facility Agents and the Prepetition Notes Indenture Trustee, respectively, and such agent and trustee will be, and shall act as, the Distribution Agent with respect to its respective Class of Claims in accordance with the terms and conditions of this Plan.  All such distributions shall be deemed completed when made by the Reorganized Debtors to the applicable Distribution Agent.  The Reorganized Debtors may employ or contract with other entities to assist in or make the distributions required by this Plan and may pay the reasonable fees and expenses of such entities and the Distribution Agents in the ordinary course of business.  No Distribution Agent shall be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

The distributions of New Equity Interests to be made under this Plan to Holders of Allowed Prepetition Notes Claims shall be made to the Prepetition Notes Indenture Trustee, which, subject to the right of the Prepetition Notes Indenture Trustee to assert its Prepetition Notes Indenture Trustee Charging Lien against such distributions, shall transmit such distributions to Holders of Allowed Prepetition Notes Claims in accordance with the Prepetition Notes Indenture.  Notwithstanding anything to the contrary in this Plan, the Prepetition Notes Indenture Trustee may transfer or direct the transfer of such distributions through the facilities of DTC and, in such event, will be entitled to recognize and transact with for all purposes under this Plan with Holders of Allowed Prepetition Notes Claims to the extent consistent with the customary practices of DTC.  The Debtors or Reorganized Debtors (as applicable) shall use their best efforts to make the New Equity Interests to be distributed to Holders of Allowed Prepetition Notes Claims eligible for distribution through the facilities of DTC.  The distributions of Subscription Rights under this

Plan to Holders of Allowed Prepetition Notes Claims and Eligible General Unsecured Claims shall be made by the Voting and Claims Agent as provided in the Rights Offering Procedures.

D.      *Delivery and Distributions; Undeliverable or Unclaimed Distributions*

    1.  Record Date for Distributions

On the Distribution Record Date, the Claims Register shall be closed. Accordingly, the Debtors, the Reorganized Debtors or other applicable Distribution Agent will have no obligation to recognize the assignment, transfer or other disposition of, or the sale of any participation in, any Allowed Claim (other than Prepetition Debt Claims) that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute securities, property, notices and other documents only to those Holders of Allowed Claims (other than Prepetition Debt Claims) who are Holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date. The Reorganized Debtors or other applicable Distribution Agent shall be entitled to recognize and deal for all purposes under this Plan with only those record holders stated on the Claims Register, or their books and records, as of the close of business on the Distribution Record Date; provided, however, that the Distribution Record Date shall not apply to the Prepetition Debt Claims and the DIP Facility Claims.

    2.  Delivery of Distributions in General

Except as otherwise provided herein, the Debtors, the Reorganized Debtors or other applicable Distribution Agent, as applicable, shall make distributions to Holders of Allowed Claims, or in care of their authorized agents, as appropriate, at the address for each such Holder or agent as indicated on the Debtors' or other applicable Distribution Agent's books and records as of the date of any such distribution; *provided*, *however*, that the manner of such distributions shall be determined in the discretion of the applicable Distribution Agent (subject to the terms and conditions of the relevant Prepetition Debt Documents, if applicable); provided further, that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in the latest Proof of Claim Filed by such Holder pursuant to Bankruptcy Rule 3001 as of the Distribution Record Date.

    3.  Minimum Distributions

Notwithstanding anything herein to the contrary, no Distribution Agent shall be required to make distributions or payments of less than $50.00 (whether in Cash or otherwise) or to make partial distributions or payments of fractions of dollars or New Equity Interests, in each case with respect to Impaired Claims. With respect to Impaired Claims, whenever any payment or distribution of a fraction of a dollar or share of New Equity Interest under this Plan would otherwise be called for, the actual payment or distribution will reflect a rounding of such fraction to the nearest whole dollar or share of New Equity Interest (up or down), with half dollars and half shares of New Equity Interest or more being rounded up to the next higher whole number and with less than half dollars and half shares of New Equity Interest being rounded down to the next lower whole number (and no Cash shall be distributed in lieu of such fractional New Equity Interest).

No Distribution Agent shall have any obligation to make a distribution on account of an Allowed Claim that is Impaired under this Plan if: (a) the aggregate amount of all distributions authorized to be made on the Subsequent Distribution Date in question is or has an economic value less than $25,000, unless such distribution is a final distribution; or (b) the amount to be distributed to the specific Holder of an Allowed Claim on such Subsequent Distribution Date does not constitute a final distribution to such Holder and is or has an economic value less than $50.00, which shall be treated as an undeliverable distribution under Article VII.D.4 below.

44

4.   <u>Undeliverable Distributions</u>

(a)   Holding of Certain Undeliverable Distributions

If the distribution to any Holder of an Allowed Claim is returned to the Distribution Agent as undeliverable or is otherwise unclaimed, no further distributions shall be made to such Holder unless and until the Distribution Agent is notified in writing of such Holder's then current address, at which time all currently due but missed distributions shall be made to such Holder on the next Subsequent Distribution Date (or such earlier date as determined by the applicable Distribution Agent).  Undeliverable distributions shall remain in the possession of the Reorganized Debtors or in the applicable reserve, subject to <u>Article VII.D.4(b)</u> hereof, until such time as any such distributions become deliverable.  Undeliverable distributions shall not be entitled to any additional interest, dividends or other accruals of any kind on account of their distribution being undeliverable.

(b)   Failure to Claim Undeliverable Distributions

Any Holder of an Allowed Claim (or any successor or assignee or other Person or Entity claiming by, through, or on behalf of, such Holder) that does not assert a right pursuant to this Plan for an undeliverable or unclaimed distribution within one (1) year after the later of the Effective Date or the date such distribution is due shall be deemed to have forfeited its rights for such undeliverable or unclaimed distribution and shall be forever barred and enjoined from asserting any such rights for an undeliverable or unclaimed distribution against the Debtors or their Estates, the Reorganized Debtors or their respective assets or property, or any Distribution Agent.  In such case, (i) for Claims other than Classes 4 and 5, any Cash, Plan Securities, or other property reserved for distribution on account of such Claim shall become the property of the Estates free and clear of any Claims of such Holder with respect thereto and notwithstanding any federal or state escheat laws to the contrary, and (ii) for Claims in Classes 4 and 5, any Plan Securities and Documents, and/or other property, as applicable, held for distribution on account of such Claim shall be allocated Pro Rata by the applicable Distribution Agent for distribution among the other Holders of Claims in such Class.  Nothing contained in this Plan shall require the Debtors, the Reorganized Debtors, or any Distribution Agent to attempt to locate any Holder of an Allowed Claim.

(c)   Failure to Present Checks

Checks issued by the Distribution Agent on account of Allowed Claims shall be null and void if not negotiated within 180 days after the issuance of such check.  In an effort to ensure that all Holders of Allowed Claims receive their allocated distributions, no later than 90 days after the issuance of such checks, the Reorganized Debtors shall File with the Bankruptcy Court a list of the Holders of any un-negotiated checks.  This list shall be maintained and updated periodically in the sole discretion of the Reorganized Debtors for as long as the Chapter 11 Cases stay open.  Requests for reissuance of any check shall be made directly to the Distribution Agent by the Holder of the relevant Allowed Claim with respect to which such check originally was issued.  Any Holder of an Allowed Claim holding an un-negotiated check that does not request reissuance of such un-negotiated check within 365 days after the date of mailing or other delivery of such check shall have its Claim for such un-negotiated check discharged and be forever barred, estopped and enjoined from asserting any such Claim against the Debtors or their Estates, the Reorganized Debtors or their respective assets or property.  In such case, any Cash held for payment on account of such Claims shall be distributed to the applicable Distribution Agent for distribution or allocation in accordance with this Plan, free and clear of any Claims of such Holder with respect thereto and notwithstanding any federal or state escheat laws to the contrary.

45

US-DOCS\115394754.19

E.      *Compliance with Tax Requirements*

In connection with this Plan and all distributions hereunder, the Reorganized Debtors or other applicable Distribution Agent shall comply with all applicable withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions hereunder shall be subject to any such applicable withholding and reporting requirements.  The Reorganized Debtors or other applicable Distribution Agent shall be authorized to take any and all actions that may be necessary or appropriate to comply with such applicable withholding and reporting requirements.  All Persons holding Claims shall be required to provide any information necessary to effect information reporting and the withholding of such taxes.  Notwithstanding any other provision of this Plan to the contrary, each Holder of an Allowed Claim shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding, and other tax obligations, on account of such distribution.

F.      *Allocation of Plan Distributions Between Principal and Interest*

To the extent that any Allowed Claim entitled to a distribution under this Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall, to the extent permitted by applicable law, be allocated for income tax purposes to the principal amount of the Claim first and then, to the extent that the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

G.      *Means of Cash Payment*

Payments of Cash made pursuant to this Plan shall be in U.S. dollars and shall be made, at the option of the Debtors or the Reorganized Debtors (as applicable), by checks drawn on, or wire transfer from, a domestic bank selected by the Debtors or the Reorganized Debtors.  Cash payments to foreign creditors may be made, at the option of the Debtors or the Reorganized Debtors, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

H.      *Timing and Calculation of Amounts to Be Distributed*

Except as otherwise provided in the "Treatment" sections in Article III hereof or as ordered by the Bankruptcy Court, on the Initial Distribution Date (or if a Claim is not an Allowed Claim on the Effective Date, on the Subsequent Distribution Date occurring after such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive the full amount of the distributions that this Plan provides for Allowed Claims in the applicable Class.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in the applicable class treatment or in Article VIII hereof.  Except as otherwise provided herein, Holders of Claims shall not be entitled to interest, dividends or accruals on the distributions provided for herein, regardless of whether such distributions are delivered on or at any time after the Effective Date.

I.      *Setoffs*

Without altering or limiting any of the rights and remedies of the Debtors and the Reorganized Debtors under section 502(d) of the Bankruptcy Code, all of which rights and remedies are hereby reserved, the Debtors and the Reorganized Debtors may, but shall not be required to, withhold (but not setoff except as set forth below) from the distributions called for hereunder on account of any Allowed Claim an amount equal to any claims, Causes of Action and Retained Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim; provided that, at least ten

46

(10) days prior to effectuating such withholding, the Debtors or the Reorganized Debtors, as applicable, shall provide written notice thereof to the applicable Holder of such Claim, and all objections and defenses of such Holder to such withholding are preserved. In the event that any such claims, Causes of Action or Retained Causes of Action are adjudicated by Final Order or otherwise resolved against the applicable Holder, the Debtors and the Reorganized Debtors may, pursuant to sections 553 or 558 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant hereto on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), the amount of such adjudicated or resolved claims, Causes of Action or Retained Causes of Action. Neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claims, Causes of Action or Retained Causes of Action, all of which are reserved unless expressly released or compromised pursuant to this Plan or the Confirmation Order.

## ARTICLE VIII.

## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS

*A.     Resolution of Disputed Claims*

### 1.     Allowance of Claims

After the Effective Date, and except as otherwise provided in this Plan, the Reorganized Debtors shall have and shall retain any and all available rights and defenses that the Debtors had with respect to any Claim, including, without limitation, the right to assert any objection to Claims based on the limitations imposed by section 502 of the Bankruptcy Code. The Debtors and the Reorganized Debtors may contest the amount and validity of any Disputed Claim or contingent or unliquidated Claim in the ordinary course of business in the manner and venue in which such Claim would have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced.

### 2.     Prosecution of Objections to Claims

After the Confirmation Date but before the Effective Date, the Debtors, and after the Effective Date, the Reorganized Debtors shall have the authority to File objections to Claims (other than Claims that are Allowed under this Plan) and settle, compromise, withdraw or litigate to judgment objections to any and all such Claims, regardless of whether such Claims are in an Unimpaired Class or otherwise; *provided*, *however*, this provision shall not apply to Professional Fee Claims, which may be objected to by any party-in-interest in these Chapter 11 Cases. From and after the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Claim without any further notice to or action, order or approval of the Bankruptcy Court. The Reorganized Debtors shall have the sole authority to administer and adjust the Claims Register and their respective books and records to reflect any such settlements or compromises without any further notice to or action, order or approval of the Bankruptcy Court.

### 3.     Claims Estimation

After the Confirmation Date but before the Effective Date, the Debtors, and after the Effective Date, the Reorganized Debtors may at any time request that the Bankruptcy Court estimate any Disputed Claim or contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any such Claim, whether for allowance or to determine the maximum amount of such Claim, including during the litigation concerning any objection to any Claim or during the pendency of any

47

appeal relating to any such objection. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court. The rights and objections of all parties are reserved in connection with any such estimation. Notwithstanding any provision otherwise in this Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under this Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.

4. Deadline to File Objections to Claims

Any objections to Claims shall be Filed by no later than the Claims Objection Deadline; provided that nothing contained herein shall limit the Reorganized Debtors' right to object to Claims, if any, Filed or amended after the Claims Objection Deadline. Moreover, notwithstanding the expiration of the Claims Objection Deadline, the Debtors or the Reorganized Debtors shall continue to have the right to amend any claims objections and to file and prosecute supplemental objections and counterclaims to a Disputed Claim until such Disputed Claim is Allowed. Moreover, notwithstanding the expiration of the Claims Objection Deadline, the Reorganized Debtors shall continue to have the right to amend any claims or other objections and to File and prosecute supplemental objections and counterclaims to a Disputed Claim until such Disputed Claim is or becomes Allowed by Final Order of the Bankruptcy Court.

B.      *No Distributions Pending Allowance*

Notwithstanding any other provision of this Plan to the contrary, no payments or distributions of any kind or nature shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim has become an Allowed Claim pursuant to a Final Order.

C.      *Distributions on Account of Disputed Claims Once They Are Allowed and Additional Distributions on Account of Previously Allowed Claims*

On each Subsequent Distribution Date (or such earlier date as determined by the Reorganized Debtors in their sole discretion), the Reorganized Debtors or other applicable Distribution Agent will make distributions (a) on account of any Disputed Claim that has become an Allowed Claim during the preceding calendar quarter, and (b) on account of previously Allowed Claims of property that would have been distributed to the Holders of such Claims on the dates distributions previously were made to Holders of Allowed Claims in such Class had the Disputed Claims that have become Allowed Claims or Disallowed Claims by Final Order of the Bankruptcy Court been Allowed or disallowed, as applicable, on such dates. Such distributions will be made pursuant to the applicable provisions of Article VII of this Plan. For the avoidance of doubt, but without limiting the terms or conditions of Article VII.B or Paragraph B of this Article VIII, any dividends or other distributions arising from property distributed to holders of Allowed Claims in a Class and paid to such Holders under this Plan shall also be paid, in the applicable amounts, to any Holder of a Disputed Claim in such Class that becomes an Allowed Claim after the date or dates that such dividends or other distributions were earlier paid to holders of Allowed Claims in such Class.

48

US-DOCS\115394754.19

*D.     Reserve for Disputed Claims*

The Debtors, the Reorganized Debtors, and the Distribution Agent may, in their respective sole discretion, establish such appropriate reserves for Disputed Claims in the applicable Class(es) as it determines necessary and appropriate, in each case with the consent of the Required Consenting Noteholders or as otherwise approved by the Bankruptcy Court.  Without limiting the foregoing, reserves (if any) for Disputed Claims shall equal, as applicable, an amount equal to 100% of distributions or property to which Holders of Disputed Claims in each applicable Class would otherwise be entitled to receive under this Plan as of such date if such Disputed Claims were Allowed Claims in their respective Face Amount (or based on the Debtors' books and records if the applicable Holder has not yet Filed a Proof of Claim and the Claims Bar Date has not yet expired); provided, however, that the Debtors and the Reorganized Debtors, as applicable, shall have the right to file a motion seeking to estimate any Disputed Claims.

On the Effective Date, the Reorganized Debtors shall make a distribution of the New Equity Interests to the Holders of Allowed Prepetition Notes Claims consistent with **Error! Reference source not found.** hereof; *provided*, that the Reorganized Debtors shall reserve the amount of New Equity Interests necessary to make distributions to all Holders of General Unsecured Claims in the Face Amount of such Holders' General Unsecured Claims as if all such General Unsecured Claims were determined to be Allowed Claims (the "**Reserved New Equity Interests**").  The Reserved New Equity Interests shall be distributed to Holders of General Unsecured Claims, as such Claims become Allowed, in accordance with the terms of this Plan.

## ARTICLE IX.

## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

*A.     Conditions Precedent to Confirmation*

It shall be a condition to Confirmation of this Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C hereof:

1.   This Plan and the Restructuring Documents shall be in form and substance consistent in all material respects with the Restructuring Support Agreement and otherwise acceptable to the Debtors and the Required Consenting Noteholders;

2.   The Disclosure Statement Order and the Backstop Order shall have been entered by the Bankruptcy Court and such orders shall have become a Final Order that has not been stayed, modified, or vacated on appeal; and

3.   The Confirmation Order shall have been entered by the Bankruptcy Court.

*B.     Conditions Precedent to Consummation*

It shall be a condition to Consummation of this Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C hereof;

1.   The Confirmation Order shall have become a Final Order and such order shall not have been amended, modified, vacated, stayed, or reversed;

2.   The Confirmation Date shall have occurred;

3.    The Bankruptcy Court shall have entered one or more Final Orders (which may include the Confirmation Order), in form and substance acceptable to the Debtors and the Required Consenting Noteholders, authorizing the assumption, assumption and assignment and rejection of the Executory Contracts and Unexpired Leases by the Debtors as contemplated in this Plan and the Plan Supplement;

4.    This Plan and the Restructuring Documents shall not have been amended or modified other than in a manner in form and substance consistent in all material respects with the Restructuring Term Sheet and otherwise acceptable to the Debtors and the Required Consenting Noteholders;

5.    The Restructuring Documents shall have been filed, tendered for delivery, and been effectuated or executed by all Entities party thereto (as appropriate), and in each case in full force and effect.  All conditions precedent to the effectiveness of such Restructuring Documents, including, without limitation, the Exit Facility Credit Agreement, the New Secured Convertible Notes Indenture, and the Backstop Purchase Agreement, shall have been satisfied or waived pursuant to the terms of such applicable Restructuring Documents (or shall be satisfied concurrently with the occurrence of the Effective Date);

6.    All consents, actions, documents, certificates and agreements necessary to implement this Plan and the transactions contemplated by this Plan shall have been, as applicable, obtained and not otherwise subject to unfulfilled conditions, effected or executed and delivered to the required parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable laws, and in each case in full force and effect;

7.    All governmental approvals and consents, including Bankruptcy Court approval, that are applicable and legally required for the consummation of this Plan shall have been obtained, not be subject to unfulfilled conditions and be in full force and effect, and all applicable waiting periods under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, shall have expired;

8.    The Debtors shall have received, or concurrently with the occurrence of the Effective Date will receive, at least $43.3 million as contemplated in connection with the Backstop Purchase Agreement and the Rights Offering;

9.    The New Board shall have been selected in accordance with the terms of this Plan and the Restructuring Support Agreement;

10. The Exit Facility Credit Agreement and the New Secured Convertible Notes Indenture shall each have closed or will close simultaneously with the effectiveness of this Plan;

11. The Restructuring Support Agreement shall be in full force and effect and shall not have been terminated in accordance with its terms;

12. The Backstop Purchase Agreement shall not have been terminated, and all conditions precedent (including the entry of the Backstop Order by the Bankruptcy Court and the Backstop Order becoming a Final Order, but excluding any conditions related to the occurrence of the Effective Date) to the obligations of the Backstop Parties under the Backstop Purchase Agreement shall have been satisfied or waived in accordance with the terms thereof, and the closing of the Backstop Purchase Agreement shall occur concurrently with the occurrence of the Effective Date;

13. The Debtors shall not be in default under either of the DIP Facilities or the Final DIP Order (or, to the extent that the Debtors are in default on the proposed Effective Date, such default shall have been waived by the applicable DIP Lenders or cured by the Debtors in a manner consistent with the DIP Facilities

US-DOCS\115394754.19

and the DIP Orders) and both of the DIP Credit Agreements shall be in full force and effect and shall not have been terminated in accordance with their terms;

14. The Carve-Out Reserve shall have been funded in full in Cash by the Debtors in accordance with the terms and conditions of this Plan;

15. To the extent invoiced, all (i) Ad Hoc Noteholders Committee Fees and Expenses, (ii) Prepetition Credit Agreement Agent and Lender Fees and Expenses, (iii) Prepetition Notes Indenture Trustee Fees and Expenses, and (iv) Backstop Expenses shall have been paid in full in Cash or reserved in a manner acceptable to the applicable Required Consenting Noteholders (or approved by order of the Bankruptcy Court) to the extent of any disputes related thereto;

16. There shall be no ruling, judgment, or order issued by any Governmental Unit making illegal, enjoining, or otherwise preventing or prohibiting the consummation of the Restructuring Transactions, unless such ruling, judgment, or order has been stayed, reversed, or vacated within three (3) Business Days after such issuance;

17. There shall be no material litigation or investigation by any Governmental Unit involving the Debtors as of the Effective Date that has had, or would reasonably be expected to have, a material adverse effect on the business, financial condition or results of operations of the Reorganized Debtors, taken as a whole; and

18. To the extent required under applicable non-bankruptcy law, the Amended/New Organizational Documents shall have been duly filed with the applicable authorities in the relevant jurisdictions.

## C.      *Waiver of Conditions*

Subject to section 1127 of the Bankruptcy Code, the conditions to Confirmation and Consummation of this Plan set forth in this Article IX may be waived by the Debtors, with the consent of the Required Consenting Noteholders, without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate this Plan.  The failure of the Debtors or Reorganized Debtors to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each right shall be deemed an ongoing right that may be asserted at any time.

## D.      *Effect of Non-Occurrence of Conditions to Confirmation or Consummation*

If the Confirmation or the Consummation of this Plan does not occur with respect to one or more of the Debtors, then this Plan shall, with respect to such applicable Debtor or Debtors, be null and void in all respects and nothing contained in this Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any Holders or any other Person or Entity; (3) constitute an Allowance of any Claim or Equity Interest; or (4) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders or any other Person or Entity in any respect.

US-DOCS\115394754.19

**ARTICLE X.**

**RELEASE, DISCHARGE, INJUNCTION AND RELATED PROVISIONS**

*A.      General*

Notwithstanding anything contained herein to the contrary, the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions (if any) and treatments hereunder, takes into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code or otherwise.  As of the Effective Date, any and all contractual, legal and equitable subordination rights, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code or otherwise, relating to the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions (if any) and treatments hereunder, are settled, compromised, terminated and released pursuant hereto; *provided*, *however*, that nothing contained herein shall preclude any Person or Entity from exercising their rights pursuant to and consistent with the terms of this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan.

*B.      **Release of Claims and Causes of Action***

1.      ***Release by the Debtors and their Estates*.  Pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, and except as otherwise expressly provided in this Plan, effective as of the Effective Date, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, the Debtors and the Reorganized Debtors, in their respective individual capacities and as debtors-in-possession, and on behalf of themselves and their respective Estates, including, without limitation, any successor to the Debtors or any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code (collectively, the "Debtor Releasing Parties"), shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver and release to each of the Released Parties (and each such Released Party so released shall be deemed forever released, waived and discharged by the Debtor Releasing Parties) and their respective assets and properties (the "Debtor Release") from any and all Claims, Causes of Action, and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of the Debtors or their Affiliates, including, without limitation, (i) the Chapter 11 Cases, the Disclosure Statement, this Plan, the Restructuring Support Agreement, the Backstop Purchase Agreement, the Rights Offering, the Restructuring Documents, the Prepetition Debt Documents, and the DIP Loan Documents, (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in this Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, the Backstop Purchase Agreement, the Rights Offering, this Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Documents, the Prepetition Debt Documents, the DIP Loan Documents, or related agreements, instruments or other documents, (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale, or rescission of the purchase or sale of any Equity Interest or Plan Securities of the Debtors or the**

52

Reorganized Debtors, and/or (vii) the Confirmation or Consummation of this Plan or the solicitation of votes on this Plan, that such Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) or that any Holder of a Claim or Equity Interest or other Person or Entity would have been legally entitled to assert for, or on behalf or in the name of, any Debtor, its respective Estate or any Reorganized Debtor (whether directly or derivatively) against any of the Released Parties; *provided*, *however*, that the foregoing provisions of this Debtor Release shall not operate to waive or release (A) the rights of such Debtor Releasing Party to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan (including, without limitation, the Exit Facility Loan Documents and the New Secured Convertible Notes Documents) or assumed or assumed and assigned, as applicable, pursuant to this Plan or pursuant to a Final Order of the Bankruptcy Court and (B) claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes a criminal act, fraud, willful misconduct, or gross negligence, in each case as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction.  The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity and the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Debtor Release.  Notwithstanding the foregoing, nothing in this Article X.B. shall or shall be deemed to (i) prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person or Entity that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors and/or (ii) operate as a release or waiver of any Intercompany Claims, in each case unless otherwise expressly provided for in this Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims released by the Debtor Release; (iii) in the best interest of the Debtors and their Estates; (iv) fair, equitable and reasonable; (v) given and made after due notice and opportunity for hearing; and (vi) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any claim or Cause of Action released pursuant to the Debtor Release.

2.      *Release By Third Parties*.  Except as otherwise expressly provided in this Plan, effective as of the Effective Date, to the fullest extent permitted by applicable law, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, and without limiting or otherwise modifying the scope of the Debtor Release provided by the Debtor Releasing Parties above, each Non-Debtor Releasing Party (together with the Debtor Releasing Parties, the "Releasing Parties") shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver, and release to each of the Released Parties (and each such Released Party so released shall be deemed forever released, waived, and discharged by the Non-Debtor Releasing Parties) and their respective assets and properties (the "Third Party Release") from any and all Claims, Causes of Action, and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or

53

omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of the Debtors or their Affiliates, including, without limitation, (i) the Chapter 11 Cases, the Disclosure Statement, this Plan, the Restructuring Support Agreement, the Backstop Purchase Agreement, the Rights Offering, the Restructuring Documents, the Prepetition Debt Documents, and the DIP Loan Documents, (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in this Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, the Backstop Purchase Agreement, the Rights Offering, this Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Documents, the Prepetition Debt Documents, the DIP Loan Documents, or related agreements, instruments or other documents, (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale or rescission of the purchase or sale of any Equity Interest or Plan Securities of the Debtors or the Reorganized Debtors, and/or (vii) the Confirmation or Consummation of this Plan or the solicitation of votes on this Plan that such Non-Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) against any of the Released Parties; *provided*, *however*, that the foregoing provisions of this Third Party Release shall not operate to waive or release (A) the rights of such Non-Debtor Releasing Party to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan (including, without limitation, the Exit Facility Loan Documents and the New Secured Convertible Notes Documents) or assumed or assumed and assigned, as applicable, pursuant to this Plan or pursuant to a Final Order of the Bankruptcy Court and (B) claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes a criminal act, fraud, willful misconduct, or gross negligence, in each case as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction.  The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity and the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Third Party Release.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third Party Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Third Party Release is:  (i) consensual; (ii) essential to the confirmation of this Plan; (iii) in exchange for the good and valuable consideration provided by the Released Parties; (iv) a good faith settlement and compromise of the Claims released by the Third Party Release; (v) in the best interest of the Debtors and all Holders of Claims and Equity Interests; (vi) fair, equitable and reasonable; (vii) given and made after due notice and opportunity for hearing; and (viii) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third Party Release.

C.      *Waiver of Statutory Limitations on Releases*

Each of the Releasing Parties in each of the releases contained above expressly acknowledges that although ordinarily a general release may not extend to Claims which the Releasing Party does not know or suspect to exist in its favor, which if known by it may have materially affected its settlement with the party released, they have carefully considered and taken into account in determining to enter into the above releases the possible existence of such unknown losses or claims.  Without limiting the generality of the foregoing, each Releasing Party expressly waives any and all rights conferred upon it by any statute or rule

54

of law which provides that a release does not extend to claims which the claimant does not know or suspect to exist in its favor at the time of providing the release, which if known by it may have materially affected its settlement with the released party.  Except as otherwise provided in this Plan, the releases contained in this Plan are effective regardless of whether those released matters are presently known, unknown, suspected or unsuspected, foreseen or unforeseen.

D.      *Discharge of Claims and Equity Interests*

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by this Plan (including, without limitation, Article V.D of this Plan) or the Confirmation Order, effective as of the Effective Date, all consideration distributed under this Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims, Equity Interests and Causes of Action of any kind or nature whatsoever against the Debtors or any of their respective assets or properties, and regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims, Equity Interests or Causes of Action.

Except as otherwise expressly provided by this Plan (including, without limitation, Article V.D of this Plan) or the Confirmation Order, upon the Effective Date, the Debtors and their Estates shall be deemed discharged and released under and to the fullest extent provided under sections 524 and 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code.  Such discharge shall void any judgment obtained against the Debtors or the Reorganized Debtors at any time, to the extent that such judgment relates to a discharged Claim.

Except as otherwise expressly provided by this Plan (including, without limitation, Article V.D of this Plan) or the Confirmation Order, upon the Effective Date: (i) the rights afforded herein and the treatment of all Claims and Equity Interests shall be in exchange for and in complete satisfaction, settlement, discharge, and release of all Claims and Equity Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors or any of their respective assets, property, or Estates; (ii) all Claims and Equity Interests shall be satisfied, discharged, and released in full, and each of the Debtor's liability with respect thereto shall be extinguished completely without further notice or action; and (iii) all Persons and Entities shall be precluded from asserting against the Debtors, the Estates, the Reorganized Debtors, each of their respective successors and assigns, and each of their respective assets and properties, any such Claims or Equity Interests, whether based upon any documents, instruments or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date or otherwise.

E.      *Exculpation*

**Effective as of the Effective Date, to the fullest extent permitted by law, the Exculpated Parties shall neither have nor incur any liability to any Person or Entity for any claims or Causes of Action arising prior to or on the Effective Date for any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Confirmation or Consummation of this Plan, the Disclosure Statement, the Restructuring Documents, the Rights Offering, the Prepetition Debt Documents, the DIP Loan Documents, or any contract, instrument, release or other agreement or document created or entered into in connection with this Plan, including the Restructuring Support Agreement and the Backstop Purchase Agreement, or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the approval of the**

55

US-DOCS\115394754.19

**Disclosure Statement or Confirmation or Consummation of this Plan; _provided_, _however_, that the foregoing provisions of this exculpation shall not operate to waive or release: (i) any Causes of Action arising from willful misconduct, actual fraud, or gross negligence of such applicable Exculpated Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; and/or (ii) the rights of any Person or Entity to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements and documents delivered under or in connection with this Plan or assumed pursuant to this Plan or Final Order of the Bankruptcy Court; _provided_, _further_, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its respective duties pursuant to, or in connection with, the above referenced documents, actions or inactions.  The foregoing exculpation shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity. Notwithstanding the foregoing, nothing in this __Article X.E__ shall or shall be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person or Entity that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors, in each case unless otherwise expressly provided for in this Plan.**

_F.      Preservation of Causes of Action_

1.   Maintenance of Retained Causes of Action

Except as otherwise provided in this __Article X__ (including, without limitation, and for the avoidance of doubt, the Releases contained in __Article X.B__ and Exculpation contained in __Article X.E__ hereof) or elsewhere in this Plan or the Confirmation Order, after the Effective Date, the Reorganized Debtors shall retain all rights to commence, prosecute, pursue, litigate or settle, as appropriate, any and all Retained Causes of Action (including those not identified in the Plan Supplement), whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including, without limitation, in an adversary proceeding Filed in the Chapter 11 Cases, and all such Retained Causes of Action shall vest in the Reorganized Debtors in accordance with this Plan.  The Reorganized Debtors, as the successors-in-interest to the Debtors and the Estates, may, and shall have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all of such Retained Causes of Action without notice to or approval from the Bankruptcy Court.

2.   Preservation of All Causes of Action Not Expressly Settled or Released

The Debtors expressly reserve all Causes of Action and Retained Causes of Action for later adjudication by the Debtors or the Reorganized Debtors (including, without limitation, Causes of Action and Retained Causes of Action not specifically identified or of which the Debtors may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances that may change or be different from those the Debtors now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of _res judicata_, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such Causes of Action or Retained Causes of Action upon or after the Confirmation or Consummation of this Plan based on the Disclosure Statement, this Plan or the Confirmation Order, except in each case where such Causes of Action or Retained Causes of Action have been expressly waived, relinquished, released, compromised or settled in this Plan (including, without limitation, and for the avoidance of doubt, the Releases contained in __Article X.B__ and Exculpation contained in __Article X.E__ hereof) or any other Final Order (including, without limitation, the Confirmation Order).  In addition, the Debtors and the Reorganized Debtors expressly reserve the right to pursue or adopt any claims alleged in any lawsuit

in which any of the Debtors are a plaintiff, defendant or an interested party, against any Person or Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

No Person or Entity may rely on the absence of a specific reference in this Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action or Retained Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action or Retained Causes of Action against them.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action and Retained Causes of Action against any Person or Entity, except as otherwise expressly provided in this Plan or the Confirmation Order.

G.      *Injunction*

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS PLAN OR THE CONFIRMATION ORDER, FROM AND AFTER THE EFFECTIVE DATE, ALL PERSONS AND ENTITIES ARE, TO THE FULLEST EXTENT PROVIDED UNDER SECTION 524 AND OTHER APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, PERMANENTLY ENJOINED FROM (I) COMMENCING OR CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY SUIT, ACTION OR OTHER PROCEEDING; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING IN ANY MANNER ANY JUDGMENT, AWARD, DECREE, OR ORDER; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE; (IV) ASSERTING A SETOFF OR RIGHT OF SUBROGATION OF ANY KIND; OR (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND,  IN EACH CASE ON ACCOUNT OF OR WITH RESPECT TO ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, EQUITY INTEREST, OR REMEDY RELEASED OR TO BE RELEASED, EXCULPATED OR TO BE EXCULPATED, SETTLED OR TO BE SETTLED, OR DISCHARGED OR TO BE DISCHARGED, PURSUANT TO THIS PLAN OR THE CONFIRMATION ORDER AGAINST ANY PERSON OR ENTITY SO RELEASED, DISCHARGED, OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY PERSON OR ENTITY SO RELEASED, DISCHARGED, OR EXCULPATED).  ALL INJUNCTIONS OR STAYS PROVIDED FOR IN THE CHAPTER 11 CASES UNDER SECTION 105 OR SECTION 362 OF THE BANKRUPTCY CODE, OR OTHERWISE, AND IN EXISTENCE ON THE CONFIRMATION DATE, SHALL REMAIN IN FULL FORCE AND EFFECT UNTIL THE EFFECTIVE DATE.

H.      *Binding Nature Of Plan*

ON THE EFFECTIVE DATE, AND EFFECTIVE AS OF THE EFFECTIVE DATE, THIS PLAN SHALL BIND, AND SHALL BE DEEMED BINDING UPON, THE DEBTORS, THE REORGANIZED DEBTORS, ANY AND ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS, ALL PERSONS AND ENTITIES THAT ARE PARTIES TO OR ARE SUBJECT TO THE SETTLEMENTS, COMPROMISES, RELEASES, EXCULPATIONS, DISCHARGES, AND INJUNCTIONS DESCRIBED IN THIS PLAN, EACH PERSON AND ENTITY ACQUIRING PROPERTY UNDER THIS PLAN, ANY AND ALL NON-DEBTOR PARTIES TO EXECUTORY CONTRACTS AND UNEXPIRED LEASES WITH THE DEBTORS AND THE RESPECTIVE SUCCESSORS AND ASSIGNS OF EACH OF THE FOREGOING, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, AND NOTWITHSTANDING WHETHER OR NOT SUCH PERSON OR ENTITY (I) WILL RECEIVE OR RETAIN ANY PROPERTY, OR INTEREST IN PROPERTY, UNDER THIS PLAN, (II) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASES OR (III) FAILED TO VOTE TO

57

US-DOCS\115394754.19

**ACCEPT OR REJECT THIS PLAN, AFFIRMATIVELY VOTED TO REJECT THIS PLAN OR IS CONCLUSIVELY PRESUMED TO REJECT THIS PLAN.**

*I.      Protection Against Discriminatory Treatment*

To the extent provided by section 525 of the Bankruptcy Code and the Supremacy Clause of the United States Constitution, all Persons and Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend or refuse to renew a license, permit, charter, franchise or other similar grant to, condition such a grant to, discriminate with respect to such a grant, against the Reorganized Debtors, or another Person or Entity with whom the Reorganized Debtors have been associated, solely because any Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge) or has not paid a debt that is dischargeable in the Chapter 11 Cases.

*J.      Integral Part of Plan*

Each of the provisions set forth in this Plan with respect to the settlement, release, discharge, exculpation, injunction, indemnification and insurance of, for or with respect to Claims and/or Causes of Action are an integral part of this Plan and essential to its implementation.  Accordingly, each Person or Entity that is a beneficiary of such provision shall have the right to independently seek to enforce such provision and such provision may not be amended, modified, or waived after the Effective Date without the prior written consent of such beneficiary.

## ARTICLE XI.

## RETENTION OF JURISDICTION

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, on and after the Effective Date, retain exclusive jurisdiction over the Chapter 11 Cases and all Entities with respect to all matters related to the Chapter 11 Cases, the Debtors and this Plan as legally permissible, including, without limitation, jurisdiction to:

1.    allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest, including, without limitation, the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of any such Claim or Equity Interest;

2.    grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan, for periods ending on or before the Effective Date; *provided*, *however*, that, from and after the Effective Date, the Reorganized Debtors shall pay Professionals in the ordinary course of business for any work performed after the Effective Date and such payment shall not be subject to the approval of the Bankruptcy Court;

3.    resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including, without limitation, those matters related to any amendment to this Plan after the Effective Date to add Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected (as applicable);

US-DOCS\115394754.19

4.   resolve any issues related to any matters adjudicated in the Chapter 11 Cases;

5.   ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Plan;

6.   decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action that are pending as of the Effective Date or that may be commenced in the future, and grant or deny any applications involving the Debtors that may be pending on the Effective Date or instituted by the Reorganized Debtors after the Effective Date, *provided, however* that the Reorganized Debtors shall reserve the right to commence actions in all appropriate forums and jurisdictions;

7.   enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with this Plan, the Plan Supplement or the Disclosure Statement;

8.   resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation or enforcement of this Plan or any Person's or Entity's obligations incurred in connection with this Plan;

9.   hear and determine all Causes of Action that are pending as of the Effective Date or that may be commenced in the future;

10.  issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with Consummation or enforcement of this Plan;

11.  enforce the terms and conditions of this Plan, the Confirmation Order, and the Restructuring Documents;

12.  resolve any cases, controversies, suits or disputes with respect to the Release, the Exculpation, the Indemnification and other provisions contained in Article X hereof and enter such orders or take such others actions as may be necessary or appropriate to implement or enforce all such provisions;

13.  hear and determine all Retained Causes of Action;

14.  enter and implement such orders or take such other actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

15.  resolve any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order or any release, exculpation, discharge, or injunction adopted in connection with this Plan; and

16.  enter an order concluding or closing the Chapter 11 Cases.

Notwithstanding the foregoing, (i) any dispute arising under or in connection with the Exit Facility Loan Documents, the New Secured Convertible Notes Documents, or the New Stockholders Agreement shall be dealt with in accordance with the provisions of the applicable document and the jurisdictional provisions contained therein and (ii) if the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in this Article of this Plan, the provisions of this

59

Article XI shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## ARTICLE XII.

## MISCELLANEOUS PROVISIONS

*A.      Substantial Consummation*

"Substantial Consummation" of this Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

*B.      Payment of Statutory Fees; Post-Effective Date Fees and Expenses*

All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code prior to the Effective Date shall be paid by the Debtors.  On and after the Effective Date, the Reorganized Debtors shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the United States Trustee.  Each Debtor shall remain obligated to pay quarterly fees to the Office of the United States Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.

The Reorganized Debtors shall pay the liabilities and charges that they incur on or after the Effective Date for Professionals' fees, disbursements, expenses, or related support services (including reasonable fees, costs and expenses incurred by Professionals relating to the preparation of interim and final fee applications and obtaining Bankruptcy Court approval thereof) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court, including, without limitation, the reasonable fees, expenses, and disbursements of the Distribution Agents and the Prepetition Notes Indenture Trustee and the fees, costs and expenses incurred by Professionals in connection with the implementation, enforcement and Consummation of this Plan and the Restructuring Documents.

*C.      Conflicts*

In the event that a provision of the Restructuring Documents or the Disclosure Statement (including any and all exhibits and attachments thereto) conflicts with a provision of this Plan or the Confirmation Order, the provision of this Plan and the Confirmation Order (as applicable) shall govern and control to the extent of such conflict.  In the event that a provision of this Plan conflicts with a provision of the Confirmation Order, the provision of the Confirmation Order shall govern and control to the extent of such conflict.

*D.      Modification of Plan*

Effective as of the date hereof and subject to the limitations and rights contained in this Plan: (a) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify this Plan prior to the entry of the Confirmation Order in a way that is in form and substance consistent in all material respects with the Restructuring Term Sheet and otherwise acceptable to the Required Consenting Noteholders, in accordance with section 1127(a) of the Bankruptcy Code; and (b) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as applicable, may, upon order of the Bankruptcy Court, amend or modify this Plan in a way that is in form and substance consistent in all material respects with the Restructuring Term Sheet and otherwise acceptable to the Required Consenting Noteholders, in accordance with section 1127(b) of the Bankruptcy Code or to remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry

US-DOCS\115394754.19

out the purpose and intent of this Plan. A Holder of a Claim that has accepted this Plan shall be deemed to have accepted this Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

E.      *Revocation or Withdrawal of Plan*

The Debtors reserve the right to revoke or withdraw this Plan prior to the Effective Date and/or to File subsequent chapter 11 plans, with respect to one or more of the Debtors. If the Debtors revoke or withdraw this Plan, or if Confirmation or Consummation of this Plan does not occur with respect to one or more of the Debtors, then with respect to the applicable Debtor or Debtors for which this Plan was revoked or withdrawn or for which Confirmation or Consummation of this Plan did not occur: (1) this Plan shall be null and void in all respects; (2) any settlement or compromise embodied in this Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by this Plan and any document or agreement executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (3) nothing contained in this Plan shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the applicable Debtors or any other Person or Entity; (b) prejudice in any manner the rights of the applicable Debtors or any other Person or Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the applicable Debtors or any other Person or Entity.

F.      *Successors and Assigns*

This Plan shall be binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, all present and former Holders of Claims and Equity Interests, other parties-in-interest, and their respective heirs, executors, administrators, successors, and assigns. The rights, benefits, and obligations of any Person or Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Person or Entity.

G.      *Reservation of Rights*

Except as expressly set forth herein, this Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order and this Plan is Consummated. Neither the filing of this Plan, any statement or provision contained herein, nor the taking of any action by the Debtors or any other Person or Entity with respect to this Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) the Debtors with respect to the Holders of Claims or Equity Interests or other Person or Entity; or (2) any Holder of a Claim or an Equity Interest or other Person or Entity prior to the Effective Date.

H.      *Further Assurances*

The Debtors or the Reorganized Debtors, as applicable, all Holders of Claims receiving distributions hereunder and all other Persons or Entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order.

I.      *Severability*

If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding,

61

alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

*J.*       *Service of Documents*

Any notice, direction or other communication given regarding the matters contemplated by this Plan (each, a "**Notice**") must be in writing, sent by personal delivery, electronic mail, courier or facsimile and addressed as follows:

**If to the Debtors**:

Hi-Crush Inc.
1330 Post Oak Blvd., Suite 600
Houston, Texas 77056
Attn: Mark C. Skolos
Tel:  (713) 980-6200
Email: mskolos@hicrush.com

with a copy to:

Latham & Watkins LLP
885 Third Avenue
New York, NY 10022
Attn:  Keith A. Simon
Tel:  (212) 906-1372
Fax:  (212) 751-4864
Email:  keith.simon@lw.com

**If to the Ad Hoc Noteholders Committee**:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Attn:  Brian S. Hermann
        Elizabeth McColm
        John T. Weber
Tel:  (212) 373-3000
Fax:  (212) 757-3990
Email:  bhermann@paulweiss.com
        emccolm@paulweiss.com
        jweber@paulweiss.com

**If to the Prepetition Credit Agreement Agent**:

JPMorgan Chase Bank, N.A.
2200 Ross Avenue, 9th Floor
Dallas, TX 75201
Attn: Andrew G. Ray

62

US-DOCS\115394754.19

Tel:  (214) 965-2592
Email:  andrew.g.ray@jpmorgan.com

A Notice is deemed to be given and received (a) if sent by personal delivery or courier, on the date of delivery if it is a Business Day and the delivery was made prior to 4:00 p.m. (local time in place of receipt) and otherwise on the next Business Day, or (b) if sent by facsimile, on the Business Day following the date of confirmation of transmission by the originating facsimile, or (c) if sent by electronic mail, when the sender receives an email from the recipient acknowledging receipt, provided that an automatic "read receipt" does not constitute acknowledgment of an email for purposes of this Article XII.J.  Any party may change its address for service from time to time by providing a Notice in accordance with the foregoing. Any element of a party's address that is not specifically changed in a Notice will be assumed not to be changed.  Sending a copy of a Notice to a party's legal counsel as contemplated above is for information purposes only and does not constitute delivery of the Notice to that party.  The failure to send a copy of a Notice to legal counsel does not invalidate delivery of that Notice to a party.

K.      *Exemption from Transfer Taxes Pursuant to Section 1146(a) of the Bankruptcy Code*

Pursuant to and to the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer of property, pursuant to or in connection with this Plan or the Restructuring Documents shall not be subject to any Stamp or Similar Tax or governmental assessment in the United States or by any other Governmental Unit, and the Confirmation Order shall direct the appropriate federal, state or local (domestic or foreign) governmental officials or agents to forgo the collection of any such Stamp or Similar Tax or governmental assessment and to accept for filing and recordation instruments or other documents evidencing such action or event without the payment of any such Stamp or Similar Tax or governmental assessment.  Such exemption specifically applies, without limitation, to (i) all actions, agreements and documents necessary to evidence and implement the provisions of, transactions contemplated by and the distributions to be made under this Plan or the Restructuring Documents, (ii) the issuance and distribution of the New Equity Interests or Plan Securities and Documents, and (iii) the maintenance or creation of security interests or any Lien as contemplated by this Plan or the Restructuring Documents.

L.      *Governing Law*

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that a Restructuring Document or an exhibit, schedule, or supplement to this Plan provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of Delaware, without giving effect to the principles of conflicts of law of such jurisdiction.

M.      *Tax Reporting and Compliance*

The Reorganized Debtors are hereby authorized, on behalf of the Debtors, to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the Debtors for all taxable periods ending after the Petition Date through and including the Effective Date.

N.      *Exhibits, Schedules, and Supplements*

All exhibits, schedules, and supplements to this Plan, including the Exhibits and the Plan Supplement, are incorporated herein and are a part of this Plan as if set forth in full herein.

63

US-DOCS\115394754.19

O.     *No Strict Construction*

This Plan is the product of extensive discussions and negotiations between and among, *inter alia*, the Debtors, the Prepetition Credit Agreement Agent, the Prepetition Notes Indenture Trustee, the Consenting Noteholders, and their respective professionals.  Each of the foregoing was represented by counsel of its choice who either participated in the formulation and documentation of, or was afforded the opportunity to review and provide comments on, this Plan, the Disclosure Statement, the Exhibits and the Plan Supplement, and the agreements and documents ancillary or related thereto.  Accordingly, unless explicitly indicated otherwise, the general rule of contract construction known as "contra proferentem" or other rule of strict construction shall not apply to the construction or interpretation of any provision of this Plan, the Disclosure Statement, the Exhibits or the Plan Supplement, or the documents ancillary and related thereto.

P.     *Entire Agreement*

Except as otherwise provided herein or therein, this Plan and the Restructuring Documents supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan and the Restructuring Documents.

Q.     *Closing of Chapter 11 Cases*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

R.     *Statutory Committees*

On the Effective Date, the current and former members of the Committee, and their respective officers, employees, counsel, advisors and agents, will be released and discharged of and from all further authority, duties, responsibilities and obligations related to and arising from and in connection with the Chapter 11 Cases and the Committee will dissolve; provided, however, that following the Effective Date, the Committee will continue in existence and have standing and a right to be heard for the following limited purposes: (i) pursuing claims and final fee applications filed pursuant to sections 330 and 331 of the Bankruptcy Code in accordance with Article II.A; and (ii) any appeals of the Confirmation Order or other appeal to which the Committee is a party.  Following the completion of the Committee's remaining duties set forth above, the Committee will be dissolved, and the retention or employment of the Committee's respective attorneys, accountants and other agents will terminate without further notice to, or action by, any Person or Entity.

S.     *2002 Notice Parties*

After the Effective Date, the Debtors and the Reorganized Debtors, as applicable, are authorized to limit the list of Persons and Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Persons and Entities who have Filed a renewed request after the Confirmation Hearing to receive documents pursuant to Bankruptcy Rule 2002.

64

US-DOCS\115394754.19

65

Dated:  August 15, 2020

Respectfully submitted,

HI-CRUSH INC. AND ITS AFFILIATE DEBTORS

*/s/ J. Philip McCormick, Jr.*

By:    J. Philip McCormick, Jr.
Title:  Chief Financial Officer

US-DOCS\115394754.19

**Exhibit A**

**Backstop Order**

US-DOCS\115394754.19

Docket #0287  Date Filed: 08/14/2020

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

ENTERED

08/14/2020

---------------------------------------------------------- x
: Chapter 11
In re: :
: Case No. 20-33495 (DRJ)
HI-CRUSH INC., *et al.*,[1] :
: (Jointly Administered)
Debtors. :
:
---------------------------------------------------------- x

**ORDER (I) AUTHORIZING DEBTORS TO (A) ENTER INTO BACKSTOP
PURCHASE AGREEMENT, (B) PAY CERTAIN AMOUNTS AND RELATED
EXPENSES, AND (C) HONOR INDEMNIFICATION OBLIGATIONS TO
CERTAIN PARTIES, AND (II) GRANTING RELATED RELIEF**

**[Relates to Motion at Docket No. 177]**

Upon the motion (the "**Motion**")[2] of the above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**") for an order (this "**Order**") (i) authorizing the Debtors to (a) enter into and perform under that certain *Backstop Purchase Agreement* (the "**Backstop Purchase Agreement**"), by and among Hi-Crush Inc., certain of its direct and indirect Debtor subsidiaries, and the Backstop Parties, attached hereto as Exhibit 1, (b) pay a Put Option Premium, a Liquidated Damages Payment, and an Expense Reimbursement, in each case to the extent provided for in the Backstop Purchase Agreement, and (c) enter into Indemnification Obligations for certain parties in accordance with the Backstop Purchase Agreement, and (ii) granting related

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number (where available), are: Hi-Crush Inc. (0530), OnCore Processing LLC (9403), Hi-Crush Augusta LLC (0668), Hi-Crush Whitehall LLC (5562), PDQ Properties LLC (9169), Hi-Crush Wyeville Operating LLC (5797), D & I Silica, LLC (9957), Hi-Crush Blair LLC (7094), Hi-Crush LMS LLC, Hi-Crush Investments Inc. (6547), Hi-Crush Permian Sand LLC, Hi-Crush Proppants LLC (0770), Hi-Crush PODS LLC, Hi-Crush Canada Inc. (9195), Hi-Crush Holdings LLC , Hi-Crush Services LLC (6206), BulkTracer Holdings LLC (4085), Pronghorn Logistics Holdings, LLC (5223), FB Industries USA Inc. (8208), PropDispatch LLC, Pronghorn Logistics, LLC (4547), and FB Logistics, LLC (8641). The Debtors' address is 1330 Post Oak Blvd, Suite 600, Houston, Texas 77056.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

US-DOCS\117157937.4



2033495200814000000000010

relief, all as more fully set forth in the Motion; and the Court having reviewed the Motion and the First Day Declaration; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and that the Court may enter a final order consistent with Article III of the United States Constitution; and the Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and that no other notice need be provided; and upon the record of, and representations made at, the hearing held by the Court on the Motion on August 14, 2020 (the "**Hearing**"); and upon the record of these Chapter 11 Cases; and the Court having determined, after due deliberation, that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest and a proper exercise of the Debtors' business judgment; and the legal and factual bases set forth in the Motion and at the Hearing having established just cause for the relief granted herein; and upon all of the proceedings had before the Court,

  **IT IS HEREBY FOUND AND DETERMINED THAT:**

  A.  The terms and conditions of the Backstop Purchase Agreement are incorporated as if fully set forth herein in the first instance. The terms and conditions under the Backstop Purchase Agreement are fair, reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, are based on good, sufficient, and sound business purposes and justifications, and are supported by reasonably equivalent value and consideration. The Backstop Purchase Agreement was negotiated in good faith and at arms' length among the Debtors, the Backstop Parties, and their respective professional advisors.

B.      Each of the Put Option Premium, the Liquidated Damages Payment, the Expense Reimbursement, and the Indemnification Obligations constitutes an actual and necessary cost and expense to preserve the Debtors' estates and is reasonable and warranted on the terms and conditions set forth in the Backstop Purchase Agreement in light of, among other things, (i) the significant benefit to the Debtors' estates of having a definitive and binding commitment to fund the Debtors' restructuring, (ii) the absence of any other parties prepared to make a comparable commitment at any time before entry of this Order, (iii) the substantial time, effort, and costs incurred by the Backstop Parties in negotiating and documenting the Backstop Purchase Agreement, the RSA, and all documentation related thereto, and (iv) the risk to the Backstop Parties that the Debtors may ultimately enter into an Alternative Transaction in accordance with the terms of the Backstop Purchase Agreement.

C.      The amount and terms and conditions of each of the Put Option Premium, the Liquidated Damages Payment, the Expense Reimbursement, and the Indemnification Obligations are reasonable and customary for this type of transaction and constitute actual and necessary costs and expenses to preserve the Debtors' estates.  The Put Option Premium, the Liquidated Damages Payment, the Expense Reimbursement, and the Indemnification Obligations are bargained-for and integral parts of the transactions specified in the Backstop Purchase Agreement and, without such inducements, the Backstop Parties would not have agreed to the terms and conditions of the Backstop Purchase Agreement.  Accordingly, the foregoing transactions are reasonable and enhance the value of the Debtors' estates.

**BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

1.      All objections to the Motion or the relief requested therein, if any, that have not been withdrawn, waived, resolved, or settled, and all reservations of rights included therein, are overruled with prejudice.

2.      The Backstop Purchase Agreement and the terms and provisions included therein are approved in their entirety pursuant to sections 105 and 363(b) of the Bankruptcy Code, and the Debtors are authorized to (a) enter into, execute, deliver, and implement the Backstop Purchase Agreement and any and all instruments, documents, and papers contemplated thereunder, and (b) take any and all actions necessary and proper to implement the terms of the Backstop Purchase Agreement and to fully perform all obligations thereunder on the conditions set forth therein.

3.      The failure to describe specifically or include any particular provision of the Backstop Purchase Agreement in the Motion or this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Backstop Purchase Agreement be entered into by the Debtors in its entirety and be binding and enforceable against the Debtors and the other signatories thereto in its entirety, and that the Debtors fully perform their obligations thereunder.

4.      The specified premiums, payments, obligations, and expenses contemplated to be paid by the Debtors pursuant to the Backstop Purchase Agreement (including the Put Option Premium, the Liquidated Damages Payment, the Expense Reimbursement, and the Indemnification Obligations) are hereby approved as reasonable and shall not be subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether contractual, equitable, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, disgorgement or any other challenges under any theory at law or in equity by any person or entity.

5. The specified premiums, payments, obligations, and expenses contemplated to be paid by the Debtors pursuant to the Backstop Purchase Agreement (including the Put Option Premium, the Liquidated Damages Payment, the Expense Reimbursement, and the Indemnification Obligations) are actual and necessary costs of preserving the Debtors' estates and as such shall be treated as allowed administrative expenses of the Debtors pursuant to sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code, payable as provided in the Backstop Purchase Agreement.

6. The Indemnification Obligations set forth in the Backstop Purchase Agreement shall constitute legal, valid, and binding obligations of the Debtors and all such obligations are enforceable against the Debtors in accordance with their respective terms, without notice, hearing, or further order of the Court, *provided*, that the Court retains jurisdiction over any dispute regarding the terms and enforcement of the Backstop Purchase Agreement.

7. The Debtors are authorized to offer, sell, distribute, pay, provide, perform under, and/or reimburse, as applicable, the Put Option Premium, the Liquidated Damages Payment, the Expense Reimbursement, and Indemnification Obligations under the Backstop Purchase Agreement, each in full and in accordance with and as and to the extent payable pursuant to the terms thereof, without further application to or order of the Court; *provided*, that upon entry of this Order, the Debtors shall promptly pay any amounts then owing on account of the Expense Reimbursement in accordance with the terms of the Backstop Purchase Agreement; *provided*, *further*, that the Liquidated Damages Payment shall be payable only upon consummation of an Alternative Transaction as set forth in the Backstop Purchase Agreement.

8. The Put Option Premium, the Liquidated Damages Payment, the Expense Reimbursement, and the Indemnification Obligations shall not be discharged, modified, or

5

otherwise affected by any chapter 11 plan of the Debtors, dismissal of these Chapter 11 Cases, or conversion of these Chapter 11 Cases to chapter 7 cases.

9.     The Debtors are authorized, but not directed, to enter into any non-material amendment, waiver, consent, supplement, or modification, to the Backstop Purchase Agreement from time to time, subject to the terms and conditions set forth in the Backstop Purchase Agreement, without further order of the Court.

10.     To the extent the automatic stay provisions of section 362 of the Bankruptcy Code would otherwise apply, such provisions are vacated and modified to effectuate all of the terms and provisions of the Backstop Purchase Agreement and this Order, including, without limitation, permitting the Backstop Parties to exercise all rights and remedies under the Backstop Purchase Agreement in accordance with its terms, terminate the Backstop Purchase Agreement in accordance with its terms, and deliver any notice contemplated thereunder, in each case, without further order of the Court.

11.     The Backstop Purchase Agreement and the provisions of this Order, including all findings herein, shall be effective and binding upon all parties in interest in these Chapter 11 Cases, including, without limitation, all creditors of any of the Debtors, any committee appointed in these Chapter 11 Cases, and the Debtors, and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for any of the Debtors, any examiner appointed pursuant to section 1104 of the Bankruptcy Code, a responsible person, officer, or any other party appointed as a legal representative or designee of any of the Debtors or with respect to the property of the estate of any of the Debtors) whether in these Chapter 11 Cases, in any successor chapter 11 or chapter 7 cases (the "**Successor Cases**"), or upon any dismissal of

any chapter 11 case or Successor Case, and shall inure to the benefit of the Backstop Parties and the Debtors and their respective successors and assigns.

12. The failure of any Backstop Party to seek relief or otherwise exercise its rights and remedies under this Order, the Backstop Purchase Agreement, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of any of the Backstop Parties, except to the extent specifically provided in the Backstop Purchase Agreement.

13. The provisions of this Order and any actions taken pursuant hereto shall survive entry of any order that may be entered (a) confirming any chapter 11 plan in any of these Chapter 11 Cases, (b) converting any of these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (c) dismissing any of these Chapter 11 Cases or Successor Cases, or (d) pursuant to which the Court abstains from hearing any of these Chapter 11 Cases or Successor Cases. The terms and conditions of this Order, and all of the terms and conditions of the Backstop Purchase Agreement, notwithstanding the entry of any order referenced in the immediately prior sentence, shall continue in full force and effect in accordance with the terms hereunder and thereunder in these Chapter 11 Cases, in any Successor Cases, or following dismissal of these Chapter 11 Cases or any Successor Cases.

14. For the avoidance of doubt, the Put Option Premium, the Liquidated Damages Payment, the Expense Reimbursement, and the Indemnification Obligations shall survive any termination of the Backstop Purchase Agreement, in accordance with the terms specified therein.

15. The Backstop Purchase Agreement shall be solely for the benefit of the parties thereto and no other person or entity shall be a third-party beneficiary thereof. No entity, other

US-DOCS\117157937.4

than the parties to the Backstop Purchase Agreement, shall have any right to seek or enforce specific performance of the Backstop Purchase Agreement.

16.     Notice of the Motion as provided therein is deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) are satisfied by such notice.

17.     To the extent that Bankruptcy Rule 6004(h) would apply to this Order, the 14-day stay thereunder is waived, for cause, and the terms and conditions of this Order are immediately effective and enforceable upon its entry.

18.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

19.     The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

**Signed:  August 14, 2020.**

_____
**DAVID R. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

US-DOCS\117157937.4

## <u>Exhibit 1</u>

**Backstop Purchase Agreement**

**BACKSTOP PURCHASE AGREEMENT**

**AMONG**

**HI-CRUSH INC.,**

**CERTAIN OF ITS DIRECT AND INDIRECT SUBSIDIARIES**

**AND**

**THE BACKSTOP PARTIES HERETO**

**Dated as of August [_], 2020**

US-DOCS\116828268.8

**TABLE OF CONTENTS**

Page

| | | |
|---|---|---|
| 1. | Rights Offering and Notes Backstop Commitments | 5 |
| | 1.1. The Rights Offering | 5 |
| | 1.2. Backstop Commitments | 6 |
| | 1.3. Put Option Notes | 8 |
| | 1.4. Certain Tax Treatment | 9 |
| 2. | Closing; Certain Expenses and Payments | 9 |
| | 2.1. Closing | 9 |
| | 2.2. Backstop Expenses | 10 |
| | 2.3. Liquidated Damages Payment | 10 |
| | 2.4. Interest; Costs and Expenses | 11 |
| 3. | Representations and Warranties of the Debtors | 12 |
| | 3.1. Organization of the Debtors | 12 |
| | 3.2. Capitalization; Subsidiaries | 12 |
| | 3.3. Authority; No Conflict | 13 |
| | 3.4. Proceedings; Orders | 14 |
| | 3.5. Brokers or Finders | 15 |
| | 3.6. Exemption from Registration | 15 |
| | 3.7. Issuance | 15 |
| | 3.8. Organizational Documents | 15 |
| | 3.9. Intellectual Property | 16 |
| | 3.10. Compliance with Laws | 16 |
| | 3.11. Licenses and Permits | 16 |
| | 3.12. Compliance With Environmental Laws | 17 |
| | 3.13. Compliance With ERISA | 18 |
| | 3.14. Compliance with Anti-Corruption, Money Laundering and Import Laws; Export Controls and Economic Sanctions | 19 |
| | 3.15. Absence of Certain Changes or Events | 20 |
| | 3.16. Material Contracts | 21 |
| | 3.17. Financial Statements; Internal Controls | 21 |
| | 3.18. Undisclosed Liabilities | 22 |
| | 3.19. Tax Matters | 22 |
| | 3.20. Labor and Employment Compliance | 23 |
| | 3.21. Related Party Transactions | 24 |
| | 3.22. Insurance | 24 |
| | 3.23. Title to Real and Personal Property | 25 |
| | 3.24. Reserves | 26 |
| 4. | Representations and Warranties of the Backstop Parties | 26 |
| | 4.1. Organization of Such Backstop Party | 26 |
| | 4.2. Authority; No Conflict | 27 |
| | 4.3. Backstop Notes Not Registered | 28 |

i

| 4.4. | Acquisition for Own Account | 28 |
|------|------|----|
| 4.5. | Accredited Investor | 28 |
| 4.6. | Brokers or Finders | 28 |
| 4.7. | Sufficient Funds | 29 |

**5. Covenants of the Debtors** ........................................................................29

| 5.1. | [Reserved]. | 29 |
|------|------|----|
| 5.2. | Rights Offering | 29 |
| 5.3. | Conditions Precedent | 29 |
| 5.4. | Notification | 29 |
| 5.5. | Conduct of Business | 29 |
| 5.6. | Use of Proceeds | 30 |
| 5.7. | Access | 30 |
| 5.8. | HSR Act and Foreign Competition Filings | 30 |
| 5.9. | Specified Issuances | 31 |
| 5.10. | Milestones | 31 |
| 5.11. | RSA Covenants | 31 |
| 5.12. | DIP Covenants | 32 |
| 5.13. | DTC Eligibility | 32 |

**6. Covenants of the Backstop Parties** ........................................................32

| 6.1. | Rights Offering | 32 |
|------|------|----|
| 6.2. | Conditions Precedent | 32 |
| 6.3. | HSR Act and Foreign Competition Filings | 32 |
| 6.4. | Specified Issuances | 33 |

**7. Conditions to Closing** ............................................................................33

| 7.1. | Conditions Precedent to Obligations of the Backstop Parties | 33 |
|------|------|----|
| 7.2. | Conditions Precedent to Obligations of the Company | 38 |

**8. Termination** ............................................................................................39

**9. Indemnification** ......................................................................................42

**10. Survival of Representations and Warranties** ........................................45

**11. Amendments and Waivers** ....................................................................45

**12. Notices, etc.** ............................................................................................46

**13. Miscellaneous** ........................................................................................47

| 13.1. | Assignments | 47 |
|-------|------|----|
| 13.2. | Severability | 47 |
| 13.3. | Entire Agreement | 48 |
| 13.4. | Counterparts | 48 |
| 13.5. | Governing Law & Jurisdiction | 48 |
| 13.6. | Waiver of Trial by Jury; Waiver of Certain Damages | 48 |
| 13.7. | Further Assurances | 49 |
| 13.8. | Specific Performance | 49 |
| 13.9. | Headings | 49 |

ii

13.10. Interpretation; Rules of Construction ................................................................. 49
13.11. Several, Not Joint, Obligations ............................................................................ 49
13.12. Disclosure ............................................................................................................ 49
13.13. No Recourse Party ............................................................................................... 50
13.14. Settlement Discussions ........................................................................................ 50
13.15. No Third Party Beneficiaries ............................................................................... 50
13.16. Arm's Length ....................................................................................................... 50

14.    Definitions.................................................................................................................... 51
14.1. Definitions in the RSA ......................................................................................... 51
14.2. Certain Defined Terms.......................................................................................... 51

**Schedules**

1      Backstop Parties

US-DOCS\116828268.8

**THIS BACKSTOP PURCHASE AGREEMENT** (as amended, supplemented, amended and restated or otherwise modified from time to time, together with any schedules, exhibits and annexes hereto, this "Agreement") is entered into as of August [__], 2020 (the "Execution Date"), by and among (a) Hi-Crush Inc., a Delaware corporation (as in existence on the Execution Date, as a debtor-in-possession in the Chapter 11 Cases (as defined below) and as a reorganized debtor, as applicable, the "Company"), (b) each of the direct and indirect Subsidiaries (as defined below) of the Company listed on the signature pages hereto under the title "Debtors" (such Subsidiaries, each as in existence on the Execution Date, as a debtor-in-possession in the Chapter 11 Cases and as a reorganized debtor, as applicable, together with the Company, each, a "Debtor" and, collectively, the "Debtors"), and (c) each of the undersigned entities and/or their investment advisors, managers, managed funds or accounts, intermediaries or nominees set forth on Schedule 1 hereto (each, a "Backstop Party" and, collectively, the "Backstop Parties"). Capitalized terms used in this Agreement are defined in Section 14 hereof.

## RECITALS

**WHEREAS**, the Debtors, the Backstop Parties and certain other "Consenting Noteholders" party thereto have entered into a Restructuring Support Agreement, dated as of July 12, 2020 (as amended, supplemented, amended and restated or otherwise modified from time to time, together with any schedules, exhibits and annexes thereto, the "RSA");

**WHEREAS**, pursuant to the terms of the RSA, the Debtors and the Consenting Noteholders have agreed to implement certain restructuring transactions for the Debtors in accordance with, and subject to, the terms and conditions set forth in, the RSA (including the Restructuring Term Sheet attached as Exhibit A thereto (including any schedules, annexes and exhibits (including the New Secured Notes Term Sheet) attached thereto, as each may be modified in accordance with the terms of the RSA, collectively, the "Restructuring Term Sheet") (it being understood and agreed that the Restructuring Term Sheet has been expressly incorporated into the RSA by reference and made part thereof as if fully set forth therein, and any reference herein to the RSA shall be deemed to include the Restructuring Term Sheet));

**WHEREAS**, on July 12, 2020 (the "Petition Date"), following the execution and delivery of the RSA by the parties thereto, the Debtors commenced voluntary, prearranged reorganization cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 – 1532 (as amended, the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court");

**WHEREAS**, the Debtors intend to restructure pursuant to a plan of reorganization that is consistent in all material respects with the terms of the RSA and otherwise in form and substance reasonably acceptable to the Required Backstop Parties (the "Plan") which will be filed by the Debtors with the Bankruptcy Court in accordance with the terms of the RSA;

**WHEREAS**, pursuant to the Plan, the Company will conduct a notes rights offering, on the terms and conditions set forth in the Plan and this Agreement (the "Rights Offering"), by distributing to each holder of an Eligible Claim as of the Rights Offering Record Date that is an Accredited Investor and timely completes, executes and delivers to the Subscription Agent an AI Questionnaire in accordance with the Rights Offering Procedures (each such holder,

US-DOCS\116828268.8

a "<u>Rights Offering Participant</u>" and, collectively, the "<u>Rights Offering Participants</u>"), non-transferable, non-certificated rights that are attached to such Eligible Claim (the "<u>Rights</u>") to purchase such Rights Offering Participant's *pro rata* share of New Secured Notes (the "<u>Rights Offering Notes</u>"), in an aggregate original principal amount of $43.3 million (the "<u>Rights Offering Amount</u>"), and such New Secured Notes shall be on terms acceptable to the Required Backstop Parties and consistent with the material terms of the term sheet attached as Exhibit 3 to the Restructuring Term Sheet (the "<u>New Secured Notes Term Sheet</u>"); and

**WHEREAS**, in order to facilitate the Rights Offering, pursuant to this Agreement, and subject to the terms, conditions and limitations set forth herein, and in reliance on the representations and warranties set forth herein, each of the Backstop Parties, severally and not jointly, has agreed to provide the Debtors with the right to require such Backstop Party to purchase, and upon exercise of such right by the Debtors, each Backstop Party has agreed to purchase from the Company, on the Effective Date (as defined in the Plan), such Backstop Party's Backstop Commitment Percentage of the Rights Offering Notes that have not been subscribed for by the Rights Offering Participants by the Rights Offering Termination Date (including the Unallocated Notes) (the "<u>Unsubscribed Notes</u>"), subject to such Backstop Party's Backstop Commitment Amount.

**NOW, THEREFORE,** in consideration of the foregoing, and the representations, warranties and covenants set forth herein, and other good and valuable consideration, the Debtors and the Backstop Parties agree as follows:

1.      **Rights Offering and Notes Backstop Commitments**.

  1.1.    **The Rights Offering**.

  (a)      The Company shall commence the Rights Offering on the Rights Offering Commencement Date.  The Rights Offering shall be conducted and consummated by the Company on the terms, subject to the conditions and in accordance with procedures that are in form and substance reasonably acceptable to the Required Backstop Parties (the "<u>Rights Offering Procedures</u>") and otherwise on the applicable terms and conditions set forth in this Agreement, the Plan and the RSA.

  (b)      The Company hereby agrees and undertakes to deliver to each of the Backstop Parties, by e-mail, a certification by an executive officer of the Company (the "<u>Backstop Certificate</u>") of (i) if there are Unsubscribed Notes, a true and accurate calculation of the aggregate original principal amount of Unsubscribed Notes, or (ii) if there are no Unsubscribed Notes, the fact that there are no Unsubscribed Notes (it being understood that the Backstop Commitments shall terminate at the Closing).  If there are Unsubscribed Notes, the execution and delivery of the Backstop Certificate by the Company shall be deemed the exercise by the Debtors of their right to require the Backstop Parties to purchase Unsubscribed Notes pursuant to <u>Section 1.2(a)</u> hereof. The Backstop Certificate shall be delivered by the Company to each of the Backstop Parties promptly after the Rights Offering Termination Date (as may be extended pursuant to the Rights Offering Procedures) and, in any event, at least five (5) Business Days prior to the anticipated Effective Date.

US-DOCS\116828268.8

1.2.    **Backstop Commitments**.

(a)    On the terms, subject to the conditions (including, without limitation, the entry of the Backstop Order by the Bankruptcy Court and the Backstop Order becoming a Final Order) and limitations, and in reliance on the representations and warranties set forth in this Agreement, each of the Backstop Parties hereby agrees, severally and not jointly, to give the Debtors the right to require such Backstop Party, and upon exercise of such right by the Debtors, each Backstop Party has agreed, to purchase from the Company, on the Effective Date, at the aggregate Purchase Price therefor, its Backstop Commitment Percentage of all Unsubscribed Notes; provided, however, that no Backstop Party shall be required to purchase Unsubscribed Notes pursuant to this Section 1.2(a) with an aggregate original principal amount that exceeds the Backstop Commitment Amount of such Backstop Party.  The Backstop Commitments of the Backstop Parties are several, not joint, obligations of the Backstop Parties, such that no Backstop Party shall be liable or otherwise responsible for the Backstop Commitment of any other Backstop Party.  If a group of Backstop Parties that are Affiliates of one another purchase Rights Offering Notes in the Rights Offering in an aggregate original principal amount that is less than the product of (a) the aggregate Backstop Commitment Percentages of such Backstop Parties and (b) the Rights Offering Amount, then such Affiliated Backstop Parties shall be required to purchase Unsubscribed Notes such that no such deficiency exists and such obligation shall constitute the Backstop Commitments of such Affiliated Backstop Parties (it being understood that such obligation to purchase such Unsubscribed Notes shall be satisfied prior to determining the Backstop Commitments of all other Backstop Parties).  The Unsubscribed Notes that each of the Backstop Parties is required to purchase pursuant to this Section 1.2(a) are referred to herein as such Backstop Party's "Backstop Commitment Notes".

(b)    On or prior to the date that is three (3) Business Days prior to the anticipated Effective Date (the "Deposit Deadline"), each Backstop Party, or an Affiliate thereof, shall, severally and not jointly, deposit or cause to be deposited into an account (the "Deposit Account") with the Subscription Agent, by wire transfer of immediately available funds, an amount equal to the aggregate Purchase Price for such Backstop Party's Backstop Commitment Notes (such Backstop Party's "Purchase Price"); provided, however, that at the election of the Required Backstop Parties, the Deposit Account shall be established with a bank or trust company approved by the Company and the Required Backstop Parties (such account, the "Escrow Account" and such bank or trust company that maintains the Escrow Account, the "Escrow Agent") pursuant to an escrow agreement, in form and substance reasonably acceptable to the Required Backstop Parties and the Company (the "Escrow Agreement").  If the Required Backstop Parties elect to establish an Escrow Account, (i) any reference in this Agreement (x) to the "Deposit Account" shall refer instead to the "Escrow Account" and (y) where applicable, to the "Subscription Agent" shall refer instead to the "Escrow Agent", and (ii) any deposit made into the Escrow Account shall be pursuant to terms of the Escrow Agreement.

(c)    In the event that a Backstop Party defaults (a "Funding Default") on its obligation to deposit its Purchase Price in the Deposit Account by the Deposit Deadline pursuant to Section 1.2(b) hereof (each such Backstop Party, a "Defaulting Backstop Party"), then each Backstop Party that is not a Defaulting Backstop Party (each, a "Non-Defaulting Backstop Party") shall have the right (the "Default Purchase Right"), but not the obligation, to elect to commit to purchase from the Company, at the aggregate Purchase Price therefor, up to such Non-Defaulting

6

Backstop Party's Adjusted Commitment Percentage of all Backstop Commitment Notes required to be purchased by the Defaulting Backstop Party pursuant to Section 1.2(a) but with respect to which such Defaulting Backstop Party did not make the required deposit in accordance with Section 1.2(b). Within two (2) Business Days after a Funding Default, the Company shall send a written notice to each Non-Defaulting Backstop Party specifying (x) the aggregate original principal amount of Backstop Commitment Notes subject to such Funding Default (collectively, the "Default Notes") and (y) the maximum aggregate original principal amount of Default Notes such Non-Defaulting Backstop Party may elect to commit to purchase (determined in accordance with the first sentence of this Section 1.2(c)). Each Non-Defaulting Backstop Party will have two (2) Business Days after receipt of such notice to elect to exercise its Default Purchase Right by notifying the Company in writing of its election and specifying the aggregate original principal amount of Default Notes that it is committing to purchase (up to the maximum aggregate original principal amount of Default Notes such Non-Defaulting Backstop Party is permitted to commit to purchase pursuant to the first sentence of this Section 1.2(c)). If any Non-Defaulting Backstop Party commits to purchase less than the maximum amount of Default Notes such Non-Defaulting Backstop Party is permitted to commit to purchase pursuant to the first sentence of this Section 1.2(c) or if any Non-Defaulting Backstop Party does not elect to commit to purchase any Default Notes within the 2-Business Day period referred to in the immediately preceding sentence, then the Default Notes that such Non-Defaulting Backstop Party does not commit to purchase may be (but are not obliged to be) purchased by Non-Defaulting Backstop Parties that exercised in full their respective Default Purchase Rights (such Non-Defaulting Backstop Parties electing to purchase, the "Final Optional Parties") (the right to make such purchase to be made on a *pro rata* basis among the Final Optional Parties based on the remaining unsubscribed Default Notes, or as otherwise agreed among the Final Optional Parties, and the process for providing commitments for such purchases to be made by mutual agreement between such Final Optional Parties and notification of such agreement, if any, and allocation to be made to the Company).

(d)     If the Non-Defaulting Backstop Parties elect to commit to purchase all (but not less than all) Default Notes in accordance with Section 1.2(c) (including by agreement of any Final Optional Parties), the Company shall notify such Non-Defaulting Backstop Parties in writing of the same. No later than one (1) Business Day after the day that the Company has notified the Non-Defaulting Backstop Parties, each Non-Defaulting Backstop Party that has elected to commit to purchase any portion of the Default Notes hereby agrees, severally and not jointly, to deposit into the Deposit Account, by wire transfer of immediately available funds, an amount equal to its portion of the aggregate Purchase Price for such Default Notes. If Non-Defaulting Backstop Parties do not elect to commit to purchase all Default Notes in accordance with this Section 1.2(c) (and there is no agreement by any Final Option Parties), then no Non-Defaulting Backstop Party shall be required to deposit in the Deposit Account any portion of the Purchase Price for the Default Notes which such Non-Defaulting Backstop Party may have elected to commit to purchase pursuant to Section 1.2(c) unless otherwise agreed to in writing by the Required Backstop Parties and then only on the terms agreed in writing by the Required Backstop Parties. The Default Notes with respect to which a Backstop Party elects to purchase pursuant to Section 1.2(c), if any, together with such Backstop Party's Backstop Commitment Notes and Put Option Notes, shall be referred to herein as such Backstop Party's "Backstop Notes".

(e)     Each Backstop Note shall be in an original principal amount of $1,000 and integral multiples thereof. Fractional Backstop Notes shall not be issued. Anything herein to the

7

contrary notwithstanding, no Backstop Party shall be required or have the right to purchase or be issued any fractional Backstop Notes. If a Backstop Party would otherwise be required or have the right to purchase or be issued Backstop Notes with an aggregate original principal amount that is not a multiple of $1,000, then such number of Backstop Notes shall be rounded upward or downward to the nearest multiple of $1,000 (with an aggregate original principal amount of at least $500 being rounded upward and less than $500 being rounded downward), and no Backstop Party shall receive any payment or other distribution in respect of any fraction of a Backstop Note such Backstop Party does not receive as a result of such rounding down or be required to provide any consideration for any fraction of a Backstop Note received as a result of such rounding up; provided, however, that (x) if any such rounding would result in the aggregate original principal amount of the Rights Offering Notes and the Backstop Commitment Notes to be more than the Rights Offering Amount being issued on the Effective Date, the Backstop Party with the smallest amount that was rounded up to the nearest multiple of $1,000 shall instead be rounded down to the nearest multiple of $1,000 and such adjustment shall be repeated with each successive Backstop Party with the smallest amount that was so rounded up until the aggregate original principal amount of the Rights Offering Notes and the Backstop Commitment Notes that will be issued on the Effective Date will equal the Rights Offering Amount, and (y) if any such rounding would result in the aggregate original principal amount of the Rights Offering Notes and the Backstop Commitment Notes to be less than the Rights Offering Amount being issued on the Effective Date, the Backstop Party with the greatest amount that was rounded down to the nearest multiple of $1,000 shall instead be rounded up to the nearest multiple of $1,000 and such adjustment shall be repeated with each successive Backstop Party with the greatest amount that was so rounded down until the aggregate original principal amount of the Rights Offering Notes and Backstop Commitment Notes that will be issued on the Effective Date will equal the Rights Offering Amount. Notwithstanding anything herein to the contrary, in the event that the number of Backstop Commitment Notes that a Backstop Party is required to purchase hereunder is rounded up in accordance with the immediately preceding sentence, the Backstop Commitment Amount shall also be rounded up in a similar manner.

1.3. **Put Option Notes**. The Debtors and the Backstop Parties hereby acknowledge that, in consideration for the Debtors' right to call the Backstop Commitments of the Backstop Parties to purchase the Unsubscribed Notes pursuant to the terms of this Agreement, the Company shall be required to issue to the Backstop Parties (or their designees) additional New Secured Notes in an original aggregate principal amount of $4,800,000 (the "Put Option Notes") on a *pro rata* basis based upon their respective Backstop Commitment Percentages; provided, however, that (a) no Defaulting Backstop Party shall be entitled to receive any Put Option Notes and (b) any Non-Defaulting Backstop Party that purchases Default Notes of a Defaulting Backstop Party shall be entitled to receive additional Put Option Notes in an aggregate original principal amount equal to the product of (x) the aggregate original principal amount of Put Option Notes that would have been issued to such Defaulting Backstop Party if such Defaulting Backstop Party had not committed a Funding Default and (y) a fraction, the numerator of which is the aggregate original principal amount of Default Notes of such Defaulting Backstop Party which such Non-Defaulting Backstop Party purchases and the denominator of which is the aggregate original principal amount of Default Notes of such Defaulting Backstop Party. The Debtors hereby further acknowledge and agree that the Put Option Notes (i) shall be fully earned as of the Execution Date (but to be issued only at the Closing), (ii) shall not be refundable under any circumstance or creditable against any other amount paid or to be paid in connection with this Agreement or any

8

of the Contemplated Transactions or otherwise, (iii) shall be issued without setoff or recoupment and shall not be subject to defense or offset on account of any claim, defense or counterclaim, (iv) shall be issued free and clear of and without deduction for any and all Taxes, levies, imposts, deductions, charges or withholdings, in each case applicable to the issuance thereof, and all liabilities with respect thereto (with appropriate gross up for withholding Taxes), and (v) shall be treated for U.S. federal income Tax purposes as a premium for an option to put the Unsubscribed Notes to the Backstop Parties.

1.4. **Certain Tax Treatment**. The Debtors and each Backstop Party hereby acknowledge and agree, except as otherwise required by applicable Law, (a) that the New Secured Notes constitute and shall be treated as debt for U.S. federal income Tax purposes (regardless of whether any such notes are Backstop Notes), (b) that the Backstop Parties' receipt of the Put Option Notes shall be treated, for U.S. federal income Tax purposes, as creating "market discount" within the meaning of Section 1278 of the Code, (c) that any calculation by the Debtors or their agents regarding the amount of "original issue discount" within the meaning of Section 1273(a) of the Code ("OID"), if any, or market discount shall be as set forth by the Debtors or their agents in accordance with applicable U.S. Tax Law, Treasury Regulations, and other applicable guidance, and will be available, after preparation, to such Backstop Party with respect to the Backstop Notes held by such Backstop Party, for any accrual period in which such Backstop Party held such Backstop Notes, promptly upon request, and (d) to adhere to this Agreement for U.S. federal income Tax purposes with respect to such Backstop Party for so long as such Backstop Party holds Backstop Notes and not to take any action or file any Tax Return, report or declaration inconsistent herewith (including, with respect to the amount of OID on the Backstop Notes). This Section 1.4 is not an admission by any Backstop Party that it is subject to United States taxation.

2. **Closing; Certain Expenses and Payments**.

2.1. **Closing**.

(a) The closing of the purchase and sale of Backstop Notes hereunder (the "Closing") will occur at 10:00 a.m., New York City time, or such other time as the parties hereto may agree, on the Effective Date or such later date as set forth under Section 1.2 hereof. At the Closing, each of the Debtors (as applicable) shall deliver to each Backstop Party, (i)(A) if the Required Backstop Parties elect to require that the New Secured Notes be in certificated form, one or more promissory notes issued by the Company payable to such Backstop Party (or its designee) in an aggregate original principal amount equal to the aggregate original principal amount of Backstop Notes acquired by such Backstop Party, duly authenticated by the indenture trustee under the New Secured Notes Indenture, or (B) if the Required Backstop Parties elect to require that the New Secured Notes be in uncertificated form and issued by book-entry registration on the books of a registrar for the New Secured Notes, an account statement delivered by the Company or any such registrar reflecting the book-entry position of the aggregate original principal amount of Backstop Notes acquired by such Backstop Party, and (ii) such certificates, counterparts to agreements, documents or instruments required to be delivered by such Debtor to such Backstop Party pursuant to Section 7.1 hereof. At the request of the Required Backstop Parties, the New Secured Notes shall be registered in the name of Cede & Co., as nominee of the Depository Trust Company ("DTC"), and be evidenced by global securities held on behalf of members or participants in DTC as nominees for the Backstop Parties. The agreements, instruments,

9

certificates and other documents to be delivered on the Effective Date by or on behalf of the Debtors will be delivered to the Backstop Parties at the offices of Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019-6064.

(b)      All Backstop Notes will be delivered free and clear of any and all Encumbrances with any and all issue, stamp, transfer or similar Taxes or duties payable in connection with such delivery duly paid by the Debtors.

(c)      Anything in this Agreement to the contrary notwithstanding (but without limiting the provisions of Section 13.1 hereof), any Backstop Party, in its sole discretion, may designate that some or all of the Backstop Notes be issued in the name of, and delivered to, one or more of its Affiliates that (in any such case) is an Accredited Investor.

2.2.      **Backstop Expenses.**  Whether or not the transactions contemplated by this Agreement or any of the other Contemplated Transactions are consummated, the Debtors hereby agree, on a joint and several basis, to reimburse in cash or pay in cash, as the case may be, the Backstop Expenses as follows: (a) all accrued and unpaid Backstop Expenses incurred up to (and including) the date of entry by the Bankruptcy Court of the Backstop Order shall be paid in full in cash on or as soon as reasonably practicable following the date of entry by the Bankruptcy Court of the Backstop Order (but in no event later than two (2) Business Days after submission of invoices following entry of the Backstop Order), without Bankruptcy Court review or further Bankruptcy Court Order, (b) after the date of entry by the Bankruptcy Court of the Backstop Order, all accrued and unpaid Backstop Expenses shall be paid in full in cash on a regular and continuing basis promptly (but in any event within five (5) Business Days) after invoices are presented to the Debtors, without Bankruptcy Court review or further Bankruptcy Court Order, (c) all accrued and unpaid Backstop Expenses incurred up to (and including) the Effective Date shall be paid in full in cash on the Effective Date, without Bankruptcy Court review or further Bankruptcy Court Order and (d) if applicable, upon termination of this Agreement, all accrued and unpaid Backstop Expenses incurred up to (and including) the date of such termination shall be paid in full in cash promptly (but in any event within five (5) Business Days) after invoices are presented to the Debtors, without Bankruptcy Court review or further Bankruptcy Court Order; provided, however, that the payment of the Backstop Expenses under each of clauses (a), (b), (c) and (d) shall be subject to the terms of the Backstop Order.  All Backstop Expenses of a Backstop Party shall be paid to such Backstop Party (or its designee) by wire transfer of immediately available funds to the account(s) specified by such Backstop Party.  The Backstop Expenses shall constitute allowed administrative expenses against the Debtors' estates under the Bankruptcy Code.  The terms set forth in this Section 2.2 shall survive termination of this Agreement and shall remain in full force and effect regardless of whether the transactions contemplated by this Agreement or any of the other Contemplated Transactions are consummated.  The obligations set forth in this Section 2.2 are in addition to, and do not limit, the Debtors' obligations under Sections 1.3, 2.3 and 9 hereof.

2.3.      **Liquidated Damages Payment**.  The Debtors hereby acknowledge and agree that the Backstop Parties have expended, and will continue to expend, considerable time, effort and expense in connection with this Agreement and the negotiation hereof, and that this Agreement provides value to, is beneficial to, and is necessary to preserve, the Debtors' estates. If any Debtor (a) enters into, publicly announces its intention to enter into (including by means of any filings made with any Governmental Body), or announces to any of the Consenting

10

Noteholders or other holders of Claims and Interests its intention to enter into, an agreement (including, without limitation, any agreement in principle, letter of intent, memorandum of understanding or definitive agreement), whether binding or non-binding, or whether subject to terms and conditions, with respect to any Alternative Transaction, (b) files any pleading or document with the Bankruptcy Court agreeing to, evidencing its intention to support, or otherwise supports, any Alternative Transaction or (c) consummates any Alternative Transaction (any of the events described in clause (a), clause (b) or clause (c), a "Triggering Event"), in any such case described in clause (a), clause (b) or clause (c), at any time (x) prior to the termination of this Agreement in accordance with the terms hereof or (y) within twelve (12) months following the termination of this Agreement in accordance with the terms hereof, then the Debtors shall pay to the Non-Defaulting Backstop Parties a cash payment in the aggregate amount of $4,800,000 (the "Liquidated Damages Payment"). The Liquidated Damages Payment (A) shall be deemed earned in full on the date of the occurrence of the Triggering Event and paid to the Non-Defaulting Backstop Parties only upon consummation of an Alternative Transaction, (B) shall be paid to the Non-Defaulting Backstop Parties on a *pro rata* basis (based on their respective Adjusted Commitment Percentages) by wire transfer of immediately available funds to the accounts designated by the Non-Defaulting Backstop Parties, (C) shall be paid without setoff or recoupment and shall not be subject to defense or offset on account of any claim, defense or counterclaim, and (D) shall be paid free and clear of and without deduction for any and all applicable Taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto (with appropriate gross-up for withholding Taxes). The terms set forth in this Section 2.3 shall survive termination of this Agreement and shall remain in full force and effect regardless of whether the transactions contemplated by this Agreement or any of the other Contemplated Transactions are consummated. The parties acknowledge that the agreements contained in this Section 2.3 are an integral part of the transactions contemplated by this Agreement, are actually necessary to preserve the value of the Debtors' estates and constitute liquidated damages and not a penalty, and that, without these agreements, the Backstop Parties would not have entered into this Agreement. The Liquidated Damages Payment shall be payable without Bankruptcy Court review or further Bankruptcy Court Order; provided, however, that the payment of the Liquidated Damages Payment shall be subject to the terms of the Backstop Order. The Liquidated Damages Payment shall constitute an allowed administrative expense against the Debtors' estates under the Bankruptcy Code. The obligations set forth in this Section 2.3 are in addition to, and do not limit, the Debtors' obligations under Sections 1.3, 2.2 and 9 hereof; provided, however, that under no circumstances shall both the Put Option Notes and the Liquidated Damages Payment be issuable or payable, as applicable, hereunder.

2.4. **Interest; Costs and Expenses.** Any amounts required to be paid by the Debtors pursuant to Section 2.2, Section 2.3 or Section 9 hereof, if not paid on or before the date on which such amounts are required to be paid in accordance with the terms of any such Section (the "Interest Commencement Date"), shall include interest on such amount from the Interest Commencement Date to the day such amount is paid, computed at an annual rate equal to the rate of interest which is identified as the "Prime Rate" as published in the Money Rates Section of The Wall Street Journal on the applicable Interest Commencement Date. In addition, the Debtors shall pay all reasonable and documented out-of-pocket costs and expenses (including legal fees and expenses) incurred by the Backstop Parties in connection with any action or proceeding (including the filing of any lawsuit or the assertion in the Chapter 11 Cases of a request for reimbursement) taken by any of them to collect such unpaid amounts (including any interest

11

accrued on such amounts under this <u>Section 2.4</u>). Amounts required to be paid by the Debtors pursuant to this <u>Section 2.4</u> shall (a) be paid without setoff or recoupment and shall not be subject to defense or offset on account of any claim, defense or counterclaim and (b) shall be paid free and clear of and without deduction for any and all applicable Taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto (with appropriate gross-up for withholding Taxes). Amounts required to be paid by the Debtors pursuant to this <u>Section 2.4</u> shall constitute allowed administrative expenses against the Debtors' estates under the Bankruptcy Code. The obligations of the Debtors under this <u>Section 2.4</u> shall survive any termination or expiration of this Agreement.

3. **Representations and Warranties of the Debtors**. Except as disclosed in (a) the Company SEC Documents filed with the SEC on or after December 31, 2018 and publicly available on the SEC's Electronic Data-Gathering, Analysis and Retrieval system prior to the date hereof (excluding any disclosures contained in the "Forward-Looking Statements" or "Risk Factors" sections thereof, or any other statements that are similarly predictive, cautionary or forward looking in nature) or (b) the disclosure schedule delivered by the Debtors to the Backstop Parties on the Execution Date and attached to this Agreement (the "<u>Debtor Disclosure Schedule</u>") (<u>provided</u> that disclosure made in one section or subsection of the Debtor Disclosure Schedule of any facts or circumstances shall be deemed adequate disclosure of such facts or circumstances with respect to every other section or subsection of the Debtor Disclosure Schedule only if (and solely to the extent) it is reasonably apparent on the face that the disclosure is responsive to the subject matter of such other section or subsection of the Debtor Disclosure Schedule; <u>provided</u>, <u>however</u>, that no information shall be deemed disclosed for purposes of any of the Fundamental Representations unless specifically set forth in the section of the Debtor Disclosure Schedule relating to such applicable Fundamental Representation), the Debtors hereby, jointly and severally, represent and warrant to the Backstop Parties as set forth in this <u>Section 3</u>. Each representation and warranty of the Debtors is made as of the Execution Date and as of the Effective Date:

3.1. **Organization of the Debtors**. Each Debtor is a corporation or limited liability company (as the case may be), duly incorporated, organized or formed (as applicable), validly existing and in good standing under the Laws of its jurisdiction of incorporation, organization or formation (as applicable), and has full corporate or limited liability company (as applicable) power and authority to conduct its business as it is now conducted and to own, lease, operate and use its assets as currently owned, leased, operated and used. Each Debtor is duly qualified or licensed to do business as a foreign corporation or limited liability company (as applicable) and is in good standing (to the extent such concept is applicable) under the Laws of each jurisdiction in which either the ownership or use of the properties owned or used by it, or the nature of the activities conducted by it, requires such qualification or registration, except where the failure to be so qualified or registered would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

3.2. **Capitalization; Subsidiaries**.

(a) Section 3.2(a) of the Debtor Disclosure Schedule sets forth the name and jurisdiction of incorporation, organization or formation (as applicable) of each Subsidiary of the Company. Except as set forth on <u>Section 3.2(a)</u> of the Debtor Disclosure Schedules, the Company or one or more of its Subsidiaries, as the case may be, legally and beneficially owns all of the

12

outstanding Interests of each of the Subsidiaries of the Company. Except for the Company's Subsidiaries and as otherwise set forth on Section 3.2(a) of the Debtor Disclosure Schedules, the Company does not own, hold or control any direct or indirect Interests of any corporation, partnership, limited liability company, trust or other Person or business. Except as described on Section 3.2(a) of the Debtor Disclosure Schedules, neither the Company nor any of its Subsidiaries has any Contract to directly or indirectly acquire any direct or indirect Equity Interest in any Person or business.

(b) All of the outstanding Interests of each Subsidiary of the Company have been duly authorized and validly issued and are fully paid and nonassessable, and the Company or one or more of its Subsidiaries has good and marketable title to such Interests, free and clear of all Encumbrances (other than transfer restrictions imposed under applicable securities Laws). There are, and there will be on the Effective Date, no (i) Contracts relating to the issuance, grant, sale or transfer of any Interests of any Subsidiary of the Company or (ii) Contracts of the Company or any Subsidiary of the Company to repurchase, redeem or otherwise acquire any Interests of any Subsidiary of the Company. No Subsidiary of the Company has granted any registration rights with respect to any of its Interests.

3.3. **Authority; No Conflict**.

(a) Each Debtor (i) has the requisite corporate or limited liability company (as applicable) power and authority (A) subject to the entry of the Solicitation Order, the Backstop Order, the Confirmation Order and any other applicable orders of the Bankruptcy Court, to enter into, execute and deliver this Agreement and the other Definitive Documentation to which it is (or will be) a party, and to enter into, execute and file with the Bankruptcy Court the Plan and (B) subject to the entry of the Solicitation Order, the Backstop Order, the Confirmation Order and any other applicable orders of the Bankruptcy Court, to perform and consummate the Contemplated Transactions, and (ii) subject to the receipt of the foregoing Orders, as applicable, has taken all necessary corporate or limited liability company (as applicable) action required for (x) the due authorization, execution and delivery of this Agreement and the other Definitive Documentation to which it is (or will be) a party, (y) the due authorization, execution and filing with the Bankruptcy Court of the Plan and (z) the performance and consummation of the Contemplated Transactions. Subject to the receipt of the foregoing Orders, as applicable, no other proceeding, consent or authorization on the part of any Debtor or any of its equity holders is necessary to authorize this Agreement or any other Definitive Documentation to which it is or will be a party or the Contemplated Transactions. Subject to the receipt of the foregoing Orders, as applicable, (1) this Agreement has been (and, in the case of each Definitive Documentation to be entered into by a Debtor at or prior to the Closing, will be) duly executed and delivered by each Debtor party hereto or thereto, as applicable and (2) constitutes (and, in the case of each Definitive Documentation to be entered into by a Debtor after the Execution Date and at or prior to the Closing, will constitute) the legal, valid and binding obligation of each Debtor (and, in the case of a Definitive Documentation, the Debtor party thereto), enforceable against such Debtor in accordance with its terms. Subject to entry of the foregoing Orders and the expiration or waiver by the Bankruptcy Court of the fourteen (14)-day period set forth in Bankruptcy Rules 6004(h) and 3020(e), the Plan constitutes the legal, valid and binding obligation of each Debtor, enforceable against such Debtor in accordance with its terms.

13

(b)      Neither the execution and delivery by the Debtors of this Agreement or any of the other Definitive Documentation, the execution or filing with the Bankruptcy Court by the Debtors of the Plan nor the performance or consummation by the Debtors of any of the Contemplated Transactions will, directly or indirectly (with or without notice or lapse of time or both):

(i)      contravene, conflict with or result in a violation or breach of any provision of the Organizational Documents of any Debtor or any of its Subsidiaries;

(ii)      contravene, conflict with or result in a violation of any Law or Order to which any Debtor or any of its Subsidiaries, or any of the properties, assets, rights or interests owned, leased or used by any Debtor or any of its Subsidiaries, are bound or may be subject;

(iii)      contravene, conflict with or result in a violation or breach of any provision of, or require any consent or other approval by, notice to, waiver from or other action by any Person under, or give rise to any right of termination, amendment, acceleration or cancellation under, any Contract to which any Debtor or any of its Subsidiaries is a party or which any of the properties, assets, rights or interests owned, leased or used by any Debtor or any of its Subsidiaries are bound or may be subject, except for any violation or breach of any such Contract that arises out of the rejection by any of the Debtors of such Contract, which rejection was done with the prior written consent of the Required Backstop Parties; or

(iv)      result in the imposition or creation of any Encumbrance upon or with respect to any of the assets, properties, rights or interests owned, leased or used by any Debtor or any of its Subsidiaries that will not be released and discharged pursuant to the Plan.

except, in the case of clause (ii) and clause (iii) above, where such occurrence, event or result would not, reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(c)      Subject to the Approvals, none of the Debtors will be required to give any notice to, make any filing with or obtain any Consent from, any Person in connection with the execution and delivery of this Agreement or any other Definitive Documentation, or the execution and filing with the Bankruptcy Court of the Plan, or the performance or consummation of any of the Contemplated Transactions, except for any consents, that if not made or obtained, would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

3.4.      **Proceedings; Orders.**  Except for any claim of a creditor or party in interest in the Chapter 11 Cases and any adversary proceedings or contested motions commenced in connection therewith, (a) there is no Proceeding pending, existing, instituted, outstanding or, to the Knowledge of the Debtors, threatened to which any Debtor or any Subsidiary thereof is a party or to which any property, asset, right or interest owned, leased or used by any Debtor or any Subsidiary thereof is bound or subject which, if adversely determined, could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and (b) no event has

14

occurred or circumstances exist that would reasonably be expected to give rise to, or serve as a basis for, any such Proceeding. There are no outstanding Orders and no unsatisfied judgments, penalties or awards against, relating to or affecting any Debtor or any of their respective Subsidiaries.

3.5. **Brokers or Finders.** Except for the fees payable to Lazard Frères & Co. LLC pursuant to the Lazard Engagement Letter, neither any Debtor, any of its Subsidiaries nor any of their respective Representatives has incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payments in connection with this Agreement, any of the other Definitive Documentation, the Plan or any of the Contemplated Transactions.

3.6. **Exemption from Registration.** Assuming the accuracy of the Backstop Parties' representations set forth in Section 4 hereof and assuming the accuracy of all of the representations, warranties and certifications made by all of the Rights Offering Participants in their respective AI Questionnaires and Proofs of Holdings, each of the Specified Issuances will be exempt from the registration and prospectus delivery requirements of the Securities Act.

3.7. **Issuance.** Subject to entry of the Solicitation Order, Backstop Order, the Confirmation Order and any other applicable orders of the Bankruptcy Court, each of the Specified Issuances has been duly and validly authorized by the Company and, when (a) the Rights Offering Notes are issued and delivered against payment therefor in the Rights Offerings, (b) the Backstop Notes are issued and delivered against payment therefor as provided herein, and (c) the shares of New Common Stock are issued and delivered upon conversion of the New Secured Notes in accordance with the terms of the New Certificate of Incorporation and the New Secured Notes Documents, all such Rights Offering Notes, Backstop Notes and shares of New Common Stock will be duly and validly issued, fully paid and non-assessable, and free and clear of all Taxes, liens, Encumbrances (other than transfer restrictions imposed under applicable securities Laws), pre-emptive rights, rights of first refusal, subscription rights and similar rights. Subject to entry by the Bankruptcy Court of the Solicitation Order, Backstop Order, the Confirmation Order and any other applicable orders of the Bankruptcy Court, the New Secured Notes Indenture has been duly authorized by the Company and at the Closing will be duly executed and delivered by the Company and, when duly executed and delivered in accordance with its terms by the Trustee, will constitute a valid and legally binding agreement of the Company enforceable against the Company in accordance with its terms. The Rights Offering Notes and Backstop Notes have been duly authorized by the Company and, when duly executed, authenticated, issued and delivered as provided in the New Secured Notes Indenture and paid for as provided herein, will be duly and validly issued and outstanding and will constitute valid and legally binding obligations of the Company enforceable against the Company in accordance with their terms, and will be entitled to the benefits of the New Secured Notes Indenture.

3.8. **Organizational Documents**. No Debtor nor any of their respective Subsidiaries is in violation of its Organizational Documents. The Company has delivered to the Backstop Parties true, correct and complete copies of the Organizational Documents of each Debtor and each of their respective Subsidiaries as in effect on the date hereof.

15

3.9. **Intellectual Property**.

(a)     Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (a) the Debtors own or possess the right to use all patents, inventions and discoveries (whether patentable or not), trademarks, service marks, trade names, trade dress, logos, internet domain names, copyrights, published and unpublished works of authorship (including software, source code and object code), and all registrations, recordations and applications of the foregoing and know-how (including trade secrets, know-how and other unpatented and/or unpatentable proprietary or confidential information, systems or procedures) and licenses related to any of the foregoing (collectively, "IP Rights") owned, licensed or used by any Debtor or any of its Subsidiaries (collectively, "Debtor IP Rights"), that are reasonably necessary to operate their businesses, without infringement upon the rights of any third-party (of which any of the Debtors and their Subsidiaries has been notified in writing), (b) to the Knowledge of the Debtors, none of the Debtors nor their respective Subsidiaries nor any Debtor IP Right, proprietary right, product, process, method, substance, part, or other material now employed, sold or offered by or contemplated to be employed, sold or offered by the Debtors or their respective Subsidiaries infringe, misappropriate or otherwise violate any IP Rights of any third party and (c) none of the Debtor IP Rights owned by any Debtor or any of its Subsidiaries have been adjudged invalid or unenforceable.  The Debtors have used commercially reasonable efforts to protect their material trade secrets and other material confidential or proprietary information.

(b)     Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (i) each Debtor and its Subsidiaries own or possess adequate rights to use all computer systems (including hardware, software databases, firmware and related equipment), communications systems, and networking systems (the "IT Systems") used by each Debtor and its Subsidiaries (the "Debtor IT Systems") and (ii) the Debtor IT Systems are adequate for their intended use in the operation of each Debtor's and its Subsidiaries' respective businesses and operations as currently conducted.

(c)     Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, all IT Systems material to the business of the Debtor and its Subsidiaries (i) perform in material conformance with its documentation, (ii) are free from any material software defect, and (iii) do not contain any virus, software routine or hardware component designed to permit unauthorized access or to disable or otherwise harm any computer, systems or software, or any software routine designed to disable a computer program automatically with the passage of time or under the positive control of a Person other than an authorized licensee or owner of the IT Systems. There has not been any material malfunction with respect to any of the Debtor IT Systems that has caused material disruption to any Debtor's or its Subsidiaries' respective businesses or operations since December 31, 2018 that has not been remedied or replaced in all material respects.

3.10. **Compliance with Laws**.  Each Debtor and each of their respective Subsidiaries is and has been since December 31, 2018 in compliance with all Laws applicable to or related to it or its business, properties or assets.

3.11. **Licenses and Permits**.  Each Debtor and its Subsidiaries possess or have obtained all Governmental Authorizations from, have made all declarations and filings with, and

have given all notices to, the appropriate Governmental Bodies that are necessary or required for the ownership, lease or use of their respective properties, assets, rights or interests, or the conduct or operation of their respective businesses or operations (collectively, the "Licenses and Permits"), except where the failure to possess, obtain, make or give any of the foregoing would not, individually or in the aggregate, reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. Neither any Debtor nor any of its Subsidiaries has received notice of any revocation, suspension or modification of any of the Licenses and Permits, or has any reason to believe that any of the Licenses and Permits will be revoked or suspended, or will not be renewed in the ordinary course, or that any such renewal will be materially impeded, delayed, hindered, conditioned or burdensome to obtain, except to the extent that any of the foregoing would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

3.12. **Compliance With Environmental Laws**. Each Debtor and its Subsidiaries:

(a) are and have been in compliance with any and all applicable Environmental Laws;

(b) have received and are in compliance with all Governmental Authorizations required of them under applicable Environmental Laws to conduct their respective businesses and operations, and there is no Order or Proceeding pending or, to the Knowledge of the Debtors, threatened which would prevent the conduct of such businesses or operations;

(c) have no knowledge and have not received written notice from any Governmental Body or any other Person of:

(i) any violations of, or liability under, any Environmental Laws; or

(ii) any actual or potential liability for the investigation or remediation of any Release of Hazardous Materials on, at, under or emanating from any currently or formerly owned or operated property or facility;

(d) are not subject to any Proceedings or Orders under any Environmental Laws and, to the Knowledge of the Debtors, any threatened Proceedings or Orders under any Environmental Laws;

(e) have no knowledge, have not treated, stored, disposed of, arranged for or permitted the disposal of, transported, handled, manufactured, distributed, exposed any Person to, or Released any Hazardous Material, or, to the Knowledge of the Debtors, owned or operated any property or facility which is or has been contaminated by any such Hazardous Material as would give rise to any current or future liabilities under any Environmental Laws; and

(f) have not assumed, undertaken, provided an indemnity with respect to, or otherwise become subject to, any liability of any other Person relating to Environmental Laws.

17

US-DOCS\116828268.8

3.13. **Compliance With ERISA**.

(a)     Section 3.13(a) of the Debtor Disclosure Schedules hereto sets forth a complete and accurate list of all material Benefit Plans. "Benefit Plans" means all employee benefit, compensation and incentive plans, arrangements and agreements (including, but not limited to, employee benefit plans within the meaning of Section 3(3) of ERISA) maintained, administered or contributed to by any Debtor or any of its Subsidiaries for or on behalf of any employees, officers, directors, managers or independent contractors, or former employees, officers, directors, managers or independent contractors of such Debtor or any of its Affiliates or for which any Debtor or any of its Subsidiaries has any material liability. Each Benefit Plan has been funded, administered and maintained in compliance in all material respects with its terms and the requirements of any applicable Laws or Orders, including, but not limited to, ERISA and the Internal Revenue Code of 1986, as amended (the "Code"). Each Benefit Plan intended to be "qualified" within the meaning of Section 401(a) of the Code has received a favorable determination or opinion letter from the Internal Revenue Service to the effect that the Benefit Plan satisfies the requirements of Section 401(a) of the Code and, to the Knowledge of the Debtors, no circumstances exist that are likely to result in the loss of the qualification of any such Benefit Plan or related trust.

(b)     None of the Benefit Plans are, and neither the Debtors, any of their respective Subsidiaries nor any of their respective ERISA Affiliates maintain, contribute to, have an obligation to contribute to, or have any liability to, or in the past six (6) years has maintained, contributed to, had an obligation to contribute to, or have any liability with respect to, (i) a multiemployer plan (within the meaning of Section 4001(3) of ERISA or Section 413(c) of the Code), whether or not subject to Title IV of ERISA; (ii) a multiple employer plan (within the meaning of Section 413(c) of the Code); (iii) a "multiple employer welfare arrangement" (within the meaning of Section 3140 of ERISA); or (iv) a "voluntary employee beneficiary association" (within the meaning of Section 501(c)(9) of the Code).

(c)     No Benefit Plan is, and neither the Debtors, any of their respective Subsidiaries nor any of their respective ERISA Affiliates maintain, contribute to, have an obligation to contribute to, or have any liability to, or in the past six (6) years has maintained, contributed to, had an obligation to contribute to, or had any liability with respect to, a plan subject to Title IV of ERISA or Section 412 or Section 4971 of the Code (any such plan, a "Pension Plan"). No Benefit Plan that is a Pension Plan or any single-employer plan of an ERISA Affiliate has unfunded liabilities, determined on a termination basis, in excess of $1,000,000.

(d)     Neither the Debtors nor any of their respective Subsidiaries or ERISA Affiliates, any Benefit Plan, any trust created thereunder, nor, to the Knowledge of the Debtors, any trustee, fiduciary or administrator thereof has engaged in a transaction in connection with which any of the Debtors or any of their respective Subsidiaries or ERISA Affiliates, any Benefit Plan, any such trust, or any trustee, fiduciary or administrator thereof, or any party dealing with any Benefit Plan or any such trust could be subject to a civil penalty or Tax under ERISA or the Code, including but not limited to, a civil penalty assessed pursuant to Section 409 or Section 502(i) of ERISA or a Tax imposed pursuant to Section 4975 or Section 4976 of the Code, except any of the foregoing that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

18

(e)     Each Benefit Plan that is maintained primarily for the benefit of employees working outside of the United States (each, a "Non-US Plan") that is required to be funded is funded to the extent required by applicable Law and for all other Non-US Plan adequate reserves have been established on the accounting statements of the applicable Debtor or Subsidiaries. Neither the Debtors nor any of their respective Subsidiaries have any material unfunded liabilities with respect to any Non-U.S. Plan.

3.14.     **Compliance with Anti-Corruption, Money Laundering and Import Laws; Export Controls and Economic Sanctions**.

(a)     None of the Debtors nor any of their respective Subsidiaries, nor, to the Knowledge of the Debtors, any of their respective officers, directors, employees, agents, consultants, distributors, resellers, representatives, sales intermediaries or other Persons acting on behalf of any of the Debtors or any of their respective Subsidiaries, have: (i) directly or indirectly, given, promised, offered, authorized the offering of, or paid anything of value to any public official or employee of any Governmental Body, in each case, for purposes of (A) influencing any act or decision of such public official or employee, (B) inducing such public official or employee to do or omit to do any act in violation of such official's or employee's lawful duty, (C) securing any improper advantage or (D) inducing such public official or employee to use such official's or employee's influence with a Governmental Body, or commercial enterprise owned or controlled by any Governmental Body (including state owned or controlled facilities), in order to assist any of the Debtors or any of their respective Subsidiaries in obtaining or retaining business; or (ii) taken any action in violation of any applicable anticorruption Law, including, without limitation, the Foreign Corrupt Practices Act of 1977, 15 U.S.C. §§ 78dd-1, et seq., the U.K. Bribery Act of 2010 and any other applicable anti-corruption or anti-bribery Law of any Governmental Body of any jurisdiction applicable to any of the Debtors or any of their respective Subsidiaries. There is no pending or, to the Knowledge of the Debtors, threatened Proceeding with respect to any violation of any applicable anti-corruption Law relating to any of the Debtors or any of their respective Subsidiaries. Each of the Debtors and each of their respective Subsidiaries has in place adequate controls to ensure compliance with any applicable anti-corruption Laws.

(b)     Each of the Debtors and each of their respective Subsidiaries are in compliance, and at all times since January 1, 2016 have complied, with (i) all applicable trade Laws, including import and export control Laws, economic/trade embargoes and sanctions, and anti-boycott Laws (the "International Trade Laws") and (ii) all applicable Laws relating to the prevention of money laundering of any Governmental Body applicable to it or its property or in respect of its operations, including, without limitation, all applicable criminal Laws and all applicable financial record-keeping, customer identification, know-your-customer and reporting requirements of the Currency and Foreign Transactions Reporting Act of 1970 (the "Money Laundering Laws"). No material Proceeding by or before any Governmental Body involving any of the Debtors or any of their respective Subsidiaries with respect to the Money Laundering Laws or International Trade Laws is pending or, to the Knowledge of the Debtors, threatened.

(c)     None of the Debtors nor their respective Subsidiaries, nor, to the Knowledge of the Debtors, any of their respective directors, officers, employees or other Persons acting on their behalf with authority to so act is currently subject to any Sanctions. None of the Debtors nor any of their respective Subsidiaries, nor, to the Knowledge of the Debtors, any of their respective

19

current or former directors, officers, employees, agents or other Persons acting on their behalf with express authority to so act, has engaged since January 1, 2016, or is engaged, in any transaction(s) or activities which would result in a violation of Sanctions in any material respect. No material Proceeding by or before any Governmental Body involving any of the Debtors or any of their respective Subsidiaries with respect to Sanctions is pending or, to the Knowledge of the Debtors, threatened.

3.15. **Absence of Certain Changes or Events**. Since December 31, 2019, and excluding any transactions effected in connection with the Chapter 11 Cases that are specifically contemplated by the RSA, each Debtor and its Subsidiaries have conducted their respective businesses in the Ordinary Course of Business, and there has not been, with respect to any Debtor or any of its Subsidiaries, any:

(a) event, occurrence or development that has had, or could be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect;

(b) declaration or payment of any dividends or distributions on or in respect of any shares of capital stock or other equity securities or redemption, purchase or acquisition of any shares of capital stock or other equity interests, in each case, other than in the Ordinary Course of Business;

(c) material amendment to any Organizational Documents (other than such amendments effected in connection with the voluntary filing of the Chapter 11 Cases with the Bankruptcy Court);

(d) split, combination or reclassification of any shares of capital stock or other equity securities;

(e) issuance, sale or other disposition of, or creation of any Encumbrance on, shares of capital stock or other equity interest (other than in connection with the DIP Facilities), or grant of any options, warrants or other rights to purchase or obtain (including upon conversion, exchange or exercise) any shares of capital stock or other equity interests;

(f) incurrence, assumption or guarantee of any material indebtedness for borrowed money other than the DIP Facilities (as defined in the RSA), except unsecured current obligations and liabilities incurred in the Ordinary Course of Business;

(g) sale, sublease, lease, license, transfer, assignment, pledge, imposition of an Encumbrance upon (or allowing such imposition), grant or other disposition (including by merger) of any material assets (whether tangible or intangible)

(h) material increase in the compensation or benefits of any current or former director, officer, employee or consultant of any Debtor or any of its Subsidiaries other than (i) ordinary-course wage-rate increases for non-salaried employees, (ii) as required by any Benefit Plan, and (iii) Debtors' senior officers or managers who received retention payments from the Debtors in July 2020 and prior to the Petition Date; or

20

(i)      any agreement or commitment to do any of the foregoing, or any action or omission that would result in any of the foregoing.

3.16.   **Material Contracts**.  Other than as a result of a rejection motion filed by any of the Debtors in the Chapter 11 Cases or as set forth on Section 3.16 of the Debtor Disclosure Schedule, each Material Contract is in full force and effect and is valid, binding and enforceable against the applicable Debtor or its applicable Subsidiary and, to the Knowledge of the Debtors, each other party thereto, in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium and other similar Laws of general applicability relating to or affecting creditor's rights generally and by the application of general principles of equity.  Other than as a result of the filing of the Chapter 11 Cases and/or any rejection motion filed by any of the Debtors in the Chapter 11 Cases, neither the Debtors nor any of their respective Subsidiaries nor, to the Knowledge of the Debtors, any other party to any Material Contract is in breach of or default under any obligation thereunder or has given notice of default to any other party thereunder nor does any condition exist that, with notice or lapse of time or both, would reasonably be expected to constitute a default thereunder.  There are no material disputes pending or, to the Knowledge of the Debtors, threatened under any Material Contract.

3.17.   **Financial Statements; Internal Controls**.

(a)      The audited consolidated balance sheet of the Company and its Subsidiaries as of December 31, 2019 and the related audited consolidated statements of operations and comprehensive loss, cash flows and changes in equity (deficit) for the fiscal year then ended, as filed with the SEC (collectively, the "Annual Financial Statements"), and (b) the unaudited condensed consolidated balance sheet of the Company and its Subsidiaries as of [_____], 2020,[1] and the related unaudited condensed consolidated statements of operations and comprehensive loss, cash flows and changes in equity (deficit) for the [____-month] period then ended, as filed with the SEC (collectively, the "Interim Financial Statements" and, together with the Annual Financial Statements, the "Financial Statements"), were prepared from the books and records of the Company and its Subsidiaries, in accordance with GAAP, applied on a consistent basis for the periods involved subject, with respect to the Interim Financial Statements, to the absence of footnotes (which, if presented, would not contain disclosures that differ materially from those included in the Annual Financial Statements) and to normal year-end adjustments (none of which are material in amount or scope).  The Financial Statements fairly present in all material respects, the financial position of the Company and its Subsidiaries as of the dates thereof and the results of their operations and cash flows for the periods then ended.

(b)      The Company has established and maintains disclosure controls and procedures and a system of internal controls over financial reporting (as such terms are defined in paragraphs (e) and (f), respectively, of Rule 13a-15 under the Exchange Act) as required by Rule 13a-15 under the Exchange Act.  As of the date hereof, neither the Company nor, to the Knowledge of the Debtors, the Company's independent registered public accounting firm, has identified or been made aware of "significant deficiencies" or "material weaknesses" (as defined by the Public Company Accounting Oversight Board) in the design or operation of the Debtors

---

[1]   Note to Draft: Interim Financial Statements to be the most recent unaudited financial statements prior to the Execution Date.

US-DOCS\116828268.8

and their respective internal controls over financial reporting which would reasonably be expected to adversely affect in any material respect their ability to record, process, summarize and report financial data, in each case which has not been subsequently remediated. The Company is in compliance in all material respects with the applicable provisions of the Sarbanes-Oxley Act of 2002, as amended, and the applicable listing and corporate governance rules and regulations of the New York Stock Exchange.

3.18. **Undisclosed Liabilities**. No Debtor nor any of their respective Subsidiaries has any material liabilities, obligations or commitments of a type required to be reflected or reserved against on a balance sheet of the Company and its Subsidiaries prepared in accordance with GAAP, except (a) those which are adequately reflected or reserved against in the Financial Statements; (b) those which are not required to be disclosed in a consolidated balance sheet of the Company or in the notes thereto prepared in accordance with GAAP and the rules and regulations of the SEC applicable thereto, or (c) those which have been incurred in the Ordinary Course of Business, consistent with past practice, since the date of the Interim Financial Statements and which are not material in amount.

3.19. **Tax Matters**.

(a) All material Tax Returns required to be filed by or on behalf of any Debtor or any of its Subsidiaries, including any consolidated, combined or unitary Tax Return of which any Debtor or any of its Subsidiaries is or was includable, have been properly prepared and duly and timely filed with the appropriate Taxing Authorities in all jurisdictions in which such Tax Returns are required to be filed (after giving effect to any valid extensions of time in which to make such filings). All material Taxes payable by or on behalf of any Debtor or any of its Subsidiaries directly, as part of the consolidated, combined or unitary Tax Return of another taxpayer, or otherwise, have been fully and timely paid, and adequate reserves or accruals for Taxes have been provided in the balance sheet included as part of the Financial Statements in respect of any period for which Tax Returns have not yet been filed or for which Taxes are not yet due and owing. No agreement, waiver or other document or arrangement extending or having the effect of extending the period for assessment or collection of a material amount of Taxes (including any applicable statute of limitations) has been executed or filed with the IRS or any other Governmental Body by or on behalf of any Debtor or any of its Subsidiaries (or any consolidated, combined or unitary group of which any Debtor or any of its Subsidiaries was or is includable for Tax purposes) and no power of attorney in respect of any Tax matter is currently in force.

(b) Each Debtor and its Subsidiaries have complied in all material respects with all applicable Laws relating to the payment and withholding of Taxes and have duly and timely withheld from employee salaries, wages, and other compensation and have paid over to the appropriate Taxing Authorities or other applicable Governmental Bodies all amounts required to be so withheld and paid over for all periods under all applicable Laws, and have complied in all material respects with all Tax information reporting provisions under all applicable Laws. No written claim has been made by any Taxing Authority in a jurisdiction where any Debtor and its Subsidiaries do not file Tax Returns that they are or may be subject to taxation by that jurisdiction.

(c) All material deficiencies asserted or assessments made as a result of any examinations by any Taxing Authority or any other Governmental Body of the Tax Returns of or

22

covering or including any Debtor or any of its Subsidiaries have been fully paid, and there are no other material audits, investigations or other Proceedings by any Taxing Authority or any other Governmental Body in progress, nor has any Debtor or any of its Subsidiaries received notice from any Taxing Authority or other applicable Governmental Body that it intends to conduct or commence such an audit, investigation or other Proceeding. No issue has been raised by any Taxing Authority or other applicable Governmental Body in any current or prior examination that, by application of the same or similar principles, could reasonably be expected to result in a material proposed deficiency for any subsequent taxable period. There are no Encumbrances for Taxes with respect to any Debtor or any of its Subsidiaries, or with respect to the assets or business of any Debtor or any of its Subsidiaries, nor is there any such Encumbrance that is pending or threatened, in each case, other than Permitted Encumbrances.

(d)     None of the Debtors nor any of its Subsidiaries has participated in any listed transaction within the meaning of Treasury Regulations Section 1.6011-4(b) (or any similar provision of state, local, or non-U.S. Tax law).

(e)     None of the Debtors or any of its Subsidiaries has been either a "distributing corporation" or a "controlled corporation" in a distribution occurring during the last five (5) years in which the parties to such distribution treated the distribution as one to which Section 355 of the Code is applicable.

3.20.   **Labor and Employment Compliance**.

(a)     Each Debtor and each of its Subsidiaries is in compliance with all applicable Laws or Orders respecting labor and employment matters, including, without limitation, labor relations, terms and conditions of employment, equal employment opportunity, discrimination, harassment, family and medical leave and other leaves of absence, disability benefits, affirmative action, employee privacy and data protection, health and safety, wage and hours, worker classification as employees or independent contractors, child labor, immigration, recordkeeping, Tax withholding, unemployment insurance, workers' compensation, and plant closures and layoffs, except where the failure to comply with such applicable Laws or Orders would not, individually or in the aggregate, reasonably be expected to be adverse in any material respect to the Debtors and their respective Subsidiaries, taken as a whole. There is no, and during the past three (3) years there has been no, Proceeding pending or, to the Knowledge of the Debtors, threatened against any Debtor or any of its Subsidiaries alleging a violation of any such applicable Law pertaining to labor or employment matters, except for any such Proceedings that would not, individually or in the aggregate, reasonably be expected to be adverse in any material respect to the Debtors and their respective Subsidiaries, taken as a whole.

(b)     As of the date hereof, there are no collective bargaining agreements, labor agreements, work rules or practices, or any other labor-related agreements or arrangements to which any of the Debtors or any of their respective Subsidiaries is party or otherwise subject with respect to any employee. Within the past three (3) years, no labor union, labor organization or other organization or group has (i) represented or purported to represent any employee, (ii) made a demand to any of the Debtors or any of their respective Subsidiaries or, to the Knowledge of the Debtors, to any Governmental Bodies for recognition or certification, and there are no representation or certification proceedings or petitions seeking a representation proceeding

23

presently pending, threatened in writing or, to the Knowledge of the Debtors, verbally threatened to be brought or filed with the National Labor Relations Board or any other labor relations Governmental Body.  Within the past three (3) years, there has been no actual or, to the Knowledge of the Debtors, threatened, labor arbitrations, grievances, material labor disputes, strikes, lockouts, walkouts, slowdowns or work stoppages, or picketing by any employee of any of the Debtors or any of their respective Subsidiaries.  None of the Debtors or any of their respective Subsidiaries has committed a material unfair labor practice (as defined in the National Labor Relations Act or any similar Law) within the past three (3) years.

3.21. **Related Party Transactions.**  There are no Contracts or other direct or indirect relationships existing between or among any of the Debtors or their Subsidiaries, on the one hand, and any director, officer or greater than five percent (5%) stockholder of any of the Debtors, on the other hand, that is required by the Exchange Act to be described in the Company's filings with the SEC and that is not so described.  A correct and complete copy of any Contract existing as of the date hereof between or among any of the Debtors or their Subsidiaries, on the one hand, and any director, officer or greater than five percent (5%) stockholder of any of the Debtors or their Subsidiaries, on the other hand, that is required by the Exchange Act to be described in the Company's filings with the SEC is filed as an exhibit to, or incorporated by reference as indicated in, the Annual Report on Form 10-K for the fiscal year ended December 31, 2019 or such subsequently filed Quarterly Report on Form 10-Q or Current Report on Form 8-K.

3.22. **Insurance**.  Except as would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect: (a) all insurance policies and surety bond arrangements of the Debtors and their respective Subsidiaries as of the Execution Date or under which any of the Debtors or any of their respective Subsidiaries or any of their respective businesses, assets or properties are insured as of the Execution Date (the "Insurance/Surety Policies") are in full force and effect, and, except to the extent any such Insurance/Surety Policies has been replaced after the Execution Date with comparable substitute insurance coverage or surety that will remain in full force and effect immediately following the Closing, will remain in full force and effect immediately following Closing, (b) all premiums payable under the material Insurance/Surety Policies have been paid to the extent such premiums are due and payable, (c) the Debtors and their respective Subsidiaries have otherwise complied with the terms and conditions of, and their obligations under, all of the material Insurance/Surety Policies in all material respects, and no event has occurred which, with notice or the lapse of time or both, would constitute such a breach or default, or permit termination, modification, or acceleration, under any of the material Insurance/Surety Policies and (d) to the Knowledge of the Debtors, there is no threatened termination of, premium increase or increase credit support obligation with respect to, or material alteration of coverage under, any of the Insurance/Surety Policies.  During the past three (3) years, no claims have been denied under the Insurance/Surety Policies and neither the Debtors nor any of their respective Subsidiaries have (a) had a claim rejected or a payment denied by any insurance provider or surety issuer, (b) had a claim under any Insurance/Surety Policies in which there is an outstanding reservation of rights or (c) had the policy limit or surety obligations under any Insurance/Surety Policies exhausted or materially reduced, except for any such rejection, denial, reservation, exhaustion or reduction that would not, individually or in the aggregate, reasonably be expected to be adverse in any material respect to the Debtors and their respective Subsidiaries, taken as a whole.  Except as would not reasonably be expected, individually or in the aggregate,

US-DOCS\116828268.8

to have a Material Adverse Effect, the Company reasonably believes that the insurance and surety bonding maintained by or on behalf of the Debtors and their respective Subsidiaries is adequate to insure against such losses and risks as are prudent and customary in the businesses in which they are engaged, and satisfying any existing contractual or regulatory obligations of the Company and its Subsidiaries.

### 3.23. **Title to Real and Personal Property**.

(a)     Section 3.23(a) of the Debtor Disclosure Schedule sets forth a true and complete list of (i) all real property and interests in real property owned in fee simple by any of the Debtors or their Subsidiaries (the "Owned Real Property"), (ii) all real property leased or licensed to any of the Debtors or their Subsidiaries (the "Leased Real Property"), and (iii) all easements and other limited real property rights held by any of the Debtors or any of their Subsidiaries (the "Easements").

(b)     Each of the Debtors and each of their respective Subsidiaries has valid fee simple title to, or a valid leasehold interest in, or valid easements or other limited property interests in, all of its Real Property and has valid title to its personal properties and assets, in each case, except for Permitted Encumbrances and except for defects in title that do not materially interfere with its ability to conduct its business as currently conducted or to utilize such properties and assets for their intended purposes; provided, however, the enforceability of the Debtors' leasehold title in any leased Real Properties may be limited by applicable bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other laws affecting creditor's rights generally or general principles of equity, including the Chapter 11 Cases. To the Knowledge of the Debtors, all such properties and assets are free and clear of Encumbrances, other than Permitted Encumbrances.

(c)     The lease agreements and other occupancy agreements related to the Leased Real Property (together with all amendments, extensions, renewals, guaranties, and other agreements relating thereto, the "Real Property Leases") and the Easements are in full force and effect, and the Debtors or their Subsidiaries hold a valid and existing leasehold or easement interest under each such Real Property Lease or Easement, free and clean of any encumbrances (other than Permitted Encumbrances). Other than as a consequence of the Chapter 11 Cases, each of the Debtors and each of their respective Subsidiaries is in compliance with all obligations under all leases and Easements to which it is a party that have not been rejected in the Chapter 11 Cases, and none of the Debtors or their Subsidiaries has received written notice of any good faith claim asserting that any such leases or Easements are not in full force and effect. Each of the Debtors and each of their Subsidiaries enjoys peaceful and undisturbed possession under all such leases and Easements, and the Debtors and their Subsidiaries have not subleased, licensed or otherwise granted any Person the right to use or occupy any portion of any Leased Real Property or Easement. To the Knowledge of the Debtors, no event has occurred or condition exists that with notice or lapse of time, or both, would constitute a default by the Debtors or any Subsidiaries, or any other party thereto, under any of the Real Property Leases.

(d)     Each of the Debtors and each of their Subsidiaries owns or possesses the right to use all of its personal property, including all Debtor IP Rights and all licenses and rights with respect to any of the foregoing used in the conduct of their businesses, without any conflict (of which any of the Debtors and their Subsidiaries has been notified in writing) with the rights of

25

others, and free from any burdensome restrictions on the present conduct of the Debtors or their respective Subsidiaries, as the case may be, except where such conflicts and restrictions would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(e)     Each lot, parcel and tract of land comprising the Real Property that is used or proposed (in accordance with the current plans of the Debtors) to be used for the mining of frac sand includes both the surface estate and mineral estate and none of the mineral estates and surface estates related to such Real Property has been severed or separately conveyed. The Debtors have made available to the Backstop Parties true, correct and complete copies of (x) all deeds for Owned Real Property, (y) all existing title policies and as-built surveys for Real Property to the extent in the possession of the Debtors and (z) all recent title insurance commitments and survey updates, if any, for Real Property to the extent in the possession of the Debtors. The Real Property constitutes all interests in real property which are currently used or currently held for use in connection with the businesses of the Debtors and their respective Subsidiaries as currently conducted and are necessary for the continued operation of the businesses of the Debtors as currently conducted.

(f)     The Debtors and their respective Subsidiaries have all necessary mineral rights, surface and subsurface rights, water rights and rights in water, rights of way, licenses, easements, ingress, egress and access rights, and all other rights and interests granting the Debtors or one or more of their Subsidiaries the rights and ability to mine, extract, remove, process, transport and market the sand and mineral reserves owned or controlled by the Debtors and their respective Subsidiaries, in the ordinary course thereof ("Debtor Mineral Rights"), free and clear of any Encumbrances (other than Permitted Encumbrances). Neither the Debtors nor any their respective Subsidiaries, nor, to the knowledge of the Debtors, any other party to a lease or other agreement providing for Debtor Mineral Rights, has violated any provision of such lease or other agreement providing for Debtor Mineral Rights, and no circumstance exists that, with or without notice, the lapse of time, or both, would constitute a default under, or give rise to any rights to terminate (in whole or in part) or suspend, any lease or other agreement providing for Debtor Mineral Rights.

3.24.    Reserves.  Section 3.24 of the Debtor Disclosure Schedule sets forth a list of each engineering or geological report, survey or other study prepared by, on behalf of, or at the direction of, the Debtors or their Subsidiaries that analyzes or otherwise relates to its available reserves. The Debtors have made available to the Backstop Parties a true and complete copy of each such report, survey or other study.

4.     **Representations and Warranties of the Backstop Parties**.  Each Backstop Party, severally and not jointly, hereby represents and warrants to the Debtors as set forth in this Section 4.  Each representation and warranty of each Backstop Party is made as of the Execution Date and as of the Effective Date:

4.1.    **Organization of Such Backstop Party.**  Such Backstop Party is duly incorporated, organized or formed (as applicable), validly existing and in good standing under the Laws of its jurisdiction of incorporation, organization or formation (as applicable), with full corporate, partnership or limited liability company (as applicable) power and authority to conduct its business as it is now conducted.

26

4.2. **Authority; No Conflict**.

(a)     Such Backstop Party (i) has the requisite corporate, partnership or limited liability company (as applicable) power and authority (A) to enter into, execute and deliver this Agreement and (B) to perform and consummate the transactions contemplated hereby, and (ii) has taken all necessary corporate, partnership or limited liability company (as applicable) action required for (x) the due authorization, execution and delivery of this Agreement and (y) the performance and consummation of the transactions contemplated hereby.  This Agreement has been duly executed and delivered by such Backstop Party.  This Agreement constitutes the legal, valid and binding obligation of such Backstop Party, enforceable against such Backstop Party in accordance with its terms, except that such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar Laws now or hereafter in effect relating to or affecting the rights and remedies of creditors and general principles of equity (whether considered in a proceeding at Law or in equity).

(b)     Neither the execution and delivery by such Backstop Party of this Agreement nor the performance or consummation by such Backstop Party of any of the transactions contemplated hereby will, directly or indirectly (with or without notice or lapse of time or both):

(i)     contravene, conflict with, or result in a violation or breach of any provision of the Organizational Documents of such Backstop Party;

(ii)     contravene, conflict with, or result in a violation of, any pending or existing Law or Order to which such Backstop Party, or any of the properties, assets, rights or interests owned, leased or used by such Backstop Party, are bound or may be subject; or

(iii)     contravene, conflict with or result in a violation or breach of any provision of, or give rise to any right of termination, acceleration or cancellation under, any Contract to which such Backstop Party is a party or which any of the properties, assets, rights or interests owned, leased or used by such Backstop Party are bound or may be subject;

except, in the case of clauses (ii) and (iii) above, where such occurrence, event or result would not reasonably be expected to prohibit, materially delay or materially and adversely impact such Backstop Party's performance or consummation of its obligations under this Agreement.

Except (x) for Consents which have been obtained, notices which have been given and filings which have been made, and (y) where the failure to give any notice, obtain any Consent or make any filing would not reasonably be expected to prohibit, materially delay or materially and adversely impact such Backstop Party's performance or consummation of its obligations under this Agreement, such Backstop Party is not and will not be required to give any notice to, make any filing with or obtain any Consent from, any Person in connection with the execution and delivery by such Backstop Party of this Agreement or the consummation or performance by such Backstop Party of any of the transactions contemplated hereby.

27

4.3. **Backstop Notes Not Registered.** Such Backstop Party understands that the Backstop Notes have not been registered under the Securities Act or any state or foreign securities or "blue sky" laws. Such Backstop Party also understands that the Backstop Notes are being offered and sold pursuant to an exemption from registration provided under Section 4(a)(2) of the Securities Act based in part upon the bona fide nature of the investment intent and the accuracy of such Backstop Party's representations contained in this Agreement and cannot be sold by such Backstop Party unless subsequently registered under the Securities Act or an exemption from registration is available.

4.4. **Acquisition for Own Account.** Such Backstop Party is acquiring the Backstop Notes for its own account (or for the accounts for which it is acting as investment advisor or manager) for investment, not otherwise as a nominee or agent, and not with a present view toward distribution, within the meaning of the Securities Act. Subject to the foregoing, by making the representations herein, such Backstop Party does not agree to hold its Backstop Notes for any minimum or other specific term and reserves the right to dispose of its Backstop Notes at any time in accordance with or pursuant to a registration statement or exemption from the registration requirements under the Securities Act and any applicable state securities Laws.

4.5. **Accredited Investor.** Such Backstop Party is an Accreditor Investor and has such knowledge and experience in financial and business matters that such Backstop Party is capable of evaluating the merits and risks of its investment in the Backstop Notes. Such Backstop Party understands and accepts that its investment in the Backstop Notes involve risks. Such Backstop Party has received such documentation as it has deemed necessary to make an informed investment decision in connection with its investment in the Backstop Notes, has had adequate time to review such documents prior to making its decision to invest, has had a full opportunity to ask questions of and receive answers from the Company or any person or persons acting on behalf of the Company concerning the terms and conditions of an investment in the Company and has made an independent decision to invest in any Backstop Notes based upon the foregoing and other information available to it, which it has deemed adequate for this purpose. With the assistance of each Backstop Party's own professional advisors, to the extent that such Backstop Party has deemed appropriate, such Backstop Party has made its own legal, tax, accounting and financial evaluation of the merits and risks of an investment in any Backstop Notes. Such Backstop Party understands and is able to bear any economic risks of such investment. Except for the representations and warranties expressly set forth in this Agreement or any other Definitive Documentation, such Backstop Party has independently evaluated the merits and risks of its decision to enter into this Agreement and disclaims reliance on any representations or warranties, either express or implied, by the Debtors. Anything herein to the contrary notwithstanding, nothing contained in any of the representations, warranties or acknowledgments made by any Backstop Party in this Section 4.5 will operate to modify or limit in any respect the representations and warranties of the Debtors or to relieve the Debtors from any obligations to the Backstop Parties for breach thereof or the making of misleading statements, fraud, or the omission of material facts in connection with the transactions contemplated herein.

4.6. **Brokers or Finders.** Such Backstop Party has not incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payments in connection with this Agreement for which the Debtors may be liable.

28

4.7. **Sufficient Funds.** Such Backstop Party has sufficient assets and the financial capacity to perform all of its obligations under this Agreement.

5. **Covenants of the Debtors.** The Debtors hereby, jointly and severally, agree with the Backstop Parties as set forth in this Section 5.

5.1. [Reserved].

5.2. **Rights Offering.** The Debtors shall promptly provide draft copies of all documents, instruments, forms, questionnaires, agreements and other materials to be entered into, delivered, distributed or otherwise used in connection with either of the Rights Offering (the "Rights Offering Documentation") for review and comment by the Backstop Parties a reasonable time prior to filing such Rights Offering Documentation with the Bankruptcy Court or entering into, delivering, distributing or using such Rights Offering Documentation. Any comments received by the Debtors from the Backstop Parties or their respective Representatives with respect to the Rights Offering Documentation shall be considered by them in good faith and, to the extent the Debtors disagree with, or determine not to incorporate, any such comments, they shall inform the Backstop Parties thereof and discuss the same with the Backstop Parties.

5.3. **Conditions Precedent.** The Debtors shall use their commercially reasonable efforts to satisfy or cause to be satisfied all the conditions precedent set forth in Section 7.1 hereof and the Plan (including, without limitation, procuring and obtaining all Consents, authorizations and waivers of, making all filings with, and giving all notices to, Persons (including Governmental Bodies) which may be necessary or required on its part in order to consummate or effect the transactions contemplated herein).

5.4. **Notification**. The Debtors shall: (a) on request by any of the Backstop Parties, cause the applicable subscription agent for the Rights Offering selected and appointed in accordance with the Rights Offering Procedures (the "Subscription Agent") to notify each of the Backstop Parties in writing of the aggregate original principal amount of Rights Offering Notes that Rights Offering Participants have subscribed for pursuant to the Rights Offering as of the close of business on the Business Day preceding such request or the most recent practicable time before such request, as the case may be, and (b) following the Rights Offering Termination Date, (i) cause the Subscription Agent to notify each of the Backstop Parties in writing, within two (2) Business Days after the Rights Offering Termination Date, of the aggregate original principal amount of Unsubscribed Notes and (ii) timely comply with their obligations under Section 1.1(b) hereof.

5.5. **Conduct of Business**. Except (a) as set forth in this Agreement or the RSA, (b) as required by the Plan or the Confirmation Order or (c) with the consent (not to be unreasonably withheld, conditioned or delayed) of the Required Backstop Parties, during the period from the Execution Date until the earlier of the Closing and the termination of this Agreement, the Debtors shall, and shall cause their respective Subsidiaries to, (i) conduct their businesses and operations only in the Ordinary Course of Business, (ii) maintain their physical assets, properties and facilities in their current working order condition and repair as of the Execution Date, ordinary wear and tear excepted, (iii) maintain their respective books and records on a basis consistent with prior practice, (iv) maintain all Insurance Policies, or suitable replacements therefor, in full force and effect, (v) use commercially reasonable efforts to preserve

29

US-DOCS\116828268.8

intact their business organizations and relationships with third parties (including creditors, lessors, licensors, suppliers, distributors and customers) and employees, (vi) manage working capital of the Debtors and their respective Subsidiaries only in the Ordinary Course of Business (including by not taking actions that have the effect of postponing or delaying the payment of any accounts payable or other liabilities or deferring expenditures to a later date), (vii) not (A) without the prior written consent of the Required Backstop Parties, enter into any Contract which would constitute a Material Contract after the applicable Debtor or Subsidiary executes and delivers such Contract, or (B) amend or supplement in any manner that is adverse to any of the Debtors or any of their respective Subsidiaries or terminate any Material Contract, and (viii) not take or permit the taking of any action not in the Ordinary Course of Business that would materially and adversely affect the Tax position or Tax attributes of the Debtors or any of their Subsidiaries following the Effective Date.

5.6.    **Use of Proceeds.**  The Debtors shall use the net cash proceeds from the sale of the Rights Offering Notes from the Rights Offering and the sale of the Backstop Notes pursuant to this Agreement solely for the purposes set forth in the Plan, the Disclosure Statement and the RSA.

5.7.    **Access**.  Promptly following the Execution Date, each of the Debtors will, and will use commercially reasonable efforts to cause its employees, officers, directors, managers, accountants, attorneys and other advisors (collectively, "Representatives") to, upon reasonably prior notice by the Backstop Parties, provide each of the Backstop Parties and its Representatives (and any financing sources of any of the Backstop Parties and their Representatives) with reasonable access to, during regular business hours (and without material disruption to the conduct of the Debtors' business) officers, management, employees and other Representatives of any of the Debtors or their respective Subsidiaries and to assets, properties, Contracts, books, records and any other information concerning the business and operations of any of the Debtors or their respective Subsidiaries as any of the Backstop Parties or any of their respective Representatives may reasonably request.

5.8.    **HSR Act and Foreign Competition Filings**.  The Debtors shall promptly prepare and file all necessary documentation and effect all applications that are necessary under the HSR Act or any applicable foreign competition Laws so that all applicable waiting periods shall have expired or been terminated thereunder with respect to the purchase of Backstop Notes hereunder, the issuance and purchase of Rights Offering Notes in connection with the Rights Offerings, or any of the other Contemplated Transactions in time for such transactions to be consummated within the timeframes contemplated hereunder, and not take any action, or fail to take any action, that is intended or reasonably likely to materially impede or delay the ability of the parties to obtain any necessary approvals required for the Contemplated Transactions.  Without limiting the provisions of Section 2.2, the Debtors shall bear all costs and expenses of the Debtors, the Subsidiaries of the Debtors and the Backstop Parties in connection with the preparation or the making of any filing under the HSR Act or applicable foreign competition Laws, including any filing fees thereunder.

US-DOCS\116828268.8

5.9.  **Specified Issuances**.  The Debtors shall:

(a)  consult with the Backstop Parties with respect to the steps (the "Specified Issuance Steps") to be taken by the Debtors to ensure that (i) each of the Specified Issuances described in clauses (a) and (b) of the definition of Specified Issuances are exempt from the registration and prospectus delivery requirements of Section 5 of the Securities Act pursuant to Section 1145(a) of the Bankruptcy Code and (ii) the Specified Issuances described in clauses (c) through (f) of the definition of Specified Issuances are exempt from the registration and prospectus delivery requirements of Section 5 of the Securities Act pursuant to Section 1145(a) of the Bankruptcy Code, Section 4(a)(2) of the Securities Act and/or any other applicable exemption; and

(b)  following preparation thereof, promptly provide copies of drafts of all documents, instruments, questionnaires, agreements and other materials to be entered into, delivered, distributed or otherwise used in connection with the Specified Issuances (the "Specified Issuance Documentation") for review and comment by the Backstop Parties.  Any comments received by the Debtors from the Required Backstop Parties or their respective Representatives with respect to the Specified Issuance Steps or the Specified Issuance Documentation shall be considered by them in good faith and, to the extent the Debtors disagree with any such comments, they shall inform the Backstop Parties thereof and discuss the same with the Backstop Parties prior to taking such Specified Issuance Steps or delivering, distributing, entering into or using any such Specified Issuance Documentation.

5.10.  **Milestones**.  The Debtors shall comply with each of the milestones set forth in Section 4 of the RSA.

5.11.  **RSA Covenants.**  Each of the covenants and agreements set forth in Section 6 of the RSA (as in effect on the Execution Date) (collectively, the "RSA Covenants") are hereby incorporated herein by reference with full force and effect as if fully set forth herein by applying the provisions thereof *mutatis mutandis* (such that all changes and modifications to the defined terms and other terminology used in the RSA Covenants shall be made so that the RSA Covenants can be applied in a logical manner in this Agreement), and the Debtors shall perform, abide by and observe, for the benefit of the Backstop Parties, all of the RSA Covenants as incorporated herein and modified hereby, and without giving effect to any amendment, modification, supplement, forbearance, waiver or termination of or to any of the RSA Covenants that are made or provided under the terms of the RSA, other than any amendment, modification, supplement, forbearance, waiver or termination of or to any of the RSA Covenants which (a) the Required Backstop Parties have provided their prior written consent or (b) have the effect of making such RSA Covenant more favorable to the Required Backstop Parties, as determined by the Required Backstop Parties in their sole discretion.  The Debtors shall not assert, or support any assertion by any third party, that the RSA Covenants, as incorporated herein and modified hereby, are not enforceable by the Backstop Parties by reason of the fact that the RSA Covenants are included in a Contract that was entered into by the Debtors prior to the Petition Date or otherwise, or that the Required Backstop Parties shall be required to obtain relief from the automatic stay from the Bankruptcy Court as a condition to the right of the Required Backstop Parties to terminate this Agreement pursuant to Section 8(b) on account of a breach or violation of any of the RSA Covenants; provided that the Debtors' entry into and approval by the Bankruptcy Court of this

31

Agreement shall not be construed as assumption by the Debtors or approval by the Bankruptcy Court of the RSA.

5.12. **DIP Covenants.** Each of the covenants and agreements set forth in Section 5 and Section 6 of the DIP TL Credit Agreement (as in effect on the Execution Date) (collectively, the "DIP Covenants") are hereby incorporated herein by reference with full force and effect as if fully set forth herein by applying the provisions thereof *mutatis mutandis* (such that all changes and modifications to the defined terms and other terminology used in the DIP Covenants shall be made so that the DIP Covenants can be applied in a logical manner in this Agreement, including by construing each reference therein to "Required Lenders" as a reference to Required Backstop Parties), and the Debtors shall perform, abide by and observe, for the benefit of the Backstop Parties, all of the DIP Covenants as incorporated herein and modified hereby, and without giving effect to any amendment, modification, supplement, forbearance, waiver or termination of or to any of the DIP Covenants that are made or provided under the terms of the DIP TL Credit Agreement, other than any amendment, modification, supplement, forbearance, waiver or termination of or to any of the DIP Covenants which (a) the Required Backstop Parties have provided their prior written consent or (b) have the effect of making such DIP Covenant more favorable to the Required Backstop Parties, as determined by the Required Backstop Parties in their sole discretion. The Debtors shall not assert, or support any assertion by any third party (including any DIP Lender), that the Required Backstop Parties shall be required to obtain relief from the automatic stay from the Bankruptcy Court as a condition to the right of the Required Backstop Parties to terminate this Agreement pursuant to Section 8(b) on account of a breach or violation of any of the DIP Covenants.

5.13. **DTC Eligibility**. At the request of the Required Backstop Parties, the Debtors shall use their reasonable best efforts to promptly make all New Secured Notes eligible for deposit with DTC.

6. **Covenants of the Backstop Parties**.

6.1. **Rights Offering.** Each Backstop Party shall use its commercially reasonable efforts in working together with the Debtors in good faith and to take or cause to be taken all actions, and do or cause to be done all things, reasonably necessary, proper or advisable such that the Debtors can timely finalize and file the Rights Offering Documentation with the Bankruptcy Court and obtain approval thereof.

6.2. **Conditions Precedent**. Each Backstop Party shall use its commercially reasonable efforts to satisfy or cause to be satisfied on or prior to the Effective Date all the conditions precedent applicable to such Backstop Party set forth in Section 7.2 hereof; provided, however, that nothing contained in this Section 6.2 shall obligate the Backstop Parties to waive any right or condition under this Agreement, the RSA, the Plan or any of the other Definitive Documentation.

6.3. **HSR Act and Foreign Competition Filings**. Each Backstop Party shall promptly prepare and file all necessary documentation and effect all applications that are necessary under the HSR Act or any applicable foreign competition Laws so that all applicable waiting periods shall have expired or been terminated thereunder with respect to the purchase of Backstop

32

Notes hereunder, the issuance and purchase of Rights Offering Securities in connection with the Rights Offerings or any of the other Contemplated Transactions within the timeframes contemplated hereunder, and not take any action that is intended or reasonably likely to materially impede or delay the ability of the parties to obtain any necessary approvals required for the Contemplated Transactions. Anything herein to the contrary notwithstanding, none of the Backstop Parties (or their respective ultimate parent entities, as such term is used in the HSR Act) shall be required to (a) disclose to any other party hereto any information contained in its HSR Notification and Report Form or filings under any applicable foreign competition Laws that such party, in its sole discretion, deems confidential, except as may be required by applicable Laws as a condition to the expiration or termination of all applicable waiting periods under the HSR Act and any applicable foreign competition Laws, (b) agree to any condition, restraint or limitation relating to its or any of its Affiliates' ability to freely own or operate all or a portion of its or any of its Affiliates' businesses or assets, (c) hold separate (including by trust or otherwise) or divest any of its or any of its Affiliates' businesses or assets, or (d) hold separate (including by trust or otherwise) or divest any assets of any of the Debtors or any of their respective Subsidiaries. Without limiting the provisions of <u>Section 2.2</u>, the Debtors shall bear all costs and expenses of the Debtors, the Subsidiaries of the Debtors and the Backstop Parties in connection with the preparation or the making of any filing under the HSR Act or any applicable foreign competition Laws, including any filing fees thereunder.

     6.4. **Specified Issuances**. Each Backstop Party shall use commercially reasonable efforts in working together with the Debtors in good faith and to take or cause to be taken all actions, and do or cause to be done all things, reasonably necessary, proper or advisable to timely finalize the Specified Issuance Documentation.

     7. **Conditions to Closing**.

     7.1. **Conditions Precedent to Obligations of the Backstop Parties.** The obligations of the Backstop Parties to subscribe for and purchase Backstop Notes (other than the Put Option Notes) pursuant to their respective Backstop Commitments are subject to the satisfaction (or waiver in writing by the Required Backstop Parties) of each of the following conditions prior to or on the Effective Date:

     (a) RSA. None of the following shall have occurred: (i) the RSA shall not have been terminated by (1) the Debtors or (2) Consenting Noteholders holding, in the aggregate, more than one-third in principal amount of the Senior Notes Claims, (ii) the RSA shall not have been invalidated or deemed unenforceable by the Bankruptcy Court or any other Governmental Body, (iii) no Noteholder Termination Event shall have occurred that was not waived in writing by the Required Backstop Parties and (iv) there shall not be continuing any cure period with respect to any event, occurrence or condition that would permit the Required Backstop Parties to terminate the RSA in accordance with its terms.

     (b) Plan and Plan Supplement. The Plan, as confirmed by the Bankruptcy Court, shall be consistent in all material respects with the terms of the RSA and otherwise in form and substance reasonably acceptable to the Required Backstop Parties. The Plan Supplement (including all schedules, documents and forms of documents contained therein or constituting a

US-DOCS\116828268.8

part thereof) shall be consistent in all material respects with the terms of the RSA and otherwise in form and substance reasonably acceptable to the Required Backstop Parties.

(c)     Disclosure Statement.  The Disclosure Statement shall be consistent in all material respects with the terms of the RSA and otherwise in form and substance reasonably acceptable to the Required Backstop Parties.

(d)     Solicitation Order.  (i) The Bankruptcy Court shall have entered the Solicitation Order, which among other things shall approve the Rights Offering Procedures, (ii) the Solicitation Order shall be consistent in all material respects with the terms of this Agreement and the RSA and otherwise in form and substance reasonably acceptable to the Required Backstop Parties, and (iii) the Solicitation Order shall be a Final Order.

(e)     Backstop Order.  (i) The Bankruptcy Court shall have entered the Backstop Order, (ii) the Backstop Order shall be consistent in all material respects with the terms of this Agreement and the RSA and otherwise in form and substance reasonably acceptable to the Required Backstop Parties, and (iii) the Backstop Order shall be a Final Order.

(f)     Confirmation Order.  (i) The Bankruptcy Court shall have entered the Confirmation Order, (ii) the Confirmation Order shall be consistent in all material respects with the terms of this Agreement and the RSA and otherwise in form and substance reasonably acceptable to the Required Backstop Parties, and (iii) the Confirmation Order shall be a Final Order.  Without limiting the generality of the foregoing, the Confirmation Order shall contain the following specific findings of fact, conclusions of Law and Orders: (A) each of the Specified Issuances described in clauses (a) and (b) of the definition of "Specified Issuances" are exempt from the registration and prospectus delivery requirements of Section 5 of the Securities Act pursuant to section 1145(a) of the Bankruptcy Code; (B) each of the Specified Issuances described in clauses (c)-(f) of the definition of "Specified Issuances" are exempt from the registration and prospectus delivery requirements of Section 5 of the Securities Act pursuant to section 1145(a) of the Bankruptcy Code, Section 4(a)(2) of the Securities Act and/or other applicable exemption; (C) the solicitation of acceptance or rejection of the Plan by the Backstop Parties and/or any of their respective Related Persons (if any such solicitation was made) was done in good faith and in compliance with the applicable provisions of the Bankruptcy Code and, as such, the Backstop Parties and any of their respective Related Persons are entitled to the benefits and protections of section 1125(e) of the Bankruptcy Code; and (D) the participation by the Backstop Parties and/or any of their respective Related Persons in the offer, issuance, sale or purchase of any security offered, issued, sold or purchased under the Plan (if any such participation was made) was done in good faith and in compliance with the applicable provisions of the Bankruptcy Code and, as such, the Backstop Parties and any of their respective Related Persons are entitled to the benefits and protections of section 1125(e) of the Bankruptcy Code.

(g)     Conditions to Confirmation and Effectiveness.  The conditions to confirmation of the Plan and the conditions to the Effective Date set forth in the Plan shall have been satisfied (or waived with the prior written consent of the Required Backstop Parties) in accordance with the Plan, and the Effective Date shall have occurred or shall occur simultaneously with the Closing.

34

(h)     <u>Rights Offering</u>.  (i) The Rights Offering shall have been conducted and consummated in accordance with the Plan, the Rights Offering Procedures, and this Agreement, and (ii) all Rights Offering Notes (other than any Unsubscribed Notes) shall have been (or concurrently with the Closing will be) issued and sold in connection with the Rights Offering.

(i)     <u>New Secured Notes</u>.  (i) Each of the New Secured Notes Documents shall (x) have been executed, authenticated and/or delivered by the Reorganized Debtors and each Person required to execute, authenticate and/or deliver the same (which, in the case of the New Secured Notes Indenture, shall include the trustee thereunder unless the Plan or the Confirmation Order provides that the New Secured Notes Documents are deemed binding on such trustee), (y) be consistent in all material respects with the terms of the RSA, the New Secured Notes Term Sheet, and otherwise in form and substance reasonably acceptable to the Required Backstop Parties, and (z) be in full force and effect, and (ii) the liens on and security interest in the Reorganized Debtors' assets securing the Reorganized Debtors' obligations under the New Secured Notes shall have been duly and validly created and perfected in a manner that is reasonably acceptable to the Required Backstop Parties.

(j)     <u>New Certificate of Incorporation</u>.  (i) The certificate of incorporation of the Company shall have been amended and restated in its entirety to be consistent in all material respects with the terms of the RSA and otherwise in form and substance reasonably acceptable to the Required Backstop Parties (the "<u>New Certificate of Incorporation</u>"), (ii) the New Certificate of Incorporation shall have been duly executed and acknowledged by the Company in accordance with applicable Law and filed with the Secretary of State of the State of Delaware, (iii) the Required Backstop Parties shall have received evidence that the New Certificate of Incorporation has been duly filed with the Secretary of State of the State of Delaware, and (iv) the New Certificate of Incorporation shall be in full force and effect.

(k)     <u>New Stockholders Agreement</u>.  (i) Reorganized Company and all Persons that are entitled to receive shares of New Common Stock pursuant to the Plan shall have executed and delivered the New Stockholders Agreement or otherwise be deemed party to the New Stockholder Agreement pursuant to the Plan and the Confirmation Order, and (ii) the New Stockholders Agreement shall be (x) consistent in all material respects with the terms of the RSA and otherwise in form and substance reasonably acceptable to the Required Backstop Parties, and (y) in full force and effect.

(l)     <u>New Registration Rights Agreement</u>.  If elected by the Required Backstop Parties, (i) Reorganized Company shall have executed and delivered the New Registration Rights Agreement, and (ii) the New Registration Rights Agreement shall be (x) consistent in all material respects with the terms of the RSA and otherwise in form and substance reasonably acceptable to the Required Backstop Parties, and (y) in full force and effect.

(m)     <u>Other Definitive Documentation</u>.  (i) All Definitive Documentation (other than those Definitive Documentation described in a separate clause of this <u>Section 7.1</u>) shall have been executed, delivered and/or filed by the parties thereto, (ii) such Definitive Documentation shall be consistent in all material respects with the terms of the RSA and otherwise in form and substance reasonably acceptable to the Required Backstop Parties, and (iii) such Definitive Documentation shall be in full force and effect.

35

(n)     No Injunctions or Restraints; Illegality.  No temporary restraining order, preliminary or permanent injunction, judgment or other Order preventing the consummation of any of the transactions contemplated by this Agreement or any of the other Contemplated Transactions shall have been entered, issued, rendered or made, nor shall any Proceeding seeking any of the foregoing be commenced, pending or threatened; nor shall there be any Law promulgated, enacted, entered, enforced or deemed applicable to any of the Backstop Parties or any of the Debtors which makes the consummation of any of the transactions contemplated by this Agreement or any of the other Contemplated Transactions (including, without limitation, each of the Specified Issuances) illegal or void.

(o)     Notices and Consents.  All Governmental Body and material third party notifications, filings, waivers, authorizations and other Consents, including Bankruptcy Court approval, necessary or required for the consummation of any of the transactions contemplated by this Agreement or any of the other Contemplated Transactions or the effectiveness of the Plan, shall have been obtained, not be subject to unfulfilled conditions and be in full force and effect; and all applicable waiting periods shall have expired without any action being taken or threatened by any Governmental Body that would restrain, prevent or otherwise impose materially adverse conditions on any of the transactions contemplated by this Agreement or any of the other Contemplated Transactions.

(p)     Proceedings.  There shall be no pending, existing, instituted, outstanding or threatened Proceeding by (x) any Person (other than a Governmental Body) involving any of the Debtors or any of their respective current or former officers, employees or directors (in their capacities as such) or (y) any Governmental Body involving any of the Debtors or any of their respective current or former officers, employees or directors (in their capacities as such), in each case that is material to the Debtors and would materially and adversely affect the ability of the Debtors to perform their obligations under, or to consummate the transactions contemplated hereby or the other Contemplated Transactions.

(q)     Representations and Warranties.  Each of (i) the representations and warranties of the Debtors in this Agreement (other than the Fundamental Representations) that are not qualified as to "materiality" or "Material Adverse Effect" shall be true and correct in all material respects, (ii) the representations and warranties of the Debtors in this Agreement (other than the Fundamental Representations) that are qualified as to "materiality" or "Material Adverse Effect" shall be true and correct in all respects, and (iii) the Fundamental Representations shall be true and correct in all respects, in each case of clauses (i), (ii) and (iii), at and as of the Execution Date and at and as of the Effective Date as if made at and as of the Effective Date (except for representations and warranties made as of a specified date, which shall be true and correct only as of the specified date).

(r)     Covenants.  Each of the Debtors shall have complied in all material respects with all covenants in this Agreement and the RSA that are applicable to the Debtors.

(s)     Backstop Expenses.  The Debtors shall have paid all Backstop Expenses that have been invoiced and that are accrued and remain unpaid as of the Effective Date in accordance with the terms of this Agreement, and no Backstop Expenses shall be required to be repaid or otherwise disgorged to the Debtors or any other Person.

36

(t)     Material Adverse Effect.  No Material Adverse Effect shall have occurred since the Execution Date (other than the events and circumstances contemplated under the RSA).

(u)     Put Option Notes.  The Company shall have issued and delivered the Put Option Notes in accordance with Sections 1.3, and no portion of the Put Option Notes shall have been invalidated or avoided.

(v)     Backstop Certificates.  The Backstop Parties shall have received a Backstop Certificate in accordance with Section 1.1(b).

(w)     No Registration; Compliance with Securities Laws.  No Proceeding shall be pending or threatened by any Governmental Body or other Person that alleges that any of the Specified Issuances is not exempt from the registration and prospectus delivery requirements of Section 5 of the Securities Act.

(x)     Officer's Certificate.  The Backstop Parties shall have received on and as of the Effective Date a certificate of an executive officer of the Debtors confirming that the conditions set forth in Sections 7.1(p), 7.1(q), 7.1(r) and 7.1(t) hereof have been satisfied.

(y)     [Reserved].

(z)     Opinions.  The Debtors shall have delivered to the Backstop Parties (i) opinions of counsel to the Debtors, dated as of the Effective Date and addressed to the Backstop Parties, addressing such matters that the Required Backstop Parties reasonably request in connection with the closing of the offering through DTC related to the offer, issuance, and sale of the New Secured Notes, and the transactions contemplated by this Agreement and the other Definitive Documents, and such opinions shall be in form and substance reasonably acceptable to the Required Backstop Parties, and (ii) any other agreement, certificate, opinion, or other documentation reasonably requested by the Required Backstop Parties to consummate the Contemplated Transactions.

(aa)    Valid Issuance.  The Backstop Notes shall be, upon issuance, validly issued, fully paid, non-assessable and free and clear of all Taxes, Encumbrances, pre-emptive rights, rights of first refusal, subscription rights and similar rights, except for any restrictions on transfer as may be imposed by applicable securities Laws.

(bb)    [Reserved].

(cc)    Minimum Liquidity Amount.  After giving effect to the Exit Payments, the Exit Liquidity Amount shall not be less than the Minimum Liquidity Amount.  Not less than five (5) Business Days prior to the anticipated Effective Date, the Company shall have delivered to the Backstop Parties a certificate, executed by an executive officer of the Company, which shall set forth a reasonably detailed calculation by the Company of the Exit Liquidity Amount.

(dd)    [Reserved].

(ee)    Securities of the Debtors.  On the Effective Date (after giving effect to the consummation of the transactions contemplated by the Plan), other than (i) the shares of New

37

Common Stock issued to holders of Allowed Senior Notes Claims and Allowed General Unsecured Claims pursuant to the Plan, (ii) the New Secured Notes issued and sold to Rights Offering Participants pursuant to the Rights Offering and to the Backstop Parties pursuant to this Agreement, (iii) the shares of New Common Stock reserved for issuance upon conversion of the New Secured Notes in accordance with the terms of the New Certification of Incorporation and the New Secured Notes Documents, and (vi) Interests of a Debtor (other than the Company) owned solely by another Debtor, no (A) Interests of any Debtor or (B) pre-emptive rights, rights of first refusal, subscription rights and/or similar rights to acquire any Interests of any Debtor (except, in the case of this clause (B), any such rights with respect to shares of New Common Stock that are expressly set forth in the New Stockholders Agreement), in any such case will be issued, outstanding or in effect.

7.2. **Conditions Precedent to Obligations of the Company.** The obligations of the Company to issue and sell the Backstop Notes to each of the Backstop Parties pursuant to this Agreement are subject to the following conditions precedent, each of which may be waived in writing by the Company:

(a) [Reserved]

(b) Plan and Plan Supplement. The Plan, as confirmed by the Bankruptcy Court, shall be consistent in all material respects with the terms of the RSA and otherwise in form and substance reasonably acceptable to the Debtors. The Plan Supplement (including all schedules, documents and forms of documents contained therein or constituting a part thereof) and all other Definitive Documentation shall be consistent in all material respects with the terms of the RSA and otherwise in form and substance reasonably acceptable to the Debtors.

(c) Disclosure Statement. The Disclosure Statement shall be consistent in all material respects with the terms of the RSA and otherwise in form and substance reasonably acceptable to the Debtors.

(d) Confirmation Order. (i) The Bankruptcy Court shall have entered the Confirmation Order, (ii) the Confirmation Order shall be consistent in all material respects with the terms of this Agreement and the RSA and otherwise in form and substance reasonably acceptable to the Debtors, and (iii) the Confirmation Order shall be a Final Order.

(e) Solicitation Order. (i) The Bankruptcy Court shall have entered the Solicitation Order, (ii) the Solicitation Order shall be consistent in all material respects with the terms of this Agreement and the RSA and otherwise in form and substance reasonably acceptable to the Debtors, and (iii) the Solicitation Order shall be a Final Order.

(f) Backstop Order. (i) The Bankruptcy Court shall have entered the Backstop Order, (ii) the Backstop Order shall be consistent in all material respects with the terms of this Agreement and the RSA and otherwise in form and substance reasonably acceptable to the Debtors, and (iii) the Backstop Order shall be a Final Order.

(g) Conditions to Confirmation and Effectiveness. The conditions to confirmation of the Plan and the conditions to the Effective Date set forth in the Plan shall have

US-DOCS\116828268.8

been satisfied or waived in accordance with the Plan, and the Effective Date shall have occurred or shall occur simultaneously with the Closing.

(h)     Rights Offerings.  The Rights Offerings shall have been consummated.

(i)     No Injunctions or Restraints; Illegality.  No temporary restraining order, preliminary or permanent injunction, judgment or other Order preventing the consummation of any of the transactions contemplated by this Agreement or any of the other Contemplated Transactions shall have been entered, issued, rendered or made, nor shall any Proceeding seeking any of the foregoing be commenced, pending or threatened; nor shall there be any Law promulgated, enacted, entered, enforced or deemed applicable to the Backstop Parties or the Debtors which makes the consummation of any of the transactions contemplated by this Agreement or any of the other Contemplated Transactions (including, without limitation, each of the Specified Issuances) illegal or void.

(j)     Representations and Warranties and Covenants.  (i) Each of (x) the representations and warranties of each Backstop Party in this Agreement that are not qualified as to "materiality" or "material adverse effect" shall be true and correct in all material respects and (y) the representations and warranties of each Backstop Party that are qualified as to "materiality" or "material adverse effect" shall be true and correct, in each case of clauses (x) and (y), at and as of the Execution Date and at and as of the Effective Date as if made at and as of the Effective Date (except for representations and warranties made as of a specified date, which shall be true and correct only as of the specified date) and (ii) each Backstop Party shall have complied in all material respects with all covenants in this Agreement applicable to it, except, in any such case of clause (i) or clause (ii) above, to the extent that any such inaccuracy or non-compliance would not reasonably be expected to prohibit, materially delay or materially and adversely impact such Backstop Party's performance or consummation of its obligations under this Agreement.

(k)     RSA.  The RSA remains in full force and effect in accordance with its terms and shall not have been terminated in accordance with its terms.

8.     **Termination**.

(a)     Unless earlier terminated in accordance with the terms of this Agreement, this Agreement (including the Backstop Commitments contemplated hereby) shall terminate automatically and immediately, without a need for any further action on the part of (or notice provided to) any Person, upon the earlier to occur of:

(i)     the Bankruptcy Court enters an Order converting the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code, appointing a trustee or custodian for any of the Debtors or dismissing the Chapter 11 Cases; and

(ii)     the date of any termination of the RSA with respect to all Consenting Noteholders;

(b)     This Agreement (including the Backstop Commitments contemplated hereby) may be terminated and the transactions contemplated hereby may be abandoned at any

39

US-DOCS\116828268.8

time by the Backstop Parties effective immediately upon the giving by the Required Backstop Parties of written notice of termination to the Debtors:

(i)     if (x) any of the Debtors shall have materially breached or materially failed to perform any of their respective representations, warranties, covenants or other obligations contained in this Agreement, or any representation or warranty of any of the Debtors in this Agreement shall have become untrue (determined as if the Debtors made their respective representations and warranties at all times on and after the Execution Date and prior to the date this Agreement is terminated), and (y) any such breach, failure to perform or occurrence referred to in clause (x) above (A) would result in a failure of a condition set forth in Section 7.1(q), Section 7.1(r) or Section 7.1(t) and (B) is not curable or able to be performed by the Drop-Dead Date, or, if curable or able to be performed by the Drop-Dead Date, is not cured or performed within ten (10) Business Days after written notice of such breach, failure or occurrence is given to the Debtors by the Required Backstop Parties (it being understood and agreed that the failure by the Debtors to comply with any of the covenant set forth in Section 5.10 by the deadlines set forth therein will result in a failure of a condition set forth in Section 7.1 and shall not be subject to cure); provided, that, this Agreement shall not terminate pursuant to this Section 8(b)(i) if any Backstop Party is then in willful or intentional breach of this Agreement;

(ii)     if any of the conditions set forth in Section 7.1 hereof become incapable of fulfillment prior to the Drop-Dead Date (other than as a result of the failure of the Backstop Parties to fulfill or comply with their obligations hereunder);

(iii)     the occurrence of a Triggering Event;

(iv)     the occurrence of (A) an acceleration of the obligations or termination of commitments under the DIP TL Credit Agreement or (B) a refunding, replacement or refinancing of the obligations under the DIP TL Credit Agreement;

(v)     if a Funding Default shall occur and Non-Defaulting Backstop Parties do not elect to commit to purchase all of the Default Notes after the process for exercising the Default Purchaser Rights has been exhausted in accordance with Section 1.2(c) hereof;

(vi)     if a Noteholder Termination Event (other than clause (m) of Section (7) of the RSA) shall occur without giving effect to any waivers of a Noteholder Termination Event;

(vii)     the Solicitation Order, the Backstop Order or the Confirmation Order is terminated, reversed, stayed, dismissed, vacated, or reconsidered, or any such Order is modified or amended after entry without the prior acquiescence or written consent (not to be unreasonably withheld, conditioned or delayed) of the Required Backstop Parties in a manner that prevents or prohibits the consummation of the Contemplated Transactions or any of the Definitive Documentation in a way

40

that cannot be remedied by the Debtors subject to the reasonable satisfaction of the Required Backstop Parties;

(viii)   if any Order has been entered by any Governmental Body that operates to materially prevent, restrict or alter the implementation of the Plan, the Rights Offering or any of the Contemplated Transactions; or

(ix)   if the Closing shall not occur on or prior to October 10, 2020 (the "Drop-Dead Date").

(c)   This Agreement (including the Backstop Commitments contemplated hereby) may be terminated at any time by the Debtors effective immediately upon the Debtors' giving of written notice of termination to the Backstop Parties:

(i)   if (x) any of the Backstop Parties shall have materially breached or materially failed to perform any of their respective representations, warranties, covenants or other obligations contained in this Agreement, or any representation or warranty of any of the Backstop Parties in this Agreement shall have become untrue (determined as if the Backstop Parties made their respective representations and warranties at all times on and after the Execution Date and prior to the date this Agreement is terminated), and (y) any such breach, failure to perform or occurrence referred to in clause (x) above (A) would result in a failure of a condition set forth in Section 7.2(j) and (B) is not curable or able to be performed by the Drop-Dead Date, or, if curable or able to be performed by the Drop-Dead Date, is not cured or performed within ten (10) Business Days after written notice of such breach, failure or occurrence is given to the Required Backstop Parties by the Debtors; provided, that, this Agreement shall not terminate pursuant to this Section 8(b)(i) if any Debtor is then in willful or intentional breach of this Agreement; provided, further, that if a Funding Default shall occur, the Debtors shall not be permitted to terminate this Agreement and the transactions contemplated hereby pursuant to this Section 8(c) unless Non-Defaulting Backstop Parties do not elect to commit to purchase all of the Default Notes after the process for exercising Default Purchase Rights has been exhausted in accordance with Section 1.2(c);

(ii)   if any of the conditions set forth in Section 7.2 hereof become incapable of fulfillment prior to the Drop-Dead Date (other than as a result of the failure of the Debtors to fulfill or comply with their obligations hereunder);

(iii)   if an HCR Termination Event shall occur without giving effect to any waivers of an HCR Termination Event;

(iv)   if any Order has been entered by any Governmental Body that operates to prevent, restrict or alter the implementation of the Plan, the Rights Offering or any of the Contemplated Transactions, in each case, on substantially the terms provided for herein or therein, in a way that cannot be remedied in all material respects by the Debtors in a manner reasonably satisfactory to the Required Backstop Parties; or

41

        (v)     the Solicitation Order, the Backstop Order or the Confirmation Order is terminated, reversed, stayed, dismissed, vacated, or reconsidered, or any such Order is modified or amended after entry without the prior acquiescence or written consent (not to be unreasonably withheld, conditioned or delayed) of the Debtors in a manner that prevents or prohibits the consummation of the Contemplated Transactions or any of the Definitive Documentation in a way that cannot be remedied by the Backstop Parties subject to the reasonable satisfaction of the Debtors.

        (d)     This Agreement (including the Backstop Commitments contemplated hereby) may be terminated at any time by mutual written consent of the Debtors and the Required Backstop Parties.

        (e)     In the event of a termination of this Agreement in accordance with this Section 8 at a time after all or any portion of the Purchase Price for Backstop Notes has been deposited into the Deposit Account by any of the Backstop Parties, the Backstop Parties that have deposited such Purchase Price (or portion thereof) shall be entitled to the return of such amount. In such a case, the Backstop Parties and the Debtors hereby agree to execute and deliver to the Subscription Agent, promptly after the effective date of any such termination (but in any event no later than two (2) Business Days after any such effective date), a letter instructing the Subscription Agent to pay to each applicable Backstop Party, by wire transfer of immediately available funds to an account designated by such Backstop Party, the amount of Purchase Price that such Backstop Party is entitled to receive pursuant to this Section 8(e); provided that, if the Required Backstop Parties elect to establish an Escrow Account pursuant to Section 1.2(b), any return of the Purchase Price for Backstop Notes deposited in the Escrow Account shall be pursuant to terms of the Escrow Agreement.

        (f)     In the event of a termination of this Agreement in accordance with this Section 8, the provisions of this Agreement shall immediately become void and of no further force or effect (other than Sections 2.2, 2.3, 2.4, 8, 9, 10, 12 and 13 hereof (and any defined terms used in any such Sections (but solely to the extent used in any such Sections)), and other than in respect of any liability of any party for any breach of this Agreement prior to such termination, which shall in each case expressly survive any such termination).

        (g)     Each Debtor hereby acknowledges and agrees and shall not dispute that the giving of notice of termination by the Required Backstop Parties pursuant to this Agreement shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code (and each Debtor hereby waives, to the greatest extent possible, the applicability of the automatic stay to the giving of such notice).

    9.     **Indemnification**.

        (a)     Whether or not the transactions contemplated by this Agreement or any of the other Contemplated Transactions are consummated, the Debtors hereby agree, jointly and severally, to indemnify and hold harmless each of the Backstop Parties and each of their respective Affiliates, stockholders, equity holders, members, partners, managers, officers, directors, employees, attorneys, accountants, financial advisors, consultants, agents, advisors and controlling

42

persons (each, in such capacity, an "Indemnified Party") from and against any and all losses, claims, damages, liabilities, penalties, judgments, settlements, costs and expenses, including reasonable attorneys' fees (other than Taxes of the Backstop Parties except to the extent otherwise provided for in Section 2.1(b) of this Agreement), whether or not related to a third party claim, imposed on, sustained, incurred or suffered by, or asserted against, any Indemnified Party as a result of, arising out of, related to or in connection with, directly or indirectly, this Agreement, the Backstop Commitments or the Rights Offering, or, subject to Section 10, any breach by any Debtor of any of its representations, warranties and/or covenants set forth in this Agreement, or any claim, litigation, investigation or other Proceeding relating to or arising out of any of the foregoing, regardless of whether any such Indemnified Party is a party thereto, and to reimburse each such Indemnified Party for the reasonable and documented legal or other out-of-pocket costs and expenses as they are incurred in connection with investigating, monitoring, responding to or defending any of the foregoing (collectively, "Losses"); provided, that the foregoing indemnification will not, as to any Indemnified Party, apply to Losses that (i) are determined by a final, non-appealable decision by the Bankruptcy Court to have resulted from (y) any act by such Indemnified Party that constitutes fraud, bad faith, gross negligence or willful misconduct or (z) the breach by such Indemnified Party of its obligations under this Agreement or the RSA, or (ii) as to a Defaulting Backstop Party, its Related Persons or any Indemnified Party related thereto, are caused by a Funding Default by such Backstop Party. If for any reason the foregoing indemnification is unavailable to any Indemnified Party or insufficient to hold it harmless, then the Debtors shall contribute to the amount paid or payable by such Indemnified Party as a result of such Loss in such proportion as is appropriate to reflect not only the relative benefits received by the Debtors, on the one hand, and such Indemnified Party, on the other hand, but also the relative fault of the Debtors, on the one hand, and such Indemnified Party, on the other hand, as well as any relevant equitable considerations. It is hereby agreed that the relative benefits to the Debtors, on the one hand, and all Indemnified Parties, on the other hand, shall be deemed to be in the same proportion as (i) the total value received or proposed to be received by the Debtors pursuant to the sale of the maximum number of Backstop Notes to the Backstop Parties pursuant to this Agreement bears to (ii) the value of the Put Option Notes issued or proposed to be issued to the Backstop Parties in connection with such sales. The Debtors also agree that no Indemnified Party shall have any liability based on its exclusive or contributory negligence or otherwise to the Debtors, any Person asserting claims on behalf of or in right of the Debtors, or any other Person in connection with or as a result of this Agreement, the Backstop Commitments, the Backstop Notes, either of the Rights Offering, any of the Definitive Documentation, the Plan (or the solicitation thereof), the Chapter 11 Cases or the transactions contemplated hereby or thereby or any of the other Contemplated Transactions, except as to any Indemnified Party to the extent that any Losses incurred by the Debtors (i) are determined by a final, non-appealable decision by the Bankruptcy Court to have resulted from (y) any act by such Indemnified Party that constitutes fraud, bad faith, gross negligence or willful misconduct or (z) the breach by such Indemnified Party of its obligations under this Agreement or the RSA, or (ii) as to a Defaulting Backstop Party, its Related Persons or any Indemnified Party related thereto, are caused by a Funding Default by such Backstop Party. The terms set forth in this Section 9 shall survive termination of this Agreement and shall remain in full force and effect regardless of whether the transactions contemplated by this Agreement or any of the other Contemplated Transactions are consummated. The indemnity and reimbursement obligations of the Debtors under this Section 9 are in addition to, and do not limit, the Debtors' obligations under Sections 2.2, 2.3 and 2.4.

43

(b)     Promptly after receipt by an Indemnified Party of notice of the commencement of any claim, litigation, investigation or other Proceeding with respect to which such Indemnified Party may be entitled to indemnification hereunder ("Actions"), such Indemnified Party will, if a claim is to be made hereunder against the Debtors in respect thereof, notify the Debtors in writing of the commencement thereof; provided, that (i) the omission to so notify the Debtors will not relieve the Debtors from any liability that they may have hereunder except to the extent (and solely to the extent) they have been actually and materially prejudiced by such failure and (ii) the omission to so notify the Debtors will not relieve the Debtors from any liability that they may have to an Indemnified Party otherwise than on account of this Section 9. In case any such Actions are brought against any Indemnified Party and such Indemnified Party notifies in writing the Debtors of the commencement thereof, if the Debtors commit in writing to fully indemnify and hold harmless the Indemnified Party with respect to such Actions to the reasonable satisfaction of the Indemnified Party, without regard to whether the Effective Date occurs, the Debtors will be entitled to participate in such Actions, and, to the extent that the Debtors elect by written notice delivered to such Indemnified Party, to assume the defense thereof, with counsel reasonably satisfactory to such Indemnified Party, provided, that if the defendants in any such Actions include both such Indemnified Party and the Debtors and such Indemnified Party shall have concluded that there may be legal defenses available to it that are different from or additional to those available to the Debtors, such Indemnified Party shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such Actions on behalf of such Indemnified Party.  Following the date of receipt by an Indemnified Party of such indemnification commitment from the Debtors and notice from the Debtors of their election to assume the defense of such Actions and approval by such Indemnified Party of counsel, the Debtors shall not be liable to such Indemnified Party for expenses incurred by such Indemnified Party in connection with the defense thereof or participation therein after such date (other than reasonable costs of investigation and monitoring) unless (w) such Indemnified Party shall have employed separate counsel in connection with the assertion of legal defenses in accordance with the proviso to the immediately preceding sentence (it being understood, however, that the Debtors shall not be liable for the expenses of more than one separate counsel representing the Indemnified Party who is party to such Action (in addition to one local counsel in each jurisdiction in which local counsel is required)), (x) the Debtors shall not have employed counsel reasonably satisfactory to such Indemnified Party to represent such Indemnified Party at the Debtors' expense within a reasonable time after notice of commencement of the Actions, (y) after the Debtors assume the defense of such Actions, such Indemnified Party determines in good faith that the Debtors are failing to reasonably defend against such Actions and provides written notice of such determination and the basis for such determination, and such failure is not reasonably cured within ten (10) Business Days of receipt of such notice or (z) any of the Debtors shall have authorized in writing the employment of counsel for such Indemnified Party.

(c)     In connection with any Action for which an Indemnified Party is assuming the defense in accordance with this Section 9, the Debtors shall not be liable for any settlement of any Actions effected by such Indemnified Party without the written consent of the Debtors.  If any settlement of any Action is consummated with the written consent of the Debtors or if there is a final judgment for the plaintiff in any such Action, the Debtors agree to indemnify and hold harmless each Indemnified Party from and against any and all Losses by reason of such settlement or judgment to the extent such Losses are otherwise subject to indemnification by the Debtors hereunder in accordance with, and subject to the limitations of, this Section 9.  The Debtors shall

44

not, without the prior written consent of an Indemnified Party, effect any settlement, compromise or other resolution of any pending or threatened Actions in respect of which indemnity has been sought hereunder by such Indemnified Party unless such settlement, compromise or other resolution (i) includes an unconditional release of such Indemnified Party in form and substance satisfactory to such Indemnified Party from all liability on the claims that are the subject matter of such Actions and (ii) does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any Indemnified Party.

10. **Survival of Representations and Warranties**. Notwithstanding any investigation at any time made by or on behalf of any party hereto with respect to, or any knowledge acquired (or capable of being acquired) about, the accuracy or inaccuracy of or compliance with, any representation or warranty made by or on behalf of any party hereto, all representations and warranties contained in this Agreement and in the certificates delivered pursuant to Sections 7.1(v), 7.1(x), and 7.1(cc) hereof shall survive the execution, delivery and performance of this Agreement.

11. **Amendments and Waivers**. Any term of this Agreement may be amended or modified and the compliance with any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively) only if such amendment, modification or waiver is signed, in the case of an amendment or modification, by the Required Backstop Parties and the Debtors, or in the case of a waiver, by the Required Backstop Parties (if compliance by the Debtors is being waived) or by the Required Backstop Parties and the Debtors (if compliance by any of the Backstop Parties is being waived); provided, however, that (a) Schedule 1 hereto may be updated in accordance with the terms of Section 13.1 hereof, (b) any amendment or modification to this Agreement that would have the effect of changing the Backstop Commitment Percentage or the Backstop Commitment Amount of any Backstop Party shall require the prior written consent of such Backstop Party, unless otherwise expressly contemplated by this Agreement, (c) any amendment or modification to (i) the definition of "Purchase Price", (ii) the allocation of the Put Option Notes among the Backstop Parties as set forth in Section 1.3, and (iii) the proviso set forth in the first sentence of Section 1.2(a), shall (in any such case) require the prior written consent of each Backstop Party adversely affected thereby, and (d) any amendment, modification or waiver to this Agreement that would adversely affect any of the rights or obligations (as applicable) of any Backstop Party set forth in this Agreement in a manner that is different or disproportionate in any material respect from the effect on the rights or obligations (as applicable) of the Required Backstop Parties set forth in this Agreement (other than in proportion to the amount of the Backstop Commitments held by each of the Backstop Parties) shall also require the written consent of such affected Backstop Party (it being understood that in determining whether consent of any Backstop Party is required pursuant to this clause (d), no personal circumstances of such Backstop Party shall be considered). No delay on the part of any party in exercising any right, power or privilege pursuant to this Agreement will operate as a waiver thereof, nor will any waiver on the part of any party of any right, power or privilege pursuant to this Agreement, or any single or partial exercise of any right, power or privilege pursuant to this Agreement, preclude any other or further exercise thereof or the exercise of any other right, power or privilege pursuant to this Agreement. The rights and remedies provided pursuant to this Agreement are cumulative and are not exclusive of any rights or remedies which any party otherwise may have at Law or in equity.

US-DOCS\116828268.8

12.    **Notices, etc.** Except as otherwise expressly provided in this Agreement, all notices, requests, demands, document deliveries and other communications under this Agreement shall be in writing and shall be deemed to have been duly given, provided, made or received (a) when delivered personally, (b) when sent by electronic mail ("e-mail") or facsimile, (c) one (1) Business Day after deposit with an overnight courier service or (d) three (3) Business Days after mailed by certified or registered mail, return receipt requested, with postage prepaid to the parties at the following addresses, facsimile numbers or e-mail addresses (or at such other address, facsimile number or e-mail address for a party as shall be specified by like notice):

(a)    if to a Backstop Party, to the address, facsimile number or e-mail address for such Backstop Party set forth on Schedule 1 hereto,

with a copy to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10038

| | |
|---|---|
| Attention: | Brian S. Hermann |
| | Elizabeth McColm |
| Fax: | (212) 492-0545 |
| Email: | bhermann@paulweiss.com |
| | emccolm@paulweiss.com |

(b)    If to the Debtors at:

Hi-Crush Inc.
1330 Post Oak Blvd., #600
Houston, Texas 77056

| | |
|---|---|
| Attention: | Robert E. Rasmus |
| Email: | razz@ redoakcap.com |

with a copy to:

Latham & Watkins LLP
885 Third Avenue
New York, New York 10022

| | |
|---|---|
| Attention: | Keith A. Simon |
| | Annemarie V. Reilly |
| Fax: | (212) 751-4864 |
| Email: | keith.simon@lw.com |
| | annemarie.reilly@lw.com |

US-DOCS\116828268.8

13.      **Miscellaneous**.

13.1.      **Assignments.**  This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and permitted assigns.  Neither this Agreement nor any of the rights, interests or obligations under this Agreement shall be assigned by any of the parties (whether by operation of Law or otherwise) without the prior written consent of the Debtors and the Required Backstop Parties.  Notwithstanding the immediately preceding sentence, any Backstop Party's rights, obligations or interests hereunder may be freely assigned, delegated or transferred, in whole or in part, by such Backstop Party, to (a) any other Backstop Party, (b) any Affiliate of a Backstop Party, or (c) any other Person not referred to in clause (a) or clause (b) above so long as such Person referred to in this clause (c) is approved in writing by the Required Backstop Parties prior to such assignment, delegation or transfer (for purposes of this clause (c), the Backstop Party proposing to make such assignment, delegation or transfer, and all of its Affiliates, shall be deemed to be Defaulting Backstop Parties for purposes of determining whether the definition of "Required Backstop Parties" has been satisfied); provided, that (x) any such assignee assumes the obligations of the assigning Backstop Party hereunder and agrees in writing prior to such assignment to be bound by the terms hereof in the same manner as the assigning Backstop Party, and (y) any assignee of a Backstop Commitment must be an Accredited Investor.  Following any assignment described in the immediately preceding sentence, Schedule 1 hereto shall be updated by the Debtors (in consultation with the assigning Backstop Party and the assignee) solely to reflect (i)(A) the name and address of the applicable assignee or assignees, and (B) the Backstop Commitment Percentage and the Backstop Commitment Amount that shall apply to such assignee or assignees, in each case as specified by the assigning Backstop Party and the assignee or assignees, and (ii) any changes to the Backstop Commitment Percentage and the Backstop Commitment Amount applicable to the assigning Backstop Party, in each case as specified by the assigning Backstop Party and the assignee or assignees, (it being understood and agreed that updates to Schedule 1 hereto shall not result in an overall change to the aggregate Backstop Commitment Percentages and Backstop Commitment Amounts for all Backstop Parties).  Any update to Schedule 1 hereto described in the immediately preceding sentence shall not be deemed an amendment to this Agreement.  Notwithstanding the foregoing or any other provisions herein, unless otherwise agreed in any instance by the Debtors and the Required Backstop Parties (for purposes of this sentence, the Backstop Party making such assignment, and all of its Affiliates, shall be deemed to be Defaulting Backstop Parties for purposes of determining whether the definition of "Required Backstop Parties" has been satisfied), no assignment of obligations by a Backstop Party to an Affiliate of such Backstop Party will relieve the assigning Backstop Party of its obligations hereunder if any such Affiliate assignee fails to perform such obligations.

13.2.      **Severability.**  If any provision of this Agreement, or the application of any such provision to any Person or circumstance, shall be held invalid or unenforceable in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision and this Agreement shall continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party hereto.  Upon any such determination of invalidity, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

47

US-DOCS\116828268.8

13.3. **Entire Agreement.** This Agreement and the RSA constitute the entire understanding among the parties hereto with respect to the subject matter hereof and replace and supersede all prior agreements and understandings, both written and oral, among the parties hereto with respect to the subject matter hereof; provided, however, that any non-disclosure and confidentiality agreement between any Debtor and any Backstop Party shall survive the execution and delivery of this Agreement in accordance with its terms.

13.4. **Counterparts.** This Agreement may be executed in any number of counterparts, each of which will be an original, and all of which, when taken together, will constitute one agreement. Delivery of an executed counterpart of this Agreement by facsimile or portable document format (PDF) will be effective as delivery of a manually executed counterpart of this Agreement.

13.5. **Governing Law & Jurisdiction**. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to such state's choice of law provisions which would require the application of the law of any other jurisdiction, except where preempted by the Bankruptcy Code. By its execution and delivery of this Agreement, each Party irrevocably and unconditionally agrees for itself that any legal action, suit, or proceeding against it with respect to any matter arising under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit, or proceeding, may be brought in the United States District Court for the Southern District of New York, and by executing and delivering this Agreement, each of the Parties irrevocably accepts and submits itself to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding. Notwithstanding the foregoing consent to New York jurisdiction, if the Chapter 11 Cases are commenced, each Party agrees that the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement. By executing and delivering this Agreement, and upon commencement of the Chapter 11 Cases, each of the Parties irrevocably and unconditionally submits to the personal jurisdiction of the Bankruptcy Court solely for purposes of any action, suit, proceeding, or other contested matter arising out of or relating to this Agreement, or for recognition or enforcement of any judgment rendered or order entered in any such action, suit, proceeding, or other contested matter.

13.6. **Waiver of Trial by Jury; Waiver of Certain Damages.** EACH OF THE PARTIES WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, BETWEEN ANY OF THE PARTIES ARISING OUT OF, CONNECTED WITH, RELATING TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN ANY OF THEM IN CONNECTION WITH THIS AGREEMENT. INSTEAD, ANY DISPUTES RESOLVED IN COURT SHALL BE RESOLVED IN A BENCH TRIAL WITHOUT A JURY. Except as prohibited by Law, the Debtors hereby waive any right which they may have to claim or recover in any action or claim referred to in the immediately preceding sentence any special, exemplary, punitive or consequential damages or any damages other than, or in addition to, actual damages. Each of the Debtors (a) certifies that none of the Backstop Parties nor any Representative of any of the Backstop Parties has represented, expressly or otherwise, that the Backstop Parties would not, in the event of litigation, seek to enforce the foregoing waivers and (b) acknowledges that, in

48

entering into this Agreement, the Backstop Parties are relying upon, among other things, the waivers and certifications contained in this Section 13.6.

13.7. **Further Assurances.** From time to time after the Execution Date, the parties hereto will execute, acknowledge and deliver to the other parties hereto such other documents, instruments and certificates, and will take such other actions, as any other party hereto may reasonably request in order to consummate the transactions contemplated by this Agreement.

13.8. **Specific Performance.** The Debtors and the Backstop Parties acknowledge and agree that (a) irreparable damage would occur in the event that any of the provisions of this Agreement are not performed in accordance with their specific terms or are otherwise breached, and (b) remedies at Law would not be adequate to compensate the non-breaching party. Accordingly, the Debtors and the Backstop Parties agree that each of them shall have the right, in addition to any other rights and remedies existing in its favor, to an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce its rights and obligations hereunder not only by an action or actions for damages but also by an action or actions for specific performance, injunctive and/or other equitable relief. The right to equitable relief, including specific performance or injunctive relief, shall exist notwithstanding, and shall not be limited by, any other provision of this Agreement. Each of the Debtors and each of the Backstop Parties hereby waives any defense that a remedy at Law is adequate and any requirement to post bond or other security in connection with actions instituted for injunctive relief, specific performance or other equitable remedies.

13.9. **Headings.** The headings in this Agreement are for reference purposes only and will not in any way affect the meaning or interpretation of this Agreement.

13.10. **Interpretation; Rules of Construction.** When a reference is made in this Agreement to a Section, Exhibit or Schedule, such reference is to a Section of, or Exhibit or Schedule to, this Agreement unless otherwise indicated. Unless the context of this Agreement otherwise requires, (a) words of any gender include each other gender; (b) words using the singular or plural number also include the plural or singular number, respectively; (c) the terms "hereof," "herein," "hereby" and derivative or similar words refer to this entire Agreement; and (d) the words "include", "includes" and "including" when used herein shall be deemed in each case to be followed by the words "without limitation". The parties hereto agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any regulation, holding, rule of construction or Law providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

13.11. **Several, Not Joint, Obligations**. The representations, warranties, covenants and other obligations of the Backstop Parties under this Agreement are, in all respects, several and not joint or joint and several, such that no Backstop Party shall be liable or otherwise responsible for any representations, warranties, covenants or other obligations of any other Backstop Party, or any breach or violation thereof.

13.12. **Disclosure**. Unless otherwise required by applicable Law, the Debtors will not disclose to any Person any of the information set forth on each of the Backstop Parties'

49

signature pages, or Schedule 1 hereto (including (x) the identities of the Backstop Parties, and (y) the Backstop Commitment, the Backstop Commitment Percentage, and the Backstop Commitment Amount of each Backstop Party), except for (a) disclosures made with the prior written consent of each Backstop Party whose information will be disclosed, (b) disclosures to the Debtors' Representatives in connection with the transactions contemplated hereby and subject to their agreement to be bound by the confidentiality provisions hereof and (c) disclosures to parties to this Agreement solely for purposes of calculating the Adjusted Commitment Percentage of a Non-Defaulting Backstop Party; provided, however, that each Backstop Party agrees to permit disclosure in the Disclosure Statement and any filings by the Debtors with the Bankruptcy Court regarding the aggregate Backstop Commitments.

13.13. **No Recourse Party**. Notwithstanding anything that may be expressed or implied in this Agreement, and notwithstanding the fact that certain of the Backstop Parties may be partnerships or limited liability companies, the Debtors and the Backstop Parties covenant, agree and acknowledge that no recourse under this Agreement shall be had against any former, current or future directors, officers, agents, Affiliates, general or limited partners, members, managers, employees, stockholders or equity holders of any Backstop Party, or any former, current or future directors, officers, agents, Affiliates, employees, general or limited partners, members, managers, employees, stockholders, equity holders or controlling persons of any of the foregoing, as such (any such Person, a "No Recourse Party"), whether by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any statute, regulation or other applicable Law, it being expressly agreed and acknowledged that no liability whatsoever shall attach to, be imposed on or otherwise be incurred by any No Recourse Party for any obligation of any Backstop Party under this Agreement for any claim based on, in respect of or by reason of such obligations or their creation.

13.14. **Settlement Discussions**. Nothing herein shall be deemed an admission of any kind. Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any Proceeding other than a Proceeding to enforce the terms of this Agreement.

13.15. **No Third Party Beneficiaries**. This Agreement is intended to be solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any Person other than the parties hereto and other than (a) the Indemnified Parties with respect to Section 9 hereof and (b) each No Recourse Party with respect to Section 13.13 hereof.

13.16. **Arm's Length.** Each Debtor acknowledges and agrees that the Backstop Parties are acting solely in the capacity of arm's length contractual counterparties to the Debtors with respect to the transactions contemplated hereby and the other Contemplated Transactions (including in connection with determining the terms of the Rights Offering) and not as financial advisors or fiduciaries to, or agents of, the Debtors or any other Person. Additionally, the Backstop Parties are not advising the Debtors or any other Person as to any legal, Tax, investment, accounting or regulatory matters in any jurisdiction. Each Debtor shall consult with its own advisors concerning such matters and shall be responsible for making its own independent investigation and appraisal of the transactions contemplated hereby and the other Contemplated Transactions, and the Backstop Parties shall have no responsibility or liability to any Debtor with respect thereto. Any review by the Backstop Parties of the Debtors, the Contemplated

50

Transactions or other matters relating to the Contemplated Transactions will be performed solely for the benefit of the Backstop Parties and shall not be on behalf of the Debtors.

14. **Definitions**.

14.1. **Definitions in the RSA**. Capitalized terms used in this Agreement and not otherwise defined in this Agreement shall have the meanings given to such terms in the RSA.

14.2. **Certain Defined Terms.** As used in this Agreement the following terms have the following respective meanings:

Actions: has the meaning given to such term in Section 9(b) hereof.

Adjusted Commitment Percentage: means, with respect to any Non-Defaulting Backstop Party, a fraction, expressed as a percentage, the numerator of which is the Backstop Commitment Percentage of such Non-Defaulting Backstop Party and the denominator of which is the Backstop Commitment Percentages of all Non-Defaulting Backstop Parties.

Affiliate: means, with respect to any Person, any other Person controlled by, controlling or under common control with such Person; provided, that, for purposes of this Agreement, none of the Debtors shall be deemed to be Affiliates of any Backstop Party. As used in this definition, "control" (including, with its correlative meanings, "controlling," "controlled by" and "under common control with") shall mean possession, directly or indirectly, of power to direct or cause the direction of management or policies of a Person (whether through ownership of securities, by contract or otherwise). A Related Fund of any Person shall be deemed to be the Affiliate of such Person.

Agreement: has the meaning given to such term in the preamble hereof.

AI Questionnaire: has the meaning given to such term in the Rights Offering Procedures.

Allowed: has the meaning given to such term in the Plan.

Alternative Transaction: has the meaning given to such term in the RSA.

Annual Financial Statements: has the meaning given to such term in Section 3.17(a) hereof.

Approvals: means all approvals and authorizations that are required under the Bankruptcy Code for the Debtors to take corporate or limited liability company (as applicable) action.

Backstop Agreement Motion: means the motion and proposed form of Order to be filed by the Debtors with the Bankruptcy Court seeking the approval of this Agreement pursuant to section 363 of the Bankruptcy Code or otherwise, authorizing the payment of certain expenses and other amounts hereunder (including the Put Option Notes, the Liquidated Damages Payment and the Backstop Expenses) and the indemnification provisions set forth herein, granting the same

51

expenses and other amounts hereunder administrative expense priority status under sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code, and granting any other related relief, which motion and proposed form of Order shall be consistent in all material respects with the RSA and otherwise in form and substance reasonably acceptable to the Required Backstop Parties and the Debtors.

Backstop Certificate: has the meaning given to such term in Section 1.1(b) hereof.

Backstop Commitment: means, with respect to any Backstop Party, the commitment of such Backstop Party, subject to the terms and conditions set forth in this Agreement, to purchase Backstop Commitment Notes pursuant to, and on the terms set forth in, Section 1.2(a) hereof; and "Backstop Commitments" means the Backstop Commitments of all of the Backstop Parties collectively.

Backstop Commitment Amount: means, with respect to any Backstop Party, (a) the dollar amount set forth opposite the name of such Backstop Party under the heading "Backstop Commitment Amount" on Schedule 1 hereto, which amount shall equal the product of (i) the Rights Offering Amount and (ii) such Backstop Party's Backstop Commitment Percentage (as it may be amended, supplemented or otherwise modified from time to time in accordance with the terms of this Agreement), minus (b) the aggregate original principal amount of all Rights Offering Notes that such Backstop Party subscribes for in the Rights Offering.

Backstop Commitment Notes: has the meaning given to such term in Section 1.2(a) hereof.

Backstop Commitment Percentage: means, with respect to any Backstop Party, the percentage set forth opposite the name of such Backstop Party under the heading "Backstop Commitment Percentage" on Schedule 1 hereto, which percentage shall be based upon the amount of Senior Notes Claims held by each respective Backstop Party as compared to the aggregate amount of Senior Notes Claims held by all Backstop Parties (as such percentage may be modified from time to time in accordance with the terms hereof); and "Backstop Commitment Percentages" means the Backstop Commitment Percentages of all of the Backstop Parties collectively.

Backstop Expenses: means the reasonable and documented out-of-pocket fees, costs, expenses, disbursements and charges of each of the Backstop Parties payable to third parties and incurred in connection with or relating to the diligence, negotiation, preparation, execution, delivery, implementation and/or consummation of the Plan, the Backstop Commitments, the Rights Offering, this Agreement, the Backstop Agreement Motion, the Backstop Order, the Definitive Documentation and/or any of the Contemplated Transactions, any amendments, waivers, consents, supplements or other modifications to any of the foregoing, and the enforcement, attempted enforcement or preservation of any rights or remedies under this Agreement, including but not limited to, (a) the reasonable and documented fees, costs and expenses of counsel, advisors and agents for each of the Backstop Parties and (b) filing fees (if any) required by the HSR Act or any other competition Laws and any expenses related thereto.

Backstop Notes: has the meaning given to such term in Section 1.2(d) hereof.

Backstop Order: has the meaning given to such term in the RSA.

US-DOCS\116828268.8

Backstop Party(ies): has the meaning given to such term in the preamble hereof.

Bankruptcy Code: has the meaning given to such term in the recitals hereof.

Bankruptcy Court: has the meaning given to such term in the recitals hereof.

Bankruptcy Rules: means the Federal Rules of Bankruptcy Procedure, as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, applicable to the Chapter 11 Cases and/or the transactions contemplated by this Agreement, and any Local Rules of the Bankruptcy Court.

Benefit Plan(s): has the meaning given to such term in Section 3.13(a) hereof.

Business Day: means any day other than a Saturday, Sunday or other day on which commercial banks in New York City, New York are authorized or required by Law to be closed.

Chapter 11 Cases: has the meaning given to such term in the recitals hereof.

Closing: has the meaning given to such term in Section 2.1(a) hereof.

Code: has the meaning given to such term in Section 3.13(a) hereof.

Company: has the meaning given to such term in the preamble hereof.

Company SEC Documents: means all of the reports, schedules, forms, statements and other documents (including exhibits and other information incorporated therein) filed with the SEC by the Debtors.

Confirmation Order: means the Order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

Consent: means any consent, waiver, approval, Order or authorization of, or registration, declaration or filing with or notice to, any Governmental Body or other Person.

Contemplated Transactions: means all of the transactions contemplated by this Agreement, the RSA, the Plan and/or the other Definitive Documentation, including, for the avoidance of doubt, the sale and issuance of the Rights Offering Notes and the Backstop Notes.

Contract: means any agreement, contract, obligation, promise, undertaking or understanding, whether written or oral including, for the avoidance of doubt, any debt instrument.

Debtor Disclosure Schedule: has the meaning given to such term in Section 3 hereof.

Debtor IP Rights: has the meaning given to such term in Section 3.9 hereof.

Debtor Mineral Rights: has the meaning given to such term in Section 3.23(f) hereof.

53

Debtor(s): has the meaning given to such term in the preamble hereof.

Default Notes: has the meaning given to such term in Section 1.2(c) hereof.

Default Purchase Right: has the meaning given to such term in Section 1.2(c) hereof.

Defaulting Backstop Party: has the meaning given to such term in Section 1.2(c) hereof.

Definitive Documentation: has the meaning given to such term in the RSA.

Deposit Account: has the meaning given to such term in Section 1.2(b) hereof.

Deposit Deadline: has the meaning given to such term in Section 1.2(b) hereof.

DIP Covenants: has the meaning given to such term in Section 5.12 hereof.

DIP TL Credit Agreement: has the meaning given to such term in the RSA.

Drop-Dead Date: has the meaning given to such term in Section 8(b)(ix) hereof.

DTC: has the meaning given to such term in Section 2.1(a) hereof.

Easements: has the meaning given to such term in Section 3.23(a) hereof.

Eligible Claims: has the meaning given to such term in the Rights Offering Procedures.

Eligible General Unsecured Claims: has the meaning given to such term in the Rights Offering Procedures.

e-mail: has the meaning given to such term in Section 12 hereof.

Encumbrance: means any charge, claim, community property interest, condition, covenant, deed of trust, equitable interest, lease, license, lien, mortgage, option, pledge, security interest, title default, encroachment or other survey defect, right of first refusal or restriction of any kind, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership.

Environmental Laws: means all applicable Laws and Orders relating to pollution or the regulation and protection of human or animal health, safety, the environment or natural resources, including without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. § 9601 et seq.); the Hazardous Materials Transportation Uniform Safety Act, as amended (49 U.S.C. § 5101 et seq.); the Resource Conservation and Recovery Act, as amended (42 U.S.C. § 6901 et seq.); the Toxic Substances Control Act, as amended (15 U.S.C. § 2601 et seq.); the Clean Air Act, as amended (42 U.S.C. § 7401 et seq.); the Clean Water Act, as amended (33 U.S.C. § 1251 et seq.); the Occupational Safety and Health Act, as amended (29 U.S.C. § 651 et seq.); the Atomic Energy Act, as amended (42

54

U.S.C. §§ 2011 et seq., 2022 et seq., 2296 et seq.); any transfer of ownership notification or approval statutes; and all counterparts or equivalents adopted, enacted, ordered, promulgated, or otherwise approved by any Governmental Body.

ERISA: means the Employee Retirement Income Security Act of 1974, as amended.

ERISA Affiliate(s): means any entity which is a member of any Debtor or its Subsidiaries' controlled group, or under common control with any Debtor or its Subsidiaries, within the meaning of Section 414 of the Code.

Escrow Account: has the meaning given to such term in Section 1.2(b) hereof.

Escrow Agent: has the meaning given to such term in Section 1.2(b) hereof.

Escrow Agreement: has the meaning given to such term in Section 1.2(b) hereof.

Event: has the meaning given to such term in this Section 14.2.

Execution Date: has the meaning given to such term in the preamble hereof.

Exit Facility Credit Agreement: has the meaning given to such term in the Plan.

Exit Liquidity Amount: means, on a pro forma basis, a reasonably detailed calculation by the Company of the Liquidity it will have on the Effective Date, after giving effect to all Exit Payments and the funding of the Rights Offering (including by the Backstop Parties pursuant to the Backstop Commitment Amount).

Exit Payments: means a schedule of all payments required to be made or funded by the Debtors under the Plan on or before the Effective Date (including on account of accrued and unpaid professional fees and expenses).

Final Optional Parties: has the meaning given to such term in Section 1.2(c) hereof.

Final Order: has the meaning given to such term in the Plan.

Financial Statements: has the meaning given to such term in Section 3.17 hereof.

Fundamental Representations: means the representations and warranties of the Debtors set forth in Sections 3.1, 3.2, 3.3(a), 3.5, 3.6 and 3.7.

Funding Default: has the meaning given to such term in Section 1.2(c) hereof.

GAAP: means generally accepted accounting principles in the United States, as in effect from time to time, consistently applied.

Governmental Authorization: means any authorization, approval, consent, license, registration, lease, ruling, permit, tariff, certification, Order, privilege, franchise, membership, entitlement, exemption, filing or registration by, with, or issued by, any Governmental Body.

55

US-DOCS\116828268.8

Governmental Body: means any federal, national, supranational, foreign, state, provincial, local, county, municipal or other government, any governmental, regulatory or administrative authority, agency, department, bureau, board, commission or official or any quasi-governmental or private body exercising any regulatory, taxing, importing or other governmental or quasi-governmental authority, or any court, tribunal, judicial or arbitral body.

Hazardous Materials: means hazardous or toxic substances or wastes, petroleum products or wastes, asbestos, asbestos-containing material, radioactive materials or wastes, medical wastes, or any other wastes, pollutants or contaminants regulated under any Environmental Law.

HCR Termination Event: has the meaning given to such term in the RSA.

HSR Act: means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the related regulations and published interpretations.

Indemnified Party: has the meaning given to such term in Section 9(a) hereof.

Insurance Policies: has the meaning given to such term in Section 3.22 hereof.

Interest Commencement Date: has the meaning given to such term in Section 2.4 hereof.

Interim Financial Statements: has the meaning given to such term in Section 3.17(a) hereof.

International Trade Laws: has the meaning given to such term in Section 3.14(b) hereof.

IP Rights: has the meaning given to such term in Section 3.9 hereof.

IT Systems: has the meaning given to such term in Section 3.9 hereof.

IRS: means the Internal Revenue Service and any Governmental Body succeeding to the functions thereof.

Knowledge of the Debtors: means the collective actual knowledge, after reasonable and due inquiry, of Robert E. Rasmus, J. Philip McCormick, Jr. and Mark C. Skolos. A reference to the word "knowledge" (whether or not capitalized) or words of a similar nature with respect to the Debtors means the Knowledge of the Debtors as defined in this definition.

Law: means any federal, national, supranational, foreign, state, provincial, local, county, municipal or similar statute, law, common law, writ, injunction, decree, guideline, policy, ordinance, regulation, rule, code, Order, Governmental Authorization, constitution, treaty, requirement, judgment or judicial or administrative doctrines enacted, promulgated, issued, enforced or entered by any Governmental Body.

56

US-DOCS\116828268.8

Lazard Engagement Letter: means the letter, dated as of April 1, 2020, by and among Lazard Frères & Co. LLC and the Company and its controlled Subsidiaries (as amended, supplemented, amended and restated or otherwise modified from time to time, together with any schedules, exhibits and annexes thereto).

Leased Real Property: has the meaning given to such term in Section 3.23(a) hereof.

Liquidated Damages Payment: has the meaning given to such term in Section 2.3 hereof.

Licenses and Permits: has the meaning given to such term in Section 3.11 hereof.

Liquidity: has the meaning given to such term in the Exit Facility Credit Agreement.

Losses: has the meaning given to such term in Section 9(a) hereof.

Material Adverse Effect: means any event, change, effect, occurrence, development, circumstance, condition, result, state of fact or change of fact (each, an "Event") that, individually or together with all other Events, has had, or would reasonably be expected to have, a material adverse effect on either (a) the business, operations, finances, properties, condition (financial or otherwise), assets or liabilities of the Debtors, taken as a whole, or (b) the ability of the Debtors, taken as a whole, to perform their respective obligations under, or to consummate the transactions contemplated by, this Agreement or any of the other Contemplated Transactions, other than the effect of (A) any change in the United States or foreign economies or securities or financial markets in general; (B) any change that generally affects the industry in which the Debtors operate; (C) any change arising in connection with earthquakes, hurricanes, other natural disasters, hostilities, acts of war, sabotage or terrorism or military actions or any escalation or material worsening of any such hostilities, acts of war, sabotage or terrorism or military actions; (D) any changes in applicable Laws or accounting rules or judicial interpretations; (E) any change resulting from the filing of the Chapter 11 Cases or from any action approved by the Bankruptcy Court so long as such action is not in breach of this Agreement, the RSA, the DIP TL Credit Agreement or either of the DIP Orders; or (F) any change resulting from the public announcement of this Agreement, compliance with terms of this Agreement (excluding any obligation of the Debtors to conduct their businesses and operations in the Ordinary Course of Business) or the consummation of the transactions contemplated hereby.

Material Contract: means any Contract to which any Debtor or any of its Subsidiaries is a party or is bound, or to which any of the property or assets of any Debtor or any of its Subsidiaries is subject, that either (a) is a "material contract," or "plans of acquisition, reorganization, arrangement, liquidation or succession" (as each such term is defined in Item 601(b)(2) or Item 601(b)(10) of Regulation S-K under the Exchange Act), (b) is material to the businesses, operations, assets or financial condition of any Debtor or any of its Subsidiaries (whether or not entered into in the Ordinary Course of Business), or (c) is likely to reasonably involve payments to or by any Debtor or any of its Subsidiaries in excess of $5,000,000 in any 12-month period.

US-DOCS\116828268.8

Minimum Liquidity Amount: means the Liquidity the Company has on the Effective Date which shall not be less than $12,500,000 after giving effect to all Exit Payments and the funding of the Rights Offering.

Money Laundering Laws: has the meaning given to such term in Section 3.14(b) hereof.

New Certificate of Incorporation: has the meaning given to such term in Section 7.1(j) hereof.

New Secured Notes Indenture: means the indenture among the Reorganized Company, as issuer, the guarantors party thereto, and the trustee therefor governing the New Secured Notes, to be dated as of the Effective Date, which shall be in form and substance reasonably satisfactory in all respects to the Required Backstop Parties.

New Secured Notes Documents: means, collectively, the New Secured Notes Indenture and any related notes, certificates, agreements, security agreements, collateral documents, documents and instruments (including any amendments, supplements, or modifications of any of the foregoing) related to or executed in connection with the New Secured Notes Indenture.

New Secured Notes Term Sheet: has the meaning given to such term in the recitals hereof.

No Recourse Party: has the meaning given to such term in Section 13.13 hereof.

Non-Defaulting Backstop Party: has the meaning give to such term in Section 1.2(c) hereof.

Non-US Plan: has the meaning given to such term in Section 3.13(e) hereof.

Noteholder Termination Event: has the meaning given to such term in the RSA.

OID: has the meaning given to such term in Section 1.4 hereof.

Order: means any order, writ, judgment, injunction, decree, rule, ruling, directive, stipulation, determination or award made, issued or entered by the Bankruptcy Court or any other Governmental Body, whether preliminary, interlocutory or final.

Ordinary Course of Business: means the ordinary and usual course of normal day-to-day operations of the Debtors and their respective Subsidiaries, consistent with past practices of the Debtors and their respective Subsidiaries, including as to timing and amount, and in compliance with all applicable Laws.

Organizational Documents: means, with respect to any Person other than a natural person, the documents by which such Person was organized (such as a certificate of incorporation, certificate of formation, certificate of limited partnership or articles of organization, and including, without limitation, any certificates of designation for preferred stock or other forms of preferred

58

equity) or which relate to the internal governance of such Person (such as by-laws, a partnership agreement or an operating, limited liability or members agreement).

Owned Real Property: has the meaning given to such term in Section 3.23(a) hereof.

Owner: has the meaning given to such term in this Section 14.2.

Pension Plan: has the meaning given to such term in Section 3.13(c) hereof.

Permitted Encumbrances: means (a) Encumbrances for utilities and current Taxes not yet due and payable or either (i) that are due but are being contested in good faith by appropriate proceedings or (ii) may not be paid as a result of the commencement of the Chapter 11 Cases, and, in case of each of the foregoing clauses (i) and (ii), for which adequate reserves have been established in the Financial Statements in accordance with GAAP, (b) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the assets of the Debtors which do not, individually or in the aggregate, adversely affect the operation of the business of the Debtors or their Subsidiaries thereon, (c) applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Law (but not restrictions arising from a violation of any such Laws) which are not violated by the current use of the assets and properties of the Debtors or any of their Subsidiaries, (d) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens incurred in the Ordinary Course of Business for sums not yet due and payable or that are due but may not be paid as a result of the commencement of the Chapter 11 Cases and that do not result from a breach, default or violation by a Debtor or any of its Subsidiaries of any Contract or Law, and (e) any obligations, liabilities or duties created by this Agreement or any of the Definitive Documentation.

Person: means an individual, a partnership, a joint venture, a corporation, a limited liability company, a trust, an unincorporated organization or a Governmental Body.

Petition Date: has the meaning given to such term in the recitals hereof.

Plan: has the meaning given to such term in the recitals hereof.

Proceeding: means any action, claim, complaint, petition, suit, arbitration, mediation, alternative dispute resolution procedure, hearing, audit, examination, investigation or other proceeding of any nature, whether civil, criminal, administrative or otherwise, direct or derivative, in Law or in equity.

Purchase Price: means, with reference to any Backstop Notes to be purchased by a Backstop Party pursuant to this Agreement, the aggregate original principal amount of such Backstop Notes.

Put Option Notes: has the meaning given to such term in Section 1.3 hereof.

Real Property: means, collectively, the Owned Real Property, the Leased Real Property, and the Easements.

Real Property Leases: has the meaning given to such term in Section 3.23(c) hereof.

Related Person: means, with respect to any Person, such Person's current and former Affiliates, members, partners, controlling persons, subsidiaries, officers, directors, managers, principals, employees, agents, managed funds, advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals, together with their respective successors and assigns.

Release: means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other receptacles containing any Hazardous Materials).

Representatives: has the meaning given to such term in Section 5.7 hereof.

Required Backstop Parties: means, as of any date of determination, Non-Defaulting Backstop Parties as of such date whose aggregate Backstop Commitment Percentages constitute more than 66-2/3% of the aggregate Backstop Commitment Percentages of all Non-Defaulting Backstop Parties as of such date.

Restructuring Term Sheet: has the meaning given to such term in the recitals hereof.

Rights Offering: has the meaning given to such term in the recitals hereof.

Rights Offering Amount: has the meaning given to such term in the recitals hereof.

Rights Offering Commencement Date: has the meaning given to such term in the Rights Offering Procedures.

Rights Offering Documentation: has the meaning given to such term in Section 5.2 hereof.

Rights Offering Notes: has the meaning given to such term in the recitals hereof.

Rights Offering Participant(s): has the meaning given to such term in the recitals hereof.

Rights Offering Procedures: has the meaning given to such term in Section 1.1(a) hereof.

Rights Offering Record Date: has the meaning given to such term in the Rights Offering Procedures.

Rights Offering Termination Date: has the meaning given to such term in the Rights Offering Procedures.

RSA: has the meaning given to such term in the recitals hereof.

RSA Covenants: has the meaning given to such term in Section 5.11 hereof.

60

Sanctions: means any sanctions administered or enforced by the U.S. government (including without limitation, the U.S. Department of the Treasury's Office of Foreign Assets Control or the U.S. Department of State), the United Nations Security Council, the European Union, Her Majesty's Treasury or other applicable jurisdictions.

SEC: means the United States Securities and Exchange Commission.

Senior Notes Claims: has the meaning given to such term in the Restructuring Term Sheet.

Solicitation Materials: has the meaning given to such term in the RSA.

Solicitation Order: has the meaning given to such term in the RSA.

Specified Issuances: means, collectively, (a) the issuance of shares of New Common Stock to the holders of Allowed General Unsecured Claims pursuant to the Plan, (b) the distribution by the Company of the Rights to the Rights Offering Participants pursuant to the Plan, (c) the issuance and sale by the Company of Rights Offering Notes to the Rights Offering Participants upon exercise of such Rights in the Rights Offering, (d) the issuance by the Company of shares of New Common Stock in connection with any conversion, in accordance with the terms of the New Certificate of Incorporation and the New Secured Notes Documents, of the Rights Offering Notes that were issued in the Rights Offering, (e) the issuance and sale by the Company of the Backstop Notes to the Backstop Parties pursuant to this Agreement, and (f) the issuance by the Company of shares of New Common Stock in connection with any conversion, in accordance with the terms of the New Certificate of Incorporation and the New Secured Notes Documents, of the Backstop Notes that were issued and sold pursuant to this Agreement.

Specified Issuance Documentation: has the meaning given to such term in Section 5.9(b) hereof.

Specified Issuance Steps: has the meaning given to such term in Section 5.9(a) hereof.

Subsidiary: means, with respect to any Person (the "Owner"), any corporation or other Person of which securities or other interests having the power to elect a majority of that corporation's or other Person's board of directors or similar governing body, or otherwise having the power to direct the business and policies of that corporation or other Person (other than securities or other interests having such power only upon the happening of a contingency that has not occurred), are held by the Owner or one or more of its Subsidiaries.

Subscription Agent: has the meaning given to such term in Section 5.4 hereof.

Tax: means any and all taxes of any kind whatsoever, including all foreign, federal, state, county, or local income, sales and use, excise, franchise, ad valorem, value added, real and personal property, unclaimed property, gross income, gross receipt, capital stock, production, license, estimated, environmental, excise, business and occupation, disability, employment, payroll, severance, withholding or all other taxes or assessments, fees, duties, levies, customs,

US-DOCS\116828268.8

tariffs, imposts, obligations and charges of the same or similar nature of the foregoing, including all interest, additions, surcharges, fees or penalties related thereto.

Tax Return: means a report, return, claim for refund, amended return, combined, consolidated, unitary or similar return or other information filed or required to be filed with a Taxing Authority with respect to Taxes, including any schedule or attachment thereto or amendment thereof.

Taxing Authority: means the IRS and any other Governmental Body responsible for the administration of any Tax.

Triggering Event: has the meaning given to such term in Section 2.3 hereof.

Unallocated Notes: means, collectively, (a) any Rights Offering Notes that holders of Eligible Claims as of the Rights Offering Record Date who are not Accredited Investors (or holders of Eligible Claims as of the Rights Offering Record Date that did not properly complete, duly execute and timely deliver to the Subscription Agent an AI Questionnaire in accordance with the Rights Offering Procedures) could have purchased if such holders had received Rights if they were Accredited Investors (or had properly completed, duly executed and timely delivered to the Subscription Agent an AI Questionnaire in accordance with the Rights Offering Procedures) and exercised such Rights in the Rights Offering, (b) any Rights Offering Notes that are not subscribed for and purchased in the Rights Offering on account of any rounding down of fractional Rights Offering Notes, and (c) any Rights Offering Notes that are not subscribed for and purchased in the Rights Offering on account of any Eligible General Unsecured Claim (or portion thereof) as of the Rights Offering Record Date failing to be an Allowed (as defined in the Rights Offering Procedures) Claim on the date that is one Business Day after the Confirmation Hearing (as defined in the Plan).

Unsubscribed Notes: has the meaning given to such term in the recitals hereof.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

62

**<u>Exhibit B</u>**

**Backstop Purchase Agreement**

[Form of Backstop Purchase Agreement Attached to Backstop Order at <u>Exhibit A</u> to this Plan]

**Exhibit C**

**Exit Facility Term Sheet**

US-DOCS\115394754.19

*Confidential*
*Subject to FRE 408*

---

### HI-CRUSH INC., ET AL.

### $25,000,000 SENIOR SECURED ABL FACILITY TERM SHEET

### JULY 14, 2020

---

Reference is made herein to (a) that certain Senior Secured Debtor-In-Possession Credit Agreement dated as of July 14, 2020 (as amended, amended and restated, supplement or otherwise modified, the "DIP ABL Credit Agreement") among Hi-Crush Inc. (the "Borrower"), the lenders and issuing lenders party thereto (the "Lenders") and JPMorgan Chase Bank, N.A., as administrative agent for the Lenders (the "Administrative Agent") and (b) that certain Credit Agreement dated as of August 1, 2018 (as amended, amended and restated, supplement or otherwise modified, the "Prepetition Credit Agreement") among the Borrower, the lenders and issuing lenders party thereto and JPMorgan Chase Bank, N.A., as administrative agent for the Lenders. Capitalized terms used but not defined herein have the meanings assigned to such term in the DIP ABL Credit Agreement.

| Term | Description |
|---|---|
| **Borrower:** | The Borrower. |
| **Guarantors:** | The Guarantors (the Borrower and the Guarantors together, the "Loan Parties"); provided that, for the avoidance of doubt, any person that guarantees the Exit Convertible Notes shall guaranty the Exit ABL Facility. |
| **Administrative Agent** | JPMorgan Chase Bank, N.A. shall be the administrative agent and collateral agent for the Exit ABL Lenders (as defined herein) (in such capacity, the "Exit ABL Agent"). |
| **Exit ABL Lenders:** | The Lenders under the DIP ABL Credit Agreement (in such capacity, the "Exit ABL Lenders" and, together with the Exit ABL Agent, the "Exit ABL Lender Parties"). |
| **Documentation:** | The Exit ABL Credit Agreement and the other Exit ABL Documents shall be prepared by counsel for the Exit ABL Agent, based upon and giving due regard to the documentation for the Borrower's existing credit agreement, with such changes to substantially reflect the terms and provisions of this Exit Term Sheet in all material respects, to reflect the exit facility nature of the Exit ABL Facility, and shall otherwise be reasonably acceptable to the Exit ABL Lenders and the Debtors in all respects. |
| | For the avoidance of doubt, the Exit Note Documents shall not contain any representations, covenants or events of default that are less favorable to the Borrower than the terms of the Exit ABL Documents on the Closing Date, other than any customary terms that reflect the nature of the Exit Notes as secured convertible notes. |
| **Exit ABL Facility:** | The Exit ABL Facility shall be a senior secured asset-based revolving loan financing facility provided by the Exit ABL Lenders with aggregate revolving commitments not to exceed $25 million (the "Exit ABL Commitments", and such loans, the "Exit ABL Loans"). |
| | After the Closing Date, the Borrower may increase the amount of Exit ABL Commitments by either (a) obtaining increased commitments from one or more |

1

| Term | Description |
|---|---|
| | existing Exit ABL Lenders on a pro rata or non-pro rata basis and/or (b) obtaining commitments from new lenders that are reasonably acceptable to the Exit ABL Agent and issuing banks to the extent that consent of the Exit ABL agent and/or issuing lender would be required for an assignment of Exit ABL Loans or Exit ABL Commitments to such new lender; such increased Exit ABL Commitments shall be on identical terms to the other Exit ABL Commitments under the Exit ABL Facility. |
| **Letters of Credit:** | Undrawn letters of credit outstanding under the DIP ABL Credit Agreement as of the Closing Date ("Existing L/Cs") shall be deemed outstanding under the Exit ABL Facility. The Exit ABL Facility shall provide for the issuance or renewal of letters of credit by certain Exit ABL Lenders; provided that the Exit ABL Facility will not permit the aggregate Letter of Credit Exposure to exceed a $25 million aggregate sublimit and fronting limits to be agreed with each issuing lender. |
| **Exit Convertible Notes:** | The "Exit Convertible Notes" shall be a senior secured convertible notes issued by the Borrower to the lenders under the DIP Term Loan Facility (the "Exit Noteholders") in an aggregate principal amount not to be less than $40 million or exceed $60 million. The definitive documents governing the Exit Convertible Notes (the "Exit Note Documents") shall be consistent with the terms set forth below and otherwise be reasonably satisfactory to the Required ABL Exit Lenders (such approval not to be unreasonably withheld, delayed or conditioned). The "Exit Note Agent" shall be Cantor Fitzgerald Securities, and together with the Exit Noteholders, shall be the "Exit Noteholder Parties". |
| | The Exit Convertible Notes shall be secured by (a) validly perfected first priority security interests in and liens on all of the Exit Note Priority Collateral (as defined herein) and (b) validly perfect second priority security interests in and liens on the Exit ABL Priority Collateral (collectively, the "Exit Note Collateral" and the liens and security interests thereon and therein, the "Exit Note Liens"). |
| | Notwithstanding anything to the contrary herein, the Exit Note Documents shall not be acceptable to the Exit ABL Lenders unless (a) the interest rate applicable to the Exit Convertible Notes is no greater than (i) 8% for interest paid in cash and (ii) 10% for interest paid in kind, (b) the Exit Convertible Notes shall not require any amortization or sinking fund payment, (c) cash interest may only be required to be paid to the extent permitted under the terms of the Exit ABL Facility and (d) the Exit Note Documents do not contain events of default, affirmative covenants or negative covenants that are more restrictive on the Loan Parties than the Exit ABL Documents, other than any customary terms that reflect the nature of the Exit Notes as secured convertible notes (the requirements in clauses (a)-(d) above, the "Exit Note Documentation Requirements"). |
| | The Exit Note Agent, Exit Noteholders, Exit ABL Agent and Exit ABL Lenders will enter into a customary intercreditor agreement reasonably acceptable to the Exit ABL Agent that reflects the collateral priorities set forth herein. |
| **Purpose:** | The proceeds of the Exit ABL Facility shall be used to, among other things: (a) pay fees, interest, payments and expenses associated with the Exit ABL Facility, (b) provide for the ongoing working capital and capital expenditure needs of the Loan Parties and (c) for other general corporate purposes. |

2

US-DOCS\116849138.4

| Term | Description |
|---|---|
| **Availability:** | The Exit ABL Facility shall be subject to the Borrowing Base, and "Availability" shall be equal to the difference between (a) the lesser of (i) the Exit ABL Commitments and (ii) the Borrowing Base (such lesser amount, the "Line Cap") minus (b) the sum of (i) the sum of (A) the aggregate principal amount of Exit ABL Loans and (B) the aggregate Letter of Credit Exposure (the amount of this clause, (i), "Revolving Exposure") and (ii) Reserves. |
| **Available Draw Conditions:** | The availability of the Exit ABL Commitments under the Exit ABL Facility shall be subject to conditions as are (a) included in the Prepetition Credit Agreement, and (b) customary for exit facilities and transactions of this type and shall include, among other conditions, that the issuance or renewal of any requested letters of credit shall not cause Availability to be less than $0 and customary anti-cash hoarding provisions. |
| **Borrowing Base:** | The "Borrowing Base" shall be an amount equal to the sum of the following: (a) 90% of each Loan Party's Eligible Accounts with respect to investment grade counterparties, plus (b) 85% of each Loan Party's Eligible Accounts with respect to non-investment grade counterparties, plus (c) 100% of each Loan Party's Eligible Cash, minus (d) reserves that the Exit ABL Agent deems necessary in its permitted discretion to maintain.  The Borrowing Base shall be determined monthly by reference to the most recently delivered Borrowing Base Certificate; provided that, (i) until the earlier of (A) the date on which Borrower's consolidated monthly financial statements for the 6th month ending after the Closing Date have been delivered to the Exit ABL Agent and (B) the date on which the difference of (1) the Borrowing Base minus (2) Eligible Cash is greater than the sum of (x) the outstanding amount of Exit ABL Loans and (y) Letter of Credit Exposure and (ii) at any time Availability is less than the greater of (A)) $7.5 million and (B) 20% of the Line Cap, the Borrowing Base shall be determined weekly by reference to the most recently delivered Borrowing Base Certificate.<br><br>"Eligible Accounts" shall be defined in a manner substantively identical to the Borrower's existing credit agreement; provided that the definition of "Specified Account Debtor" shall be amended to comprise Chevron and EOG Resources for so long as each maintains investment grade credit ratings in a manner consistent with the DIP ABL Facility.<br><br>"Eligible Cash" means the amount of unrestricted cash of the Loan Parties that is (a) held in a segregated account with the Exit ABL Agent and subject to a fully-blocked account control agreement and (b) not subject to liens other than liens in favor of the Exit ABL Agent for the benefit of the secured parties under the Exit ABL Facility, liens in favor of the Exit Note Agent for the benefit of the secured parties under the Exit Convertible Notes that are junior to the liens of the Exit ABL Agent and permitted liens attaching by operation of law in favor of the Exit ABL Agent in its capacity as depository bank.<br><br>Eligible Cash shall be released by the Exit ABL Agent upon the request of the Borrower in a manner consistent with the DIP ABL Facility subject to a threshold to be agreed. |
| **Field Exams:** | The Borrower shall, and shall cause each of its Subsidiaries to, permit the Exit ABL Agent or a third party selected by the Exit ABL Agent to, upon the Exit |

US-DOCS\116849138.4

| Term | Description |
|---|---|
| | ABL Agent's request, conduct field examinations with respect to any accounts included in the calculation of the Borrowing Base, at reasonable business times and upon reasonable prior notice to the Borrower; <u>provided</u> that (i) the Borrower shall bear the cost of one field examination in any fiscal year and (ii) if Availability is less than the greater of (a) $7.5 million and (b) 20% of the Line Cap, the Borrower shall bear the cost of one additional field examination in any fiscal year; <u>provided</u> <u>further</u> that if an Event of Default has occurred and is continuing, the Borrower shall bear the cost of all field examinations requested by the Exit ABL Agent. |
| **Interest Rates and Fees:** | As set forth on <u>Annex A</u> hereto. |
| **Default Rate:** | Upon the occurrence and during the continuance of any Event of Default (each as defined in the Exit ABL Credit Agreement), with respect to the principal amount of the outstanding Exit ABL Loans and any overdue amount (including overdue interest), the applicable interest rate plus 2.00% per annum. |
| **Maturity:** | The earliest of (a) August 1, 2023 and (b) the date all Exit ABL Loans become due and payable under the Exit ABL Documents, whether by acceleration or otherwise (such date, the "<u>Maturity Date</u>"). |
| **Collateral** | The obligations of the Loan Parties under the Exit ABL Facility shall be secured by (a) a validly perfected first priority security interest in and lien on the all of the Loan Parties' assets securing any obligations under the Prepetition Credit Agreement ("<u>Exit ABL Priority Collateral</u>" and, the liens and security interests thereon and therein, the "<u>Exit ABL Priority Liens</u>") and (b) a validly perfected second priority security interest in an lien on all of the Loan Parties' assets that do not constitute Exit ABL Priority Collateral (the "<u>Exit Note Priority Collateral</u>" and, together the Exit ABL Priority Collateral, the "<u>Exit ABL Collateral</u>" and the liens and security interests thereon and therein, the "<u>Exit Note Priority Liens</u>" and, together with the Exit ABL Priority Liens, the "<u>Exit ABL Liens</u>").

All of the Exit ABL Liens shall be created on terms and pursuant to documentation satisfactory to the Exit ABL Agent and the Required Exit ABL Lenders in their reasonable discretion. |
| **Cash Dominion:** | All cash of the Borrower and its Subsidiaries will be subject to cash dominion (a) at all times during the period beginning on the Closing Date and ending on the date the Borrower's consolidated monthly financial statements for the 6th month ending after the Closing Date have been delivered to the Exit ABL Agent and (b) at any other time that a Covenant/Dominion Trigger Period has occurred and is continuing |
| **Mandatory Prepayments:** | The Exit ABL Documents will contain mandatory prepayment provisions customary for exit facilities of this type.  Prior to the Maturity Date, the following mandatory prepayments, subject to any applicable intercreditor agreement, shall be required:

  - <u>Overadvances</u>:  Prepayments of the Exit ABL Loans and, to the extent that any portion of such prepayment remains, make deposits into the Cash Collateral Account to provide cash collateral for the Letter of Credit Exposure in an amount equal to the overadvance upon the sum of |

4

| Term | Description |
|---|---|
| | the outstanding principal amount of all Exit ABL Loans and Letter of Credit Exposure exceeding the Line Cap. |
| | • Asset Sales:  Prepayments of the Exit ABL Loans and, to the extent that any portion of such prepayment remains, make deposits into the Cash Collateral Account to provide cash collateral for the Letter of Credit Exposure in an amount equal to 100% of the net cash proceeds of the sale or other disposition of any Exit ABL Priority Collateral, except for ordinary course and *de minimis* sales and additional exceptions to be agreed on in the Exit ABL Documents and, after making any such prepayment, the Borrower shall deliver a pro forma Borrowing Base Certificate accounting for such asset sale; |
| | • Insurance Proceeds:  Prepayments of the Exit ABL Loans and, to the extent that any portion of such prepayment remains, make deposits into the Cash Collateral Account to provide cash collateral for the Letter of Credit Exposure in an amount equal to 100% of the net cash proceeds of insurance paid on account of any loss of Exit ABL Priority Collateral subject to exceptions to be agreed on in the Exit ABL Documents and, after making any such prepayment, the Borrower shall deliver a pro forma Borrowing Base Certificate accounting for such loss; and |
| | • Incurrence of Indebtedness:  Prepayments of the Exit ABL Loans and, to the extent that any portion of such prepayment remains, make deposits into the Cash Collateral Account to provide cash collateral for the Letter of Credit Exposure in an amount equal to 100% of the net cash proceeds of any indebtedness incurred by the Loan Parties or any of their respective subsidiaries after the Closing Date (other than the Exit Convertible Notes and any other indebtedness otherwise permitted under the Exit ABL Documents) to the extent such net cash proceeds are not used to prepay the Exit Convertible Notes, payable no later than the date of receipt. |
| | • Consolidated Cash Balance. Prepayments of the Exit ABL Loans in an amount equal to the amount by which the aggregate amount of cash and cash equivalents of the Borrower and its subsidiaries exceeds a threshold to be agreed. |
| **Optional Prepayments:** | Prior to the Maturity Date, the Borrower may, (a) upon at least three business days' prior written notice in the case of Eurodollar Loans and (b) upon at least one business days' prior written notice in the case of ABR Loans and, in each case, at the end of any applicable interest period (or at other times with the payment of applicable breakage costs), prepay in full or in part (other than such breakage costs), the Exit ABL Loans. |
| **Representations and Warranties:** | The Exit ABL Credit Agreement shall contain such representations and warranties as are (a) included in the Prepetition Credit Agreement and (b) customary for exit facilities and transactions of this type. |
| **Other Covenants** | The Exit ABL Credit Agreement shall contain such other affirmative and negative covenants as are (a) included in the Prepetition Credit Agreement and (b) customary for exit facilities and transactions of this type; provided that: |

5

| Term | Description |
|---|---|
| | • **Indebtedness**. The Loan Parties and their subsidiaries shall not be permitted: |
| |    ○ (a) to incur debt for borrowed money other than, (i) after the conversion of the Exit Convertible Notes and the delivery of monthly financial statements for the first 6 months ending after the Closing Date, unsecured debt so long as total leverage, on a pro forma basis for such incurrence (and, to the extent such indebtedness is incurred prior to the delivery of financial statements for four quarters following the Closing Date, to be calculated on an annualized basis) does not exceed 1.00:1.00, (ii) a basket for capital leases and purchase money indebtedness to be agreed, (iii) a general basket to be agreed and (iv) other customary baskets to be agreed; or |
| |    ○ (b) to incur secured debt other than (i) the Exit ABL Facility, (ii) the Exit Convertible Notes, (iii) a basket for permitted capital leases and purchase money indebtedness, and (iv) other customary baskets to be agreed. |
| | • **Restricted Payments**. The Loan Parties and their subsidiaries shall not be permitted to make dividends, distributions or repurchases of equity interests, except that Loan Parties may (i) make dividends or distributions to other Loan Parties owning equity of such Loan Parties and subsidiaries of Loan Parties may make dividends or distributions to other subsidiaries of Loan Parties and to Loan Parties owning such subsidiary's equity interests and (ii) make restricted payments subject to customary "payment conditions" to be agreed. |
| | • **Investments**. The Loan Parties and their subsidiaries shall not be permitted to make any investments, except that the Loan Parties and their subsidiaries may (i) make investments in other Loan Parties or subsidiaries of Loan Parties, with investments of Loan Parties in subsidiaries who are not Loan Parties subject to a sublimit to be agreed, (ii) make investments utilizing a general investments basket to be agreed and (iii) make investments subject to customary "payment conditions" to be agreed. |
| | • **Prepayments of Principal of Indebtedness**. (a) The Loan Parties and their subsidiaries shall not be permitted to make optional prepayments or redemptions (including offers to redeem) in respect of principal of indebtedness, including the Exit Convertible Notes (i) prior to the 12 month anniversary of the Closing Date, (ii) after the 12 month anniversary of the Closing Date unless the Loan Parties have Liquidity greater than $12.5 million and the Fixed Charge Coverage Ratio is greater than 1.25:1.00 and (iii) the difference of (A) the Borrowing Base minus (B) Eligible Cash is greater than the sum of (x) the outstanding amount of Exit ABL Loans and (y) Letter of Credit Exposure, in each case, on a pro forma basis for such mandatory prepayment. (b) The Loan Parties and their subsidiaries shall not be permitted to make mandatory prepayment payments or redemptions (including offers to redeem) in respect of the principal of indebtedness unless the Loan Parties have |

6

| Term | Description |
|---|---|
| | Liquidity greater than $12.5 million and the Fixed Charge Coverage Ratio is greater than 1.25:1.00, in each case, on a pro forma basis for such mandatory prepayment.<br><br>• <u>Payments of Cash Interest</u>.  The Loan Parties and their subsidiaries shall not be permitted to make cash interest payments on indebtedness (including the Exit Convertible Notes) (a) prior to the 12 month anniversary of the Closing Date or (b) after the 12 month anniversary of the Closing Date unless (i) the Loan Parties have Liquidity greater than $12.5 million and the Fixed Charge Coverage Ratio is greater than 1.25:1.00 and the difference of (A) the Borrowing Base minus (B) Eligible Cash is greater than the sum of (x) the outstanding amount of Exit ABL Loans and (y) Letter of Credit Exposure, in each case on a pro forma basis for such cash interest payment.<br><br>• <u>Limitations on Amendments</u>. The Exit ABL Loan Documents shall include a limitation on amendments to the Exit Convertible Notes that are adverse to the Exit ABL Lender Parties. |
| **Financial Covenants:** | At all times during the period beginning on the Closing Date and ending on the date the Borrower's consolidated monthly financial statements for the 6th month ending after the Closing Date have been delivered to the Exit ABL Agent, the Borrower shall not permit Liquidity to be less than $10 million (the "<u>Liquidity Covenant</u>"). A financial officer of the Borrower shall certify as to compliance with such requirement weekly concurrently with the delivery of each weekly Borrowing Base Certificate.<br><br>"<u>Liquidity</u>" shall mean the sum of (a) Availability and (b) Cash and Cash Equivalents for the Loan Parties (other than (i) Cash or Cash Equivalents not held in a Controlled Account, (ii) any Cash or Cash Equivalents pledged to secure any Loan Party's obligations under a letter of credit and (iii) Eligible Cash).<br><br>Upon the occurrence and during the continuance of a Covenant/Dominion Trigger Period on or after the delivery of consolidated financial statements for the sixth month ending after the Closing Date, the Borrower shall not permit the Fixed Charge Coverage Ratio to be less than 1.00:1.00 as of the last day of the most recent trailing twelve month period then ending for which monthly financial statements have been delivered; <u>provided</u> that the Fixed Charge Coverage Ratio for the sixth, seventh, eighth, ninth, tenth and eleventh months ending after the Closing Date shall be calculated on an annualized basis based on all monthly financial statements delivered after the Closing Date, but on or prior to the date of such calculation. For example, with respect to a testing of the Fixed Charge Coverage Ratio following the delivery of financial statements for the 6th month ending after the Closing Date, but prior to the delivery of financial statements for the 7th month ending after the Closing Date, Fixed Charges and EBITDA will be calculated by multiplying such amounts for such 6 month period by 2 and with respect to a testing of the Fixed Charge Coverage Ratio following the delivery of financial statements for the 7th month ending after the Closing Date, but prior to the delivery of financial statements for the 8th month ending after the Closing Date, Fixed Charges and EBITDA will be calculated by |

7

| Term | Description |
|---|---|
|  | multiplying such amounts for such 7 month period by 12/7 and so on until the delivery of financial statements for the 12th month ending after the Closing Date at which time the calculation of Fixed Charges and EBITDA shall be on a trailing 12 month basis.  Once such covenant is in effect, the Borrower shall continue to maintain such Fixed Charge Coverage Ratio as of the last date of each month thereafter until such Covenant/Dominion Trigger Period is no longer continuing.<br><br>"Covenant/Dominion Trigger Period" shall occur at any time that (a) Availability is less than the greater of (i) $7.5 million and (ii) 15% of the Line Cap or (b) an Event of Default has occurred and is continuing. Once commenced, a Covenant/Dominion Trigger Period shall be deemed to be continuing until such time as (x) no Event of Default is continuing and (y) if such Covenant/Dominion Trigger Period resulted from an event specified in the preceding clause (a), Availability equals or exceeds for 30 consecutive days the greater of (1) $7.5 million and (2) 15% of the Line Cap.<br><br>The definitions of "Fixed Charge Coverage Ratio", "Fixed Charges" and "EBITDA" shall be consistent with the definitions of such terms in the DIP ABL Credit Agreement with changes to be mutually agreed. |
| **Reporting:** | The Borrower shall deliver to the Exit ABL Agent and the Exit ABL Lenders:<br><br>• monthly unaudited consolidated financial statements of the Borrower and its subsidiaries within 30 days after the end of each fiscal month, certified by a financial officer of the Borrower and including an operational report consistent with that delivered under the DIP ABL Credit Agreement;<br><br>• quarterly unaudited consolidated financial statements of the Borrower and its subsidiaries within 45 days of quarter-end for the first three fiscal quarters of the fiscal year, certified by the Borrower's chief financial officer and including management discussion and analysis;<br><br>• annual audited consolidated financial statements of the Borrower and its subsidiaries within 120 days of year-end, certified with respect to such consolidated statements by the Borrower's independent certified public accountants and including management discussion and analysis;<br><br>• concurrently with the delivery of the monthly, quarterly, or annual financial statements above, a Compliance Certificate; provided that each Compliance Certificate delivered in connection with the financial statements referenced above shall contain a reasonably detailed calculation of the Fixed Charge Coverage Ratio as of the end of the period covered by such financial statements regardless of whether the Fixed Charge Coverage Ratio covenant is then in effect.<br><br>• (a) an annual operating, capital and cash flow budget for the immediately following fiscal year and detailed on a quarterly basis and (b) a copy of the plan and forecast (including a projected consolidated balance sheet, income statement and cash flow statement) of the Borrower for each quarter of the upcoming fiscal year in form reasonably satisfactory to the Exit ABL Agent within 60 days of year-end; |

US-DOCS\116849138.4

| Term | Description |
|---|---|
| | • a monthly Borrowing Base Certificate and supporting documents within 20 days of the end of each calendar month; <u>provided</u> that, (a) until the earlier of (i) the date on which Borrower's consolidated monthly financial statements for the 6th month ending after the Closing Date have been delivered to the Exit ABL Agent and (ii) the date on which the difference of (A) the Borrowing Base minus (B) Eligible Cash is greater than the sum of (x) the outstanding amount of Exit ABL Loans and (y) Letter of Credit Exposure and (b) at any time Availability is less than the greater of (i) $7.5 million and (ii) 20% of the Line Cap, the Borrower shall deliver a weekly Borrowing Base Certificate and supporting documents within 3 Business Days of the end of each calendar week calculated as of the close of business on the last Business Day of such preceding calendar week;<br><br>• each weekly Borrowing Base Certificate delivered during the period beginning on the Closing Date and ending on the date the Borrower's consolidated monthly financial statements for the 6th month ending after the Closing Date shall contain a certification and supporting information demonstrating that the Loan Parties have been in compliance with the Liquidity Covenant at all times during such preceding calendar week and, to the extent that, prior to the date on which Borrower's consolidated monthly financial statements for the 6th month ending after the Closing Date have been delivered to the Exit ABL Agent, the Borrower is no longer required to deliver weekly borrowing base certificates, the Borrower shall deliver a certification and supporting information demonstrating that the Loan Parties have been in compliance with the Liquidity Covenant at all times during such preceding calendar week within 3 Business Days of the end of each calendar week; and<br><br>• all other certificates, reports and notices as are (a) included in the Prepetition Credit Agreement, (b) customary for exit facilities and transactions of this type or (c) required to be provided under the Exit Note Documents. |
| **Conditions Precedent to Exit ABL Facility** | The conversion of the DIP ABL Facility into the Exit ABL Facility shall be subject to the satisfaction of conditions precedent (collectively, the "<u>Conditions Precedent</u>"; the date of satisfaction of such conditions, the "<u>Closing Date</u>") including, but not limited to:<br><br>• each of the Exit Note Documents shall be in form and substance consistent with the Exit Note Documentation Requirements and otherwise reasonably satisfactory to the Exit ABL Lenders, and shall have been executed and delivered by each Loan Party thereto;<br><br>• the Borrower and its Subsidiaries shall have Liquidity of not less than $12.5 million,<br><br>• the Borrower and its Subsidiaries shall have Availability of not less than $0;<br><br>• the conditions precedent under the Exit Note Documents for the funding of any Exit Convertible Notes shall have been satisfied; and |

9

US-DOCS\116849138.4

| Term | Description |
|---|---|
| | • the Borrower and its Subsidiaries shall not have more than $70 million of Debt (excluding Debt in respect of undrawn letters of credit) outstanding as of the Closing Date. |
| **Events of Default:** | Events of Default shall be customary for exit facilities of this type and include, without limitation:<br><br>• failure to pay principal or interest on the Exit ABL Loans or any fees under the Exit ABL Facility when due (with a 3 business day grace period for the failure to pay interest or fees);<br><br>• failure of any representation or warranty of any Loan Party contained in any Exit ABL Document to be true and correct in all material respects when made;<br><br>• breach of any covenant, provided that certain affirmative covenants may be subject to a thirty (30) day grace period (from the earlier of the date that (i) any Loan Party obtains knowledge of such breach and (ii) any Loan Party receives written notice of such default from the Exit ABL Agent or the Required Exit ABL Lenders);<br><br>• a cross-default to the Exit Note Documents;<br><br>• any change in control (the definition of which is to be agreed, but shall include any "change in control" triggering a default or event of default under the Exit Note Documents; and<br><br>• other defaults as are (a) included in the Prepetition Credit Agreement or (b) customary for exit facilities and transactions of this type. |
| **Remedies:** | Customary for exit facilities and transactions of this type |
| **Assignments and Participations:** | Customary for exit facilities and transactions of this type; provided, the Borrower will not have consent rights with respect to assignments and participations during the continuance of any Event of Default. |
| **Expenses and Indemnification:** | All reasonable, documented, out-of-pocket expenses (limited to (a) reasonable legal fees and reasonable, documented, out-of-pocket expenses of one primary counsel, and one local counsel in each relevant jurisdiction for the Exit ABL Agent; and (b) reasonable legal fees and reasonable, documented, out-of-pocket expenses of one primary counsel, one local counsel in each relevant jurisdiction and one financial advisor for the Exit ABL Lenders) of the Exit ABL Lender Parties incurred in connection with the negotiation and documentation of the Exit ABL Facility with respect to the Loan Parties.  In addition, all reasonable, documented, out-of-pocket fees, costs and expenses (including but not limited to reasonable legal fees and documented, out-of-pocket expenses) of the Exit ABL Agent and the Exit ABL Lenders for workout proceedings and enforcement costs associated with the Exit ABL Facility are to be paid by the Borrower.<br><br>The Borrower will indemnify the Exit ABL Lender Parties, and hold them harmless from and against all reasonable out-of-pocket costs, expenses (including but not limited to reasonable legal fees and expenses) and liabilities arising out of or relating to the transactions contemplated hereby and any actual or proposed use of the proceeds of any loans made under the Exit ABL Facility; |

10

| Term | Description |
|---|---|
| | provided that no such person will be indemnified for costs, expenses or liabilities to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have been incurred solely by reason of the gross negligence, bad faith or willful misconduct of such person. |
| **Governing Law:** | The Exit ABL Documents shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to the conflict of law principles thereof.  Each party to the Exit ABL Documents will waive the rights to trial by jury. |
| **Amendments** | All amendments, modifications and waivers of the Exit ABL Documents shall require the consent of the Required Exit ABL Lenders, except in the case of amendments, modifications, or waivers customarily requiring consent from all Exit ABL Lenders, all affected Exit ABL Lenders and/or letter of credit issuing banks.<br><br>"Required Exit ABL Lenders" shall mean Exit ABL Lenders holding a majority of the aggregate outstanding principal amount of Exit ABL Loans (defined below), Letter of Credit Exposure and any unfunded commitments in respect of the Exit ABL Facility; provided that, as long as there are three or fewer Exit ABL Lenders, Required Exit ABL Lenders shall mean all Exit ABL Lenders. |

11

US-DOCS\116849138.4

**Annex A**

**Specific Terms of Exit ABL Facility**

**Interest Rate:**   The interest rate applicable to the Exit ABL Loans will be (a) for Eurodollar Loans, 1-month, 2-month, 3-month or 6-month LIBOR, LIBOR floor of 1.00% and (b) for ABR Loans, the Alternate Base Rate plus, in each case, the applicable amount in the grid below. Interest on ABR Loans shall be payable quarterly in arrears and interest on Eurodollar Loans shall be payable in arrears at the end of the Interest Period applicable to such Eurodollar Loans provided that, if the Borrower elects a 6-month interest period for Eurodollar Loans, interest shall be payable every 3 months.

| Level | Fixed Charge Coverage Ratio | Eurodollar Loan Applicable Margin | ABR Loan Applicable Margin |
|-------|------------------------------|-----------------------------------|----------------------------|
| I | <1.50:1.00 | 3.50% | 2.50% |
| II | • 1.50:1.00 and <2.00:1.00 | 3.25% | 2.25% |
| III | • 2.00:1.00 | 3.00% | 2.00% |

The applicable Level shall be adjusted quarterly upon delivery of quarterly financial statements. Until the delivery of quarterly financial statements for the first full fiscal quarter ending after the Closing Date, the Interest Rate shall be determined by reference to Level I. Upon failure to delivery timely quarterly financial statements, the Interest Rate shall be determined by reference to Level I.  In the event that financial statements are restated, to the extent that additional interest would have been required in accordance with the restated financials, the Borrower shall pay such additional interest promptly upon demand.

**Letter of Credit Fees:**   Letter of Credit fees equal to the applicable margin with respect to Eurodollar Loans on the aggregate stated amount of each letter of credit outstanding under the Exit ABL Facility payable monthly.

**Commitment Fee:**   0.50% of the aggregate Unused Commitment of each Exit ABL Lender.

**Upfront Fee:**   0.50% of the aggregate principal amount of Exit ABL Commitments, payable on the Closing Date.

US-DOCS\116849138.4

**Exhibit D**

**Restructuring Support Agreement**

US-DOCS\115394754.19

*Execution Version*

**THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER, NOR A SOLICITATION FOR AN OFFER, WITH RESPECT TO ANY SECURITIES, NOR IS IT A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND PROVISIONS OF THE BANKRUPTCY CODE.**

**THIS RESTRUCTURING SUPPORT AGREEMENT IS A PART OF A COMPREHENSIVE COMPROMISE AND SETTLEMENT, EACH ELEMENT OF WHICH IS CONSIDERATION FOR THE OTHER ELEMENTS AND AN INTEGRAL ASPECT OF THE RESTRUCTURING.  THIS RESTRUCTURING SUPPORT AGREEMENT IS CONFIDENTIAL AND SUBJECT TO FEDERAL RULE OF EVIDENCE 408.  NOTHING IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION OR A WAIVER, AND EACH STATEMENT CONTAINED HEREIN IS MADE WITHOUT PREJUDICE SOLELY FOR SETTLEMENT PURPOSES, WITH A FULL RESERVATION AS TO ALL RIGHTS, REMEDIES, CLAIMS OR DEFENSES OF THE PARTIES.**

**THE TRANSACTIONS DESCRIBED HEREIN WILL BE SUBJECT TO THE NEGOTIATION AND COMPLETION OF DEFINITIVE DOCUMENTATION INCORPORATING THE TERMS SET FORTH HEREIN, AND THE CLOSING OF ANY TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH AGREED DEFINITIVE DOCUMENTATION.**

---

**HI-CRUSH, INC., ET AL.**

**RESTRUCTURING SUPPORT AGREEMENT**

**July 12, 2020**

---

This RESTRUCTURING SUPPORT AGREEMENT (together with the exhibits and schedules attached hereto, as each may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof, this "Agreement"), dated as of July 12, 2020, is entered into by and among:  (i) Hi-Crush Inc. ("Holdco") and its undersigned subsidiaries (collectively with Holdco, the "HCR Entities" and each an "HCR Entity"); and (ii) the undersigned holders (the "Consenting Noteholders") of the 9.500% senior notes (the "Senior Notes") issued by Holdco pursuant to that certain Indenture, dated as of August 1, 2018, by and among Holdco, as issuer, the guarantors party thereto, and U.S. Bank National Association, as trustee (in such capacity, together with any successor transferee, the "Notes Trustee") (as amended, restated, supplemented or otherwise modified, the "Indenture" and, together with all ancillary documents related thereto, the "Senior Notes Documents"), and any holder of Senior Notes that may become in accordance with Section 13 hereof.  This Agreement collectively refers to the HCR Entities and the Consenting Noteholders as the "Parties" and each individually as a "Party."

## RECITALS

WHEREAS, the Parties have engaged in good faith, arm's-length negotiations regarding certain restructuring transactions (the "Restructuring Transactions") pursuant to the terms and conditions set forth in this Agreement that is consistent with the terms and conditions of the term sheet attached hereto as **Exhibit A** (the "Restructuring Term Sheet")[1];

WHEREAS, it is anticipated that the Restructuring Transactions will be implemented through a prearranged plan of reorganization (as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with its terms and this Agreement, the "Plan") to be consummated in jointly administered voluntary cases commenced by the HCR Entities (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the, "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"), pursuant to the Plan, which will be filed by the HCR Entities in the Chapter 11 Cases;

WHEREAS, certain of the HCR Entities' current lenders (the "Existing Lenders", and in such capacities, the "DIP ABL Lenders") and JPMorgan Chase Bank, N.A., as administrative agent (the "Existing Agent", and in such capacity, the "DIP ABL Agent") under that certain Credit Agreement, dated as of August 1, 2018 (as amended, restated, supplemented or otherwise modified from time to time, the "Existing Credit Agreement" and, together with the collateral and ancillary documents related thereto the "Existing Credit Documents") by and among Holdco, as borrower, the guarantors party thereto, the Existing Lenders, and the Existing Agent, have committed to provide a debtor-in-possession superpriority senior secured asset-based revolving loan financing facility (the "DIP ABL Facility") and otherwise extend credit to the HCR Entities during the pendency of the Chapter 11 Cases pursuant to a credit agreement substantially in the form attached as Exhibit 1 to the Restructuring Term Sheet (the "DIP ABL Agreement") and otherwise pursuant to the DIP Orders (as defined herein) and the applicable Definitive Documentation;

WHEREAS, certain Consenting Noteholders or affiliates thereof (in their capacities as such, the "DIP Term Loan Lenders") have committed to provide a debtor-in-possession superpriority secured delayed-draw term loan financing facility (the "DIP Term Loan Facility") and otherwise extend credit to the HCR Entities during the pendency of the Chapter 11 Cases pursuant to a credit agreement substantially in the form attached as Exhibit 2 to the Restructuring Term Sheet (the "DIP TL Credit Agreement" and together with the DIP ABL Agreement, the "DIP Agreements") and otherwise pursuant to the DIP Orders and the applicable Definitive Documentation (as defined herein);

WHEREAS, the DIP ABL Lenders and DIP ABL Agent have committed to refinance the DIP ABL Facility and the obligations thereunder, including any issued and outstanding letters of credit, and to provide post-emergence working capital liquidity to the HCR Entities through a new senior secured asset-based revolving loan facility (including the letter of credit sub-limit,

---

[1]   Unless otherwise noted, capitalized terms used but not immediately defined have the meanings given to such terms elsewhere in this Agreement or in the Restructuring Term Sheet (including any exhibits thereto), as applicable.

2

the "Exit ABL Facility") on terms consistent with the Restructuring Term Sheet and otherwise pursuant to the applicable Definitive Documentation, and such exit financing will be consummated in conjunction with the Plan; and

WHEREAS, certain Consenting Noteholders or affiliates thereof (in their capacities as such, the "Backstop Parties") have committed to backstop the Rights Offering for the New Secured Convertible Notes on terms consistent with the Restructuring Term Sheet and the term sheet attached as Exhibit 3 to the Restructuring Term Sheet (the "New Secured Notes Term Sheet") and otherwise pursuant to the applicable Definitive Documentation, and such Rights Offering will be consummated in conjunction with the Plan, with the proceeds of such Rights Offering to be used to satisfy in full the DIP TL Obligations and to provide liquidity to the Reorganized Debtors.

NOW, THEREFORE, in consideration of the promises, mutual covenants, and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the Parties, intending to be legally bound, hereby agrees as follows:

## AGREEMENT

1.      RSA Effective Date.  This Agreement shall become effective, and the obligations contained herein shall become binding upon the Parties, upon the first date (such date, the "RSA Effective Date") that:

   (a)      this Agreement has been executed and delivered by all of the following:

      (i)      each HCR Entity; and

      (ii)      Consenting Noteholders holding, in aggregate, at least two-thirds in principal amount of all "claims" (as defined in section 101(5) of the Bankruptcy Code) outstanding under the Senior Notes Documents (the "Senior Notes Claims").

   (b)      the reasonable and documented fees and expenses of the Ad Hoc Group Advisors invoiced and outstanding as of the date hereof have been paid in full in cash.

2.      Exhibits and Schedules Incorporated by Reference.  Each of the exhibits attached hereto, including the Restructuring Term Sheet, and any schedules to such exhibits (collectively, the "Exhibits and Schedules") are expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include the Exhibits and Schedules.  In the event of any inconsistency between this Agreement (excluding the Exhibits and Schedules) and the Exhibits and Schedules, the Exhibits and Schedules shall govern.  In the event of any inconsistency between the terms of this Agreement (including the Exhibits and Schedules) and the Plan, the terms of the Plan shall govern.

3

3.      Definitive Documentation.

(a)     The definitive documents and agreements governing the Restructuring Transactions (collectively, the "Definitive Documentation") shall include, without limitation:

(i)     this Agreement (as amended, modified, or otherwise supplemented);

(ii)    the Plan and any exhibit to the Plan or document contained in a supplement to the Plan that is not otherwise identified herein or in the Restructuring Term Sheet;

(iii)   the order confirming the Plan (the "Confirmation Order") and any motion or other pleadings related to the Plan, all exhibits thereto, or confirmation of the Plan;

(iv)    a disclosure statement and all exhibits thereto with respect to the Plan (the "Disclosure Statement") and the solicitation materials (including the Rights Offering Procedures) with respect to the Plan (the "Solicitation Materials");

(v)     the (A) motion by the Debtors seeking an order from the Bankruptcy Court (1) granting approval of the Solicitation Materials and the Disclosure Statement, (2) scheduling a hearing for confirmation of the Plan, and (3) approving the Rights Offering Procedures (such order, the "Solicitation Order"), and (B) Solicitation Order;

(vi)    the (A) interim order authorizing the use of cash collateral and approving the DIP ABL Facilities and DIP Term Loan Facility (together, the "DIP Facilities") on terms consistent with the Restructuring Term Sheet and the DIP Agreements (the "Interim DIP Order"), (B) the final order authorizing the use of cash collateral and approving the DIP Facilities on terms consistent with the Restructuring Term Sheet and the DIP Agreements (the "Final DIP Order" and together with the Interim DIP Order, the "DIP Orders"), and (C) any motions or other pleadings or documents to be filed in support of the entry of the DIP Orders;

(vii)   the DIP TL Credit Agreement to be entered into in accordance with the Restructuring Term Sheet and the DIP Orders, including any amendments, modifications, or supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, supplements, or modifications of any of the foregoing) related to or executed in connection therewith (collectively, the "DIP TL Documents");

4

(viii)   the DIP ABL Agreement to be entered into in accordance with the Restructuring Term Sheet and the DIP Orders, including any amendments, modifications, or supplements thereto, and together with any related notes, certificates, agreements, letters of credit, security agreements, documents, and instruments (including any amendments, supplements, or modifications of any of the foregoing) related to or executed in connection therewith (collectively, the "DIP ABL Documents" and together with the DIP TL Documents, the "DIP Documents");

(ix)   the credit agreement for the Exit ABL Facility (the "Exit ABL Credit Agreement") to be entered into in accordance with the Restructuring Term Sheet, including any amendments, modifications, or supplements thereto, and together with any related notes, certificates, agreements, letters of credit, security agreements, documents, and instruments (including any amendments, modifications, or supplements of any of the foregoing) related to or executed in connection therewith (collectively, the "Exit ABL Documents");

(x)   the terms, conditions, and procedures setting forth the method to conduct the Rights Offering (the "Rights Offering Procedures"), and any amendments, modifications, or supplements thereto, and together with any related agreements, documents, or instruments thereto;

(xi)   the (A) agreement setting forth (1) the identities of the Backstop Parties (including any third-parties other than Consenting Noteholders) for the Rights Offering and (2) the terms and conditions of the Rights Offering, the Backstop Commitments, and the payment of consideration to the Backstop Parties in exchange for such commitments (as amended, modified, or supplemented, the "Backstop Purchase Agreement"), together with any related agreements, documents, or instruments, and which shall be acceptable to the Consenting Noteholders comprising the Backstop Parties, (B) motion by the Debtors seeking authority from the Bankruptcy Court to enter into the Backstop Purchase Agreement and to satisfy their obligations to the Backstop Parties thereunder (including granting such obligations administrative expense priority status under sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code), together with any other pleadings or documents to be filed in support of such motion, and (C) order of the Bankruptcy Court approving such motion (the "Backstop Order", and together the documents referenced in clauses (A) and (B), the "Backstop Documents");

5

(xii)   the definitive debt documents for the New Secured Convertible Notes, in accordance with the terms and conditions of the New Secured Notes Term Sheet, including any amendments, modifications, or supplements thereto, and together with any related indenture, notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, supplements, or modifications of any of the foregoing) related to or executed in connection therewith (the foregoing documents collectively, the "New Secured Convertible Notes Documents");

(xiii)   the new stockholders agreement (which may include an amendment to the existing Holdco stockholder agreement), that shall set forth the rights and obligations of the holders of the common stock to be issued by Reorganized Holdco (the "New Common Stock"), and to which all such holders shall be bound or deemed bound (the "New Stockholders' Agreement"); and

(xiv)   the forms of certificates of incorporation, certificates of formation, limited liability company agreements, partnership agreements, or other forms of organizational documents and bylaws for Reorganized Debtors (the "Amended Governance Documents").

(b)   Except as set forth herein, the Definitive Documentation (and any modifications, restatements, supplements or amendments to any of them) will, after the RSA Effective Date, remain subject to negotiation and shall, upon completion, contain terms, conditions, representations, warranties, and covenants consistent in all material respects with the terms of this Agreement (including the Exhibits and Schedules) and be in form and substance reasonably satisfactory in all respects to each of: (i) the HCR Entities, and (ii) the Consenting Noteholders (A) who have agreed, as Backstop Parties, to provide Backstop Commitments to fund the Rights Offering under the Backstop Purchase Agreement, as indicated on their respective signature pages hereto, and (B) who represent at least two-thirds of such Backstop Commitments (the "Required Consenting Noteholders").

4.   Milestones. The HCR Entities shall implement the Restructuring Transactions in accordance with the following milestones (the "Milestones"); provided that the HCR Entities may extend a Milestone only with the express prior written consent of the Required Consenting Noteholders:

(a)   The HCR Entities shall commence the Chapter 11 Cases by filing voluntary petitions under chapter 11 of the Bankruptcy Code with the Bankruptcy Court no later than July 12, 2020 (the "Petition Date").

(b)     No later than the date that is five (5) days following the Petition Date, the Bankruptcy Court shall enter the Interim DIP Order approving the DIP Facilities on an interim basis, subject to compliance with Section 3 hereof.

(c)     No later than the date that is fourteen (14) days following the Petition Date, the HCR Entities shall file the Plan, the Disclosure Statement, the related Solicitation Materials and the motion seeking entry of the Solicitation Order, which documents shall be subject to compliance with Section 3 hereof.

(d)     No later than the date that is twenty-five (25) days following the Petition Date, the Bankruptcy Court shall enter the Final DIP Order approving the DIP Facilities on a final basis, each subject to compliance with Section 3 hereof.

(e)     No later than the date that is forty-five (45) days following the Petition Date, the Bankruptcy Court shall enter (i) the Backstop Order approving the Backstop Purchase Agreement and other Backstop Documents, and (ii) the Solicitation Order approving the Solicitation Materials and Rights Offering Procedures, each subject to compliance with Section 3 hereof.

(f)     No later than the date that is seventy-five (75) days following the Petition Date, the Bankruptcy Court shall enter the Confirmation Order, which order shall be subject to compliance with Section 3 hereof.

(g)     No later than the date that is ninety (90) days following the Petition Date, the effective date of the Plan (the "Effective Date") shall occur.

5.     Commitment of Consenting Noteholders.   Each Consenting Noteholder shall (severally and not jointly and severally) from the RSA Effective Date until the occurrence of a Termination Date (as defined in Section 11):

(a)     support and cooperate with the HCR Entities and make commercially reasonable efforts to consummate the Restructuring Transactions in accordance with the Plan and the terms and conditions of this Agreement, the Restructuring Term Sheet, and the other Definitive Documentation (but without limiting the applicable consent and approval rights provided in this Agreement and the Definitive Documentation), by:  (i) voting all of its Claims and Interests, as applicable, now or hereafter owned by such Consenting Noteholder (or for which such Consenting Noteholder now or hereafter serves as the nominee, investment manager, or advisor for holders thereof) to accept the Plan; (ii) timely returning a duly-executed ballot in connection therewith; and (iii) not "opting out" of or objecting to any releases, indemnity and exculpation under the Plan (and to the extent required by the ballot, affirmatively "opting in" to such releases, indemnity and exculpation) (except such Consenting Noteholder shall no

7

longer be prohibited from "opting out" of, or required to "opt in" to, granting such a release, indemnity, or exculpation to any Party that has materially breached or terminated this Agreement);

(b) support and, as applicable, take all reasonable actions necessary to implement and consummate, the Rights Offering, including to the extent such Consenting Noteholder is a Backstop Party, the funding of any commitments under the Backstop Documents, in each case subject further to the terms and conditions of the Backstop Documents;

(c) not, directly or indirectly, seek, support, negotiate, engage in any discussions relating to, or solicit an Alternative Transaction (as defined below);

(d) not withdraw, amend, or revoke (or cause to be withdrawn, amended, or revoked) its tender, consent, or vote with respect to the Plan; provided however, that upon the occurrence of a Termination Date all tenders, consents, and votes tendered by the Consenting Noteholders shall be immediately revoked and deemed void *ab initio*, without any further notice to or action, order, or approval of the Bankruptcy Court;

(e) support, and not object to, or delay or impede, or take any other action to interfere, directly or indirectly, with the Restructuring Transactions;

(f) support, and not object to, or delay or impede, or take any other action to interfere, directly or indirectly, with the entry by the Bankruptcy Court of any of the DIP Orders, the Backstop Order, the Solicitation Order, or the Confirmation Order; and

(g) to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions, negotiate in good faith appropriate additional or alternative provisions to address any such impediment; provided that the economic outcome for the Parties, the anticipated timing of the closing and other material terms of this Agreement must be substantially preserved in any such alternate provisions.

Notwithstanding the foregoing, in the event that (i) the Bankruptcy Court does not approve the releases and exculpation as described in the Restructuring Term Sheet pursuant to the Plan and the Confirmation Order and (ii) this Agreement has not been terminated as of the date of entry of the Confirmation Order, then each Consenting Noteholder covenants and agrees to support and not object to the Reorganized Debtors providing such releases and exculpation (and, to the extent applicable, take reasonable steps to cause the Reorganized Debtors to provide such releases and exculpation) as promptly as reasonably possible after the occurrence of the date on which the Restructuring Transactions are substantially consummated in accordance with the terms and conditions of the Definitive Documentation (and each Consenting Noteholder covenants and agrees not to object to, delay, impede, or take any other action (including to

8

instruct or direct any other person or entity) to interfere with the prompt consummation thereof), which covenants and agreements shall survive the occurrence of the Termination Date.

Further, notwithstanding the foregoing, (i) nothing in this Agreement and neither a vote to accept the Plan by any Consenting Noteholder nor the acceptance of the Plan by any Consenting Noteholder shall (x) be construed to prohibit any Consenting Noteholder from contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement or the Definitive Documentation, or exercising any consent rights provided with respect to the Required Consenting Noteholders hereunder or its rights or remedies specifically reserved herein or in the Senior Notes Documents, the DIP TL Documents, or the Definitive Documentation; (y) be construed to prohibit or limit any Consenting Noteholder from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases, so long as, from the RSA Effective Date until the occurrence of a Termination Date, such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement, are not prohibited by this Agreement and are not for the purpose of hindering, delaying, or preventing the consummation of the Restructuring Transactions; or (z) limit the ability of a Consenting Noteholder to sell or enter into any transactions in connection with any Claims, Interests or any other claims against or interests in the HCR Entities, subject to Section 13 of this Agreement, and (ii) except as otherwise expressly provided in this Agreement, nothing in this Agreement shall require any Consenting Noteholder to incur any expenses, liabilities, or other obligations, or agree to any commitments, undertakings, concessions, indemnities, or other arrangements that would reasonably be expected to result in expenses, liabilities, or other obligations to any Consenting Noteholder.

6.   Commitment of the HCR Entities.

(a)   Subject to clause (c) of this Section 6, the HCR Entities shall, from the RSA Effective Date until the occurrence of a Termination Date:

(i)   (A) support and take all reasonable actions necessary to implement and consummate the Restructuring in as timely a manner as practicable under applicable law and on the terms and conditions contemplated by this Agreement, the Restructuring Term Sheet, and the Definitive Documentation, (B) not take any actions, directly or indirectly, inconsistent with this Agreement, the Restructuring Term Sheet, or the Definitive Documentation, and (C) negotiate in good faith, execute, perform its obligations under, and consummate the transactions contemplated by, the Definitive Documentation to which it is (or will be) a party;

(ii)   timely file a formal objection, in form and substance reasonably acceptable to the Required Consenting Noteholders, to any motion filed with the Bankruptcy Court by a third-party seeking the entry of an order (A) directing the appointment of a trustee or examiner with enlarged powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code with respect to any HCR Entity, any of their subsidiaries, or their respective properties,

9

(B) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (C) dismissing the Chapter 11 Cases, (D) modifying or terminating the HCR Entities' exclusive right to file or solicit acceptances of a plan of reorganization; (E) challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the DIP Term Loan Claims, DIP ABL Claims, or the Senior Notes Claims, as applicable, or asserting any other cause of action against or with respect or relating to such claims or any liens securing such claims (if applicable); or (F) that would hinder, impede, or delay the implementation of the Restructuring as contemplated by this Agreement;

(iii)    timely comply with all Milestones;

(iv)    to the extent that any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the transactions contemplated in this Agreement or the Plan, negotiate in good faith appropriate additional or alternative provisions to address any such impediment, in consultation with the Required Consenting Noteholders; provided, however, that the economic outcome for the Parties, the anticipated timing of confirmation and the effective date of the Plan, and other material terms as contemplated herein and in the Plan must be substantially preserved, as determined by the Required Consenting Noteholders, in their sole discretion;

(v)    not sell, or file any motion or application seeking to sell, any assets other than in the ordinary course of business without the prior written consent of the Required Consenting Noteholders (not to be unreasonably withheld or delayed);

(vi)    (A) not make or declare any dividends, distributions, or other payments on account of its equity and (B) ensure that Holdco does not make any transfers (whether by dividend, distribution, or otherwise) to any direct or indirect parent entity or shareholder of Holdco and that no other HCR Entity makes any transfers (whether by dividend, distribution, or otherwise) to any direct or indirect parent entity or shareholder of Holdco;

(vii)    maintain their good standing under the laws of the state or other jurisdiction in which they are incorporated or organized;

(viii)    promptly notify the Consenting Noteholders and Ad Hoc Group Advisors in writing of the commencement of any governmental or third party complaints, litigations, investigations, or hearings (or

10

communications indicating that the same may be contemplated or threatened);

(ix) if the HCR Entities know of a breach by any Party of such Party's obligations, undertakings, representations, warranties, or covenants set forth in this Agreement, furnish prompt written notice (and in any event within two (2) business days of such actual knowledge) to the Consenting Noteholders and Ad Hoc Group Advisors;

(x) consult with and provide to the Ad Hoc Group Advisors any proposed treatments, amendments, or modifications with respect to any Railcar Lease to which the Required Consenting Noteholders are entitled to consent per the terms of this Agreement and the Restructuring Term Sheet;

(xi) not grant, agree to grant or make any payment on account of (including pursuant to a key employee retention plan, key employee incentive plan, or other similar agreement or arrangement) any additional or any increase in the wages, salary, bonus, commissions, retirement benefits, pension, severance or other compensation or benefits (including in the form of any vested or unvested Interests in Holdco or any other equity interest of any kind or nature) of any director, manager, officer, or management- or executive-level employee of any of the HCR Entities without the prior written consent of the Required Consenting Noteholders (not to be unreasonably withheld or delayed);

(xii) not (a) enter into, adopt, or establish any new compensation or benefit plans or arrangements (including employment agreements and any retention, success, or other bonus plans), or (b) amend or terminate any existing compensation or benefit plans or arrangements (including employment agreements), except in the case of this clause (b) as required by Law or the terms of the benefit plan or arrangement, in each case, without the prior written consent of the Required Consenting Noteholders (not to be unreasonably withheld or delayed);

(xiii) not incur or commit to incur any capital expenditures, other than capital expenditures that are contemplated by the DIP Budget;

(xiv) pay in cash (A) prior to the Petition Date, all reasonable and documented fees and expenses accrued prior to the Petition Date for which invoices or receipts are furnished by the Ad Hoc Group Advisors, (B) after the Petition Date, subject to any applicable orders of the Bankruptcy Court but without the need to file fee or retention applications, all reasonable and documented fees and expenses incurred prior to (to the extent not previously paid) on

11

and after the Petition Date from time to time by the Ad Hoc Group Advisors, but in any event within five business days of delivery to the HCR Entities of any applicable invoice or receipt, and (C) on the Effective Date, reimbursement to the Ad Hoc Group Advisors for all reasonable and documented fees and expenses incurred and outstanding in connection with the Restructuring Transactions (including any estimated fees and expenses estimated to be incurred through the Effective Date pursuant to the terms and conditions of the Plan); and

(xv)    not terminate the applicable engagement agreements of, and not breach the reimbursement obligations owed to, the Ad Hoc Group Advisors.

(b)    The HCR Entities shall not, directly or indirectly, at any time prior to consummation of the Restructuring Transactions, solicit, encourage or initiate any offer or proposal from, or actively negotiate term sheets or other definitive documentation, or enter into any agreement (other than a confidentiality agreement permitted under this Section 6(b)) with, any person or entity concerning any actual or proposed transaction involving any or all of any dissolution, winding up, liquidation, reorganization (including a competing plan of reorganization or other financial and/or corporate restructuring of the HCR Entities), assignment for the benefit of creditors, transaction, merger, consolidation, tender offer, exchange offer, business combination, joint venture, partnership, sale of a material portion of assets, sale, issuance, or other disposition of any equity or debt interests, financing (debt (including any alternative debtor-in-possession financing other than under the DIP Facilities) or equity), or recapitalization or restructuring of any of the Debtors (including, for the avoidance of doubt, a transaction premised on a sale of a material portion of assets under section 363 of the Bankruptcy Code), other than the Restructuring Transactions (each, an "Alternative Transaction"); provided, however, that if any of the HCR Entities receives a proposal or expression of interest regarding any Alternative Transaction from the RSA Effective Date until the occurrence of a Termination Date, the HCR Entities shall, (A) within twenty-four (24) hours, (i) notify counsel to the other Parties of any proposals for, or expressions of interest in, an Alternative Transaction, with such notice to include the material terms thereof, including the identity of the person or group of persons involved, and (ii) furnish counsel to the other Parties with copies of any written offer, oral offer, or any other information that they receive relating to the foregoing and shall promptly inform counsel to the other Parties of any material changes to such proposals, and (B) not enter into any confidentiality agreement with a party interested in an Alternative Transaction unless such party consents to identifying and providing to counsel to the Parties (under a reasonably acceptable confidentiality agreement) the information contemplated under this Section 6(b).

12

(c)     Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require the HCR Entities or any directors, officers, managers, or members of the HCR Entities, each in its capacity as a director, officer, manager, or member of the HCR Entities, to take any action or to refrain from taking any action, to the extent inconsistent with the exercise of its fiduciary duties they have under applicable law, rule, or regulation (as reasonably determined by them in good faith after receiving advice from outside counsel).

(d)     From and after the RSA Effective Date, the HCR Entities will operate the business of the HCR Entities in the ordinary course (subject to the terms of the DIP Budget) and keep the Consenting Noteholders reasonably informed about the operations of the HCR Entities (provided, that any transaction (or series of related transactions) in an amount exceeding $5 million is deemed not to be in the ordinary course of business for purposes of this Section 6(d) and the HCR Entities shall be required to obtain the consent of the Required Consenting Noteholders to effectuate such transaction (or series of related transactions)), and the HCR Entities shall provide to the Ad Hoc Group Advisors, and shall direct its employees, officers, advisors, and other representatives to provide the Ad Hoc Group Advisors, (A) reasonable access (without any material disruption to the conduct of the HCR Entities' businesses) to the HCR Entities' books and records during normal business hours; (B) reasonable access to the management and advisors of the HCR Entities during normal business hours; and (C) timely and reasonable responses to all reasonable diligence requests, in each case, for the purposes of evaluating the HCR Entities' assets, liabilities, operations, businesses, finances, strategies, prospects, and affairs.

7.     Noteholder Termination Events.  The obligations of the Consenting Noteholders under this Agreement shall automatically terminate upon the occurrence of any of the following events, unless waived, in writing, by the Required Consenting Noteholders on a prospective or retroactive basis (each, a "Noteholder Termination Event"):

(a)     the failure to meet any of the Milestones unless (i) such failure is the result of any act, omission, or delay on the part of the Consenting Noteholders, as the case may be, in violation of their obligations under this Agreement or (ii) such Milestone is extended in accordance with Section 4 of this Agreement; provided that, a Party in breach of any of its respective undertakings, obligations, representations, warranties, or covenants set forth in this Agreement cannot enforce this Section 7(a);

(b)     the occurrence of a material breach of this Agreement by any HCR Entity that has not been cured (if susceptible to cure) before the earlier of (i) five (5) business days after written notice to the HCR Entities of such material breach from the Required Consenting Noteholders, as the case may be, asserting such termination and (ii) one (1) calendar day prior to any

13

proposed Effective Date; _provided_, that for the avoidance of doubt, any breach of Sections 6(a)(xi), 6(a)(xii) or 6(a)(xiii) shall constitute a material breach;

(c)    the conversion of one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code;

(d)    the dismissal of one or more of the Chapter 11 Cases;

(e)    the appointment of a trustee, receiver, or examiner with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code in one or more of the Chapter 11 Cases;

(f)    (i) any Definitive Documentation does not comply with Section 3 of this Agreement or (ii) any other document or agreement necessary to consummate the Restructuring Transactions is not satisfactory or reasonably satisfactory (as applicable) to the Required Consenting Noteholders;

(g)    the HCR Entities (i) amend or modify, or file a pleading seeking authority to amend or modify, any Definitive Documentation in a manner that is materially inconsistent with this Agreement; (ii) suspend, withdraw, or revoke their support for the Restructuring Transactions; (iii) actively negotiate term sheets or other definitive documentation regarding an Alternative Transaction; or (iv) publicly announce their intention to take any such action listed in clauses (i) through (iii) of this subsection;

(h)    any HCR Entity (i) files or publicly announces that it will file any plan of reorganization other than the Plan or (ii) withdraws or publicly announces its intention not to support the Plan;

(i)    any HCR Entity files any motion or application seeking authority to sell any material assets without the prior written consent of the Required Consenting Noteholders, or such motion or application is inconsistent with the commitments set forth in Sections 6 hereof;

(j)    the issuance by any governmental authority, including the Bankruptcy Court, any regulatory authority, or any other court of competent jurisdiction, of any ruling or order enjoining the substantial consummation of any of the Restructuring Transactions, which ruling or order has become final and non-appealable;

(k)    the Bankruptcy Court enters any order authorizing the use of cash collateral or post-petition financing that is not in the form of the applicable DIP Orders or otherwise consented to by the Required Consenting Noteholders (such consent not to be unreasonably withheld);

(l) the occurrence of any Event of Default under the DIP Orders or the DIP TL Credit Agreement or DIP ABL Credit Agreement (as defined therein, respectively), as applicable, that has not been cured (if susceptible to cure) or waived by the applicable percentage of DIP Term Loan Lenders or DIP ABL Lenders, as applicable, in accordance with the terms of the DIP TL Credit Agreement or DIP ABL Credit Agreement, as applicable;

(m) the termination of the Backstop Purchase Agreement in accordance with the Backstop Documents;

(n) the HCR Entities seek to, or file any motion or application, including in connection with the Plan, seeking authority to, reject, assume, assume and assign, amend, supplement, or modify any Railcar Lease or other material executory contract or unexpired lease, without the prior written consent of the Required Consenting Noteholders (such consent not to be unreasonably withheld);

(o) the HCR Entities assume, assume and assign, amend, supplement or modify any Railcar Lease, or enter into any new agreement or arrangement with the Railcar Lessors on a post-petition basis without the prior written consent of the Required Consenting Noteholders (such consent not to be unreasonably withheld);

(p) a breach by any HCR Entity of any representation, warranty, or covenant of such HCR Entity set forth in Section 17 of this Agreement that could reasonably be expected to have a material adverse impact on the consummation of the Restructuring Transactions that (to the extent curable) has not been cured before the earlier of (i) five (5) business days after the receipt by the HCR Entities of written notice and description of such breach from any other Party and (ii) one (1) calendar day prior to any proposed Effective Date;

(q) either (i) any HCR Entity, or any other party acting on behalf, of the HCR Entities, files a motion, application, or adversary proceeding (or any HCR Entity supports any such motion, application, or adversary proceeding filed or commenced by any third party) challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the DIP Term Loan Claims or the Senior Notes Claims or asserting any other cause of action against the DIP Term Loan Lenders or the Consenting Noteholders and/or with respect or relating to such DIP Term Loan Claims or Senior Notes Claims, each as applicable; or (ii) the Bankruptcy Court (or any court with jurisdiction over the Chapter 11 Cases) enters an order that could reasonably be expected to have a material adverse impact on the consummation of the Restructuring Transactions and such order has become final and non-appealable;

15

(r)     any HCR Entity terminates its obligations under and in accordance with Section 8 of this Agreement;

(s)     the Bankruptcy Court enters an order in the Chapter 11 Cases terminating any of the HCR Entities' exclusive right to file a plan or plans of reorganization or to solicit acceptances thereof pursuant to section 1121 of the Bankruptcy Code;

(t)     the Bankruptcy Court enters an order granting relief from the automatic stay imposed by section 362 of the Bankruptcy Code authorizing any party to proceed against any material asset of any of the HCR Entities that would materially and adversely affect any of the HCR Entities' ability to operate their businesses in the ordinary course;

(u)     the commencement of an involuntary case against any HCR Entity or any HCR Entity's foreign subsidiaries and affiliates or the filing of an involuntary petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization or other relief in respect of such HCR Entity or such HCR Entity's foreign subsidiaries and affiliates, or their debts, or of a substantial part of their assets, under any federal, state or foreign bankruptcy, insolvency, administrative receivership or similar law now or hereafter in effect, provided, that such involuntary proceeding is not dismissed or converted by the HCR Entities to a voluntary case within a period of thirty (30) days after the filing thereof, or if any court grants the relief sought in such involuntary proceeding;

(v)     any HCR Entity (i) voluntarily commences any case or files any petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization or other relief under any federal, state, or foreign bankruptcy, insolvency, administrative receivership or similar law now or hereafter in effect except the voluntary case contemplated under this Agreement, (ii) consents to the institution of, or failing to contest in a timely and appropriate manner, any involuntary proceeding or petition described above, (iii) files an answer admitting the material allegations of a petition filed against it in any such proceeding, (iv) applies for or consents to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator or similar official, (v) makes a general assignment or arrangement for the benefit of creditors or (vi) takes any corporate action for the purpose of authorizing any of the foregoing;

(w)     if (i) any of the DIP Orders or the Backstop Order are reversed, stayed, dismissed, vacated, reconsidered, modified, or amended without the consent of the Required Consenting Noteholders, or (ii) a motion for reconsideration, reargument, or rehearing with respect to any such order

16

has been filed and the HCR Entities have failed to timely object to such motion;

(x)   if (i) the Solicitation Order or the Confirmation Order are reversed, stayed, dismissed, vacated, reconsidered, modified, or amended without the consent of the Required Consenting Noteholders, or (ii) a motion for reconsideration, reargument, or rehearing with respect to any such order has been filed and the HCR Entities have failed to timely object to such motion;

(y)   the occurrence of the Maturity Date (as defined in either the DIP TL Credit Agreement or in the DIP ABL Agreement, as applicable) without the Plan having been substantially consummated; or

(z)   at any time after the RSA Effective Date but prior to the Effective Date, Mr. Robert Rasmus ceases to serve as Chief Executive Officer of Holdco for any reason; provided, that a Noteholder Termination Event shall not occur under this Section 7(z) if, within three (3) business days of the date that Mr. Rasmus ceases to serve as Chief Executive Officer for any reason, the board of directors, managing members or other governing body of each HCR Entity, as applicable, appoints Mr. Ryan Omohundro, of Alvarez & Marsal North America, LLC (or such other person acceptable to the Required Consenting Noteholders), to the position of Chief Restructuring Officer (the "CRO") of each of the HCR Entities and bestows upon the CRO all duties and responsibilities customarily associated with such position, including, without limitation, the duties and responsibilities exercised by Mr. Rasmus as of the RSA Effective Date.

For the avoidance of doubt, subject to Section 9, any written waiver of the occurrence of a Noteholder Termination Event granted in writing by the Required Consenting Noteholders shall bind all Consenting Noteholders with respect to such written waiver.

8.   HCR Entities' Termination Events.  Each HCR Entity may, upon notice to the Consenting Noteholders, terminate its obligations under this Agreement upon the occurrence of any of the following events (each, a "HCR Termination Event"), subject to the rights of the HCR Entities to fully or conditionally waive, in writing, on a prospective or retroactive basis, the occurrence of a HCR Termination Event:

(a)   a breach by a Consenting Noteholder (such Consenting Noteholder in breach, a "Defaulting Noteholder") of any obligation, representation, warranty, or covenant of such Consenting Noteholder set forth in this Agreement that could reasonably be expected to have a material adverse impact on the consummation of the Restructuring Transactions that (to the extent curable) has not been cured before the earlier of (i) five (5) business days after notice to all Parties of such breach and a description thereof and (ii) one (1) calendar day prior to any proposed Effective Date; provided, however, notwithstanding the foregoing, it shall not be a HCR

17

Termination Event if the non-breaching Consenting Noteholders hold more than two-thirds in principal amount of the Senior Notes Claims;

(b)     if the board of directors of any HCR Entity determines, and notifies the Ad Hoc Group Advisors within twenty-four (24) hours of such determination, after receiving advice from outside counsel, that (i) proceeding with the Restructuring Transactions (including, without limitation, the Plan or solicitation of the Plan) would be inconsistent with the exercise of its fiduciary duties, or (ii) an Alternative Transaction is more favorable than the Plan and continued support of the Plan would be inconsistent with the exercise of its fiduciary duties; provided, that the HCR Entities shall give the Consenting Noteholders not less than three (3) Business Days' prior written notice before exercising the termination right in accordance with this Section 8(b); or

(c)     the issuance by any governmental authority, including the Bankruptcy Court, any regulatory authority, or any other court of competent jurisdiction, of any ruling or order enjoining the substantial consummation of any of the Restructuring Transactions, which ruling or order has become final and non-appealable; provided, however, that the HCR Entities have made commercially reasonable, good faith efforts to cure, vacate, or have overruled such ruling or order prior to terminating this Agreement.

9.     Individual Termination. Any Consenting Noteholder may terminate this Agreement as to itself only, upon written notice to the other Parties, in the event that:

(a)     such Consenting Noteholder has transferred all (but not less than all) of its Senior Notes Claims in accordance with Section 13 of this Agreement (such termination shall be effective on the date on which such Consenting Noteholder has effected such transfer, satisfied the requirements of Section 13 and provided the written notice required above in this Section 9); or

(b)     this Agreement is amended without its consent in such a way as to alter any of the material terms hereof in a manner that is disproportionately adverse to such Consenting Noteholder as compared to similarly situated Consenting Noteholders by giving ten (10) Business Days' written notice to the HCR Entities and the other Consenting Noteholders; provided, that such written notice shall be given by the applicable Consenting Noteholder within five (5) Business Days of such amendment, filing, or execution.

18

10.      Mutual Termination; Automatic Termination.    This Agreement and the obligations of all Parties hereunder may be terminated by mutual written agreement by and among Holdco, on behalf of itself and each other HCR Entity and the Required Consenting Noteholders.  Notwithstanding anything in this Agreement to the contrary, this Agreement shall terminate automatically without further required action upon the occurrence of the Effective Date.

11.      Effect of Termination.

(a)      The earliest date on which termination of this Agreement as to a Party is effective in accordance with Sections 7, 8, 9 or 10 of this Agreement shall be referred to, with respect to such Party, as a "Termination Date".

(b)      Upon the occurrence of a Termination Date, the terminating Party's obligations under this Agreement shall be terminated effective immediately, and such Party or Parties shall be released from its commitments, undertakings, and agreements; provided, however, that each of the following shall survive any such termination:  (a) any claim for breach of this Agreement that occurs prior to such Termination Date, and all rights and remedies with respect to such claims shall not be prejudiced in any way; and (b) Sections 2, 11, 15 (for purposes of enforcement of obligations accrued through the Termination Date), 16, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 29, with respect to the last sentence of 31, 32, 33, 35, 36 and 37.  The automatic stay imposed by section 362 of the Bankruptcy Code shall not prohibit a Party from taking any action necessary to effectuate the termination of and otherwise enforce this Agreement pursuant to and in accordance with the terms hereof.

12.      Cooperation and Support.  The HCR Entities shall provide draft copies of all material "first day" motions, applications, and other material documents related to the Definitive Documentation that any HCR Entity intends to file with the Bankruptcy Court in any of the Chapter 11 Cases to the Ad Hoc Group Advisors at least three (3) calendar days (or as soon as is reasonably practicable under the circumstances) prior to the date when such HCR Entity intends to file such document, and shall consult in good faith with such counsel regarding the form and substance of any such proposed filing; provided that all such "first day" and other material motions, applications, and other documents that any HCR Entity intends to file with the Bankruptcy Court in any of the Chapter 11 Cases (other than the Definitive Documentation) shall be in the form and substance reasonably satisfactory to the Required Consenting Noteholders. The HCR Entities will use reasonable efforts to provide draft copies of all other material pleadings any HCR Entity intends to file with the Bankruptcy Court to the Ad Hoc Group Advisors at least three (3) calendar days prior to filing such pleading (or as soon as is reasonably practicable under the circumstances), and shall consult in good faith with such counsel regarding the form and substance of any such proposed pleading.  For the avoidance of doubt, the Parties agree, consistent with clause (b) of Section 3 hereof, (a) to negotiate in good faith the Definitive Documentation that is subject to negotiation and completion on the RSA Effective Date and (b) that, notwithstanding anything herein to the contrary, the Definitive Documentation, including any motions or orders related thereto, shall be consistent with this Agreement and

19

otherwise subject to the applicable consent rights of the Consenting Noteholders set forth in clause (b) of Section 3.

13. <u>Transfers of Claims</u>.

(a) No Consenting Noteholder shall (i) sell, transfer, assign, pledge, grant a participation interest in, or otherwise dispose of, directly or indirectly, any of its right, title, or interest in respect of any of such Consenting Noteholder's Senior Notes Claims in whole or in part, or (ii) deposit any of such Consenting Noteholder's Senior Notes Claims into a voting trust, or grant any proxies, or enter into a voting agreement with respect to any such claims (the actions described in <u>Clauses (i)</u> and <u>(ii)</u> are collectively referred to herein as a "<u>Transfer</u>" and the Consenting Noteholder making such Transfer is referred to herein as the "<u>Transferor</u>"), unless such Transfer is to or with another Consenting Noteholder or any other entity (a "<u>Transferee</u>") that first agrees in writing to be bound by the terms of this Agreement by executing and delivering to the HCR Entities and the Ad Hoc Group Advisors a Transferee Joinder substantially in the form attached hereto as **Exhibit B** (the "<u>Transferee Joinder</u>").  With respect to Senior Notes Claims held by the relevant Transferee upon consummation of a Transfer in accordance herewith, such Transferee is deemed to make all of the representations, warranties, and covenants of a Consenting Noteholder set forth in this Agreement as of the date of such Transfer. Upon compliance with the foregoing, the Transferor shall be deemed to relinquish its rights and be released from its obligations (except for any claim for breach of this Agreement that occurs prior to such Transfer and any remedies with respect to such claim) under this Agreement to the extent of such transferred rights and obligations.

(b) Notwithstanding anything herein to the contrary, (i) the foregoing <u>Clause (a)</u> of this <u>Section 13</u> shall not preclude any Consenting Noteholder from transferring Senior Notes Claims to affiliates of such Consenting Noteholder (each, a "<u>Consenting Noteholder Affiliate</u>"), which Consenting Noteholder Affiliate shall be automatically bound by this Agreement upon the transfer of such Senior Notes Claims; and (ii) a Consenting Noteholder may effect a Transfer of its Senior Notes Claims to an entity that is acting in its capacity as a Qualified Marketmaker[2] without the requirement that the Qualified Marketmaker become a Consenting Noteholder; <u>provided</u>, that any subsequent Transfer by such Qualified Marketmaker of the right, title or interest in such Senior Notes Claims is to

---

[2]  As used herein, the term "***Qualified Marketmaker***" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers claims against the HCR Entities (or enter with customers into long and short positions in claims against the HCR Entities), in its capacity as a dealer or market maker in claims against the HCR Entities and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

a Transferee that is or becomes a Consenting Noteholder at the time of such Transfer by executing and delivering a Transferee Joinder and to the extent any Consenting Noteholder is acting in its capacity as a Qualified Marketmaker, it may effect a Transfer of any Senior Notes Claims that it acquires from a holder of such claims that is not a Consenting Noteholder without the requirement that the Transferee be or become a Consenting Noteholder.  Notwithstanding the foregoing, if, at the time of the proposed Transfer of such claims to the Qualified Marketmaker, such claims (A) may be voted on the Plan, the proposed Transferor must first vote such claims in accordance with the requirements of this Agreement or (B) have not yet been and may not yet be voted on the Plan and such Qualified Marketmaker does not effect a Transfer of such claims to a subsequent transferee prior to the third (3rd) business day prior to the expiration of the voting deadline (such date, the "Qualified Marketmaker Joinder Date"), such Qualified Marketmaker shall be required to (and the Transfer documentation to the Qualified Marketmaker shall have provided that it shall), on the first (1st) business day immediately following the Qualified Marketmaker Joinder Date, become a Consenting Noteholder with respect to such Senior Notes Claims in accordance with the terms hereof for the purposes of voting on the Plan as contemplated hereunder (provided that the Qualified Marketmaker shall automatically, and without further notice or action, no longer be a Consenting Noteholder with respect to such Senior Notes Claims at such time that the transferee of such claims becomes a Consenting Noteholder with respect to such claims).

(c)     Any Transfer made in violation of this Section 13 shall be deemed null and void *ab initio* and of no force or effect, regardless of any prior notice provided to the HCR Entities and/or any Consenting Noteholder, and shall not create any obligation or liability of any HCR Entity or any other Consenting Noteholder to the purported transferee.

(d)     This Section 13 shall not impose any obligation on the HCR Entities to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Noteholder to transfer any of its Senior Notes Claims.  Notwithstanding anything to the contrary herein, to the extent the HCR Entities and any another Party have entered into a confidentiality agreement, the terms of such confidentiality agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such confidentiality agreement.

14.     Further Acquisition of Claims or Interests.  Except as set forth in Section 13, nothing in this Agreement shall be construed as precluding any Consenting Noteholder or any of its affiliates from acquiring any claims (as defined in section 101(5) of the Bankruptcy Code) against the HCR Entities ("Claims"), Senior Notes Claims, additional claims arising from the DIP Term Loan Facility (the "DIP Term Loan Claims"), or interests in the instruments underlying any of the Claims, Senior Notes Claims or the DIP Term Loan Claims; provided,

however, that any such additional Claims, Senior Notes Claims or DIP Term Loan Claims acquired by any Consenting Noteholder or by any of its affiliates shall automatically be subject to the terms and conditions of this Agreement.  Upon any such further acquisition by a Consenting Noteholder or any of its affiliates, such Consenting Noteholder shall promptly notify counsel to the HCR Entities, who will then promptly notify the Ad Hoc Group Advisors.

15.     Fees and Expenses.  In accordance with and subject to Section 6(a)(xiv) and Section 6(a)(xv) hereof, the DIP Orders and/or the Backstop Order (as applicable), which orders shall provide for the payment of all reasonable and documented fees and expenses described in this Agreement and the Definitive Documentation, the HCR Entities shall pay or reimburse when due all reasonable and documented fees and expenses (including reasonable and documented travel costs and expenses) of the Ad Hoc Group Advisors (regardless of whether such fees and expenses were incurred before or after the Petition Date) incurred through and including the date on which a Termination Date has occurred, in each case solely to the extent set forth in the engagement letters between the HCR Entities and each respective Ad Hoc Group Advisor.

16.     Consents and Acknowledgments.

(a)     Each Party irrevocably acknowledges and agrees that this Agreement is not and shall not be deemed to be a solicitation for acceptances of the Plan.  The acceptance of the Plan by each of the Consenting Noteholders will not be solicited until such Consenting Noteholders has received the Disclosure Statement and Solicitation Materials in accordance with the Solicitation Order or applicable law, and will be subject to sections 1125, 1126, and 1127 of the Bankruptcy Code.

(b)     By executing this Agreement, each Consenting Noteholder (including, for the avoidance of doubt, any entity that may execute this Agreement or a Transferee Joinder after the RSA Effective Date) forbears from exercising remedies with respect to any Default or Event of Default as defined under the Senior Notes Documents that has occurred and is continuing as of the RSA Effective Date or is caused by the HCR Entities' entry into this Agreement or the other documents related to this Agreement and the transactions contemplated in this Agreement.  For the avoidance of doubt, the forbearance set forth in this Section 16(b) shall not constitute a waiver with respect to any Default or Event of Default under the Senior Notes Documents and shall not bar any Consenting Noteholders from filing a proof of claim or taking action to establish the amount of such claim. Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict any right of any holder of the Senior Notes to protect and preserve any right, remedy, condition, or approval requirement under this Agreement or the Definitive Documentation.  Upon the termination of this Agreement, the agreement of the Consenting Noteholders to forbear from exercising rights and remedies in accordance with this Section 16(b) shall immediately terminate without requirement of any demand, presentment or protest of any kind, all of which the HCR Entities hereby waive.

22

17.     Representations and Warranties.

(a)     Each Consenting Noteholder hereby represents and warrants on a several and not joint and several basis for itself and not any other person or entity that the following statements are true, correct, and complete, to the best of its actual knowledge, as of the date hereof:

(i)     it has the requisite organizational power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement;

(ii)    the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate or other organizational action on its part;

(iii)   the execution and delivery by it of this Agreement does not (A) violate its certificates of incorporation, or bylaws, or other organizational documents, or those of any of its affiliates in any material respect, or (B) result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its affiliates is a party;

(iv)    this Agreement is its legally valid and binding obligation, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally, or by equitable principles relating to enforceability;

(v)     the execution, delivery, and performance by it of this Agreement does not require any registration or filing with, the consent or approval of, notice to, or any other action with any federal, state, or other governmental authority or regulatory body, except (A) any of the foregoing as may be necessary and/or required for disclosure by the Securities and Exchange Commission and applicable state securities laws, (B) any of the foregoing as may be necessary and/or required in connection with the Chapter 11 Cases, including the approval of the Disclosure Statement and confirmation of the Plan, (C) any other registrations, filings, consents, approvals, notices, or other actions, the failure of which to make, obtain or take, as applicable, would not be reasonably likely, individually or in the aggregate, to materially delay or materially impair the ability of any Party hereto to consummate the Restructuring Transactions contemplated hereby;

(vi)    such Consenting Noteholder is an "accredited investor" within the meaning of Rule 501 of Regulation D promulgated under the

Securities Act of 1933, as amended (the "Securities Act"), with sufficient knowledge and experience to evaluate properly the terms and conditions of this Agreement, and has been afforded the opportunity to consult with its legal and financial advisors with respect to its decision to execute this Agreement, and it has made its own analysis and decision to enter into this Agreement and otherwise investigated this matter to its full satisfaction;

(vii)    such Consenting Noteholder acknowledges the HCR Entities' representation and warranty that the issuance and any resale of the New Common Stock pursuant to the Plan is intended to be exempt from registration under the Securities Act pursuant to Section 4(a)(2) of the Securities Act and Regulation D thereunder or pursuant to section 1145 of the Bankruptcy Code, as applicable; and

(viii)    it (A) either (1) is the sole owner of the claims and interests identified below its name on its signature page hereof and in the amounts set forth therein, free and clear of all claims, liens, encumbrances, charges, equity options, proxy, voting restrictions, rights of first refusal or other limitations on dispositions of any kind, or (2) has all necessary investment or voting discretion with respect to the principal amount of claims and interests identified below its name on its signature page hereof, and has the power and authority to bind the owner(s) of such claims and interests to the terms of this Agreement; (B) is entitled (for its own accounts or for the accounts of such other owners) to all of the rights and economic benefits of such claims and interests; and (C) to the knowledge of the individuals working on the Restructuring Transactions, does not directly or indirectly own any Senior Notes Claims, other than as identified below its name on its signature page hereof.

(b)    Each HCR Entity hereby represents and warrants on a joint and several basis (and not any other person or entity other than the HCR Entities) that the following statements are true, correct, and complete, to the best of its actual knowledge, as of the date hereof:

(i)    it has the requisite corporate or other organizational power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement;

(ii)    the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate or other organizational action on its part, including, without limitation, approval of each of the independent

24

directors of each of the corporate entities that comprise the HCR Entities;

(iii)    the execution and delivery by it of this Agreement does not (A) violate its certificates of incorporation, or bylaws, or other organizational documents, or those of any of its affiliates in any material respect, or (B) result in a breach of, or constitute (with due notice or lapse of time or both) a default (other than, for the avoidance of doubt, a breach or default that would be triggered as a result of the Chapter 11 Cases of any HCR Entity's undertaking to implement the Restructuring Transactions through the Chapter 11 Cases) under any material contractual obligation to which it or any of its affiliates is a party;

(iv)    the execution, delivery, and performance by it of this Agreement does not require any registration or filing with, the consent or approval of, notice to, or any other action with any federal, state, or other governmental authority or regulatory body, except (A) any of the foregoing as may be necessary and/or required for disclosure by the Securities and Exchange Commission and applicable state securities or "blue sky" laws, (B) any of the foregoing as may be necessary and/or required in connection with the Chapter 11 Cases, including the approval of the Disclosure Statement and confirmation of the Plan, (C) filings of amended certificates of incorporation or articles of formation or other organizational documents with applicable state authorities, and other registrations, filings, consents, approvals, notices, or other actions that are reasonably necessary to maintain permits, licenses, qualifications, and governmental approvals to carry on the business of the HCR Entities, and (D) any other registrations, filings, consents, approvals, notices, or other actions, the failure of which to make, obtain or take, as applicable, would not be reasonably likely, individually or in the aggregate, to materially delay or materially impair the ability of any Party hereto to consummate the Restructuring Transactions contemplated hereby;

(v)    the issuance of and any resale of the New Common Stock pursuant to the Plan is intended to be exempt from registration under the Securities Act pursuant to Section 4(a)(2) of the Securities Act and Regulation D thereunder or pursuant to section 1145 of the Bankruptcy Code;

(vi)    subject to the provisions of sections 1125 and 1126 of the Bankruptcy Code, this Agreement is its legally valid and binding obligation, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or

25

limiting creditors' rights generally, or by equitable principles relating to enforceability; and

(vii)    it has sufficient knowledge and experience to evaluate properly the terms and conditions of the Plan and this Agreement, and has been afforded the opportunity to consult with its legal and financial advisors with respect to its decision to execute this Agreement, and it has made its own analysis and decision to enter into this Agreement and otherwise investigated this matter to its full satisfaction.

18.    <u>Survival of Agreement</u>.  Each of the Parties acknowledges and agrees that this Agreement is being executed in connection with negotiations concerning a possible financial restructuring of the HCR Entities and in contemplation of possible chapter 11 filings by the HCR Entities and the rights granted in this Agreement are enforceable by each signatory hereto without approval of any court, including, without limitation, the Bankruptcy Court.

19.    <u>Settlement Discussions</u>.  The Parties acknowledge that this Agreement, the Plan, and all negotiations relating hereto are part of a proposed settlement of matters that could otherwise be the subject of litigation.  Pursuant to Rule 408 of the Federal Rules of Evidence, any applicable state rules of evidence, and any other applicable law, foreign or domestic, the Restructuring Term Sheet, this Agreement, the Plan, any related documents, and all negotiations relating thereto shall not be construed as or deemed to be an admission of any kind or be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

20.    <u>Relationship Among Parties</u>.

(a)    None of the Consenting Noteholders shall have any fiduciary duty, any duty of trust or confidence in any form, or other duties or responsibilities to each other, the HCR Entities or their affiliates, or any of the HCR Entities' or their affiliates' creditors or other stakeholders, including any holders of Senior Notes Claims, and, other than as expressly set forth in this Agreement, there are no commitments among or between the Consenting Noteholders.  It is understood and agreed that any Consenting Noteholder may trade in any debt or equity securities of the HCR Entities without the consent of the HCR Entities or any other Consenting Noteholder, subject to applicable securities laws and <u>Sections 13</u> and <u>14</u> of this Agreement.   No prior history, pattern, or practice of sharing confidences among or between any of the Consenting Noteholders or the HCR Entities shall in any way affect or negate this understanding and agreement.

(b)    The obligations of each Consenting Noteholder are several and not joint with the obligations of any other Consenting Noteholder.  Nothing contained herein and no action taken by any Consenting Noteholder shall be deemed to constitute the Consenting Noteholders as a partnership, an association, a joint venture, or any other kind of group or entity, or create

26

a presumption that the Consenting Noteholders are in any way acting in concert.  The decision of each Consenting Noteholder to enter into this Agreement has been made by each such Consenting Noteholder independently of any other Consenting Noteholder.

(c)     The Consenting Noteholders are not part of a "group" (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Securities Exchange Act of 1934, as amended or any successor provision), including any group acting for the purpose of acquiring, holding, or disposing of securities (within the meaning of Rule 13d-5(b)(1) under the Securities Exchange Act of 1934, as amended), with any other Party.  For the avoidance of doubt, neither the existence of this Agreement, nor any action that may be taken by a Consenting Noteholder pursuant to this Agreement, shall be deemed to constitute or to create a presumption by any of the Parties that the Consenting Stakeholders are in any way acting in concert or as such a "group" within the meaning of Rule 13d-5(b)(1).

(d)     The HCR Entities understand that the Consenting Noteholders are engaged in a wide range of financial services and businesses, and in furtherance of the foregoing, the HCR Entities acknowledge and agree that the obligations set forth in this Agreement shall only apply to the trading desk(s) or business group(s) of the Consenting Noteholders that principally manage or supervise such Consenting Noteholder's investment in the HCR Entities, and shall not apply to any other trading desk or business group of the Consenting Noteholder so long as they are not acting at the direction or for the benefit of such Consenting Noteholder.

21.     Specific Performance.  It is understood and agreed by the Parties that money damages may be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief as a remedy of any such breach of this Agreement, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

22.     Governing Law & Jurisdiction.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to such state's choice of law provisions which would require the application of the law of any other jurisdiction, except where preempted by the Bankruptcy Code.  By its execution and delivery of this Agreement, each Party irrevocably and unconditionally agrees for itself that any legal action, suit, or proceeding against it with respect to any matter arising under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit, or proceeding, may be brought in the United States District Court for the Southern District of New York, and by executing and delivering this Agreement, each of the Parties irrevocably accepts and submits itself to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding. Notwithstanding the foregoing consent to New York jurisdiction, if the Chapter 11 Cases are commenced, each Party agrees that the Bankruptcy Court shall have exclusive jurisdiction of all

27

matters arising out of or in connection with this Agreement.  By executing and delivering this Agreement, and upon commencement of the Chapter 11 Cases, each of the Parties irrevocably and unconditionally submits to the personal jurisdiction of the Bankruptcy Court solely for purposes of any action, suit, proceeding, or other contested matter arising out of or relating to this Agreement, or for recognition or enforcement of any judgment rendered or order entered in any such action, suit, proceeding, or other contested matter.

23.     <u>WAIVER OF RIGHT TO TRIAL BY JURY</u>.   EACH OF THE PARTIES WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, BETWEEN ANY OF THE PARTIES ARISING OUT OF, CONNECTED WITH, RELATING TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN ANY OF THEM IN CONNECTION WITH THIS AGREEMENT.  INSTEAD, ANY DISPUTES RESOLVED IN COURT SHALL BE RESOLVED IN A BENCH TRIAL WITHOUT A JURY.

24.     <u>Successors and Assigns</u>.  Subject to Section 13, neither this Agreement nor any of the rights or obligations hereunder may be assigned by any Party hereto without the prior written consent of the other Parties hereto, and then only to a Person who has agreed to be bound by the provisions of this Agreement.  Except as otherwise provided in this Agreement, this Agreement is intended to bind and inure to the benefit of each of the Parties and each of their respective permitted successors, assigns, heirs, executors, administrators, and representatives.

25.     <u>No Third-Party Beneficiaries</u>.  Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary of this Agreement.

26.     <u>Notices</u>.  All notices (including, without limitation, any notice of termination or breach) and other communications from any Party hereunder shall be in writing and shall be deemed to have been duly given if personally delivered by courier service, messenger, email, or facsimile to the other Parties at the applicable addresses below, or such other addresses as may be furnished hereafter by notice in writing.  Any notice of termination or breach shall be delivered to all other Parties.

(a)     If to any HCR Entity:

Hi-Crush, Inc.
1330 Post Oak Blvd., #600
Houston, Texas 77056
Attn.:  Robert E. Rasmus
Email: razz@redoakcap.com

*With a copy to*:

28

Latham & Watkins LLP
885 Third Avenue
New York, New York 10022
Attn:   Keith A Simon
        Annemarie V. Reilly
Email: keith.simon@lw.com
        annemarie.reilly@lw.com

(b)     If to the Consenting Noteholders, to the notice address provided on such Consenting Noteholder's signature page

*With a copy to*:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Attn.: Brian S. Hermann
        Elizabeth McColm
        John T. Weber
Email: bhermann@paulweiss.com
        emccolm@paulweiss.com
        jweber@paulweiss.com

27.     Entire Agreement.   This Agreement (including the Exhibits and Schedules) constitutes the entire agreement of the Parties with respect to the subject matter of this Agreement, and supersedes all prior negotiations, agreements, and understandings, whether written or oral, among the Parties with respect to the subject matter of this Agreement; provided that any confidentiality agreement between or among the Parties shall remain in full force and effect in accordance with its terms; provided further that the Parties intend to enter into the Definitive Documentation after the date hereof to consummate the Restructuring Transactions.

28.     Amendments.   Except as otherwise provided herein, this Agreement may not be modified, amended, or supplemented, and no term or provision hereof or thereof waived, without the prior written consent of the HCR Entities and the Required Consenting Noteholders, provided that, (i) the written consent of each Consenting Noteholder and the HCR Entities shall be required for any amendments, amendments and restatements, modifications, or other changes to Section 9 and this Section 28 and (ii) the written consent of each Consenting Noteholder and the HCR Entities shall be required for any amendment or modification of the defined term "Required Consenting Noteholders".   In determining whether any consent or approval has been given or obtained by the Required Consenting Noteholders or the Consenting Noteholders, as applicable, each then existing Defaulting Noteholder and its respective Senior Notes Claims shall be excluded from such determination.

29.     Reservation of Rights.

(a)     Except as expressly provided in this Agreement or the Restructuring Term Sheet, including, without limitation, Section 5(a) of this Agreement,

nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of any Party to protect and preserve its rights, remedies and interests, including, without limitation, its claims against any of the other Parties.

(b)     Without limiting clause (a) of this <u>Section 29</u> in any way, if this Agreement is terminated for any reason, nothing shall be construed herein as a waiver by any Party of any or all of such Party's rights, remedies, claims, and defenses and the Parties expressly reserve any and all of their respective rights, remedies, claims and defenses, subject to <u>Section 19</u> of this Agreement.  This Agreement, the Plan, and any related document shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever.  Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.

30.     <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which, when so executed, shall constitute the same instrument, and the counterparts may be delivered by facsimile transmission or by electronic mail in portable document format (.pdf).

31.     <u>Public Disclosure</u>.  The HCR Entities shall deliver drafts to the Ad Hoc Group Advisors of any press releases and public documents that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement to the general public (each a "<u>Public Disclosure</u>") at least two (2) calendar days before making any such disclosure. Any Public Disclosure shall be reasonably acceptable to the HCR Entities and the Required Consenting Noteholders.  Under no circumstances may any Party make any public disclosure of any kind that would disclose either: (i) the holdings of any Consenting Noteholder (including on the signature pages of the Consenting Noteholders, which shall not be publicly disclosed or filed) or (ii) the identity of any Consenting Noteholder without the prior written consent of such Consenting Noteholder or the order of a Bankruptcy Court or other court with competent jurisdiction; provided, however, that notwithstanding the foregoing, the HCR Entities shall not be required to keep confidential the aggregate holdings of all Consenting Noteholders, and each Consenting Noteholder hereby consents to the disclosure of the execution of this Agreement by the HCR Entities, and the terms and contents hereof, in the Plan, the Disclosure Statement filed therewith, and any filings by the HCR Entities with the Bankruptcy Court or the Securities and Exchange Commission, or as otherwise required by applicable law or regulation, or the rules of any applicable stock exchange or regulatory body.

32.     <u>Creditors' Committee</u>. Notwithstanding anything herein to the contrary, if any Consenting Noteholder is appointed to, and serves on an official committee of creditors in the Chapter 11 Cases, the terms of this Agreement shall not be construed so as to limit such Consenting Noteholder's exercise of its fiduciary duties arising from its service on such committee; *provided*, *however*, that service as a member of a committee shall not relieve such Consenting Noteholder of its obligations to affirmatively support the Restructuring Transactions on the terms and conditions set forth in this Agreement and the Restructuring Term Sheet on the terms and conditions set forth in this Agreement

30

33. <u>Severability</u>. If any portion of this Agreement shall be held to be invalid, unenforceable, void or voidable, or violative of applicable law, the remaining portions of this Agreement insofar as they may practicably be performed shall remain in full force and effect and binding on the Parties.

34. <u>Headings</u>. The section headings of this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement.

35. <u>Interpretation</u>. This Agreement is the product of negotiations among the Parties, and the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement or any portion hereof, shall not be effective in regard to the interpretation hereof. For purposes of this Agreement, unless otherwise specified: (a) each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) all references herein to "Articles," "Sections," and "Exhibits" are references to Articles, Sections, and Exhibits of this Agreement; (c) the words "herein," "hereof," "hereunder," and "hereto," refer to this Agreement in its entirety rather than to a particular portion of this Agreement; and (d) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation". The phrase "reasonable best efforts", "commercially reasonable best efforts", "commercially reasonable efforts" or words or phrases of similar import as used herein shall not be deemed to require any party to enforce or exhaust their appellate rights in any court of competent jurisdiction, including, without limitation, the Bankruptcy Court.

36. <u>Computation of Time</u>. Rule 9006(a) of the Federal Rules of Bankruptcy Procedure applies in computing any period of time prescribed or allowed herein only to the extent such period of time governs a Milestone pertaining to the entry of an order by the Bankruptcy Court in the Chapter 11 Cases.

37. <u>Remedies Cumulative; No Waiver</u>. All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party. The failure of any Party hereto to exercise any right, power, or remedy provided under this Agreement or otherwise available in respect hereof at law or in equity, or to insist upon strict compliance by any other Party hereto with its obligations hereunder, and any custom or practice of the parties at variance with the terms hereof, shall not constitute a waiver by such Party of its right to exercise any such or other right, power, or remedy or to demand such strict compliance.

38. <u>Additional Parties</u>. Without in any way limiting the provisions hereof, additional holders of Senior Notes Claims may elect to become Parties by executing and delivering to the HCR Entities and the Ad Hoc Group Advisors a counterpart hereof. Such additional holders of Senior Notes Claims shall become a Party to this Agreement as a Consenting Noteholder in accordance with the terms of this Agreement.

*[Signature pages follow]*

31

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date and year first written above.

**HCR Entities**

Hi Crush Inc.
OnCore Processing LLC,
Hi Crush Augusta LLC,
Hi-Crush Whitehall LLC,
PDQ Properties LLC,
Hi-Crush Wyeville Operating LLC,
D & I Silica, LLC,
Hi-Crush Blair LLC,
Hi Crush LMS LLC,
Hi Crush Investments Inc.,
Hi Crush Permian Sand LLC,
Hi Crush Proppants LLC,
Hi-Crush Pods LLC,
Hi-Crush Canada Inc.,
Hi-Crush Holdings LLC,
Hi Crush Services LLC,
BulkTracer Holdings LLC,
Pronghorn Logistics Holdings, LLC,
FB Industries USA Inc.,
PropDispatch LLC,
Pronghorn Logistics, LLC, and
FB Logistics, LLC

By: _____
Name: J Philip McCormick, Jr.
Title:   Authorized Signatory

**CONSENTING NOTEHOLDER**

**BlueMountain Foinaven Master Fund L.P.**
By: BlueMountain Capital Management, LLC,
        its investment manager


_____
Name: Richard Horne
Title: Deputy General Counsel, Tax

Principal Amount of Senior Notes Claims:

Notice Address:

280 Park Avenue, 12th floor
New York, NY 10017

Fax:
Attention:
Email: legalnotices@bluemountaincapital.com


        THE ABOVE-SIGNED CONSENTING NOTEHOLDER HEREBY (PLEASE CHECK <u>ONE AND ONLY ONE</u>):


**X  ELECTS TO BE A BACKSTOP PARTY AND COMMITS TO BACKSTOPPING THE RIGHTS OFFERING PURSUANT TO THE BACKSTOP PURCHASE AGREEMENT;**

**OR**

☐ **ELECTS NOT TO BE A BACKSTOP PARTY.**

**CONSENTING NOTEHOLDER**

**BlueMountain Fursan Fund L.P.**
By: BlueMountain Capital Management, LLC,
         its investment manager

_____

Name: Richard Horne
Title: Deputy General Counsel, Tax

Principal Amount of Senior Notes Claims:

Notice Address:

280 Park Avenue, 12th floor
New York, NY 10017

Fax:
Attention:
Email: legalnotices@bluemountaincapital.com

        THE ABOVE-SIGNED CONSENTING NOTEHOLDER HEREBY (PLEASE CHECK <u>ONE AND ONLY ONE</u>):

**X ELECTS TO BE A BACKSTOP PARTY AND COMMITS TO BACKSTOPPING THE RIGHTS OFFERING PURSUANT TO THE BACKSTOP PURCHASE AGREEMENT;**

**OR**

☐ **ELECTS NOT TO BE A BACKSTOP PARTY.**

[*Signature Page to Restructuring Support Agreement*]

**CONSENTING NOTEHOLDER**

**BlueMountain Summit Trading L.P.**
By: BlueMountain Capital Management, LLC,
        its investment manager


_____

Name: Richard Horne
Title: Deputy General Counsel, Tax


Principal Amount of Senior Notes Claims:



Notice Address:

280 Park Avenue, 12th floor
New York, NY 10017

Fax:
Attention:
Email: legalnotices@bluemountaincapital.com


      THE ABOVE-SIGNED CONSENTING NOTEHOLDER HEREBY (PLEASE CHECK <u>ONE AND ONLY ONE</u>):


**X  ELECTS TO BE A BACKSTOP PARTY AND COMMITS TO BACKSTOPPING THE RIGHTS OFFERING PURSUANT TO THE BACKSTOP PURCHASE AGREEMENT;**

**OR**

☐ **ELECTS NOT TO BE A BACKSTOP PARTY.**


[*Signature Page to Restructuring Support Agreement*]
US-DOCS\116636316.4   HCR - RSA

**CONSENTING NOTEHOLDER**

**CLEARLAKE CAPITAL PARTNERS V FINANCE, L.P.**

By: Clearlake Capital Partners V GP, L.P.
Its: General Partner

By: _____
    Name: José E. Feliciano
    Title: Co-President

By: Clearlake Capital Partners, LLC
Its: General Partner

By: _____
    Name: José E. Feliciano
    Title: Managing Partner

Principal Amount of Senior Notes Claims:

Notice Address:

Fax:
Attention:
Email:

       THE ABOVE-SIGNED CONSENTING NOTEHOLDER HEREBY (PLEASE CHECK **ONE AND ONLY ONE**):

☑ **ELECTS TO BE A BACKSTOP PARTY AND COMMITS TO BACKSTOPPING THE RIGHTS OFFERING PURSUANT TO THE BACKSTOP PURCHASE AGREEMENT;**

**OR**

*[Signature Page to Restructuring Support Agreement]*
US-DOCS\116636316.4  HCR - RSA

☐ ELECTS NOT TO BE A BACKSTOP PARTY.

**CONSENTING NOTEHOLDER**

**MSD CREDIT OPPORTUNITY MASTER FUND, L.P.**

By: <u>                                        </u>
Name:      Marcello Liguori
Title:       Managing Director

Principal Amount of Senior Notes Claims:



<u>Notice Address</u>:
<u>c/o MSD Partners, L.P.</u>
<u>645 Fifth Avenue, 21st Floor</u>
<u>New York, NY 10022</u>

Fax:
Attention:        <u>Marcello Liguori</u>


THE ABOVE-SIGNED CONSENTING NOTEHOLDER HEREBY (PLEASE CHECK <u>ONE AND ONLY ONE</u>):

✓ **ELECTS TO BE A BACKSTOP PARTY AND COMMITS TO BACKSTOPPING THE RIGHTS OFFERING PURSUANT TO THE BACKSTOP PURCHASE AGREEMENT;**

**OR**

**ELECTS NOT TO BE A BACKSTOP PARTY.**

**CONSENTING NOTEHOLDER**

**PineBridge Investments,** on behalf of its managed funds and accounts set forth on Schedule A

By: _John Yovanovic_

Name:  John Yovanovic

Title:  Managing Director

Principal Amount of Senior Notes Claims: ███████████

Notice Address:
PineBridge Investments
Park Avenue Tower
65 East 55th Street
New York, NY 10022

Fax:
Attention:      Shivank Kumar
Email:           Shivank.Kumar@pinebridge.com

THE ABOVE-SIGNED CONSENTING NOTEHOLDER HEREBY (PLEASE CHECK ONE AND ONLY ONE):

☐  ELECTS TO BE A BACKSTOP PARTY AND COMMITS TO BACKSTOPPING THE RIGHTS OFFERING PURSUANT TO THE BACKSTOP PURCHASE AGREEMENT;

OR

[●] ELECTS NOT TO BE A BACKSTOP PARTY.

### Schedule A

| PineBridge Funds and Accounts | Principal Amount of Senior Notes Claims |
|---|---|
| CSAA Insurance Exchange | ███████ |
| IA Clarington Global Bond Fund | ███████ |
| Ivy PineBridge High Yield Fund | ███████ |
| Maryland State Retirement | ███████ |
| PineBridge US Focus High Yield Bond Mother Fund | ███████ |
| PineBridge Global Opportunistic DM Credit Fund | ███████ |
| PineBridge Multi-Income Fund | ███████ |
| PineBridge Global Funds – PineBridge Global Strategic Income Fund | ███████ |
| Seasons ST – Diversified Fixed Income Core Bnd | ███████ |
| Standard Insurance Company | ███████ |
| PineBridge TW Global Multi Strategic | ███████ |
| VALIC Retirement Co II – Core Bond Fund | ███████ |
| Honeywell Fixed Income | ███████ |
| RLI Insurance | ███████ |

3

**CONSENTING NOTEHOLDER**

**PineBridge Investments,** on behalf of its managed funds and accounts set forth on Schedule B

By:

Name:    John Yovanovic

Title:    Managing Director

Principal Amount of Senior Notes Claims:    ██████████████

Notice Address:
PineBridge Investments
Park Avenue Tower
65 East 55th Street
New York, NY 10022

Fax:
Attention:        Shivank Kumar
Email:            Shivank.Kumar@pinebridge.com

        THE ABOVE-SIGNED CONSENTING NOTEHOLDER HEREBY (PLEASE CHECK <u>ONE AND ONLY ONE</u>):

[●] ELECTS TO BE A BACKSTOP PARTY AND COMMITS TO BACKSTOPPING THE RIGHTS OFFERING PURSUANT TO THE BACKSTOP PURCHASE AGREEMENT;

OR

[] ELECTS NOT TO BE A BACKSTOP PARTY.

4

**Schedule B**

| PineBridge Funds and Accounts | Principal Amount of Senior Notes Claims |
|---|---|
| Abbott Laboratories Annuity Retirement Plan | ▮ |
| Abbott-AbbVie Multiple Employer Pension Plan | ▮ |
| Dunham High-Yield Bond Fund | ▮ |
| VALIC Retirement Co II –Strategic Bond Fund | ▮ |
| NM PERA PINEBRIDGE | ▮ |
| Sun America Strategic Income Fund | ▮ |
| Sun America Series High Yield | ▮ |
| TA UNCONSTRAINED BOND FUND HY | ▮ |

**CONSENTING NOTEHOLDER**

**WHITEBOX RELATIVE VALUE PARTNERS, L.P.**
**By: Whitebox Advisors LLC its investment manager**

By: _Luke Harris_
Name: Luke Harris
Title: General Counsel – Corporate, Transactions &
Litigation


Principal Amount of Senior Notes Claims:


Notice Address:

3033 Excelsior Blvd., Suite 500
Minneapolis, MN 55416


Fax: N/A
Attention: Scott Specken
Email: SSpecken@whiteboxadvisors.com


THE ABOVE-SIGNED CONSENTING NOTEHOLDER HEREBY (PLEASE CHECK <u>ONE AND ONLY ONE</u>):

☒ **ELECTS TO BE A BACKSTOP PARTY AND COMMITS TO BACKSTOPPING THE RIGHTS OFFERING PURSUANT TO THE BACKSTOP PURCHASE AGREEMENT;**

**OR**

☐ **ELECTS NOT TO BE A BACKSTOP PARTY.**

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING NOTEHOLDER**

**WHITEBOX CREDIT PARTNERS, LP**

By: _____

Name:  Mark Strefling

Title:  Partner & CEO


Principal Amount of Senior Notes Claims:


Notice Address:

3033 Excelsior Blvd, Suite 500
Minneapolis, MN 55416


Fax: N/A
Attention: Scott Specken
Email:
SSpecken@whiteboxadvisors.com


THE ABOVE-SIGNED CONSENTING NOTEHOLDER HEREBY (PLEASE CHECK ONE AND ONLY ONE):

☒ ELECTS TO BE A BACKSTOP PARTY AND COMMITS TO BACKSTOPPING THE RIGHTS OFFERING PURSUANT TO THE BACKSTOP PURCHASE AGREEMENT;

OR

☐ ELECTS NOT TO BE A BACKSTOP PARTY.

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING NOTEHOLDER**

**WHITEBOX GT FUND, LP**
**By: Whitebox Advisors LLC its investment manager**

By: _Luke Harris_
Name: Luke Harris
Title: General Counsel – Corporate, Transactions &
Litigation


Principal Amount of Senior Notes Claims:


Notice Address:

3033 Excelsior Blvd., Suite 500
Minneapolis, MN 55416


Fax: N/A
Attention: Scott Specken
Email: SSpecken@whiteboxadvisors.com


        THE ABOVE-SIGNED CONSENTING NOTEHOLDER HEREBY (PLEASE CHECK <u>ONE AND ONLY ONE</u>):

☒  **ELECTS TO BE A BACKSTOP PARTY AND COMMITS TO BACKSTOPPING THE RIGHTS OFFERING PURSUANT TO THE BACKSTOP PURCHASE AGREEMENT;**

**OR**

☐ **ELECTS NOT TO BE A BACKSTOP PARTY.**

[*Signature Page to Restructuring Support Agreement*]

**CONSENTING NOTEHOLDER**

**WHITEBOX MULTI-STRATEGY PARTNERS, L.P.**
**By: Whitebox Advisors LLC its investment manager**

By: *Luke Harris*

Name: Luke Harris
Title: General Counsel – Corporate, Transactions &
Litigation

Principal Amount of Senior Notes Claims:    ████████████

Notice Address:

3033 Excelsior Blvd., Suite 500
Minneapolis, MN 55416

Fax: N/A
Attention: Scott Specken
Email: SSpecken@whiteboxadvisors.com

   THE ABOVE-SIGNED CONSENTING NOTEHOLDER HEREBY (PLEASE CHECK <u>ONE AND ONLY ONE</u>):

☒ **ELECTS TO BE A BACKSTOP PARTY AND COMMITS TO BACKSTOPPING THE RIGHTS OFFERING PURSUANT TO THE BACKSTOP PURCHASE AGREEMENT;**

**OR**

☐ **ELECTS NOT TO BE A BACKSTOP PARTY.**

[*Signature Page to Restructuring Support Agreement*]

**CONSENTING NOTEHOLDER**

**PANDORA SELECT PARTNERS, L.P.**
**By: Whitebox Advisors LLC its investment manager**

By:_____
Name: Luke Harris
Title: General Counsel – Corporate, Transactions & Litigation

Principal Amount of Senior Notes Claims:

Notice Address:

3033 Excelsior Blvd., Suite 500
Minneapolis, MN 55416

Fax: N/A
Attention: Scott Specken
Email:
SSpecken@whiteboxadvisors.com

THE ABOVE-SIGNED CONSENTING NOTEHOLDER HEREBY (PLEASE CHECK <u>ONE AND ONLY ONE</u>):

☒ **ELECTS TO BE A BACKSTOP PARTY AND COMMITS TO BACKSTOPPING THE RIGHTS OFFERING PURSUANT TO THE BACKSTOP PURCHASE AGREEMENT;**

**OR**

☐ **ELECTS NOT TO BE A BACKSTOP PARTY.**

[*Signature Page to Restructuring Support Agreement*]

**Exhibit A to the Restructuring Support Agreement**

**Restructuring Term Sheet**

*Execution Version*

---

### HI-CRUSH INC., ET AL.

### RESTRUCTURING TERM SHEET

### July 12, 2020

---

This non-binding indicative term sheet (the "Term Sheet") sets forth the principal terms of a comprehensive restructuring (the "Restructuring") of the existing debt and other obligations of the HCR Entities (defined below).   The Restructuring will be consummated through the commencement by the HCR Entities of voluntary cases under chapter 11 (the "Chapter 11 Cases") of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"), in accordance with the terms of the RSA (as defined below) to be executed by the HCR Entities and the Consenting Noteholders (as defined below) and to which this Term Sheet is appended. Capitalized terms used but not otherwise defined herein have the meaning given to such terms in the RSA (defined below).

THIS TERM SHEET DOES NOT CONSTITUTE AN OFFER OF SECURITIES OR A SOLICITATION OF THE ACCEPTANCE OR REJECTION OF A CHAPTER 11 PLAN FOR PURPOSES OF SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE (AS DEFINED IN THE RSA).   ANY SUCH OFFER OR SOLICITATION WILL ONLY BE MADE IN COMPLIANCE WITH ALL APPLICABLE SECURITIES, BANKRUPTCY, AND OTHER APPLICABLE LAWS.

THIS TERM SHEET IS BEING PROVIDED AS PART OF A COMPREHENSIVE COMPROMISE AND SETTLEMENT, EACH ELEMENT OF WHICH IS CONSIDERATION FOR THE OTHER ELEMENTS AND AN INTEGRAL ASPECT OF THE RESTRUCTURING. THIS TERM SHEET IS CONFIDENTIAL AND SUBJECT TO FEDERAL RULE OF EVIDENCE 408.   NOTHING IN THIS TERM SHEET SHALL CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION OR A WAIVER, AND EACH STATEMENT CONTAINED HEREIN IS MADE WITHOUT PREJUDICE SOLELY FOR SETTLEMENT PURPOSES, WITH A FULL RESERVATION AS TO ALL RIGHTS, REMEDIES, CLAIMS OR DEFENSES OF THE CONSENTING LENDERS.

THE TRANSACTIONS DESCRIBED HEREIN WILL BE SUBJECT TO THE NEGOTIATION AND COMPLETION OF DEFINITIVE DOCUMENTATION INCORPORATING THE TERMS SET FORTH HEREIN, AND THE CLOSING OF ANY TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH AGREED DEFINITIVE DOCUMENTATION.

| Material Terms of the Restructuring | |
|---|---|
| **Term** | **Description** |
| *Overview of the Restructuring* | This Term Sheet contemplates the Restructuring of Hi-Crush Inc. (f/k/a Hi-Crush Partners LP) ("Holdco") and its direct and indirect subsidiaries (collectively with Holdco, the "HCR Entities" or the "Debtors" and each a "HCR Entity"). The Restructuring will be consummated pursuant to a joint "pre-arranged" chapter 11 plan of reorganization (as amended, restated, modified or otherwise supplemented, the "Plan" and, the supplement thereto, the "Plan Supplement") to be confirmed by the Bankruptcy Court. To effectuate the Restructuring, certain parties, including: (a) the HCR Entities and (b) certain holders (the "Consenting Noteholders") of the 9.500% senior notes (the "Senior Notes") issued by Holdco pursuant to that certain Indenture, dated as of August 1, 2018 (as amended, restated, supplemented or otherwise modified, the "Indenture" and, together with all ancillary documents related thereto, the "Senior Notes Documents"), by and among Holdco, as issuer, the guarantors party thereto, and U.S. Bank National Association, as trustee, will enter into a Restructuring Support Agreement (as amended, restated, supplemented or otherwise modified in accordance with the terms hereof and thereof, the "RSA") consistent in all respects with the material terms set forth herein.<br><br>The Chapter 11 Cases will be financed by two debtor-in-possession financing facilities, including (a) an up to $30 million superpriority senior secured asset-based revolving loan financing facility (the "DIP ABL Facility") pursuant to a credit agreement substantially in the form attached hereto as **Exhibit 1** (the "DIP ABL Agreement") that shall refinance and satisfy in full the HCR Entities' obligations under that certain Credit Agreement, dated as of August 1, 2018 (as amended, restated, supplemented or otherwise modified from time to time, the "Existing Credit Agreement" and, together with the collateral and ancillary documents related thereto the "Existing Credit Documents" and the credit facility thereunder, the "Existing Credit Facility") by and among Holdco, as borrower, the guarantors party thereto, the lenders party thereto from time to time and JPMorgan Chase Bank, N.A., as administrative agent. The DIP ABL Facility shall be funded by certain of the existing lenders to the Existing Credit Agreement (such lenders, the "Existing Lenders", and in such capacity, the "DIP ABL Lenders"), and the existing administrative agent under the Existing Credit Agreement shall act as the administrative agent thereunder (the "Existing Agent" and, in such capacity, the "DIP ABL Agent"). The letters of credit outstanding under the Existing Credit Agreement shall be deemed ("Existing L/Cs") outstanding under the DIP ABL Facility.<br><br>The second debtor-in-possession financing facility shall be a $40 million superpriority secured delayed-draw term loan financing facility (the "DIP Term Loan Facility") pursuant to a credit agreement substantially in the form attached hereto as **Exhibit 2** (the "DIP TL Agreement"). The DIP Term Loan Facility shall be funded by members of the ad hoc group of Consenting Noteholders (the "Ad Hoc Group") that are represented by Paul, Weiss, Rifkind, Wharton & Garrison LLP, as counsel, Porter Hedges LLP, as local counsel, and Moelis & Company LLC, as financial advisor and investment banker (together, the "Ad Hoc Group Advisors").<br><br>On the effective date of the Restructuring (the "Effective Date"): (a) subject to satisfaction of certain conditions set forth in the DIP ABL Facility, the Exit ABL |

2

| | |
|---|---|
| | Facility (as defined herein) and/or the other Definitive Documentation, the DIP ABL Facility shall be refinanced by the Exit ABL Facility (as defined herein), and the Existing L/Cs shall be deemed outstanding under the Exit ABL Facility; (b) the HCR Entities shall consummate the Rights Offering (as defined below) pursuant to which the Rights Offering Participants and the Backstop Parties (each as defined below) shall fund an aggregate amount of $43.3 million[1] (excluding the Put Option Premium) to acquire the New Secured Convertible Notes (defined below) to be issued by the Reorganized Debtors (as defined below), and the proceeds of the Rights Offering shall be used to satisfy the HCR Entities' obligations under the DIP Term Loan Facility, including any accrued and unpaid fees and interest (the "DIP TL Obligations"), and (c) the Senior Notes Claims and the General Unsecured Claims (each, as defined below) shall be equitized. <br><br> As reorganized on the Effective Date pursuant to the Plan, the HCR Entities shall be referred to collectively herein as the "Reorganized Debtors," and as reorganized on the Effective Date pursuant to the Plan, Holdco shall be referred to herein as "Reorganized Holdco." |
| ***Rights Offering*** | The Debtors shall effectuate a rights offering during the Chapter 11 Cases and in conjunction with and pursuant to the Plan (the "Rights Offering") to record holders as of a specified record date of Allowed[2] Senior Notes Claims and Allowed General Unsecured Claims (each, as defined below), each of which shall be an "accredited investor" (as such term is defined in Rule 501 under the Securities Act) (an "Accredited Investor") and shall complete a customary accredited investor questionnaire (each such holder, a "Rights Offering Participant" and, collectively, the "Rights Offering Participants"). Each Rights Offering Participant shall be offered the right (collectively, the "Rights"), attached to its respective Allowed Senior Notes Claim or Allowed General Unsecured Claim, to purchase its *pro rata* share (based on such Rights Offering Participant's relative share of the total amount of all Allowed Senior Notes Claims and Allowed General Unsecured Claims) of the New Secured Convertible Notes (defined below) for an aggregate purchase price of $43.3 million (the "Rights Offering Amount"). Rights Offering Participants shall be issued Rights at no charge. The Rights shall be attached to each Allowed Senior Notes Claim and each Allowed General Unsecured Claim and shall be transferable with such Allowed claims as shall be set forth in the Rights Offering Procedures (as defined herein). <br><br> Each Rights Offering Participant electing to exercise its Rights shall purchase New Secured Convertible Notes by paying cash in an aggregate amount equal to the aggregate original principal amount of the New Secured Convertible Notes to be acquired by such Rights Offering Participant in the Rights Offering. <br><br> Any New Secured Convertible Notes that are not subscribed for and purchased in the Rights Offering by a Rights Offering Participant (including any portion of the Rights Offering Amount that holders of Allowed Senior Notes Claims or Allowed General Unsecured Claims as of the applicable record date who are not Accredited Investors could have purchased if such holders exercised their respective Rights in the Rights Offering) shall be put to and purchased by the Backstop Parties in |

---

[1] Amount subject to professional fee budget acceptable to the Backstop Parties.

[2] "Allowed" shall mean any claim that is determined to be an allowed claim in the Chapter 11 Cases in accordance with section 502 or section 506 of the Bankruptcy Code.

| | |
|---|---|
| | accordance with the terms and conditions of the Backstop Purchase Agreement; provided, however, that no Backstop Party shall be required to purchase the New Secured Convertible Notes pursuant to such Backstop Party's Backstop Commitment in an aggregate original principal amount that exceeds the Backstop Commitment Amount (as defined below) for such Backstop Party. There will be no over-subscription privilege in the Rights Offering, such that any New Secured Convertible Notes that are not subscribed for and purchased in the Rights Offering by a Rights Offering Participant (including any portion of the Rights Offering Amount that holders of Allowed Senior Notes Claims or Allowed General Unsecured Claims as of the applicable record date who are not Accredited Investors could have purchased if such holders exercised their respective Rights in the Rights Offering) will not be offered to other Rights Offering Participants, but rather will be purchased by the Backstop Parties (subject to their respective Backstop Commitment Amounts applicable to the Rights Offering) in accordance with the terms and conditions of the Backstop Purchase Agreement. |
| | The aggregate amount of cash received by the Debtors from (a) Rights Offering Participants and (b) the Backstop Parties pursuant to the Backstop Purchase Agreement, in each case, for the New Secured Convertible Notes shall be used: (w) first, to satisfy the DIP TL Obligations; (x) second, to satisfy out-of-pocket costs and expenses incurred by the Debtors in connection with the Restructuring, (y) third, if necessary, to cash collateralize letter of credit obligations that shall become outstanding under the Exit ABL Facility, in an amount not to exceed $25 million, and (z) fourth, for working capital and other general corporate purposes of the Reorganized Debtors following the Effective Date. |
| | The Rights Offering shall be conducted by the Debtors and consummated on terms, subject to conditions and in accordance with procedures that are consistent in all material respects with this Term Sheet and otherwise in form and substance acceptable to the Debtors and the Required Backstop Parties (the "Rights Offering Procedures"). The HCR Entities shall seek to establish the general bar date to file proofs of claim for a date no later than forty-five (45) days after the Petition Date so the universe of General Unsecured Claims (defined below) is known for purposes of the Rights Offering. |
| ***Backstop Commitments*** | In conjunction with the Restructuring, certain members of the Ad Hoc Group (in such capacity, the "Backstop Parties" and, the Backstop Parties representing at least two-thirds of the Backstop Commitments, the "Required Backstop Parties") shall provide the Debtors with a commitment to backstop the Rights Offering on terms and conditions set forth in the Backstop Purchase Agreement. |
| | On the terms and subject to the conditions set forth in the Backstop Purchase Agreement, each of the Backstop Parties will severally, and not jointly, purchase its Backstop Commitment Percentage (as defined below) (subject to such Backstop Party's applicable Backstop Commitment Amount) of the New Secured Convertible Notes offered for sale in the Rights Offering that are not purchased by Rights Offering Participants (including any portion of the Rights Offering Amount that holders of Allowed Senior Notes Claims or Allowed General Unsecured Claims as of the applicable record date who are not Accredited Investors could have purchased if such holders exercised their respective Rights in the Rights Offering) (the "Unsubscribed Notes") at par. |

4

In the event that a Backstop Party defaults on its obligation to purchase Unsubscribed Notes (a "Defaulting Backstop Party"), then each Backstop Party that is not a Defaulting Backstop Party (each, a "Non-Defaulting Backstop Party") shall also have the right, but not the obligation, to purchase its Adjusted Commitment Percentage of such Unsubscribed Notes at par and on the terms set forth in the Backstop Purchase Agreement.

"Adjusted Commitment Percentage" means, with respect to any Non-Defaulting Backstop Party, a fraction, expressed as a percentage, the numerator of which is the Backstop Commitment Percentage of such Non-Defaulting Backstop Party and the denominator of which is the aggregate Backstop Commitment Percentages of all Non-Defaulting Backstop Parties.

"Backstop Commitment" means, with respect to any Backstop Party for the Rights Offering, the commitment, on the terms set forth in the Backstop Purchase Agreement, of such Backstop Party to purchase (directly or through an affiliate) a portion of the New Secured Convertible Notes offered for sale in the Rights Offering to the extent that such Rights Offering is not fully subscribed pursuant to the terms and conditions thereof.  If a group of Backstop Parties that are affiliates of one another purchase New Secured Convertible Notes in the Rights Offering in an aggregate original principal amount that is less than the product of (a) aggregate Backstop Commitment Percentages of such Backstop Parties and (b) the Rights Offering Amount, then such affiliated Backstop Parties shall be required to purchase Unsubscribed Notes such that no such deficiency exists and such obligation shall constitute the Backstop Commitments of such affiliated Backstop Parties (it being understood that such obligation to purchase such Unsubscribed Notes shall be satisfied prior to determining the Backstop Commitments of all other Backstop Parties).

"Backstop Commitment Amount" means, with respect to any Backstop Party, (a) the product of (i) the Rights Offering Amount and (ii) such Backstop Party's Backstop Commitment Percentage, minus (b) the aggregate original principal amount of New Secured Convertible Notes that such Backstop Party purchases in the Rights Offering in its capacity as a Rights Offering Participant.

"Backstop Commitment Percentage" means, with respect to any Backstop Party, a percentage that will be ascribed to such Backstop Party, which percentage will based upon the amount of Senior Notes Claims held by each respective Backstop Party as compared to the aggregate amount of Senior Notes Claims held by all Backstop Parties.

"Backstop Purchase Agreement" means an agreement to be executed by and between the Debtors and the Backstop Parties setting forth, among other things, the terms and conditions of the Rights Offering, the Backstop Commitments, the payment of the Put Option Premium, the Liquidated Damages Payment and the Backstop Expenses (each as defined below), such agreement to contain representations, warranties, covenants, conditions to closing, termination rights, indemnities, reimbursements and other terms and provisions that are consistent in all material respects with this Term Sheet and otherwise acceptable to the Debtors and the Backstop Parties, and the disclosures to the representations and warranties made by the Debtors in the Backstop Purchase Agreement shall be reasonably acceptable to the Backstop Parties.

5

In consideration for the Debtors' right to cause the Backstop Parties to purchase (directly or through an affiliate) their respective Backstop Commitment Percentages of the Unsubscribed Notes (limited by their respective Backstop Commitment Amounts), the Reorganized Debtors shall be required to make a non-refundable put option premium (the "Put Option Premium") equal to $4.8 million, which Put Option Premium shall be paid in the form of New Secured Convertible Notes to be issued on the Effective Date.  The Put Option Premium shall be paid to the Backstop Parties on a *pro rata* basis based upon their respective Backstop Commitment Percentages; provided, however, that (a) no Defaulting Backstop Party shall be entitled to any portion of the Put Option Premium, and (b) Non-Defaulting Backstop Parties that purchase Unsubscribed Notes that are offered for sale in the Rights Offering that are not purchased by any other Backstop Party (in its capacity as a Right Offering Participant) pursuant to the exercise of such other Backstop Party's Rights in such Rights Offering shall be entitled to receive a proportionate share of the amount of the Put Option Premium that would have otherwise been distributed to the applicable Defaulting Backstop Party if such Defaulting Backstop Party had been a Non-Defaulting Backstop Party.  The Put Option Premium (i) shall be fully earned as of the date of execution of the Backstop Purchase Agreement, (ii) shall not be refundable under any circumstance or creditable against any other amount paid or to be paid in connection with the Backstop Purchase Agreement or otherwise, (iii) shall be issued without setoff or recoupment and shall not be subject to defense or offset on account of any claim, defense or counterclaim, (iv) shall be issued free and clear of and without deduction for any and all applicable taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto (with appropriate gross-up for withholding taxes), and (v) shall be treated for U.S. federal income tax purposes as a premium for an option to put the Unsubscribed Notes to the Backstop Parties.

If any Debtor (a) enters into, publicly announces its intention to enter into, or announces to any of the parties to the RSA or other holders of claims against or interest in any of the Debtors its intention to enter into, an agreement (including, without limitation, any agreement in principle, letter of intent, memorandum of understanding or definitive agreement), whether binding or non-binding, or whether subject to terms and conditions, with respect to any Alternative Transaction (as defined in the RSA), (b) files any pleading or document with the Bankruptcy Court agreeing to, evidencing its intention to support, or otherwise supports, any Alternative Transaction or (c) consummates any Alternative Transaction (any of the events described in clause (a), clause (b) or clause (c), a "Triggering Event"), in any such case described in clause (a), clause (b) or clause (c), at any time prior to the termination of the Backstop Purchase Agreement or within twelve (12) months following the termination of the Backstop Purchase Agreement, then the Debtors will pay to the Non-Defaulting Backstop Parties a cash payment in the aggregate amount of $4.8 million (the "Liquidated Damages Payment"), such Liquidated Damages Payment shall be deemed earned in full on the date of the occurrence of the Triggering Event and to be paid to the Non-Defaulting Backstop Parties on a *pro rata* basis based upon their respective Adjusted Commitment Percentages.  The Liquidated Damages Payment, if any, shall be (A) paid (1) only upon consummation of an Alternative Transaction, (2) without setoff or recoupment and shall not be subject to defense or offset on account of any claim, defense or counterclaim, and (3) free and clear of and without deduction for any and all applicable taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto

6

| | (with appropriate gross-up for withholding taxes), and (B) treated as having administrative expense priority status under sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code. |
|---|---|
| | The Debtors will reimburse or pay, as the case may be, all reasonable fees, costs, expenses, disbursements and charges of the Backstop Parties incurred in connection with or relating to the diligence, negotiation, preparation, execution, delivery, implementation and/or consummation of the Plan, the Rights Offering, the Backstop Commitments, the Backstop Purchase Agreement, the Backstop Approval Motion, the Backstop Order, and the transactions contemplated by any of the foregoing, or any of the other Definitive Documentation, and the enforcement, attempted enforcement or preservation of any rights or remedies under the Backstop Purchase Agreement or any of the other Definitive Documentation (collectively, the "Backstop Expenses"), including, but not limited to, (i) the reasonable and documented fees, costs and expenses of, counsel, advisors and agents for the Backstop Parties (including, for the avoidance of doubt, the Ad Hoc Group Advisors' reasonable and documented fees and expenses) and (y) filing fees (if any) required by the Hart Scott Rodino Antitrust Improvements Act of 1976 or any other competition Laws and any expenses related thereto. |
| | The Backstop Commitment of a Backstop Party shall not be assigned (whether by operation of Law or otherwise) without the prior written consent of the Debtors and the Required Backstop Parties. Notwithstanding the immediately preceding sentence, any Backstop Party's Backstop Commitment may be freely assigned or transferred, in whole or in part, by such Backstop Party, to (a) any other Backstop Party or (b) any affiliate of a Backstop Party; provided, that any such assignee of a Backstop Commitment must be an Accredited Investor. |
| **New Secured Convertible Notes** | On the Effective Date, Reorganized Holdco shall issue new secured convertible notes in an aggregate principal amount of the Rights Offering Amount (the "New Secured Convertible Notes"). The New Secured Convertible Notes shall be on terms acceptable to the Debtors and the Required Backstop Parties and consistent with the material terms set forth in the term sheet attached hereto as **Exhibit 3** (the "New Secured Notes Term Sheet"). |
| **Exit ABL Facility** | On the Effective Date, the Reorganized Debtors shall enter into a new credit agreement (the "Exit ABL Credit Agreement" and, collectively with any other definitive documentation governing the Exit ABL Facility, the "Exit ABL Documents") providing for a new senior secured asset-based revolving loan facility in the aggregate principal commitment amount of not less than $20 million, and shall provide for a not less than $20 million letter of credit sub-limit (the "Exit ABL Facility"), which shall refinance and replace the DIP ABL Facility, and the Existing L/Cs outstanding under the DIP ABL Facility shall be deemed outstanding under the Exit ABL Facility. |
| | The Exit ABL Documents shall be on terms substantially similar to the Existing Credit Documents, and shall be on terms reasonably acceptable to the Reorganized HCR Entities and the Required Backstop Parties. |

| Treatment of Claims and Interests Under the Restructuring and the Plan | |
|---|---|
| **Claim** | **Proposed Treatment** |
| **Unclassified Claims** | |
| *DIP ABL Claims* | **Treatment.** On the Effective Date, each holder of an Allowed claim under DIP ABL Agreement (collectively, the "DIP ABL Claims") shall receive payment in full in cash from the proceeds of the Exit ABL Facility, and the Existing L/Cs under the DIP ABL Facility that remain undrawn as of the Effective Date shall be deemed outstanding under the Exit ABL Facility or, if necessary, be 105% cash collateralized as of the Effective Date and remain outstanding.<br><br>**Voting.** Not classified; non-voting. |
| *DIP Term Loan Claims* | **Treatment.** On the Effective Date, each holder of an Allowed claim under the DIP TL Agreement (collectively, the "DIP Term Loan Claims") shall receive payment in full in cash from the proceeds of the Rights Offering and Backstop Purchase Agreement.<br><br>**Voting.** Not classified; non-voting. |
| *Administrative Claims* | **Treatment.** Except to the extent that a holder of an Allowed administrative claim (collectively, the "Administrative Claims") and the Debtors, with the consent of the Required Backstop Parties, which consent shall not be unreasonably withheld, agree in writing to less favorable treatment for such Administrative Claim, such holder shall receive payment in full, in cash, of the unpaid portion of its Allowed Administrative Claim on the Effective Date or as soon thereafter as reasonably practicable (or, if payment is not then due, on the due date of such Allowed Administrative Claim).<br><br>Administrative Claims shall include, among other things: (a) claims against the Debtors arising under section 503(b) of the Bankruptcy Code; (b) Allowed claims for reasonable fees and expenses of professionals retained in the Chapter 11 Cases with the approval of the Bankruptcy Court; and (c) the Backstop Expenses and the Liquidated Damages Payment in accordance with the terms and conditions of the Backstop Purchase Agreement and the Backstop Order.<br><br>**Voting.** Not classified; non-voting. |
| *Priority Tax Claims* | **Treatment.** All Allowed claims against the Debtors under section 507(a)(8) of the Bankruptcy Code (collectively, the "Priority Tax Claims") shall be treated in accordance with section 1129(a)(9)(C) of the Bankruptcy Code.<br><br>**Voting.** Not classified; non-voting. |
| *Intercompany Claims* | There shall be no distributions on account of intercompany claims between and among the Debtors and their subsidiaries. Notwithstanding the foregoing, (a) the Debtors, with the consent of the Required Backstop Parties, may reinstate or compromise, as the case may be, the intercompany claims between and among the Debtors and their subsidiaries, and (b) the treatment of the intercompany claims shall be effectuated in a tax efficient manner. |

| Classified Claims and Interests | |
| --- | --- |
| *Other Secured Claims* | **Treatment.** Except to the extent that a holder of an Allowed secured claim, other than a DIP Claim (collectively, the "Other Secured Claims"), and the Debtors, with the consent of the Required Backstop Parties, which consent shall not be unreasonably withheld, agree in writing to less favorable treatment for such Other Secured Claim, such holder shall receive either (a) payment in full in cash of the unpaid portion of their Allowed Other Secured Claims, including any interest thereon required to be paid under section 506(b) of the Bankruptcy Code (or if payment is not then due, on the due date of such Allowed Other Secured Claims), (b) reinstatement pursuant to section 1124 of the Bankruptcy Code, (c) the return or abandonment of the collateral securing such claim to such holder, or (d) such other treatment necessary to satisfy section 1129 of the Bankruptcy Code.<br><br>**Voting.** Unimpaired. Each holder of an Allowed Other Secured Claim will be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, each holder of an Allowed Other Secured Claim will not be entitled to vote to accept or reject the Plan. |
| *Other Priority Claims* | **Treatment.** Except to the extent that a holder of an Allowed claim described in section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim (collectively, the "Other Priority Claims") and the Debtors, with the consent of the Required Backstop Parties, which consent shall not be unreasonably withheld, agree in writing to less favorable treatment for such Other Priority Claim, such holder shall receive payment in full, in cash, of the unpaid portion of its Allowed Other Priority Claim on the Effective Date or as soon thereafter as reasonably practicable (or, if payment is not then due, on the due date of such Other Priority Claim).<br><br>**Voting.** Unimpaired. Each holder of an Other Priority Claim will be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, each holder of an Allowed Other Priority Claim will not be entitled to vote to accept or reject the Plan. |
| *Senior Notes Claims* | **Treatment.** On the Effective Date or as soon thereafter as reasonably practicable, each holder of an Allowed claim arising under the Senior Notes Documents (collectively, the "Senior Notes Claims"), except to the extent that a holder of an Allowed Senior Notes Claim agrees to less favorable treatment of its Allowed Senior Notes Claim, shall receive its *pro rata* share of:<br><br>  (a) the Rights (which shall be attached to each Allowed Senior Notes Claim and transferable with such Allowed Senior Notes Claim as set forth in the Rights Offering Procedures, but the Rights may only be exercised to the extent the holder is an Accredited Investor); and<br><br>  (b) 100% of the common equity of Reorganized Holdco (the "New Common Stock") shared *pro rata* with the holders of Allowed General Unsecured Claims (as defined herein) (subject to dilution on account of (i) the New Common Stock issued upon conversion of the New Secured Convertible Notes, and (ii) the MIP Equity).<br><br>**Voting.** Impaired. Each holder of an Allowed Senior Notes Claim will be entitled to vote to accept or reject the Plan. |

| | |
|---|---|
| **General Unsecured Claims** | **Treatment.** On the Effective Date or as soon thereafter as reasonably practicable, each holder of an Allowed unsecured claim that is not (a) an Administrative Claim, (b) a Priority Tax Claim, (c) an Other Priority Claim, (d) a Senior Notes Claim, (e) an Intercompany Claim, or (f) a Section 510(b) Claim (as defined below) (collectively, the "General Unsecured Claims"), except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment of its Allowed General Unsecured Claim, shall receive its *pro rata* share of: |
| | (c) the Rights (which shall be attached to each Allowed General Unsecured Claim and transferable with such Allowed General Unsecured Claim as set forth in the Rights Offering Procedures, but the Rights may only be exercised to the extent the holder is an Accredited Investor); and |
| | (d) 100% of the New Common Stock shared *pro rata* with the holders of Allowed Senior Notes Claims (subject to dilution on account of (i) the New Common Stock issued upon conversion of the New Secured Convertible Notes, and (ii) the MIP Equity). |
| | **Voting.** Impaired. Each holder of an Allowed General Unsecured Claim will be entitled to vote to accept or reject the Plan. |
| **Section 510(b) Claims** | **Treatment.** Holders of any claim subject to subordination under section 510(b) of the Bankruptcy Code (collectively, the "Section 510(b) Claims"), shall receive no recovery. |
| | **Voting.** Impaired. Each holder of a Section 510(b) Claim will be deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, each holder of a Section 510(b) Claim will not be entitled to vote to accept or reject the Plan. |
| **Interests in Holdco** | **Treatment.** On the Effective Date, all Interests in Holdco will be cancelled and the holders of Interests in Holdco shall not receive or retain any distribution, property, or other value on account of their Interests in Holdco. |
| | "Interests" means the common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Debtor and options, warrants, rights, or other securities or agreements to acquire the common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Debtor (whether or not arising under or in connection with any employment agreement). |
| | **Voting.** Impaired. Holders of Interests in Holdco are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan. |
| **General Provisions** | |
| **Capital Structure** | On the Effective Date, the debt and equity capital structure of the Reorganized Debtors will be consistent in all material respects with the capital structure of the Reorganized Debtors as set forth in this Term Sheet, unless otherwise agreed to by the Required Backstop Parties. |
| | Neither the New Common Stock, the New Secured Convertible Notes nor any other Interests in of any of the Reorganized Debtors will be listed for trading on a securities exchange, and none of the Reorganized Debtors will be required to file |

| | |
|---|---|
| | reports with the United States Securities and Exchange Commission unless it is required to do so pursuant to the Exchange Act. |
| *Interests in Holdco Subsidiaries* | All existing Interests in HCR Entities other than Holdco shall remain effective and outstanding on the Effective Date and shall be owned and held by the same applicable Person(s) that held or owned such Interests immediately before the Effective Date. |
| *Executory Contracts and Unexpired Leases* | Executory contracts and unexpired leases shall be assumed or rejected (as the case may be), as determined by the Debtors, and with the consent of the Required Backstop Parties, which consent shall not be unreasonably withheld; provided, however, that any executory contract or unexpired lease between any of the HCR Entities in respect of the use of rail cars shall be assumed or rejected by the applicable HCR Entity (such executory contracts or unexpired leases, the "Railcar Leases") only with the consent of the Required Backstop Parties; provided, further, that the Debtors shall not enter into any modification or amendment to any Railcar Leases or enter into any new Railcar Leases without the consent of the Required Backstop Parties. |
| *Employee Compensation, Severance, and Benefits Programs* | All employment agreements and severance policies, including all employment, compensation and benefit plans, policies, and programs of the Debtors applicable to any of their employees and retirees, including without limitation, all workers' compensation programs, savings plans, retirement plans, healthcare plans, disability plans, incentive plans, life and accidental death and dismemberment insurance plans (collectively, the "Specified Employee Plans"), shall be assumed by the Debtors (and assigned to the Reorganized Debtors, if necessary) pursuant to section 365(a) of the Bankruptcy Code, either by separate motion filed with the Bankruptcy Court or pursuant to the terms of the Plan and the order confirming the Plan; provided, in each case, with respect to any provision of a Specified Employee Plan that relates to a "change in control", "change of control" or words of similar import, that the Debtors, and, if applicable, the individual participants in the applicable Specified Employee Plan, agree that the Restructuring and related transactions do not constitute such an event for purposes of such Specified Employee Plan. Notwithstanding anything contained herein, any employment agreements or offer letters relating to senior management personnel and officers of the HCR Entities shall not be assumed without the advanced written consent of the Required Backstop Parties. |
| *D&O Liability Insurance Policies, Tail Policies, and Indemnification* | The Debtors shall maintain and continue in full force and effect all insurance policies (and purchase any related tail policies providing for coverage for at least a six-year period after the Effective Date) for directors', managers' and officers' liability (the "D&O Liability Insurance Policies"). The Debtors shall assume (and assign to the Reorganized Debtors, if necessary), pursuant to section 365(a) of the Bankruptcy Code, either by a separate motion filed with the Bankruptcy Court or pursuant to the terms of the Plan and the order confirming the Plan, all of the D&O Liability Insurance Policies and all indemnification provision in existence as of the date of the RSA for directors, managers and officers of the HCR Entities (whether in by-laws, certificate of formation or incorporation, board resolutions, employment contracts, or otherwise, such indemnification provisions, "Indemnification Provisions"). All claims arising from the D&O Liability Insurance Policies and such Indemnification Provisions shall be unimpaired by the Plan. Notwithstanding anything to the contrary herein, the Reorganized Debtors shall not assume any obligations under the Indemnification Provisions with respect to any of the Debtors' |

11

| | |
|---|---|
| | senior officers or managers, as applicable, who (i) received retention payments from the Debtors in July 2020 and prior to the Petition Date, and (ii) are not employed by the Reorganized Debtors as of June 30, 2021 (such senior managers or officers, the "Designated Persons"). |
| **Cancellation of Instruments, Certificates and Other Documents** | On the Effective Date, except to the extent otherwise provided above or in the Plan, all instruments, certificates and other documents evidencing indebtedness or debt securities of, or Interests in, any of the Debtors shall be cancelled, and the obligations of the Debtors thereunder, or in any way related thereto, shall be discharged. |
| **Restructuring Expenses** | On the Effective Date, in addition to the Backstop Expenses, without the need to file a fee or retention application in the Chapter 11 Cases, the HCR Entities shall pay all reasonable and documented fees and expenses, including fees and expenses estimated to be incurred through the Effective Date to the extent invoiced at least one (1) business day prior to the Effective Date, of the Ad Hoc Group Advisors (the "Restructuring Expenses"). |
| **Exemption from SEC Registration** | The issuance of all securities under the Plan will be exempt from registration under (a) section 1145 of the Bankruptcy Code to the extent permitted pursuant to section 1145 of the Bankruptcy Code, or (b) such other applicable securities law exemption that is acceptable to the Debtors and the Required Backstop Parties. |
| **Definitive Documentation** | The Definitive Documentation, including the Plan Supplement, shall be in form and substance acceptable to the Debtors and the Required Backstop Parties.  The Plan and each of the Definitive Documentation shall contain conditions precedent that are usual and customary for the transactions contemplated thereby. |
| **Tax Issues** | The terms of the Restructuring shall, to the extent practicable, be structured to (a) preserve or otherwise maximize favorable tax attributes (including tax basis) of the HCR Entities, and (b) achieve the most optimal and efficient tax outcomes for the HCR Entities, the Consenting Noteholders, and the Backstop Parties taking into account applicable tax and securities law, applicable regulations, and business and cost considerations, in a manner acceptable to the Debtors and the Required Backstop Parties. |
| **Fiduciary Out** | Notwithstanding anything to the contrary herein, the terms of this Term Sheet shall be subject to the "fiduciary out" provisions set forth in the RSA. |
| **Company Governance/Organizational Documents/Release** | |
| **New Board** | The composition of Reorganized Holdco's initial board of directors (the "New Board") shall consist of five (5) directors in total, which shall include (a) the Chief Executive Officer of Reorganized Holdco and (b) other directors designated by the Backstop Parties prior to the Effective Date and disclosed in the Plan Supplement. |
| **Management Incentive Plan** | After the Effective Date, the New Board shall adopt a management equity incentive plan (the "MIP") pursuant to which New Common Stock (or restricted stock units, options, or other instruments (including "profits interests" in Reorganized Holdco), or some combination of the foregoing) representing up to 10% of the New Common Stock issued as of the Effective Date on a fully diluted basis may be reserved for grants (the "MIP Equity") to be made from time to time to the directors, officers, and other management of Reorganized Holdco, subject to the terms and conditions |

| | |
|---|---|
| | set forth in the MIP. The details and allocation of the MIP and the underlying awards will be determined by the New Board. |
| *New Stockholders' Agreement / Amended Governance Documents* | Holders of New Common Stock shall be deemed parties to the New Stockholders' Agreement, subject to the consent rights set forth in the RSA, the material terms of which shall be set forth in the Plan Supplement. The Amended Governance Documents shall be subject to the consent rights set forth in the RSA. |
| *Releases* | The Plan and order confirming the Plan shall provide customary mutual releases, with a customary exclusion for criminal acts, gross negligence, willful misconduct, and fraud, in each case, to the fullest extent permitted by law, for the benefit of the HCR Entities, members of the Ad Hoc Group, the DIP ABL Lenders, the DIP ABL Agent, the DIP Term Loan Lenders, the DIP Term Loan Agent, the Consenting Noteholders, the Backstop Parties, the Existing Agent, the Existing Lenders, and such entities' respective current and former affiliates, and such entities' and their current and former affiliates' current and former officers, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, and each of their current and former officers, managers, directors, equity holders, principals, members, employees, agents, managed accounts or funds, management companies, fund advisors, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such (collectively, the "Released Parties"); provided, that the Designated Persons shall not be Released Parties.

Such releases shall include, without limitation, any and all claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, including any derivative claims and avoidance actions, of the HCR Entities and such other releasing party, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the HCR Entities or such other releasing party would have been legally entitled to assert in its own right (whether individually or collectively), or on behalf of the holder of any claim or equity interest (whether individually or collectively) or other entity, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place at any time prior to or on the Effective Date arising from or related in any way in whole or in part to the HCR Entities or their affiliates or subsidiaries, the Existing Credit Facility, the Senior Notes, the DIP ABL Facility, the DIP Term Loan Facility, the Exit ABL Facility, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the HCR Entities, the subject matter of, or the transactions or events giving rise to, any claim or equity interest that is treated in the Plan, or the negotiation, formulation, or preparation of the Definitive Documentation or related agreements, instruments, or other documents. To the maximum extent permitted by applicable law, any such releases shall bind all parties who affirmatively vote to accept the Plan, those parties who abstain from voting on the Plan if they fail to opt-out of the releases, those parties that vote to reject the Plan unless they opt-out of the releases, and those non-voting parties that fail to return an opt-out form. |
| *Exculpation* | Customary exculpation provisions. |

14

| *Discharge* | Customary discharge provisions. |
|---|---|
| *Injunction* | Customary injunction provisions. |

*     *     *     *

## Exhibit 1

### DIP ABL Agreement

**DIP ABL Agreement**

Available at Docket No. 9

**Exhibit 2**

**DIP TL Agreement**

**DIP TL Agreement**

Available at Docket No. 9

**Exhibit 3**

**New Secured Notes Term Sheet**

| Hi-Crush Inc. – Summary of Terms of New Secured Convertible Notes[1] | |
|---|---|
| Issuer | • Reorganized Holdco |
| Guarantors | • All domestic subsidiaries of Reorganized Holdco |
| Size | • $48.1 million of New Secured Convertible Notes (inclusive of $4.8 million on account of the Put Option Premium) to be issued on the Effective Date |
| Initial Principal Amount | • $1,000 per New Secured Convertible Note |
| Initial Purchasers | • Holders of Allowed Senior Notes Claims and Allowed General Unsecured Claims who are Accredited Investors and participate in the Rights Offering; to be fully backstopped by the Backstop Parties |
| Trustee / Collateral Agent | • To be selected by the Required Backstop Parties |
| Collateral and Priority | • Secured on (a) a second lien basis on all assets of the Issuer and the Guarantors securing any obligations under the prepetition credit agreement (the "Exit ABL Priority Collateral"), which such Exit ABL Priority Collateral shall secure on a first lien basis the obligations of the Issuer and the Guarantors under the Exit ABL Facility, and (b) a first lien basis on all assets that do not constitute Exit ABL Priority Collateral, in each case, subject to certain exceptions agreed to by the Required Backstop Parties.<br>• A typical crossing-lien arrangement and secured note/ABL intercreditor agreement, in each case that is acceptable to the Required Backstop Parties, shall be entered into in order to provide the holders of the New Secured Convertible Notes with first lien claims on all assets of the Issuer and the Guarantors other than the Exit ABL Priority Collateral, on which the holders of the New Secured Convertible Notes would have a second lien claim. |
| Interest Rate and Fees | • Interest Rate: 8.0%, payable in cash; or 10.0% payable in-kind at the Issuer's option. |
| Conversion | • In the aggregate, convertible into 95% of the total number of shares of New Common Stock that are issued and outstanding on the Effective Date after giving effect to the consummation of the Restructuring (subject to dilution by the MIP Equity).<br>• The New Secured Convertible Notes will be convertible at any time in whole or in part at the sole option of the holder thereof.<br>• Mandatory Conversion Events: None, except for mandatory conversion upon the consummation of a M&A transaction involving all, or substantially all, of the Issuer's and Guarantors' assets that has been consented to by holders of at least two-thirds in amount of the aggregate principal amount of all then outstanding New Secured Convertible Notes. |
| Maturity | • 5½ years from the issue date |
| Amortization | • None |
| Call Protection | • NC2 / 50% of the coupon / 25% of the coupon / par |
| Use of Proceeds | • To satisfy DIP Term Loan Facility obligations, pay expenses incurred in connection with the Restructuring and for working capital and other general corporate purposes |
| Mandatory Prepayments | • Asset sale offers shall be made at par with any excess cash proceeds after giving effect to reinvestment rights acceptable to the Required Backstop Parties<br>• Such asset sale offers shall be subject to *de minimis* exceptions and customary carveouts acceptable to the Required Backstop Parties |

---

[1] Defined terms used herein but not defined herein shall have the definitions assigned to such terms in the Restructuring Term Sheet to which this Exhibit 2 is attached.

| | |
|---|---|
| **Change of Control** | • To be defined in a manner acceptable to the Required Backstop Parties<br>• Occurrence triggers a 101 Change of Control Offer |
| **Governance Voting Rights** | • Pursuant to Section 221 of Delaware Law, holders shall be entitled to vote upon all matters upon which holders of any class or classes of New Common Stock have the right to vote and shall be deemed to be stockholders of Reorganized Holdco (and the New Secured Convertible Notes shall be deemed to be stock) for the purpose of any provision of Delaware law that requires the vote of stockholders as a prerequisite to any corporate action, including the appointment of directors. The number of votes represented by each New Secured Convertible Note shall be equal to the largest number of whole shares of New Common Stock (rounded down to the nearest whole share) into which such New Secured Convertible Note may be converted, in accordance with the indenture governing the terms of the New Secured Convertible Notes, at the record date for the determination of the stockholders entitled to vote on such matters or, if no such record date is established, at the date such vote is taken. |
| **Covenants** | • To include an aggregate of $35 million of debt and lien incurrence capacity for project financing, with all such project financing to be subject to the approval of the New Board in all respects.<br>• To include other affirmative and negative covenants acceptable to the Required Backstop Parties |
| **Financial Covenants** | • None |
| **Events of Default** | • To include events of default acceptable to the Required Backstop Parties |
| **Conditions Precedent** | • Other customary conditions precedent for an issuance of senior secured convertible notes<br>• Consummation of a plan of reorganization acceptable to the Required Backstop Parties<br>• Execution of definitive documentation acceptable to the Required Backstop Parties |

**Exhibit B to the Restructuring Support Agreement**

**Form of Transferee Joinder**

**Form of Transferee Joinder**

This joinder (this "Joinder") to the Restructuring Support Agreement (the "Agreement"), dated as of July 12, 2020, by and among:  (i) the HCR Entities and (ii) Consenting Noteholders, is executed and delivered by [_____] (the "Joining Party") as of [_____].  Each capitalized term used herein but not otherwise defined shall have the meaning ascribed to it in the Agreement.

1.      Agreement to be Bound.  The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder as Annex 1 (as the same has been or may be hereafter amended, restated, or otherwise modified from time to time in accordance with the provisions thereof).  The Joining Party shall hereafter be deemed to be a Party for all purposes under the Agreement and one or more of the entities comprising the Consenting Noteholder.

2.      Representations and Warranties.  The Joining Party hereby represents and warrants to each other Party to the Agreement that, as of the date hereof, such Joining Party (a) is the legal or beneficial holder of, and has all necessary authority (including authority to bind any other legal or beneficial holder) with respect to, the Senior Notes Claims identified below its name on the signature page hereof, and (b) makes, as of the date hereof, the representations and warranties set forth in Section 17(a) of the Agreement to each other Party.

3.      Governing Law.  This Joinder shall be governed by and construed in accordance with the internal laws of the State of New York without regard to any conflicts of law provisions which would require the application of the law of any other jurisdiction.

4.      Notice.  All notices and other communications given or made pursuant to the Agreement shall be sent to:

        To the Joining Party at:

        [JOINING PARTY]
        [ADDRESS]
        Attn:
        Facsimile:
        Email:

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date first written above.

**[JOINING PARTY]**


By: _____

Name:

Title:


Principal Amount of Senior Notes Claims:                    $_____


Notice Address:



Fax:

Attention:

Email:

**Annex 1** to the Form of Transferee Joinder

**Restructuring Support Agreement**

**Exhibit E**

**Rights Offering Procedures**

US-DOCS\115394754.19

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

------------------------------------------------------------- x

In re:  : Chapter 11

  :

HI-CRUSH INC., *et al.*,  : Case No. 20-33495 (DRJ)

  :

Debtors.[1]  : (Jointly Administered)

  :

------------------------------------------------------------- x

## RIGHTS OFFERING PROCEDURES

### 1.  Introduction

Hi-Crush Inc. ("Hi-Crush") and its affiliated debtors and debtors-in-possession (collectively, the "Debtors") are pursuing a proposed restructuring (the "Restructuring") of their existing debt and other obligations to be effectuated pursuant to the *Joint Plan of Reorganization for Hi-Crush Inc. and Its Affiliated Debtors under Chapter 11 of the Bankruptcy Code*, dated as of August 15, 2020 (the "Plan") in connection with voluntary, prearranged cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 – 1532 (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"), in accordance with the terms and conditions set forth in that certain Restructuring Support Agreement, dated as of July 12, 2020 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "RSA"),[2] by and among the Debtors and the Consenting Noteholders (as defined in the RSA) party thereto.

In connection with the Plan, and with the approval of these rights offering procedures (these "Rights Offering Procedures") in the Disclosure Statement Order and in accordance with the terms of the Backstop Purchase Agreement, the Debtors shall launch a rights

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Hi-Crush Inc. (0530), OnCore Processing LLC (9403), Hi-Crush Augusta LLC (0668), Hi-Crush Whitehall LLC (5562), PDQ Properties LLC (9169), Hi-Crush Wyeville Operating LLC (5797), D & I Silica, LLC (9957), Hi-Crush Blair LLC (7094), Hi-Crush LMS LLC, Hi-Crush Investments Inc. (6547), Hi-Crush Permian Sand LLC, Hi-Crush Proppants LLC (0770), Hi-Crush PODS LLC, Hi-Crush Canada Inc. (9195), Hi-Crush Holdings LLC, Hi-Crush Services LLC (6206), BulkTracer Holdings LLC (4085), Pronghorn Logistics Holdings, LLC (5223), FB Industries USA Inc. (8208), PropDispatch LLC, Pronghorn Logistics, LLC (4547), and FB Logistics, LLC (8641).  The Debtors' address is 1330 Post Oak Blvd, Suite 600, Houston, Texas 77056.

[2]  All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the RSA or, if any such term is not defined in the RSA, such term shall have the meaning given to it in (i) the Plan, or (ii) that certain Backstop Purchase Agreement, executed on or about August 17, 2020 (together with all exhibits, schedules and attachments thereto, as amended, supplemented, amended and restated or otherwise modified from time to time, the "Backstop Purchase Agreement"), by and among Hi-Crush Inc. and certain of its direct and indirect subsidiaries, and the entities party thereto defined therein as "Backstop Parties," as applicable.

US-DOCS\117189109.2

offering (the "Rights Offering") pursuant to which each holder of an Eligible Claim (as defined below) as of the Rights Offering Record Date (as defined below) that is an Accredited Investor (as set forth in a properly completed and duly executed AI Questionnaire (as defined below) that is delivered by such holder to the Subscription Agent (as defined below) on or prior to the Questionnaire Deadline (as defined below) in accordance with these Rights Offering Procedures) (each such holder, a "Rights Offering Participant" and, collectively, the "Rights Offering Participants") will be entitled to receive non-certificated rights that are attached to such Eligible Claim (the "Rights"), to purchase (without any obligation to so purchase) such Rights Offering Participant's *pro rata* share (based on the proportion that such Rights Offering Participant's Eligible Claim as of the Rights Offering Record Date bears to the aggregate amount of (i) all Eligible General Unsecured Claims (as defined below) as of the Rights Offering Record Date held by each Person that has certified it is an Accredited Investor (as demonstrated by such Person's properly completed, duly executed and timely delivered AI Questionnaire) on or prior to the Questionnaire Deadline plus (ii) all Allowed Prepetition Notes Claims held by each Person that has certified it is an Accredited Investor (as demonstrated by such Person's properly completed, duly executed and timely delivered AI Questionnaire) on or prior to the Questionnaire Deadline as of the Rights Offering Record Date) of New Secured Notes (the "Rights Offering Notes") in an aggregate original principal amount of $43,300,000 (the "Rights Offering Amount"). Rights Offering Participants will be issued Rights at no charge. Each Rights Offering Participant may exercise all or any portion of such Rights Offering Participant's Rights.

"Allowed" means, solely for purposes of these Rights Offering Procedures, with respect to any Claims (or any portion thereof), as of any date of determination, (a) a Claim that is evidenced by a Proof of Claim filed by the applicable Claims Bar Date in accordance with the Claims Bar Date Order; (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely filed; or (c) a Claim that is allowed pursuant to the Plan or a Final Order of the Bankruptcy Court as of such date; provided, that with respect to a Claim described in clauses (a) and (b) above (except any Claim previously allowed pursuant to the DIP Orders), such Claim shall be considered "Allowed" as of such date of determination only to the extent that, with respect to such Claim, no objection to allowance or priority or request for estimation thereof has been interposed on or prior to such date, or such an objection is so interposed and the Claim has been allowed by Final Order of the Bankruptcy Court as of such date; provided further that, solely for purposes of these Rights Offering Procedures, any objection to allowance or priority or request for estimation of a Claim must be filed by no later than the Rights Offering Record Date.

"Disallowed" shall have the meaning given to such term in the Plan.

"Disputed" means, solely for purposes of these Rights Offering Procedures, with respect to any Claim (or any portion thereof), as of any date of determination, a Claim that is neither Allowed nor Disallowed as of such date.

"Eligible Claim" means any Allowed Prepetition Notes Claim or Eligible General Unsecured Claim.

2

"Eligible General Unsecured Claim" means any General Unsecured Claim that is either Allowed or Disputed.  For the avoidance of doubt, "General Unsecured Claims" shall not include "Prepetition Notes Claims."

Prior to receipt of the Rights Exercise Form (as defined below) and the other documents and materials related to the Rights Offering, each holder of an Eligible Claim as of the date of entry of the Disclosure Statement Order (the "Questionnaire Record Date") will receive an accredited investor questionnaire (the "AI Questionnaire"), which must be completed and delivered (if a Rights Offering Participant's Prepetition Notes are held in "street name," by way of such Rights Offering Participant's bank, brokerage house, or other financial institution (each, a "Nominee")) to KCC LLC, the subscription agent for the Rights Offering (in such capacity, the "Subscription Agent"), by each such holder that wants to participate in the Rights Offering by no later than September 4, 2020 (the "Questionnaire Deadline").  Any holder of an Eligible Claim as of the Questionnaire Record Date that does not properly complete, duly execute and deliver to the Subscription Agent an AI Questionnaire so that such AI Questionnaire is actually received by the Subscription Agent on or prior to the Questionnaire Deadline will not be eligible to participate in the Rights Offering unless otherwise agreed to by the Debtors with the written consent of the Required Backstop Parties.  Anything herein to the contrary notwithstanding, the Backstop Parties and their Affiliates (as defined in the Backstop Purchase Agreement), in their capacities as holders of Eligible Claims as of the Questionnaire Record Date, shall not be required to complete, execute and deliver an AI Questionnaire and shall be deemed Rights Offering Participants.  Each holder of an Allowed Prepetition Notes Claim as of the Questionnaire Record Date is entitled to receive sufficient copies of the AI Questionnaire for distribution to the beneficial owners of the Prepetition Notes for whom such Rights Offering Participant holds such Prepetition Notes.  Transferees of Eligible Claims received after the Questionnaire Record Date but before the Questionnaire Deadline are entitled to request an AI Questionnaire from the Subscription Agent, and the Subscription Agent will, to the extent reasonably practicable, facilitate the submission of such AI Questionnaire and Proof of Holding forms from such transferees.

The Rights Offering will be conducted in accordance with the following dates and deadlines:

| Event | Date or Time |
|---|---|
| Questionnaire Record Date | August 14, 2020 |
| Questionnaire Deadline | September 4, 2020 |
| Rights Offering Record Date | September 4, 2020 |
| Rights Offering Commencement Date | September 9, 2020 |
| Rights Offering Termination Date & Time | September 29, 2020, at 5:00 p.m. (Prevailing Central Time) |

3

US-DOCS\117189109.2

Rights Offering Notes shall be issued in minimum denominations of 1,000 and integral multiples of $1,000 thereof.  Fractional Rights Offering Notes shall not be issued upon exercise of the Rights and Rights Offering Participants that otherwise would have received fractional Rights Offering Notes shall not be paid any compensation in respect of such fractional Rights Offering Notes. Each Rights Offering Participant's maximum amount of Rights Offering Notes that such Rights Offering Participant is permitted to subscribe for pursuant to the exercise of its Rights shall be rounded down to the nearest whole Rights Offering Note.

**THE DISCLOSURE STATEMENT DISTRIBUTED IN CONNECTION WITH THE DEBTORS' SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN WILL SET FORTH IMPORTANT INFORMATION THAT SHOULD BE CAREFULLY READ AND CONSIDERED BY EACH RIGHTS OFFERING PARTICIPANT PRIOR TO MAKING A DECISION TO PARTICIPATE IN THE RIGHTS OFFERING, INCLUDING ARTICLE VI OF THE DISCLOSURE STATEMENT REGARDING CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE EXERCISING ANY RIGHTS.**

2.      **Backstop Purchase Agreement**

Any Rights Offering Notes that are not subscribed for and purchased in the Rights Offering by a Rights Offering Participant (including (i) any Rights Offering Notes that holders of Eligible Claims as of the Rights Offering Record Date who are not Accredited Investors (or holders of Eligible Claims as of the Rights Offering Record Date that did not properly complete, duly execute and deliver to the Subscription Agent by the Questionnaire Deadline an AI Questionnaire in accordance with these Rights Offering Procedures) could have purchased if such holders had received Rights if they were Accredited Investors (or had properly completed, duly executed and delivered to the Subscription Agent by the Questionnaire Deadline an AI Questionnaire in accordance with these Rights Offering Procedures) and exercised such Rights in the Rights Offering, (ii) any Rights Offering Notes that are not subscribed for and purchased in the Rights Offering on account of any rounding down of fractional Rights Offering Notes, (iii) any Rights Offering Notes that are not subscribed for and purchased in the Rights Offering on account of any Rights Offering Participant failing to satisfy any of the Rights Offering Conditions (as defined below) or Additional Conditions (as defined below), or (iv) any Rights Offering Notes that are not subscribed for and purchased in the Rights Offering on account of any Eligible General Unsecured Claim as of the Rights Offering Record Date (or any portion thereof) failing to be an Allowed Claim on the date that is one (1) Business Day after the Confirmation Hearing) (such Rights Offering Notes, the "Unsubscribed Notes") shall be put to and purchased by the Backstop Parties (subject to their respective Backstop Commitment Amounts) in accordance with the terms and conditions of the Backstop Purchase Agreement.

There will be no over-subscription privilege provided in connection with the Rights Offering, such that any Unsubscribed Notes will not be offered to other Rights Offering Participants, but rather will be purchased by the Backstop Parties (subject to their respective Backstop Commitment Amounts) in accordance with the terms and conditions of the Backstop Purchase Agreement.

4

In consideration for the Debtors' right to call the Backstop Commitments (as defined in the Backstop Purchase Agreement) of the Backstop Parties to purchase the Unsubscribed Notes pursuant to the terms of the Backstop Purchase Agreement, Hi-Crush shall be required to issue to the Backstop Parties (or their designees) additional New Secured Notes in an original aggregate principal amount of $4,800,000 (the "Put Option Notes") on a *pro rata* basis based upon their respective Backstop Commitment Percentages. The Put Option Notes will be issued only to the Backstop Parties that do not default on their respective Backstop Commitments.

3.      **Commencement and Expiration of the Rights Offering; Rights Offering Record Date**

The Rights Offering shall commence on September 9, 2020 (the "Rights Offering Commencement Date"). On the Rights Offering Commencement Date, the Rights Exercise Form and the other documents and materials related to the Rights Offering shall be mailed by or on behalf of the Debtors to the Rights Offering Participants. The "Rights Offering Record Date" shall mean September 4, 2020.

The Rights Offering shall expire at 5:00 p.m. (Prevailing Central Time) on September 29 (such date, the "Rights Offering Termination Date" and such time on the Rights Offering Termination Date, the "Rights Offering Termination Time"). If the Rights Offering Termination Date and/or the Rights Offering Termination Time is/are extended in accordance with the terms of these Rights Offering Procedures, the Debtors shall promptly notify the Rights Offering Participants, before 9:00 a.m. (Prevailing Central Time) on the Business Day before the then-effective Rights Offering Termination Date, in writing, of such extension and the date of the new Rights Offering Termination Date and/or the time of the new Rights Offering Termination Time. Each Rights Offering Participant intending to participate in the Rights Offering must affirmatively make an election to exercise its Rights at or prior to the Rights Offering Termination Time in accordance with the provisions of Section 4 below.

4.      **Exercise of Rights**

Each Rights Offering Participant that elects to participate in the Rights Offering must have timely satisfied each of the Rights Offering Conditions (as defined below). Any Rights Offering Participant that has timely satisfied each of the Rights Offering Conditions shall be deemed to have made a binding, irrevocable election to exercise its Rights to the extent set forth in the Rights Exercise Form delivered by such Rights Offering Participant (a "Binding Rights Election"); *provided*, *however*, that (A) a Rights Offering Participant's right to participate in the Rights Offering shall remain subject to its compliance with the Additional Conditions, and (B) the right of a Rights Offering Participant that holds an Eligible General Unsecured Claim as of the Rights Offering Record Date to participate in the Rights Offering is subject to termination as set forth in the "Rights Forfeiture Events" section of these Rights Offering Procedures.

5

**(a)      The Binding Rights Election Cannot Be Withdrawn**

Each Rights Offering Participant is entitled to participate in the Rights Offering solely to the extent provided in these Rights Offering Procedures. Furthermore, each Rights Offering Participant may exercise all or any portion of such Rights Offering Participant's Rights.

**(b)      Exercise by Rights Offering Participants**

To exercise its Rights, each Rights Offering Participant must satisfy each of the following conditions (collectively, the "Rights Offering Conditions"):

(i) deliver a duly executed and properly completed AI Questionnaire (by way of such Rights Offering Participant's Nominee, if applicable) to the Subscription Agent so that such AI Questionnaire is *actually received* by the Subscription Agent at or before the Questionnaire Deadline;

(ii) deliver a duly executed and properly completed Rights Offering subscription exercise form (the "Rights Exercise Form") to the Subscription Agent so that such Rights Exercise Form is *actually received* by the Subscription Agent at or before the Rights Offering Termination Time; and

(iii) pay to the Subscription Agent, by wire transfer of immediately available funds in accordance with the Payment Instructions (as defined below), its Aggregate Exercise Price (as defined below), so that payment of the Aggregate Exercise Price is *actually received* by the Subscription Agent at or before the Rights Offering Termination Time.

In addition to the foregoing, to participate in the Rights Offering, a Rights Offering Participant must also:

(x) vote to accept the Plan with respect to all of the Claims and Equity Interests owned (or of which the right to vote to accept the Plan is controlled) by such Rights Offering Participant (to the extent any such Claims and Equity Interests are entitled to vote to accept or reject the Plan) and timely deliver a ballot voting to accept the Plan with respect to all of the Claims and Equity Interests owned or controlled by such Rights Offering Participant (to the extent any such Claims and Equity Interests are entitled to vote to accept or reject the Plan) in accordance with solicitation procedures approved by the Bankruptcy Court, and

(y) not opt out of any releases set forth in Article X.B of the Plan (clauses (x) and (y) of this sentence being the "Additional Conditions").

Any Rights Offering Notes that could have been subscribed for and purchased pursuant to a valid exercise of Rights that satisfied the Rights Offering Conditions and the Additional Conditions, but did not satisfy one or more of the Rights Offering Conditions or Additional Conditions, shall be deemed not to have been subscribed for and purchased in the Rights Offering by such Rights Offering Participant and shall be Unsubscribed Notes.

US-DOCS\117189109.2

If (i) a Rights Offering Participant shall not be permitted to participate in the Rights Offering because such Rights Offering Participant failed to satisfy all of the Rights Offering Conditions and all of the Additional Conditions, and (ii) such Rights Offering Participant shall have delivered to the Subscription Agent such Rights Offering Participant's Aggregate Exercise Price (or any portion thereof), then such Aggregate Exercise Price (or any portion thereof) shall be refunded to such Rights Offering Participant, without interest, as soon as reasonably practicable (but in no event later than ten (10) Business Days) after the Effective Date (without offset, set-off, counterclaim or reduction of any kind by the Subscription Agent or any of the Debtors).

Anything herein to the contrary notwithstanding, if any Backstop Party that holds an Eligible Claim as of the Rights Offering Record Date or any Backstop Party's Affiliate that holds an Eligible Claim as of the Rights Offering Record Date (in either case) participates in the Rights Offering in its capacity as a Rights Offering Participant, then such Backstop Party or such Affiliate shall not be required to pay its Aggregate Exercise Price at or before the Rights Offering Termination Time, but rather shall be permitted to deposit its Aggregate Exercise Price into the Deposit Account (as defined in the Backstop Purchase Agreement) at any time on or before the Deposit Deadline (as defined in the Backstop Purchase Agreement) in the same manner that a Backstop Party would be required to deposit its Aggregate Purchase Price into the Deposit Account pursuant to Section 1.2(b) of the Backstop Purchase Agreement.

To facilitate the exercise of the Rights, on the Rights Offering Commencement Date, the Debtors will cause the Subscription Agent to distribute to all Rights Offering Participants a Rights Exercise Form, together with instructions for the proper completion, due execution and timely delivery to the Subscription Agent of the Rights Exercise Form (by way of such Rights Offering Participant's Nominee, if applicable).

When the Rights Exercise Form is distributed to Rights Offering Participants, the Debtors shall include in such distribution written instructions (the "Payment Instructions") relating to the payment of the Aggregate Exercise Price for each Rights Offering Participant that exercises its Rights.  The Payment Instructions shall include wire transfer instructions for the payment of the Aggregate Exercise Price for each Rights Offering Participant that exercises its Rights.

The purchase price for Rights Offering Notes shall be equal to the principal amount thereof. Any reference to a Rights Offering Participant's "Aggregate Exercise Price" shall mean an aggregate amount equal to the portion of the Rights Offering Amount that such Rights Offering Participant validly elects to subscribe for and purchase (as set forth in the Rights Exercise Form that such Rights Offering Participant properly completes and duly executes and delivers to the Subscription Agent at or before the Rights Offering Termination Time).  Each Rights Offering Participant electing to exercise its Rights in the Rights Offering shall pay its Aggregate Exercise Price by paying cash in an aggregate amount equal to the Aggregate Exercise Price for such Rights Offering Participant.

7

**(c)      Failure to Exercise Rights**

**Unexercised Rights (including Rights that are not validly exercised) will be relinquished immediately following the Rights Offering Termination Time.** If a Rights Offering Participant does not satisfy each of the Rights Offering Conditions and each of the Additional Conditions for any reason (including by failing to deliver a duly executed and properly completed Rights Exercise Form to the Subscription Agent so that such document is *actually received* by the Subscription Agent at or before the Rights Offering Termination Time), such Rights Offering Participant shall be deemed to have fully and irrevocably relinquished and waived its Rights. Rights issued to a Rights Offering Participant that holds an Eligible General Unsecured Claim as of the Rights Offering Record Date are also subject to termination, and the exercise thereof is subject to voidance, rescission and invalidation, pursuant to the terms set forth in the "Rights Forfeiture Events" section of these Rights Offering Procedures.

Any attempt to exercise Rights after the Rights Offering Termination Time shall be null and void and the Debtors shall not be obligated to honor any such purported exercise after the Rights Offering Termination Time, regardless of when the documents relating thereto were sent.

**The method of delivery of the Rights Exercise Form, the AI Questionnaire, and any other documents is at the option and sole risk of the Person making such delivery, and delivery will be considered made only when *actually received* by the Subscription Agent. If delivery is by mail, registered mail with return receipt requested, properly insured, is encouraged and strongly recommended. In all cases, the Person delivering such documents should allow sufficient time to ensure timely delivery on or prior to the Questionnaire Deadline and the Rights Offering Termination Time (as applicable).**

**The risk of non-delivery of the AI Questionnaire, the Rights Exercise Form and any other documents sent to the Subscription Agent in connection with the Rights Offering and/or the exercise of the Rights lies solely with the Person making such delivery, and none of the Debtors, the Reorganized Debtors, the Backstop Parties, or any of their respective officers, directors, employees, agents or advisors, including the Subscription Agent, assumes the risk of non-delivery under any circumstance whatsoever.**

**(d)      Payment for Rights Offering Notes**

If, on or prior to the Rights Offering Termination Time, the Subscription Agent for any reason does not receive from or on behalf of a Rights Offering Participant immediately available funds by wire transfer in an amount equal to the Aggregate Exercise Price for such Rights Offering Participant's exercised Rights, such Rights Offering Participant shall be deemed to have fully and irrevocably relinquished and waived its Rights. Anything herein to the contrary notwithstanding, if any Backstop Party that holds an Eligible Claim as of the Rights Offering Record Date or any Backstop Party's Affiliate that holds an Eligible Claim as of the Rights Offering Record Date (in either case) participates in the Rights Offering in its capacity as a Rights Offering Participant, then such Backstop Party or such Affiliate shall not be required to pay its Aggregate Exercise Price (if any) at or before the Rights Offering Termination Time, but rather shall be permitted to deposit its Aggregate Exercise Price into the Deposit Account at any

8

US-DOCS\117189109.2

time on or before the Deposit Deadline in the same manner as such Backstop Party would be required to deposit its Purchase Price pursuant to Section 1.2(b) of the Backstop Purchase Agreement.

The aggregate amount of cash received by the Debtors from (i) Rights Offering Participants for Rights Offering Notes in the Rights Offering (other than cash that is to be refunded to Rights Offering Participants as expressly set forth in these Rights Offering Procedures) and (ii) the Backstop Parties for Unsubscribed Notes pursuant to the Backstop Purchase Agreement shall be used by the Reorganized Debtors solely for the purposes set forth in the Plan.

### (e)  Deemed Representations and Acknowledgements

Any Rights Offering Participant exercising Rights and, except in the case of subclause (1) of this clause (d), any Affiliate of such Rights Offering Participant that is identified in such Rights Offering Participant's Rights Exercise Form shall be deemed to have made the following representations and acknowledgements:

1.   such Person held an Eligible Claim as of the Rights Offering Record Date;

2.   such Person is an Accredited Investor;

3.   the exercise of the Rights is and shall be irrevocable; provided, that (A) nothing in these Rights Offering Procedures shall amend, modify or otherwise alter the right of the Required Backstop Parties to terminate the Backstop Purchase Agreement pursuant to the terms of the Backstop Purchase Agreement, and (B) the right of a Rights Offering Participant that holds an Eligible General Unsecured Claim as of the Rights Offering Record Date to participate in the Rights Offering is subject to termination as set forth in the "Rights Forfeiture Events" section of these Rights Offering Procedures;

4.   such Person has read and understands these Rights Offering Procedures, the Rights Exercise Form, the Plan, and the Disclosure Statement and understands the terms and conditions herein and therein and the risks associated with the Debtors and their business as described in the Disclosure Statement;

5.   such Person is not relying upon any information, representation or warranty other than as expressly set forth in these Rights Offering Procedures, the Rights Exercise Form, the Plan, or the Disclosure Statement; provided, however, that the Backstop Parties are relying on the representations and warranties of the Debtors made in the Backstop Purchase Agreement; and

6.   such Person has consulted, to the extent deemed appropriate, with its own advisors as to the financial, tax, legal and related matters concerning an investment in the Rights Offering Notes and on that basis believes that an

9

investment in the Rights Offering Notes is suitable and appropriate for itself.

**(f)**      **Disputes, Waivers, and Extensions**

All determinations as to the proper completion, due execution, timeliness, or eligibility of any exercise of Rights arising in connection with the submission of a Rights Exercise Form or an AI Questionnaire, and other matters affecting the validity or effectiveness of any attempted exercise of any Rights, shall be reasonably made by the Debtors, in consultation with the Required Backstop Parties, which determinations shall be final and binding.  A Rights Exercise Form or AI Questionnaire shall be deemed not properly completed, duly executed and/or duly delivered unless and until all defects and irregularities have been waived or cured within such time as the Debtors, with the prior written consent of the Required Backstop Parties, determine in their discretion.  The Debtors reserve the right, but are under no obligation, to give notice to any Rights Offering Participant regarding any defect or irregularity in connection with any purported exercise of Rights by such Rights Offering Participant and the Debtors may, but are under no obligation to, permit such defect or irregularity to be cured within such time as they may, with the prior written consent of the Required Backstop Parties, determine in their discretion.  None of the Debtors, the Subscription Agent, or the Backstop Parties shall incur any liability for failure to give such notification.

The Debtors, with the prior written consent of the Required Backstop Parties, may (i) extend the duration of the Rights Offering or adopt additional procedures to more efficiently administer the distribution and exercise of the Rights; and (ii) make such other changes to the Rights Offering, including changes that affect which Persons constitute Rights Offering Participants, that the Debtors, in the exercise of their reasonable judgment, determine are necessary.

**(g)**      **Funds**

All payments required to be made in connection with a Rights Offering Participant's exercise of its Rights (the "Rights Offering Funds") shall be deposited in accordance with the "Payment for Rights Offering Notes" section of these Rights Offering Procedures and held by the Subscription Agent in a segregated account or accounts pending the Effective Date, which segregated account or accounts will: (i) not constitute property of the Debtors' estates until the Effective Date; (ii) be separate and apart from, and not commingled with, the Subscription Agent's general operating funds and any other funds subject to any lien or any cash collateral arrangements; (iii) be maintained for the sole purpose of holding the money for administration of the Rights Offering until the Effective Date; and (iv) be invested only in cash, cash equivalents and short-term direct obligations of the United States government.  Subject to any provisions to the contrary, as set forth in (x) the "Exercise of Rights – Exercise by Rights Offering Participants" section of these Rights Offering Procedures, (y) the second paragraph of the "Rights Offering Conditioned Upon Confirmation of the Plan: Reservation of Rights" section of these Rights Offering Procedures, and (z) the last paragraph in the "Rights Forfeiture Events" section of these Rights Offering Procedures, the Subscription Agent shall not use the Rights Offering Funds for any purpose other than to release the funds as directed by the

10

Debtors on the Effective Date and shall not encumber, or permit the Rights Offering Funds to be encumbered, by any lien or similar encumbrance.

        **(h)**      **Plan Releases**

See Article X.B of the Plan for important information regarding releases.

**5.**      **Transferability; Revocation**

Rights Offering Participants may transfer Eligible Claims, and the Rights attached to such Eligible Claims, at any time prior to the Rights Offering Record Date. If an Eligible Claim is transferred by a Rights Offering Participant prior to the Rights Offering Record Date, the transferee of such Eligible Claim shall be entitled to exercise the Rights arising out of the transferred Eligible Claim as a Rights Offering Participant, *provided* that the transferee is an Accredited Investor (as set forth in a properly completed and duly executed AI Questionnaire submitted so that it is *actually received* by the Questionnaire Deadline). After the Rights Offering Record Date, the Rights shall not be transferrable, even if the underlying Eligible Claim is transferred after the Rights Offering Record Date. Once the Rights Offering Participant has properly exercised its Rights by making a Binding Rights Election, such exercise will not be permitted to be revoked by such Rights Offering Participant.

**6.**      **Rights Forfeiture Events**

If a Rights Offering Participant's Eligible General Unsecured Claim as of the Rights Offering Record Date (or any portion thereof) is not an Allowed General Unsecured Claim[3] on the date that is one (1) Business Day after the Confirmation Hearing (a "Rights Forfeiture Event"), then (in any such case): (i) such Rights Offering Participant's Rights that were issued to such Rights Offering Participant on account of such Eligible General Unsecured Claim (or such portion thereof) shall be deemed immediately and automatically terminated as of the date of the occurrence of such Rights Forfeiture Event (even if such Rights were exercised prior to such date), without a need for any further action on the part of (or notice provided to) any Person, except as otherwise provided in this Section 6, (ii) such Rights Offering Participant shall not be permitted to participate in the Rights Offering with respect to such Rights, and (iii) any exercise of such Rights by (or on behalf of) such Rights Offering Participant prior to the date of the occurrence of such Rights Forfeiture Event shall be deemed void, irrevocably rescinded and of no further force or effect, and the Rights Offering Notes that could have been subscribed for and purchased pursuant to a valid exercise of such Rights shall be deemed not to have been subscribed for and purchased in the Rights Offering.

If (a) a Rights Offering Participant exercised its Rights (on account of its Eligible General Unsecured Claim as of the Rights Offering Record Date (or any portion thereof)) on or before the Rights Offering Termination Time in accordance with the Rights Offering Procedures, and (b) a Rights Forfeiture Event shall occur with respect to such Eligible General Unsecured Claim (or such portion thereof), then such Rights Offering Participant shall be entitled to receive

---

[3]    For the avoidance of doubt, solely for purposes of these Rights Offering Procedures, any objection to allowance or priority or request for estimation of a Claim must be filed by no later than the Rights Offering Record Date.

US-DOCS\117189109.2

from the Debtors a notice of such Rights Forfeiture Event as soon as reasonably practicable following the occurrence thereof; *provided*, *however*, that the failure of the Debtors to deliver any such notice shall not affect the occurrence of the Rights Forfeiture Event or the effects thereof on the Rights Offering Participant's Rights (or the exercise thereof) or the ability of such Rights Offering Participant to participate in the Rights Offering, all as set forth in the immediately preceding paragraph.  Furthermore, if (i) a Rights Forfeiture Event shall occur with respect to a Rights Offering Participant's Eligible General Unsecured Claim (or any portion thereof) as of the Rights Offering Termination Time, and (ii) such Rights Offering Participant shall have delivered to the Subscription Agent the Aggregate Exercise Price (or any portion thereof) with respect to the exercise of any of the Rights received by such Rights Offering Participant on account of such Eligible General Unsecured Claim (or such portion thereof), then such Aggregate Exercise Price (or such portion thereof) shall be refunded to such Rights Offering Participant, without interest, as soon as reasonably practicable (but in no event later than ten (10) Business Days) after the Effective Date (without offset, set-off, counterclaim or reduction of any kind by the Subscription Agent or any of the Debtors).

**7.**      **Inquiries and Transmittal Of Documents; Subscription Agent**

The instructions contained in the Rights Exercise Form should be carefully read and strictly followed.   All questions relating to these Rights Offering Procedures, other documents associated with the Rights Offering, or the requirements to participate in the Rights Offering should be directed to the Subscription Agent:

**Hi-Crush Inc.**
**c/o KCC**
**222 North Pacific Coast Highway, Suite 300**
**El Segundo, California 90245-5614**
**+1 (877) 499-4509 (Domestic)**
**+1 (917) 281-4800 (International)**

**Via Email: HiCrushInfo@kccllc.com**

**8.**      **Rights Offering Conditioned Upon Confirmation of the Plan; Reservation of Rights**

All exercises of Rights are subject to and conditioned upon the confirmation and effectiveness of the Plan.  The Debtors will accept a Binding Rights Election only upon the confirmation (subject to termination for a Rights Forfeiture Event) and effectiveness of the Plan.

In the event that (i) the Rights Offering is terminated, (ii) the Debtors revoke or withdraw the Plan, or (iii) the Backstop Purchase Agreement is terminated in accordance with the terms thereof, the Subscription Agent shall return all amounts received from the Rights Offering Participants, without any interest, as soon as reasonably practicable (but in no event later than ten (10) Business Days) after the occurrence of any of the foregoing events (all without offset, set-off, counterclaim or reduction of any kind by the Subscription Agent or any of the Debtors), and, in the case of <u>clauses (ii)</u> and <u>(iii)</u> above, the Rights Offering shall automatically be terminated.

12

9. **Miscellaneous**

    (a)    **Rights Offering Distribution Date**

The Rights Offering Notes acquired in connection with the Rights Offering by Rights Offering Participants that have elected to participate in the Rights Offering and who have validly exercised their Rights shall be distributed in accordance with the distribution provisions contained in the Plan.

    (b)    **No Public Market or Listing**

There is not and there may not be a public market for the Rights Offering Notes, and the Debtors do not intend to seek any listing or quotation of the Rights Offering Notes on any stock exchange, other trading market or quotation system of any type whatsoever on the Effective Date. Accordingly, there can be no assurance that an active trading market for the Rights Offering Notes will ever develop or, if such a market does develop, that it will be maintained.

*[Remainder of Page Intentionally Left Blank]*

13

US-DOCS\117189109.2

## SCHEDULE 1

## Form of Rights Exercise Form

## INSTRUCTIONS TO RIGHTS EXERCISE FORM[1]

You have received the attached Rights Exercise Form because you are (i) a holder of an Eligible Claim as of the Rights Offering Record Date and (ii) an Accredited Investor (as set forth in an executed AI Questionnaire that was delivered by you to the Subscription Agent on or prior to the Questionnaire Deadline in accordance with the Rights Offering procedures).  **If you wish to participate in the Rights Offering, each of the Rights Offering Conditions and each of the Additional Conditions must be satisfied at or prior to the Rights Offering Termination Time (5:00 p.m. (Prevailing Central Time) on September 29, 2020), unless provided otherwise herein.**  You may deliver this Rights Exercise Form via electronic mail or regular mail, overnight or hand delivery to the Subscription Agent at the following address:

**Hi-Crush Inc.**
**c/o KCC**
**222 North Pacific Coast Highway, Suite 300**
**El Segundo, California 90245-5614**
**+1 (877) 499-4509 (Domestic)**
**+1 (917) 281-4800 (International)**

**Via Email: HiCrushInfo@kccllc.com**

The Rights Offering Procedures are hereby incorporated herein by reference as if fully set forth herein.  Please consult the Plan, the Disclosure Statement, the Rights Offering Procedures, and the Disclosure Statement Order (collectively, the "Rights Offering Documents") for a complete description of the Rights Offering.  Copies of the Rights Offering Documents may be obtained, free of charge, by contacting the Subscription Agent.

To subscribe for Rights Offering Notes pursuant to the Rights Offering:

1.      Review the amount of your Eligible Claim set forth in Item 1a.

2.      Review your Total Maximum Subscription Amount (as defined below) set forth in Item 1b.

3.      Calculate your Aggregate Exercise Price.

4.      Read and complete the certifications, representations, warranties and agreements in Item 3.

5.      Deliver a duly executed and properly completed Rights Exercise Form to the Subscription Agent so that it is *actually received* by the Subscription Agent at or before the Rights Offering Termination Time.

---

[1]   All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Rights Offering Procedures or, if any such term is not defined in the Rights Offering Procedures, such term shall have the meaning given to it in the Plan.

US-DOCS\117189109.2

6.    <u>Pay</u> the Aggregate Exercise Price (if any) to the Subscription Agent in accordance with the Payment Instructions set forth in Item 4 so that such payment is *actually received* by the Subscription Agent at or before the Rights Offering Termination Time; *provided*, *however*, that if any Backstop Party that holds an Eligible Claim as of the Rights Offering Record Date or any Backstop Party's Affiliate that holds an Eligible Claim as of the Rights Offering Record Date (in either case) participates in the Rights Offering in its capacity as a Rights Offering Participant, then such Backstop Party or such Affiliate shall be permitted to deposit its Aggregate Exercise Price into the Deposit Account at any time on or before the Deposit Deadline in the same manner that a Backstop Party would be required to deposit its Purchase Price into the Deposit Account pursuant to Section 1.2(b) of the Backstop Purchase Agreement.

7.    <u>Deliver</u> your W-8 or W-9, as applicable, to the Subscription Agent so that it is *actually received* by the Subscription Agent at or before the Rights Offering Termination Time pursuant to Item 5.

Participation in the Rights Offering is voluntary, and is limited to Rights Offering Participants. Furthermore, each Rights Offering Participant may exercise all or any portion of such Rights Offering Participant's Rights; *provided*, *however*, that a Rights Offering Participant shall not be permitted to participate in the Rights Offering unless such Rights Offering Participant satisfies all of the Rights Offering Conditions and all of the Additional Conditions (subject to any exceptions to the satisfaction of any such conditions applicable to any Backstop Party or any of its Affiliates, as set forth in the Rights Offering Procedures).  In addition, Rights issued to a Rights Offering Participant on account of an Eligible General Unsecured Claim held by such Rights Offering Participant as of the Rights Offering Record Date (or any portion thereof) are also subject to termination, and the exercise thereof is subject to voidance, rescission and invalidation, pursuant to the terms set forth in the "Rights Forfeiture Events" section of the Rights Offering Procedures.

[*Remainder of Page Intentionally Left Blank*.]

2

US-DOCS\117189109.2

**RIGHTS EXERCISE FORM**

**Rights Offering Termination Time**

**The Rights Offering Termination Time is 5:00 p.m. (Prevailing Central Time) on September 29, 2020.**

**Please consult the Rights Offering Documents for additional information with respect to this Rights Exercise Form.**

Rights Offering Participants (including any Backstop Party that holds an Eligible Claim as of the Rights Offering Record Date or any Backstop Party's Affiliate that holds an Eligible Claim as of the Rights Offering Record Date) are entitled to participate in the Rights Offering, as further described in the Rights Offering Procedures.  To exercise your Rights, review the amounts in Items 1a and 1b below and read and complete, as applicable, Items 2, 3, 4 and 5 below.

**Item 1. Amount of Eligible Claim(s)**

Pursuant to the Rights Offering Procedures, each Rights Offering Participant is entitled to participate in the Rights Offering to the extent of such Rights Offering Participant's Eligible Claims as of the Rights Offering Record Date.

 a. As of the Rights Offering Record Date, the amount of your Eligible Claim is:

> $_____
> *[PRE-PRINTED]*

 b. Therefore, for the purposes of the Rights Offering, you have Rights to subscribe for up to the **maximum** aggregate original principal amount of Rights Offering Notes set forth in the box below (the "Total Maximum Subscription Amount").  Each Rights Offering Participant may subscribe for all or any portion of its Total Maximum Subscription Amount; *provided*, *however*, that a Rights Offering Participant may elect to subscribe for and purchase any portion of its Total Maximum Subscription Amount only in multiples of $1,000.

> $_____
> (the Total Maximum Subscription Amount)[1]
> *[PRE-PRINTED]*

---

[1] The Total Maximum Subscription Amount shall equal the product of (rounded down to the nearest whole $1,000) (a) $43.3 million and (b) the quotient obtained by dividing (i) the amount set forth in Item 1.a. <u>by</u> (ii) the amount of (x) all Eligible General Unsecured Claims as of the Rights Offering Record Date held by each Person that has certified it is an Accredited Investor (as demonstrated by such Person's properly completed,

US-DOCS\117189109.2

**Item 2. Calculation of Aggregate Exercise Price**

Your Aggregate Exercise Price shall be an amount equal to the portion of your Total Maximum Subscription Amount that you validly elect to subscribe for and purchase. The portion of your Total Maximum Subscription Amount that you elect to subscribe for and purchase shall only be in multiples of $1,000. Please indicate your Aggregate Exercise Price below.

$_____
(your Aggregate Exercise Price)

To exercise your Rights, you must pay an amount equal to the Aggregate Exercise Price in accordance with the Payment Instructions set forth below in Item 4 so that such payment is actually received by the Subscription Agent at or before the Rights Offering Termination Time. Anything herein to the contrary notwithstanding, if any Backstop Party that holds an Eligible Claim as of the Rights Offering Record Date or any Backstop Party's Affiliate that holds an Eligible Claim as of the Rights Offering Record Date (in either case) participates in the Rights Offering in its capacity as a Rights Offering Participant, then such Backstop Party or such affiliate shall not be required to pay its Aggregate Exercise Price (if any) at or before the Rights Offering Termination Time, but rather shall be permitted to deposit its Aggregate Exercise Price into the Deposit Account at any time on or before the Deposit Deadline in the same manner that such Backstop Party would be required to deposit its Purchase Price pursuant to Section 1.2(b) of the Backstop Purchase Agreement.

**Item 3. Subscription Certifications, Representations, Warranties and Agreements**

Except in the case of Section 1(a) of this Item 3, the certifications, representations, warranties and agreements set forth in this Item 3 shall be deemed to be made jointly and severally by the Rights Offering Participant exercising Rights and any Affiliate of such Rights Offering Participant. By returning the Rights Exercise Form:

1. The Rights Offering Participant hereby certifies that it (a) was the holder of the Eligible Claims identified in Item 1a as of the Rights Offering Record Date; (b) agrees to be bound by all the terms and conditions of the Rights Offering Procedures; (c) has obtained a copy of the Rights Offering Documents and understands that the exercise of Rights pursuant to the Rights Offering is subject to all the terms and conditions set forth in such Rights Offering Documents; (d) has read and understands Article X.B of the Plan and agrees to the releases set forth therein; and (e) has satisfied the Additional Conditions.

---

duly executed and timely returned AI Questionnaire) on or prior to the Questionnaire Deadline plus (y) all Allowed Prepetition Notes Claims as of the Rights Offering Record Date.

2

2.  The Rights Offering Participant hereby represents and warrants that (a) to the extent such Rights Offering Participant is not an individual, it is duly formed, validly existing, and in good standing under the laws of the jurisdiction of its formation; and (b) it has the requisite power and authority to enter into, execute and deliver this Rights Exercise Form and to perform its obligations hereunder and in each of the other Rights Offering Documents and has taken all necessary action required for due authorization, execution, delivery and performance hereunder and thereunder.

3.  The Rights Offering Participant acknowledges and understands that this Rights Exercise Form shall not be binding on the Debtors or Reorganized Debtors until the conditions to effectiveness of the Plan, as set forth in the Plan, are satisfied.

4.  The Rights Offering Participant hereby agrees that this Rights Exercise Form constitutes a valid and binding obligation of the Rights Offering Participant, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium, and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith, and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

5.  The Rights Offering Participant hereby represents and warrants that the exercise of its Rights is and shall be irrevocable; *provided*, that (a) nothing in the Rights Offering Procedures shall amend, modify or otherwise alter the right of the Required Backstop Parties to terminate the Backstop Purchase Agreement pursuant to the terms of the Backstop Purchase Agreement, and (b) the right to participate in the Rights Offering of a Rights Offering Participant that holds an Eligible General Unsecured Claim as of the Rights Offering Record Date is subject to termination as set forth in the "Rights Forfeiture Events" section of the Rights Offering Procedures.

6.  The Rights Offering Participant hereby represents and warrants that it has duly executed and properly completed an AI Questionnaire pursuant to which such Rights Offering Participant has certified that it is an Accredited Investor, and such Rights Offering Participant understands that the Debtors are relying on such certification.

7.  The Rights Offering Participant hereby represents and warrants that (a) the Rights Offering Notes are being acquired by such Rights Offering Participant for the account of such Rights Offering Participant for investment purposes only, within the meaning of the Securities Act, and not with a view to the distribution thereof, and in compliance with all applicable securities laws; and (b) no one other than the Rights Offering Participant has any right to acquire the Rights Offering Notes being acquired by the Rights Offering Participant.

3

8. The Rights Offering Participant hereby represents and warrants that its financial condition is such that the Rights Offering Participant has no need for any liquidity in its investment in the Reorganized Debtors and is able to bear the risk of holding the Rights Offering Notes for an indefinite period of time and the risk of loss of its entire investment in the Reorganized Debtors.

9. The Rights Offering Participant hereby represents and warrants that it (a) is capable of evaluating the merits and risks of acquiring the Rights Offering Notes; and (b) has consulted, to the extent deemed appropriate, with its own advisors as to the financial, tax, legal and related matters concerning an investment in the Rights Offering Notes and on that basis believes that an investment in the Rights Offering Notes is suitable and appropriate for itself.

10. The Rights Offering Participant hereby represents and warrants that (a) it has been given the opportunity to (i) ask questions and receive satisfactory answers concerning the terms and conditions of the Rights Offering, and (ii) obtain additional information in order to evaluate the merits and risks of an investment in the Reorganized Debtors, and to verify the accuracy of the information contained in the Rights Offering Documents; (b) it has read and understands the Rights Offering Documents and the terms and conditions herein and therein and the risks associated with the Debtors and their business as described in the Disclosure Statement; and (c) no statement, printed material or other information that is contrary to the information contained in any Rights Offering Document has been given or made by or on behalf of the Debtors or the Backstop Parties to such Rights Offering Participant.

11. The Rights Offering Participant acknowledges and understands that:

   a) An investment in the Reorganized Debtors is speculative and involves significant risks.

   b) The Rights Offering Notes will be subject to certain restrictions on transferability as described in the Plan and, as a result of the foregoing, the marketability of the Rights Offering Notes will be severely limited.

   c) The Rights Offering Participant will not transfer, sell or otherwise dispose of the Rights Offering Notes in any manner that will violate the Securities Act or any state or foreign securities laws.

   d) The Rights Offering Notes have not been, and will not be, registered under the Securities Act or any state or foreign securities laws, and are being offered and sold in reliance upon federal, state and foreign exemptions from registration requirements for transactions not involving any public offering. The Rights Offering Participant recognizes that reliance upon such exemptions is based in part upon the representations of such Rights Offering Participant contained herein and in the AI Questionnaire executed and delivered by the Rights Offering Participant.

4

US-DOCS\117189109.2

12. The Rights Offering Participant hereby represents and warrants that it is not relying upon any information, representation or warranty other than as expressly set forth in any of the Rights Offering Documents; *provided*, *however*, that the Backstop Parties are relying on the representations and warranties of the Debtors made in the Backstop Purchase Agreement.

13. The Rights Offering Participant hereby represents and warrants that it is aware that (a) no federal, state, local or foreign agency has passed upon the Rights Offering Notes or made any finding or determination as to the fairness of an investment in the Rights Offering Notes; and (b) the data set forth in any Rights Offering Documents or in any supplemental letters or materials thereto are not necessarily indicative of future returns, if any, which may be achieved by the Reorganized Debtors.

14. The Rights Offering Participant hereby acknowledges that the Debtors and the Reorganized Debtors seek to comply with all applicable anti-money laundering laws and regulations. In furtherance of such efforts, the Rights Offering Participant hereby represents and agrees that (a) no part of the Rights Offering Funds used by the Rights Offering Participant to acquire the Rights Offering Notes has been, or shall be, directly or indirectly derived from, or related to, any activity that may contravene federal, state, or international laws and regulations, including anti-money laundering laws and regulations; and (b) no contribution or payment to the Debtors or the Reorganized Debtors by the Rights Offering Participant shall cause the Debtors or the Reorganized Debtors to be in violation of any applicable anti-money laundering laws and regulations including without limitation, the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001 and the U.S. Department of the Treasury Office of Foreign Assets Control regulations, each as amended. The Rights Offering Participant hereby agrees to (x) provide the Debtors and the Reorganized Debtors all information that may be reasonably requested to comply with applicable U.S. law; and (y) promptly notify the Debtors and the Reorganized Debtors (if legally permitted) if there is any change with respect to the representations and warranties provided herein.

15. The Rights Offering Participant hereby agrees to provide such information and to execute and deliver such documents as may reasonably be necessary to comply with any and all laws, rules and regulations to which the Debtors or Reorganized Debtors are subject.

US-DOCS\117189109.2

Certification by Rights Offering Participant: _____

Date: _____

Name of Rights Offering Participant: _____ _____

(Print or Type)

Social Security or Federal Tax I.D. No.: _____ _____

Signature: _____

Name of Person Signing: _____ _____

(If other than Rights Offering Participant)

Title (if corporation, partnership or LLC): _____

Street Address: _____

City, State, Zip Code: _____ _____

Contact E-mail: _____ _____

Telephone Number: _____

Certification by Affiliate 1[2]: _____

Date: _____

Name of Affiliate: _____

(Print or Type)

Social Security or Federal Tax I.D. No.: _____ _____

Signature: _____

Name of Person Signing: _____ _____

(If other than Affiliate)

Title (if corporation, partnership or LLC): _____

Street Address: _____

City, State, Zip Code: _____

Contact E-mail: _____

Telephone Number: _____

---

[2]   Certifications by additional Affiliates to be attached as necessary.

US-DOCS\117189109.2

**Item 4. Payment Instructions**

You must make your payment of the Aggregate Exercise Price calculated in Item 2c above (if any) by wire transfer so that it is *actually received* by the Subscription Agent at or before the Rights Offering Termination Time.

Please have wire transfers delivered to: [TBD]

**Item 5. Tax Information**

1. Each Rights Offering Participant that is a U.S. person[3] must provide its taxpayer identification number on a signed Internal Revenue Service ("IRS") form W-9 to the Subscription Agent.  This form is necessary for the Debtors and the Reorganized Debtors, as applicable, to comply with its tax filing obligations and to establish that the Rights Offering Participant is not subject to certain withholding tax obligations applicable to U.S. and non-U.S. persons.  The enclosed W-9 form contains detailed instructions for furnishing this information.

2. Each Rights Offering Participant that is not a U.S. person (as defined in the previous paragraph) is required to provide information about its status for withholding purposes, generally on an IRS form W-8BEN (for individuals) or W-8BEN-E (for most foreign entities), form W-8IMY (for most foreign intermediaries, flow-through entities, and certain U.S. branches), form W-8EXP (for most foreign governments, foreign central banks of issue, foreign tax-exempt organizations, foreign private foundations, and governments of certain U.S. possessions), or form W-8ECI (for most non-U.S. persons receiving income that is effectively connected with the conduct of a trade or business in the United States). Each Rights Offering Participant that is not a U.S. person should provide the Subscription Agent with the appropriate form W-8. Please contact the Subscription Agent if you need further information regarding these forms.  Rights Offering Participants may also access the IRS website (www.irs.gov) to obtain the appropriate form W-8 and its instructions.

**Item 6. Miscellaneous**

1. The representations, warranties, covenants, and agreements of the Rights Offering Participant contained in this Rights Exercise Form will survive the execution hereof and the distribution of the Rights Offering Notes to such Rights Offering Participant.

---

3    The definition of "U.S. person" for this purpose includes a U.S. citizen or resident, a corporation organized in the United States, a partnership organized in the United States, a limited liability company organized in the United States (other than a limited liability company wholly-owned by a foreign person), an estate (other than a foreign estate the income of which, from sources without the United States which is not effectively connected with the conduct of a trade or business within the United States, is not includible in gross income), and a trust if (1) a court within the United States is able to exercise primary supervision over the administration of the trust, and (2) one or more U.S. persons have the authority to control all substantial decisions of the trust.

7

8

2.  Neither this Rights Exercise Form nor any provision hereof shall be waived, modified, discharged, or terminated except by an instrument in writing signed by the party against whom any such waiver, modification, discharge, or termination is sought; *provided*, *however*, that any waiver by (a) the Debtors shall not be valid without the prior written consent of the Required Backstop Parties; and (b) the Reorganized Debtors shall be in accordance with the Plan and the terms contained herein.

3.  References herein to a person or entity in either gender include the other gender or no gender, as appropriate.

4.  This Rights Exercise Form may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which taken together shall be deemed to constitute one and the same agreement.

5.  This Rights Exercise Form and its validity, construction and performance shall be governed in all respects by the laws of the State of New York.

*[Remainder of Page Intentionally Left Blank]*

8

US-DOCS\117189109.2

## SCHEDULE 2

## Form of AI Questionnaire

## INSTRUCTIONS TO AI QUESTIONNAIRE[1]

You have received the attached accredited investor questionnaire (the "AI Questionnaire") because you are a holder of an Eligible Claim (as defined below) as of August 14, 2020 (the "Questionnaire Record Date"). If you wish to participate in the Rights Offering, you must deliver (through your Nominee (as defined below), if your Eligible Claim is held in "street name" by a bank, brokerage house, or other financial institution) a duly executed and properly completed copy of this AI Questionnaire to the Subscription Agent (as defined below) so that it is *actually received* by the Subscription Agent on or before September 4, 2020 (the "Questionnaire Deadline"); *provided*, *however*, that any Backstop party that holds an Eligible Claim as of the Questionnaire Record Date and any Backstop Party's Affiliate that holds an Eligible Claim as of the Questionnaire Record Date shall not be required to complete and deliver an AI Questionnaire and shall be deemed a Rights Offering Participant (as defined below).

"Allowed" means, solely for purposes of these Rights Offering Procedures, with respect to any Claims (or any portion thereof), as of any date of determination, (a) a Claim that is evidenced by a Proof of Claim filed by the applicable Claims Bar Date in accordance with the Claims Bar Date Order; (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely filed; or (c) a Claim that is allowed pursuant to the Plan or a Final Order of the Bankruptcy Court as of such date; provided, that with respect to a Claim described in clauses (a) and (b) above (except any Claim previously allowed pursuant to the DIP Orders), such Claim shall be considered "Allowed" as of such date of determination only to the extent that, with respect to such Claim, no objection to allowance or priority or request for estimation thereof has been interposed on or prior to such date, or such an objection is so interposed and the Claim has been allowed by Final Order of the Bankruptcy Court as of such date; provided, further that, solely for purposes of these Rights Offering Procedures, any objection to allowance or priority or request for estimation of a Claim must be filed by no later than the Rights Offering Record Date.

"Disallowed" shall have the meaning given to such term in the Plan.

"Disputed" means, solely for purposes of these Rights Offering Procedures, with respect to any Claim (or any portion thereof), as of any date of determination, a Claim that is neither Allowed nor Disallowed as of such date.

"Eligible Claim" means any Allowed Prepetition Notes Claim or Eligible General Unsecured Claim.

"Eligible General Unsecured Claim" means any General Unsecured Claim that is either Allowed or Disputed. For the avoidance of doubt, "General Unsecured Claims" shall not include "Prepetition Notes Claims."

---

[1] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Rights Offering Procedures to which this AI Questionnaire is attached.

If (a) your Eligible Claims are held directly in your own name and *not* through any Nominee, you may deliver, or (b) your Eligible Claims are held in "street name" by a bank, brokerage house, or other financial institution, you must coordinate with your Nominee (as defined herein) to submit, this AI Questionnaire via  electronic mail or regular mail, overnight or hand delivery to KCC LLC, the subscription agent for the Rights Offering (in such capacity, the "Subscription Agent"), so that it is *actually received* by the Subscription Agent at or before the Questionnaire Deadline, at the following address:

**Hi-Crush Inc.**
**c/o KCC**
**222 North Pacific Coast Highway, Suite 300**
**El Segundo, California 90245-5614**
**+1 (877) 499-4509 (Domestic)**
**+1 (917) 281-4800 (International)**

**Via Email: HiCrushInfo@kccllc.com**

To duly execute, properly complete and deliver to the Subscription Agent this AI Questionnaire:

1.      Review the amount of your Eligible Claim in Section 1.

2.      Complete the "Eligibility Certification" in Section 2.

3.      Initial next to the applicable paragraph in the "Accredited Investor Certification" in Section 3.

4.      Coordinate to have your Nominee complete the Nominee Confirmation of Ownership in Section 4 if you are a holder of an Allowed Prepetition Notes Claim.

5.      Deliver (or have your Nominee deliver, if applicable) this AI Questionnaire to the Subscription Agent so that it is *actually received* by the Subscription Agent on or before the Questionnaire Deadline.

[*Remainder of Page Intentionally Left Blank.*]

2

US-DOCS\117189109.2

## AI QUESTIONNAIRE

**DELIVER TO (BY WAY OF NOMINEE, IF APPLICABLE):**

**Hi-Crush Inc.**
**c/o KCC**
**222 North Pacific Coast Highway, Suite 300**
**El Segundo, California 90245-5614**
**+1 (877) 499-4509 (Domestic)**
**+1 (917) 281-4800 (International)**

**Via Email: HiCrushInfo@kccllc.com**

**Section 1: Confirmation of Ownership**

**Your ownership of an Eligible Claim must be confirmed in order to be eligible to receive Rights.**

If you hold an Eligible Claim based on your ownership of Prepetition Notes, and your Prepetition Notes are held in "street name" by a bank, brokerage house, or other financial institution (each, a "<u>Nominee</u>"), you must forward your AI Questionnaire to the Nominee with sufficient time for the Nominee to complete the "Nominee Confirmation of Ownership" in Section 4 of this AI Questionnaire (including providing the Nominee's medallion guarantee or list of authorized signatories) and for the Nominee to deliver the AI Questionnaire to the Subscription Agent so that it is *actually received* by the Subscription Agent on or before the Questionnaire Deadline. If authorized to do so, the Nominee may complete the entire AI Questionnaire on your behalf.

**Item 1. Amount of Eligible Claim(s)**. I certify that I hold an Eligible Claim in the following amount as of the Questionnaire Deadline (September 4, 2020) set forth in the box below or that I am the authorized signatory of that beneficial owner.



$_____

**Section 2: Eligibility Certification**

In order to receive Rights under the Plan, the holder of an Eligible Claim must:

1. Be an Accredited Investor;

2. Answer "Yes" to Question 1 below; and

3. Deliver a duly executed and properly completed copy of this AI Questionnaire to the Subscription Agent so that it is *actually received* by the Subscription Agent on or before the Questionnaire Deadline.

**Question 1.** Is the respondent an "Accredited Investor"?___Yes___No

If "Yes", please indicate which category (*i.e.,* 1 through 8) of Section 3 below that the respondent falls under: _____

IN WITNESS WHEREOF, I certify that: (i) I am an authorized signatory of the holder indicated below; (ii) I executed this AI Questionnaire on the date set forth below; and (iii) this AI Questionnaire (x) contains accurate representations with respect to the undersigned and (y) is a certification to the Debtors and the Bankruptcy Court.

_____
  (Signature)

By: _____
(Please Print or Type)

Title: _____
(Please Print or Type)

Address, telephone number and facsimile number:

_____


_____


_____


Certain communications during the Rights Offering may be performed via e-mail.  For that reason, you are required to provide your e-mail address below:

_____
  (E-Mail Address)

## Section 3: Accredited Investor Certification

Please indicate the basis on which you would be deemed an "Accredited Investor" by initialing the appropriate line provided below.

An Accredited Investor shall include any person who comes within any of the following categories, or who the issuer reasonably believes comes within any of the following categories, at the time of the sale of the securities to that person:

2

1.   _____ **initials**    any bank as defined in section 3(a)(2) of the Securities Act of 1933 (as amended and including any rule or regulation promulgated thereunder, the "<u>Securities Act</u>"), or any savings and loan association or other institution as defined in section 3(a)(5)(A) of the Securities Act, whether in its individual or fiduciary capacity; any broker or dealer registered pursuant to section 15 of the Securities Exchange Act of 1934, as amended; any insurance company as defined in section 2(a)(13) of the Securities Act; any investment company registered under the Investment Company Act of 1940, as amended, or a business development company as defined in section 2(a)(48) of that Act; any Small Business Investment Company licensed by the U.S. Small Business Administration under section 301(c) or (d) of the Small Business Investment Act of 1958, as amended; any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000; any employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974, as amended, if the investment decision is made by a plan fiduciary, as defined in section 3(21) of such Act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors;

2.   _____ **initials**    any private business development company as defined in section 202(a)(22) of the Investment Advisers Act of 1940, as amended;

3.   _____ **initials**    any organization described in section 501(c)(3) of the Internal Revenue Code of 1986, as amended, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

4.   _____ **initials**    any director, executive officer, or general partner of the issuer of the securities being offered or sold, or any director, executive officer, or general partner of a general partner of that issuer;

3

5. \_\_\_\_\_ **initials** any natural person whose individual net worth, or joint net worth with that person's spouse, exceeds \$1,000,000;[1]

6. \_\_\_\_\_ **initials** any natural person who had an individual income in excess of \$200,000 in each of the two most recent years or joint income with that person's spouse in excess of \$300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

7. \_\_\_\_\_ **initials** any trust, with total assets in excess of \$5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in 17 C.F.R. 230.506(b)(2)(ii); and

8. \_\_\_\_\_ **initials** any entity in which all of the equity owners are accredited investors.

**Section 4: Nominee Confirmation of Ownership and DTC Matters**

(A) **WITH RESPECT TO ELIGIBLE GENERAL UNSECURED CLAIMS ONLY. The New Secured Convertible Notes are expected to be held through DTC. Thus, in order to receive New Secured Convertible Notes, you must have, or open, a brokerage account with a DTC participant to act as your nominee to hold any New Secured Convertible Notes purchased by you in the Rights Offering. The Subscription Agent will coordinate with you to obtain this information prior to the allocation of the New Secured Convertible Notes.**

(B) **TO BE COMPLETED BY HOLDERS OF PREPETITION NOTES ONLY. Your ownership of Prepetition Notes must be confirmed in order to participate in the Rights Offering**.

The nominee holding your Prepetition Notes Claims as of  September 4, 2020 (the "Questionnaire Deadline")  must complete Box A on your behalf.  Box B is only required if any or all of your Prepetition Notes Claims were on loan as of the Questionnaire Deadline (as determined by your nominee). Please attach a separate Nominee Certification if your Prepetition Notes Claims are held through more than one nominee.

---

[1] For the purposes of determining net worth: (A) the person's primary residence shall not be included as an asset; (B) indebtedness that is secured by the person's primary residence, up to the estimated fair market value of the primary residence at the time of the sale of securities, shall not be included as a liability (except that if the amount of such indebtedness outstanding at the time of sale of securities exceeds the amount outstanding 60 days before such time, other than as a result of the acquisition of the primary residence, the amount of such excess shall be included as a liability); and (C) indebtedness that is secured by the person's primary residence in excess of the estimated fair market value of the primary residence at the time of the sale of securities shall be included as a liability.

4

| Box A<br>**For Use Only by the Nominee** | Box B<br>**Nominee Proxy - Only if Needed** |
|---|---|
| DTC Participant Name:  _____ | DTC Participant Name:  _____ |
| DTC Participant Number:  _____ | DTC Participant Number:  _____ |
| Principal Amount of Prepetition Notes (CUSIP 428337 AA 7) held by this account as of the Questionnaire Deadline:<br><br>_____ principal amount | Principal Amount of Prepetition Notes (CUSIP 428337 AA 7) held on behalf of, and hereby assigned to, the Nominee listed in Box A as of the Questionnaire Deadline:<br><br>_____  principal amount |
| Principal Amount of Prepetition Notes (CUSIP U322H AA 0) held by this account as of the Questionnaire Deadline:<br><br>_____ principal amount | Principal Amount of Prepetition Notes (CUSIP U4322H AA 0) held on behalf of, and hereby assigned to, the Nominee listed in Box A as of the Questionnaire Deadline:<br><br>_____ principal amount |
| Medallion Guarantee: | Medallion Guarantee: |
| Nominee Authorized Signature:_____ | Nominee Authorized Signature:_____ |
| Nominee Contact Name:_____ | Nominee Contact Name:_____ |
| Nominee Contact Tel #:_____ | Nominee Contact Tel #:_____ |
| Nominee Contact Email:_____ | Nominee Contact Email:_____ |
| Beneficial Holder Name:_____ | Beneficial Holder Name:_____ |

For multiple accounts at the same Nominee, a Medallion Guaranteed table of Beneficial Holder Names, Beneficial Holder Account Numbers and Principal Amounts of the Prepetition Notes held as of the Questionnaire Record Date may be provided.

**DELIVER TO (BY WAY OF NOMINEE, IF APPLICABLE):**

**Hi-Crush Inc.**
**c/o KCC**
**222 North Pacific Coast Highway, Suite 300**
**El Segundo, California 90245-5614**
**+1 (877) 499-4509 (Domestic)**
**+1 (917) 281-4800 (International)**
**Via Email: HiCrushInfo@kccllc.com**

5

**EXHIBIT B**

Financial Projections

US-DOCS\115539486.19

**Exhibit B:  Financial Projections**

The Debtors believe that the Plan[1] meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor under the Plan.  In connection with the planning and development of a plan of reorganization and for the purposes of determining whether such plan would satisfy this feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.

The Debtors do not, as a matter of course, publish their business plans or strategies, projections or anticipated financial position.  Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated business plans or Financial Projections to holders of Claims or other parties in interest going forward, or to include such information in documents required to be filed with the SEC or otherwise make such information public, unless required to do so by the SEC or other regulatory bodies pursuant to the provisions of the Plan.

In connection with the Disclosure Statement, the Debtors' management team ("Management") prepared the Financial Projections for the years 2020 through 2025 (the "Projection Period"). The Financial Projections were prepared by Management and are based on several assumptions made by Management with respect to the future performance of the Reorganized Debtors' operations.

The Debtors have prepared the Financial Projections based on information available to them, including information derived from public sources that have not been independently verified. No representation or warranty, expressed or implied, is provided in relation to fairness, accuracy, correctness, completeness, or reliability of the information, opinions, or conclusions expressed herein.

THESE FINANCIAL PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH PUBLISHED GUIDELINES OF THE SEC OR GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS FOR PREPARATION AND PRESENTATION OF PROSPECTIVE FINANCIAL INFORMATION.

ALTHOUGH MANAGEMENT HAS PREPARED THE FINANCIAL PROJECTIONS IN GOOD FAITH AND BELIEVES THE ASSUMPTIONS TO BE REASONABLE, IT IS IMPORTANT TO NOTE THAT NEITHER THE DEBTORS NOR THE REORGANIZED DEBTORS CAN PROVIDE ANY ASSURANCE THAT SUCH ASSUMPTIONS WILL BE REALIZED.  AS DESCRIBED IN DETAIL IN THE DISCLOSURE STATEMENT, A VARIETY OF RISK FACTORS COULD AFFECT THE RESULTS AND MUST BE CONSIDERED.  ACCORDINGLY, THE FINANCIAL PROJECTIONS SHOULD BE REVIEWED IN CONJUNCTION WITH A REVIEW OF THE DISCLOSURE STATEMENT

---

[1] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization for Hi-Crush and Its Debtor Affiliates* (the "Disclosure Statement"), to which these Financial Projections are attached as **Exhibit B**.

AND THE ASSUMPTIONS DESCRIBED HEREIN, INCLUDING ALL RELEVANT QUALIFICATIONS AND FOOTNOTES.

The Financial Projections contain certain forward-looking statements, all of which are based on various estimates and assumptions. Such forward looking statements are subject to inherent uncertainties and to a wide variety of significant business, economic, and competitive risks, including those summarized herein. When used in the Financial Projections, the words, "anticipate," "believe," "estimate," "will," "may," "intend," "expect," and similar expressions should be generally identified as forward-looking statements. Although the Debtors believe that their plans, intentions, and expectations reflected in the forward-looking statements are reasonable, they cannot be sure that they will be achieved. These statements are only predictions and are not guarantees of future performance or results. Forward-looking statements are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated by a forward-looking statement. All forward-looking statements attributable to the Debtors or Persons or Entities acting on their behalf are expressly qualified in their entirety by the cautionary statements set forth herein. Forward-looking statements speak only as of the date on which they are made. Except as required by law, the Debtors expressly disclaim any obligation to update any forward-looking statement, whether because of new information, future events, or otherwise.

The Financial Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in the Disclosure Statement and the Plan in their entirety as well as the notes and assumptions set forth below.

The Financial Projections are subject to inherent risks and uncertainties, most of which are difficult to predict and many of which are beyond Management's control. Although Management believes these assumptions are reasonable under the circumstances, such assumptions are subject to significant uncertainties, including, but not limited to, (a) changes in capital spending on oil and natural gas well completions in various end markets; (b) oil, natural gas, and other commodity pricing; (c) applicable laws and regulations; (d) interest rates and inflation; (e) business combinations among the Debtors' competitors, suppliers, and customers; (f) severe or unseasonable weather; and (g) availability and cost of raw materials. Additional information regarding these uncertainties are described in Article VI of the Disclosure Statement. Should one or more of the risks or uncertainties referenced in the Disclosure Statement occur, or should underlying assumptions prove incorrect, actual results and plans could differ materially from those expressed in the Financial Projections. Further, new factors could cause actual results to differ materially from those described in the Financial Projections, and it is not possible to predict all such factors, or to the extent to which any such factor or combination of factors may cause actual results to differ from those contained in the Financial Projections. The Financial Projections herein are not, and must not be viewed as, a representation of fact, prediction or guaranty of the reorganized Debtors' future performance.

A. **General Assumptions**

   i. **Overview**

The Debtors and their consolidated subsidiaries provide fully-integrated proppant and related logistics services to a diverse group of oil and gas exploration and production companies

and providers of oilfield services in the United States.  The Debtors support hydraulic fracturing operations, offering frac sand production, wellsite storage systems, last mile services and software supporting supply chain and logistics operations.  Frac sand is fundamental to the well completion process during hydraulic fracturing.  It is used as a propping agent to facilitate the creation of fractures in the hydrocarbon-bearing rock.  Proppant-filled fractures create conductive channels through which the hydrocarbons can flow more freely from the formation into the wellbore and subsequently to the surface.  The Debtors principally operate the business across four business lines—(i) production and processing facilities, (ii) transportation capabilities, (iii) rail terminal facilities and (iv) logistics and well-site operations.  Demand for the Debtors' services is partly a function of their clients' willingness to make capital expenditures and operating expenditures to explore for, develop and produce hydrocarbons.

Capital expenditures by oil and gas exploration and production companies tend to be relatively sensitive to volatility in oil or natural gas prices because project decisions are tied to a return on investment spanning multiple months or years.  When commodity prices are depressed for longer periods of time, capital expenditure projects are routinely deferred until prices are forecasted to return to an acceptable level.  In contrast, both mandatory and discretionary operating expenditures are more stable than capital expenditures as these expenditures are less sensitive to commodity price volatility.  Mandatory operating expenditure projects involve activities that cannot be avoided in the short term, such as regulatory compliance, safety, contractual obligations and certain projects to maintain the well and related infrastructure in operating condition. Discretionary operating expenditure projects may not be critical to the short-term viability of a lease or field and are generally evaluated according to a simple short-term payout criterion that is less dependent on commodity price forecasts.

The Debtors' strategy as a premier provider of frac sand and logistics services relies upon their ability to leverage relationships with existing clients, within and across business lines, expand their client base in the areas where they currently operate, grow their geographic diversification through selective expansion and continue to identify and develop opportunities to enhance and differentiate their service offerings.

The Debtors have invested substantially in developing "in-basin" frac sand production facilities in the Permian Basin of West Texas and logistics capabilities to competitively position themselves as a preferred service provider among oil and gas exploration and production companies.

### ii. Presentation

The Financial Projections are presented in a consistent format with forecasts included as part of the Debtors quarterly reporting releases. The projections contain non-GAAP financial measures as defined by SEC Regulation G. The Company's quarterly results releases are reported on a consolidated basis.  As a result, the Company has shown the results of all consolidated entities within the Financial Projections presented herein.

### iii. Accounting Policies

The Financial Projections have been prepared using accounting policies that are materially consistent with those applied in the Company's historical financial statements. The Financial Projections do not reflect the formal implementation of reorganization accounting pursuant to FASB Accounting Standards Codification Topic 852, Reorganizations ("ASC 852"). Overall, the implementation of ASC 852 is not anticipated to have a material impact on the underlying economics of the Plan.

The Debtors' independent auditor has not examined, compiled or performed any procedures with respect to the financial information contained in this exhibit.

### iv. Methodology

The Financial Projections incorporate Management's operating assumptions and capital plan and are based on various strategic reviews, historical performance, management's views of market dynamics, as well as corresponding assumptions regarding pricing, market share, cost structure and key performance indicators by region and segment, including:

- production & processing facilities: monthly sand volumes, revenue per ton, cost per ton, mine utilization percentage and contribution margin;

- transportation capabilities: monthly rail freight rates, monthly railcar lease expense, realized price per ton and cost per ton of purchased sand;

- rail terminal facilities: throughput utilization percentage, compensation expenses, utilities, repair and maintenance, IT connectivity and 3rd party transload fees;

- logistics and well-site operations: storage system utilization, number of wellsite operations crews, tons per crew and trucking and equipment margins.

Additionally, management gathered input from the Company's advisors regarding the impact of a Chapter 11 filing on the Company's business plan. Management assumed a pre-arranged Chapter 11 filing on July 12, 2020 with an emergence at the end of September 2020.

### v. Market Forecast

The Financial Projections were prepared based on the level of expected spending in the energy industry, which is heavily influenced by the current and expected future prices of oil and natural gas. Changes in expenditures result in an increased or decreased demand for products and services. Frac fleet and drilling rig activity, among many other factors, are indicators of the level of spending for the completion of oil and natural gas wells.

### vi. Plan Consummation

The Financial Projections are based on, and assume the successful implementation of, the Reorganized Debtors' business plan. The Financial Projections assume that the Plan will be consummated in September 2020. Both the business plan and the Financial Projections reflect

US-DOCS\116878682.9

numerous assumptions, including various assumptions regarding the anticipated future performance of the Reorganized Debtors, industry performance, general business and economic conditions, and other matters, many of which are beyond the control of the Reorganized Debtors. In addition, the assumptions may not fully account for the uncertainty and disruption of business that may accompany a restructuring in bankruptcy court. Therefore, although the Financial Projections are necessarily presented with numerical specificity, the actual results achieved during the period of the Financial Projections will likely vary from the projected results. These variations may be material.  Accordingly, no representation can be or is being made with respect to the accuracy of the Financial Projections or the ability of the Reorganized Debtors to achieve the projected results of operations.

In deciding whether to vote to accept or reject the proposed Plan, creditors must make their own determinations as to the reasonableness of such assumptions and the reliability of the Financial Projections.  Moreover, the Financial Projections were prepared solely in connection with the restructuring pursuant to the Plan.

## B.  Principal Assumptions for the Financial Projections

### i.    Revenue

The Financial Projections include revenue generated from providing frac sand and related logistics services to numerous oil and gas exploration and production and oilfield services companies.  The revenue forecast is developed separately for each of the Company's primary business lines.  Higher or lower activity and productivity related to the increase in sand volumes, utilization, margins, among other things, in the Company's product lines are major factors in revenue and margin generation.

### ii.   Operating Cost

Operating Cost includes certain variable and fixed costs, such as excavation and processing costs, employee related costs, supply, repair and maintenance costs, safety costs, rental costs, depreciation and amortization, insurance, property taxes, operating overhead and other costs. Operating Cost relies on the Company's ability to manage the workforce, supply chain, business processes, information technology systems and technological innovation and commercialization, including the impact of restructuring, business enhancements, and transformation efforts. Operating Cost is projected based on historical operating costs and expected utilization of products and services currently under contract and expectations regarding future contracts, services provided without contracts and spot sales of frac sand.  Operating Cost is projected by business unit.

### iii.  General and Administrative Expense

General and Administrative Expense ("G&A") is primarily composed of labor costs, professional and accounting fees, legal expenses, taxes, property and casualty insurance premiums and other expenses associated with corporate overhead.  Projected G&A is based primarily on historical G&A costs, adjusted for inflationary expectations, recent cost reduction efforts and upcoming known one-time or non-recurring expenditures. Annual G&A is projected to be

US-DOCS\116878682.9

approximately $30 million in 2021 with annual average increases of approximately 8% through the projection period.

### iv.   Equity Investments

Equity Investments include income or loss associated with the Debtors' investment in unconsolidated equity affiliates.  As non-cash income, income associated with the Debtors' equity investments is shown in the Financial Projections as a negative adjustment.

### v.   Capital Expenditures

Forecasted capital expenditures were prepared with consideration for the needs of the Debtors' fixed assets. Capital expenditures primarily relate to routine maintenance and investment in the Debtors' frac sand production facilities and logistics and wellsite operations equipment. Capital expenditures also include capitalized corporate expenditures, such as expenditures required to maintain the Debtors' information technology equipment and software.

### vi.   Working Capital & Other

Working capital assumptions are based on movements in accounts receivable, accounts payable, and other current assets and liabilities. Projected balances are based on the historical cash conversion cycle of the Company's specific business units. Prospective working capital assumptions were supplemented by Management as deemed appropriate. Other items include adjustments associated with certain forecasted non-cash G&A expenses.

### vii.   Cash Interest

Post-emergence cash interest is forecasted based on the post-emergence capital structure as detailed in the "Capital Structure" section included herein and the Plan and the exhibits thereto.

### viii.   Non-Recurring

Forecasted non-recurring items include cash deposits to and releases from a restricted account for purposes of cash collateralizing outstanding letters of credit under the Exit Facility (as defined herein).

### ix.   Capital Structure

The reorganized Company's estimated post-emergence capital structure is assumed to be effective at emergence at the end of September 2020. The Financial Projections assume the following key assumptions at emergence:

- A first lien secured asset-based lending facility (the "Exit Facility") entered into at emergence with $25 million in commitments and a $25 million letter of credit sub-facility. The Exit Facility is assumed to be undrawn as of the Effective Date, with approximately $24 million of existing letters of credit extended under the letter of credit sub-facility. The Exit Facility bears cash interest, payable quarterly, at a *per annum* rate of (a) for Eurodollar Loans, 1, 2, 3 or 6 month LIBOR, with a LIBOR floor of 1.00%

and (b) for ABR Loans, the Alternate Base Rate plus, in each case, the applicable amount set forth in Annex A of the Exit Facility Term Sheet.  Unused commitments under the Exit Facility shall also incur (i) a commitment fee of 0.50% *per annum* and (ii) fees on outstanding letters of credit at a rate equal to the applicable margin with respect to Eurodollar Loans under the Exit Facility, payable monthly.

- $48.1 million in New Secured Convertible Notes issued at emergence. The New Secured Convertible Notes will bear interest at a fixed rate of 10% *per annum*, which will be payable semi-annually in-kind in the form of an increase to the principal amount. The New Secured Convertible Notes are set to mature five years and six months from issuance at emergence. The New Secured Convertible Notes are convertible into 95% of the pro forma New Equity Interests, subject to dilution by any New Equity Interest issued in connection with the New Management Incentive Plan Equity, as described in Article IV of the Disclosure Statement.  The New Secured Convertible Notes will be secured on (i) a second lien basis on all assets of the Company securing any obligations under the Exit Facility, and (ii) a first lien basis on all assets that do not constitute collateral for such Exit Facility.

|  |  | Fiscal Year Ending December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| ($ in millions) | 4Q'20E | 2021E | 2022E | 2023E | 2024E | 2025E | FN |
| **Projected Income Statement** | | | | | | | |
| Total Revenue | $47 | $264 | $292 | $332 | $363 | $425 | [1,2] |
| ( - ) Operating Cost | (34) | (194) | (222) | (256) | (282) | (337) | |
| **Gross Margin** | **$13** | **$70** | **$70** | **$76** | **$81** | **$88** | |
| *Gross Margin %* | 28% | 26% | 24% | 23% | 22% | 21% | |
| ( - ) G&A Expense | (8) | (30) | (33) | (37) | (40) | (41) | |
| ( - / + ) Equity Investments | (2) | (6) | (6) | (6) | (6) | (6) | [3] |
| **Adjusted EBITDA** | **$3** | **$33** | **$31** | **$34** | **$35** | **$41** | |
| | | | | | | | |
| **Projected Cash Flow Statement** | | | | | | | |
| Adjusted EBITDA | $3 | $33 | $31 | $34 | $35 | $41 | |
| ( - ) Capital Expenditures | (1) | (9) | (13) | (13) | (10) | (9) | |
| ( - / + ) Change in Working Capital & Other | 4 | (6) | (2) | 1 | 1 | (1) | |
| **Unlevered Free Cash Flow** | **$6** | **$18** | **$16** | **$22** | **$26** | **$32** | |
| ( - ) Cash Interest | (0) | (0) | (0) | (0) | (0) | (0) | |
| ( - / + ) Non-Recurring | -- | 7 | 2 | 2 | -- | -- | |
| **Total Change in Cash** | **$6** | **$25** | **$18** | **$24** | **$25** | **$31** | |
| | | | | | | | |
| Beginning Cash | $14 | $20 | $45 | $63 | $87 | $112 | |
| **Ending Cash** | **$20** | **$45** | **$63** | **$87** | **$112** | **$143** | |

*Note:*

[1] *Before the Petition Date, the Company received a notice of termination of a material sand purchase agreement. The Company disputes the validity of the termination and has engaged with the counterparty in an effort to resolve the dispute. The Company does not believe such alleged termination warrants any modification to the projections at this time.*

[2] *Implies full year revenue and Adjusted EBITDA of $283 million and $8 million, respectively, pro forma for one-time severance and restructuring costs.*

[3] *Reflects an adjustment resulting from non-cash income from unconsolidated equity affiliates.*

## **EXHIBIT C**

Liquidation Analysis

## Exhibit C: Liquidation Analysis

### Introduction

Often referred to as the "best interests of creditors" test, section 1129(a)(7) of the Bankruptcy Code[1] requires that a Bankruptcy Court find, as a condition to confirmation of a plan of reorganization, that each holder of a claim or interest in each impaired class either (i) has accepted the plan; or (ii) will receive or retain under the plan property of a value, as of the effective date of the confirmed plan, that is not less than the amount such holder would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code.[2]

To conduct this Liquidation Analysis, the Debtors and their advisors have taken the following steps:

i)   estimated the cash proceeds that a chapter 7 trustee (a "**Trustee**") would generate if each Debtor's chapter 11 case was converted to a chapter 7 case on the Effective Date and the assets of such Debtor's Estate were liquidated (the "**Liquidation Proceeds**");

ii)  determined the distribution that each holder of a Claim or Equity Interest would receive from the Liquidation Proceeds under the priority scheme set forth in chapter 7 (the "**Liquidation Distribution**"); and

iii) compared each holder's Liquidation Distribution to the distribution such holder would receive under the Debtors' chapter 11 Plan if the Plan were confirmed and consummated (the "**Plan Distribution**").

This Liquidation Analysis represents an estimate of cash distributions and recovery percentages based on a hypothetical chapter 7 liquidation of the Debtors' assets. It is therefore a hypothetical analysis based on certain assumptions discussed herein and in the Disclosure Statement.  As such, asset values and claims discussed herein may differ materially from amounts referred to in the Plan and Disclosure Statement.  The Liquidation Analysis should be read in conjunction with the assumptions, qualifications, and explanations set forth in the Disclosure Statement and the Plan in their entirety, as well as the notes and assumptions set forth below.

The determination of the costs of, and proceeds from, the hypothetical liquidation of the Debtors' assets in a chapter 7 case involves the use of estimates and assumptions that, although considered reasonable by the Debtors based on their business judgment and input from their advisors, are subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors, their management and their advisors. The Liquidation Analysis was prepared for the sole purpose of generating a reasonable, good faith estimate of the proceeds that would be generated if the Debtors' assets were liquidated in accordance with chapter 7 of the

---

[1] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Disclosure Statement, to which this Liquidation Analysis is attached **Exhibit C**, or the Plan attached to the Disclosure Statement as **Exhibit A**.

[2] Additional references to chapter 7 throughout this exhibit assumed to encompass similar insolvency proceedings in non-US jurisdictions. Local / jurisdictional laws and/or rules governing liquidation priorities outside the US are assumed to be generally consistent with those set forth in chapter 7 of the Bankruptcy Code. Any deviations of such laws and/or rules would not materially impact the conclusions of this analysis.

1

Bankruptcy Code.  The Liquidation Analysis is not intended, and should not be used, for any other purpose.

All of the limitations and risk factors set forth in the Disclosure Statement are applicable to this Liquidation Analysis and are incorporated by reference herein.   The underlying financial information in the Liquidation Analysis was prepared using policies that are generally consistent with those applied in historical financial statements but was not compiled or examined by independent accountants and was not prepared to comply with GAAP or SEC reporting requirements.

THE DEBTORS AND THEIR ADVISORS MAKE NO REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THE ESTIMATES CONTAINED HEREIN OR A CHAPTER 7 TRUSTEE'S ABILITY TO ACHIEVE FORECASTED RESULTS. IN THE EVENT THESE CHAPTER 11 CASES ARE CONVERTED TO A CHAPTER 7 LIQUIDATION, ACTUAL RESULTS COULD VARY FROM THE ESTIMATES SET FORTH IN THIS LIQUIDATION ANALYSIS.

### BASIS OF PRESENTATION

The Liquidation Analysis has been prepared assuming that the Debtors' chapter 7 liquidation commences on or about September 30, 2020 (the "**Liquidation Date**").  The pro forma values referenced herein are projected as of the Liquidation Date and utilize the May 31, 2020 balance sheet and projected results of operations and cash flow over the projection period to the assumed Liquidation Date.  The Debtors have assumed that the Liquidation Date is a reasonable proxy for the anticipated Effective Date.  The Liquidation Analysis was prepared on a legal entity basis for each Debtor (and non-debtor) and, for presentation purposes, summarized into a consolidated report.

In preparing the Liquidation Analysis, the Debtors estimated Allowed Claims based on a review of the Debtors' financial statements and projected results of operations and cash flow over the projection period to account for estimated liabilities, as necessary.  The cessation of business in a liquidation is likely to trigger certain claims and funding requirements that would otherwise not exist under the Plan absent a liquidation.  Such claims could include chapter 7 administrative expense claims, including, wind down costs, trustee fees, and professional fees, among other claims. Some of these claims and funding obligations could be significant and would be entitled to administrative or priority status in payment from liquidation proceeds.  The Debtors' estimates of Allowed Claims set forth in the Liquidation Analysis should not be relied on for the purpose of determining the value of any distribution to be made on account of Allowed Claims or Equity Interests under the Plan.

NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE, OR CONSTITUTES, A CONCESSION, ADMISSION, OR ALLOWANCE OF ANY CLAIM BY THE DEBTORS. THE ACTUAL AMOUNT OR PRIORITY OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH AND USED IN THE LIQUIDATION ANALYSIS. THE DEBTORS RESERVE ALL RIGHTS TO SUPPLEMENT, MODIFY, OR AMEND THE ANALYSIS SET FORTH HEREIN.

US-DOCS\117149488.5

Chapter 7 administrative expense claims that arise in a liquidation scenario would be paid in full from the Liquidation Proceeds prior to proceeds being made available for distribution to holders of Allowed Claims.  Under the "absolute priority rule," no junior creditor may receive any distributions until all senior creditors are paid in full, and no equity holder may receive any distribution until all creditors are paid in full.  The assumed distributions to creditors as reflected in the Liquidation Analysis are estimated in accordance with the absolute priority rule.

This Liquidation Analysis does not include any recoveries or related litigation costs resulting from any potential preference, fraudulent transfer, or other litigation or avoidance actions that may be available under the Bankruptcy Code because of the cost of such litigation, the uncertainty of the outcome, and potential disputes regarding these matters. In addition, the Liquidation Analysis assumes all customer contracts are terminated on the Liquidation Date. Rejection damages claims have been estimated for purposes of this analysis, however, actual claims could materially differ from estimates.  Finally, the Liquidation Analysis does not include estimates for the tax consequences that may be triggered upon the liquidation and sale of assets in the manner described above. Such tax consequences could be material.

**LIQUIDATION PROCESS**

The Debtors' liquidation would be conducted pursuant to chapter 7 of the Bankruptcy Code. The Debtors have assumed that their liquidation would occur over approximately six months during which the Trustee would efficiently and effectively monetize substantially all the assets on the consolidated balance sheet and administer and wind-down the Estates.[3]

As part of the Trustee's liquidation process, the initial step would be to develop a liquidation plan designed to generate proceeds from the sale of assets that it would then distribute to creditors.  This liquidation process would have three major components:

    i)  Cash proceeds from asset sales ("**Gross Distribution Proceeds**");

    ii) Costs to liquidate the business and administer the Estates under chapter 7 (**"Liquidation Adjustments"**);

    iii)Remaining proceeds available for distribution to claimants ("**Net Distribution Proceeds**").

**i)   Gross Distribution Proceeds**

The Gross Distribution Proceeds reflect the proceeds the Trustee would generate from a hypothetical chapter 7 liquidation.  Under section 704 of the Bankruptcy Code, a Trustee must, among other duties, collect and convert property of the Estates as expeditiously as is compatible with the best interests of parties in interest, which could result in potentially distressed recoveries. This Liquidation Analysis assumes the Trustee will market the assets on an accelerated timeline and consummate the sale transactions within six months from the Liquidation Date.  Asset values in the liquidation process will likely be materially reduced due to, among other things, (i) the

---

[3] Although the Liquidation Analysis assumes the liquidation process would occur over a six-month period, it is possible the disposition and recovery from certain assets could take shorter or longer to realize.

3

US-DOCS\117149488.5

accelerated time frame in which the assets are marketed and sold; (ii) negative vendor / customer reaction; and (iii) the generally forced nature of the sale.

The Debtors have assumed the Trustee will retain lawyers, financial advisors, and investment bankers to support the sale and transition of assets over the six-month liquidation period.

## ii)   The Liquidation Adjustments

The Liquidation Adjustments reflect the costs the Trustee would incur to monetize the assets and wind down the Estates in chapter 7 and include the following:

- Expenses necessary to efficiently and effectively monetize the assets (the "**Wind Down Budget**");

- Chapter 7 professional fees;

- Chapter 7 Trustee fees; and

## iii) Net Distribution Proceeds

The Net Distribution Proceeds reflect amounts available to Holders of Claims after the Liquidation Adjustments are netted against the Gross Distribution Proceeds.   Under this analysis, the Liquidation Proceeds are distributed to Holders of Claims against, and Equity Interests in, the Debtors in accordance with the Bankruptcy Code's priority scheme:

- Superpriority Carve-Out Claims – Claims attributed to accrued and unpaid fees for the U.S. Trustee and Clerk of the Bankruptcy Court, and certain Professional Persons (as defined in the Interim DIP Order);

- Superpriority DIP ABL Claims – Claims attributed to the DIP ABL Credit Agreement;

- Superpriority DIP Term Loan Claims – Claims attributed to the DIP Term Loan Credit Agreement, including accrued and unpaid principal and interest as of the Liquidation Date;

- Administrative Expenses – Claims for post-petition accounts payable, post-petition intercompany claims, post-petition accrued expenses, Professional Fee Claims, and other claims granted administrative expense priority status under section 503(b)(9) of the Bankruptcy Code during these Chapter 11 Cases.

- Other Secured Claims – There are no assumed Other Secured Claims for purposes of the Liquidation Analysis;

- Priority Tax Claims – Claims entitled to priority under section 507 of the Bankruptcy Code.

- Other Priority Claims – There are no assumed Other Priority Claims for purposes of the Liquidation Analysis;

4

US-DOCS\117149488.5

- <u>Prepetition Notes Claims</u> – Any and all Claims arising from, under, or in connection with the Prepetition Notes, the Prepetition Notes Indenture (each, as defined in the Plan), or any other related document or agreement. Notably, the Prepetition Notes Claims maintain structural priority over General Unsecured Claims because each Debtor guaranteed the "Obligations" (as defined in the Prepetition Notes Indenture), whereas General Unsecured Claims generally only maintain a Claim against a single Debtor entity.

- <u>General Unsecured Claims</u> – Claims arising from non-priority claims, including certain pre-petition liabilities not subject to first-day relief and various other unsecured liabilities, and excluding the Prepetition Notes Claims.

- <u>Intercompany Claims</u> – Claims arising from amounts the Debtors owe to other Debtors and/or non-Debtor Affiliates;

- <u>Intercompany Interests</u> – Equity Interests arising from the Debtors' Equity Interests in other Debtors and Non-Debtor Affiliates.

- <u>Old Parent Interests</u> – Claims arising from Equity Interests in Debtor Hi-Crush Inc.

5

US-DOCS\117149488.5

CONCLUSION

The Debtors have determined, as summarized in the table below, on the Effective Date, that the Plan will provide all Holders of Allowed Claims and Equity Interests with a recovery that is not less than what they would otherwise receive pursuant to a liquidation of the Debtors' assets under chapter 7 of the Bankruptcy Code. Accordingly, the Plan satisfies the requirement of 1129(a)(7) of the Bankruptcy Code.

*Summary Recovery Table*

|  | Plan Recoveries (1) | | | Chapter 7 Liquidation Recoveries (2) | | |
|---|---|---|---|---|---|---|
|  | Low | Midpoint | High | Low | Midpoint | High |
| Superpriority Carve-Out Claims | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Superpriority DIP ABL Claims | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Superpriority DIP Term Loan Claims | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Administrative Expenses | 100.0% | 100.0% | 100.0% | 26.9% | 56.8% | 70.4% |
| Priority Tax Claims | 100.0% | 100.0% | 100.0% | 64.7% | 69.1% | 84.0% |
| Prepetition Notes Claims | 26.2% | 31.9% | 37.4% | 0.6% | 1.9% | 4.7% |
| General Unsecured Claims | 26.2% | 31.9% | 37.4% | 0.0% | 0.0% | 0.5% |
| Intercompany Claims | N/A | N/A | N/A | 0.0% | 0.0% | 0.0% |
| Intercompany Interests | N/A | N/A | N/A | 0.0% | 0.0% | 0.0% |
| Old Parent Interests | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |

**Notes**
(1) Plan Recoveries assume full participation in the rights offering by both Prepetition Notes and General Unsecured Claims.
(2) The Liquidation Analysis was prepared on a legal entity basis for each Debtor and, for presentation purposes, summarized into a consolidated report. This entity-by-entity analysis is the reason, for example, why Priority Tax Claims receive a higher recovery than Administrative Expenses, and also why Prepetition Notes Claims and General Unsecured Claims receive any recovery in chapter 7 when neither Priority Tax Claims nor Administrative Expenses get paid in full.

US-DOCS\117149488.5

**The Liquidation Analysis should be reviewed with the accompanying "Specific Notes to the Liquidation Analysis" set forth on the following pages.  The below tables reflect the consolidation of the standalone liquidation analyses for each Debtor and non-debtor.**

*USD in millions*

| Gross Liquidation Proceeds | | 31-May Net Book Value | Adjustments / Setoffs | 30-Sep Pro Forma Value | Recovery Estimate % | | | Recovery Estimate $ | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Low | Midpoint | High | Low | Midpoint | High |
| **Current Assets** | | | | | | | | | | |
| Unrestricted Cash | [A] | 32.1 | (19.1) | 12.9 | 100.0% | 100.0% | 100.0% | 12.9 | 12.9 | 12.9 |
| Restricted Cash | [A] | - | 13.0 | 13.0 | 0.0% | 0.0% | 0.0% | - | - | - |
| Accounts Receivable | [B] | 24.0 | 0.2 | 24.0 | 72.7% | 77.7% | 82.7% | 17.4 | 18.6 | 19.8 |
| Inventory | [C] | 30.1 | (1.8) | 28.3 | 28.3% | 35.9% | 43.5% | 8.0 | 10.2 | 12.3 |
| Other Current Assets | [D] | 6.4 | 1.0 | 7.4 | 0.0% | 0.0% | 0.0% | - | - | - |
| **Total Current Assets** | | **92.5** | **(6.7)** | **85.6** | **44.8%** | **48.7%** | **52.6%** | **38.3** | **41.7** | **45.0** |
| **Property Plant & Equipment, Net** | | | | | | | | | | |
| Land | [E] | 272.1 | (4.4) | 267.7 | 1.7% | 3.6% | 5.5% | 4.4 | 9.6 | 14.7 |
| Plant & Equiptment | [F] | 214.4 | (3.4) | 211.0 | 6.0% | 8.5% | 11.1% | 12.6 | 18.0 | 23.3 |
| Other PP&E, Net | [G] | 173.6 | (0.2) | 173.3 | 13.4% | 16.6% | 19.7% | 23.2 | 28.7 | 34.2 |
| **Total PP&E** | | **660.1** | **(8.0)** | **652.0** | **6.2%** | **8.6%** | **11.1%** | **40.2** | **56.3** | **72.3** |
| **Other Assets** | | | | | | | | | | |
| Intangible Assets | [H] | 36.3 | (0.0) | 36.3 | 0.0% | 0.0% | 0.0% | - | - | - |
| Investment in PropX | [I] | 55.1 | (16.0) | 39.0 | 0.0% | 5.0% | 10.0% | - | 2.0 | 3.9 |
| Other Long Term Assets | [J] | 48.0 | (0.1) | 48.0 | 0.0% | 0.0% | 0.0% | - | - | - |
| **Total Other Assets** | | **139.4** | **(16.1)** | **123.3** | **0.0%** | **1.6%** | **3.2%** | **-** | **2.0** | **3.9** |
| **Gross Liquidation Proceeds** | | **892.1** | **(30.8)** | **860.9** | **9.1%** | **11.6%** | **14.1%** | **78.6** | **99.9** | **121.2** |
| **Less: Liquidation Adjustments** | | | | | | | | | | |
| Wind Down Budget | [K] | | | | | | | (8.1) | (8.1) | (8.1) |
| Professional Fees | [L] | | | | | | | (2.4) | (2.2) | (1.8) |
| Trustee Fees | [M] | | | | | | | (2.3) | (3.0) | (3.6) |
| **Net Liquidation Proceeds** | | **892.1** | **(30.8)** | **860.9** | **7.6%** | **10.1%** | **12.5%** | **65.7** | **86.6** | **107.7** |
| **Value Redistribution:** | | | | | | | | | | |
| Intercompany Receivables - Non-Debtor | [N] | 54.7 | - | 54.7 | 0.2% | 0.2% | 0.2% | 0.1 | 0.1 | 0.1 |
| Investments in Subsidiaries | [O] | nmf | nmf | nmf | nmf | nmf | nmf | - | - | - |
| **Total Value Redistribution** | | **54.7** | **-** | **54.7** | **0.2%** | **0.2%** | **0.2%** | **0.1** | **0.1** | **0.1** |
| **Net Liquidation Proceeds Available for Distribution** | | **946.7** | **(30.8)** | **915.6** | **7.2%** | **9.5%** | **11.8%** | **65.9** | **86.7** | **107.8** |

7

*USD in millions*

| | | Claims | | | % Recovery | | | $ Recovery | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Low | Midpoint | High | Low | Midpoint | High | Low | Midpoint | High |
| Total Proceeds | | | | | | | | 65.9 | 86.7 | 107.8 |
| Less: Superpriority Carve-Out Claims | [P] | (4.7) | (4.7) | (4.7) | 100.0% | 100.0% | 100.0% | (4.7) | (4.7) | (4.7) |
| Remaining Amount Available for Distribution | | | | | | | | 61.2 | 82.0 | 103.1 |
| Less: Superpriority DIP ABL Claims | [Q] | (11.0) | (11.0) | (11.0) | 100.0% | 100.0% | 100.0% | (11.0) | (11.0) | (11.0) |
| Remaining Amount Available for Distribution | | | | | | | | 50.1 | 70.9 | 92.1 |
| Less: Superpriority DIP Term Loan Claims | [Q] | (31.8) | (31.8) | (31.8) | 100.0% | 100.0% | 100.0% | (31.8) | (31.8) | (31.8) |
| Remaining Amount Available for Distribution | | | | | | | | 18.3 | 39.1 | 60.3 |
| Less: Other Priority Claims | [R] | - | - | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Remaining Amount Available for Distribution | | | | | | | | 18.3 | 39.1 | 60.3 |
| Less: Other Secured Claims | [S] | - | - | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Remaining Amount Available for Distribution | | | | | | | | 18.3 | 39.1 | 60.3 |
| Less: Priority Tax Claims | [T] | (3.8) | (3.8) | (3.8) | 64.7% | 69.1% | 84.0% | (2.5) | (2.6) | (3.2) |
| Remaining Amount Available for Distribution | | | | | | | | 15.9 | 36.5 | 57.1 |
| Less: Chapter 11 Administrative Expense | [U] | (48.4) | (48.4) | (48.4) | 26.9% | 56.8% | 70.4% | (13.0) | (27.5) | (34.1) |
| Remaining Amount Available for Distribution | | | | | | | | 2.8 | 9.0 | 23.0 |
| Less: Prepetition Notes Claims | [V] | (477.8) | (477.8) | (477.8) | 0.6% | 1.9% | 4.7% | (2.8) | (9.0) | (22.3) |
| Remaining Amount Available for Distribution | | | | | | | | 0.0 | 0.0 | 0.7 |
| Less: General Unsecured Claims | [W] | (133.5) | (133.5) | (133.5) | 0.0% | 0.0% | 0.5% | (0.0) | (0.0) | (0.7) |
| Remaining Amount Available for Distribution | | | | | | | | - | - | - |
| Less: Intercompany Claims | [X] | (54.5) | (54.5) | (54.5) | 0.0% | 0.0% | 0.0% | - | - | - |
| Remaining Amount Available for Distribution | | | | | | | | - | - | - |
| Less: Intercompany Interests | [Y] | nmf | nmf | nmf | nmf | nmf | nmf | - | - | - |
| Remaining Amount Available for Distribution | | | | | | | | - | - | - |
| Less: Old Parent Interests | [Z] | nmf | nmf | nmf | nmf | nmf | nmf | - | - | - |
| Remaining Amount Available for Distribution | | | | | | | | - | - | - |

8

SPECIFIC NOTES TO THE LIQUIDATION ANALYSIS

### *Gross Liquidation Proceeds from External Assets*

The below table summarizes asset recoverability percentages for the Debtors' assets. Net Distribution Proceeds on the sale of non-debtor assets are recovered by the Debtors via settlement of intercompany receivables and/or equity distributions factoring the priority of claims that reside at each non-debtor (reference Value Redistribution section below).

| Note | Asset Type / Assumptions | Debtors' Recovery |
|---|---|---|
| A | Unrestricted cash consist of all cash and liquid investments, if applicable, and restricted cash consist of cash collateralizing letters of credit. The Liquidation Analysis assumes cash collateralized letters of credit are drawn on the Liquidation Date and are not recoverable. | 50% |
| B | Accounts Receivable consist of trade amounts owed for frac sand, transportation and logistics services provided to oilfield services companies and oil & natural gas exploration and production customers. The analysis assumes that customers would terminate contracts at the Liquidation Date and offset the costs associated with switching to a new provider against amounts owed.  The interruption of business caused by the liquidation could further impact the ability of the Trustee to collect on these amounts. | 78% |
| C | Inventory consists of wet frac sand, dry frac sand, spare parts, diesel and unleaded fuel, and sand material that is onsite or in transit. The Debtors expect wet frac sand could be sold in a liquidation scenario at values ranging from approximately $0 per ton to $3 per ton. Depending on the location of the dry sand product, the Debtors the sand can be sold at values ranging from approximately $12 to $18 per ton for Northern White Sand and $6 to $8 per ton for Kermit Sand.  Associated spare parts are assumed to be liquidated with assumed de minimis recoveries. | 36% |
| D | Other Current Assets consist of prepaid (1) insurance, rent, taxes and other miscellaneous prepaid items; (2) supplier, customer and other miscellaneous deposits; (3) deferred charges; and (4) deferred tax assets.  Prepaid expenses are assumed to be recoverable to the extent such amounts can be refunded or used to offset expenses included in the Wind Down Budget. | 0% |

| Note | Asset Type / Assumptions | Debtors' Recovery |
|------|--------------------------|-------------------|
| E | Land includes owned real estate (mines and terminal properties), land acquisition costs, and mine development. | 4% |
| F | Plant & Equipment ("PP&E") includes mining equipment and associated equipment used in processing facilities (Wet and Dry plants). | 9% |
| G | Other PP&E, Net consists of (1) rail equipment, (2) leasehold improvements, (3) construction in progress, (4) transload facilities and equipment, (5) vehicles, and (6) other miscellaneous equipment. | 17% |
| H | Intangible Assets includes goodwill, patents and other intangible assets. | 0% |
| I | Investment in PropX represents the minority ownership interest in Proppant Express Investments, LLC. | 5% |
| J | Other Long Term Assets consist of (1) right of use assets, (2) capitalized debt issuance costs, and (3) other assets. | 0% |

## *Liquidation Adjustments*

K.        Wind Down Budget

The Wind Down Budget includes the expenses the Trustee will incur to efficiently and effectively monetize the assets over the six-month liquidation period. These expenses relate to labor, building rent, facilities expenses, transportation expense, insurance, health and safety expenses, and taxes. The Liquidation Analysis assumes total wind down costs of approximately $8.1 million for the Debtors and their non-Debtor Affiliates over the six-month period following the Liquidation Date.

L.        Professional Fees

The post-conversion Professional Fees include estimates for certain professionals that will provide assistance and services during the wind down period. The Liquidation Analysis assumes the Trustee will retain lawyers, financial advisors, and investment bankers to assist in the liquidation. These advisors will assist in marketing the Debtors' assets, litigating claims and resolving tax litigation matters, and resolving other matters relating to the wind down of the Debtors' Estates. The Liquidation Analysis estimates Professional Fees at a range of 2% to 3% of Gross Liquidation Proceeds.

US-DOCS\117149488.5

M.        Trustee Fees

Section 326(a) of the Bankruptcy Code provides that Trustee Fees may not exceed 3% of distributable proceeds *in excess* of $1 million.  The Liquidation Analysis assumes the Trustee Fees would be approximately 3% of Gross Liquidation Proceeds from External Assets.

### *Value Redistribution*

For purposes of determining the recoverability of (i) intercompany receivables owed to the Debtors from non-Debtor Affiliates and (ii) the Debtors' Equity Interests in non-Debtor Affiliated subsidiaries, individual liquidation analyses were performed on each Debtor and non-Debtor Affiliate on a standalone basis. The recoverability of the Debtors' intercompany receivables and investments in subsidiaries was calculated prior to determining the proceeds available for distribution to the Debtors' claimants.

N.        Intercompany Receivables – Non-Debtor

Historically, the Debtors and their Affiliated subsidiaries created intercompany receivables and payables as a result of various transactions related to intercompany trade debt, overhead and expense allocations, and other intercompany charges. In addition, there are several entities that act as cash poolers for the organization. The recoverability of Intercompany Receivables owed to the Debtors is assumed to be approximately 0.2%, or $0.1 million.

O.        Investments in Subsidiaries

The Debtors' investments in Affiliated subsidiaries include the Debtors' Equity Interests in Debtor and non-Debtor Affiliates. The Liquidation Analysis assumes no recoveries on the Debtors' Equity Interests in non-Debtor Affiliates.

### *Net Liquidation Proceeds Available for Distribution*

Based on the Liquidation Analysis, the Net Liquidation Proceeds Available for Distribution to the Debtors' claimants range from approximately $65.9 million to $107.8 million.

### *Claims*

P.        Carve-Out Claims

The Interim Dip Order grants superpriority status to Allowed Professional Fees (as defined in the Interim DIP Order) earned, accrued or incurred by Professionals at any time before or on the first business day following delivery of the Carve-Out Trigger Notice (as defined in the Interim DIP Order). Additionally, the Interim DIP Order provides for payment of Allowed Professional Fees, subject to the professional fee Post-Carve-Out Trigger Notice Cap (as defined in the Interim DIP Order), incurred after the first business day following the date of delivery of the Carve-Out Trigger Notice. The Liquidation Analysis assumes approximately $4.7 million in Carve-Out Claims (as define in the Interim DIP Order) at the Liquidation Date. The Liquidation Analysis assumes the Liquidation Proceeds would be sufficient to satisfy 100% of the Carve-Out Claims

Q.        DIP Facility Claims

11

The Bankruptcy Code grants superpriority administrative expense claim status to claims made pursuant to the Debtors' DIP Loan Document.  The Liquidation Analysis assumes DIP Facility Claims outstanding as of the Liquidation Date include unpaid principal and interest in the amount of approximately $11.0 million and $31.8 million for DIP ABL Facility Claims and DIP Term Loan Facility Claims, respectively.

The Liquidation Analysis assumes the Liquidation Proceeds would be sufficient to satisfy 100% of the DIP Facility Claims.

R.        Other Priority Claims

The Liquidation Analysis assumes there will be no Other Priority Claims as of the Liquidation Date.

S.        Other Secured Claims

The Liquidation Analysis assumes there will be no Other Secured Claims at the Debtors as of the Liquidation Date.

T.        Priority Tax Claims

Priority Tax Claims consist of accrued and unpaid income, sales and use, franchise, property, VAT and other taxes owed at the Debtors and non-debtors. The Liquidation Analysis assumes the Liquidation Proceeds would be sufficient to satisfy approximately 69% of the Priority Tax Claims.

U.        Chapter 11 Administrative Expense

Chapter 11 Administrative Expense consist of estimated post-petition accrued operating expenditures and other administrative and professional services. The Liquidation Analysis assumes approximately $48.4 million in Chapter 11 Administrative Expense at the Liquidation Date.  The Liquidation Analysis further assumes the Liquidation Proceeds would be sufficient to satisfy approximately 57% of the Chapter 11 Administrative Expense.

V.        Prepetition Notes Claims

Prepetition Notes Claims consist of any and all Claims arising from, under, or in connection with the Prepetition Notes, the Prepetition Notes Indenture, or any related document or agreement, including for accrued and unpaid principal, interest and fees through September 30, 2020. The Liquidation Analysis assumes approximately $477.8 million in Prepetition Note Claims at the Liquidation Date. Senior Notes recovery amounts may vary from General Unsecured recovery due to the liquidation being performed on a legal entity basis and the location of each claim. The Liquidation Analysis further assumes the Liquidation Proceeds would be sufficient to satisfy approximately 2% of the Prepetition Note Claims.

W.        General Unsecured Claims

General Unsecured Claims consist certain general unsecured prepetition liabilities not subject to first-day relief, and exclude the Prepetition Notes Claims.  The actual amount of General Unsecured Claims could vary materially from these estimates.  No order has been entered by the

12

US-DOCS\117149488.5

Bankruptcy Court estimating or otherwise fixing the amount of General Unsecured Claims at the Debtors.  The Liquidation Analysis assumes approximately $133.5 million in General Unsecured Claims at the Liquidation Date. The Liquidation Analysis further assumes the Liquidation Proceeds would be sufficient to satisfy less than 0.1% of the General Unsecured Claims.

X.          Intercompany Claims

Intercompany Claims consist of amounts owed by and between the Debtors and/or non-Debtor Affiliates for pre-petition intercompany activity. The Liquidation Analysis further assumes there would be no recovery on these Claims. See Value Redistribution section above for further detail on recoverability of amounts owed by the non-debtors to the Debtors.

Y.          Intercompany Interests

Intercompany Interests consist of the Debtors' Equity Interests in other Debtors or non-Debtor Affiliates. The Liquidation Analysis assumes there would be no recovery on these Equity Interests.

Z.  Old Parent Interests

Old Parent Interests consist of common Equity Interests in Hi-Crush Inc. The Liquidation Analysis assumes there would be no recovery on these Equity Interests.

13

**EXHIBIT D**

[Reserved]

**EXHIBIT E**

Valuation Analysis

**EXHIBIT E VALUATION OF THE DEBTORS**

THE INFORMATION CONTAINED HEREIN IS NOT A PREDICTION OR GUARANTEE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN. THE INFORMATION IS PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING ADEQUATE INFORMATION UNDER SECTION 1125 OF THE BANKRUPTCY CODE TO ENABLE THE HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF CLAIMS AGAINST THE DEBTORS OR ANY OF THEIR AFFILIATES.[1]

A summary of the valuation analysis is set forth below. The estimates of the enterprise value contained therein do not reflect values that could be attainable in public or private markets, and are not a prediction or guarantee of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan.

Depending on the results of the Reorganized Debtors' operations, changes in the financial markets and/or other economic conditions, including the economic impact of the COVID-19 virus, the value of the Reorganized Debtors may change significantly. In addition, the valuation of newly issued securities is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things, prevailing interest rates, conditions in the financial markets, the anticipated initial securities holdings of prepetition creditors, some of which may prefer to liquidate their investments rather than hold them on a long-term basis, the potentially dilutive impact of certain events, including the conversion of convertible debt securities such as the New Secured Convertible Notes and issuance of equity securities pursuant to any management incentive compensation plan, and other factors that generally influence the prices of securities. Actual market prices of such securities also may be affected by the Debtors' history in the Chapter 11 Cases, conditions affecting generally the industry in which the Debtors participate and by other factors not capable of accurate prediction. Accordingly, the reorganization enterprise value estimated by Lazard does not necessarily reflect, and should not be construed as reflecting, values that will be attained in the public or private markets. The estimated reorganization enterprise value depends highly upon achieving the future financial results set forth in the Financial Projections, as well as the realization of certain other assumptions that are not guaranteed. The valuations set forth therein represent estimated reorganization enterprise values and do not necessarily reflect values that could be attainable in public or private markets.

## Valuation Analysis of the Reorganized Debtors

### A. Estimated Valuation

Solely for the purposes of the Plan and the Disclosure Statement, Lazard Frères & Co. LLC ("Lazard"), as investment banker to the Debtors, has estimated a range of total enterprise

---

[1] All capitalized terms used but not otherwise defined herein shall have .the meanings ascribed to them in the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization for Hi-Crush and Its Debtor Affiliates* (the "Disclosure Statement"), to which this Valuation Analysis is attached as **Exhibit E**.

value ("Enterprise Value") for the Reorganized Debtors on a consolidated going-concern basis and pro forma for the transactions contemplated by the Plan (the "Valuation Analysis"). The Valuation Analysis is based on financial information and projections provided by the Debtors' management, including the Financial Projections attached to the Disclosure Statement as **Exhibit B** (collectively the "Projections"), and information that is publicly available or was provided by other sources. The Valuation Analysis assumes that the Effective Date will occur on September 30, 2020. The valuation estimates set forth herein represent valuation analyses of the Reorganized Debtors based on the application of customary valuation techniques to the extent deemed appropriate by Lazard.

Based on the Projections and solely for the purposes of the Plan, the value of the Reorganized Debtors' operations on a going concern basis, the Enterprise Value is estimated to be approximately $145 million to $215 million with a midpoint of $180 million. The Valuation Analysis assumes that, between the date of filing of the Disclosure Statement and the assumed Effective Date, no material changes that would affect the Projections or estimated valuation will occur.

The Valuation Analysis does not constitute an opinion as to fairness from a financial point of view of the consideration to be received or paid under the Plan, of the terms and provisions of the Plan, or with respect to any other matters.

## B. Valuation Methodology

The consolidated value of the Reorganized Debtors was estimated by primarily relying on two generally accepted valuation techniques: (i) Discounted Cash Flow ("DCF") Analysis and (ii) Comparable Company Analysis. While Lazard recognizes that the precedent transaction methodology is often used, Lazard believes that this methodology has less relevance for purposes of assessing the Enterprise Value of the Reorganized Debtors due to the lack of recent comparable precedent transactions, among other factors.

(i)        Discounted Cash Flow Analysis:

DCF analysis is a forward-looking enterprise valuation methodology that estimates the value of an asset or business by calculating the present value of expected future cash flows to be generated by that asset or business. Under this methodology, projected future cash flows are discounted by the weighted average cost of capital of the business (the "Discount Rate"). The Discount Rate reflects the estimated rate of return that would be required by debt and equity investors to invest in the business based on its capital structure. The Enterprise Value of the firm is determined by calculating the present value of the unlevered after-tax free cash flows based on the Projections plus an estimate for the value of the firm beyond the Projection period, known as the terminal value. The range of potential terminal values was calculated by applying a multiple to earnings before interest, taxes, depreciation and amortization ("EBITDA") and by deriving a value using an assumed perpetuity growth rate applied to the unlevered after-tax free cash flow in the final year of the Projection period. The terminal value was then discounted back to the assumed Effective Date.

(ii) <u>Comparable Public Company Analysis:</u>

Comparable Public Company Analysis estimates the value of a company relative to other publicly traded companies with similar operating and financial characteristics. A set of publicly traded companies was selected based on similar business and financial characteristics to the Reorganized Debtors. Criteria for the selected reference group included, among other relevant characteristics, similarity in business, business risks, growth prospects, product mix, customer base, margins, geography, market presence, size and scale of operations. The selected reference group may not be comparable to the Reorganized Debtors in all aspects, and may differ materially in others.

In deriving Enterprise Value ranges under the Comparable Public Company Analysis methodology, EBITDA multiples were the primary valuation metric. Based on 2022, 2023 and "cycle"[2] multiples of the selected reference group and certain qualitative judgments based on differences between the characteristics of the Reorganized Debtors and the selected reference group, a range of multiples was then applied to the Reorganized Debtors' implied 2022, 2023 and "cycle" EBITDA. While the analysis considered implied enterprise values based on both the book and market values of debt, Lazard focused and relied on enterprise values calculated based on the market value debt.

THE VALUATION ANALYSIS REFLECTS WORK PERFORMED BY LAZARD ON THE BASIS OF INFORMATION IN RESPECT OF THE BUSINESSES AND ASSETS OF THE DEBTORS AVAILABLE TO LAZARD AS OF JULY 2, 2020. IT SHOULD BE UNDERSTOOD THAT, ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY HAVE AFFECTED OR AFFECT LAZARD'S CONCLUSIONS, LAZARD DOES NOT HAVE ANY OBLIGATION TO UPDATE, REVISE, OR REAFFIRM ITS VALUATION ANALYSIS AND DOES NOT INTEND TO DO SO. LAZARD IS NOT MAKING ANY ASSESSMENT REGARDING IMPACT OR THE ECONOMIC EFFECTS OF THE COVID-19 VIRUS, INCLUDING WITH RESPECT TO THE POTENTIAL IMPACT OR EFFECTS ON THE FUTURE FINANCIAL PERFORMANCE OF THE REORGANIZED DEBTORS. SUBSEQUENT DEVELOPMENTS, INCLUDING, WITHOUT LIMITATION, IN RELATION TO COVID-19, MAY AFFECT THE PROJECTIONS AND OTHER INFORMATION THAT LAZARD UTILIZED IN THE VALUATION ANALYSIS. LAZARD ASSUMES NO RESPONSIBILITY FOR UPDATING OR REVISING THE VALUATION ANALYSIS BASED ON CIRCUMSTANCES OR EVENTS AFTER THE DATE HEREOF.

LAZARD DID NOT INDEPENDENTLY VERIFY THE PROJECTIONS OR OTHER INFORMATION THAT LAZARD USED IN THE VALUATION ANALYSIS, AND NO INDEPENDENT VALUATIONS OR APPRAISALS OF THE DEBTORS WERE SOUGHT OR OBTAINED IN CONNECTION THEREWITH.

THE VALUATION ANALYSIS WAS DEVELOPED SOLELY FOR PURPOSES OF THE PLAN AND THE ANALYSIS OF POTENTIAL RELATIVE RECOVERIES TO CREDITORS THEREUNDER. THE VALUATION ANALYSIS REFLECTS THE

---

[2] Defined as the average of 2018 reported EBITDA through 2023 estimated EBITDA.

US-DOCS\116874051.6

APPLICATION OF VARIOUS VALUATION TECHNIQUES, DOES NOT PURPORT TO BE AN OPINION AND DOES NOT PURPORT TO REFLECT OR CONSTITUTE AN APPRAISAL, LIQUIDATION VALUE, OR ESTIMATE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED OR ASSETS TO BE SOLD PURSUANT TO THE PLAN, WHICH MAY BE SIGNIFICANTLY DIFFERENT THAN THE AMOUNTS SET FORTH IN THE VALUATION ANALYSIS.

THE VALUE OF AN OPERATING BUSINESS IS SUBJECT TO NUMEROUS UNCERTAINTIES AND CONTINGENCIES THAT ARE DIFFICULT TO PREDICT AND WILL FLUCTUATE WITH CHANGES IN FACTORS AFFECTING THE FINANCIAL CONDITION AND PROSPECTS OF SUCH A BUSINESS. AS A RESULT, THE VALUATION ANALYSIS IS NOT NECESSARILY INDICATIVE OF ACTUAL OUTCOMES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN. BECAUSE SUCH ESTIMATES ARE INHERENTLY SUBJECT TO UNCERTAINTIES, NEITHER THE DEBTORS, LAZARD, NOR ANY OTHER PERSON ASSUMES RESPONSIBILITY FOR THEIR ACCURACY.  IN ADDITION, THE POTENTIAL VALUATION OF NEWLY ISSUED SECURITIES IS SUBJECT TO ADDITIONAL UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE DIFFICULT TO PREDICT. ACTUAL MARKET PRICES OF SUCH SECURITIES AT ISSUANCE WILL DEPEND UPON, AMONG OTHER THINGS, PREVAILING INTEREST RATES, CONDITIONS IN THE FINANCIAL AND COMMODITY MARKETS, THE ANTICIPATED INITIAL SECURITIES HOLDINGS OF PREPETITION CREDITORS, SOME OF WHICH MAY PREFER TO LIQUIDATE THEIR INVESTMENTS RATHER THAN HOLD THEM ON A LONG-TERM BASIS, THE POTENTIALLY DILUTIVE IMPACT OF CERTAIN EVENTS, INCLUDING THE CONVERSION OF CONVERTIBLE DEBT SECURITIES SUCH AS THE NEW SECURED CONVERTIBLE NOTES AND THE ISSUANCE OF EQUITY SECURITIES PURSUANT TO ANY MANAGEMENT INCENTIVE COMPENSATION PLAN, AND OTHER FACTORS THAT GENERALLY INFLUENCE THE PRICES OF SECURITIES.

Management of the Debtors advised Lazard, and Lazard assumed, that the Projections were reasonably prepared in good faith and on a basis reflecting the Debtors' best estimates and judgments as to the future operating and financial performance of the Reorganized Debtors.  The Valuation Analysis assumes that the actual performance of the Reorganized Debtors will correspond to the Projections in all material respects.  If the business performs at levels below or above those set forth in the Projections, such performance may have a materially negative or positive impact, respectively, on the Valuation Analysis and estimated potential ranges of Enterprise Value therein.

In preparing the Valuation Analysis, Lazard:  (a) reviewed certain historical financial information of the Debtors for recent years and interim periods; (b) reviewed certain financial and operating data of the Debtors, including the Projections; (c) discussed the Debtors' operations and future prospects with the Debtors' senior management team and third-party advisors; (d) reviewed certain publicly available financial data for, and considered the market value of, public companies that Lazard deemed generally relevant in analyzing the value of the Reorganized Debtors; (e) considered certain economic and industry information that Lazard deemed generally relevant to the Reorganized Debtors; and (f) conducted such other studies, analyses, inquiries, and investigations as Lazard deemed appropriate.  Lazard assumed and relied

US-DOCS\116874051.6

on the accuracy and completeness of all financial and other information furnished to it by the Debtors' management and other parties as well as publicly available information.

The Valuation Analysis does not constitute a recommendation to any Holder of Allowed Claims or any other person as to how such person should vote or otherwise act with respect to the Plan.  Lazard has not been requested to, and does not express any view as to, the potential value of the Reorganized Debtors' securities on issuance or at any other time.

Lazard did not estimate the value of any tax attributes nor did it estimate the impact of any cancellation of indebtedness income on the Reorganized Debtors' Projections.  Such matters are subject to many uncertainties and contingencies that are difficult to predict. Any changes to the assumptions on the availability of tax attributes or the impact of cancellation of indebtedness income on the Reorganized Debtors' Projections could materially impact Lazard's valuation analysis.

THE SUMMARY SET FORTH ABOVE DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE VALUATION ANALYSIS PERFORMED BY LAZARD. THE PREPARATION OF A VALUATION ANALYSIS INVOLVES VARIOUS DETERMINATIONS AS TO THE MOST APPROPRIATE AND RELEVANT METHODS OF FINANCIAL ANALYSIS AND THE APPLICATION OF THESE METHODS IN THE PARTICULAR CIRCUMSTANCES AND, THEREFORE, SUCH AN ANALYSIS IS NOT READILY SUITABLE TO SUMMARY DESCRIPTION. THE VALUATION ANALYSIS PERFORMED BY LAZARD IS NOT NECESSARILY INDICATIVE OF ACTUAL VALUES OR FUTURE RESULTS, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE DESCRIBED HEREIN.

LAZARD IS ACTING AS INVESTMENT BANKER TO THE DEBTORS, AND HAS NOT BEEN, WILL NOT BE RESPONSIBLE FOR, AND WILL NOT PROVIDE ANY TAX, ACCOUNTING, ACTUARIAL, LEGAL, OR OTHER SPECIALIST ADVICE.

US-DOCS\116874051.6

**EXHIBIT F**

Disclosure Statement Order

US-DOCS\115539486.19

ENTERED
08/14/2020

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

```
-------------------------------------------------------- x
In re:                                                   :    Chapter 11
                                                         :
HI-CRUSH INC., et al.,[1]                                :    Case No. 20-33495 (DRJ)
                                                         :
                        Debtors.                         :    (Jointly Administered)
                                                         :
-------------------------------------------------------- x
```

**ORDER (I) APPROVING ADEQUACY OF DISCLOSURE STATEMENT,
(II) SCHEDULING HEARING ON CONFIRMATION OF PLAN,
(III) ESTABLISHING DEADLINE TO OBJECT TO PLAN AND FORM OF
NOTICE THEREOF, (IV) APPROVING (A) SOLICITATION PROCEDURES,
(B) FORMS OF BALLOTS AND NOTICES OF NON-VOTING AND LIMITED
VOTING STATUS, AND (C) RIGHTS OFFERING MATERIALS, (V) APPROVING
PROCEDURES FOR ASSUMPTION OF CONTRACTS AND LEASES AND
FORM AND MANNER OF CURE NOTICE, AND (VI) GRANTING RELATED RELIEF**

**[Relates to Motion at Docket No. 176]**

Upon the motion (the "**Motion**")[2] of the Debtors for entry of an Order:

    i.    approving the *Disclosure Statement for Joint Plan of Reorganization for Hi-Crush Inc. and its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code* (as may be amended, modified or supplemented from time to time, the "**Disclosure Statement**");

    ii.    scheduling a hearing (the **Confirmation Hearing**") on September 23, 2020, or as soon thereafter as the Court's calendar allows, to consider confirmation of the *Joint Plan of Reorganization for Hi-Crush Inc. and its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code*, dated July 27, 2020 (as may be amended, modified or supplemented from time to time, the "**Plan**");

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Hi-Crush Inc. (0530), OnCore Processing LLC (9403), Hi-Crush Augusta LLC (0668), Hi-Crush Whitehall LLC (5562), PDQ Properties LLC (9169), Hi-Crush Wyeville Operating LLC (5797), D & I Silica, LLC (9957), Hi-Crush Blair LLC (7094), Hi-Crush LMS LLC, Hi-Crush Investments Inc. (6547), Hi-Crush Permian Sand LLC, Hi-Crush Proppants LLC (0770), Hi-Crush PODS LLC, Hi-Crush Canada Inc. (9195), Hi-Crush Holdings LLC, Hi-Crush Services LLC (6206), BulkTracer Holdings LLC (4085), Pronghorn Logistics Holdings, LLC (5223), FB Industries USA Inc. (8208), PropDispatch LLC, Pronghorn Logistics, LLC (4547), and FB Logistics, LLC (8641).  The Debtors' address is 1330 Post Oak Blvd, Suite 600, Houston, Texas 77056.

[2]    Capitalized terms used but not defined herein shall have the same

US-DOCS\116659544.12



2033495200814000000000035

iii. establishing September 18, 2020, at 5:00 p.m. (Prevailing Central Time), as the deadline to file objections to confirmation of the Plan (the "**Confirmation Objection Deadline**");

iv. approving the notice of the Disclosure Statement Hearing and the form and manner of the notice of the Confirmation Hearing;

v. establishing the Voting Record Date (as defined below) and approving procedures for temporary allowance of Claims that are subject to an objection filed by the Debtors and the form and manner of the notice related thereto;

vi. approving the Solicitation Procedures with respect to the Plan and the forms of Ballots, the Notices of Non-Voting Status and Opt Out Opportunity, the Notice of Non-Voting Status: Disputed Claims, the Notice of Limited Voting Status to Holders of Contingent, Unliquidated, or Disputed Claims for Which No Objection Has Been Filed, the Contract/Lease Notice, and the Cover Letter;

vii. approving the Rights Offering Materials and authorizing the Debtors to commence the Rights Offering;

viii. approving the Assumption Procedures (as defined below) and the form and manner of the Cure Notice (as defined below); and

ix. granting related relief;

and the Court having reviewed the Motion and the First Day Declaration; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. § 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and that this Court may enter a final order consistent with Article III of the United States Constitution; and the Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that proper and adequate notice of the Motion has been given and that no other or further notice is necessary; and upon the record herein; and all objections, if any, to entry of this Order having been withdrawn, resolved, or overruled; and after due deliberation thereon; and the Court having determined that there is good and sufficient cause for the relief granted in the Order, it is hereby

2

US-DOCS\116659544.12

**ORDERED THAT**:

1. The Disclosure Statement is approved as containing adequate information within the meaning of section 1125 of the Bankruptcy Code, and the Debtors are authorized to distribute the Disclosure Statement and the Solicitation Packages in order to solicit votes on, and pursue confirmation of, the Plan.

2. The Disclosure Statement Notice, as proposed in the Motion and the form of notice annexed hereto as Exhibit 1, is approved. Service of the Disclosure Statement Notice as set forth in the Motion is deemed to have been good and sufficient notice of the Disclosure Statement Hearing, the Disclosure Statement Objection Deadline, and procedures for objecting to the adequacy of the Disclosure Statement.

3. A Confirmation Hearing to consider confirmation of the Plan is hereby scheduled to be held before this Court on September 23, 2020 at 2:00 p.m. (Prevailing Central Time). The Confirmation Hearing may be continued from time to time by the Court without further notice other than adjournments announced in open court or in the filing of a notice or a hearing agenda in the Chapter 11 Cases.

4. Any objections to the Plan shall: (i) be in writing; (ii) conform to the Bankruptcy Rules and the Bankruptcy Local Rules; (iii) state the name and address of the objecting party and the amount and nature of the Claim or Equity Interest held by such Entity; (iv) state with particularity the basis and nature of any objection; and (v) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is **actually received** no later than 5:00 p.m. Prevailing Central Time on September 18, 2020 (the "**Confirmation Objection Deadline**") by the following parties (the "**Notice Parties**"):

   a. Counsel to the Debtors: Latham & Watkins LLP, 885 Third Avenue, New York, NY 10022 (Attn: Keith A. Simon, Esq. and Annemarie V. Reilly, Esq.) (keith.simon@lw.com and annemarie.reilly@lw.com) and Hunton Andrews Kurth LLP, 600 Travis Street, Suite 4200, Houston, TX (Attn: Timothy A. Davidson II,

3

US-DOCS\116659544.12

Esq. and Ashley L. Harper, Esq.) (TadDavidson@HuntonAK.com and AshleyHarper@HuntonAK.com);

b. Counsel to the DIP ABL Agent: Simpson, Thacher & Bartlett LLP, 425 Lexington Avenue, New York, NY 10017 (Attn: Elisha Graff, Esq. and Daniel L. Biller, Esq.) (egraff@stblaw.com and dbiller@stblaw.com);

c. Counsel to the Ad Hoc Noteholders Committee: Paul, Weiss, Rifkind, Wharton & Garrison, LLP, 1285 Avenue of the Americas, New York, NY 10019 (Attn: Brian S. Hermann, Esq. and Elizabeth R. McColm, Esq.) (bhermann@paulweiss.com and emccolm@paulweiss.com) and Porter Hedges LLP, 1000 Main St., 36th Floor, Houston, TX 77002 (Attn: John F. Higgins, Esq.) (JHiggins@porterhedges.com);

d. Counsel to any statutory committee appointed in these Chapter 11 Cases; and

e. the Office of the United States Trustee for the Southern District of Texas, 515 Rusk Street, Suite 3516, Houston, TX 77002 (Attn: Stephen Statham, Esq. and Hector Duran, Esq.) (stephen.statham@usdoj.gov and hector.duranjr@usdoj.gov).

5. Any objections that fail to comply with the requirements set forth in this Order may, in the Court's discretion, not be considered and may be overruled.

6. The deadline to file any brief in support of confirmation of the Plan and reply to any objections shall be September 22, 2020 at 5:00 p.m. (Prevailing Central Time) (the "**Reply Deadline**").

7. The Confirmation Hearing Notice, as proposed in the Motion and the form of notice annexed hereto as Exhibit 2, shall be deemed good and sufficient notice of the Confirmation Hearing and no further notice need be given; *provided*, *however*, that any provision of Bankruptcy Rule 3017(d) requiring the Debtors to distribute the Disclosure Statement and the Plan to parties not entitled to vote, whether because they are unimpaired or because they are deemed to reject the Plan, or any parties in interest other than as prescribed in this Order, shall be waived; *provided further*, *however*, that the Disclosure Statement and Plan shall remain posted in PDF format at www.kccllc.net/hicrush and shall be provided in either electronic or paper form to any parties in interest upon written request to the Debtors. The Debtors shall also serve a copy of the Confirmation Hearing Notice on all known creditors, interest holders, and interested parties, except

4

the Debtors are not required to serve notice of any kind upon any person or entity to whom the Debtors mailed the Disclosure Statement Notice and had such notice returned by the United States Postal Service marked "undeliverable as addressed," "moved - left no forwarding address," "forwarding order expired," or any similar reason, and as to whom a further reasonable search has failed to disclose an accurate alternate address

8.     The Debtors, in their discretion, are authorized pursuant to Bankruptcy Rule 2002(*l*), to give supplemental publication notice of the Confirmation Hearing, within five (5) business days after the entry of the this Order on the docket, in *The New York Times*, the *Houston Chronicle*, and such other local newspapers, trade journals or similar publications, if any, as the Debtors deem appropriate, electronically on the Debtors' case information website (located at www.kccllc.net/hicrush), and/or in any other trade or other publications the Debtors deem necessary, which publication notice shall constitute good and sufficient notice of the Confirmation Hearing and the Confirmation Objection Deadline (and related procedures) to persons who do not receive the Confirmation Hearing Notice by mail.

9.     Service of the Confirmation Hearing Notice as set forth in the Motion and herein is sufficient notice of the Petition Date, the Confirmation Hearing, the Confirmation Objection Deadline, the Reply Deadline and procedures for objecting to confirmation of the Plan.

10.     The dates and deadlines proposed in the Motion related to the Solicitation Procedures and the Rights Offering Procedures are hereby approved as set forth on Chart A attached hereto.

11.     The Voting Record Date shall be August 14, 2020 with respect to all Claims and Equity Interests. The Debtors shall use the Voting Record Date for determining which Entities are entitled to, as applicable, receive Solicitation Packages, vote to accept or reject the Plan, and receive the Confirmation Hearing Notice and any other notices described in the Motion.

5

12.     Any Holder of a Claim for which an objection is pending on the Voting Record Date, whether such objection relates to the entire Claim or a portion thereof, shall not be entitled to vote on the Plan and shall not be counted in determining whether the requirements of section 1126(c) of the Bankruptcy Code have been met with respect to the Plan (except to the extent and in the manner as may be set forth in the objection) unless (i) the Claim has been temporarily allowed for voting purposes pursuant to Bankruptcy Rule 3018(a) and in accordance with this Order, or (ii) on or before the Voting Deadline, the objection to such Claim has been withdrawn or resolved in favor of the creditor asserting the Claim.

13.     A recipient of an objection to expunge or disallow its Claim will receive a Notice of Non-Voting Status: Disputed Claim, substantially in the form attached hereto as Exhibit 3.

14.     August 30, 2020 at 5:00 p.m. (Prevailing Central Time) (the "**Rule 3018(a) Motion Deadline**") shall be the deadline for filing and serving any motion requesting temporary allowance of a Claim for purposes of voting pursuant to Bankruptcy Rule 3018(a) (the "**Rule 3018(a) Motion(s)**").

15.     Rule 3018(a) Motions must be filed with the Court no later than the Rule 3018(a) Motion Deadline and served on the Notice Parties; provided, however, that if an objection to a Claim is filed on or after the date that is fourteen (14) days before the Rule 3018(a) Motion Deadline, then the Rule 3018(a) Motion Deadline shall be extended as to such Claim such that the holder thereof shall have at least fourteen (14) days to file a Rule 3018(a) Motion.

16.     Any party timely filing and serving a Rule 3018(a) Motion shall be provided a Ballot by no later than three (3) business days after the Rule 3018(a) Motion is filed and be permitted to cast a provisional vote to accept or reject the Plan, if such party is in a Voting Class. If, and to the extent that, the Debtors and such party are unable to resolve the issues raised by the

6

Rule 3018(a) Motion prior to the Voting Deadline, then at the Confirmation Hearing this Court shall determine whether the provisional Ballot should be counted as a vote on the Plan.

17. Nothing in this Order shall affect or limit any party's rights to object to any Proof of Claim or Rule 3018(a) Motion.

18. The Debtors are authorized to solicit acceptances of the Plan from Holders of Prepetition Notes Claims in Class 4 and Holders of General Unsecured Claims in Class 5 of the Plan.

19. The Solicitation Procedures utilized by the Debtors for distribution of the Solicitation Packages in soliciting acceptances and rejections of the Plan (as set forth in the Motion) satisfy the requirements of the Bankruptcy Code and the Bankruptcy Rules and are approved.

20. Nominees are required to forward Solicitation Packages and notices to the Beneficial Holders of Prepetition Notes Claims in Class 4 of the Plan within five (5) business days of receiving the Solicitation Packages and related notices. To the extent the Nominees incur out-of-pocket expenses in connection with distribution of the Solicitation Packages and related notices, the Debtors are authorized, but not directed, to reimburse such entities for their reasonable and customary expenses incurred in this regard.

21. The procedures used for tabulations of votes to accept or reject the Plan as set forth in the Motion and as provided by the Ballots are approved.

22. The Notices of Non-Voting Status and Opt-Out Opportunity, substantially in the forms attached hereto as Exhibit 4, 4A, 5, 5A, 5B, and 5C are approved. The Debtors are authorized to send the Notices of Non-Voting Status and Opt-Out Opportunity and the Confirmation Hearing Notice to the applicable Non-Voting Holders in lieu of a Solicitation Package.

7

23.     The Beneficial Owner Ballot, the Master Ballot, and the Class 5 Ballot substantially in the forms attached hereto as Exhibits 6A, 6B, and 6C, respectively, are approved.

24.     The Notice of Limited Voting Status to Holders of Contingent, Unliquidated, or Disputed Claims for Which No Objection Has Been Filed, substantially in the form of Exhibit 7 attached hereto, is approved.  The Debtors are authorized to distribute the Notice of Limited Voting Status to Holders of Contingent, Unliquidated, or Disputed Claims for Which No Objection Has Been Filed as set forth in the Motion.

25.     The Debtors shall file the Plan Supplement with the Court on or before September 11, 2020 (the "**Plan Supplement Filing Date**"), which filing is without prejudice to the Debtors' rights to amend or supplement the Plan Supplement.

26.     The Debtors shall serve copies of the Solicitation Package (other than a Ballot), and the Plan Supplement to (i) the United States Trustee for the Southern District of Texas; (ii) the parties included on the Debtors' consolidated list of the holders of the 30 largest unsecured claims against the Debtors; (iii) Simpson, Thacher & Bartlett LLP as counsel to the agent for the Debtors' prepetition and postpetition secured asset-based revolving credit facility; (iv) U.S. Bank National Association, as indenture trustee for the Debtors' prepetition notes; (v) counsel to the Ad Hoc Noteholders Committee (a) Paul, Weiss, Rifkind, Wharton & Garrison LLP, and (b) Porter Hedges LLP; (vi) Shipman & Goodwin LLP as counsel to the agent under the Debtors' postpetition term loan facility; (vii) the United States Attorney's Office for the Southern District of Texas; (viii) the Internal Revenue Service; (ix) the Securities and Exchange Commission; (x) the state attorneys general for states in which the Debtors conduct business; and (xi) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002.

27.     The Debtors shall not be required to deliver Ballots or Solicitation Packages to counterparties to the Debtors' executory contracts and unexpired leases who do not have scheduled

8

Claims or Claims based upon filed Proofs of Claim. Rather, in lieu thereof, and in accordance with Bankruptcy Rule 3017(d), the Debtors shall mail to all such counterparties, the Contract/Lease Notice, substantially in the form attached hereto as Exhibit 8, by no later than the Solicitation Mailing Date.

28. The Rights Offering Materials, substantially in the form attached hereto as Exhibit 9, reflect the Debtors' exercise of prudent business judgment and provide sufficient information to enable each Rights Offering Participant to duly participate in the Rights Offering, and are hereby approved. The Debtors are authorized to distribute the Rights Offering Materials as set forth in therein and in the Motion.

29. The Debtors are authorized to commence and conduct the Rights Offering in accordance with and as described in the Rights Offering Materials, the Backstop Purchase Agreement, the Plan, and the Disclosure Statement.

30. The Debtors are authorized to mail, or caused to be mailed, an AI Questionnaire to each holder of an Allowed Prepetition Notes Claim or an Eligible General Unsecured Claim (each, as defined in the Rights Offering Procedures) on or before the Solicitation Mailing Date. As set forth in the Right Offering Procedures, as a condition to becoming a Rights Offering Participant, each holder of an Allowed Prepetition Notes Claim or an Eligible General Unsecured Claim intending to participate in the Rights Offerings shall certify that it is an Accredited Investor by properly completing, duly executing, and timely delivering an AI Questionnaire to the subscription agent for the Rights Offering so that such AI Questionnaire is **actually received** by the subscription agent on or before the AI Questionnaire Deadline; *provided*, *however*, that any Backstop Party that holds an Allowed Prepetition Notes Claim as of the Rights Offering Record Date and any Backstop Party's Affiliate (as defined in the Backstop Purchase Agreement) that holds an Allowed Prepetition Notes Claim as of the Rights Offering Record Date shall not be

9

required to complete and deliver an AI Questionnaire and shall be deemed a Rights Offering Participant.

31. The period for Holders of Allowed Prepetition Notes Claims and Eligible General Unsecured Claims to submit their respective AI Questionnaires is a reasonable period of time for such Holders to complete and submit such AI Questionnaires, and such period is approved.

32. The subscription period for Rights Offering Participants to exercise their Rights is a reasonable period of time for the Rights Offering Participants to make an informed decision regarding whether to exercise their Rights, and such subscription period is approved.

33. Each Rights Offerings Participant (other than the Backstop Parties) intending to participate in the Rights Offerings must affirmatively make a binding election to exercise its Rights on or prior to the Rights Offering Termination Date and must otherwise timely satisfy each of the terms and conditions set forth in the Rights Offering Materials, and will be deemed to have relinquished and waived all rights to participate in the Rights Offerings to the extent such Rights Offering Participant fails to timely satisfy each of the terms and conditions set forth in the Rights Offering Materials.

34. The Rights may only be exercised by or through the Rights Offering Participant entitled to exercise such rights on the Rights Offering Record Date, as set forth in the Rights Offering Materials.

35. The distribution of the Rights in connection with the Rights Offerings, the issuance of New Secured Convertible Notes on the Effective Date to Rights Offering Participants upon exercise of such Rights, and the distribution of unsubscribed New Secured Convertible Notes to the Backstop Parties purchased by the Backstop Parties pursuant to the Backstop Purchase Agreement, each qualify for the exemption from registration under applicable U.S. securities laws to the extent provided by section 4(a)(2) of the Securities Act.

36.     In consultation with counsel for the Backstop Parties, the Debtors may modify the Rights Offering Procedures or adopt any additional detailed procedures, consistent with the provisions of the Rights Offering Procedures, to effectuate the Rights Offerings and to issue the New Secured Convertible Notes.

37.     In consultation with counsel for the Backstop Parties, the Debtors are authorized and empowered to execute and deliver such documents, and to take and perform all actions necessary, to implement and effectuate the Rights Offerings.

38.     In connection with the assumption of any executory contract or unexpired lease by the Debtors (any such contract or lease, a "**Contract or Lease**" and, collectively, the "**Contracts and Leases**"), the following procedures (the "**Assumption Procedures**") are authorized and approved:

    a.    Notice. The Debtors shall mail (or cause to be mailed) the notice attached as Exhibit 10 to this Order (the "**Cure Notice**") to all counterparties to the Debtors' Contracts and Leases (the "**Contract Parties**") by no later than September 4, 2020.

    b.    Content of the Cure Notice. The Cure Notice will include the following information: (i) the title of the Contract or Lease to be assumed; (ii) the name of the counterparty to the Contract or Lease; (iii) any applicable cure amounts, whether arising prepetition or post-petition (the "**Cure Amount**"); and (iv) the deadline by which any such Contract Party must object to the assumption of such Contract or Lease.

    c.    Objections. Objections to the proposed Cure Amount and adequate assurance of future performance obligations to the Contract Parties must: (i) be in writing; (ii) set forth the nature of the objector's claims against or interests in the Debtors' estates and the basis for the objection and the specific grounds therefor; (iii) comply with the Bankruptcy Rules, Bankruptcy Local Rules, and orders of this Court; and (iv) be filed with the Clerk of the Court by the Confirmation Objection Deadline (or the 14th day after the date the objecting Contract Party is served with the Cure Notice, if such date is later than the Confirmation Objection Deadline).

    d.    Effects of Objecting to a Cure Notice. A properly filed objection to a Cure Notice will reserve such objecting party's rights against the Debtors with respect to the relevant objection (each such objection a "**Cure Objection**").

11

e.      <u>Effects of Not Objecting to a Cure Notice</u>. If a Contract Party does not object to: (a) the Cure Amount for its Contracts and Leases; (b) the ability of the Debtors to provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code; or (c) any other matter pertaining to assumption, then the Cure Amounts owed to such Contract Party shall be paid as soon as reasonably practicable after the effective date of the assumption of such Contract or Lease, and such Contract Party shall forever be barred and estopped from objecting (i) to the proposed Cure Amount as the amount to cure all defaults to satisfy section 365 of the Bankruptcy Code and from asserting that any additional amounts are due or defaults exist; (ii) that any conditions to assumption must be satisfied under such Contract or Lease before it can be assumed; or (iii) that the Debtors have not provided adequate assurance of future performance as contemplated by section 365 of the Bankruptcy Code.

39.      If a Contract Party objects to the Cure Amount for its Contract or Lease, then such Contract Party's rights are reserved.  If the Plan is approved, then Cure Objections will be resolved in accordance with the provisions of the Plan.

40.      The Debtors shall cause the Voting and Claims Agent to mail a copy of the Cure Notice to the Contract Parties no later than September 4, 2020.  The mailing of the Cure Notice to the Contract Parties will not (i) obligate the Debtors to assume any Contract or Lease or (ii) constitute any admission or agreement of the Debtors that such Contract or Lease is an "executory" contract or unexpired lease.

41.      The cover letter to be attached to the Disclosure Statement, in substantially the form attached hereto as <u>Exhibit 11</u>, is approved.

42.      The Debtors are authorized, in consultation with the Ad Hoc Noteholder Committee, to make non-substantive modifications and ministerial changes, which are consistent in all material respects with the Restructuring Support Agreement, to any documents in the Solicitation Package without further approval of the Court prior to the dissemination of such documents, including, without limitation, changes to correct typographical and grammatical errors and to make conforming changes to the Plan and Disclosure Statement and any other materials included in the Solicitation Package prior to their dissemination.

12

43. Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion under the circumstances and the requirements of the applicable Bankruptcy Rules and the Bankruptcy Local Rules are satisfied by such notice.

44. The contents of the Motion satisfy the requirements of Bankruptcy Rules 6003(b) and 6004(a).

45. Notwithstanding Bankruptcy Rule 6004(h), to the extent applicable, this Order shall be effective and enforceable immediately upon entry hereof.

46. The Debtors are hereby authorized to take such actions and to execute such documents as may be necessary to implement the relief granted by this Order.

47. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

    **Signed: August 14, 2020.**

_____
**DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE**

13

## Chart A

### Approved Dates and Deadlines

| Event | Date/Deadline |
|---|---|
| Petition Date | July 12, 2020 |
| Mailing of Disclosure Statement Notice | July 27, 2020 |
| Disclosure Statement Objection Deadline | August 13, 2020 |
| Disclosure Statement Hearing | August 14, 2020 |
| Voting Record Date | August 14, 2020 |
| AI Questionnaire Record Date | August 14, 2020 |
| Solicitation Mailing Date | August 20, 2020 |
| Mailing of AI Questionnaire | August 20, 2020 |
| Rule 3018(a) Motion Deadline | August 30, 2020 |
| AI Questionnaire Deadline | September 4, 2020 |
| Mailing of Cure Notice | September 4, 2020 |
| Rights Offering Record Date | September 4, 2020 |
| Rights Offering Commencement Date | September 9, 2020 |
| Plan Supplement Filing Deadline | September 11, 2020 |
| Voting Deadline | September 18, 2020 |
| Confirmation Objection Deadline | September 18, 2020 |
| Release Opt-Out Deadline | September 18, 2020 |
| Reply Deadline | September 22, 2020 |
| Plan Confirmation Hearing | September 23, 2020 |
| Rights Offering Termination Date | September 29, 2020 |

US-DOCS\116659544.12

# EXHIBIT 1

**Disclosure Statement Notice**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

```
----------------------------------------------------------- x
In re:                                      :   Chapter 11
                                            :
HI-CRUSH INC., et al.,¹                     :   Case No. 20-33496 (DRJ)
                                            :
            Debtors.                        :   (Jointly Administered)
                                            :
----------------------------------------------------------- x
```

### NOTICE OF DISCLOSURE STATEMENT HEARING

TO:  **ALL HOLDERS OF CLAIMS AGAINST, AND HOLDERS OF EQUITY INTERESTS IN, HI-CRUSH INC. AND ITS AFFILIATED DEBTORS AND DEBTORS IN POSSESSION AND ALL OTHER PARTIES IN INTEREST IN THE ABOVE-CAPTIONED CHAPTER 11 CASES.**

**PLEASE TAKE NOTICE THAT** on July 12, 2020 (the "**Petition Date**"), Hi-Crush Inc. and its affiliated debtors, as debtors and debtors in possession (collectively, the "**Debtors**"), each commenced a case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**").

**PLEASE TAKE FURTHER NOTICE THAT** on July 27, 2020, the Debtors filed their (i) *Joint Plan of Reorganization for Hi-Crush Inc. and its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code* [Docket No. 174] (as may be amended, modified or supplemented from time to time, the "**Plan**"), (ii) *Disclosure Statement for the Joint Plan of Reorganization for Hi-Crush Inc. and its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code* [Docket No. 175] (as may be amended, modified or supplemented from time to time, the "**Disclosure Statement**"),² and (iii) *Emergency Motion for Entry of an Order (I) Approving Adequacy of Disclosure Statement, (II) Scheduling Hearing on Confirmation of Plan, (III) Establishing Deadline to Object to Plan and Form of Notice Thereof, (IV) Approving (A) Solicitation Procedures, (B) Forms of Ballots and Notices of Non-Voting and Limited Voting Status, and (C) Rights Offering Materials, (V)*

---

¹ The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Hi-Crush Inc. (0530), OnCore Processing LLC (9403), Hi-Crush Augusta LLC (0668), Hi-Crush Whitehall LLC (5562), PDQ Properties LLC (9169), Hi-Crush Wyeville Operating LLC (5797), D & I Silica, LLC (9957), Hi-Crush Blair LLC (7094), Hi-Crush LMS LLC, Hi-Crush Investments Inc. (6547), Hi-Crush Permian Sand LLC, Hi-Crush Proppants LLC (0770), Hi-Crush PODS LLC, Hi-Crush Canada Inc. (9195), Hi-Crush Holdings LLC , Hi-Crush Services LLC (6206), BulkTracer Holdings LLC (4085), Pronghorn Logistics Holdings, LLC (5223), FB Industries USA Inc. (8208), PropDispatch LLC, Pronghorn Logistics, LLC (4547), and FB Logistics, LLC (8641). The Debtors' address is 1330 Post Oak Blvd, Suite 600, Houston, Texas 77056.

² Capitalized terms used but not otherwise defined herein will have the meanings set forth in the Plan.

US-DOCS\116659544.12

*Approving Procedures for Assumption of Contracts and Leases and Form and Manner of Cure Notice, and (VI) Granting Related Relief* [Docket No. 176] (the "**Disclosure Statement Motion**").

**PLEASE TAKE FURTHER NOTICE THAT** a hearing (the "**Disclosure Statement Hearing**") is scheduled for August 14, 2020 at 11:00 a.m. (Prevailing Central Time) to approve the adequacy of the Disclosure Statement and certain related relief. The Disclosure Statement Hearing will take place in Courtroom 400, 4th Floor, 515 Rusk Street, Houston, TX 77002 or via videoconference, if necessary.[3] The Disclosure Statement Hearing may be continued from time to time by the Bankruptcy Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Bankruptcy Court and served on such parties as the Bankruptcy Court may order.

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement, the Plan or related documents, you should contact Kurtzman Carson Consultants LLC, the voting and claims agent retained by the Debtors in these Chapter 11 Cases, by: (i) calling the Debtors' restructuring hotline at 866-554-5810 (US and Canada) or 781-575-2032 (international); (ii) visiting the Debtors' restructuring website at: http://www.kccllc.net/hicrush; and/or (iii) writing to Hi-Crush Claims Processing Center, c/o Kurtzman Carson Consultants LLC, 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA 90245. You may also obtain copies of any pleadings filed in these Chapter 11 Cases for a fee via PACER at: http://www.deb.uscourts.gov or free of charge at http://www.kccllc.net/hicrush.

**PLEASE TAKE FURTHER NOTICE THAT** objections, if any, to the adequacy of the Disclosure Statement or the relief sought in connection therewith must: (i) be in writing; (ii) conform to the Bankruptcy Rules and the Bankruptcy Local Rules; (iii) state the name and address of the objecting party and the amount and nature of the Claim or Equity Interest held by such Entity; (iv) state with particularity the basis and nature of any objection; and (v) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served on each of the following parties (the "**Notice Parties**") so that it is actually received by no later than 12:00 p.m. (Prevailing Central Time) on August 13, 2020 (the "**Disclosure Statement Objection Deadline**").

Notice Parties.  The Notice Parties include:

- Counsel to the Debtors: Latham & Watkins LLP, 885 Third Avenue, New York, NY 10022 (Attn: Keith A. Simon, Esq. and Annemarie V. Reilly, Esq.) (keith.simon@lw.com and annemarie.reilly@lw.com) and Hunton Andrews Kurth LLP, 600 Travis Street, Suite 4200,

---

[3] If the hearing occurs over videoconference the Court will utilize GoToMeeting for the hearing.  You should download the free GoToMeeting application on each device that will be used to connect to the hearing.  If you choose to connect via a web browser, available literature suggests that Chrome is the preferred browser. Please note that connecting through a browser may limit the availability of some GoToMeeting features.  To connect to the hearing, you should enter the meeting code "JudgeJones".  You can also connect using the link on Judge Jones' homepage on the Southern District of Texas website.  Once connected to GoToMeeting, click the settings icon in the upper right corner and enter your name under the personal information setting.  In either event, audio for the Disclosure Statement Hearing will be available by using the Court's regular dial-in number. The dial-in number is +1 (832) 917-1510.  You will be responsible for your own long-distance charges.  You will be asked to key in the conference room number. Judge Jones' conference room number is 205691.

Houston, TX (Attn: Timothy A. Davidson II, Esq. and Ashley L. Harper, Esq.) (TadDavidson@HuntonAK.com and AshleyHarper@HuntonAK.com);

- Counsel to the DIP ABL Agent: Simpson, Thacher & Bartlett LLP, 425 Lexington Avenue, New York, NY 10017 (Attn: Elisha Graff, Esq. and Daniel L. Biller, Esq.) (egraff@stblaw.com and dbiller@stblaw.com);

- Counsel to the Ad Hoc Noteholders Committee: Paul, Weiss, Rifkind, Wharton & Garrison, LLP, 1285 Avenue of the Americas, New York, NY 10019 (Attn: Brian S. Hermann, Esq. and Elizabeth R. McColm, Esq.) (bhermann@paulweiss.com and emccolm@paulweiss.com) and Porter Hedges LLP, 1000 Main St., 36th Floor, Houston, TX 77002 (Attn: John F. Higgins, Esq.) (JHiggins@porterhedges.com);

- Counsel to any statutory committee appointed in these Chapter 11 Cases; and

- the Office of the United States Trustee for the Southern District of Texas, 515 Rusk Street, Suite 3516, Houston, TX 77002 (Attn: Stephen Statham, Esq. and Hector Duran, Esq.) (stephen.statham@usdoj.gov and hector.duranjr@usdoj.gov).

**PLEASE TAKE FURTHER NOTICE THAT** only those objections made in writing and timely filed and received by the Disclosure Statement Objection Deadline will be considered by the Bankruptcy Court during the Disclosure Statement Hearing.  If no objections to the Disclosure Statement Motion are timely and properly filed and served in accordance with the procedures set forth herein, the Bankruptcy Court may enter an order granting the relief requested in the Disclosure Statement Motion without further notice.

Dated: July 27, 2020
　　　　Houston, Texas

| HUNTON ANDREWS KURTH LLP | LATHAM & WATKINS LLP |
|---|---|
| Timothy A. ("Tad") Davidson II<br>Ashley L. Harper<br>600 Travis Street, Suite 4200<br>Houston, Texas 77002<br>Telephone:  (713) 220-4200<br>Facsimile:  (713) 220-4285 | George A. Davis<br>Keith A. Simon<br>David A. Hammerman<br>Annemarie V. Reilly<br>Hugh K. Murtagh<br>885 Third Avenue<br>New York, New York 10022<br>Telephone:  (212) 906-1200<br>Facsimile:  (212) 751-4864 |
| Proposed Counsel for the Debtors and Debtors-in-Possession ||

US-DOCS\116659544.12

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, PLEASE CONTACT THE VOTING AND CLAIMS AGENT AT THE NUMBER OR ADDRESS SPECIFIED ABOVE. PLEASE NOTE THAT THE VOTING AND CLAIMS AGENT CANNOT PROVIDE LEGAL ADVICE.**

US-DOCS\116659544.12

**Exhibit 2**

**Confirmation Hearing Notice**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

---------------------------------------------------------- x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| HI-CRUSH INC., *et al.*,[1] | : | Case No. 20-33496 (DRJ) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

---------------------------------------------------------- x

**NOTICE OF (I) PLAN CONFIRMATION HEARING, (II) OBJECTION AND
VOTING DEADLINES, AND (III) SOLICITATION AND VOTING PROCEDURES**

> YOU ARE RECEIVING THIS NOTICE BECAUSE YOU MAY BE ENTITLED
> TO VOTE ON THE PLAN. THEREFORE, YOU SHOULD READ THIS
> NOTICE CAREFULLY AND DISCUSS IT WITH YOUR ATTORNEY. IF
> YOU DO NOT HAVE AN ATTORNEY, YOU MAY WISH TO CONSULT ONE.

TO: **ALL HOLDERS OF CLAIMS AGAINST, AND HOLDERS OF EQUITY INTERESTS IN, HI-CRUSH INC. AND ITS AFFILIATED DEBTORS AND DEBTORS IN POSSESSION AND ALL OTHER PARTIES IN INTEREST IN THE ABOVE-CAPTIONED CHAPTER 11 CASES.**

**PLEASE TAKE NOTICE THAT** on July 12, 2020 (the "**Petition Date**"), Hi-Crush Inc. and its affiliated debtors, as debtors and debtors in possession (collectively, the "**Debtors**"), each commenced a case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**").

**PLEASE TAKE FURTHER NOTICE THAT** on [ ● ], 2020, the Bankruptcy Court entered an order approving the *Disclosure Statement for Joint Plan of Reorganization for Hi-Crush Inc. and its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code* (as may be amended, modified or supplemented from time to time, the "**Disclosure Statement**") [Docket No. [ ● ]] and the Debtors now intend to solicit votes from the Holders of Claims in Class 4 (Prepetition Notes Claims) and Class 5 (General Unsecured Claims), of record as of August 14, 2020 (the "**Voting Record Date**").

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Hi-Crush Inc. (0530), OnCore Processing LLC (9403), Hi-Crush Augusta LLC (0668), Hi-Crush Whitehall LLC (5562), PDQ Properties LLC (9169), Hi-Crush Wyeville Operating LLC (5797), D & I Silica, LLC (9957), Hi-Crush Blair LLC (7094), Hi-Crush LMS LLC, Hi-Crush Investments Inc. (6547), Hi-Crush Permian Sand LLC, Hi-Crush Proppants LLC (0770), Hi-Crush PODS LLC, Hi-Crush Canada Inc. (9195), Hi-Crush Holdings LLC , Hi-Crush Services LLC (6206), BulkTracer Holdings LLC (4085), Pronghorn Logistics Holdings, LLC (5223), FB Industries USA Inc. (8208), PropDispatch LLC, Pronghorn Logistics, LLC (4547), and FB Logistics, LLC (8641). The Debtors' address is 1330 Post Oak Blvd, Suite 600, Houston, Texas 77056.

US-DOCS\116659544.12

**PLEASE TAKE FURTHER NOTICE THAT** a hearing (the "**Confirmation Hearing**") is scheduled for September 23, 2020 at 2:00 p.m. (Prevailing Central Time) to consider confirmation of the *Joint Plan of Reorganization for Hi-Crush Inc. and its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code*, dated July 27, 2020 (as may be amended, modified or supplemented from time to time, the "**Plan**").[2]  The Confirmation Hearing will take place in Courtroom 400, 4th Floor, 515 Rusk Street, Houston, TX 77002 or via videoconference, if necessary.[3]  The Confirmation Hearing may be continued from time to time by the Bankruptcy Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Bankruptcy Court and served on such parties as the Bankruptcy Court may order.  Moreover, the Plan may be modified or amended, if necessary, pursuant to section 1127 of the Bankruptcy Code, prior to, during or as a result of the Confirmation Hearing, without further notice to parties in interest.

Only Holders of Claims in Class 4 and Class 5 are entitled to vote to accept or reject the Plan.  All other Classes of Claims and Equity Interests are either deemed to accept or to reject the Plan and, therefore, are not entitled to vote.

## VOTING DEADLINES
**The deadline for the submission of votes to accept or reject the Plan is September 18, 2020 at 5:00 p.m. (Prevailing Central Time) (the** "**Voting Deadline**"**).**
CRITICAL INFORMATION REGARDING VOTING ON THE PLAN

1.      On July 27, 2020, the Debtors filed the Plan and the Disclosure Statement pursuant to sections 1125 and 1126(b) of the Bankruptcy Code.  Copies of the Plan and the Disclosure Statement may be obtained free of charge by visiting the website maintained by the Debtors' voting and claims agent, Kurtzman Carson Consultants LLC (the "**Voting and Claims Agent**"), at www.kccllc.net/hicrush.  Copies of the Plan and Disclosure Statement may also be obtained by calling the Voting and Claims Agent at 866-554-5810 (US and Canada) or 781-575-2032 (international) or by sending an electronic mail message to HiCrushinfo@kccllc.com with "Hi-Crush" in the subject line.

2.      In accordance with sections 1122 and 1123 of the Bankruptcy Code, the Plan contemplates classifying Holders of Claims and Equity Interests into various Classes for all purposes, including with respect to voting on the Plan, as follows:

---

[2]      Capitalized terms used but not otherwise defined herein will have the meanings set forth in the Plan.

[3]      If the hearing occurs over videoconference the Court will utilize GoToMeeting for the hearing.  You should download the free GoToMeeting application on each device that will be used to connect to the hearing.  If you choose to connect via a web browser, available literature suggests that Chrome is the preferred browser. Please note that connecting through a browser may limit the availability of some GoToMeeting features.  To connect to the hearing, you should enter the meeting code "JudgeJones".  You can also connect using the link on Judge Jones' homepage on the Southern District of Texas website.  Once connected to GoToMeeting, click the settings icon in the upper right corner and enter your name under the personal information setting.  In either event, audio for the Confirmation Hearing will be available by using the Court's regular dial-in number.  The dial-in number is +1 (832) 917-1510.  You will be responsible for your own long-distance charges.  You will be asked to key in the conference room number.  Judge Jones' conference room number is 205691.

2

**SUMMARY OF STATUS AND VOTING RIGHTS**

| Class | Claim/Equity Interest | Status | Voting Rights |
|-------|-----------------------|--------|---------------|
| 1. | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2. | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3. | Secured Tax Claims | Unimpaired | Deemed to Accept |
| 4. | *Prepetition Notes Claims* | *Impaired* | *Entitled to Vote* |
| 5. | *General Unsecured Claims* | *Impaired* | *Entitled to Vote* |
| 6. | Intercompany Claims | Impaired | Deemed to Accept |
| 7. | Old Affiliate Interests in any Parent Subsidiary | Unimpaired | Deemed to Accept |
| 8. | Old Parent Interests | Impaired | Deemed to Reject |

3. <u>Voting Record Date</u>. The Voting Record Date is August 14**,** 2020. The Voting Record Date is the date by which it will be determined which Holders of Claims in Class 4 and Class 5 are entitled to vote on the Plan.

4. <u>Voting Deadline</u>. The Voting Deadline for voting on the Plan is **5:00 p.m. Prevailing Central Time on September 18, 2020**. If you held a Claim against one or more of the Debtors as of the Voting Record Date and are entitled to vote to accept or reject the Plan, you should have received a Ballot and corresponding voting instructions. For your vote to be counted, you <u>must</u>: (a) follow such voting instructions carefully, (b) complete <u>all</u> the required information on the Ballot; <u>and</u> (c) sign, date and return your completed Ballot so that it is **actually received** by the Voting and Claims Agent according to and as set forth in detail in the voting instructions on or before the Voting Deadline. If you are a Holder of Prepetition Notes Claims in Class 4 and you are instructed to return your Beneficial Holder Ballot to your Nominee, you must submit your completed ballot to your Nominee in enough time for your Nominee to send a Master Ballot recording your vote to the Voting and Claims Agent by the Voting Deadline. *A failure to follow such instructions may disqualify your vote.*

CRITICAL INFORMATION REGARDING OBJECTING TO THE PLAN

ARTICLE X OF THE PLAN CONTAINS RELEASE, EXCULPATION AND INJUNCTION PROVISIONS. THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

5. <u>Plan Objection Deadline</u>. The deadline for filing objections to the Plan is **September 18, 2020 at 5:00 p.m. Prevailing Central Time** (the "**Confirmation Objection Deadline**").

3

6.      Objections to the Plan.  Any objection to the Plan must: (i) be in writing; (ii) conform to the Bankruptcy Rules and the Bankruptcy Local Rules; (iii) state the name and address of the objecting party and the amount and nature of the Claim or Equity Interest held by such Entity; (iv) state with particularity the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (v) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is **actually received** no later than the Confirmation Objection Deadline by the parties listed below (the "**Notice Parties**").  CONFIRMATION OBJECTIONS NOT TIMELY FILED AND SERVED IN THE MANNER SET FORTH HEREIN MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND MAY BE OVERRULED WITHOUT FURTHER NOTICE.

7.      Notice Parties.  The Notice Parties include:

- Counsel to the Debtors: Latham & Watkins LLP, 885 Third Avenue, New York, NY 10022 (Attn: Keith A. Simon, Esq. and Annemarie V. Reilly, Esq.) (keith.simon@lw.com and annemarie.reilly@lw.com) and Hunton Andrews Kurth LLP, 600 Travis Street, Suite 4200, Houston, TX (Attn: Timothy A. Davidson II, Esq. and Ashley L. Harper, Esq.) (TadDavidson@HuntonAK.com and AshleyHarper@HuntonAK.com);

- Counsel to the DIP ABL Agent: Simpson, Thacher & Bartlett LLP, 425 Lexington Avenue, New York, NY 10017 (Attn: Elisha Graff, Esq. and Daniel L. Biller, Esq.) (egraff@stblaw.com and dbiller@stblaw.com);

- Counsel to the Ad Hoc Noteholders Committee: Paul, Weiss, Rifkind, Wharton & Garrison, LLP, 1285 Avenue of the Americas, New York, NY 10019 (Attn: Brian S. Hermann, Esq. and Elizabeth R. McColm, Esq.) (bhermann@paulweiss.com and emccolm@paulweiss.com) and Porter Hedges LLP, 1000 Main St., 36th Floor, Houston, TX 77002 (Attn: John F. Higgins, Esq.) (JHiggins@porterhedges.com);

- Counsel to any statutory committee appointed in these Chapter 11 Cases; and

- the Office of the United States Trustee for the Southern District of Texas, 515 Rusk Street, Suite 3516, Houston, TX 77002 (Attn: Stephen Statham, Esq. and Hector Duran, Esq.) (stephen.statham@usdoj.gov and hector.duranjr@usdoj.gov).

NON-VOTING STATUS OF HOLDERS OF CERTAIN CLAIMS AND EQUITY INTERESTS

8.      As set forth in the Plan, certain Holders of Claims and Equity Interests are **not** entitled to vote on the Plan.  As a result, such parties did not receive any ballots and other related solicitation materials to vote on the Plan. The Holders of Claims in Class 1 (Other Priority Claims), Class 2 (Other Secured Claims), Class 3 (Secured Tax Claims), and Class 7 (Old Affiliate Interests in any Parent Subsidiary) are Unimpaired.  Pursuant to section 1126(f) of the Bankruptcy Code, the Holders of Claims or Equity Interests in each of the foregoing Classes are conclusively presumed to have accepted the Plan and, thus, are not entitled to vote.

4

9.      While Class 6 (Intercompany Claims) is Impaired, the Holders of Claims in Class 6 are not entitled to vote as they are deemed to accept the Plan as they are Affiliates of the Debtors. Further, while Class 8 (Old Parent Interests) is Impaired, such Holders are not entitled to vote as they are deemed to reject the Plan.

10.      All Classes that are not Affiliates of the Debtors will be provided with this notice. As explained above, the Voting and Claims Agent will provide you, free of charge, with copies of the Plan and the Disclosure Statement, upon request.

<u>NOTICE REGARDING CERTAIN RELEASE, EXCULPATION AND INJUNCTION PROVISIONS IN THE PLAN</u>

**PLEASE BE ADVISED THAT THE PLAN CONTAINS CERTAIN RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, INCLUDING THOSE LISTED BELOW.  YOU ARE ADVISED AND ENCOURAGED TO CAREFULLY REVIEW AND CONSIDER THE PLAN, INCLUDING THE RELEASE, EXCULPATION AND INJUNCTION PROVISIONS, AS YOUR RIGHTS MIGHT BE AFFECTED.**
      **<u>Article X.B – Release of Claims and Causes of Action</u>**

1.      ***<u>Release by the Debtors and their Estates</u>.*  Pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, and except as otherwise expressly provided in the Plan, effective as of the Effective Date, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, the Debtors and the Reorganized Debtors, in their respective individual capacities and as debtors-in-possession, and on behalf of themselves and their respective Estates, including, without limitation, any successor to the Debtors or any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code (collectively, the "<u>Debtor Releasing Parties</u>") shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver and release to each of the Released Parties (and each such Released Party so released shall be deemed forever released, waived and discharged by the Debtor Releasing Parties) and their respective assets and properties (the "<u>Debtor Release</u>") from any and all Claims, Causes of Action, and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of the Debtors or their Affiliates, including, without limitation, (i) the Chapter 11 Cases, the Disclosure Statement, the Plan, the Restructuring Support Agreement, the Backstop Purchase Agreement, the Rights Offering, the Restructuring Documents, the Prepetition Debt Documents, and the DIP Loan Documents, (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, the Backstop Purchase Agreement, the Rights Offering, the Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Documents, the Prepetition Debt Documents, the DIP Loan Documents, or related agreements, instruments or other documents, (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale, or rescission of the purchase or sale of any Equity Interest or Plan Securities of the Debtors or the Reorganized Debtors, and/or (vii) the Confirmation or Consummation of the Plan or the solicitation**

5

US-DOCS\116659544.12

of votes on the Plan that such Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) or that any Holder of a Claim or Equity Interest or other Person or Entity would have been legally entitled to assert for, or on behalf or in the name of, any Debtor, its respective Estate or any Reorganized Debtor (whether directly or derivatively) against any of the Released Parties; *provided*, *however*, that the foregoing provisions of this Debtor Release shall not operate to waive or release (A) the rights of such Debtor Releasing Party to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with the Plan (including, without limitation, the Exit Facility Loan Documents and the New Secured Convertible Notes Documents) or assumed or assumed and assigned, as applicable, pursuant to the Plan or pursuant to a Final Order of the Bankruptcy Court and (B) claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes a criminal act, fraud, willful misconduct, or gross negligence, in each case as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction. The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity and the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Debtor Release. Notwithstanding the foregoing, nothing in this <u>Article X.B.</u> shall or shall be deemed to (i) prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person or Entity that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors and/or (ii) operate as a release or waiver of any Intercompany Claims, in each case unless otherwise expressly provided for in this Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims released by the Debtor Release; (iii) in the best interest of the Debtors and their Estates; (iv) fair, equitable and reasonable; (v) given and made after due notice and opportunity for hearing; and (vi) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any claim or Cause of Action released pursuant to the Debtor Release.

2. *Release By Third Parties*. Except as otherwise expressly provided in the Plan, effective as of the Effective Date, to the fullest extent permitted by applicable law, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, and without limiting or otherwise modifying the scope of the Debtor Release provided by the Debtor Releasing Parties above, each Non-Debtor Releasing Party (together with the Debtor Releasing Parties, the "<u>Releasing Parties</u>") shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver, and release to each of the Released Parties (and each such Released Party so released shall be deemed forever released, waived, and discharged by the Non-Debtor Releasing Parties) and their respective assets and properties (the "<u>Third Party Release</u>") from any and all Claims, Causes of Action, and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of the Debtors or their Affiliates, including,

US-DOCS\116659544.12

without limitation, (i) the Chapter 11 Cases, the Disclosure Statement, the Plan, the Restructuring Support Agreement, the Backstop Purchase Agreement, the Rights Offering, the Restructuring Documents, the Prepetition Debt Documents, and the DIP Loan Documents, (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, the Backstop Purchase Agreement, the Rights Offering, this Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Documents, the Prepetition Debt Documents, the DIP Loan Documents, or related agreements, instruments or other documents, (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale or rescission of the purchase or sale of any Equity Interest or Plan Securities of the Debtors or the Reorganized Debtors, and/or (vii) the Confirmation or Consummation of the Plan or the solicitation of votes on this Plan that such Non-Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) against any of the Released Parties; *provided*, *however*, that the foregoing provisions of this Third Party Release shall not operate to waive or release (A) the rights of such Non-Debtor Releasing Party to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan (including, without limitation, the Exit Facility Loan Documents and the New Secured Convertible Notes Documents) or assumed or assumed and assigned, as applicable, pursuant to the Plan or pursuant to a Final Order of the Bankruptcy Court and (B) claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes a criminal act, fraud, willful misconduct, or gross negligence, in each case as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction. The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity and the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Third Party Release.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third Party Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Third Party Release is: (i) consensual; (ii) essential to the confirmation of the Plan; (iii) in exchange for the good and valuable consideration provided by the Released Parties; (iv) a good faith settlement and compromise of the Claims released by the Third Party Release; (v) in the best interest of the Debtors and all Holders of Claims and Equity Interests; (vi) fair, equitable and reasonable; (vii) given and made after due notice and opportunity for hearing; and (viii) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third Party Release.

### Article X.E – Exculpation

Effective as of the Effective Date, to the fullest extent permitted by law, the Exculpated Parties shall neither have nor incur any liability to any Person or Entity for any claims or Causes of Action arising prior to or on the Effective Date for any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Confirmation or Consummation of this Plan, the Disclosure Statement, the Restructuring Documents, the Rights Offering, the Prepetition Debt Documents, the DIP Loan Documents, or any contract, instrument, release or other agreement or document created or entered into in connection with this Plan, including the Restructuring Support Agreement and the Backstop Purchase Agreement, or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the approval of the Disclosure Statement or Confirmation or Consummation of this Plan;

7

provided, however, that the foregoing provisions of this exculpation shall not operate to waive or release: (i) any Causes of Action arising from willful misconduct, actual fraud, or gross negligence of such applicable Exculpated Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; and/or (ii) the rights of any Person or Entity to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements and documents delivered under or in connection with this Plan or assumed pursuant to this Plan or Final Order of the Bankruptcy Court; provided, further, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its respective duties pursuant to, or in connection with, the above referenced documents, actions or inactions. The foregoing exculpation shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity. Notwithstanding the foregoing, nothing in this Article X.E shall or shall be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person or Entity that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors, in each case unless otherwise expressly provided for in the Plan.

### Article X.G – Injunction

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, FROM AND AFTER THE EFFECTIVE DATE, ALL PERSONS AND ENTITIES ARE, TO THE FULLEST EXTENT PROVIDED UNDER SECTION 524 AND OTHER APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, PERMANENTLY ENJOINED FROM (I) COMMENCING OR CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY SUIT, ACTION OR OTHER PROCEEDING; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING IN ANY MANNER ANY JUDGMENT, AWARD, DECREE, OR ORDER; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE; (IV) ASSERTING A SETOFF OR RIGHT OF SUBROGATION OF ANY KIND; OR (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND, IN EACH CASE ON ACCOUNT OF OR WITH RESPECT TO ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, EQUITY INTEREST, OR REMEDY RELEASED OR TO BE RELEASED, EXCULPATED OR TO BE EXCULPATED, SETTLED OR TO BE SETTLED OR DISCHARGED OR TO BE DISCHARGED PURSUANT TO THIS PLAN OR THE CONFIRMATION ORDER AGAINST ANY PERSON OR ENTITY SO RELEASED, DISCHARGED, OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY PERSON OR ENTITY SO RELEASED, DISCHARGED, OR EXCULPATED). ALL INJUNCTIONS OR STAYS PROVIDED FOR IN THE CHAPTER 11 CASES UNDER SECTION 105 OR SECTION 362 OF THE BANKRUPTCY CODE, OR OTHERWISE, AND IN EXISTENCE ON THE CONFIRMATION DATE, SHALL REMAIN IN FULL FORCE AND EFFECT UNTIL THE EFFECTIVE DATE.**

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, PLEASE CONTACT THE VOTING AND CLAIMS AGENT AT THE NUMBER OR ADDRESS SPECIFIED ABOVE. PLEASE NOTE THAT THE VOTING AND CLAIMS AGENT CANNOT PROVIDE LEGAL ADVICE.**

US-DOCS\116659544.12

9

**Exhibit 3**

**Notice of Non-Voting Status: Disputed Claims**

US-DOCS\116659544.12

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

```
------------------------------------------------------------- x
In re:                                                        :   Chapter 11
                                                              :
HI-CRUSH INC., et al.,[1]                                     :   Case No. 20-33496 (DRJ)
                                                              :
            Debtors.                                          :   (Jointly Administered)
                                                              :
------------------------------------------------------------- x
```

**NOTICE OF NON-VOTING STATUS TO HOLDERS OF CLAIMS
FOR WHICH AN OBJECTION HAS BEEN FILED BY THE DEBTORS**

**PLEASE TAKE NOTICE THAT** Hi-Crush Inc. and its affiliated debtors, as debtors and debtors in possession (collectively, the "**Debtors**") have commenced solicitation of votes to accept the *Joint Plan of Reorganization for Hi-Crush Inc. and Its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code* (as may be amended, modified, or supplemented from time to time, the "**Plan**").[2] Copies of the Plan and the *Disclosure Statement for Joint Plan of Reorganization for Hi-Crush Inc. and its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code* (as may be amended, modified or supplemented from time to time, the "**Disclosure Statement**") may be obtained free of charge by visiting the website maintained by the Debtors' voting and claims agent, Kurtzman Carson Consultants LLC (the "**Voting and Claims Agent**"), at www.kccllc.net/hicrush. Copies of the Plan and Disclosure Statement may also be obtained by calling the Voting and Claims Agent at 866-554-5810 (US and Canada) or 781-575-2032 (international) or by sending an electronic mail message to HiCrushinfo@kccllc.com with "Hi-Crush" in the subject line.

**PLEASE TAKE FURTHER NOTICE THAT** you are receiving this notice because you are the Holder of a Claim that has filed a Proof of Claim, which is subject, in whole or in part, to an objection filed by the Debtors. As a result, you are not entitled to vote on the Plan for any purpose and you have not been sent a Solicitation Package or Ballot. Provided that you are the Holder of a Claim in Class 4 or Class 5, if you disagree with the Debtors' classification or status of your Claim, then you <u>MUST</u> file with the Bankruptcy Court and serve upon the parties listed below (the "**Notice Parties**"), on or before 5:00 p.m. (Prevailing Central Time) on **August 30, 2020** (the "**Rule 3018(a) Motion Deadline**"), a motion requesting temporary allowance of the full amount of your Claim solely for voting purposes in accordance with Bankruptcy Rule 3018 (such motion, the "**Rule 3018(a) Motion**"). No later than three (3) Business Days after the filing and service of such Rule 3018(a) Motion, the Voting and Claims Agent will send you a Solicitation Package, including the appropriate Ballot, and a pre-addressed, postage pre-paid envelope, which

---

[1]      The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Hi-Crush Inc. (0530), OnCore Processing LLC (9403), Hi-Crush Augusta LLC (0668), Hi-Crush Whitehall LLC (5562), PDQ Properties LLC (9169), Hi-Crush Wyeville Operating LLC (5797), D & I Silica, LLC (9957), Hi-Crush Blair LLC (7094), Hi-Crush LMS LLC, Hi-Crush Investments Inc. (6547), Hi-Crush Permian Sand LLC, Hi-Crush Proppants LLC (0770), Hi-Crush PODS LLC, Hi-Crush Canada Inc. (9195), Hi-Crush Holdings LLC , Hi-Crush Services LLC (6206), BulkTracer Holdings LLC (4085), Pronghorn Logistics Holdings, LLC (5223), FB Industries USA Inc. (8208), PropDispatch LLC, Pronghorn Logistics, LLC (4547), and FB Logistics, LLC (8641). The Debtors' address is 1330 Post Oak Blvd, Suite 600, Houston, Texas 77056.

[2]      Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

2

you must then return according to the instructions attached thereto so that your Ballot is **actually received** by the Voting and Claims Agent on or before **September 18, 2020** (the "**Voting Deadline**"). Please be advised that the Debtors reserve all of their rights and objections regarding any and all Rule 3018(a) Motions that may be filed with the Bankruptcy Court and that the distribution of a Solicitation Package is not and shall not constitute a waiver or release of such rights and objections.

**PLEASE TAKE FURTHER NOTICE THAT** a hearing (the "**Confirmation Hearing**") is scheduled for September 23, 2020 at 2:00 p.m. (Prevailing Central Time) to consider confirmation of the Plan. The Confirmation Hearing will take place in Courtroom 400, 4th Floor, 515 Rusk Street, Houston, TX 77002 or via videoconference, if necessary.[3] The Confirmation Hearing may be continued from time to time by the Bankruptcy Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Bankruptcy Court and served on such parties as the Bankruptcy Court may order. Moreover, the Plan may be modified or amended, if necessary, pursuant to section 1127 of the Bankruptcy Code, prior to, during or as a result of the Confirmation Hearing, without further notice to parties in interest.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the Plan is **September 18, 2020 at 5:00 p.m. (Prevailing Central Time)** (the "**Confirmation Objection Deadline**"). Any objection to the Plan must: (i) be in writing; (ii) conform to the Bankruptcy Rules and the Bankruptcy Local Rules; (iii) state the name and address of the objecting party and the amount and nature of the Claim of such Entity; (iv) state with particularity the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (v) be filed, contemporaneously with a proof of service, with the Bankruptcy Court no later than the Confirmation Objection Deadline and served on the Notice Parties. CONFIRMATION OBJECTIONS NOT TIMELY FILED AND SERVED IN THE MANNER SET FORTH HEREIN MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND MAY BE OVERRULED WITHOUT FURTHER NOTICE.

Notice Parties. The Notice Parties include:

- Counsel to the Debtors: Latham & Watkins LLP, 885 Third Avenue, New York, NY 10022 (Attn: Keith A. Simon, Esq. and Annemarie V. Reilly, Esq.) (keith.simon@lw.com and annemarie.reilly@lw.com) and Hunton Andrews Kurth LLP, 600 Travis Street, Suite 4200, Houston, TX (Attn: Timothy A. Davidson II, Esq. and Ashley L. Harper, Esq.) (TadDavidson@HuntonAK.com and AshleyHarper@HuntonAK.com);

---

[3] If the hearing occurs over videoconference the Court will utilize GoToMeeting for the hearing. You should download the free GoToMeeting application on each device that will be used to connect to the hearing. If you choose to connect via a web browser, available literature suggests that Chrome is the preferred browser. Please note that connecting through a browser may limit the availability of some GoToMeeting features. To connect to the hearing, you should enter the meeting code "JudgeJones". You can also connect using the link on Judge Jones' homepage on the Southern District of Texas website. Once connected to GoToMeeting, click the settings icon in the upper right corner and enter your name under the personal information setting. In either event, audio for the Confirmation Hearing will be available by using the Court's regular dial-in number. The dial-in number is +1 (832) 917-1510. You will be responsible for your own long-distance charges. You will be asked to key in the conference room number. Judge Jones' conference room number is 205691.

3

US-DOCS\116659544.12

- Counsel to the DIP ABL Agent: Simpson, Thacher & Bartlett LLP, 425 Lexington Avenue, New York, NY 10017 (Attn: Elisha Graff, Esq. and Daniel L. Biller, Esq.) (egraff@stblaw.com and dbiller@stblaw.com);

- Counsel to the Ad Hoc Noteholders Committee: Paul, Weiss, Rifkind, Wharton & Garrison, LLP, 1285 Avenue of the Americas, New York, NY 10019 (Attn: Brian S. Hermann, Esq. and Elizabeth R. McColm, Esq.) (bhermann@paulweiss.com and emccolm@paulweiss.com) and Porter Hedges LLP, 1000 Main St., 36th Floor, Houston, TX 77002 (Attn: John F. Higgins, Esq.) (JHiggins@porterhedges.com);

- Counsel to any statutory committee appointed in these Chapter 11 Cases; and

- the Office of the United States Trustee for the Southern District of Texas, 515 Rusk Street, Suite 3516, Houston, TX 77002 (Attn: Stephen Statham, Esq. and Hector Duran, Esq.) (stephen.statham@usdoj.gov and hector.duranjr@usdoj.gov).

---

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, PLEASE CONTACT THE VOTING AND CLAIMS AGENT AT THE NUMBER OR ADDRESS SPECIFIED ABOVE. PLEASE NOTE THAT THE VOTING AND CLAIMS AGENT CANNOT PROVIDE LEGAL ADVICE.**

---

[_____], 2020
Houston, Texas


| **HUNTON ANDREWS KURTH LLP** | **LATHAM & WATKINS LLP** |
|---|---|
| Timothy A. ("Tad") Davidson II <br> Ashley L. Harper <br> 600 Travis Street, Suite 4200 <br> Houston, Texas 77002 <br> Telephone: (713) 220-4200 <br> Facsimile: (713) 220-4285 | George A. Davis <br> Keith A. Simon <br> David A. Hammerman <br> Annemarie V. Reilly <br> Hugh K. Murtagh <br> 885 Third Avenue <br> New York, New York 10022 <br> Telephone: (212) 906-1200 <br> Facsimile: (212) 751-4864 |
| [Proposed] Counsel for the Debtors and Debtors-in-Possession ||

4

US-DOCS\116659544.12

## NOTICE REGARDING CERTAIN RELEASE, EXCULPATION AND INJUNCTION PROVISIONS IN THE PLAN

**PLEASE BE ADVISED THAT THE PLAN CONTAINS CERTAIN RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, INCLUDING THOSE LISTED BELOW. YOU ARE ADVISED AND ENCOURAGED TO CAREFULLY REVIEW AND CONSIDER THE PLAN, INCLUDING THE RELEASE, EXCULPATION AND INJUNCTION PROVISIONS, AS YOUR RIGHTS MIGHT BE AFFECTED.**

### Article X.B – Release of Claims and Causes of Action

1. ***Release by the Debtors and their Estates.*** **Pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, and except as otherwise expressly provided in the Plan, effective as of the Effective Date, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, the Debtors and the Reorganized Debtors, in their respective individual capacities and as debtors-in-possession, and on behalf of themselves and their respective Estates, including, without limitation, any successor to the Debtors or any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code (collectively, the "Debtor Releasing Parties") shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver and release to each of the Released Parties (and each such Released Party so released shall be deemed forever released, waived and discharged by the Debtor Releasing Parties) and their respective assets and properties (the "Debtor Release") from any and all Claims, Causes of Action, and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of the Debtors or their Affiliates, including, without limitation, (i) the Chapter 11 Cases, the Disclosure Statement, the Plan, the Restructuring Support Agreement, the Backstop Purchase Agreement, the Rights Offering, the Restructuring Documents, the Prepetition Debt Documents, and the DIP Loan Documents, (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, the Backstop Purchase Agreement, the Rights Offering, the Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Documents, the Prepetition Debt Documents, the DIP Loan Documents, or related agreements, instruments or other documents, (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale, or rescission of the purchase or sale of any Equity Interest or Plan Securities of the Debtors or the Reorganized Debtors, and/or (vii) the Confirmation or Consummation of the Plan or the solicitation of votes on the Plan that such Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) or that any Holder of a Claim or Equity Interest or other Person or Entity would have been legally entitled to assert for, or on behalf or in the name of, any Debtor, its respective Estate or any Reorganized Debtor (whether directly or derivatively) against any of the Released Parties; *provided*, *however*, that the foregoing provisions of this Debtor Release shall not operate to waive or release (A) the rights of such Debtor Releasing Party to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with the Plan (including, without limitation, the Exit Facility Loan Documents and the**

5

New Secured Convertible Notes Documents) or assumed or assumed and assigned, as applicable, pursuant to the Plan or pursuant to a Final Order of the Bankruptcy Court and (B) claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes a criminal act, fraud, willful misconduct, or gross negligence, in each case as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction. The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity and the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Debtor Release. Notwithstanding the foregoing, nothing in this **Article X.B.** shall or shall be deemed to (i) prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person or Entity that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors and/or (ii) operate as a release or waiver of any Intercompany Claims, in each case unless otherwise expressly provided for in this Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims released by the Debtor Release; (iii) in the best interest of the Debtors and their Estates; (iv) fair, equitable and reasonable; (v) given and made after due notice and opportunity for hearing; and (vi) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any claim or Cause of Action released pursuant to the Debtor Release.

2. *Release By Third Parties*. Except as otherwise expressly provided in the Plan, effective as of the Effective Date, to the fullest extent permitted by applicable law, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, and without limiting or otherwise modifying the scope of the Debtor Release provided by the Debtor Releasing Parties above, each Non-Debtor Releasing Party (together with the Debtor Releasing Parties, the "**Releasing Parties**") shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver, and release to each of the Released Parties (and each such Released Party so released shall be deemed forever released, waived, and discharged by the Non-Debtor Releasing Parties) and their respective assets and properties (the "**Third Party Release**") from any and all Claims, Causes of Action, and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of the Debtors or their Affiliates, including, without limitation, (i) the Chapter 11 Cases, the Disclosure Statement, the Plan, the Restructuring Support Agreement, the Backstop Purchase Agreement, the Rights Offering, the Restructuring Documents, the Prepetition Debt Documents, and the DIP Loan Documents, (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, the Backstop Purchase Agreement, the Rights Offering, this Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Documents, the Prepetition Debt Documents, the DIP Loan Documents, or related

6

agreements, instruments or other documents, (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale or rescission of the purchase or sale of any Equity Interest or Plan Securities of the Debtors or the Reorganized Debtors, and/or (vii) the Confirmation or Consummation of the Plan or the solicitation of votes on this Plan that such Non-Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) against any of the Released Parties; *provided*, *however*, that the foregoing provisions of this Third Party Release shall not operate to waive or release (A) the rights of such Non-Debtor Releasing Party to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan (including, without limitation, the Exit Facility Loan Documents and the New Secured Convertible Notes Documents) or assumed or assumed and assigned, as applicable, pursuant to the Plan or pursuant to a Final Order of the Bankruptcy Court and (B) claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes a criminal act, fraud, willful misconduct, or gross negligence, in each case as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction. The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity and the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Third Party Release.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third Party Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Third Party Release is: (i) consensual; (ii) essential to the confirmation of the Plan; (iii) in exchange for the good and valuable consideration provided by the Released Parties; (iv) a good faith settlement and compromise of the Claims released by the Third Party Release; (v) in the best interest of the Debtors and all Holders of Claims and Equity Interests; (vi) fair, equitable and reasonable; (vii) given and made after due notice and opportunity for hearing; and (viii) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third Party Release.

## Article X.E – <u>Exculpation</u>

Effective as of the Effective Date, to the fullest extent permitted by law, the Exculpated Parties shall neither have nor incur any liability to any Person or Entity for any claims or Causes of Action arising prior to or on the Effective Date for any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Confirmation or Consummation of this Plan, the Disclosure Statement, the Restructuring Documents, the Rights Offering, the Prepetition Debt Documents, the DIP Loan Documents, or any contract, instrument, release or other agreement or document created or entered into in connection with this Plan, including the Restructuring Support Agreement and the Backstop Purchase Agreement, or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the approval of the Disclosure Statement or Confirmation or Consummation of this Plan; provided, however, that the foregoing provisions of this exculpation shall not operate to waive or release: (i) any Causes of Action arising from willful misconduct, actual fraud, or gross negligence of such applicable Exculpated Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; and/or (ii) the rights of any Person or Entity to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements and documents delivered under or in connection with this Plan or assumed pursuant to this Plan or Final Order of the Bankruptcy Court; provided, further, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its respective duties pursuant to, or in connection with, the above referenced documents, actions or inactions. The

7

foregoing exculpation shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity.  Notwithstanding the foregoing, nothing in this <u>Article X.E</u> shall or shall be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person or Entity that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors, in each case unless otherwise expressly provided for in the Plan.

**Article X.G – <u>Injunction</u>**

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, FROM AND AFTER THE EFFECTIVE DATE, ALL PERSONS AND ENTITIES ARE, TO THE FULLEST EXTENT PROVIDED UNDER SECTION 524 AND OTHER APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, PERMANENTLY ENJOINED FROM (I) COMMENCING OR CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY SUIT, ACTION OR OTHER PROCEEDING; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING IN ANY MANNER ANY JUDGMENT, AWARD, DECREE, OR ORDER; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE; (IV) ASSERTING A SETOFF OR RIGHT OF SUBROGATION OF ANY KIND; OR (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND,  IN EACH CASE ON ACCOUNT OF OR WITH RESPECT TO ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, EQUITY INTEREST, OR REMEDY RELEASED OR TO BE RELEASED, EXCULPATED OR TO BE EXCULPATED, SETTLED OR TO BE SETTLED OR DISCHARGED OR TO BE DISCHARGED PURSUANT TO THIS PLAN OR THE CONFIRMATION ORDER AGAINST ANY PERSON OR ENTITY SO RELEASED, DISCHARGED, OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY PERSON OR ENTITY SO RELEASED, DISCHARGED, OR EXCULPATED).  ALL INJUNCTIONS OR STAYS PROVIDED FOR IN THE CHAPTER 11 CASES UNDER SECTION 105 OR SECTION 362 OF THE BANKRUPTCY CODE, OR OTHERWISE, AND IN EXISTENCE ON THE CONFIRMATION DATE, SHALL REMAIN IN FULL FORCE AND EFFECT UNTIL THE EFFECTIVE DATE.**

**Article X.H – <u>Binding Nature Of Plan</u>**

**ON THE EFFECTIVE DATE, AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE PLAN SHALL BIND, AND SHALL BE DEEMED BINDING UPON, THE DEBTORS, THE REORGANIZED DEBTORS, ANY AND ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS, ALL PERSONS AND ENTITIES THAT ARE PARTIES TO OR ARE SUBJECT TO THE SETTLEMENTS, COMPROMISES, RELEASES, EXCULPATIONS, DISCHARGES, AND INJUNCTIONS DESCRIBED IN THE PLAN, EACH PERSON AND ENTITY ACQUIRING PROPERTY UNDER THIS PLAN, ANY AND ALL NON-DEBTOR PARTIES TO EXECUTORY CONTRACTS AND UNEXPIRED LEASES WITH THE DEBTORS AND THE RESPECTIVE SUCCESSORS AND ASSIGNS OF EACH OF THE FOREGOING, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, AND NOTWITHSTANDING WHETHER OR NOT SUCH PERSON OR ENTITY (I) WILL RECEIVE OR RETAIN ANY PROPERTY, OR INTEREST IN PROPERTY, UNDER THE PLAN, (II) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASES OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN, AFFIRMATIVELY VOTED TO REJECT THIS PLAN OR IS CONCLUSIVELY PRESUMED TO REJECT THE PLAN.**

US-DOCS\116659544.12

**Relevant Definitions Related to Release and Exculpation Provisions:**

"*Exculpated Parties*" means, collectively, the following:

(a) the Debtors;

(b) the Reorganized Debtors;

(c) the Prepetition Credit Agreement Agent;

(d) the Prepetition Credit Agreement Lenders;

(e) the Prepetition Notes Indenture Trustee;

(f) the DIP Agents;

(g) the DIP Lenders;

(h) the Ad Hoc Noteholder Committee and the members thereof in their capacities as such;

(i) the Consenting Noteholders;

(j) the Backstop Parties;

(k) the Distribution Agents;

(l) the Exit Facility Agent;

(m) the Exit Facility Lenders;

(n) the New Secured Convertible Notes Indenture Trustee;

(o) the New Secured Convertible Noteholders;

(p) the Releasing Old Parent Interestholders; and

(q) with respect to each of the foregoing Persons or Entities in clauses (a) through (p), the Related Persons of each such Person or Entity, in each case solely in their capacity as such.

"*Indemnified Parties*" means each of the Debtors' and their respective subsidiaries' current and former directors, officers, and managers in their respective capacities as such, and solely to the extent that such Person was serving in such capacity on or any time after the Petition Date; <u>provided</u>, that the Designated Persons shall not be Indemnified Parties under the Plan.

"*Non-Debtor Releasing Parties*" means, collectively, the following:

(a) the Prepetition Credit Agreement Agent;

(b) the Prepetition Credit Agreement Lenders;

(c) the Prepetition Notes Indenture Trustee;

9

US-DOCS\116659544.12

(d) the DIP Agents;

(e) the DIP Lenders;

(f) the Ad Hoc Noteholder Committee and the members thereof in their capacities as such;

(g) the Releasing Prepetition Noteholders;

(h) the Backstop Parties;

(i) the Distribution Agents;

(j) the Exit Facility Agent and the Exit Facility Lenders;

(k) the New Secured Convertible Notes Indenture Trustee and the New Secured Convertible Noteholders;

(l) those Holders of Claims deemed to accept the Plan that do not affirmatively opt out of the Third Party Release as provided on their respective Ballots/Opt-Out Forms;

(m) those Holders of General Unsecured Claims that do not affirmatively opt out of the Third Party Release as provided on their respective Ballots/Opt-Out Forms;

(n) all Holders of Claims that vote to accept the Plan; and

(o) the Releasing Old Parent Interestholders.

"Released Party" means, collectively, the following:

(a) the Debtors;

(b) the Reorganized Debtors;

(c) the Prepetition Credit Agreement Agent;

(d) the Prepetition Credit Agreement Lenders;

(e) the Prepetition Notes Indenture Trustee;

(f) the DIP Agents;

(g) the DIP Lenders;

(h) the Ad Hoc Noteholder Committee and the members thereof in their capacities as such;

(i) the Releasing Prepetition Noteholders;

(j) the Backstop Parties;

(k) the Distribution Agents;

(l) the Exit Facility Agent and the Exit Facility Lenders;

10

(m) the New Secured Convertible Notes Indenture Trustee and the New Secured Convertible Noteholders;

(n) the Releasing Old Parent Interestholders; and

(o) with respect to each of the foregoing Persons or Entities in clauses (a) through (n), the Related Persons of each such Person or Entity, in each case solely in their capacity as such; provided, that the Designated Persons shall not be Released Parties under the Plan.

11

# EXHIBIT 4

**Form of Notice of Non-Voting Status and Opt-Out Opportunity: Deemed to Accept**

US-DOCS\116659544.12

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

```
------------------------------------------------------------ x
In re:                                    :   Chapter 11
                                          :
HI-CRUSH INC., et al.,[1]                 :   Case No. 20-33496 (DRJ)
                                          :
              Debtors.                    :   (Jointly Administered)
                                          :
------------------------------------------------------------ x
```

## NOTICE OF NON-VOTING STATUS
## AND OPT-OUT OPPORTUNITY: DEEMED TO ACCEPT

**PLEASE TAKE NOTICE THAT** Hi-Crush Inc. and its affiliated debtors, as debtors and debtors in possession (collectively, the "**Debtors**") have commenced solicitation of votes to accept the *Joint Plan of Reorganization for Hi-Crush Inc. and Its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code* (as may be amended, modified, or supplemented from time to time, the "**Plan**").[2] Copies of the Plan and the *Disclosure Statement for Joint Plan of Reorganization for Hi-Crush Inc. and its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code* (as may be amended, modified or supplemented from time to time, the "**Disclosure Statement**") may be obtained free of charge by visiting the website maintained by the Debtors' voting and claims agent, Kurtzman Carson Consultants LLC (the "**Voting and Claims Agent**"), at www.kccllc.net/hicrush. Copies of the Plan and Disclosure Statement may also be obtained by calling the Voting and Claims Agent at 866-554-5810 (US and Canada) or 781-575-2032 (international) or by sending an electronic mail message to HiCrushinfo@kccllc.com with "Hi-Crush" in the subject line.

**PLEASE TAKE FURTHER NOTICE THAT** you are receiving this notice (the "**Notice of Non-Voting Status: Deemed to Accept**") because, according to the Debtors' books and records, you are a Holder of Claims in Class 1 (Other Priority Claims), Class 2 (Other Secured Claims), or Class 3 (Secured Tax Claims). Pursuant to the terms of the Plan, your Claim against the Debtors is Unimpaired and therefore, pursuant to section 1126(f) of title 11 of the United States Code, you are deemed to have accepted the Plan.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Hi-Crush Inc. (0530), OnCore Processing LLC (9403), Hi-Crush Augusta LLC (0668), Hi-Crush Whitehall LLC (5562), PDQ Properties LLC (9169), Hi-Crush Wyeville Operating LLC (5797), D & I Silica, LLC (9957), Hi-Crush Blair LLC (7094), Hi-Crush LMS LLC, Hi-Crush Investments Inc. (6547), Hi-Crush Permian Sand LLC, Hi-Crush Proppants LLC (0770), Hi-Crush PODS LLC, Hi-Crush Canada Inc. (9195), Hi-Crush Holdings LLC , Hi-Crush Services LLC (6206), BulkTracer Holdings LLC (4085), Pronghorn Logistics Holdings, LLC (5223), FB Industries USA Inc. (8208), PropDispatch LLC, Pronghorn Logistics, LLC (4547), and FB Logistics, LLC (8641). The Debtors' address is 1330 Post Oak Blvd, Suite 600, Houston, Texas 77056.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

US-DOCS\116659544.12

**PLEASE TAKE FURTHER NOTICE THAT** you may elect not to grant the Third Party Release contained in Article X.B.2 of the Plan, copied below. If you elect not to grant the Third Party Release contained in Article X.B.2 of the Plan, please follow the instructions on the "Opt-Out" form affixed hereto and return the form to the Voting and Claims Agent in accordance with such instructions. Election to opt out is at your option. The deadline to submit a completed form in order to "opt out" of the Third-Party Release is September 18, 2020 at 5:00 p.m. (Prevailing Central Time) (the "**Release Opt-Out Deadline**"). **PLEASE BE ADVISED THAT YOU MUST AFFIRMATIVELY OPT-OUT OF THE THIRD PARTY RELEASE AND SUBMIT THE OPT-OUT FORM WITH YOUR ELECTION TO THE VOTING AND CLAIMS AGENT PRIOR TO THE RELEASE OPT-OUT DEADLINE IF YOU WISH TO OPT-OUT OF THE THIRD PARTY RELEASE.**

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to confirmation of the Plan is September 18, 2020, at 5:00 p.m. (Prevailing Central Time) (the "**Confirmation Objection Deadline**"). Any objection to the Plan must: (i) be in writing; (ii) conform to the Bankruptcy Rules and the Bankruptcy Local Rules; (iii) state the name and address of the objecting party and the amount and nature of the Claim or Equity Interest held by such Entity; (iv) state with particularity the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (v) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is **actually received** no later than the Confirmation Objection Deadline by the parties listed below (the "**Notice Parties**"). CONFIRMATION OBJECTIONS NOT TIMELY FILED AND SERVED IN THE MANNER SET FORTH HEREIN MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND MAY BE OVERRULED WITHOUT FURTHER NOTICE.

Notice Parties. The Notice Parties include:

- Counsel to the Debtors: Latham & Watkins LLP, 885 Third Avenue, New York, NY 10022 (Attn: Keith A. Simon, Esq. and Annemarie V. Reilly, Esq.) (keith.simon@lw.com and annemarie.reilly@lw.com) and Hunton Andrews Kurth LLP, 600 Travis Street, Suite 4200, Houston, TX (Attn: Timothy A. Davidson II, Esq. and Ashley L. Harper, Esq.) (TadDavidson@HuntonAK.com and AshleyHarper@HuntonAK.com);

- Counsel to the DIP ABL Agent: Simpson, Thacher & Bartlett LLP, 425 Lexington Avenue, New York, NY 10017 (Attn: Elisha Graff, Esq. and Daniel L. Biller, Esq.) (egraff@stblaw.com and dbiller@stblaw.com);

- Counsel to the Ad Hoc Noteholders Committee: Paul, Weiss, Rifkind, Wharton & Garrison, LLP, 1285 Avenue of the Americas, New York, NY 10019 (Attn: Brian S. Hermann, Esq. and Elizabeth R. McColm, Esq.) (bhermann@paulweiss.com and emccolm@paulweiss.com) and Porter Hedges LLP, 1000 Main St., 36th Floor, Houston, TX 77002 (Attn: John F. Higgins, Esq.) (JHiggins@porterhedges.com);

- Counsel to any statutory committee appointed in these Chapter 11 Cases; and

2

- the Office of the United States Trustee for the Southern District of Texas, 515 Rusk Street, Suite 3516, Houston, TX 77002 (Attn: Stephen Statham, Esq. and Hector Duran, Esq.) (stephen.statham@usdoj.gov and hector.duranjr@usdoj.gov).

**PLEASE TAKE FURTHER NOTICE THAT** a hearing (the "**Confirmation Hearing**") is scheduled for September 23, 2020 at 2:00 p.m. (Prevailing Central Time) to consider confirmation of the Plan.  The Confirmation Hearing will take place in Courtroom 400, 4th Floor, 515 Rusk Street, Houston, TX 77002 or via videoconference, if necessary.[3]  The Confirmation Hearing may be continued from time to time by the Bankruptcy Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Bankruptcy Court and served on such parties as the Bankruptcy Court may order.   Moreover, the Plan may be modified or amended, if necessary, pursuant to section 1127 of the Bankruptcy Code, prior to, during or as a result of the Confirmation Hearing, without further notice to parties in interest.

## NOTICE REGARDING CERTAIN RELEASE, EXCULPATION AND INJUNCTION PROVISIONS IN THE PLAN

**PLEASE BE ADVISED THAT THE PLAN CONTAINS CERTAIN RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, INCLUDING THOSE LISTED BELOW.  YOU ARE ADVISED AND ENCOURAGED TO CAREFULLY REVIEW AND CONSIDER THE PLAN, INCLUDING THE RELEASE, EXCULPATION AND INJUNCTION PROVISIONS, AS YOUR RIGHTS MIGHT BE AFFECTED.**

**Article X.B – Release of Claims and Causes of Action**

1.     ***Release by the Debtors and their Estates.***  **Pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, and except as otherwise expressly provided in the Plan, effective as of the Effective Date, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, the Debtors and the Reorganized Debtors, in their respective individual capacities and as debtors-in-possession, and on behalf of themselves and their respective Estates, including, without limitation, any successor to the Debtors or any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code (collectively, the "Debtor Releasing Parties") shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver and release to each of the Released Parties (and each such Released Party so released shall be deemed forever released, waived and discharged by the Debtor Releasing Parties) and their respective assets and properties (the "Debtor Release") from any and all Claims, Causes of Action, and any other debts,**

---

[3]     If the hearing occurs over videoconference the Court will utilize GoToMeeting for the hearing.  You should download the free GoToMeeting application on each device that will be used to connect to the hearing.  If you choose to connect via a web browser, available literature suggests that Chrome is the preferred browser. Please note that connecting through a browser may limit the availability of some GoToMeeting features.  To connect to the hearing, you should enter the meeting code "JudgeJones".  You can also connect using the link on Judge Jones' homepage on the Southern District of Texas website.  Once connected to GoToMeeting, click the settings icon in the upper right corner and enter your name under the personal information setting.  In either event, audio for the Confirmation Hearing will be available by using the Court's regular dial-in number. The dial-in number is +1 (832) 917-1510.  You will be responsible for your own long-distance charges.  You will be asked to key in the conference room number.  Judge Jones' conference room number is 205691.

US-DOCS\116659544.12

obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of the Debtors or their Affiliates, including, without limitation, (i) the Chapter 11 Cases, the Disclosure Statement, the Plan, the Restructuring Support Agreement, the Backstop Purchase Agreement, the Rights Offering, the Restructuring Documents, the Prepetition Debt Documents, and the DIP Loan Documents, (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, the Backstop Purchase Agreement, the Rights Offering, the Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Documents, the Prepetition Debt Documents, the DIP Loan Documents, or related agreements, instruments or other documents, (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale, or rescission of the purchase or sale of any Equity Interest or Plan Securities of the Debtors or the Reorganized Debtors, and/or (vii) the Confirmation or Consummation of the Plan or the solicitation of votes on the Plan that such Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) or that any Holder of a Claim or Equity Interest or other Person or Entity would have been legally entitled to assert for, or on behalf or in the name of, any Debtor, its respective Estate or any Reorganized Debtor (whether directly or derivatively) against any of the Released Parties; *provided*, *however*, that the foregoing provisions of this Debtor Release shall not operate to waive or release (A) the rights of such Debtor Releasing Party to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with the Plan (including, without limitation, the Exit Facility Loan Documents and the New Secured Convertible Notes Documents) or assumed or assumed and assigned, as applicable, pursuant to the Plan or pursuant to a Final Order of the Bankruptcy Court and (B) claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes a criminal act, fraud, willful misconduct, or gross negligence, in each case as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction. The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity and the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Debtor Release. Notwithstanding the foregoing, nothing in this Article X.B. shall or shall be deemed to (i) prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person or Entity that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors and/or (ii) operate as a release or waiver of any Intercompany Claims, in each case unless otherwise expressly provided for in this Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims released by the Debtor Release; (iii) in the best interest of the Debtors and their Estates; (iv) fair, equitable and reasonable; (v) given and made after due notice and opportunity for hearing; and (vi) a bar to any of

4

the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any claim or Cause of Action released pursuant to the Debtor Release.

2. *Release By Third Parties*. **Except as otherwise expressly provided in the Plan, effective as of the Effective Date, to the fullest extent permitted by applicable law, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, and without limiting or otherwise modifying the scope of the Debtor Release provided by the Debtor Releasing Parties above, each Non-Debtor Releasing Party (together with the Debtor Releasing Parties, the "Releasing Parties") shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver, and release to each of the Released Parties (and each such Released Party so released shall be deemed forever released, waived, and discharged by the Non-Debtor Releasing Parties) and their respective assets and properties (the "Third Party Release") from any and all Claims, Causes of Action, and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of the Debtors or their Affiliates, including, without limitation, (i) the Chapter 11 Cases, the Disclosure Statement, the Plan, the Restructuring Support Agreement, the Backstop Purchase Agreement, the Rights Offering, the Restructuring Documents, the Prepetition Debt Documents, and the DIP Loan Documents, (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, the Backstop Purchase Agreement, the Rights Offering, this Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Documents, the Prepetition Debt Documents, the DIP Loan Documents, or related agreements, instruments or other documents, (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale or rescission of the purchase or sale of any Equity Interest or Plan Securities of the Debtors or the Reorganized Debtors, and/or (vii) the Confirmation or Consummation of the Plan or the solicitation of votes on this Plan that such Non-Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) against any of the Released Parties; *provided*, *however*, that the foregoing provisions of this Third Party Release shall not operate to waive or release (A) the rights of such Non-Debtor Releasing Party to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan (including, without limitation, the Exit Facility Loan Documents and the New Secured Convertible Notes Documents) or assumed or assumed and assigned, as applicable, pursuant to the Plan or pursuant to a Final Order of the Bankruptcy Court and (B) claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes a criminal act, fraud, willful misconduct, or gross negligence, in each case as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction. The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity and the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Third Party Release.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third Party Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Third Party Release is: (i) consensual; (ii) essential to the confirmation of the Plan;**

5

**(iii) in exchange for the good and valuable consideration provided by the Released Parties; (iv) a good faith settlement and compromise of the Claims released by the Third Party Release; (v) in the best interest of the Debtors and all Holders of Claims and Equity Interests; (vi) fair, equitable and reasonable; (vii) given and made after due notice and opportunity for hearing; and (viii) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third Party Release.**

## Article X.E – <u>Exculpation</u>

Effective as of the Effective Date, to the fullest extent permitted by law, the Exculpated Parties shall neither have nor incur any liability to any Person or Entity for any claims or Causes of Action arising prior to or on the Effective Date for any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Confirmation or Consummation of this Plan, the Disclosure Statement, the Restructuring Documents, the Rights Offering, the Prepetition Debt Documents, the DIP Loan Documents, or any contract, instrument, release or other agreement or document created or entered into in connection with this Plan, including the Restructuring Support Agreement and the Backstop Purchase Agreement, or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the approval of the Disclosure Statement or Confirmation or Consummation of this Plan; provided, however, that the foregoing provisions of this exculpation shall not operate to waive or release: (i) any Causes of Action arising from willful misconduct, actual fraud, or gross negligence of such applicable Exculpated Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; and/or (ii) the rights of any Person or Entity to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements and documents delivered under or in connection with this Plan or assumed pursuant to this Plan or Final Order of the Bankruptcy Court; provided, further, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its respective duties pursuant to, or in connection with, the above referenced documents, actions or inactions. The foregoing exculpation shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity. Notwithstanding the foregoing, nothing in this <u>Article X.E</u> shall or shall be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person or Entity that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors, in each case unless otherwise expressly provided for in the Plan.

## Article X.G – <u>Injunction</u>

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, FROM AND AFTER THE EFFECTIVE DATE, ALL PERSONS AND ENTITIES ARE, TO THE FULLEST EXTENT PROVIDED UNDER SECTION 524 AND OTHER APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, PERMANENTLY ENJOINED FROM (I) COMMENCING OR CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY SUIT, ACTION OR OTHER PROCEEDING; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING IN ANY MANNER ANY JUDGMENT, AWARD, DECREE, OR ORDER; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE; (IV) ASSERTING A SETOFF OR RIGHT OF SUBROGATION OF ANY KIND; OR (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND,  IN EACH CASE ON ACCOUNT OF OR WITH RESPECT TO ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, EQUITY INTEREST, OR REMEDY RELEASED OR TO BE RELEASED, EXCULPATED OR TO**

US-DOCS\116659544.12

**BE EXCULPATED, SETTLED OR TO BE SETTLED OR DISCHARGED OR TO BE DISCHARGED PURSUANT TO THIS PLAN OR THE CONFIRMATION ORDER AGAINST ANY PERSON OR ENTITY SO RELEASED, DISCHARGED, OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY PERSON OR ENTITY SO RELEASED, DISCHARGED, OR EXCULPATED). ALL INJUNCTIONS OR STAYS PROVIDED FOR IN THE CHAPTER 11 CASES UNDER SECTION 105 OR SECTION 362 OF THE BANKRUPTCY CODE, OR OTHERWISE, AND IN EXISTENCE ON THE CONFIRMATION DATE, SHALL REMAIN IN FULL FORCE AND EFFECT UNTIL THE EFFECTIVE DATE.**

**Article X.H – <u>Binding Nature Of Plan</u>**

ON THE EFFECTIVE DATE, AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE PLAN SHALL BIND, AND SHALL BE DEEMED BINDING UPON, THE DEBTORS, THE REORGANIZED DEBTORS, ANY AND ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS, ALL PERSONS AND ENTITIES THAT ARE PARTIES TO OR ARE SUBJECT TO THE SETTLEMENTS, COMPROMISES, RELEASES, EXCULPATIONS, DISCHARGES, AND INJUNCTIONS DESCRIBED IN THE PLAN, EACH PERSON AND ENTITY ACQUIRING PROPERTY UNDER THIS PLAN, ANY AND ALL NON-DEBTOR PARTIES TO EXECUTORY CONTRACTS AND UNEXPIRED LEASES WITH THE DEBTORS AND THE RESPECTIVE SUCCESSORS AND ASSIGNS OF EACH OF THE FOREGOING, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, AND NOTWITHSTANDING WHETHER OR NOT SUCH PERSON OR ENTITY (I) WILL RECEIVE OR RETAIN ANY PROPERTY, OR INTEREST IN PROPERTY, UNDER THE PLAN, (II) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASES OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN, AFFIRMATIVELY VOTED TO REJECT THIS PLAN OR IS CONCLUSIVELY PRESUMED TO REJECT THE PLAN.**

**<u>Relevant Definitions Related to Release and Exculpation Provisions</u>:**

"*Exculpated Parties*" means, collectively, the following:

(a) the Debtors;

(b) the Reorganized Debtors;

(c) the Prepetition Credit Agreement Agent;

(d) the Prepetition Credit Agreement Lenders;

(e) the Prepetition Notes Indenture Trustee;

(f) the DIP Agents;

(g) the DIP Lenders;

(h) the Ad Hoc Noteholder Committee and the members thereof in their capacities as such;

(i) the Consenting Noteholders;

(j) the Backstop Parties;

7

(k) the Distribution Agents;

(l) the Exit Facility Agent;

(m) the Exit Facility Lenders;

(n) the New Secured Convertible Notes Indenture Trustee;

(o) the New Secured Convertible Noteholders;

(p) the Releasing Old Parent Interestholders; and

(q) with respect to each of the foregoing Persons or Entities in clauses (a) through (p), the Related Persons of each such Person or Entity, in each case solely in their capacity as such.

"*Indemnified Parties*" means each of the Debtors' and their respective subsidiaries' current and former directors, officers, and managers in their respective capacities as such, and solely to the extent that such Person was serving in such capacity on or any time after the Petition Date; <u>provided</u>, that the Designated Persons shall not be Indemnified Parties under the Plan.

"*Non-Debtor Releasing Parties*" means, collectively, the following:

(a) the Prepetition Credit Agreement Agent;

(b) the Prepetition Credit Agreement Lenders;

(c) the Prepetition Notes Indenture Trustee;

(d) the DIP Agents;

(e) the DIP Lenders;

(f) the Ad Hoc Noteholder Committee and the members thereof in their capacities as such;

(g) the Releasing Prepetition Noteholders;

(h) the Backstop Parties;

(i) the Distribution Agents;

(j) the Exit Facility Agent and the Exit Facility Lenders;

(k) the New Secured Convertible Notes Indenture Trustee and the New Secured Convertible Noteholders;

(l) those Holders of Claims deemed to accept the Plan that do not affirmatively opt out of the Third Party Release as provided on their respective Ballots/Opt-Out Forms;

(m) those Holders of General Unsecured Claims that do not affirmatively opt out of the Third Party Release as provided on their respective Ballots/Opt-Out Forms;

(n) all Holders of Claims that vote to accept the Plan; and

8

(o) the Releasing Old Parent Interestholders.

"Released Party" means, collectively, the following:

(a) the Debtors;

(b) the Reorganized Debtors;

(c) the Prepetition Credit Agreement Agent;

(d) the Prepetition Credit Agreement Lenders;

(e) the Prepetition Notes Indenture Trustee;

(f) the DIP Agents;

(g) the DIP Lenders;

(h) the Ad Hoc Noteholder Committee and the members thereof in their capacities as such;

(i) the Releasing Prepetition Noteholders;

(j) the Backstop Parties;

(k) the Distribution Agents;

(l) the Exit Facility Agent and the Exit Facility Lenders;

(m) the New Secured Convertible Notes Indenture Trustee and the New Secured Convertible Noteholders;

(n) the Releasing Old Parent Interestholders; and

(o) with respect to each of the foregoing Persons or Entities in clauses (a) through (n), the Related Persons of each such Person or Entity, in each case solely in their capacity as such; provided, that the Designated Persons shall not be Released Parties under the Plan.

---

**IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE VOTING AND CLAIMS AGENT.**

---

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, PLEASE CONTACT THE VOTING AND CLAIMS AGENT AT THE NUMBER OR ADDRESS SPECIFIED ABOVE. PLEASE NOTE THAT THE VOTING AND CLAIMS AGENT CANNOT PROVIDE LEGAL ADVICE.**

---

US-DOCS\116659544.12

**Exhibit 4A**

**Opt-Out Form for Classes Deemed to Accept**

US-DOCS\116659544.12

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

```
------------------------------------------------- x
In re:                            :    Chapter 11
                                  :
HI-CRUSH INC., et al.,[1]         :    Case No. 20-33495 (DRJ)
                                  :
            Debtors.              :    (Jointly Administered)
                                  :
------------------------------------------------- x
```

## OPT-OUT FORM FOR HOLDERS OF CLAIMS IN
## CLASS 1 – OTHER PRIORITY CLAIMS, CLASS 2 – OTHER
## SECURED CLAIMS AND CLASS 3 – SECURED TAX CLAIMS

PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING THIS OPT-OUT FORM CAREFULLY BEFORE COMPLETING THIS OPT-OUT FORM.

**UNLESS YOU CHECK THE BOX ON THIS OPT-OUT FORM BELOW AND FOLLOW ALL INSTRUCTIONS, YOU WILL BE HELD TO FOREVER RELEASE THE RELEASED PARTIES IN ACCORDANCE WITH THE PLAN.**

**THIS OPT-OUT FORM MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE ACTUALLY RECEIVED BY KURTZMAN CARSON CONSULTANTS LLC (THE "VOTING AND CLAIMS AGENT" OR "KCC") ON OR BEFORE 5:00 P.M. PREVAILING CENTRAL TIME ON SEPTEMBER 18, 2020 (THE "RELEASE OPT-OUT DEADLINE").**

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**") are soliciting votes with respect to the *Joint Plan of Reorganization for Hi-Crush Inc. and Its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code* (as may be amended from time to time, the "**Plan**") as set forth in the Disclosure Statement for the Plan (as may be amended from time to time, the "**Disclosure Statement**"). Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

As set forth in the Notice of Non-Voting Status and Opt-Out Opportunity: Deemed to Accept accompanying this opt-out form (the "**Opt-Out Form**"), you are receiving this Opt-Out

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Hi-Crush Inc. (0530), OnCore Processing LLC (9403), Hi-Crush Augusta LLC (0668), Hi-Crush Whitehall LLC (5562), PDQ Properties LLC (9169), Hi-Crush Wyeville Operating LLC (5797), D & I Silica, LLC (9957), Hi-Crush Blair LLC (7094), Hi-Crush LMS LLC, Hi-Crush Investments Inc. (6547), Hi-Crush Permian Sand LLC, Hi-Crush Proppants LLC (0770), Hi-Crush PODS LLC, Hi-Crush Canada Inc. (9195), Hi-Crush Holdings LLC, Hi-Crush Services LLC (6206), BulkTracer Holdings LLC (4085), Pronghorn Logistics Holdings, LLC (5223), FB Industries USA Inc. (8208), PropDispatch LLC, Pronghorn Logistics, LLC (4547), and FB Logistics, LLC (8641). The Debtors' address is 1330 Post Oak Blvd, Suite 600, Houston, Texas 77056.

US-DOCS\116659544.12

Form because our records indicate that you are a Holder of a Claim in either Class 1 (Other Priority Claims), Class 2 (Other Secured Claims), or Class 3 (Secured Tax Claims) as of the Voting Record Date. Pursuant to the terms of the Plan, Holders of Claims in Classes 1, 2, and 3 are Unimpaired under the Plan and, therefore, pursuant to section 1126(f) of title 11 of the United States Code, you are deemed to have accepted the Plan. Accordingly, this Opt-Out Form is being provided to Holders of Claims in Classes 1, 2 and 3 solely for the purpose of allowing such Holders to affirmatively opt out of the Third Party Release (defined herein) set forth in the Plan, if they so choose. You will be deemed to consent to the Third-Party Release set forth in Article X.B.2 of the Plan unless you clearly indicate your decision to opt-out of the Third-Party Release by checking the box in Item 1 of this Opt-Out Form.

This Opt-Out Form may not be used for any purpose other than opting out of the Third Party Release contained in the Plan. If you believe you have received this Opt-Out Form in error, or if you believe that you have received the wrong Opt-Out Form, please contact the Voting and Claims Agent immediately at the address, email address, or telephone number set forth above.

Before completing this Opt-Out Form, please read and follow the enclosed "Instructions for Completing this Opt-Out Form" carefully to ensure that you complete, execute and return this Opt-Out Form properly.

**Item 1. Optional Third-Party Release Election.**

Item 1 is to be completed **only** if you are **opting out** of the Third-Party Release contained in Article X.B.2 of the Plan.

**IMPORTANT INFORMATION REGARDING THE RELEASE OF CLAIMS BY THIRD PARTIES:**

ARTICLE X OF THE PLAN CONTAINS RELEASE, EXCULPATION AND INJUNCTION PROVISIONS, WHICH ARE SET FORTH AT THE END OF THIS FORM. YOU SHOULD REVIEW THESE PROVISIONS CAREFULLY.

**If you submit your Opt-Out Form without this box checked, then you will be deemed to CONSENT to the Third Party Release set forth in Article X.B.2 of the Plan. PLEASE BE ADVISED THAT BY NOT CHECKING THE BOX BELOW YOU ELECT TO GRANT THE THIRD PARTY RELEASE IN EACH AND EVERY CAPACITY IN WHICH YOU HOLD A CLAIM AGAINST, OR EQUITY INTEREST IN, ANY OF THE DEBTORS. YOU MUST AFFIRMATIVELY CHECK THE BOX BELOW IN ORDER TO OPT-OUT OF THE THIRD PARTY RELEASE.**

**PLEASE ALSO BE ADVISED THAT THE DEBTOR RELEASE CONTAINED IN ARTICLE X.B.1 OF THE PLAN WILL BE INCLUDED IN THE CONFIRMATION ORDER AND THAT IT IS SEPARATE FROM AND INDEPENDENT OF THE THIRD PARTY RELEASE. IF YOU OBJECT TO THE DEBTOR RELEASE, YOU MUST FILE A SEPARATE OBJECTION WITH THE BANKRUPTCY COURT IN ACCORDANCE WITH THE PROCEDURES DESCRIBED IN THE DISCLOSURE STATEMENT ORDER.**

US-DOCS\116659544.12

☐ OPT-OUT ELECTION:  The undersigned elects to opt-out of the Third Party Release contained in Article X.B.2 of the Plan.

**Item 2. Certifications.**

By signing this Opt-Out Form, the undersigned certifies to the Bankruptcy Court and the Debtors:

a. that either: (i) the undersigned is the Holder of a Claim in Class 1 – Other Priority Claims, Class 2 – Other Secured Claims, or Class 3 – Secured Tax Claims, or (ii) the undersigned is an authorized signatory for a Holder of a Claim in Class 1 – Other Priority Claims, Class 2 – Other Secured Claims, or Class 3 – Secured Tax Claims;

b. that the undersigned (or in the case of an authorized signatory, the Holder) has received a copy of the Notice of Non-Voting Status and Opt-Out Opportunity: Deemed to Accept, including instructions to access the Disclosure Statement, and that this Opt-Out Form is made pursuant to the terms and conditions set forth therein;

c. that the undersigned has made the same election with respect to all Class 1 – Other Priority Claims, Class 2 – Other Secured Claims, or Class 3 – Secured Tax Claims; and

d. that no other Opt-Out Form with respect to the Holder's Class 1 – Other Priority Claims, Class 2 – Other Secured Claims, or Class 3 – Secured Tax Claims have been cast or, if any other Opt-Out Forms have been cast with respect to such Claims or Equity Interests in the Debtors, such Opt-Out Forms are hereby revoked.

YOUR RECEIPT OF THIS OPT-OUT FORM DOES NOT SIGNIFY THAT YOUR CLAIM OR EQUITY INTEREST HAS BEEN OR WILL BE ALLOWED.

3

US-DOCS\116659544.12

| | |
|---|---|
| **Name of Holder:** | |
| | (Print or Type) |
| **Social Security or Federal Tax Identification Number:** | |
| **Signature:** | |
| **Name of Signatory:** | |
| | (If other than Holder) |
| **Title:** | |
| **Address:** | |
| | |
| | |
| **Date Completed:** | |

If your address or contact information has changed, please note the new information here.

**PLEASE COMPLETE, SIGN AND DATE THIS OPT-OUT FORM AND RETURN IT PROMPTLY IN THE ENVELOPE PROVIDED TO THE ADDRESSEE SPECIFIED THEREON.**

IF THE VOTING AND CLAIMS AGENT DOES NOT ACTUALLY RECEIVE THIS OPT-OUT FORM ON OR BEFORE 5:00 P.M. PREVAILING CENTRAL TIME ON SEPTEMBER 18, 2020, THEN YOUR ELECTION TRANSMITTED HEREBY WILL NOT BE EFFECTIVE.

OPT-OUT FORMS SENT BY FACSIMILE, TELECOPY, OR ELECTRONIC MAIL WILL NOT BE ACCEPTED

4

US-DOCS\116659544.12

| Class 1 – Other Priority Claims, Class 2 – Other Secured Claims, and Class 3 – Secured Tax Claims |
|---|

### INSTRUCTIONS FOR COMPLETING THIS FORM

1. Capitalized terms used in the Opt-Out Form or in these instructions (the "**Opt-Out Form Instructions**") but not otherwise defined therein or herein shall have the meaning set forth in the Plan.

2. To ensure that your election is counted, you <u>must</u> complete the Opt-Out Form and take the following steps: (a) clearly indicate your decision to "opt out" of the Third-Party Release set forth in the Plan in Item 1 above; (b) make sure that the information required by Item 2 above has been correctly inserted; <u>and</u> (c) sign, date and return an original of your Opt-Out Form in accordance with paragraph 3 directly below.

3. **Return of Opt-Out Form**: Your Form MUST be returned to the Voting and Claims Agent so as to be **actually received** by the Voting and Claims Agent on or before the Release Opt-Out Deadline, which is 5:00 p.m. prevailing Central Time on September 18, 2020. You must return your completed Opt-Out Form <u>directly to the Voting and Claims Agent</u> so that it is **actually received** by the Voting and Claims Agent on or before the Voting Deadline.

4. If an Opt-Out Form is received by the Voting and Claims Agent <u>after</u> the Release Opt-Out Deadline, it will not be effective, unless the Debtors have granted an extension of the Release Opt-Out Deadline in writing with respect to such Opt-Out Form. Additionally**,** the following Opt-Out Forms will <u>NOT</u> be counted:

   ➢ ANY OPT-OUT FORM THAT IS ILLEGIBLE OR CONTAINS INSUFFICIENT INFORMATION TO PERMIT THE IDENTIFICATION OF THE HOLDER OF THE CLAIM OR EQUITY INTEREST;

   ➢ ANY OPT-OUT FORM CAST BY OR ON BEHALF OF AN ENTITY THAT IS NOT ENTITLED TO OPT-OUT OF THE THIRD-PARTY RELEASE;

   ➢ ANY OPT-OUT FORM SENT TO THE DEBTORS, THE DEBTORS' AGENTS/REPRESENTATIVES (OTHER THAN THE VOTING AND CLAIMS AGENT), ANY INDENTURE TRUSTEE OR THE DEBTORS' FINANCIAL OR LEGAL ADVISORS;

   ➢ ANY OPT-OUT FORM TRANSMITTED BY FACSIMILE, TELECOPY, OR ELECTRONIC MAIL;

   ➢ ANY UNSIGNED OPT-OUT FORM**;** OR

   ➢ ANY OPT-OUT FORM NOT COMPLETED IN ACCORDANCE WITH THE PROCEDURES APPROVED IN THE DISCLOSURE STATEMENT ORDER.

US-DOCS\116659544.12

5.   The method of delivery of Opt-Out Forms to the Voting and Claims Agent is at the election and risk of each Holder of a Claim or Equity Interest.  Except as otherwise provided herein, such delivery will be deemed made to the Voting and Claims Agent only when the Voting and Claims Agent **actually receives** the originally executed Opt-Out Form.  Instead of effecting delivery by first-class mail, it is recommended, though not required, that Holders use overnight or hand delivery service.  In all cases, Holders should allow sufficient time to assure timely delivery.

6.   If multiple Opt-Out Forms are received from the same Holder of a Class 1 – Other Priority Claims, Class 2 – Other Secured Claims, or Class 3 – Secured Tax Claims  with respect to the same Class 1, 2 or 3 Claim prior to the Release Opt-Out Deadline, the last Opt-Out Form timely received will supersede and revoke any earlier received Opt-Out Forms.

7.   The Opt-Out Form is not a letter of transmittal and may not be used for any purpose other than to opt-out of the Third Party Release.  Accordingly, at this time, Holders of Claims or Equity Interests should not surrender certificates or instruments representing or evidencing their Claims or Equity Interests, and neither the Debtors nor the Voting and Claims Agent will accept delivery of any such certificates or instruments surrendered together with an Opt-Out Form.

8.   This Opt-Out Form does not constitute, and shall not be deemed to be, (a) a proof of Claim or (b) an assertion or admission of a Claim.

9.   Please be sure to sign and date your Form.  If you are signing an Opt-Out Form in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Voting and Claims Agent, the Debtors or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Holder.  In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Opt-Out Form.

**PLEASE RETURN YOUR OPT-OUT FORM PROMPTLY!**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS OPT-OUT FORM
OR THE INSTRUCTIONS OR PROCEDURES, PLEASE CONTACT
THE VOTING AND CLAIMS AGENT AT:**

**866-554-5810 (Toll Free U.S. and Canada) or 781-575-2032 (International)**

**Or via email: HiCrushinfo@kccllc.com**

---

**IF THE VOTING AND CLAIMS AGENT DOES NOT ACTUALLY RECEIVE
THIS OPT-OUT FORM FROM YOU BEFORE THE RELEASE OPT-OUT
DEADLINE, WHICH IS 5:00 P.M. PREVAILING CENTRAL TIME ON
SEPTEMBER 18, 2020, THEN YOUR OPT-OUT ELECTION TRANSMITTED
HEREBY WILL NOT BE EFFECTIVE.**

---

6

US-DOCS\116659544.12

NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, REGARDING THE DEBTORS OR THE PLAN, OTHER THAN WHAT IS CONTAINED IN THE DOCUMENTS MAILED HEREWITH.

**PLEASE BE ADVISED THAT THE PLAN CONTAINS CERTAIN RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, INCLUDING THOSE LISTED BELOW. YOU ARE ADVISED AND ENCOURAGED TO CAREFULLY REVIEW AND CONSIDER THE PLAN, INCLUDING THE RELEASE, EXCULPATION AND INJUNCTION PROVISIONS, AS YOUR RIGHTS MIGHT BE AFFECTED.**

**Article X.B – <u>Release of Claims and Causes of Action</u>**

1.        *<u>Release by the Debtors and their Estates</u>.* **Pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, and except as otherwise expressly provided in the Plan, effective as of the Effective Date, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, the Debtors and the Reorganized Debtors, in their respective individual capacities and as debtors-in-possession, and on behalf of themselves and their respective Estates, including, without limitation, any successor to the Debtors or any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code (collectively, the "<u>Debtor Releasing Parties</u>") shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver and release to each of the Released Parties (and each such Released Party so released shall be deemed forever released, waived and discharged by the Debtor Releasing Parties) and their respective assets and properties (the "<u>Debtor Release</u>") from any and all Claims, Causes of Action, and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of the Debtors or their Affiliates, including, without limitation, (i) the Chapter 11 Cases, the Disclosure Statement, the Plan, the Restructuring Support Agreement, the Backstop Purchase Agreement, the Rights Offering, the Restructuring Documents, the Prepetition Debt Documents, and the DIP Loan Documents, (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, the Backstop Purchase Agreement, the Rights Offering, the Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Documents, the Prepetition Debt Documents, the DIP Loan Documents, or related agreements, instruments or other documents, (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale, or rescission of the purchase or sale of any Equity Interest or Plan Securities of the Debtors or the Reorganized Debtors, and/or (vii) the Confirmation or Consummation of the Plan or the solicitation of votes on the Plan that such Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) or that any Holder of a Claim or Equity Interest or other Person or Entity would have been legally entitled to assert for, or on behalf or in the name of, any Debtor, its respective Estate or any Reorganized Debtor (whether directly or derivatively) against any of the Released Parties; *provided*, *however*, that the foregoing provisions of this Debtor Release shall not operate to waive or release (A) the rights of such Debtor Releasing Party to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or**

7

in connection with the Plan (including, without limitation, the Exit Facility Loan Documents and the New Secured Convertible Notes Documents) or assumed or assumed and assigned, as applicable, pursuant to the Plan or pursuant to a Final Order of the Bankruptcy Court and (B) claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes a criminal act, fraud, willful misconduct, or gross negligence, in each case as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction. The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity and the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Debtor Release. Notwithstanding the foregoing, nothing in this **Article X.B.** shall or shall be deemed to (i) prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person or Entity that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors and/or (ii) operate as a release or waiver of any Intercompany Claims, in each case unless otherwise expressly provided for in this Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims released by the Debtor Release; (iii) in the best interest of the Debtors and their Estates; (iv) fair, equitable and reasonable; (v) given and made after due notice and opportunity for hearing; and (vi) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any claim or Cause of Action released pursuant to the Debtor Release.

2. *Release By Third Parties.* Except as otherwise expressly provided in the Plan, effective as of the Effective Date, to the fullest extent permitted by applicable law, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, and without limiting or otherwise modifying the scope of the Debtor Release provided by the Debtor Releasing Parties above, each Non-Debtor Releasing Party (together with the Debtor Releasing Parties, the "**Releasing Parties**") shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver, and release to each of the Released Parties (and each such Released Party so released shall be deemed forever released, waived, and discharged by the Non-Debtor Releasing Parties) and their respective assets and properties (the "**Third Party Release**") from any and all Claims, Causes of Action, and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of the Debtors or their Affiliates, including, without limitation, (i) the Chapter 11 Cases, the Disclosure Statement, the Plan, the Restructuring Support Agreement, the Backstop Purchase Agreement, the Rights Offering, the Restructuring Documents, the Prepetition Debt Documents, and the DIP Loan Documents, (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, the Backstop Purchase Agreement, the Rights Offering, this Plan, the Disclosure Statement, the Plan Supplement,

8

the Restructuring Documents, the Prepetition Debt Documents, the DIP Loan Documents, or related agreements, instruments or other documents, (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale or rescission of the purchase or sale of any Equity Interest or Plan Securities of the Debtors or the Reorganized Debtors, and/or (vii) the Confirmation or Consummation of the Plan or the solicitation of votes on this Plan that such Non-Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) against any of the Released Parties; *provided*, *however*, that the foregoing provisions of this Third Party Release shall not operate to waive or release (A) the rights of such Non-Debtor Releasing Party to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan (including, without limitation, the Exit Facility Loan Documents and the New Secured Convertible Notes Documents) or assumed or assumed and assigned, as applicable, pursuant to the Plan or pursuant to a Final Order of the Bankruptcy Court and (B) claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes a criminal act, fraud, willful misconduct, or gross negligence, in each case as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction. The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity and the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Third Party Release.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third Party Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Third Party Release is: (i) consensual; (ii) essential to the confirmation of the Plan; (iii) in exchange for the good and valuable consideration provided by the Released Parties; (iv) a good faith settlement and compromise of the Claims released by the Third Party Release; (v) in the best interest of the Debtors and all Holders of Claims and Equity Interests; (vi) fair, equitable and reasonable; (vii) given and made after due notice and opportunity for hearing; and (viii) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third Party Release.

## Article X.E – <u>Exculpation</u>

Effective as of the Effective Date, to the fullest extent permitted by law, the Exculpated Parties shall neither have nor incur any liability to any Person or Entity for any claims or Causes of Action arising prior to or on the Effective Date for any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Confirmation or Consummation of this Plan, the Disclosure Statement, the Restructuring Documents, the Rights Offering, the Prepetition Debt Documents, the DIP Loan Documents, or any contract, instrument, release or other agreement or document created or entered into in connection with this Plan, including the Restructuring Support Agreement and the Backstop Purchase Agreement, or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the approval of the Disclosure Statement or Confirmation or Consummation of this Plan; provided, however, that the foregoing provisions of this exculpation shall not operate to waive or release: (i) any Causes of Action arising from willful misconduct, actual fraud, or gross negligence of such applicable Exculpated Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; and/or (ii) the rights of any Person or Entity to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements and documents delivered under or in connection with this Plan or assumed pursuant to this Plan or Final Order of the Bankruptcy Court; provided, further, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its respective

9

US-DOCS\116659544.12

duties pursuant to, or in connection with, the above referenced documents, actions or inactions. The foregoing exculpation shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity. Notwithstanding the foregoing, nothing in this Article X.E shall or shall be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person or Entity that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors, in each case unless otherwise expressly provided for in the Plan.

### Article X.G – Injunction

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, FROM AND AFTER THE EFFECTIVE DATE, ALL PERSONS AND ENTITIES ARE, TO THE FULLEST EXTENT PROVIDED UNDER SECTION 524 AND OTHER APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, PERMANENTLY ENJOINED FROM (I) COMMENCING OR CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY SUIT, ACTION OR OTHER PROCEEDING; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING IN ANY MANNER ANY JUDGMENT, AWARD, DECREE, OR ORDER; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE; (IV) ASSERTING A SETOFF OR RIGHT OF SUBROGATION OF ANY KIND; OR (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND, IN EACH CASE ON ACCOUNT OF OR WITH RESPECT TO ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, EQUITY INTEREST, OR REMEDY RELEASED OR TO BE RELEASED, EXCULPATED OR TO BE EXCULPATED, SETTLED OR TO BE SETTLED OR DISCHARGED OR TO BE DISCHARGED PURSUANT TO THIS PLAN OR THE CONFIRMATION ORDER AGAINST ANY PERSON OR ENTITY SO RELEASED, DISCHARGED, OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY PERSON OR ENTITY SO RELEASED, DISCHARGED, OR EXCULPATED). ALL INJUNCTIONS OR STAYS PROVIDED FOR IN THE CHAPTER 11 CASES UNDER SECTION 105 OR SECTION 362 OF THE BANKRUPTCY CODE, OR OTHERWISE, AND IN EXISTENCE ON THE CONFIRMATION DATE, SHALL REMAIN IN FULL FORCE AND EFFECT UNTIL THE EFFECTIVE DATE.**

### Article X.H – Binding Nature Of Plan

**ON THE EFFECTIVE DATE, AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE PLAN SHALL BIND, AND SHALL BE DEEMED BINDING UPON, THE DEBTORS, THE REORGANIZED DEBTORS, ANY AND ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS, ALL PERSONS AND ENTITIES THAT ARE PARTIES TO OR ARE SUBJECT TO THE SETTLEMENTS, COMPROMISES, RELEASES, EXCULPATIONS, DISCHARGES, AND INJUNCTIONS DESCRIBED IN THE PLAN, EACH PERSON AND ENTITY ACQUIRING PROPERTY UNDER THIS PLAN, ANY AND ALL NON-DEBTOR PARTIES TO EXECUTORY CONTRACTS AND UNEXPIRED LEASES WITH THE DEBTORS AND THE RESPECTIVE SUCCESSORS AND ASSIGNS OF EACH OF THE FOREGOING, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, AND NOTWITHSTANDING WHETHER OR NOT SUCH PERSON OR ENTITY (I) WILL RECEIVE OR RETAIN ANY PROPERTY, OR INTEREST IN PROPERTY, UNDER THE PLAN, (II) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASES OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN, AFFIRMATIVELY VOTED TO REJECT THIS PLAN OR IS CONCLUSIVELY PRESUMED TO REJECT THE PLAN.**

US-DOCS\116659544.12

**Relevant Definitions Related to Release and Exculpation Provisions:**

"*Exculpated Parties*" means, collectively, the following:

(a) the Debtors;

(b) the Reorganized Debtors;

(c) the Prepetition Credit Agreement Agent;

(d) the Prepetition Credit Agreement Lenders;

(e) the Prepetition Notes Indenture Trustee;

(f) the DIP Agents;

(g) the DIP Lenders;

(h) the Ad Hoc Noteholder Committee and the members thereof in their capacities as such;

(i) the Consenting Noteholders;

(j) the Backstop Parties;

(k) the Distribution Agents;

(l) the Exit Facility Agent;

(m) the Exit Facility Lenders;

(n) the New Secured Convertible Notes Indenture Trustee;

(o) the New Secured Convertible Noteholders;

(p) the Releasing Old Parent Interestholders; and

(q) with respect to each of the foregoing Persons or Entities in clauses (a) through (p), the Related Persons of each such Person or Entity, in each case solely in their capacity as such.

"*Indemnified Parties*" means each of the Debtors' and their respective subsidiaries' current and former directors, officers, and managers in their respective capacities as such, and solely to the extent that such Person was serving in such capacity on or any time after the Petition Date; provided, that the Designated Persons shall not be Indemnified Parties under the Plan.

"*Non-Debtor Releasing Parties*" means, collectively, the following:

(a) the Prepetition Credit Agreement Agent;

(b) the Prepetition Credit Agreement Lenders;

(c) the Prepetition Notes Indenture Trustee;

11

(d) the DIP Agents;

(e) the DIP Lenders;

(f) the Ad Hoc Noteholder Committee and the members thereof in their capacities as such;

(g) the Releasing Prepetition Noteholders;

(h) the Backstop Parties;

(i) the Distribution Agents;

(j) the Exit Facility Agent and the Exit Facility Lenders;

(k) the New Secured Convertible Notes Indenture Trustee and the New Secured Convertible Noteholders;

(l) those Holders of Claims deemed to accept the Plan that do not affirmatively opt out of the Third Party Release as provided on their respective Ballots/Opt-Out Forms;

(m) those Holders of General Unsecured Claims that do not affirmatively opt out of the Third Party Release as provided on their respective Ballots/Opt-Out Forms;

(n) all Holders of Claims that vote to accept the Plan; and

(o) the Releasing Old Parent Interestholders.

"Released Party" means, collectively, the following:

(a) the Debtors;

(b) the Reorganized Debtors;

(c) the Prepetition Credit Agreement Agent;

(d) the Prepetition Credit Agreement Lenders;

(e) the Prepetition Notes Indenture Trustee;

(f) the DIP Agents;

(g) the DIP Lenders;

(h) the Ad Hoc Noteholder Committee and the members thereof in their capacities as such;

(i) the Releasing Prepetition Noteholders;

(j) the Backstop Parties;

(k) the Distribution Agents;

(l) the Exit Facility Agent and the Exit Facility Lenders;

12

13

(m) the New Secured Convertible Notes Indenture Trustee and the New Secured Convertible Noteholders;

(n) the Releasing Old Parent Interestholders; and

(o) with respect to each of the foregoing Persons or Entities in clauses (a) through (n), the Related Persons of each such Person or Entity, in each case solely in their capacity as such; provided, that the Designated Persons shall not be Released Parties under the Plan.

US-DOCS\116659544.12

**EXHIBIT 5**

**Form of Notice of Non-Voting Status and Opt-Out Opportunity: Deemed to Reject**

US-DOCS\116659544.12

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

```
-------------------------------------------------------------- x
                                              :
In re:                                        :   Chapter 11
                                              :
HI-CRUSH INC., et al.,¹                       :   Case No. 20-33496 (DRJ)
                                              :
              Debtors.                        :   (Jointly Administered)
                                              :
-------------------------------------------------------------- x
```

**NOTICE OF NON-VOTING STATUS
AND OPT-OUT OPPORTUNITY: DEEMED TO REJECT**

**PLEASE TAKE NOTICE THAT** Hi-Crush Inc. and its affiliated debtors, as debtors and debtors in possession (collectively, the "**Debtors**") have commenced solicitation of votes to accept the *Joint Plan of Reorganization for Hi-Crush Inc. and Its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code* (as may be amended, modified, or supplemented from time to time, the "**Plan**").[2] Copies of the Plan and the *Disclosure Statement for Joint Plan of Reorganization for Hi-Crush Inc. and its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code* (as may be amended, modified or supplemented from time to time, the "**Disclosure Statement**") may be obtained free of charge by visiting the website maintained by the Debtors' voting and claims agent, Kurtzman Carson Consultants LLC (the "**Voting and Claims Agent**"), at www.kccllc.net/hicrush. Copies of the Plan and Disclosure Statement may also be obtained by calling the Voting and Claims Agent at 866-554-5810 (US and Canada) or 781-575-2032 (international) or by sending an electronic mail message to HiCrushinfo@kccllc.com with "Hi-Crush" in the subject line.

**PLEASE TAKE FURTHER NOTICE THAT** you are receiving this notice (the "**Notice of Non-Voting Status and Opt-Out Opportunity: Deemed to Reject**") because, according to the Debtors' books and records, you are a Holder of Equity Interests in Class 8 (Old Parent Interests). Pursuant to the terms of the Plan, Holders of Equity Interests in Class 8 are not entitled to receive or retain any recovery under the Plan and, therefore, pursuant to section 1126(g) of title 11 of the United States Code, you are deemed to have rejected the Plan.

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Hi-Crush Inc. (0530), OnCore Processing LLC (9403), Hi-Crush Augusta LLC (0668), Hi-Crush Whitehall LLC (5562), PDQ Properties LLC (9169), Hi-Crush Wyeville Operating LLC (5797), D & I Silica, LLC (9957), Hi-Crush Blair LLC (7094), Hi-Crush LMS LLC, Hi-Crush Investments Inc. (6547), Hi-Crush Permian Sand LLC, Hi-Crush Proppants LLC (0770), Hi-Crush PODS LLC, Hi-Crush Canada Inc. (9195), Hi-Crush Holdings LLC , Hi-Crush Services LLC (6206), BulkTracer Holdings LLC (4085), Pronghorn Logistics Holdings, LLC (5223), FB Industries USA Inc. (8208), PropDispatch LLC, Pronghorn Logistics, LLC (4547), and FB Logistics, LLC (8641).  The Debtors' address is 1330 Post Oak Blvd, Suite 600, Houston, Texas 77056.

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

US-DOCS\116659544.12

**PLEASE TAKE FURTHER NOTICE THAT** you may elect not to grant the Third Party Release contained in Article X.B.2 of the Plan, copied below. If you elect not to grant the Third Party Release contained in Article X.B.2 of the Plan, please follow the instructions on the "Opt-Out" form affixed hereto and return the form to the Voting and Claims Agent in accordance with such instructions. Election to opt out is at your option. The deadline to submit a completed form in order to "opt out" of the Third-Party Release is September 18, 2020 at 5:00 p.m. (Prevailing Central Time) (the "**Release Opt-Out Deadline**"). **PLEASE BE ADVISED THAT YOU MUST AFFIRMATIVELY OPT-OUT OF THE THIRD PARTY RELEASE AND SUBMIT THE OPT-OUT FORM WITH YOUR ELECTION TO THE VOTING AND CLAIMS AGENT PRIOR TO THE RELEASE OPT-OUT DEADLINE IF YOU WISH TO OPT-OUT OF THE THIRD PARTY RELEASE.**

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to confirmation of the Plan is September 18, 2020, at 5:00 p.m. (Prevailing Central Time) (the "**Confirmation Objection Deadline**"). Any objection to the Plan must: (i) be in writing; (ii) conform to the Bankruptcy Rules and the Bankruptcy Local Rules; (iii) state the name and address of the objecting party and the amount and nature of the Claim or Equity Interest held by such Entity; (iv) state with particularity the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (v) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is **actually received** no later than the Confirmation Objection Deadline by the parties listed below (the "**Notice Parties**"). CONFIRMATION OBJECTIONS NOT TIMELY FILED AND SERVED IN THE MANNER SET FORTH HEREIN MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND MAY BE OVERRULED WITHOUT FURTHER NOTICE.

Notice Parties. The Notice Parties include:

- Counsel to the Debtors: Latham & Watkins LLP, 885 Third Avenue, New York, NY 10022 (Attn: Keith A. Simon, Esq. and Annemarie V. Reilly, Esq.) (keith.simon@lw.com and annemarie.reilly@lw.com) and Hunton Andrews Kurth LLP, 600 Travis Street, Suite 4200, Houston, TX (Attn: Timothy A. Davidson II, Esq. and Ashley L. Harper, Esq.) (TadDavidson@HuntonAK.com and AshleyHarper@HuntonAK.com);

- Counsel to the DIP ABL Agent: Simpson, Thacher & Bartlett LLP, 425 Lexington Avenue, New York, NY 10017 (Attn: Elisha Graff, Esq. and Daniel L. Biller, Esq.) (egraff@stblaw.com and dbiller@stblaw.com);

- Counsel to the Ad Hoc Noteholders Committee: Paul, Weiss, Rifkind, Wharton & Garrison, LLP, 1285 Avenue of the Americas, New York, NY 10019 (Attn: Brian S. Hermann, Esq. and Elizabeth R. McColm, Esq.) (bhermann@paulweiss.com and emccolm@paulweiss.com) and Porter Hedges LLP, 1000 Main St., 36th Floor, Houston, TX 77002 (Attn: John F. Higgins, Esq.) (JHiggins@porterhedges.com);

- Counsel to any statutory committee appointed in these Chapter 11 Cases; and

2

- the Office of the United States Trustee for the Southern District of Texas, 515 Rusk Street, Suite 3516, Houston, TX 77002 (Attn: Stephen Statham, Esq. and Hector Duran, Esq.) (stephen.statham@usdoj.gov and hector.duranjr@usdoj.gov).

**PLEASE TAKE FURTHER NOTICE THAT** a hearing (the "**Confirmation Hearing**") is scheduled for September 23, 2020 at 2:00 p.m. (Prevailing Central Time) to consider confirmation of the Plan.  The Confirmation Hearing will take place in Courtroom 400, 4th Floor, 515 Rusk Street, Houston, TX 77002 or via videoconference, if necessary.[3]  The Confirmation Hearing may be continued from time to time by the Bankruptcy Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Bankruptcy Court and served on such parties as the Bankruptcy Court may order.  Moreover, the Plan may be modified or amended, if necessary, pursuant to section 1127 of the Bankruptcy Code, prior to, during or as a result of the Confirmation Hearing, without further notice to parties in interest.

## NOTICE REGARDING CERTAIN RELEASE, EXCULPATION AND INJUNCTION PROVISIONS IN THE PLAN

**PLEASE BE ADVISED THAT THE PLAN CONTAINS CERTAIN RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, INCLUDING THOSE LISTED BELOW.  YOU ARE ADVISED AND ENCOURAGED TO CAREFULLY REVIEW AND CONSIDER THE PLAN, INCLUDING THE RELEASE, EXCULPATION AND INJUNCTION PROVISIONS, AS YOUR RIGHTS MIGHT BE AFFECTED.**

**Article X.B – Release of Claims and Causes of Action**

1.     *Release by the Debtors and their Estates*.  **Pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, and except as otherwise expressly provided in the Plan, effective as of the Effective Date, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, the Debtors and the Reorganized Debtors, in their respective individual capacities and as debtors-in-possession, and on behalf of themselves and their respective Estates, including, without limitation, any successor to the Debtors or any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code (collectively, the "Debtor Releasing Parties") shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver and release to each of the Released Parties (and each such Released Party so released shall be deemed forever released, waived and discharged by the Debtor Releasing Parties) and their respective assets and properties (the "Debtor Release") from any and all Claims, Causes of Action, and any other debts,**

---

[3]     If the hearing occurs over videoconference the Court will utilize GoToMeeting for the hearing.  You should download the free GoToMeeting application on each device that will be used to connect to the hearing.  If you choose to connect via a web browser, available literature suggests that Chrome is the preferred browser. Please note that connecting through a browser may limit the availability of some GoToMeeting features.  To connect to the hearing, you should enter the meeting code "JudgeJones".  You can also connect using the link on Judge Jones' homepage on the Southern District of Texas website.  Once connected to GoToMeeting, click the settings icon in the upper right corner and enter your name under the personal information setting.  In either event, audio for the Confirmation Hearing will be available by using the Court's regular dial-in number. The dial-in number is +1 (832) 917-1510.  You will be responsible for your own long-distance charges.  You will be asked to key in the conference room number.  Judge Jones' conference room number is 205691.

3

obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of the Debtors or their Affiliates, including, without limitation, (i) the Chapter 11 Cases, the Disclosure Statement, the Plan, the Restructuring Support Agreement, the Backstop Purchase Agreement, the Rights Offering, the Restructuring Documents, the Prepetition Debt Documents, and the DIP Loan Documents, (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, the Backstop Purchase Agreement, the Rights Offering, the Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Documents, the Prepetition Debt Documents, the DIP Loan Documents, or related agreements, instruments or other documents, (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale, or rescission of the purchase or sale of any Equity Interest or Plan Securities of the Debtors or the Reorganized Debtors, and/or (vii) the Confirmation or Consummation of the Plan or the solicitation of votes on the Plan that such Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) or that any Holder of a Claim or Equity Interest or other Person or Entity would have been legally entitled to assert for, or on behalf or in the name of, any Debtor, its respective Estate or any Reorganized Debtor (whether directly or derivatively) against any of the Released Parties; *provided*, *however*, that the foregoing provisions of this Debtor Release shall not operate to waive or release (A) the rights of such Debtor Releasing Party to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with the Plan (including, without limitation, the Exit Facility Loan Documents and the New Secured Convertible Notes Documents) or assumed or assumed and assigned, as applicable, pursuant to the Plan or pursuant to a Final Order of the Bankruptcy Court and (B) claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes a criminal act, fraud, willful misconduct, or gross negligence, in each case as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction. The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity and the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Debtor Release. Notwithstanding the foregoing, nothing in this Article X.B. shall or shall be deemed to (i) prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person or Entity that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors and/or (ii) operate as a release or waiver of any Intercompany Claims, in each case unless otherwise expressly provided for in this Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims released by the Debtor Release; (iii) in the best interest of the Debtors and their Estates; (iv) fair, equitable and reasonable; (v) given and made after due notice and opportunity for hearing; and (vi) a bar to any of

US-DOCS\116659544.12

the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any claim or Cause of Action released pursuant to the Debtor Release.

2.      *Release By Third Parties*.  Except as otherwise expressly provided in the Plan, effective as of the Effective Date, to the fullest extent permitted by applicable law, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, and without limiting or otherwise modifying the scope of the Debtor Release provided by the Debtor Releasing Parties above, each Non-Debtor Releasing Party (together with the Debtor Releasing Parties, the "Releasing Parties") shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver, and release to each of the Released Parties (and each such Released Party so released shall be deemed forever released, waived, and discharged by the Non-Debtor Releasing Parties) and their respective assets and properties (the "Third Party Release") from any and all Claims, Causes of Action, and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of the Debtors or their Affiliates, including, without limitation, (i) the Chapter 11 Cases, the Disclosure Statement, the Plan, the Restructuring Support Agreement, the Backstop Purchase Agreement, the Rights Offering, the Restructuring Documents, the Prepetition Debt Documents, and the DIP Loan Documents, (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, the Backstop Purchase Agreement, the Rights Offering, this Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Documents, the Prepetition Debt Documents, the DIP Loan Documents, or related agreements, instruments or other documents, (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale or rescission of the purchase or sale of any Equity Interest or Plan Securities of the Debtors or the Reorganized Debtors, and/or (vii) the Confirmation or Consummation of the Plan or the solicitation of votes on this Plan that such Non-Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) against any of the Released Parties; *provided*, *however*, that the foregoing provisions of this Third Party Release shall not operate to waive or release (A) the rights of such Non-Debtor Releasing Party to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan (including, without limitation, the Exit Facility Loan Documents and the New Secured Convertible Notes Documents) or assumed or assumed and assigned, as applicable, pursuant to the Plan or pursuant to a Final Order of the Bankruptcy Court and (B) claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes a criminal act, fraud, willful misconduct, or gross negligence, in each case as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction.  The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity and the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Third Party Release.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third Party Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Third Party Release is:  (i) consensual; (ii) essential to the confirmation of the Plan;

5

**(iii) in exchange for the good and valuable consideration provided by the Released Parties; (iv) a good faith settlement and compromise of the Claims released by the Third Party Release; (v) in the best interest of the Debtors and all Holders of Claims and Equity Interests; (vi) fair, equitable and reasonable; (vii) given and made after due notice and opportunity for hearing; and (viii) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third Party Release.**

## Article X.E – <u>Exculpation</u>

Effective as of the Effective Date, to the fullest extent permitted by law, the Exculpated Parties shall neither have nor incur any liability to any Person or Entity for any claims or Causes of Action arising prior to or on the Effective Date for any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Confirmation or Consummation of this Plan, the Disclosure Statement, the Restructuring Documents, the Rights Offering, the Prepetition Debt Documents, the DIP Loan Documents, or any contract, instrument, release or other agreement or document created or entered into in connection with this Plan, including the Restructuring Support Agreement and the Backstop Purchase Agreement, or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the approval of the Disclosure Statement or Confirmation or Consummation of this Plan; provided, however, that the foregoing provisions of this exculpation shall not operate to waive or release: (i) any Causes of Action arising from willful misconduct, actual fraud, or gross negligence of such applicable Exculpated Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; and/or (ii) the rights of any Person or Entity to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements and documents delivered under or in connection with this Plan or assumed pursuant to this Plan or Final Order of the Bankruptcy Court; provided, further, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its respective duties pursuant to, or in connection with, the above referenced documents, actions or inactions. The foregoing exculpation shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity. Notwithstanding the foregoing, nothing in this <u>Article X.E</u> shall or shall be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person or Entity that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors, in each case unless otherwise expressly provided for in the Plan.

## Article X.G – <u>Injunction</u>

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, FROM AND AFTER THE EFFECTIVE DATE, ALL PERSONS AND ENTITIES ARE, TO THE FULLEST EXTENT PROVIDED UNDER SECTION 524 AND OTHER APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, PERMANENTLY ENJOINED FROM (I) COMMENCING OR CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY SUIT, ACTION OR OTHER PROCEEDING; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING IN ANY MANNER ANY JUDGMENT, AWARD, DECREE, OR ORDER; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE; (IV) ASSERTING A SETOFF OR RIGHT OF SUBROGATION OF ANY KIND; OR (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND, IN EACH CASE ON ACCOUNT OF OR WITH RESPECT TO ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, EQUITY INTEREST, OR REMEDY RELEASED OR TO BE RELEASED, EXCULPATED OR TO**

6

BE EXCULPATED, SETTLED OR TO BE SETTLED OR DISCHARGED OR TO BE DISCHARGED PURSUANT TO THIS PLAN OR THE CONFIRMATION ORDER AGAINST ANY PERSON OR ENTITY SO RELEASED, DISCHARGED, OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY PERSON OR ENTITY SO RELEASED, DISCHARGED, OR EXCULPATED). ALL INJUNCTIONS OR STAYS PROVIDED FOR IN THE CHAPTER 11 CASES UNDER SECTION 105 OR SECTION 362 OF THE BANKRUPTCY CODE, OR OTHERWISE, AND IN EXISTENCE ON THE CONFIRMATION DATE, SHALL REMAIN IN FULL FORCE AND EFFECT UNTIL THE EFFECTIVE DATE.

**Article X.H – <u>Binding Nature Of Plan</u>**

ON THE EFFECTIVE DATE, AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE PLAN SHALL BIND, AND SHALL BE DEEMED BINDING UPON, THE DEBTORS, THE REORGANIZED DEBTORS, ANY AND ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS, ALL PERSONS AND ENTITIES THAT ARE PARTIES TO OR ARE SUBJECT TO THE SETTLEMENTS, COMPROMISES, RELEASES, EXCULPATIONS, DISCHARGES, AND INJUNCTIONS DESCRIBED IN THE PLAN, EACH PERSON AND ENTITY ACQUIRING PROPERTY UNDER THIS PLAN, ANY AND ALL NON-DEBTOR PARTIES TO EXECUTORY CONTRACTS AND UNEXPIRED LEASES WITH THE DEBTORS AND THE RESPECTIVE SUCCESSORS AND ASSIGNS OF EACH OF THE FOREGOING, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, AND NOTWITHSTANDING WHETHER OR NOT SUCH PERSON OR ENTITY (I) WILL RECEIVE OR RETAIN ANY PROPERTY, OR INTEREST IN PROPERTY, UNDER THE PLAN, (II) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASES OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN, AFFIRMATIVELY VOTED TO REJECT THIS PLAN OR IS CONCLUSIVELY PRESUMED TO REJECT THE PLAN.

**<u>Relevant Definitions Related to Release and Exculpation Provisions</u>:**

"*Exculpated Parties*" means, collectively, the following:

    (a) the Debtors;

    (b) the Reorganized Debtors;

    (c) the Prepetition Credit Agreement Agent;

    (d) the Prepetition Credit Agreement Lenders;

    (e) the Prepetition Notes Indenture Trustee;

    (f) the DIP Agents;

    (g) the DIP Lenders;

    (h) the Ad Hoc Noteholder Committee and the members thereof in their capacities as such;

    (i) the Consenting Noteholders;

    (j) the Backstop Parties;

7

US-DOCS\116659544.12

(k) the Distribution Agents;

(l) the Exit Facility Agent;

(m) the Exit Facility Lenders;

(n) the New Secured Convertible Notes Indenture Trustee;

(o) the New Secured Convertible Noteholders;

(p) the Releasing Old Parent Interestholders; and

(q) with respect to each of the foregoing Persons or Entities in clauses (a) through (p), the Related Persons of each such Person or Entity, in each case solely in their capacity as such.

"*Indemnified Parties*" means each of the Debtors' and their respective subsidiaries' current and former directors, officers, and managers in their respective capacities as such, and solely to the extent that such Person was serving in such capacity on or any time after the Petition Date; provided, that the Designated Persons shall not be Indemnified Parties under the Plan.

"*Non-Debtor Releasing Parties*" means, collectively, the following:

(a) the Prepetition Credit Agreement Agent;

(b) the Prepetition Credit Agreement Lenders;

(c) the Prepetition Notes Indenture Trustee;

(d) the DIP Agents;

(e) the DIP Lenders;

(f) the Ad Hoc Noteholder Committee and the members thereof in their capacities as such;

(g) the Releasing Prepetition Noteholders;

(h) the Backstop Parties;

(i) the Distribution Agents;

(j) the Exit Facility Agent and the Exit Facility Lenders;

(k) the New Secured Convertible Notes Indenture Trustee and the New Secured Convertible Noteholders;

(l) those Holders of Claims deemed to accept the Plan that do not affirmatively opt out of the Third Party Release as provided on their respective Ballots/Opt-Out Forms;

(m) those Holders of General Unsecured Claims that do not affirmatively opt out of the Third Party Release as provided on their respective Ballots/Opt-Out Forms;

(n) all Holders of Claims that vote to accept the Plan; and

8

(o) the Releasing Old Parent Interestholders.

"Released Party" means, collectively, the following:

(a) the Debtors;

(b) the Reorganized Debtors;

(c) the Prepetition Credit Agreement Agent;

(d) the Prepetition Credit Agreement Lenders;

(e) the Prepetition Notes Indenture Trustee;

(f) the DIP Agents;

(g) the DIP Lenders;

(h) the Ad Hoc Noteholder Committee and the members thereof in their capacities as such;

(i) the Releasing Prepetition Noteholders;

(j) the Backstop Parties;

(k) the Distribution Agents;

(l) the Exit Facility Agent and the Exit Facility Lenders;

(m) the New Secured Convertible Notes Indenture Trustee and the New Secured Convertible Noteholders;

(n) the Releasing Old Parent Interestholders; and

(o) with respect to each of the foregoing Persons or Entities in clauses (a) through (n), the Related Persons of each such Person or Entity, in each case solely in their capacity as such; provided, that the Designated Persons shall not be Released Parties under the Plan.

> **THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES AND TO PROVIDE YOU WITH THE OPPORTUNITY TO OPT OUT OF THE THIRD-PARTY RELEASE PROVIDED IN THE PLAN. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE VOTING AND CLAIMS AGENT. PLEASE NOTE THAT THE VOTING AND CLAIMS AGENT CANNOT PROVIDE LEGAL ADVICE.**

**EXHIBIT 5A**

**Class 8 Opt-Out Form: Registered Holders**

US-DOCS\116659544.12

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

---------------------------------------------------- x

In re:      :    Chapter 11

: 

HI-CRUSH INC., *et al.*,[1]      :    Case No. 20-33495 (DRJ)

: 

Debtors.      :    (Jointly Administered)

: 

---------------------------------------------------- x

## REGISTERED HOLDER OPT-OUT FORM FOR
## <u>CLASS 8 – OLD PARENT INTERESTS</u>

PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING THIS OPT-OUT FORM CAREFULLY <u>BEFORE</u> COMPLETING THIS OPT-OUT FORM.

**UNLESS YOU CHECK THE BOX ON THIS OPT-OUT FORM BELOW AND FOLLOW ALL INSTRUCTIONS, YOU WILL BE HELD TO FOREVER RELEASE THE RELEASED PARTIES IN ACCORDANCE WITH THE PLAN.**

**THIS OPT-OUT FORM MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE <u>ACTUALLY</u> <u>RECEIVED</u> BY KURTZMAN CARSON CONSULTANTS LLC (THE "<u>VOTING AND CLAIMS AGENT</u>" OR "<u>KCC</u>") ON OR BEFORE 5:00 P.M. PREVAILING CENTRAL TIME ON SEPTEMBER 18, 2020 (THE "<u>RELEASE OPT-OUT DEADLINE</u>").**

---

[1]      The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Hi-Crush Inc. (0530), OnCore Processing LLC (9403), Hi-Crush Augusta LLC (0668), Hi-Crush Whitehall LLC (5562), PDQ Properties LLC (9169), Hi-Crush Wyeville Operating LLC (5797), D & I Silica, LLC (9957), Hi-Crush Blair LLC (7094), Hi-Crush LMS LLC, Hi-Crush Investments Inc. (6547), Hi-Crush Permian Sand LLC, Hi-Crush Proppants LLC (0770), Hi-Crush PODS LLC, Hi-Crush Canada Inc. (9195), Hi-Crush Holdings LLC, Hi-Crush Services LLC (6206), BulkTracer Holdings LLC (4085), Pronghorn Logistics Holdings, LLC (5223), FB Industries USA Inc. (8208), PropDispatch LLC, Pronghorn Logistics, LLC (4547), and FB Logistics, LLC (8641). The Debtors' address is 1330 Post Oak Blvd, Suite 600, Houston, Texas 77056.

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**") are soliciting votes with respect to the *Joint Plan of Reorganization for Hi-Crush Inc. and Its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code* (as may be amended from time to time, the "**Plan**") as set forth in the Disclosure Statement for the Plan (as may be amended from time to time, the "**Disclosure Statement**"). Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

As set forth in the Notice of Non-Voting Status and Opt-Out Opportunity: Deemed to Reject accompanying this opt-out form (the "**Opt-Out Form**"), you are receiving this Opt-Out Form because our records indicate that you are a Holder of Equity Interests in Class 8 (Old Parent Interests) as of the Voting Record Date. Pursuant to the terms of the Plan, Holders of Equity Interests in Class 8 are not entitled to receive or retain any recovery under the Plan and, therefore, pursuant to section 1126(g) of title 11 of the United States Code, you are deemed to have rejected the Plan. Accordingly, this Opt-Out Form is being provided to Holders of Old Parent Interests in Class 8 solely for the purpose of allowing such Holders to affirmatively opt out of the Third Party Release (defined herein) set forth in the Plan, if they so choose. Even though you are deemed to reject the Plan, you will nevertheless be deemed to consent to the Third-Party Release set forth in Article X.B.2 of the Plan unless you clearly indicate your decision to opt-out of the Third-Party Release by checking the box in Item 1 of this Opt-Out Form.

This Opt-Out Form may not be used for any purpose other than opting out of the Third Party Release contained in the Plan. If you believe you have received this Opt-Out Form in error, or if you believe that you have received the wrong Opt-Out Form, please contact the Voting and Claims Agent <u>immediately</u> at the address, email address, or telephone number set forth above.

Before completing this Opt-Out Form, please read and follow the enclosed "Instructions for Completing this Opt-Out Form" carefully to ensure that you complete, execute and return this Opt-Out Form properly.

**<u>Item 1</u>. Optional Third-Party Release Election.**

Item 1 is to be completed **only** if you are **opting out** of the Third-Party Release contained in <u>Article X.B.2</u> of the Plan.

**<u>IMPORTANT INFORMATION REGARDING THE RELEASE OF CLAIMS BY THIRD PARTIES</u>:**

ARTICLE X OF THE PLAN CONTAINS RELEASE, EXCULPATION AND INJUNCTION PROVISIONS, WHICH ARE SET FORTH AT THE END OF THIS FORM. YOU SHOULD REVIEW THESE PROVISIONS CAREFULLY.

**If you submit your Opt-Out Form without this box checked, then you will be deemed to <u>CONSENT</u> to the Third Party Release set forth in Article X.B.2 of the Plan. PLEASE BE ADVISED THAT BY <u>NOT</u> CHECKING THE BOX BELOW YOU ELECT TO GRANT THE THIRD PARTY RELEASE IN EACH AND EVERY CAPACITY IN WHICH YOU HOLD A CLAIM AGAINST, OR EQUITY INTEREST IN, ANY OF THE DEBTORS.**

2

**YOU MUST AFFIRMATIVELY CHECK THE BOX BELOW IN ORDER TO OPT-OUT OF THE THIRD PARTY RELEASE.**

**PLEASE ALSO BE ADVISED THAT THE DEBTOR RELEASE CONTAINED IN ARTICLE X.B.1 OF THE PLAN WILL BE INCLUDED IN THE CONFIRMATION ORDER AND THAT IT IS SEPARATE FROM AND INDEPENDENT OF THE THIRD PARTY RELEASE.  IF YOU OBJECT TO THE DEBTOR RELEASE, YOU MUST FILE A SEPARATE OBJECTION WITH THE BANKRUPTCY COURT IN ACCORDANCE WITH THE PROCEDURES DESCRIBED IN THE DISCLOSURE STATEMENT ORDER.**

☐   OPT-OUT ELECTION:  The undersigned elects to opt-out of the Third Party Release contained in <u>Article X.B.2 </u>of the Plan.

<u>Item 2</u>. **Certifications.**

By signing this Opt-Out Form, the undersigned certifies to the Bankruptcy Court and the Debtors:

a.   that either: (i) the undersigned is the Holder of the Class 8 – Old Parent Interests, or (ii) the undersigned is an authorized signatory for an Entity that is beneficial Holder of Class 8 – Old Parent Interests;

b.   that the undersigned (or in the case of an authorized signatory, the Holder) has received a copy of the Notice of Non-Voting Status and Opt-Out Opportunity: Deemed to Reject, including instructions to access the Disclosure Statement, and that this Opt-Out Form is made pursuant to the terms and conditions set forth therein;

c.   that the undersigned has made the same election with respect to all Class 8 – Old Parent Interests; and

d.   that no other Opt-Out Form with respect to the Beneficial Holder's Class 8 – Old Parent Interests have been cast or, if any other Opt-Out Forms have been cast with respect to such Equity Interests in the Debtors, such Opt-Out Forms are hereby revoked.

YOUR RECEIPT OF THIS OPT-OUT FORM DOES NOT SIGNIFY THAT YOUR CLAIM OR EQUITY INTEREST HAS BEEN OR WILL BE ALLOWED.

3

| | |
|---|---|
| **Name of Holder:** | |
| | _(Print or Type)_ |
| **Social Security or Federal Tax Identification Number:** | |
| **Signature:** | |
| **Name of Signatory:** | |
| | _(If other than Holder)_ |
| **Title:** | |
| **Address:** | |
| | |
| | |
| **Date Completed:** | |

If your address or contact information has changed, please note the new information here.

**PLEASE COMPLETE, SIGN AND DATE THIS OPT-OUT FORM AND RETURN IT <u>PROMPTLY</u> IN THE ENVELOPE PROVIDED TO THE ADDRESSEE SPECIFIED THEREON.**

IF THE VOTING AND CLAIMS AGENT DOES NOT <u>ACTUALLY</u> <u>RECEIVE</u> THIS OPT-OUT FORM ON OR BEFORE 5:00 P.M. PREVAILING CENTRAL TIME ON SEPTEMBER 18, 2020, THEN YOUR ELECTION TRANSMITTED HEREBY WILL NOT BE EFFECTIVE.

OPT-OUT FORMS SENT BY FACSIMILE, TELECOPY, OR ELECTRONIC MAIL WILL <u>NOT</u> BE ACCEPTED

4

US-DOCS\116659544.12

---
**Class 8 – Old Parent Interests**
---

## INSTRUCTIONS FOR COMPLETING THIS FORM

1. Capitalized terms used in the Opt-Out Form or in these instructions (the "**Opt-Out Form Instructions**") but not otherwise defined therein or herein shall have the meaning set forth in the Plan.

2. To ensure that your election is counted, you must complete the Opt-Out Form and take the following steps: (a) clearly indicate your decision to "opt out" of the Third-Party Release set forth in the Plan in Item 1 above; (b) make sure that the information required by Item 2 above has been correctly inserted; and (c) sign, date and return an original of your Opt-Out Form in accordance with paragraph 3 directly below.

3. **Return of Opt-Out Form**: Your Form MUST be returned to the Voting and Claims Agent so as to be **actually received** by the Voting and Claims Agent on or before the Release Opt-Out Deadline, which is 5:00 p.m. prevailing Central Time on September 18, 2020. You must return your completed Opt-Out Form directly to the Voting and Claims Agent so that it is **actually received** by the Voting and Claims Agent on or before the Voting Deadline.

4. If an Opt-Out Form is received by the Voting and Claims Agent after the Release Opt-Out Deadline, it will not be effective, unless the Debtors have granted an extension of the Release Opt-Out Deadline in writing with respect to such Opt-Out Form. Additionally, the following Opt-Out Forms will NOT be counted:

   ➢ ANY OPT-OUT FORM THAT IS ILLEGIBLE OR CONTAINS INSUFFICIENT INFORMATION TO PERMIT THE IDENTIFICATION OF THE HOLDER OF THE CLAIM OR EQUITY INTEREST;

   ➢ ANY OPT-OUT FORM CAST BY OR ON BEHALF OF AN ENTITY THAT IS NOT ENTITLED TO OPT-OUT OF THE THIRD-PARTY RELEASE;

   ➢ ANY OPT-OUT FORM SENT TO THE DEBTORS, THE DEBTORS' AGENTS/REPRESENTATIVES (OTHER THAN THE VOTING AND CLAIMS AGENT), ANY INDENTURE TRUSTEE OR THE DEBTORS' FINANCIAL OR LEGAL ADVISORS;

   ➢ ANY OPT-OUT FORM TRANSMITTED BY FACSIMILE, TELECOPY, OR ELECTRONIC MAIL;

   ➢ ANY UNSIGNED OPT-OUT FORM; OR

   ➢ ANY OPT-OUT FORM NOT COMPLETED IN ACCORDANCE WITH THE PROCEDURES APPROVED IN THE DISCLOSURE STATEMENT ORDER.

5

US-DOCS\116659544.12

5.    The method of delivery of Opt-Out Forms to the Voting and Claims Agent is at the election and risk of each Holder of a Claim or Equity Interest. Except as otherwise provided herein, such delivery will be deemed made to the Voting and Claims Agent only when the Voting and Claims Agent **actually** **receives** the originally executed Opt-Out Form. Instead of effecting delivery by first-class mail, it is recommended, though not required, that Holders use overnight or hand delivery service. In all cases, Holders should allow sufficient time to assure timely delivery.

6.    If multiple Opt-Out Forms are received from the same Holder of a Class 8 – Old Parent Interest with respect to the same Class 8 Claim prior to the Release Opt-Out Deadline, the last Opt-Out Form timely received will supersede and revoke any earlier received Opt-Out Forms.

7.    The Opt-Out Form is not a letter of transmittal and may not be used for any purpose other than to opt-out of the Third Party Release. Accordingly, at this time, Holders of Claims or Equity Interests should not surrender certificates or instruments representing or evidencing their Claims, and neither the Debtors nor the Voting and Claims Agent will accept delivery of any such certificates or instruments surrendered together with an Opt-Out Form.

8.    This Opt-Out Form does not constitute, and shall not be deemed to be, (a) a proof of Claim or (b) an assertion or admission of a Claim.

9.    Please be sure to sign and date your Form. If you are signing an Opt-Out Form in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Voting and Claims Agent, the Debtors or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Holder. In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Opt-Out Form.

**PLEASE RETURN YOUR OPT-OUT FORM PROMPTLY!**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS OPT-OUT FORM
OR THE INSTRUCTIONS OR PROCEDURES, PLEASE CONTACT
THE VOTING AND CLAIMS AGENT AT:**
**866-554-5810 (Toll Free U.S. and Canada) or 781-575-2032 (International)**
**Or via email: HiCrushinfo@kccllc.com**

---

**IF THE VOTING AND CLAIMS AGENT DOES NOT ACTUALLY RECEIVE
THIS OPT-OUT FORM FROM YOU BEFORE THE RELEASE OPT-OUT
DEADLINE, WHICH IS 5:00 P.M. PREVAILING CENTRAL TIME ON
SEPTEMBER 18, 2020, THEN YOUR OPT-OUT ELECTION TRANSMITTED
HEREBY WILL NOT BE EFFECTIVE.**

---

6

US-DOCS\116659544.12

NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, REGARDING THE DEBTORS OR THE PLAN, OTHER THAN WHAT IS CONTAINED IN THE DOCUMENTS MAILED HEREWITH.

**PLEASE BE ADVISED THAT THE PLAN CONTAINS CERTAIN RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, INCLUDING THOSE LISTED BELOW. YOU ARE ADVISED AND ENCOURAGED TO CAREFULLY REVIEW AND CONSIDER THE PLAN, INCLUDING THE RELEASE, EXCULPATION AND INJUNCTION PROVISIONS, AS YOUR RIGHTS MIGHT BE AFFECTED.**

**Article X.B – <u>Release of Claims and Causes of Action</u>**

1. ***<u>Release by the Debtors and their Estates</u>*. Pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, and except as otherwise expressly provided in the Plan, effective as of the Effective Date, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, the Debtors and the Reorganized Debtors, in their respective individual capacities and as debtors-in-possession, and on behalf of themselves and their respective Estates, including, without limitation, any successor to the Debtors or any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code (collectively, the "<u>Debtor Releasing Parties</u>") shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver and release to each of the Released Parties (and each such Released Party so released shall be deemed forever released, waived and discharged by the Debtor Releasing Parties) and their respective assets and properties (the "<u>Debtor Release</u>") from any and all Claims, Causes of Action, and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of the Debtors or their Affiliates, including, without limitation, (i) the Chapter 11 Cases, the Disclosure Statement, the Plan, the Restructuring Support Agreement, the Backstop Purchase Agreement, the Rights Offering, the Restructuring Documents, the Prepetition Debt Documents, and the DIP Loan Documents, (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, the Backstop Purchase Agreement, the Rights Offering, the Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Documents, the Prepetition Debt Documents, the DIP Loan Documents, or related agreements, instruments or other documents, (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale, or rescission of the purchase or sale of any Equity Interest or Plan Securities of the Debtors or the Reorganized Debtors, and/or (vii) the Confirmation or Consummation of the Plan or the solicitation of votes on the Plan that such Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) or that any Holder of a Claim or Equity Interest or other Person or Entity would have been legally entitled to assert for, or on behalf or in the name of, any Debtor, its respective Estate or any Reorganized Debtor (whether directly or derivatively) against any of the Released Parties; *<u>provided</u>*, *<u>however</u>*, that the foregoing provisions of this Debtor Release shall not operate to waive or release (A) the rights of such Debtor Releasing Party to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or**

7

in connection with the Plan (including, without limitation, the Exit Facility Loan Documents and the New Secured Convertible Notes Documents) or assumed or assumed and assigned, as applicable, pursuant to the Plan or pursuant to a Final Order of the Bankruptcy Court and (B) claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes a criminal act, fraud, willful misconduct, or gross negligence, in each case as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction. The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity and the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Debtor Release. Notwithstanding the foregoing, nothing in this **Article X.B.** shall or shall be deemed to (i) prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person or Entity that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors and/or (ii) operate as a release or waiver of any Intercompany Claims, in each case unless otherwise expressly provided for in this Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims released by the Debtor Release; (iii) in the best interest of the Debtors and their Estates; (iv) fair, equitable and reasonable; (v) given and made after due notice and opportunity for hearing; and (vi) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any claim or Cause of Action released pursuant to the Debtor Release.

2. *Release By Third Parties.* Except as otherwise expressly provided in the Plan, effective as of the Effective Date, to the fullest extent permitted by applicable law, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, and without limiting or otherwise modifying the scope of the Debtor Release provided by the Debtor Releasing Parties above, each Non-Debtor Releasing Party (together with the Debtor Releasing Parties, the "**Releasing Parties**") shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver, and release to each of the Released Parties (and each such Released Party so released shall be deemed forever released, waived, and discharged by the Non-Debtor Releasing Parties) and their respective assets and properties (the "**Third Party Release**") from any and all Claims, Causes of Action, and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of the Debtors or their Affiliates, including, without limitation, (i) the Chapter 11 Cases, the Disclosure Statement, the Plan, the Restructuring Support Agreement, the Backstop Purchase Agreement, the Rights Offering, the Restructuring Documents, the Prepetition Debt Documents, and the DIP Loan Documents, (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, the Backstop Purchase Agreement, the Rights Offering, this Plan, the Disclosure Statement, the Plan Supplement,

US-DOCS\116659544.12

the Restructuring Documents, the Prepetition Debt Documents, the DIP Loan Documents, or related agreements, instruments or other documents, (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale or rescission of the purchase or sale of any Equity Interest or Plan Securities of the Debtors or the Reorganized Debtors, and/or (vii) the Confirmation or Consummation of the Plan or the solicitation of votes on this Plan that such Non-Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) against any of the Released Parties; *provided*, *however*, that the foregoing provisions of this Third Party Release shall not operate to waive or release (A) the rights of such Non-Debtor Releasing Party to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan (including, without limitation, the Exit Facility Loan Documents and the New Secured Convertible Notes Documents) or assumed or assumed and assigned, as applicable, pursuant to the Plan or pursuant to a Final Order of the Bankruptcy Court and (B) claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes a criminal act, fraud, willful misconduct, or gross negligence, in each case as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction. The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity and the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Third Party Release.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third Party Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Third Party Release is: (i) consensual; (ii) essential to the confirmation of the Plan; (iii) in exchange for the good and valuable consideration provided by the Released Parties; (iv) a good faith settlement and compromise of the Claims released by the Third Party Release; (v) in the best interest of the Debtors and all Holders of Claims and Equity Interests; (vi) fair, equitable and reasonable; (vii) given and made after due notice and opportunity for hearing; and (viii) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third Party Release.**

## Article X.E – <u>Exculpation</u>

Effective as of the Effective Date, to the fullest extent permitted by law, the Exculpated Parties shall neither have nor incur any liability to any Person or Entity for any claims or Causes of Action arising prior to or on the Effective Date for any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Confirmation or Consummation of this Plan, the Disclosure Statement, the Restructuring Documents, the Rights Offering, the Prepetition Debt Documents, the DIP Loan Documents, or any contract, instrument, release or other agreement or document created or entered into in connection with this Plan, including the Restructuring Support Agreement and the Backstop Purchase Agreement, or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the approval of the Disclosure Statement or Confirmation or Consummation of this Plan; provided, however, that the foregoing provisions of this exculpation shall not operate to waive or release: (i) any Causes of Action arising from willful misconduct, actual fraud, or gross negligence of such applicable Exculpated Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; and/or (ii) the rights of any Person or Entity to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements and documents delivered under or in connection with this Plan or assumed pursuant to this Plan or Final Order of the Bankruptcy Court; provided, further, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its respective

duties pursuant to, or in connection with, the above referenced documents, actions or inactions. The foregoing exculpation shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity. Notwithstanding the foregoing, nothing in this Article X.E shall or shall be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person or Entity that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors, in each case unless otherwise expressly provided for in the Plan.

## Article X.G – Injunction

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, FROM AND AFTER THE EFFECTIVE DATE, ALL PERSONS AND ENTITIES ARE, TO THE FULLEST EXTENT PROVIDED UNDER SECTION 524 AND OTHER APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, PERMANENTLY ENJOINED FROM (I) COMMENCING OR CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY SUIT, ACTION OR OTHER PROCEEDING; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING IN ANY MANNER ANY JUDGMENT, AWARD, DECREE, OR ORDER; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE; (IV) ASSERTING A SETOFF OR RIGHT OF SUBROGATION OF ANY KIND; OR (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND, IN EACH CASE ON ACCOUNT OF OR WITH RESPECT TO ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, EQUITY INTEREST, OR REMEDY RELEASED OR TO BE RELEASED, EXCULPATED OR TO BE EXCULPATED, SETTLED OR TO BE SETTLED OR DISCHARGED OR TO BE DISCHARGED PURSUANT TO THIS PLAN OR THE CONFIRMATION ORDER AGAINST ANY PERSON OR ENTITY SO RELEASED, DISCHARGED, OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY PERSON OR ENTITY SO RELEASED, DISCHARGED, OR EXCULPATED). ALL INJUNCTIONS OR STAYS PROVIDED FOR IN THE CHAPTER 11 CASES UNDER SECTION 105 OR SECTION 362 OF THE BANKRUPTCY CODE, OR OTHERWISE, AND IN EXISTENCE ON THE CONFIRMATION DATE, SHALL REMAIN IN FULL FORCE AND EFFECT UNTIL THE EFFECTIVE DATE.

## Article X.H – Binding Nature Of Plan

ON THE EFFECTIVE DATE, AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE PLAN SHALL BIND, AND SHALL BE DEEMED BINDING UPON, THE DEBTORS, THE REORGANIZED DEBTORS, ANY AND ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS, ALL PERSONS AND ENTITIES THAT ARE PARTIES TO OR ARE SUBJECT TO THE SETTLEMENTS, COMPROMISES, RELEASES, EXCULPATIONS, DISCHARGES, AND INJUNCTIONS DESCRIBED IN THE PLAN, EACH PERSON AND ENTITY ACQUIRING PROPERTY UNDER THIS PLAN, ANY AND ALL NON-DEBTOR PARTIES TO EXECUTORY CONTRACTS AND UNEXPIRED LEASES WITH THE DEBTORS AND THE RESPECTIVE SUCCESSORS AND ASSIGNS OF EACH OF THE FOREGOING, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, AND NOTWITHSTANDING WHETHER OR NOT SUCH PERSON OR ENTITY (I) WILL RECEIVE OR RETAIN ANY PROPERTY, OR INTEREST IN PROPERTY, UNDER THE PLAN, (II) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASES OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN, AFFIRMATIVELY VOTED TO REJECT THIS PLAN OR IS CONCLUSIVELY PRESUMED TO REJECT THE PLAN.

10

**Relevant Definitions Related to Release and Exculpation Provisions:**

"*Exculpated Parties*" means, collectively, the following:

(a) the Debtors;

(b) the Reorganized Debtors;

(c) the Prepetition Credit Agreement Agent;

(d) the Prepetition Credit Agreement Lenders;

(e) the Prepetition Notes Indenture Trustee;

(f) the DIP Agents;

(g) the DIP Lenders;

(h) the Ad Hoc Noteholder Committee and the members thereof in their capacities as such;

(i) the Consenting Noteholders;

(j) the Backstop Parties;

(k) the Distribution Agents;

(l) the Exit Facility Agent;

(m) the Exit Facility Lenders;

(n) the New Secured Convertible Notes Indenture Trustee;

(o) the New Secured Convertible Noteholders;

(p) the Releasing Old Parent Interestholders; and

(q) with respect to each of the foregoing Persons or Entities in clauses (a) through (p), the Related Persons of each such Person or Entity, in each case solely in their capacity as such.

"*Indemnified Parties*" means each of the Debtors' and their respective subsidiaries' current and former directors, officers, and managers in their respective capacities as such, and solely to the extent that such Person was serving in such capacity on or any time after the Petition Date; provided, that the Designated Persons shall not be Indemnified Parties under the Plan.

"*Non-Debtor Releasing Parties*" means, collectively, the following:

(a) the Prepetition Credit Agreement Agent;

(b) the Prepetition Credit Agreement Lenders;

(c) the Prepetition Notes Indenture Trustee;

11

US-DOCS\116659544.12

(d) the DIP Agents;

(e) the DIP Lenders;

(f) the Ad Hoc Noteholder Committee and the members thereof in their capacities as such;

(g) the Releasing Prepetition Noteholders;

(h) the Backstop Parties;

(i) the Distribution Agents;

(j) the Exit Facility Agent and the Exit Facility Lenders;

(k) the New Secured Convertible Notes Indenture Trustee and the New Secured Convertible Noteholders;

(l) those Holders of Claims deemed to accept the Plan that do not affirmatively opt out of the Third Party Release as provided on their respective Ballots/Opt-Out Forms;

(m) those Holders of General Unsecured Claims that do not affirmatively opt out of the Third Party Release as provided on their respective Ballots/Opt-Out Forms;

(n) all Holders of Claims that vote to accept the Plan; and

(o) the Releasing Old Parent Interestholders.

"Released Party" means, collectively, the following:

(a) the Debtors;

(b) the Reorganized Debtors;

(c) the Prepetition Credit Agreement Agent;

(d) the Prepetition Credit Agreement Lenders;

(e) the Prepetition Notes Indenture Trustee;

(f) the DIP Agents;

(g) the DIP Lenders;

(h) the Ad Hoc Noteholder Committee and the members thereof in their capacities as such;

(i) the Releasing Prepetition Noteholders;

(j) the Backstop Parties;

(k) the Distribution Agents;

(l) the Exit Facility Agent and the Exit Facility Lenders;

12

13

(m) the New Secured Convertible Notes Indenture Trustee and the New Secured Convertible Noteholders;

(n) the Releasing Old Parent Interestholders; and

(o) with respect to each of the foregoing Persons or Entities in clauses (a) through (n), the Related Persons of each such Person or Entity, in each case solely in their capacity as such; provided, that the Designated Persons shall not be Released Parties under the Plan.

**EXHIBIT 5B**

**Class 8 Opt-Out Form: Beneficial Holders**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

```
------------------------------------------------- x
                                                  :   Chapter 11
In re:                                            :
                                                  :   Case No. 20-33495 (DRJ)
HI-CRUSH INC., et al.,[1]                         :
                                                  :   (Jointly Administered)
            Debtors.                              :
                                                  x
-------------------------------------------------
```

**BENEFICIAL HOLDER OPT-OUT FORM FOR
<u>CLASS 8 – OLD PARENT INTERESTS</u>**

PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING THIS BENEFICIAL HOLDER OPT-OUT FORM CAREFULLY <u>BEFORE</u> COMPLETING THIS BENEFICIAL HOLDER OPT-OUT FORM.

**UNLESS YOU CHECK THE BOX ON THIS BENEFICIAL HOLDER OPT-OUT FORM BELOW AND FOLLOW ALL INSTRUCTIONS, YOU WILL BE HELD TO FOREVER RELEASE THE RELEASED PARTIES IN ACCORDANCE WITH THE PLAN.**

**THIS BENEFICIAL HOLDER OPT-OUT FORM MUST BE COMPLETED, EXECUTED AND RETURNED TO YOUR NOMINEE IN SUFFICIENT TIME TO ALLOW YOUR NOMINEE TO PROCESS YOUR INSTRUCTIONS ON A MASTER OPT-OUT FORM AND RETURN TO KURTZMAN CARSON CONSULTANTS LLC (THE "<u>VOTING AND CLAIMS AGENT</u>" OR "<u>KCC</u>") SO THAT IS ACTUALLY RECEIVED ON OR BEFORE 5:00 P.M. PREVAILING CENTRAL TIME ON SEPTEMBER 18, 2020 (THE "<u>RELEASE OPT-OUT DEADLINE</u>").**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Hi-Crush Inc. (0530), OnCore Processing LLC (9403), Hi-Crush Augusta LLC (0668), Hi-Crush Whitehall LLC (5562), PDQ Properties LLC (9169), Hi-Crush Wyeville Operating LLC (5797), D & I Silica, LLC (9957), Hi-Crush Blair LLC (7094), Hi-Crush LMS LLC, Hi-Crush Investments Inc. (6547), Hi-Crush Permian Sand LLC, Hi-Crush Proppants LLC (0770), Hi-Crush PODS LLC, Hi-Crush Canada Inc. (9195), Hi-Crush Holdings LLC, Hi-Crush Services LLC (6206), BulkTracer Holdings LLC (4085), Pronghorn Logistics Holdings, LLC (5223), FB Industries USA Inc. (8208), PropDispatch LLC, Pronghorn Logistics, LLC (4547), and FB Logistics, LLC (8641). The Debtors' address is 1330 Post Oak Blvd, Suite 600, Houston, Texas 77056.

US-DOCS\116659544.12

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**") are soliciting votes with respect to the *Joint Plan of Reorganization for Hi-Crush Inc. and Its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code* (as may be amended from time to time, the "**Plan**") as set forth in the Disclosure Statement for the Plan (as may be amended from time to time, the "**Disclosure Statement**").  Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

As set forth in the Notice of Non-Voting Status and Opt-Out Opportunity: Deemed to Reject accompanying this opt-out form (the "**Beneficial Holder Opt-Out Form**"), you are receiving this Beneficial Holder Opt-Out Form because you are a Holder of Equity Interests in Class 8 (Old Parent Interests) as of the Voting Record Date.  Pursuant to the terms of the Plan, Holders of Equity Interests in Class 8 are not entitled to receive or retain any recovery under the Plan and, therefore, pursuant to section 1126(g) of title 11 of the United States Code, you are deemed to have rejected the Plan.  Accordingly, this Beneficial Holder Opt-Out Form is being provided to Holders of Old Parent Interests in Class 8 solely for the purpose of allowing such Holders to affirmatively opt out of the Third Party Release (defined herein) set forth in the Plan, if they so choose.  Even though you are deemed to reject the Plan, you will nevertheless be deemed to consent to the Third-Party Release set forth in Article X.B.2 of the Plan unless you clearly indicate your decision to opt-out of the Third-Party Release by checking the box in Item 1 of this Beneficial Holder Opt-Out Form.

This Beneficial Holder Opt-Out Form may not be used for any purpose other than opting out of the Third Party Release contained in the Plan.  If you believe you have received this Beneficial Holder Opt-Out Form in error, or if you believe that you have received the wrong Opt-Out Form, please contact the Voting and Claims Agent immediately at the address, email address, or telephone number set forth above.

Before completing this Beneficial Holder Opt-Out Form, please read and follow the enclosed "Instructions for Completing this Beneficial Holder Opt-Out Form" carefully to ensure that you complete, execute and return this Beneficial Holder Opt-Out Form properly.

**Item 1. Optional Third-Party Release Election.**

Item 1 is to be completed **only** if you are **opting out** of the Third-Party Release contained in Article X.B.2 of the Plan.

**IMPORTANT INFORMATION REGARDING THE RELEASE OF CLAIMS BY THIRD PARTIES:**

ARTICLE X OF THE PLAN CONTAINS RELEASE, EXCULPATION AND INJUNCTION PROVISIONS, WHICH ARE SET FORTH AT THE END OF THIS BENEFICIAL HOLDER OPT-OUT FORM.  YOU SHOULD REVIEW THESE PROVISIONS CAREFULLY.

**If you submit this Beneficial Holder Opt-Out Form or your Nominee submits the Master Opt-Out Form on your behalf without this box checked, then you will be deemed to CONSENT to the Third Party Release set forth in Article X.B.2 of the Plan.  PLEASE BE ADVISED THAT BY NOT CHECKING THE BOX BELOW YOU ELECT TO GRANT**

**THE THIRD PARTY RELEASE IN EACH AND EVERY CAPACITY IN WHICH YOU HOLD A CLAIM AGAINST, OR EQUITY INTEREST IN, ANY OF THE DEBTORS. YOU MUST AFFIRMATIVELY CHECK THE BOX BELOW IN ORDER TO OPT-OUT OF THE THIRD PARTY RELEASE.**

**PLEASE ALSO BE ADVISED THAT THE DEBTOR RELEASE CONTAINED IN ARTICLE X.B.1 OF THE PLAN WILL BE INCLUDED IN THE CONFIRMATION ORDER AND THAT IT IS SEPARATE FROM AND INDEPENDENT OF THE THIRD PARTY RELEASE. IF YOU OBJECT TO THE DEBTOR RELEASE, YOU MUST FILE A SEPARATE OBJECTION WITH THE BANKRUPTCY COURT IN ACCORDANCE WITH THE PROCEDURES DESCRIBED IN THE DISCLOSURE STATEMENT ORDER.**

☐ OPT-OUT ELECTION: The undersigned elects to opt-out of the Third Party Release contained in Article X.B.2 of the Plan.

**Item 2. Certifications.**

By signing this Beneficial Holder Opt-Out Form, the undersigned certifies to the Bankruptcy Court and the Debtors:

a. that either: (i) the undersigned is the Holder of the Class 8 – Old Parent Interests, or (ii) the undersigned is an authorized signatory for an Entity that is beneficial Holder of Class 8 – Old Parent Interests;

b. that the undersigned (or in the case of an authorized signatory, the Holder) has received a copy of the Notice of Non-Voting Status and Opt-Out Opportunity: Deemed to Reject, including instructions to access the Disclosure Statement, and that this Beneficial Holder Opt-Out Form is made pursuant to the terms and conditions set forth therein;

c. that the undersigned has made the same election with respect to all Class 8 – Old Parent Interests; and

d. that no other Opt-Out Form with respect to the beneficial Holder's Class 8 – Old Parent Interests have been cast or, if any other Opt-Out Forms have been cast with respect to such Claims against, or Equity Interests in, the Debtors, such Opt-Out Forms are hereby revoked.

By signing this Beneficial Holder Opt-Out Form, the undersigned authorizes and instructs its Nominee (a) to furnish the election information in a Master Opt-Out Form to be transmitted to the Voting and Claims Agent and (b) to retain this Beneficial Holder Opt-Out Form and related information in its records for at least one year after the Effective Date of the Plan.

3

US-DOCS\116659544.12

4

| | |
|---|---|
| **Name of Holder:** | |
| | (Print or Type) |
| **Social Security or Federal Tax Identification Number:** | |
| **Signature:** | |
| **Name of Signatory:** | |
| | (If other than Holder) |
| **Title:** | |
| **Address:** | |
| | |
| | |
| | |
| **Date Completed:** | |

YOUR RECEIPT OF THIS OPT-OUT FORM DOES NOT SIGNIFY THAT YOUR CLAIM OR EQUITY INTEREST HAS BEEN OR WILL BE ALLOWED.

US-DOCS\116659544.12

5

If your address or contact information has changed, please note the new information here.

**PLEASE COMPLETE, SIGN AND DATE THIS BENEFICIAL HOLDER OPT-OUT FORM AND RETURN IT TO YOUR NOMINEE IN SUFFICIENT TIME TO ALLOW YOUR NOMINEE TO PROCESS YOUR INSTRUCTIONS ON A MASTER OPT-OUT FORM AND RETURN TO THE VOTING AND CLAIMS AGENT SO THAT IT IS ACTUALLY RECEIVED ON OR PRIOR TO THE RELEASE OPT OUT DEADLINE.**

IF THE VOTING AND CLAIMS AGENT DOES NOT <u>ACTUALLY</u> <u>RECEIVE</u> A MASTER OPT-OUT FORM ON OR BEFORE 5:00 P.M. PREVAILING CENTRAL TIME ON SEPTEMBER 18, 2020, THEN YOUR ELECTION TRANSMITTED HEREBY WILL NOT BE EFFECTIVE.

BENEFICIAL HOLDER OPT-OUT FORMS SENT DIRECTLY TO THE VOTING AND CLAIMS AGENT BY FACSIMILE, TELECOPY, OR ELECTRONIC MAIL WILL <u>NOT</u> BE ACCEPTED

US-DOCS\116659544.12

| Class 8 – Old Parent Interests |
|---|

## INSTRUCTIONS FOR COMPLETING THIS FORM

1. Capitalized terms used in the Opt-Out Form or in these instructions (the "**Opt-Out Form Instructions**") but not otherwise defined therein or herein shall have the meaning set forth in the Plan, a copy of which also accompanies the Opt-Out Form.

2. To ensure that your election is counted, you <u>must</u> complete the Opt-Out Form and take the following steps:  (a) make sure that the information required by Item 1 above has been correctly inserted; (b) clearly indicate your decision opt out of the Plan if applicable; <u>and</u> (c) sign, date and return an original of your Opt-Out Form to your Nominee in accordance with paragraph 3 directly below.

3. **Return of Opt-Out Form**:  Your Opt-Out Form MUST be returned to your Nominee in sufficient time to allow your Nominee to process your instructions on a Master Opt-Out Form and return to the Voting and Claims Agent so as to be **actually received** by the Voting and Claims Agent on or before the Release Opt-Out Deadline, which is 5:00 p.m. prevailing Central Time on September 18, 2020.

4. If a Master Opt-Out Form is received by the Voting and Claims Agent <u>after</u> the Release Opt-Out Deadline, it will not be effective, unless the Debtors have granted an extension of the Release Opt-Out Deadline in writing with respect to such Opt-Out Form.  Additionally, the following Opt-Out Forms will <u>NOT</u> be counted:

   ➢ ANY BENEFICIAL HOLDER OR MASTER OPT-OUT FORM THAT IS ILLEGIBLE OR CONTAINS INSUFFICIENT INFORMATION TO PERMIT THE IDENTIFICATION OF THE HOLDER OF THE EQUITY INTEREST;

   ➢ ANY BENEFICIAL HOLDER OR MASTER OPT-OUT FORM CAST BY OR ON BEHALF OF AN ENTITY THAT IS NOT ENTITLED TO OPT-OUT OF THE THIRD-PARTY RELEASE;

   ➢ ANY BENEFICIAL HOLDER OR MASTER OPT-OUT FORM SENT TO THE DEBTORS, THE DEBTORS' AGENTS/REPRESENTATIVES (OTHER THAN THE VOTING AND CLAIMS AGENT), ANY INDENTURE TRUSTEE OR THE DEBTORS' FINANCIAL OR LEGAL ADVISORS;

   ➢ ANY BENEFICIAL HOLDER  OPT-OUT FORM TRANSMITTED BY FACSIMILE, TELECOPY OR ELECTRONIC MAIL (UNLESS THE AFOREMENTIONED IS PRE-AUTHORIZED BY THE NOMINEE);

   ➢ ANY UNSIGNED BENEFICIAL HOLDER OR MASTER OPT-OUT FORM; OR

US-DOCS\116659544.12

> ➤ ANY BENEFICIAL HOLDER OR MASTER OPT-OUT FORM NOT CAST IN ACCORDANCE WITH THE PROCEDURES APPROVED IN THE DISCLOSURE STATEMENT ORDER.

5.  The method of delivery of Opt-Out Forms to your Nominee is at the election and risk of each Holder of a Claim or Equity Interest.  Except as otherwise provided herein, such delivery will be deemed made to the Voting and Claims Agent only when the Voting and Claims Agent **actually** **receives** a Master Opt-Out Form from your Nominee.  Instead of effecting delivery by first-class mail, it is recommended, though not required, that your Nominee use an overnight or hand delivery service.  In all cases, Beneficial Holders, or their Nominees, should allow sufficient time to assure timely delivery.

6.  If multiple Opt-Out Forms are received from the same Holder of a Class 8 – Old Parent Interest with respect to the same Class 8 Claim prior to the Release Opt-Out Deadline, the last Opt-Out Form timely received will supersede and revoke any earlier received Opt-Out Forms.

7.  The Opt-Out Form is not a letter of transmittal and may not be used for any purpose other than to opt-out of the Third Party Release.  Accordingly, at this time, Holders of Equity Interests should not surrender certificates or instruments representing or evidencing their Claims or Equity Interests, and neither the Debtors nor the Voting and Claims Agent will accept delivery of any such certificates or instruments surrendered together with an Opt-Out Form.

8.  This Opt-Out Form does not constitute, and shall not be deemed to be, (a) a proof of Claim or (b) an assertion or admission of a Claim.

9.  Please be sure to sign and date your Opt-Out Form.  If you are signing an Opt-Out Form in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Voting and Claims Agent, the Debtors or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Holder.  In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Opt-Out Form.

US-DOCS\116659544.12

**PLEASE RETURN YOUR OPT-OUT FORM PROMPTLY!**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BENEFICIAL HOLDER OPT-OUT FORM OR THE INSTRUCTIONS OR PROCEDURES, PLEASE CONTACT THE VOTING AND CLAIMS AGENT AT:**

**866-554-5810 (Toll Free U.S. and Canada) or 781-575-2032 (International)**

**Or via email: HiCrushinfo@kccllc.com**

---

**IF THE VOTING AND CLAIMS AGENT DOES NOT <u>ACTUALLY</u> <u>RECEIVE</u> A MASTER OPT-OUT FORM FROM YOUR NOMINEE BEFORE THE RELEASE OPT-OUT DEADLINE, WHICH IS 5:00 P.M. PREVAILING CENTRAL TIME ON SEPTEMBER 18, 2020, THEN YOUR ELECTION TRANSMITTED HEREBY WILL NOT BE EFFECTIVE.**

---

NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, REGARDING THE DEBTORS OR THE PLAN, OTHER THAN WHAT IS CONTAINED IN THE DOCUMENTS MAILED HEREWITH.

**PLEASE BE ADVISED THAT THE PLAN CONTAINS CERTAIN RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, INCLUDING THOSE LISTED BELOW. YOU ARE ADVISED AND ENCOURAGED TO CAREFULLY REVIEW AND CONSIDER THE PLAN, INCLUDING THE RELEASE, EXCULPATION AND INJUNCTION PROVISIONS, AS YOUR RIGHTS MIGHT BE AFFECTED.**

**Article X.B – <u>Release of Claims and Causes of Action</u>**

1. ***<u>Release by the Debtors and their Estates</u>.* Pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, and except as otherwise expressly provided in the Plan, effective as of the Effective Date, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, the Debtors and the Reorganized Debtors, in their respective individual capacities and as debtors-in-possession, and on behalf of themselves and their respective Estates, including, without limitation, any successor to the Debtors or any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code (collectively, the "<u>Debtor Releasing Parties</u>") shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver and release to each of the Released Parties (and each such Released Party so released shall be deemed forever released, waived and discharged by the Debtor Releasing Parties) and their respective assets and properties (the "<u>Debtor Release</u>") from any and all Claims, Causes of Action, and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of the Debtors or their Affiliates, including, without limitation, (i) the Chapter 11 Cases, the Disclosure Statement, the Plan, the Restructuring Support Agreement, the Backstop Purchase Agreement, the Rights Offering, the Restructuring Documents, the Prepetition Debt Documents, and the DIP Loan Documents, (ii) the**

8

subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, the Backstop Purchase Agreement, the Rights Offering, the Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Documents, the Prepetition Debt Documents, the DIP Loan Documents, or related agreements, instruments or other documents, (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale, or rescission of the purchase or sale of any Equity Interest or Plan Securities of the Debtors or the Reorganized Debtors, and/or (vii) the Confirmation or Consummation of the Plan or the solicitation of votes on the Plan that such Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) or that any Holder of a Claim or Equity Interest or other Person or Entity would have been legally entitled to assert for, or on behalf or in the name of, any Debtor, its respective Estate or any Reorganized Debtor (whether directly or derivatively) against any of the Released Parties; *provided*, *however*, that the foregoing provisions of this Debtor Release shall not operate to waive or release (A) the rights of such Debtor Releasing Party to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with the Plan (including, without limitation, the Exit Facility Loan Documents and the New Secured Convertible Notes Documents) or assumed or assumed and assigned, as applicable, pursuant to the Plan or pursuant to a Final Order of the Bankruptcy Court and (B) claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes a criminal act, fraud, willful misconduct, or gross negligence, in each case as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction. The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity and the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Debtor Release. Notwithstanding the foregoing, nothing in this **Article X.B.** shall or shall be deemed to (i) prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person or Entity that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors and/or (ii) operate as a release or waiver of any Intercompany Claims, in each case unless otherwise expressly provided for in this Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims released by the Debtor Release; (iii) in the best interest of the Debtors and their Estates; (iv) fair, equitable and reasonable; (v) given and made after due notice and opportunity for hearing; and (vi) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any claim or Cause of Action released pursuant to the Debtor Release.

2.     *Release By Third Parties*. Except as otherwise expressly provided in the Plan, effective as of the Effective Date, to the fullest extent permitted by applicable law, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, and without limiting or otherwise modifying the scope of the Debtor Release provided by the Debtor Releasing Parties above, each Non-Debtor Releasing Party (together with the Debtor Releasing Parties, the "Releasing Parties") shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver, and release to each of the

9

Released Parties (and each such Released Party so released shall be deemed forever released, waived, and discharged by the Non-Debtor Releasing Parties) and their respective assets and properties (the "**Third Party Release**") from any and all Claims, Causes of Action, and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of the Debtors or their Affiliates, including, without limitation, (i) the Chapter 11 Cases, the Disclosure Statement, the Plan, the Restructuring Support Agreement, the Backstop Purchase Agreement, the Rights Offering, the Restructuring Documents, the Prepetition Debt Documents, and the DIP Loan Documents, (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, the Backstop Purchase Agreement, the Rights Offering, this Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Documents, the Prepetition Debt Documents, the DIP Loan Documents, or related agreements, instruments or other documents, (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale or rescission of the purchase or sale of any Equity Interest or Plan Securities of the Debtors or the Reorganized Debtors, and/or (vii) the Confirmation or Consummation of the Plan or the solicitation of votes on this Plan that such Non-Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) against any of the Released Parties; *provided*, *however*, that the foregoing provisions of this Third Party Release shall not operate to waive or release (A) the rights of such Non-Debtor Releasing Party to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan (including, without limitation, the Exit Facility Loan Documents and the New Secured Convertible Notes Documents) or assumed or assumed and assigned, as applicable, pursuant to the Plan or pursuant to a Final Order of the Bankruptcy Court and (B) claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes a criminal act, fraud, willful misconduct, or gross negligence, in each case as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction.  The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity and the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Third Party Release.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third Party Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Third Party Release is:  (i) consensual; (ii) essential to the confirmation of the Plan; (iii) in exchange for the good and valuable consideration provided by the Released Parties; (iv) a good faith settlement and compromise of the Claims released by the Third Party Release; (v) in the best interest of the Debtors and all Holders of Claims and Equity Interests; (vi) fair, equitable and reasonable; (vii) given and made after due notice and opportunity for hearing; and (viii) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third Party Release.

US-DOCS\116659544.12

## Article X.E – <u>Exculpation</u>

Effective as of the Effective Date, to the fullest extent permitted by law, the Exculpated Parties shall neither have nor incur any liability to any Person or Entity for any claims or Causes of Action arising prior to or on the Effective Date for any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Confirmation or Consummation of this Plan, the Disclosure Statement, the Restructuring Documents, the Rights Offering, the Prepetition Debt Documents, the DIP Loan Documents, or any contract, instrument, release or other agreement or document created or entered into in connection with this Plan, including the Restructuring Support Agreement and the Backstop Purchase Agreement, or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the approval of the Disclosure Statement or Confirmation or Consummation of this Plan; <u>provided</u>, <u>however</u>, that the foregoing provisions of this exculpation shall not operate to waive or release: (i) any Causes of Action arising from willful misconduct, actual fraud, or gross negligence of such applicable Exculpated Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; and/or (ii) the rights of any Person or Entity to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements and documents delivered under or in connection with this Plan or assumed pursuant to this Plan or Final Order of the Bankruptcy Court; <u>provided</u>, <u>further</u>, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its respective duties pursuant to, or in connection with, the above referenced documents, actions or inactions.  The foregoing exculpation shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity.  Notwithstanding the foregoing, nothing in this <u>Article X.E</u> shall or shall be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person or Entity that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors, in each case unless otherwise expressly provided for in the Plan.

## Article X.G – <u>Injunction</u>

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, FROM AND AFTER THE EFFECTIVE DATE, ALL PERSONS AND ENTITIES ARE, TO THE FULLEST EXTENT PROVIDED UNDER SECTION 524 AND OTHER APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, PERMANENTLY ENJOINED FROM (I) COMMENCING OR CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY SUIT, ACTION OR OTHER PROCEEDING; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING IN ANY MANNER ANY JUDGMENT, AWARD, DECREE, OR ORDER; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE; (IV) ASSERTING A SETOFF OR RIGHT OF SUBROGATION OF ANY KIND; OR (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND,  IN EACH CASE ON ACCOUNT OF OR WITH RESPECT TO ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, EQUITY INTEREST, OR REMEDY RELEASED OR TO BE RELEASED, EXCULPATED OR TO BE EXCULPATED, SETTLED OR TO BE SETTLED OR DISCHARGED OR TO BE DISCHARGED PURSUANT TO THIS PLAN OR THE CONFIRMATION ORDER AGAINST ANY PERSON OR ENTITY SO RELEASED, DISCHARGED, OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY PERSON OR ENTITY SO RELEASED, DISCHARGED, OR EXCULPATED).  ALL INJUNCTIONS OR STAYS PROVIDED FOR IN THE CHAPTER 11 CASES UNDER SECTION 105 OR SECTION 362 OF THE BANKRUPTCY CODE, OR**

11

US-DOCS\116659544.12

**OTHERWISE, AND IN EXISTENCE ON THE CONFIRMATION DATE, SHALL REMAIN IN FULL FORCE AND EFFECT UNTIL THE EFFECTIVE DATE.**

**Article X.H – <u>Binding Nature Of Plan</u>**

ON THE EFFECTIVE DATE, AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE PLAN SHALL BIND, AND SHALL BE DEEMED BINDING UPON, THE DEBTORS, THE REORGANIZED DEBTORS, ANY AND ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS, ALL PERSONS AND ENTITIES THAT ARE PARTIES TO OR ARE SUBJECT TO THE SETTLEMENTS, COMPROMISES, RELEASES, EXCULPATIONS, DISCHARGES, AND INJUNCTIONS DESCRIBED IN THE PLAN, EACH PERSON AND ENTITY ACQUIRING PROPERTY UNDER THIS PLAN, ANY AND ALL NON-DEBTOR PARTIES TO EXECUTORY CONTRACTS AND UNEXPIRED LEASES WITH THE DEBTORS AND THE RESPECTIVE SUCCESSORS AND ASSIGNS OF EACH OF THE FOREGOING, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, AND NOTWITHSTANDING WHETHER OR NOT SUCH PERSON OR ENTITY (I) WILL RECEIVE OR RETAIN ANY PROPERTY, OR INTEREST IN PROPERTY, UNDER THE PLAN, (II) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASES OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN, AFFIRMATIVELY VOTED TO REJECT THIS PLAN OR IS CONCLUSIVELY PRESUMED TO REJECT THE PLAN.

**<u>Relevant Definitions Related to Release and Exculpation Provisions</u>:**

"*Exculpated Parties*" means, collectively, the following:

(a) the Debtors;

(b) the Reorganized Debtors;

(c) the Prepetition Credit Agreement Agent;

(d) the Prepetition Credit Agreement Lenders;

(e) the Prepetition Notes Indenture Trustee;

(f) the DIP Agents;

(g) the DIP Lenders;

(h) the Ad Hoc Noteholder Committee and the members thereof in their capacities as such;

(i) the Consenting Noteholders;

(j) the Backstop Parties;

(k) the Distribution Agents;

(l) the Exit Facility Agent;

(m) the Exit Facility Lenders;

12

(n) the New Secured Convertible Notes Indenture Trustee;

(o) the New Secured Convertible Noteholders;

(p) the Releasing Old Parent Interestholders; and

(q) with respect to each of the foregoing Persons or Entities in clauses (a) through (p), the Related Persons of each such Person or Entity, in each case solely in their capacity as such.

"*Indemnified Parties*" means each of the Debtors' and their respective subsidiaries' current and former directors, officers, and managers in their respective capacities as such, and solely to the extent that such Person was serving in such capacity on or any time after the Petition Date; provided, that the Designated Persons shall not be Indemnified Parties under the Plan.

"*Non-Debtor Releasing Parties*" means, collectively, the following:

(a) the Prepetition Credit Agreement Agent;

(b) the Prepetition Credit Agreement Lenders;

(c) the Prepetition Notes Indenture Trustee;

(d) the DIP Agents;

(e) the DIP Lenders;

(f) the Ad Hoc Noteholder Committee and the members thereof in their capacities as such;

(g) the Releasing Prepetition Noteholders;

(h) the Backstop Parties;

(i) the Distribution Agents;

(j) the Exit Facility Agent and the Exit Facility Lenders;

(k) the New Secured Convertible Notes Indenture Trustee and the New Secured Convertible Noteholders;

(l) those Holders of Claims deemed to accept the Plan that do not affirmatively opt out of the Third Party Release as provided on their respective Ballots/Opt-Out Forms;

(m) those Holders of General Unsecured Claims that do not affirmatively opt out of the Third Party Release as provided on their respective Ballots/Opt-Out Forms;

(n) all Holders of Claims that vote to accept the Plan; and

(o) the Releasing Old Parent Interestholders.

"Released Party" means, collectively, the following:

(a) the Debtors;

13

(b) the Reorganized Debtors;

(c) the Prepetition Credit Agreement Agent;

(d) the Prepetition Credit Agreement Lenders;

(e) the Prepetition Notes Indenture Trustee;

(f) the DIP Agents;

(g) the DIP Lenders;

(h) the Ad Hoc Noteholder Committee and the members thereof in their capacities as such;

(i) the Releasing Prepetition Noteholders;

(j) the Backstop Parties;

(k) the Distribution Agents;

(l) the Exit Facility Agent and the Exit Facility Lenders;

(m) the New Secured Convertible Notes Indenture Trustee and the New Secured Convertible Noteholders;

(n) the Releasing Old Parent Interestholders; and

(o) with respect to each of the foregoing Persons or Entities in clauses (a) through (n), the Related Persons of each such Person or Entity, in each case solely in their capacity as such; provided, that the Designated Persons shall not be Released Parties under the Plan.

14

## EXHIBIT 5C

## Class 8 Opt-Out Form: Master Form

US-DOCS\116659544.12

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

```
------------------------------------------------- x
                                                  :   Chapter 11
In re:                                            :
                                                  :   Case No. 20-33495 (DRJ)
HI-CRUSH INC., et al.,¹                           :
                                                  :   (Jointly Administered)
                           Debtors.               :
                                                  x
-------------------------------------------------
```

**MASTER OPT-OUT FORM FOR
<u>CLASS 8 – OLD PARENT INTERESTS</u>**

PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING THIS MASTER OPT-OUT FORM CAREFULLY <u>BEFORE</u> COMPLETING THIS MASTER OPT-OUT FORM.

**THIS MASTER OPT-OUT FORM MUST BE COMPLETED, EXECUTED AND RETURNED SO AS TO BE <u>ACTUALLY</u> <u>RECEIVED</u> BY KURTZMAN CARSON CONSULTANTS LLC (THE "<u>VOTING AND CLAIMS AGENT</u>" OR "<u>KCC</u>") ON OR BEFORE 5:00 P.M. PREVAILING CENTRAL TIME ON SEPTEMBER 18, 2020 (THE "<u>RELEASE OPT-OUT DEADLINE</u>").**

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**") are soliciting votes with respect to the *Joint Plan of Reorganization for Hi-Crush Inc. and Its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code* (as may be amended from time to time, the "**Plan**") as set forth in the Disclosure Statement for the Plan (as may be amended from time to time, the "**Disclosure Statement**"). Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

As set forth in the Notice of Non-Voting Status and Opt-Out Opportunity: Deemed to Reject accompanying this opt-out form (the "**Master Opt-Out Form**"), you are receiving this Master Opt-Out Form because you are a bank, broker, or other financial institution (each, a "**Nominee**") that holds equity securities in Hi-Crush Inc. (the "**Old Parent Interests**") in "street

---

¹ The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Hi-Crush Inc. (0530), OnCore Processing LLC (9403), Hi-Crush Augusta LLC (0668), Hi-Crush Whitehall LLC (5562), PDQ Properties LLC (9169), Hi-Crush Wyeville Operating LLC (5797), D & I Silica, LLC (9957), Hi-Crush Blair LLC (7094), Hi-Crush LMS LLC, Hi-Crush Investments Inc. (6547), Hi-Crush Permian Sand LLC, Hi-Crush Proppants LLC (0770), Hi-Crush PODS LLC, Hi-Crush Canada Inc. (9195), Hi-Crush Holdings LLC, Hi-Crush Services LLC (6206), BulkTracer Holdings LLC (4085), Pronghorn Logistics Holdings, LLC (5223), FB Industries USA Inc. (8208), PropDispatch LLC, Pronghorn Logistics, LLC (4547), and FB Logistics, LLC (8641). The Debtors' address is 1330 Post Oak Blvd, Suite 600, Houston, Texas 77056.

US-DOCS\116659544.12

name" on behalf of a Beneficial Holder[2] of such Old Parent Interests as of August 14, 2020 (the "**Voting Record Date**"), or you are a Nominee's agent.

Pursuant to the terms of the Plan, Holders of Equity Interests in Class 8 are not entitled to receive or retain any recovery under the Plan and, therefore, pursuant to section 1126(g) of title 11 of the United State Code, Beneficial Holders of Class 8 Old Parent Interests are deemed to have rejected the Plan.  Beneficial Holders of Class 8 Old Parent Interests, however, have the right to, subject to the limitations set forth herein, affirmatively opt out of the third party release contained in Article X.B.2 of the Plan (the "**Third Party Release**"), if they so choose.  Nominees or their agents should use this Master Opt-Out Form to convey the election of such Beneficial Holders to opt-out of the Third Party Release.

This Master Opt-Out Form may not be used for any purpose other than conveying their Beneficial Holder clients' elections to opt out of the Third Party Release.  If you believe you have received this Master Opt-Out Form in error, or if you believe that you have received the wrong Master Opt-Out Form, please contact the Voting and Claims Agent immediately at the address, email address, or telephone number set forth above.  Nothing contained herein or in the enclosed documents shall render you or any other entity an agent of the Debtors or the Voting and Claims Agent or authorize you or any other entity to use any document or make any statements on behalf of any of the Debtors with respect to the Plan, except for the statement contained in the documents enclosed herewith.

You are required to distribute the Beneficial Holder Opt-Out Form contained herewith to your Beneficial Holder clients holding Equity Interests in Class 8 – Old Parent Interests as of the Voting Record Date within five (5) business days of your receipt of the Solicitation Packages in which this Master Opt-Out Form was included.  With respect to the Beneficial Holder Opt-Out Forms returned to you, you must (1) execute this Master Opt-Out Form so as to reflect the Third Party Release elections set forth in such Beneficial Holder Opt-Out Forms and (2) forward this Master Opt-Out Form to the Voting and Claims Agent in accordance with the Master Opt-Out Form Instructions accompanying this Master Opt-Out Form.  **Any election delivered to you by a Beneficial Holder shall not be counted unless you complete, sign, and return this Master Opt-Out Form to the Voting and Claims Agent so that it is actually received by the Release Opt-Out Deadline.**

Before completing this Master Opt-Out Form, please read and follow the enclosed "Instructions for Completing this Master Opt-Out Form" carefully to ensure that you complete, execute and return this Master Opt-Out Form properly.

---

[2]   A "**Beneficial Holder**" means an entity that beneficially owns Class 8 Old Parent Interests whose claims have not been satisfied prior to the Voting Record Date pursuant to Court order or otherwise, as reflected in the records maintained by the Nominee.

2

**Item 1. Certification of Authority to Make Elections.**

The undersigned certifies that as of the Voting Record Date, the undersigned:

☐      Is a Nominee for the Beneficial Holders in the principal number of Class 8 – Old Parent Interests listed in Item 2 below, or

☐      Is acting under a power of attorney or agency (a copy of which will be provided upon request) granted by a Nominee for the Beneficial Holders in the principal number of Class 8 – Old Parent Interests listed in Item 2 below, or

☐      Has been granted a proxy (an original of which is attached hereto) from a Nominee for the Beneficial Holders (or the Beneficial Holders itself/themselves) in the principal number of Class 8 – Old Parent Interests listed in Item 2 below;

and accordingly, has full power and authority to convey decisions to opt-out of the Third-Party Release, on behalf of the Beneficial Holders of the Class 8 – Old Parent Interests described in Item 2.

**Item 2. Optional Third-Party Release Election.**

The undersigned certifies that that the information provided below (including any information provided on additional sheets attached hereto) is a true and accurate schedule of the Beneficial Holders of Class 8 – Old Parent Interests, as identified by their respective account numbers, that made a decision to opt-out of the Third-Party Release via e-mail, telephone, internet application, facsimile, voting instruction form, or other customary means of conveying such information.

Indicate in the appropriate column below the Beneficial Holder/Account Number of each Beneficial Holder that completed and returned the Beneficial Holder Opt-Out Form and the aggregate number of Class 8 – Old Parent Interests held by such Beneficial Holder/Account Number electing to opt-out of the Third-Party Release or attach such information to this Master Opt-Out Form in the form of the following table.

Please complete the information requested below (add additional sheets if necessary):

| Beneficial Holder/Account Number | Amount of Class 8 – Old Parent Interest Holders Electing to Opt-Out of Third-Party Release |
| --- | --- |
| 1. | |
| 2. | |
| 3. | |
| 4. | |
| 5. | |

3

US-DOCS\116659544.12

| TOTAL | |
|---|---|

## Item 3. Additional Certifications.

By signing this Master Opt-Out Form, the undersigned certifies to the Bankruptcy Court and the Debtors:

a. that either: (i) the undersigned has received a completed Opt-Out Form from each Beneficial Holder of Class 8 – Old Parent Interests listed in Item 2 of this Master Opt-Out Form, or (ii) an e-mail, recorded telephone call, internet transmission, facsimile, voting instruction form, or other customary means of communication conveying a decision to opt-out of the releases from each Holder of Class 8 – Old Parent Interests;

b. that the undersigned is a Nominee (or agent of the Nominee) of the Class 8 – Old Parent Interests; and

c. that the undersigned has properly disclosed for each Beneficial Holder who submitted a Beneficial Holder Opt-Out Form or opt-out decisions via other customary means: (i) the respective number of the Class 8 – Old Parent Interests owned by each Beneficial Holder and (B) the customer account or other identification number for each such Beneficial Holder.

| | |
|---|---|
| **Institution:** | _____ |
| | **(Print or Type)** |
| **DTC Participant Number:** | _____ |
| **Signature:** | _____ |
| **Name of Signatory:** | _____ |
| **Title:** | _____ |
| **Address:** | _____ |
| | _____ |
| | _____ |
| **Date Completed:** | _____ |

If your address or contact information has changed, please note the new information here.

4

**PLEASE COMPLETE, SIGN AND DATE THIS MASTER OPT-OUT FORM AND RETURN IT PROMPTLY VIA FIRST CLASS MAIL, OVERNIGHT COURIER, EMAIL OR HAND DELIVERY TO:**

Hi-Crush Ballot Processing
c/o KCC
222 N. Pacific Coast Highway, Suite 300
El Segundo, CA 90245
Email: HiCrushinfo@kccllc.com

Telephone:  877-499-4509 (Toll Free U.S. and Canada)
917-281-4800 (International)

**IF THE VOTING AND CLAIMS AGENT DOES NOT <u>ACTUALLY</u> <u>RECEIVE</u> THIS MASTER OPT-OUT FORM ON OR BEFORE 5:00 P.M. PREVAILING CENTRAL TIME ON SEPTEMBER 18, 2020, THE ELECTIONS TRANSMITTED HEREBY WILL <u>NOT</u> BE EFFECTIVE.**

**OPT-OUT FORMS SENT BY FACSIMILE OR TELECOPY WILL <u>NOT</u> BE ACCEPTED.  MASTER OPT-OUT FORMS MAY BE SUBMITTED BY EMAIL TO:** *HiCrushinfo@kccllc.com*

5

| Class 8 – Old Parent Interests |
|---|

## INSTRUCTIONS FOR COMPLETING THIS MASTER OPT-OUT FORM

1.  Capitalized terms used in the Master Opt-Out Form or in these instructions (the "**Master Opt-Out Form Instructions**") but not otherwise defined therein or herein shall have the meaning set forth in the Plan.

2.  **Distribution of the Opt-Out Forms:**

    ➢ You should immediately distribute the Beneficial Holder Opt-Out Forms accompanied by pre-addressed, postage-paid return envelopes to all Beneficial Holders of Class 8 – Old Parent Interests as of the Voting Record Date and take any action required to enable each such Beneficial Holders to make an opt-out election timely. You must include a pre-addressed, postage-paid return envelope or must certify that your Beneficial Holder clients that did not receive return envelopes were provided with electronic or other means (consented to by such Beneficial Holder clients) of returning their Beneficial Holder Opt-Out Forms in a timely manner.

    ➢ Any election delivered to you by a Beneficial Holder shall not be counted until you complete, sign, and return this Master Opt-Out Form to the Voting and Claims Agent, so that it is actually received by the Release Opt-Out Deadline.

3.  You should solicit elections from your Beneficial Holder clients via the (a) delivery of duly completed Beneficial Holder Opt-Out Forms or (b) conveyance of their decision to opt-out of the releases via e-mail, telephone, internet application, facsimile, voting instruction form, or other customary and approved means of conveying such information.

4.  With regard to any Beneficial Holder Opt-Out Forms returned to you by a Beneficial Holder, you must: (a) compile and validate the elections and other relevant information of each such Beneficial Holder on the Master Opt-Out Form using the customer name or account number assigned by you to each such Beneficial Holder; (b) execute the Master Opt-Out Form; and (c) transmit the Master Opt-Out form to the Voting and Claims Agent.

5.  **Return of Master Opt-Out Form**: The Master Opt-Out Form must be returned to the Voting and Claims Agent so as to be **actually received** by the Voting and Claims Agent on or before the Release Opt-Out Deadline, which is 5:00 p.m. prevailing Central Time on September 18, 2020.

6.  If a Master Opt-Out Form is received by the Voting and Claims Agent after the Release Opt-Out Deadline, it will not be effective, unless the Debtors have granted an extension of the Release Opt-Out Deadline in writing with respect to such Master Opt-Out Form. Additionally, the following Opt-Out Forms will NOT be counted:

    ➢ ANY MASTER OPT-OUT FORM THAT IS ILLEGIBLE OR CONTAINS INSUFFICIENT INFORMATION TO PERMIT THE IDENTIFICATION OF THE HOLDER OF THE CLAIM OR EQUITY INTEREST;

US-DOCS\116659544.12

> ➢ ANY MASTER OPT-OUT FORM CAST BY OR ON BEHALF OF AN ENTITY THAT IS NOT ENTITLED TO OPT-OUT OF THE THIRD-PARTY RELEASE;

> ➢ ANY MASTER OPT-OUT FORM SENT TO THE DEBTORS, THE DEBTORS' AGENTS/REPRESENTATIVES (OTHER THAN THE VOTING AND CLAIMS AGENT), ANY INDENTURE TRUSTEE OR THE DEBTORS' FINANCIAL OR LEGAL ADVISORS;

> ➢ ANY UNSIGNED MASTER OPT-OUT FORM; OR

> ➢ ANY MASTER OPT-OUT FORM NOT COMPLETED IN ACCORDANCE WITH THE PROCEDURES APPROVED IN THE DISCLOSURE STATEMENT ORDER.

7. The method of delivery of Master Opt-Out Forms to the Voting and Claims Agent is at the election and risk of Nominee. Except as otherwise provided herein, such delivery will be deemed made to the Voting and Claims Agent only when the Voting and Claims Agent **actually receives** the originally executed Master Opt-Out Form. Instead of effecting delivery by first-class mail, it is recommended, though not required, that Nominees use an overnight or hand delivery service. In all cases, Nominees should allow sufficient time to assure timely delivery.

8. Multiple Master Opt-Out Forms may be completed and delivered to the Voting and Claims Agent. Elections reflected by multiple Master Opt-Out Forms will be deemed valid. If two or more Master Opt-Out Forms are submitted, please mark the subsequent Master Opt-Out Form(s) with the words "Additional Election" or such other language as you customarily use to indicate an additional election that is not meant to revoke an earlier election.

9. The Master Opt-Out Form is not a letter of transmittal and may not be used for any purpose other than to transmit elections to opt-out of the Third-Party Release. Holders of Class 8 – Old Parent Interests should not surrender certificates (if any) representing their Class 8 – Old Parent Interests at this time, and neither the Debtors nor the Voting and Claims Agent will accept delivery of any such certificates transmitted together with a Master Opt-Out Form

10. This Master Opt-Out Form does not constitute, and shall not be deemed to be, (a) a proof of Claim or (b) an assertion or admission of a Claim.

11. Please be sure to sign and date your Master Opt-Out Form. If you are signing a Master Opt-Out Form in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Voting and Claims Agent, the Debtors or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Holder. In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Master Opt-Out Form.

7

12.     No fees or commissions or other remuneration will be payable to any broker, bank, dealer or other person in connection with this solicitation.  Upon written request, however, the Debtor will reimburse you for customary mailing and handling expenses incurred by you in forwarding the Opt-Out Forms to your client(s).

**PLEASE RETURN YOUR MASTER OPT-OUT FORM PROMPTLY!**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS MASTER OPT-OUT FORM OR THE VOTING INSTRUCTIONS OR PROCEDURES, PLEASE CONTACT THE VOTING AND CLAIMS AGENT AT:**

**877-499-4509 (Toll Free U.S. and Canada) or 917-281-4800 (International)**

**Or via email: HiCrushinfo@kccllc.com**

---

**IF THE VOTING AND CLAIMS AGENT DOES NOT <u>ACTUALLY</u> <u>RECEIVE</u> THIS MASTER OPT-OUT FORM FROM YOU BEFORE THE RELEASE OPT-OUT DEADLINE, WHICH IS 5:00 P.M. PREVAILING CENTRAL TIME ON SEPTEMBER 18, 2020, THEN YOUR VOTE TRANSMITTED HEREBY WILL NOT BE COUNTED.**

---

NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, REGARDING THE DEBTORS OR THE PLAN, OTHER THAN WHAT IS CONTAINED IN THE SOLICITATION PACKAGE MAILED HEREWITH.

**PLEASE BE ADVISED THAT THE PLAN CONTAINS CERTAIN RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, INCLUDING THOSE LISTED BELOW.  YOU ARE ADVISED AND ENCOURAGED TO CAREFULLY REVIEW AND CONSIDER THE PLAN, INCLUDING THE RELEASE, EXCULPATION AND INJUNCTION PROVISIONS, AS YOUR RIGHTS MIGHT BE AFFECTED.**

**Article X.B – <u>Release of Claims and Causes of Action</u>**

1.     ***Release by the Debtors and their Estates*.  Pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, and except as otherwise expressly provided in the Plan, effective as of the Effective Date, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, the Debtors and the Reorganized Debtors, in their respective individual capacities and as debtors-in-possession, and on behalf of themselves and their respective Estates, including, without limitation, any successor to the Debtors or any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code (collectively, the "<u>Debtor Releasing Parties</u>") shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver and release to each of the Released Parties (and each such Released Party so released shall be deemed forever released, waived and discharged by the Debtor Releasing Parties) and their respective assets and properties (the "<u>Debtor Release</u>") from any and all Claims, Causes of Action, and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of**

8

federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of the Debtors or their Affiliates, including, without limitation, (i) the Chapter 11 Cases, the Disclosure Statement, the Plan, the Restructuring Support Agreement, the Backstop Purchase Agreement, the Rights Offering, the Restructuring Documents, the Prepetition Debt Documents, and the DIP Loan Documents, (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, the Backstop Purchase Agreement, the Rights Offering, the Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Documents, the Prepetition Debt Documents, the DIP Loan Documents, or related agreements, instruments or other documents, (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale, or rescission of the purchase or sale of any Equity Interest or Plan Securities of the Debtors or the Reorganized Debtors, and/or (vii) the Confirmation or Consummation of the Plan or the solicitation of votes on the Plan that such Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) or that any Holder of a Claim or Equity Interest or other Person or Entity would have been legally entitled to assert for, or on behalf or in the name of, any Debtor, its respective Estate or any Reorganized Debtor (whether directly or derivatively) against any of the Released Parties; *provided*, *however*, that the foregoing provisions of this Debtor Release shall not operate to waive or release (A) the rights of such Debtor Releasing Party to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with the Plan (including, without limitation, the Exit Facility Loan Documents and the New Secured Convertible Notes Documents) or assumed or assumed and assigned, as applicable, pursuant to the Plan or pursuant to a Final Order of the Bankruptcy Court and (B) claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes a criminal act, fraud, willful misconduct, or gross negligence, in each case as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction. The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity and the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Debtor Release. Notwithstanding the foregoing, nothing in this **Article X.B.** shall or shall be deemed to (i) prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person or Entity that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors and/or (ii) operate as a release or waiver of any Intercompany Claims, in each case unless otherwise expressly provided for in this Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims released by the Debtor Release; (iii) in the best interest of the Debtors and their Estates; (iv) fair, equitable and reasonable; (v) given and made after due notice and opportunity for hearing; and (vi) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any claim or Cause of Action released pursuant to the Debtor Release.

2.  *Release By Third Parties*.  **Except as otherwise expressly provided in the Plan, effective as of the Effective Date, to the fullest extent permitted by applicable law, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, and without limiting or otherwise modifying the scope of the Debtor Release provided by the Debtor Releasing Parties above, each Non-Debtor Releasing Party (together with the Debtor Releasing Parties, the "Releasing Parties") shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver, and release to each of the Released Parties (and each such Released Party so released shall be deemed forever released, waived, and discharged by the Non-Debtor Releasing Parties) and their respective assets and properties (the "Third Party Release") from any and all Claims, Causes of Action, and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of the Debtors or their Affiliates, including, without limitation, (i) the Chapter 11 Cases, the Disclosure Statement, the Plan, the Restructuring Support Agreement, the Backstop Purchase Agreement, the Rights Offering, the Restructuring Documents, the Prepetition Debt Documents, and the DIP Loan Documents, (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, the Backstop Purchase Agreement, the Rights Offering, this Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Documents, the Prepetition Debt Documents, the DIP Loan Documents, or related agreements, instruments or other documents, (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale or rescission of the purchase or sale of any Equity Interest or Plan Securities of the Debtors or the Reorganized Debtors, and/or (vii) the Confirmation or Consummation of the Plan or the solicitation of votes on this Plan that such Non-Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) against any of the Released Parties; *provided*, *however*, that the foregoing provisions of this Third Party Release shall not operate to waive or release (A) the rights of such Non-Debtor Releasing Party to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan (including, without limitation, the Exit Facility Loan Documents and the New Secured Convertible Notes Documents) or assumed or assumed and assigned, as applicable, pursuant to the Plan or pursuant to a Final Order of the Bankruptcy Court and (B) claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes a criminal act, fraud, willful misconduct, or gross negligence, in each case as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction.  The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity and the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Third Party Release.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third Party Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Third Party Release is:  (i) consensual; (ii) essential to the confirmation of the Plan; (iii) in exchange for the good and valuable consideration provided by the Released Parties; (iv) a good faith settlement and compromise of the Claims released by the Third Party Release; (v) in the best**

10

interest of the Debtors and all Holders of Claims and Equity Interests; (vi) fair, equitable and reasonable; (vii) given and made after due notice and opportunity for hearing; and (viii) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third Party Release.

## Article X.E – <u>Exculpation</u>

Effective as of the Effective Date, to the fullest extent permitted by law, the Exculpated Parties shall neither have nor incur any liability to any Person or Entity for any claims or Causes of Action arising prior to or on the Effective Date for any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Confirmation or Consummation of this Plan, the Disclosure Statement, the Restructuring Documents, the Rights Offering, the Prepetition Debt Documents, the DIP Loan Documents, or any contract, instrument, release or other agreement or document created or entered into in connection with this Plan, including the Restructuring Support Agreement and the Backstop Purchase Agreement, or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the approval of the Disclosure Statement or Confirmation or Consummation of this Plan; <u>provided</u>, <u>however</u>, that the foregoing provisions of this exculpation shall not operate to waive or release: (i) any Causes of Action arising from willful misconduct, actual fraud, or gross negligence of such applicable Exculpated Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; and/or (ii) the rights of any Person or Entity to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements and documents delivered under or in connection with this Plan or assumed pursuant to this Plan or Final Order of the Bankruptcy Court; <u>provided</u>, <u>further</u>, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its respective duties pursuant to, or in connection with, the above referenced documents, actions or inactions.  The foregoing exculpation shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity.  Notwithstanding the foregoing, nothing in this <u>Article X.E</u> shall or shall be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person or Entity that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors, in each case unless otherwise expressly provided for in the Plan.

## Article X.G – <u>Injunction</u>

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, FROM AND AFTER THE EFFECTIVE DATE, ALL PERSONS AND ENTITIES ARE, TO THE FULLEST EXTENT PROVIDED UNDER SECTION 524 AND OTHER APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, PERMANENTLY ENJOINED FROM (I) COMMENCING OR CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY SUIT, ACTION OR OTHER PROCEEDING; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING IN ANY MANNER ANY JUDGMENT, AWARD, DECREE, OR ORDER; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE; (IV) ASSERTING A SETOFF OR RIGHT OF SUBROGATION OF ANY KIND; OR (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND,  IN EACH CASE ON ACCOUNT OF OR WITH RESPECT TO ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, EQUITY INTEREST, OR REMEDY RELEASED OR TO BE RELEASED, EXCULPATED OR TO BE EXCULPATED, SETTLED OR TO BE SETTLED OR DISCHARGED OR TO BE DISCHARGED PURSUANT TO THIS PLAN OR THE CONFIRMATION ORDER AGAINST**

11

ANY PERSON OR ENTITY SO RELEASED, DISCHARGED, OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY PERSON OR ENTITY SO RELEASED, DISCHARGED, OR EXCULPATED).  ALL INJUNCTIONS OR STAYS PROVIDED FOR IN THE CHAPTER 11 CASES UNDER SECTION 105 OR SECTION 362 OF THE BANKRUPTCY CODE, OR OTHERWISE, AND IN EXISTENCE ON THE CONFIRMATION DATE, SHALL REMAIN IN FULL FORCE AND EFFECT UNTIL THE EFFECTIVE DATE.

**Article X.H – <u>Binding Nature Of Plan</u>**

ON THE EFFECTIVE DATE, AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE PLAN SHALL BIND, AND SHALL BE DEEMED BINDING UPON, THE DEBTORS, THE REORGANIZED DEBTORS, ANY AND ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS, ALL PERSONS AND ENTITIES THAT ARE PARTIES TO OR ARE SUBJECT TO THE SETTLEMENTS, COMPROMISES, RELEASES, EXCULPATIONS, DISCHARGES, AND INJUNCTIONS DESCRIBED IN THE PLAN, EACH PERSON AND ENTITY ACQUIRING PROPERTY UNDER THIS PLAN, ANY AND ALL NON-DEBTOR PARTIES TO EXECUTORY CONTRACTS AND UNEXPIRED LEASES WITH THE DEBTORS AND THE RESPECTIVE SUCCESSORS AND ASSIGNS OF EACH OF THE FOREGOING, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, AND NOTWITHSTANDING WHETHER OR NOT SUCH PERSON OR ENTITY (I) WILL RECEIVE OR RETAIN ANY PROPERTY, OR INTEREST IN PROPERTY, UNDER THE PLAN, (II) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASES OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN, AFFIRMATIVELY VOTED TO REJECT THIS PLAN OR IS CONCLUSIVELY PRESUMED TO REJECT THE PLAN.

**<u>Relevant Definitions Related to Release and Exculpation Provisions</u>:**

"*Exculpated Parties*" means, collectively, the following:

(a) the Debtors;

(b) the Reorganized Debtors;

(c) the Prepetition Credit Agreement Agent;

(d) the Prepetition Credit Agreement Lenders;

(e) the Prepetition Notes Indenture Trustee;

(f) the DIP Agents;

(g) the DIP Lenders;

(h) the Ad Hoc Noteholder Committee and the members thereof in their capacities as such;

(i) the Consenting Noteholders;

(j) the Backstop Parties;

(k) the Distribution Agents;

12

US-DOCS\116659544.12

(l) the Exit Facility Agent;

(m) the Exit Facility Lenders;

(n) the New Secured Convertible Notes Indenture Trustee;

(o) the New Secured Convertible Noteholders;

(p) the Releasing Old Parent Interestholders; and

(q) with respect to each of the foregoing Persons or Entities in clauses (a) through (p), the Related Persons of each such Person or Entity, in each case solely in their capacity as such.

"*Indemnified Parties*" means each of the Debtors' and their respective subsidiaries' current and former directors, officers, and managers in their respective capacities as such, and solely to the extent that such Person was serving in such capacity on or any time after the Petition Date; provided, that the Designated Persons shall not be Indemnified Parties under the Plan.

"*Non-Debtor Releasing Parties*" means, collectively, the following:

(a) the Prepetition Credit Agreement Agent;

(b) the Prepetition Credit Agreement Lenders;

(c) the Prepetition Notes Indenture Trustee;

(d) the DIP Agents;

(e) the DIP Lenders;

(f) the Ad Hoc Noteholder Committee and the members thereof in their capacities as such;

(g) the Releasing Prepetition Noteholders;

(h) the Backstop Parties;

(i) the Distribution Agents;

(j) the Exit Facility Agent and the Exit Facility Lenders;

(k) the New Secured Convertible Notes Indenture Trustee and the New Secured Convertible Noteholders;

(l) those Holders of Claims deemed to accept the Plan that do not affirmatively opt out of the Third Party Release as provided on their respective Ballots/Opt-Out Forms;

(m) those Holders of General Unsecured Claims that do not affirmatively opt out of the Third Party Release as provided on their respective Ballots/Opt-Out Forms;

(n) all Holders of Claims that vote to accept the Plan; and

(o) the Releasing Old Parent Interestholders.

13

"Released Party" means, collectively, the following:

(a) the Debtors;

(b) the Reorganized Debtors;

(c) the Prepetition Credit Agreement Agent;

(d) the Prepetition Credit Agreement Lenders;

(e) the Prepetition Notes Indenture Trustee;

(f) the DIP Agents;

(g) the DIP Lenders;

(h) the Ad Hoc Noteholder Committee and the members thereof in their capacities as such;

(i) the Releasing Prepetition Noteholders;

(j) the Backstop Parties;

(k) the Distribution Agents;

(l) the Exit Facility Agent and the Exit Facility Lenders;

(m) the New Secured Convertible Notes Indenture Trustee and the New Secured Convertible Noteholders;

(n) the Releasing Old Parent Interestholders; and

(o) with respect to each of the foregoing Persons or Entities in clauses (a) through (n), the Related Persons of each such Person or Entity, in each case solely in their capacity as such; provided, that the Designated Persons shall not be Released Parties under the Plan.

14

# EXHIBIT 6

## Ballots

US-DOCS\116659544.12

# EXHIBIT 6A

## Beneficial Ballot for Class 4

US-DOCS\116659544.12

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

------------------------------------------------------------ x
In re:                                                       :   Chapter 11
                                                             :
HI-CRUSH INC., *et al.*,[1]                                   :   Case No. 20-33495 (DRJ)
                                                             :
                         Debtors.                            :   (Jointly Administered)
                                                             :
------------------------------------------------------------ x

**BENEFICIAL HOLDER BALLOT FOR
CLASS 4 – PREPETITION NOTES CLAIMS**

PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING THIS BENEFICIAL HOLDER BALLOT CAREFULLY <u>BEFORE</u> COMPLETING THIS BALLOT.  BALLOTS ARE ONLY BEING SOLICITED FROM HOLDERS OF CLASS 4 PREPETITION NOTES CLAIMS.

**IN ORDER FOR YOUR VOTE TO BE COUNTED, ALL (I) PRE-VALIDATED BENEFICIAL HOLDER BALLOTS; (II) BENEFICIAL HOLDER BALLOTS OF RECORD OWNERS; AND (III) MASTER BALLOTS CAST ON BEHALF OF BENEFICIAL HOLDER BALLOTS THAT WERE NOT PRE-VALIDATED MUST BE COMPLETED, EXECUTED AND RETURNED SO AS TO BE <u>ACTUALLY RECEIVED</u> BY KURTZMAN CARSON CONSULTANTS LLC (THE "<u>VOTING AND CLAIMS AGENT</u>" OR "<u>KCC</u>") ON OR BEFORE 5:00 P.M. PREVAILING CENTRAL TIME ON SEPTEMBER 18, 2020 (THE "<u>VOTING DEADLINE</u>") IN ACCORDANCE WITH THE FOLLOWING:**

A.      **IF YOU RECEIVED A RETURN ENVELOPE ADDRESSED TO YOUR NOMINEE OWNER**:[2]

    YOUR NOMINEE HAS <u>NOT</u> PRE-VALIDATED THIS BENEFICIAL HOLDER BALLOT, WHICH MEANS THAT YOU MUST RETURN THIS BENEFICIAL HOLDER BALLOT TO YOUR NOMINEE IN SUFFICIENT TIME TO PERMIT YOUR NOMINEE TO DELIVER A MASTER BALLOT INCLUDING YOUR VOTE TO THE VOTING AND CLAIMS AGENT BY THE VOTING DEADLINE. PLEASE FOLLOW THE INSTRUCTIONS OF YOUR NOMINEE TO RETURN YOUR VOTE ON THE PLAN.

B.      **IF YOU RECEIVED A RETURN ENVELOPE ADDRESSED TO THE VOTING AND CLAIMS AGENT:**

    **YOUR NOMINEE HAS PRE-VALIDATED THIS BENEFICIAL HOLDER BALLOT FOR YOU**

---

[1]      The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Hi-Crush Inc. (0530), OnCore Processing LLC (9403), Hi-Crush Augusta LLC (0668), Hi-Crush Whitehall LLC (5562), PDQ Properties LLC (9169), Hi-Crush Wyeville Operating LLC (5797), D & I Silica, LLC (9957), Hi-Crush Blair LLC (7094), Hi-Crush LMS LLC, Hi-Crush Investments Inc. (6547), Hi-Crush Permian Sand LLC, Hi-Crush Proppants LLC (0770), Hi-Crush PODS LLC, Hi-Crush Canada Inc. (9195), Hi-Crush Holdings LLC, Hi-Crush Services LLC (6206), BulkTracer Holdings LLC (4085), Pronghorn Logistics Holdings, LLC (5223), FB Industries USA Inc. (8208), PropDispatch LLC, Pronghorn Logistics, LLC (4547), and FB Logistics, LLC (8641).  The Debtors' address is 1330 Post Oak Blvd, Suite 600, Houston, Texas 77056.

[2]      "**Nominee**" means the bank, brokerage firm, or the agent thereof as the entity through which the Beneficial Holders hold the Prepetition Notes.

US-DOCS\116659544.12

THEREFORE, YOU MUST RETURN THIS BENEFICIAL HOLDER BALLOT DIRECTLY TO THE VOTING AND CLAIMS AGENT SO IT IS **ACTUALLY RECEIVED** ON OR BEFORE THE VOTING DEADLINE.

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**") are soliciting votes with respect to the *Joint Plan of Reorganization for Hi-Crush Inc. and Its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code* (as may be amended from time to time, the "**Plan**") as set forth in the Disclosure Statement for the Plan (as may be amended from time to time, the "**Disclosure Statement**").  Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

You are receiving this Beneficial Holder Ballot because you are a Beneficial Holder of those certain 9.500% senior unsecured notes due 2026 issued by Hi-Crush Partners LP,[3] pursuant to that certain indenture, dated as of August 1, 2018 among Hi-Crush Partners LP, the guarantors named therein or party thereto, and U.S. Bank National Association, as may be amended modified or supplemented from time to time (the "**Prepetition Notes**") as of the close of business on August 14, 2020 (the "**Voting Record Date**").  Accordingly, you have a right to vote to accept or reject the Plan.

Your rights are described in the Disclosure Statement, which is included (along with the Plan, Confirmation Hearing Notice and certain other materials) in the Solicitation Package you are receiving with this Beneficial Holder Ballot.  If you need to obtain additional solicitation materials, you may contact the Debtors' Voting and Claims Agent by: (1) visiting the Debtors' restructuring website at www.kccllc.net/hicrush; (2) writing to Hi-Crush Ballot Processing c/o KCC, 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA 90245; and/or (3) calling the Debtors' restructuring hotline at 866-554-5810 (Toll Free U.S. or Canada) or 781-575-2032 (International).  You may also obtain these documents (other than a Ballot) and any other pleadings filed in the Debtors' Chapter 11 Cases (once the Chapter 11 Cases are commenced and for a fee) via PACER at: https://www.txs.uscourts.gov/bankruptcy or free of charge at www.kccllc.net/hicrush.

This Beneficial Holder Ballot may not be used for any purpose other than (i) casting votes to accept or reject the Plan and (ii) opting out of the Third Party Release.  If you believe you have received this Beneficial Holder Ballot in error, or if you believe that you have received the wrong Ballot, please contact the Voting and Claims Agent immediately at the address, email address, or telephone number set forth above.

You should review the Disclosure Statement and the Plan in their entirety before you vote.  You may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of your Claim.  Your Claim has been placed in Class 4 – Prepetition Notes Claims under the Plan.  The Bankruptcy Court can confirm the Plan and bind you if the Plan is accepted by the Holders of at least two-thirds in amount and more than one-half in number of the allowed Claims in each impaired Class who vote on the Plan and if the Plan otherwise satisfies the applicable requirements of Bankruptcy Code Section 1129(a).  If the requisite acceptances are not obtained, the Bankruptcy Court nonetheless may confirm the Plan if it finds that the Plan (a) provides fair and equitable treatment to, and does not unfairly discriminate against, each Class rejecting the Plan and (b) otherwise satisfies the requirements of Bankruptcy Code Section 1129(b).  If the Plan is confirmed by the Bankruptcy Court, it will be binding on you whether or not you vote or affirmatively vote to reject the Plan.  To have your vote counted, you must complete, sign and return this Ballot pursuant to the instructions provided herein, so that your vote is received by the Voting and Claims Agent by the Voting Deadline.

Before completing this Beneficial Holder Ballot, please read and follow the enclosed "Instructions for Completing this Beneficial Holder Ballot" carefully to ensure that you complete, execute and return this Beneficial Holder Ballot properly.

---

[3]   On May 31, 2019, Hi-Crush Partners LP converted to the Delaware corporation Hi-Crush Inc.

US-DOCS\116659544.12

**Item 1.** **Amount of Claim.**

The undersigned hereby certifies that as of the Voting Record Date, the undersigned was the Beneficial Holder (or authorized signatory for the Beneficial Holder) of Class 4 – Prepetition Notes Claims in the following aggregate unpaid principal amount (insert unpaid principal amount in box below if not already entered).  If your Prepetition Notes are held by a Nominee on your behalf and you do not know the amount of the Prepetition Notes held, please contact your Nominee <u>immediately</u>:

$_____

**Item 2.** **Vote on Plan.**

The Holder of the Class 4 – Prepetition Notes Claims against the Debtors set forth in Item 1 above votes to (please check <u>one</u> box below):

☐      **ACCEPT** (vote FOR) the Plan             ☐      **REJECT** (vote AGAINST) the Plan

THE DEBTORS RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.

<u>**IMPORTANT INFORMATION REGARDING THE RELEASE OF CLAIMS BY THIRD PARTIES**</u>

ARTICLE X OF THE PLAN CONTAINS RELEASE, EXCULPATION AND INJUNCTION PROVISIONS, WHICH ARE SET FORTH AT THE END OF THIS BALLOT.  YOU SHOULD REVIEW THESE PROVISIONS CAREFULLY.

**If you vote to accept the plan, you will be deemed to have consented to the Third Party Release set forth in Article X.B.2 of the Plan.  If you vote to reject the Plan or abstain from voting, you may elect not to grant the Third Party Release contained in Article X.B.2 of the Plan.  Check the box below if you elect not to grant the Third Party Release contained in Article X.B.2 of the Plan.  If you are <u>not</u> a signatory to the Restructuring Support Agreement, election to withhold consent is at your option.  If you submit your Ballot with this box checked, then you will be deemed <u>NOT</u> to consent to the Third Party Release set forth in Article X.B.2 of the Plan.  PLEASE BE ADVISED THAT BY NOT CHECKING THE BOX BELOW YOU ELECT TO GRANT THE THIRD PARTY RELEASE IN EACH AND EVERY CAPACITY IN WHICH YOU HOLD A CLAIM AGAINST, OR INTEREST IN, ANY OF THE DEBTORS.  YOU MUST AFFIRMATIVELY CHECK THE BOX BELOW IN ORDER TO OPT-OUT OF THE THIRD PARTY RELEASE.**

**PLEASE ALSO BE ADVISED THAT THE DEBTOR RELEASE CONTAINED IN ARTICLE X.B.1 OF THE PLAN WILL BE INCLUDED IN THE CONFIRMATION ORDER AND THAT IT IS SEPARATE FROM AND INDEPENDENT OF THE THIRD PARTY RELEASE.  IF YOU OBJECT TO THE DEBTOR RELEASE, YOU MUST FILE A SEPARATE OBJECTION WITH THE BANKRUPTCY COURT IN ACCORDANCE WITH THE PROCEDURES DESCRIBED IN THE DISCLOSURE STATEMENT ORDER.**

☐      OPT-OUT ELECTION:  The undersigned elects to opt-out of the Third Party Release contained in Article X.B.2 of the Plan.

**Item 3.**      **Certifications as to Class 4 – Prepetition Notes Claims Held in Additional Accounts.**

By completing and returning this Beneficial Holder Ballot, the undersigned Beneficial Holder certifies that either (1) it has not submitted any other Ballots for other Class 4 – Prepetition Notes Claims held in other accounts or other record names or (2) it has provided the information specified in the following table for all other Class 4 – Prepetition

3

Notes Claims for which it has submitted additional Beneficial Holder Ballots, each of which indicates the same vote to accept or reject the Plan (please use additional sheets of paper if necessary):

ONLY COMPLETE THIS SECTION IF YOU HAVE VOTED CLASS 4 – PREPETITION NOTES CLAIMS ON A BENEFICIAL HOLDER BALLOT OTHER THAN THIS BENEFICIAL HOLDER BALLOT.

| | Name of Beneficial Holder | Account Number | Nominee | Principal Amount of Other Class 4 – Prepetition Notes Claims Voted | CUSIP of Other Class 4 - Prepetition Notes Claim Voted |
|---|---|---|---|---|---|
| 1. | | | | $ | |
| 2. | | | | $ | |
| 3. | | | | $ | |
| 4. | | | | $ | |
| 5. | | | | $ | |
| 6. | | | | $ | |
| 7. | | | | $ | |
| 8. | | | | $ | |
| 9. | | | | $ | |
| 10. | | | | $ | |

**Item 4. Certifications.**

By signing this Beneficial Holder Ballot, the undersigned certifies to the Bankruptcy Court and the Debtors:

e. that either: (i) the undersigned is the Beneficial Holder of the Class 4 – Prepetition Notes Claims being voted; or (ii) the undersigned is an authorized signatory for an Entity that is a Beneficial Holder of the Class 4 – Prepetition Notes Claims being voted, and, in either case, has full power and authority to vote to accept or reject the Plan with respect to the Claims identified in Item 1 above;

f. that the undersigned (or in the case of an authorized signatory, the Beneficial Holder) has received a copy of the Disclosure Statement and the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

g. that the undersigned has cast the same vote with respect to all Class 4 – Prepetition Notes Claims in a single Class;

h. that no other Beneficial Holder Ballots with respect to the amount of the Class 4 – Prepetition Notes Claims identified in Item 1 above have been cast or, if any other Beneficial Holder Ballots have been cast with respect to such Class 4 Claims, then any such earlier Beneficial Holder Ballots are hereby revoked; and

4

      i.        that if applicable, the undersigned has voted in accordance with any obligations pursuant to that certain Restructuring Support Agreement, entered into as of July 12, 2020.

By signing this Beneficial Holder Ballot, the undersigned authorizes and instructs its Nominee (unless this is a pre-validated Beneficial Holder Ballot or the Beneficial Holder Ballot of a Registered Record Owner to be forwarded directly by the undersigned to the Voting and Claims Agent) (a) to furnish the voting information and the amount of Class 4 – Prepetition Notes Claims the Nominee holds on its behalf in a Master Ballot to be transmitted to the Voting and Claims Agent and (b) to retain this Beneficial Holder Ballot and related information in its records for at least one year after the Effective Date of the Plan.

| | |
|---|---|
| **Name of Holder:** | _____ |
| | (Print or Type) |
| **Social Security or Federal Tax Identification Number:** | _____ |
| **Signature:** | _____ |
| **Name of Signatory:** | _____ |
| | (If other than Holder) |
| **Title:** | _____ |
| **Address:** | _____ |
| | _____ |
| | _____ |
| **Date Completed:** | _____ |

No fees, commissions or other remuneration will be payable to any person for soliciting votes on the Plan.

If your address or contact information has changed, please note the new information here.

**PLEASE COMPLETE, SIGN AND DATE THIS BENEFICIAL HOLDER BALLOT AND RETURN IT <u>PROMPTLY</u> IN THE ENVELOPE PROVIDED TO THE ADDRESSEE SPECIFIED THEREON.**

IF THE VOTING AND CLAIMS AGENT DOES NOT <u>ACTUALLY</u> <u>RECEIVE</u> THIS BENEFICIAL HOLDER BALLOT (IF PRE-VALIDATED OR IF OF A REGISTERED RECORD OWNER) <u>OR</u> THE MASTER BALLOT INCORPORATING THE VOTE CAST BY THIS BENEFICIAL HOLDER BALLOT ON OR BEFORE 5:00 P.M. PREVAILING CENTRAL TIME ON SEPTEMBER 18, 2020, THEN YOUR VOTE TRANSMITTED BY THIS BENEFICIAL HOLDER BALLOT WILL <u>NOT</u> BE COUNTED TOWARD CONFIRMATION OF THE PLAN.

IF YOU ARE RETURNING THIS BENEFICIAL HOLDER BALLOT TO YOUR NOMINEE, PLEASE ALLOW SUFFICIENT TIME FOR YOUR NOMINEE TO RECEIVE YOUR BALLOT AND PROCESS YOUR VOTE ON A MASTER BALLOT SUCH THAT THE MASTER BALLOT IS RECEIVED BY THE VOTING AND CLAIMS AGENT ON OR BEFORE 5:00 P.M. PREVAILING CENTRAL TIME ON SEPTEMBER 18, 2020.

BALLOTS SENT BY FACSIMILE, TELECOPY, OR ELECTRONIC MAIL WILL <u>NOT</u> BE ACCEPTED

US-DOCS\116659544.12

| Class 4 – Prepetition Notes Claims |
|---|

## INSTRUCTIONS FOR COMPLETING THIS BENEFICIAL HOLDER BALLOT

10. The Debtors are soliciting the votes of Holders of Claims with respect to the Plan attached as Exhibit A to the Disclosure Statement. Capitalized terms used in the Beneficial Holder Ballot or in these instructions (the "**Ballot Instructions**") but not otherwise defined therein or herein shall have the meaning set forth in the Plan, a copy of which also accompanies the Beneficial Holder Ballot.

11. To ensure that your vote is counted, you <u>must</u> complete the Beneficial Holder Ballot and take the following steps: (a) make sure that the information required by Item 1 above has been correctly inserted (if you do not know the amount of your claim, please contact your Nominee); (b) clearly indicate your decision either to accept or reject the Plan in the boxes provided in Item 2 above; (c) provide the information required by Item 3 above, if applicable, <u>and</u> (d) sign, date and return an original of your Beneficial Holder Ballot in accordance with paragraph 3 directly below.

12. **Return of Beneficial Holder Ballots**: Your Beneficial Holder Ballot (if pre-validated or if you are a record Holder) or the Master Ballot incorporating the vote cast on your Beneficial Holder Ballot MUST be returned to the Voting and Claims Agent so as to be **actually received** by the Voting and Claims Agent on or before the Voting Deadline, which is 5:00 p.m. prevailing Central Time on September 18, 2020. To ensure your vote is counted toward confirmation of the Plan, please read the following information carefully so that you understand where your Beneficial Holder Ballot must be sent in order for it to be received before the Voting Deadline:

> ➢ <u>Pre-validated Beneficial Holder Ballot and Beneficial Holder Ballots of Registered Record Owners</u>: If you received a Beneficial Holder Ballot and a return envelope addressed to the Voting and Claims Agent, then you must return your completed Beneficial Holder Ballot <u>directly to the Voting and Claims Agent</u> so that it is **actually received** by the Voting and Claims Agent on or before the Voting Deadline.

> ➢ <u>Not pre-validated Beneficial Holder Ballot</u>: If you received a Beneficial Holder Ballot and a return envelope addressed to your Nominee, you must return your completed Beneficial Holder Ballot <u>directly to your Nominee</u> so that it is **actually received** by the Nominee in sufficient time to permit your Nominee to deliver a Master Ballot including your vote to the Voting and Claims Agent by the Voting Deadline.

13. If a Master Ballot or Beneficial Holder Ballot is received by the Voting and Claims Agent <u>after</u> the Voting Deadline, it will not be counted, unless the Debtors have granted an extension of the Voting Deadline in writing with respect to such Master Ballot or Beneficial Holder Ballot. Additionally**,** the following Beneficial Holder Ballots will <u>NOT</u> be counted:

> ➢ ANY BENEFICIAL HOLDER BALLOT THAT IS ILLEGIBLE OR CONTAINS INSUFFICIENT INFORMATION TO PERMIT THE IDENTIFICATION OF THE HOLDER OF THE CLAIM;

> ➢ ANY BENEFICIAL HOLDER BALLOT CAST BY OR ON BEHALF OF AN ENTITY THAT DOES NOT HOLD A CLAIM IN ONE OF THE VOTING CLASSES;

> ➢ ANY BENEFICIAL HOLDER BALLOT THAT (A) IS PROPERLY COMPLETED, EXECUTED AND TIMELY FILED, BUT DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN, OR (B) INDICATES BOTH AN ACCEPTANCE AND REJECTION OF THE PLAN, OR (C) PARTIALLY ACCEPTS AND PARTIALLY REJECTS THE PLAN;

US-DOCS\116659544.12

> ANY BENEFICIAL HOLDER BALLOT CAST FOR A CLAIM THAT IS SUBJECT TO AN OBJECTION PENDING AS OF THE VOTING RECORD DATE (EXCEPT AS OTHERWISE PROVIDED IN THE DISCLOSURE STATEMENT ORDER);

> ANY BENEFICIAL HOLDER BALLOT SENT TO THE DEBTORS, THE DEBTORS' AGENTS/REPRESENTATIVES (OTHER THAN THE VOTING AND CLAIMS AGENT), ANY INDENTURE TRUSTEE OR THE DEBTORS' FINANCIAL OR LEGAL ADVISORS;

> ANY BENEFICIAL HOLDER BALLOT TRANSMITTED BY FACSIMILE, TELECOPY OR ELECTRONIC MAIL (UNLESS THE AFOREMENTIONED IS PRE-AUTHORIZED BY THE NOMINEE);

> ANY UNSIGNED BENEFICIAL HOLDER BALLOT; OR

> ANY BENEFICIAL HOLDER BALLOT NOT CAST IN ACCORDANCE WITH THE PROCEDURES APPROVED IN THE DISCLOSURE STATEMENT ORDER.

14.     The method of delivery of Beneficial Holder Ballots to the Voting and Claims Agent or your Nominee is at the election and risk of each Holder of a Prepetition Notes Claim. Except as otherwise provided herein, such delivery will be deemed made to the Voting and Claims Agent only when the Voting and Claims Agent **actually receives** the originally executed Beneficial Holder Ballot or Master Ballot incorporating the Beneficial Holder Ballot. Instead of effecting delivery by first-class mail, it is recommended, though not required, that Holders use an overnight or hand delivery service. In all cases, Holders should allow sufficient time to assure timely delivery.

15.     Your Nominee is authorized to collect votes to accept or to reject the Plan from Beneficial Holders in accordance with their customary practices, including the use of a "voting instruction form" in lieu of (or in addition to) a Beneficial Owner Ballot, as well as collecting votes from Beneficial Holders through online voting, by phone, facsimile, or other electronic means.

16.     If multiple Beneficial Holder Ballots are received from the same Holder of a Class 4 – Prepetition Notes Claim with respect to the same Class 4 Claim prior to the Voting Deadline, the last Beneficial Holder Ballot timely received will supersede and revoke any earlier received Beneficial Holder Ballots.

17.     You must vote all of your Prepetition Notes Claims within Class 4 either to accept or reject the Plan and may not split your vote. Further, if a Holder has multiple Prepetition Notes Claims within Class 4, the Debtors may, in their discretion, aggregate the Claims of any particular Holder with multiple Prepetition Notes Claims within Class 4 for the purpose of counting votes.

18.     The Beneficial Holder Ballot is not a letter of transmittal and may not be used for any purpose other than (i) to vote to accept or reject the Plan and (ii) opt-out of the Third Party Release. Accordingly, at this time, Holders of Claims should not surrender certificates or instruments representing or evidencing their Claims, and neither the Debtors nor the Voting and Claims Agent will accept delivery of any such certificates or instruments surrendered together with a Beneficial Holder Ballot.

19.     This Beneficial Holder Ballot does not constitute, and shall not be deemed to be, (a) a proof of Claim or (b) an assertion or admission of a Claim.

20.     Please be sure to sign and date your Beneficial Holder Ballot. If you are signing a Beneficial Holder Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Voting and Claims Agent, the Debtors or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Holder. In addition, please provide your

7

US-DOCS\116659544.12

name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Beneficial Holder Ballot.

21.     If you hold Claims in more than one Class under the Plan you may receive more than one Ballot coded for each different Class.  Each Ballot votes only your Claims indicated on that Ballot, so please complete and return each Beneficial Holder Ballot and/or Ballot that you received.

22.     If the Restructuring Support Agreement (as defined in the Plan) terminates in accordance with its terms and if you are a "Consenting Noteholder" as defined in the Restructuring Support Agreement, then your Beneficial Holder Ballot shall be immediately revoked and deemed void ab initio, without any further notice to or action, order, or approval of the Bankruptcy Court.

**PLEASE RETURN YOUR BENEFICIAL HOLDER BALLOT PROMPTLY!**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BENEFICIAL HOLDER BALLOT
OR THE VOTING INSTRUCTIONS OR PROCEDURES, PLEASE CONTACT
THE VOTING AND CLAIMS AGENT AT:**

**866-554-5810 (Toll Free U.S. and Canada) or 781-575-2032 (International)**

**Or via email: HiCrushinfo@kccllc.com**

> **IF THE VOTING AND CLAIMS AGENT DOES NOT ACTUALLY RECEIVE THIS PRE-VALIDATED BENEFICIAL HOLDER BALLOT FROM YOU OR THE MASTER BALLOT CONTAINING YOUR VOTE FROM YOUR NOMINEE ON OR BEFORE THE VOTING DEADLINE, WHICH IS 5:00 P.M. PREVAILING CENTRAL TIME ON SEPTEMBER 18, 2020, THEN YOUR VOTE TRANSMITTED HEREBY WILL NOT BE COUNTED.**

NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, REGARDING THE DEBTORS OR THE PLAN, OTHER THAN WHAT IS CONTAINED IN THE SOLICITATION PACKAGE MAILED HEREWITH.

**PLEASE BE ADVISED THAT THE PLAN CONTAINS CERTAIN RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, INCLUDING THOSE LISTED BELOW.  YOU ARE ADVISED AND ENCOURAGED TO CAREFULLY REVIEW AND CONSIDER THE PLAN, INCLUDING THE RELEASE, EXCULPATION AND INJUNCTION PROVISIONS, AS YOUR RIGHTS MIGHT BE AFFECTED.**

**Article X.B – Release of Claims and Causes of Action**

1.     *Release by the Debtors and their Estates*.  **Pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, and except as otherwise expressly provided in the Plan, effective as of the Effective Date, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, the Debtors and the Reorganized Debtors, in their respective individual capacities and as debtors-in-possession, and on behalf of themselves and their respective Estates, including, without limitation, any successor to the Debtors or any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code (collectively, the "Debtor Releasing Parties") shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver and release to each of the Released Parties (and each such Released Party so released shall be deemed forever released, waived and discharged by the Debtor Releasing Parties) and their respective assets and properties (the "Debtor Release") from any and all Claims, Causes of Action, and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of the Debtors or their Affiliates, including, without limitation, (i) the Chapter 11 Cases, the Disclosure**

8

Statement, the Plan, the Restructuring Support Agreement, the Backstop Purchase Agreement, the Rights Offering, the Restructuring Documents, the Prepetition Debt Documents, and the DIP Loan Documents, (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, the Backstop Purchase Agreement, the Rights Offering, the Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Documents, the Prepetition Debt Documents, the DIP Loan Documents, or related agreements, instruments or other documents, (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale, or rescission of the purchase or sale of any Equity Interest or Plan Securities of the Debtors or the Reorganized Debtors, and/or (vii) the Confirmation or Consummation of the Plan or the solicitation of votes on the Plan that such Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) or that any Holder of a Claim or Equity Interest or other Person or Entity would have been legally entitled to assert for, or on behalf or in the name of, any Debtor, its respective Estate or any Reorganized Debtor (whether directly or derivatively) against any of the Released Parties; *provided*, *however*, that the foregoing provisions of this Debtor Release shall not operate to waive or release (A) the rights of such Debtor Releasing Party to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with the Plan (including, without limitation, the Exit Facility Loan Documents and the New Secured Convertible Notes Documents) or assumed or assumed and assigned, as applicable, pursuant to the Plan or pursuant to a Final Order of the Bankruptcy Court and (B) claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes a criminal act, fraud, willful misconduct, or gross negligence, in each case as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction. The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity and the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Debtor Release. Notwithstanding the foregoing, nothing in this Article X.B. shall or shall be deemed to (i) prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person or Entity that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors and/or (ii) operate as a release or waiver of any Intercompany Claims, in each case unless otherwise expressly provided for in this Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims released by the Debtor Release; (iii) in the best interest of the Debtors and their Estates; (iv) fair, equitable and reasonable; (v) given and made after due notice and opportunity for hearing; and (vi) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any claim or Cause of Action released pursuant to the Debtor Release.

2. *Release By Third Parties*. Except as otherwise expressly provided in the Plan, effective as of the Effective Date, to the fullest extent permitted by applicable law, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, and without limiting or otherwise modifying the scope of the Debtor Release provided by the Debtor Releasing Parties above, each Non-Debtor Releasing Party (together with the Debtor Releasing Parties, the "Releasing Parties") shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver, and release to each of the Released Parties (and each such Released Party so released shall be deemed forever released, waived, and discharged by the Non-Debtor Releasing Parties) and their respective assets and properties (the "Third Party Release") from any and all Claims, Causes of Action, and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related

9

US-DOCS\116659544.12

in any way in whole or in part to any of the Debtors or their Affiliates, including, without limitation, (i) the Chapter 11 Cases, the Disclosure Statement, the Plan, the Restructuring Support Agreement, the Backstop Purchase Agreement, the Rights Offering, the Restructuring Documents, the Prepetition Debt Documents, and the DIP Loan Documents, (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, the Backstop Purchase Agreement, the Rights Offering, this Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Documents, the Prepetition Debt Documents, the DIP Loan Documents, or related agreements, instruments or other documents, (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale or rescission of the purchase or sale of any Equity Interest or Plan Securities of the Debtors or the Reorganized Debtors, and/or (vii) the Confirmation or Consummation of the Plan or the solicitation of votes on this Plan that such Non-Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) against any of the Released Parties; *provided*, *however*, that the foregoing provisions of this Third Party Release shall not operate to waive or release (A) the rights of such Non-Debtor Releasing Party to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan (including, without limitation, the Exit Facility Loan Documents and the New Secured Convertible Notes Documents) or assumed or assumed and assigned, as applicable, pursuant to the Plan or pursuant to a Final Order of the Bankruptcy Court and (B) claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes a criminal act, fraud, willful misconduct, or gross negligence, in each case as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction. The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity and the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Third Party Release.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third Party Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Third Party Release is: (i) consensual; (ii) essential to the confirmation of the Plan; (iii) in exchange for the good and valuable consideration provided by the Released Parties; (iv) a good faith settlement and compromise of the Claims released by the Third Party Release; (v) in the best interest of the Debtors and all Holders of Claims and Equity Interests; (vi) fair, equitable and reasonable; (vii) given and made after due notice and opportunity for hearing; and (viii) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third Party Release.

### Article X.E – Exculpation

Effective as of the Effective Date, to the fullest extent permitted by law, the Exculpated Parties shall neither have nor incur any liability to any Person or Entity for any claims or Causes of Action arising prior to or on the Effective Date for any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Confirmation or Consummation of this Plan, the Disclosure Statement, the Restructuring Documents, the Rights Offering, the Prepetition Debt Documents, the DIP Loan Documents, or any contract, instrument, release or other agreement or document created or entered into in connection with this Plan, including the Restructuring Support Agreement and the Backstop Purchase Agreement, or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the approval of the Disclosure Statement or Confirmation or Consummation of this Plan; provided, however, that the foregoing provisions of this exculpation shall not operate to waive or release: (i) any Causes of Action arising from willful misconduct, actual fraud, or gross negligence of such applicable Exculpated Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; and/or (ii) the rights of any Person or Entity to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements and documents delivered under or in connection with this Plan or assumed pursuant to this Plan or Final Order of the Bankruptcy Court; provided, further, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its respective duties pursuant to, or in connection with, the above referenced documents, actions or inactions. The foregoing exculpation shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or

10

rule or the vote, consent, authorization or approval of any Person or Entity. Notwithstanding the foregoing, nothing in this Article X.E shall or shall be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person or Entity that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors, in each case unless otherwise expressly provided for in the Plan.

**Article X.G – <u>Injunction</u>**

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, FROM AND AFTER THE EFFECTIVE DATE, ALL PERSONS AND ENTITIES ARE, TO THE FULLEST EXTENT PROVIDED UNDER SECTION 524 AND OTHER APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, PERMANENTLY ENJOINED FROM (I) COMMENCING OR CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY SUIT, ACTION OR OTHER PROCEEDING; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING IN ANY MANNER ANY JUDGMENT, AWARD, DECREE, OR ORDER; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE; (IV) ASSERTING A SETOFF OR RIGHT OF SUBROGATION OF ANY KIND; OR (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND, IN EACH CASE ON ACCOUNT OF OR WITH RESPECT TO ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, EQUITY INTEREST, OR REMEDY RELEASED OR TO BE RELEASED, EXCULPATED OR TO BE EXCULPATED, SETTLED OR TO BE SETTLED OR DISCHARGED OR TO BE DISCHARGED PURSUANT TO THIS PLAN OR THE CONFIRMATION ORDER AGAINST ANY PERSON OR ENTITY SO RELEASED, DISCHARGED, OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY PERSON OR ENTITY SO RELEASED, DISCHARGED, OR EXCULPATED). ALL INJUNCTIONS OR STAYS PROVIDED FOR IN THE CHAPTER 11 CASES UNDER SECTION 105 OR SECTION 362 OF THE BANKRUPTCY CODE, OR OTHERWISE, AND IN EXISTENCE ON THE CONFIRMATION DATE, SHALL REMAIN IN FULL FORCE AND EFFECT UNTIL THE EFFECTIVE DATE.**

**Article X.H – <u>Binding Nature Of Plan</u>**

**ON THE EFFECTIVE DATE, AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE PLAN SHALL BIND, AND SHALL BE DEEMED BINDING UPON, THE DEBTORS, THE REORGANIZED DEBTORS, ANY AND ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS, ALL PERSONS AND ENTITIES THAT ARE PARTIES TO OR ARE SUBJECT TO THE SETTLEMENTS, COMPROMISES, RELEASES, EXCULPATIONS, DISCHARGES, AND INJUNCTIONS DESCRIBED IN THE PLAN, EACH PERSON AND ENTITY ACQUIRING PROPERTY UNDER THIS PLAN, ANY AND ALL NON-DEBTOR PARTIES TO EXECUTORY CONTRACTS AND UNEXPIRED LEASES WITH THE DEBTORS AND THE RESPECTIVE SUCCESSORS AND ASSIGNS OF EACH OF THE FOREGOING, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, AND NOTWITHSTANDING WHETHER OR NOT SUCH PERSON OR ENTITY (I) WILL RECEIVE OR RETAIN ANY PROPERTY, OR INTEREST IN PROPERTY, UNDER THE PLAN, (II) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASES OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN, AFFIRMATIVELY VOTED TO REJECT THIS PLAN OR IS CONCLUSIVELY PRESUMED TO REJECT THE PLAN.**

<u>**Relevant Definitions Related to Release and Exculpation Provisions**</u>:

"*Exculpated Parties*" means, collectively, the following:

(a) the Debtors;

(b) the Reorganized Debtors;

(c) the Prepetition Credit Agreement Agent;

(d) the Prepetition Credit Agreement Lenders;

11

(e) the Prepetition Notes Indenture Trustee;

(f) the DIP Agents;

(g) the DIP Lenders;

(h) the Ad Hoc Noteholder Committee and the members thereof in their capacities as such;

(i) the Consenting Noteholders;

(j) the Backstop Parties;

(k) the Distribution Agents;

(l) the Exit Facility Agent;

(m) the Exit Facility Lenders;

(n) the New Secured Convertible Notes Indenture Trustee;

(o) the New Secured Convertible Noteholders;

(p) the Releasing Old Parent Interestholders; and

(q) with respect to each of the foregoing Persons or Entities in clauses (a) through (p), the Related Persons of each such Person or Entity, in each case solely in their capacity as such.

"*Indemnified Parties*" means each of the Debtors' and their respective subsidiaries' current and former directors, officers, and managers in their respective capacities as such, and solely to the extent that such Person was serving in such capacity on or any time after the Petition Date; provided, that the Designated Persons shall not be Indemnified Parties under the Plan.

"*Non-Debtor Releasing Parties*" means, collectively, the following:

(a) the Prepetition Credit Agreement Agent;

(b) the Prepetition Credit Agreement Lenders;

(c) the Prepetition Notes Indenture Trustee;

(d) the DIP Agents;

(e) the DIP Lenders;

(f) the Ad Hoc Noteholder Committee and the members thereof in their capacities as such;

(g) the Releasing Prepetition Noteholders;

(h) the Backstop Parties;

(i) the Distribution Agents;

(j) the Exit Facility Agent and the Exit Facility Lenders;

12

US-DOCS\116659544.12

13

(k) the New Secured Convertible Notes Indenture Trustee and the New Secured Convertible Noteholders;

(l) those Holders of Claims deemed to accept the Plan that do not affirmatively opt out of the Third Party Release as provided on their respective Ballots/Opt-Out Forms;

(m) those Holders of General Unsecured Claims that do not affirmatively opt out of the Third Party Release as provided on their respective Ballots/Opt-Out Forms;

(n) all Holders of Claims that vote to accept the Plan; and

(o) the Releasing Old Parent Interestholders.

"Released Party" means, collectively, the following:

(a) the Debtors;

(b) the Reorganized Debtors;

(c) the Prepetition Credit Agreement Agent;

(d) the Prepetition Credit Agreement Lenders;

(e) the Prepetition Notes Indenture Trustee;

(f) the DIP Agents;

(g) the DIP Lenders;

(h) the Ad Hoc Noteholder Committee and the members thereof in their capacities as such;

(i) the Releasing Prepetition Noteholders;

(j) the Backstop Parties;

(k) the Distribution Agents;

(l) the Exit Facility Agent and the Exit Facility Lenders;

(m) the New Secured Convertible Notes Indenture Trustee and the New Secured Convertible Noteholders;

(n) the Releasing Old Parent Interestholders; and

(o) with respect to each of the foregoing Persons or Entities in clauses (a) through (n), the Related Persons of each such Person or Entity, in each case solely in their capacity as such; provided, that the Designated Persons shall not be Released Parties under the Plan.

US-DOCS\116659544.12

**Exhibit A**

Your Nominee may have checked a box below to indicate the CUSIP/ISIN to which this Class 4 Beneficial Holder Ballot pertains, or otherwise provided that information to you on a label or schedule attached to the Beneficial Holder Ballot:

| Class 4 (Prepetition Notes Claims) | | |
|---|---|---|
| ☐ | 9.50% Sr Unsecured Notes (144A) | 428337 AA 7 / US428337AA70 |
| ☐ | 9.50% Sr Unsecured Notes (REG S) | U4322H AA 0 / USU4322HAA06 |

US-DOCS\116659544.12

**EXHIBIT 6B**

**Master Ballot for Class 4**

US-DOCS\116659544.12

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| ------------------------------------------------------------ x | | |
| In re: | : | Chapter 11 |
| | : | |
| HI-CRUSH INC., *et al.*,[1] | : | Case No. 20-33495 (DRJ) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |
| ------------------------------------------------------------ x | | |

**MASTER BALLOT FOR NOMINEES OF**
**BENEFICIAL HOLDERS OF CLASS 4 - PREPETITION NOTES CLAIMS**

PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING THIS MASTER HOLDER BALLOT CAREFULLY <u>BEFORE</u> COMPLETING THIS MASTER BALLOT.

**THIS MASTER BALLOT MUST BE COMPLETED, EXECUTED AND RETURNED SO THAT IT IS <u>ACTUALLY RECEIVED</u> BY THE VOTING AND CLAIMS AGENT (KURTZMAN CARSON CONSULTANTS LLC) ON OR BEFORE 5:00 P.M. PREVAILING CENTRAL TIME ON SEPTEMBER 18, 2020 (THE "VOTING DEADLINE"):**

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**") are soliciting votes with respect to the *Joint Plan of Reorganization for Hi-Crush Inc. and Its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code* (as may be amended from time to time, the "**Plan**") as set forth in the Disclosure Statement for the Plan (as may be amended from time to time, the "**Disclosure Statement**"). Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

This Master Ballot is being sent to you because, as of the Voting Record Date (the close of business on August 14, 2020), you are a bank, brokerage firm, or the agent thereof (each, a "**Nominee**") as the entity through which the holder of one or more beneficial interests (collectively, the "**Beneficial Holders**") holds those certain 9.500% senior unsecured notes due 2026 issued by Hi-Crush Partners LP,[2] pursuant to that certain indenture, dated as of August 1, 2018 among Hi-Crush Partners LP, the guarantors named therein or party thereto, and U.S. Bank National Association, as may be amended modified or supplemented from time to time (the "**Prepetition Notes**").

As a Nominee, you are required, within five (5) business days of your receipt of the Solicitation Packages in which this Master Ballot was included, to deliver a Solicitation Package, including a Beneficial Holder Ballot, to each Beneficial Holder for whom you hold Prepetition Notes as of the close of business on August 14, 2020 (the "**Voting Record Date**") and take any action required to enable such Beneficial Holder to timely vote its Claim to accept or reject the Plan. You should include in each Solicitation Package a return envelope addressed to you, unless you choose to pre-validate such Beneficial Holder Ballot, in which case the Solicitation Package should include a return envelope addressed only to Kurtzman Carson Consultants LLC (the "**Voting and Claims Agent**" or "**KCC**"). With respect to any Beneficial Holder Ballots returned to you, you must (1) execute this Master Ballot so as to reflect the voting

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Hi-Crush Inc. (0530), OnCore Processing LLC (9403), Hi-Crush Augusta LLC (0668), Hi-Crush Whitehall LLC (5562), PDQ Properties LLC (9169), Hi-Crush Wyeville Operating LLC (5797), D & I Silica, LLC (9957), Hi-Crush Blair LLC (7094), Hi-Crush LMS LLC, Hi-Crush Investments Inc. (6547), Hi-Crush Permian Sand LLC, Hi-Crush Proppants LLC (0770), Hi-Crush PODS LLC, Hi-Crush Canada Inc. (9195), Hi-Crush Holdings LLC, Hi-Crush Services LLC (6206), BulkTracer Holdings LLC (4085), Pronghorn Logistics Holdings, LLC (5223), FB Industries USA Inc. (8208), PropDispatch LLC, Pronghorn Logistics, LLC (4547), and FB Logistics, LLC (8641).  The Debtors' address is 1330 Post Oak Blvd, Suite 600, Houston, Texas 77056.

[2]     On May 31, 2019, Hi-Crush Partners LP converted to the Delaware corporation Hi-Crush Inc.

US-DOCS\116659544.12

2

instructions given to you and the Third Party Release election set forth in the Beneficial Holder Ballots by the Beneficial Holders for whom you hold Prepetition Notes and (2) forward this Master Ballot to the Voting and Claims Agent in accordance with the Master Ballot Instructions accompanying this Master Ballot.

If you are both the registered Holder and Beneficial Holder of any Prepetition Notes and you wish to vote such Prepetition Notes, you MUST complete a Beneficial Holder Ballot and return it to the Voting and Claims Agent prior to the Voting Deadline.

If you need to obtain additional solicitation materials, you may contact the Debtors' Voting and Claims Agent by: (1) visiting the Debtors' restructuring website at www.kccllc.net/hicrush; (2) writing to Hi-Crush Ballot Processing c/o KCC, 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA 90245; and/or (3) calling the Debtors' restructuring hotline at 877-499-4509 (Toll Free U.S. or Canada) or 917-281-4800 (International). You may also obtain these documents (other than a Ballot) and any other pleadings filed in the Debtors' Chapter 11 Cases (once the Chapter 11 Cases are commenced and for a fee) via PACER at: https://www.txs.uscourts.gov/bankruptcy or free of charge at www.kccllc.net/hicrush.

This Master Ballot may not be used for any purpose other than (i) casting votes to accept or reject the Plan and (ii) transmitting the Third Party Release elections. If you believe you have received this Master Ballot in error, or if you believe that you have received the wrong Ballot, please contact the Voting and Claims Agent immediately at the address or telephone number set forth above.

---

**If the Voting and Claims Agent does not actually receive this Master Ballot on or before the Voting Deadline, which is 5:00 p.m. prevailing Central Time on September 18, 2020, then the Beneficial Holders' votes transmitted on such Master Ballot will NOT be counted.**

---

Before completing this Master Ballot, please read and follow the enclosed "Instructions for Completing this Master Ballot" carefully to ensure that you complete, execute and return this Master Ballot properly.

ARTICLE X OF THE PLAN CONTAINS RELEASE, EXCULPATION AND INJUNCTION PROVISIONS, WHICH ARE SET FORTH AT THE END OF THIS BALLOT. YOU SHOULD REVIEW THESE PROVISIONS CAREFULLY.

2

US-DOCS\116659544.12

**Item 1.** **Certification of Authority to Vote.**

The undersigned hereby certifies that, as of the Voting Record Date (the close of business on August 14, 2020), the undersigned (please check the applicable box):

❑ is a Nominee for the Beneficial Holders of the aggregate principal amount of Class 4 Prepetition Notes Claims listed in Item 2 below and is the registered Holder of the Prepetition Notes Claims represented by any such Class 4 Prepetition Notes Claims; or

❑ is acting under a power of attorney and/or agency agreement (a copy of which will be provided upon request) granted by a Nominee that is the registered Holder of the aggregate principal amount of Class 4 Prepetition Notes Claims listed in Item 2 below; or

❑ has been granted a proxy (an original of which is annexed hereto) from (1) a Nominee or (2) a Beneficial Holder, that is the registered Holder of the aggregate amount of the Class 4 Prepetition Notes Claims listed in Item 2 below;

and, accordingly, has full power and authority to vote to accept or reject the Plan on behalf of the Beneficial Holders of the Class 4 Prepetition Notes Claims described in Item 2 below.

3

US-DOCS\116659544.12

**Item 2.** **Class 4 Claims Vote.**

Number of Beneficial Holders: The undersigned transmits the following votes of Beneficial Holders in respect of their Class 4 Prepetition Notes Claims. The undersigned certifies that the following Beneficial Holders of Class 4 Prepetition Notes Claims, as identified by their respective customer account numbers set forth below, are Beneficial Holders of the Debtors' Prepetition Notes as of the Voting Record Date and have delivered to the undersigned, as Nominee, Beneficial Holder Ballots or other customary and acceptable forms for conveying votes.

To Properly Complete the Following Table: Indicate in the appropriate column below the aggregate principal amount of Prepetition Notes voted for each account (please use additional sheets of paper if necessary and, if possible, attach such information to this Master Ballot in the form of the following table). Please note: (1) each account of a Beneficial Holder must vote all such Beneficial Holder's Class 4 Prepetition Notes Claims to accept or reject the Plan and may not split such vote; and (2) do not count any Beneficial Holder Ballot executed by the Beneficial Holder that does not indicate an acceptance or rejection of the Plan or that indicates both an acceptance and a rejection of the Plan.

| Your Customer Account Number For Each Beneficial Holder of Voting Class 4 Prepetition Notes Claims | Face Amount of Prepetition Notes In order to vote on the Plan, the Beneficial Holder must have checked a box in Item 2 on the Beneficial Holder Ballot to ACCEPT or REJECT the Plan. In addition, if the Beneficial Holder returned a signed Beneficial Holder Ballot but did not check a box in Item 2 or checked both boxes in Item 2, the Beneficial Holder Ballot will not be counted for purposes of determining acceptance or rejection of the Plan. | | Consent to Third Party Release Check Below if Beneficial Holder checked the "Opt-Out Election" box in Item 2 on the Beneficial Holder Ballot. |
|---|---|---|---|
| | **ACCEPT THE PLAN** | **REJECT THE PLAN** | |
| 1. | $ | $ | ❑ |
| 2. | $ | $ | ❑ |
| 3. | $ | $ | ❑ |
| 4. | $ | $ | ❑ |
| 5. | $ | $ | ❑ |
| 6. | $ | $ | ❑ |
| 7. | $ | $ | ❑ |
| 8. | $ | $ | ❑ |
| 9. | $ | $ | ❑ |
| 10. | $ | $ | ❑ |
| **TOTALS:** | $ | $ | ❑ |

4

US-DOCS\116659544.12

**Item 3.  Certification as to Transcription of Information from Item 3 of the Beneficial Holder Ballots as to Class 4 Claims Voted Through Other Beneficial Holder Ballots.**

The undersigned certifies that it has transcribed in the following table the information, if any, provided by Beneficial Holders in Item 3 of each of the Beneficial Holder's original Beneficial Holder Ballots, identifying any Class 4 Prepetition Notes Claims for which such Beneficial Holders have submitted other Beneficial Holder Ballots other than to the undersigned:

| Your Customer Account Number For Each Beneficial Holder of Voting Class 4 Prepetition Notes Claims | | TRANSCRIBE FROM ITEM 3 OF THE BENEFICIAL HOLDER BALLOTS: | | | |
| --- | --- | --- | --- | --- | --- |
| | Account Number | Name of Nominee | Name of Holder | Principal Amount of Other Class 4 Prepetition Notes Claims Voted | CUSIP of Other Class 4 Prepetition Notes Claims Voted |
| 1. | | | | $ | |
| 2. | | | | $ | |
| 3. | | | | $ | |
| 4. | | | | $ | |
| 5. | | | | $ | |
| 6. | | | | $ | |
| 7. | | | | $ | |
| 8. | | | | $ | |
| 9. | | | | $ | |
| 10. | | | | $ | |

5

**Item 4**.  **Certification.**

By signing this Master Ballot, the undersigned certifies to the Bankruptcy Court and the Debtors that:

(a)     it has received a copy of the Disclosure Statement, the Beneficial Holder Ballots and the Solicitation Package and has delivered the same to the Beneficial Holders listed on the Beneficial Holder Ballots;

(b)     it has received a completed and signed Beneficial Holder Ballot (or otherwise accepted and customary form for the conveyance of a vote) from each Beneficial Holder listed in Item 2 of this Master Ballot;

(c)     it is the Nominee of the Prepetition Notes being voted;

(d)     it has been authorized by each such Beneficial Holder to vote on the Plan and to make applicable elections;

(e)     it has properly disclosed:

  i)      the number of Beneficial Holders who completed Beneficial Holder Ballots;

  ii)     the respective amounts of the Class 4 Prepetition Notes Claims owned, as the case may be, by each Beneficial Holder who completed a Beneficial Holder Ballot;

  iii)    each such Beneficial Holder's respective vote concerning the Plan and election to opt-out or not to opt-out of the Third Party Release;

  iv)     each such Beneficial Holder's certification as to other Class 4 Prepetition Notes Claims voted; and

  v)      the customer account or other identification number for each such Beneficial Holder;

(f)     each such Beneficial Holder has certified to the undersigned that it is eligible to vote on the Plan; and

(g)     it will maintain Beneficial Holder Ballots and evidence of separate transactions returned by Beneficial Holders (whether properly completed or defective) for at least one year after the Effective Date of the Plan and disclose all such information to the Bankruptcy Court or the Debtors, as the case may be, if so ordered.

| | |
|---|---|
| Name of Nominee: | _____ |
| | (Print or Type) |
| Participant Number: | _____ |
| Name of Proxy Holder or Agent for Nominee: | _____ |
| | (Print or Type) |
| Social Security or Federal Tax Identification Number: | _____ |
| Signature: | _____ |
| Name of Signatory: | _____ |
| | (If other than Nominee) |
| Title: | _____ |
| Address: | _____ |
| | _____ |
| | _____ |
| Date Completed: | _____ |

6

US-DOCS\116659544.12

**PLEASE COMPLETE, SIGN, AND DATE THIS MASTER BALLOT AND RETURN IT PROMPTLY VIA FIRST CLASS MAIL, OVERNIGHT COURIER, EMAIL OR HAND DELIVERY TO:**

Hi-Crush Ballot Processing

c/o KCC

222 N. Pacific Coast Highway, Suite 300

El Segundo, CA 90245

Email: HiCrushinfo@kccllc.com

Telephone:  877-499-4509 (Toll Free U.S. and Canada)

917-281-4800 (International)

**IF THE VOTING AND CLAIMS AGENT DOES NOT <u>ACTUALLY</u> <u>RECEIVE</u> THIS MASTER BALLOT ON OR BEFORE 5:00 P.M. PREVAILING CENTRAL TIME ON SEPTEMBER 18, 2020, THE VOTES CAST HEREBY WILL <u>NOT</u> BE COUNTED.**

**BALLOTS SENT BY FACSIMILE OR TELECOPY WILL <u>NOT</u> BE ACCEPTED.  MASTER BALLOTS MAY BE SUBMITTED BY EMAIL TO:** *HiCrushinfo@kccllc.com*

US-DOCS\116659544.12

| Class 4 — Nominees of Beneficial Holders of Prepetition Notes Claims |
| --- |

### INSTRUCTIONS FOR COMPLETING THIS MASTER BALLOT

1. The Debtors are soliciting the votes of Holders of Claims with respect to the Plan attached as Exhibit A to the Disclosure Statement. Capitalized terms used in the Master Ballot or in these instructions (the "**Master Ballot Instructions**") but not otherwise defined therein or herein shall have the meaning set forth in the Plan, a copy of which also accompanies the Master Ballot.

### HOW TO VOTE:

2. WITHIN FIVE (5) BUSINESS DAYS OF YOUR RECEIPT OF THE SOLICITATION PACKAGES, YOU MUST DISTRIBUTE SOLICITATION PACKAGE(S), INCLUDING BENEFICIAL HOLDERS BALLOTS, TO EACH BENEFICIAL HOLDER OF CLASS 4 PREPETITION NOTES CLAIMS AS OF THE VOTING RECORD DATE AND TAKE ANY ACTION REQUIRED TO ENABLE EACH SUCH BENEFICIAL HOLDER TO TIMELY VOTE THEIR CLAIMS.

3. IF YOU ARE BOTH THE RECORD HOLDER AND THE BENEFICIAL HOLDER OF ANY PRINCIPAL AMOUNT OF THE PREPETITION NOTES AND YOU WISH TO VOTE ANY CLASS 4 PREPETITION NOTES CLAIMS ON ACCOUNT THEREOF, THEN YOU MUST COMPLETE AND EXECUTE AN INDIVIDUAL BENEFICIAL HOLDER BALLOT AND RETURN THE SAME TO THE VOTING AND CLAIMS AGENT IN ACCORDANCE WITH THESE INSTRUCTIONS AND THE INSTRUCTIONS ATTACHED TO SUCH BENEFICIAL HOLDER BALLOT.

4. IF YOU ARE TRANSMITTING THE VOTES OF ANY BENEFICIAL HOLDERS OTHER THAN YOURSELF (I.E. YOU ARE A NOMINEE), YOU MAY, AT YOUR OPTION, ELECT TO PRE-VALIDATE THE BENEFICIAL HOLDER BALLOTS SENT TO YOU BY THE VOTING AND CLAIMS AGENT. BASED ON YOUR DECISION AS TO WHETHER OR NOT TO PRE-VALIDATE BENEFICIAL HOLDERS BALLOTS, THE INSTRUCTIONS IN EITHER PARAGRAPH (5) OR PARAGRAPH (6) BELOW APPLY (BUT NOT BOTH).

5. **PRE-VALIDATED BENEFICIAL HOLDER BALLOTS**: A NOMINEE "PRE-VALIDATES" A BENEFICIAL HOLDER BALLOT BY INDICATING THEREON THE RECORD HOLDER OF THE PREPETITION NOTES CLAIMS VOTED, THE AMOUNT OF THE PREPETITION NOTES HELD BY THE BENEFICIAL HOLDER AND THE APPROPRIATE ACCOUNT NUMBERS THROUGH WHICH THE BENEFICIAL HOLDER'S HOLDINGS ARE DERIVED. THE NOMINEE MUST ALSO COMPLETE AND EXECUTE THE CLASS 4 BENEFICIAL HOLDER BALLOT (OTHER THAN ITEM 2 AND ITEM 3 THEREIN). IF YOU CHOOSE TO PRE-VALIDATE INDIVIDUAL BENEFICIAL HOLDER BALLOTS, YOU MUST IMMEDIATELY: (A) "PRE-VALIDATE" THE INDIVIDUAL BENEFICIAL HOLDER BALLOT CONTAINED IN THE SOLICITATION PACKAGE SENT TO YOU BY THE VOTING AND CLAIMS AGENT AND (B) FORWARD THE SOLICITATION PACKAGE TO THE BENEFICIAL HOLDER FOR VOTING, INCLUDING:

    i. the pre-validated Beneficial Holder Ballot;

    ii. a return envelope addressed to the Voting and Claims Agent as follows: Hi-Crush Ballot Processing c/o KCC, 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA 90245; and

    iii. clear instructions stating that Beneficial Holders must return their pre-validated Beneficial Holder Ballot directly to the Voting and Claims Agent so that it is **actually received** by the Voting and Claims Agent on or before the Voting Deadline.

8

US-DOCS\116659544.12

6. **NON-PRE-VALIDATED BENEFICIAL HOLDER BALLOTS:** IF YOU DO <u>NOT</u> CHOOSE TO PRE-VALIDATE INDIVIDUAL BENEFICIAL HOLDER BALLOTS, YOU MUST:

    i.    <u>immediately</u> forward the Solicitation Package(s) sent to you by the Voting and Claims Agent to each Beneficial Holder for voting, including: (a) the Beneficial Holder Ballot; (b) a return envelope addressed to the Nominee; and (c) clear instructions stating that Beneficial Holders must return their Beneficial Holder Ballot directly to the Nominee so that it is **actually received** by the Nominee with enough time for the Nominee to prepare the Master Ballot in accordance with paragraph (ii) directly below and return the Master Ballot to the Voting and Claims Agent so it is **actually received** by the Voting and Claims Agent on or before the Voting Deadline; and

    ii.    upon receipt of completed, executed Beneficial Holder Ballots returned to you by a Beneficial Holder you must:

> ➤ CHECK THE APPROPRIATE BOX IN ITEM 1 OF THE MASTER BALLOT;
>
> ➤ COMPILE AND VALIDATE THE VOTES, ELECTIONS, AND OTHER RELEVANT INFORMATION OF EACH SUCH BENEFICIAL HOLDER IN ITEM 2 AND ITEM 3 OF THE MASTER BALLOT USING THE CUSTOMER ACCOUNT NUMBER OR OTHER IDENTIFICATION NUMBER ASSIGNED BY YOU TO EACH SUCH BENEFICIAL HOLDER;
>
> ➤ DATE AND EXECUTE THE MASTER BALLOT;
>
> ➤ TRANSMIT SUCH MASTER BALLOT TO THE VOTING AND CLAIMS AGENT BY THE VOTING DEADLINE; AND
>
> ➤ RETAIN SUCH BENEFICIAL HOLDER BALLOTS IN YOUR FILES FOR A PERIOD OF AT LEAST ONE YEAR AFTER THE EFFECTIVE DATE OF THE PLAN (AS YOU MAY BE ORDERED TO PRODUCE THE BENEFICIAL HOLDER BALLOTS TO THE DEBTORS OR THE BANKRUPTCY COURT).[3]

7. IF A MASTER BALLOT IS RECEIVED <u>AFTER</u> THE VOTING DEADLINE, IT WILL NOT BE COUNTED, UNLESS THE DEBTORS HAVE GRANTED AN EXTENSION OF THE VOTING DEADLINE IN WRITING WITH RESPECT TO SUCH MASTER BALLOT. ADDITIONALLY, THE FOLLOWING MASTER BALLOTS (AND THEREFORE BENEFICIAL HOLDER BALLOTS REFLECTED THEREON) WILL <u>NOT</u> BE COUNTED:

> ➤ ANY MASTER BALLOT THAT IS ILLEGIBLE OR CONTAINS INSUFFICIENT INFORMATION TO PERMIT THE IDENTIFICATION OF THE HOLDER OF THE CLAIM;

---

[3] In addition, you are authorized to collect votes to accept or to reject the Plan from Beneficial Holders in accordance with your customary practices, including the use of a "voting instruction form" in lieu of (or in addition to) a Beneficial Owner Ballot, and collecting votes from Beneficial Holders through online voting, by phone, facsimile, or other electronic means.

9

> ➤ ANY MASTER BALLOT CAST BY OR ON BEHALF OF AN ENTITY THAT DOES NOT HOLD A CLAIM IN ONE OF THE VOTING CLASSES;

> ➤ ANY MASTER BALLOT THAT (A) IS PROPERLY COMPLETED, EXECUTED AND TIMELY FILED, BUT DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN, OR (B) WITH RESPECT TO A SINGLE ACCOUNT NUMBER, INDICATES BOTH AN ACCEPTANCE AND REJECTION OF THE PLAN, OR (C) WITH RESPECT TO A SINGLE ACCOUNT NUMBER, PARTIALLY ACCEPTS AND PARTIALLY REJECTS THE PLAN;

> ➤ ANY MASTER BALLOT CAST FOR A CLAIM THAT IS SUBJECT TO AN OBJECTION PENDING AS OF THE VOTING RECORD DATE (EXCEPT AS OTHERWISE PROVIDED IN THE DISCLOSURE STATEMENT ORDER);

> ➤ ANY MASTER BALLOT SENT TO THE DEBTORS, THE DEBTORS' AGENTS/REPRESENTATIVES (OTHER THAN THE VOTING AND CLAIMS AGENT), ANY INDENTURE TRUSTEE OR THE DEBTORS' FINANCIAL OR LEGAL ADVISORS;

> ➤ ANY MASTER BALLOT TRANSMITTED BY FACSIMILE OR TELECOPY;

> ➤ ANY UNSIGNED MASTER BALLOT; OR

> ➤ ANY MASTER BALLOT NOT CAST IN ACCORDANCE WITH THE PROCEDURES APPROVED IN THE DISCLOSURE STATEMENT ORDER.

8. ANY BALLOT RETURNED TO YOU BY A BENEFICIAL HOLDER OF A CLAIM SHALL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN UNTIL YOU PROPERLY COMPLETE AND DELIVER TO THE VOTING AND CLAIMS AGENT A MASTER BALLOT THAT REFLECTS THE VOTE OF SUCH BENEFICIAL HOLDERS BY THE VOTING DEADLINE OR OTHERWISE VALIDATE THE BENEFICIAL HOLDER BALLOT IN A MANNER ACCEPTABLE TO THE VOTING AND CLAIMS AGENT.

9. THE METHOD OF DELIVERY OF MASTER BALLOTS TO THE VOTING AND CLAIMS AGENT IS AT THE ELECTION AND RISK OF EACH NOMINEE. EXCEPT AS OTHERWISE PROVIDED HEREIN, SUCH DELIVERY WILL BE DEEMED MADE ONLY WHEN THE VOTING AND CLAIMS AGENT **ACTUALLY RECEIVES** THE ORIGINALLY EXECUTED MASTER BALLOT. INSTEAD OF EFFECTING DELIVERY BY FIRST-CLASS MAIL, IT IS RECOMMENDED, THOUGH NOT REQUIRED, THAT NOMINEES USE AN OVERNIGHT OR HAND DELIVERY SERVICE OR SUBMIT THEIR BALLOTS VIA EMAIL. IN ALL CASES, NOMINEES SHOULD ALLOW SUFFICIENT TIME TO ASSURE TIMELY DELIVERY.

10. IF MULTIPLE MASTER BALLOTS ARE RECEIVED FROM THE SAME NOMINEE WITH RESPECT TO THE SAME BENEFICIAL HOLDER BALLOT BELONGING TO A BENEFICIAL HOLDER OF A CLAIM PRIOR TO THE VOTING DEADLINE, THE LAST MASTER BALLOT TIMELY RECEIVED WILL SUPERSEDE AND REVOKE ANY EARLIER RECEIVED MASTER BALLOTS. IF YOU RECEIVE MORE THAN ONE BENEFICIAL HOLDER BALLOT FROM THE SAME BENEFICIAL HOLDER, THE LATEST DATED BENEFICIAL HOLDER BALLOT YOU RECEIVE BEFORE YOU SUBMIT THE MASTER BALLOT SHALL BE DEEMED TO SUPERSEDE ANY PRIOR BENEFICIAL

10

HOLDER BALLOTS SUBMITTED BY SUCH BENEFICIAL HOLDER AND YOU SHOULD COMPLETE THE MASTER BALLOT ACCORDINGLY.

11.    THE MASTER BALLOT IS NOT A LETTER OF TRANSMITTAL AND MAY NOT BE USED FOR ANY PURPOSE OTHER THAN TO VOTE TO ACCEPT OR REJECT THE PLAN.  ACCORDINGLY, AT THIS TIME, HOLDERS OF CLAIMS SHOULD NOT SURRENDER CERTIFICATES OR INSTRUMENTS REPRESENTING OR EVIDENCING THEIR CLAIMS AND YOU SHOULD NOT ACCEPT DELIVERY OF ANY SUCH CERTIFICATES OR INSTRUMENTS SURRENDERED TOGETHER WITH A BENEFICIAL HOLDER BALLOT.

12.    THIS MASTER BALLOT DOES NOT CONSTITUTE, AND SHALL NOT BE DEEMED TO BE, (A) A PROOF OF CLAIM OR (B) AN ASSERTION OR ADMISSION OF A CLAIM.

13.    PLEASE BE SURE TO PROPERLY EXECUTE YOUR MASTER BALLOT.  YOU MUST:  (A) SIGN AND DATE YOUR MASTER BALLOT; (B) IF APPLICABLE, INDICATE THAT YOU ARE SIGNING A MASTER BALLOT IN YOUR CAPACITY AS A TRUSTEE, EXECUTOR, ADMINISTRATOR, GUARDIAN, ATTORNEY IN FACT, OFFICER OF A CORPORATION OR OTHERWISE ACTING IN A FIDUCIARY OR REPRESENTATIVE CAPACITY AND, IF REQUIRED OR REQUESTED BY THE VOTING AND CLAIMS AGENT, THE DEBTORS OR THE BANKRUPTCY COURT, SUBMIT PROPER EVIDENCE TO THE REQUESTING PARTY TO SO ACT ON BEHALF OF SUCH BENEFICIAL HOLDER; AND (C) PROVIDE YOUR NAME AND MAILING ADDRESS IF IT IS DIFFERENT FROM THAT SET FORTH ON THE ATTACHED MAILING LABEL OR IF NO SUCH MAILING LABEL IS ATTACHED TO THE MASTER BALLOT.

14.    NO FEES OR COMMISSIONS OR OTHER REMUNERATION WILL BE PAYABLE TO ANY NOMINEE FOR SOLICITING BENEFICIAL HOLDER BALLOTS ACCEPTING OR REJECTING THE PLAN.  THE DEBTORS WILL, HOWEVER, UPON REQUEST, REIMBURSE YOU FOR CUSTOMARY MAILING AND HANDLING EXPENSES INCURRED BY YOU IN FORWARDING THE BENEFICIAL HOLDER BALLOTS AND OTHER ENCLOSED MATERIALS TO YOUR CUSTOMERS.

15.    IF THE RESTRUCTURING SUPPORT AGREEMENT (AS DEFINED IN THE PLAN) TERMINATES IN ACCORDANCE WITH ITS TERMS AND IF YOU OR THE BENEFICIAL HOLDER ARE A "CONSENTING NOTEHOLDER" AS DEFINED IN THE RESTRUCTURING SUPPORT AGREEMENT, THEN YOUR MASTER BALLOT AND ANY RELATED BENEFICIAL HOLDER BALLOTS WITH RESPECT TO THE CLAIMS OF SUCH CONSENTING NOTEHOLDERS SHALL BE IMMEDIATELY REVOKED AND DEEMED VOID *AB INITIO*, WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT.

**PLEASE RETURN YOUR MASTER BALLOT PROMPTLY!**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS MASTER BALLOT
OR THE VOTING INSTRUCTIONS OR PROCEDURES, PLEASE CONTACT
THE VOTING AND CLAIMS AGENT AT:**

**877-499-4509 (Toll Free U.S. and Canada) or 917-281-4800 (International)**

**Or via email: HiCrushinfo@kccllc.com**

> **NOTHING CONTAINED HEREIN OR IN THE ENCLOSED DOCUMENTS SHALL RENDER YOU OR ANY OTHER ENTITY THE AGENT OF THE DEBTORS OR THE VOTING AND CLAIMS AGENT OR AUTHORIZE YOU OR ANY OTHER ENTITY TO USE ANY DOCUMENT OR MAKE ANY STATEMENTS ON BEHALF OF THE DEBTORS WITH RESPECT TO THE PLAN.**

**IF THE VOTING AND CLAIMS AGENT DOES NOT ACTUALLY RECEIVE THIS MASTER BALLOT ON OR BEFORE THE VOTING DEADLINE, WHICH IS 5:00 P.M. PREVAILING CENTRAL TIME ON SEPTEMBER 18, 2020, THEN THE VOTES TRANSMITTED THEREBY WILL NOT BE COUNTED.**

11

NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, REGARDING THE DEBTORS OR THE PLAN, OTHER THAN WHAT IS CONTAINED IN THE SOLICITATION PACKAGE MAILED HEREWITH.

**PLEASE BE ADVISED THAT THE PLAN CONTAINS CERTAIN RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, INCLUDING THOSE LISTED BELOW. YOU ARE ADVISED AND ENCOURAGED TO CAREFULLY REVIEW AND CONSIDER THE PLAN, INCLUDING THE RELEASE, EXCULPATION AND INJUNCTION PROVISIONS, AS YOUR RIGHTS MIGHT BE AFFECTED.**

**Article X.B – Release of Claims and Causes of Action**

1.       *Release by the Debtors and their Estates.* **Pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, and except as otherwise expressly provided in the Plan, effective as of the Effective Date, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, the Debtors and the Reorganized Debtors, in their respective individual capacities and as debtors-in-possession, and on behalf of themselves and their respective Estates, including, without limitation, any successor to the Debtors or any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code (collectively, the "Debtor Releasing Parties") shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver and release to each of the Released Parties (and each such Released Party so released shall be deemed forever released, waived and discharged by the Debtor Releasing Parties) and their respective assets and properties (the "Debtor Release") from any and all Claims, Causes of Action, and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of the Debtors or their Affiliates, including, without limitation, (i) the Chapter 11 Cases, the Disclosure Statement, the Plan, the Restructuring Support Agreement, the Backstop Purchase Agreement, the Rights Offering, the Restructuring Documents, the Prepetition Debt Documents, and the DIP Loan Documents, (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, the Backstop Purchase Agreement, the Rights Offering, the Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Documents, the Prepetition Debt Documents, the DIP Loan Documents, or related agreements, instruments or other documents, (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale, or rescission of the purchase or sale of any Equity Interest or Plan Securities of the Debtors or the Reorganized Debtors, and/or (vii) the Confirmation or Consummation of the Plan or the solicitation of votes on the Plan that such Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) or that any Holder of a Claim or Equity Interest or other Person or Entity would have been legally entitled to assert for, or on behalf or in the name of, any Debtor, its respective Estate or any Reorganized Debtor (whether directly or derivatively) against any of the Released Parties; *provided*, *however*, that the foregoing provisions of this Debtor Release shall not operate to waive or release (A) the rights of such Debtor Releasing Party to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with the Plan (including, without limitation, the Exit Facility Loan Documents and the New Secured Convertible Notes Documents) or assumed or assumed and assigned, as applicable, pursuant to the Plan or pursuant to a Final Order of the Bankruptcy Court and (B) claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes a criminal act, fraud, willful misconduct, or gross negligence, in each case as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction. The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity and the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Debtor Release. Notwithstanding the**

12

US-DOCS\116659544.12

foregoing, nothing in this <u>Article X.B.</u> shall or shall be deemed to (i) prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person or Entity that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors and/or (ii) operate as a release or waiver of any Intercompany Claims, in each case unless otherwise expressly provided for in this Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims released by the Debtor Release; (iii) in the best interest of the Debtors and their Estates; (iv) fair, equitable and reasonable; (v) given and made after due notice and opportunity for hearing; and (vi) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any claim or Cause of Action released pursuant to the Debtor Release.

2.    *<u>Release By Third Parties</u>.*  Except as otherwise expressly provided in the Plan, effective as of the Effective Date, to the fullest extent permitted by applicable law, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, and without limiting or otherwise modifying the scope of the Debtor Release provided by the Debtor Releasing Parties above, each Non-Debtor Releasing Party (together with the Debtor Releasing Parties, the "<u>Releasing Parties</u>") shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver, and release to each of the Released Parties (and each such Released Party so released shall be deemed forever released, waived, and discharged by the Non-Debtor Releasing Parties) and their respective assets and properties (the "<u>Third Party Release</u>") from any and all Claims, Causes of Action, and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of the Debtors or their Affiliates, including, without limitation, (i) the Chapter 11 Cases, the Disclosure Statement, the Plan, the Restructuring Support Agreement, the Backstop Purchase Agreement, the Rights Offering, the Restructuring Documents, the Prepetition Debt Documents, and the DIP Loan Documents, (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, the Backstop Purchase Agreement, the Rights Offering, this Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Documents, the Prepetition Debt Documents, the DIP Loan Documents, or related agreements, instruments or other documents, (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale or rescission of the purchase or sale of any Equity Interest or Plan Securities of the Debtors or the Reorganized Debtors, and/or (vii) the Confirmation or Consummation of the Plan or the solicitation of votes on this Plan that such Non-Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) against any of the Released Parties; *provided*, *however*, that the foregoing provisions of this Third Party Release shall not operate to waive or release (A) the rights of such Non-Debtor Releasing Party to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan (including, without limitation, the Exit Facility Loan Documents and the New Secured Convertible Notes Documents) or assumed or assumed and assigned, as applicable, pursuant to the Plan or pursuant to a Final Order of the Bankruptcy Court and (B) claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes a criminal act, fraud, willful misconduct, or gross negligence, in each case as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction.  The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity and the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Third Party Release.

13

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third Party Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Third Party Release is:  (i) consensual; (ii) essential to the confirmation of the Plan; (iii) in exchange for the good and valuable consideration provided by the Released Parties; (iv) a good faith settlement and compromise of the Claims released by the Third Party Release; (v) in the best interest of the Debtors and all Holders of Claims and Equity Interests; (vi) fair, equitable and reasonable; (vii) given and made after due notice and opportunity for hearing; and (viii) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third Party Release.

## Article X.E – Exculpation

Effective as of the Effective Date, to the fullest extent permitted by law, the Exculpated Parties shall neither have nor incur any liability to any Person or Entity for any claims or Causes of Action arising prior to or on the Effective Date for any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Confirmation or Consummation of this Plan, the Disclosure Statement, the Restructuring Documents, the Rights Offering, the Prepetition Debt Documents, the DIP Loan Documents, or any contract, instrument, release or other agreement or document created or entered into in connection with this Plan, including the Restructuring Support Agreement and the Backstop Purchase Agreement, or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the approval of the Disclosure Statement or Confirmation or Consummation of this Plan; provided, however, that the foregoing provisions of this exculpation shall not operate to waive or release: (i) any Causes of Action arising from willful misconduct, actual fraud, or gross negligence of such applicable Exculpated Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; and/or (ii) the rights of any Person or Entity to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements and documents delivered under or in connection with this Plan or assumed pursuant to this Plan or Final Order of the Bankruptcy Court; provided, further, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its respective duties pursuant to, or in connection with, the above referenced documents, actions or inactions.  The foregoing exculpation shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity.  Notwithstanding the foregoing, nothing in this Article X.E shall or shall be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person or Entity that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors, in each case unless otherwise expressly provided for in the Plan.

## Article X.G – Injunction

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, FROM AND AFTER THE EFFECTIVE DATE, ALL PERSONS AND ENTITIES ARE, TO THE FULLEST EXTENT PROVIDED UNDER SECTION 524 AND OTHER APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, PERMANENTLY ENJOINED FROM (I) COMMENCING OR CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY SUIT, ACTION OR OTHER PROCEEDING; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING IN ANY MANNER ANY JUDGMENT, AWARD, DECREE, OR ORDER; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE; (IV) ASSERTING A SETOFF OR RIGHT OF SUBROGATION OF ANY KIND; OR (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND,  IN EACH CASE ON ACCOUNT OF OR WITH RESPECT TO ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, EQUITY INTEREST, OR REMEDY RELEASED OR TO BE RELEASED, EXCULPATED OR TO BE EXCULPATED, SETTLED OR TO BE SETTLED OR DISCHARGED OR TO BE DISCHARGED PURSUANT TO THIS PLAN OR THE CONFIRMATION ORDER AGAINST ANY PERSON OR ENTITY SO RELEASED, DISCHARGED, OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY PERSON OR ENTITY SO RELEASED, DISCHARGED, OR EXCULPATED).  ALL INJUNCTIONS OR STAYS PROVIDED FOR IN THE CHAPTER 11 CASES UNDER SECTION 105 OR SECTION 362 OF THE**

14

**BANKRUPTCY CODE, OR OTHERWISE, AND IN EXISTENCE ON THE CONFIRMATION DATE, SHALL REMAIN IN FULL FORCE AND EFFECT UNTIL THE EFFECTIVE DATE.**

**Article X.H – <u>Binding Nature Of Plan</u>**

**ON THE EFFECTIVE DATE, AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE PLAN SHALL BIND, AND SHALL BE DEEMED BINDING UPON, THE DEBTORS, THE REORGANIZED DEBTORS, ANY AND ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS, ALL PERSONS AND ENTITIES THAT ARE PARTIES TO OR ARE SUBJECT TO THE SETTLEMENTS, COMPROMISES, RELEASES, EXCULPATIONS, DISCHARGES, AND INJUNCTIONS DESCRIBED IN THE PLAN, EACH PERSON AND ENTITY ACQUIRING PROPERTY UNDER THIS PLAN, ANY AND ALL NON-DEBTOR PARTIES TO EXECUTORY CONTRACTS AND UNEXPIRED LEASES WITH THE DEBTORS AND THE RESPECTIVE SUCCESSORS AND ASSIGNS OF EACH OF THE FOREGOING, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, AND NOTWITHSTANDING WHETHER OR NOT SUCH PERSON OR ENTITY (I) WILL RECEIVE OR RETAIN ANY PROPERTY, OR INTEREST IN PROPERTY, UNDER THE PLAN, (II) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASES OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN, AFFIRMATIVELY VOTED TO REJECT THIS PLAN OR IS CONCLUSIVELY PRESUMED TO REJECT THE PLAN.**

**<u>Relevant Definitions Related to Release and Exculpation Provisions</u>:**

"*Exculpated Parties*" means, collectively, the following:

(a) the Debtors;

(b) the Reorganized Debtors;

(c) the Prepetition Credit Agreement Agent;

(d) the Prepetition Credit Agreement Lenders;

(e) the Prepetition Notes Indenture Trustee;

(f) the DIP Agents;

(g) the DIP Lenders;

(h) the Ad Hoc Noteholder Committee and the members thereof in their capacities as such;

(i) the Consenting Noteholders;

(j) the Backstop Parties;

(k) the Distribution Agents;

(l) the Exit Facility Agent;

(m) the Exit Facility Lenders;

(n) the New Secured Convertible Notes Indenture Trustee;

(o) the New Secured Convertible Noteholders;

(p) the Releasing Old Parent Interestholders; and

15

(q) with respect to each of the foregoing Persons or Entities in clauses (a) through (p), the Related Persons of each such Person or Entity, in each case solely in their capacity as such.

"*Indemnified Parties*" means each of the Debtors' and their respective subsidiaries' current and former directors, officers, and managers in their respective capacities as such, and solely to the extent that such Person was serving in such capacity on or any time after the Petition Date; provided, that the Designated Persons shall not be Indemnified Parties under the Plan.

"*Non-Debtor Releasing Parties*" means, collectively, the following:

(a) the Prepetition Credit Agreement Agent;

(b) the Prepetition Credit Agreement Lenders;

(c) the Prepetition Notes Indenture Trustee;

(d) the DIP Agents;

(e) the DIP Lenders;

(f) the Ad Hoc Noteholder Committee and the members thereof in their capacities as such;

(g) the Releasing Prepetition Noteholders;

(h) the Backstop Parties;

(i) the Distribution Agents;

(j) the Exit Facility Agent and the Exit Facility Lenders;

(k) the New Secured Convertible Notes Indenture Trustee and the New Secured Convertible Noteholders;

(l) those Holders of Claims deemed to accept the Plan that do not affirmatively opt out of the Third Party Release as provided on their respective Ballots/Opt-Out Forms;

(m) those Holders of General Unsecured Claims that do not affirmatively opt out of the Third Party Release as provided on their respective Ballots/Opt-Out Forms;

(n) all Holders of Claims that vote to accept the Plan; and

(o) the Releasing Old Parent Interestholders.

"Released Party" means, collectively, the following:

(a) the Debtors;

(b) the Reorganized Debtors;

(c) the Prepetition Credit Agreement Agent;

(d) the Prepetition Credit Agreement Lenders;

(e) the Prepetition Notes Indenture Trustee;

16

(f) the DIP Agents;

(g) the DIP Lenders;

(h) the Ad Hoc Noteholder Committee and the members thereof in their capacities as such;

(i) the Releasing Prepetition Noteholders;

(j) the Backstop Parties;

(k) the Distribution Agents;

(l) the Exit Facility Agent and the Exit Facility Lenders;

(m) the New Secured Convertible Notes Indenture Trustee and the New Secured Convertible Noteholders;

(n) the Releasing Old Parent Interestholders; and

(o) with respect to each of the foregoing Persons or Entities in clauses (a) through (n), the Related Persons of each such Person or Entity, in each case solely in their capacity as such; provided, that the Designated Persons shall not be Released Parties under the Plan.

17

**EXHIBIT 6C**

**Class 5 Ballot**

US-DOCS\116659544.12

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

```
------------------------------------------------------------- x
In re:                                        :   Chapter 11
                                              :
HI-CRUSH INC., et al.,[1]                     :   Case No. 20-33495 (DRJ)
                                              :
                    Debtors.                  :   (Jointly Administered)
                                              :
------------------------------------------------------------- x
```

## BALLOT FOR
## CLASS 5 – GENERAL UNSECURED CLAIMS

PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING THIS BALLOT CAREFULLY BEFORE COMPLETING THIS BALLOT.

**IN ORDER FOR YOUR VOTE TO BE COUNTED, ALL BALLOTS MUST BE COMPLETED, EXECUTED AND RETURNED SO AS TO BE ACTUALLY RECEIVED BY KURTZMAN CARSON CONSULTANTS LLC (THE "VOTING AND CLAIMS AGENT" OR "KCC") ON OR BEFORE 5:00 P.M. PREVAILING CENTRAL TIME ON SEPTEMBER 18, 2020 (THE "VOTING DEADLINE").**

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**") are soliciting votes with respect to the *Joint Plan of Reorganization for Hi-Crush Inc. and Its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code* (as may be amended from time to time, the "**Plan**") as set forth in the Disclosure Statement for the Plan (as may be amended from time to time, the "**Disclosure Statement**"). Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

You are receiving this Ballot because our records indicate that you are a Holder of a Claim that is not a/an Administrative Claim; DIP Facility Claim; Professional Fee Claim; Priority Tax Claim; Secured Tax Claim; Other Priority Claim; Other Secured Claim; Prepetition Credit Agreement Claim; Prepetition Notes Claim; Intercompany Claim; or 510(b) Equity Claim (a "**General Unsecured Claim**") as of the close of business on August 14, 2020 (the "**Voting Record Date**"). Accordingly, you have a right to vote to accept or reject the Plan.

Your rights are described in the Disclosure Statement, which is included (along with the Plan, the Confirmation Hearing Notice and certain other materials) in the Solicitation Package you are receiving with this Ballot. If you need to obtain additional solicitation materials, you may contact the Debtors' Voting and Claims Agent by: (1) visiting the Debtors' restructuring website at www.kccllc.net/hicrush; (2) writing to Hi-Crush Ballot Processing c/o KCC, 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA 90245; and/or (3) calling the Debtors' restructuring hotline at 866-554-5810 (Toll Free U.S. or Canada) or 781-575-2032 (International). You may also obtain these documents (other than a Ballot) and any other pleadings filed in the Debtors' Chapter 11 Cases (once the Chapter 11 Cases are commenced and for a fee) via PACER at: https://www.txs.uscourts.gov/bankruptcy or free of charge at www.kccllc.net/hicrush.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Hi-Crush Inc. (0530), OnCore Processing LLC (9403), Hi-Crush Augusta LLC (0668), Hi-Crush Whitehall LLC (5562), PDQ Properties LLC (9169), Hi-Crush Wyeville Operating LLC (5797), D & I Silica, LLC (9957), Hi-Crush Blair LLC (7094), Hi-Crush LMS LLC, Hi-Crush Investments Inc. (6547), Hi-Crush Permian Sand LLC, Hi-Crush Proppants LLC (0770), Hi-Crush PODS LLC, Hi-Crush Canada Inc. (9195), Hi-Crush Holdings LLC, Hi-Crush Services LLC (6206), BulkTracer Holdings LLC (4085), Pronghorn Logistics Holdings, LLC (5223), FB Industries USA Inc. (8208), PropDispatch LLC, Pronghorn Logistics, LLC (4547), and FB Logistics, LLC (8641). The Debtors' address is 1330 Post Oak Blvd, Suite 600, Houston, Texas 77056.

2

This Ballot may not be used for any purpose other than (i) casting votes to accept or reject the Plan and (ii) opting out of the Third Party Release.  If you believe you have received this Ballot in error, or if you believe that you have received the wrong Ballot, please contact the Voting and Claims Agent immediately at the address, email address, or telephone number set forth above.

You should review the Disclosure Statement and the Plan in their entirety before you vote.  You may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of your Claim.  Your Claim has been placed in Class 5 – General Unsecured Claims under the Plan.  The Bankruptcy Court can confirm the Plan and bind you if the Plan is accepted by the Holders of at least two-thirds in amount and more than one-half in number of the allowed Claims in each impaired Class who vote on the Plan and if the Plan otherwise satisfies the applicable requirements of Bankruptcy Code Section 1129(a).  If the requisite acceptances are not obtained, the Bankruptcy Court nonetheless may confirm the Plan if it finds that the Plan (a) provides fair and equitable treatment to, and does not unfairly discriminate against, each Class rejecting the Plan and (b) otherwise satisfies the requirements of Bankruptcy Code Section 1129(b).  If the Plan is confirmed by the Bankruptcy Court, it will be binding on you whether or not you vote or affirmatively vote to reject the Plan.  To have your vote counted, you must complete, sign and return this Ballot pursuant to the instructions provided herein, so that your vote is received by the Voting and Claims Agent by the Voting Deadline.

Before completing this Ballot, please read and follow the enclosed "Instructions for Completing this Ballot" carefully to ensure that you complete, execute and return this Ballot properly.

There are two ways by which you may submit your Ballot.  You may return your Ballot to the Voting and Claims Agent via mail by following the instructions set forth below or you may submit your Ballot via the Voting and Claims Agent's online portal.  To submit your Ballot via the Voting and Claims Agent's online portal, please visit www.kccllc.net/hicrush. Click on the "E-Ballot" section of the website and follow the instructions to submit your Ballot.

IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Ballot:

Unique E-Ballot Form ID#:_____

The Voting and Claims Agent's online portal is the sole manner in which Ballots will be accepted via electronic or online transmission.

**Item 1. Amount of Claim.**

The undersigned hereby certifies that as of the Voting Record Date, the undersigned was the Holder of Class 5 – General Unsecured Claims in the following aggregate unpaid principal amount, without regard to any accrued but unpaid interest.

$_____

**Item 2. Vote on Plan.**

The Holder of the Class 5 – General Unsecured Claims against the Debtors set forth in Item 1 above votes to (please check one box below):

| ☐ | **ACCEPT** (vote FOR) the Plan | ☐ | **REJECT** (vote AGAINST) the Plan |

THE DEBTORS RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.

2

US-DOCS\116659544.12

**IMPORTANT INFORMATION REGARDING THE RELEASE OF CLAIMS BY THIRD PARTIES**

ARTICLE X OF THE PLAN CONTAINS RELEASE, EXCULPATION AND INJUNCTION PROVISIONS, WHICH ARE SET FORTH AT THE END OF THIS BALLOT. YOU SHOULD REVIEW THESE PROVISIONS CAREFULLY.

**If you vote to accept the plan, you will be deemed to have consented to the Third Party Release set forth in Article X.B.2 of the Plan. If you vote to reject the Plan or abstain from voting, you may elect not to grant the Third Party Release contained in Article X.B.2 of the Plan. Check the box below if you elect not to grant the Third Party Release contained in Article X.B.2 of the Plan. Election to withhold consent is at your option. If you submit your Ballot with this box checked, then you will be deemed NOT to consent to the Third Party Release set forth in Article X.B.2 of the Plan. PLEASE BE ADVISED THAT BY NOT CHECKING THE BOX BELOW YOU ELECT TO GRANT THE THIRD PARTY RELEASE IN EACH AND EVERY CAPACITY IN WHICH YOU HOLD A CLAIM AGAINST, OR INTEREST IN, ANY OF THE DEBTORS. YOU MUST AFFIRMATIVELY CHECK THE BOX BELOW IN ORDER TO OPT-OUT OF THE THIRD PARTY RELEASE.**

**PLEASE ALSO BE ADVISED THAT THE DEBTOR RELEASE CONTAINED IN ARTICLE X.B.1 OF THE PLAN WILL BE INCLUDED IN THE CONFIRMATION ORDER AND THAT IT IS SEPARATE FROM AND INDEPENDENT OF THE THIRD PARTY RELEASE. IF YOU OBJECT TO THE DEBTOR RELEASE, YOU MUST FILE A SEPARATE OBJECTION WITH THE BANKRUPTCY COURT IN ACCORDANCE WITH THE PROCEDURES DESCRIBED IN THE DISCLOSURE STATEMENT ORDER.**

☐ OPT-OUT ELECTION: The undersigned elects to opt-out of the Third Party Release contained in Article X.B.2 of the Plan.

**Item 3. Certifications.**

By signing this Ballot, the undersigned certifies to the Bankruptcy Court and the Debtors:

a. that either: (i) the undersigned is the Holder of the Class 5 – General Unsecured Claims being voted; or (ii) the undersigned is an authorized signatory for an Entity that is a Holder of the Class 5 – General Unsecured Claims being voted, and, in either case, has full power and authority to vote to accept or reject the Plan with respect to the Claims identified in Item 1 above;

b. that the undersigned (or in the case of an authorized signatory, the Holder) has received a copy of the Disclosure Statement and the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

c. that the undersigned has cast the same vote with respect to all Class 5 – General Unsecured Claims in a single Class; and

d. that no other Ballots with respect to the amount of the Class 5 – General Unsecured Claims identified in Item 1 above have been cast or, if any other Ballots have been cast with respect to such Class 5 Claims, then any such earlier Ballots are hereby revoked.

YOUR RECEIPT OF THIS BALLOT DOES NOT SIGNIFY THAT YOUR CLAIM OR INTEREST HAS BEEN OR WILL BE ALLOWED.

3

| | |
|---|---|
| **Name of Holder:** | |
| | **(Print or Type)** |
| **Social Security or Federal Tax Identification Number:** | |
| **Signature:** | |
| **Name of Signatory:** | |
| | **(If other than Holder)** |
| **Title:** | |
| **Address:** | |
| | |
| | |
| | |
| **Date Completed:** | |

No fees, commissions or other remuneration will be payable to any person for soliciting votes on the Plan.

If your address or contact information has changed, please note the new information here.

**PLEASE COMPLETE, SIGN AND DATE THIS BALLOT AND RETURN IT <u>PROMPTLY</u> IN THE ENVELOPE PROVIDED TO THE ADDRESSEE SPECIFIED THEREON.**

IF THE VOTING AND CLAIMS AGENT DOES NOT <u>ACTUALLY</u> <u>RECEIVE</u> THIS BALLOT OR BEFORE 5:00 P.M. PREVAILING CENTRAL TIME ON SEPTEMBER 18, 2020, THEN YOUR VOTE TRANSMITTED BY THIS BALLOT WILL <u>NOT</u> BE COUNTED TOWARD CONFIRMATION OF THE PLAN.

BALLOTS SENT BY FACSIMILE, TELECOPY, OR ELECTRONIC MAIL (OTHER THAN THROUGH THE VOTING AND CLAIMS AGENT'S ONLINE PORTAL IN ACCORDANCE WITH THE BELOW)  WILL <u>NOT</u> BE ACCEPTED

4

US-DOCS\116659544.12

| Class 5 – General Unsecured Claims |
|---|

**INSTRUCTIONS FOR COMPLETING THIS BALLOT**

1.     The Debtors are soliciting the votes of Holders of Claims with respect to the Plan attached as Exhibit A to the Disclosure Statement.  Capitalized terms used in the Ballot or in these instructions (the "**Ballot Instructions**") but not otherwise defined therein or herein shall have the meaning set forth in the Plan, a copy of which also accompanies the Ballot.

2.     To ensure that your vote is counted, you <u>must</u> complete the Ballot and take the following steps:  (a) make sure that the information required by Item 1 above has been correctly inserted; (b) clearly indicate your decision either to accept or reject the Plan in the boxes provided in Item 2 above; <u>and</u> (c) sign, date and return an original of your Ballot in accordance with paragraph 3 directly below.

3.     **Return of Ballots**:  Your Ballot MUST be returned to the Voting and Claims Agent so as to be **actually received** by the Voting and Claims Agent on or before the Voting Deadline, which is 5:00 p.m. Prevailing Central Time on September 18, 2020.  To ensure your vote is counted toward confirmation of the Plan, you must return your completed Ballot <u>directly to the Voting and Claims Agent</u> so that it is **actually received** by the Voting and Claims Agent on or before the Voting Deadline.  To submit your Ballot via the Voting and Claims Agent's online portal, please visit www.kccllc.net/hicrush. Click on the "E-Ballot" section of the website and follow the instructions to submit your Ballot, using your Unique E-Ballot Form ID# set forth above..

4.     If a Ballot is received by the Voting and Claims Agent <u>after</u> the Voting Deadline, it will not be counted, unless the Debtors have granted an extension of the Voting Deadline in writing with respect to such Ballot. Additionally**,** the following Ballots will <u>NOT</u> be counted:

> ➢ ANY BALLOT THAT IS ILLEGIBLE OR CONTAINS INSUFFICIENT INFORMATION TO PERMIT THE IDENTIFICATION OF THE HOLDER OF THE CLAIM;

> ➢ ANY BALLOT CAST BY OR ON BEHALF OF AN ENTITY THAT DOES NOT HOLD A CLAIM IN ONE OF THE VOTING CLASSES;

> ➢ ANY BALLOT CAST FOR A CLAIM LISTED IN THE SCHEDULES AS CONTINGENT, UNLIQUIDATED OR DISPUTED FOR WHICH THE APPLICABLE BAR DATE HAS PASSED AND NO PROOF OF CLAIM WAS TIMELY FILED;

> ➢ ANY BALLOT THAT (A) IS PROPERLY COMPLETED, EXECUTED AND TIMELY FILED, BUT DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN, OR (B) INDICATES BOTH AN ACCEPTANCE AND REJECTION OF THE PLAN, OR (C) PARTIALLY ACCEPTS AND PARTIALLY REJECTS THE PLAN;

> ➢ ANY BALLOT CAST FOR A CLAIM THAT IS SUBJECT TO AN OBJECTION PENDING AS OF THE VOTING RECORD DATE (EXCEPT AS OTHERWISE PROVIDED IN THE DISCLOSURE STATEMENT ORDER);

> ➢ ANY BALLOT SENT TO THE DEBTORS, THE DEBTORS' AGENTS/REPRESENTATIVES (OTHER THAN THE VOTING AND CLAIMS AGENT), ANY INDENTURE TRUSTEE OR THE DEBTORS' FINANCIAL OR LEGAL ADVISORS;

> ➢ ANY BALLOT TRANSMITTED BY FACSIMILE, TELECOPY, OR ELECTRONIC MAIL (OTHER THAN THROUGH THE VOTING AND CLAIMS AGENT'S ONLINE PORTAL;

> ➢ ANY UNSIGNED BALLOT; OR

US-DOCS\116659544.12

> ANY BALLOT NOT CAST IN ACCORDANCE WITH THE PROCEDURES APPROVED IN THE DISCLOSURE STATEMENT ORDER.

5.   The method of delivery of Ballots to the Voting and Claims Agent is at the election and risk of each Holder of a General Unsecured Claim.  Except as otherwise provided herein, such delivery will be deemed made to the Voting and Claims Agent only when the Voting and Claims Agent **actually receives** the originally executed Ballot.  Instead of effecting delivery by first-class mail, it is recommended, though not required, that Holders use an overnight or hand delivery service.  In all cases, Holders should allow sufficient time to assure timely delivery.

6.   If multiple Ballots are received from the same Holder of a Class 5 – General Unsecured Claim with respect to the same Class 5 Claim prior to the Voting Deadline, the last Ballot timely received will supersede and revoke any earlier received Ballots.

7.   You must vote all of your General Unsecured Claims within Class 5 either to accept or reject the Plan and may not split your vote.  Further, if a Holder has multiple General Unsecured Claims within Class 5, the Debtors may, in their discretion, aggregate the Claims of any particular Holder with multiple General Unsecured Claims within Class 5 for the purpose of counting votes.

8.   The Ballot is not a letter of transmittal and may not be used for any purpose other than (i) to vote to accept or reject the Plan and (ii) opt-out of the Third Party Release.  Accordingly, at this time, Holders of Claims should not surrender certificates or instruments representing or evidencing their Claims, and neither the Debtors nor the Voting and Claims Agent will accept delivery of any such certificates or instruments surrendered together with a Ballot.

9.   This Ballot does not constitute, and shall not be deemed to be, (a) a proof of Claim or (b) an assertion or admission of a Claim.

10.  Please be sure to sign and date your Ballot.  If you are signing a Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Voting and Claims Agent, the Debtors or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Holder.  In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Ballot.

11.  If you hold Claims in more than one Class under the Plan you may receive more than one Ballot coded for each different Class.  Each Ballot votes only your Claims indicated on that Ballot, so please complete and return each Ballot and/or Ballot that you received.

**PLEASE RETURN YOUR BALLOT PROMPTLY!**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE VOTING INSTRUCTIONS OR PROCEDURES, PLEASE CONTACT THE VOTING AND CLAIMS AGENT AT: 866-554-5810 (Toll Free U.S. and Canada) or 781-575-2032 (International) Or via email: HiCrushinfo@kccllc.com**

> **IF THE VOTING AND CLAIMS AGENT DOES NOT ACTUALLY RECEIVE THIS BALLOT FROM YOU BEFORE THE VOTING DEADLINE, WHICH IS 5:00 P.M. PREVAILING CENTRAL TIME ON SEPTEMBER 18, 2020, THEN YOUR VOTE TRANSMITTED HEREBY WILL NOT BE COUNTED.**

NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, REGARDING THE DEBTORS OR THE PLAN, OTHER THAN WHAT IS CONTAINED IN THE SOLICITATION PACKAGE MAILED HEREWITH.

**PLEASE BE ADVISED THAT THE PLAN CONTAINS CERTAIN RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, INCLUDING THOSE LISTED BELOW. YOU ARE ADVISED AND ENCOURAGED TO CAREFULLY REVIEW AND CONSIDER THE PLAN, INCLUDING THE RELEASE, EXCULPATION AND INJUNCTION PROVISIONS, AS YOUR RIGHTS MIGHT BE AFFECTED.**

**Article X.B – <u>Release of Claims and Causes of Action</u>**

1. ***<u>Release by the Debtors and their Estates</u>.* Pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, and except as otherwise expressly provided in the Plan, effective as of the Effective Date, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, the Debtors and the Reorganized Debtors, in their respective individual capacities and as debtors-in-possession, and on behalf of themselves and their respective Estates, including, without limitation, any successor to the Debtors or any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code (collectively, the "<u>Debtor Releasing Parties</u>") shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver and release to each of the Released Parties (and each such Released Party so released shall be deemed forever released, waived and discharged by the Debtor Releasing Parties) and their respective assets and properties (the "<u>Debtor Release</u>") from any and all Claims, Causes of Action, and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of the Debtors or their Affiliates, including, without limitation, (i) the Chapter 11 Cases, the Disclosure Statement, the Plan, the Restructuring Support Agreement, the Backstop Purchase Agreement, the Rights Offering, the Restructuring Documents, the Prepetition Debt Documents, and the DIP Loan Documents, (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, the Backstop Purchase Agreement, the Rights Offering, the Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Documents, the Prepetition Debt Documents, the DIP Loan Documents, or related agreements, instruments or other documents, (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale, or rescission of the purchase or sale of any Equity Interest or Plan Securities of the Debtors or the Reorganized Debtors, and/or (vii) the Confirmation or Consummation of the Plan or the solicitation of votes on the Plan that such Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) or that any Holder of a Claim or Equity Interest or other Person or Entity would have been legally entitled to assert for, or on behalf or in the name of, any Debtor, its respective Estate or any Reorganized Debtor (whether directly or derivatively) against any of the Released Parties; *provided*, *however*, that the foregoing provisions of this Debtor Release shall not operate to waive or release (A) the rights of such Debtor Releasing Party to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with the Plan (including, without limitation, the Exit Facility Loan Documents and the New Secured Convertible Notes Documents) or assumed or assumed and assigned, as applicable, pursuant to the Plan or pursuant to a Final Order of the Bankruptcy Court and (B) claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes a criminal act, fraud, willful misconduct, or gross negligence, in each case as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction. The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity and the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Debtor Release. Notwithstanding the

7

US-DOCS\116659544.12

foregoing, nothing in this <u>Article X.B.</u> shall or shall be deemed to (i) prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person or Entity that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors and/or (ii) operate as a release or waiver of any Intercompany Claims, in each case unless otherwise expressly provided for in this Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims released by the Debtor Release; (iii) in the best interest of the Debtors and their Estates; (iv) fair, equitable and reasonable; (v) given and made after due notice and opportunity for hearing; and (vi) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any claim or Cause of Action released pursuant to the Debtor Release.

2.    *<u>Release By Third Parties</u>.*  Except as otherwise expressly provided in the Plan, effective as of the Effective Date, to the fullest extent permitted by applicable law, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, and without limiting or otherwise modifying the scope of the Debtor Release provided by the Debtor Releasing Parties above, each Non-Debtor Releasing Party (together with the Debtor Releasing Parties, the "<u>Releasing Parties</u>") shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver, and release to each of the Released Parties (and each such Released Party so released shall be deemed forever released, waived, and discharged by the Non-Debtor Releasing Parties) and their respective assets and properties (the "<u>Third Party Release</u>") from any and all Claims, Causes of Action, and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of the Debtors or their Affiliates, including, without limitation, (i) the Chapter 11 Cases, the Disclosure Statement, the Plan, the Restructuring Support Agreement, the Backstop Purchase Agreement, the Rights Offering, the Restructuring Documents, the Prepetition Debt Documents, and the DIP Loan Documents, (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, the Backstop Purchase Agreement, the Rights Offering, this Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Documents, the Prepetition Debt Documents, the DIP Loan Documents, or related agreements, instruments or other documents, (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale or rescission of the purchase or sale of any Equity Interest or Plan Securities of the Debtors or the Reorganized Debtors, and/or (vii) the Confirmation or Consummation of the Plan or the solicitation of votes on this Plan that such Non-Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) against any of the Released Parties; *<u>provided</u>*, *<u>however</u>*, that the foregoing provisions of this Third Party Release shall not operate to waive or release (A) the rights of such Non-Debtor Releasing Party to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan (including, without limitation, the Exit Facility Loan Documents and the New Secured Convertible Notes Documents) or assumed or assumed and assigned, as applicable, pursuant to the Plan or pursuant to a Final Order of the Bankruptcy Court and (B) claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes a criminal act, fraud, willful misconduct, or gross negligence, in each case as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction.  The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity and the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Third Party Release.

8

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third Party Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Third Party Release is:  (i) consensual; (ii) essential to the confirmation of the Plan; (iii) in exchange for the good and valuable consideration provided by the Released Parties; (iv) a good faith settlement and compromise of the Claims released by the Third Party Release; (v) in the best interest of the Debtors and all Holders of Claims and Equity Interests; (vi) fair, equitable and reasonable; (vii) given and made after due notice and opportunity for hearing; and (viii) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third Party Release.

**Article X.E – <u>Exculpation</u>**

Effective as of the Effective Date, to the fullest extent permitted by law, the Exculpated Parties shall neither have nor incur any liability to any Person or Entity for any claims or Causes of Action arising prior to or on the Effective Date for any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Confirmation or Consummation of this Plan, the Disclosure Statement, the Restructuring Documents, the Rights Offering, the Prepetition Debt Documents, the DIP Loan Documents, or any contract, instrument, release or other agreement or document created or entered into in connection with this Plan, including the Restructuring Support Agreement and the Backstop Purchase Agreement, or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the approval of the Disclosure Statement or Confirmation or Consummation of this Plan; <u>provided</u>, <u>however</u>, that the foregoing provisions of this exculpation shall not operate to waive or release: (i) any Causes of Action arising from willful misconduct, actual fraud, or gross negligence of such applicable Exculpated Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; and/or (ii) the rights of any Person or Entity to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements and documents delivered under or in connection with this Plan or assumed pursuant to this Plan or Final Order of the Bankruptcy Court; <u>provided</u>, <u>further</u>, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its respective duties pursuant to, or in connection with, the above referenced documents, actions or inactions.  The foregoing exculpation shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity.  Notwithstanding the foregoing, nothing in this <u>Article X.E</u> shall or shall be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person or Entity that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors, in each case unless otherwise expressly provided for in the Plan.

**Article X.G – <u>Injunction</u>**

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, FROM AND AFTER THE EFFECTIVE DATE, ALL PERSONS AND ENTITIES ARE, TO THE FULLEST EXTENT PROVIDED UNDER SECTION 524 AND OTHER APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, PERMANENTLY ENJOINED FROM (I) COMMENCING OR CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY SUIT, ACTION OR OTHER PROCEEDING; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING IN ANY MANNER ANY JUDGMENT, AWARD, DECREE, OR ORDER; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE; (IV) ASSERTING A SETOFF OR RIGHT OF SUBROGATION OF ANY KIND; OR (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND,  IN EACH CASE ON ACCOUNT OF OR WITH RESPECT TO ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, EQUITY INTEREST, OR REMEDY RELEASED OR TO BE RELEASED, EXCULPATED OR TO BE EXCULPATED, SETTLED OR TO BE SETTLED OR DISCHARGED OR TO BE DISCHARGED PURSUANT TO THIS PLAN OR THE CONFIRMATION ORDER AGAINST ANY PERSON OR ENTITY SO RELEASED, DISCHARGED, OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY PERSON OR ENTITY SO RELEASED, DISCHARGED, OR EXCULPATED).  ALL INJUNCTIONS OR STAYS PROVIDED FOR IN THE CHAPTER 11 CASES UNDER SECTION 105 OR SECTION 362 OF THE**

US-DOCS\116659544.12

**BANKRUPTCY CODE, OR OTHERWISE, AND IN EXISTENCE ON THE CONFIRMATION DATE, SHALL REMAIN IN FULL FORCE AND EFFECT UNTIL THE EFFECTIVE DATE.**

**Article X.H – <u>Binding Nature Of Plan</u>**

      **ON THE EFFECTIVE DATE, AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE PLAN SHALL BIND, AND SHALL BE DEEMED BINDING UPON, THE DEBTORS, THE REORGANIZED DEBTORS, ANY AND ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS, ALL PERSONS AND ENTITIES THAT ARE PARTIES TO OR ARE SUBJECT TO THE SETTLEMENTS, COMPROMISES, RELEASES, EXCULPATIONS, DISCHARGES, AND INJUNCTIONS DESCRIBED IN THE PLAN, EACH PERSON AND ENTITY ACQUIRING PROPERTY UNDER THIS PLAN, ANY AND ALL NON-DEBTOR PARTIES TO EXECUTORY CONTRACTS AND UNEXPIRED LEASES WITH THE DEBTORS AND THE RESPECTIVE SUCCESSORS AND ASSIGNS OF EACH OF THE FOREGOING, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, AND NOTWITHSTANDING WHETHER OR NOT SUCH PERSON OR ENTITY (I) WILL RECEIVE OR RETAIN ANY PROPERTY, OR INTEREST IN PROPERTY, UNDER THE PLAN, (II) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASES OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN, AFFIRMATIVELY VOTED TO REJECT THIS PLAN OR IS CONCLUSIVELY PRESUMED TO REJECT THE PLAN.**

**<u>Relevant Definitions Related to Release and Exculpation Provisions</u>:**

    "*Exculpated Parties*" means, collectively, the following:

      (a) the Debtors;

      (b) the Reorganized Debtors;

      (c) the Prepetition Credit Agreement Agent;

      (d) the Prepetition Credit Agreement Lenders;

      (e) the Prepetition Notes Indenture Trustee;

      (f) the DIP Agents;

      (g) the DIP Lenders;

      (h) the Ad Hoc Noteholder Committee and the members thereof in their capacities as such;

      (i) the Consenting Noteholders;

      (j) the Backstop Parties;

      (k) the Distribution Agents;

      (l) the Exit Facility Agent;

      (m) the Exit Facility Lenders;

      (n) the New Secured Convertible Notes Indenture Trustee;

      (o) the New Secured Convertible Noteholders;

      (p) the Releasing Old Parent Interestholders; and

10

US-DOCS\116659544.12

(q) with respect to each of the foregoing Persons or Entities in clauses (a) through (p), the Related Persons of each such Person or Entity, in each case solely in their capacity as such.

"*Indemnified Parties*" means each of the Debtors' and their respective subsidiaries' current and former directors, officers, and managers in their respective capacities as such, and solely to the extent that such Person was serving in such capacity on or any time after the Petition Date; <u>provided</u>, that the Designated Persons shall not be Indemnified Parties under the Plan.

"*Non-Debtor Releasing Parties*" means, collectively, the following:

(a) the Prepetition Credit Agreement Agent;

(b) the Prepetition Credit Agreement Lenders;

(c) the Prepetition Notes Indenture Trustee;

(d) the DIP Agents;

(e) the DIP Lenders;

(f) the Ad Hoc Noteholder Committee and the members thereof in their capacities as such;

(g) the Releasing Prepetition Noteholders;

(h) the Backstop Parties;

(i) the Distribution Agents;

(j) the Exit Facility Agent and the Exit Facility Lenders;

(k) the New Secured Convertible Notes Indenture Trustee and the New Secured Convertible Noteholders;

(l) those Holders of Claims deemed to accept the Plan that do not affirmatively opt out of the Third Party Release as provided on their respective Ballots/Opt-Out Forms;

(m) those Holders of General Unsecured Claims that do not affirmatively opt out of the Third Party Release as provided on their respective Ballots/Opt-Out Forms;

(n) all Holders of Claims that vote to accept the Plan; and

(o) the Releasing Old Parent Interestholders.

"Released Party" means, collectively, the following:

(a) the Debtors;

(b) the Reorganized Debtors;

(c) the Prepetition Credit Agreement Agent;

(d) the Prepetition Credit Agreement Lenders;

(e) the Prepetition Notes Indenture Trustee;

11

(f) the DIP Agents;

(g) the DIP Lenders;

(h) the Ad Hoc Noteholder Committee and the members thereof in their capacities as such;

(i) the Releasing Prepetition Noteholders;

(j) the Backstop Parties;

(k) the Distribution Agents;

(l) the Exit Facility Agent and the Exit Facility Lenders;

(m) the New Secured Convertible Notes Indenture Trustee and the New Secured Convertible Noteholders;

(n) the Releasing Old Parent Interestholders; and

(o) with respect to each of the foregoing Persons or Entities in clauses (a) through (n), the Related Persons of each such Person or Entity, in each case solely in their capacity as such; provided, that the Designated Persons shall not be Released Parties under the Plan.

12

**Exhibit 7**

**Notice of Limited Voting Status to Holders of Contingent, Unliquidated, or Disputed Claims for Which No Objection Has Been Filed**

US-DOCS\116659544.12

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

```
------------------------------------------------------------- x
In re:                                           :    Chapter 11
                                                 :
HI-CRUSH INC., et al.,¹                          :    Case No. 20-33496 (DRJ)
                                                 :
              Debtors.                           :    (Jointly Administered)
                                                 :
------------------------------------------------------------- x
```

**NOTICE OF LIMITED VOTING STATUS TO
HOLDERS OF CONTINGENT, UNLIQUIDATED, OR
DISPUTED CLAIMS FOR WHICH NO OBJECTION HAS BEEN FILED**

    **PLEASE TAKE NOTICE THAT** Hi-Crush Inc. and its affiliated debtors, as debtors and debtors in possession (collectively, the "**Debtors**") have commenced solicitation of votes to accept the *Joint Plan of Reorganization for Hi-Crush Inc. and Its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code* (as may be amended, modified, or supplemented from time to time, the "**Plan**").[2] Copies of the Plan and the *Disclosure Statement for Joint Plan of Reorganization for Hi-Crush Inc. and its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code* (as may be amended, modified or supplemented from time to time, the "**Disclosure Statement**") may be obtained free of charge by visiting the website maintained by the Debtors' voting and claims agent, Kurtzman Carson Consultants LLC (the "**Voting and Claims Agent**"), at www.kccllc.net/hicrush. Copies of the Plan and Disclosure Statement may also be obtained by calling the Voting and Claims Agent at 866-554-5810 (US and Canada) or 781-575-2032 (international) or by sending an electronic mail message to HiCrushinfo@kccllc.com with "Hi-Crush" in the subject line.

    **PLEASE TAKE FURTHER NOTICE THAT** you are receiving this notice because you are the Holder of a Claim that has filed a Proof of Claim, which, in whole or in part, reflects a contingent, unliquidated, or disputed claim, but which is not subject to an objection filed by the Debtors. Along with this notice, you have been provided (i) a Solicitation Package that contains a Ballot and (ii) the Confirmation Hearing Notice. As a result of the status of your claim as contingent, unliquidated, or disputed, your vote will be counted for numerosity purposes and

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Hi-Crush Inc. (0530), OnCore Processing LLC (9403), Hi-Crush Augusta LLC (0668), Hi-Crush Whitehall LLC (5562), PDQ Properties LLC (9169), Hi-Crush Wyeville Operating LLC (5797), D & I Silica, LLC (9957), Hi-Crush Blair LLC (7094), Hi-Crush LMS LLC, Hi-Crush Investments Inc. (6547), Hi-Crush Permian Sand LLC, Hi-Crush Proppants LLC (0770), Hi-Crush PODS LLC, Hi-Crush Canada Inc. (9195), Hi-Crush Holdings LLC , Hi-Crush Services LLC (6206), BulkTracer Holdings LLC (4085), Pronghorn Logistics Holdings, LLC (5223), FB Industries USA Inc. (8208), PropDispatch LLC, Pronghorn Logistics, LLC (4547), and FB Logistics, LLC (8641). The Debtors' address is 1330 Post Oak Blvd, Suite 600, Houston, Texas 77056.

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

US-DOCS\116659544.12

allowed in the amount of $1.00 for voting purposes only.  You must return your Ballot according to the instructions listed therein so it is **actually received** by the Voting and Claims Agent on or before September 18, 2020 (the "**Voting Deadline**") otherwise your vote will not be counted.  If you disagree with the Debtors' classification or status of your Claim, then you MUST file with the Bankruptcy Court and serve upon the Notice Parties listed below, on or before 5:00 p.m. (Prevailing Central Time) on August 30, 2020 (the "**Rule 3018(a) Motion Deadline**"), a motion requesting temporary allowance of your Claim in a specified amount solely for voting purposes in accordance with Bankruptcy Rule 3018 (such motion, the "**Rule 3018(a) Motion**").  Please be advised that the Debtors reserve all of their rights and objections regarding any and all Rule 3018(a) Motions that may be filed with the Bankruptcy Court and that the distribution of a Solicitation Package is not and shall not constitute a waiver or release of such rights and objections. In the event that your Rule 3018(a) Motion is granted, the Debtors will revise the amount of your Claim in the amount approved by the Bankruptcy Court for purposes of tabulating your vote.  You will not receive a new Ballot with a revised Claim amount.

        **PLEASE TAKE FURTHER NOTICE THAT** a hearing (the "**Confirmation Hearing**") is scheduled for September 23, 2020 at 2:00 p.m. (Prevailing Central Time) to consider confirmation of the Plan.  The Confirmation Hearing will take place in Courtroom 400, 4th Floor, 515 Rusk Street, Houston, TX 77002 or via videoconference, if necessary.[3]  The Confirmation Hearing may be continued from time to time by the Bankruptcy Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Bankruptcy Court and served on such parties as the Bankruptcy Court may order.  Moreover, the Plan may be modified or amended, if necessary, pursuant to section 1127 of the Bankruptcy Code, prior to, during or as a result of the Confirmation Hearing, without further notice to parties in interest.

        **PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the Plan is **September 18, 2020 at 5:00 p.m. (Prevailing Central Time)** (the "**Confirmation Objection Deadline**").  Any objection to the Plan must: (i) be in writing; (ii) conform to the Bankruptcy Rules and the Bankruptcy Local Rules; (iii) state the name and address of the objecting party and the amount and nature of the Claim of such Entity; (iv) state with particularity the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (v) be filed, contemporaneously with a proof of service, with the Bankruptcy Court no later than the Confirmation Objection Deadline and served on the parties listed below (the "**Notice Parties**"). CONFIRMATION OBJECTIONS NOT TIMELY FILED

---

[3]       If the hearing occurs over videoconference the Court will utilize GoToMeeting for the hearing.  You should download the free GoToMeeting application on each device that will be used to connect to the hearing.  If you choose to connect via a web browser, available literature suggests that Chrome is the preferred browser. Please note that connecting through a browser may limit the availability of some GoToMeeting features.  To connect to the hearing, you should enter the meeting code "JudgeJones".  You can also connect using the link on Judge Jones' homepage on the Southern District of Texas website.  Once connected to GoToMeeting, click the settings icon in the upper right corner and enter your name under the personal information setting.  In either event, audio for the Confirmation Hearing will be available by using the Court's regular dial-in number. The dial-in number is +1 (832) 917-1510.  You will be responsible for your own long-distance charges.  You will be asked to key in the conference room number.  Judge Jones' conference room number is 205691..

2

AND SERVED IN THE MANNER SET FORTH HEREIN MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND MAY BE OVERRULED WITHOUT FURTHER NOTICE.

Notice Parties.  The Notice Parties include:

- Counsel to the Debtors: Latham & Watkins LLP, 885 Third Avenue, New York, NY 10022 (Attn: Keith A. Simon, Esq. and Annemarie V. Reilly, Esq.) (keith.simon@lw.com and annemarie.reilly@lw.com) and Hunton Andrews Kurth LLP, 600 Travis Street, Suite 4200, Houston, TX (Attn: Timothy A. Davidson II, Esq. and Ashley L. Harper, Esq.) (TadDavidson@HuntonAK.com and AshleyHarper@HuntonAK.com);

- Counsel to the DIP ABL Agent: Simpson, Thacher & Bartlett LLP, 425 Lexington Avenue, New York, NY 10017 (Attn: Elisha Graff, Esq. and Daniel L. Biller, Esq.) (egraff@stblaw.com and dbiller@stblaw.com);

- Counsel to the Ad Hoc Noteholders Committee: Paul, Weiss, Rifkind, Wharton & Garrison, LLP, 1285 Avenue of the Americas, New York, NY 10019 (Attn: Brian S. Hermann, Esq. and Elizabeth R. McColm, Esq.) (bhermann@paulweiss.com and emccolm@paulweiss.com) and Porter Hedges LLP, 1000 Main St., 36th Floor, Houston, TX 77002 (Attn: John F. Higgins, Esq.) (JHiggins@porterhedges.com);

- Counsel to any statutory committee appointed in these Chapter 11 Cases; and

- the Office of the United States Trustee for the Southern District of Texas, 515 Rusk Street, Suite 3516, Houston, TX 77002 (Attn: Stephen Statham, Esq. and Hector Duran, Esq.) (stephen.statham@usdoj.gov and hector.duranjr@usdoj.gov).

---

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, PLEASE CONTACT THE VOTING AND CLAIMS AGENT AT THE NUMBER OR ADDRESS SPECIFIED ABOVE. PLEASE NOTE THAT THE VOTING AND CLAIMS AGENT CANNOT PROVIDE LEGAL ADVICE.**

---

[_____], 2020
Houston, Texas

3

US-DOCS\116659544.12

4

| HUNTON ANDREWS KURTH LLP | LATHAM & WATKINS LLP |
|---|---|
| Timothy A. ("Tad") Davidson II<br>Ashley L. Harper<br>600 Travis Street, Suite 4200<br>Houston, Texas 77002<br>Telephone:  (713) 220-4200<br>Facsimile:   (713) 220-4285 | George A. Davis<br>Keith A. Simon<br>David A. Hammerman<br>Annemarie V. Reilly<br>Hugh K. Murtagh<br>885 Third Avenue<br>New York, New York 10022<br>Telephone:  (212) 906-1200<br>Facsimile:   (212) 751-4864 |
| [Proposed] Counsel for the Debtors and Debtors-in-Possession ||

US-DOCS\116659544.12

**<u>NOTICE REGARDING CERTAIN RELEASE, EXCULPATION AND INJUNCTION
PROVISIONS IN THE PLAN</u>**

**PLEASE BE ADVISED THAT THE PLAN CONTAINS CERTAIN RELEASE,
EXCULPATION, AND INJUNCTION PROVISIONS, INCLUDING THOSE LISTED
BELOW.  YOU ARE ADVISED AND ENCOURAGED TO CAREFULLY REVIEW AND
CONSIDER THE PLAN, INCLUDING THE RELEASE, EXCULPATION AND
INJUNCTION PROVISIONS, AS YOUR RIGHTS MIGHT BE AFFECTED.**

**Article X.B – <u>Release of Claims and Causes of Action</u>**

1.      ***Release by the Debtors and their Estates.***  **Pursuant to section 1123(b) and any other
applicable provisions of the Bankruptcy Code, and except as otherwise expressly provided in the
Plan, effective as of the Effective Date, for good and valuable consideration provided by each of the
Released Parties, the adequacy and sufficiency of which is hereby confirmed, the Debtors and the
Reorganized Debtors, in their respective individual capacities and as debtors-in-possession, and on
behalf of themselves and their respective Estates, including, without limitation, any successor to the
Debtors or any Estate representative appointed or selected pursuant to section 1123(b)(3) of the
Bankruptcy Code (collectively, the "<u>Debtor Releasing Parties</u>") shall be deemed to have conclusively,
absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver and release to
each of the Released Parties (and each such Released Party so released shall be deemed forever
released, waived and discharged by the Debtor Releasing Parties) and their respective assets and
properties (the "<u>Debtor Release</u>") from any and all Claims, Causes of Action, and any other debts,
obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or
unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective
Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of
federal or state securities laws, or otherwise, based in whole or in part upon any act or omission,
transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective
Date arising from or related in any way in whole or in part to any of the Debtors or their Affiliates,
including, without limitation, (i) the Chapter 11 Cases, the Disclosure Statement, the Plan, the
Restructuring Support Agreement, the Backstop Purchase Agreement, the Rights Offering, the
Restructuring Documents, the Prepetition Debt Documents, and the DIP Loan Documents, (ii) the
subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is
treated in the Plan, (iii) the business or contractual arrangements between any Debtor and any
Released Parties, (iv) the negotiation, formulation or preparation of the Restructuring Support
Agreement, the Backstop Purchase Agreement, the Rights Offering, the Plan, the Disclosure
Statement, the Plan Supplement, the Restructuring Documents, the Prepetition Debt Documents, the
DIP Loan Documents, or related agreements, instruments or other documents, (v) the restructuring
of Claims or Equity Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale, or
rescission of the purchase or sale of any Equity Interest or Plan Securities of the Debtors or the
Reorganized Debtors, and/or (vii) the Confirmation or Consummation of the Plan or the solicitation
of votes on the Plan that such Debtor Releasing Party would have been legally entitled to assert
(whether individually or collectively) or that any Holder of a Claim or Equity Interest or other Person
or Entity would have been legally entitled to assert for, or on behalf or in the name of, any Debtor,
its respective Estate or any Reorganized Debtor (whether directly or derivatively) against any of the
Released Parties; *provided*, *however*, that the foregoing provisions of this Debtor Release shall not
operate to waive or release (A) the rights of such Debtor Releasing Party to enforce the Plan and the
contracts, instruments, releases, indentures, and other agreements or documents delivered under or
in connection with the Plan (including, without limitation, the Exit Facility Loan Documents and the
New Secured Convertible Notes Documents) or assumed or assumed and assigned, as applicable,**

5

pursuant to the Plan or pursuant to a Final Order of the Bankruptcy Court and (B) claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes a criminal act, fraud, willful misconduct, or gross negligence, in each case as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction. The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity and the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Debtor Release. Notwithstanding the foregoing, nothing in this **Article X.B.** shall or shall be deemed to (i) prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person or Entity that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors and/or (ii) operate as a release or waiver of any Intercompany Claims, in each case unless otherwise expressly provided for in this Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims released by the Debtor Release; (iii) in the best interest of the Debtors and their Estates; (iv) fair, equitable and reasonable; (v) given and made after due notice and opportunity for hearing; and (vi) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any claim or Cause of Action released pursuant to the Debtor Release.

2.    *Release By Third Parties*. Except as otherwise expressly provided in the Plan, effective as of the Effective Date, to the fullest extent permitted by applicable law, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, and without limiting or otherwise modifying the scope of the Debtor Release provided by the Debtor Releasing Parties above, each Non-Debtor Releasing Party (together with the Debtor Releasing Parties, the "**Releasing Parties**") shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver, and release to each of the Released Parties (and each such Released Party so released shall be deemed forever released, waived, and discharged by the Non-Debtor Releasing Parties) and their respective assets and properties (the "**Third Party Release**") from any and all Claims, Causes of Action, and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of the Debtors or their Affiliates, including, without limitation, (i) the Chapter 11 Cases, the Disclosure Statement, the Plan, the Restructuring Support Agreement, the Backstop Purchase Agreement, the Rights Offering, the Restructuring Documents, the Prepetition Debt Documents, and the DIP Loan Documents, (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, the Backstop Purchase Agreement, the Rights Offering, this Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Documents, the Prepetition Debt Documents, the DIP Loan Documents, or related agreements, instruments or other documents, (v) the restructuring of Claims or Equity Interests

6

prior to or during the Chapter 11 Cases, (vi) the purchase, sale or rescission of the purchase or sale of any Equity Interest or Plan Securities of the Debtors or the Reorganized Debtors, and/or (vii) the Confirmation or Consummation of the Plan or the solicitation of votes on this Plan that such Non-Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) against any of the Released Parties; *provided*, *however*, that the foregoing provisions of this Third Party Release shall not operate to waive or release (A) the rights of such Non-Debtor Releasing Party to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan (including, without limitation, the Exit Facility Loan Documents and the New Secured Convertible Notes Documents) or assumed or assumed and assigned, as applicable, pursuant to the Plan or pursuant to a Final Order of the Bankruptcy Court and (B) claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes a criminal act, fraud, willful misconduct, or gross negligence, in each case as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction.  The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity and the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Third Party Release.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third Party Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Third Party Release is:  (i) consensual; (ii) essential to the confirmation of the Plan; (iii) in exchange for the good and valuable consideration provided by the Released Parties; (iv) a good faith settlement and compromise of the Claims released by the Third Party Release; (v) in the best interest of the Debtors and all Holders of Claims and Equity Interests; (vi) fair, equitable and reasonable; (vii) given and made after due notice and opportunity for hearing; and (viii) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third Party Release.

## Article X.E – <u>Exculpation</u>

Effective as of the Effective Date, to the fullest extent permitted by law, the Exculpated Parties shall neither have nor incur any liability to any Person or Entity for any claims or Causes of Action arising prior to or on the Effective Date for any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Confirmation or Consummation of this Plan, the Disclosure Statement, the Restructuring Documents, the Rights Offering, the Prepetition Debt Documents, the DIP Loan Documents, or any contract, instrument, release or other agreement or document created or entered into in connection with this Plan, including the Restructuring Support Agreement and the Backstop Purchase Agreement, or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the approval of the Disclosure Statement or Confirmation or Consummation of this Plan; provided, however, that the foregoing provisions of this exculpation shall not operate to waive or release: (i) any Causes of Action arising from willful misconduct, actual fraud, or gross negligence of such applicable Exculpated Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; and/or (ii) the rights of any Person or Entity to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements and documents delivered under or in connection with this Plan or assumed pursuant to this Plan or Final Order of the Bankruptcy Court; provided, further, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its respective duties pursuant to, or in connection with, the above referenced documents, actions or inactions.  The foregoing exculpation shall be effective as of the Effective Date without further notice to or order of the

7

Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity.  Notwithstanding the foregoing, nothing in this Article X.E shall or shall be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person or Entity that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors, in each case unless otherwise expressly provided for in the Plan.

### Article X.G – Injunction

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, FROM AND AFTER THE EFFECTIVE DATE, ALL PERSONS AND ENTITIES ARE, TO THE FULLEST EXTENT PROVIDED UNDER SECTION 524 AND OTHER APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, PERMANENTLY ENJOINED FROM (I) COMMENCING OR CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY SUIT, ACTION OR OTHER PROCEEDING; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING IN ANY MANNER ANY JUDGMENT, AWARD, DECREE, OR ORDER; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE; (IV) ASSERTING A SETOFF OR RIGHT OF SUBROGATION OF ANY KIND; OR (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND,  IN EACH CASE ON ACCOUNT OF OR WITH RESPECT TO ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, EQUITY INTEREST, OR REMEDY RELEASED OR TO BE RELEASED, EXCULPATED OR TO BE EXCULPATED, SETTLED OR TO BE SETTLED OR DISCHARGED OR TO BE DISCHARGED PURSUANT TO THIS PLAN OR THE CONFIRMATION ORDER AGAINST ANY PERSON OR ENTITY SO RELEASED, DISCHARGED, OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY PERSON OR ENTITY SO RELEASED, DISCHARGED, OR EXCULPATED).  ALL INJUNCTIONS OR STAYS PROVIDED FOR IN THE CHAPTER 11 CASES UNDER SECTION 105 OR SECTION 362 OF THE BANKRUPTCY CODE, OR OTHERWISE, AND IN EXISTENCE ON THE CONFIRMATION DATE, SHALL REMAIN IN FULL FORCE AND EFFECT UNTIL THE EFFECTIVE DATE.**

### Article X.H – Binding Nature Of Plan

**ON THE EFFECTIVE DATE, AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE PLAN SHALL BIND, AND SHALL BE DEEMED BINDING UPON, THE DEBTORS, THE REORGANIZED DEBTORS, ANY AND ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS, ALL PERSONS AND ENTITIES THAT ARE PARTIES TO OR ARE SUBJECT TO THE SETTLEMENTS, COMPROMISES, RELEASES, EXCULPATIONS, DISCHARGES, AND INJUNCTIONS DESCRIBED IN THE PLAN, EACH PERSON AND ENTITY ACQUIRING PROPERTY UNDER THIS PLAN, ANY AND ALL NON-DEBTOR PARTIES TO EXECUTORY CONTRACTS AND UNEXPIRED LEASES WITH THE DEBTORS AND THE RESPECTIVE SUCCESSORS AND ASSIGNS OF EACH OF THE FOREGOING, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, AND NOTWITHSTANDING WHETHER OR NOT SUCH PERSON OR ENTITY (I) WILL RECEIVE OR RETAIN ANY PROPERTY, OR INTEREST IN PROPERTY, UNDER THE PLAN, (II) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASES OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN, AFFIRMATIVELY VOTED TO REJECT THIS PLAN OR IS CONCLUSIVELY PRESUMED TO REJECT THE PLAN.**

**Relevant Definitions Related to Release and Exculpation Provisions:**

"*Exculpated Parties*" means, collectively, the following:

(a) the Debtors;

(b) the Reorganized Debtors;

(c) the Prepetition Credit Agreement Agent;

(d) the Prepetition Credit Agreement Lenders;

(e) the Prepetition Notes Indenture Trustee;

(f) the DIP Agents;

(g) the DIP Lenders;

(h) the Ad Hoc Noteholder Committee and the members thereof in their capacities as such;

(i) the Consenting Noteholders;

(j) the Backstop Parties;

(k) the Distribution Agents;

(l) the Exit Facility Agent;

(m) the Exit Facility Lenders;

(n) the New Secured Convertible Notes Indenture Trustee;

(o) the New Secured Convertible Noteholders;

(p) the Releasing Old Parent Interestholders; and

(q) with respect to each of the foregoing Persons or Entities in clauses (a) through (p), the Related Persons of each such Person or Entity, in each case solely in their capacity as such.

"*Indemnified Parties*" means each of the Debtors' and their respective subsidiaries' current and former directors, officers, and managers in their respective capacities as such, and solely to the extent that such Person was serving in such capacity on or any time after the Petition Date; provided, that the Designated Persons shall not be Indemnified Parties under the Plan.

"*Non-Debtor Releasing Parties*" means, collectively, the following:

(a) the Prepetition Credit Agreement Agent;

(b) the Prepetition Credit Agreement Lenders;

(c) the Prepetition Notes Indenture Trustee;

9

US-DOCS\116659544.12

(d) the DIP Agents;

(e) the DIP Lenders;

(f) the Ad Hoc Noteholder Committee and the members thereof in their capacities as such;

(g) the Releasing Prepetition Noteholders;

(h) the Backstop Parties;

(i) the Distribution Agents;

(j) the Exit Facility Agent and the Exit Facility Lenders;

(k) the New Secured Convertible Notes Indenture Trustee and the New Secured Convertible Noteholders;

(l) those Holders of Claims deemed to accept the Plan that do not affirmatively opt out of the Third Party Release as provided on their respective Ballots/Opt-Out Forms;

(m) those Holders of General Unsecured Claims that do not affirmatively opt out of the Third Party Release as provided on their respective Ballots/Opt-Out Forms;

(n) all Holders of Claims that vote to accept the Plan; and

(o) the Releasing Old Parent Interestholders.

"Released Party" means, collectively, the following:

(a) the Debtors;

(b) the Reorganized Debtors;

(c) the Prepetition Credit Agreement Agent;

(d) the Prepetition Credit Agreement Lenders;

(e) the Prepetition Notes Indenture Trustee;

(f) the DIP Agents;

(g) the DIP Lenders;

(h) the Ad Hoc Noteholder Committee and the members thereof in their capacities as such;

(i) the Releasing Prepetition Noteholders;

(j) the Backstop Parties;

(k) the Distribution Agents;

(l) the Exit Facility Agent and the Exit Facility Lenders;

10

(m) the New Secured Convertible Notes Indenture Trustee and the New Secured Convertible Noteholders;

(n) the Releasing Old Parent Interestholders; and

(o) with respect to each of the foregoing Persons or Entities in clauses (a) through (n), the Related Persons of each such Person or Entity, in each case solely in their capacity as such; provided, that the Designated Persons shall not be Released Parties under the Plan.

11

US-DOCS\116659544.12

**Exhibit 8**

**Contract/Lease Notice**

US-DOCS\116659544.12

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

------------------------------------------------------------- x
In re:                                                     :     Chapter 11
                                                           :
HI-CRUSH INC., *et al.*,[1]                                :     Case No. 20-33496 (DRJ)
                                                           :
            Debtors.                                       :     (Jointly Administered)
                                                           :
------------------------------------------------------------- x

## NOTICE TO CONTRACT AND LEASE COUNTERPARTIES

**PLEASE TAKE NOTICE THAT** Hi-Crush Inc. and its affiliated debtors, as debtors and debtors in possession (collectively, the "**Debtors**") have commenced solicitation of votes to accept the *Joint Plan of Reorganization for Hi-Crush Inc. and Its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code* (as may be amended, modified, or supplemented from time to time, the "**Plan**").[2] Copies of the Plan and the *Disclosure Statement for Joint Plan of Reorganization for Hi-Crush Inc. and its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code* (as may be amended, modified or supplemented from time to time, the "**Disclosure Statement**") may be obtained free of charge by visiting the website maintained by the Debtors' voting and claims agent, Kurtzman Carson Consultants LLC (the "**Voting and Claims Agent**"), at www.kccllc.net/hicrush. Copies of the Plan and Disclosure Statement may also be obtained by calling the Voting and Claims Agent at 866-554-5810 (US and Canada) or 781-575-2032 (international) or by sending an electronic mail message to HiCrushinfo@kccllc.com with "Hi-Crush" in the subject line.

**PLEASE TAKE FURTHER NOTICE THAT** you are receiving this notice because you or one of your affiliates is a counterparty to an executory contract or unexpired lease with one or more of the Debtors that has not been assumed or rejected as of the Voting Record Date (August 14, 2020).[3]

**PLEASE TAKE FURTHER NOTICE THAT** a hearing (the "**Confirmation Hearing**") is scheduled for September 23, 2020 at 2:00 p.m. (Prevailing Central Time) to consider

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Hi-Crush Inc. (0530), OnCore Processing LLC (9403), Hi-Crush Augusta LLC (0668), Hi-Crush Whitehall LLC (5562), PDQ Properties LLC (9169), Hi-Crush Wyeville Operating LLC (5797), D & I Silica, LLC (9957), Hi-Crush Blair LLC (7094), Hi-Crush LMS LLC, Hi-Crush Investments Inc. (6547), Hi-Crush Permian Sand LLC, Hi-Crush Proppants LLC (0770), Hi-Crush PODS LLC, Hi-Crush Canada Inc. (9195), Hi-Crush Holdings LLC , Hi-Crush Services LLC (6206), BulkTracer Holdings LLC (4085), Pronghorn Logistics Holdings, LLC (5223), FB Industries USA Inc. (8208), PropDispatch LLC, Pronghorn Logistics, LLC (4547), and FB Logistics, LLC (8641). The Debtors' address is 1330 Post Oak Blvd, Suite 600, Houston, Texas 77056.

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

[3]     This notice is being sent to counterparties to contracts and leases that may be executory contracts and unexpired leases. This notice is *not* an admission by the Debtors that such contract or lease is executory or unexpired.

confirmation of the Plan.  The Confirmation Hearing will take place in Courtroom 400, 4th Floor, 515 Rusk Street, Houston, TX 77002 or via videoconference, if necessary.[4]  The Confirmation Hearing may be continued from time to time by the Bankruptcy Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Bankruptcy Court and served on such parties as the Bankruptcy Court may order.  Moreover, the Plan may be modified or amended, if necessary, pursuant to section 1127 of the Bankruptcy Code, prior to, during or as a result of the Confirmation Hearing, without further notice to parties in interest.

**PLEASE TAKE FURTHER NOTICE THAT,** notwithstanding that you are not entitled to vote on the Plan, you are nevertheless a party in interest in the Debtors' Chapter 11 Cases and you are entitled to participate in the Debtors' Chapter 11 Cases, including by filing objections to confirmation of the Plan.  The deadline for filing objections to confirmation of the Plan is September 18, 2020, at 5:00 p.m. (Prevailing Central Time) (the "**Confirmation Objection Deadline**").  Any objection to the Plan must: (i) be in writing; (ii) conform to the Bankruptcy Rules and the Bankruptcy Local Rules; (iii) state the name and address of the objecting party and the amount and nature of the Claim or Equity Interest held by such Entity; (iv) state with particularity the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (v) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is **actually received** no later than the Confirmation Objection Deadline by the parties listed below (the "**Notice Parties**"). CONFIRMATION OBJECTIONS NOT TIMELY FILED AND SERVED IN THE MANNER SET FORTH HEREIN MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND MAY BE OVERRULED WITHOUT FURTHER NOTICE.

<u>Notice Parties</u>.  The Notice Parties include:

- Counsel to the Debtors: Latham & Watkins LLP, 885 Third Avenue, New York, NY 10022 (Attn: Keith A. Simon, Esq. and Annemarie V. Reilly, Esq.) (keith.simon@lw.com and annemarie.reilly@lw.com) and Hunton Andrews Kurth LLP, 600 Travis Street, Suite 4200, Houston, TX (Attn: Timothy A. Davidson II, Esq. and Ashley L. Harper, Esq.) (TadDavidson@HuntonAK.com and AshleyHarper@HuntonAK.com);

- Counsel to the DIP ABL Agent: Simpson, Thacher & Bartlett LLP, 425 Lexington Avenue, New York, NY 10017 (Attn: Elisha Graff, Esq. and Daniel L. Biller, Esq.) (egraff@stblaw.com and dbiller@stblaw.com);

---

[4]    If the hearing occurs over videoconference the Court will utilize GoToMeeting for the hearing.  You should download the free GoToMeeting application on each device that will be used to connect to the hearing.  If you choose to connect via a web browser, available literature suggests that Chrome is the preferred browser. Please note that connecting through a browser may limit the availability of some GoToMeeting features.  To connect to the hearing, you should enter the meeting code "JudgeJones".  You can also connect using the link on Judge Jones' homepage on the Southern District of Texas website.  Once connected to GoToMeeting, click the settings icon in the upper right corner and enter your name under the personal information setting.  In either event, audio for the Confirmation Hearing will be available by using the Court's regular dial-in number. The dial-in number is +1 (832) 917-1510.  You will be responsible for your own long-distance charges.  You will be asked to key in the conference room number.  Judge Jones' conference room number is 205691.

2

- Counsel to the Ad Hoc Noteholders Committee: Paul, Weiss, Rifkind, Wharton & Garrison, LLP, 1285 Avenue of the Americas, New York, NY 10019 (Attn: Brian S. Hermann, Esq. and Elizabeth R. McColm, Esq.) (bhermann@paulweiss.com and emccolm@paulweiss.com) and Porter Hedges LLP, 1000 Main St., 36th Floor, Houston, TX 77002 (Attn: John F. Higgins, Esq.) (JHiggins@porterhedges.com);

- Counsel to any statutory committee appointed in these Chapter 11 Cases; and

- the Office of the United States Trustee for the Southern District of Texas, 515 Rusk Street, Suite 3516, Houston, TX 77002 (Attn: Stephen Statham, Esq. and Hector Duran, Esq.) (stephen.statham@usdoj.gov and hector.duranjr@usdoj.gov).

THE PLAN CONTAINS RELEASE, EXCULPATION AND INJUNCTION PROVISIONS. THE PROVISIONS ARE SET FORTH AT THE END OF THIS NOTICE. YOU SHOULD REVIEW THESE PROVISIONS CAREFULLY.

---

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, PLEASE CONTACT THE VOTING AND CLAIMS AGENT AT THE NUMBER OR ADDRESS SPECIFIED ABOVE. PLEASE NOTE THAT THE VOTING AND CLAIMS AGENT CANNOT PROVIDE LEGAL ADVICE.**

---

[_____], 2020
Houston, Texas

| HUNTON ANDREWS KURTH LLP | LATHAM & WATKINS LLP |
|---|---|
| Timothy A. ("Tad") Davidson II <br> Ashley L. Harper <br> 600 Travis Street, Suite 4200 <br> Houston, Texas 77002 <br> Telephone:  (713) 220-4200 <br> Facsimile:   (713) 220-4285 | George A. Davis <br> Keith A. Simon <br> David A. Hammerman <br> Annemarie V. Reilly <br> Hugh K. Murtagh <br> 885 Third Avenue <br> New York, New York 10022 <br> Telephone:  (212) 906-1200 <br> Facsimile:   (212) 751-4864 |
| [Proposed] Counsel for the Debtors and Debtors-in-Possession ||

3

## NOTICE REGARDING CERTAIN RELEASE, EXCULPATION AND INJUNCTION PROVISIONS IN THE PLAN

**PLEASE BE ADVISED THAT THE PLAN CONTAINS CERTAIN RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, INCLUDING THOSE LISTED BELOW.  YOU ARE ADVISED AND ENCOURAGED TO CAREFULLY REVIEW AND CONSIDER THE PLAN, INCLUDING THE RELEASE, EXCULPATION AND INJUNCTION PROVISIONS, AS YOUR RIGHTS MIGHT BE AFFECTED.**

**Article X.B – <u>Release of Claims and Causes of Action</u>**

1.     *<u>Release by the Debtors and their Estates</u>.*  **Pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, and except as otherwise expressly provided in the Plan, effective as of the Effective Date, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, the Debtors and the Reorganized Debtors, in their respective individual capacities and as debtors-in-possession, and on behalf of themselves and their respective Estates, including, without limitation, any successor to the Debtors or any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code (collectively, the "<u>Debtor Releasing Parties</u>") shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver and release to each of the Released Parties (and each such Released Party so released shall be deemed forever released, waived and discharged by the Debtor Releasing Parties) and their respective assets and properties (the "<u>Debtor Release</u>") from any and all Claims, Causes of Action, and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of the Debtors or their Affiliates, including, without limitation, (i) the Chapter 11 Cases, the Disclosure Statement, the Plan, the Restructuring Support Agreement, the Backstop Purchase Agreement, the Rights Offering, the Restructuring Documents, the Prepetition Debt Documents, and the DIP Loan Documents, (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, the Backstop Purchase Agreement, the Rights Offering, the Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Documents, the Prepetition Debt Documents, the DIP Loan Documents, or related agreements, instruments or other documents, (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale, or rescission of the purchase or sale of any Equity Interest or Plan Securities of the Debtors or the Reorganized Debtors, and/or (vii) the Confirmation or Consummation of the Plan or the solicitation of votes on the Plan that such Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) or that any Holder of a Claim or Equity Interest or other Person or Entity would have been legally entitled to assert for, or on behalf or in the name of, any Debtor, its respective Estate or any Reorganized Debtor (whether directly or derivatively) against any of the Released Parties; *provided*, *however*, that the foregoing provisions of this Debtor Release shall not operate to waive or release (A) the rights of such Debtor Releasing Party to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with the Plan (including, without limitation, the Exit Facility Loan Documents and the New Secured Convertible Notes Documents) or assumed or assumed and assigned, as applicable,**

4

pursuant to the Plan or pursuant to a Final Order of the Bankruptcy Court and (B) claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes a criminal act, fraud, willful misconduct, or gross negligence, in each case as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction.  The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity and the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Debtor Release.  Notwithstanding the foregoing, nothing in this **Article X.B.** shall or shall be deemed to (i) prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person or Entity that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors and/or (ii) operate as a release or waiver of any Intercompany Claims, in each case unless otherwise expressly provided for in this Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims released by the Debtor Release; (iii) in the best interest of the Debtors and their Estates; (iv) fair, equitable and reasonable; (v) given and made after due notice and opportunity for hearing; and (vi) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any claim or Cause of Action released pursuant to the Debtor Release.

2.     *Release By Third Parties*.  **Except as otherwise expressly provided in the Plan, effective as of the Effective Date, to the fullest extent permitted by applicable law, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, and without limiting or otherwise modifying the scope of the Debtor Release provided by the Debtor Releasing Parties above, each Non-Debtor Releasing Party (together with the Debtor Releasing Parties, the "Releasing Parties") shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver, and release to each of the Released Parties (and each such Released Party so released shall be deemed forever released, waived, and discharged by the Non-Debtor Releasing Parties) and their respective assets and properties (the "Third Party Release") from any and all Claims, Causes of Action, and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of the Debtors or their Affiliates, including, without limitation, (i) the Chapter 11 Cases, the Disclosure Statement, the Plan, the Restructuring Support Agreement, the Backstop Purchase Agreement, the Rights Offering, the Restructuring Documents, the Prepetition Debt Documents, and the DIP Loan Documents, (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, the Backstop Purchase Agreement, the Rights Offering, this Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Documents, the Prepetition Debt Documents, the DIP Loan Documents, or related agreements, instruments or other documents, (v) the restructuring of Claims or Equity Interests**

US-DOCS\116659544.12

**prior to or during the Chapter 11 Cases, (vi) the purchase, sale or rescission of the purchase or sale of any Equity Interest or Plan Securities of the Debtors or the Reorganized Debtors, and/or (vii) the Confirmation or Consummation of the Plan or the solicitation of votes on this Plan that such Non-Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) against any of the Released Parties;** *provided*, *however*, **that the foregoing provisions of this Third Party Release shall not operate to waive or release (A) the rights of such Non-Debtor Releasing Party to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan (including, without limitation, the Exit Facility Loan Documents and the New Secured Convertible Notes Documents) or assumed or assumed and assigned, as applicable, pursuant to the Plan or pursuant to a Final Order of the Bankruptcy Court and (B) claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes a criminal act, fraud, willful misconduct, or gross negligence, in each case as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction. The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity and the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Third Party Release.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third Party Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Third Party Release is: (i) consensual; (ii) essential to the confirmation of the Plan; (iii) in exchange for the good and valuable consideration provided by the Released Parties; (iv) a good faith settlement and compromise of the Claims released by the Third Party Release; (v) in the best interest of the Debtors and all Holders of Claims and Equity Interests; (vi) fair, equitable and reasonable; (vii) given and made after due notice and opportunity for hearing; and (viii) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third Party Release.**

## Article X.E – <u>Exculpation</u>

Effective as of the Effective Date, to the fullest extent permitted by law, the Exculpated Parties shall neither have nor incur any liability to any Person or Entity for any claims or Causes of Action arising prior to or on the Effective Date for any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Confirmation or Consummation of this Plan, the Disclosure Statement, the Restructuring Documents, the Rights Offering, the Prepetition Debt Documents, the DIP Loan Documents, or any contract, instrument, release or other agreement or document created or entered into in connection with this Plan, including the Restructuring Support Agreement and the Backstop Purchase Agreement, or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the approval of the Disclosure Statement or Confirmation or Consummation of this Plan; provided, however, that the foregoing provisions of this exculpation shall not operate to waive or release: (i) any Causes of Action arising from willful misconduct, actual fraud, or gross negligence of such applicable Exculpated Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; and/or (ii) the rights of any Person or Entity to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements and documents delivered under or in connection with this Plan or assumed pursuant to this Plan or Final Order of the Bankruptcy Court; provided, further, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its respective duties pursuant to, or in connection with, the above referenced documents, actions or inactions. The foregoing exculpation shall be effective as of the Effective Date without further notice to or order of the

US-DOCS\116659544.12

Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity.  Notwithstanding the foregoing, nothing in this Article X.E shall or shall be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person or Entity that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors, in each case unless otherwise expressly provided for in the Plan.

### Article X.G – Injunction

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, FROM AND AFTER THE EFFECTIVE DATE, ALL PERSONS AND ENTITIES ARE, TO THE FULLEST EXTENT PROVIDED UNDER SECTION 524 AND OTHER APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, PERMANENTLY ENJOINED FROM (I) COMMENCING OR CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY SUIT, ACTION OR OTHER PROCEEDING; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING IN ANY MANNER ANY JUDGMENT, AWARD, DECREE, OR ORDER; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE; (IV) ASSERTING A SETOFF OR RIGHT OF SUBROGATION OF ANY KIND; OR (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND,  IN EACH CASE ON ACCOUNT OF OR WITH RESPECT TO ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, EQUITY INTEREST, OR REMEDY RELEASED OR TO BE RELEASED, EXCULPATED OR TO BE EXCULPATED, SETTLED OR TO BE SETTLED OR DISCHARGED OR TO BE DISCHARGED PURSUANT TO THIS PLAN OR THE CONFIRMATION ORDER AGAINST ANY PERSON OR ENTITY SO RELEASED, DISCHARGED, OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY PERSON OR ENTITY SO RELEASED, DISCHARGED, OR EXCULPATED).  ALL INJUNCTIONS OR STAYS PROVIDED FOR IN THE CHAPTER 11 CASES UNDER SECTION 105 OR SECTION 362 OF THE BANKRUPTCY CODE, OR OTHERWISE, AND IN EXISTENCE ON THE CONFIRMATION DATE, SHALL REMAIN IN FULL FORCE AND EFFECT UNTIL THE EFFECTIVE DATE.

### Article X.H – Binding Nature Of Plan

ON THE EFFECTIVE DATE, AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE PLAN SHALL BIND, AND SHALL BE DEEMED BINDING UPON, THE DEBTORS, THE REORGANIZED DEBTORS, ANY AND ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS, ALL PERSONS AND ENTITIES THAT ARE PARTIES TO OR ARE SUBJECT TO THE SETTLEMENTS, COMPROMISES, RELEASES, EXCULPATIONS, DISCHARGES, AND INJUNCTIONS DESCRIBED IN THE PLAN, EACH PERSON AND ENTITY ACQUIRING PROPERTY UNDER THIS PLAN, ANY AND ALL NON-DEBTOR PARTIES TO EXECUTORY CONTRACTS AND UNEXPIRED LEASES WITH THE DEBTORS AND THE RESPECTIVE SUCCESSORS AND ASSIGNS OF EACH OF THE FOREGOING, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, AND NOTWITHSTANDING WHETHER OR NOT SUCH PERSON OR ENTITY (I) WILL RECEIVE OR RETAIN ANY PROPERTY, OR INTEREST IN PROPERTY, UNDER THE PLAN, (II) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASES OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN, AFFIRMATIVELY VOTED TO REJECT THIS PLAN OR IS CONCLUSIVELY PRESUMED TO REJECT THE PLAN.

US-DOCS\116659544.12

**Relevant Definitions Related to Release and Exculpation Provisions:**

"*Exculpated Parties*" means, collectively, the following:

(a) the Debtors;

(b) the Reorganized Debtors;

(c) the Prepetition Credit Agreement Agent;

(d) the Prepetition Credit Agreement Lenders;

(e) the Prepetition Notes Indenture Trustee;

(f) the DIP Agents;

(g) the DIP Lenders;

(h) the Ad Hoc Noteholder Committee and the members thereof in their capacities as such;

(i) the Consenting Noteholders;

(j) the Backstop Parties;

(k) the Distribution Agents;

(l) the Exit Facility Agent;

(m) the Exit Facility Lenders;

(n) the New Secured Convertible Notes Indenture Trustee;

(o) the New Secured Convertible Noteholders;

(p) the Releasing Old Parent Interestholders; and

(q) with respect to each of the foregoing Persons or Entities in clauses (a) through (p), the Related Persons of each such Person or Entity, in each case solely in their capacity as such.

"*Indemnified Parties*" means each of the Debtors' and their respective subsidiaries' current and former directors, officers, and managers in their respective capacities as such, and solely to the extent that such Person was serving in such capacity on or any time after the Petition Date; provided, that the Designated Persons shall not be Indemnified Parties under the Plan.

"*Non-Debtor Releasing Parties*" means, collectively, the following:

(a) the Prepetition Credit Agreement Agent;

(b) the Prepetition Credit Agreement Lenders;

(c) the Prepetition Notes Indenture Trustee;

8

US-DOCS\116659544.12

(d) the DIP Agents;

(e) the DIP Lenders;

(f) the Ad Hoc Noteholder Committee and the members thereof in their capacities as such;

(g) the Releasing Prepetition Noteholders;

(h) the Backstop Parties;

(i) the Distribution Agents;

(j) the Exit Facility Agent and the Exit Facility Lenders;

(k) the New Secured Convertible Notes Indenture Trustee and the New Secured Convertible Noteholders;

(l) those Holders of Claims deemed to accept the Plan that do not affirmatively opt out of the Third Party Release as provided on their respective Ballots/Opt-Out Forms;

(m) those Holders of General Unsecured Claims that do not affirmatively opt out of the Third Party Release as provided on their respective Ballots/Opt-Out Forms;

(n) all Holders of Claims that vote to accept the Plan; and

(o) the Releasing Old Parent Interestholders.

"Released Party" means, collectively, the following:

(a) the Debtors;

(b) the Reorganized Debtors;

(c) the Prepetition Credit Agreement Agent;

(d) the Prepetition Credit Agreement Lenders;

(e) the Prepetition Notes Indenture Trustee;

(f) the DIP Agents;

(g) the DIP Lenders;

(h) the Ad Hoc Noteholder Committee and the members thereof in their capacities as such;

(i) the Releasing Prepetition Noteholders;

(j) the Backstop Parties;

(k) the Distribution Agents;

(l) the Exit Facility Agent and the Exit Facility Lenders;

9

(m) the New Secured Convertible Notes Indenture Trustee and the New Secured Convertible Noteholders;

(n) the Releasing Old Parent Interestholders; and

(o) with respect to each of the foregoing Persons or Entities in clauses (a) through (n), the Related Persons of each such Person or Entity, in each case solely in their capacity as such; provided, that the Designated Persons shall not be Released Parties under the Plan.

10

**Exhibit 9**

**Rights Offering Materials**

US-DOCS\116659544.12

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

```
----------------------------------------------------------- x
```
In re:                                                        :   Chapter 11
                                                             :
HI-CRUSH INC., *et al.*,                                     :   Case No. 20-33495 (DRJ)
                                                             :
            Debtors.[1]                                      :   (Jointly Administered)
                                                             :
```
----------------------------------------------------------- x
```

## RIGHTS OFFERING PROCEDURES

**1.      Introduction**

        Hi-Crush Inc. ("Hi-Crush") and its affiliated debtors and debtors-in-possession (collectively, the "Debtors") are pursuing a proposed restructuring (the "Restructuring") of their existing debt and other obligations to be effectuated pursuant to the *Joint Plan of Reorganization for Hi-Crush Inc. and Its Affiliated Debtors under Chapter 11 of the Bankruptcy Code*, dated as of July 27, 2020 Docket No. [__] (the "Plan") in connection with voluntary, prearranged cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 – 1532 (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"), in accordance with the terms and conditions set forth in that certain Restructuring Support Agreement, dated as of July 12, 2020 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "RSA"),[2] by and among the Debtors and the Consenting Noteholders (as defined in the RSA) party thereto.

        In connection with the Plan, and with the approval of these rights offering procedures (these "Rights Offering Procedures") in the Disclosure Statement Order and in accordance with the terms of the Backstop Purchase Agreement, the Debtors shall launch a rights offering (the "Rights Offering") pursuant to which each holder of an Eligible Claim (as defined

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Hi-Crush Inc. (0530), OnCore Processing LLC (9403), Hi-Crush Augusta LLC (0668), Hi-Crush Whitehall LLC (5562), PDQ Properties LLC (9169), Hi-Crush Wyeville Operating LLC (5797), D & I Silica, LLC (9957), Hi-Crush Blair LLC (7094), Hi-Crush LMS LLC, Hi-Crush Investments Inc. (6547), Hi-Crush Permian Sand LLC, Hi-Crush Proppants LLC (0770), Hi-Crush PODS LLC, Hi-Crush Canada Inc. (9195), Hi-Crush Holdings LLC, Hi-Crush Services LLC (6206), BulkTracer Holdings LLC (4085), Pronghorn Logistics Holdings, LLC (5223), FB Industries USA Inc. (8208), PropDispatch LLC, Pronghorn Logistics, LLC (4547), and FB Logistics, LLC (8641).  The Debtors' address is 1330 Post Oak Blvd, Suite 600, Houston, Texas 77056.

[2]     All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the RSA or, if any such term is not defined in the RSA, such term shall have the meaning given to it in (i) the Plan, or (ii) that certain Backstop Purchase Agreement, dated as of [_____], 2020 (together with all exhibits, schedules and attachments thereto, as amended, supplemented, amended and restated or otherwise modified from time to time, the "Backstop Purchase Agreement"), by and among Hi-Crush Inc. and certain of its direct and indirect subsidiaries, and the entities party thereto defined therein as "Backstop Parties," as applicable.

US-DOCS\117189109.1

below) as of the Rights Offering Record Date (as defined below) that is an Accredited Investor (as set forth in a properly completed and duly executed AI Questionnaire (as defined below) that is delivered by such holder to the Subscription Agent (as defined below) on or prior to the Questionnaire Deadline (as defined below) in accordance with these Rights Offering Procedures) (each such holder, a "Rights Offering Participant" and, collectively, the "Rights Offering Participants") will be entitled to receive non-certificated rights that are attached to such Eligible Claim (the "Rights"), to purchase (without any obligation to so purchase) such Rights Offering Participant's *pro rata* share (based on the proportion that such Rights Offering Participant's Eligible Claim as of the Rights Offering Record Date bears to the aggregate amount of (i) all Eligible General Unsecured Claims (as defined below) as of the Rights Offering Record Date held by each Person that has certified it is an Accredited Investor (as demonstrated by such Person's properly completed, duly executed and timely delivered AI Questionnaire) on or prior to the Questionnaire Deadline plus (ii) all Allowed Prepetition Notes Claims held by each Person that has certified it is an Accredited Investor (as demonstrated by such Person's properly completed, duly executed and timely delivered AI Questionnaire) on or prior to the Questionnaire Deadline as of the Rights Offering Record Date) of New Secured Notes (the "Rights Offering Notes") in an aggregate original principal amount of $43,300,000 (the "Rights Offering Amount").  Rights Offering Participants will be issued Rights at no charge.  Each Rights Offering Participant may exercise all or any portion of such Rights Offering Participant's Rights.

"Allowed" means, solely for purposes of these Rights Offering Procedures, with respect to any Claims (or any portion thereof), as of any date of determination, (a) a Claim that is evidenced by a Proof of Claim filed by the applicable Claims Bar Date in accordance with the Claims Bar Date Order; (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely filed; or (c) a Claim that is allowed pursuant to the Plan or a Final Order of the Bankruptcy Court as of such date; provided, that with respect to a Claim described in clauses (a) and (b) above (except any Claim previously allowed pursuant to the DIP Orders), such Claim shall be considered "Allowed" as of such date of determination only to the extent that, with respect to such Claim, no objection to allowance or priority or  request for estimation thereof has been interposed on or prior to such date, or such an objection is so interposed and the Claim has been allowed by Final Order of the Bankruptcy Court as of such date; provided further that, solely for purposes of these Rights Offering Procedures, any objection to allowance or priority or request for estimation of a Claim must be filed by no later than the Rights Offering Record Date.

"Disallowed" shall have the meaning given to such term in the Plan.

"Disputed" means, solely for purposes of these Rights Offering Procedures, with respect to any Claim (or any portion thereof), as of any date of determination, a Claim that is neither Allowed nor Disallowed as of such date.

"Eligible Claim" means any Allowed Prepetition Notes Claim or Eligible General Unsecured Claim.

"Eligible General Unsecured Claim" means any General Unsecured Claim that is either Allowed or Disputed.  For the avoidance of doubt, "General Unsecured Claims" shall not include "Prepetition Notes Claims."

Prior to receipt of the Rights Exercise Form (as defined below) and the other documents and materials related to the Rights Offering, each holder of an Eligible Claim as of the date of entry of the Disclosure Statement Order (the "Questionnaire Record Date") will receive an accredited investor questionnaire (the "AI Questionnaire"), which must be completed and delivered (if a Rights Offering Participant's Prepetition Notes are held in "street name," by way of such Rights Offering Participant's bank, brokerage house, or other financial institution (each, a "Nominee")) to KCC LLC, the subscription agent for the Rights Offering (in such capacity, the "Subscription Agent"), by each such holder that wants to participate in the Rights Offering by no later than September 4, 2020 (the "Questionnaire Deadline").  Any holder of an Eligible Claim as of the Questionnaire Record Date that does not properly complete, duly execute and deliver to the Subscription Agent an AI Questionnaire so that such AI Questionnaire is actually received by the Subscription Agent on or prior to the Questionnaire Deadline will not be eligible to participate in the Rights Offering unless otherwise agreed to by the Debtors with the written consent of the Required Backstop Parties.  Anything herein to the contrary notwithstanding, the Backstop Parties and their Affiliates (as defined in the Backstop Purchase Agreement), in their capacities as holders of Eligible Claims as of the Questionnaire Record Date, shall not be required to complete, execute and deliver an AI Questionnaire and shall be deemed Rights Offering Participants.  Each holder of an Allowed Prepetition Notes Claim as of the Questionnaire Record Date is entitled to receive sufficient copies of the AI Questionnaire for distribution to the beneficial owners of the Prepetition Notes for whom such Rights Offering Participant holds such Prepetition Notes.  Transferees of Eligible Claims received after the Questionnaire Record Date but before the Questionnaire Deadline are entitled to request an AI Questionnaire from the Subscription Agent, and the Subscription Agent will, to the extent reasonably practicable, facilitate the submission of such AI Questionnaire and Proof of Holding forms from such transferees.

The Rights Offering will be conducted in accordance with the following dates and deadlines:

| Event | Date or Time |
|---|---|
| Questionnaire Record Date | August 14, 2020 |
| Questionnaire Deadline | September 4, 2020 |
| Rights Offering Record Date | September 4, 2020 |
| Rights Offering Commencement Date | September 9, 2020 |
| Rights Offering Termination Date & Time | September 29, 2020, at 5:00 p.m. (Prevailing Central Time) |

3

US-DOCS\117189109.1

Rights Offering Notes shall be issued in minimum denominations of 1,000 and integral multiples of $1,000 thereof.  Fractional Rights Offering Notes shall not be issued upon exercise of the Rights and Rights Offering Participants that otherwise would have received fractional Rights Offering Notes shall not be paid any compensation in respect of such fractional Rights Offering Notes. Each Rights Offering Participant's maximum amount of Rights Offering Notes that such Rights Offering Participant is permitted to subscribe for pursuant to the exercise of its Rights shall be rounded down to the nearest whole Rights Offering Note.

**THE DISCLOSURE STATEMENT DISTRIBUTED IN CONNECTION WITH THE DEBTORS' SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN WILL SET FORTH IMPORTANT INFORMATION THAT SHOULD BE CAREFULLY READ AND CONSIDERED BY EACH RIGHTS OFFERING PARTICIPANT PRIOR TO MAKING A DECISION TO PARTICIPATE IN THE RIGHTS OFFERING, INCLUDING ARTICLE VI OF THE DISCLOSURE STATEMENT REGARDING CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE EXERCISING ANY RIGHTS.**

2.      **Backstop Purchase Agreement**

Any Rights Offering Notes that are not subscribed for and purchased in the Rights Offering by a Rights Offering Participant (including (i) any Rights Offering Notes that holders of Eligible Claims as of the Rights Offering Record Date who are not Accredited Investors (or holders of Eligible Claims as of the Rights Offering Record Date that did not properly complete, duly execute and deliver to the Subscription Agent by the Questionnaire Deadline an AI Questionnaire in accordance with these Rights Offering Procedures) could have purchased if such holders had received Rights if they were Accredited Investors (or had properly completed, duly executed and delivered to the Subscription Agent by the Questionnaire Deadline an AI Questionnaire in accordance with these Rights Offering Procedures) and exercised such Rights in the Rights Offering, (ii) any Rights Offering Notes that are not subscribed for and purchased in the Rights Offering on account of any rounding down of fractional Rights Offering Notes, (iii) any Rights Offering Notes that are not subscribed for and purchased in the Rights Offering on account of any Rights Offering Participant failing to satisfy any of the Rights Offering Conditions (as defined below) or Additional Conditions (as defined below), or (iv) any Rights Offering Notes that are not subscribed for and purchased in the Rights Offering on account of any Eligible General Unsecured Claim as of the Rights Offering Record Date (or any portion thereof) failing to be an Allowed Claim on the date that is one (1) Business Day after the Confirmation Hearing) (such Rights Offering Notes, the "Unsubscribed Notes") shall be put to and purchased by the Backstop Parties (subject to their respective Backstop Commitment Amounts) in accordance with the terms and conditions of the Backstop Purchase Agreement.

There will be no over-subscription privilege provided in connection with the Rights Offering, such that any Unsubscribed Notes will not be offered to other Rights Offering Participants, but rather will be purchased by the Backstop Parties (subject to their respective Backstop Commitment Amounts) in accordance with the terms and conditions of the Backstop Purchase Agreement.

4

US-DOCS\117189109.1

In consideration for the Debtors' right to call the Backstop Commitments (as defined in the Backstop Purchase Agreement) of the Backstop Parties to purchase the Unsubscribed Notes pursuant to the terms of the Backstop Purchase Agreement, Hi-Crush shall be required to issue to the Backstop Parties (or their designees) additional New Secured Notes in an original aggregate principal amount of $4,800,000 (the "Put Option Notes") on a *pro rata* basis based upon their respective Backstop Commitment Percentages. The Put Option Notes will be issued only to the Backstop Parties that do not default on their respective Backstop Commitments.

3. **Commencement and Expiration of the Rights Offering; Rights Offering Record Date**

The Rights Offering shall commence on September 9, 2020 (the "Rights Offering Commencement Date"). On the Rights Offering Commencement Date, the Rights Exercise Form and the other documents and materials related to the Rights Offering shall be mailed by or on behalf of the Debtors to the Rights Offering Participants. The "Rights Offering Record Date" shall mean September 4, 2020.

The Rights Offering shall expire at 5:00 p.m. (Prevailing Central Time) on September 29 (such date, the "Rights Offering Termination Date" and such time on the Rights Offering Termination Date, the "Rights Offering Termination Time"). If the Rights Offering Termination Date and/or the Rights Offering Termination Time is/are extended in accordance with the terms of these Rights Offering Procedures, the Debtors shall promptly notify the Rights Offering Participants, before 9:00 a.m. (Prevailing Central Time) on the Business Day before the then-effective Rights Offering Termination Date, in writing, of such extension and the date of the new Rights Offering Termination Date and/or the time of the new Rights Offering Termination Time. Each Rights Offering Participant intending to participate in the Rights Offering must affirmatively make an election to exercise its Rights at or prior to the Rights Offering Termination Time in accordance with the provisions of Section 4 below.

4. **Exercise of Rights**

Each Rights Offering Participant that elects to participate in the Rights Offering must have timely satisfied each of the Rights Offering Conditions (as defined below). Any Rights Offering Participant that has timely satisfied each of the Rights Offering Conditions shall be deemed to have made a binding, irrevocable election to exercise its Rights to the extent set forth in the Rights Exercise Form delivered by such Rights Offering Participant (a "Binding Rights Election"); *provided*, *however*, that (A) a Rights Offering Participant's right to participate in the Rights Offering shall remain subject to its compliance with the Additional Conditions, and (B) the right of a Rights Offering Participant that holds an Eligible General Unsecured Claim as of the Rights Offering Record Date to participate in the Rights Offering is subject to termination as set forth in the "Rights Forfeiture Events" section of these Rights Offering Procedures.

(a)     **The Binding Rights Election Cannot Be Withdrawn**

Each Rights Offering Participant is entitled to participate in the Rights Offering solely to the extent provided in these Rights Offering Procedures. Furthermore, each Rights Offering Participant may exercise all or any portion of such Rights Offering Participant's Rights.

(b)     **Exercise by Rights Offering Participants**

To exercise its Rights, each Rights Offering Participant must satisfy each of the following conditions (collectively, the "Rights Offering Conditions"):

(i) deliver a duly executed and properly completed AI Questionnaire (by way of such Rights Offering Participant's Nominee, if applicable) to the Subscription Agent so that such AI Questionnaire is *actually received* by the Subscription Agent at or before the Questionnaire Deadline;

(ii) deliver a duly executed and properly completed Rights Offering subscription exercise form (the "Rights Exercise Form") to the Subscription Agent so that such Rights Exercise Form is *actually received* by the Subscription Agent at or before the Rights Offering Termination Time; and

(iii) pay to the Subscription Agent, by wire transfer of immediately available funds in accordance with the Payment Instructions (as defined below), its Aggregate Exercise Price (as defined below), so that payment of the Aggregate Exercise Price is *actually received* by the Subscription Agent at or before the Rights Offering Termination Time.

In addition to the foregoing, to participate in the Rights Offering, a Rights Offering Participant must also:

(x) vote to accept the Plan with respect to all of the Claims and Equity Interests owned (or of which the right to vote to accept the Plan is controlled) by such Rights Offering Participant (to the extent any such Claims and Equity Interests are entitled to vote to accept or reject the Plan) and timely deliver a ballot voting to accept the Plan with respect to all of the Claims and Equity Interests owned or controlled by such Rights Offering Participant (to the extent any such Claims and Equity Interests are entitled to vote to accept or reject the Plan) in accordance with solicitation procedures approved by the Bankruptcy Court, and

(y) not opt out of any releases set forth in Article X.B of the Plan (clauses (x) and (y) of this sentence being the "Additional Conditions").

Any Rights Offering Notes that could have been subscribed for and purchased pursuant to a valid exercise of Rights that satisfied the Rights Offering Conditions and the Additional Conditions, but did not satisfy one or more of the Rights Offering Conditions or Additional Conditions, shall be deemed not to have been subscribed for and purchased in the Rights Offering by such Rights Offering Participant and shall be Unsubscribed Notes.

6

If (i) a Rights Offering Participant shall not be permitted to participate in the Rights Offering because such Rights Offering Participant failed to satisfy all of the Rights Offering Conditions and all of the Additional Conditions, and (ii) such Rights Offering Participant shall have delivered to the Subscription Agent such Rights Offering Participant's Aggregate Exercise Price (or any portion thereof), then such Aggregate Exercise Price (or any portion thereof) shall be refunded to such Rights Offering Participant, without interest, as soon as reasonably practicable (but in no event later than ten (10) Business Days) after the Effective Date (without offset, set-off, counterclaim or reduction of any kind by the Subscription Agent or any of the Debtors).

Anything herein to the contrary notwithstanding, if any Backstop Party that holds an Eligible Claim as of the Rights Offering Record Date or any Backstop Party's Affiliate that holds an Eligible Claim as of the Rights Offering Record Date (in either case) participates in the Rights Offering in its capacity as a Rights Offering Participant, then such Backstop Party or such Affiliate shall not be required to pay its Aggregate Exercise Price at or before the Rights Offering Termination Time, but rather shall be permitted to deposit its Aggregate Exercise Price into the Deposit Account (as defined in the Backstop Purchase Agreement) at any time on or before the Deposit Deadline (as defined in the Backstop Purchase Agreement) in the same manner that a Backstop Party would be required to deposit its Aggregate Purchase Price into the Deposit Account pursuant to Section 1.2(b) of the Backstop Purchase Agreement.

To facilitate the exercise of the Rights, on the Rights Offering Commencement Date, the Debtors will cause the Subscription Agent to distribute to all Rights Offering Participants a Rights Exercise Form, together with instructions for the proper completion, due execution and timely delivery to the Subscription Agent of the Rights Exercise Form (by way of such Rights Offering Participant's Nominee, if applicable).

When the Rights Exercise Form is distributed to Rights Offering Participants, the Debtors shall include in such distribution written instructions (the "Payment Instructions") relating to the payment of the Aggregate Exercise Price for each Rights Offering Participant that exercises its Rights.  The Payment Instructions shall include wire transfer instructions for the payment of the Aggregate Exercise Price for each Rights Offering Participant that exercises its Rights.

The purchase price for Rights Offering Notes shall be equal to the principal amount thereof. Any reference to a Rights Offering Participant's "Aggregate Exercise Price" shall mean an aggregate amount equal to the portion of the Rights Offering Amount that such Rights Offering Participant validly elects to subscribe for and purchase (as set forth in the Rights Exercise Form that such Rights Offering Participant properly completes and duly executes and delivers to the Subscription Agent at or before the Rights Offering Termination Time).  Each Rights Offering Participant electing to exercise its Rights in the Rights Offering shall pay its Aggregate Exercise Price by paying cash in an aggregate amount equal to the Aggregate Exercise Price for such Rights Offering Participant.

US-DOCS\117189109.1

(c)  **Failure to Exercise Rights**

**Unexercised Rights (including Rights that are not validly exercised) will be relinquished immediately following the Rights Offering Termination Time.**  If a Rights Offering Participant does not satisfy each of the Rights Offering Conditions and each of the Additional Conditions for any reason (including by failing to deliver a duly executed and properly completed Rights Exercise Form to the Subscription Agent so that such document is *actually received* by the Subscription Agent at or before the Rights Offering Termination Time), such Rights Offering Participant shall be deemed to have fully and irrevocably relinquished and waived its Rights.  Rights issued to a Rights Offering Participant that holds an Eligible General Unsecured Claim as of the Rights Offering Record Date are also subject to termination, and the exercise thereof is subject to voidance, rescission and invalidation, pursuant to the terms set forth in the "Rights Forfeiture Events" section of these Rights Offering Procedures.

Any attempt to exercise Rights after the Rights Offering Termination Time shall be null and void and the Debtors shall not be obligated to honor any such purported exercise after the Rights Offering Termination Time, regardless of when the documents relating thereto were sent.

**The method of delivery of the Rights Exercise Form, the AI Questionnaire, and any other documents is at the option and sole risk of the Person making such delivery, and delivery will be considered made only when *actually received* by the Subscription Agent.  If delivery is by mail, registered mail with return receipt requested, properly insured, is encouraged and strongly recommended.  In all cases, the Person delivering such documents should allow sufficient time to ensure timely delivery on or prior to the Questionnaire Deadline and the Rights Offering Termination Time (as applicable).**

**The risk of non-delivery of the AI Questionnaire, the Rights Exercise Form and any other documents sent to the Subscription Agent in connection with the Rights Offering and/or the exercise of the Rights lies solely with the Person making such delivery, and none of the Debtors, the Reorganized Debtors, the Backstop Parties, or any of their respective officers, directors, employees, agents or advisors, including the Subscription Agent, assumes the risk of non-delivery under any circumstance whatsoever.**

(d)  **Payment for Rights Offering Notes**

If, on or prior to the Rights Offering Termination Time, the Subscription Agent for any reason does not receive from or on behalf of a Rights Offering Participant immediately available funds by wire transfer in an amount equal to the Aggregate Exercise Price for such Rights Offering Participant's exercised Rights, such Rights Offering Participant shall be deemed to have fully and irrevocably relinquished and waived its Rights.  Anything herein to the contrary notwithstanding, if any Backstop Party that holds an Eligible Claim as of the Rights Offering Record Date or any Backstop Party's Affiliate that holds an Eligible Claim as of the Rights Offering Record Date (in either case) participates in the Rights Offering in its capacity as a Rights Offering Participant, then such Backstop Party or such Affiliate shall not be required to pay its Aggregate Exercise Price (if any) at or before the Rights Offering Termination Time, but rather shall be permitted to deposit its Aggregate Exercise Price into the Deposit Account at any

8

time on or before the Deposit Deadline in the same manner as such Backstop Party would be required to deposit its Purchase Price pursuant to Section 1.2(b) of the Backstop Purchase Agreement.

The aggregate amount of cash received by the Debtors from (i) Rights Offering Participants for Rights Offering Notes in the Rights Offering (other than cash that is to be refunded to Rights Offering Participants as expressly set forth in these Rights Offering Procedures) and (ii) the Backstop Parties for Unsubscribed Notes pursuant to the Backstop Purchase Agreement shall be used by the Reorganized Debtors solely for the purposes set forth in the Plan.

### (e)  Deemed Representations and Acknowledgements

Any Rights Offering Participant exercising Rights and, except in the case of subclause (1) of this clause (d), any Affiliate of such Rights Offering Participant that is identified in such Rights Offering Participant's Rights Exercise Form shall be deemed to have made the following representations and acknowledgements:

1. such Person held an Eligible Claim as of the Rights Offering Record Date;

2. such Person is an Accredited Investor;

3. the exercise of the Rights is and shall be irrevocable; provided, that (A) nothing in these Rights Offering Procedures shall amend, modify or otherwise alter the right of the Required Backstop Parties to terminate the Backstop Purchase Agreement pursuant to the terms of the Backstop Purchase Agreement, and (B) the right of a Rights Offering Participant that holds an Eligible General Unsecured Claim as of the Rights Offering Record Date to participate in the Rights Offering is subject to termination as set forth in the "Rights Forfeiture Events" section of these Rights Offering Procedures;

4. such Person has read and understands these Rights Offering Procedures, the Rights Exercise Form, the Plan, and the Disclosure Statement and understands the terms and conditions herein and therein and the risks associated with the Debtors and their business as described in the Disclosure Statement;

5. such Person is not relying upon any information, representation or warranty other than as expressly set forth in these Rights Offering Procedures, the Rights Exercise Form, the Plan, or the Disclosure Statement; provided, however, that the Backstop Parties are relying on the representations and warranties of the Debtors made in the Backstop Purchase Agreement; and

6. such Person has consulted, to the extent deemed appropriate, with its own advisors as to the financial, tax, legal and related matters concerning an investment in the Rights Offering Notes and on that basis believes that an

9

investment in the Rights Offering Notes is suitable and appropriate for itself.

**(f)** **Disputes, Waivers, and Extensions**

All determinations as to the proper completion, due execution, timeliness, or eligibility of any exercise of Rights arising in connection with the submission of a Rights Exercise Form or an AI Questionnaire, and other matters affecting the validity or effectiveness of any attempted exercise of any Rights, shall be reasonably made by the Debtors, in consultation with the Required Backstop Parties, which determinations shall be final and binding.  A Rights Exercise Form or AI Questionnaire shall be deemed not properly completed, duly executed and/or duly delivered unless and until all defects and irregularities have been waived or cured within such time as the Debtors, with the prior written consent of the Required Backstop Parties, determine in their discretion.  The Debtors reserve the right, but are under no obligation, to give notice to any Rights Offering Participant regarding any defect or irregularity in connection with any purported exercise of Rights by such Rights Offering Participant and the Debtors may, but are under no obligation to, permit such defect or irregularity to be cured within such time as they may, with the prior written consent of the Required Backstop Parties, determine in their discretion.  None of the Debtors, the Subscription Agent, or the Backstop Parties shall incur any liability for failure to give such notification.

The Debtors, with the prior written consent of the Required Backstop Parties, may (i) extend the duration of the Rights Offering or adopt additional procedures to more efficiently administer the distribution and exercise of the Rights; and (ii) make such other changes to the Rights Offering, including changes that affect which Persons constitute Rights Offering Participants, that the Debtors, in the exercise of their reasonable judgment, determine are necessary.

**(g)** **Funds**

All payments required to be made in connection with a Rights Offering Participant's exercise of its Rights (the "<u>Rights Offering Funds</u>") shall be deposited in accordance with the "Payment for Rights Offering Notes" section of these Rights Offering Procedures and held by the Subscription Agent in a segregated account or accounts pending the Effective Date, which segregated account or accounts will: (i) not constitute property of the Debtors' estates until the Effective Date; (ii) be separate and apart from, and not commingled with, the Subscription Agent's general operating funds and any other funds subject to any lien or any cash collateral arrangements; (iii) be maintained for the sole purpose of holding the money for administration of the Rights Offering until the Effective Date; and (iv) be invested only in cash, cash equivalents and short-term direct obligations of the United States government. Subject to any provisions to the contrary, as set forth in (x) the "Exercise of Rights – Exercise by Rights Offering Participants" section of these Rights Offering Procedures, (y) the second paragraph of the "Rights Offering Conditioned Upon Confirmation of the Plan: Reservation of Rights" section of these Rights Offering Procedures, and (z) the last paragraph in the "Rights Forfeiture Events" section of these Rights Offering Procedures, the Subscription Agent shall not use the Rights Offering Funds for any purpose other than to release the funds as directed by the

10

Debtors on the Effective Date and shall not encumber, or permit the Rights Offering Funds to be encumbered, by any lien or similar encumbrance.

**(h)** **Plan Releases**

See Article X.B of the Plan for important information regarding releases.

**5.** **Transferability; Revocation**

Rights Offering Participants may transfer Eligible Claims, and the Rights attached to such Eligible Claims, at any time prior to the Rights Offering Record Date.  If an Eligible Claim is transferred by a Rights Offering Participant prior to the Rights Offering Record Date, the transferee of such Eligible Claim shall be entitled to exercise the Rights arising out of the transferred Eligible Claim as a Rights Offering Participant, *provided* that the transferee is an Accredited Investor (as set forth in a properly completed and duly executed AI Questionnaire submitted so that it is *actually received* by the Questionnaire Deadline).  After the Rights Offering Record Date, the Rights shall not be transferrable, even if the underlying Eligible Claim is transferred after the Rights Offering Record Date.  Once the Rights Offering Participant has properly exercised its Rights by making a Binding Rights Election, such exercise will not be permitted to be revoked by such Rights Offering Participant.

**6.** **Rights Forfeiture Events**

If a Rights Offering Participant's Eligible General Unsecured Claim as of the Rights Offering Record Date (or any portion thereof) is not an Allowed General Unsecured Claim[3] on the date that is one (1) Business Day after the Confirmation Hearing (a "Rights Forfeiture Event"), then (in any such case): (i) such Rights Offering Participant's Rights that were issued to such Rights Offering Participant on account of such Eligible General Unsecured Claim (or such portion thereof) shall be deemed immediately and automatically terminated as of the date of the occurrence of such Rights Forfeiture Event (even if such Rights were exercised prior to such date), without a need for any further action on the part of (or notice provided to) any Person, except as otherwise provided in this Section 6, (ii) such Rights Offering Participant shall not be permitted to participate in the Rights Offering with respect to such Rights, and (iii) any exercise of such Rights by (or on behalf of) such Rights Offering Participant prior to the date of the occurrence of such Rights Forfeiture Event shall be deemed void, irrevocably rescinded and of no further force or effect, and the Rights Offering Notes that could have been subscribed for and purchased pursuant to a valid exercise of such Rights shall be deemed not to have been subscribed for and purchased in the Rights Offering.

If (a) a Rights Offering Participant exercised its Rights (on account of its Eligible General Unsecured Claim as of the Rights Offering Record Date (or any portion thereof)) on or before the Rights Offering Termination Time in accordance with the Rights Offering Procedures, and (b) a Rights Forfeiture Event shall occur with respect to such Eligible General Unsecured Claim (or such portion thereof), then such Rights Offering Participant shall be entitled to receive

---

[3]    For the avoidance of doubt, solely for purposes of these Rights Offering Procedures, any objection to allowance or priority or request for estimation of a Claim must be filed by no later than the Rights Offering Record Date.

11

from the Debtors a notice of such Rights Forfeiture Event as soon as reasonably practicable following the occurrence thereof; *provided*, *however*, that the failure of the Debtors to deliver any such notice shall not affect the occurrence of the Rights Forfeiture Event or the effects thereof on the Rights Offering Participant's Rights (or the exercise thereof) or the ability of such Rights Offering Participant to participate in the Rights Offering, all as set forth in the immediately preceding paragraph. Furthermore, if (i) a Rights Forfeiture Event shall occur with respect to a Rights Offering Participant's Eligible General Unsecured Claim (or any portion thereof) as of the Rights Offering Termination Time, and (ii) such Rights Offering Participant shall have delivered to the Subscription Agent the Aggregate Exercise Price (or any portion thereof) with respect to the exercise of any of the Rights received by such Rights Offering Participant on account of such Eligible General Unsecured Claim (or such portion thereof), then such Aggregate Exercise Price (or such portion thereof) shall be refunded to such Rights Offering Participant, without interest, as soon as reasonably practicable (but in no event later than ten (10) Business Days) after the Effective Date (without offset, set-off, counterclaim or reduction of any kind by the Subscription Agent or any of the Debtors).

**7.       Inquiries and Transmittal Of Documents; Subscription Agent**

The instructions contained in the Rights Exercise Form should be carefully read and strictly followed. All questions relating to these Rights Offering Procedures, other documents associated with the Rights Offering, or the requirements to participate in the Rights Offering should be directed to the Subscription Agent:

**Hi-Crush Inc.**
**c/o KCC**
**222 North Pacific Coast Highway, Suite 300**
**El Segundo, California 90245-5614**
**+1 (877) 499-4509 (Domestic)**
**+1 (917) 281-4800 (International)**

**Via Email: HiCrushInfo@kccllc.com**

**8.       Rights Offering Conditioned Upon Confirmation of the Plan; Reservation of Rights**

All exercises of Rights are subject to and conditioned upon the confirmation and effectiveness of the Plan. The Debtors will accept a Binding Rights Election only upon the confirmation (subject to termination for a Rights Forfeiture Event) and effectiveness of the Plan.

In the event that (i) the Rights Offering is terminated, (ii) the Debtors revoke or withdraw the Plan, or (iii) the Backstop Purchase Agreement is terminated in accordance with the terms thereof, the Subscription Agent shall return all amounts received from the Rights Offering Participants, without any interest, as soon as reasonably practicable (but in no event later than ten (10) Business Days) after the occurrence of any of the foregoing events (all without offset, set-off, counterclaim or reduction of any kind by the Subscription Agent or any of the Debtors), and, in the case of clauses (ii) and (iii) above, the Rights Offering shall automatically be terminated.

12

9.    **Miscellaneous**

(a)    **Rights Offering Distribution Date**

The Rights Offering Notes acquired in connection with the Rights Offering by Rights Offering Participants that have elected to participate in the Rights Offering and who have validly exercised their Rights shall be distributed in accordance with the distribution provisions contained in the Plan.

(b)    **No Public Market or Listing**

There is not and there may not be a public market for the Rights Offering Notes, and the Debtors do not intend to seek any listing or quotation of the Rights Offering Notes on any stock exchange, other trading market or quotation system of any type whatsoever on the Effective Date.   Accordingly, there can be no assurance that an active trading market for the Rights Offering Notes will ever develop or, if such a market does develop, that it will be maintained.

[*Remainder of Page Intentionally Left Blank*]

13

## SCHEDULE 1

## Form of Rights Exercise Form

US-DOCS\117189109.1

## INSTRUCTIONS TO RIGHTS EXERCISE FORM[1]

You have received the attached Rights Exercise Form because you are (i) a holder of an Eligible Claim as of the Rights Offering Record Date and (ii) an Accredited Investor (as set forth in an executed AI Questionnaire that was delivered by you to the Subscription Agent on or prior to the Questionnaire Deadline in accordance with the Rights Offering procedures).  **If you wish to participate in the Rights Offering, each of the Rights Offering Conditions and each of the Additional Conditions must be satisfied at or prior to the Rights Offering Termination Time (5:00 p.m. (Prevailing Central Time) on September 29, 2020), unless provided otherwise herein.**  You may deliver this Rights Exercise Form via electronic mail or regular mail, overnight or hand delivery to the Subscription Agent at the following address:

**Hi-Crush Inc.**
**c/o KCC**
**222 North Pacific Coast Highway, Suite 300**
**El Segundo, California 90245-5614**
**+1 (877) 499-4509 (Domestic)**
**+1 (917) 281-4800 (International)**

**Via Email: HiCrushInfo@kccllc.com**

The Rights Offering Procedures are hereby incorporated herein by reference as if fully set forth herein.  Please consult the Plan, the Disclosure Statement, the Rights Offering Procedures, and the Disclosure Statement Order (collectively, the "Rights Offering Documents") for a complete description of the Rights Offering.  Copies of the Rights Offering Documents may be obtained, free of charge, by contacting the Subscription Agent.

To subscribe for Rights Offering Notes pursuant to the Rights Offering:

1. Review the amount of your Eligible Claim set forth in Item 1a.

2. Review your Total Maximum Subscription Amount (as defined below) set forth in Item 1b.

3. Calculate your Aggregate Exercise Price.

4. Read and complete the certifications, representations, warranties and agreements in Item 3.

5. Deliver a duly executed and properly completed Rights Exercise Form to the Subscription Agent so that it is *actually received* by the Subscription Agent at or before the Rights Offering Termination Time.

---

[1] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Rights Offering Procedures or, if any such term is not defined in the Rights Offering Procedures, such term shall have the meaning given to it in the Plan.

6. <u>Pay</u> the Aggregate Exercise Price (if any) to the Subscription Agent in accordance with the Payment Instructions set forth in Item 4 so that such payment is *actually received* by the Subscription Agent at or before the Rights Offering Termination Time; *provided*, *however*, that if any Backstop Party that holds an Eligible Claim as of the Rights Offering Record Date or any Backstop Party's Affiliate that holds an Eligible Claim as of the Rights Offering Record Date (in either case) participates in the Rights Offering in its capacity as a Rights Offering Participant, then such Backstop Party or such Affiliate shall be permitted to deposit its Aggregate Exercise Price into the Deposit Account at any time on or before the Deposit Deadline in the same manner that a Backstop Party would be required to deposit its Purchase Price into the Deposit Account pursuant to Section 1.2(b) of the Backstop Purchase Agreement.

7. <u>Deliver</u> your W-8 or W-9, as applicable, to the Subscription Agent so that it is *actually received* by the Subscription Agent at or before the Rights Offering Termination Time pursuant to Item 5.

Participation in the Rights Offering is voluntary, and is limited to Rights Offering Participants. Furthermore, each Rights Offering Participant may exercise all or any portion of such Rights Offering Participant's Rights; *provided*, *however*, that a Rights Offering Participant shall not be permitted to participate in the Rights Offering unless such Rights Offering Participant satisfies all of the Rights Offering Conditions and all of the Additional Conditions (subject to any exceptions to the satisfaction of any such conditions applicable to any Backstop Party or any of its Affiliates, as set forth in the Rights Offering Procedures). In addition, Rights issued to a Rights Offering Participant on account of an Eligible General Unsecured Claim held by such Rights Offering Participant as of the Rights Offering Record Date (or any portion thereof) are also subject to termination, and the exercise thereof is subject to voidance, rescission and invalidation, pursuant to the terms set forth in the "Rights Forfeiture Events" section of the Rights Offering Procedures.

[*Remainder of Page Intentionally Left Blank*.]

2

# RIGHTS EXERCISE FORM

## Rights Offering Termination Time

**The Rights Offering Termination Time is 5:00 p.m. (Prevailing Central Time) on September 29, 2020.**

**Please consult the Rights Offering Documents for additional information with respect to this Rights Exercise Form.**

Rights Offering Participants (including any Backstop Party that holds an Eligible Claim as of the Rights Offering Record Date or any Backstop Party's Affiliate that holds an Eligible Claim as of the Rights Offering Record Date) are entitled to participate in the Rights Offering, as further described in the Rights Offering Procedures.  To exercise your Rights, review the amounts in Items 1a and 1b below and read and complete, as applicable, Items 2, 3, 4 and 5 below.

**Item 1. Amount of Eligible Claim(s)**

Pursuant to the Rights Offering Procedures, each Rights Offering Participant is entitled to participate in the Rights Offering to the extent of such Rights Offering Participant's Eligible Claims as of the Rights Offering Record Date.

    a.   As of the Rights Offering Record Date, the amount of your Eligible Claim is:

> $_____
> *[PRE-PRINTED]*

    b. Therefore, for the purposes of the Rights Offering, you have Rights to subscribe for up to the **maximum** aggregate original principal amount of Rights Offering Notes set forth in the box below (the "Total Maximum Subscription Amount").  Each Rights Offering Participant may subscribe for all or any portion of its Total Maximum Subscription Amount; *provided*, *however*, that a Rights Offering Participant may elect to subscribe for and purchase any portion of its Total Maximum Subscription Amount only in multiples of $1,000.

> $_____
> (the Total Maximum Subscription Amount)[1]
> *[PRE-PRINTED]*

---

[1] The Total Maximum Subscription Amount shall equal the product of (rounded down to the nearest whole $1,000) (a) $43.3 million and (b) the quotient obtained by dividing (i) the amount set forth in Item 1.a. <u>by</u> (ii) the amount of (x) all Eligible General Unsecured Claims as of the Rights Offering Record Date held by each Person that has certified it is an Accredited Investor (as demonstrated by such Person's properly completed, duly executed and timely returned AI Questionnaire) on or prior to the Questionnaire Deadline plus (y) all Allowed Prepetition Notes Claims as of the Rights Offering Record Date.

**Item 2. Calculation of Aggregate Exercise Price**

Your Aggregate Exercise Price shall be an amount equal to the portion of your Total Maximum Subscription Amount that you validly elect to subscribe for and purchase.  The portion of your Total Maximum Subscription Amount that you elect to subscribe for and purchase shall only be in multiples of $1,000.  Please indicate your Aggregate Exercise Price below.



$_____
(your Aggregate Exercise Price)

To exercise your Rights, you must pay an amount equal to the Aggregate Exercise Price in accordance with the Payment Instructions set forth below in Item 4 so that such payment is actually received by the Subscription Agent at or before the Rights Offering Termination Time.  Anything herein to the contrary notwithstanding, if any Backstop Party that holds an Eligible Claim as of the Rights Offering Record Date or any Backstop Party's Affiliate that holds an Eligible Claim as of the Rights Offering Record Date (in either case) participates in the Rights Offering in its capacity as a Rights Offering Participant, then such Backstop Party or such affiliate shall not be required to pay its Aggregate Exercise Price (if any) at or before the Rights Offering Termination Time, but rather shall be permitted to deposit its Aggregate Exercise Price into the Deposit Account at any time on or before the Deposit Deadline in the same manner that such Backstop Party would be required to deposit its Purchase Price pursuant to Section 1.2(b) of the Backstop Purchase Agreement.

**Item 3. Subscription Certifications, Representations, Warranties and Agreements**

Except in the case of Section 1(a) of this Item 3, the certifications, representations, warranties and agreements set forth in this Item 3 shall be deemed to be made jointly and severally by the Rights Offering Participant exercising Rights and any Affiliate of such Rights Offering Participant. By returning the Rights Exercise Form:

1. The Rights Offering Participant hereby certifies that it (a) was the holder of the Eligible Claims identified in Item 1a as of the Rights Offering Record Date; (b) agrees to be bound by all the terms and conditions of the Rights Offering Procedures; (c) has obtained a copy of the Rights Offering Documents and understands that the exercise of Rights pursuant to the Rights Offering is subject to all the terms and conditions set forth in such Rights Offering Documents; (d) has read and understands Article X.B of the Plan and agrees to the releases set forth therein; and (e) has satisfied the Additional Conditions.

2. The Rights Offering Participant hereby represents and warrants that (a) to the extent such Rights Offering Participant is not an individual, it is duly formed, validly existing, and in good standing under the laws of the jurisdiction of its formation; and (b) it has the requisite power and authority to enter into, execute and deliver this Rights Exercise Form and to perform its obligations hereunder

2

US-DOCS\117189109.1

and in each of the other Rights Offering Documents and has taken all necessary action required for due authorization, execution, delivery and performance hereunder and thereunder.

3.   The Rights Offering Participant acknowledges and understands that this Rights Exercise Form shall not be binding on the Debtors or Reorganized Debtors until the conditions to effectiveness of the Plan, as set forth in the Plan, are satisfied.

4.   The Rights Offering Participant hereby agrees that this Rights Exercise Form constitutes a valid and binding obligation of the Rights Offering Participant, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium, and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith, and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

5.   The Rights Offering Participant hereby represents and warrants that the exercise of its Rights is and shall be irrevocable; *provided*, that (a) nothing in the Rights Offering Procedures shall amend, modify or otherwise alter the right of the Required Backstop Parties to terminate the Backstop Purchase Agreement pursuant to the terms of the Backstop Purchase Agreement, and (b) the right to participate in the Rights Offering of a Rights Offering Participant that holds an Eligible General Unsecured Claim as of the Rights Offering Record Date is subject to termination as set forth in the "Rights Forfeiture Events" section of the Rights Offering Procedures.

6.   The Rights Offering Participant hereby represents and warrants that it has duly executed and properly completed an AI Questionnaire pursuant to which such Rights Offering Participant has certified that it is an Accredited Investor, and such Rights Offering Participant understands that the Debtors are relying on such certification.

7.   The Rights Offering Participant hereby represents and warrants that (a) the Rights Offering Notes are being acquired by such Rights Offering Participant for the account of such Rights Offering Participant for investment purposes only, within the meaning of the Securities Act, and not with a view to the distribution thereof, and in compliance with all applicable securities laws; and (b) no one other than the Rights Offering Participant has any right to acquire the Rights Offering Notes being acquired by the Rights Offering Participant.

8.   The Rights Offering Participant hereby represents and warrants that its financial condition is such that the Rights Offering Participant has no need for any liquidity in its investment in the Reorganized Debtors and is able to bear the risk of holding the Rights Offering Notes for an indefinite period of time and the risk of loss of its entire investment in the Reorganized Debtors.

3

US-DOCS\117189109.1

9. The Rights Offering Participant hereby represents and warrants that it (a) is capable of evaluating the merits and risks of acquiring the Rights Offering Notes; and (b) has consulted, to the extent deemed appropriate, with its own advisors as to the financial, tax, legal and related matters concerning an investment in the Rights Offering Notes and on that basis believes that an investment in the Rights Offering Notes is suitable and appropriate for itself.

10. The Rights Offering Participant hereby represents and warrants that (a) it has been given the opportunity to (i) ask questions and receive satisfactory answers concerning the terms and conditions of the Rights Offering, and (ii) obtain additional information in order to evaluate the merits and risks of an investment in the Reorganized Debtors, and to verify the accuracy of the information contained in the Rights Offering Documents; (b) it has read and understands the Rights Offering Documents and the terms and conditions herein and therein and the risks associated with the Debtors and their business as described in the Disclosure Statement; and (c) no statement, printed material or other information that is contrary to the information contained in any Rights Offering Document has been given or made by or on behalf of the Debtors or the Backstop Parties to such Rights Offering Participant.

11. The Rights Offering Participant acknowledges and understands that:

   a) An investment in the Reorganized Debtors is speculative and involves significant risks.

   b) The Rights Offering Notes will be subject to certain restrictions on transferability as described in the Plan and, as a result of the foregoing, the marketability of the Rights Offering Notes will be severely limited.

   c) The Rights Offering Participant will not transfer, sell or otherwise dispose of the Rights Offering Notes in any manner that will violate the Securities Act or any state or foreign securities laws.

   d) The Rights Offering Notes have not been, and will not be, registered under the Securities Act or any state or foreign securities laws, and are being offered and sold in reliance upon federal, state and foreign exemptions from registration requirements for transactions not involving any public offering. The Rights Offering Participant recognizes that reliance upon such exemptions is based in part upon the representations of such Rights Offering Participant contained herein and in the AI Questionnaire executed and delivered by the Rights Offering Participant.

12. The Rights Offering Participant hereby represents and warrants that it is not relying upon any information, representation or warranty other than as expressly set forth in any of the Rights Offering Documents; *provided*, *however*, that the Backstop Parties are relying on the representations and warranties of the Debtors made in the Backstop Purchase Agreement.

US-DOCS\117189109.1

13. The Rights Offering Participant hereby represents and warrants that it is aware that (a) no federal, state, local or foreign agency has passed upon the Rights Offering Notes or made any finding or determination as to the fairness of an investment in the Rights Offering Notes; and (b) the data set forth in any Rights Offering Documents or in any supplemental letters or materials thereto are not necessarily indicative of future returns, if any, which may be achieved by the Reorganized Debtors.

14. The Rights Offering Participant hereby acknowledges that the Debtors and the Reorganized Debtors seek to comply with all applicable anti-money laundering laws and regulations. In furtherance of such efforts, the Rights Offering Participant hereby represents and agrees that (a) no part of the Rights Offering Funds used by the Rights Offering Participant to acquire the Rights Offering Notes has been, or shall be, directly or indirectly derived from, or related to, any activity that may contravene federal, state, or international laws and regulations, including anti-money laundering laws and regulations; and (b) no contribution or payment to the Debtors or the Reorganized Debtors by the Rights Offering Participant shall cause the Debtors or the Reorganized Debtors to be in violation of any applicable anti-money laundering laws and regulations including without limitation, the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001 and the U.S. Department of the Treasury Office of Foreign Assets Control regulations, each as amended. The Rights Offering Participant hereby agrees to (x) provide the Debtors and the Reorganized Debtors all information that may be reasonably requested to comply with applicable U.S. law; and (y) promptly notify the Debtors and the Reorganized Debtors (if legally permitted) if there is any change with respect to the representations and warranties provided herein.

15. The Rights Offering Participant hereby agrees to provide such information and to execute and deliver such documents as may reasonably be necessary to comply with any and all laws, rules and regulations to which the Debtors or Reorganized Debtors are subject.

5

Certification by Rights Offering Participant:

Date:

Name of Rights Offering Participant:

(Print or Type)

Social Security or Federal Tax I.D. No.:

Signature:

Name of Person Signing:

(If other than Rights Offering Participant)

Title (if corporation, partnership or LLC):

Street Address:

City, State, Zip Code:

Contact E-mail:

Telephone Number:

Certification by Affiliate 1[2]:

Date:

Name of Affiliate:

(Print or Type)

Social Security or Federal Tax I.D. No.:

Signature:

Name of Person Signing:

(If other than Affiliate)

Title (if corporation, partnership or LLC):

Street Address:

City, State, Zip Code:

Contact E-mail:

Telephone Number:

---

[2]   Certifications by additional Affiliates to be attached as necessary.

6

## Item 4. Payment Instructions

You must make your payment of the Aggregate Exercise Price calculated in Item 2c above (if any) by wire transfer so that it is *actually received* by the Subscription Agent at or before the Rights Offering Termination Time.

Please have wire transfers delivered to: [TBD]

## Item 5. Tax Information

1. Each Rights Offering Participant that is a U.S. person[3] must provide its taxpayer identification number on a signed Internal Revenue Service ("IRS") form W-9 to the Subscription Agent. This form is necessary for the Debtors and the Reorganized Debtors, as applicable, to comply with its tax filing obligations and to establish that the Rights Offering Participant is not subject to certain withholding tax obligations applicable to U.S. and non-U.S. persons. The enclosed W-9 form contains detailed instructions for furnishing this information.

2. Each Rights Offering Participant that is not a U.S. person (as defined in the previous paragraph) is required to provide information about its status for withholding purposes, generally on an IRS form W-8BEN (for individuals) or W-8BEN-E (for most foreign entities), form W-8IMY (for most foreign intermediaries, flow-through entities, and certain U.S. branches), form W-8EXP (for most foreign governments, foreign central banks of issue, foreign tax-exempt organizations, foreign private foundations, and governments of certain U.S. possessions), or form W-8ECI (for most non-U.S. persons receiving income that is effectively connected with the conduct of a trade or business in the United States). Each Rights Offering Participant that is not a U.S. person should provide the Subscription Agent with the appropriate form W-8. Please contact the Subscription Agent if you need further information regarding these forms. Rights Offering Participants may also access the IRS website (www.irs.gov) to obtain the appropriate form W-8 and its instructions.

## Item 6. Miscellaneous

1. The representations, warranties, covenants, and agreements of the Rights Offering Participant contained in this Rights Exercise Form will survive the execution hereof and the distribution of the Rights Offering Notes to such Rights Offering Participant.

---

[3] The definition of "U.S. person" for this purpose includes a U.S. citizen or resident, a corporation organized in the United States, a partnership organized in the United States, a limited liability company organized in the United States (other than a limited liability company wholly-owned by a foreign person), an estate (other than a foreign estate the income of which, from sources without the United States which is not effectively connected with the conduct of a trade or business within the United States, is not includible in gross income), and a trust if (1) a court within the United States is able to exercise primary supervision over the administration of the trust, and (2) one or more U.S. persons have the authority to control all substantial decisions of the trust.

7

8

2. Neither this Rights Exercise Form nor any provision hereof shall be waived, modified, discharged, or terminated except by an instrument in writing signed by the party against whom any such waiver, modification, discharge, or termination is sought; *provided*, *however*, that any waiver by (a) the Debtors shall not be valid without the prior written consent of the Required Backstop Parties; and (b) the Reorganized Debtors shall be in accordance with the Plan and the terms contained herein.

3. References herein to a person or entity in either gender include the other gender or no gender, as appropriate.

4. This Rights Exercise Form may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which taken together shall be deemed to constitute one and the same agreement.

5. This Rights Exercise Form and its validity, construction and performance shall be governed in all respects by the laws of the State of New York.

[*Remainder of Page Intentionally Left Blank*]

US-DOCS\117189109.1

## SCHEDULE 2

## Form of AI Questionnaire

# INSTRUCTIONS TO AI QUESTIONNAIRE[1]

You have received the attached accredited investor questionnaire (the "AI Questionnaire") because you are a holder of an Eligible Claim (as defined below) as of August 14, 2020 (the "Questionnaire Record Date").  If you wish to participate in the Rights Offering, you must deliver (through your Nominee (as defined below), if your Eligible Claim is held in "street name" by a bank, brokerage house, or other financial institution) a duly executed and properly completed copy of this AI Questionnaire to the Subscription Agent (as defined below) so that it is *actually received* by the Subscription Agent on or before September 4, 2020 (the "Questionnaire Deadline"); *provided*, *however*, that any Backstop party that holds an Eligible Claim as of the Questionnaire Record Date and any Backstop Party's Affiliate that holds an Eligible Claim as of the Questionnaire Record Date shall not be required to complete and deliver an AI Questionnaire and shall be deemed a Rights Offering Participant (as defined below).

"Allowed" means, solely for purposes of these Rights Offering Procedures, with respect to any Claims (or any portion thereof), as of any date of determination, (a) a Claim that is evidenced by a Proof of Claim filed by the applicable Claims Bar Date in accordance with the Claims Bar Date Order; (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely filed; or (c) a Claim that is allowed pursuant to the Plan or a Final Order of the Bankruptcy Court as of such date; provided, that with respect to a Claim described in clauses (a) and (b) above (except any Claim previously allowed pursuant to the DIP Orders), such Claim shall be considered "Allowed" as of such date of determination only to the extent that, with respect to such Claim, no objection to allowance or priority or  request for estimation thereof has been interposed on or prior to such date, or such an objection is so interposed and the Claim has been allowed by Final Order of the Bankruptcy Court as of such date; provided, further that, solely for purposes of these Rights Offering Procedures, any objection to allowance or priority or request for estimation of a Claim must be filed by no later than the Rights Offering Record Date.

"Disallowed" shall have the meaning given to such term in the Plan.

"Disputed" means, solely for purposes of these Rights Offering Procedures, with respect to any Claim (or any portion thereof), as of any date of determination, a Claim that is neither Allowed nor Disallowed as of such date.

"Eligible Claim" means any Allowed Prepetition Notes Claim or Eligible General Unsecured Claim.

"Eligible General Unsecured Claim" means any General Unsecured Claim that is either Allowed or Disputed.  For the avoidance of doubt, "General Unsecured Claims" shall not include "Prepetition Notes Claims."

---

[1]    All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Rights Offering Procedures to which this AI Questionnaire is attached.

If (a) your Eligible Claims are held directly in your own name and *not* through any Nominee, you may deliver, or (b) your Eligible Claims are held in "street name" by a bank, brokerage house, or other financial institution, you must coordinate with your Nominee (as defined herein) to submit, this AI Questionnaire via electronic mail or regular mail, overnight or hand delivery to KCC LLC, the subscription agent for the Rights Offering (in such capacity, the "<u>Subscription Agent</u>"), so that it is *actually received* by the Subscription Agent at or before the Questionnaire Deadline, at the following address:

**Hi-Crush Inc.**
**c/o KCC**
**222 North Pacific Coast Highway, Suite 300**
**El Segundo, California 90245-5614**
**+1 (877) 499-4509 (Domestic)**
**+1 (917) 281-4800 (International)**

**Via Email: HiCrushInfo@kccllc.com**

To duly execute, properly complete and deliver to the Subscription Agent this AI Questionnaire:

1. <u>Review</u> the amount of your Eligible Claim in Section 1.

2. <u>Complete</u> the "Eligibility Certification" in Section 2.

3. <u>Initial</u> next to the applicable paragraph in the "Accredited Investor Certification" in Section 3.

4. <u>Coordinate</u> to have your Nominee complete the Nominee Confirmation of Ownership in Section 4 if you are a holder of an Allowed Prepetition Notes Claim.

5. <u>Deliver</u> (or have your Nominee deliver, if applicable) this AI Questionnaire to the Subscription Agent so that it is *actually received* by the Subscription Agent on or before the Questionnaire Deadline.

[*Remainder of Page Intentionally Left Blank*.]

2

## AI QUESTIONNAIRE

**DELIVER TO (BY WAY OF NOMINEE, IF APPLICABLE):**

**Hi-Crush Inc.**
**c/o KCC**
**222 North Pacific Coast Highway, Suite 300**
**El Segundo, California 90245-5614**
**+1 (877) 499-4509 (Domestic)**
**+1 (917) 281-4800 (International)**

**Via Email: HiCrushInfo@kccllc.com**

**Section 1: Confirmation of Ownership**

**Your ownership of an Eligible Claim must be confirmed in order to be eligible to receive Rights.**

If you hold an Eligible Claim based on your ownership of Prepetition Notes, and your Prepetition Notes are held in "street name" by a bank, brokerage house, or other financial institution (each, a "<u>Nominee</u>"), you must forward your AI Questionnaire to the Nominee with sufficient time for the Nominee to complete the "Nominee Confirmation of Ownership" in Section 4 of this AI Questionnaire (including providing the Nominee's medallion guarantee or list of authorized signatories) and for the Nominee to deliver the AI Questionnaire to the Subscription Agent so that it is *actually received* by the Subscription Agent on or before the Questionnaire Deadline.  If authorized to do so, the Nominee may complete the entire AI Questionnaire on your behalf.

**Item 1. Amount of Eligible Claim(s)**.  I certify that I hold an Eligible Claim in the following amount as of the Questionnaire Deadline (September 4, 2020) set forth in the box below or that I am the authorized signatory of that beneficial owner.



**Section 2: Eligibility Certification**

In order to receive Rights under the Plan, the holder of an Eligible Claim must:

1. Be an Accredited Investor;

2. Answer "Yes" to Question 1 below; and

3. Deliver a duly executed and properly completed copy of this AI Questionnaire to the Subscription Agent so that it is *actually received* by the Subscription Agent on or before the Questionnaire Deadline.

US-DOCS\117189109.1

2

**Question 1.** Is the respondent an "Accredited Investor"?___Yes___No

If "Yes", please indicate which category (*i.e.,* 1 through 8) of Section 3 below that the respondent falls under:  _____

IN WITNESS WHEREOF, I certify that: (i) I am an authorized signatory of the holder indicated below; (ii) I executed this AI Questionnaire on the date set forth below; and (iii) this AI Questionnaire (x) contains accurate representations with respect to the undersigned and (y) is a certification to the Debtors and the Bankruptcy Court.

_____

  (Signature)

By: _____
(Please Print or Type)

Title: _____
(Please Print or Type)

Address, telephone number and facsimile number:

_____

_____

_____

Certain communications during the Rights Offering may be performed via e-mail.  For that reason, you are required to provide your e-mail address below:

_____

  (E-Mail Address)

**Section 3: Accredited Investor Certification**

Please indicate the basis on which you would be deemed an "Accredited Investor" by initialing the appropriate line provided below.

An Accredited Investor shall include any person who comes within any of the following categories, or who the issuer reasonably believes comes within any of the following categories, at the time of the sale of the securities to that person:

2

1.    _____ **initials**    any bank as defined in section 3(a)(2) of the Securities Act of 1933 (as amended and including any rule or regulation promulgated thereunder, the "<u>Securities Act</u>"), or any savings and loan association or other institution as defined in section 3(a)(5)(A) of the Securities Act, whether in its individual or fiduciary capacity; any broker or dealer registered pursuant to section 15 of the Securities Exchange Act of 1934, as amended; any insurance company as defined in section 2(a)(13) of the Securities Act; any investment company registered under the Investment Company Act of 1940, as amended, or a business development company as defined in section 2(a)(48) of that Act; any Small Business Investment Company licensed by the U.S. Small Business Administration under section 301(c) or (d) of the Small Business Investment Act of 1958, as amended; any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000; any employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974, as amended, if the investment decision is made by a plan fiduciary, as defined in section 3(21) of such Act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors;

2.    _____ **initials**    any private business development company as defined in section 202(a)(22) of the Investment Advisers Act of 1940, as amended;

3.    _____ **initials**    any organization described in section 501(c)(3) of the Internal Revenue Code of 1986, as amended, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

4.    _____ **initials**    any director, executive officer, or general partner of the issuer of the securities being offered or sold, or any director, executive officer, or general partner of a general partner of that issuer;

3

5. _____ **initials**   any natural person whose individual net worth, or joint net worth with that person's spouse, exceeds $1,000,000;[1]

6. _____ **initials**   any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

7. _____ **initials**   any trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in 17 C.F.R. 230.506(b)(2)(ii); and

8. _____ **initials**   any entity in which all of the equity owners are accredited investors.

**Section 4: Nominee Confirmation of Ownership and DTC Matters**

(A)   **WITH RESPECT TO ELIGIBLE GENERAL UNSECURED CLAIMS ONLY.  The New Secured Convertible Notes are expected to be held through DTC.  Thus, in order to receive New Secured Convertible Notes, you must have, or open, a brokerage account with a DTC participant to act as your nominee to hold any New Secured Convertible Notes purchased by you in the Rights Offering.  The Subscription Agent will coordinate with you to obtain this information prior to the allocation of the New Secured Convertible Notes.**

(B)   **TO BE COMPLETED BY HOLDERS OF PREPETITION NOTES ONLY. Your ownership of Prepetition Notes must be confirmed in order to participate in the Rights Offering**.

The nominee holding your Prepetition Notes Claims as of  September 4, 2020 (the "Questionnaire Deadline")  must complete Box A on your behalf.  Box B is only required if any or all of your Prepetition Notes Claims were on loan as of the Questionnaire Deadline (as determined by your nominee). Please attach a separate Nominee Certification if your Prepetition Notes Claims are held through more than one nominee.

---

[1]   For the purposes of determining net worth: (A) the person's primary residence shall not be included as an asset; (B) indebtedness that is secured by the person's primary residence, up to the estimated fair market value of the primary residence at the time of the sale of securities, shall not be included as a liability (except that if the amount of such indebtedness outstanding at the time of sale of securities exceeds the amount outstanding 60 days before such time, other than as a result of the acquisition of the primary residence, the amount of such excess shall be included as a liability); and (C) indebtedness that is secured by the person's primary residence in excess of the estimated fair market value of the primary residence at the time of the sale of securities shall be included as a liability.

4

| Box A<br>For Use Only by the Nominee | Box B<br>Nominee Proxy - Only if Needed |
|---|---|
| DTC Participant Name:  _____ | DTC Participant Name:  _____ |
| DTC Participant Number:  _____ | DTC Participant Number:  _____ |
| Principal Amount of Prepetition Notes (CUSIP 428337 AA 7) held by this account as of the Questionnaire Deadline:<br><br>_____ principal amount | Principal Amount of Prepetition Notes (CUSIP 428337 AA 7) held on behalf of, and hereby assigned to, the Nominee listed in Box A as of the Questionnaire Deadline:<br><br>_____  principal amount |
| Principal Amount of Prepetition Notes (CUSIP U322H AA 0) held by this account as of the Questionnaire Deadline:<br><br>_____ principal amount | Principal Amount of Prepetition Notes (CUSIP U4322H AA 0) held on behalf of, and hereby assigned to, the Nominee listed in Box A as of the Questionnaire Deadline:<br><br>_____ principal amount |
| Medallion Guarantee: | Medallion Guarantee: |
| Nominee Authorized Signature:_____ | Nominee Authorized Signature:_____ |
| Nominee Contact Name:_____ | Nominee Contact Name:_____ |
| Nominee Contact Tel #:_____ | Nominee Contact Tel #:_____ |
| Nominee Contact Email:_____ | Nominee Contact Email:_____ |
| Beneficial Holder Name:_____ | Beneficial Holder Name:_____ |

For multiple accounts at the same Nominee, a Medallion Guaranteed table of Beneficial Holder Names, Beneficial Holder Account Numbers and Principal Amounts of the Prepetition Notes held as of the Questionnaire Record Date may be provided.

**DELIVER TO (BY WAY OF NOMINEE, IF APPLICABLE):**

**Hi-Crush Inc.**
**c/o KCC**
**222 North Pacific Coast Highway, Suite 300**
**El Segundo, California 90245-5614**
**+1 (877) 499-4509 (Domestic)**
**+1 (917) 281-4800 (International)**
**Via Email: HiCrushInfo@kccllc.com**

5

US-DOCS\117189109.1

**Exhibit 10**

**Cure Notice**

US-DOCS\116659544.12

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

```
------------------------------------------------------------- x
In re:                                                         :   Chapter 11
                                                               :
HI-CRUSH INC., et al.,¹                                        :   Case No. 20-33496 (DRJ)
                                                               :
                 Debtors.                                      :   (Jointly Administered)
                                                               :
------------------------------------------------------------- x
```

**NOTICE OF CURE AMOUNTS IN CONNECTION WITH CONTRACTS AND LEASES**

**TO:    ALL NON-DEBTOR COUNTERPARTIES TO THE DEBTORS' CONTRACTS AND LEASES LISTED ON THE CONTRACT SCHEDULE ATTACHED HERETO**

**PLEASE TAKE NOTICE** that pursuant to the *Order (I) Approving Adequacy of Disclosure Statement, (II) Scheduling Hearing on Confirmation of Plan, (III) Establishing Deadline to Object to Plan and Form of Notice Thereof, (IV) Approving (A) Solicitation Procedures, (B) Forms of Ballots and Notices of Non-Voting and Limited Voting Status, and (C) Rights Offering Materials, (V) Approving Procedures for Assumption of Contracts and Leases and Form and Manner of Cure Notice, and (VI) Granting Related Relief* [Docket No. [ ● ]] (the "**Disclosure Statement Order**")² entered by the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "**Court**") on [●], 2020, the above-captioned debtors and debtors in possession (the "**Debtors**"), hereby provide notice (this "**Cure Notice**") that one or more of the Debtors is party to the contract(s) or unexpired lease(s) (each, a "**Contract or Lease**" and, collectively, the "**Contracts and Leases**") listed on Exhibit A attached hereto (the "**Contract Schedule**") to which you are a counterparty. The Debtors have conducted a review of their books and records and have determined that the cure amount for unpaid monetary obligations under such Contract(s) or Lease(s) is as set forth on the Contract Schedule (the "**Cure Amount**").

**YOU ARE RECEIVING THIS NOTICE BECAUSE YOU OR ONE OF YOUR AFFILIATES IS A COUNTERPARTY (A "CONTRACT PARTY") TO ONE OR MORE CONTRACTS OR LEASES, WITH ONE OR MORE OF THE DEBTORS, WHICH MAY**

---

¹ The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Hi-Crush Inc. (0530), OnCore Processing LLC (9403), Hi-Crush Augusta LLC (0668), Hi-Crush Whitehall LLC (5562), PDQ Properties LLC (9169), Hi-Crush Wyeville Operating LLC (5797), D & I Silica, LLC (9957), Hi-Crush Blair LLC (7094), Hi-Crush LMS LLC, Hi-Crush Investments Inc. (6547), Hi-Crush Permian Sand LLC, Hi-Crush Proppants LLC (0770), Hi-Crush PODS LLC, Hi-Crush Canada Inc. (9195), Hi-Crush Holdings LLC , Hi-Crush Services LLC (6206), BulkTracer Holdings LLC (4085), Pronghorn Logistics Holdings, LLC (5223), FB Industries USA Inc. (8208), PropDispatch LLC, Pronghorn Logistics, LLC (4547), and FB Logistics, LLC (8641). The Debtors' address is 1330 Post Oak Blvd, Suite 600, Houston, Texas 77056.

² Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Disclosure Statement Order.

US-DOCS\116659544.12

**BE EXECUTORY CONTRACTS OR UNEXPIRED LEASES AS SET FORTH ON THE CONTRACT SCHEDULE ATTACHED HERETO AS <u>EXHIBIT A</u>.[3]**

**PLEASE TAKE FURTHER NOTICE** that if the Contract Schedule lists a Cure Amount of $0.00 for a particular Contract or Lease, the Debtors believe there is no cure amount outstanding for that Contract or Lease as of the date of this Cure Notice.

**PLEASE TAKE FURTHER NOTICE** that if you agree with the Cure Amount associated with a Contract or Lease to which you are a party as of the date of this Cure Notice, you need not take any action.

**PLEASE TAKE FURTHER NOTICE** that if you disagree with the proposed Cure Amount, object to the proposed assumption of the Contract(s) or Lease(s) or object to the Debtors' ability to provide adequate assurance of future performance with respect to any Contract(s) or Lease(s), you must file an objection (a "**Cure Objection**") with the Court no later than 5:00 p.m. (Prevailing Central Time) on September 18, 2020 (or the 14th day after the date the objecting Contract Party is served with the Cure Notice, if such date is later than September 18, 2020) (the "**Cure Objection Deadline**").  Any Cure Objection must (a) be in writing; (b) set forth the nature of the objector's claims against or interests in the Debtors' estates and the basis for the objection and the specific grounds therefor; (c) comply with the Bankruptcy Rules, Bankruptcy Local Rules, and orders of this Court; and (d) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is **actually received** no later than the Cure Objection Deadline by the parties listed below (the "**Notice Parties**").

<u>Notice Parties</u>.  The Notice Parties include:

- Counsel to the Debtors: Latham & Watkins LLP, 885 Third Avenue, New York, NY 10022 (Attn: Keith A. Simon, Esq. and Annemarie V. Reilly, Esq.) (keith.simon@lw.com and annemarie.reilly@lw.com) and Hunton Andrews Kurth LLP, 600 Travis Street, Suite 4200, Houston, TX (Attn: Timothy A. Davidson II, Esq. and Ashley L. Harper, Esq.) (TadDavidson@HuntonAK.com and AshleyHarper@HuntonAK.com);

- Counsel to the DIP ABL Agent: Simpson, Thacher & Bartlett LLP, 425 Lexington Avenue, New York, NY 10017 (Attn: Elisha Graff, Esq. and Daniel L. Biller, Esq.) (egraff@stblaw.com and dbiller@stblaw.com);

- Counsel to the Ad Hoc Noteholders Committee: Paul, Weiss, Rifkind, Wharton & Garrison, LLP, 1285 Avenue of the Americas, New York, NY 10019 (Attn: Brian S. Hermann, Esq. and Elizabeth R. McColm, Esq.) (bhermann@paulweiss.com and emccolm@paulweiss.com) and Porter Hedges LLP, 1000 Main St., 36th Floor, Houston, TX 77002 (Attn: John F. Higgins, Esq.) (JHiggins@porterhedges.com);

---

[3] This Cure Notice is being sent to counterparties to contracts and leases that may be executory contracts and unexpired leases.  This Cure Notice is *not* an admission by the Debtors that such contract or lease is executory or unexpired.

2

- Counsel to any statutory committee appointed in these Chapter 11 Cases; and

- the Office of the United States Trustee for the Southern District of Texas, 515 Rusk Street, Suite 3516, Houston, TX 77002 (Attn: Stephen Statham, Esq. and Hector Duran, Esq.) (stephen.statham@usdoj.gov and hector.duranjr@usdoj.gov).

**PLEASE TAKE FURTHER NOTICE** that pursuant to the Disclosure Statement Order, if you do not timely file a Cure Objection by the appropriate deadline, then you shall forever be barred and estopped from objecting: (a) to the Cure Amount as the amount to cure all defaults to satisfy section 365 of the Bankruptcy Code and from asserting that any additional amounts are due or defaults exist; (b) that any conditions to assumption must be satisfied under the Contract or Lease to which you are a Contract Party before such Contract or Lease can be assumed; or (c) that the Debtors have not provided adequate assurance of future performance as contemplated by section 365 of the Bankruptcy Code.

**PLEASE TAKE FURTHER NOTICE** that if you do not object to (a) the Cure Amount for your Contract(s) or Lease(s); (b) the ability of the Debtors to provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code; or (c) any other matter pertaining to assumption, then the Cure Amount(s) owed to you shall be paid as soon as reasonably practicable after the effective date of the assumption of such Contracts or Leases.

**PLEASE TAKE FURTHER NOTICE** that in the event of a timely filed Cure Objection by a Contract Party regarding: (a) the amount of any Cure Amount; (b) the ability of the Debtors or the reorganized Debtors, as applicable, to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code), if applicable, under the Contract(s) or Lease(s) to be assumed; or (c) any other matter pertaining to assumption, the Court shall hear such Cure Objection and determine the amount of any disputed Cure Amount not settled by the parties at the Confirmation Hearing, which is scheduled to take place on September 23, 2020 at 2:00 p.m. (Prevailing Central Time) in Courtroom 400, 4th Floor, 515 Rusk Street, Houston, TX 77002 or via videoconference, if necessary.[4]  The Confirmation Hearing may be continued from time to time by the Bankruptcy Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Bankruptcy Court and served on such parties as the Bankruptcy Court may order.  Moreover, the Plan may be modified or amended, if necessary, pursuant to section 1127 of the Bankruptcy Code, prior to, during or as a result of the Confirmation Hearing, without further notice to parties in interest.

---

[4] If the hearing occurs over videoconference the Court will utilize GoToMeeting for the hearing.  You should download the free GoToMeeting application on each device that will be used to connect to the hearing.  If you choose to connect via a web browser, available literature suggests that Chrome is the preferred browser. Please note that connecting through a browser may limit the availability of some GoToMeeting features.  To connect to the hearing, you should enter the meeting code "JudgeJones".  You can also connect using the link on Judge Jones' homepage on the Southern District of Texas website.  Once connected to GoToMeeting, click the settings icon in the upper right corner and enter your name under the personal information setting.  In either event, audio for the Confirmation Hearing will be available by using the Court's regular dial-in number. The dial-in number is +1 (832) 917-1510.  You will be responsible for your own long-distance charges.  You will be asked to key in the conference room number.  Judge Jones' conference room number is 205691

US-DOCS\116659544.12

**PLEASE TAKE FURTHER NOTICE** that the Debtors' listing of a Contract or Lease on this Cure Notice shall not be deemed or construed as (a) a promise by the Debtors to seek the assumption of such Contract or Lease, (b) a limitation or waiver on the Debtors' ability to amend, modify or supplement this Cure Notice with an updated Cure Amount for a particular Contract or Lease, which updated Cure Amount may be lower than the original Cure Amount listed for such particular Contract or Lease, (c) a limitation or waiver on the Debtors' ability to seek to reject any Contract or Lease, or (d) an admission that any Contract or Lease is, in fact, an executory contract or unexpired lease under section 365 of the Bankruptcy Code. Moreover, the Debtors explicitly reserve their rights, in their sole discretion, to reject or assume each Contract or Lease pursuant to section 365(a) of the Bankruptcy Code and nothing herein (i) alters in any way the prepetition nature of the Contracts and Leases or the validity, priority, or amount of any claims of a counterparty to a Contract or Lease against the Debtors that may arise under such Contract or Lease, (ii) creates a postpetition contract or agreement, or (iii) elevates to administrative expense priority any claims of a counterparty to a Contract or Lease against the Debtors that may arise under such Contract or Lease. The Debtors reserve all their rights, claims and causes of action with respect to the contracts, leases and other agreements listed on the Contract Schedule.

**PLEASE TAKE FURTHER NOTICE** that all documents filed with the Court in connection with the above-captioned Chapter 11 cases, including the Disclosure Statement Order and the Plan, are available for free on the case information website of the Debtors' Voting and Claims Agent, Kurtzman Carson Consultants LLC at www.kccllc.net/hicrush.

---

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, PLEASE CONTACT THE VOTING AND CLAIMS AGENT AT THE NUMBER OR ADDRESS SPECIFIED ABOVE. PLEASE NOTE THAT THE VOTING AND CLAIMS AGENT CANNOT PROVIDE LEGAL ADVICE.**

---

US-DOCS\116659544.12

**Exhibit 11**

**Disclosure Statement Cover Letter**

US-DOCS\116659544.12

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | § Chapter 11 |
| | § |
| | § Case No. 20-33495 (DRJ) |
| HI-CRUSH INC., *et al.*, | § |
| | § (Jointly Administered) |
| Debtors.[1] | § |
| | § |
| | § |

## COVER LETTER AND RECOMMENDATION OF THE DEBTORS

**To:    ALL HOLDERS OF CLAIMS IN CLASSES 4 AND 5**

You are receiving this letter because you are a Holder of a Claim (a "**Voting Holder**") in one or more of the following Classes as set forth in the *Joint Plan of Reorganization for Hi-Crush Inc. and Its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code* (as may be amended, modified, or supplemented, the "**Plan**"):  Class 4 Prepetition Notes Claims and Class 5 General Unsecured Claims. [2]  As a Voting Holder, you are entitled to vote to accept or reject the Plan.  *Therefore, you should read this letter and the enclosed materials carefully and discuss them with your attorney.  If you do not have an attorney, you may wish to consult one.*

As set forth in the enclosed disclosure statement (the "**Disclosure Statement**") and accompanying materials (collectively, the "**Solicitation Package**"), Hi-Crush Inc. and its affiliated debtors and debtors in possession in the above-captioned Chapter 11 Cases (collectively, the "**Debtors**") are jointly proposing the Plan to implement a comprehensive financial restructuring to deleverage the Debtors' balance sheet to ensure the long-term viability of the Debtors' enterprise.  The Plan is the result of substantial negotiations among the Debtors and an ad hoc group of holders of the Debtors' 9.5% Senior Unsecured Notes due 2026 (the "**Ad Hoc Group**").  Such negotiations resulted in the Debtors' entry into a Restructuring Support Agreement, dated as of July 12, 2020 (the "**RSA**"), with noteholders that collectively hold approximately 94% of the outstanding principal amount of the Debtors senior unsecured notes, including the members of the Ad Hoc Group.  The Ad Hoc Group and other key stakeholders support the Plan.

The Plan reflects the reality that as of the Petition Date, the Debtors had approximately $450 million of Prepetition Notes issued and outstanding in addition to $22.3 million in

---

[1]    The Debtors in these chapter 11 cases and the last four digits of their federal tax identification numbers are as follows: Hi-Crush Inc. (0530), OnCore Processing LLC (9403), Hi-Crush Augusta LLC (0668), Hi-Crush Whitehall LLC (5562), PDQ Properties LLC (9169), Hi-Crush Wyeville Operating LLC (5797), D & I Silica, LLC (9957), Hi-Crush Blair LLC (7094), Hi-Crush LMS LLC, Hi-Crush Investments Inc. (6547), Hi-Crush Permian Sand LLC, Hi-Crush Proppants LLC (0770), Hi-Crush PODS LLC, Hi-Crush Canada Inc. (9195), Hi-Crush Holdings LLC, Hi-Crush Services LLC (6206), BulkTracer Holdings LLC (4085), Pronghorn Logistics Holdings, LLC (5223), FB Industries USA Inc. (8208), PropDispatch LLC, Pronghorn Logistics, LLC (4547), and FB Logistics, LLC (8641).  The Debtors' address is 1330 Post Oak Blvd, Suite 600, Houston, Texas 77056.

[2]    Capitalized terms used and not otherwise defined herein shall have the meaning given to them in the Plan.

US-DOCS\116659544.12

outstanding letter of credit commitments under their Prepetition Credit Agreement, an unsustainable amount of debt for the Debtors in the current business environment.  To right-size their prepetition capital structure, the Debtors, by the Plan, seek, among other things, to (i) equitize the Allowed Prepetition Notes Claims and the Allowed General Unsecured Claims, (ii) conduct a $43.3 million Rights Offering to eligible Holders of Allowed Prepetition Notes Claims and Allowed General Unsecured Claims, and (iii) enter into a new exit credit agreement providing for a new senior secured asset-based revolving loan facility with an aggregate principal commitment amount of up to $25 million and up to a $25 million letter of credit sub-limit.  If confirmed, the Plan will allow the Debtors to eliminate approximately $450 million of unsecured note debt, reduce their annual interest expense by more than $43 million, and thereby significantly enhance their financial flexibility upon their exit from bankruptcy.  This, in turn, will provide the Debtors with a stronger market position, and an enhanced ability to execute on their go-forward operational strategy.

The Debtors strongly recommend that you vote to accept the Plan.  The Debtors believe that liquidation under chapter 7 would result in smaller distributions to creditors than those provided for in the Plan, as described in further detail in the Disclosure Statement and the exhibits attached thereto.  The Debtors also encourage all eligible Holders of Allowed Prepetition Notes Claims and Allowed General Unsecured Claims to participate in the Rights Offering.

The Debtors believe that confirmation and consummation of the Plan is in the best interests of all Holders of Claims and urge the Voting Holders to vote in favor of the Plan.

---

**THE DEBTORS STRONGLY URGE YOU TO VOTE IN FAVOR OF THE PLAN.**

**YOU MAY DO SO BY TIMELY SUBMITTING A BALLOT INDICATING YOUR ACCEPTANCE OF THE PLAN AS EXPLAINED IN THE VOTING INSTRUCTIONS ACCOMPANYING THE BALLOT.  THE VOTING DEADLINE IS [SEPTEMBER 18], 2020, AT 5:00 P.M. (PREVAILING CENTRAL TIME).**

---

If you have any questions about the materials in the Solicitation Package, please feel free to contact (a) the Debtors' Balloting Agent, Kurtzman Carson Consultants LLC ("**KCC**") by: (1) visiting the Debtors' restructuring website at: http://www.kccllc.net/HiCrush; (2) writing to KCC via email at HiCrushinfo@kccllc.com with "Hi-Crush" in the subject line; and/or (3) calling KCC at (866) 554-5810 (US or Canada) or (781) 575-2032 (International); or (b) the Debtors' counsel, Latham & Watkins LLP, 330 N. Wabash Ave. Suite 2800 Chicago, IL 60611 (Attn:  Asif Attarwala (email:  asif.attarwala@lw.com)) or 885 Third Avenue, New York, NY 10022 (Attn: Annemarie Reilly (email:  annemarie.reilly@lw.com)).  *Please do not direct any inquiries directly to the Debtors.*

2